UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
----------------------------------------------------------x
JOHN E. ANDRUS MEMORIAL, INC. (d/b/a   :   filed electronically
ANDRUS ON HUDSON),                      :
                                        :   07-CV-3432 (CLB) (KNF)
                         Plaintiff      :
        -against-                       :
                                        :   **DEFENDANT'S STATEMENT**
                                        :   **OF MATERIAL FACTS**
RICHARD F. DAINES, as Commissioner of the :   **PURSUANT TO**
New York State Department of Health,    :   **LOCAL RULE 56.1**
                                        :
                         Defendant.     :
----------------------------------------------------------x

Pursuant to Local Civil Rule 56.1 of the United States District Court, Southern District of New York, defendant, Richard F. Daines, as Commissioner of the New York State Department of Health ("DOH"), by his attorney, Andrew M. Cuomo, Attorney General of the State of New York, hereby submits the following statement of material facts as to which he contends that there exist no genuine issue to be tried. The Affidavit of Neil Benjamin, dated July 11, 2007 ("Benjamin Aff."), and the Affidavit of David R. Sandman, PhD, dated July 10, 2007 ("Sandman Aff."), are referred to herein.

**I.   Creation Of The New York State Commission On Healthcare Facilities In The Twenty-First Century**

1.   In April, 2005, the New York State Legislature passed, and then Governor George E. Pataki signed, legislation creating the New York State Commission on Healthcare Facilities in the 21st Century ("Commission"). That legislation came into being as Part K of Chapter 58 of the Laws of 2003 as added by Section 31 of Part E of Chapter 63 of the Laws of 2005 (the "Enabling Legislation").

2.   A true and accurate copy of the Enabling Legislation is annexed to the Sandman

Aff. as Exhibit A.

3. The Enabling Legislation provided for regional input. Sandman Aff. ¶ 8. For purposes of such input, the State was divided into six regions (Long Island, New York City, Hudson Valley, Northern, Central and Western). Id. The plaintiff ("Andrus") is located in the Hudson Valley Region. Id. The Enabling Legislation required the appointment of regional members to the Commission, who were authorized to vote only on recommendations related solely to their respective regions. Id. The Enabling Legislation at § 7(c), (d) also required the creation of one Regional Advisory Committee ("RAC") for each region, which was required to "develop recommendations for reconfiguring its region's general hospital and nursing home bed supply to align bed supply with regional and local needs." Id. The RACs were required by the Enabling Legislation to transmit their final reports to the Commission on November 15, 2006. Id.

4. A true and accurate copy of the Hudson Valley Regional Advisory Committee Report is annexed to the Sandman Aff. as Exhibit C.

5. Section 8 of the Enabling Legislation required the Commission to "develop recommendations for reconfiguring the state's general hospital and nursing home bed supply to align bed supply to regional needs," and specifically to "make recommendations relating to facilities to be closed and facilities to be resized, consolidated, converted or restructured" in each region of the State. Sandman Aff. ¶ 9. The Enabling Legislation instructed the Commission to transmit its recommendations to the Governor and Legislature by December 1, 2006. Id.

6. Section 9 of the Enabling Legislation provides that the New York State Commissioner of Health "shall take all actions necessary to implement, in a reasonable, cost

efficient manner, the recommendations of the Commission," unless the Governor fails to transmit the final recommendations, along with his approval, to the Legislature on or before December 5, 2006, or a majority of the members of each house of the Legislature vote to adopt a concurrent resolution rejecting the Commission's recommendations in their entirety by December 31, 2006. Sandman Aff. ¶ 10.

7. The Commission transmitted its final recommendations, entitled <u>A Plan to Stabilize and Strengthen New York's Health Care System</u> ("Final Report")," to the Governor and Legislature on November 28, 2006. Sandman Aff. ¶ 11.

8. A true and accurate copy of the Final Report is attached to the Sandman Aff. Exhibit B.

9. Governor Pataki transmitted the Final Report and his approval thereof to the Legislature on November 30, 2006. Sandman Aff. ¶ 11.

10. A true and accurate copy of Governor Pataki's transmittal and approval of the Final Report is annexed to the Sandman Aff. as Exhibit D.

11. The New York State Legislature did not pass a concurrent resolution rejecting the Commission's recommendations prior to the end of 2006. <u>Id.</u>

## II. The Commission Process

12. The Commission, which operated independently of any existing state agency, used an approach that was both quantitative and qualitative. Sandman Aff. ¶ 12. The Commission's decision making process was informed and driven by review of objective data and quantitative analysis. <u>Id.</u> But, the Commission's recommendations also reflected significant public input, understanding of local market conditions, and professional judgment. <u>Id.</u>

13. The Commission and its staff performed detailed analysis of each hospital and nursing home throughout the State. Sandman Aff. at ¶ 13. Central to the Commission's quantitative analysis was its "analytic framework" and, for hospitals, its "absorption and access analysis." Id.

14. The Commission's analytic framework applied the factors that the Commission was required to consider under the Enabling Legislation, and required the consideration of over 40 metrics for each hospital and nursing home, reflecting six criteria: service to vulnerable populations, availability of services, quality of care, utilization, viability and economic impact. Sandman Aff. ¶ 14. This framework was a starting point for focused and continual deliberations and discussions, and did not constitute final determinations of which institutions to rightsize. Id.

15. The analytic framework employed by the Commission is discussed in the Final Report, at pages 68-70. Sandman Aff. Exh. B.

16. A true and accurate copy of analytic framework data employed by the Commission, relevant to nursing homes, are annexed to the Sandman Aff. as Exhibit E.

18. A true and accurate copy of demonstrative exhibits from a presentation by Commission staff entitled "Identifying Opportunities to Shift Long Term Care Resources," which discusses the allocation of long term care resources, is annexed to the Sandman Aff. as Exhibit G.

19. The quantitative data utilized by the Commission were primarily derived from information reported by facilities themselves on the Institutional Cost Reports submitted to DOH each year. Sandman Aff. ¶ 16.

20. The Commission's qualitative analysis was conducted in conjunction with the

RACs. Sandman Aff. ¶ 17.

21.     Both the Commission and the Hudson Valley RAC were required by the Enabling Legislation (§§ 7(a), 8(a)) to conduct extensive outreach to stakeholders in the region including but not limited to community-based organizations, health care providers, labor unions, payers, businesses and consumers. Id. In particular, the Commission and the RACs were charged with conducting formal public hearings, and fostering discussions among stakeholders. Id.

22.     The Commission and RACs conducted nineteen public hearings statewide, including three in the Hudson Valley Region. Sandman Aff. ¶ 18.

23.     True and accurate copies of documents reflecting the details concerning the time and location of those public hearings are annexed to the Sandman Aff. as Exhibit H.

24.     True and accurate copies of the agendas for the public hearings, are annexed to the Sandman Aff. as Exhibit I.

25.     Andrus did not choose to participate in any of the public hearings identified in the preceding paragraphs. Sandman Aff. ¶ 18.

26.     Reflecting its mandate to foster discussions among stakeholders, the Commission encouraged voluntary rightsizing efforts. Sandman Aff. ¶ 19. Philosophically, the Commission believed that "bottom-up" solutions derived by health care providers can be superior to "top-down" imposed edicts. Id. Practically, the Commission also believed that locally developed solutions with stakeholder participation are easier to implement. Id. In particular, the Commission offered facilities a procedure that was designed to enable facilities to engage in voluntary rightsizing discussions under the supervision of the Commission and DOH without incurring antitrust liability. Id.

27. A true and accurate copy of the March 9, 2006 memorandum from the Commission to all general hospital and residential health care facility administrators, announcing the Commission's Voluntary Rightsizing Procedures, is annexed to the Sandman Aff. as Exhibit J.

28. Early in the Commission process, facilities of interest were identified by Commission staff. Sandman Aff. ¶ 20. Andrus was identified as a possible candidate for right-sizing and /or conversion to an assisted living program due to its low occupancy level, recent history of patient care deficits, low care needs of its residents and its financial problems. Id. Another consideration was its prior decision to seek to become an alternative care provider as a continuing care retirement community. Id.

29. The Hudson Valley RAC, along with Commission staff, made a point of arranging to meet with representatives of such facilities of interest to learn each facility's perspective on the factors leading to their being identified as right-sizing candidates. Sandman Aff. ¶ 21.

30. Members of the Hudson Valley RAC and Commission staff met with Betsy Biddle, Andrus' executive director, on or about June 19, 2006. Sandman Aff. ¶ 22. At that meeting topics included Andrus' previous attempt to convert itself into a continuing care retirement community, reducing its nursing home bed complement to 72; its proposal to transfer 50 beds to Beth Abraham Hospital in resolution of outstanding debts resulting from the proposed conversion and its general finances. Id.

31. A true and accurate copy of Executive Director Biddle's letter to Dr. Robert Amler, the Hudson Valley RAC chairperson, dated June 23, 2006, thanking him for the meeting, is annexed to the Sandman Aff. as Exhibit K. Attachments to the letter included Andrus' 2005

financial statement and an agreement between Andrus and Beth Abraham Hospital to transfer authority to operate the 50 nursing home beds.

32. Andrus did not seek any further opportunity to present its views to the Commission or the Hudson Valley RAC. Sandman Aff. ¶ 23. Such opportunity was available to facilities that sought to do so. Id. For example, the Commission recommended the closure of Community Hospital of Dobbs Ferry, which was also located in the Hudson Valley Region. Id. at ¶ 24. Community Hospital at Dobbs Ferry submitted comments to the Commission and RACs including:

    a. A letter from the President and CEO of St. John's Riverside Hospital, Jim Foy, to Dr. Robert Amler, the Hudson Valley RAC chairperson, dated April 18, 2006, which thanked Dr. Amler for the opportunity to meet with the Hudson Valley RAC on April 18, 2006, and sought to explain the importance of Community Hospital at Dobbs Ferry to the Riverside Health Care System, which includes St. John's Riverside Hospital.

    b. Mr. Foy again wrote to Dr. Amler on May 11, 2006, providing information requested by Dr. Amler as a further follow up to an April 7, 2006 meeting. Mr. Foy detailed the relationship of the different entities comprising the Riverside Health Care System including St. John's Riverside Hospital, Yonkers General Hospital and Community Hospital at Dobbs Ferry. The letter included numerous attachments describing the System's organization and finances.

    c. Representatives of Community Hospital at Dobbs Ferry, including its

>President and CEO, Ronald J. Corti, met with Commission staff on October 6, 2006, to explain the services that Mr. Corti believed were essential services provided by Community Hospital to the surrounding communities.

Sandman Aff. ¶ 25.

### III. The Commission's Recommendations

33. In regard to Andrus, the Final Report recommended that Andrus downsize all 247 nursing home beds and add 140 assisted living program beds and possibly other non-institutional services. Sandman Aff. Exh. B at 122, Benjamin Aff. ¶ 3. The Commission's Assessment of Andrus are found in the Final Report at Sandman Aff. Exh. B at 123.

34. On January 31, 2007, DOH sent a letter to Andrus ("Implementation Outline") advising it of the Commission's recommendation and requesting that Andrus contact DOH to arrange a meeting if such a meeting was desired. Benjamin Aff. ¶ 4.

35. A true and accurate copy of the Implementation Outline is annexed to the Benjamin Aff. as Exhibit A.

36. The Implementation Outline is consistent with the Commission's Final Report (page 90), which provides that "the Commissioner shall implement each recommendation as expeditiously as possible, but in no event later than June 30, 2008." Benjamin Aff. ¶ 7.

37. While DOH has the authority to implement the downsizing all 247 of Andrus' nursing home beds and thereby close the facility as currently operated, DOH will not seek to compel Andrus to convert the facility to an assisted living program. Benjamin Aff. ¶ 8.

38. Nursing homes are facilities providing nursing care to sick, invalid, infirm,

disabled or convalescent persons in addition to lodging and board or health related services (N.Y. Public Health Law § 2801(2)) and must have an operating certificate issued by the Department. Benjamin Aff. ¶ 9; N.Y. Public Health Law § 2805. In contrast, the terms "assisted living" and "assisted living residence" mean an entity which provides or arranges for housing, on-site monitoring, and personal care services and/or home health care services, in a home like setting. Benjamin Aff. ¶ 10; N.Y. Public Health Law § 4651(1).

## IV. Data Concerning Andrus

39. Andrus' physical plant is over sixty years old. Sandman Aff. ¶ 34.

### A. Decertification of Nursing Home Beds at Andrus

40. During its tenure, the Commission looked to the most recent data available to it when reviewing different facilities. Sandman Aff. ¶ 30. Data from 2005 was not reported to DOH by facilities until mid-2006, which meant that it was not available for consideration by the Commission. Id. Financial data for 2006 could not be available until 2007, so it could not be relied upon by the Commission. Id.

41. The Commission did note and consider Andrus' 2005 financial statement and Andrus' representation that its operations were not losing money in 2006. Sandman Aff. ¶ 30.

42. Andrus had among the lowest occupancy rates in Westchester County. Sandman Aff. ¶ 31.

43. According to the data considered by the Commission for the period 2001-2003, Andrus had among the highest rates in Westchester for admitting low care patients, with 21% of these admissions being considered Reduced Physical Functioning A or Reduced Physical Functioning B patients, the two lowest care categories. Sandman Aff. ¶ 32. In 2003 Andrus had

45 residents classified on the lowest category, Reduced Physical Functioning A. Id.

44. A true and accurate copy of a listing of Reduced Physical Functioning A and Reduced Physical Function B resident counts for all facilities is annexed to the Sandman Aff. as Exhibit L.

45. Andrus' 2003 case mix index ("CMI") of 0.91, was the lowest of all nursing homes in the Hudson Valley Region, with few having CMIs below 1.1. Sandman Aff. ¶ 33.

46  A true and accurate copy of a list of 2003 CMIs for all Hudson Valley Region nursing homes is annexed to the Sandman Aff. as Exhibit M.

47. The Commission's finding that Andrus had 26 deficiencies in 2005 accurately reflects the data contained in Sandman Exhibit M. Sandman Aff. ¶ 35.

48. A true and accurate copy of the statement of deficiencies resulting from a May 2005 survey of Andrus' operation is annexed to the Sandman Aff. as Exhibit N. Those survey results show 26 deficiencies in the care provided to residents. Id. For some deficiencies there are repeated violations as the care to multiple residents failed to conform to minimum standards. Id.

49. When facilities did not respond to Commission inquiries, and available data indicated the facility might warrant review, the Commission explicitly recommended such review by the DOH Commissioner and, if warranted, closure, downsizing or conversions. Sandman Aff. ¶ 36.

50. The complaint at ¶¶ 29-33 contains allegations regarding the "transfer" of 50 of Andrus' certified beds to another facility. The Final Report considered Andrus' occupancy, with and without the 50 beds. Benjamin Aff. ¶ 11.

51.  For periods prior to July 1, 2006, Andrus possessed an operating certificate to operate a 247 bed nursing home. Benjamin Aff. ¶ 12.

52.  By letter dated January 24, 2007, DOH approved a reduction in Andrus' licensed capacity to 197 beds, effective July 1, 2006. Id. A true and accurate copy of the January 24, 2007 DOH letter is annexed to the Benjamin Aff. as Exhibit B.

53.  Following Andrus' failure to obtain local zoning approval for the construction of a continuing care retirement community, including 201 independent living units and a 72 bed nursing home, Andrus entered into an agreement in 2002 with Beth Abraham Hospital, its partner in the continuing care community application, to transfer 50 nursing home beds to Beth Abraham Hospital in lieu of payment of a promissory note held by Beth Abraham Hospital. Benjamin Aff. ¶ 13.

54.  A true and accurate copy of Andrus' 2002 agreement with Beth Abraham Hospital is annexed to the Benjamin Aff. as Exhibit C.

55.  DOH never approved Andrus' 2002 agreement with Beth Abraham Hospital. Benjamin Aff. ¶ 13.

56.  If Andrus had merely sought to decertify 50 beds, this would have been a fairly routine matter that could have been accomplished within approximately six months of Andrus submitting a properly documented request. Benjamin Aff. ¶ 14.

57.  Andrus' attempt to transfer 50 of its certified beds to another facility necessitated approval by the New York Public Health Council. Benjamin Aff. ¶ 15.

58.  In seeking to be allowed to immediately decertify the 50 beds, but still have them treated as available beds at the time of review of the transfer, Andrus sought extraordinary

treatment. Benjamin Aff. ¶ 15.

59.  Under New York State law, a facility cannot transfer its operating certificate, which is its license to operate, or its establishment approval or its bed complement. Benjamin Aff. ¶ 16; N.Y. Public Health Law § 2801-a(4). In seeking to obtain the 50 beds, Beth Abraham Hospital would have to obtain establishment approval under N.Y. Public Health Law § 2801-a and possibly construction approval pursuant to N.Y. Public Health Law § 2802 and apply for a revised operating certificate pursuant to N.Y. Public Health Law § 2805. Benjamin Aff. ¶ 16.

60.  N.Y. Public Health Law § 2801-a provides that no hospital shall be established without the approval of the Public Health Council. Benjamin Aff. ¶ 17. Establishment approval confers upon a sole proprietorship, partnership or corporation the authority to own and operate a nursing home. Id.  A certificate of incorporation including the power to operate a nursing home cannot be filed with the Secretary of State without first being approved by the N.Y. Public Health Council. N.Y. Business Corporation Law § 201(e); N.Y. Not-for-Profit Corporation Law § 404(o). In considering such an application, the Public Health Council considers the public need for the existence of the institution at the time and place and under the circumstances proposed, the character, competence and standing in the community of the sponsors and the financial resources and feasibility of the proposal. Benjamin Aff. ¶ 17; N.Y. Public Health Law § 2801-a(3)).

60.  The foregoing requirements also apply to an existing nursing home which seeks to purchase existing beds from another nursing home. Benjamin Aff. ¶ 18.

61.  The Public Health Council, which is established pursuant to N.Y. Public Health Law § 220, acts on establishment applications with the advice of the N.Y. State Hospital Review

and Planning Council ("SHRPC"). Benjamin Aff. ¶ 19; N.Y. Public Health Law § 2801-a(2). The SHRPC is established pursuant to N.Y. Public Health Law § 2904; Benjamin Aff. ¶ 19.

62.     Pursuant to N.Y. Public Health Law § 2802, construction of a facility must be approved by the Commissioner of Health. Benjamin Aff. ¶ 20. The SHRPC must be provided an opportunity to make a recommendation on the construction application prior to the Commissioner acting on the application. Id. When an application for both establishment and construction approval is considered, the process for issuance of both approvals is combined. Id. The consideration of establishment and/or construction applications is known as the Certificate of Need review process. Id.

63.     The criteria for granting construction approval, which are specified at New York Public Health Law ("PHL") § 2802(3), are essentially the same as the establishment. Benjamin Aff. ¶ 21.

64.     Construction approval is necessary for various projects at existing nursing homes, including expansions, renovations and capital improvements. Benjamin Aff. ¶ 21 at fn 1. The nature of the approval process is dependent upon the proposed construction including the work proposed and the cost. Id.; 10 NYCRR § 710.1(c). Lower cost projects or those that merely update existing facility infrastructure are subject to limited review which does not include consideration of need, only architectural review. Benjamin Aff. ¶ 21 at fn 1; 10 NYCRR § 710.1(c)(4). Such was the case for three construction approvals granted to Andrus since 2004: emergency heating, boiler replacement ($2,970,900), approved on March 17, 2006; electrical upgrades ($1,877,000), approved on February 10, 2006; and, telephone system, brickwork, kitchen and resident room upgrades ($1,072,264), approved on August 5, 2004. Benjamin Aff. ¶

21 at fn 1.

65. When a party seeks to purchase an existing nursing home or its beds, it is necessary to obtain establishment and/or construction approval including consideration of the character and competence of the proposed operator, the financial feasibility of the proposed purchaser and the need for the beds. Benjamin Aff. ¶ 22.

66. In considering public need for nursing home beds, DOH identifies the currently available beds in the planning area ( which, in Andrus' case, would be Westchester County), including existing beds and beds that have been approved for construction but are not yet in operation and compares the available beds to the number of needed beds. Benjamin Aff. ¶ 23; 10 N.Y.C.R.R. §§ 670.3(a), 709.3(g). New beds can only be added if there is a need for the beds. Benjamin Aff. ¶ 23.

67. When an operator seeks to sell a facility or beds that are in operation, DOH will often permit a transfer to a new operator even if there are excess beds in the planning area. Benjamin Aff. ¶ 24. This is not the case when such beds were decertified prior to submission of an application to approve the transfer. Id. In seeking to be allowed to decertify beds in 2002, but have them treated as available beds at some unknown time in the future when Beth Abraham Hospital might file an application for approval to purchase the beds, Andrus sought to receive special treatment. Id.

68. In mid-July 2006, DOH reached a conceptual resolution of this matter allowing decertification of Andrus' beds, subject to Beth Abraham Hospital submitting an application for approval to purchase the beds within 18 months. Benjamin Aff. ¶ 25. The January 24, 2007, approval (Benjamin Aff. Exh. B) memorialized this agreement. Benjamin Aff. ¶ 25. DOH

agreed to make the approval retroactive to July when the conceptual agreement was reached, but no basis exists for using an earlier approval date. Id.

### B. Funding Available to Andrus to Implement the Commission's Recommendations.

69. On May 16, 2007, DOH issued a Request for Application ("RFA") for funding of implementation of commission mandates. Benjamin Aff. ¶ 26. A true and accurate copy of the RFA is annexed to the Benjamin Aff. as Exhibit D.

70. Applications for funding were due on July 16, 2007. Benjamin Aff. ¶ 26. As of July 9, 2007, DOH had not received an application from Andrus. Benjamin Aff. ¶ 26 at fn. 2.

71. Funding for implementation of the commission mandates is available under the Health Care Efficiency and Affordability Law of New York Capital Grant Program (PHL § 2818) and the Federal-State Health Reform Partnership ("F-SHRP"). Benjamin Aff. ¶ 27.

72. F-SHRP, a Federal-State Health Reform Partnership Medicaid section 1115 Demonstration is the result of a September 29, 2006 agreement between DOH and the U.S. Centers for Medicare and Medicaid Services. Benjamin Aff. ¶ 28. A true and accurate copy of this agreement is annexed to the Benjamin Aff. as Exhibit E.

73. The goals of this federal/state partnership include promoting the efficient operation of the State's health care system; consolidating and right-sizing New York's health care system by reducing excess capacity in the acute care systems; shifting emphasis in long-term care from institutional-based to community-based settings. Benjamin Aff. ¶ 29.

74. Under F-SHRP, the federal government will invest up to $1.5 billion ($300 million per year) in agreed upon reform initiatives including initiatives to right size and

restructure the acute and long-term care delivery system. Benjamin Aff. ¶ 30.

    75.    The federal investment in these reforms is conditioned upon the following:

        a.    The F-SHRP waiver must generate federal saving sufficient to offset the federal investment;

        b.    The State must meet a series of established performance milestones set forth in the waiver terms and conditions including a final implementation report regarding the Berger Commission recommendations by July 15, 2008.

Benjamin Aff. ¶ 31.

    76.    The RFA issued by DOH (Benjamin Aff. as Exhibit D) provides facilities which are the subject of Commission recommendations with an opportunity to submit their compliance plan to DOH, along with a request for grant funds to assist with implementation of the requirements. Benjamin Aff. ¶ 32.

    77.    Applications will be reviewed by DOH and granted in conformance with the terms set forth in the RFA. Benjamin Aff. ¶ 33.

**WHEREFORE**, it is respectfully requested that defendants' motion for summary judgment be granted.

Dated: New York, New York
       July 13, 2007

                                        ANDREW M. CUOMO
                                        Attorney General of the
                                         State of New York
                                        <u>Attorney for Defendant</u>

                                      By: _____
                                         John P. Gasior
                                         Assistant Attorney General
                                         120 Broadway, 24th Floor
                                         New York, New York 10271
                                         212-416-8570

07-CV-3442 (CLB)(KNF)

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

JOHN E. ANDRUS MEMORIAL, INC. (d/b/a ANDRUS ON HUDSON),

                                          *Plaintiff,*

            -*against*-

RICHARD F. DAINES, as Commissioner of the New York State Department of Health,

                                          *Defendant.*

**DEFENDANT'S STATEMENT OF MATERIAL FACTS PURSUANT TO LOCAL RULE 56.1**

**ANDREW M. CUOMO**
Attorney General of the
State of New York
**ATTORNEY FOR DEFENDANT**
Office and Post Office Address

120 Broadway, 24th Floor
New York, New York 10271
(212)–416-8570

*Personal service of a copy of the within _____ is admitted this ___ day of _____ 2007.*