UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

------------------------------------------------------------x

JOHN E. ANDRUS MEMORIAL, INC. (d/b/a    :
ANDRUS ON HUDSON),                       :
                                         :    07-CV-3432 (CLB) (KNF)
                            Plaintiff    :
        -against-                        :
                                         :
                                         :
RICHARD F. DAINES, as Commissioner of the :
New York State Department of Health,     :
                                         :
                            Defendant.   :
------------------------------------------------------------x

## MEMORANDUM OF LAW IN SUPPORT OF DEFENDANT'S
## MOTION FOR SUMMARY JUDGMENT

**ANDREW M. CUOMO**
Attorney General of the State of New York
Attorney for Defendant
Office of the Attorney General
120 Broadway 24th floor
New York, New York 10271
212-416-8570

Of Counsel
John P. Gasior
Assistant Attorney General
Sasha Samberg-Champion
Assistant Solicitor General

## TABLE OF CONTENTS

Pages

TABLE OF AUTHORITIES ....................................................... ii

PRELIMINARY STATEMENT ..................................................... 1

STATEMENT OF THE CASE ..................................................... 1

ARGUMENT ................................................................. 6

POINT I    -    ANDRUS CANNOT SUBSTANTIATE A
DUE PROCESS CAUSE OF ACTION .......................... 7

A.    Because Plaintiff's Operating Certificate is Subject to Revocation for Lack of Public
Need, Any Arguable "Property Interest" It Has Is Limited ...................... 7

B.    Andrus Received All The Procedural Due Process To Which
It Was Constitutionally Entitled ........................................... 9

1.    Andrus received adequate notice that its operating license
was subject to revocation. ............................................. 10

2.    Andrus had a meaningful opportunity to be heard. ........................... 13

C.    Andrus Received Substantive Due Process Because The
Procedures Employed By The Commission Were Neither
Arbitrary Nor Outrageous .............................................. 17

POINT II    -    ANDRUS CANNOT SUBSTANTIATE A "TAKING"
CAUSE OF ACTION ...................................... 18

POINT III    -    ANDRUS' CONTRACTS CLAUSE CLAIM MUST FAIL ......... 21

POINT IV    -    ANDRUS' REQUEST FOR AN INJUNCTION
SHOULD BE DENIED .................................... 24

CONCLUSION .............................................................. 25

## TABLE OF AUTHORITIES

Cases                                                                              Pages

Acton v. United States,
    401 F.2d 896 (9th Cir. 1968) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19

Allied Structural Steel Co. v. Spannaus,
    438 U.S. 234 (1978) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21

American Pelagic,
    379 F.3d 1363 (Fed. Cir. 2004) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19

Asbestec Const. Serv. Inc. v. U.S. E.P.A.,
    849 F.2d 765 (2nd Cir. 1988) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19

Atkins v. Parker,
    472 U.S. 115 (1985) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8, 9, 10

Board of Regents v. Roth,
    408 U.S. 564 (1972) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7

Bower Associates v. Town of Pleasant Valley,
    2 N.Y.3d 617 (2004) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17

Buffalo Teachers Federation v. Tobe,
    464 F.3d 362 (2d Cir. 2006), cert. denied 127 S. Ct. 2133 (2007) . . . . . . . . . . 21, 22, 23

Burns Harbor Fish Co. v. Ralston,
    800 F. Supp. 722 (S.D. Ind. 1992) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19

Cleveland Board of Education v. Loudermill,
    470 U.S. 532 (1985) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8

College Sav. Bank v. Florida Prepaid Postsecondary Education Expense Board,
    527 U.S. 666 (1999) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19

Community Hospital at Dobbs Ferry v. Novello,
    No. 24650/06 (N.Y. Sup. Ct., West. Cty. July 10, 2007) . . . . . . . . . . . . . . . . . . . . . . . . 12

County Line Joint Venture v. Grand Prairie,
    839 F.2d 1142 (5th Cir. 1988) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9

ii

<u>Cases</u>                                                                                                <u>Pages</u>

County of Sacramento v. Lewis,
    523 U.S. 833 (1998) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17

Dusenberry v. United States,
    534 U.S. 161 (2002) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11, 12

Exxon Corporation v. Eagerton,
    462 U.S. 176 (1983) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21

Gattis v. Gravett,
    806 F.2d 778 (8th Cir. 1986) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9

Hunter v. SEC,
    879 F. Supp. 494 (E.D. Pa. 1995) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19

Kirk v. Maumee Valley Electric Co.,
    279 U.S. 797 (1929) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9

Lewis v. Hynes,
    82 Misc. 2d 256 (N.Y. Sup. Ct. Queens Cty. 1975),
    <u>aff'd</u> 51 A.D. 2d 550 (2d Dep't 1976) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8

Loretto v. Teleprompter Manhattan CATV Corp.,
    458 U.S. 419 (1982) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19

Lowrance v. Achtyl,
    20 F.3d 529 (2nd Cir. 1994) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17

Lucas v. South Carolina Coastal Council,
    505 U.S. 1003 (1992) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19, 20

Mathews v. Eldridge,
    424 U.S. 319 (1976) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7, 9, 13

McKinney v. Commissioner of New York State Department of Health,
    2007 WL. 1747029 (1st Dep't June 19, 2007) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2, 3

Medical Social of the State of New York v. Cuomo,
    976 F.2d 812 (2nd Cir. 1992) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17

Cases                                                                    Pages

Medtronic, Inc. v. Lohr,
    518 U.S. 470 (1996) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17

Mitchell v. W.T. Grant Co.,
    416 U.S. 600 (1974) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7, 9

Morrissey v. Brewer,
    408 U.S. 471 (1972) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9, 13

Mullane v. Central Hanover,
    339 U.S. 306 (1950) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11

Niagara Recycling, Inc., v. Town of Niagara,
    83 A.D.2d 316 (4th Dept. 1981) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17

Penn Cent. Transp. v. City of New York,,
    438 U.S. 104 (1978) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20

Plaza Health Laboratoriess, Inc. v. Perales,
    878 F.2d 577 (2d Cir. 1989) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7, 9, 11

RR Village Association, Inc. v. Denver Sewer Corp.,
    826 F.2d 1197 (2nd Cir. 1987) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13

Sal Tinnerello & Sons, Inc. v. Town of Stonington,
    141 F.3d 46 (2d Cir. 1998) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 22, 23

San Remo Hotel, L.P. v. City & County of San Francisco,
    545 U.S. 323 (2005) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20

Sanitation and Recycling Industrial, Inc. v. City of New York,
    107 F.3d 985 (2d Cir. 1997) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 22, 23

Sanitation & Recycling Ind., Inc. v. City of New York,
    928 F. Supp. 407 (S.D.N.Y. 1996),
    aff'd, 107 F.3d 985 (2nd Cir. 1997) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19, 22

St. Joseph Hospital of Cheektowaga v. Novello,
    15 Misc.3d 333 (Erie County 2007 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12, 18, 22, 23

Cases                                                                                    Pages

Sunward Electronics, Inc. v. McDonald,
   362 F.3d 17 (2d Cir. 2004) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 24

Town of Orangetown v. Magee,
   88 N.Y.2d 41 (1996) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17

United States v. Pewee Coal Co.,
   341 U.S. 114 (1951) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19

Uzzillia v. Commissioner of Health,
   47 A.D.2d 492 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8

Weigner v. New York,
   852 F.2d 646 (2d Cir. 1988) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12


STATUTES

10 N.Y.C.R.R. § 86-2.10(a)(5) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5

Fed. R. Civ. P. Rules 56(b) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

L. 2005, ch. 63, Part E, § 31 ("Enabling Act")
   § 1 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2
   § 2(a) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2, 10
   § 7 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3
   § 7(d) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3, 8
   § 8(a) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8
   § 8(b) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3, 10
   § 8(c) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4
   § 9 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3 n.5
   § 9(a) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5
   § 9(b) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4
   § 11 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3, 3 n.5

N.Y. Pub. Health L. § 2801 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8 n.8

N.Y. Pub. Health L. § 2806(6)(a) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8

## PRELIMINARY STATEMENT

Defendant, Richard F. Daines ("Defendant"), as Commissioner of the New York State Department of Health ("DOH"), by his attorney, Andrew M. Cuomo, Attorney General of the State of New York, respectfully submits this memorandum of law, along with the affidavits of Neil Benjamin ("Benjamin Aff."), David R. Sandman, PhD ("Sandman Aff."), and John Gasior ("Gasior Aff."), in support of his motion for summary judgment, pursuant to Fed. R. Civ. P. Rule 56(b).

In this action, plaintiff, John E. Andrus Memorial, Inc. (d/b/a Andrus On Hudson) ("Andrus"), presents constitutional challenges to legislation which created the New York State Commission on Healthcare Facilities in the 21st-First Century ("Commission"). Andrus also challenges the recommendation in the Commission's report, A Plan To Stabilize and Strengthen New York's Health Care System ("Commission Report")[1], that the nursing home operated by Andrus be closed. Defendant submits that plaintiff's constitutional challenges cannot be supported legally and that there are no genuine issues of material fact. As such, Andrus' causes of action cannot be sustained and, therefore, the complaint must be dismissed and judgment entered for the Defendant.

## STATEMENT OF THE CASE

In April of 2005, the New York State Legislature passed, and then Governor Pataki signed, legislation creating the so-called Berger Commission, so named after the commission's chairman, Stephen Berger. The legislation came into being as Part K of Chapter 58 of the Laws

---

[1] A copy of the Commission Report is annexed to the Sandman Aff. as Exhibit B.

of 2003 as added by Section 31 of Part E of Chapter 63 of the Laws of 2005. That statute will be

referred to herein as the "Enabling Legislation".[2]

The Legislature's findings and purposes are summarized in Section 1 of Enabling

Legislation. Among other things, the Legislature found that, in too many sectors of the State's

health care system, supply was ahead of demand. It determined that health care resources must

"be aligned so that excess capacity is minimized, thereby promoting stability and efficiency in

the health care delivery system infrastructure. . . . that it is in the interest of the state to undertake

at this time a rational, independent review of health care capacity and resources in the state."

Toward this end the Legislature created the Commission:

> In order to undertake such review rationally and equitably, the
> legislature determines that it is necessary to establish a commission
> separate and apart from existing bodies responsible for the
> establishment and continued oversight of general hospitals and
> nursing homes, which shall be charged with examining the supply of
> general hospital and nursing home facilities, and recommending
> changes that will result in a more coherent, streamlined health care
> system in the state of New York.

Enabling Legislation, §1. The Commission was charged with ". . . examining the system of

general hospitals and nursing homes in New York state and recommending changes to that

system in light of factors submitted pursuant to section five of this act and additional factors

established by the commission."[3] Id. §2(a).

---

[2] A copy of the Enabling Legislation is annexed to the Sandman Aff. as Exhibit "A."

[3] A number of actions have been brought throughout the State challenging various aspects
of the Enabling Legislation and its implementation. Recently, in McKinney v. Commissioner of
New York State Dept. of Health, 2007 WL 1747029 (1st Dep't June 19, 2007), the Appellate
Division, First Department, rejected the argument that the Enabling Legislation unconstitutionally
delegated the Legislature's lawmaking power to the executive branch and affirmed dismissal of that
(continued...)

2

The Commission consisted of 18 statewide members and additional regional members
from each of six regions, including a Hudson Valley Region, which is where the Andrus facility
is located.[4]  Id., §7.  Each of the six regions had a regional advisory committee ("RAC") charged
with "develop[ing] recommendations for reconfiguring its region's general hospital and nursing
home bed supply to align bed supply with regional and local needs."  Id., §7(d);  see also §7(d)
(functions of RACs).  After the submission of a RACs' recommendations (if any), the
Commission was required to develop recommendations for reconfiguring the state's general
hospital and nursing home bed supply to align bed supply to regional needs, id., §8(a), and "make
recommendations relating to facilities to be closed and facilities to be resized, consolidated,
converted, or restructured, within each region."  Id., §8(b).

The Commission was required to work quickly.  It was given a limited existence; the
Commission, and its authority, were designated to expire on December 31, 2006.  Id. §11.[5]  The
Enabling Legislation required the Commission, by December 1, 2006, to supply the Governor
and the Legislature with recommendations which would include, inter alia, "specific

---

[3] ( . . . continued)

action.  The Appellate Division stated that, "[h]aving made the basic policy choice that some
hospitals and nursing homes needed to be closed and others needed to be resized, consolidated,
converted, or restructured, the legislation permissibly authorized the Commission 'to fill in details
and make subsidiary policy choices consistent with the enabling legislation'"  Id.
at *1.  A copy of the McKinney decision is annexed to the Gasior Aff. as Exhibit C .

[4] The Hudson Valley Region consists of Delaware, Dutchess, Orange, Putnam, Rockland,
Sullivan, Ulster and Westchester counties.  Sandman Aff. Exh. B at 65.

[5]Section 11 of the Enabling Legislation provides that sections 2-8, in which the Commission
was created and defined, would "expire and be deemed repealed December 31, 2006."  Section 9,
under which DOH is directed to implement the Commission's recommendations, will "expire and
be deemed repealed" on June 8, 2008.

recommendations for facilities to be closed and specific recommendations for facilities to be resized, consolidated, converted, or restructured." Id., §8(e). If the Governor approved the report/recommendations and if the Legislature did not vote to reject the recommendations on or by December 31, 2006, the recommendations would acquire the force of law. Id., §9(b).

Nineteen hearings were held throughout the State. Sandman Aff. ¶ 18. Three hearings were held in the Hudson Valley region. Sandman Aff. Exh. B at 68. Details concerning the time and location of these hearings, and the agendas for the public hearings, are annexed to the Sandman Aff. as Exhibits H and I respectively. The Commission and the RACs heard from hundreds of witnesses and reviewed thousands of pages of testimony submitted during hearings. Sandman Aff. Exh. B at 68.

Of particular relevance here, on or about June 19, 2006, members of the Hudson Valley RAC and Commission staff met with Betsy Biddle, plaintiff's executive director. Sandman Aff. ¶ 22. At that meeting, topics included a previous attempt by Andrus to convert itself into a continuing care retirement community, reducing its nursing home bed complement to 72, Andrus' proposal to transfer 50 beds to Beth Abraham Hospital, its resolution of outstanding debts resulting from the proposed conversion and its general finances. Id. A copy of Ms. Biddle's letter to Dr. Robert Amler, the Hudson Valley RAC chairperson, dated June 23, 2006, is annexed to the Sandman Aff. as Exhibit K.

On November 28, 2006 the Commission sent the Commission Report to the Governor and the State Legislature. Sandman Aff. ¶ 11. Its recommendations directly affected 57 hospitals around the state, with 48 hospitals to be reconfigured or converted, and nine hospitals to be closed altogether. Sandman Aff. Exh. B at 10-11; see also 91-218 (describing specific

4

recommendations). The Commission Report also recommended that approximately 25 nursing facilities should be downsized, closed or otherwise reconfigured.[6]  Id. at 11.

Among those 25 nursing facilities was Andrus-on-Hudson, the plaintiff in this action. The Commission Report recommended that Andrus eliminate all 247 residential health care ("RHC") beds that it was certified to operate and replace them with 140 assisted living program ("ALP") beds. Sandman Aff. Exh. B at 123. It noted that Westchester County as a whole had too many RHC beds and not enough ALP beds. Id. Andrus was an excellent candidate for a conversion to address this problem. First, it had one of the lowest "case mix indexes in the State," reflecting the relative good health of its patients.[7] Of Andrus' 176 residents, about half had low-acuity conditions and "could be better served in an ALP, if that were available." Id. Second, its physical plant was "old and in need of capital improvements" anyway. Third, its facility "has private rooms and baths," making conversion to an ALP "economical." Id.

On November 30, 2006, then Governor Pataki transmitted his approval to the Legislature. Sandman Aff. ¶ 11. The Legislature, in turn, did not vote to reject the recommendations. Id. Thus, as of January 1, 2007, the Commission Report gained the force of law and the Commission ceased to exist. The Commissioner of Health of the State of New York, currently defendant Richard F. Daines, became obliged under Enabling Legislation § 9(a) to "take all actions

---

[6] The Commission estimated that the long-term recommendations for downsizing or closing nursing homes would make highly-targeted nursing bed reductions of approximately 3,000, or 2.6 percent of the state's supply. Sandman Aff. Exh. B at 11. Twice as many nursing homes were to be downsized as closed. Id. The Commission estimated that implementing its recommendations for all facilities would result in savings of about $1.5 billion per year at a cost of approximately $1.2 billion. Id. 225-229.

[7] The Case Mix Index ("CMI") for nursing homes is defined at 10 N.Y.C.R.R. § 86-2.10(a)(5). How nursing home CMIs are developed is discussed in Sandman Aff. footnote 1.

5

necessary to implement, in a reasonable, cost-efficient manner, the recommendations of the commission." DOH must implement the Commission's recommendations by June 30, 2008. Sandman Aff. Exh. B at 90.

On January 31, 2007, DOH sent a letter to Andrus, advising plaintiff of the Commission's recommendations and requesting that plaintiff contact DOH to arrange a meeting, if such a meeting was desired. Benjamin Aff. ¶ 4. The letter included an implementation outline which, consistent with the Commission Report (Sandman Aff. Exh. B at 90), provides that "the Commissioner shall implement each recommendation as expeditiously as possible, but in no event later than June 30, 2008."

This complaint was filed on or about April 30, 2007. Gasior Aff. § 3, Exh. A. Defendant served his answer to the complaint on June 5, 2007. Gasior Aff.§ 4, Exh. B. The complaint features seven claims for relief and all are premised on alleged violations of the United States Constitution. Plaintiff essentially seeks a declaration that the Enabling Legislation is unconstitutional and that any actions taken by Defendant to implement the Commission Report should be enjoined.

### ARGUMENT

Andrus alleges that the Commission, and the Defendant by his implementation of the Commission Report, have taken, or will take actions which will cause Andrus to suffer procedural (complaint ¶¶ 74-76) and substantive (id. ¶¶ 77-79, 80-82) due process violations, as well as unconstitutional takings and interferences with contractual relationships. The gravamen of these claims rests on whether Defendant may legally, pursuant to the Enabling Legislation,

6

revoke Andrus operating certificate, without which it can no longer do business as presently constituted. Andrus' claims cannot be sustained.

## POINT I
## ANDRUS CANNOT SUBSTANTIATE A
## DUE PROCESS CAUSE OF ACTION

Even if Andrus had a property interest in its operating certificate -- the scope of which would be limited -- the procedures afforded under the Enabling Legislation provided all the process due. The basic requirements of due process are notice and an opportunity to be heard. Mitchell v. W.T. Grant Co., 416 U.S. 600, 634 (1974). Plaintiff had both. Application of the three-factor test articulated in Mathews v. Eldridge, 424 U.S. 319, 335 (1976), makes clear that plaintiff cannot make out a procedural due process violation.

### A.     Because Plaintiff's Operating Certificate is Subject to Revocation for Lack of Public Need, Any Arguable "Property Interest" It Has Is Limited

Any due process analysis must begin with an examination of the supposed property interest at issue. Here, any such property interest plaintiff may have in its operating certificate is at best qualified and extremely limited, given the power the State always has retained to revoke that operating certificate for lack of public need.

"Property interests, or course, are created and their dimensions defined by existing rules or understandings that stem from an independent source such as state law." Board of Regents v. Roth, 408 U.S. 564, 577 (1972). In determining what, if any, property interest a litigant has, a court must "focus initially on the relevant statute, regulation, or contract establishing eligibility for the government benefit at issue." Plaza Health Labs., Inc. v. Perales, 878 F.2d 577, 581 (2d Cir. 1989). Thus, a statute conferring a benefit also defines its nature and scope. Roth, 408 U.S. at 578.

7

Long before the Enabling Legislation was enacted, New York law put all hospitals on notice that their continued operation, far from being an entitlement, would be conditioned on an ongoing public need for their beds and services. Specifically, N.Y. Public Health Law § 2806(6)(a) has long required the State to revoke a facility's operating certificate upon a determination by the Commissioner of Health that the facility's closure would serve the public interest by realigning the community's bed supply to actual public need.[8] The Enabling Legislation simply created a process by which this long-existing qualification could be more effectively implemented by evaluating public need on a regional, as opposed to an individualized or even localized basis. See Enabling Legislation, §§ 7(d), 8(a). Plaintiff cannot complain that this pre-existing qualification took on greater practical force subsequent to the Enabling Legislation's passage. Whatever protected interest plaintiff may have had was in a substantive right, not in a particular procedure. See Cleveland Bd. of Educ. v. Loudermill, 470 U.S. 532, 541 (1985). Moreover, to the extent that the Enabling Legislation altered the character of plaintiff's "entitlement," the Legislature may permissibly take such action without the need for heightened procedural protections, as a "legislative determination provides all the process that is due." Atkins v. Parker, 472 U.S. 115, 130 (1985)  (footnote omitted);[9] see also County Line Joint

---

[8] New York Public Health Law § 2801 includes "nursing home" within the definition of "Hospital." See Uzzillia v. Commissioner of Health, 47 A.D.2d 492, 496 n3 (2d Dep't 1975) (article 28 'hospital' includes 'nursing home'). As a "hospital" it is subject to the regulatory provisions of Article 28 of the Public Health Law. Lewis v. Hynes, 82 Misc.2d 256, 260 (N.Y. Sup. Ct. Queens Cty. 1975), aff'd 51 A.D. 2d 550 (2d Dep't Jan. 19, 1976).

[9] In Atkins, plaintiffs were recipients of food stamps who challenged the notice given to them following a change in federal law which reduced their benefits.  The Court observed, "[b]ecause the substantive reduction in the level of petitioners' benefits was the direct consequence of the statutory amendment, they have no basis for challenging the procedure that caused them to
(continued...)

8

Venture v. Grand Prairie, 839 F.2d 1142, 1144 (5th Cir. 1988); Gattis v. Gravett, 806 F.2d 778,

781 (8th Cir. 1986) (though legislative alteration of previously conferred property interest may be

a deprivation, legislative process itself provides citizens with all process due).

     Thus, facilities such as Andrus have no more than a conditional right to operate and they

must cease operating if the State determines that there is no longer a public need for their facility.

See Kirk v. Maumee Valley Electric Co., 279 U.S. 797, 802 (1929) (State's exercise of reserved

powers does not violate due process). The discretion retained by the State to revoke an operating

license "suggests that the recipients have of such benefits have no entitlement to them" as would

trigger constitutional due process protections. Plaza Health Labs., 878 F.2d at 581. And, as

demonstrated below, the process afforded plaintiff was more than sufficient to protect whatever

limited, conditional constitutional interest it may have had.

## B.    Andrus Received All The Procedural Due Process To Which It Was Constitutionally Entitled

     Andrus, and every Article 28 facility in New York, received all the notice and opportunity

to be heard which could reasonably be provided and which the Constitution requires. The

essence of procedural due process is notice and an opportunity to be heard. See, e.g. Mitchell v.

W. T. Grant Co., 416 U.S. at 634. When due process is required, the process to be provided is

itself a flexible concept. Mathews v. Eldridge, 424 U.S. 319, 335 (1976); Morrissey v. Brewer,

408 U.S. 471, 481 (1972). Under the circumstances presented, there can be no genuine issue of

material fact that Andrus received both notice and a meaningful opportunity to be heard.

---

[9] (. . .continued)

receive a different, less valuable property interest after the amendment became effective." Atkins,

472 U.S. at 130.

9

### 1.  Andrus received adequate notice that its operating license was subject to revocation.

Andrus received more than adequate notice that the Commission was considering revoking its operating license.  The Commission was not obligated to provide the sort of super-notice that Andrus complains it did not receive.  First of all, the Enabling Legislation is a public law.  From the plain language of the statute it has always been clear that every hospital and nursing home in the State was being reviewed with an eye toward closure or restructuring.  See Enabling Legislation § 2(a) (providing that the Commission "shall be charged with examining the system of general hospitals and nursing homes in New York state and recommending changes to that system"); id. § 8(b) (providing that the "commission shall make recommendations relating to facilities to be closed and facilities to be resized, consolidated, converted, or restructured, within each region.").  Where a governmental entity is required to make decisions which will affect many individuals or entities, individualized notice is not required.  See, e.g. Atkins, 472 U.S. at 129-31.

In any event, the record makes clear that Andrus was actually on clear notice that it was a candidate for Commission action.  The Hudson Valley RAC early on identified Andrus as a "facility of interest" because of, inter alia, its "low occupancy level, recent history of patient care deficits, low care for the needs of its residents and financial problems."  Sandman Aff. ¶ 20.  Accordingly, members of the RAC, as well as Commission staff, met with Andrus' executive director on or about June 19, 2006.  Id. ¶ 22.  At that meeting, among the topics discussed were Andrus' previous attempt to convert itself into a continuing care retirement community; the possibility of reducing its nursing home bed complement to 72; its proposal to transfer 50 beds to

10

Beth Abraham Hospital to resolve outstanding debts resulting from the proposed conversion; and its general finances. Id. There can be no question that Andrus was put on notice of the seriousness of its situation.

Tellingly, Andrus does not even allege that it was not aware of the Commission's proceeding or the possible consequences. See Plaza Health Labs., 878 F.2d at 582 (finding no notice problem where plaintiff "does not claim to have been unaware" of what was at issue and where "it would require little thought" for the plaintiff to have deduced it). Rather, Andrus complains that "at no point during any of its communications with the Hudson Valley RAC was the Andrus informed that it was being targeted or considered for closure, nor told why it was being so targeted or considered." Complaint ¶ 43. It further complains that the Commission issued its final report "without affording the Andrus any notice of its contemplated actions." Id. ¶ 52. In essence, Andrus claims that it should have been informed not just of the pendency of the Commission's proceeding, but also of the likely outcome of its determination, notwithstanding that such determination had not been made. But this is not the law. See Dusenberry v. United States, 534 U.S. 161, 170 (2002) (Due Process Clause's notice requirement is "only that the Government's effort be 'reasonably calculated' to apprise a party of the pendency of the action"); Mullane v. Central Hanover, 339 U.S. 306, 315 (1950) ("The criterion [for notice] is not the possibility of conceivable injury but the just and reasonable character of the requirements, having reference to the subject with which the statute deals.") (internal quote omitted).

As a state court recently aptly put it, in disposing of a similar challenge to the Enabling Legislation:

> There is no question that the plaintiffs received notice of the
> deliberations of the [Berger] Commission and an opportunity to

11

> submit written material. Every hospital was on notice that the Commission might recommend its closing or consolidation. It is unreasonable to expect that as the Commission deliberated and certain hospitals became more likely to be affected that some sort of super notice would be required. The notice received by plaintiffs was sufficient.

St. Joseph Hospital of Cheektowaga v. Novello, 15 Misc.3d 333, 343-44 (Erie County 2007)

("St. Joseph").[10] The State's actions were reasonably calculated to put Andrus on notice of the

pendency of the Commission's proceedings, and indeed Andrus was actually on notice of them.

"Due process requires no more." Dusenberry, 534 U.S. at 173; see Weigner v. New York, 852

F.2d 646, 652 (2d Cir. 1988) (city fulfilled its notice obligation by informed interested parties of

foreclosure proceeding and available remedies; "it was not required to send additional notices as

each step in the foreclosure proceeding was completed or when each of the available remedies

was about to lapse").[11]

---

[10]    A different conclusion recently was reached in Cmty. Hospital at Dobbs Ferry v. Novello, No. 24650/06 (N.Y. Sup. Ct., West. Cty. July 10, 2007), another case challenging implementation of the Enabling Legislation. There, the court found that plaintiff hospital was likely to prevail on its due process claim because the Berger Commission "reviewed every hospital and nursing home in New York State without identifying which facilities were likely to be recommended for closure." This "generalized notice," it held in conclusory fashion, was insufficient to satisfy procedural due process. The decision neither cites any due process cases nor applies the due process analysis required by Matthews and its progeny. Defendant respectfully submits that the decision is not supported by federal case law and will be overturned on appeal. A copy of the decision is annexed to the Gasior Aff. as Exh. D.

[11]  Indeed, if Andrus' theory of proper notice had been applied, it likely would have led to undesirable results. Had the Commission notified some facilities that they were being considered for closing before deliberations were complete, Andrus would, with some justification, argue that the Commission had engaged in some measure of pre-judgment. The most reasonable and fair means of notice under the circumstances was to let all facilities know from the outset that they could be selected for closing or other restructuring.

## 2.    Andrus had a meaningful opportunity to be heard.

Equally unavailable is Andrus' claim that it had no "meaningful opportunity to be heard," Complaint, ¶ 75.  Andrus, like all other facilities in the State, had frequent opportunities to influence the Commission process, including with respect to the very errors it now claims the Commission made.

"[D]ue process is flexible and calls for such procedural protections as the particular situation demands."  Morrissey v. Brewer, 408 U.S. 471, 481 (1972).  It does not necessarily require a trial-type hearing, RR Village Association, Inc. v. Denver Sewer Corp., 826 F.2d 1197 (2nd Cir. 1987), but rather requires only "some form of hearing" before an individual is finally deprived of a property interest.  Matthews v. Eldridge, 424 U.S. at 333 (1976).  "The fundamental requirement of due process is the opportunity to be heard 'at a meaningful time and in a meaningful manner.'"  Id. at 333.  In determining whether the process provided was sufficient, courts weigh: (1) "the private interest that will be affected by the official action"; (2) "the risk of an erroneous deprivation of such interest through the procedures used, and the probable value, if any, of additional or substitute procedural safeguards"; and (3) "the Government's interest, including the function involved and the fiscal and administrative burdens that the additional or substitute procedural requirement would entail."  Id. at 335.

Here, Andrus was informed of objective data upon which the Commission would rely in rendering its determinations with respect to each hospital and nursing home, and was provided an opportunity to submit corrected and/or updated information.  The Commission and the RACs conducted nineteen public hearings statewide, including three in the Hudson Valley.  Sandman Aff. ¶ 18.  Andrus was invited to participate in public hearings, though it did not do so.  Id.  It

13

also was offered the opportunity to engage in voluntary rightsizing discussions under the

supervision of the Commission and the Department of Health without incurring antitrust liability.

Id. ¶ 19.

     Andrus' own complaint further undermines its claim that it had no meaningful

opportunity to be heard. It acknowledges, first, that its executive director met with the RAC and

Commission staff. Complaint ¶ 43. It also acknowledges that the RAC requested information

from it, id. ¶ 42, and that it submitted considerable information to the RAC and to the

Commission, id. ¶¶ 4, 43, 48, 50. Andrus' real complaint is not that it had no opportunity to

make the Commission aware of its views, but rather that the Commission, having been apprised

of these views, disagreed with them. See, e.g., Complaint ¶ 46 ("The Andrus' Executive

Director informed the Hudson Valley RAC that the Andrus was financially stable and provided

supporting data. Nevertheless, without a proper factual basis, the Hudson Valley RAC appears to

have reached the very opposite conclusion.").

     A comparison with the process afforded other facilities at similar risk, moreover, suggests

that any deficiencies in the information available to the Commission were caused by Andrus'

own lack of diligence in presenting its case. See Sandman Aff. ¶ 25 (describing efforts of

another affected hospital). For example, unlike other facilities, Andrus did not participate in

public hearings. Sandman Aff. ¶ 18. A constant refrain in Andrus' complaint is that the

Commission and its staff failed to visit its facility or speak with its staff and residents. See

Complaint ¶¶ 5, 6, 44, 58. But it would have been unreasonable for the Commission,

unprompted, to conduct such extensive visits at each facility in the state, or even each facility

ultimately targeted for closure or restructuring. There is no evidence that, if Andrus believed

14

such visits would have been invaluable, it could not have arranged them. Fundamentally,
Andrus' suggestion is that the burden was on the Commission, not itself, to make its case for
remaining open. It has not established that the Commission's procedures failed to provide it with
the opportunity to be heard, which is all that due process requires; at most, it has established that
it failed to fully take advantage of the opportunities provided.

In any event, the Commission did receive and work from accurate data. See Sandman
Aff. ¶¶ 29-36. Andrus does not substantiate its misleading claim that the Commission based its
recommendation on "several fundamentally flawed assumptions about the Andrus' current
financial status and nursing home operations."[12] Complaint ¶ 53. For example, contrary to
Andrus' claim that the Commission mistakenly called it a 247-bed facility, id. ¶ 54, the
Commission specifically noted that Andrus was in the process of selling 50 beds, and calculated
Andrus' occupancy rate based on both 197 and 247 available beds. See Sandman Aff. Exh. B at
123. Similarly, after stating that the facility "had been operating at a significant loss until 2006,"
a fact that Andrus does not dispute, the Commission specifically noted Andrus' claim that "it is
now operating in the black." Id. Andrus' complaint that the Commission characterized this as a
"claim" rather than a "fact," Complaint ¶ 55, is a quibble about wording rather than substance, as
the Commission did not challenge the claim.

---

[12] Andrus' claims regarding inaccuracies in the Hudson Valley RAC's report, see Complaint
¶¶ 41-51, would be irrelevant even if true, so long as those inaccuracies did not make their way into
the Commission Report, the only state action at issue. But in any case, the Hudson Valley RAC's
report reveals that, far from ignoring Andrus' contentions that its financial situation was improving
and its facially low occupancy rate was somewhat misleading, the RAC accepted these premises as
true. See Hudson Valley RAC Report at 10 ("After speaking with the Administrator, the Committee
is less concerned about the financial stability . . . than about the low acuity of their patients.").
Andrus does not claim that the RAC was mistaken about the low acuity of its patients, the major
factor driving the RAC's recommendation.

15

The Commission's statement that "about half" of Andrus' residents had low-acuity conditions and could be better served in an ALP, Sandman Aff. Exh. B at 123, is fully consistent with Andrus' statement that "many" of its residents require 24-hour nursing home care, Complaint ¶ 57, and would have to be transferred to another facility for such care, id. ¶ 58. Far from ignoring Andrus' previous failure to win local approval to convert its campus into a continuing care retirement community, see id. ¶ 62, the Commission specifically acknowledged this. See Sandman Aff. Exh. B at 123. As the Commission's executive director states, the Commission believed its recommended conversion of Andrus to "a single structure assisted living facility" would be "possibly more acceptable to the local community than the proposed continuing care retirement community, which included construction of over 200 new independent living units along with the continued operation of a nursing home." Sandman Aff. ¶ 34. Finally, Andrus cannot substantiate its claim that the Commission wrongly believed that Andrus had been cited for 26 deficiencies in 2005, Complaint ¶ 66. See Sandman Aff. ¶ 35 (explaining that Commission was correct).

Given that Andrus has not shown that the Commission made any of the errors it attributes to the Commission, it cannot demonstrate that any of the additional procedural steps it claims the Commission should have taken would have meaningfully reduced the risk of erroneous deprivation. It certainly has not shown that any such reduction could outweigh the monumental increase in administrative burden that it argues the Commission should have shouldered by conducting site visits with staff and patient interviews at each potentially affected facility. Andrus' claim of a procedural due process violation should be dismissed.

16

**C.    Andrus Received Substantive Due Process Because The Procedures Employed By The Commission Were Neither Arbitrary Nor Outrageous**

To make out a claim for a violation of substantive due process, plaintiffs must show (1) the existence of a constitutional right, and (2) state action interfering with that right which is constitutionally "arbitrary." Lowrance v. Achtyl, 20 F.3d 529, 537 (2nd Cir. 1994). Beyond Andrus' lack of a cognizable property interest, it can prove no set of facts that would render the Commission's recommendations "arbitrary."

An "arbitrary action" in this context means much more than just an "incorrect or ill-advised" action. It must be "conscience-shocking," see, e.g. Lowrance at 537; see also County of Sacramento v. Lewis, 523 U.S. 833 (1998). "[S]ubstantive due process standards are violated only by conduct that is so outrageously arbitrary as to constitute a gross abuse of governmental authority." Bower Assocs. v. Town of Pleasant Valley, 2 N.Y.3d 617, 628-29 (2004) quoting Natale v. Town of Ridgefield, 170 F. 3d 258, 263 (2d Cir. 1999). The plaintiff must show that the governmental action was wholly without legal justification. Id. at 627; see also Town of Orangetown v. Magee, 88 N.Y.2d 41, 42 (1996); Niagara Recycling, Inc., v. Town of Niagara, 83 A.D.2d 316, 327 (4th Dept. 1981).

As a matter of law, the joint and several actions of the Defendant and the Commission which have set Andrus on the course to closure cannot be regarded as arbitrary or outrageous. Their actions fall squarely within the State's police power. See, e.g., Medtronic, Inc. v. Lohr, 518 U.S. 470, 475 (1996); Medical Soc. of the State of New York v. Cuomo, 976 F.2d 812, 816 (2nd Cir. 1992) ("The regulation of public health and cost of medical care are virtual paradigms of matters traditionally within police powers of the state.").

In St. Joseph, the Erie County Supreme Court has rejected a virtually identical challenge:

17

Unless there is a showing of both a property right and that the actions of the state or municipality were made "wholly without legal justification," claims under substantive due process cannot lie. . . . Where the state acts under its police power for the welfare of its citizens, those actions do not constitute a violation of any substantive due process rights.

The legislative findings contained in Section 1 of the Enabling Act demonstrate that the actions of the State in enacting the Enabling Act were in furtherance of its police power by evaluating the State's health care system and by aligning health care resources in a stable and efficient manner.

St. Joseph, 15 Misc.3d at 342. Beyond any genuine material dispute, the Commission had data available upon which it could rationally determine that Andrus Hospital should be slated for closure. Accordingly, Andrus' substantive due process claim cannot proceed.

## POINT II
## ANDRUS CANNOT SUBSTANTIATE A "TAKING" CAUSE OF ACTION

In its third and fourth claims for relief, Andrus asserts that implementation of the Commission's recommendations affecting Andrus constitutes two distinct Takings Clause violations, one stemming from the "taking" of Andrus' operating certificate, Complaint ¶¶ 80-82, and the other stemming from the alleged loss of assets caused by and costs incurred as a result of carrying out the Commission's recommendations, id. ¶¶ 83-85. Andrus does not argue that the State should pay compensation; it argues only that Defendant should be enjoined from fulfilling the mandate which will eventually bring about Andrus' closure. Id. at 82. Neither theory presents an actual Takings Clause violation.

With respect to Andrus' operating certificate, as discussed above, no nursing home or hospital in New York State has a legitimate expectation that it will hold its operating certificate in perpetuity. An Article 28 operating certificate, like other licenses created by the government, can be cancelled by the government and is not transferable; such a license may be categorically

18

exempt from a takings claim.  See, e.g. American Pelagic, 379 F.3d 1363, 1373 (Fed. Cir.

2004); Acton v. United States, 401 F.2d 896, 899 (9th Cir. 1968); Burns Harbor Fish Co. v.

Ralston, 800 F. Supp. 722, 726-29 (S.D. Ind. 1992) (collecting cases).  Moreover, while the

assets of a business are "property," and any State taking of those assets may be a "deprivation,"

it is well established that "the activity of doing business or of making a profit is not property at

all."  College Sav. Bank v. Florida Prepaid Postsecondary Educ. Expense Bd., 527 U.S. 666,

667 (1999).  The Second Circuit has recognized that the loss of a future business opportunity is

not a protectable property interest.  See Asbestec Const. Serv. Inc. v. U.S. E.P.A., 849 F.2d 765,

769-70 (2nd Cir. 1988); see also Sanitation & Recycling Ind., Inc. v. City of New York, 928 F.

Supp. 407, 420-21 (S.D.N.Y. 1996), aff'd, 107 F.3d 985 (2nd Cir. 1997) ("right" to continue

business on same terms as in the past is not a protectable property right); see also Hunter v.

SEC, 879 F. Supp. 494, 497 (E.D. Pa. 1995) (examining lost potential business opportunities).

      With respect to its second takings claim, Andrus has not made clear in what respect it

believes it suffered a taking of its other assets.  The most obvious categorical "taking" is a direct

government seizure or physical invasion of private property.  See, e.g., United States v. Pewee

Coal Co., 341 U.S. 114 (1951).  No such situation is presented in this action.  Nor does Andrus

allege that the government requires it to suffer a permanent physical invasion of property, see,

e.g. Loretto v. Teleprompter Manhattan CATV Corp., 458 U.S. 419 (1982) (state law required

landlords to permit cable companies to install cable facilities in apartment buildings).  Nor,

finally, has Andrus been deprived of "all economically beneficial use" of its property.  See

Lucas v. South Carolina Coastal Council, 505 U.S. 1003, 1019 (1992) (emphasis in original).

Andrus may convert its nursing home into other uses, such as the Commission's

recommendation to add assisted living and possibly other non-institutional services. Andrus

occupies 26 acres of real estate in Westchester County, Complaint ¶ 62, property which can

readily be put to economically robust uses. Compare Lucas, 505 U.S. at 1020 (taking found

where trial court determined that parcel of land had "been rendered valueless" by government

action).

Indeed, Andrus has made no showing that the economic value of its property has been

reduced in any way, let alone to the unusual degree required to make out a constitutional claim.

See Penn Central, 438 U.S. at 124 ("[G]overnment may execute laws and programs that

adversely affect recognized economic values."). All that has happened here is that the State,

which previously saw fit to grant Andrus a license to operate a certain type of facility on its

premises, has withdrawn that permission. It has not restricted Andrus' use of its property in any

way beyond the general rule, not challenged here, that only those who are granted operating

certificates may operate health care facilities. As such, there is no genuine "takings" claim

before the Court.

Finally, to the extent that Andrus complains of the costs potentially associated with

carrying out the Commission's recommendations, see Complaint ¶ 84, its recourse right now is

a suit in the New York Court of Claims for compensation, not a Takings Clause claim before

this Court for injunctive relief. Not until the State actually fails to provide adequate

compensation for a supposed taking is a takings claim ripe. See San Remo Hotel, L.P. v. City &

County of San Francisco, 545 U.S. 323, 327 (2005). Moreover, the State has provided an

administrative process by which millions of dollars are currently available to assist facilities in

carrying out the Commission's recommendations. Benjamin Aff. ¶ 25. Because Andrus has not

20

attempted to secure compensation either administratively or in the Court of Claims, this Court should not entertain its takings claim.

## POINT III
## ANDRUS' CONTRACTS CLAUSE CLAIM MUST FAIL

Andrus' fifth claim for relief contends that Andrus has an enforceable interest in maintaining contractual relationships with physicians, staff and vendors, which depend upon Andrus' retention of its operating certificate. See Complaint, ¶¶ 86-89. This claim can be quickly disposed of, as Andrus fails to plead, let alone establish, a Contracts Clause violation. While Andrus may subjectively desire to maintain those relationships, as a matter of law they provide no basis for its ostensible cause of action.

The protections of the Contract Clause do "not trump the police power of a state to protect the general welfare of its citizens, a power which is 'paramount to any rights under contracts between individuals.'" Buffalo Teachers Fed'n v. Tobe, 464 F.3d 362, 367 (2d Cir. 2006), cert. denied 127 S. Ct. 2133 (2007) ("Buffalo Teachers"), quoting Allied Structural Steel Co. v. Spannaus, 438 U.S. 234, 241 (1978). The Supreme Court "has long recognized that a statute does not violate the Contract Clause simply because it has the effect of restricting, or even barring altogether, the performance of duties created by contracts entered into prior to its enactment. . . . The Contract Clause does not deprive the States of their 'broad power to adopt general regulatory measures without being concerned that private contracts will be impaired, or even destroyed, as a result.' " Exxon Corporation v. Eagerton, 462 U.S. 176, 190 (1983) (citations omitted). Thus, a simple allegation that a state law impairs an obligation under a contract, which is all that Andrus alleges, see Complaint ¶ 87, does "not necessarily give rise to

21

a viable Contracts Clause claim." Buffalo Teachers, 464 F.3d at 368. This cause of action can
thus be dismissed for failure to plead essential elements.

In any event, Andrus cannot come close to making out a Contracts Clause claim. It
cannot even clear the threshold inquiry of establishing that the contractual impairment is
"substantial" in relation to "the reasonable expectations" of those forming the contract. Buffalo
Teachers, 464 F.3d at 368. "If the plaintiff could anticipate, expect, or foresee the governmental
action at the time of contract execution, the plaintiff will ordinarily not be able to prevail." Sal
Tinnerello & Sons, Inc. v. Town of Stonington, 141 F.3d 46, 53 (2d Cir. 1998). Any claim that
a governmental entity's action was unforeseeable is "less potent" where that entity reserved the
right to take the action before the contract was formed. Id. Moreover, even when the
governmental entity had not previously taken the specific action in question, "[w]here an
industry is heavily regulated, regulation of contracts may be foreseeable." Sanitation and
Recycling Indus., Inc. v. City of New York, 107 F.3d 985, 993 (2d Cir. 1997); see id. at 994
("[A]lthough the City has never before regulated the duration of carters' contracts, carters have
been for decades subject to the City's regulations and may be held to have anticipated regulation
of this sort."); Sanitation and Recycling Indus., Inc. v. City of New York, 928 F. Supp. 407, 414
(S.D.N.Y. 1996)(Pollack, J.), aff'd by Sanitation Recycling Indus., Inc. v. City of New York,
107 F.3d 985, 993 (2d Cir. 1997) ("level of scrutiny" given a law "varies inversely with the
degree of prior regulation in a particular industry"). Here, not only is the health care industry
heavily regulated in general, but the Department of Health always reserved the specific right to
revoke or modify Andrus' operating license, either for cause or for lack of public need, even
before the Enabling Legislation. See St. Joseph, 15 Misc. 3d at 347 ("[T]he Enabling Act

22

creates no greater impingement on contract rights than Public Health Law § 2806(6) does."). After the passage of the Enabling Legislation, of course, it was even more foreseeable that Andrus could be required to close or restructure.

And even if Andrus could demonstrate substantial impairment of its reasonable expectations, such impairment is permissible so long as it was a "reasonable and necessary" means of serving "a legitimate public purpose such as remedying a general social or economic problem." Buffalo Teachers, 464 F.3d at 368. There can be no question that the Enabling Legislation served a "legitimate public purpose," as its purpose was neither "a benefit to special interests," Sanitation & Recycling Indus., 107 F.3d at 993, nor "the financial benefit of the sovereign," Buffalo Teachers, 464 F.3d at 368. Rather, it was intended to address the financial and operational crisis in the healthcare industry and reduce overall expenditures by both private companies and the State by cutting excess capacity. See id. at 368-69 ("[C]ourts have often held that the legislative interest in addressing a fiscal emergency is a legitimate public interest."); Sal Tinnerello & Sons, 141 F.3d at 54 ("[T]he economic interest of the state alone may be sufficient to provide the necessary public purpose under the Contract Clause.").

Finally, because the State itself is not a party to the contracts at issue, this Court should "defer to a legislature's determination as to whether a particular law was reasonable and necessary." Buffalo Teachers at 369; see Sal Tinnerello & Sons, 141 F.3d at 54-55 (court should not substitute its judgment for the Legislature's, but reviews legislative choice only for rationality). In any event, because the end of reducing excess capacity could not be accomplished without affecting contract rights, St. Joseph Hosp., 15 Misc. 3d at 347, Andrus

23

cannot claim that the state action was unreasonable or unnecessary. For all these reasons, Andrus' Contracts Clause claim must fail.

<div align="center">

**POINT IV**
**ANDRUS' REQUEST FOR AN INJUNCTION SHOULD BE DENIED**

</div>

Plaintiff's seventh claim for relief (complaint ¶¶ 93-100.) seeks an order enjoining Defendant from implementing the Enabling Legislation and the Commission's recommendations affecting Andrus. That claim cannot be sustained. The seventh claim for relief phrases no new theory of liability. Rather, it incorporates prior causes of action by reference, repeats certain allegations, asserts that "Andrus has a substantial likelihood of success on the merits" (id. at ¶ 97) and states that an injunction is "necessary to maintain the status quo pending resolution of this matter". Id. at ¶ 98. Andrus' seventh claim for relief thus appears to be a request for a preliminary injunction. Andrus has not made a motion for a preliminary injunction and thus the court need not consider this claim.

In any event, a party seeking a preliminary injunction must demonstrate (1) the likelihood of irreparable injury in the absence of such an injunction, and (2) either (a) likelihood of success on the merits or (b) sufficiently serious questions going to the merits to make them a fair ground for litigation plus a balance of hardships tipping decidedly toward the party requesting the preliminary relief. Sunward Electronics, Inc. v. McDonald, 362 F.3d 17, 24 (2d Cir. 2004). As discussed above, there is no likelihood that Andrus will be successful on the merits of its substantive claims. Accordingly, it would not be entitled to a preliminary injunciont, even if it moved for one.

<div align="center">

24

</div>

## CONCLUSION

The Defendant respectfully submits that his Motion for Summary Judgment should be granted and Andrus' complaint dismissed, and the Court should grant such other and further relief as it deems just and proper.

Dated: New York, New York
       July 13, 2007

<div style="margin-left: 40%;">

ANDREW M. CUOMO
Attorney General of the
    State of New York
Attorney for Defendant

By: _____

John P. Gasior
Assistant Attorney General
120 Broadway, 24th Floor
New York, New York 10271
212-416-8570

</div>

TO:   Peter G. Bergmann, Esq.
      Brian McGovern, Esq.
      Cadwalader, Wickersham & Taft LLP
      One World Financial Center
      New York, New York 10281
      Telephone: 212-504-6000

25