# AFFIDAVIT OF NEIL BENJAMIN
# WITH EXHIBITS A THROUGH E

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-------------------------------------------------------------------------------X

JOHN E. ANDRUS MEMORIAL, INC. (d/b/a ANDRUS          :
ON HUDSON),
                                                     :
                              Plaintiff,
                                                     :

              - against -                            :          07-CV-3432

**RICHARD F. DAINES**, as Commissioner of the New York    :
State Department of Health,
                                                     :

                              Defendant.             :

-------------------------------------------------------------------------------X

**AFFIDAVIT IN SUPPORT OF
DEFENDANT'S MOTION FOR
SUMMARY JUDGMENT**

STATE OF NEW YORK    ) ss.:
COUNTY OF ALBANY     )

      **NEIL BENJAMIN**, being duly sworn, deposes and says:

      1.    I am Director of the Division of Health Facility Planning in the Office of Health Systems Management, New York State Department of Health ("Department" or "DOH"). I am familiar with the facts set forth herein.

      2.    I make this affidavit support of defendant's motion for summary judgment.

## THE RECOMMENDATION

      3.    The New York State Commission on Health Care Facilities in the 21st Century ("Commission") recommended that plaintiff "downsize", i.e., close, all 247 nursing home beds and add 140 assisted living program beds and possibly other non-institutional services.

4.      On January 31, 2007, the Department sent a letter to plaintiff

advising plaintiff of the Commission's recommendation and requesting that plaintiff

contact the Department to arrange a meeting if such a meeting was desired. A

copy of this letter is annexed hereto as Exhibit A.

5.      The letter, in acknowledging "the unique circumstances created

by the process," assured facilities that

> the Department is committed to carrying out its implementation
> mandate within the parameters of the Report and enabling
> statute. Appropriate Central and Regional Office Department
> staff will be closely involved in the implementation process, and
> will welcome an ongoing discussion with affected providers as
> we move toward an orderly implementation of the
> Commission's recommendations.

6.      The letter also set out an implementation outline as follows:

•       Meet with DOH, to discuss nursing home closure and plans for

assisted living programs, no later than June 30, 2007.

•       Submit closure plan for nursing home no later than

September 30, 2007.

•       Commissioner to approve nursing home closure plan no later

than December 31, 2007.

•       Submit application for 140 bed assisted living program no later

than December 31, 2007.

•       Commissioner approves assisted living program application no

later than June 30, 2008.

•       Revocation of nursing home operating certificate by

Commissioner no later than June 30, 2008.

- 2 -

7.     The implementation outline is consistent with the Commission's Final Report (page 90), which provides that "the Commissioner shall implement each recommendation as expeditiously as possible, but in no event later than June 30, 2008."

8.     However, the Department acknowledges that if plaintiff were to downsize all 247 nursing home beds and close its facility, the Department would not seek to compel plaintiff to convert the facility to an assisted living program.

9.     Nursing homes are facilities providing nursing care to sick, invalid, infirm, disabled or convalescent persons in addition to lodging and board or health related services (N.Y. Public Health Law § 2801(2)) and must have an operating certificate issued by the Department. N.Y. Public Health Law § 2805.

10.    In contrast, the terms "assisted living" and "assisted living residence" mean an entity which provides or arranges for housing, on-site monitoring, and personal care services and/or home health care services, in a home like setting. N.Y. Public Health Law § 4651(1).

## **THE 50 BED DECERTIFICATION**

11.    While plaintiff makes an issue of its asserted cessation of use of 50 nursing home beds, this is not an issue herein as the Commission in its Final Report considered plaintiff's occupancy, with and without the 50 beds. However, as the issue has been raised, I will explain the legal requirements related to decertification and transfer of nursing home beds.

12.    For periods prior to July 1, 2006, plaintiff possessed an operating certificate to operate a 247 bed nursing home. By a letter dated January 24, 2007, the Department approved a reduction in plaintiff's licensed capacity to 197 beds, effective July 1, 2006. A copy of this letter is annexed hereto as Exhibit B.

- 3 -

13.     Following plaintiff's failure to obtain local zoning approval for the construction of a continuing care retirement community (N.Y. Public Health Law § 4600 et seq.) including 201 independent living units and a 72 bed nursing home, plaintiff entered into an agreement with Beth Abraham Hospital, its partner in the continuing care community application, to transfer 50 nursing home beds to Beth Abraham Hospital in lieu of payment of a promissory note held by Beth Abraham Hospital. A copy of this agreement from 2002 is annexed hereto as Exhibit C. The Department never approved this agreement.

14.     If plaintiff had merely sought to decertify 50 beds, this would have been a fairly routine matter that could have been accomplished within approximately six months of plaintiff submitting a properly documented request.

15.     However, plaintiff sought to transfer the 50 beds to another facility necessitating approval by the New York Public Health Council. In seeking to be allowed to immediately decertify the 50 beds, but still have them treated as available beds at the time of review of the transfer, plaintiff sought extraordinary treatment.

16.     Under New York State law, a facility cannot transfer its operating certificate, which is its license to operate, or its establishment approval or its bed complement. See N.Y. Public Health Law § 2801-a(4). In seeking to obtain the 50 beds, Beth Abraham Hospital would have to obtain establishment approval under N.Y. Public Health Law § 2801-a and possibly construction approval pursuant to N.Y. Public Health Law § 2802 and apply for a revised operating certificate pursuant to N.Y. Public Health Law § 2805.

17.     N.Y. Public Health Law § 2801-a provides that no hospital shall be established without the approval of the Public Health Council. Establishment approval confers upon a sole proprietorship, partnership or corporation the authority

- 4 -

to own and operate a nursing home.  For example, a certificate of incorporation including the power to operate a nursing home cannot be filed with the Secretary of State without first being approved by the N.Y. Public Health Council. N.Y. Business Corporation Law § 201(e), N.Y. Not-for-Profit Corporation Law § 404(o).  In considering such an application the Public Health Council considers the public need for the existence of the institution at the time and place and under the circumstances proposed, the character, competence and standing in the community of the sponsors and the financial resources and feasibility of the proposal (see N.Y. Public Health Law § 2801-a(3)).

       18.     This requirement also applies to an existing nursing home which seeks to purchase existing beds from another nursing home.

       19.     The Public Health Council, which is established pursuant to N.Y. Public Health Law § 220, acts on establishment applications with the advice of the N.Y. State Hospital Review and Planning Council ("SHRPC"). See N.Y. Public Health Law § 2801-a(2).  The SHRPC is established pursuant to N.Y. Public Health Law § 2904.

       20.     Pursuant to N.Y. Public Health Law § 2802 construction of a facility must be approved by the Commissioner of Health.  The SHRPC must be provided an opportunity to make a recommendation on the construction application prior to the Commissioner acting on the application.  When an application for both establishment and construction approval is considered, the process for issuance of both approvals is combined.  The consideration of establishment and/or construction applications is known as the Certificate of Need review process.

- 5 -

21.    The criteria for granting construction approval, which are specified at PHL § 2802(3), are essentially the same as the establishment.[1]

22.    When a party seeks to purchase an existing nursing home or its beds it is necessary to obtain establishment and/or construction approval including consideration of the character and competence of the proposed operator, the financial feasibility of the proposed purchaser and the need for the beds.

23.    In considering public need for nursing home beds, the Department identifies the currently available beds in the planning area which, in this case would be Westchester County, including existing beds and beds that have been approved for construction but are not yet in operation and compares the available beds to the number of needed beds.    10 NYCRR §§ 670.3(a) and 709.3(g).    New beds can only be added if there is a need for the beds.

24.    When an operator seeks to sell a facility or beds that are in operation, the Department will often permit a transfer to a new operator even if there are excess beds in the planning area.    This is not the case when such beds were decertified prior to submission of an application to approve the transfer.    In seeking to be allowed to decertify beds in 2002, but have them treated as available beds at some unknown time in the future when Beth Abraham Hospital might file an application for approval to purchase the beds, plaintiff sought to receive special treatment.

---

[1] Construction approval is necessary for various projects at existing nursing homes including expansions, renovations, capital improvements, etc.  However, the nature of the review is dependent upon the proposed construction including the work proposed and the cost.  10 NYCRR § 710.1(c). Lower cost projects or those that merely update existing facility infrastructure are subject to limited review which does not include consideration of need, only architectural review.  10 NYCRR § 710.1(c)(4).  Such was the case for three construction approvals granted to plaintiff since 2004:
- emergency heating, boiler replacement ($2,970,900) approved on March 17, 2006;
- electrical upgrades ($1,877,000), approved on February 10, 2006; and
- telephone system, brickwork, kitchen and resident room upgrades ($1,072,264) approved on August 5, 2004.

25.     In mid-July 2006, the Department reached a conceptual resolution of this matter allowing decertification of the beds subject to Beth Abraham Hospital submitting an application for approval to purchase the beds within 18 months.  The January 24, 2007, approval (exhibit B) memorialized this agreement.  The Department agreed to make the approval retroactive to July when the conceptual agreement was reached, but no basis exists for using an earlier approval date.

## FUNDING

26.     On May 16, 2007, the Department issued a Request for Application ("RFA") for funding of implementation of commission mandates. Applications for funding were due on July 16, 2007.  A copy of the RFA is annexed hereto as Exhibit D.[2]

27.     Funding was available under the Health Care Efficiency and Affordability Law of New York Capital Grant Program (PHL § 2818) and the Federal-State Health Reform Partnership ("F-SHRP").

28.     F-SHRP, a Federal-State Health Reform Partnership Medicaid Section 1115 Demonstration is the result of a September 29, 2006 agreement between the Department and the U.S. Centers for Medicare and Medicaid Services. A copy of the agreement is annexed hereto as Exhibit E.

29.     The goals of this partnership including promoting the efficient operation of the State's health care system; consolidating and right-sizing New York's health care system by reducing excess capacity in the acute care systems; shifting emphasis in long-term care from institutional-based to community-based settings.

---

[2] As of July 9, 2007, the Department had not received an application from plaintiff.

- 7 -

30.    Under F-SHRP, the federal government will invest up to $1.5 billion ($300 million per year) in agreed upon reform initiatives including initiatives to right size and restructure the acute and long-term care delivery system.

31.    The federal investment in these reforms is conditioned upon the following:

- The F-SHRP waiver must generate federal saving sufficient to offset the federal investment.

- The State must meet a series of established performance milestones set forth in the waiver terms and conditions including a final implementation report regarding the Berger Commission recommendations by July 15, 2008.

32.    The RFA provides facilities which are the subject of Commission recommendations with an opportunity to submit their compliance plan to the Department, along with a request for grant funds to assist with implementation of the requirements.

33.    Applications will be reviewed and granted in conformance with the terms set forth in the RFA.

**WHEREFORE**, it is respectfully submitted that defendant's motion for summary judgment should be granted and the complaint dismissed.

**NEIL BENJAMIN**

Sworn to before me this

11ᵗʰ day of July, 2007

**NOTARY PUBLIC**

HAROLD J. ROSENTHAL
NOTARY PUBLIC, State of New York
No. 4609439
Qualified in Albany County
Commission Expires March 30, 2009
Sept

- 8 -

# EXHIBIT A



# STATE OF NEW YORK
# DEPARTMENT OF HEALTH

Corning Tower    The Governor Nelson A. Rockefeller Empire State Plaza    Albany, New York 12237

January 31, 2007

Ms. Betsy Biddle
Andrus on Hudson Nursing Home
185 Old Broadway
Hastings-on-Hudson, New York 10706

Re:    Commission on Health Care Facilities in the 21ˢᵗ
Century

Dear Ms. Biddle:

In accordance with Section 31 of Part E of Chapter 63 of the Laws of 2005, the Commission on Health Care Facilities in the 21ˢᵗ Century ("the Commission") has been authorized to develop specific recommendations to rightsize and reconfigure health care facilities in New York. Your facility is the subject of at least one of the recommendations contained in the Commission's December 2006 final report, *A Plan to Stabilize and Strengthen New York's Health Care System*, which became law on January 1, 2007 in accordance with Section 9 of Commission statute. All recommendations must be implemented by the Commissioner of Health no later than June 30, 2008.

The purpose of this letter is to advise you of the Department's expectations, as outlined on the enclosure, regarding the steps and deliverables necessary to implement the Commission's recommendations within the required timeframe. This implementation outline will be further defined to develop a process that assures appropriate compliance throughout the timeline.

Acknowledging the unique circumstances created by this process, the Department is committed to carrying out its implementation mandate within the parameters of the Report and enabling statute. Appropriate Central and Regional Office Department staff will be closely involved in the implementation process, and will welcome an ongoing discussion with affected providers as we move toward an orderly implementation of the Commission's recommendations.

Please contact Mr. Neil Benjamin, Assistant Director, Division of Health Facility Planning at (518) 402-0967 should you wish to schedule a meeting to discuss the implementation of this recommendation. In the meantime, your attention to the enclosure is respectfully requested.

Sincerely,

David Wollner
Director
Office of Health Systems Management

Enclosure
cc:    Regional Office Director

New York State Department of Health Implementation of Recommendation by the Commission on Health Care Facilities in the 21st Century

Facility Name:      **Andrus on Hudson Nursing Home**

Commission Region:       Hudson Valley
                        Long Term Care # 2

Commission Recommendation:

It is recommended that Andrus-on-Hudson downsize all 247 RHCF beds and add 140 ALP beds and possibly other non-institutional services.

*Note: Integral to an understanding of the above recommendation and terms used therein are the definitions contained in preface material of the Commission's final report. The final report is available on the Commission's website at www.nyhealthcarecommission.org and the Preface is located on page 86-90. You are urged to become familiar with these terms.*

Affected Facilities:      **Andrus on Hudson Nursing Home**

Outline of Implementation:

- Meet with DOH, to discuss NH closure and plans for ALP, no later than 6/30/07.

- Submit closure plan for NH no later than 9/30/07.

- Commissioner to approve NH closure plan no later than 12/31/07.

- Submit application for 140 bed ALP no later than 12/31/07.

- Commissioner approves ALP application no later than 6/30/08.

- Revocation of NH operating certificate by Commissioner no later than 6/30/08.

EXHIBIT B

# STATE OF NEW YORK
# DEPARTMENT OF HEALTH

Corning Tower    The Governor Nelson A. Rockefeller Empire State Plaza    Albany, New York 12237

January 24, 2007

Mr. Robert Wild
111 Great Neck Road
Great Neck, New York  11021

Dear Mr. Wild:

The Department of Health approves the request of Andrus on Hudson ("Andrus") for permanent decertification of 50 RHCF beds, to a licensed capacity of 197 beds. This approval is effective as of July 1, 2006, the approximate date that the Department advanced verbal approval of the decertification and treatment of the beds as enumerated below.

This approval is advanced in consideration of the agreement negotiated between Andrus and Beth Abraham Health Services ("BAHS") dated July 3, 2002, in settlement of a contractual issue, and in recognition of the due diligence invested into discussions between the two parties. Continued inclusion of these 50 beds on the Andrus operating certificate, absent the ability to admit patients pursuant to terms of the Agreement, has created a financial hardship for Andrus, particularly as it prepares to implement the recommendations of the Commission on Health care Facilities in the 21st Century ("Commission"). Furthermore, the Department acknowledges both our agreement in principle to this bed decertification in discussions with both parties, toward the end of Summer 2006, and reference to the Agreement in the description section of the Commission recommendation for Andrus.

This letter also will serve to memorialize the Department's commitment to BAHS regarding the duration of time that the 50 beds will be considered as part of the existing statewide RHCF bed resource for purposes of processing a CON application. The DOH agrees  to recognize these beds as part of the existing resource for a period not to exceed 18 months, beginning January 1, 2007. This timeframe requires submission of a change-in-ownership CON for the 50 beds no later than Dec. 31, 2007, for processing through to the Public Health Council (PHC)  during the subsequent 6 months. PHC approval is required to advance Article 28 operating authority to BAHS.

Should the CON application fail to proceed to the PHC no later than June 30, 2008, the subject 50 beds will be removed from the existing resource, and the CON withdrawn from processing. This timeline may be adjusted by the Department if extenuating circumstances are encountered on the part of the Department and/or circumstances occur that are beyond the control of BAHS.

Please contact Neil Benjamin at (518) 402–0967 should you have any questions.

Sincerely,

David Wollner
Director
Office of Health Systems Management

cc: Peter Bergmann

# EXHIBIT C



# CADWALADER

*Cadwalader, Wickersham & Taft*

100 Maiden Lane
New York, NY 10038
Tel: 212 504-6000
Fax: 212 504-6666

August 1, 2002

New York
Charlotte
Washington
London

## VIA FEDERAL EXPRESS

Robert B. Kay, Esq.
Kay & Boose LLP
One Dag Hammarskjold Plaza
New York, New York 10017-2299

Re:    JEAM/Beth Abraham Health Services

Dear Bob:

I am enclosing two fully executed counterparts of each of the following closing documents, all of which are dated as of July 3, 2002:

1.    The agreement between BAHS and JEAM;

2.    The Guaranty executed on behalf of Helen A. Benedict Foundation, Inc. ("HBF");

3.    The Assignment and Transfer Agreement between BAHS and JEAM;

4.    The Release executed on behalf of JEAM, HBF and Surdna Foundation, Inc.;

5.    The Release executed on behalf of BAHS; and

6.    The letter agreement from BAHS to JEAM with respect to JEAM's ability to terminate contracts with affiliates of BAHS.

I am also enclosing the original Promissory Note in the amount of $2,775,000 dated July 3, 2002 made by JEAM, which we have stamped "cancelled".

By copy of this letter, I am advising John Lynagh that I do not yet have a copy of the minutes of the meeting of July 3, 2002 of the members of JEAM and the amended by-laws, effective as of the Closing, which delete all references to the Class B Members and Directors and which replace the First Amended and Restated By-laws.

Sincerely,

Peter G. Bergmann

Enclosures

cc:    Mr. Lynagh



AGREEMENT dated as of the 3rd day of July, 2002, by and between **BETH ABRAHAM HEALTH SERVICES**, a New York not-for-profit corporation with an office located at 612 Allerton Avenue, Bronx, New York 10467 ("BAHS"), and **JOHN E. ANDRUS MEMORIAL, INC.**, a New York not-for-profit corporation with an office located at 185 Old Broadway, Hastings-on-Hudson, New York 10706-3801 ("JEAM").

WHEREAS, the parties entered into an agreement dated as of February 10, 1997, as amended by the First Addendum dated as of November 10, 1997 and the Second Addendum dated as of December 28, 1998 (the "Restructuring Agreement"), which provided for the restructuring of the membership and the Board of Directors of JEAM, and for the ongoing operation of the long term care facility located at 185 Old Broadway, Hastings-on-Hudson, New York 10706-3801 (the "Home") operated by JEAM;

WHEREAS, simultaneously with the execution of the Restructuring Agreement, BAHS and JEAM entered into a Consulting Agreement, pursuant to which BAHS furnished consulting services to JEAM with respect to the operation of the Home for a period that terminated as of the First Restructuring, as such term is defined in the Restructuring Agreement;

WHEREAS, BAHS wishes to arrange for the withdrawal and resignation of its designees as members, directors and officers of JEAM, and the parties wish to terminate the Restructuring Agreement and resolve the financial arrangements between the parties, and in connection therewith, to provide for the transfer of the authority to operate, and the relocation of, fifty (50) nursing facility beds from JEAM to BAHS (the "License").

NOW, THEREFORE, in consideration of the mutual agreements which follow and other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, BAHS and JEAM, intending to be legally bound, hereby agree as follows:

### 1. Financial Accommodations

JEAM shall arrange for the payment by the Helen A. Benedict Foundation, Inc. to BAHS of $3,700,000 at the closing (the "Closing") to take place at the offices of Cadwalader, Wickersham & Taft, 100 Maiden Lane, New York, New York 10038 at 2 P.M. on July 3, 2002 (the "Closing Date"), to, among other things, reimburse BAHS in part for advances made by BAHS to fund the development of a continuing care retirement community at the Home and compensate BAHS for project and facility expenses incurred by BAHS in connection with the operation of the Home. This payment shall be made at the Closing by:

(a) Delivery by JEAM of a check to BAHS in the amount of $925,000;

(b) Delivery by JEAM of a fully executed promissory note payable on July 31, 2002 in the amount of $2,775,000 unconditionally guaranteed by Helen A. Benedict Foundation, Inc. in the form annexed hereto as Exhibit A; and

(c) Delivery by Helen A. Benedict Foundation, Inc. of a fully executed unconditional guaranty of the promissory note in the form annexed hereto as Exhibit B.

### 2. Termination of Restructuring Agreement

The Restructuring Agreement shall terminate as of the Closing Date upon delivery of the items described in Section 4 below. No obligations contained in the Restructuring Agreement shall survive such termination.

### 3. License Transfer

In recognition of BAHS's efforts over the last five years to develop an Article 46 continuing care retirement community and its assistance with the ongoing operation of the Home, JEAM hereby assigns, sells and transfers to BAHS (or an affiliate or other designee of BAHS) all of JEAM's right and title to, and interest in, the License. JEAM shall execute and deliver to BAHS a fully executed assignment and transfer agreement in the form annexed hereto

2

as Exhibit C at the Closing. JEAM covenants and agrees to comply with all applicable laws in operating the Home, and to retain the ability and authority to effectuate the assignment, sale or transfer (subject to any governmental approvals that may be required) of all of JEAM's right and title to, and interest in, the License to BAHS or any third party as contemplated in this Section until the New York State Department of Health and any other applicable governmental authority approves the assignment, sale or transfer and the License has been effectively transferred. Subsequent to the Closing, JEAM will not act or purport to act as if it has any right or power to own, operate, relocate or control the fifty (50) nursing facility beds reflected in the License, and JEAM and its successors and assigns will be bound by the covenants and obligations set forth in this Section, including in any reorganization, liquidation or dissolution of JEAM, or the closure of the Home. In the event that JEAM enters into any agreement or takes any action with respect to the operations of JEAM or the Home, including, but not limited to, engaging in any merger, consolidation, combination, joint venture, disposition of assets or properties, or transfer of control, JEAM agrees to require any party involved in the transaction to agree to be bound by the covenants and obligations set forth in this Section. The parties respectively covenant and agree to undertake all reasonable action required to obtain all applicable consents, approvals, waivers and' agreements of any third parties (including, without limitation, the New York State Department of Health) as may be necessary to consummate the assignment, sale or transfer of the License to BAHS (or an affiliate or other designee of BAHS) by the earliest possible date, and to cooperate fully to effect the governmental approvals of the assignment, sale or transfer of the License, all of the foregoing at BAHS's expense. JEAM acknowledges that it has received valid consideration for the assignment, sale or transfer of the License and will execute a Certificate of Need application to decertify fifty (50) of its nursing facility beds if requested by BAHS as well as execute any other documents necessary to effectuate the governmental approvals of the

3

assignment, sale or transfer of the License, all of the foregoing at BAHS's expense. JEAM's obligations pursuant to the preceding sentence shall not continue beyond December 31, 2003. In the event that the transfer is not approved by all applicable governmental authorities on or before the first anniversary of the Closing Date, at the option of BAHS, JEAM shall be designated to act as BAHS's agent to assign, sell or transfer all of its right and title to, and interest in, the License to a third party designated by BAHS and shall deliver all of the proceeds of any such assignment, sale or transfer to BAHS less any expenses reasonably incurred by JEAM in connection with such transaction. BAHS shall indemnify and hold harmless JEAM from and against any claims, causes of action, liabilities, costs and damages of any nature whatsoever, arising out of or in connection with JEAM's performance of any of the actions referred to in this Section 3 in accordance with this Agreement or at the request or direction of BAHS.

**4. Documents to be Delivered at Closing**

All transfers and deliveries required to be made hereunder at the Closing shall be deemed to take place simultaneously and to be effective as of the time on the Closing Date that all of such transfers and deliveries have taken place. At the Closing, BAHS and JEAM shall deliver, or shall cause to be delivered, the following:

(a) A check payable to BAHS in the amount of $925,000;

(b) The promissory note provided for in Section 1(b);

(c) The guaranty provided for in Section 1(c);

(d) The assignment and transfer agreement provided for in Section 3;

(e) The releases provided for in Section 7; and

(f) This Agreement.

4

## 5. Resignation of Class B Members and Directors

(a) Upon the Closing, BAHS shall cause the resignation of all the Class B Members and Directors of JEAM, and shall cause all such individuals to resign their positions as officers, or on any committees of the Board of Directors, of JEAM, and the Helen A. Benedict Foundation, Inc., as applicable, effective as of the Closing and shall direct any BAHS personnel to promptly quit the JEAM premises.

(b) JEAM shall adopt amended by-laws as of the Closing to replace the First Amended and Restated By-laws currently in effect, which shall delete all references to the Class B Members and Directors.

## 6. Public Disclosure

The parties to this Agreement shall not authorize, issue, give or make any notification or disclosure to any third party or to the public relating to this Agreement or any of the matters contemplated or provided for herein (other than to Federal, State and local governmental authorities, or as required by law, or to enforce judicially any provision of this Agreement), except in a form to be agreed upon by BAHS and JEAM no later than the Closing Date and except that JEAM shall be entitled to advise third parties that JEAM no longer has any right or power to own, operate, relocate or control the fifty (50) nursing facility beds reflected in the License. In all other respects, this Agreement and its provisions shall be kept strictly confidential.

## 7. Releases

(a) BAHS shall deliver a fully executed release in the form annexed hereto as Exhibit D at the Closing.

(b) JEAM, Helen A. Benedict Foundation, Inc. and Surdna Foundation, Inc. shall deliver a fully executed release in the form annexed hereto as Exhibit E at the Closing.

5

## 8. Transition

(a) JEAM and BAHS shall use their best efforts to expeditiously arrange for the transfer of all administrative functions currently provided by BAHS to JEAM. BAHS shall continue to provide fiscal, payroll, and accounting services to JEAM at no cost through August 15, 2002. Commencing August 16, 2002, if requested by JEAM, BAHS shall provide such services at an hourly rate for each employee of BAHS actually providing such services equivalent to twice their hourly salary in order to reflect non-salary benefits and other direct and indirect costs of BAHS. Under no circumstances shall BAHS be required to continue to provide such services to JEAM after December 31, 2002, provided that BAHS has performed in accordance with this Section. Promptly after the Closing, BAHS shall make available to JEAM, and as soon thereafter as practicable during the transition period BAHS shall deliver, the originals of any JEAM books and records, including any of those listed on Schedule A annexed hereto that are in its possession or control, and all original documentation in the possession of BAHS relating to uncollected JEAM accounts receivable. JEAM and BAHS shall cooperate with each other to facilitate the transfer of all computer operations being performed by BAHS on behalf of JEAM (which shall include a joint request by JEAM and BAHS to install the Reliable software on a CPU at JEAM's premises), and JEAM shall pay any costs of third parties subsequent to August 15, 2002 relating to these computer operations and their transfer to JEAM incurred by BAHS after August 15, 2002. JEAM and BAHS shall also cooperate with each other to facilitate the continuation of all insurance coverage arranged by BAHS on behalf of JEAM until the expiration dates of current policies, and the transfer, extension or replacement of such policies, so that JEAM may be able to maintain continuing coverage for its ongoing operations.

(b) JEAM shall arrange for the employment of a licensed nursing home administrator at the Home qualified as required by New York State law and the regulations

6

promulgated by the New York State Department of Health no later than July 8, 2002.

### 9. Cooperation

Following the Closing, BAHS shall cooperate with JEAM, as may be reasonably necessary, at JEAM's sole cost and expense, in connection with regulatory and litigation matters relating to the operations of JEAM during the period from the First Restructuring, as such term is defined in the Restructuring Agreement, to the Closing.

### 10. Non-Disparagement

The parties agree that they shall not, and shall ensure that none of their respective officers, directors, trustees, administrators, employees, agents and representatives shall not, make any disparaging, negative, or derogatory statements about any other party to this Agreement to any third party or to employees of any other party, including, but not limited to, any of their past, present or future officers, directors, trustees, administrators, employees, agents, representatives or programs.

### 11. Disputes

Any dispute arising from this Agreement or the provisions thereof shall be governed by the laws of the State of New York.

IN WITNESS WHEREOF, the undersigned have executed this Agreement as of the date first above written.

BETH ABRAHAM HEALTH SERVICES

By: _____
Michael Potack
Chairman

7

JOHN E. ANDRUS MEMORIAL, INC.

By: _____

Peter B. Benedict
Chairman

**AGREED TO AND ACCEPTED AS
TO PARAGRAPHS 1, 6, 7(b), AND 10:**

HELEN A. BENEDICT
    FOUNDATION, INC.

By: _____
    Name:   FREDERICK MOON
    Title:   PRESIDENT

**AGREED TO AND ACCEPTED AS
TO PARAGRAPHS 6, 7(b), AND 10:**

SURDNA FOUNDATION, INC.

By: _____
    Name:   FREDERICK MOON
    Title:   DIRECTOR

8

## EXHIBIT A

## PROMISSORY NOTE

**$2,775,000.00**                                                      **July 3, 2002**

FOR VALUE RECEIVED, **JOHN E. ANDRUS MEMORIAL, INC.,** a New York not-for-profit corporation with an office located at 185 Old Broadway, Hastings-on-Hudson, New York 10706-3801 (the "Maker"), unconditionally promises to pay to the order of **BETH ABRAHAM HEALTH SERVICES,** a New York not-for-profit corporation with an office located at 612 Allerton Avenue, Bronx, New York 10467 (the "Holder"), the principal sum of TWO MILLION SEVEN HUNDRED AND SEVENTY-FIVE THOUSAND AND 00/100 DOLLARS ($2,775,000.00), payable as hereinafter provided in lawful money of the United States of America at the office of the Holder at the address set forth above (or at such other place as from time to time may be designated by the Holder).

The principal amount of this Promissory Note shall be due and payable on July 31, 2002 without notice or demand. The Maker may prepay this Promissory Note in full or in part at any time before July 31, 2002 without penalty or premium.

In the event the Maker does not pay this Promissory Note in full on or before July 31, 2002, the Maker will pay the Holder the principal amount plus interest on the overdue amount at the rate of twelve percent (12%) per annum accruing from July 31, 2002.

The liability of the Maker under this Promissory Note is absolute and unconditional regardless of (a) any change in the time, manner or place of payment of, or in any other term of, this Promissory Note, or any other amendment or waiver of or any consent to departure from any of the terms of this Promissory Note; (b) any present or future law, regulation or order of any jurisdiction (whether of right or in fact) or of any agency thereof purporting to reduce, amend, restructure or otherwise affect any term of this Promissory Note; (c) without being limited by the

foregoing, any lack of validity or enforceability of this Promissory Note; and (d) any other defense, setoff or counterclaim whatsoever with respect to (i) this Promissory Note, (ii) the Agreement dated of even date herewith between the Maker and the Holder, or (iii) otherwise, which might constitute a defense, setoff or counterclaim available to, or result in the discharge of, the Maker or a guarantor.

   The Maker represents and warrants that this Promissory Note (a) has been authorized by all necessary action; (b) does not violate any agreement, instrument, law, regulation or order applicable to the Maker; (c) does not require the consent or approval of any person or entity, including, but not limited to, any governmental authority, or any filing or registration of any kind; and (d) is the legal, valid and binding obligation of the Maker enforceable against the Maker in accordance with its terms, except to the extent that enforcement may be limited by applicable bankruptcy, insolvency and other similar laws affecting creditors' rights generally.

   The remedies provided in this Promissory Note are cumulative and not exclusive of any remedies provided by law.

   The Maker waives presentment, demand, notice of dishonor, protest, notice of acceptance of this Promissory Note, and any other formality with respect to this Promissory Note.

   The Maker shall reimburse the Holder on demand for all costs, expenses and charges (including, without limitation, the fees, disbursements and charges of legal counsel for the Holder) incurred by the Holder in connection with the enforcement of this Promissory Note.

   This Promissory Note shall be binding on the Maker, and shall inure to the benefit of the Holder and its respective successors and assigns. The Maker may not assign or transfer its rights or obligations under this Promissory Note.

   This Promissory Note shall be governed by and construed in accordance with the laws of the State of New York. The invalidity, illegality or unenforceability of any provision of this Promissory Note shall not affect or impair the validity, legality or enforceability of the

remainder of this Promissory Note, and to this end, the provisions of this Promissory Note are declared to be severable. No amendment or waiver of any provision of this Promissory Note, nor consent to any departure by the Maker therefrom, shall be effective unless it is in writing and signed by the Holder, and then the waiver or consent shall be effective only in the specific instance and for the specific purpose for which given. No failure on the part of the Holder to exercise, and no delay in exercising, any right under this Promissory Note shall operate as a waiver or preclude any other or further exercise thereof or the exercise of any other right.

All notices, requests and demands to or upon the respective parties hereto to be effective shall be in writing (including by facsimile transmission) and, unless otherwise expressly provided herein, shall be deemed to have been duly given or made (a) in the case of delivery by hand, when delivered, (b) in the case of delivery by mail, three (3) days after being deposited in the mails, postage prepaid, or (c) in the case of delivery by facsimile transmission, when sent and receipt has been electronically confirmed, addressed to the parties at the addresses set forth above (or to such other address as may be hereafter notified by the respective parties hereto).

IN WITNESS WHEREOF, the Maker has caused this Promissory Note to be executed by its duly authorized representative as of the date first set forth above.

MAKER:

JOHN E. ANDRUS MEMORIAL, INC.

By:_____
    Peter B. Benedict
    Chairman

A-3

## EXHIBIT B

## GUARANTY

GUARANTY· dated as of July 3, 2002 made by **HELEN A. BENEDICT FOUNDATION, INC.**, a New York not-for-profit corporation with an office located at 330 Madison Avenue, 30th Floor, New York, New York 10017 (the "Guarantor"), in favor of **BETH ABRAHAM HEALTH SERVICES**, a New York not-for-profit corporation with an office located at 612 Allerton Avenue, Bronx, New York 10467 (the "Holder").

The Guarantor unconditionally and irrevocably guarantees to the Holder the punctual payment of all sums now owing or which may in the future be owing by **JOHN E. ANDRUS MEMORIAL, INC.**, a New York not-for-profit corporation (the "Maker"), under the Promissory Note dated of even date herewith, when the same is due and payable on July 31, 2002 in the original principal amount of $2,775,000, plus any unpaid interest. This Guaranty is a guaranty of payment and not of collection only. The Holder shall not be required to exhaust any right or remedy or take any action against the Maker or any other person or entity or any collateral.

The liability of the Guarantor under this Guaranty is absolute and unconditional regardless of (a) any change in the time, manner or place of payment of, or in any other term of, the Promissory Note, or any other amendment or waiver of or any consent to departure from any of the ·terms of the Promissory Note; (b) any present or future law, regulation or order of any jurisdiction (whether of right or in fact) or of any agency thereof purporting to reduce, amend, restructure or otherwise affect any term of the Promissory Note; (c) without being limited by the foregoing, any lack of validity or enforceability of the Promissory Note; and (d) any other defense, setoff or counterclaim whatsoever with respect to (i) the Promissory Note, (ii) the Agreement dated of even date herewith between the Maker and the Holder, or (iii) otherwise, which might constitute a defense, setoff or counterclaim available to, or result in the discharge of, the Maker or a guarantor.



This Guaranty is a continuing guaranty of the payment of the Maker under the Promissory Note and shall remain in full force and effect until payment is made in full.

The Guarantor represents and warrants that this Guaranty (a) has been authorized by all necessary action; (b) does not violate any agreement, instrument, law, regulation or order applicable to the Guarantor; (c) does not require the consent or approval of any person or entity, including, but not limited to, any governmental authority, or any filing or registration of any kind; and (d) is the legal, valid and binding obligation of the Guarantor enforceable against the Guarantor in accordance with its terms, except to the extent that enforcement may be limited by applicable bankruptcy, insolvency and other similar laws affecting creditors' rights generally. The Guarantor further represents and covenants that it has, and will maintain, sufficient funds to make any payment required under this Guaranty.

The remedies provided in this Guaranty are cumulative and not exclusive of any remedies provided by law.

The Guarantor waives presentment, demand, notice of dishonor, protest, notice of acceptance of this Guaranty, and any other formality with respect to this Guaranty.

This Guaranty shall be governed by and construed in accordance with the laws of the State of New York. The invalidity, illegality or unenforceability of any provision of this Guaranty shall not affect or impair the validity, legality or enforceability of the remainder of this Guaranty, and to this end, the provisions of this Guaranty are declared to be severable. No amendment or waiver of any provision of this Guaranty, nor consent to any departure by the Guarantor therefrom, shall be effective unless it is in writing and signed by the Holder, and then the waiver or consent shall be effective only in the specific instance and for the specific purpose for which given. No failure on the part of the Holder to exercise, and no delay in exercising, any right under this Guaranty shall operate as a waiver or preclude any other or further exercise thereof or the exercise of any other right.

B-2

The Guarantor shall reimburse the Holder on demand for all costs, expenses and charges (including, without limitation, the fees, disbursements and charges of legal counsel for the Holder) incurred by the Holder in connection with the enforcement of this Guaranty. This Guaranty shall continue to be effective or be reinstated, as the case may be, if at any time any payment of the Promissory Note is rescinded or must otherwise be returned by the Holder on the insolvency, bankruptcy or reorganization of the Maker or otherwise, all as though the payment had not been made.

This Guaranty shall be binding on the Guarantor, and shall inure to the benefit of the Holder and its respective successors and assigns. The Guarantor may not assign or transfer its rights or obligations under this Guaranty.

All notices, requests and demands to or upon the respective parties hereto to be effective shall be in writing (including by facsimile transmission) and, unless otherwise expressly provided herein, shall be deemed to have been duly given or made (a) in the case of delivery by hand, when delivered, (b) in the case of delivery by mail, three (3) days after being deposited in the mails, postage prepaid, or (c) in the case of delivery by facsimile transmission, when sent and receipt has been electronically confirmed, addressed to the parties at the addresses set forth above (or to such other address as may be hereafter notified by the respective parties hereto).

IN WITNESS WHEREOF, the Guarantor has caused this Guaranty to be executed by its duly authorized representative as of the date first set forth above.

GUARANTOR:

HELEN A. BENEDICT FOUNDATION, INC.

By:_____
    Name:
    Title:

B-3

## EXHIBIT C

## ASSIGNMENT AND TRANSFER AGREEMENT

AGREEMENT dated as of the 3rd day of July, 2002 by and between **JOHN E. ANDRUS MEMORIAL, INC.**, a New York not-for-profit corporation with an office located at 185 Old Broadway, Hastings-on-Hudson, New York 10706-3801 ("Assignor"), and **BETH ABRAHAM HEALTH SERVICES**, a New York not-for-profit corporation with an office located at 612 Allerton Avenue, Bronx, New York 10467 ("Assignee").

## W I T N E S S E T H :

WHEREAS, Assignor and Assignee have entered into an Agreement dated as of even date herewith (the "Agreement"), pursuant to which Assignor has agreed to assign, sell and transfer to Assignee all of Assignor's right and title to, and interest in, the authority to operate, and the relocation of, fifty (50) nursing facility beds from Assignor to Assignee (the "License").

NOW, THEREFORE, for good and valuable consideration, the receipt and sufficiency of which is hereby acknowledged, Assignor hereby irrevocably sells, conveys, sets over, delivers, assigns and transfers to Assignee the License as of the date hereof.

TO HAVE AND TO HOLD the foregoing License, together with all rights belonging or appertaining to the same in any way to Assignee, its successors and assigns, absolutely to its own use.

It is the intent of Assignor that this Assignment will assign, sell and transfer all of Assignor's right, title and interest in and to the License to Assignee or, at Assignee's request, an affiliate or other designee of Assignee. Assignor warrants to Assignee that it has not engaged in any action or failure to act inconsistent with this Assignment and that, to the best of its knowledge, the foregoing License assigned, sold, and transferred to Assignee hereunder is free and clear of all liens, encumbrances and clouds upon title whatsoever, and that Assignor has good, right and lawful authority to assign, sell, and transfer said License as aforesaid, subject to all necessary governmental consents and approvals.

Assignor further covenants that it shall execute and deliver such additional instruments of assignment, sale, and transfer and shall take such other action as Assignee reasonably may request in order more effectively to assign, sell, and transfer title to Assignee or, at Assignee's request, an affiliate or other designee of Assignee, of said License, all of the foregoing at Assignee's sole cost and expense. Assignor covenants that it shall cooperate fully with Assignee to effect the assignment, sale, and transfer of the License, including, without limitation, execution of a Certificate of Need application to decertify fifty (50) of its nursing facility beds if requested by Assignee as well as execute any other documents necessary to effectuate the governmental approvals of the assignment, sale or transfer of the License, all of the foregoing at Assignee's sole cost and expense.

Assignee hereby accepts the foregoing assignment and transfer.

This Assignment and Transfer Agreement is delivered pursuant and subject to, and in accordance with, the terms and conditions of the Agreement.

This Assignment and Transfer Agreement shall be binding on Assignor, Assignee, and their respective successors and permitted assigns.

This Assignment and Transfer Agreement shall be governed by and construed in accordance with the laws of the State of New York.

IN WITNESS WHEREOF, Assignor and Assignee have caused this Assignment and Transfer Agreement to be executed by their duly authorized officers as of the day and year first above written.

JOHN E. ANDRUS MEMORIAL, INC.

By:_____

Peter B. Benedict
Chairman

C-2

BETH ABRAHAM HEALTH SERVICES

By:_____
   Michael Potack
   Chairman

## EXHIBIT D

## RELEASE

KNOW YE ALL BY THESE PRESENTS (hereinafter referred to as the "Release") that for good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, **BETH ABRAHAM HEALTH SERVICES**, a New York not-for-profit corporation (the "Releasor"), does by this Release remise, release and forever discharge **JOHN E. ANDRUS MEMORIAL, INC.**, a New York not-for-profit corporation, **HELEN A. BENEDICT FOUNDATION, INC.**, a New York not-for-profit corporation, and **SURDNA FOUNDATION, INC.**, a New York not-for-profit corporation, together with their respective officers, directors, trustees, administrators, employees, agents and representatives (hereinafter referred to as the "Releasees"), and Releasees' successors and assigns, from all actions, causes of action, suits, debts, dues, sums of money, accounts, reckonings, bonds, bills, specialties, covenants, contracts, controversies, agreements, promises, variances, trespasses, damages, judgments, executions, claims, and demands whatsoever, in law or equity, which against the Releasees, the Releasor, and Releasor's successors and assigns, ever had, now has or hereafter can, shall or may have, for, upon, or by reason of any manner, cause or thing whatsoever from the beginning of the world to the day of the date of this Release. Nothing in this Release affects in any way (a) the obligations of Releasees created by the Agreement of even date herewith, or (b) any claims of Beth Abraham Health Services arising as a result of the acts of any officers, directors or employees of John E. Andrus Memorial, Inc. while acting on behalf of John E. Andrus Memorial, Inc., if a judgment or other final adjudication has established that such acts were committed in bad faith or were the result of active and deliberate dishonesty and were material to the cause of action so adjudicated, or that the actor personally gained in fact a financial profit or other advantage to which he or she was not entitled, as contemplated by New York Not-for-Profit Corporation Law § 721.

The Releasor further hereby warrants, and covenants to, and agrees with the Releasees, that:

1.    This Release has been duly and validly executed by, for and on behalf of the Releasor, and constitutes the legal, valid and binding obligations of the Releasor, and is enforceable in all respects against the Releasor in accordance with the terms of this Release.

2.    This Release may not be changed orally, and it can be changed only by the written agreement of duly authorized representatives of the Releasor and the Releasees pursuant to this Paragraph 2.

3.    This Release and the rights of the Releasor and the Releasees hereunder shall be governed by, and construed and interpreted in accordance with, the laws of the State of New York, without regard to the conflicts of law rules of the State of New York.

4.    There are no intended or unintended third-party beneficiaries to this Release.

IN WITNESS WHEREOF, the parties hereto, by their authorized representatives, have duly executed this Agreement as of July 3, 2002.

**BETH ABRAHAM HEALTH SERVICES**

By:_____
  Michael Potack
  Chairman

## EXHIBIT E

## RELEASE

KNOW YE ALL BY THESE PRESENTS (hereinafter referred to as the "Release") that for good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, JOHN E. ANDRUS MEMORIAL, INC., a New York not-for-profit corporation, HELEN A. BENEDICT FOUNDATION, INC., a New York not-for-profit corporation, and SURDNA FOUNDATION, INC., a New York not-for-profit corporation (hereinafter individually and collectively referred to as the "Releasors"), do by this Release remise, release and forever discharge BETH ABRAHAM HEALTH SERVICES, a New York not-for-profit corporation, together with its officers, directors, trustees, administrators, employees, agents and representatives (hereinafter referred to as the "Releasees"), and Releasees' successors and assigns, from all actions, causes of action, suits, debts, dues, sums of money, accounts, reckonings, bonds, bills, specialties, covenants, contracts, controversies, agreements, promises, variances, trespasses, damages, judgments, executions, claims, and demands whatsoever, in law or equity, which against the Releasees, the Releasors, and Releasors' successors and assigns, ever had, now has or hereafter can, shall or may have, for, upon, or by reason of any manner, cause or thing whatsoever from the beginning of the world to the day of the date of this Release. Nothing in this Release affects in any way (a) the obligations of Releasees created by the Agreement of even date herewith, or (b) any claims of John E. Andrus Memorial, Inc. arising as a result of the acts of any officers, directors or employees of Beth Abraham Health Services while acting on behalf of John E. Andrus Memorial, Inc., if a judgment or other final adjudication has established that such acts were committed in bad faith or were the result of active and deliberate dishonesty and were material to the cause of action so adjudicated, or that the actor personally gained in fact a financial profit or other advantage to which he or she was not entitled, as contemplated by New York Not-for-Profit Corporation Law § 721.

The Releasors further hereby warrant, and covenant to, and agree with the Releasees, that:

1. This Release has been duly and validly executed by, for and on behalf of the Releasors, and each of them, and constitutes the legal, valid and binding obligations of the Releasors, and each of them, and is enforceable in all respects against the Releasors, and each of them, in accordance with the terms of this Release.

2. This Release may not be changed orally, and it can be changed only by the written agreement of duly authorized representatives of the Releasors and the Releasees pursuant to this Paragraph 2.

3. This Release may be executed in any number of counterparts, each of which shall be an original, but such counterparts shall together constitute but one and the same instrument.

4. This Release and the rights of the Releasors and the Releasees hereunder shall be governed by, and construed and interpreted in accordance with, the laws of the State of New York, without regard to the conflicts of law rules of the State of New York.

5. There are no intended or unintended third-party beneficiaries to this Release.

IN WITNESS WHEREOF, the parties hereto, by their authorized representatives, have duly executed this Agreement as of July 3, 2002.

**JOHN E. ANDRUS MEMORIAL, INC.**

By:_____
    Peter B. Benedict
    Chairman

**HELEN A. BENEDICT FOUNDATION, INC.**

By:_____
    Name:
    Title:

E-2

**SURDNA FOUNDATION, INC.**

By:_____
       Name:
       Title:

## SCHEDULE A – ORIGINAL JEAM DOCUMENTS



Medicare and Medicaid cost reports for the last three years

All third party payor per diem rate calculations in effect in 2002

Description of any outstanding appeals with Medicare or Medicaid regarding rates and reimbursement

All Human Resources related files, including existing or pending union actions, worker's compensation cases, EEO cases, and benefits-related issues

). All documentation relating to existing or pending lawsuits (e.g., letters from attorneys requesting information regarding issues)

1. Cash reconciliation (particularly for accounts from 1/1/02)

2. Accounts receivable listing and all correspondence related to collections

3. All organizational documents and related minutes, correspondence and files

4. All payroll-related information

5. Operating financial statements (P&L with PPDs, budget variance reports) for each month in 2002 and YTD

5. Banking arrangements (specifically, rules regarding facsimile signatures and check limits)

7. All CCRC planning and related documents including floor plans (originals), environmental reports, ALTA surveys, appraisals, market studies, etc.)

3. Certificate of Occupancy

). Fire marshall or applicable state equivalent inspection reports and certificates

). Any notices from federal, state and local agencies and authorities concerning real property, including condemnation, safety and health, environmental, zoning and land use violations

1. Documentation that FFE and MME belongs to JEAM

2. All service, affiliation, professional, and employment contracts

3. All other material contracts, agreements, and understandings

4. All current licenses, permits and certificates necessary in the operation of the facility

5. Descriptions of all pending or threatened actions, arbitration proceedings or claims or investigations, including any by a governmental agency, by individuals employed at the facility, and patient claims, and any orders, judgments or decrees of any court or governmental authority

5. Copies of all state and local tax filings and related documents for the past two years (including payroll tax filings)

7. Sales and use tax returns ( if any) for the last two years

3. Current provider agreements with Medicare, Medicaid, Veteran's Administration, Blue Cross, and others



29. Any special contracts currently in effect to provide patient services (e.g., HMO contracts)

30. List of any major repairs and capital expenditures done in the last three years with respect to the facilities

31. Description of the employee fringe benefits and eligibility definitions

32. Insurance loss runs and claims for the last three years and for 2002, and any documentation of those claims outstanding

33. Resumes for Betsy Biddle and Lauren

34. Most recent DOH inspection reports, including Life Safety Code inspection reports, and any citations, plans for correction and reinspection reports for the current year and preceding two years

35. Copies of any resident complaints and ombudsperson reports received in the last year

36. All financial records for 1999, 2000, 2001 and 2002, including, but not limited to:

    (a) Detailed General Ledgers for the 12 months ended December 31, 2001 and 2000;

    (b) Detailed General Ledger for the six months ended June 30, 2002;

    (c) Detailed transaction listing for the period from June 30, 2001 to the end of transition period;

    (d) Supporting sub-ledgers, such as cash receipts, cash disbursements, payroll, general journal, check registers, and other supporting books of entry;

    (e) Copies of all monthly bank reconciliations for all JEAM accounts from December 1999 through latest available;

    (f) All documents supporting charges to JEAM, for costs such as for insurance, payroll, and other charges;

    (g) All accounts payable supporting documentation and cash disbursement backup;

    (h) Workpapers provided to auditors;

    (i) Workpapers related to information for JEAM tax returns;

    (j) All documents related to auditors and tax return preparation such as G/L combinations;

    (k) All financial statement workpapers and combinations of G/L accounts used to prepare financial statements; and

    (l) Any audit-related workpapers prepared such as ratio analysis and detailed account reconciliations and analysis.

*BETH ABRAHAM HEALTH SERVICES*
*612 Allerton Avenue*
*Bronx, New York 10467*

July 3, 2002

Mr. Peter B. Benedict
Chairman
John E. Andrus Memorial, Inc.
185 Old Broadway
Hastings-on-Hudson, New York 10706-3801

Re:    Beth Abraham Health Services/John E. Andrus Memorial, Inc.

Dear Mr. Benedict:

In connection with the execution of the Agreement dated as of today's date between Beth Abraham Health Services, a New York not-for-profit corporation with an office located at 612 Allerton Avenue, Bronx, New York 10467 ("BAHS"), and John E. Andrus Memorial, Inc., a New York not-for-profit corporation with an office located at 185 Old Broadway, Hastings-on-Hudson, New York 10706-3801 ("JEAM"), pursuant to which the parties will terminate the Restructuring Agreement, and resolve the financial arrangements between the parties, BAHS agrees, at JEAM's written request delivered no less than ninety (90) days before the effective date of a proposed contract termination, to arrange for the prospective termination of any contract made or modified during the period from the First Restructuring to the Closing between JEAM and any affiliate controlled by BAHS or Bethco Corporation, or any entity in which any officers, directors or employees of BAHS having the title of vice president or more senior has a substantial financial interest, without penalty to JEAM and without imposing upon JEAM any obligation beyond paying the fair market value for goods or services actually delivered to JEAM prior to the effective date of such termination. With respect to the agreement entered into with Unitex Textile Rental Services, JEAM agrees that the contractually-agreed price is fair market value, and that said agreement can be terminated without penalty in accordance with the foregoing provisions of this letter agreement. This letter agreement shall terminate on June 30, 2003.

Mr. Peter B. Benedict                    -2-                    July 3, 2002

All capitalized terms used and otherwise defined herein shall have the meanings set forth in the Agreement.

This letter agreement may be amended only by a writing signed by both parties. This letter agreement shall be governed by and construed in accordance with the laws of the State of New York.

Please signify your agreement to the foregoing by executing this letter in the space provided below and returning it to the undersigned at the above address.

Sincerely yours,

BETH ABRAHAM HEALTH SERVICES

By:_____
Michael Potack
Chairman

AGREED TO AND ACCEPTED:

JOHN E. ANDRUS MEMORIAL, INC.

By:_____
Peter B. Benedict
Chairman

# EXHIBIT D

# Request for Applications

### RFA Number <u>0705141214</u>

# Implementation of Commission Mandates

Issued by the
### New York State Department of Health
and the
### Dormitory Authority of the State of New York

*Request for Applications Issued:*      May 16, 2007

*Key Dates:*

| | |
|---|---|
| Information Conference: | May 24, 2007 |
| Applications Due: | July 16, 2007, 3:00 p. m. |

*Information Conference Location:*
Governor Nelson A. Rockefeller Empire State Plaza
Carol F. Huxley Theater, New York State Museum
Albany, New York

Directions are available at http://www.ogs.state.ny.us/visiting/gettingAround/defaultParking.html

## Contact Name & Address:

Robert G. Schmidt
Director, HEAL Implementation Team
New York State Department of Health
Division of Health Facility Planning
433 River Street, 6th floor
Troy, NY 12180
(518) 408-0845
e-mail: CHCFMandates@health.state.ny.us

## New York State Department of Health
### Request for Applications for Implementation of Commission Mandates

### 1.1 Notice of Available Funds

This notice is directed to the 81 facilities subject to the requirements of the Commission on Health Care Facilities in the Twenty-First Century (the Commission). All 81 facilities are mandated to comply with the Commission's requirements and have received separate communications from the Department of Health (DOH) identifying the specific compliance requirements related to their specific circumstances. This application process provides the facilities with an opportunity to submit their compliance plan to the Department in conjunction with a request for grant funds to assist with implementation of the requirements. **It is intended to be the primary and perhaps only opportunity for those facilities to request financial assistance for complying with Commission requirements. Facilities that fail to apply may forfeit any opportunity for future funding.** Compliance plans and applications which do not fully comport with Commission requirements may be returned to the applicant for reconsideration.

As part of this application process, a significant proportion of total available funds are available to reimburse facilities for expenditures they make prior to October 1, 2007. Accordingly, applications that include a request for support for expenses incurred between January 1, 2007, and September 30, 2007, may receive a significantly more favorable response than applications which request support only for expenditures to be incurred in a later period.

Applications will be reviewed on a rolling basis beginning on the date of this notice. Applications received earlier in the review period stand a greater likelihood of being reviewed in a manner that will ensure access to this dedicated pool of funds. **All applications must be received in the Department of Health no later than 3:00 p. m. on July 16, 2007.**

Facilities interested in requesting financial assistance must complete the Application for Financial Assistance attached to this document. In rare instances, such as when complex, ongoing merger negotiations make completing such an application impractical, the Commissioner may grant an extension for filing this financial application. In that event, applicants are required at a minimum to submit a request for an extension, as well as their general plan for complying with the Commission requirements, as described below, and a general description of their expected sources of funds, the intended uses of those funds, the overall cost of any project, historical financial information and the anticipated amount of funds to be requested from the State.

### 1.2 Background

The recommendations set forth in the December, 2006 report of the Commission gained the force of law effective January 1, 2007, and hence assumed the status of a legal mandate. Chapter 63 of the Laws of 2005 requires each of the 81

facilities subject to the Commission mandates to submit to the Commissioner of Health, in a form and manner determined by the Commissioner, an acceptable plan of compliance with the Final Report of the Commission. The same law authorizes and requires the Commissioner of Health to take all steps necessary to implement the Commission's mandates by June 30, 2008, in a reasonable and cost efficient manner.

Funding is currently available under the Health Care Efficiency and Affordability Law (HEAL) and the Federal–State Health Reform Partnership (F-SHRP) to assist facilities in implementing compliance activities that comport with Commission mandates and which are deemed reasonable and cost-efficient by the Commissioner of Health. Any facility interested in requesting financial assistance to meet its Commission mandate must complete the Application for Financial Assistance attached to this notice. While submission of an application for financial assistance is voluntary, facilities are encouraged to apply for assistance at this time, as funding to support the implementation of Commission mandates may not be available in the future. The Department of Health (DOH) and the Dormitory Authority of the State of New York (DASNY) will review requests for HEAL/F-SHRP funds submitted in response to this notice.

### 1.3 Compliance Plan

Earlier this year, each of the 81 hospitals and nursing homes subject to Commission mandates received a letter from the Director of the DOH Office of Health Systems Management (OHSM) advising them of the steps and deliverables necessary to implement the Commission mandate pertaining to their individual facilities. The technical components (sections A through F) of the Application for Financial Assistance attached to this notice will be deemed and reviewed as a plan for compliance with the applicant facility's Commission mandate.

### 1.4 Eligible Applicant

An eligible applicant for the financial assistance available under this announcement must be an entity that is a legally existing organization, capable of entering into a binding contract, and one which is also the following:

- one of the 81 facilities subject to one or more of the 57 recommendations issued in the Commission's report of December, 2006;

**or**

- a corporation established under the Public Health Law as an active member of one or more of the 81 facilities.

3

## 1.5 Deadline for Submission

Requests for financial assistance to support implementation of the compliance plan will be accepted on a continuous basis beginning May 16, 2007. Requests received by July 16, 2007 which fully comply with the Commission's mandate for the applicant facility may receive early review (see Section 1.6).

## 1.6 Basis of Awards

Funds will be awarded in relation to the costs of the required Commission implementation activities for the applicant facility and with consideration of the facility's available resources. Award decisions will be governed by the principles set forth in the Commission's December, 2006 report (see page 230 of the report):

- Public funds for the implementation of Commission mandates must be used judiciously and in the most prudent possible manner;

- Insofar as facilities are capable of funding their own closure, conversion, affiliation, or rightsizing, they must do so;

- The costs of implementation activities must be shared among all interested parties, and the State need only contribute a portion of these costs.

Using these principles, DOH and DASNY will review applications to determine the minimum public investment needed for the proposed project. This approach will provide the basis for negotiation, as needed, of changes in costs and activities proposed by the applicant facility to implement its Commission mandate. In some instances, DOH and DASNY may determine that no public funds are needed for an applicant to successfully implement their specific recommendation.

In the several specific categories of Commission-mandated activities, which are closures, construction, and reorganization (merger, consolidation, affiliation)[1] the State contribution will be further guided by the following principles:

1. Facilities must self-fund proposed activities as much as possible, including through private, third-party financing and, for closures, the sale of assets.

2. State funds will be made available only in the absence of other possible funding.

With the above principles in mind, the applicant must demonstrate a strong level of financial commitment to the implementation of the changes required by the Commission, including a reasonable level of borrowing, if necessary. The applicant must describe how the requested HEAL/F-SHRP funds will complement the facility's own substantial commitment of assets and borrowing to support activities necessary to carry out the Commission's mandated changes.

---

[1] For applications seeking State funds for the support of mergers and affiliations, DOH and DASNY will give more favorable consideration to proposals for full asset merger or affiliation under an active parent, as compared to requests for support of affiliation under a passive parent or some lesser affiliation.

4

Grant moneys will be available to cover funds disbursed by the facility beginning
January 1, 2007, for the applicant facility's implementation of its Commission
mandate. Requests for funding should relate to the entire implementation period.

> **Applicants should note that a significant amount of grant moneys
> will be available to reimburse for funds actually disbursed prior to
> the close of the Federal fiscal year on September 30, 2007.**

During their review process, DOH and DASNY reserve the right to require
additional information from an applicant, e. g., seek a revised financial plan or
clarification or amendment of the implementation plan.

> **An application may receive early consideration for review if it:**
>
> - **Is fully compliant with the Commission's mandate for the facility;**
> - **Has few barriers to implementation;**
> - **Is deemed reasonable, cost-effective and financially feasible;**
> - **Reflects significant expenditures before October 1, 2007.**

### 1.7 Eligible Costs

Funds may be available for planning, legal, architectural, design and consulting
costs. In addition, priority will be given to funds designed to ensure that the health
and safety of the public is preserved during implementation of the Commission's
requirements.

In the case of the closure of a facility, funds may be provided to ensure the safe
and orderly closure of the facility, including costs of closure, severance payments
and retraining expenses; costs of paying off outstanding liabilities; and costs
incurred to maximize the preservation of assets. Equity and efficiency may both
be considered in awarding funds for closing facilities.

In the case of a merger or affiliation, funds may be available to support
restructuring activities designed to effectuate better integration among the facilities.
If it is anticipated that affected facilities will be able to achieve cost savings through
their merger activities, monies may be made available to supplement available
funds upon a demonstration of need.

Specific examples of eligible costs **may include, but are not limited to:**

   a) Legal fees associated with the development and execution of closure
      actions and merger/affiliation/shared governance arrangements, including
      but not limited to:
      o dissolution of governing entities
      o transfer of assets

- o establishment of new corporate governing entities
- o transfer of medical records

b) Consultant fees;

c) Payment of debt;

d) Repayment of outstanding DASNY restructuring pool loans;

e) Discharge of existing long-term debt or mortgage associated with a facility being closed;

f) Security contract for abandoned building/equipment;

g) Retention of medical records;

h) Building insurance during the closure process;

i) Medical malpractice liability obligations during closure;

j) Severance and pension payments and retraining expenses in connection with staff layoffs related to closure, conversion, reorganization or downsizing;

k) Renovation of vacated inpatient space to accommodate ambulatory or community-based services called for in the Commission's report;

l) Expansion/ upgrading of existing space necessary to effect Commission requirements;

m) New construction to achieve shared or consolidated services as required by the Commission;

n) The relocation of beds and/or services associated with the consolidation of services as required by the Commission;

o) Medical equipment associated with the required change;

p) Initiation or expansion of home- or community-based services;

q) Architectural and design fees;

r) Consultant fees and other expenditures associated with the preparation of CON applications and other requests for approval of restructuring activities required by the Commission;

s) Preparation of facility space to accommodate patients and supportive services during renovation and construction.

t) Other costs deemed acceptable by the Commissioner of Health.

6

Applications must include a justification for all costs included in the project budget, along with a discussion of how the expenses relate to the implementation of the Commission's mandate for the applicant facility.

## 1.8 Contracts

If financial assistance is provided, State contracts obligating the funds shall bind the recipient to fully implement the activities described in the funding application and relating to the Commission's mandate for the facility. Failure of the contractor to carry out the Commission's mandate within the required timeframe will result in financial penalty, including the recovery of awarded funds.

Contracts shall also provide for the repayment to the State of funds awarded to the recipient facility to implement its Commission's mandate, when the costs of implementation are recovered, in whole or in part, by the sale of facility real estate, other assets or other transactions.

The State reserves the right to enter into multi-year contracts which may incorporate successive phases of the implementation project.

Contracts awarded to eligible applicants shall require that work performed thereunder shall be deemed "public work" and subject to and performed in accordance with Articles 8, 9 and 10 of the New York State Labor Law; and the contractors performing such work shall also be deemed a State agency for the purpose of Article 15-A of the Executive Law and be subject to the provisions of that article.

## 1.9 Information Conference

An information conference will be held in Albany on May 24, 2007, Empire State Plaza, in the Carol F. Huxley Theater of the New York State Museum, from 1:00 p. m. to 4:00 p. m. to answer questions eligible applicants may have. This conference is not intended to provide a forum to discuss the merits of Commission recommendations, but rather to assist applicants in completing a successful application.

## 1.10  How to File an Application

Applications must be **received** at the following address **by 3:00 PM** on the date shown on the cover page of this RFA.

> Robert G. Schmidt
> Director, HEAL Implementation Team
> New York State Department of Health
> Division of Health Facility Planning
> 433 River Street, 6th Floor
> Troy, NY  12180

7

Eligible Applicants must submit two complete original and signed applications, along with four hard copies of the application and six copies on separate compact discs (CD's). These electronically readable CD's must include a compete copy of the application, readable in Adobe's .pdf format. Application packages should be clearly labeled with the name and number of the RFA as listed on the cover of this RFA document.

Applications should be concise, single-spaced, and use at least a 12-point type.

# New York State Department of Health
# Application for Financial Assistance

To implement a mandate resulting from the December 2006
*Final Report of the Commission on Health Care Facilities in the 21st Century*

## *Cover Page*

**Facility** _____

**Region:** ☐ Central        ☐ Hudson Valley   ☐ Long Island
☐ Northern       ☐ Western         ☐ New York City

**Recommendation Related To:**        ☐ Acute Care      ☐ Long Term Care

**Recommendation #** _____ **(as shown in December 2006 Report)**

**Project Name** _____

**Facility Name** _____

**Applicant Address** _____

_____

**Contact Name** _____

**Title** _____

**Telephone** __(_____)_____

**Fax** __(_____)_____

**e-Mail** _____

**Signature of an individual who would be authorized to bind the Applicant to any
contract resulting from this application:**

**Signature** _____

**Title** _____

**Date** _____

9

New York State Department of Health
# Application for Financial Assistance
To implement a mandate resulting from the December 2006
*Final Report of the Commission on Health Care Facilities in the 21st Century*

# *Format and Instructions*

Earlier this year, each of the 81 hospitals and nursing homes subject to Commission mandates received a letter from the Director of the DOH Office of Health Systems Management (OHSM) advising them of the steps and deliverables necessary to implement the Commission mandates pertaining to their individual facilities. The Compliance Plan must describe the activities that will be undertaken by the facility to attain the specified deliverables. Required elements of the Compliance Plan are as follows:

**NOTE: As described in Section 1.3 of the Request for Applications, submission of Sections A through F below (technical components) will be deemed and reviewed as a Compliance Plan. Facilities seeking financial assistance in relation to this plan must also submit sections G through N.**

## A.    Executive Summary

A brief summary of the proposed implementation project and how it will achieve the closure, conversion, reorganization, or downsizing prescribed for the facility by the Commission.

## B.    Impact on the Institution

A description of how the facility will change through compliance with the Commission's mandate and the implementation of the activities in the associated plan. For example:

- Changes in inpatient, outpatient and community-based services;
- Altered physical plant
- Organizational changes
  o  Changes in governance structure
  o  Consolidation of departments or other units
  o  New approaches to management

- In the case of a merger, joint governance structure, or affiliation, a description of how the plan will assure access to women's health services.

- Benefits to the institution
  o  Savings
  o  Efficiency
  o  Improved creditworthiness

- Community Input
  - Outreach efforts which the facility engaged in to inform the community of the facility's plan and incorporate community concerns into the proposed project.

## C.    Objectives, Tasks and Timeline

A description of objectives to be achieved in progressing toward the outcome prescribed in the Commission's mandate for the facility, with the tasks (sub-objectives) required to attain each objective. These objectives and tasks must be set sequentially within a timeline whose end date is that prescribed in the Commission's mandate for the facility, or sooner, with dates identified for completion of each objective. The objectives and timeline must be consistent with the implementation outline set forth in the January 31, 2007, letter from the Director of the Office of Health Systems Management to the applicant facility.

## D.    Resources for Compliance

A narrative description of the sources and uses of funds required and available to the applicant to implement the compliance plan, including any HEAL/F-SHRP funds being requested in the attached Financial Application.

## E.    Monitoring Plan

The application must describe the methodology that will be used to track progress within the project. The monitoring plan must include a feedback mechanism to identify unforeseen barriers encountered in project implementation and procedures to make needed adjustments in tasks and schedules.

## F.    Reporting Requirements

The facility must submit a monthly report to DOH describing the general progress of the project in carrying the implementation activities described in the technical application. In addition, the facility must submit more detailed quarterly reports which, at a minimum, include:

- Discussion of milestones achieved and evaluation of project status;
- Discussion of any delays or other issues encountered;
- Plan of action for addressing any delays or other issues encountered;
- Objectives for the next reporting period;
- Objectives for the remaining project period;
- Financial report of project expenses and revenues.

Quarterly reports must relate expenditures to the progress of the project in implementing the Commission's mandate for the facility, with reference to the implementation outline and sequence of activities set forth in the January 31, 2007 letter from the Director of the Office of Health Systems Management to the affected facility.

11

## G.    Project Budget

Using the attached schedules, provide a Project Budget and Financial Plan that includes all components of the application, including those that will be funded with sources other than HEAL/F-SHRP grant funds. Also show the amount of each budget planned to be funded with HEAL/F-SHRP funds. **Provide a detailed discussion of the reasonableness of each budgeted item,** describing why the item is relevant and necessary to the project and how the cost was determined. Identify and describe all private or other sources of funding for the project, including governmental agencies or other grant funds.

## H.    Retirement of Debt and Other Liabilities

For retirement of debt, provide a description of material liabilities showing the nature and amount of the liability, whether the liability is secured or unsecured and if secured, a description of the collateral (including estimate of its value) securing the debt. Separately identify each reserve fund or escrow account applicable to each debt by type and amount.

For payroll related liabilities, provide a description of the work force including any collective bargaining relationships, severance policy, and an estimate of WARN act liability (if applicable). Describe any steps being taken to mitigate the liability.

Include broker's estimates of value or appraisals for all real property assets and actuarial studies for pension and malpractice liabilities. The State reserves the right, at a later date, to require an independent appraisal.

## I.    Cost Effectiveness

Describe why the project is a cost-effective investment as compared to other approaches to implementation of the compliance plan. Describe how the requested HEAL/F-SHRP funds will complement the facility's own substantial commitment of assets and borrowing to support activities necessary to carry out the Commission's mandated changes. If applicable, describe how HEAL/F-SHRP funds will be used to ensure that the health and safety of the public is preserved during implementation of the Commission's requirements.

## J.    Financial Feasibility - Non-Closure Projects

Provide a detailed discussion showing how the project will contribute to the institution's financial viability upon completion. Provide a feasibility plan for paying or retiring capital debt. Include supporting documents such as a balance sheet, a profit and loss statement, including a cash flow statement, etc. for the Project through three years after completion.

## K.    Applicant Financial Position

Provide evidence of the financial position of the applicant. This would include a copy of the prior two annual audited financial statements and a year-to-date financial statement, and any other relevant evidence. Entities whose financial statements have not been subjected to an audit must include any additional information available to satisfy this test and appropriate certifications. The applicant should provide a narrative description of balance sheet items, including accounts receivable (age, nature, payor) and all other significant assets (type, age, location, use, net book and market value, restrictions on use) and accounts payable (age, nature, obligee) and other significant liabilities (source, purpose, age, terms, collateral, current / delinquent).

## L.    Certifications

All applicants must provide a signed certification document as provided in Schedule 6.

## M.    General Corporate Information

1.    Provide a list of grants applied for in the last three years and whether the grants were awarded or declined.

2.    Provide the name of any parent, sibling, or subsidiary corporation of the applicant.

3.    Include with the application a copy of Form 990 or evidence of an up-to-date filing with the Attorney General of New York State.

4.    Provide the name and phone number of the person responsible for preparing the applicant's financial statements.

## N.    Schedules

Schedule 1: Project Summary
Schedule 2: Construction Project Costs
            Schedule 2a: Construction Subproject Costs
            Schedule 2b: Construction Subproject Costs by Period
Schedule 3: Closing Project Costs
Schedule 4: Reorganization Project Costs
Schedule 5: Sources of Funds
Schedule 6: Certification Form

All fund sources and expenses associated with the proposed project must be disclosed. Total fund sources should equal total expenses. If fund sources exceed expenses, a detailed explanation must be included. Each schedule must include the name, phone number, and e-mail address of the person responsible for preparing the form.