UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

-------------------------------------------------------------------x
JOHN E. ANDRUS MEMORIAL, INC. (d/b/a          :          filed electronically
ANDRUS ON HUDSON),                            :
                                              :          07-CV-3432 (CLB) (KNF)
                            Plaintiff         :
        -against-                             :
                                              :          **AFFIDAVIT OF JOHN GASIOR**
                                              :          **IN SUPPORT OF DEFENDANT'S**
RICHARD F. DAINES, as Commissioner of the     :          **MOTION FOR SUMMARY**
New York State Department of Health,          :          **JUDGMENT**
                                              :
                            Defendant.        :
-------------------------------------------------------------------x

**STATE OF NEW YORK    )**
                       **: ss.:**
**COUNTY OF NEW YORK  )**

            **JOHN GASIOR**, being duly sworn, deposes and says:

        1.      I am an Assistant Attorney General in the Office of Andrew M. Cuomo, Attorney

General of the State of New York, attorney for the defendant in this action.

        2.      I submit this affidavit in support of defendant's motion for summary judgment

pursuant to Fed. R. Civ. P. Rule 56(b).

        3.      Annexed hereto as Exhibit A is a true and accurate copy of the Complaint served

on defendant in this action. The complaint was filed on or about April 30, 2007.

        4.      Annexed hereto as Exhibit B is a true and accurate copy of defendant's answer,

which was served on June 5, 2007.

        5.      On or about May 30, 2007, plaintiff served its First Request For Production Of

Documents and Interrogatories ("Plaintiff's Discovery").

        6.      On July 2, 2007, defendant served written responses to Plaintiff's Discovery. A

privilege log of documents withheld from production also was served on that date. Documents

which defendant believes to be responsive to Plaintiff's Discovery were produced on June 19, 2007 and June 29, 2007.

7.      Annexed hereto as Exhibit C is a true and accurate copy of McKinney v. Commissioner of New York State Dept. of Health, 2007 WL 1747029 (1st Dep't June 19, 2007).

8.      Annexed hereto as Exhibit D is a true and accurate copy of Cmty. Hospital at Dobbs Ferry v. Novello, No. 24650/06 (N.Y. Sup. Ct., West. Cty. July 10, 2007)

9.      Annexed hereto as Exhibit E is a true and accurate copy of NextG Networks of New York, Inc. v. City of New York, No. 03 Civ. 9672(RMB), 2004 WL 2884308 (S.D.N.Y. 2004).

        **WHEREFORE**, I respectfully request that the Court grant defendant's motion for summary judgment and that the Court grant defendant such other and further relief as the Court deems just and proper.

Dated: New York, New York
       July 13, 2007

                                                 JOHN P. GASIOR
                                                 Assistant Attorney General

Sworn to before me this
13th day of July, 2007

Notary Public

CARRELL A. GILES
NOTARY PUBLIC STATE OF NEW YORK
NO. 01GI4876134
QUALIFIED IN KINGS COUNTY
TERM EXPIRES APRIL 20, 2011

2

# EXHIBIT A

*J. Brennan*
*5/7/07*

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

**JUDGE BRIEANT**
------------------------------------------------------------------------------- x

JOHN E. ANDRUS MEMORIAL, INC. (d/b/a ANDRUS     :
ON HUDSON),

                      Plaintiff,     **07** 07 Civ. **CV**     **3432**

         -against-     :

RICHARD F. DAINES, as Commissioner of the New York     :
State Department of Health,

                Defendant.     :



------------------------------------------------------------------------------- x

## COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

Plaintiff John E. Andrus Memorial, Inc. (d/b/a Andrus on Hudson) (the "Andrus"), by and through its attorneys, Cadwalader, Wickersham & Taft LLP, as and for its complaint against defendant Richard F. Daines, as Commissioner of the New York State Department of Health (the "Commissioner of Health"), respectfully alleges as follows:

### INTRODUCTION

1. This is an action pursuant to 42 U.S.C. § 1983 and 28 U.S.C. §§ 2201-02 for declaratory and injunctive relief arising from defendant's unconstitutional attempt to force the Andrus -- a thriving not-for-profit nursing home caring for approximately 183 infirm elderly residents in Westchester County -- to cease operating as a nursing home, as it has done for the past 53 years of its existence, and instead transform itself at the direction of the State into an entirely new and distinct program -- assisted living -- providing a lower level of care. The

defendant issued his directive to the Andrus under the auspices of implementing the "recommendations" pertaining to the Andrus contained in the Final Report of the New York State Commission on Healthcare Facilities in the 21st Century, often referred to as "the Berger Commission" after its Chair, Stephen Berger.

2. Pursuant to Section 31 of Part E of Chapter 63 of the Laws of 2005 ("the Enabling Legislation"), the Berger Commission was ostensibly granted the extraordinary power to unilaterally decide which hospitals and nursing homes in New York State get to continue operating as such and which must relinquish their operating certificates. By operation of the Enabling Legislation, the Berger Commission's recommendations -- although never actually voted on by the New York State Legislature nor subjected to "due process" or any other form of review -- now have the force of law.

## SUMMARY OF THE ANDRUS' CLAIMS

3. The Andrus brings this action: (a) to challenge the constitutionality of the Enabling Legislation; (b) to vindicate its federal constitutional right of due process of law in its continued operation as a nursing home pursuant to its Operating Certificate; and (c) to enjoin implementation of the Berger Commission's recommendations that the Andrus close its nursing home and "convert" its operations to an assisted living program, or "ALP". As detailed below, the Berger Commission, and defendant or his predecessor, acting under color of state law –

-- failed to provide the Andrus with notice that its facility was being targeted for closure throughout the Berger Commission's secretive deliberations;

-- failed to provide the Andrus with an opportunity to be heard and present evidence directly to the Berger Commission, showing why its closure as a nursing home would contravene and undermine the statutory parameters governing the Berger Commission's already broad exercise of decision-making authority; and

-- mandated the rescission of the Andrus' Operating Certificate based on patently faulty information and mistaken assumptions about the Andrus' financial condition and the continued care needs of its nursing home residents.

4.      Indeed, in deciding to close the Andrus' nursing home, the Berger Commission relied on outmoded financial data and ignored more current information submitted by the Andrus, establishing that the Andrus had achieved financial health and stability, operating at near-full capacity and in the black. Moreover, under the guise of implementing the Berger Commission's recommendations, defendant has imposed a date certain for the closure of the Andrus' nursing home and forced "conversion" to an ALP without first determining (i) whether or how the care needs of the Andrus' nursing home residents can be safely met in the lower assisted living level of care; (ii) whether or how operating an ALP alone on the Andrus' campus is financially feasible; or (iii) whether or how the State will pay for the inevitably high cost of closure and conversion, and compensate the Andrus for the value of its license to operate as a nursing home and other property losses.

5.      Regarding (i) in Paragraph 4 hereof, none of the Commission members or staff ever interviewed the Andrus management or evaluated the medical and functional status of its residents, many of whom will require continued nursing home care.

6.      Regarding (ii) in Paragraph 4 hereof, the Andrus' half-century old building housing its nursing home, from its floor space to the size of its units, is configured to accommodate a 24-hour skilled nursing facility, and cannot be "retrofitted" for assisted living units absent substantial outlays of capital. In this regard, the Berger Commission never inspected the Andrus' plant and overhead cost structure to determine if conversion to an assisted living use was even viable, let alone cost-effective. Nor has defendant assured the Andrus that the governmental funding needed to pay for such a restructuring will be made available to the Andrus.

-3-

7. Regarding (iii) in Paragraph 4 hereof, defendant appears to be proceeding as though the Andrus will be made to either bear the cost of closure and conversion itself by depleting its own charitable assets, even though it is the State that unilaterally mandated that course of action, or offload the cost onto a charitable foundation, even though neither is obligated to bear such cost.

8. Compounding the irrationality of the Berger Commission's edict to shutter the Andrus' nursing home is the fact that – contrary to the Commission's unfounded presumption – this mandate will force the relocation of many of Andrus' residents to another nursing facility in Westchester County in order to ensure continued care and services at an appropriate level, which the assisted living level of care alone cannot provide. That eventuality will not only cause "transfer trauma" for these aged, frail residents, many of whom have called the Andrus their home for years, but also caring for the same residents at other nursing facilities within the vicinity of the Andrus will actually cost the Medicaid program and the rest of the health care system more money -- estimated conservatively at more than $3.8 million a year. That is because the Andrus happens to be one of the lowest-cost facilities in Westchester County – a fact also lost on the Berger Commission. Thus, closure of the Andrus' nursing home will only exacerbate the very problem that the Berger Commission was supposed to remedy and thereby subvert the objectives of the Enabling Legislation – "promoting stability and efficiency in the health care delivery system infrastructure."

9. For the foregoing reasons, the Berger Commission's recommendation to close the Andrus' nursing home and convert the Andrus to an assisted living program was made wholly without legal justification.

10. Without any input from the Andrus, the Commissioner of Health has already mapped out a timetable for the Andrus' demise as a nursing home, and decreed that the

-4-

Andrus submit a closure plan no later than September 30, 2007 and that the Department of Health revoke the Andrus' nursing home Operating Certificate by June 30, 2008.  Unless enjoined, defendant will irrevocably abrogate the Andrus' property interest in its Operating Certificate and other property rights – and terminate its very existence as a nursing home – in violation of, and in disregard for, its rights of due process protected by the United States Constitution -- to say nothing of the hardship and potential harm that a compulsory closure would visit upon the Andrus' employees and the elderly residents it is caring for.

## PARTIES

11.     The Andrus is a not-for-profit skilled nursing facility located in Hastings-on-Hudson, in Westchester County, New York.  The Andrus is licensed by the New York State Department of Health as a "residential health care facility", or nursing home, and is authorized by the Department to care for up to 197 nursing home residents.  The Andrus is also a certified provider in the federal Medicare program, providing skilled nursing and rehabilitative services to individuals aged 65 and over; and in the State Medicaid program, providing medical assistance, including long-term nursing home care, to indigent and medically needy individuals.

12.     Defendant Richard F. Daines is being sued in his official capacity as Commissioner of Health for the State of New York, and also maintains offices in the City and County of New York.  The Commissioner of Health is required to implement the Berger Commission's recommendations affecting the Andrus pursuant to the Enabling Legislation.

## JURISDICTION AND VENUE

13.     This action is brought pursuant to 42 U.S.C. § 1983 and the Fifth and Fourteenth Amendments to the United States Constitution.

14.     This Court has jurisdiction over this proceeding pursuant to 28 U.S.C. §§ 1331 and 1343(a).

15.     Venue of this action in this District is proper pursuant to 28 U.S.C. § 1391(b).

## THE ENABLING LEGISLATION

16.     In April 2005, the New York State Legislature passed, and then-Governor Pataki signed into law the Enabling Legislation, providing for the creation of the Berger Commission with the charge of examining and recommending changes to the system of hospitals and nursing homes in New York State and with the ostensible goal of "promoting stability and efficiency in the health care delivery system infrastructure" and achieving cost savings to the health care system.

17.     The Berger Commission was to consist of eighteen statewide members, to be appointed by members of both branches of the State Legislature as well as the Governor. Six members were to be appointed by the State Senate and Assembly leadership and twelve members were appointed by the Governor. In addition, the Governor was to name the Chair of the Commission, and selected Stephen Berger to fill this role.

18.     Under the Enabling Legislation, the Berger Commission was permitted to deliberate in executive session, closed to the public, only "when addressing in detail the medical, financial, or credit history" of a particular facility. This provision was intended to protect the facilities by preventing the public release of information of a confidential medical or commercially-sensitive nature that facilities may have shared with Berger Commission staff during its deliberations. It was not intended to broadly shield the deliberations from public view

-6-

or prevent facilities from learning that they were being targeted for "rightsizing" until after the recommendation was a *fait d'accompli*.

19.    Pursuant to the Enabling Legislation, the Berger Commission established a Regional Advisory Committee ("RAC") for six designated regions of New York State, including Long Island, New York City, Hudson Valley, Northern, Central, and Western New York. The Hudson Valley Region encompasses Delaware, Dutchess, Orange, Putnam, Rockland, Sullivan, Ulster, and Westchester Counties. These RACs were charged with conducting "formal public hearings" and each submitting a Report to the Berger Commission by November 15, 2006 containing their own, non-binding recommendations for "reconfiguring" hospitals and residential health care facilities in their respective regions, with specific "recommendations for facilities to be closed . . . and . . . resized, consolidated, converted, or restructured."

20.    The Enabling Legislation endowed the Berger Commission with broad authority to make final recommendations for resizing, closure, consolidation, conversion, or other restructuring of hospitals and nursing homes, taking into account the region-by-region RAC proposals. However, the Enabling Legislation did not authorize the revocation of a facility's operating certificate or other adverse action against a facility without legal justification, or when contrary to the parameters delineated in the Enabling Legislation.

21.    Specifically, when deciding which hospitals and nursing homes to "resize," "close," "convert," "consolidate" or "restructure", the Berger Commission was to consider, among other factors, "the economic impact of right sizing"; the "financial status" of the facilities; the "capital debt being carried" by facilities and the availability of alternative sources of funding for paying down or retiring the capital debt; the "potential conversion of facilities or current facility capacity for uses other than as inpatient or residential facilities;" "the extent to which a facility serves the health care needs of the region, including serving Medicaid

-7-

recipients"; and "the extent to which the actions recommended by the Commission would result in greater stability and efficiency in the delivery of needed healthcare services for a community." As shown below, in the case of Andrus, all of these factors weigh against taking any adverse action against its nursing home.

22.    Upon information and belief, the Enabling Legislation was modeled after Federal military base-closing legislation. However, that legislation raised no due process concerns because the military bases were owned not by private parties or public charities but by the Federal government.

23.    The Enabling Legislation required the Berger Commission to transmit its Final Report to the Governor and the Legislature containing its "rightsizing" recommendations for facilities across the State on or before December 1, 2006. Pursuant to the Enabling Legislation, the Berger Commission's recommendations would then have the force of law as of January 1, 2007 unless the Governor failed to transmit the recommendations to the Legislature with his approval by December 5, 2006 or both houses of the Legislature passed a concurrent resolution rejecting the recommendations in their entirety by December 31, 2006. The Commissioner of Health would then be obligated to implement the recommendations.

24.    The Enabling Legislation contained no provision for the piecemeal adoption or rejection of the Berger Commission's particular recommendations affecting specific facilities. They had to be adopted or rejected as a whole.

## THE FACTS

### The Andrus

25.    The Andrus was established by the family of John E. Andrus in 1953 as a not-for-profit home for 247 elderly residents, situated on the same 26-acre campus it continues to

-8-

occupy today. In 1969 and continuing for the next 38 years, the Andrus has been licensed as a "residential health care facility", or nursing home, by the New York State Department of Health.

26. The Andrus provides short-term rehabilitative and long-term skilled nursing care as well as hospice care to approximately 183 residents, most of whom are from Westchester County or elsewhere in the Hudson Valley Region. The residents receiving long-term nursing home care at the Andrus have resided there for an average of three years, eight months.

27. The Andrus' residents are old: their average age is 88 years. The Andrus' residents are also infirm: only 22% of the Andrus' residents can be characterized as "low acuity". The majority of its residents have medical needs that cannot be adequately met in a lower level of care such as assisted living.

28. The majority of Andrus' residents are both elderly and poor: 138 residents, comprising 73% of its long-term residents, financially qualify for Medicaid, while 21 of the remaining residents, or 11% of its total population, are paid for by Medicare. As such, the Andrus receives most of its operating revenues from the Medicare and Medicaid programs.

## The Andrus' Voluntary Rightsizing

29. The Andrus had been licensed to operate 247 beds in its nursing home but in 2002 voluntarily reduced its complement of nursing home beds to 197 by transferring 50 beds to another facility. The Andrus' current capacity of 197 certified beds reflects the true demand for its care and services among the elderly in the Westchester communities that it serves. The Andrus' approximately 183 current residents fill 93% of the 197 beds currently certified by the Department of Health.

30. In 1996, the Andrus developed a plan to expand the scope of services provided to the elderly living on its campus, by offering a continuum of health care, ranging

from independent living to accommodate up to 402 senior citizens, along with 24 assisted living and 48 skilled nursing beds, in a residential setting referred to as a "Continuing Care Retirement Community" ("CCRC").

31.     In furtherance of this plan, the Andrus determined to voluntarily suspend any new admissions to the nursing home temporarily, while the plan underwent the requisite governmental reviews.    This voluntary suspension of admissions resulted in a decline in occupancy and revenues beginning in 1998.

32.     The New York State Departments of Health and Insurance, and the Life Care Council of New York State, all approved the application of the Andrus to be a CCRC. However, in November 2001, the Board of Trustees of the Village of Hastings-on-Hudson denied the Andrus the permits necessary to undertake an expansion of its campus to a CCRC. Following the denial, the Andrus' Board of Trustees redeveloped its strategic plan, and the Andrus resumed its regular nursing home admissions, re-occupying over time almost all of its nursing home bed complement.

33.     At the same time, the Andrus recognized that all 247 of its originally certified nursing home beds were no longer necessary and, in 2002, agreed to reduce its total capacity to 197 certified beds.    The Department of Health gave approval of the Andrus' voluntary decertification on January 24, 2007, but erroneously only gave it retroactive effect to July 1, 2006.

## The Andrus' Current Occupancy

34.     Since 2002, the Andrus continued to fill its nursing home beds with primarily Westchester County residents in need of skilled nursing home care, and steadily increased its occupancy levels.  By 2006, the Andrus had achieved an occupancy rate of 93% based on its 197 bed capacity.

-10-

## The Andrus' Nursing Home Capital Improvements

35.     In conjunction with its improved occupancy, in 2006, the Andrus sought and obtained the Department of Health's approval for over $6,000,000 in capital improvements, designed to upgrade and modernize its 1953 physical plant. These improvements included replacement of the facility's boilers, and electrical and plumbing upgrades and replacements.

36.     Significantly, all of these capital improvements contemplated that the Andrus would continue to use the structure as a nursing home; indeed, the Andrus' continued operation of a nursing home was a fundamental requisite to establishing "need" under the Department of Health's regulations for approval of this nursing facility capital project.

37.     With the capital improvements completed, the Andrus is now able to continue providing high quality, skilled nursing home care in its original facility well into the future.

## The Andrus' Current Financial Condition

38.     Similarly, with its steadily improving occupancy and refurbished physical plant, the Andrus has also seen its financial picture improve commensurately. After operating at a deficit, due in large part to its aborted expansion plan as a CCRC and related temporary suspension of nursing home admissions, the Andrus has operated at a surplus by resuming admissions in 2003, improving its operating efficiencies, and achieving financial stability. The Andrus closed its books with a surplus in both 2005 and 2006.

39.     With its voluntary rightsizing; occupancy at near capacity; upgraded nursing home plant; and consecutive years of surplus operations, the Andrus stands in stark contrast to other nursing homes in Westchester County and elsewhere in the Hudson Valley Region that are losing in their struggle to fill beds and break even and yet were spared the Berger

Commission "axe". Indeed, all of the foregoing factors augur a long and prosperous future for the Andrus – as a nursing home.

40.     In disregard of the foregoing factors, and of the parameters set forth in the Enabling Legislation, the Berger Commission arbitrarily and capriciously determined to target Andrus for compulsory "rightsizing" – down to zero nursing home beds -- and prematurely terminate its existence as a nursing home.

**The Hudson Valley RAC's Errors About The Andrus**

41.     As discussed earlier, the State's six Regional Advisory Committees, or "RACs", were supposed to gather information about the regions' hospitals and nursing homes and the regional and local health care needs they are addressing and, on that basis, to make non-binding recommendations to the Berger Commission as to which facilities within the region should be "rightsized". Many of the Berger Commission's errors that resulted in the adverse recommendations affecting the Andrus can be traced to the mistaken factual assumptions and flawed data relied on by the Hudson Valley RAC in its deliberations.

42.     During its discussions, the Hudson Valley RAC requested information from several of the facilities, including the Andrus, Sky View Rehabilitation and Health Care Center, Victory Lake Nursing Center, and Split Rock Rehabilitation and Health Care Center. Sky View, Victory Lake, and Split Rock declined to comply with the RAC's request for information. In contrast, the Andrus did comply and otherwise fully cooperated with the RAC.

43.     The Executive Director of the Andrus spoke with the Hudson Valley RAC, and provided the RAC with relevant and timely information about the Andrus' finances and operations. Yet, at no point during any of its communications with the Hudson Valley RAC was the Andrus informed that it was being targeted or considered for closure, nor told why it was being so targeted or considered.

-12-

44.    No member of the Hudson Valley RAC, nor for that matter any staff of the Berger Commission, ever visited the Andrus' nursing home or toured its campus. No staff or member of the Berger Commission had a conversation or other communication with any representative of the Andrus prior to making its recommendations in November 2006.

45.    In its Report to the Berger Commission, the Hudson Valley RAC recommended that the Andrus "be considered for conversion to ALP beds". Such a recommendation is wholly unwarranted and unsupported by the facts pertaining to the Andrus.

46.    The Andrus' Executive Director informed the Hudson Valley RAC that the Andrus was financially stable and provided supporting data. Nevertheless, without a proper factual basis, the Hudson Valley RAC appears to have reached the very opposite conclusion.

47.    The Hudson Valley RAC Report referred to the Andrus' alleged "low occupancy and case mix index (in 2003, 39.2% and .90, respectively)" and resulting "obvious financial problems." Those statements reflect the Hudson Valley RAC's materially erroneous views about the Andrus' current occupancy levels and financial status, in the following respects:

48.    First, the 2003 data cited by the Hudson Valley RAC was stale and unrepresentative of the Andrus at the time it was making its report in November 2006. As described earlier, in 2003 the Andrus was still in the process of restoring occupancy following the rejection of its plan to expand to a CCRC. However, as the Andrus proved to be the nursing facility of choice for more and more of Westchester's elderly, the Andrus steadily improved occupancy at the nursing home, almost doubling from an average of 97 occupied beds in 2003 to 183 residents by 2006. Notably, the Andrus provided the Hudson Valley RAC with more current occupancy data, but the RAC evidently ignored it.

49.    Second, the cited occupancy rate of 39%, even for 2003, is inaccurate and grossly understates the Andrus' true occupancy levels, because the Hudson Valley RAC

-13-

mistakenly presumed a bed capacity of 247 certified beds rather than the Andrus' true complement of 197 beds due to the Andrus' voluntary transfer of 50 beds. In 2003, the Andrus' occupancy rate was 49% based on 197 certified beds. As noted above, by 2006, the Andrus achieved an average occupancy level of 93%.

50.     Third, the statement by the Hudson Valley RAC, referenced above (Paragraph 47 hereof), also ignores the fact that by 2005 the Andrus was no longer experiencing "financial problems" but was operating at a surplus. This information was also shared with the Hudson Valley RAC – to no avail. Again in 2006, the Andrus continued to operate in the black.

51.     The Hudson Valley RAC issued its report to the Berger Commission containing its "rightsizing" recommendations on November 15, 2006. However, the Report was not released to the public – nor made accessible to the Andrus – until the Berger Commission issued its Final Report, on November 28, 2006. As a consequence, the Andrus was never given the opportunity to speak with or present testimony to the Berger Commission directly to refute the many flawed assumptions and factual inaccuracies in the Hudson Valley RAC Report.

## The Fundamental Flaws in the Berger Commission's Final Report

52.     Similarly, without affording the Andrus any notice of its contemplated actions or an opportunity to be heard, the Berger Commission issued its Final Report on November 28, 2006. In the Final Report, the Berger Commission recommended that all of the Andrus' nursing home beds be decertified, and that it add 140 ALP beds instead.

53.     Like the Hudson Valley RAC, the Berger Commission based its recommendations on several fundamentally flawed assumptions about the Andrus' current financial status and nursing home operations. In so doing, the Berger Commission acted wholly inconsistent with the statutory criteria in the Enabling Legislation delineating the proper bases for such drastic action as the rescission of a facility's operating certificate.

-14-

54.    In the Final Report, the Berger Commission described the Andrus as a "247-bed" facility that "has been operating at a significant loss until 2006" and that it only now "claims" to be operating in the black. In fact, as described above, the Andrus years earlier "downsized" by 50 beds to a 197-bed nursing facility, and is now successfully approaching 100% capacity. Equally significantly, the Andrus' recovery of its occupancy levels reflects the growing demand for its nursing home care and services among senior citizens in Westchester County in need of long term care.

55.    Contrary to the Berger Commission's suggestion, it is more than a "claim", but a fact that due to the Andrus' greatly improved occupancy levels and other measures, the Andrus is now operating at a surplus, not a deficit. In ignoring that reality, the Berger Commission contravened the statutory mandate that it consider the "financial status of a facility" when deciding whether closure or other adverse action is warranted.

56.    On the other hand, converting the Andrus to an assisted living facility, at best, would cause operating shortfalls. Here, too, the Berger Commission failed to properly consider the "economic impact of right sizing," one of the other factors delineated in the Enabling Legislation.

57.    In the Final Report, the Berger Commission presumed that the "low" acuity of the Andrus on Hudson's residents relative to other nursing homes meant that a majority of its residents "could be better served in an ALP". Contrary to the Commission's conclusory assertion, the residential health care facility beds now in use at the Andrus cannot be converted to assisted living slots without profoundly disrupting the 24-hour nursing home care that many of its residents require. In erroneously presuming otherwise without factual basis, the Berger Commission contravened the mandate in the Enabling Legislation that the Commission take into account the "potential conversion. . . for uses other than inpatient or residential facilities."

-15-

58.     The Berger Commission recommended closing the Andrus' nursing home and converting it to an ALP despite – or perhaps because of – the fact that none of the Commission's staff or members ever visited the Andrus' nursing home, much less performed any clinical assessment of the Andrus' residents and their actual care needs. Indeed, if the Berger Commission's recommendations affecting the Andrus were implemented, many if not most of the Andrus' residents -- largely frail elderly averaging 88 years old who consider the Andrus their "home" -- would have to be transferred to another skilled nursing facility and consequently endure the trauma associated with such a move.

59.     As noted earlier, the Andrus is one of the lowest-cost nursing homes currently operating in Westchester County. Thus, the inevitable transfer of the Andrus' residents to other nursing facilities will not achieve the desired "efficiency in the delivery of needed healthcare services for a community", a factor mandated by the Enabling Legislation. Rather, closing the Andrus will produce the opposite result, and will actually increase the expense of caring for the same residents in other nearby nursing homes by at least $3.8 million a year.

60.     Moreover, since most of the Andrus' residents are covered by Medicaid, it will end up costing the Medicaid program three or more million dollars per year in additional funds to cover their nursing home stays at nearby facilities in Westchester County. In this regard, the Berger Commission similarly failed to take into consideration "the extent to which [the Andrus] serves the healthcare needs of the region, including serving Medicaid recipients", also a factor in the Enabling Legislation.

61.     In the Final Report, the Berger Commission alleges that the Andrus' conversion to an ALP would be "economical". In one scenario, the Berger Commission recommends that the Andrus complete a floor by floor renovation of its existing facility to convert it to an ALP. However, such a statement ignores the reality that any conversion of the

-16-

Andrus' physical plant – designed and built a half century ago – into a residence that is both attractive to prospective assisted living residents and fully compliant with ALP regulations, would be a hugely costly undertaking. The Berger Commission has failed to account for those renovation costs, and has made no provision for how such a conversion would be paid for or how it could be financially feasible. In this regard as well, the Berger Commission failed to properly consider the "economic impact" of the mandated conversion.

62.    As an alternative, the Berger Commission states that the Andrus could build additional ALP homes on its campus. However, the Village of Hastings-on-Hudson previously refused the Andrus permission to develop its property when it rejected its plan to expand the campus to a CCRC. Simply put, the 26 acres on which these ALP homes would be built are in all probability essentially untouchable.

63.    Overall, the Final Report fails to address or explain how the significant costs associated with closure of the Andrus' nursing home and "conversion" to an ALP will be financed. Nor does the Berger Commission provide for or pledge any governmental funding to finance the mandated closure and conversion. This is so even though it is defendant who would be effectively rescinding the Andrus' license to operate as a nursing home, involuntarily. Thus, forcing the Andrus to pay for its own closure and reconfiguration as an assisted living facility would only exacerbate the deprivation of the Andrus' property rights and interests stemming from implementation of the Berger Commission's recommendations -- beyond the substantial harm from revoking the Operating Certificate itself.

64.    The Final Report refers to the "financial support from the Andrus Family Foundation" previously given to the Andrus. In fact, two charitable foundations started by the Andrus family, the Surdna Foundation ("Surdna") and Helen Benedict Foundation ("Helen Benedict"), have provided the Andrus in the past with grants for specific capital projects. (There

-17-

is no such "Andrus Family Foundation".) In citing to the prior foundation grants, the Berger Commission appears to have operated on the assumption that the Andrus can count on funds from Surdna and/or Helen Benedict to offset the likely high cost of closure and conversion. There is, however, no basis for such an assumption.

65.    To the contrary, Surdna and Helen Benedict have been and remain separate and independent from the Andrus, with separate management and governing boards. Neither foundation has any legal or contractual obligation to provide any future support to the Andrus. Thus, it cannot possibly fall within the Berger Commission's authority, or that of the Commissioner of Health, to expect or compel Surdna or Helen Benedict (let alone the Andrus) to pick up the tab for the cost of closure and conversion that the Berger Commission and the Commissioner of Health have together mandated.

66.    The Berger Commission made several other factual errors about the Andrus as revealed in the Final Report. For instance, the Final Report states that "[t]he facility has a history of a high number of deficiencies (26 in its 2005 survey), many of which are attributable to the building's deteriorating condition." Both the Berger Commission's conclusion and the premise on which it rests are demonstrably wrong. In its 2005 resident survey, the Andrus was cited for only 8 survey deficiencies related to resident care, none of which involved harm to any patients, and 6 other deficiencies for building/environment. Thus, the Berger Commission's misstatement nearly doubled the actual number of Andrus survey citations.

67.    The Final Report alleges that the Andrus' physical plant is old and in need of capital improvements. In this regard, the Berger Commission failed to acknowledge that the Andrus had already recognized -- and addressed -- the need for capital improvements; the Andrus sought and obtained Department of Health approval for over $6,000,000 in capital

-18-

improvements to its original building. These improvements were specifically designed and approved for the continued operation of the Andrus as a skilled nursing facility, not as an ALP.

68.    Ironically, the Berger Commission notes elsewhere in the Final Report that one of the presumed advantages to the implementation of its "rightsizing" recommendations will be the prevention of wasted capital expenditure. Closure of the Andrus' nursing home would represent a significant waste of resources, as the Andrus' capital project is already completed, with the Andrus putting up $1.4 million of its own equity and borrowing several million dollars to finance the balance of the project costs.

*    *    *

69.    Governor Pataki transmitted the Berger Commission's Final Report to the New York State Legislature, with his approval, on November 30, 2006. The Legislature did not pass a resolution disapproving the Berger Commission's recommendations on or before December 31, 2006. As such, pursuant to the Enabling Legislation, the Commission's recommendations have the force and effect of law as of January 1, 2007.

**Defendant's Implementation of the Berger Commission's Recommendations**

70.    The Berger Commission's recommendations to close the Andrus' nursing home and convert its operations to an ALP, premised on misinformation about the Andrus' operations and financial status, make no sense economically, financially, or clinically. As these recommendations also defy the statutory criteria set forth in the Enabling Legislation, the recommendations are wholly without legal justification.

71.    The Commissioner of Health nevertheless is obligated under the Enabling Legislation to implement the Berger's recommendations contained in the Report by June 30, 2008.

-19-

72. By letter dated January 31, 2007, the Andrus received its first communication from defendant concerning the Berger Commission's recommendations. In that letter, the Department of Health told the Andrus that the Department "expected" the Andrus to follow a timetable of "steps and deliverables", devised by the Department alone, which it considered "necessary to implement the [Berger] Commission's recommendations within the required timeframe." The Department's timetable called for the Andrus' submission of a nursing home closure plan by September 30, 2007 and was to culminate in the Commissioner of Health's revocation of its nursing home Operating Certificate no later than June 30, 2008.

73. Thus, absent declaratory and injunctive relief from this Court, the Commissioner of Health will have rescinded the Andrus' nursing home Operating Certificate by June 30, 2008 and forced it to convert to an ALP or other use. At stake then is the Andrus' constitutionally protected property interest in its Operating Certificate and related property, and quite possibly its very survival as a not-for-profit health care provider, not only to its current elderly residents but also to future medically needy senior citizens in Westchester County.

## FIRST CLAIM FOR RELIEF
(Violation of Procedural Due Process)

74. The Andrus repeats and realleges each and every allegation contained in Paragraphs 1 through 73 as if fully set forth herein.

75. The Enabling Legislation requires that the Commissioner of Health implement the Berger Commission's recommendations, including the revocation of the Andrus' nursing home Operating Certificate, without providing prior notice to the Andrus or affording the Andrus any meaningful opportunity to be heard. In fact, no notice nor opportunity to be heard before the Berger Commission was afforded to the Andrus, and the Berger Commission's

deliberations were conducted largely in secret. Such actions violate the Andrus' procedural due process rights under the Fifth and Fourteenth Amendments of the United States Constitution.

76.    The Andrus is entitled to a declaratory judgment that the Enabling Legislation and the Berger Commission's recommendations affecting the Andrus are unconstitutional under the Due Process Clauses of the Fifth and Fourteenth Amendments of the United States Constitution, and that defendant is enjoined from taking any adverse action against the Andrus in furtherance of the Enabling Legislation and said recommendations.

## SECOND CLAIM FOR RELIEF
(Violation of Substantive Due Process -- Revocation of Operating Certificate)

77.    The Andrus repeats and realleges each and every allegation contained in Paragraphs 1 through 76 hereof as if fully set forth herein.

78.    Defendant's    implementation    of    the    Berger    Commission's recommendations affecting the Andrus, including the prospective revocation of the Andrus' nursing home Operating Certificate, deprives the Andrus of its substantive due process rights in violation of the Fifth and Fourteenth Amendments of the United States Constitution.

79.    The Andrus is entitled to an order enjoining defendant from taking such adverse action against the Andrus.

## THIRD CLAIM FOR RELIEF
(Violation of the Takings Clause -- Revocation of Operating Certificate)

80.    The Andrus repeats and realleges each and every allegation contained in Paragraphs 1 through 79 hereof as if fully set forth herein.

81.    Defendant's    implementation    of    the    Berger    Commission's recommendations affecting the Andrus, including the prospective revocation of the Andrus'

nursing home Operating Certificate, constitutes an unconstitutional taking of its property in violation of the Fifth and Fourteenth Amendments of the United States Constitution.

82.    The Andrus is entitled to an order enjoining defendant from taking such adverse action against the Andrus.

## FOURTH CLAIM FOR RELIEF
(Violation of Substantive Due Process and the Takings Clause -- Closure/Conversion)

83.    The Andrus repeats and realleges each and every allegation contained in Paragraphs 1 through 82 hereof as if fully set forth herein.

84.    Defendant's    implementation    of    the    Berger    Commission's recommendations affecting the Andrus, including the prospective closure of the Andrus' nursing home and forced "conversion" of its operations to an assisted living program, with no provision for governmental funding for the costs associated with such closure and conversion, and loss of property, deprives the Andrus of its substantive due process rights and constitutes an unconstitutional taking of its charitable assets in violation of the Fifth and Fourteenth Amendments if the United States Constitution.

85.    The Andrus is entitled to an order enjoining defendant from taking such adverse action against the Andrus.

## FIFTH CLAIM FOR RELIEF
(Violation of Contracts Clause)

86.    The Andrus repeats and realleges each and every allegation contained in Paragraphs 1 through 85 hereof as if fully set forth herein.

87.    The Andrus has existing contractual relationships with physicians, staff, and vendors that the Andrus will be unable to complete if the Andrus' nursing home Operating

-22-

Certificate is revoked and the Andrus is converted from a nursing facility to an assisted living program.

88.    The Enabling Legislation thus violates the Andrus' rights under the Contracts Clause of Article 1, Section 10, of the United States Constitution.

89.    The Andrus is entitled to a judgment declaring that the Enabling Legislation and the Berger Commission's recommendations affecting the Andrus violate the Andrus' rights under the Contracts Clause of Article 1, Section 10, of the United States Constitution.

### SIXTH CLAIM FOR RELIEF
(42 U.S.C. § 1983)

90.    The Andrus repeats and realleges each and every allegation contained in Paragraphs 1 through 89 hereof as if fully set forth herein.

91.    Defendant has acted under the color of state law in causing or threatening to cause the deprivation of the Andrus' constitutional rights under the Fifth and Fourteenth Amendments and under the Contracts Clause of the United States Constitution, as detailed above, and are entitled to redress therefor under 42 U.S.C. § 1983.

92.    The Andrus is entitled to an order enjoining defendant from implementing the Berger Commission's recommendations affecting the Andrus, and requiring defendant to pay the Andrus' attorneys' fees for commencing and prosecuting this action pursuant to 42 U.S.C § 1988.

### SEVENTH CLAIM FOR RELIEF
(Equitable Relief)

93.    The Andrus repeats and realleges each and every allegation contained in Paragraphs 1 through 92 hereof as if fully set forth herein.

-23-

94.     The Andrus will suffer immediate and irreparable harm if the defendant implements the Berger Commission's recommendations affecting the Andrus, including the revocation of the Andrus' nursing home Operating Certificate and forced conversion of its operations to an assisted living program.

95.     The Andrus' relationships with residents and employees, as well as physicians and vendors, will also be irreparably damaged if the Berger Commission's recommendations are implemented.

96.     The injury that the Andrus will suffer if its Operating Certificate is revoked and it is forced to convert to an assisted living program cannot be quantified, and thus the Andrus has no adequate legal remedy. Therefore, the Andrus requires injunctive relief to prevent irreparable harm.

97.     The Andrus has a substantial likelihood of success on the merits at the ultimate trial of these issues.

98.     Equity requires that the Andrus be granted an injunction to maintain the status quo pending the ultimate resolution of this matter. If not granted injunctive relief, the Andrus' nursing home will be closed and (assuming it were even financially feasible) its operations will be converted to an assisted living program, thereby fundamentally and irrevocably changing the nature of the Andrus, if not terminating its existence, forever.

99.     No prior or pending request for the same or similar relief has been made by or on behalf of the Andrus in this or any other action.

100.    Thus, the Andrus is entitled to an order enjoining defendant from implementing the Enabling Legislation and the Berger Commission's recommendations affecting the Andrus.

-24-

WHEREFORE, the Plaintiff John E. Andrus Memorial, Inc. (d/b/a Andrus on Hudson) respectfully demands an order and judgment against defendant as follows:

(A)    On the Plaintiff's First Claim for Relief:

(i)    Declaring Section 31 of Part E of Chapter 63 of the Laws of 2005 of New York (the "Enabling Legislation"), and any actions taken by defendant pursuant thereto to implement the Berger Commission's recommendations affecting the Andrus, to be unconstitutional as violative of the Fifth and Fourteenth Amendments of the United States Constitution; and

(ii)    Enjoining defendant from revoking the Andrus' Residential Health Care Facility Operating Certificate or otherwise implementing the Berger Commission's recommendations affecting the Andrus; and

(B)    On the Plaintiff's Second, Third and Fourth Claims for Relief:

(i)    Declaring the Berger Commission's recommendations affecting the Andrus to be unconstitutional as violative of the Fifth and Fourteenth Amendments of the United States Constitution; and

(ii)    Enjoining defendant from revoking the Andrus' Residential Health Care Facility Operating Certificate or otherwise implementing the Berger Commission's recommendations affecting the Andrus; and

(C)    On the Plaintiff's Fifth Claim for Relief:

(i)    Declaring Section 31 of Part E of Chapter 63 of the Laws of 2005 of New York, and any actions taken by defendant pursuant thereto to implement the Berger Commission's recommendations affecting the Andrus, to be unconstitutional as violative of the Contracts Clause of Article 1, Section 10, of the United States Constitution; and

(ii)    Enjoining defendant from revoking the Andrus' Residential Health Care Facility Operating Certificate or otherwise implementing the Berger Commission's recommendations affecting the Andrus; and

(D)    On the Plaintiff's Sixth Claim for Relief:

(i)    Declaring Section 31 of Part E of Chapter 63 of the Laws of 2005 of New York, and any actions taken by defendant pursuant thereto to implement the Berger Commission's recommendations affecting the Andrus, to be unconstitutional;

(ii)    Enjoining defendant from implementing the Berger Commission's recommendations affecting the Andrus; and

(iii)    pursuant to 42 U.S.C. § 1988, awarding Plaintiff its attorneys' fees for commencing and prosecuting the instant action; and

(E)    On the Plaintiff's Seventh Claim for Relief:

(i)    Permanently enjoining defendant from enforcing the provisions of Section 31 of Part E of Chapter 63 of the Laws of 2005 of New York against the Andrus or otherwise implementing the Berger Commission's recommendations affecting the Andrus; and

(F)    Granting Plaintiff such other and further relief that this Court deems just

and proper.

Dated:    New York, New York
          April 30, 2007

CADWALADER, WICKERSHAM & TAFT LLP

By:_____

    Peter G. Bergmann (PG-9691)

Attorneys for Plaintiff
    John E. Andrus Memorial, Inc. (d/b/a Andrus on
    Hudson)
Office and Post Office Address:
One World Financial Center
New York, New York 10281
Telephone:  (212) 504-6000

-27-

Case No. 07 cv 3432 (CLB)

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

JOHN E. ANDRUS MEMORIAL (d/b/a Andrus on Hudson),

Plaintiff,

-against-

RICHARD F. DAINES, as Commissioner of the New York State
Department of Health,

Defendant.

## COMPLAINT

CADWALADER, WICKERSHAM & TAFT LLP

One World Financial Center
New York, NY 10281

(212) 504-6000

Attorneys for Plaintiff

# EXHIBIT B

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-------------------------------------------------------------------x
JOHN E. ANDRUS MEMORIAL, INC. (d/b/a      :        filed electronically
ANDRUS ON HUDSON,                          :
                                           :        07-CV-3432 (CLB) (KNF)
                          Plaintiff,       :
      -against-                            :
                                           :        **ANSWER**
RICHARD F. DAINES, as Commissioner of the  :
New York State Department of Health,       :
                                           :
                          Defendant.       :
-------------------------------------------------------------------x

Defendant, Richard F. Daines, as Commissioner of the New York State Department of

Health, by his attorney, Andrew M. Cuomo, Attorney General of the State of New York, answers

the Complaint as follows:

1.      Paragraphs 1-2: These paragraphs serve to introduce the action and summarize

plaintiff's claims, they do not present allegations of fact to be admitted, denied or otherwise

addressed in an answer. To the extent a response may be deemed necessary, denies.

2.      Paragraph 3: The paragraph, in the first sentence, summarizes plaintiff's claims

and does not present allegations of fact to be admitted, denied or otherwise addressed in an answer.

To the extent a response may be deemed necessary, denies. As to the second sentence of the

paragraph, denies.

3.      Paragraph 4: Denies.

4.      Paragraph 5: Denies knowledge or information sufficient to form a belief as to

the truth or veracity of the allegations contained therein.

5.      Paragraph 6: Denies knowledge or information sufficient to form a belief as to

the truth or veracity of the allegations in the first two sentences. With respect to the last sentence,