# AFFIDAVIT OF DAVID R. SANDMAN Ph.D

# PART 3 OF 8

.

# CENTRAL REGION

## LONG-TERM CARE RECOMMENDATIONS

### *Recommendation 1*

#### Facility (ies)

Van Duyn Home and Hospital (Onondaga County)
Community General Hospital's Skilled Nursing Facility (Onondaga County)

#### Recommended Action

It is recommended that Van Duyn Home and Hospital and Community General Hospital's
Skilled Nursing Facility be joined under a single unified governance structure under the control
of Community General Hospital, and downsize their combined number of RHCF beds by
approximately 75.

#### Facility Description(s)

Van Duyn is a 526-bed residential health care facility located in Syracuse, owned and operated
by Onondaga County. Van Duyn provides baseline services[*] and shorter-term care. It serves a
key role in moving patients out of the hospital, including potential residents who are unlikely to
be admitted to private facilities due to their Medicaid-pending status, which puts months of
payment at risk for a provider.

---

[*] Baseline services are designated by operating certificate. A facility that provides baseline services offers all
services required by federal and state regulations: nursing and medical care, which includes podiatry and
opthamology, physical and occupational therapy, social services, recreational activities, dietician services,
nutritional support, and personal care.

101

While Van Duyn has fairly high occupancy rate, ranging from 95% to 97% over the 2002 to 2004 period, the facility operates at a considerable operating loss. The projected deficit for Van Duyn in 2006-07 is $8 million, which is a significant burden on Onondaga tax-payers.

Van Duyn has a very low case mix index (1.02 in 2003, compared to an adjusted statewide average of 1.19), and 22% of its residents in 2001-2003 were designated as "PA" or "PB," which are the two lowest need levels by the resource utilization group (RUG) score. PA and PB residents have the greatest potential for placement in alternative community settings. Van Duyn may be filling some its beds with individuals who may be better-served in less-restrictive settings.

Van Duyn is on the same campus as Community General Hospital (CGH), which, in addition to providing acute care services, also houses a 50-bed skilled nursing facility (SNF). The Community General SNF also has a fairly high occupancy rate, which ranged from 94% to 96% over the 2002 to 2004 period. CGH receives a hospital-based SNF Medicaid rate. The CGH SNF's case mix index in 2003 was 1.02, which is relatively low, and between 2001 and 2003, 19% of its residents fell in the PA/PB category. At the same time, CGH needs space for its acute care plans, including private rooms.

#### Assessment

Both Van Duyn and the CGH SNF face constraints due to their physical plants. Van Duyn's building includes a long, double-loaded corridor, which impairs the staff's line-of-sight, and restricts social interactions and on-floor therapeutic activities. Some existing nursing home beds are unnecessary given Onondaga's Program of All Inclusive Care for the Elderly (PACE) and the growth of home- and community-based services in the county that could delay or avoid nursing home placement.

An integrated organization will reduce the duplication of services across the two facilities, reduce operating costs at Van Duyn, enable Van Duyn to receive a hospital-based reimbursement rate, and create an integrated continuum of care on the campus. Under Community General's

102

control, Van Duyn must continue its role as a leading provider of care serving hard-to-place populations including those patients with Medicaid-pending status. The reconfiguration and change of ownership is being developed with a consultant, and will require capital support.

## *Recommendation 2*

### **Facility (ies)**

Mercy of Northern New York (Jefferson County)

### **Recommended Action**

It is recommended that Mercy of Northern New York downsize by 76 RHCF beds to 224 RHCF beds. It is further recommended that the facility add a 60-bed ALP, a 16-slot ADHCP and possibly other non-institutional services in the vacated Madonna building.

### **Facility Description(s)**

Mercy of Northern New York (MNNY) is a voluntary, 300-bed residential health care facility in Jefferson County. The facility provides baseline services and a broader spectrum of services, including certified home care, renal dialysis, and ambulatory physical and behavioral health services. The facility emerged from bankruptcy in January 2006, and is developing plans to put itself on solid financial footing. MNNY suffers from relatively low occupancy, which ranged from 92% to 94% over 2002 to 2004, and a 90% Medicaid payor mix, which has reduced bed-hold revenue by several hundred thousand dollars each year.

MNNY has a low case mix index (1.09), and approximately 25% of its residents in 2001-03 were low-acuity. MNNY has questionable quality of care. It has been at the top of the *Consumer Reports* nursing home watch list for the past four years. The combination of low occupancy and

103

low revenue resulted in the facility providing nursing hours per resident per day significantly that was below statewide average, which in turn could hurt its quality of care and reputation.

## Assessment

Jefferson County presents a compelling opportunity to shift long-term care resources from institutional to alternative settings. There is a small surplus of nursing home beds according to the need methodology. The county had an occupancy rate of less than 89% in 2004, and has a shortage of non-institutional alternatives. Jefferson has only 20 slots of non-institutional services per 1,000 seniors, which is significantly below the statewide average of 33 slots per 1,000 seniors. In particular, Jefferson County has no Medicaid assisted living program (ALP) beds, which may explain why so many low-acuity residents are in nursing homes.

MNNY has a viable plan for converting its Madonna Home into an ALP. It would house 15 units per floor, designed as a Green House model. This model includes the construction of homes for 6 to 10 elders who require skilled nursing care, and is designed to create a warm, welcoming community. By reducing its bed complement by 76 beds, MNNY should vacate one existing building on its campus, which should be renovated to house an ALP and adult day health care program (ADHCP) for approximately $1 million, for which the provider will arrange financing. MNNY already warehouses its empty beds for this purpose, and the process to vacate should take fewer than six months.

This recommendation will require the establishment of an adult home for the purposes of creating an ALP. We recommend that the Department expedite this unless quality and competence standards are not met.

104

## *Recommendation 3*

### Facility (ies)

Willow Point (Broome County)

### Recommended Action

It is recommended that Willow Point downsize by between 83 and 103 RHCF beds to approximately 280 to 300 RHCF beds, rebuild its facility in a configuration that reflects today's therapeutic milieu, and add a 30-slot ADHCP.

### Facility Description(s)

Willow Point is a 383-bed residential health care facility owned and operated by Broome County. It provides baseline services. While the facility enjoyed fairly high occupancy (96-98% in the 2002 to 2004 period), it is plagued by several problems. First, Willow Point is financially unstable and is a financial burden on the county. In 2000-02, it lost over $6.4 million. Second, the facility has quality problems. It had 12 survey deficiencies, which is significantly above the regional average of 5, and a few immediate jeopardy citations of life-threatening situations. Some of Willow Point's Medicare quality indicators fall well below statewide averages, including the percentage of residents in pain and who lose continence. The size and age of the Willow Point facility is inappropriate for skilled nursing care. Its long, double-loaded corridors inhibit interactions and do not provide today's therapeutic milieu.

### Assessment

There is opportunity for resource shifts in Broome County. While the bed need methodology shows few surplus beds, the 2004 occupancy across the county was only 92.8%. In addition, the county still needs over 650 slots for non-institutional services, especially for adult day health care, for which only 20 slots exists for the entire county.

105



Because of the age, size, and physical layout of the facility, the Commission recommends that the facility be replaced with a modern, high-quality facility that houses multiple levels of care. The new facility should accommodate an ADHCP on the first floor, perhaps with additional space to expand if future needs warrant. The new facility should be opened for residents in approximately two-and-a-half to three years.

## *Recommendation 4*

### Facility (ies)

Lakeside Nursing Home (Tompkins County)

### Recommended Action

It is recommended that Lakeside Nursing Home close, and that an 80-bed ALP, a 25-slot ADHCP and possibly other non-institutional services be added somewhere in Tompkins County by another sponsor, pending completion of an RFP process.

### Facility Description(s)

Lakeside Nursing Home is a 260-bed propriety residential health care facility in Tompkins county. It provides baseline services. Lakeside does not offer a broad spectrum of services, and does not provide post-acute care or specialty services. Its case mix index was 1.05 in 2003.

Due to severe quality issues several years ago, the Department of Health arranged a receivership of Lakeside Nursing Home by Peregrine Health Management Company in 2000. Quality of care has improved under Peregrine's receivership, although the facility has appeared on the *Consumer Reports* watchlist for the past four years.

106



The facility operates under Chapter 11 bankruptcy protection, and maintains sizable debts, including to the State. It has had a large operating loss for a number of years. In 2004, the facility ran at less than 85% occupancy, and which has reached as low as 65%.

## Assessment

Tompkins County has a documented excess supply of nursing home beds according to the bed need methodology. The county's nursing facilities as a whole operate at only 92.7% occupancy. Tompkins County has 28 non-institutional slots per 1,000 seniors compared to a statewide average of 33 slots per 1,000 seniors, and has no ALP beds or ADHCP slots within its borders.

Due to severe quality concerns and financial distress, Lakeside Nursing Home should close. In its place, the Department of Health should seek development via an request for proposal process of an 80-bed ALP and 20-30-slot ADHCP. Upon selection of a developer and operator, Lakeside should proceed to close.

## *Recommendation 5*

### Facility (ies)

United Helpers, Canton (St. Lawrence County)

### Recommended Action

It is recommended that United Helpers, Canton downsize by approximately 64 RHCF beds to approximately 96 RHCF beds, rebuild its facility, and add a 48-bed ALP and possibly other non-institutional services.

## Facility Description(s)

United Helpers Canton (UHC) is a 160-bed not-for-profit residential health care facility in St. Lawrence County. UHC has a sub-acute care program and provides outpatient physical therapy. United Helpers is part of a broader system that provides a full continuum of services, including independent living and adult home programs, and other skilled nursing facilities. UHC had a relatively high occupancy of 95% in 2004; however, nearly 30% of those beds in 2001-03 were occupied by low-acuity residents, some of whom could likely be served by an ALP if that were available.

## Assessment

St. Lawrence County is over-bedded. The bed need methodology indicates a surplus of 158 nursing home beds. It has a dearth of non-institutional alternatives, including no ALP beds or ADHCP slots.

UHC proposed downsizing by 16 beds in its plans for a replacement facility, and to build state-of-the-art "pods" of 12 and neighborhoods of 48. The Commission recommends that UHC further downsize its RHCF beds and convert them to lower levels of care, for which is a significant unmet need in that community.

UHC should submit a certificate of need (CON) application for a replacement facility. UHC is working with a number of local organizations as it plans its replacement facility in Canton. This may include co-locating an on-site child day care center and hospice residence. The Commission recommends that this CON include a 48-bed ALP. No quality and competence issues are anticipated as the United Helpers system already owns and operates adult homes in New York.

108

# HUDSON VALLEY REGION

## ACUTE CARE RECOMENDATIONS

### *Recommendation 1*

**Facility (ies)**

Kingston Hospital (Ulster County)
Benedictine Hospital (Ulster County)

**Recommended Action**

It is recommended that Kingston and Benedictine Hospitals be joined under a single unified governance structure, provided that Kingston Hospital continues to provide access to the reproductive services currently offered at such hospital at a location proximate to Kingston Hospital. It is recommended that the joined facility be licensed for approximately 250 to 300 inpatient beds. It is further recommended that the Commissioner refrain from either approving any applications that have been or will be filed by either facility or providing any other consent requested by either facility, prior to the execution by the facilities of a binding agreement to join under a single unified governance structure, except where such approval or consent is necessary to protect the life, health, safety and welfare of facility patients, residents or staff. If Kingston and Benedictine Hospitals fail to execute such an agreement by December 31, 2007, it is recommended that the Commissioner of Health close one of the facilities and expand the other to accommodate the patient volume of the closed facility.



**Facility Description(s)**

Kingston Hospital and Benedictine Hospital are located in Kingston within blocks of one another. Benedictine, a community hospital sponsored by the Benedictine Sisters, is the larger facility of the two, and has 222 licensed beds. Kingston, a secular community hospital, has 145 licensed beds. Both hospitals provide medical/surgical, emergency, and obstetrics care, and run level 1 perinatal centers. The two hospitals had a similar number of inpatient discharges and emergency visits, but Kingston had significantly more outpatient visits than Benedictine. Kingston is affiliated with Margaretville Hospital, a federally-designated critical access hospital in Delaware County. Each of the hospitals has approximately 750 full-time equivalent employees.

**Assessment**

There are too many hospital beds in Kingston. Neither hospital is fully occupied; however, neither hospital can readily absorb all of the other hospital's patients. Sixty-nine percent of Benedictine's 176 available beds were occupied in 2004. Kingston operated all of its 145 certified beds, and had a 73.7% occupancy rate in 2004.

There is unnecessary and wasteful duplication of services in Kingston and in Ulster County. Both Kingston and Benedictine hospitals are designated stroke centers and level 1 perinatal centers. Both facilities operate emergency departments and provide medical/surgical and maternity care. Although Kingston Hospital has only 9 licensed maternity beds, they had 491 obstetrics discharges; Benedictine Hospital has 16 maternity beds, which is almost twice the number as Kingston, but performed only 376 births. Neither maternity program is financially viable at this low volume, and neither can afford to offer access to the specialized services and amenities that a larger combined program might afford.

Both institutions are financially precarious. In 2003, Kingston Hospital had a -10.4% operating margin; Benedictine's operating margin was -2.1%. Each of the hospitals has (non DASNY) long-term debt of approximately \$25 million.

110

The institutions have drafted an unsigned memorandum of agreement to establish a parent corporation with broad powers over the two hospitals. The new corporation will become the sole corporate member of both hospitals, which will continue as separate and distinct corporations. Kingston Hospital will retain its identity as a non-sectarian institution, and Benedictine will continue to function as a Catholic hospital sponsored by the Benedictine Sisters, conforming to the Ethical and Religious Directives for Catholic Health Care Services. The proposed structure will allow for continued access to a full range of reproductive health services in Kingston.

Reconfiguration will improve the financial standing of both facilities, reduce duplication of services, allow for efficient future investments, and improve the organization's ability to meet the community's health care needs. This arrangement also offers a new model for merging sectarian and non-sectarian intuitions, which potentially could be replicated in other areas of the State.

## *Recommendation 2*

### **Facility (ies)**

Sound Shore Medical Center (Westchester County)
Mt. Vernon Hospital (Westchester County)

### **Recommended Action**

It is recommended that Mt. Vernon Hospital downsize approximately 32 medical/surgical beds, and convert approximately 20 additional medical/surgical beds into a 20 bed transitional care unit. It is further recommended that Mt. Vernon Hospital convert approximately 24 additional medical/surgical beds into a 24 bed mentally impaired chemical abusers (MICA) unit, provided that the Commissioner of Mental Health and the Commissioner of Alcoholism and Substance Abuse Services approve such conversions. It is recommended that Sound Shore Medical Center

decertify approximately 9 pediatrics and 60 medical/surgical beds, and convert additional medical/surgical and obstetrics beds into 5 additional Level III NICU beds and 5 detoxification beds.

## Facility Description(s)

Sound Shore Medical Center and Mt. Vernon Hospital are separately licensed facilities within the Sound Shore Health Care System, which also includes a 150-bed nursing home, school of nursing, adult day health program, and a Medicaid managed care organization. Both are teaching hospitals affiliated with the New York Medical College.

Sound Shore has 321 certified beds, of which 240 were staffed in 2004. It is an area trauma center, designated stroke center, comprehensive community cancer center and level III neonatal intensive care unit. Sound Shore has approximately 1,200 full-time equivalent employees.

Mt. Vernon Hospital has 228 certified beds, of which 164 were staffed in 2004. It offers medical/surgical services, and specializes in behavioral health services, including one of two psychiatric units in Westchester county approved to receive involuntary admissions of patients who may be an immediate danger to themselves or others. Approximately 47% of Mt. Vernon's patients come from medically underserved communities. Thirty-three percent of its inpatients were Medicaid-covered or uninsured, and 73% of emergency department visits were Medicaid-covered or uninsured in 2004. A large share of Mt. Vernon's approximately 600 employees reside in the local community, which has a substantial minority population.

## Assessment

Sound Shore and Mt. Vernon entered into an affiliation agreement in 1996. Both hospitals share a common parent corporation with authority for strategic planning and system direction. Working through integrated leadership, the system succeeded in a financial turnaround of Mt. Vernon Hospital. According to Mt. Vernon, its operating margin in 2005 was $1.2 million. By affiliating, each hospital saves capital through economies of scale, service reconfiguration and

112

programmatic changes such as the consolidation of previously duplicative obstetrics departments at the Sound Shore campus and psychiatry departments at the Mt. Vernon campus.

The Sound Shore Health System should further rightsize and reconfigure its services by implementing the following changes:

- Mt. Vernon Hospital should decertify 32 medical/surgical beds, and convert another 44 medical/surgical beds to a 20-bed transitional care unit (a New York State pilot program) and a 24-bed mentally impaired chemical abusers (MICA) unit. Mt. Vernon's total bed complement will be reduced by 32 beds.

- Sound Shore Medical Center should decertify 9 pediatric and 60 medical/surgical beds, and convert additional medical/surgical and obstetrics beds to 5 additional level III neonatal intensive care unit beds and 5 detoxification service beds. Sound Shore's total bed complement will be reduced by 71 beds.

This restructuring plan eliminates excess capacity by converting beds for underused services to those for needed services, and consolidating service lines and reducing duplication between the hospitals. This restructuring plan will strengthen Mt. Vernon Hospital, which provides essential, accessible care to the residents of the medically underserved City of Mt. Vernon, and the hospital will continue to offer services designed to meet the particular needs of the local community, including emergency, medical/surgical, AIDS, psychiatry, transitional, behavioral and detoxification care.

113

## *Recommendation 3*

**Facility (ies)**

Orange Regional Medical Center (Orange County)

**Recommended Action**

Contingent upon financing, it is recommended that Orange Regional Medical Center close its existing campuses and consolidate its operations at a new, smaller replacement facility that is downsized by approximately 100 beds to approximately 350 beds.

**Facility Description(s)**

Orange Regional Medical Center (ORMC) was formed in September 2002 by merging the Arden Hill Hospital in Goshen with the Horton Medical Center in Middletown. ORMC's two campuses are eight miles apart. The Arden Hill Hospital has174 licensed beds, and the Horton Medical Center has 276 licensed beds. ORMC provides inpatient medical/surgical, behavioral health and physical rehabilitation services, and outpatient services at 15 locations. Together with Bon Secours Hospital and St. Anthony Community Hospital, ORMC serves the western half of Orange County, and has a 38% market share of County discharges. The St. Luke's/Cornwall system largely serves the eastern half of the County and has a 25% market share of County discharges. Twenty-seven percent of discharges of county residents occur in other counties.

ORMC employs approximately 2,500 people, and is the largest non-governmental employer in Orange County. According to ORMC, its operating profit was $4 million in 2005, and it carries $54 million in outstanding debt. ORMC has clinical affiliations with NY-Presbyterian Hospital, Westchester Medical Center, and the New York University Hospital for Joint Diseases.

114

**Assessment**

ORMC's facilities upgraded its technologies, recruited additional physicians, and strengthened its financial position following the merger and system restructuring. Its services include diagnostic imaging, behavioral health, oncology, physical rehabilitation, and diagnostic cardiac catheterization.

ORMC should further rationalize its provision of care to meet the growing health care needs of its community, which is among the fastest growing counties in New York. The two existing hospitals are old and out-dated and cannot accommodate modern technology. Neither hospital has sufficient capacity to absorb the other. If the campuses were consolidated, ORMC would achieve economies of scale in its staffing, supplies, plant operations and equipment.

ORMC acquired a 61-acre site to construct a smaller facility than the two hospitals with approximately 350 licensed beds. The site is located between the existing campuses and at the intersection of major roads. The cost to construct and establish this new facility is approximately $250 million. In addition, the system requires approximately $54 million to retire its outstanding debt. Despite its positive margin, ORMC's creditworthiness relative to other hospitals nationally is low, and it has limited access to capital in the private markets.

## *Recommendation 4*

### **Facility (ies)**

Community Hospital at Dobbs Ferry (Westchester County)

### **Recommended Action**

It is recommended that Community Hospital at Dobbs Ferry close in an orderly fashion.

115

**Facility Description(s)**

Community Hospital at Dobbs Ferry (CHDF) is a small general hospital. It has 50 certified beds, 30 of which are operational. It had an average daily census of only 20 inpatients in 2004. CHDF provides only basic medical/surgical services; it does not provide obstetric, pediatric or psychiatric care. It specializes in short-stay surgery, of which it performs approximately 3,000 procedures per year. The hospital's emergency room provided nearly 9,000 visits in 2004. CHDF is located in an affluent suburb, and the majority of the town's residents have commercial insurance or Medicare. The community supports the hospital with fundraising efforts, most recently to support the renovation of its emergency room. The hospital has approximately 150 full-time equivalent employees.

The hospital had many years of operating losses and defaulted on federal loans twice. Riverside Health Care System (Riverside) acquired CHDF at auction for $4.6 million. Riverside operates two acute-care campuses in Yonkers, St. John's Riverside Hospital and the Park Care Pavilion. CHDF operates under a management contract with St. John's Riverside, which also serves as its passive parent.

**Assessment**

Community Hospital at Dobbs Ferry performs poorly on the Commission's criteria. It has extremely low utilization, provides no specialized services, provides very little care to vulnerable populations, and makes only a small economic contribution to the region's economy. CHDF had approximately 1,696 discharges in 2004. In 2004, only 5% of its inpatients had Medicaid coverage or were uninsured, and 6% of its patients came from medically underserved areas. It has 50 certified beds and an average daily census of approximately 20 patients.

Community Hospital at Dobbs Ferry is a prime example of excess capacity, which the Commission was charged to eliminate. Excess capacity jeopardizes quality of care by dispersing patients over too many institutions, induces unnecessary and costly utilization of services, and causes needless and duplicative capital investment.

116

Analysis performed by the Commission indicates that patients who currently use CHDF readily could be absorbed within reasonable travel times by neighboring institutions, including St. John's Riverside, Westchester Medical Center, White Plains Hospital and Phelps Memorial Hospital, all of which provide more comprehensive ranges of services. Those urgent/emergent patients using CHDF's emergency department could similarly be absorbed by neighboring hospitals within acceptable travel time limits.

CHDF is only 3 miles north of the St. John's Riverside Andrus site in Yonkers. It has been asserted that surgeons using CHDF do not practice at St. John's Riverside, and would not transfer their business there because of physician and patient preference to avoid Yonkers. The Commission does not find this a convincing argument for maintaining the Dobbs Ferry site. A hospital should not remain open in order to serve the convenience of a small number of physicians.

While CHDF lost money for fifteen straight years, Riverside's CEO reported that revenue generated by CHDF resulted in approximately $700,000 profit to the Riverside system in 2005, and that CHDF absorbed approximately $2 million per year in system overhead expenses. It is uncertain whether CHDF will continue to generate profit for Riverside, especially given its prior chronic losses. The Riverside system is sustainable without the financial contributions of Dobbs Ferry. Furthermore, environmental changes will make positive contributions to Riverside's bottom line. NY State is in the process of approving a certificate of need application for a cardiac catheterization lab that Riverside estimates will ultimately generate approximately $2.5 million in total annual revenues. Reimbursement changes by Medicare will also positively affect Riverside's financial condition.

While the Commission is concerned with the financial viability of the Riverside system, it is not persuaded that an unnecessary hospital should remain open simply to subsidize other hospitals. The argument that we should sustain a hospital that scores so poorly under the Commission's analytic framework in order to shore up another hospital is not supportable within the



Commission's charge, which specifically targets opportunities to rightsize the health care delivery system in order to best meet community health care needs.

## *Recommendation 5*

### Facility (ies)

Westchester Medical Center (Westchester County)

### Recommended Action

It is recommended that Westchester Medical Center evaluate the clinical and financial viability of reestablishing the Fareri Children's Hospital as an independent entity and determine the impact of such change on access to and quality of care in the Hudson Valley region as well as the impact on both the Medical Center and the Children's Hospital. It is further recommended that Westchester Medical Center conduct a strategic planning process to evaluate its clinical service mix and identify opportunities for reconfiguration that is non-duplicative of services in community hospitals.

### Facility Description(s)

Westchester Medical Center (WMC) is an academic medical center affiliated with the New York Medical College in Valhalla. It is the Hudson Valley region's specialty referral center for all tertiary and quaternary levels of care, including organ transplantation. It has the region's only level 1 trauma center, the region's only burn center, the Fareri Children's Hospital, and the state-funded regional resource center for training and preparedness against terrorist attacks and natural disasters.

WMC provided approximately 23,809 discharges, 25,868 emergency visits and 145,290 outpatient visits in 2004. Thirty-one percent of its inpatients and 39% of its emergency

118

department admissions were Medicaid-covered or uninsured in 2004. WMC reported that 90% of its 635 certified and available beds are occupied. WMC's children's hospital has 120 beds and is fully occupied. WMC has approximately 4,000 full-time equivalent employees across all of its facilities.

WMC is operated by the Westchester County Health Care Corporation, (WCHCC) a public benefit corporation established by New York State in 1997 to assume the function of Westchester County's Department of Hospitals. WCHCC financed itself by issuing serial bonds backed by Westchester County. According to a transition agreement with WCHCC, the County has guaranteed debt to finance WCHCC's working capital so long as WCHCC meets certain performance measures. If WCHCC does not meet these performance measures, the County can compel WCHCC to hire consultants to evaluate and possibly restructure its fiscal affairs, and must offer its recommendations to the County government.

#### Assessment

The vision of WMC is to serve as a non-duplicative, tertiary referral center for all counties in the Hudson Valley. Although community hospitals have increased their provision of tertiary services, this goal has been largely realized. Today, WMC has among the highest case mix indexes in New York State, which reflects the acuity level of its patients.

WMC has had significant operating and financial problems following its conversion to a public benefit corporation. WMC's operating deficits from 2001 to 2004 total $207 million. These losses triggered an audit by the State government, management changes, hiring of a consultant, and implementation of a financial recovery plan. The current executive management team has competently reduced costs and improved the facility's financial viability. It is renegotiating its contracts with commercial payers to increase payments to the facility. WMC projects a $22 million surplus in 2006, made possible in part due to a county subsidy of approximately $55 million. In addition, WMC recently received the State's commitment to increase its Medicaid payments by $75 million over three years. Independent agencies have raised their ratings of WMC's debt.

119

WMC's recent fiscal stabilization enables the facility to make clinical and structural changes that could further strengthen the institution. It is especially critical to evaluate the optimal relationship between WMC and the Children's Hospital. Currently, the facilities are fully integrated financially, operationally, and managerially. Of $270 million in total outstanding bonds at WMC, approximately two-thirds - $140 million - is attributable to the Children's Hospital. It has been estimated that the annual operating loss of Children's Hospital is approximately $20 million, or roughly one-third of the total annual operating loss at WMC in 2005. WMC must undertake a comprehensive evaluation of the feasibility of establishing Children's Hospital as an independent facility. Furthermore, WMC must proceed with a strategic planning process to assess their clinical portfolio and their position in the market.

# HUDSON VALLEY REGION

# LONG-TERM CARE RECOMMENDATIONS

## *Recommendation 1*

### Facility (ies)

The Valley View Center for Nursing Care and Rehab (Orange)

### Recommended Action

It is recommended that Valley View Center for Nursing Care and Rehab downsize by approximately 160 RHCF beds to approximately 360 RHCF beds and add an 80-bed ALP, a 30-slot ADHCP and possibly other non-institutional services in the vacated building. In the remaining buildings, it is recommended that the facility convert 50 RHCF beds to a 20-bed ventilator-dependent unit and a 30-bed behavioral step-down unit.

### Facility Description(s)

The Valley View is a 520-bed residential health care facility, owned and operated by Orange County. The facility provides baseline services, locked dementia care, an expanding and successful short-term rehabilitation program, and an 8-bed AIDS care center that has been entirely unoccupied since 2003. It coordinates closely with the county's long-term home health care program.

With a new administrator in place, Valley View has over 95% occupancy of its staffed beds, and it has a high case mix index (1.16). It had 17 deficiencies compared to a regional average of 5, but no immediate jeopardies. Valley View's faces significant financial problems. It has lost over

121

$1 million per year in operations, and had a loss of $2.6 million in 2002. The facility's labor contract requires greater than 50% benefits and includes staff maintenance restrictions.

Valley View operates two buildings, including the Perry building that houses 160 beds with shared bathrooms. Valley View has eliminated beds from the Perry building and intends to close it as soon as feasible.

## Assessment

Orange County's population has grown significantly. While the county has a documented bed need of 388 additional nursing home beds, the existing providers are only 92% occupied. Moreover, the county has large unmet need for non-institutional services, particularly ALP beds and ADHCP slots. With more non-institutional options available in the county, the long-term care system will be better balanced for the future population growth.

The Perry building should be closed and converted to accommodate an ALP and ADHCP.

## *Recommendation 2*

### Facility (ies)

Andrus-on-Hudson (Westchester)

### Recommended Action

It is recommended that Andrus-on-Hudson downsize all 247 RHCF beds and add 140 ALP beds and possibly other non-institutional services.

122

**Facility Description(s)**

Andrus-on-Hudson is a not-for-profit, 247-bed residential health care facility that provides baseline and sub-acute services in Westchester County. Its board of trustees tried for seven years to convert their campus into a continuing care retirement community (CCRC), with independent apartments and 48 SNF beds, but was denied building rights by the town of Hastings. They currently have 176 beds occupied (71% of its certified beds, or 89% of "available beds," pending a 50-bed sale to another provider). The facility had been operating at a significant loss until 2006, and receives financial support from the Andrus Family Foundation. The home owes the foundation $13 million, but that sum may not be exchanged. The facility claims that it is now operating in the black.

Andrus-on-Hudson has one of the lowest case mix indexes in the State (0.91). Of their 176 residents, about half have low-acuity conditions. These residents could be better served in an ALP, if that were available. The physical plant is old and in need of capital improvements. The facility has private rooms and baths; and therefore, its conversion to an ALP facility would be economical. The facility has a history of a high number of deficiencies (26 in its 2005 survey), many of which are attributable to the building's deteriorating condition.

**Assessment**

There are opportunities to shift resources from institutions to other settings in Westchester County. The State's bed need methodology shows an excess of 653 beds. There are over 1,000 PAs and PBs in the existing beds, and county occupancy was only 88% in 2004. There are too many nursing home beds and not enough appropriate residents in Westchester nursing homes. At the same time, Westchester has an unmet need for approximately 1,100 non-institutional slots.

The optimal direction would be to build new ALP homes on the Andrus campus. Should that not be feasible, the Commission recommends a floor-by-floor renovation of the existing building to create ALP apartments and common space out of the nursing floors.

## *Recommendation 3*

### Facility (ies)

Taylor Care Center (Westchester)

### Recommended Action

It is recommended that Taylor Care Center downsize by approximately 140 RHCF beds to approximately 181 RHCF beds.

### Facility Description(s)

Taylor Care Center (TCC) is operated by the Westchester Public Health Corporation, which also operates the Westchester Medical Center. TCC is a 321-bed residential health care facility which provides baseline services, and has a 27-bed ventilator-dependent care unit. TCC offers distinctive sub-acute care for individuals with complex medical needs. The facility fills 42 beds with these complex sub-acute residents, referred by Westchester Medical Center, St. John's Hospital, White Plains Hospital, Montefiore Hospital, and Columbia-Presbyterian Hospital. TCC is licensed for an additional 252 beds, but staffs only 156. Its occupancy rate based on certified beds is only 79%, assuming all 156 staffed are occupied.

TCC has a high case mix index (1.25), and provides solid quality of care. TCC houses 10 uncompensated residents. Very few nursing homes, even county-financed nursing homes, have more than 1 or 2 residents on charity care. Due to its high-intensity care and several uncompensated cases, TCC operates at a significant loss of $6 million per year, which is down from as much as $13 million in previous years.

124

**Assessment**

Both the bed need methodology results and the 88% county-wide occupancy provide evidence that Westchester County is over-bedded. TCC in particular competes with some high-quality nursing homes who are finding it difficult to keep their beds filled. Downsizing TCC will strengthen a number of other facilities in the county.

## *Recommendation 4*

**Facility (ies)**

Achieve Rehabilitation (Sullivan)

**Recommended Action**

It is recommended that Achieve Rehabilitation downsize by approximately 40 RHCF beds to approximately 100 RHCF beds.

**Facility Description(s)**

Achieve Rehabilitation is a 140-bed residential health care facility in Sullivan County, providing baseline services. Challenges at the facility include:

- Low occupancy. Only 89% of its beds were occupied in 2004, which, according to its administrator, has not increased since then.
- Quality of care. Achieve had 16 survey deficiencies, including two level 3, actual-harm deficiencies. The regional average for total deficiencies is 4. In addition, Achieve has a much higher rate of substantiated complaints than the statewide average.
- Low acuity. Over one-quarter of Achieve's residents have low-acuity conditions. Some of these residents could be served in a less-restrictive setting.

125

**Assessment**

A downsized facility could devote additional resources to solve or mitigate its substantial quality of care problems. Closure of Achieve is impractical because there would be an insufficient number of nursing home beds in Sullivan County should Achieve close. There are only four nursing homes in Sullivan County, and there is a documented deficit of 137 beds in the county according to the state need methodology. The other three nursing homes in the county have very high occupancy rates.

## *Recommendation 5*

### Facility (ies)

Sky View Rehabilitation and Health Care Center (Westchester)

### Recommended Action

It is recommended that Sky View Rehabilitation and Health Care Center close, downsize or convert, contingent on the determination of the Commissioner of Health, after a comprehensive review of the facility in light of the Commission's analytic framework, that such closure, downsizing or conversion would be consistent with the mandate and other recommendations of the Commission.

### Facility Description(s)

Skyview Rehabilitation and Health Care Center is a 192-bed proprietary residential health care facility that provides baseline services in Westchester County. It had an occupancy rate of 93% in 2004. Skyview faces quality and viability issues.

126

**Assessment**

This facility was identified as a facility of interest based on the Commission's criteria. The Regional Advisory Committee and Commission repeatedly contacted the administrator of this facility, but have received no response to date. Given the facility's location in the well-served northwest of Westchester, closure, downsizing or conversion may be warranted. The Commissioner's review should be completed by June 30, 2007, and any closure, downsizing or conversion should be completed by June 30, 2008.

# LONG ISLAND REGION

# ACUTE CARE RECOMMENDATIONS

## *Recommendation 1*

### Facility (ies)

Eastern Long Island Hospital (Suffolk County)

Southampton Hospital (Suffolk County)

Peconic Medical Center (Formerly Central Suffolk) (Suffolk County)

Brookhaven Memorial Medical Center (Suffolk County)

University Hospital at Stony Brook (Suffolk County)

### Recommended Action

It is recommended that Eastern Long Island Hospital, Peconic Medical Center, and Southampton Hospital be joined in a single unified governance structure with full authority to develop a strategic plan which restructures the hospitals to ensure access to services, rationalize bed capacity, minimize duplication of services, create management efficiencies and develop an integrated health care delivery system for the North and South Forks, Riverhead and the communities immediately to the west. It is further recommended that the Commissioner refrain from either approving any applications that have been or will be filed by any of the facilities or providing any other consent requested by any of the facilities, prior to the execution by the facilities of a binding agreement to join under a single unified governance structure, except where such approval or consent is necessary to protect the life, health, safety and welfare of facility patients, residents or staff.

It is recommended that these hospitals develop an affiliation with University Hospital at Stony Brook in order to gain access to tertiary care services and the other benefits inherent in relationship with an academic medical center.

It is recommended that Brookhaven Memorial Hospital continue joint planning with the three East End hospitals, and explore becoming part of the new entity.

It is further recommended that the hospitals implement the following bed and service reconfigurations:

Southampton Hospital, currently certified for 168 beds, should downsize its certified bed capacity to 125, to be comprised of 103 medical/surgical, 3 pediatric, and 19 obstetrics, for a reduction of 37 medical surgical and 6 pediatric beds.

Brookhaven Memorial Hospital, currently certified for 321 beds, should increase its certified bed capacity to 326, to be comprised of 262 medical/surgical, 14 obstetrics, 10 pediatric, and 40 psychiatry, for a reduction of 10 obstetrics and 5 pediatric beds, and an addition of 20 psychiatry beds.

Eastern Long Island Hospital, currently certified for 80 beds, should expand its certified bed capacity to 85, to be comprised of 37 medical surgical, 5 alcohol detox, 23 psychiatry, and 20 alcohol rehabilitation, for an addition of 5 psychiatry beds.

Peconic Bay Medical Center, currently certified for 154 beds, should downsize its certified bed capacity to 140 beds, comprised of 114 medical/surgical, 8 obstetrics, and 18 physical medicine rehabilitation beds, for a reduction of 32 medical surgical beds, and a transfer of 18 certified physical medicine rehabilitation beds from University Hospital at Stony Brook.

University Hospital should downsize 18 certified, but not available physical medicine rehabilitation beds. These 18 beds should be added to Peconic Bay Medical Center.

129



## Facility Description(s)

The "East End" hospitals, Eastern Long Island, Peconic, and Southampton hospitals, historically have served the easternmost part of Long Island, including the south and north forks, Riverhead, and communities immediately to their west. Brookhaven Memorial is close to the East End hospitals, located on the south shore of Suffolk County. Recent changes in the area's demographics, including a 7% growth in population in the four hospitals' joint service area, has prompted a four-way joint planning effort to meet the needs of their shared community.

| (2004 data) | Eastern Long Island Hospital | Peconic Hospital | Southampton Hospital | Brookhaven Hospital |
|---|---|---|---|---|
| Certified Beds | 80 | 154 | 168 | 321 |
| Staffed Beds | 80 | 154 | 120 | 251 |
| ADC | 62 | 74 | 69 | 231 |
| Discharges | 3,084 | 6,079 | 6,844 | 14,254 |
| ED Visits | 7,980 | 23,809 | 24,886 | 58,832 |
| Operating Margin (2003) | -1.6% | -0.3%% | -3.4% | 0.4% |
| % Medicaid/Uninsured | 24% | 17% | 15% | 20% |
| FTE | 267 | 621 | 639 | 1,452 |

Eastern Long Island, Peconic and Brookhaven hospitals are clinically affiliated with SUNY Stony Brook. Southampton Hospital is developing a similar affiliation. Each of the hospitals has an active, supportive relationship with Suffolk County's network of health centers that serve as the outpatient healthcare safety net in Suffolk.

All four hospitals provide medical/surgical and emergency services. Peconic, Brookhaven and Southampton hospitals provide obstetric and pediatric services. Eastern Long Island Hospital has expertise in psychiatry and substance abuse services. Brookhaven Memorial, the largest of the four institutions, has an approved certificate of need to build a diagnostic cardiac catheterization lab.



**Assessment**

Because of the topography of the East End, the distribution of population, and distance and drive times between the hospitals, particularly in summer, access to emergency and acute inpatient care must be maintained at all three locations. None of the East End hospitals is a viable candidate for closure.

The size of the East End's population, however, makes it impracticable to maintain three small, independent community hospitals, all of which aspire to provide a comprehensive range of health services. Competition for patient volume in this sparsely populated area further will clinically and financially weaken two and possibly all three hospitals. It is imperative to rationalize and consolidate service delivery to improve the hospitals' quality of care and fiscal standing.

The three East End hospitals, together with Brookhaven Memorial Hospital, have developed a proposal to reconfigure services and joint governance. Given this proposed cooperative venture, the hospitals have withdrawn certificate of need applications for competitive services. The detailed plan includes: the growth of centers of excellence in obstetrics, primarily at Southampton and Brookhaven hospitals, with a smaller program at Peconic hospital, an expanded behavioral health program at Eastern Long Island and Brookhaven hospitals that will serve all four hospitals, additional physical medicine rehabilitation services at Peconic Bay to serve all four hospitals, overall reductions in medical/surgical and pediatric bed capacity at all four hospitals. Additionally, the hospitals recognize the need for expanded outpatient services.

Three of the hospitals developed a collaborative relationship, the Peconic Health System (PHS), in 1997, but they dissolved this relationship in 2006. PHS disbanded because there was a lack of capital for investment, and the hospitals ultimately disapproved of its governance structure. The lack of capital restrained the system from making required investments to rationalize services and from realizing economies of scale. In addition, the PHS board of directors required supermajority ratification process for many proposals, and had insufficient delegatory powers from the individual hospital boards that had remained in place. This structure made it difficult for

131

meaningful change to occur; therefore, the interests of the individual hospitals were favored over the collective interests of all the East End hospitals.

The current four-member planning group has hired a consultant to propose the most effective governance structure for the new entity. The Commission believes that this new governance structure should include representation not only of the founding members, but also of other community members who did not serve as a trustee of any of the hospitals and who share a broad definition of the communities to be served.

University Hospital at Stony Brook and these community hospitals have conducted discussions to form a larger health network. The community hospitals would gain Stony Brook's assistance as an academic, tertiary partner, thereby improving the provision of care to Suffolk residents. These discussions should continue. Patients must have access to tertiary services that cannot be efficiently provided at a community hospital. University Hospital, as the regional academic health center, should assume this role.

## *Recommendation 2*

### **Facility (ies)**

University Hospital at Stony Brook (Suffolk County)

### **Recommended Action**

It is recommended that University Hospital at Stony Brook be given the operational and governance freedom to enter into meaningful partnerships with other hospitals so as to create a health care delivery system that will better serve the needs of the region.

**Facility Description(s)**

University Hospital at Stony Brook is Suffolk County's only academic medical center and its only tertiary care provider. At 504 certified beds, it has the county's only open heart surgery program, comprehensive cancer center, comprehensive epilepsy center, and level III neonatal intensive care unit. The hospital has a level I trauma center. It had approximately 29,954 discharges, 64,727 ED visits and 269,815 outpatient visits in 2004. Medicaid-covered and uninsured patients represented 22% of its discharges and 32% of its emergency department admissions. University Hospital at Stony Brook had approximately 4,055 full-time equivalent employees in 2003.

**Assessment**

University Hospital at Stony Brook is an important regional provider of tertiary health services, and a health care delivery leader in Long Island. It has not sufficiently strengthened its relationships with surrounding community hospitals. As a publicly financed academic medical center, University Hospital must enter into health system partnerships with other hospitals to strengthen its regional role. Compared with University Hospital, the two other SUNY hospitals in Syracuse and Brooklyn have relatively stronger ties to their neighboring community hospitals.

The Commission recognizes the overarching importance of the provision of medical education at the University. University Hospital should continue align itself with SUNY, but also have the operational and governance independence to enter into meaningful partnerships with other hospitals so as to create a health care delivery system that will better serve the needs of the region. The intellectual and financial assets of University Hospital, which include the expertise of its staff, the depth of its clinical programs, and the hundreds of millions of dollars already invested in equipment and facilities, must be leveraged for a greater good. The failure to expand University Hospital's regional role would result in a lost opportunity to better serve the residents of Long Island and strengthen the community hospitals upon which it is dependent for referrals. In addition, a failure to create a stronger relationship may encourage community hospitals to pursue the development of alternatives with other health systems, which may diminish

133

University Hospital's regional influence and increase the likelihood of the need to subsidize the hospital, which is a burden that will ultimately fall on all New York State taxpayers.


## *Recommendation 3*

### **Facility (ies)**

St. Charles Hospital (Suffolk County)

J.T. Mather Memorial Hospital (Suffolk County)

### **Recommended Action**

It is recommended that St. Charles Hospital downsize 77 medical/surgical beds, convert the remaining 37 medical/surgical beds to psychiatric and alcohol detoxification beds, provided that the Commissioner of Mental Health and the Commissioner of Alcoholism and Substance Abuse Services approve such conversions, and discontinue its emergency department. It is further recommended that J.T. Mather Memorial Hospital convert all 37 of its psychiatric and alcohol detoxification beds to medical/surgical beds, provided that the Commissioner of Mental Health and the Commissioner of Alcoholism and Substance Abuse Services approve such conversions. It is further recommended that the Commissioner refrain from either approving any applications that have been or will be filed by either facility or providing any other consent requested by either facility, prior to the implementation of the foregoing service reconfiguration, except where such approval or consent is necessary to protect the life, health, safety and welfare of facility patients, residents or staff.

### **Facility Descriptions**

These two hospitals are located less than a mile apart on adjacent parcels of property in the town of Port Jefferson. Their location in Suffolk County is not easily accessible, as Port Jefferson is a

134



distance north from the Long Island Expressway, which is the major thoroughfare in Nassau and Suffolk Counties.

J. T. Mather is a free-standing community hospital with 248 certified beds. St. Charles is a member of the Catholic Health Services of Long Island with 289 certified beds.

St. Charles' services include physical medicine and rehabilitation, obstetrics, alcohol rehabilitation, orthopedics, general medical/surgical services and pediatric beds, several outpatient rehabilitation centers and an emergency department. J.T. Mather focuses on acute medical/surgical care and also maintains 37 beds for psychiatry and alcohol detoxification. In addition to general medical/surgical beds, both hospitals operate emergency departments. The Mather emergency room volume is approximately twice that of St. Charles. Perhaps reflecting their differences in clinical configuration, Mather's uncompensated care cost was $21,216,477 versus St. Charles' uncompensated care of $1,789,004.

Mather Hospital generated a modest surplus from operations for the past several years, but is now reporting operating losses and declining utilization. St. Charles has fiscally stabilized, reduced expenses, and has operated at essentially break even for one year, following several years of significant operating losses. Information supplied by St. Charles showed bottom line losses as follows: $25 million in 2000, $24.5 million in 2001, $12.6 million in 2002, $8 million in 2003, $8.9 million in 2004, and $614,000 in 2005. St. Charles has debt service costs on $72 million, of which $69.1 is DASNY debt. Mather has debt service costs on $32.2 million, $28.3 million of which is DASNY debt.

Both hospitals have suffered volume losses from program investments made by SUNY University Hospital at Stony Brook and from shifts in physician participation in insurance plans. In this area, discharge volumes are decreasing at Mather, St. Charles and St. Catherine of Siena while Stony Brook is experiencing an increase in discharges.

Mather and St. Charles share a common medical staff. Each of the hospitals employs approximately 1,300 full-time equivalents.

135

**Assessment**

In the past, these hospitals voluntarily created an alliance to distribute services so that both could survive and focus on niche roles to better serve their communities. The goal of the Mather - St. Charles Health Alliance was to avoid the competitive duplication of costly services and technologies and permit more resources to be invested in clinical program development. It was also structured to accommodate the Ethical and Religious Directives for Catholic Healthcare Organizations. Mather focused on acute medical/surgical services and St. Charles pursued a specialty rehabilitation hospital strategy in addition to operating orthopedic and obstetrical services. Duplication however remains for medical/surgical and emergency services and other services, such as behavioral health, are split between the facilities.

In recent years, reimbursement reductions and the movement of care from inpatient to ambulatory and niche providers have created an imbalance in the Alliance which makes it difficult to maintain and build on the relationship. There is pressure on both hospitals to continually invest in facilities and technology to remain competitive. Recently, for example, both hospitals launched competitive bariatric surgery programs. Competition for medical/surgical services, including orthopedics and neurosurgery, is ongoing.

The debt of St. Charles Hospital is part of the obligated group for the Catholic Health Services of Long Island (CHS). The CEO of CHS has proposed a new strategy for St. Charles focusing on the niche services of acute rehabilitation, obstetrics, alcohol rehabilitation, hospice, and other specialty programs. Accordingly, CHS recently moved substance abuse beds from Mercy to St. Charles. It was reported by CHS leadership that there are financial issues facing several of the other CHS hospitals so it is preferable to continue to operate St. Charles as a niche provider rather than to cease operations.

The Commission believes that the goals of the previously constituted Alliance between the two hospitals as it was envisioned approximately 10 years ago represents the most feasible approach to meeting the health care needs of the community. Market changes, competition for

medical/surgical services and the influence of Stony Brook have created challenges to meeting these goals. Although only one full service hospital is theoretically required to meet community needs, both Mather and St. Charles have been the beneficiaries of substantial capital investment. The proposed action will create one such full service hospital operated between two campuses and two sponsors.

The duplication of medical/surgical services in Port Jefferson must be eliminated to end the medical arms race for those services, avoid expending scarce resources, and prevent the progressive weakening of both St. Charles and Mather. With this realignment of beds and services, both hospitals will continue to serve the market without duplication and can develop and provide complementary, non-duplicative clinical programs into the future. In particular, St. Charles should pursue development of its plans for niche services for rehabilitation, obstetrics, psychiatry, alcohol rehabilitation, palliative care and hospice and can pursue its desire to utilize remaining excess facilities for other than Article 28 services. J.T. Mather should enhance its position as the main acute care hospital with the emergency department and free up its behavioral health and alcohol detoxification beds to accommodate the medical/surgical needs of the local community.

## *Recommendation 4*

### **Facility (ies)**

Nassau University Medical Center (Nassau County)

### **Recommended Action**

It is recommended that Nassau University Medical Center downsize its certified capacity of 631 to 530 certified beds, to be comprised of 173 medical/surgical, 26 pediatric, 30 obstetrics, 25 physical medicine rehabilitation, 120 psychiatry, 13 child psychiatry, 20 alcohol detoxification,

137

30 substance abuse rehabilitation, 10 burn care, 33 intensive care, 6 pediatric intensive care, 28 NICU, and 16 prison health beds. This represents a downsizing of 133 medical/surgical, 20 pediatric, 6 obstetrics, 5 physical medicine/rehabilitation, and 10 NICU beds, together with an addition of 30 psychiatry, 13 child psychiatry, and 30 substance abuse rehabilitation beds, provided that the Commissioner of Mental Health and the Commissioner of Alcoholism and Substance Abuse Services approve such additions.

## Facility Description(s)

Nassau University Medical Center, a 631-bed community teaching hospital, is part of the Nassau Health Care Corporation (NHCC), which also includes the A. Holly Patterson Extended Care Facility (AHP), an 889-bed skilled nursing facility, and six Article 28 diagnostic and treatment centers that are located in communities with high health care needs.

NUMC is the principal safety net hospital for low income and uninsured residents of Nassau County. Located in East Meadow in central Nassau County, the Medical Center had approximately 22,728 discharges 75,022 emergency department visits, and 196,398 outpatient visits in 2004. Medicaid-covered and uninsured patients represent 51% of discharges and 57% of emergency department admissions. The Medical Center had approximately 3,019 full-time equivalent employees in 2003.

NHCC receives a substantial subsidy from Nassau County to compensate it for the major role it plays in providing acute care access to many Nassau County communities with documented health disparities and large proportions of low income or underinsured residents. NHCC was created to assist Nassau County in addressing a budget shortfall by purchasing the assets from the County and transferring those assets to a newly formed public benefit corporation. NHCC financed the purchase with additional debt that was guaranteed by Nassau County. The establishment of a public benefit corporation was also intended to provide increased flexibility to operate the constituent facilities free of government-owned restrictions.



**Assessment**

NUMC has faced great challenges and obstacles before and since it achieved financial stability in 1999, when its ownership was transferred from the county to NHCC. Unstable leadership and shifting strategies have punctuated its precarious operating history. NUMC operates in the same competitive marketplace as do other Long Island hospitals, but it is burdened by operational constraints due to the county's prior ownership. The increased debt load, which is secured by Nassau County funds, coupled with a disproportionately heavy Medicaid payor mix, has intensified government oversight and involvement. Accordingly, the Nassau County government retained consultants to help stabilize NHCC's finances, and has recently appointed new management and governance of NHCC.

The continued existence of NUMC as an acute care hospital is critical to the residents of Nassau County; it is the county's main safety net provider. Poverty in NUMC's primary service area is almost double the rate in the county overall. Compared to other Long Island hospitals, NUMC's patients are disproportionately racial minorities and are foreign-born, non-English speaking residents. According to NUMC, it had over 50% of all Medicaid inpatient discharges from Nassau County hospitals. While other providers in Nassau County play an important role in providing access to Medicaid, uninsured and underserved populations, many of these hospitals operate their staffed beds at relatively high occupancy rates and have long wait periods in their emergency departments for inpatient beds. If NUMC were to close, neighboring hospitals could not absorb NUMC's 75,000 emergency visits and approximately 21,000 inpatient admissions.

The leadership of NHCC understands that it must redefine its mission and develop appropriate strategies given its and its competitors' fiscal and operating situations. NHCC developed a plan that redefines its mission and strengthens its core clinical services. In July 2006, NHCC negotiated a $40 million bail-out plan with the State, including an agreement to rescind most of the subsidy cuts originally proposed, to increase reimbursement for its nursing home, and to provide additional state aid for treating uninsured patients. In exchange, NHCC recommitted itself to its mission to serve the surrounding communities of East Meadow, Westbury,

139

Hempstead, Freeport, Roosevelt and Uniondale, most of which have large minority and uninsured populations.

NUMC must focus on being a high-quality community teaching hospital providing for the health care needs of the communities that are dependent on it for primary, emergent and acute care. It should continue to provide certain tertiary services: trauma, burn, and neonatal care. It should not invest in tertiary services that require significant investment to develop. It should continue to develop collaborations with alternate facilities that offer those tertiary services NUMC does not provide.

NUMC has three vacant floors of raw space that could be used for program expansion or consolidation. NUMC should modify its existing space to its most efficient use before any new construction. This is particularly important with respect to the rebuilding of A. Holly Patterson Nursing Home.

## *Recommendation 5*

### Facility (ies)

Long Beach Medical Center (Nassau County)

### Recommended Action

It is recommended that Long Beach Medical Center downsize its bed capacity to approximately 145 beds. Contingent upon New York State's development of new reimbursement options and alternative institutional models, Long Beach should reconfigure as a smaller facility focused on emergency and ambulatory care services with a more limited number of inpatient beds and linkages to a more comprehensive partner.

**Facility Description(s)**

Long Beach Medical Center (LBMC) consists of a 203-bed community hospital and a 200-bed sub-acute and skilled nursing facility. LBMC is located in the city of Long Beach on a south shore barrier island accessible to the mainland by three drawbridges located at the east, west and middle of Long Beach Island. LBMC is located adjacent to the central drawbridge that connects to Nassau County. The closest hospital to Long Beach is South Nassau Communities Hospital which is located 5 miles to the north over the adjacent drawbridge. Seven miles to the west is St. John's Episcopal Hospital and nine miles to the west is Peninsula Hospital. While these distances do not appear to be a barrier to alternate access, all three drawbridges are frequently up during summer, snarling traffic and blocking emergency access.

LBMC had 5,621 discharges, 14,743 emergency department visits, and had an average daily census of 117 patients in 2004. The hospital reported 76% occupancy of its available beds for 2005. LBMC's inpatient payor mix includes a high percentage of Medicare (59%), and Medicaid and Uninsured (28%) patients. LBMC had approximately 970 full-time equivalent employees in 2003. The hospital has $28 million in long-term debt, approximately $22 million with DASNY.

LBMC had break-even operational margins between 2001 and 2004. Its revenue has recently, and most likely temporarily, lost approximately 12% of its revenue due to requirements imposed by the New York State Office of Alcoholism and Substance Abuse Services (OASAS) that LBMC cease treating inpatient substance abuse patients until OASAS licenses LBMC to resume. LBMC has submitted required certificate of need applications to provide inpatient substance abuse services.

**Assessment**

There are approximately 40,000 residents in Long Beach and its adjacent island communities. There is a relatively large concentration of nursing homes, adult homes and assisted living facilities in Long Beach, and 16% of the population is over 65 years old. Because of the concentration of healthcare and housing facilities for the elderly, summer-time surges in

population, recreational and boating facilities, geographic isolation, and dependence on drawbridges to access the mainland, LBMC, despite its size and unstable financial situation, must remain open so that the community has appropriate access to emergency services and acute care. Eighty-eight percent of LBMC inpatients who are Long Beach residents were admitted under an emergent classification, and 68% of Long Beach residents who were admitted to other hospitals also were categorized as emergent.

While the Long Beach community seeks emergency and acute care at LBMC, Long Beach residents travel off the island for elective treatment. There were approximately 6,000 discharges in New York State of Long Beach residents, and of these, approximately 3,000 were discharged from LBMC. The remaining 50% sought care at mainland hospitals, including South Nassau Communities Hospital, St. Francis Hospital, North Shore University Hospital and Mercy Medical Center for acute inpatient, surgical and maternity care that LBMC does not provide.

LBMC cannot compete in the medical arms race. LBMC would benefit from reconfiguration and support from or integration with a strong partner or health system. The hospital has attempted to join a larger system; however, the hospital's largely medical, low-acuity case mix and its financial situation make it an unattractive acquisition target or potential partner.

The City of Long Beach needs a health care facility, and changes in the reimbursement system and an affiliation with a strong partner would improve LBMC's financial standing. LBMC will likely benefit from the proposed changes in Medicare's reimbursement, but will not solve the hospital's structural financial problems. Should there be changes in reimbursement, LBMC should be reconfigured as a new type of provider, with relatively few beds, and with a focus on emergency and ambulatory care, with a limited number of clinical services, with adequate capacity to stabilize and transfer patients with more complicated cases. Pending such changes, LBMC should eliminate its excess capacity by decertifying and downsizing to 145 certified beds, a level that accommodates its average daily census at reasonable occupancy, and permits the hospital to add adequate beds to accommodate periods of peak census in the summer.

142

# LONG ISLAND REGION

## LONG-TERM CARE RECOMMENDATIONS

### *Recommendation 1*

#### Facility (ies)

A. Holly Patterson Extended Care Facility (Nassau County)

#### Recommended Action

It is recommended that A. Holly Patterson Extended Care Facility (AHP) downsize by approximately 589 RHCF beds to approximately 300 RHCF beds, and transfer its sub-acute services to the empty floors of the Nassau University Medical Center (NUMC), provided that such sub-acute services continue to be operated by AHP. It is further recommended that AHP rebuild a smaller facility on its existing campus, and add a 150-bed ALP and possibly other non-institutional services.

#### Facility Description(s)

A. Holly Patterson Extended Care Facility (AHP) is an 889-bed residential health care facility owned and operated by the Nassau County Health Care Corporation, a public benefit corporation. It provides baseline services, and operates an 80-bed subacute service, a 20-bed AIDS unit, and provides ventilator care.

AHP's occupancy rate of 60% is one of the lowest occupancy levels in the State. In 2002, it filled 84% of its beds. Approximately 23% of its beds are filled with low-acuity residents, some of whom can be served in a less-intensive setting if such services were available. Quality of care

143

is of concern at AHP. The number of deficiencies cited by State surveyors ranged from 5 to 16 over the last three years, whereas the regional median is 3. Some of AHP's quality indicators are far below the regional average, including percent of residents losing bowel and bladder control, residents experiencing pain, and short-stay residents obtaining pressure sores.

## Assessment

Nassau County has excess nursing home capacity. Despite a paper need for more than 1,200 nursing home beds, the county operates at a meager 90% occupancy rate. Even when AHP eliminated its unused beds, the remaining providers ran at about a 6% vacancy rate in 2004. Such excess capacity hurts the providers financially. Providers lose bed-hold payments, are forced to accept lower-acuity individuals than they might otherwise, thereby reducing total Medicaid revenue through a lower CMI, and must spend valuable funds on marketing efforts to capture the available admissions.

AHP should transfer its sub-acute residents to the Nassau University Medical Center (NUMC) campus. The NUMC building has 3 empty floors that could be remodeled to satisfy nursing home regulations to accommodate AHP's sub-acute services. The Commission does not recommend moving the remaining long-term AHP program off the current campus because the development of an ALP and perhaps independent-living on the campus with the SNF has tremendous value.

The Commission recommends that the State immediately decertify 309 of AHP's licensed beds. None of these beds is currently not in use. Nassau County Health Care Corporation should concomitantly contract for the development of a 150-bed Medicaid ALP on the campus, to be completed within 24 months. Upon completion of the ALP construction, the State should decertify 120 further beds over the first 12-month period, and the remaining 160 when the ALP is operational.

144



## *Recommendation 2*

### **Facility (ies)**

Cold Spring Hills Center for Nursing and Rehabilitation (Nassau County)

### **Recommended Action**

It is recommended that Cold Spring Hills Center for Nursing and Rehabilitation downsize by approximately 90 RHCF beds (one building) to approximately 582 RHCF beds, and add a 24-bed Ventilator unit, an evening ADHCP, and a 12-station hemo-dialysis center on the existing campus.

### **Facility Description(s)**

Cold Spring Hills (CSH) is a 672-bed proprietary residential health care facility housed in several buildings. It houses a sub-acute program, a 50-slot gerontological-psychiatric adult day program, and a long-term home health care program. It has a high case mix index of 1.18. The facility was placed in receivership in 1996, and purchased in October 2004. Since the purchase, there have been quality and occupancy improvements at CSH. According to the provider, it ran at 94.5% occupancy in 2005.

CSH has been cited for between 6 and 12 deficiencies over the last three years, while the regional median is 3. It was cited with a level 3 deficiency in its last survey, falling in the bottom quintile for the region. Community reputation has been described as poor. The facility's recent affiliation with the North Shore-Long Island Jewish Health System, however, may strengthen both quality of care and community reputation.



**Assessment**

Nassau County has excess nursing home beds. 2004 county occupancy was 90%, and nearly 900 PA/PB level residents occupy SNF beds in the county. Nursing homes in the county informed the Commission that it is difficult to keep beds filled, particularly with the recent new facilities established in the area. In addition, CSH borders Suffolk County, which has a stronger occupancy level (96%), but also a small number of calculated excess beds (48). A downsizing at CSH could strengthen providers in both counties.

CSH is among the largest nursing homes in the State. The recommendation to downsize will maintain CSH in its current reimbursement peer group and will ease surplus capacity in the region. An entire building should be closed to maximize efficiencies and gains from downsizing. CSH, with its clinical affiliation with North Shore-LIJ, should be bolstered in its ability to serve a post-acute role.

The Commission recommends approving its application for 24 ventilator beds and for the creation of an on-site, 12-station hemodialysis center. The Commission further recommends that CSH's application for a 50-slot shift of evening adult day care be approved to provide additional non-institutional resources for the community,

## *Recommendation 3*

### **Facility (ies)**

Brunswick Hospital Center, Inc. (Suffolk County)

### **Recommended Action**

It is recommended that Brunswick Hospital Center, Inc. downsize all 94 RHCF beds and close as an Article 28 long term care facility. It is further recommended that a 50-bed ALP and possibly

146

other non-institutional services be added somewhere in Suffolk County by another sponsor, pending completion of an RFP process.

## Facility Description(s)

Brunswick Hospital Center, Inc. is a proprietary health care corporation that operates a 64-bed physical medicine and rehabilitation facility (the "Brunswick Physical Medicine and Rehabilitation Hospital", also recommended for closure), a 94-bed nursing home (the "Brunswick Nursing Home"), and a 124-bed psychiatric facility licensed under Article 31 of the Mental Hygiene Law (the "Brunswick Hall Center for Behavioral Health & Wellness"). These facilities share a campus in Amityville, which neighbors Broadlawn Manor, a 320-bed residential health care facility.

Previously, Brunswick Hospital Center, Inc. also operated an emergency room and medical/surgical unit licensed for an additional 192 medical/surgical beds, but those beds were decertified and those units discontinued pursuant to a petition for reorganization under Chapter 11 of the United States Bankruptcy Code filed in October 2005. That case is pending.

The Brunswick Nursing Home had been in receivership from 2001-05. The facility saw admissions decline in this period. It currently runs at 95% occupancy, and makes a profit. Even though Brunswick's emergency room and medical/surgical unit ceased operations, Brunswick Nursing Home maintains its hospital-based Medicaid rate.

This nursing home has raised some quality concerns. It was cited for 15 deficiencies in its most recent survey, compared to a regional median of 3. It has poor performance measures on pressure sores, weight gain, and continence. Some of its survey deficiencies are due to its physical plant, which is housed in two cottages dating from 1938 and the early 1950s. The operator plans to move the nursing home operation into the general hospital building. While this would provide in-wall gases for ventilator-dependent residents, the hospital building is 120 years old, and would not provide state-of-the-art long-term care.

147



**Assessment**

New facilities in Suffolk County have increased the supply of nursing home beds and competition for appropriate residents. With nearly 1,000 low-acuity residents in Suffolk nursing homes, non-institutional alternatives must be established.

Brunswick Nursing Home does not appear to have a strong referral base from local hospitals. Good Samaritan and North Shore hospitals refer their patients to this nursing home and to their own affiliated facilities. Notably, Good Samaritan may work more closely to refer to Catholic Health System facilities and North Shore recently entered into an affiliation with CSH.

The creation of the ALP for Suffolk County should proceed through an RFP process.