To determine the proportions of volume that are likely to be avoided and transferred, The Commission reviewed the impact of several recent hospital closures on patient volume and used that data to generate an appropriate "avoidance factor." That factor was then applied to the dollar value of the discharges from the facilities recommended for closure. In the case of facilities recommended for downsizing, a percentage of that factor representing the percentage of beds being downsized was applied.

A similar process was applied in regard to nursing homes. First, the average regional rate per day for each nursing home recommended for downsizing was used to determine an average annual rate per resident. This figure was further adjusted based on each facility's actual occupancy to yield a dollar value for the volume of patients served by the downsized beds. The downsizings attributable to conversions were then segregated from the "pure" downsizings. The dollar value of those "pure" downsizings represents the provider benefit accruing from them, insofar as that volume is likely to transfer elsewhere. The annual dollar value of the downsizings attributable to conversions was then reduced by the annual cost of the lower acuity slots that will result from such conversions, yielding a figure representing the payer benefit accruing from such conversions.

Similar caveats apply to the nursing home estimates. While it could also be argued that the new low-acuity slots will be filled by individuals not currently receiving any formal long term care services, the result could be in a net increase in annual costs. Such an argument is without merit. Since no lower-intensity service is added without eliminating an equal or greater number of nursing home beds, it is appropriate to assume a net cost savings.

**Estimating Benefits: Improved Access to State Funding**

To estimate potential benefits to providers, the dollar value representing the likely volume transfer was supplemented by a figure representing the indigent care, graduate medical education and workforce recruitment and retention pool distributions which would otherwise be made to facilities recommended for closure. Under the current iteration of HCRA, such funds will automatically be redistributed to remaining facilities.

223

**Estimating Benefits and Savings: Elimination of Duplicative Costs**

To estimate the potential savings attributable to the elimination of duplicative costs at affiliating facilities, each facility's annual expenditure on administrative and general labor costs was obtained from that facility's 2004 cost report. Where facilities have been recommended for affiliation, their expenditures were averaged, and the excess was identified as a potential benefit. The percentage of such costs attributable to patients covered by Medicaid managed care was then identified as a potential benefit to the Medicaid system since those savings will likely be reflected in facility rates, and the remainder identified as a potential benefit to the providers themselves.

**Estimating Benefits and Savings: Avoided Capital Investment**

To estimate the potential savings attributable to avoided capital investment, first Commission staff identified pending Certificate of Need (CON) projects attributable to such facilities that would be unnecessary or inappropriate in light of Commission recommendations. Then, Commission staff calculated the extent to which the cost of such projects (including both principal and interest costs) would be reflected in those facilities' annual Medicaid rates. The resulting figure represents the capital costs of pending projects that would be avoided by Commission recommendations.

However, the list of pending CON applications is not an exhaustive representation of the capital investments in the hospital and nursing home system that will be necessary in the years to come. In order to accurately reflect such investments on the hospital side, the Commission used each hospital's average age of plant to identify the potential cost of upgrading that hospital to the statewide average age of plant, eliminating any duplication where a hospital already had an application for such upgrade pending Then, Commission staff calculated the extent to which the cost of such projects (including both principal and interest costs) would be reflected in those facilities' annual Medicaid rates.

The analysis on the nursing home side necessarily differed, since the amount of each project to be reflected in the State Medicaid rate is capped by law. Therefore, the Commission estimated the cost of each such project and the amount of the applicable cap before calculating the extent to which the cost of such projects (including both principal and interest costs) would be reflected in those facilities' annual Medicaid rates.

224

**Estimating Benefits: Leveraged Savings**

To estimate the potential Medicaid savings attributable to the reinvestment of other calculated savings, Commission staff first identified the ratio of the cost of the Commission's recommendations to the potential Medicaid savings to be otherwise derived from the recommendations. Staff then applied that ratio to those savings themselves in order to identify the further savings to be derived from those reinvested funds.

In order to estimate additional savings that can be derived from funds currently used by the State to address emergency closures, staff identified the average amount of funds loaned each year from the Health Care Restructuring Pool for such purposes. That amount was reduced by the proportion of excess beds being removed from the system by the Commission recommendations, in order to identify a useful proxy for the amount of emergency fundings likely to be necessary after implementation of the recommendations. The difference represents Restructuring Pool funds likely to be available to generate additional costs savings. Those savings were then calculated by applying the same ratio applied to other Commission savings.

**Total Benefits and Savings:**

The total estimated savings for payors is around $806 million annually or $8 billion over ten years. This includes an annual savings to Medicaid of around $249 million, or $2.5 billion over ten years, and an annual savings to Medicare of around $322 million, or $3.2 billion over ten years. The total estimated benefit to providers is around $721 million annually or $7.2 billion over ten years. Together, these calculations yield a total benefit to payors and providers of over $1.5 billion annually, or $15 billion over ten years.

**Potential Costs: General Principles**

Implementation of the Commission's recommendations will require capital investments in some instances. Some of the recommendations are essentially cost-free. For example, recommendations in which the Commission has recommended further study and/or discussion carry no measurable cost. Similarly, recommendations that require only the decertification of a number of beds generally have negligible direct costs. Other long-term recommendations are contingent on various factors; unless those factors are fulfilled, no immediate costs will be

225

incurred. It is also imperative to note that just because a recommendation carries costs, that fact alone does not require that those costs be covered with public funds. In fact, the opposite is true. Insofar as facilities are capable of funding their own closure, conversion, affiliation, or rightsizing, they must do so. Taxpayer funds should be used prudently.

The realization of some Commission recommendations will entail costs, some of which are substantial and which should be estimated. Just like the savings estimates, the potential costs are difficult to ascertain with precision and are necessarily based on some broad assumptions. As with the savings estimates however, they represent measurable phenomena and provide reasonable indicators of the order of magnitude of necessary investments.

### Potential Cost Categories: Closure, Construction & Affiliation

The likely costs of implementing the Commission's recommendation fall into three general categories:

**Closure costs:** These costs associated with closure include the outstanding debt of the facility to be closed, including outstanding capital debt as well as vendor debt, pension costs and any other third party liabilities. Insofar as this cost category includes debt of the Dormitory Authority and/or the Federal Housing Authority, it is particularly important to be cognizant of those debts and ensure their repayment so as not to jeopardize the industry's access to future capital investment. Similarly, insofar as a facility's debt represents a potential obligation of the State (as is the case with facilities participating in the Secured Hospital Program), that fact needs to be carefully considered and the necessary investments made to ensure that the net costs to the State do not outweigh the concomitant benefits. There are also direct costs attendant to the closure process itself, including costs of severance and retraining for employees, maintenance and security for the physical plant, and medical record transfer/storage. Finally, there are also legal and consulting costs associated with the planning and implementation of the closure process. While it is particularly difficult to estimate these latter costs since so much is dependent on variables outside the control of the Commission (e.g., whether or not a facility declares bankruptcy, thereby multiplying its legal costs considerably), some attempt to estimate these costs is warranted.

226

**Construction costs:** Such costs encompass not only new construction such as when the Commission recommends that a facility be rebuilt, but also the costs of renovating existing infrastructure such as in the case of bed or building conversions. The Department of Health has extensive experience estimating such costs in the context of the certificate of need (CON) process and is able to do so taking into account not only the difference between new construction and renovations, but also cost variations across regions.

**Affiliation costs:** This analysis does account for the costs of affiliation planning. Affiliation costs are difficult to project because of wide variation in the circumstances under which the affiliations will occur. In the case of simple affiliations (e.g., affiliation under a passive parent or the further affiliation of facilities already enjoying a close relationship), the costs are likely to be minimal. In more complex cases (e.g., full asset merger or the affiliation of religious and secular facilities), the costs could be considerable. In some cases, such affiliation will also require substantial capital investment and other significant implementation costs. However, the impracticality of defining those capital costs in each instance precludes any useful estimate of those capital costs and they have been excluded for the purposes of this analysis. This exclusion is justified; the efficiencies resulting from affiliation clearly benefit the affiliating entities and it is appropriate to expect the costs of such affiliation to be borne by those entities. In particular cases, however, it may be appropriate for public funding to be directed toward such costs.

### Estimating Costs of Closures and Restructuring

Facility cost reports provide a solid basis from which to begin quantifying the likely costs of closures and conversions and each facility's ability to contribute to those costs. These cost reports, and the balance sheets on which they are based, capture many costs inherent in facility closure, including capital debt, vendor debt, and pension costs, as well as the assets available to cover those costs. Since, in a closure scenario, all of a facility's assets can conceivably be used to offset closure costs, it is appropriate to begin the analysis of such costs by identifying a facility's net assets. When those assets are negative, that reflects what it likely to be a net cost of closure. Where those assets are positive, that reflects an available cost offset. In theory, a facility's net assets incorporate both restricted and unrestricted assets. Restricted assets (e.g.,

227

charitable donations for some restricted purpose) may be available to offset closure costs but also may not. In practice, however, there are few variations between the unrestricted and total net assets of the facilities recommended for closure. Consequently, each facility's total net assets were used as a starting point for estimating closure costs.

As with the savings estimates, caveats apply to these cost estimates. The Commission did not always have access to specific information held by facilities. For example, without knowing the details of specific facilities' loan obligations, the Commission had to assume the presence of full closure costs even when the Commission has recommended a facility's conversion or rebuilding. In these cases, it is possible that a facility will be able to convert or rebuild without triggering the sort of liabilities associated with closure (e.g., without violating a bond covenant or other contractual obligation). In such cases, we have erred on the conservative side and assumed that these costs will occur although they may not.

Real property value is an important piece of a facility's assets. Therefore, where available, the fair market value of facility real property has been included as a cost offset. These estimates are a useful mechanism for identifying those closure recommendations that can be substantially or completely subsidized by the sale of facility real estate. Some cautions are appropriate. First, a facility's balance sheet includes an amount representing real property value but only that property's net book value (generally, the purchase price less accumulated depreciation). In many cases, especially downstate, that value bears little relationship to the property's fair market value. Thus, the values used as offsets were obtained from the facilities themselves. In some, but not all cases, the providers' estimates were based on independent appraisals. Second, it was not possible in all cases to obtain the fair market value of facility real property. In such cases, the potential value of the facility's real property was not included as a potential cost offset. Third, where real property fair market value was included, it was impossible to extract the portion of that value that was already included on that facility's balance sheet. Thus, a portion of that facility's real property value may have been double-counted.

The closure process itself can entail costs. The Commission examined past hospital closures to identify some average transaction costs, as a means of predicting the likely cost of future closures. The analysis of previous closures generated an average per bed, per month cost. The same analysis identified an average length of time within which closures have been completed. The result was a cost per bed figure, easily adaptable to specific hospital closure

228

recommendations. That number, with some modifications, also provided the basis for an analogous assessment of likely nursing home closure transaction costs. The first modification involves average length of closure; nursing homes typically close much more quickly than hospitals. Similarly, the per bed cost of closure is generally much smaller, owing at least in part to the smaller staffing ratios in nursing homes.

Both hospital and nursing home closures will entail legal and consulting costs. These costs are extremely variable, depending in large part on decisions made by providers and regulators during the closure process. One of the biggest decisions to be made by facilities recommended for closure is whether or not to declare bankruptcy; a declaration that can be extremely costly unto itself. For purposes of the Commission's cost analysis, staff assumed that every facility recommended for closure would declare bankruptcy. In practice, this will not necessarily be true. With this assumption in mind, prior closure experiences were reviewed to generate an average per month legal and consulting cost.

The costs of new construction were relatively easier to determine. These estimates were based on actual experience with new construction and renovations in connection with the certificate of need process. These estimates take into account regional price differences, which can be considerable. The cost estimates do encompass everything directly related to construction, but do not include land or financing costs, or the costs of demolition, where applicable. They also assume the renovation of existing facilities where possible but specific factors may impact an existing structure's appropriateness for conversion. Also, in instances where the new construction is not tied to bed number (e.g., where the new construction is a diagnostic and treatment center), the analysis estimated the necessary bed count and/or square footage and the cost was determined based on that estimate.

The foregoing calculations yield a total cost of approximately $1.2 billion, including approximately $350 million in closure costs, $1.1 billion in construction costs, $11 million in affiliation planning costs, and $300 million in offsets from the sale of facility real property. Not all of these costs will be borne by the State; almost $606 million of that is attributable to two contingent projects that the Commissioner will not be required to implement absent available funding.

**Funding: Principles for Investment**

Vast and unprecedented sums are available to support the restructuring of NY State's health care system and cover the costs of implementing the Commission's recommendations. The Health Care Efficiency and Affordability Law for New Yorkers (HEAL-NY) allocates $1 billion over four years. HEAL-NY will improve the stability, quality, and efficiency of the health care delivery system by providing capital grant funds to cover expenses associated with physical reconfiguration, conversion, downsizing, or closure of hospitals and nursing homes. Furthermore, the Federal-State Health Reform Partnership (F-SHRP) allocates an additional $1.5 billion for similar purposes. F-SHRP is a five year demonstration that will promote efficient operation of the State's health care system, consolidate and rightsize the delivery system, shift emphasis in long term care from institutional-based to community-based settings, expand the adoption of advanced health information technology, and improve ambulatory and primary care provision.

Although HEAL and F-SHRP are critical to financing the commission's recommendations, they are not and should not be the only sources of funding. Indeed, public funds should be used in the most prudent possible manner. Taxpayer dollars must be used judiciously. Insofar as facilities are capable of funding their own closure, conversion, affiliation, or rightsizing, they should be expected to do so. Additional sources of financing include traditional third-party financing mechanisms, debt restructuring, the HCRA restructuring pool, and others. The Commission believes it to be appropriate that costs will be shared among all the interested parties and that the State need only contribute a portion of those costs. That portion may be determined by the State in light of the following guidance for future funding decisions. By category, the Commission suggests that the following principles should govern State investment in the Commission recommendations:

**Closure Costs:**

1. Facilities should be expected to self-fund insofar as possible, including through the sale of assets.

2. State funds should be made available only in the absence of other possible funding.

3. If state funds are to be used, this cost category should be given priority for funding under the Federal-State Health Reform Partnership (F-SHRP), since this cost category is most likely to

230

result in measurable state and federal savings, and the availability of F-SHRP funds is tied to such measures.

4. If State funds are to be used, priority should be given, first, to those facilities that participate in the Secured Hospital Program, then to other DASNY clients, then to those non-DASNY clients that are not part of an obligated group.

## Construction Costs:

1. Facilities should be expected to self-fund insofar as possible, including via private third-party financing.

2. State funds should be made available only in the absence of other possible funding.

3. If state funds are to be used, this cost category should be given priority for funding under the Healthcare Efficiency and Affordability Law (HEAL), since this cost category is more clearly eligible for such funding than the other cost categories.

4. If State funds are to be used, priority should be given to those facilities that are not part of an obligated group.

## Affiliation Costs:

1. Facilities should be expected to self-fund insofar as possible, except in regard to affiliation planning costs.

2. State funds should be made available only in the absence of other possible funding, except in regard to affiliation planning costs.

3. If state funds are to be used, priority should be given to recommendations for full asset merger or affiliation under an active parent, as opposed to affiliation under a passive parent or some lesser affiliation.

231

# SANDMAN EXHIBIT C

# Hudson Valley Regional Advisory Committee

# Final Report Submitted to the Commission on Health Care Facilities in the Twenty-First Century

# November 15, 2006

Dr. Robert Amler, Chair ▯ Charles Bell ▯ William Florence ▯
David H. Freed* ▯ Peter Hamilton* ▯ Kenneth Herman ▯
Dr. Linda Landesman ▯ Michael Pascale ▯ Dr. Barry Perlman

*New members as of June 2, 2006, did not attend any meetings

# TABLE OF CONTENTS

**INTRODUCTION**                                        **1**

**PART 1:  FACILITY REVIEW & ANALYSIS**                 **3**

  **ACUTE CARE FACILITIES**                   **3**

  **LONG TERM CARE FACILITIES**               **10**

**PART 2:  COMMITTEE COMMENTARY AND POLICY
RECOMMENDATIONS**                                       **13**

  **ACUTE CARE**                              **13**

  **LONG TERM CARE**                          **16**

# INTRODUCTION

## CHARGE AND PURPOSE

This report is respectfully submitted to the New York State Commission on Health Care Facilities in the Twenty-First Century by the Hudson Valley Regional Advisory Committee. In the authorizing legislation, Regional Advisory Committees were commissioned to ensure that the knowledge and expertise of local stakeholders were well integrated into the Commission's recommendation process. Regional Advisory Committees members were asked, in particular, to contribute their knowledge of local circumstances, history, and understanding of potential solutions. The Regional Advisory Committees were charged with adding value to the Commission's deliberations by developing qualitative insights and local understandings that can ultimately be merged with the largely quantitative analyses being conducted by Commission staff.

The Hudson Valley Regional Advisory Committee (the Committee) held 16 meetings, from December 2005 through June 2006, including 3 formal public hearings in Middletown, New Paltz, and Valhalla. These hearings included participation by 34 health care providers, health care associations, community-based organizations, payers, and consumers. The Committee members discussed fundamental issues, specifically quality of care, access barriers, reimbursement policies, and market strategies affecting the provision of acute- and long-term health care in the Hudson Valley region as well as the State of New York. The Committee has included some discussion of these elements in this report, recognizing that their resolution lies well outside the formal charge and available resources of the Committee.

## REGIONAL BACKGROUND

The Hudson Valley region, as defined by the Commission, is composed of eight counties north and northwest of New York City: Delaware, Dutchess, Orange, Putnam, Rockland, Sullivan, Ulster, and Westchester, the most populous by far. The region encompasses a diverse array of communities and lifestyle settings ranging from inner-city urban, with significant urban health problems, suburban and exurban communities, to rural agricultural. In addition, access to care is compromised in the large forested mountainous areas that include America's northernmost section of Appalachia, with limited transportation, limited access to medical specialties, and five federally designated Critical Access Hospitals (CAHs).

Population growth in this region is forecasted to continue to grow at approximately 5% per year. The elderly population (persons 75 years and older) is forecasted to grow from 5% of the region's population in 2000 to 8% in 2030. Above-average growth will continue in Orange, Putnam, Sullivan, and Ulster. Modest declines in population are forecasted in Delaware, Rockland, and Westchester.

The population of the Hudson Valley region is diverse in race, color, ethnicity, primary language, etc. The region has a rich history and highly developed network of social services, mental health services, advocacy for children and elderly, disability services, and vocational rehabilitation. The region is also home to a vibrant and healthy private sector that includes biotechnology and pharmaceutical companies, and innovative healthcare and service providers. In 2004, average wages in the region were approximately $44,300. In 2000 an estimated 11.4% of the population in the Hudson Valley, was uninsured. There are 22 designated Medically Underserved Areas or Populations in this region.

The current geographic distribution of healthcare facilities, both acute- and long-term care, is an unplanned and somewhat arbitrary result of history and community development. Planning is required to right-size this allocation. A strategic and evidence-based network of integrated healthcare service – from ambulatory to long-term care settings – is needed to manage and care for patients as they move through the various levels of care. This model would ideally encompass health promotion and preventive care for all residents, enhanced occupational safety and health, improved access to acute- and long-term care and rehabilitative services, and embedded quality-assurance elements.

2

# PART 1
# FACILITY REVIEW AND ANALYSIS

## THE REVIEW PROCESS

In order to fully review each of the facilities the Committee took the following steps:

- Gathered and reviewed individual facility data provided by the Commission, provider associations, providers of acute and long-term care
- Reviewed data from additional sources including the Centers for Medicare and Medicaid Services (CMS) Hospital Compare; Joint Commission on Accreditation of Healthcare Organizations survey results; and Department of Health Surveys
- Reviewed provider presentations at Committee meetings
- Reviewed testimony provided at three public hearings
- Held individual meetings with providers from facilities of interest, provider representatives who wanted to discuss their facilities in more detail than their public testimony allowed, interested community members, and experts in the field. In addition, representatives from Northern Metropolitan Hospital Association (NorMet), Hospital Association of New York State (HANYS), New York State Health Facilities Association (NYSHFA), New York State Association of Homes and Services for the Aging (NYSAHSA), and Home Care Association of New York State (HCANYS) made presentations to the Committee. Facility market penetration and geographic location were also analyzed
- Reviewed and analyzed audited financial statements of acute-care facilities of interest.

All facility data were compared with the Commission's criteria. Based on its review and analysis the Committee makes the following observations and nonbinding recommendations in accordance with its formal charge:

## *ACUTE CARE FACILITIES*

In reviewing the northern tier consisting of six counties, Delaware, Dutchess, Orange, Putnam, Sullivan, and Ulster, it is evident that the hospitals are fairly well distributed geographically up to an hour's drive from each other, with few exceptions Five of the hospitals are designated Critical Access Hospitals (CAH). One each in Sullivan, and Ulster, and three in Delaware County. In the southern tier consisting of Rockland and Westchester counties, Westchester clearly has a denser concentration of hospitals, thereby reflecting the greater population density. These facilities are located close to each other and actively compete for patients in each other's markets. The Committee examined each facility with respect to the Commission's six criteria, in particular occupancy rates and market share, because of the smaller distances and shorter travel times compared to the northern parts of the region.

In the last few years, five hospitals in the Hudson Valley region have closed voluntarily, principally on the basis of market forces. Many other facilities have downsized, right-sized, or realigned their services to adjust to new economic, technological, and professional realities.

Other health care systems have taken steps to consolidate, merge, or coordinate specialties to improve efficiencies and reduce costs. The reductions in bed capacity to date, as well as the reductions proposed by the Committee, are summarized in the following chart:

| Name of Acute Care Facility | Decrease in certified beds | Closure/Decertification | Actual/ Proposed |
|---|---|---|---|
| Julia Butterfield Memorial | (36) | Closed | Actual |
| *Delaware Valley Hospital | (17) | Decertified | Actual |
| *Margaretville Memorial Hospital | (7) | Decertified | Actual |
| *O'Connor Hospital | (13) | Decertified | Actual |
| *Catskill Regional Medical Center – G Hermann Site | (15) | Decertified | Actual |
| *Ellenville Regional Hospital | (26) | Decertified | Actual |
| St. Agnes Hospital | (106) | Closed | Actual |
| New York United Hospital | (224) | Closed | Actual |
| St. Francis Beacon Division | (100) | Closed | Actual |
| The Hospital | (45) | Closed | Actual |
| Mount Vernon Hospital | (32) | Decertify | Proposed |
| Sound Shore Medical Center | (71) | Decertify | Proposed |
| Orange Regional Medical Center | (100) | Decertify | Proposed |
| **Total Regional Reduction** | (792) | | |

* Now designated CAH

## FACILITIES OF INTEREST

***The Kingston Hospital and Benedictine Hospital*** have initiated discussions with the help of a facilitator regarding sharing services under the protective antitrust umbrella of the Commission. As of the date of this report, the two hospitals plan to execute a Memorandum of Agreement. The Memorandum of Agreement is currently under review by the Archdiocese of New York and the sponsors of Benedictine Hospital.

The two hospitals have submitted a request to the New York State Department of Health for a short-term loan from HEAL-NY to cover some initial transaction costs. The hospitals have also submitted materials to the Public Advocacy Group in the Attorney General's Office, and anticipate meeting with the staff of the Attorney General's office during the summer of 2006. The hospitals expect to have a binding alignment agreement by September 1, 2006 and submit a Certificate of Need (CON) application by October 1, 2006. The Committee agrees this is the right direction to take.

### Recommendation:
The Committee recommends that the Commission encourage the process and continue its umbrella of protection. However, if it appears that these two facilities are not going to take definitive action, the Commission should undertake a careful evaluation to consider closure or conversion of one of the inpatient facilities, and reconfigure ambulatory services and outpatient diagnostic services. The Committee has additional comments, contained later in this report, concerning antitrust protection afforded by the Commission.

4

***Saint Francis Hospital and Vassar Brothers Medical Center*** both located in Poughkeepsie, offer similar services to similar populations. The two hospitals serve their populations in various ways. For example, St. Francis Hospital is the only Level II Trauma Center between Albany Medical Center and Westchester Medical Center. It has the only secure inpatient psych services as well as outpatient services. In addition it runs a full-day preschool program. Recently, the Hospital Foundation raised over $3,000,000 for improvements to the facility.

Several years ago, the two hospitals entered into a shared-service agreement that included information technology which resulted in cost savings for both institutions. This arrangement, which was widely believed to be beneficial to both hospitals and the community, ended when the State Attorney General brought an antitrust action. The financial effects of this action were catastrophic for St. Francis Hospital and for Vassar Brothers Medical Center. Since then, however, both hospitals have become profitable. St. Francis Hospital recently completed a public sale of municipal bonds through Merrill Lynch, an innovative financing approach, and as a result has a very strong balance sheet. Vassar Brothers has joined the Health Quest System and continues to meet the needs of its community and is financially strong. Both hospitals are now financially sound and have not needed government intervention to bail them out.

Although the vulnerable populations in the city of Poughkeepsie might benefit from some coalescence of services, the two hospitals currently operate under an antitrust settlement agreement with New York State, in which they are contractually prohibited from discussing any type of merger or shared services arrangements. As a result, the two hospitals are legally precluded from considering any consolidation of services The Committee finds this unfortunate because the City of Poughkeepsie has limited financial resources to serve its vulnerable population, and therefore would benefit from the efficiencies that might be realized through right-sizing.

#### Recommendation:
The Committee recommends that the Commission discuss with the State Attorney General the nullification of the settlement agreement that prohibits shared services discussions.

***Sound Shore Health System*** includes the Mount Vernon Hospital and Sound Shore Medical Center of Westchester. The system is proceeding with right-sizing moves under a single management structure that is consistent with the Commission's charge. The Sound Shore Health System has received approval for 20 Transitional Care Unit (TCU) beds and has submitted a Certificate of Need (CON) request for 24 Mentally Impaired Chemical Abusers (MICA) beds. They are matching the services they provide at each facility with their respective communities' needs. In addition, services not provided elsewhere in the area are being added or expanded. For example, they consolidated the Obstetrics and Gynecology services at Sound Shore Medical Center of Westchester, and provide psychiatric and HIV services at The Mount Vernon Hospital.

The Committee finds compelling reasons, based on the Commission's criteria, to support the current management team and their right-sizing plans. About 47% of Mount Vernon patients come from medically underserved communities. The hospital employs about 633 FTEs, with the

5

majority coming from the immediate community. The Committee has reviewed the hospitals' audited financial statements and other data.

**Recommendation:**
The Committee agrees with the plan submitted by the Sound Shore management and recommends the decertification and conversion of the following beds in the Sound Shore Health System:

| Mount Vernon Hospital | Current Certified Beds | Decertified | Converted | Proposed Beds |
|---|---|---|---|---|
| Type of Bed: | | | | |
| Mentally Impaired Chemical Abusers | 0 | | 24 | 24 |
| Transitional Care Unit | 0 | | 20 | 20 |
| ICU | 12 | (2) | | 10 |
| Medical/Surgical | 184 | (30) | (44) | 110 |
| Other Units | 32 | | | 32 |
| Total Bed Complement | 228 | (32) | 0 | 196 |

| Sound Shore Medical Center of Westchester | Current Certified Beds | Decertified | Converted | Proposed Beds |
|---|---|---|---|---|
| Type of Bed: | | | | |
| Pediatric | 14 | (9) | | 5 |
| Obstetrics | 24 | | (1) | 23 |
| Neonatal (level III) | 10 | | 5 | 15 |
| Detox | 10 | | 5 | 15 |
| Medical/Surgical | 251 | (60) | (11) | 180 |
| ICU | 12 | | | 12 |
| Total Bed Complement | 321 | (69) | (2) | 250 |

*Westchester Medical Center (WMC)* is the region's specialty referral center for tertiary and quaternary levels of care. It also hosts the region's only Level 1 Trauma Center, the region's only Burn Center, and the state-funded Regional Resource Center for training and preparedness against terrorist attacks, natural disasters, and other types of disasters. Because of the poor financial performance of this institution and significant management problems, an outside management group was contracted in 2004 to turn the institution around and restore its financial health. The Committee recognizes that the Hudson Valley region depends on this facility because of its designation and the services it provides. Therefore it met with the interim CEO, an employee of the outside "turnaround" management group, to review his leadership team's strategy and plans.

After a full and complete description of WMC's restoration plans, the Committee found strong reason to initially support the management team's strategy and the CEO's ability as an administrator to implement those plans. Additionally, the Committee reviewed and analyzed WMC's audited financial statements and related financial documents. It is evident that the management team has taken several key steps to improve the financial viability of the institution. These include implementing a time and attendance system to better manage and control payroll

costs, and a new billing and collections system, which has significantly reduced the size and age of the accounts receivable. In addition to the operational improvements, many clinical initiatives have been implemented to improve the quality and safety of patient care. The Committee further noted that since the meeting with the CEO, several of WMC's important objectives have been reached or nearly reached.

**Recommendation:**
It appears that Westchester Medical Center is taking valid steps toward recovery. The Committee recommends continued monitoring of the facility and a re-examination of its financial and managerial health in 2007.

*The Community Hospital at Dobbs Ferry (CHDF)* has low occupancy and poor market share. It scores the lowest of all hospitals in our region, based on the Commission's six criteria, and thus there is a strong case for closure. In its own cluster of zip codes, it draws only 7% market share, and 45% within its immediate zip code of 10522.

After further analysis, the Committee learned that the hospital was recently bought at auction by Riverside Health Care System (Riverside), which operates its neighboring acute-care hospitals to the South in Yonkers: St. John's Riverside Hospital and the Park Care Pavilion, formerly Yonkers General Hospital. Riverside now operates CHDF as a profitable facility for ambulatory care and inpatient medical-surgical services. Also, the Dobbs Ferry community raised $11 million to renovate the emergency department. This facility is profitable and has earned tangible financial support from its community. According to Riverside's CEO, CHDF generates approximately $750,000 annual profit to the system, and absorbs approximately $2 million per year in system overhead expenses.

Some Committee members have questioned what would be the benefit of closing CHDF? There are no efficiencies to be gained, and possibly profit to be lost. Only about 8% of their patients are Medicaid patients. It does not cause any real burden to the taxpayers. But if the hospital closes, there could be an additional burden to the taxpayers because the hospital's contribution to supporting Riverside's operations in Yonkers would be lost. Riverside's CEO asserts that his main facility would capture very few of the CHDF patients. He also reports that the loss of revenue would threaten financial stability at St. John's Riverside Hospital and Park Care Pavilion; it would particularly damage their ability to provide indigent care and needed community-based services to the people of the southwest area of Yonkers. Riverside has demonstrated its institutional commitment with many programs that focus public outreach efforts most intensively on those Yonkers neighborhoods with the greatest need. In addition, in reviewing its financial reports the Committee found that the management is effectively addressing billing and system problems to improve the quality of care and the efficiency of the institutions.

The Committee members requested an expert financial review by the New York State Department of Health of St. John's Riverside Hospital and CHDF's financials to verify the facts and examine in greater detail the financial and social consequences of closing the CHDF. The Committee urges the Commission to carefully examine the results of this expert review when it

is completed. A key question is whether there is truly no or minimal costs to New York taxpayers if CHDF stays open in its current mode. Additional questions are, if CHDF is closed, should St. John's Riverside Hospital be considered for HEAL-NY support to offset its losses and pay off debt, and conversely, if CHDF remains open, should Riverside decertify 50-60 beds in the Riverside System.

## Recommendation:

The Committee finds that, viewed independently, CHDF is a candidate for closure. The potential value of the Dobbs Ferry property is a considerable factor in this evaluation. However the Committee recommends that the Commission not take this action without careful evaluation of the impact this may have on the financial stability of the Riverside Health Care System. If, in fact, Riverside receives a positive impact from CHDF, and there is limited if any savings to the state from closure, this creative approach should not be thwarted. If, after review, the Commission decides in favor of closure, consideration should be given to allocating HEAL-NY funds, allocated to debt repayment; to repay the $8 million debt CHDF has with Riverside in the event that it is not otherwise provided in the accounting processes.

In summary, three alternatives are being submitted for continued review and decision making by the Commission:
1. Close CHDF
2. Close inpatient beds and fully convert CHDF to an ambulatory facility which includes ambulatory surgery
3. Maintain CHDF in its current form and if utilization of inpatient facility drops, revisit option 1 and 2.

The Committee recommends that after the expert financial analysis has been completed and the key questions identified have been sufficiently addressed, the Commission should make its decision before the final report is published. The alternative chosen should not only provide financial stability to the Riverside System, but also provide the needed services to the vulnerable community in Yonkers.

OTHER RIGHT-SIZING OPPORTUNITIES IN YONKERS—The Committee finds that additional opportunities may exist to further optimize healthcare services in Yonkers to better serve the indigent community in the south side of the city as well as the northern community. The Committee recommends that the Commission encourage additional discussions on this point. It is suggested that such discussions include Riverside Health Care System and St. Joseph's Medical Center, as well as community health centers, private practitioners, especially large group practices, and other medically related provider groups, other interested community-based organizations and businesses. The goal of this effort would be an integrated system of medical care in Yonkers. It is suggested that the Yonkers based hospitals take the lead in this effort by availing themselves of the protective antitrust umbrella afforded by the Commission to initiate the suggested discussions.

8

## OTHER PROVIDERS WHO PRESENTED AT COMMITTEE MEETINGS

*Delaware Valley Hospital, Margaretville Memorial Hospital, and O'Connor Hospital* have worked together to voluntarily right-size, reorganize their services, including converting all of the hospitals to designated Critical Access Hospitals. In addition, they developed plans for the types of ambulatory services needed by the communities they serve. The Committee supports their efforts to date and recommends that consideration be given to allocation of HEAL-NY dollars in 2006 and 2007 to improve the ambulatory care services provided by all three facilities.

*Orange Regional Medical Center* has been formed as a single hospital from a full-asset merger of two hospitals in the Middletown area. Horton Medical Center and Arden Hill Hospital combined in 2000. The CEO of Orange Regional Medical Center presented to the Committee a proposal to close the two aging plants and replace them with a totally new facility on new acreage at the intersection of Interstate 84 and US Route 17. The proposed medical center will have approximately 100 fewer acute care beds than their current capacity, in favor of more ambulatory service capabilities. The new plans include further consolidation of services and significant improvement of systems. The management team anticipates submitting a Certificate of Need in August. The Committee had a positive response to these consolidation plans. However in the absence of a Certificate of Need filing at the time of this report, the Committee makes no recommendation about this hospital.

*St. Luke's-Cornwall Hospital* was formed in 2002 when St. Luke's Hospital Newburgh and Cornwall Hospital merged and restructured as a single medical center with two campuses (Newburgh and Cornwall). This merger was driven by the market and economic forces at the time and is a good example of community right-sizing. New programs continue to be developed, services have been consolidated and operational improvements are being made.

## OTHER HOSPITAL SYSTEMS IN THE HUDSON VALLEY REGION

*Bon Secours* includes Bon Secours Community Hospital, Good Samaritan Hospital and St. Anthony Community Hospital. Additionally Bon Secours Charity Health System provides the services of a Certified Home Health Agency, two long-term care facilities, an assisted living and adult home facility, and several other off-site medical programs.

*Pinnacle Healthcare, Inc.* members are: Hudson Valley Hospital Center, Sound Shore Medical Center of Westchester, St. John's Riverside Hospital - Andrus Pavilion & Park Care Pavilion, Taylor Care Center, The Mount Vernon Hospital, and Westchester Medical Center.

*Health Quest* operates Northern Dutchess Hospital Center, Vassar Brothers Medical Center, and Putnam Hospital.

The Committee recommends that these systems be examined as potential models of right-sizing and reviewed for further change opportunities within their individual structures.

9

## *LONG-TERM CARE FACILITIES*

Based on the criteria developed by the New York State Department of Health, and data provided by Commission staff, the Committee identified seven nursing home facilities for further analysis. Administrators of these facilities were invited to discuss their facilities and the available financial, utilization, and quality data. The Committee also noted important changing trends in the provision of long-term care. An important factor that affects decision-making in this region is that as the population in the Hudson Valley continues to increase; the percent of elderly (those over 65 years) is forecasted to increase as well. In addition, significant changes in consumer attitudes and preferences are requiring a more community-/home-based approach to care for this growing segment of the population.

### FACILITIES OF INTEREST

*Achieve Rehabilitation and Nursing*—This facility was selected because of low occupancy (93.1% in 2003), case mix concerns and a history of survey and complaint issues. After a conference call with the new administrator at Achieve Rehabilitation and Nursing, the Committee was not confident of the direction in which the facility is moving. The administrator did not adequately answer questions regarding the financial viability of the facility and the quality of care being provided. At the time of the conference call, a DOH survey had just been completed; the results are not yet available.

#### Recommendation:
Based on the survey results, and given the absence of up-to-date financial data, the Committee recommends that the Commission consider conversion of the facility to much needed Assisted Living Program (ALP) beds in Sullivan County.

*Andrus-on-Hudson*—When reviewing the Commission criteria, Andrus-on-Hudson was highlighted because of low occupancy and case mix (in 2003, 39.2% and .90 respectively). Because of these factors, there are obvious financial problems. After speaking with the Administrator, the Committee is less concerned about the financial stability (since there is a large foundation underwriting their capital expenditures) than about the low acuity of their patients.

#### Recommendation:
The Committee recommends that this facility be considered for conversion to ALP beds.

10

***Bethel Nursing and Rehab***—Based on the 2003 data initially reviewed by the Committee, both facilities of Bethel Nursing and Rehab were considered as facilities of interest because of their low occupancy (87.5% and 85.7%), quality of care and financial problems. The Committee met with the new Administrator of the facilities. The Committee supports the progress made to date. In addition to improving occupancy, the administration has made significant improvements in patient safety and service quality. Other priorities that the management team discussed are the need to improve staff retention and service delivery.

**Recommendation:**
The Committee recommends continued monitoring of progress by evaluating 2005 and 2006 data when available from the New York State Department of Health Survey, and ICRs, before considering decertification or conversion of beds.

***Sky View Rehabilitation and Health Care Center*** --was identified as a facility of interest based on the Commission's criteria. The Committee repeatedly tried to contact the administrator of this facility, left messages and sent a certified letter from David Sandman indicating the Committee's interest. To date they have not contacted the Committee.

**Recommendation:**
In the absence of updated information, the Committee recommends that the facility be considered for closure or conversion.

***Taylor Care Center***—is operated by Westchester Medical Center. The Center operates in an aging plant in need of upgrades. In 2003, Taylor Care's occupancy was 79%. The Committee notes that the case mix is different from a typical nursing home because it provides more post-acute care than sub-acute care. The management team concurs that they need to decertify and convert beds at this facility. 100 beds have been mothballed to date.

**Recommendation:**
The Committee recommends decertifying the 100 mothballed beds and converting some beds to ALP beds. The management team has hired a consultant to study the market and make program/rightsizing recommendations. The report is not yet available. It will be submitted to the Commission hopefully within the next few weeks. After the Commission reviews the consultant's report, additional changes should be considered.

***The Valley View Center for Nursing and Rehabilitation***— This facility is owned and operated by Orange County. The facility was identified because of occupancy, financial and quality of care problems. After speaking with the administrator, it is evident that significant steps have been taken to right-size as the facility decertifies and converts beds. The Committee noted that the administration is taking needed steps to reduce costs and improve revenue by expanding services. For example, they are negotiating a separate contract with their county employees that should significantly reduce indirect labor costs. Also, they are negotiating with Meals-on-Wheels to move their headquarters and food service to Valley View's campus. Additionally,

11

they have been speaking with Orange County officials about centralizing services for the aging on their campus such as the Office of the Aging. The County has already agreed to move Adult Protective Services to this campus.

**Recommendation:**
The Committee supports the management team's plan to decertify 160 beds and convert the space to much needed ALP beds in Orange County.

*Victory Lake Nursing Center* -- was identified as a facility of interest based on the Commission's criteria. The Committee repeatedly tried to contact the administrator of this facility, left messages and sent a certified letter from David Sandman indicating the Committee's interest. To date they have not contacted the Committee.

**Recommendation:**
In the absence of updated information, the Committee recommends that the facility be considered for closure or conversion.

# PART 2
# COMMITTEE COMMENTARY
# AND POLICY RECOMMENDATIONS

Based on its review and analysis the Committee presents the following commentary and policy recommendations in accordance with its formal charge:

## *ACUTE CARE*

### ANTITRUST CONCERNS
*Comments on this topic will be forwarded in the following weeks.*

### CERTIFIED BEDS AND SURGE CAPACITY

The Committee finds that in addition to the day-to-day capacity analysis, discussion is also warranted in the realm of surge capacity. New York State has invested heavily (and justifiably) in statewide monitoring and response systems to ensure adequate access to healthcare facilities during a terrorist attack, natural disaster, and other calamities. Because of this investment, it is critical to look at the total number of acute care beds, the location of functional beds, and beds that can be used for surge capacity. It is therefore recommended that the Commission review each facility in the region and request that all unstaffed beds be decertified so that the true size of the working system can be known. Once the system size is established, beds can be added to individual facilities for surge capacity and these beds would need to be maintained in operating condition (furnished, equipment operational and clean) but not staffed. Consideration should be given to these facilities in the form of a small sum or rate to cover the cost of maintaining this classification of beds.

### COMPETITIVE ENVIRONMENT

New York State hospitals are facing well-documented economic pressures. Five significant concerns that affect the Hudson Valley Region are:

- The loss of patient revenue as a result of the migration of patients to hospitals in Connecticut and New Jersey. Those hospitals receive reimbursement rates 18 to 25 percent higher than New York State hospitals. They are stronger financially and therefore have the means to make themselves attractive to New York residents who have full benefit insurance. Nor Met estimates that some out-of-state hospitals just over the border see one-third or more of their patients from New York State. New York State's Medicaid money leaving the state to Greenwich Hospital alone is $1.3 million per year. New Jersey hospitals near the border treat some 10,000 patients per year from New York. The Committee finds that this is a real loss for New York and its taxpayers; they are left paying for a greater proportion of low-pay and no-pay, and also risk losing some of the

13

best nurses, physicians, and other providers – those with the greatest professional mobility – to higher paying and more rewarding work opportunities.

- Critical expenses have increased beyond normal inflation and faster than revenue growth. Reimbursement rates need to be commensurate with the costs. The current reimbursement system does not adequately compensate for outpatient care. The Medicaid rate should be brought in line with current costs and improved to provide primary care and preventive care.

- Private enterprise providers are not subject to the same Certificate of Need (CON) regulations to which hospitals must adhere; therefore an uneven playing field is created. This results in the movement of insured patients from hospital-based services to centers established by independent physician groups and private corporations.

- Insurance companies and other healthcare payers have no responsibility to participate in the development and maintenance of the healthcare providers and systems from which they derive their profits. The Westchester County Association's (WCA) Taskforce on Health Care recommends mandatory reinvestment in community health care by the businesses in Westchester. They further propose other cost-cutting measures that would streamline access to and payment/reimbursement for healthcare services. Their approach would bring new money into the system without increased burden on the state/ tax payer.

- Infusion of capital for facilities' improvement and Information Systems (IS) is required. Sources might include: Insurance investing, Health Care Efficiency and Affordability Law (HEAL-NY), Federal State Health Reform Partnership (F-SHRP), other state and federal sources, and easing of private bond markets. Insurance providers need to invest a percentage of their profits into the hospitals with whom they contract.

The Committee strongly suggests that the Commission pursues the needed reimbursement and CON changes necessary to allow NYS hospitals to compete on a "level playing field", and support the development and implementation of legislation that would mandate the WCA proposal. In addition, some form of regional health system planning to provide stronger mechanisms for data collection, monitoring, oversight and coordination at the regional level needs to be considered. The health systems planning process should be open to participation and input by a full range of stakeholders, including providers, payers, workers and consumers.


## NEW YORK STATE LICENSED MENTAL HEALTH SYSTEM (Article 31)

It is important to keep in mind that the Article 28 system provides 35% of the in and out patient services provided for by Article 31. The Committee has not made any recommendations which would adversely affect this system in the Hudson Valley Region. However, we suggest that this issue be carefully reviewed as changes in Article 28 facilities are made, to avoid inadvertently having an adverse affect on the Article 31 services.

## SAFETY NET HOSPITALS

The Committee is not recommending closure of any "safety net" hospitals. While it is beyond the Committee's charge to recommend changes in reimbursement methodologies, it is suggesting that the Commission carefully examine the approach to reimbursement for these vulnerable hospitals in order to ensure that there is no further degradation of the system of "safety-net" hospitals which is essential for care of the indigent in underserved areas. It is the view of the Committee that a number of such critical hospitals may not survive without recognition of and appropriate response to their situation.

## LONG-TERM CARE

### COMMUNITY-BASED LONG-TERM CARE OPTIONS

As part of its review of long-term care, the Committee met with providers of community-based services. This was extremely beneficial as the Committee addressed the increasing need for services and the public's preference for care in less restrictive and non-institutional settings. The Committee reviewed the New York State Department of Health's analysis of unmet non-institutional community-based service needs.

The data for the Hudson Valley region have been summarized as follows:

| County | DOH Unmet Needs | Approved ADHC Slots | Approved LTHHCP Slots | Approved ACF Beds | Approved ALP Beds |
|---|---|---|---|---|---|
| Delaware | 306 | 0 | 50 | 65 | 0 |
| Dutchess | 584 | 72 | 325 | 421 | 115 |
| Orange | 942 | 84 | 453 | 439 | 55 |
| Putnam | 605 | 27 | 75 | 0 | 0 |
| Rockland | 543 | 127 | 295 | 1,130 | 146 |
| Sullivan | 247 | 64 | 100 | 181 | 0 |
| Ulster | (85) | 15 | 204 | 145 | 102 |
| Westchester | 1,107 | 473 | 2,233 | 1,574 | 40 |
| **Total HV** | **4,249** | **862** | **3,735** | **3,955** | **458** |

Based on the Committee's review of all the available data, it is evident that there is a consumer preference and need for additional community-based services, especially congregate care. More affordable senior housing and assisted living program (ALP) beds are one option. Based on the Committee's meetings with providers and public hearing testimony, the Committee recommends expansion of the Assisted Living Program and Enhanced Assisted Living Residences (EALR), particularly in the rural communities. These programs are designed for persons who are eligible to receive care in a nursing home, but who are medically stable and can therefore be served in less intensive and expensive settings. For those facilities under consideration for downsizing or closure, the Committee recommends that the excess bed capacity be converted to ALP beds or EALRs.

Adult Day Health Care Programs are another alternative for congregate care in less intensive settings. As these programs are expanded within the region, the Committee recommends consideration of a model of care that includes transportation. This will improve the access and delivery of services to a population that might otherwise be isolated from health care and activity. The Long-Term Home Health Care Programs (Lombardi Programs) offer another alternative for community-based health care. Advances in technology, especially telemedicine

16

and telemonitoring, have enhanced the ability of long-term home healthcare providers to serve more patients in rural settings. The Committee supports these advances and recommends that these programs be allocated HEAL-NY and F-SHARP dollars to improve the access and care to elderly, disabled and chronically-ill patients in the community.

## CONCERNS ABOUT LONG-TERM CARE FOR PERSONS WITH SERIOUS AND PERSISTENT MENTAL ILLNESS (SPMI)

The Committee is aware that many PA/PB (low acuity) patients in long-term care facilities that would be potentially eligible for transfer to alternative settings, in addition to medical and activities of daily living support requirements may have SPMI. This group might do well in alternative settings such as ALPs or other congregate residential settings. However, it is critical that mental health professionals be included in the transition and care planning for the SPMI population, to ensure the protection and adequacy of services available to this vulnerable population.

## POLICY SOLUTIONS

Changes in state policy must develop solutions in order to reduce the institutional and financial barriers to community-based care for elderly, disabled and chronically-ill consumers. These barriers include: the lack of affordable, accessible housing, which often makes nursing home care the only option for those losing their housing; the limited number of service providers willing to offer community-based care because of low reimbursement rates; the lack of resources committed to high-quality discharge planning; and the lack of community-based practitioners with offices that are fully accessible to those with mobility impairments and those who are deaf and hearing-impaired.

Based on the Committee's review of the long-term care market, it is clear that a carefully coordinated approach to care delivery is essential. The establishment of the Long-Term Care Restructuring Advisory Council and development of local Point of Entry programs are first steps. The services provided should include an integrated approach to long-term care and development of a continuum of care options for the elderly, disabled and chronically-ill populations. The system should include a wide spectrum of community-based services as well as education and training for family care-givers. As recommendations to reduce nursing home bed capacity are implemented, it is important that options are available to the lower acuity patients now residing in nursing homes. Continuum of care planning and service integration must include community options such as ALPs, Adult Day Center programs and low-cost senior housing for the elderly, disabled and chronically-ill populations.

17

# SANDMAN EXHIBIT D



STATE OF NEW YORK
EXECUTIVE CHAMBER
ALBANY 12224

**GEORGE E. PATAKI**
GOVERNOR

December 4, 2006

Dear Commissioner Novello:

Pursuant to Chapters 58 and 63 of the Laws of 2005 (the "Act"), I hereby transmit the final report of the Commission on Health Care Facilities in the 21st Century (the "Commission") entitled: "A Plan to Stabilize and Strengthen New York's Health Care System" ("Report").

On November 30, 2006, I issued a message approving the recommendations of the Commission and transmitted such message and the Report to the State Legislature, in accordance with the provisions of the Act. A copy of the message is attached for your convenience. By this letter, and in accordance with the terms of the Act, I hereby approve the Report and the recommendations set forth therein.

Pursuant to the Act, the Commissioner of Health shall take all actions necessary to implement the recommendations set forth in the Report in a reasonable, cost-efficient manner, unless both Houses of the Legislature adopt a concurrent resolution rejecting such recommendations in their entirety by December 31, 2006. Further, implementation of these recommendations shall not begin prior to December 31, 2006.

Thank you for you assistance in this matter.

Very truly yours,

George E. Pataki

Commissioner Antonia C. Novello
Department of Health
Corning Tower
Empire State Plaza
Albany, New York  12237



**State of New York**

**Executive Chamber**

### TO THE LEGISLATURE OF THE STATE OF NEW YORK

Pursuant to Chapters 58 and 63 of the Laws of 2005. I hereby approve the recommendations of the Commission on Health Care Facilities in the 21st Century (the "Commission") contained in the final report of the Commission entitled: "A Plan to Stabilize and Strengthen New York's Health Care System" ("Report").

I commend Stephen Berger for his exceptional efforts in chairing this Commission, and all of the members of the Commission who devoted countless hours to ensuring that their recommendations would result in a health care system that will advance New York's role as a national leader in providing quality health care to all of its residents.

I strongly urge you to accept the Commission's recommendations, which will continue the critical work of transforming the New York State health care system, work that we began more than a decade ago. At that time, with your assistance, we enacted the Health Care Reform Act, which substantially deregulated the health care industry. Since that time, we have enacted Child Health Plus, Family Health Plus, Healthy New York and other critical legislation to ensure that New York's children and families are able to access affordable health care coverage.

In 2003, in response to escalating health care costs and the dire financial situation faced by New York State hospitals and nursing homes, I created the Health Care Reform Working Group. The Working Group concluded that if we failed to act, the annual growth of the Medicaid program, combined with the demographics of the aging baby-boomer generation, would leave our State with a healthcare system that consumes an ever greater amount of resources without producing concomitant benefits to the health of New Yorkers. Together, we recognized the validity of these conclusions, and jointly agreed to the creation of the Commission, the Report of which I approve and transmit to you today.

The reforms recommended by the Commission in the Report will restructure the health care industry in a manner that will allow for a continued emphasis on patient care. Some of the significant cost savings, estimated by the Commission at over $800 million annually, can be re-invested in a healthier, more responsive system that will improve the lives of all New Yorkers. Additionally, the State has committed $1 billion through the HEAL NY program, and an additional $1.5 billion is available through the F-SHRP agreement that we have reached with the federal government. These funds will help implement the Commission's recommendations. However, the acceptance and implementation of the Commission's recommendations is a prerequisite to accessing the $1.5 billion in federal health-care funds, and any failure of the State to fully implement these recommendations will cause New York to forfeit these crucial federal funds. Finally, I note that the recommendations of the Commission must be considered as a package, and cannot be altered to address individual closing and consolidation recommendations.

The Commission's recommendations herald an extraordinary opportunity to improve the lives of all New Yorkers. By approving the Commission's recommendations, we will help create a 21st century health care system that is far more flexible, leaner, stronger and more affordable than the one we have today. For that reason, I hereby approve the Commission's report to the full extent of my authority, and commend you to accept it as well.

November 30, 2006

s/ George E. Pataki