UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---

JOHN E. ANDRUS MEMORIAL, INC. (d/b/a ANDRUS ON HUDSON),

                    Plaintiff,

                -against-

RICHARD F. DAINES, as Commissioner of the New York State Department of Health,

                    Defendant.

---

Filed Electronically

07-CV-3432 (CLB)(MDF)

**PLAINTIFF'S RESPONSE TO DEFENDANT'S STATEMENT OF UNDISPUTED MATERIAL FACTS**

---

Pursuant to Local Civil Rule 56.1(b) of the United States District Courts for the Southern and Eastern Districts of New York, plaintiff John E. Andrus Memorial, Inc. (d/b/a Andrus on Hudson), by its attorneys, Cadwalader, Wickersham & Taft LLP, hereby responds to the Defendant's Statement of Material Facts, as follows:

**I.      Creation Of The New York State Commission On Healthcare Facilities In The Twenty-First Century**

      1.      In April, 2005, the New York State Legislature passed, and then Governor George E. Pataki signed, legislation creating the New York State Commission on Healthcare Facilities in the 21st Century ("Commission"). That legislation came into being as Part K of Chapter 58 of the Laws of 2003 as added by Section 31 of Part E of Chapter 63 of the Laws of 2005 (the "Enabling Legislation").

*Response*: The Andrus does not contest these allegations for purposes of this motion.

      2.      A true and accurate copy of the Enabling Legislation is annexed to the Sandman Aff. as Exhibit A.

*Response*: The Andrus does not contest this allegation for purposes of this motion.

      3.      The Enabling Legislation provided for regional input. Sandman Aff. ¶ 8. For purposes of such input, the State was divided into six regions (Long Island, New York City, Hudson Valley, Northern, Central and Western). Id. The plaintiff ("Andrus") is located in the Hudson Valley Region. Id. The Enabling Legislation required the appointment of regional members to the Commission, who were authorized to vote only on recommendations related solely to their respective regions. Id. The Enabling Legislation at § 7(c), (d) also required the

creation of one Regional Advisory Committee ("RAC") for each region, which was required to "develop recommendations for reconfiguring its region's general hospital and nursing home bed supply to align bed supply with regional and local needs." <u>Id.</u> The RACs were required by the Enabling Legislation to transmit their final reports to the Commission on November 15, 2006. <u>Id.</u>

<u>Response</u>:  The Andrus does not contest these allegations for purposes of this motion, but refers

the Court to the Enabling Legislation for other relevant provisions contained therein.

4.      A true and accurate copy of the Hudson Valley Regional Advisory Committee Report is annexed to the Sandman Aff. as Exhibit C.

<u>Response</u>:  The Andrus does not contest this allegation for purposes of this motion.

5.      Section 8 of the Enabling Legislation required the Commission to "develop recommendations for reconfiguring the state's general hospital and nursing home bed supply to align bed supply to regional needs," and specifically to "make recommendations relating to facilities to be closed and facilities to be resized, consolidated, converted or restructured" in each region of the State.  Sandman Aff. ¶ 9.  The Enabling Legislation instructed the Commission to transmit its recommendations to the Governor and Legislature by December 1, 2006.  <u>Id.</u>

<u>Response</u>:  The Andrus does not contest these allegations for purposes of this motion, but refers

the Court to the Enabling Legislation for other relevant provisions contained therein.

6.      Section 9 of the Enabling Legislation provides that the New York State Commissioner of Health "shall take all actions necessary to implement, in a reasonable, cost efficient manner, the recommendations of the Commission," unless the Governor fails to transmit the final recommendations, along with his approval, to the Legislature on or before December 5, 2006, or a majority of the members of each house of the Legislature vote to adopt a concurrent resolution rejecting the Commission's recommendations in their entirety by December 31, 2006.  Sandman Aff. ¶ 10.

<u>Response</u>:  The Andrus does not contest this allegation for purposes of this motion, but refers the

Court to the Enabling Legislation for other relevant provisions contained therein.

7.      The Commission transmitted its final recommendations, entitled <u>A Plan to Stabilize and Strengthen New York's Health Care System</u> ("Final Report")," to the Governor and Legislature on November 28, 2006.  Sandman Aff. ¶ 11.

<u>Response</u>:  The Andrus does not contest this allegation for purposes of this motion.

8.      A true and accurate copy of the Final Report is attached to the Sandman Aff. Exhibit B.

<u>Response</u>:  The Andrus does not contest this allegation for purposes of this motion.

9.     Governor Pataki transmitted the Final Report and his approval thereof to the Legislature on November 30, 2006.  Sandman Aff. ¶ 11.

*Response*:  The Andrus does not contest this allegation for purposes of this motion.

10.     A true and accurate copy of Governor Pataki's transmittal and approval of the Final Report is annexed to the Sandman Aff. as Exhibit D.

*Response*:  The Andrus does not contest this allegation for purposes of this motion.

11.     The New York State Legislature did not pass a concurrent resolution rejecting the Commission's recommendations prior to the end of 2006.  Id.

*Response*:  The Andrus does not contest this allegation for purposes of this motion.

## II.     The Commission Process

12.     The Commission, which operated independently of any existing state agency, used an approach that was both quantitative and qualitative.  Sandman Aff. ¶ 12.  The Commission's decision making process was informed and driven by review of objective data and quantitative analysis.  Id.  But, the Commission's recommendations also reflected significant public input, understanding of local market conditions, and professional judgment.  Id.

*Response*:     The Andrus disputes these allegations.  The New York State Commission on Healthcare Facilities in the 21st Century (the "Berger Commission") failed to properly consider accurate and current data about the Andrus' level of occupancy, financial stability, quality of resident care, and resident care needs, and instead relied on outmoded and inaccurate data in recommending closure of the Andrus' nursing home.  See Affidavit of Betsy Biddle In Opposition to Defendant's Summary Judgment Motion, sworn to on August 13, 2007 (the "Biddle Affidavit"), ¶¶ 56 through 63; Berger Commission Final Report, p. 123 (Ex. B to Sandman Affidavit).  It is also disputed that the Berger Commission's recommendations reflected significant public input, understanding local market conditions, and professional judgment with respect to the Andrus.

13.     The Commission and its staff performed detailed analysis of each hospital and nursing home throughout the State.  Sandman Aff. at ¶ 13.  Central to the Commission's quantitative analysis was its "analytic framework" and, for hospitals, its "absorption and access analysis."  Id.

*Response*:  The Andrus disputes these allegations.  The Berger Commission failed to properly consider accurate and current data about the Andrus' level of occupancy, financial stability, quality of resident care, and resident care needs, and instead relied on outmoded and inaccurate data in recommending closure of the Andrus' nursing home.  See Biddle Affidavit, ¶¶ 56 through 63; Berger Commission Final Report, p. 123 (Ex. B to Sandman Affidavit).

14.    The Commission's analytic framework applied the factors that the Commission was required to consider under the Enabling Legislation, and required the consideration of over 40 metrics for each hospital and nursing home, reflecting six criteria: service to vulnerable populations, availability of services, quality of care, utilization, viability and economic impact. Sandman Aff. ¶ 14.  This framework was a starting point for focused and continual deliberations and discussions, and did not constitute final determinations of which institutions to rightsize.  Id.

*Response*:  The Andrus disputes these allegations.  The Berger Commission failed to properly consider accurate and current data about the Andrus' level of occupancy, financial stability, quality of resident care, and resident care needs, and instead relied on outmoded and inaccurate data in recommending closure of the Andrus' nursing home.  See Biddle Affidavit, ¶¶ 56 through 63; Berger Commission Final Report, p. 123 (Ex. B to Sandman Affidavit).  The Andrus does not contest that the Berger Commission was required to consider the factors delineated in the Enabling Legislation, but avers that in the Andrus' case, it failed to do so.

15.    The analytic framework employed by the Commission is discussed in the Final Report, at pages 68-70.  Sandman Aff. Exh. B.

*Response*:  The Andrus does not contest that the analytic framework that the Berger Commission was supposed to employ is discussed in the Final Report at pages 68-70.

16.    A true and accurate copy of analytic framework data employed by the Commission, relevant to nursing homes, are annexed to the Sandman Aff. as Exhibit E.

*Response*:  The Andrus does not contest that a copy of the analytic framework data that the Berger Commission was supposed to employ is annexed to the Sandman Affidavit as Exhibit E.

17.    (There is no paragraph numbered 17.)

18.     A true and accurate copy of demonstrative exhibits from a presentation by Commission staff entitled "Identifying Opportunities to Shift Long Term Care Resources," which discusses the allocation of long term care resources, is annexed to the Sandman Aff. as Exhibit G.

*Response*:  The Andrus does not contest this allegation for purposes of this motion.

19.     The quantitative data utilized by the Commission were primarily derived from information reported by facilities themselves on the Institutional Cost Reports submitted to DOH each year.  Sandman Aff. ¶ 16.

*Response*:  The Andrus does not dispute that the Berger Commission relied in part on data reported on the Institutional Cost Reports for the 2000-2002 cost periods submitted to the Department of Health, but avers that in the Andrus' case, the Berger Commission failed to consider more current financial data made timely available to it, including the Andrus' 2005 certified financial statements.

20.     The Commission's qualitative analysis was conducted in conjunction with the RACs.  Sandman Aff. ¶ 17.

*Response*:  The Andrus disputes this allegation.  Neither the RAC nor the Berger Commission performed any meaningful "qualitative analysis" of the Andrus' situation.  For instance, while the Berger Commission assumed that the Andrus could readily convert its nursing facility to an assisted living program and that its residents could be safely cared for at that lower level of care, based solely on the facility's overall "case mix index", neither the RAC nor the Berger Commission ever visited the Andrus to view the facility, clinically assess the residents, or see firsthand the care being delivered to them.   See Biddle Affidavit, ¶¶ 64 through 69, 74.

21.     Both the Commission and the Hudson Valley RAC were required by the Enabling Legislation (§§ 7(a), 8(a)) to conduct extensive outreach to stakeholders in the region including but not limited to community-based organizations, health care providers, labor unions, payers, businesses and consumers.  Id.  In particular, the Commission and the RACs were charged with conducting formal public hearings, and fostering discussions among stakeholders.  Id.

*Response*:  The Andrus does not contest these allegations for purposes of this motion, but refers the Court to the Enabling Legislation for other relevant provisions contained therein.

22.    The Commission and RACs conducted nineteen public hearings statewide, including three in the Hudson Valley Region.  Sandman Aff. ¶ 18.

*Response*:  The Andrus does not contest this allegation for purposes of this motion.

23.    True and accurate copies of documents reflecting the details concerning the time and location of those public hearings are annexed to the Sandman Aff. as Exhibit H.

*Response*:  The Andrus does not contest this allegation for purposes of this motion.

24.    True and accurate copies of the agendas for the public hearings are annexed to the Sandman Aff. as Exhibit I.

*Response*:  The Andrus does not contest this allegation for purposes of this motion.

25.    Andrus did not choose to participate in any of the public hearings identified in the preceding paragraphs.  Sandman Aff. ¶ 18.

*Response*:  The Andrus disputes this allegation.  The Andrus did not receive notice from either the RAC or the Berger Commission that the Berger Commission was considering the Andrus' nursing home for closure, and the purported grounds for such action, and was not notified that it had to defend itself against closure in public hearings or otherwise.  Accordingly, the Andrus was not afforded a meaningful opportunity to participate in any of the public hearings scheduled by the RAC and the Berger Commission.  See Biddle Affidavit, ¶¶ 34 through 37.

26.    Reflecting its mandate to foster discussions among stakeholders, the Commission encouraged voluntary rightsizing efforts.  Sandman Aff. ¶ 19.  Philosophically, the Commission believed that "bottom-up" solutions derived by health care providers can be superior to "top-down" imposed edicts.  Id.  Practically, the Commission also believed that locally developed solutions with stakeholder participation are easier to implement.  Id.  In particular, the Commission offered facilities a procedure that was designed to enable facilities to engage in voluntary rightsizing discussions under the supervision of the Commission and DOH without incurring antitrust liability.  Id.

*Response*:  The Andrus disputes these allegations concerning the Berger Commission's approach to "rightsizing" in the Andrus' case.  The Berger Commission ignored more current data about the Andrus' operations and financial condition and imposed its mandate to close the Andrus' nursing home without regard to the Andrus' occupancy, its financial stability, the true quality of its residents' care, its voluntary reduction of bed capacity by 50 beds to 197 beds, and the

continued demand for its nursing home care and services among elderly in the Hudson Valley region.  See Biddle Affidavit, ¶¶ 56 through 62; Berger Commission Final Report, p. 123 (Ex. B to Sandman Affidavit).

27.    A true and accurate copy of the March 9, 2006 memorandum from the Commission to all general hospital and residential health care facility administrators, announcing the Commission's Voluntary Rightsizing Procedures, is annexed to the Sandman Aff. as Exhibit J.

*Response*:  The Andrus does not contest this allegation for purposes of this motion.

28.    Early in the Commission process, facilities of interest were identified by Commission staff.  Sandman Aff. ¶ 20.  Andrus was identified as a possible candidate for right-sizing and/or conversion to an assisted living program due to its low occupancy level, recent history of patient care deficits, low care needs of its residents and its financial problems.  Id.  Another consideration was its prior decision to seek to become an alternative care provider as a continuing care retirement community.  Id.

*Response*:  The Andrus disputes these allegations insofar as neither the Berger Commission nor its staff ever notified the Andrus that it had been identified as one of the "facilities of interest" and a possible candidate for right-sizing due to its allegedly "low occupancy level, recent history of patient care deficits, low care needs of its residents and its financial problems"; and avers that none of those "factors" identified by defendant are accurate.  See Biddle Affidavit, ¶¶ 28, 56 through 62.

29.    The Hudson Valley RAC, along with Commission staff, made a point of arranging to meet with representatives of such facilities of interest to learn each facility's perspective on the factors leading to their being identified as right-sizing candidates.  Sandman Aff. ¶ 21.

*Response*:   The Andrus disputes this allegation insofar as the Hudson Valley RAC or Commission staff never notified the Andrus that it was meeting with the Andrus "to learn each facility's perspective on the factors leading to their being identified as right-sizing candidates", and avers that the RAC told the Andrus that the purpose of the meeting was to hear the Andrus'

"good story" about its current situation and future prospects.  See Biddle Affidavit, ¶¶ 28 through

30.

30.     Members of the Hudson Valley RAC and Commission staff met with Betsy Biddle, Andrus' executive director, on or about June 19, 2006.  Sandman Aff. ¶ 22.  At that meeting topics included Andrus' previous attempt to convert itself into a continuing care retirement community, reducing its nursing home bed complement to 72; its proposal to transfer 50 beds to Beth Abraham Hospital in resolution of outstanding debts resulting from the proposed conversion and its general finances.  Id.

*Response*:  The Andrus does not contest that the Hudson Valley RAC and Berger Commission

staff met with Ms. Biddle on June 20, 2006 and discussed its prior history, but avers that Ms.

Biddle told the participants of its improved occupancy following the resumption of nursing home

admissions in October 2002 after the rejection of its continuing care retirement community

("CCRC") proposal by the Village of Hastings-on-Hudson; its agreement to transfer 50 of its

beds to Beth Abraham Health Services, resulting in a reduced complement of 197 nursing home

beds; and its improved finances and operating surplus in 2005 and 2006.  See Biddle Affidavit,

¶¶ 29 through 30.

31.     A true and accurate copy of Executive Director Biddle's letter to Dr. Robert Amler, the Hudson Valley RAC chairperson, dated June 23, 2006, thanking him for the meeting, is annexed to the Sandman Aff. as Exhibit K.  Attachments to the letter included Andrus' 2005 financial statement and an agreement between Andrus and Beth Abraham Hospital to transfer authority to operate the 50 nursing home beds.

*Response*:  The Andrus does not contest these allegations for purposes of this motion.

32.     Andrus did not seek any further opportunity to present its views to the Commission or the Hudson Valley RAC.  Sandman Aff. ¶ 23.  Such opportunity was available to facilities that sought to do so.  Id.  For example, the Commission recommended the closure of Community Hospital of Dobbs Ferry, which was also located in the Hudson Valley Region.  Id. at ¶ 24.  Community Hospital at Dobbs Ferry submitted comments to the Commission and RACs including:

    a.     A letter from the President and CEO of St. John's Riverside Hospital, Jim Foy, to Dr. Robert Amler, the Hudson Valley RAC chairperson, dated April 18, 2006, which thanked Dr. Amler for the opportunity to meet with the Hudson Valley RAC on April 18, 2006, and sought to explain the

importance of Community Hospital at Dobbs Ferry to the Riverside Health Care System, which includes St. John's Riverside Hospital.

    b.    Mr. Foy again wrote to Dr. Amler on May 11, 2006, providing information requested by Dr. Amler as a further follow up to an April 7, 2006 meeting. Mr. Foy detailed the relationship of the different entities comprising the Riverside Health Care System including St. John's Riverside Hospital, Yonkers General Hospital and Community Hospital at Dobbs Ferry. The letter included numerous attachments describing the System's organization and finances.

    c.    Representatives of Community Hospital at Dobbs Ferry, including its President and CEO, Ronald J. Corti, met with Commission staff on October 6, 2006, to explain the services that Mr. Corti believed were essential services provided by Community Hospital to the surrounding communities.

Sandman Aff. ¶ 25.

_Response_: The Andrus disputes these allegations. The Andrus was never afforded a meaningful opportunity to present its views to the Berger Commission or the Hudson Valley RAC concerning the contemplated closure of the Andrus' nursing home or the grounds for such recommendation, as neither the RAC nor the Berger Commission notified the Andrus of same at any time during their review process. See Biddle Affidavit, ¶¶ 34 through 37. The Andrus did not know that it needed to "present its views" to the Commission or the Hudson Valley RAC. If Community Hospitals at Dobbs Ferry submitted further information to the RAC after being notified it was a candidate for closure, it stands in stark contrast to the Andrus, which did not receive such advance communication.

## III.    The Commission's Recommendations

    33.    In regard to Andrus, the Final Report recommended that Andrus downsize all 247 nursing home beds and add 140 assisted living program beds and possibly other non-institutional services. Sandman Aff. Exh. B at 122, Benjamin Aff. ¶ 3. The Commission's Assessment of Andrus are found in the Final Report at Sandman Aff. Exh. B at 123.

_Response_: The Andrus does not contest these allegations for purposes of this motion.

34.     On January 31, 2007, DOH sent a letter to Andrus ("Implementation Outline") advising it of the Commission's recommendation and requesting that Andrus contact DOH to arrange a meeting if such a meeting was desired.  Benjamin Aff. ¶ 4.

*Response*:  The Andrus does not contest this allegation for purposes of this motion.

35.     A true and accurate copy of the Implementation Outline is annexed to the Benjamin Aff.  as Exhibit A.

*Response*:  The Andrus does not contest this allegation for purposes of this motion.

36.     The Implementation Outline is consistent with the Commission's Final Report (page 90), which provides that "the Commissioner shall implement each recommendation as expeditiously as possible, but in no event later than June 30, 2008." Benjamin Aff. ¶ 7.

*Response*:  The Andrus does not contest this allegation for purposes of this motion.

37.     While DOH has the authority to implement the downsizing of all 247 of Andrus' nursing home beds and thereby close the facility as currently operated, DOH will not seek to compel Andrus to convert the facility to an assisted living program.  Benjamin Aff. ¶ 8.

*Response*:  The Andrus disputes the allegation that the Department of Health has authority to implement the elimination of all of the Andrus' nursing home beds based on the Berger Commission's recommendation, and avers (i) that implementing the recommendation would violate the Andrus' constitutional rights to due process, among other rights, and (ii) that conversion of the Andrus to an assisted living program coupled with the elimination of all of its nursing home beds is not a viable option.

38.     Nursing homes are facilities providing nursing care to sick, invalid, infirm, disabled or convalescent persons in addition to lodging and board or health related services (N.Y. Public Health Law § 2801(2)) and must have an operating certificate issued by the Department. Benjamin Aff. ¶ 9; N.Y. Public Health Law § 2805.  In contrast, the terms "assisted living" and "assisted living residence" mean an entity which provides or arranges for housing, on-site monitoring, and personal care services and/or home health care services, in a home like setting. Benjamin Aff. ¶ 10; N.Y. Public Health Law § 4651(1).

*Response*:  The Andrus does not contest this allegation for the purposes of this motion.

**IV.     Data Concerning Andrus**

39.     Andrus' physical plant is over sixty years old.  Sandman Aff. ¶ 34.

*Response*:   The Andrus disputes this allegation, and avers that its original building was constructed in 1953, making the structure 54 years old, and that renovations to the physical plant have been done periodically, including in 2006.

### A.    Decertification of Nursing Home Beds at Andrus

40.    During its tenure, the Commission looked to the most recent data available to it when reviewing different facilities.  Sandman Aff. 30.  Data from 2005 was not reported to DOH by facilities until mid-2006, which meant that it was not available for consideration by the Commission.  Id.  Financial data for 2006 could not be available until 2007, so it could not be relied upon by the Commission.  Id.

*Response*:  The Andrus disputes these allegations.  In June 2006, the Andrus furnished the RAC with its 2005 certified financial statements along with other current census and 2006 financial information.  The Berger Commission had ample time and opportunity to consider and rely on the more current data furnished by the Andrus; it did not issue its Final Report until November 28, 2006, four months after receiving the data.  The Berger Commission nevertheless failed to consider the most recent data made available to it concerning the Andrus, and instead relied on outmoded and inaccurate data.  See Biddle Affidavit, ¶¶ 28 through 34, 59 through 63; Exhibit K to Sandman Affidavit, pp. 121-28.

41.    The Commission did note and consider Andrus' 2005 financial statement and Andrus' representation that its operations were not losing money in 2006.  Sandman Aff. ¶ 30.

*Response*:  The Andrus disputes this allegation.  According to its Final Report, the Berger Commission assumed, contrary to the Andrus' 2005 certified financial statements, that the Andrus was "operating at a significant loss" in 2005, and characterized the Andrus' reported surplus in 2006 as a mere "claim."  See Biddle Affidavit, ¶¶ 59 through 63; Berger Commission Final Report, p. 123 (Ex. B to Sandman Affidavit).

42.    Andrus had among the lowest occupancy rates in Westchester County.  Sandman Aff. ¶ 31.

*Response*:  The Andrus disputes this allegation for purposes of this motion.  The Andrus'

occupancy rate was 87% on average in 2005, and 90% by year end 2005 and also on average in

2006 based on its current 197-bed capacity.  See Biddle Affidavit, ¶¶ 43 through 44.  It was not

among the lowest occupancy rates in Westchester County in 2005 and 2006.

43.    According to the data considered by the Commission for the period 2001-2003, Andrus had among the highest rates in Westchester for admitting low care patients, with 21% of these admissions being considered Reduced Physical Functioning A or Reduced Physical Functioning B patients, the two lowest care categories.  Sandman Aff. ¶ 32.  In 2003 Andrus had 45 residents classified on the lowest category, Reduced Physical Functioning A.  Id.

*Response*:  The Andrus disputes these allegations as well as the relevance of the Andrus 2001-03

data.  Also, sixteen nursing homes in the Hudson Valley RAC admitted 20 or more residents

categorized as Reduced Physical Functioning A or Reduced Physical Functioning B under the

Resource Utilization Group ("RUG") – II reimbursement classification system utilized by the

Department of Health in the 2001-2003 period.  See Biddle Affidavit, ¶¶ 13, n. 2; Exhibit E to

Sandman Affidavit.

44.    A true and accurate copy of a listing of Reduced Physical Functioning A and Reduced Physical Function B resident counts for all facilities is annexed to the Sandman Aff. as Exhibit L.

*Response*:  The Andrus does not contest the allegation for purposes of this motion but disputes

the relevance of 2003 Andrus data.

45.    Andrus' 2003 case mix index ("CMI") of 0.91, was the lowest of all nursing homes in the Hudson Valley Region, with few having CMIs below 1.1.  Sandman Aff. ¶ 33.

*Response*:  The Andrus does not contest this allegation for purposes of this motion but disputes

the relevance of 2003 Andrus data.

46.    A true and accurate copy of a list of 2003 CMIs for all Hudson Valley Region nursing homes is annexed to the Sandman Aff. as Exhibit M.

*Response*:  The Andrus does not contest this allegation for purposes of this motion but disputes

the relevance of 2003 Andrus data.

47.    The Commission's finding that Andrus had 26 deficiencies in 2005 accurately reflects the data contained in Sandman Exhibit M.  Sandman Aff. ¶ 35.

*Response*:  The Andrus disputes this allegation.  The 2005 survey attached as Exhibit M to the Sandman Affidavit reflects only 14 deficiencies, 6 only of which relate to patient care, and 8 of which relate to building/environment.  See Biddle Affidavit, ¶¶ 84 through 87; Exhibit M to Sandman Affidavit.

48.    A true and accurate copy of the statement of deficiencies resulting from a May 2005 survey of Andrus' operation is annexed to the Sandman Aff. as Exhibit N.  Those survey results show 26 deficiencies in the care provided to residents.  Id.  For some deficiencies there are repeated violations as the care to multiple residents failed to conform to minimum standards. Id.

*Response*:    The Andrus disputes these allegations.    Although Exhibit M of the Sandman Affidavit is a true copy of the Statement of Deficiencies issued to the Andrus on its 2005 annual survey, the Statement of Deficiencies cites only 14 deficiencies, only 6 of which relate to patient care and 8 relate to the Andrus building/environment, and avers that none of the cited deficiencies involve actual harm to any patients.  See Biddle Affidavit, ¶¶ 84 through 87; Exhibit M to Sandman Affidavit.

49.    When facilities did not respond to Commission inquiries, and available data indicated the facility might warrant review, the Commission explicitly recommended such review by the DOH Commissioner and, if warranted, closure, downsizing or conversions. Sandman Aff. ¶ 36.

*Response*:  The Andrus does not have sufficient information to dispute this allegation for purposes this motion, but avers that the Berger Commission did not mandate closure of any of the "facilities of interest" in the Hudson Valley RAC that failed to respond to the Berger Commission's inquiries.  See Biddle Affidavit, ¶ 40; Hudson Valley RAC Report, p. 10.

50.    The complaint at ¶¶ 29-33 contains allegations regarding the "transfer" of 50 of Andrus' certified beds to another facility.  The Final Report considered Andrus' occupancy, with and without the 50 beds.  Benjamin Aff. ¶ 11.

*Response*:  The Andrus disputes the allegation in the second sentence in part.  The Berger Commission in its Final Report failed to consider the Andrus' occupancy, with its true complement of 197 nursing home beds, in 2006.  See Biddle Affidavit, ¶¶ 56 through 57; Berger Commission Final Report, p. 123 (Ex. B to Sandman Affidavit).

51.    For periods prior to July 1, 2006, Andrus possessed an operating certificate to operate a 247 bed nursing home.  Benjamin Aff. ¶ 12.

*Response*:  The Andrus does not dispute this allegation for purposes of this motion, but avers (i) that the Andrus did not operate a 247-bed nursing home from July 2, 2002 through June 30, 2006, and had agreed to transfer 50 of the 247 nursing home beds originally certified by the Department of Health as of July 2, 2002; (ii) that the Department of Health knew of the agreement to transfer those 50 beds in 2002, and that the Andrus was only operating a 197 bed nursing home since July 2002; and (iii) that the Department of Health incorrectly decertified 50 Andrus beds as of July 1, 2006 rather than July 2, 2002.

52.    By letter dated January 24, 2007, DOH approved a reduction in Andrus' licensed capacity to 197 beds, effective July 1, 2006.  Id.  A true and accurate copy of the January 24, 2007 DOH letter is annexed to the Benjamin Aff. as Exhibit B.

*Response*:  The Andrus does not contest these allegations for purposes of this motion.

53.    Following Andrus' failure to obtain local zoning approval for the construction of a continuing care retirement community, including 201 independent living units and a 72 bed nursing home, Andrus entered into an agreement in 2002 with Beth Abraham Hospital, its partner in the continuing care community application, to transfer 50 nursing home beds to Beth Abraham Hospital in lieu of payment of a promissory note held by Beth Abraham Hospital. Benjamin Aff. ¶ 13.

*Response*:  The Andrus does not contest these allegations for purposes of this motion.

54.    A true and accurate copy of Andrus' 2002 agreement with Beth Abraham Hospital is annexed to the Benjamin Aff. as Exhibit C.

*Response*:  The Andrus does not contest this allegation for purposes of this motion.

55.    DOH never approved Andrus' 2002 agreement with Beth Abraham Hospital. Benjamin Aff. ¶ 13.

_Response_:  The Andrus disputes this allegation.  The Department of Health approved the transfer of 50 beds from the Andrus to Beth Abraham Health Services orally as early as 2002, but no later than July 2006.  See Biddle Affidavit, ¶¶ 19 through 21; Exhibit B to Benjamin Affidavit.

56.     If Andrus had merely sought to decertify 50 beds, this would have been a fairly routine matter that could have been accomplished within approximately six months of Andrus submitting a properly documented request.  Benjamin Aff. ¶ 14.

_Response_:  The Andrus disputes these allegations for purposes of this motion as well as their relevance.

57.     Andrus' attempt to transfer 50 of its certified beds to another facility necessitated approval by the New York Public Health Council.  Benjamin Aff. ¶ 15.

_Response_:  The Andrus does not contest that the allegation that the transfer of the Andrus' 50 nursing home beds requires Public Health Council approval, but disputes its relevance.

58.     In seeking to be allowed to immediately decertify the 50 beds, but still have them treated as available beds at the time of review of the transfer, Andrus sought extraordinary treatment.  Benjamin Aff. ¶ 15.

_Response_:  The Andrus disputes the allegation that the Andrus sought "extraordinary treatment" or that they were "available" beds, as well as the relevance of these allegations.

59.     Under New York State law, a facility cannot transfer its operating certificate, which is its license to operate, or its establishment approval or its bed complement.  Benjamin Aff. ¶ 16; N.Y. Public Health Law § 2801-a(4).  In seeking to obtain the 50 beds, Beth Abraham Hospital would have to obtain establishment approval under N.Y. Public Health Law § 2801-a and possibly construction approval pursuant to N.Y. Public Health Law § 2802 and apply for a revised operating certificate pursuant to N.Y. Public Health Law § 2805.  Benjamin Aff. ¶ 16.

_Response_:  The Andrus does not contest these allegations for purposes of this motion, but disputes their relevance and avers that (i) the Department of Health knew as early as 2002, that the Andrus had agreed to transfer 50 of its 247 nursing home beds previously certified by the Department of Health, and that it was operating with a reduced complement of 197 beds; and (ii) the RAC and the Berger Commission knew those facts in June 2006, sufficiently in advance

of the Berger Commission's issuing its Final Report on November 28, 2006 to have considered

those facts in any recommendations affecting the Andrus.

60.    N.Y. Public Health Law § 2801-a provides that no hospital shall be established without the approval of the Public Health Council. Benjamin Aff. ¶ 17.  Establishment approval confers upon a sole proprietorship, partnership or corporation the authority to own and operate a nursing home.  Id.  A certificate of incorporation including the power to operate a nursing home cannot be filed with the Secretary of State without first being approved by the N.Y. Public Health Council.  N.Y. Business Corporation Law § 201(e); N.Y. Not-for-Profit Corporation Law § 404(o).  In considering such an application, the Public Health Council considers the public need for the existence of the institution at the time and place and under the circumstances proposed, the character, competence and standing in the community of the sponsors and the financial resources and feasibility of the proposal.  Benjamin Aff. ¶ 17; N.Y. Public Health Law § 2801-a(3)).

_Response_:  The Andrus does not contest these allegations for purposes of this motion, but refers

the Court to the referenced statutes for other relevant provisions contained therein.

(This is the second paragraph numbered 60.)  The foregoing requirements also apply to an existing nursing home which seeks to purchase existing beds from another nursing home.  Benjamin Aff. ¶ 18.

_Response_:  The Andrus does not contest this allegation for purposes of this motion, but refers the

Court to the referenced statutes for other relevant provisions contained therein.

61.    The Public Health Council, which is established pursuant to N.Y. Public Health Law § 220, acts on establishment applications with the advice of the N.Y. State Hospital Review and Planning Council ("SHRPC").  Benjamin Aff. ¶ 19; N.Y. Public Health Law § 2801-a(2).  The SHRPC is established pursuant to N.Y. Public Health Law § 2904; Benjamin Aff. ¶ 19.

_Response_:  The Andrus does not contest this allegation for purposes of this motion, but disputes

its relevance.

62.    Pursuant to N.Y. Public Health Law § 2802, construction of a facility must be approved by the Commissioner of Health.  Benjamin Aff. ¶ 20.  The SHRPC must be provided an opportunity to make a recommendation on the construction application prior to the Commissioner acting on the application.  Id.  When an application for both establishment and construction approval is considered, the process for issuance of both approvals is combined.  Id.  The consideration of establishment and/or construction applications is known as the Certificate of Need review process.  Id.

*Response*:  The Andrus does not contest these allegations for purposes of this motion, but disputes their relevance.

63.     The criteria for granting construction approval, which are specified at New York Public Health Law ("PHL") § 2802(3), are essentially the same as the establishment.  Benjamin Aff. ¶ 21.

*Response*:  The Andrus does not contest this allegation for purposes of this motion, but disputes its relevance.

64.     Construction approval is necessary for various projects at existing nursing homes, including expansions, renovations and capital improvements.  Benjamin Aff. ¶ 21 at fn 1.  The nature of the approval process is dependent upon the proposed construction including the work proposed and the cost.  Id.; 10 NYCRR § 710.1(c).  Lower cost projects or those that merely update existing facility infrastructure are subject to limited review which does not include consideration of need, only architectural review.  Benjamin Aff. ¶ 21 at fn 1; 10 NYCRR § 710.1(c)(4).  Such was the case for three construction approvals granted to Andrus since 2004: emergency heating, boiler replacement ($2,970,900), approved on March 17, 2006; electrical upgrades ($1,877,000), approved on February 10, 2006; and, telephone system, brickwork, kitchen and resident room upgrades ($1,072,264), approved on August 5, 2004.  Benjamin Aff. ¶ 21 at fn 1.

*Response*:  The Andrus does not contest these allegations for purposes of this motion, but avers (i) that in the Andrus' case, there was no issue of public need raised by its $6 million capital improvements project and (ii) that the improvements did not substantively change the type of services involved inasmuch as it was contemplated that the Andrus would continue operating the building as a nursing home.

65.     When a party seeks to purchase an existing nursing home or its beds, it is necessary to obtain establishment and/or construction approval including consideration of the character and competence of the proposed operator, the financial feasibility of the proposed purchaser and the need for the beds.  Benjamin Aff. ¶ 22.

*Response*:  The Andrus does not contest this allegation for purposes of this motion, but disputes its relevance.

66.     In considering public need for nursing home beds, DOH identifies the currently available beds in the planning area (which, in Andrus' case, would be Westchester County), including existing beds and beds that have been approved for construction but are not yet in

operation and compares the available beds to the number of needed beds.  Benjamin Aff. ¶ 23; 10 N.Y.C.R.R. §§ 670.3(a), 709.3(g).  New beds can only be added if there is a need for the beds. Benjamin Aff. ¶ 23.

_Response_:  The Andrus does not contest these allegations for purposes of this motion, but avers that when the Department of Health determines to revoke a nursing facility's operating certificate authorizing it to operate nursing home beds, the nursing facility is provided notice of the grounds for revocation and afforded a hearing to address and/or contest the grounds.  See N.Y. Public Health Law § 2806(3), (6) (describing process required when the Commissioner of Health seeks to revoke an operating certificate for cause, or for lack of public need, respectively).

      67.    When an operator seeks to sell a facility or beds that are in operation, DOH will often permit a transfer to a new operator even if there are excess beds in the planning area. Benjamin Aff. ¶ 24.  This is not the case when such beds were decertified prior to submission of an application to approve the transfer.  Id.  In seeking to be allowed to decertify beds in 2002, but have them treated as available beds at some unknown time in the future when Beth Abraham Hospital might file an application for approval to purchase the beds, Andrus sought to receive special treatment.  Id.

_Response_:  The Andrus disputes the allegation that the Andrus sought "special treatment" as well as the relevance of these allegations, and avers that: (i) the Department of Health knew as early as 2002, that the Andrus had agreed to transfer 50 of its 247 nursing home beds previously certified by the Department of Health, and that it was operating with a reduced complement of 197 beds; and (ii) the RAC and the Berger Commission knew those facts in June 2006, sufficiently in advance of the Berger Commission's issuing its Final Report on November 28, 2006 to have considered those facts in any recommendations affecting the Andrus.

      68.    In mid-July 2006, DOH reached a conceptual resolution of this matter allowing decertification of Andrus' beds, subject to Beth Abraham Hospital submitting an application for approval to purchase the beds within 18 months.  Benjamin Aff. ¶ 25.  The January 24, 2007, approval (Benjamin Aff. Exh. B) memorialized this agreement.  Benjamin Aff. ¶ 25.  DOH agreed to make the approval retroactive to July when the conceptual agreement was reached, but no basis exists for using an earlier approval date.  Id.

*Response*:   The Andrus disputes these allegations as well as their relevance, and avers that: (i) the Department of Health knew as early as 2002, that the Andrus had agreed to transfer 50 of its 247 nursing home beds previously certified by the Department of Health, and that it was operating with a reduced complement of 197 beds; and (ii) the RAC and the Berger Commission knew those facts in June 2006, sufficiently in advance of the Berger Commission's issuing its Final Report on November 28, 2006 to have considered those facts in any recommendations affecting the Andrus.

**B.    Funding Available to Andrus to Implement the Commission's Recommendations.**

69.    On May 16, 2007, DOH issued a Request for Application ("RFA") for funding of implementation of commission mandates.  Benjamin Aff. 1126.  A true and accurate copy of the RFA is annexed to the Benjamin Aff. as Exhibit D.

*Response*:  The Andrus does not contest these allegations for purposes of this motion.

70.    Applications for funding were due on July 16, 2007.  Benjamin Aff. ¶ 26.  As of July 9, 2007, DOH had not received an application from Andrus.  Benjamin Aff. ¶ 26 at fn. 2.

*Response*:  The Andrus does not contest these allegations for purposes of this motion, but avers that on July 16, 2007, the Andrus timely filed an application for F-SHRP funding, with a "Combined Model", providing for the Andrus' operation of a 140-slot assisted living program, the option recommended by the Berger Commission, along with other community-based programs, but allowing the Andrus to retain and continue operating 120 nursing home beds; or (in the event that the Department of Health rejects the Combined Model) a "Closure Model", providing for closure of the Andrus' nursing home as mandated by the Berger Commission and the termination of all Andrus operations, without prejudice to its claims for relief in this action and all other rights and remedies and based on the Department of Health's statement that a "legal challenge to the Commission mandates does not preclude a facility from applying for funds".

71.     Funding for implementation of the commission mandates is available under the Health Care Efficiency and Affordability Law of New York Capital Grant Program (PHL § 2818) and the Federal-State Health Reform Partnership ("F-SHRP").  Benjamin Aff. ¶ 27.

_Response_:  The Andrus does not contest these allegations for purposes of this motion, but avers

that the referenced funding is available only if the following conditions are met:

  1.  Facilities must self-fund proposed activities as much as possible, including through private, third-party financing and, for closures, the sale of assets.

  2.  State funds will be made available only in the absence of other possible funding.

Exhibit D to Benjamin Affidavit, page 4.

72.     F-SHRP, a Federal-State Health Reform Partnership Medicaid section 1115 Demonstration is the result of a September 29, 2006 agreement between DOH and the U.S. Centers for Medicare and Medicaid Services.  Benjamin Aff. ¶ 28.  A true and accurate copy of this agreement is annexed to the Benjamin Aff. as Exhibit E.

_Response_:  The Andrus does not contest these allegations for purposes of this motion.

73.     The goals of this federal/state partnership include promoting the efficient operation of the State's health care system; consolidating and right-sizing New York's health care system by reducing excess capacity in the acute care systems; shifting emphasis in long-term care from institutional-based to community-based settings.  Benjamin Aff. ¶ 29.

_Response_:  The Andrus does not contest these allegations for purposes of this motion, but avers

that the goals of the referenced federal/state partnership are not so limited.

74.     Under F-SHRP, the federal government will invest up to $1.5 billion ($300 million per year) in agreed upon reform initiatives including initiatives to right size and restructure the acute and long-term care delivery system.  Benjamin Aff. ¶ 30.

_Response_:  The Andrus does not contest these allegations for purposes of this motion.

75.     The federal investment in these reforms is conditioned upon the following:

  a.    The F-SHRP waiver must generate federal saving sufficient to offset the federal investment;

  b.    The State must meet a series of established performance milestones set forth in the waiver terms and conditions including a final implementation report regarding the Berger Commission recommendations by July 15, 2008.

Benjamin Aff. 31.

*Response*:  The Andrus does not contest these allegations for purposes of this motion.

76.    The RFA issued by DOH (Benjamin Aff. as Exhibit D) provides facilities which are the subject of Commission recommendations with an opportunity to submit their compliance plan to DOH, along with a request for grant funds to assist with implementation of the requirements.  Benjamin Aff. ¶ 32.

*Response*:  The Andrus does not contest these allegations for purposes of this motion, but avers

that the grant funds are available to facilities only if the following conditions are met:

      1.  Facilities must self-fund proposed activities as much as possible, including through private, third-party financing and, for closures, the sale of assets.

      2.  State funds will be made available only in the absence of other possible funding.

77.    Applications will be reviewed by DOH and granted in conformance with the terms set forth in the RFA.  Benjamin Aff. ¶ 33.

*Response*:  The Andrus does not contest these allegations for purposes of this motion, but avers

that the allegations concern only the Department of Health's express intentions and that, upon

information and belief, the Department of Health has not yet acted on any of the referenced

applications.

WHEREFORE, in light of the controverted Statement of Material Facts submitted by defendant, the Andrus respectfully requests that the Court deny defendant's motion for summary judgment.

Dated:      New York, New York
            August 13, 2007

CADWALADER, WICKERSHAM & TAFT LLP


By:_____s/Peter G. Bergmann_____
            Peter  G. Bergmann (PB-9691)

Attorneys for Plaintiff
   John E. Andrus Memorial, Inc.
   (d/b/a Andrus on Hudson)
Office and Post Office Address:
One World Financial Center
New York, New York  10281
Telephone:  (212) 504-6000

TO:    John P. Gasior, Esq.
       Assistant Attorney General
       Office of the Attorney General of the State of New York
       Attorneys for Defendant
       120 Broadway – 24th Floor
       New York, New York  10271