UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

JOHN E. ANDRUS MEMORIAL, INC. (d/b/a ANDRUS ON
HUDSON),

                                        Plaintiff,

                    -against-

RICHARD F. DAINES, as Commissioner of the New York
State Department of Health,

                                        Defendant.

Filed Electronically

07-CV-3432 (CLB)(MDF)

**PLAINTIFF'S MEMORANDUM OF LAW IN OPPOSITION
TO DEFENDANT'S MOTION FOR SUMMARY JUDGMENT**

CADWALADER, WICKERSHAM & TAFT LLP
One World Financial Center
New York, New York  10281
Telephone: (212) 504-6000

Attorneys for Plaintiff

## TABLE OF CONTENTS

**PAGE**

TABLE OF AUTHORITIES ................................................................................. ii

PRELIMINARY STATEMENT ........................................................................... 1

COUNTER-STATEMENT OF THE CASE ......................................................... 3

    Enabling Legislation ...................................................................................... 3

    The Andrus ..................................................................................................... 3

    The Andrus' CCRC Proposal ......................................................................... 4

    The Andrus Today .......................................................................................... 5

    The June 2006 Meeting with the RAC ........................................................... 5

    No Notice of the RAC Report's Faulty Findings ........................................... 6

    The Fundamental Flaws in the Berger Commission's Report ....................... 7

STANDARD OF REVIEW ................................................................................. 9

POINT I      THE ANDRUS HAS A PROTECTED PROPERTY INTEREST IN ITS NURSING HOME OPERATING CERTIFICATE ............................................. 10

POINT II    THE ANDRUS WAS DEPRIVED OF ITS PROCEDURAL DUE PROCESS RIGHT TO NOTICE AND HEARING ............................................. 12

    A.    The Andrus Did Not Receive Adequate Notice ...................................... 12

    B.    The Andrus Was Never Afforded A Meaningful Opportunity to Be Heard ........................................................................................................ 17

POINT III  CLOSING THE ANDRUS' NURSING HOME AND RESCINDING ITS OPERATING CERTIFICATE IS WHOLLY UNJUSTIFIED AND VIOLATIVE OF SUBSTANTIVE DUE PROCESS ......................................... 20

POINT IV  THE REVOCATION OF THE ANDRUS' NURSING HOME OPERATING CERTIFICATE CONSTITUTES A "TAKING" ......................... 23

POINT V   THERE ARE MATERIAL ISSUES OF FACT PRECLUDING DISMISSAL OF THE ANDRUS' CONTRACTS CLAUSE CLAIM ................ 25

CONCLUSION ................................................................................................. 26

## TABLE OF AUTHORITIES

**PAGE(S)**

**CASES:**

Allied Structural Steel Co. v. Spannaus,
   438 U.S. 234 (1978).................................................................................. 25

Armstrong v. Manzo,
   380 U.S. 545 (1965).................................................................................. 17

Atkins v. Parker,
   472 U.S. 115 (1985).................................................................................. 15

Brody v. Village of Port Chester,
   434 F.3d 121 (2d Cir. 2005)....................................................................... 17

Buffalo Teachers Fed'n v. Tobe,
   464 F.3d 362 (2d Cir. 2006), cert. denied, 127 S. Ct. 2133 (2007)................. 25-26

Burka v. New York City Transit Auth.,
   110 F.R.D. 660 (S.D.N.Y. 1986)................................................................... 3

Celotex Corp. v. Catrett,
   477 U.S. 317 (1986), cert. denied, 484 U.S. 1066 (1988) ............................... 9

Cleveland Bd. of Educ. v. Loudermill,
   470 U.S. 532 (1985), cert. denied, 488 U.S. 946 (1988) ............................... 12

Commercial Cleaning Servs. v. Colin Serv. Sys.,
   271 F.3d 374 (2d Cir. 2001)....................................................................... 2

Community Hosp. at Dobbs Ferry v. Novello,
   No. 24650/06, slip. op. at 2 (N.Y. Sup. Ct. Westchester Cty. July 10, 2007)...... 23

County of Sacramento v. Lewis,
   523 U.S. 833 (1998).................................................................................. 21

Daniels v. Williams,
   474 U.S. 327 (1986).................................................................................. 21

Edelman v. Jordan,
   415 U.S. 651 (1974).................................................................................. 25

Fair Assessment in Real Estate Ass'n v. McNary,
   454 U.S. 100 (1981).................................................................................. 25

Great Northern Life Ins. Co. v. Read,
   322 U.S. 47 (1944) ................................................................................... 25

Grossman v. Schwartz,
    125 F.R.D. 376 (S.D.N.Y. 1989) ........................................................................................ 3

Harlen Assocs. v. Village of Mineola,
    273 F.3d 494 (2d Cir. 2001) .............................................................................................. 10

Hellstrom v. U.S. Dep't of Veteran's Affairs,
    201 F.3d 94 (2d Cir. 2000), aff'd, No. 01-6245, 2002 WL 31008794 (2d Cir. Sept. 9,
    2002) ..................................................................................................................................... 2

Huntleigh USA Corp v. United States,
    63 Fed. Cl. 440 (2005) ....................................................................................................... 24

James v. Universal Motown Records, Inc.,
    No. 03 Civ. 4487 (LAK), 2004 WL 1368225 (S.D.N.Y. June 16, 2004) ........................... 10

Kennecott Copper Corp. v. State Tax Comm'n,
    327 U.S. 573 (1946) .......................................................................................................... 25

Lucas v. South Carolina Coastal Council,
    505 U.S. 1003 (1992) ........................................................................................................ 24

Mariac Shipping Co., Ltd. v. Meta Corp.,
    No. 05 Civ. 2224 (LAK), 2007 WL 1662067 (S.D.N.Y. June 11, 2007) ........................... 13

Mathews v. Eldridge,
    424 U.S. 319 (1976) ................................................................................................... 17, 19

Meloff v. New York Life Ins. Co.,
    51 F. 3d 372 (2d Cir. 1995) ................................................................................................ 3

Memphis Light, Gas & Water Div. v. Kraft,
    436 U.S. 1 (1978) ............................................................................................................. 12

Mullane v. Central Hanover Bank & Trust Co.,
    399 U.S. 306 (1950) .......................................................................................................... 17

Plaza Health Labs., Inc. v. Perales,
    878 F.2d 577 (2d Cir. 1987) ..................................................................................... 10, 15-16

St. Bartholomew's Church v. City of New York,
    728 F. Supp. 958 (S.D.N.Y. 1989), aff'd, 914 F.2d 348 (2d Cir. 1990), cert. denied,
    499 U.S. 905 (1991) .......................................................................................................... 24

St. Joseph Hosp. of Cheektowaga v. Novello,
    15 Misc.3d 333 (Sup. Ct. Erie Cty. 2007,) ....................................................................... 23

St. Joseph Hosp. of Cheektowaga v. Novello,
    ___ N.Y.S.2d ___, No. 07-00587, 2007 WL 2044870 (N.Y. App. Div. 4th Dep't July
    18, 2007) ...................................................................................................................... 10, 23

Scotto v. Almenas,
    143 F.3d 105 (2d Cir. 1998) ................................................................. 10

Wantanabe Realty Corp. v. City of New York,
    315 F. Supp. 375 (S.D.N.Y. 2003) ................................................. 21-22

Weigner v. City of New York,
    852 F.2d 646 (2d Cir. 1988), cert. denied, 488 U.S. 1005 (1989).................................. 16-17

Wolff v. McDonnell,
    418 U.S. 539 (1974)............................................................................ 21

## STATUTES & OTHER AUTHORITIES:

L. 2005, ch. 63, Part E, § 31 ("Enabling Legislation")  ............................................. 3, 8

Fed. R. Civ. P. 56(e) ................................................................................... 10

N.Y. Public Health Law § 2806(6) (McKinney 2007) ............................................. 11

1978 N.Y. Sess. Laws 1460 ........................................................................ 12

10 N.Y.C.R.R. Part 51 (New York State Uniform Hearing Procedure)..................................... 20

This memorandum of law is submitted on behalf of plaintiff John E. Andrus Memorial, Inc. (d/b/a Andrus on Hudson) (the "Andrus") in opposition to defendant's motion for summary judgment. The facts warranting denial of the motion are set forth in the affidavit of the Andrus' Executive Director, Betsy Biddle, sworn to on August 8, 2007 (the "Biddle Aff.").

## PRELIMINARY STATEMENT

This is an action pursuant to 42 U.S.C. § 1983 and 28 U.S.C. §§ 2201-02 for declaratory and injunctive relief, arising from defendant's effort to force the Andrus, a not-for-profit nursing home in Hastings-on-Hudson, to cease operating as a nursing home as it has for the past 53 years of its existence, or else "convert" its facility to an entirely new and distinct program -- assisted living -- providing a lower level of care, while retaining none of its existing nursing home beds. The defendant issued his directive to the Andrus under the auspices of implementing the "recommendations" affecting to the Andrus contained in the Final Report of the New York State Commission on Healthcare Facilities in the 21st Century, often referred to as "the Berger Commission" after its Chair, Stephen Berger. The Andrus seeks to vindicate its federal constitutional rights to due process of law and enjoin implementation of the Berger Commission mandate to revoke Andrus' operating certificate and close its nursing home.

Defendant's motion for summary judgment, seeking dismissal of the Andrus' action, is premised upon assertions of allegedly undisputed "material facts", which the Biddle Affidavit has established to be erroneous. See, e.g., Plaintiff's Response to Deft's Statement of Material Facts, ¶¶ 12-14, 20, 25-26, 28-29, 40-41, 47-48. As shown in the Biddle Affidavit, the Berger Commission:

> -- failed to provide the Andrus with notice that its facility was being targeted for closure, or of the grounds for recommended closure (Biddle Aff. ¶ 26);

> -- failed to provide the Andrus with an opportunity to be heard and present evidence directly to the Berger Commission, showing why its closure as a nursing home would contravene and undermine the statutory factors governing the Berger

Commission's "rightsizing" decision-making authority (Biddle Aff. ¶ 37); and

-- mandated the rescission of the Andrus' operating certificate and closure of its nursing home based on patently faulty information and mistaken assumptions about the Andrus' financial condition, occupancy, the quality of care being delivered to its nursing home residents as well as their continued need for nursing home care, and the financial feasibility of converting the Andrus to an assisted living program (Biddle Aff. ¶¶ 39-46).

Simply put, the record on this motion shows, contrary to defendant's contention, that the Berger Commission got wrong many of the "facts" about the Andrus that led the Commission to conclude, erroneously, that the Andrus' nursing home should be closed.

Before this motion was filed, the Andrus sought limited discovery from defendant, including disclosure of the identity of any Berger Commission member or staff who were familiar with the review done of the Andrus, with the intent of deposing one or more individuals to probe further the flawed data and assumptions underlying the Berger Commission's recommendation to close the Andrus' nursing home. In addition, the Andrus sought, among other documents, any drafts of Berger Commission reports or analyses done of the Andrus that may shed light on that issue. In response, the defendant failed to identify any one individual with personal knowledge about the Commission's review of the Andrus, and withheld from production any and all drafts on the ground of "executive privilege". See McGovern Aff., Ex. A.

On this motion, however, defendant offered the affidavit of the Berger Commission's former Executive Director, David Sandman, who is not a Berger Commission member and who does not have personal knowledge about some of the concededly "material" issues concerning the Andrus. At the very least, the Andrus should have the opportunity to examine Mr. Sandman and other Berger Commission representatives under oath to explore the apparent inconsistencies in his own affidavit, concerning exactly what the Commission "considered" in deciding to close the Andrus' nursing home.[1] For the foregoing reasons, as detailed more fully below, defendant's

---

[1] See Commercial Cleaning Servs. v. Colin Serv. Sys., 271 F.3d 374, 386 (2d Cir. 2001). "[T]he nonmoving party must have had the opportunity to discover information that is essential to [its] opposition of the motion."

motion for summary judgment should be denied.

**COUNTER-STATEMENT OF THE CASE**

**Enabling Legislation**

The Berger Commission was empowered to make "rightsizing" recommendations for hospitals and nursing homes, taking into account the region-by-region RAC proposals.  L. 2005, ch. 63, Part E, § 31 ("Enabling Legislation"), § 7.  The Enabling Legislation, however, did not give the Berger Commission unfettered authority to eliminate nursing home and hospital beds or close facilities, without regard to the particular facts and circumstances presented by each facility.  Rather, the Enabling Legislation delineated factors specific to each facility that were to inform the Berger Commission's recommendations as to whether, and which, facilities should be closed or rightsized –

- "the economic impact of right-sizing";
- the "financial status" of the facilities;
- the "capital debt being carried" by facilities and the availability of alternative sources of funding for paying down or retiring the capital debt;
- the "potential conversion of facilities or current facility capacity for uses other than as inpatient or residential facilities";
- "the extent to which a facility serves the health care needs of the region, including serving Medicaid recipients"; and
- "the extent to which the actions recommended by the Commission would result in greater stability and efficiency in the delivery of needed health care services for a community".

Id. § 5.  All these statutory factors weigh against closure of the Andrus' nursing home.

**The Andrus**

The Andrus is a not-for-profit charitable organization established in 1953 to provide a

---

Id.; Hellstrom v. U.S. Dep't of Veteran's Affairs, 201 F.3d 94, 97 (2d Cir. 2000), aff'd, No. 01-6245, 2002 WL 31008794, at *1 (2d Cir. Sept. 9, 2002) (finding that summary judgment should only be granted if "after discovery, the nonmoving party has failed to make a sufficient showing on an essential element of [its] case with respect to which [it] has the burden of proof); Meloff v. New York Life Ins. Co., 51 F.3d 372, 375-76 (2d Cir. 1995) (vacating lower court's summary judgment order where plaintiff had insufficient time to conduct discovery).  See also Grossman v. Schwartz, 125 F.R.D. 376, 381 (S.D.N.Y. 1989) (in a civil rights action, "where the deliberative process of State . . . officials is itself genuinely in dispute, privileges designed to shield that process from public scrutiny must yield").  Burka v. New York City Transit Auth., 110 F.R.D. 660, 667 (S.D.N.Y. 1986) ("[w]here the decision-making process itself is the subject of the litigation, the deliberative privilege may not be raised as a bar against disclosure of critical information").

home for elderly residents.  Biddle Aff. ¶ 10.  The Andrus operates on the same 26-acre campus and in the same original structure as it did when it first opened its doors over 50 years ago.  Id. In 1969 and continuing for the next 38 years, the Andrus has been licensed as a "residential health care facility", or nursing home, by the New York State Department of Health, and is currently certified to care for up to 197 residents.  Id. at ¶ 11.  The Andrus currently cares for approximately 180 elderly residents, the vast majority of whom are from Westchester County or elsewhere in the Hudson Valley Region.  Id. at ¶ 12.  Most Andrus residents are both elderly and poor:  averaging 88 years, roughly 75% of its long-term care residents financially qualify for the State Medicaid program while 29% of the remaining residents, or 7% of its total population, are paid for by the Federal Medicare program.  Id. at ¶¶ 13-14.

**The Andrus' CCRC Proposal**

In 1996, the Andrus developed plans to operate a "continuing care retirement community", or CCRC, serving 400 senior residents in its existing building and in new units to be built on its campus.  Id. at ¶ 16. The Andrus sought the requisite State and local governmental approvals for the CCRC project.  Id.  While those applications were pending, the Andrus voluntarily suspended new admissions to its nursing home.  Id. at ¶ 17.  Although temporary, the admissions freeze resulted in a decline in occupancy and revenues, beginning in 1998.  Id.

All State regulatory agencies, including the Department of Health, approved the Andrus' application to expand into a CCRC.  Id. at ¶ 18.  In November 2001, however, the Board of Trustees for the Village of Hastings-on-Hudson denied the Andrus the requisite construction permits to build on the campus.  Id. Accordingly, the Andrus had to abort its CCRC proposal.  Id.

Following the Village's rejection of the Andrus' CCRC proposal, the Andrus determined that it would continue its historic role as a long-term care provider for Westchester's elderly, but with a scaled-back complement of nursing home beds.  Id. at ¶ 20.  In July 2002, the Andrus agreed to transfer 50 of its certified beds to another not-for-profit nursing facility, Beth Abraham

Health Services.  Id. at ¶ 21.  In October of that year, the Andrus also resumed the admission of residents to its nursing home.  Id.

**The Andrus Today**

From an average census of 72 residents in 2002, following the four-year temporary suspension of admissions, the Andrus filled its nursing home with more residents, building to an average census of 171 residents in 2005, and achieving an average census of 176 in 2006, with an occupancy rate of approximately 90% based on a 197-bed capacity.  Id. at ¶ 22.  Over the same time frame, the Andrus reversed the operating losses it had experienced during the admissions freeze and achieved an operating surplus in 2005 and again in 2006.  Id. at ¶ 23.  The Andrus projects a further operating surplus in 2007.  Id.

**The June 2006 Meeting with the RAC**

The Andrus' only prior substantive communication with either the Hudson Valley RAC or the Berger Commission occurred at a single meeting held on June 20, 2006.  Id. at ¶ 27.  Attending the June 2006 meeting for the Andrus was its Executive Director, Betsy Biddle.  Id. at ¶ 28.  Ms. Biddle met with members of the Hudson Valley RAC along with a Berger Commission staff member (Alison Silvers).  Id. Notably absent from the meeting was defendant's affiant and the former Executive Director of the Berger Commission, David Sandman.  Id.

In none of the discussions before, during or after the June 2006 meeting was there any mention or suggestion to the Andrus that the RAC or the Berger Commission had already identified the nursing home for right-sizing.  Id. Nor was there any hint given that the RAC was requesting the meeting to discuss why the Andrus should or should not be closed, id., for alleged "low occupancy level, recent history of patient care deficits, low care needs of its residents and its financial problems".  See Sandman Aff. ¶ 20. To the contrary, Ms. Biddle was told that the meeting was sought, in the words of one Commission representative, to hear the "good story" that the Andrus had to tell about its current situation and future plans. Biddle Aff. at ¶ 29.

At the June 2006 meeting, Ms. Biddle explained to the participants how the Andrus had turned around its operations following the rejection of its CCRC proposal. Id. Ms. Biddle discussed the temporary suspension of nursing home admissions during the pendency of the Andrus' CCRC proposal, causing occupancy and revenue to fall, and the resumption of admissions, in late 2002, resulting in steadily rising resident census. Ms. Biddle also informed the participants that in July 2002, the Andrus had agreed to transfer 50 beds to another not-for-profit nursing facility, reducing its nursing home bed complement to 197 beds. Ms. Biddle further advised that the Andrus' occupancy had reached 176 residents by year end 2005, reflecting a 90% occupancy rate with its existing 197 bed complement, and that its census was currently 182 residents. Id. Finally, Ms. Biddle reported that the Andrus had achieved an operating surplus in 2005 and continued operating at a surplus in 2006. Id. at ¶ 30.

Later that week, on June 23, 2006, Ms. Biddle submitted copies of the Andrus' 2005 certified financial statements and the 50-bed transfer agreement to the Hudson Valley RAC. Id. at ¶ 32; Sandman Aff., Ex. K. This information was provided four months before the Berger Commission issued its Report in November 2006 containing their "right-sizing" recommendations. Following the June 2006 meeting, the Andrus never heard again from either the RAC or the Berger Commission until November 28, 2006, when their reports were released. Biddle Aff. at ¶ 38.

**No Notice of the RAC Report's Faulty Findings**

Many of the errors that resulted in the Berger Commission's recommendation to close the Andrus can be traced to the mistaken factual assumptions and flawed data relied on by the Hudson Valley RAC in its final report. Id. at ¶ 39. The Hudson Valley RAC issued its report to the Berger Commission on November 15, 2006, but did not release it to the Andrus or to the public until the Berger Commission issued its Final Report, on November 28, 2006. Id. at ¶ 45. Consequently, the Andrus was never given the opportunity to speak with or present information

to the Berger Commission directly, to refute the flawed assumptions and factual inaccuracies in the Hudson Valley RAC Report. Id.

**The Fundamental Flaws in the Berger Commission's Report**

With only the RAC Report and no opportunity for response from the Andrus, the Berger Commission issued its Report on November 28, 2006, recommending that all of the Andrus' nursing home beds be eliminated and its operating certificate, rescinded. Like the Hudson Valley RAC, the Berger Commission made several fundamentally flawed assumptions about the Andrus' financial status and nursing home operations. Id. at ¶ 56. In so doing, the Commission acted wholly inconsistent with the factors set out in the Enabling Legislation that were to inform its recommendations, particularly one as drastic as revoking a facility's operating certificate.

*Misstatement of Financial Condition*. The Berger Commission described the Andrus as a "247-bed" facility that "has been operating at a significant loss until 2006" and that only now "claims" to be operating in the black in 2006. Sandman Aff., Ex. B, page 123. In fact, the Andrus years earlier had voluntarily "rightsized" to a 197-bed nursing facility, and had been approaching 100% capacity. Biddle Aff. at ¶ 57.

Contrary to defendant's statement of uncontested material facts, the Berger Commission did not "note and consider" the Andrus' 2005 certified financial statements. Indeed, the Final Report makes no mention of the 2005 financial statements.[2] Instead, the Berger Commission assumed – contrary to the certified financial statements -- that the Andrus had incurred "significant operating losses" in 2005, when in fact the financial statements reflect a net operating surplus of $509,179. Id. at ¶ 58. In doing so, the Berger Commission contravened the statutory mandate that it properly consider the "financial status of a facility" when deciding

---

[2] In the same affidavit, Mr. Sandman states that the Berger Commission received the 2005 data "too late" in its review process. Apart from being inconsistent with his prior statement, this assertion is also inaccurate: the Andrus' 2005 financial statement was furnished four months before the Commission issued its report recommending closure.

whether closure or other adverse action is warranted.  Enabling Legislation, § 5

*Overstatement of Survey Deficiencies*.  The Berger Commission's Final Report states that the Andrus has a "history of a high number of deficiencies (26 in its 2005 survey)."  Sandman Aff., Ex. B p. 123.  In this regard, the defendant has vouched for this "finding" as "an accurate depiction of [a May 2005] survey."  Sandman Aff., ¶ 35.  This "finding" is flatly inaccurate.

On the 2005 survey, the Andrus was cited for only 8 deficiencies related to patient care, none of which involved harm to any residents, and 6 deficiencies for building/environment, for a total of 14 deficiencies, not 26.  Sandman Aff., Ex. N.

*Assisted Living Is Not a Viable Option*.  The Berger Commission mandated either closing down the Andrus nursing home entirely or converting the Andrus to a lower level of care and adding 140 Assisted Living Program ("ALP") beds with zero nursing home beds.  Id. at ¶ 64.  The latter option, however, is simply not viable.  Id.

Without having conducted any fact investigation or ever visited the Andrus' campus, the Berger Commission assumed that converting the Andrus to an ALP would be "economical".  Sandman Aff., Ex. B, p. 123.  In fact, conversion, at best, would yield severe operating shortfalls and hasten its demise.  Biddle Aff. at ¶ 65.  Simply put, the Andrus cannot operate an assisted living program absent the continued operation of a majority of its existing nursing home beds.  Id.  Here, too, the Berger Commission failed to properly consider the "economic impact of right sizing," one of the other factors delineated in the Enabling Legislation.  Id.

*"Low Acuity" Does Not Justify Closure*.  The Berger Commission presumed that the "low" acuity of the Andrus on Hudson's residents relative to other nursing homes meant that a majority of its residents "could be better served in an ALP".  Sandman Aff., Ex. B, page 123.  Again, the Berger Commission and staff never performed any clinical assessment of the Andrus' residents and their actual care needs to substantiate that supposition.  Biddle Aff. at ¶ 74.  In erroneously presuming otherwise without factual basis, the Berger Commission contravened the

8

mandate in the Enabling Legislation that the Commission take into account the "potential conversion . . . for uses other than inpatient or residential facilities."

In fact, the vast majority of the Andrus' residents – an estimated 140 of its 180 current residents – would require continued nursing home care.  Id.  If the Andrus' nursing home were to close, most of the Andrus' residents -- largely frail elderly averaging 88 years old who consider the Andrus their home -- would likely have to be transferred to another skilled nursing facility and consequently endure the trauma associated with such a move.  Id. at ¶ 76.

Moreover, caring for Andrus residents at other nursing facilities within the vicinity of the Andrus will actually increase the costs to the Medicaid program and the rest of the health care system -- estimated conservatively at more than $3.8 million a year.  Id.  That is because the Andrus happens to be one of the lowest-cost facilities in Westchester County.  Id.  Furthermore, since most Andrus residents are covered by Medicaid, id. at ¶ 77, and would cost the program more money residing elsewhere, the Berger Commission similarly failed to take into consideration "the extent to which [the Andrus] serves the health care needs of the region, including serving Medicaid recipients", also a factor in the Enabling Legislation.

_Paying for Closure or Conversion._  Overall, the Berger Commission's Final Report fails to address or explain how the significant costs associated with closure of the Andrus' nursing home and "conversion" to an ALP will be financed.  The grant monies available under the HEAL-4 Program, referenced by defendant, will not pay for the cost of conversion or closure so long as the facility has assets to cover those expenses in the first instance.  Id. at ¶ 80.

## STANDARD OF REVIEW

A motion for summary judgment should be denied when the record on the motion demonstrates that there are genuine issues of material fact in dispute precluding summary judgment.  See Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986), cert. denied, 484 U.S. 1006 (1988).  The moving party is required to present supporting affidavits from individuals with

personal knowledge of the facts in support of its motion.  Fed. R. Civ. P. 56(e).  See Scotto v. Almenas, 143 F.3d 105, 114 (2d Cir. 1998) (motion for summary judgment granted, where opposing party failed to supply affidavits from individuals with personal knowledge of the facts at issue); James v. Universal Motown Records, Inc., No. 03 Civ. 4487 (LAK), 2004 WL 1368225, at *1 (S.D.N.Y. June 16, 2004) (motion for summary judgment denied, where supporting affidavit failed to establish that affiant was competent to testify as to the matters in the affidavit).  All inferences must be drawn in favor of the non-moving party.  Harlen Assocs. v. Village of Mineola, 273 F.3d 494, 499 (2d Cir. 2001).

Under these standards, the record on this motion points to several "material" factual disputes that at the very least preclude dismissal of the Andrus' constitutional claims on summary judgment and warrant further discovery and trial to be properly resolved.

## I.    THE ANDRUS HAS A PROTECTED PROPERTY INTEREST IN ITS NURSING HOME OPERATING CERTIFICATE

Since 1969, the Andrus has operated a licensed residential health care facility pursuant to an operating certificate issued by the Department of Health under Article 28 of the New York Public Health Law.  For its part, the defendant does not seriously dispute that the operating certificate conferred on the Andrus is a property interest protected by due process of law.  See Plaza Health Labs., Inc. v. Perales, 878 F.2d 577, 581 (2d Cir. 1987).  Instead, the defendant tries mightily to diminish that interest by characterizing the "supposed property interest" as "qualified" and "extremely limited", and subject to the "discretion" retained by the State under Public Health Law § 2806.  Def't's Memo. at 9.  However, even in the one case cited approvingly by the defendant, a provider's property interest in an Article 28 operating certificate was recognized to be "substantial".  St. Joseph Hosp. of Cheektowaga v. Novello, ___ N.Y.S.2d ___, No. 07-00587, 2007 WL 2044870, at *1 (N.Y. App. Div. 4th Dep't July 18, 2007).

Moreover, Section 2806 of the Public Health Law, also invoked by defendant, does not justify dispensing with notice and hearing when an Article 28 operating certificate is being revoked.  Under Public Health Law § 2806(6), the Commissioner of Health may revoke an operating certificate for cause or upon a finding that there is no public need for the facility, but only after providing the affected facility with notice and an evidentiary hearing to contest the asserted basis for termination.  N.Y. Pub. Health Law § 2806(6) (McKinney 2007).  The Department of Health is not, nor has ever been, authorized to revoke the operating certificate of a facility without affording that minimum level of due process.

After invoking Section 2806 as authority for a so-called "qualified" property interest in an operating certificate, the defendant quickly retreats from the statute, arguing that, with the enactment of the Enabling Legislation, "[w]hatever protected interest plaintiff may have had [under Section 2806] was in a substantial right, not in a particular procedure."  Deft's Memo. at 8.  According to defendant, Article 28 may well be the source of the Andrus' property interest in its operating certificate, but the Enabling Legislation, providing no facility-specific due process, trumps any procedural protections afforded under Section 2806.

Contrary to defendant's suggestion, the State of New York, in enacting Section 2806, did not intend to create any super-procedural protections for nursing homes and hospitals, above and beyond the dictates of constitutional due process.  Rather, the Legislature enacted Section 2806 with the understanding that doing so was necessary to comply with the constitutional requirements of notice and hearing whenever the State, through the Department of Health, acts to revoke a nursing home or hospital operating certificate.  In adopting Section 2806 in 1978, the New York State Legislature declared that "[i]t is the intention of the Legislature to provide a mechanism to protect the rights of patients' health care while taking due consideration of the due process and property rights of the operators of such facilities.  The rights and property of such

operators shall be preserved subject to the rights of patients to receive care appropriate to their needs." 1978 N.Y. Sess. Laws 1460.

Thus, Section 2806 actually codifies the rights to notice and an evidentiary hearing, for providers facing the loss of their license to operate, that are guaranteed under the Due Process Clause of the Constitution. The fact that the Enabling Legislation does not provide for facility-specific notice and hearing in the case of a Berger Commission-mandated closure does not support the inferential leap that the Constitution does not require the procedural protections found in Section 2806 before the State can take away a facility's operating certificate – an indisputably "substantial" property interest – under the auspices of the Berger Commission.

## II.     THE ANDRUS WAS DEPRIVED OF ITS PROCEDURAL DUE PROCESS RIGHT TO NOTICE AND HEARING

When a protected property interest is at stake, the minimum due process required by the Constitution is notice and an opportunity to be heard. Cleveland Bd. of Educ. v. Loudermill, 470 U.S. 532, 542 (1985), cert. denied, 488 U.S. 946 (1988). In this case, the Andrus was provided no notice or opportunity to challenge the Berger Commission's closure mandate in an evidentiary hearing. As such, the Andrus has raised genuine issues of fact as to whether the "process" actually given to the Andrus was constitutionally adequate.

## A.     The Andrus Did Not Receive Adequate Notice

To pass constitutional muster, notice must provide an individual or entity with sufficient information about the contemplated action affecting a protected property interest and the grounds for such action so as to allow the individual or entity to marshal evidence and prepare a defense to the proposed action. See Memphis Light, Gas & Water Div. v. Kraft, 436 U.S. 1, 14-16 (1978). In this case, the Andrus received no prior notice whatsoever of the Berger Commission's recommendation to close the Andrus' nursing home, or the purported grounds for such recommendation, until after the fact, when the RAC and the Berger Commission simultaneously issued their Final Reports.

12

Defendant maintains that the Andrus was "actually on clear notice" that it was a candidate for rightsizing by virtue of the topics discussed at the June 20, 2006 meeting between Ms. Biddle and the Hudson Valley RAC. According to defendant, this meeting put the Andrus "on notice of the seriousness of its situation", and the Andrus should have somehow gleaned that the Andrus was pegged for closure by the Berger Commission over its alleged "low occupancy, recent history of patient care deficits, low care for the needs of its residents and financial problems". To support this notion of notice by inference, the defendant relies solely on the account of the June 2006 meeting described in Mr. Sandman's Affidavit. The Sandman Affidavit, however, has not probative value; Mr. Sandman was not even present at the meeting and has no personal knowledge of the nature or substance of the discussions held between Ms. Biddle and the Hudson Valley RAC.[3]

On the other hand, in her sworn statement, Ms. Biddle, who did attend the June 2006 meeting on behalf of the Andrus, has put the lie to such "notice" and established that none of the participants at the meeting mentioned or even suggested that the Andrus was a candidate for closure. To the contrary, Ms. Biddle was told that the purpose of the meeting was to allow the Andrus to tell its "good story" of its current condition and future prospects. After Ms. Biddle detailed the Andrus' success story – improved resident census, occupancy levels at 90%, and operating surpluses in 2005 and 2006 – the Andrus had no reason to believe that it would face any adverse action at the hands of the Berger Commission.

Even if, as defendant maintains, (i) the Andrus had been targeted for closure early on in the Berger Commission's review process, and (ii) the RAC had scheduled to meet with the

---

[3] Rule 56(e) requires that the affiant be competent to testify as to the matters within the affidavit; "personal knowledge" cannot be based on information gathered from inquiries made of others or a review of court records. Mariac Shipping Co., Ltd. v. Meta Corp., No. 05 Civ. 2224 (LAK), 2007 WL 1662067, at *6 (S.D.N.Y. June 11, 2007).

Andrus to hear the facility's "perspective" on closure, the RAC and Berger Commission kept that agenda hidden from the Andrus -- before, during, and after the June 2006 meeting.

The defendant unapologetically asserts that the Andrus was not entitled anyway to "particularized" notice that it was being considered for closure, or why. According to defendant, all that due process requires is a "generalized notice" that the Berger Commission has the authority to make binding recommendations to close hospitals and nursing homes. Under defendant's theory, the mere possibility that any one facility may be closed based on a Berger Commission recommendation is sufficient notice to all facilities, including those actually recommended for closure.

Clearly, the "generalized notice" that all facilities could be forced to close is inadequate as a matter of constitutional law, precisely because the Berger Commission was <u>not</u> granted the power to close any and all facilities without first investigating the particular facts and circumstances of each facility and analyzing the factors set out in the Enabling Legislation. That is, the Berger Commission was duty-bound to evaluate each hospital and nursing home on its merits, in light of the facility-specific factors enumerated in the Enabling Legislation.

As such, to be adequate, the notice given to any facility adversely affected by the Berger Commission's recommendations must inform the facility of the particular statutory factors being relied on by the Commission. Otherwise, a facility like the Andrus would have no way of knowing that the Berger Commission was considering closure based on one or more of those factors. Likewise, a facility would not know that it even needed to defend itself, let alone what documents or information it would need to present to the Commission in order to rebut or correct the putative grounds for recommended closure. This is especially true in the Andrus' case, where it was successfully operating at near-capacity and with a surplus; was caring for a majority of Medicaid residents; was meeting the continued demand for its services in the community; and was unable to readily convert to any alternative use due to the Village of Hastings-on-Hudson's

zoning – all factors that under the Enabling Legislation would have weighed heavily <u>against</u> the Andrus' being targeted for closure.

None of the authorities cited by the defendant support the proposition that the mere enactment of the Enabling Legislation, endowing the Berger Commission with the power to "right size" nursing homes and hospitals, was sufficient notice to adversely affected facilities to satisfy due process. As its primary authority, defendant cites to <u>Atkins</u> v. <u>Parker</u>, 472 U.S. 115 (1985), a case that is clearly inapposite. There, Congress enacted an across-the-board 2% reduction of a household's earned income that may be deducted in computing eligibility for food stamps. In upholding the sufficiency of a "generalized" notice, the Supreme Court reasoned that this reduction in benefits "does not concern the procedural fairness of individual eligibility determinations. Rather, it involves a legislatively mandated substantive change in the scope of the entire program." <u>Id.</u> at 129. The Court continued: "Because the substantive reduction in the level of petitioners' benefits was the direct consequence of the statutory amendment, they have no basis for challenging the procedure that caused them to receive a different, less valuable property interest after the amendment became effective. . . ." <u>Id.</u> at 130.

In stark contrast, the Enabling Legislation did not effect an across-the-board reduction of nursing home and hospital beds or mandate the closure of facilities *en masse*.[4] Rather, the Legislature carefully circumscribed the powers of the Berger Commission and prescribed the factors that the Commission was to consider before making any closure or rightsizing recommendation.

Reliance on the Second Circuit's decision in <u>Plaza Health</u> is also misplaced. In <u>Plaza Health</u>, 878 F.2d 577, the plaintiff, a New Jersey laboratory, had been indicted on charges of

---

[4] Nor did the Enabling Legislation authorize the Berger Commission to select facilities for closure at random or whim; at least then, arguably every facility would have known that it was equally vulnerable to a closure edict, and a more particularized notice would not have aided any defense to closure.

knowingly causing the release of hazardous substances from its laboratory, including the discharge of medical waste, into the Hudson River. The State of New York's Medicaid agency determined to terminate plaintiff's participation in the Medicaid program. The administrative notice issued to the plaintiff stated that the basis for termination was plaintiff's indictment. Thus, the plaintiff in Plaza Health knew precisely what action was being taken against it -- termination from the Medicaid program -- and the basis for such action -- its recent indictment. The Second Circuit found the notice to be sufficient, explaining that "[w]hile the notice did not mention the New Jersey indictment *in haec verba*, [plaintiff] does not claim to have been unaware that it had been indicted or that this was the criminal charge alluded to in the DSS notice." Id. at 582.

Here, the Andrus was not provided notice, in any form, that the Berger Commission had targeted the Andrus' nursing home for closure. What is more, to state the obvious, the Andrus was never charged with a crime or notified of any adverse action being taken by any other regulatory agency or body throughout the Berger Commission review process. As such, there was no way for the Andrus to have divined that the Berger Commission would be recommending its closure, and on what grounds.

Finally, the Second Circuit's decision in Weigner v. New York, 852 F.2d 646 (2d Cir. 1988), cert. denied, 488 U.S. 1005 (1989), also cited by the defendant, does not support his position. In Weigner, the City of New York did give notice to the plaintiff, a property owner, that the City was commencing an *in rem* foreclosure proceeding against plaintiff's property for non-payment of taxes. Suffice it to say that notice of the pendency of a judicial proceeding, seeking the relief of foreclosure against a specific property owned by a particular individual or entity, is not equivalent to the "generalized" notice of the pendency of the Berger Commission's

16

proceedings, with no notice ever being provided to the Andrus that closure of its nursing home was being recommended or why.[5]

**B.    The Andrus Was Never Afforded A Meaningful Opportunity To Be Heard**

Defendant concedes that "[t]he fundamental requirement of due process is the opportunity to be heard 'at a meaningful time and in a meaningful manner'". Mathews v. Eldridge, 424 U.S. 319, 333 (1976) (citing Armstrong v. Manzo, 380 U.S. 545, 552 (1965)). Here, the Andrus was never provided an evidentiary hearing in advance of the Berger Commission's Final Report in order to defend itself against recommended closure or to present documents and information refuting the factual errors and assumptions the Commission had made about the Andrus' operations and financial condition.

Defendant nevertheless argues that the "Andrus, like all other facilities in the State, had frequent opportunities to influence the Commission process, including with respect to the very errors it now claims the Commission made." Def't's Memo at 13. Defendant then faults the Andrus for not having participated in the Commission's public hearings nor for asking the Commission to come inspect the Andrus or evaluate its residents. This "blame the victim" defense is unavailing.

For any "opportunity" to appear to be truly "meaningful", an individual or entity must be given notice that it is being subjected to adverse action and will need to defend itself, in a public hearing or otherwise. Absent such notice, the opportunity for a hearing has "little reality or worth". Mullane v. Central Hanover Bank & Trust Co., 339 U.S. 306, 314 (1950). See Brody v. Village of Port Chester, 434 F.3d 121, 129 (2d Cir. 2005) (finding that property owner not properly notified of the available condemnation appeals process). To reiterate, the Andrus was

---

[5] Also, in Weigner, the City of New York had mailed a foreclosure notice to the plaintiff. All that was at issue in the Weigner case was whether the City was required to send "additional notices as each step in the foreclosure proceeding was completed or when each of the available remedies was about to lapse." Id. at 652. Of course, the Andrus did not receive even one notice, by mail or otherwise, of the contemplated closure of its nursing home or of the grounds for closure.

never notified that closure was being contemplated, let alone the purported grounds for closure, at any time prior to receiving the Berger Commission's Final Report.

The RAC did not let the Andrus know at the June 2006 meeting of the impending closure of its nursing home and the grounds for same. But even if that meeting were somehow sufficient notice, however obtuse or cryptic it may have been, it did not give the Andrus a chance to address the Berger Commission at the public hearings. That is because all of the Berger Commission hearings had taken place in the early part of 2006 and were concluded by the time the RAC met with the Andrus in June 2006. Needless to say, to be meaningful, the notice should precede the opportunity to be heard, and not vice versa.

Plainly, the Andrus should have been afforded an evidentiary hearing, with proper notice. In response, the defendant suggests that the failure to provide notice and hearing was, at worst, harmless error, and assures the Court that the Berger Commission had considered whatever updated data or information the Andrus had to offer. To that end, the defendant asserts that the Berger Commission "<u>did</u> receive and work from accurate data", and that the Andrus cannot show otherwise. Defendant further contends that the Andrus "does not dispute" that it had been "operating at a significant loss" through 2005; that it cannot "substantiate its claim that the Commission wrongly decided that Andrus had been cited for 26 deficiencies in 2005"; and that it cannot show that the "Commission made any of the errors [the Andrus] attributes to the Commission". Deft's Memo at 16.

Through the Biddle Affidavit, the Andrus has revealed a raft of errors on the Berger Commission's part, all of which were an integral – concededly, "material" – basis for its recommendation to close the Andrus' nursing home. For instance, the Commission completely ignored the Andrus' 2005 certified financial statements, showing a $500,000-plus surplus in 2005, and reached the demonstrably incorrect conclusion that it had incurred a severe operating

loss that year. Likewise, the Andrus was cited for 14, not 26, deficiencies in 2005, and was never cited for that number of deficiencies on any annual survey.

Based on the foregoing, it cannot be said as a matter of law that the "process" afforded to Andrus satisfied the Constitution. Indeed, when balancing the different interests at stake in deciding what process is due, the conclusion is inescapable that the State, at a minimum, should have afforded the Andrus an evidentiary hearing, with proper notice, before mandating revocation of its operating certificate under the auspices of the Berger Commission. The nature of the process due is not fixed, and turns on the consideration of three factors: the nature of the protected interest, the risk of erroneous deprivation and the value of additional process, and the nature of the government interest at stake. Mathews, 424 U.S. at 334.

> First, there can be no question but that the "private interest . . . affected by the official action" -- namely, the revocation of the Andrus' operating certificate -- is a "substantial" property interest. Rescission of the operating certificate will deprive the Andrus of its ability to continue operating as a nursing home as it has for the past 38 years.

> Second, the Andrus has more than established a "risk of an erroneous deprivation of such interest through the procedures used, and the probable value, if any, of additional or substitute procedural safeguards" resulting from the lack of notice and evidentiary hearing. That risk actually has come to pass as a direct result of the Berger Commission's reliance on outmoded and incorrect data about the Andrus.

> Third, the "government's interest, including the function involved and the fiscal and administrative burdens that the additional or substitute procedure requirement would entail," should not override the Andrus' substantial property interest in maintaining its operating certificate and the equally strong interest in avoiding serious risk of erroneous deprivation -- a risk that has come to roost. Moreover, the government's interest, as articulated in the Enabling Legislation, is not limited to the reduction of nursing home and hospital beds in the State. Rather, the State's interests also include ensuring that the Berger Commission identify for "right sizing" only those facilities that would be appropriate for such action under the factors delineated in the Enabling Legislation. Stated otherwise, the very same statute that embodies the government's interest in "rightsizing" hospitals and nursing homes also expresses the State's interest, shared by the Andrus, in avoiding a recommendation of closure against the wrong candidate.

Nor would it have been too burdensome or expensive for the State to provide the

minimum notice and evidentiary hearing to the Andrus or other adversely affected facilities. With no burden at all, the State could have notified the Andrus of the contemplated closure of its nursing home and the grounds for closure.  As defendant readily concedes, when the RAC met with the Andrus in June 2006, the Berger Commission had already identified the Andrus as a candidate for "rightsizing".

Moreover, as defendant admits, the Department of Health does provide notice and an evidentiary hearing to any facility identified for closure for cause or lack of public need under the existing framework provided for under Public Health Law § 2806.  See 10 N.Y.C.R.R. Part 51.  To offer the same procedural safeguards to facilities identified by the Berger Commission, the State would not have to "reinvent the wheel" or create a hearing process from scratch; it already has the machinery, manpower and experience to conduct such hearings.  It would merely require extending that hearing system to those facilities adversely affected by the Berger Commission's recommendations.

With so much at stake for the targeted facilities, it is only fair that the State assume the modest "burden" of providing notice and an evidentiary hearing for them, to ensure (i) that the Berger Commission makes its recommendations on the basis of sound, reliable data that can be tested by the one party with the most to lose from the Commission's reliance on faulty data; and (ii) that the Commission does not act (as happened here) to revoke an operating certificate inconsistent with the facts or the governing statutory factors.

III.    **CLOSING THE ANDRUS' NURSING HOME AND RESCINDING ITS OPERATING CERTIFICATE IS WHOLLY UNJUSTIFIED AND VIOLATIVE OF SUBSTANTIVE DUE PROCESS**

As shown above, the procedures employed by the State (or the lack thereof) in determining to close the Andrus' nursing home were fundamentally unfair and in violation of the Andrus' rights to procedural due process of law.  Irrespective of these procedural flaws, rescinding the Andrus operating certificate, premised as it is on such patently faulty data, would

also violate substantive due process.  As the one District Court has observed, "[t]he substantive component of the Due Process Clause bars 'certain government actions regardless of the fairness of the procedures used to implement them.'"  <u>Wantanabe Realty Corp.</u> v. <u>City of New York</u>, 315 F. Supp. 2d 375, 392 (S.D.N.Y. 2003) (citing <u>Daniels</u> v. <u>Williams</u>, 474 U.S. 327, 331 (1986)). Its "'touchstone . . . is protection of the individual against arbitrary action of government'" not only by procedural unfairness, but by the "'exercise of power without any reasonable justification in the service of a legitimate governmental objective.'"  <u>Id.</u> (citing <u>Wolff</u> v. <u>McDonnell</u>, 418 U.S. 539, 558 (1974) and <u>County of Sacramento</u> v. <u>Lewis</u>, 523 U.S. 833, 846 (1998).  To rise to the level of a substantive due process violation, the government's conduct must be without legal justification or be so arbitrary as to shock the conscience.  <u>Co. of Sacramento</u>, 523 U.S. at 846.

There is, at the very least, a genuine and material issue of fact as to whether the Berger Commission had any justification to mandate the closure of the Andrus' nursing home.  In recommending closure, the Berger Commission flatly ignored the Andrus' 2005 certified financial statements and assumed, incorrectly, that the Andrus had severe operating losses that year, and had only "claimed" a surplus in 2006.  <u>In fact</u>, the Andrus achieved an operating surplus of more than $500,000 in 2006 and continued to operate at a surplus in 2006.  Having proceeded on such a fundamentally mistaken premise, the Commission failed to properly consider the "financial status" of the Andrus, as required under the Enabling Legislation.

The Berger Commission also proceeded on the misapprehension that the Andrus was providing unsatisfactory care to its residents, as evidenced by a 2005 Department of Health annual survey that supposedly cited the Andrus with "26" patient-care deficiencies, when <u>in fact</u> only 14 were cited, with just 6 relating to patient care.  To the extent that the Berger Commission was viewing the closure of the Andrus' nursing home as a "potential for improved quality of care", one of the other factors in the Enabling Legislation, its perception of the Andrus was

warped by a gross error made about the Andrus' survey results.

The Berger Commission also assumed incorrectly that the Andrus could readily convert to an assisted living program, and that its current residents could be safely cared for at a lower level of care. In fact, as the Biddle Affidavit shows, it is not feasible, financially or otherwise, for the Andrus to operate an assisted living program without retaining a majority of its nursing home beds. Similarly, most Andrus residents would have to be transferred to another nursing facility, with some 140 residents being uprooted and costing the State Medicaid program almost $4 million more a year for their care. The Berger Commission's recommendation thus defies the Enabling Legislation's mandate that it give due regard for the "potential conversion of facilities or current facility capacity for uses other than as inpatient or residential facilities", "the extent to which a facility serves the health care needs of the region, including serving Medicaid recipients", and "the extent to which the actions recommended by the Commission would result in greater stability and efficiency in the delivery of needed health care services for a community." On all three factors, the Berger Commission missed the mark by a wide margin.

Whether viewed individually or in combination, the myriad of mistaken assumptions and flawed data, at the very least, raises a triable issue of fact as to whether the Berger Commission had any legal justification to mandate closure of the Andrus' nursing home, and whether it acted so arbitrarily as to shock the conscience. Plainly, on this record there is no basis for concluding as a matter of law that a violation of due process had not occurred. Indeed, one court has recently held that where a government relies on data that is demonstrably invalid or unreliable, it may give rise to a sufficient level of arbitrariness as to violate substantive due process.[6]

The defendant states that the Berger Commission "rightsizing" recommendations were a

---

[6] See Wantanabe Realty, supra, 315 F. Supp. 2d at 393-94 (denying motion to dismiss substantive due process claim that municipality's demolition of plaintiff's roller coaster lacked justification, where, in deciding to order the demolition, municipal official admittedly relied on the determination of an engineer known to be unqualified to evaluate it for structural integrity).

proper exercise of the State's police power. This assertion is, in effect, a "straw man." Much as defendant would like to recast the issue in this case, there is no contention being made that the State lacks the power to regulate or "rightsize" nursing home and hospital bed supply in the public interest. Rather, the Andrus' claim turns on whether, in the Andrus' case, the Berger Commission was justified in recommending closure, where it relied on demonstrably incorrect and outmoded data and acted inconsistently with the very statute that conferred such decision-making authority on the Commission.

The defendant cites to the recent State court decision in St. Joseph Hospital, rejecting a substantive due process claim by a hospital that had been slated for closure by the Berger Commission. St. Joseph Hosp. of Cheektowaga v. Novello, 15 Misc. 3d 333 (Sup. Ct. Erie Cty. 2007). The Andrus submits that the St. Joseph case was wrongfully decided and should not be followed.[7] Regardless, defendant is mistaken in claiming that the constitutional challenge raised in St. Joseph is "identical" to the Andrus' due process claim in this action.[8]

## IV.    THE REVOCATION OF THE ANDRUS' NURSING HOME OPERATING CERTIFICATE CONSTITUTES A "TAKING"

When a government divests an individual or entity of property without providing compensation, the government action constitutes a "taking" prohibited by the Constitution. U.S. Const. Am. 5. Government "takings" are not limited to the physical seizure of property, but may also include regulatory actions that leave a landowner without economically beneficial uses of

---

[7] Compare St. Joseph Hosp. of Cheektowaga v. Novello, 2007 WL 2044870, at *8 ("To close a health care facility without at least allowing the facility to properly consider the basis for the government's decision is a violation of constitutionally protected due process rights.") (Fahey, J. dissenting); Community Hosp. at Dobbs Ferry v. Novello, No. 24650/06, slip op. at 2 (N.Y. Sup. Ct. Westchester Cty. July 10, 2007) ("This generalized notice did not fulfill Dobbs Ferry's guarantee of . . . due process.").

[8] Unlike the Andrus, the plaintiff in St. Joseph made no allegation that the Berger Commission had relied on mistaken or outmoded data or had failed to properly consider the statutory factors delineated in the Enabling Legislation in recommending closure of its hospital. Instead, the St. Joseph plaintiff made a broad challenge to the constitutionality of the Enabling Legislation. See McGovern Aff., Ex. C. Here, the Andrus has shown (or at the very least raised a factual issue) that closure of its nursing home is wholly unjustified on the facts and actually contravenes the factors delineated in the Enabling Legislation that were to inform and circumscribe the Commission's power to mandate closure or "rightsizing" of facilities.

23

the property.  Lucas v. South Carolina Coastal Council, 505 U.S. 1003, 1017-18 (1992).

To be sure, not every regulation which impacts the value or use of property can be considered a taking.  However, when the regulatory action divests the property owner of all legitimate uses of the property, a taking has occurred.  Id. at 1018.  That the property being taken is regulated does not preclude a takings claim.  See Huntleigh USA Corp. v. United States, 63 Fed. Cl. 440, 445-47 (2005).  Furthermore, where the property at issue is used in furtherance of a not-for-profit organization's charitable purpose, any government action that prevents or seriously interferes with the continued ability of the organization to fulfill its charitable mission also amounts to a taking.  St. Bartholomew's Church v. City of New York, 728 F. Supp. 958, 966 (S.D.N.Y. 1989), aff'd, 914 F.2d 348 (2d Cir. 1990), cert denied, 499 U.S. 905 (1991).

On this motion, the defendant baldly asserts that the property upon which the Andrus operates its nursing home can be put to other "economically robust uses", including, presumably, as an assisted living facility.  Def't's Memo. at 20.  This statement not only lacks any factual support.  It is directly at odds with the evidence on this motion, including (i) the Andrus' past efforts, stymied by local land-use authorities, to develop the property into a CCRC and (ii) the inability of the Andrus to operate an assisted living program on its campus without retaining a majority of its existing nursing home beds.  At the very least, the Biddle Affidavit raises genuine issues of fact as to whether there are other economic uses to the Andrus' property – consistent with the Andrus' charitable mission to serve the elderly – that does not include the continued operation of a majority of its existing nursing home beds.

The defendant also contends that any claim that the Andrus may have about the forced liquidation of its charitable assets to fund closure or conversion is not yet "ripe" for review until the State has actually failed and refused to compensate the Andrus for its losses.  This contention is flawed, on several levels.  In the first place, this State has already publicly declared that it will

not make the F-SHRP monies available to adversely affected facilities unless and until the facility has used up all of its own assets to pay for any mandated closure or conversion.

Moreover, defendant's position amounts to a jurisdictional "Catch-22". If, as defendant maintains, this Court cannot review a "takings" claim until the Andrus actually incurs the cost and the State denies compensation, the Federal Court would never have jurisdiction to hear such claims.[9] If sustained, defendant's view would effectively close the door of the Federal Courts to takings claims of this nature. Defendant's position, however, cannot withstand scrutiny: the Andrus seeks only declaratory and injunctive relief, now, to prevent a constitutional violation from occurring. That relief is clearly ripe and justiciable. Indeed, the very purpose of Section 1983 is to provide for redress of ongoing or prospective constitutional violations by state actors. Fair Assessment in Real Estate Ass'n v. McNary, 454 U.S. 100, 103-04 (1981).

## V.     THERE ARE MATERIAL ISSUES OF FACT PRECLUDING DISMISSAL OF THE ANDRUS' CONTRACTS CLAUSE CLAIM

The Contracts Clause acts as a limitation on an otherwise valid exercise of a state's police power. Allied Structural Steel Co. v. Spannaus, 438 U.S. 234, 243 (1978). Though this limitation is not absolute, it recognizes a need to balance the state's authority in exercising its police power with the interests of individuals in retaining their private right of contract. Buffalo Teachers Fed'n v. Tobe, 464 F.3d 362, 367-68 (2d Cir. 2006), cert. denied, 127 S.Ct. 2133 (2007). Resolution of a contracts clause claim requires a three-question inquiry: (1) are the impaired contractual rights substantial? (2) does the law or regulation serve a legitimate public purpose? and (3) are the means of accomplishing this legitimate purpose, if one exists, reasonable and necessary? Id. at 368.

Briefly, the record here raises triable issues of fact on all three prongs of inquiry:

---

[9] That is because, once that claim has ripened into one for compensatory damages, the Eleventh Amendment to the Constitution would bar relief; the federal courts cannot award relief against the states for past wrongs compensable as money damages. Edelman v. Jordan, 415 U.S. 651, 663 (1974) (citing Great Northern Life Ins. Co v. Read, 322 U.S. 47 (1944); Kennecott Copper Corp. v. State Tax Comm'n, 327 U.S. 573 (1946)).

1)      the closure of the Andrus' nursing home will necessitate the termination of a whole host of ongoing contractual relations necessary to maintain and operate the facility, including the Andrus' relationships with vendors, contractors, physicians, and health care personnel.

2)      The Andrus does not question the Enabling Legislation's objectives to streamline the delivery of health care services and realign the supply of nursing home and hospital beds with current and projected demands.  However, in the Andrus' case, the recommendation to close its nursing home does not serve those purposes and, in many respects, subverts the statute's goals by, for instance, making the cost of caring for Andrus' current Medicaid residents even higher and forcing the relocation of its elderly and infirm residents.

3)      In the Andrus' case, the State has chosen a plainly unreasonable means for accomplishing the objectives of the Enabling Legislation.  The Berger Commission's recommendation to close the Andrus' nursing home flatly defies many of the factors in the Enabling Legislation the Commission was to consider in carrying out its "rightsizing" charge.

The defendant maintains that the conceded impairment of Andrus' contracts is not substantial, on the theory that because nursing homes are heavily regulated, the regulation of nursing home contracts is "foreseeable".  However, it could not have been foreseen that the Andrus would be forced to close its nursing home under the auspices of the Berger Commission; the Andrus was a financially stable nursing facility, with solid levels of occupancy, serving a largely Medicaid-eligible elderly population, and with continued demand for its services within communities in Westchester County.  Indeed, applying the factors set out in the Enabling Legislation to the Andrus' situation, it was only foreseeable that the Andrus would not be slated for closure but would remain a viable nursing facility and continue serving Westchester County's elderly in need of long-term care well into the future.

## CONCLUSION

The Berger Commission's mandate to close the Andrus' nursing home, premised on misinformation about the Andrus' operations and financial status, makes no sense economically, financially, or clinically.  As its recommendations also defy the factors set forth in the Enabling Legislation, the mandate is wholly without legal justification.  At the very least, the Andrus has raised numerous "material" factual issues that would need to be developed in

discovery and resolved before the Court can properly determine the Andrus' substantial constitutional claims.

WHEREFORE, for the foregoing reasons, defendant's motion for summary judgment should be denied in its entirety.

Dated:    New York, New York
          August 13, 2007

CADWALADER, WICKERSHAM & TAFT LLP


By: _____ s/Peter G. Bergmann _____
          Peter G. Bergmann (PB-9691)

Attorneys for Plaintiff
   John E. Andrus Memorial, Inc.
    (d/b/a Andrus on Hudson)
One World Financial Center
New York, New York  10281
Telephone: (212) 504-6000

Of Counsel:
  Brian T. McGovern
  Ariel V. Gordon