UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

JOHN E. ANDRUS MEMORIAL, INC. (d/b/a ANDRUS ON
HUDSON),

                                           Plaintiff,

                    -against-

RICHARD F. DAINES, as Commissioner of the New York
State Department of Health,

                                           Defendant.

2007 Civ. 3432 (CLB)(MDF)


AFFIDAVIT OF BETSY
BIDDLE IN OPPOSITION TO
DEFENDANT'S MOTION FOR
SUMMARY JUDGMENT

STATE OF NEW YORK          )
                           :   ss.:
COUNTY OF WESTCHESTER )

BETSY BIDDLE, being duly sworn, deposes and says:

1.      I am the Executive Director of plaintiff John E. Andrus Memorial, Inc.,
d/b/a Andrus on Hudson (the "Andrus"), and have served in that capacity since September 1999.
The Andrus is a 197 bed not-for-profit nursing home built in 1953, and located in Hastings-on-
Hudson in Westchester County.  I have read the affidavits of David R. Sandman, sworn to on
July 10, 2007 (the "Sandman Affidavit") and of Neil Benjamin, sworn to on July 11, 2007 (the
"Benjamin Affidavit") in support of defendant's motion for summary judgment, and am
personally and fully familiar with the facts set forth below.  I submit this affidavit in response to
those affidavits and in opposition to defendant's summary judgment motion.

2.      If defendant's motion is granted, the result is likely to be a closure of the
nursing facility, which has been in operation for several decades and is currently at 90%
occupancy.  Closing the Andrus' nursing home would necessitate the transfer of its 180 residents

to other facilities that ironically operate at higher costs, and would result in the loss of over 200 jobs.

3.     On November 28, 2006, we received a telephone call from a representative of the Continuing Care Leadership Coalition, an association of not-for-profit and public long term care providers of which the Andrus is a member, informing the Andrus that a just-released report by the New York State Commission on Health Care Facilities in the 21st Century, known as the "Berger Commission", had identified the Andrus as one of the nursing homes in the State recommended for closure.  That telephone call was the first notice the Andrus had received that the Berger Commission was even contemplating any adverse action against the Andrus, and it came after the Berger Commission had already made its determination.  Needless to say, the news came as a complete shock to me and the organization.

4.     At no time during the Berger Commission's proceedings was the Andrus informed that closure was being considered or that the Berger Commission was relying on outmoded data and demonstrably mistaken information about the Andrus' occupancy, financial condition, and resident care.  Having never received such notice, the Andrus was never made aware that it had to defend itself against a recommended closure and the grounds for such a recommendation, either at the Berger Commission's public hearings or in any other setting.  That is, the Andrus was kept in the dark about the Berger Commission's plans and its reasons for closing the Andrus' nursing home.

5.     Thus, whatever "opportunity" there may have been to appear before the Berger Commission, the Andrus never had the chance to refute the numerous factual errors and assumptions that evidently formed the basis for the Commission's recommendation to shut down the Andrus, and to present data directly to the Berger Commission showing the substantial size

of its resident census, its financial stability, and the fine care being provided to its elderly residents.

6.      Indeed, defendant acknowledges that without ever having spoken with me or any other Andrus representative, the Berger Commission had identified the Andrus as a possible candidate for "right-sizing" early on in the review process.  Sandman Affidavit, ¶ 20. Yet, never in the 18-month life of the Berger Commission and the Commission's Hudson Valley Regional Advisory Committee ("RAC") did either body bother to notify the Andrus that it was being considered for closure, or why.

7.      Nor can the defendant credibly claim that it was "too late" in the process for the Berger Commission to consider any corrected or more current Andrus data.  The Andrus did submit current financial information and resident occupancy data to the RAC in June 2006, five months before the Berger Commission issued its final report.  For reasons I cannot fathom, the Berger Commission chose to ignore it.

8.      Through my affidavit, the Andrus is presenting to the Court the facts that controvert many of the "material facts" identified by the defendant based on the Sandman Affidavit and Benjamin Affidavit.   There is, however, no dispute that defendant's implementation of the Berger Commission's "mandate" to eliminate all of the Andrus' nursing home beds would deprive the Andrus of its ability to continue operating as a nursing facility, as it has continuously to the present under an operating certificate issued by the Department of Health in 1969.  The Andrus submits that the State failed to provide the Andrus with the requisite "process" that is due when such drastic action is being taken by the State.

9.      Far from being a technical error, this lack of due process clearly harmed the Andrus:  there is a complete disconnect between the troubled facility depicted in the RAC and Berger Commission reports and the true picture of the Andrus.  Without having afforded the

Andrus notice and a meaningful opportunity to be heard, the Berger Commission, with only the flawed report of the Hudson Valley RAC, determined that the Andrus nursing home should be forced to close, despite available evidence showing that the Andrus was – and to this day continues to be – a thriving, financially stable not-for-profit nursing facility addressing the long-term care needs of 180 senior citizens.  What is at stake, however, is more than the Andrus' property interest; it is the continued care and safety of those elderly residing there who call the Andrus their home.

**The Andrus**

10.    The Andrus is a not-for-profit charitable organization established in 1953 by the family of John E. Andrus to provide a home for elderly individuals.  Located in Hastings-on-Hudson, the Andrus operates on the same 26-acre campus and in the same original structure as it did when it first opened its doors over 50 years ago.

11.    In 1969 and continuing for the next 38 years, the Andrus has been licensed as a "residential health care facility", or nursing home by the New York State Department of Health, and is currently certified to care for up to 197 residents.  The Andrus is a certified provider in the Federal Medicare program, providing subacute and skilled nursing and rehabilitative services to individuals aged 65 and over; and in the State Medicaid program, providing medical assistance, including long-term nursing home care, to indigent and medically needy individuals.

12.    The Andrus currently cares for approximately 180 elderly residents, the majority of whom are from Westchester County or elsewhere in the Hudson Valley region.  The approximately 170 individuals receiving long-term nursing care at the Andrus have each resided there, on average, for roughly four years.

13.    The Andrus' residents are elderly:  their average age is 88 years.  The Andrus residents are also infirm:  only 22% of the Andrus' current residents can be characterized as "low acuity"[1] and not suffering from dementia.  Many of these residents require the 24-hour nursing supervision provided only in a nursing facility.  The remaining 78% of the Andrus' residents have substantial care needs that, for the most part, cannot be adequately met in any other level of care lower than a nursing home.

14.    Finally, the majority of the Andrus residents are both elderly and poor: roughly 75% of its long-term care residents financially qualify for Medicaid while 29% of the remaining residents, or 7% of its total population, are paid for by Medicare.

15.    As I mentioned earlier, since 1953 and continuing through the present, the Andrus has operated in the same building originally constructed on its Hastings-on-Hudson campus.  In 2006, the Andrus upgraded and modernized the existing structure with a $6 million capital improvement project, approved in advance by the Department of Health through its regulatory process.  This modernization project allowed the Andrus to continue operating successfully as a nursing home.

**The Andrus' CCRC Proposal**

16.    In 1996, the Andrus had explored the possibility of developing its campus with new structures, and expanding its range of services to the elderly.  To that end, the Andrus developed plans to operate a "continuing care retirement community", or CCRC, that would offer senior residents with three levels of care, dictated by their care needs, including independent living, assisted living, and skilled nursing home care, in its existing building as well

---

[1]    The New York State Department of Health has used the term "low acuity" synonymously with those nursing home residents categorized as "Reduced Physical Functioning A" or "Reduced Physical Functioning B" under the Department of Health's Resource Utilization Group ("RUG")-II reimbursement classification system.  See 10 N.Y.C.R.R. § 86-2.30 and Appendix 13-A.

as new units accommodating up to 400 senior citizens. The Andrus sought the requisite approvals for its development plan from the New York State Departments of Health and Insurance, the Life Care Council of New York State, and the Board of Trustees of the Village of Hastings-on-Hudson.

17.     While those applications were pending, the Andrus voluntarily suspended new admissions to the nursing home. The reason for suspending admissions was to minimize the disruption and transfer trauma that our residents would suffer once approvals had been obtained and construction started. Although temporary, the admissions freeze resulted in a decline in occupancy and revenues, beginning in 1998.

18.     All State regulatory agencies, including the Department of Health, approved the Andrus' application to expand into a CCRC, and the Department of Health was aware of the admissions freeze throughout the CCRC review process. Unfortunately, in November 2001, the Village Board of Trustees denied the Andrus the requisite construction permits to build on the campus. Accordingly, the Andrus had to abort its CCRC project.

**The Andrus' Voluntary Right-Sizing**

19.     Following the Village's rejection of the Andrus' CCRC proposal, the Andrus' Board of Trustees redeveloped a strategic plan for the Andrus' future. Part of that planning involved an assessment of the projected demand for the residential long-term care services that the Andrus has provided to Westchester County residents for decades.

20.     After considering its options, the Andrus determined that it would continue its historic role as a long-term care provider for Westchester's elderly, but with a scaled-back complement of nursing home beds. The Board approved the reduction of 50 nursing home beds from the Andrus' capacity from 247 beds to 197 beds.

21.     In October 2002, Andrus resumed the admission of residents to its nursing home, and agreed to transfer 50 of its certified bed complement to another not-for-profit nursing facility.  Although the Department of Health was apprised of the transfer agreement, upon information and belief, as early as 2002, and thereafter the Andrus sought to decertify the beds, the Department of Health did not approve the bed decertification until January 24, 2007, and only made it retroactive to July 1, 2006 rather than the July 2, 2002 date of the agreement to transfer the beds.  See Exhibit B to Benjamin Affidavit.[2]

**The Andrus' Current Occupancy and Financial Condition**

22.     Based on the Andrus' positive financial performance over the past several years, it is evident that operating the Andrus' nursing home with a 197 bed complement is the optimal level of occupancy in light of the continued demand for its services in Westchester County.  From an average census of 72 residents in 2002, following the four-year temporary suspension of admissions, the Andrus filled its nursing home with residents, building to an average census of 171 residents in 2005, and achieving an average census of 176 in 2006, with an occupancy rate of approximately 90% that year based on a 197 bed capacity.

23.     Over the same time frame, the Andrus reversed the operating losses it had experienced during the admissions freeze and achieved an operating surplus in 2005 and again in 2006.  The Andrus projects another year of positive fiscal results in 2007.  Indeed, we remain a

---

[2] In the Benjamin Affidavit, the defendant has tried to justify the July 1, 2006 effective date of decertification on the grounds that the Andrus had sought to transfer beds in addition to decertifying them, and that the Department had not reached a "conceptual resolution" with that plan until July 2006. Benjamin Affidavit at ¶ 25.  This determination is being challenged by the Andrus in a separate proceeding commenced pursuant to Article 78 of the New York Civil Practice Law and Rules in New York State Supreme Court, Westchester County.  See John E. Andrus Memorial, Inc. (d/b/a Andrus on Hudson v. Daines, N.Y.S. Sup. Ct., Westchester Co. Index No. 9894/07 (Zambelli, J.).  Regardless of the effective date of decertification, however, it is clear that the Department knew earlier than July 2006 – four months before the Hudson Valley RAC and the Berger Commission issued their respective reports – that the Andrus' true capacity was 197 beds, not 247 beds.

financially viable nursing home today, despite the release of the Berger Commission's report last November calling for closure of the Andrus and accompanying adverse publicity.

24.     In 2005, in conjunction with its improved occupancy and financial condition, the Andrus undertook the $6 million capital improvement project I mentioned earlier. The Andrus replaced the facility's boiler and upgraded the electrical and plumbing systems in its 1953 building.  These improvements were completed in 2006.

**The RAC and Berger Commission**

25.     The Berger Commission along with its regional advisory committees had begun work in the latter part of 2005.  See Ex. B to Sandman Affidavit, page 65.  The Berger Commission's statutory charge was to recommend reconfiguring hospitals and nursing homes in New York State in such a manner as to "ensure that the regional and local supply of general hospital and nursing home facilities was best configured to appropriately respond to community needs of quality, affordable and assessable care, with meaningful efficiencies in delivery and financing that promote infrastructure stability."  Enabling Legislation, § 1 (Ex. A to Sandman Affidavit, page 1).  The Legislature, however, did not give the Berger Commission unfettered authority to revoke a facility's operating certificate or eliminate beds.  Rather, the Legislature directed the Berger Commission to make its "right-sizing" recommendations in consideration of the following factors enumerated in the Enabling Legislation:

- the "economic impact of right-sizing"

- the "financial status" of the facilities

- the "capital debt being carried" by facilities

- the "availability of alternative sources of funding for paying down or retiring capital debt"

- the "potential conversion of facilities or current facility capacity for uses other than as inpatient or residential facilities"

- the "extent to which a facility serves the health care needs of the region, including serving Medicaid recipients"

- the "extent to which the actions recommended by the Commission would result in greater stability and efficiency in the delivery of needed health care services for the community"

Enabling Legislation, § 4 (Ex. A to Sandman Affidavit, pages 2-3).

26.    Viewing the Andrus against these factors, the Andrus had no reason to believe that it would be targeted for closure. It was not until the RAC and Berger Commission issued their final reports in November 2006 that the Andrus learned otherwise.

**The June 2006 Meeting With the RAC**

27.    Indeed, the Andrus' only substantive communication with either the Hudson Valley RAC or the Berger Commission occurred at a single meeting held on June 20, 2006, at the Hudson Valley RAC's office on the campus of Westchester Medical College, in Valhalla, New York. Ironically, defendant cites to the June 2006 meeting as some sort of "proxy" for actual notice to the Andrus that it was being targeted for closure. See Memorandum of Law in Support of Defendant's Motion for Summary Judgment dated July 13, 2007 ("Deft's Memo."), page 10. To support that notion, defendant relies on the Sandman Affidavit, in which Mr. Sandman claims that the RAC and Berger Commission already had targeted the Andrus along with other "facilities of interest" for possible closure, and had scheduled the meeting "to learn each facility's perspective on factors leading to their being identified as right-sizing candidates." (Paragraph 21).

28.    Attending the June 2006 meeting were members of the Hudson Valley RAC along with a Berger Commission staff member (Alison Silvers). Notably, Mr. Sandman was not present at the meeting and does not know personally what transpired. On the other hand, I did attend that meeting, and can state categorically that in none of the discussions before,

during or after the meeting was there any mention or suggestion that the RAC or the Berger Commission had already identified the Andrus for right-sizing, or was requesting the meeting to discuss why it should be closed for alleged "low occupancy level, recent history of patient care deficits, low care needs of its residents and its financial problems". Sandman Affidavit, ¶ 20. If the closure of the Andrus' nursing home was on their agenda, the participants kept it completely hidden from me.

   29. To the contrary, I was told that the meeting was sought, in the words of one Commission representative, to hear the "good story" that the Andrus had to tell about its current situation and future plans. With much pride, I obliged the RAC, and explained how the Andrus had turned around its operations following the rejection of its CCRC proposal. I told the participants that while the Andrus' CCRC proposal was being reviewed, we suspended admissions to the nursing home, causing revenue to fall, but that in late 2002 we resumed admissions and over the past few years steadily restored our resident census. I also informed the participants that in July 2002, the Andrus had agreed to transfer 50 beds to another not-for-profit nursing facility, Beth Abraham Health Services, and reduced its nursing home bed complement to 197 beds. I advised them that the Andrus' occupancy had reached 176 residents by year end 2005, reflecting a 90% occupancy rate with our existing 197 bed complement. I also noted that our census was currently 182 residents, and had even occasionally climbed above 190 residents in the early part of 2006.

   30. Lastly, I advised the participants that, with our improved occupancy levels, the Andrus had achieved an operating surplus in 2005, and had continued operating in the black through 2006.

   31. By the conclusion of the meeting, I came away with the understanding that the RAC was impressed with the Andrus' accomplishments and its prospects for the future. I

certainly had no reason to suspect that the RAC or Berger Commission would recommend that any adverse action be taken against the Andrus.

32.    The participants to the June 2006 meeting welcomed my offer to provide copies of the Andrus' 2005 certified financial statements and the July 2002 50 bed transfer agreement.  As promised, later that week on June 23, 2006, I sent the Andrus' 2005 certified financial statements and the transfer agreement to the RAC's Chair.  Exhibit K to Sandman Affidavit.

33.    In the Sandman Affidavit, defendant tries to justify the Berger Commission's oversight of the 2005 data by asserting that it was received "too late for consideration by the Commission."[3]  The documents submitted with the Sandman Affidavit (Exhibit K) establish that the 2005 data did not come "too late".  The Andrus furnished it to the RAC's Chair in June 2006, on the heels of a meeting that the RAC had ostensibly scheduled to learn the "facility's perspective" before reaching any final conclusions.

34.    What is particularly galling is that, even though, according to the Sandman Affidavit (Paragraph 20), the RAC and Berger Commission had already identified the Andrus for possible closure, they failed to disclose that fact when I met with the RAC in June 2006.  Indeed, we met face-to-face, sat across a table from one another, and discussed the Andrus in positive terms for over an hour.  Yet, not one participant let me know that this meeting was not about the Andrus' "good story", but about its closure.  Nor did either body ever bother to provide such

---

[3] In the very same paragraph, Mr. Sandman contradicts himself, stating that the "Commission did note and consider plaintiff's 2005 financial data and plaintiffs' representation that its operations were not losing money in 2006."  I will address this contention later on in my affidavit.  Respectfully, Mr. Sandman's statement cannot be reconciled with his assertion, uttered in virtually the next breath, that the 2005 data was received "too late" to be considered.  Far from establishing "undisputed" issues of fact, the Sandman Affidavit itself has raised a host of questions and concerns that cannot be resolved on this motion.

notice to the Andrus at any subsequent time, until they issued their final reports in November 2006. By then, to borrow Mr. Sandman's phrase, it was clearly "too late".

35. The defendant maintains that it would have been too burdensome to have given notice to the Andrus and the other adversely affected facilities. I cannot speak for the other facilities, but I can state unequivocally that it would have been no burden at all for the RAC and Commission staff attending the June 2006 meeting to tell the Andrus on a confidential basis that it was being targeted for closure, and why. Instead, they withheld that information, and proceeded with an evidently pre-ordained determination to close the Andrus, regardless of its sound financial condition, solid occupancy, quality of its residents' care, or other factors.

36. In his memorandum of law, the defendant attempts to rationalize withholding notice to the Andrus on the ground that it was somehow best – for the Andrus – not to be told: "Had the Commission notified some facilities that they were being considered for closing before deliberations were complete, Andrus would, with some justification, argue that the Commission had engaged in some measure of pre-judgment." Defendant's Memo, page 12, note 11. The RAC and Berger Commission hardly did any favor to the Andrus in withholding notice from the facility.

37. To reiterate, with no notice, the Andrus never had any meaningful opportunity to defend itself against closure and the purported grounds for closure for the simple reason that it did not know it needed to defend itself. What is more, in the Andrus' circumstances, depriving the facility of notice was the worst-possible scenario and especially injurious to the Andrus, precisely because the RAC and Berger Commission had already effectively "pre-judged" the Andrus' nursing home for possible closure early on in the process. Having admittedly "engaged in some measure of pre-judgment" before the June 2006 meeting, it was even more critical to the protection of the Andrus' rights that it be notified of the

12

contemplated closure of its nursing home and of the "factors" purportedly leading the RAC and Berger Commission toward such action, before it becomes a *fait d'accompli*.

38.     Following the June 2006 meeting, the Andrus never heard again from either the Hudson Valley RAC or the Berger Commission until November 28, 2006, the day that the RAC and Berger Commission simultaneously made public their final reports.

**The RAC Report's Faulty Findings**

39.     Many of the errors that resulted in the Berger Commission's recommendation to close the Andrus can be traced to the mistaken factual assumptions and flawed data relied on by the Hudson Valley RAC in its final report.

40.     From the very outset, it is apparent that the Andrus was not subjected to the same standards that were applied to other "facilities of interest".  According to the Hudson Valley RAC report, the Hudson Valley RAC requested information from the Andrus, Sky View Rehabilitation and Health Care Center, Victory Lake Nursing Center, and Split Rock Rehabilitation and Health Care Center.  See Exhibit C to Sandman Affidavit, page 10.  Sky View, Victory Lake and Split Rock evidently declined to comply with the RAC's request, while the Andrus did comply and otherwise fully cooperated with the RAC.  Inexplicably, the Andrus is the only facility among this group that the Berger Commission mandated be closed by the Department of Health.

41.     The Hudson Valley RAC report cited the Andrus' alleged "low occupancy and case mix index (in 2003, 39.2% and .90, respectively)" and resulting "obvious financial problems."  Those statements reflect the Hudson Valley RAC's materially erroneous views about the Andrus' occupancy and financial status, in the following respects:

42.     First, the 2003 data cited by the Hudson Valley RAC was stale and unrepresentative of the Andrus.  As I explained to the RAC at the June 2006 meeting, the Andrus

had suspended admissions to its nursing home during the pendency of the Andrus' CCRC proposal, which resulted in a temporary reduction of its resident census and operating revenues. The Andrus was still in the process of restoring its occupancy in 2003, less than two years after the Village's rejection of its CCRC expansion plans and only one year after the Andrus regrouped and developed a new strategic plan.

43.     However, as the Andrus proved to be the nursing facility of choice for more and more of Westchester's elderly, the Andrus steadily improved occupancy at the nursing home.  The Andrus averaged 97 occupied beds in 2003.  By 2005, that figure rose to an average of 171 residents, reaching 176 residents by year end.  Our occupancy continued to improve in 2006.  On June 20, 2006, the day of my meeting with the RAC, our census stood at 183 residents.  I shared all of this information with the RAC at our meeting.  Despite having timely received this information, the Hudson Valley RAC evidently ignored it and preferred to rely on the old data instead, evidently because it was more suited to support a closure objective. Meanwhile, other Westchester nursing homes were not even supplying information.

44.     Second, the cited occupancy rate of 39%, even for 2003, is inaccurate and grossly understates the Andrus' true occupancy levels, because the Hudson Valley RAC mistakenly presumed a bed capacity of 247 certified beds rather than the Andrus' true complement of 197 beds due to the Andrus' voluntary transfer of 50 beds.  That error is inexcusable, as again I informed the RAC at our June 2006 meeting of the 2002 agreement to move 50 of our beds, and I even provided the Committee with a copy of the transfer agreement immediately following the meeting.  In 2003, the Andrus' occupancy rate was 49% based on 197 certified beds.  By 2005 and 2006, the Andrus achieved respectable average occupancy rates of 87% and 90% respectively.

14

45.     Third, the RAC's reference to the Andrus' "obvious financial problems" is also mistaken and ignores the fact that by 2005, the Andrus was operating at a surplus.  Again in 2006, the Andrus continued to operate in the black.  This information was also timely shared with the Hudson Valley RAC at the June 2006 meeting and confirmed by the Andrus' 2005 certified financial statements submitted to the RAC's Chair that same week.  That data, too, was ignored.

**No Notice of the RAC Report's Faulty Findings**

46.     The Hudson Valley RAC issued its report to the Berger Commission containing its "rightsizing" recommendations on November 15, 2006.  However, the RAC Report was not released to the public – nor made accessible to the Andrus – until the Berger Commission issued its Final Report, on November 28, 2006.  Consequently, the Andrus was never given the opportunity to speak with or present testimony to the Berger Commission directly to refute the many flawed assumptions and factual inaccuracies in the Hudson Valley RAC Report.  Likewise, without affording the Andrus any notice of its contemplated actions or a meaningful opportunity to be heard, the Berger Commission issued its Final Report on November 28, 2006, recommending that all of the Andrus' nursing home beds be eliminated and its operating certificate rescinded.

47.     Defendant argues that the Andrus had the opportunity to address the Berger Commission at the public hearings but chose not to.  That claim is misleading at best, as the Andrus was never even notified that closure was being contemplated, let alone the purported grounds for closure, at any time prior to receiving the Berger Commission Report.  Certainly, the Notices of Public Hearing issued by the Berger Commission gave no such notice to the Andrus.  See Exhibits H and I to Sandman Affidavit.

48.     The RAC did not even let me know at our June 2006 meeting.  Defendant suggests that the concededly unstated message being conveyed to the Andrus at that meeting was that the Andrus was a closure target of the Berger Commission.  No such message was communicated, directly or indirectly.  If the defendant is implying that the "writing was on the wall", the message was written in invisible ink.

49.     But even if the June 2006 meeting were somehow sufficient notice, however cryptic it may have been, it did not give the Andrus a chance to address the Berger Commission at the public hearings.  That is because all of the Berger Commission hearings had taken place in the early part of 2006 and were concluded by the time the RAC met with me in June 2006.  Needless to say, to be effective, the notice should precede the opportunity to be heard, and not vice-versa.

50.     Defendant suggests that simply knowing that the Berger Commission had the power to close any one facility in the State was sufficient "generalized" notice to all facilities that could be adversely affected by the Berger Commission's recommendations.  Deft.'s Memo., page 10.  This contention is flawed for several reasons.

51.     First, if it were true that the mere possibility that a hospital or nursing facility could be closed were enough to compel a facility to participate in the Berger Commission hearings, then virtually every facility in the State (over 1,000 of them) would have availed itself of the public hearing process.  Such an eventuality would have inundated the Commission and brought its work to a screeching halt.  Strangely enough, in the same motion papers, the defendant argues that it would have been too burdensome for the Berger Commission to provide particularized notice and hold hearings for the far narrower, more discrete class of facilities actually being targeted for closure by the Berger Commission.

52.     With so much at stake for targeted facilities, it is only fair that the State assume the modest "burden" of notice and hearings for them, to ensure (i) that the Berger Commission makes its recommendations on the basis of sound, reliable data that can be tested by the one party with the most to lose from the Commission's reliance on faulty information; and (ii) that the Commission does not act (as happened here) to revoke an operating certificate inconsistently with the facts or the governing statutory factors.  Indeed, in this case, it would have been no burden at all for the RAC or Berger Commission to have at least alerted the Andrus that it was a candidate for closure and identified the "factors" informing its thinking in this regard, by simply saying so at the June 2006 meeting.  It is the RAC and Berger Commission, and not the Andrus, that chose not to avail itself of that opportunity.

53.     Second, the mere possibility of closure does not inform any adversely affected facility of the particular grounds that the Berger Commission may have been relying on as the basis for its recommended action.  Thus, a facility like the Andrus would have no way of knowing what documents or information it needed to present, if any, to address those grounds.  Without knowing that basic information, any "opportunity" to be heard is hardly meaningful.

54.     Finally, the "generalized notice" to all facilities that they could be forced to close by the Berger Commission is also inadequate because the Berger Commission was not granted the power to select facilities for closure at whim, without regard to any particular facts or circumstances.  That is, an across-the-board elimination of hospital and nursing home beds in New York State was not the Berger Commission's sole statutory "mandate".  If it were so, then one might argue that any and all facilities in the State are "fair game" for closure and are "on notice" by virtue of the Berger Commission's very existence.  Instead, the Legislature directed the Berger Commission to consider a host of factors when making any "rightsizing" recommendations.  See paragraph 25 of this affidavit.

55.     As a general matter, unless a facility is notified in advance that the Berger Commission is considering closure based on one or more of the statutory factors, a facility would have no reason to suspect it was being targeted.  This is especially true in the Andrus' case, where it had so dramatically turned the corner and was successfully operating at near-capacity and with a surplus; was caring for a majority of Medicaid residents; was meeting the continued demand for its services in the community; and was not amenable to ready conversion to any alternative use – all factors that under the Enabling Legislation would weigh heavily <u>against</u> the Andrus' being targeted for closure.

**<u>The Fundamental Flaws in the Berger Commission's Report</u>**

56.     Like the Hudson Valley RAC, the Berger Commission based its recommendations on several fundamentally flawed assumptions about the Andrus' financial circumstances and nursing home operations.  In so doing, the Berger Commission acted wholly inconsistent with the facts about the Andrus as well as the factors set out in the Enabling Legislation that were to guide the Berger Commission before it recommended such drastic action as the revocation of a facility's operating certificate.

57.     In the Final Report, the Berger Commission described the Andrus as a "247 bed" facility that "has been operating at a significant loss until 2006" and that it only now "claims" to be operating in the black.  <u>See</u> Exhibit B to Sandman Affidavit, page 123.  In fact, as described above, the Andrus years earlier had voluntarily "rightsized" to a <u>197</u> bed nursing facility, and has been successfully approaching 100% capacity.  Equally significant, the Andrus' solid occupancy levels, around 90% or better, over the past several years reflect the strong, continued demand for its nursing home services among Westchester's senior citizens.

58.     Moreover, contrary to the Berger Commission's suggestion, it is more than a "claim", but a <u>fact</u>, that the Andrus was operating at a surplus, not a deficit.  Indeed, the

Andrus' independent auditors reviewed the Andrus' financial statements for 2005, certified them to be accurate, and reported a surplus (net of grant monies) of $509,179 on the Statement of Operations.  See Exhibit K to Sandman Affidavit (Exhibit B to attached Financial Statements). The 2005 certified financial statements were furnished to the RAC in June 2006, but neither the RAC nor the Berger Commission even mention them.  Instead, the Berger Commission dismissed what I told the RAC at our meeting as a mere "claim", and then only with respect to fiscal year 2006, not 2005.  In doing so, the Berger Commission contravened the statutory mandate that it properly consider the "financial status of a facility" when deciding whether closure or other adverse action is warranted.

59.    Defendant does not dispute that, to properly discharge its statutory responsibilities, it is critical that the Berger Commission act on the most current and accurate data about facilities made available to it.  Exhibit A to McGovern Affidavit ("In terms of Utilization, we are seeking the most current and correct information on occupancy. . . .")  In this regard, defendant asserts that the Berger "Commission did note and consider plaintiff's 2005 financial statement and plaintiff's representation that its operations were not losing money in 2006." Sandman Affidavit, ¶ 30.  Defendant cites to that assertion as a "material fact" that is undisputed.  Defendant's Statement of Material Facts, ¶ 41.

60.    This contention by Mr. Sandman – who was a staff member of the Berger Commission but not a Commissioner – is very much in dispute, and is actually belied by the Berger Commission Report, stating (incorrectly) that the "facility has been operating at a significant loss until 2006, . . . [and] claims that it is now operating in the black."  Exhibit B to Sandman Affidavit, p. 123.  It is thus crystal clear that the Berger Commission never "considered" the 2005 certified financial statements and, more importantly, assumed -- contrary

to the 2005 certified financial statements -- that the Andrus had incurred "significant operating losses" that year, as opposed to the over $500,000 surplus reflected in the financial statements.

61.     On this crucial point, among several others, the Berger Commission simply got the "material facts" about the Andrus wrong; mistakenly concluded that the Andrus was a nursing facility in financial distress (which ironically is the situation with many other nursing facilities in Westchester County that managed to avoid closure), and not one actually experiencing success; and as a consequence, arrived at the fundamentally flawed conclusion that the Andrus should be closed.

62.     As the Andrus stated in the Complaint, the Berger Commission had improperly relied on outmoded financial data and failed to consider more current data.  To deflect this point, the defendant tries to distance himself from the Berger Commission's own words, and accuses the Andrus of "quibbling" over the Commission's characterization of the Andrus' reported financial stability as a mere "claim".  Defendant's Memo., page 15.  Under defendant's theory, because the Berger Commission did not outright reject the Andrus' "claim", the Commission actually was accepting it as a matter of fact.  This hindsight "spin" cannot alter the plain import of the Berger Commission's language.

63.     On the other hand, the only other financial data that the RAC or Berger Commission did actually consider and cite was derived from 2004 or earlier.  See also Exhibit E to Sandman Affidavit. [4]

---

[4] The 2000-2002 profit and loss data reviewed by the Berger Commission show that 24 nursing facilities in the Hudson Valley Region reported operating deficits on average during that time frame.  Sandman Affidavit, Ex E,  19th and 20th pages.  Yet, the Berger Commission only mandated closure of the Andrus, in spite of its vastly improved financial condition in subsequent years in recovering from its terminated CCRC project.

**Assisted Living Is Not A Viable Option**

64.     The Berger Commission has offered the Andrus the "Hobson's choice" of either closing down its nursing home entirely, or converting to a lower level of care and adding 140 Assisted Living Program ("ALP") beds with <u>zero</u> nursing home beds.  This latter option, however, is simply not viable.

65.     Converting the Andrus to an assisted living facility, at best, would yield severe operating shortfalls and bring about the Andrus' hasty demise.  With the assistance of outside financial consultants, we have carefully analyzed different possible models for operating the Andrus premised on an ALP along with other community-based programs, and have found that none are financially feasible absent the continued operation of a majority of our existing nursing home beds.  Here too, the Berger Commission failed to properly consider the "economic impact of right sizing", one of the other factors delineated in the Enabling Legislation.

66.     Obviously, closing the nursing home would force the Andrus to lay off over 200 employees, and would sever our relations with physicians, food vendors and other suppliers, and the many other individuals and entities with whom the Andrus does business in order to maintain and operate its nursing home.  This will no doubt have a negative impact on the local economy, a factor that the Berger Commission also should have considered under the Enabling Legislation.

67.     In the Final Report, the Berger Commission asserts that the Andrus' conversion to an ALP would be "economical".  Exhibit B to Sandman Affidavit, p. 123.  In one scenario, the Berger Commission recommends that the Andrus complete a floor by floor renovation of its existing facility to convert it to an ALP.  However, such a statement ignores the reality that any conversion of the Andrus' physical plant – designed and built a half century ago – into a residence that is both attractive to prospective assisted living residents and fully

21

compliant with ALP regulations, would be a hugely costly undertaking.  In this regard as well, the Berger Commission failed to properly consider the "economic impact" of the mandated conversion.

68.    As an alternative, the Berger Commission states that the Andrus could build additional ALP homes on its campus.  However, the Village of Hastings-on-Hudson previously refused the Andrus permission to develop its property when it rejected its plan to expand the campus to a CCRC.  Simply put, the 26 acres on which these ALP homes would be built are in all probability essentially untouchable.

69.    In this regard, there is no basis in logic or fact for Mr. Sandman's rank speculation that constructing a new building or new units on the Andrus' campus to accommodate an ALP, a program covered by Medicaid, as opposed to a CCRC, would somehow be more palatable to the Village of Hastings-on-Hudson.  Sandman Affidavit, ¶ 34.  Tellingly, neither the RAC nor the Berger Commission bothered to investigate whether there were any facts to support such surmise.

**"Low Acuity" Does Not Justify Closure**

70.    In the Final Report, the Berger Commission presumed that the "low" acuity of the Andrus on Hudson's residents relative to other nursing homes meant that a majority of its residents "could be better served in an ALP".  Exhibit B to Sandman Affidavit, page 123. Contrary to that conclusory assertion, the residential health care facility beds now in use at the Andrus cannot be converted to assisted living slots without profoundly disrupting the 24-hour nursing home care that many of its residents require.  In erroneously presuming otherwise without a factual basis, the Berger Commission contravened the mandate in the Enabling Legislation to take into account the "potential conversion. . . for uses other than inpatient or residential facilities."

71.    The RAC and Berger Commission cited to the Andrus' Physical A and Physical B residents to support the assumption that the Andrus' residents could be safely cared for in an assisted living program. These residents comprise roughly 44% of the Andrus' resident population, of which close to half suffer from dementia or other mental impairment. The remainder of our residents clearly have greater care needs and would require continued nursing home care. Thus, it makes no sense that a significant majority of the Andrus' residents would be forced to transfer to another nursing facility – a traumatic event for any chronically ill senior – based on the Berger Commission's belief that some of the 44% of the Andrus' low-acuity residents could get by with only assisted living. Indeed, we estimate that more than 140 of our current residents would still require skilled nursing care.

72.    Even focusing only on the 44% of Andrus residents who are categorized as Physical A or Physical B, the Berger Commission is incorrect in assuming that all of those residents can be safely cared for in a lower level of care such as assisted living. I wish to point out that while our Physical A and Physical B residents have a lower acuity score relative to other nursing home residents, they nevertheless have been determined to be so infirm and medically needy as to qualify for nursing home care under the Department of Health's own criteria. In fact, classification as "Physical A" or "Physical B" denotes nursing home eligibility. While certain nursing homes over the years may have favored the admission of more acute care residents -- and the commensurately higher governmental reimbursement for rendering services to them -- some nursing homes, including the Andrus, have accepted residents into their facilities without discriminating against those in need of long term care at lower acuity levels.

73.    Furthermore, the Berger Commission itself assumed that only an estimated 19% of the Physical A and Physical B nursing home residents in the State could be cared for in an alternative level of care setting. See Exhibit A to McGovern Affidavit. The Andrus' Physical

A and Physical B residents are no different; one half of them suffer from the onset of dementia and need 24-hour nursing supervision.[5]

74.     The Berger Commission recommended closing the Andrus' nursing home and converting it to an ALP despite – or perhaps because of – the fact that <u>none</u> of the Commission's staff or members ever visited the Andrus' nursing home, much less performed any clinical assessment of the Andrus' residents and their actual care needs.  Indeed, if the Berger Commission's recommendations affecting the Andrus were implemented, most of the Andrus' residents -- largely frail elderly averaging 88 years old who consider the Andrus their home -- would have to be transferred to another skilled nursing facility and consequently endure the trauma associated with such a move.

75.     Here too, the defendant faults the Andrus for not inviting the RAC or Commission staff to visit the Andrus or assess its residents.  <u>See</u> Defendant's Memo, pp. 14-15.  That charge is also unfair, as the Andrus had no idea that the RAC or the Commission was recommending closure of our nursing home on the mistaken belief that the residents could all be safely cared for in an ALP.

76.     Moreover, transferring most of the Andrus' residents to another nursing home – an inevitability – will not only cause "transfer trauma" for these aged, frail residents.  Caring for Andrus residents at other nursing facilities within the vicinity of the Andrus <u>will</u> also

_____

[5] While placing great emphasis on the Andrus' 2003 Case Mix Index information relative to other facilities, defendant has ignored the Berger Commission's other data, showing that there are ten nursing facilities in the Hudson Valley Region that do not even offer subacute care (which the Andrus does).  <u>See</u> Sandman Affidavit, Exhibit E, 68th and 69th pages.  <u>None</u> of those facilities were mandated to close by the Berger Commission.  Defendant also now points to the 21% of Physical A and Physical B admissions to the Andrus in 2003.  Notably, in the 2001-2003 years reviewed by the Berger Commission, a total of 16 nursing homes in the Hudson Valley Region admitted 20% or more residents who were classified as Physical A or Physical B.  <u>Id.</u>, 4th and 5th pages.  Of those 16 facilities, only the Andrus was directed to close.

actually cost the Medicaid program and the rest of the health care system more money –
estimated conservatively at more than $3.8 million a year.[6]  That is because the Andrus happens
to be one of the lowest-cost facilities in Westchester County – a fact apparently lost on the
Berger Commission.  Such an outcome is plainly contrary to the aim of "rightsizing".

77.     Furthermore, since most of the Andrus' residents are covered by the
Medicaid program, it will end up costing the State three or more million dollars per year in
additional funds to cover their nursing home care at nearby facilities in Westchester County.  In
this regard, the Berger Commission similarly failed to take into consideration "the extent to
which [the Andrus] serves the healthcare needs of the region, including serving Medicaid
recipients", also a factor in the Enabling Legislation.

78.     Lastly, relocating these residents has been made all the more difficult
since the Berger Commission issued its report.  Upon information and belief, another nursing
facility in nearby Yonkers, the Home for Aged Blind, recently reached an agreement with the
Department of Health to voluntarily surrender its 219 nursing home beds in exchange for other
licensed programs.  Closing the Home for Aged Blind's nursing facility means that there will be
that many fewer beds in the vicinity to absorb the Andrus' displaced residents.   As a
consequence, many Andrus residents will have to be relocated to facilities that much further
away from the Andrus.

**Paying For Closure or Conversion**

79.     Overall, the Berger Commission's Final Report fails to address or explain
how the significant costs associated with closure of the Andrus' nursing home and "conversion"

---

[6] This estimate is based on an analysis my staff and I performed of the 2006 Medicaid reimbursement
rates of Westchester County nursing homes promulgated by the Department of Health, and a comparison
of the Andrus' rates with the rates of nursing facilities within a five- mile radius of the Andrus.

to an ALP will be financed. This is so even though it is the defendant who would be effectively rescinding the Andrus' license to operate as a nursing home, involuntarily.

80.     In the Benjamin Affidavit, the defendant points to the availability of funds to facilities impacted by the Berger Commission's recommendations under the State's Health Care Efficiency and Affordability Law of New York Capital Program ("HEAL-4") and the Federal-State Health Reform Partnership ("F-SHRP"). (Paragraphs 26-33). This is somewhat disingenuous, as the HEAL-4 grant monies will not be made available to pay for the cost of conversion or closure so long as the facility has assets to cover those expenses in the first instance. The RFP for the HEAL-4 applications explicitly states:

> 1.     Facilities must self-fund proposed activities as much as possible, including through private, third-party financing and, for closures, the sale of assets.
>
> 2.     State funds will be available only in the absence of other possible funding.

Exhibit D to Benjamin Affidavit, p. 4. Thus, if forced to close, the Andrus would have to liquidate charitable assets entrusted to the organization before HEAL-4 funds can be used. Moreover, forcing the Andrus to pay for its own closure or reconfiguration as an assisted living facility would only exacerbate the substantial harm from revocation of its nursing home operating certificate, and in itself is a violation of the due process and constitutional property rights of the Andrus. Also, HEAL-4 funds are over-subscribed by a factor of 10, based on the applications submitted by affected facilities.

81.     It seems that the Berger Commission targeted the Andrus on the supposition that as a not-for-profit charitable organization, the Andrus would more readily submit to closure than a for-profit entity, with a proprietary investment as opposed to charitable assets to protect. Indeed, the vast majority of the entities targeted for closure are nonprofit health

care providers.  In any event, the Andrus' voluntary trustees feel no less a fiduciary obligation to safeguard its assets than would any proprietary board.

82.     The Final Report refers to the "financial support from the Andrus Family Foundation" previously given to the Andrus.  Exhibit B to Sandman Affidavit, p. 123.  In fact, two charitable foundations started by the Andrus family, the Surdna Foundation ("Surdna") and the Helen Benedict Foundation ("Helen Benedict"), have provided the Andrus in the past with grants for specific capital projects.  (There is no such "Andrus Family Foundation").  In citing to these prior foundation grants, the Berger Commission appears to have operated on the assumption that the Andrus can count on funds from Surdna and/or Helen Benedict to offset the high cost of closure and conversion.

83.     To the contrary, Surdna and Helen Benedict have been and remain separate and independent from the Andrus, with separate management and governing boards.  Neither foundation has any legal or contractual obligation to provide any future support to the Andrus.  Thus, it cannot possibly fall within the Berger Commission's authority, or that of the Commissioner of Health, to expect or compel Surdna or Helen Benedict (let alone the Andrus) to pick up the tab for the cost of closure and conversion that the Berger Commission and the Commissioner of Health have together mandated.

**<u>Overstatement of Survey Deficiencies</u>**

84.     The Berger Commission made several other factual errors about the Andrus in its Final Report.  For instance, the Final Report states that "[t]he facility has a history of a high number of deficiencies (26 in its 2005 survey), many of which are attributable to the building's deteriorating condition."  Exhibit B to Sandman Affidavit, p. 123.  In his affidavit, Mr. Sandman claims that this "finding" is "an accurate depiction of [a May 2005] survey", which purportedly "shows 26 deficiencies in the care provided to residents."  Sandman Affidavit, ¶ 35.

85.     With so many other errors in the Berger Commission's report, defendant has apparently sought to elevate the importance of the 2005 survey results over some of the other "factors" underlying the Commission's recommendation.  However, on this factor as well -- contrary to Mr. Sandman's sworn statement -- the Berger Commission expressly relied on flatly inaccurate data and proceeded on the demonstrably mistaken assumption that the Andrus had "a history of patient care deficits", which justified its closure.  Sandman Affidavit, ¶ 20.

86.     In the Department of Health's 2005 resident survey, the Andrus was cited for only 8 survey deficiencies related to resident care, none of which involved harm to any patients, and 6 other deficiencies for building/environment, for a total of 14 deficiencies, not 26. Sandman Affidavit, Exhibit N.  Thus, the Berger Commission's misstatement nearly doubled the actual number of Andrus survey citations.  Nor were any of the cited deficiencies at Andrus a high level of severity or scope as to constitute substandard quality of care under the survey regulations.

87.     In all of my eight years with the Andrus, the facility has never been cited with as many as 26 deficiencies on any annual resident survey.

88.     The Final Report alleges that the Andrus' physical plant is old and in need of capital improvements.  Exhibit B to Sandman Affidavit, p. 123.  In this regard, the Berger Commission failed to acknowledge that the Andrus had already recognized -- and addressed -- the need for capital improvements; the Andrus sought and obtained Department of Health approval in 2005 for approximately $6,000,000 in capital improvements to its original building. These improvements were specifically designed and approved for the continued operation of the Andrus as a skilled nursing facility.

89.     Ironically, the Berger Commission notes elsewhere in the Final Report that one of the presumed advantages to the implementation of its "rightsizing" recommendations

will be the prevention of wasted capital expenditure. Exhibit B to Sandman Affidavit, p. 224. Closure of the Andrus' nursing home would represent a significant waste of resources, as the Andrus' capital project is already completed, with the Andrus putting up $1.4 million of its own equity and borrowing several million dollars to finance the balance of the renovation costs.

**Defendant's Implementation of the Berger Commission's Recommendations**

90.     By letter dated January 31, 2007, the Andrus received its first communication from defendant concerning the Berger Commission's recommendations.  In that letter, the Department of Health told the Andrus that the Department "expected" the Andrus to follow a timetable of "steps and deliverables", devised by the Department alone, which it considered "necessary to implement the [Berger] Commission's recommendations within the required timeframe."  Exhibit A to Benjamin Affidavit.  The Department's timetable called for the Andrus' submission of a nursing home closure plan by September 30, 2007 and was to culminate in the Commissioner of Health's revocation of its nursing home Operating Certificate no later than June 30, 2008.

91.     Thus, unless this Court stops defendant, the Commissioner of Health will have compelled the submission of a closure plan by September 30, 2007, and rescinded the Andrus' nursing home Operating Certificate by June 30, 2008.

## **CONCLUSION**

92.    The Berger Commission's mandate to close the Andrus' nursing home, premised on misinformation about the Andrus' operations and financial status, makes no sense economically, financially, or clinically.  As its recommendations also defy the factors set forth in the Enabling Legislation, the mandate is wholly without legal justification.

93.    We submit that defendant's actions in furtherance of the Berger Commission's recommendations will violate the Andrus' constitutional rights of due process of law and deprive it of its property interest in its Operating Certificate.  These actions will also likely spell the demise of the Andrus as a not-for-profit health care provider, and represent a clear and present threat to its infirm elderly residents, who will have to be moved out of their "home" and into another facility.

94.    At the very least, there are numerous "material" factual issues that need to be explored further in discovery and thereafter resolved before the Court can properly determine the substantial claims and asserted defenses raised in this case.

WHEREFORE, for the foregoing reasons, I urge the Court to deny defendant's motion for summary judgment, and to allow the Andrus the opportunity to establish that the Berger Commission's recommendations affecting the Andrus, if implemented, would deprive the Andrus of due process of law and would violate other rights guaranteed it under the Constitution.

Betsy Biddle

Sworn to before me this
8 day of August, 2007.

Notary Public

Peggy Zorilo
Notary Public State of New York
01ZO6091212
Residing in Westchester County
My commission expires April 20, 2011