UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-----------------------------------------------------------------x
JOHN E. ANDRUS MEMORIAL, INC. (d/b/a        :        filed electronically
ANDRUS ON HUDSON),                          :
                                            :        07-CV-3432 (CLB) (KNF)
                               Plaintiff,   :
                                            :        **REPLY AFFIDAVIT OF JOHN**
                - against -                 :        **GASIOR IN SUPPORT OF**
                                            :        **DEFENDANT'S MOTION FOR**
RICHARD F. DAINES, as Commissioner of the   :        **SUMMARY JUDGMENT**
New York State Department of Health,        :
                                            :
                               Defendant.   :
-----------------------------------------------------------------x

**STATE OF NEW YORK    )**
                          **: ss.:**
**COUNTY OF NEW YORK  )**

        **JOHN GASIOR**, being duly sworn, deposes and says:

        1.     I am an Assistant Attorney General in the Office of Andrew M. Cuomo, Attorney

General of the State of New York, attorney for the defendant in this action.

        2.     I submit this affidavit in support of defendant's motion for summary judgment

pursuant to Fed. R. Civ. P. Rule 56(b).

        3.     Annexed hereto as Exhibit A is a true and accurate copy of St. Joseph Hospital of

Cheektowaga v. Novello, 2007 WL 2044870, 2007 N.Y. Slip Op. 06090 (4th Dep't July 18,

2007).

        4.     Annexed hereto as Exhibit B is a true and accurate copy of W. 95 Hous. Corp. v.

N.Y. City Dep't of Hous. Pres., 2001 WL 664628 (S.D.N.Y. 2001).

        **WHEREFORE**, I respectfully request that the Court grant defendant's motion for

summary judgment and that the Court grant defendant such other and further relief as the Court

deems just and proper.

Dated: New York, New York
     August 21, 2007

JOHN GASIOR
Assistant Attorney General

Sworn to before me this
21st day of August, 2007

Notary Public

CARRELL A. GILES
NOTARY PUBLIC STATE OF NEW YORK
NO. 01GI4876134
QUALIFIED IN KINGS COUNTY
TERM EXPIRES APRIL 20, 2011

2

**GASIOR  REPLY AFFIDAVIT  - EXHIBIT A**

Westlaw.

--- N.Y.S.2d ----
--- N.Y.S.2d ----, 2007 WL 2044870 (N.Y.A.D. 4 Dept.), 2007 N.Y. Slip Op. 06090
(Cite as: --- N.Y.S.2d ----)

**H**
St. Joseph Hosp. of Cheektowaga v. Novello
N.Y.A.D. 4 Dept.,2007.

Supreme Court, Appellate Division, Fourth
Department, New York.
ST. JOSEPH HOSPITAL OF CHEEKTOWAGA and
Catholic Health System, Inc., Plaintiffs-Appellants,
v.
Antonia C. NOVELLO, as New York State Health
Commissioner, New York State Commission on
Healthcare Facilities in the 21st Century, George E.
Pataki, as Governor of State of New York, and State
of New York, Defendants-Respondents.
July 18, 2007.

**Background:** Hospital sued to prevent state Health
Commissioner from implementing Commission on
Healthcare Facilities' recommendation to close hospital.
The Supreme Court, Erie County, 15 Misc.3d 333, 828
N.Y.S.2d 877,Joseph D. Mintz, J., granted summary
judgment for state, and hospital appealed.

**Holdings:** The Supreme Court, Appellate Division,
Centra, J., held that:

(1) enabling legislation did not violate procedural due
process as applied to hospital;

(2) enabling legislation did not violate substantive due
process;

(3) "legislative veto" section of enabling legislation was
severable from remainder of act;

(4) enabling legislation comported with state
constitution's Free Exercise Clause; and

(5) enabling legislation comported with federal
constitution's Contract Clause.

Affirmed as modified.

Fahey, J., filed dissenting opinion.

**[1] Constitutional Law 92 ⟜1004**

92 Constitutional Law
  92VI Enforcement of Constitutional Provisions
    92VI(C) Determination of Constitutional
Questions
      92VI(C)3 Presumptions and Construction as
to Constitutionality
        92k1001 Doubt
          92k1004 k. Proof Beyond a Reasonable
Doubt. Most Cited Cases
Challenge to facial constitutionality of statute requires
that plaintiff surmount presumption of constitutionality
accorded to legislative enactments by proof beyond
reasonable doubt.

**[2] Constitutional Law 92 ⟜3875**

92 Constitutional Law
  92XXVII Due Process
    92XXVII(B) Protections Provided and
Deprivations Prohibited in General
      92k3875 k. Factors Considered; Flexibility
and Balancing. Most Cited Cases
Factors in determining what process is constitutionally
due are: (1) private interests affected by proceeding; (2)
risk of error created by state's chosen procedure; and
(3) countervailing governmental interest supporting use
of challenged procedure. U.S.C.A. Const.Amend. 14;
McKinney's Const. Art. 1, § 6.

**[3] Constitutional Law 92 ⟜4329**

92 Constitutional Law
  92XXVII Due Process
    92XXVII(G) Particular Issues and Applications
      92XXVII(G)14 Environment and Health
        92k4329 k. Health Care; Hospitals and

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

--- N.Y.S.2d ----
--- N.Y.S.2d ----, 2007 WL 2044870 (N.Y.A.D. 4 Dept.), 2007 N.Y. Slip Op. 06090
(Cite as: --- N.Y.S.2d ----)

Page 2

Nursing Homes. Most Cited Cases

**Health 198H ⊂⟶105**

198H Health
  198HI Regulation in General
    198HI(A) In General
      198Hk102 Constitutional and Statutory
Provisions
        198Hk105 k. Validity. Most Cited Cases
Legislation providing for implementation by Health
Commissioner of Commission on Healthcare Facilities'
recommendations absent rejection by both houses of
legislature did not violate procedural due process as
applied to hospital recommended for closure, even
though hospital's operators did not receive
individualized warning of possible closure and
individualized hearing prior to recommendation;
operators were aware that hospital's closing was
possibility, and had opportunity to appear at regional
hearing prior to recommendation and to submit
unlimited documents. U.S.C.A. Const.Amend. 14;
McKinney's Const. Art. 1, § 6; McKinney's Public
Health Law § 2806; Laws of 2005, Ch. 63, Pt. E, § 31.

Legislation providing for implementation by Health
Commissioner of Commission on Healthcare Facilities'
recommendations absent rejection by both houses of
legislature did not violate procedural due process as
applied to hospital recommended for closure, even
though hospital's operators did not receive
individualized warning of possible closure and
individualized hearing prior to recommendation;
operators were aware that hospital's closing was
possibility, and had opportunity to appear at regional
hearing prior to recommendation and to submit
unlimited documents. U.S.C.A. Const.Amend. 14;
McKinney's Const. Art. 1, § 6; McKinney's Public
Health Law § 2806; Laws of 2005, Ch. 63, Pt. E, § 31.

**[4] Constitutional Law 92 ⊂⟶4329**

92 Constitutional Law
  92XXVII Due Process
    92XXVII(G) Particular Issues and Applications
      92XXVII(G)14 Environment and Health
        92k4329 k. Health Care; Hospitals and

Nursing Homes. Most Cited Cases

**Health 198H ⊂⟶105**

198H Health
  198HI Regulation in General
    198HI(A) In General
      198Hk102 Constitutional and Statutory
Provisions
        198Hk105 k. Validity. Most Cited Cases
Legislation providing for implementation by Health
Commissioner of Commission on Healthcare Facilities'
recommendations did not violate substantive due
process as applied to hospital recommended for closure;
recommendation was not without legal justification or
outrageously arbitrary, given legitimacy of
Commission's task of "right-sizing" health care and
recommendation's comporting with that purpose.
U.S.C.A. Const.Amend. 14; McKinney's Const. Art. 1,
§ 6; McKinney's Public Health Law § 2806; Laws of
2005, Ch. 63, Pt. E, § 31.

Legislation providing for implementation by Health
Commissioner of Commission on Healthcare Facilities'
recommendations did not violate substantive due
process as applied to hospital recommended for closure;
recommendation was not without legal justification or
outrageously arbitrary, given legitimacy of
Commission's task of "right-sizing" health care and
recommendation's comporting with that purpose.
U.S.C.A. Const.Amend. 14; McKinney's Const. Art. 1,
§ 6; McKinney's Public Health Law § 2806; Laws of
2005, Ch. 63, Pt. E, § 31.

**[5] Constitutional Law 92 ⊂⟶3896**

92 Constitutional Law
  92XXVII Due Process
    92XXVII(B) Protections Provided and
Deprivations Prohibited in General
      92k3892 Substantive Due Process in General
        92k3896 k. Egregiousness; "Shock the
Conscience" Test. Most Cited Cases
Only the most egregious official conduct can be said to
be arbitrary, for purposes of claim of violation of
substantive due process. U.S.C.A. Const.Amend. 14;
McKinney's Const. Art. 1, § 6.

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

--- N.Y.S.2d ----
--- N.Y.S.2d ----, 2007 WL 2044870 (N.Y.A.D. 4 Dept.), 2007 N.Y. Slip Op. 06090
(Cite as: — N.Y.S.2d ----)

[6] Statutes 361 🔑64(2)

361 Statutes
    361I Enactment, Requisites, and Validity in General
        361k64 Effect of Partial Invalidity
            361k64(2) k. Acts Relating to Particular
Subjects in General. Most Cited Cases
Section of legislation providing for implementation by
Health Commissioner of Commission on Healthcare
Facilities' recommendations absent "legislative veto" of
entire Commission report was severable from remainder
of legislative act, and thus, even if violative of state
constitution's Presentment Clause or doctrine of
separation of powers, section did not invalidate entire
act; act contained severance clause, and legislature did
not intend validity of act to depend on validity of
legislative veto, given its specific directives and
appointments to Commission. McKinney's Const. Art.
4, § 7; McKinney's Public Health Law § 2806; Laws of
2005, Ch. 63, Pt. E, § 31.

[7] Constitutional Law 92 🔑1398(1)

92 Constitutional Law
    92XIII Freedom of Religion and Conscience
        92XIII(B) Particular Issues and Applications
            92k1394 Health Care
                92k1398 Facilities
                    92k1398(1) k. In General. Most Cited
Cases

Health 198H 🔑105

198H Health
    198HI Regulation in General
        198HI(A) In General
            198Hk102 Constitutional and Statutory
Provisions
                198Hk105 k. Validity. Most Cited Cases
Legislation providing for implementation by Health
Commissioner of Commission on Healthcare Facilities'
recommendations comported with state constitution's
Free Exercise Clause, in Catholic hospital's challenge to
Commission's recommendation for hospital's closing;
legislation did not target Catholic hospitals, and nothing
in act imposed any restrictions on religious freedom.
McKinney's Const. Art. 1, § 3; McKinney's Public

Health Law § 2806; Laws of 2005, Ch. 63, Pt. E, § 31.

Legislation providing for implementation by Health
Commissioner of Commission on Healthcare Facilities'
recommendations comported with state constitution's
Free Exercise Clause, in Catholic hospital's challenge to
Commission's recommendation for hospital's closing;
legislation did not target Catholic hospitals, and nothing
in act imposed any restrictions on religious freedom.
McKinney's Const. Art. 1, § 3; McKinney's Public
Health Law § 2806; Laws of 2005, Ch. 63, Pt. E, § 31.

[8] Constitutional Law 92 🔑1306

92 Constitutional Law
    92XIII Freedom of Religion and Conscience
        92XIII(A) In General
            92k1302 Free Exercise of Religion
                92k1306 k. Burden on Religion. Most
Cited Cases
On Free Exercise Clause challenge to statute that
imposes incidental burden on free exercise, court
balances incidental burden against interest advanced by
legislation. McKinney's Const. Art. 1, § 3.

[9] Constitutional Law 92 🔑2745

92 Constitutional Law
    92XXII Obligation of Contract
        92XXII(C) Contracts with Non-Governmental
Entities
                92XXII(C)2 Particular Issues and
Applications
                    92k2745 k. In General. Most Cited Cases

Constitutional Law 92 🔑2753

92 Constitutional Law
    92XXII Obligation of Contract
        92XXII(C) Contracts with Non-Governmental
Entities
                92XXII(C)2 Particular Issues and
Applications
                    92k2753 k. Sales in General. Most Cited
Cases

Health 198H 🔑105

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

--- N.Y.S.2d ----                                                                          Page 4
--- N.Y.S.2d ----, 2007 WL 2044870 (N.Y.A.D. 4 Dept.), 2007 N.Y. Slip Op. 06090
(Cite as: --- N.Y.S.2d ----)

198H Health
    198HI Regulation in General
        198HI(A) In General
            198Hk102 Constitutional and Statutory
Provisions
            198Hk105 k. Validity. Most Cited Cases
Legislation providing for implementation by Health
Commissioner of Commission on Healthcare Facilities'
recommendations comported with federal constitution's
Contract Clause, even though closing of hospital on
Commission's recommendation resulted in impairment
of hospital's contracts with various vendors, suppliers,
and employees; legislation had legitimate public
purpose of reconfiguring supply of hospital/nursing
home facilities to align with demand, and Commission's
recommendations for closure or downsizing were
necessary and reasonable to accomplish that end.
U.S.C.A. Const. Art. 1, § 10, cl. 1.

Legislation providing for implementation by Health
Commissioner of Commission on Healthcare Facilities'
recommendations comported with federal constitution's
Contract Clause, even though closing of hospital on
Commission's recommendation resulted in impairment
of hospital's contracts with various vendors, suppliers,
and employees; legislation had legitimate public
purpose of reconfiguring supply of hospital/nursing
home facilities to align with demand, and Commission's
recommendations for closure or downsizing were
necessary and reasonable to accomplish that end.
U.S.C.A. Const. Art. 1, § 10, cl. 1.

[10] Constitutional Law 92 ☜2671

92 Constitutional Law
    92XXII Obligation of Contract
        92XXII(A) In General
            92k2671 k. Existence and Extent of
Impairment. Most Cited Cases

Constitutional Law 92 ☜2672

92 Constitutional Law
    92XXII Obligation of Contract
        92XXII(A) In General
            92k2672 k. Police Power; Purpose of
Regulation. Most Cited Cases

On Contract Clause challenge to state legislation, court
first determines whether there was substantial
impairment of contractual relationship; if so,
impairment is examined in light of nature and purpose
of legislation, and is upheld if it is reasonable and
necessary to accomplish legitimate public purpose.
U.S.C.A. Const. Art. 1, § 10, cl. 1.


Phillips Lytle LLP, Buffalo (Kenneth A. Manning of
Counsel), for Plaintiffs-Appellants.
Andrew M. Cuomo, Attorney General, Albany (Victor
Paladino of Counsel), for Defendants-Respondents.

PRESENT: SCUDDER, P.J., CENTRA, LUNN,
FAHEY, AND PERADOTTO, JJ.Opinion by
CENTRA, J.

                          I

*1 At issue on this appeal is the constitutionality of
certain Enabling Legislation, i.e., section 31 of part E of
chapter 63 of the Laws of 2005 (hereafter, Legislation).
Pursuant to the Legislation, the Legislature created
defendant New York State Commission on Healthcare
Facilities in the 21st Century (Commission) and
charged it with "examining the supply of general
hospital and nursing home facilities, and recommending
changes that will result in a more coherent, streamlined
health care system in the state of New York." The
Commission recommended the closing of plaintiff St.
Joseph Hospital of Cheektowaga (St. Joseph). We note
at the outset that the issue whether the Commission's
recommendation to close St. Joseph was rational is not
before us. Rather, the sole issue before us on this
appeal, as framed by the parties, is whether the
Legislation is constitutional, and we conclude that it is.


                          II

Plaintiff Catholic Health System, Inc. (CHS) is a
not-for-profit corporation that operates an integrated
network of health care ministries throughout western
New York, including St. Joseph. Plaintiffs commenced
this action seeking injunctive, declaratory, and other
relief, and they thereafter moved for summary judgment

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

--- N.Y.S.2d ----
--- N.Y.S.2d ----, 2007 WL 2044870 (N.Y.A.D. 4 Dept.), 2007 N.Y. Slip Op. 06090
(Cite as: --- N.Y.S.2d ----)

Page 5

seeking a declaration pursuant to several causes of action and seeking a permanent injunction enjoining defendants from taking any steps to revoke or rescind St. Joseph's Certificate of Operation (operating certificate), to close St. Joseph, or otherwise to interfere with St. Joseph's ongoing operations and business. Defendants cross-moved for summary judgment declaring that the Legislation does not violate the New York and United States Constitutions and dismissing the remainder of the amended complaint. Supreme Court denied plaintiffs' motion and granted defendants' cross motion, stating that the amended complaint "is in all respects dismissed" (*St. Joseph Hosp. of Cheektowaga v. Novello*, 15 Misc.3d 333, 349, 828 N.Y.S.2d 877). Although the court properly declared that the Legislation is constitutional, it erred in dismissing the amended complaint "in all respects" (*id.*). We therefore conclude that the order and judgment should be modified by vacating the provision dismissing those causes of action seeking a declaratory judgment (*see Boyd v. Allstate Life Ins. Co. of N.Y.*, 267 A.D.2d 1038, 1039, 700 N.Y.S.2d 332).

III

The Legislature created the Commission to maximize return from resources that have been invested in the health care system by aligning resources "so that excess capacity is minimized." The Legislation set forth nine specific factors for the Commission to consider in completing its task. A regional advisory committee (RAC) was formed for each of six regions, and each RAC was charged with conducting public hearings within its region and developing "recommendations for reconfiguring its region's general hospital and nursing home bed supply to align bed supply with regional and local needs." The RACs were to transmit their recommendations to the Commission, including their recommendations concerning which facilities should be closed, resized, consolidated, converted, or restructured.

*2 The Legislation further directed the Commission to transmit to the Governor a report containing its final recommendations on or before December 1, 2006. The recommendations of the Commission would not be

implemented unless the Governor transmitted the Commission's report with his written approval to the Commissioner of Health and transmitted a message to the Legislature indicating his approval of the recommendations on or before December 5, 2006. In addition, the recommendations would not be implemented if, after receiving the message from the Governor, "a majority of the members of each house of the legislature vote to adopt a concurrent resolution rejecting the recommendations of the [C]ommission ... in their entirety" by December 31, 2006.

On November 28, 2006, the Commission sent its report to Governor Pataki recommending, inter alia, the closing of St. Joseph. On November 30, 2006, the Governor transmitted a message to the Legislature indicating that he approved the Commission's report. The Legislature did not adopt a resolution rejecting the recommendations of the Commission by December 31, 2006, and the recommendations therefore became effective.

IV

[1] In order to prevail on their challenge to the facial constitutionality of the Legislation, plaintiffs "must surmount the presumption of constitutionality accorded to legislative enactments by proof 'beyond a reasonable doubt' " (*Matter of Moran Towing Corp. v. Urbach*, 99 N.Y.2d 443, 448, 757 N.Y.S.2d 513, 787 N.E.2d 624).

[2] Plaintiffs first contend that the Legislation violates their rights to procedural and substantive due process pursuant to the Fourteenth Amendment of the United States Constitution and article I, § 6 of the New York Constitution. We agree with plaintiffs that they have a protected property interest in St. Joseph's operating certificate (*see generally Bell v. Burson*, 402 U.S. 535, 539, 91 S.Ct. 1586, 29 L.Ed.2d 90; *Honey Dippers Septic Tank Servs. v. Landi*, 198 A.D.2d 402, 604 N.Y.S.2d 128). We conclude, however, that the Legislation satisfies the minimum procedural due process requirements (*see Morgenthau v. Citisource, Inc.*, 68 N.Y.2d 211, 221, 508 N.Y.S.2d 152, 500 N.E.2d 850). "It is not the role of the courts to rewrite statutes that have been promulgated by the legislative

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

--- N.Y.S.2d ----
--- N.Y.S.2d ----, 2007 WL 2044870 (N.Y.A.D. 4 Dept.), 2007 N.Y. Slip Op. 06090
(Cite as: --- N.Y.S.2d ----)

Page 6

branch of government nor is it our role to comment on the wisdom of the statute" (*id.* at 223, 508 N.Y.S.2d 152, 500 N.E.2d 850). The determination concerning "what process is constitutionally due ... [is] based on the balancing of three factors: (1) the private interests affected by the proceeding; (2) the risk of error created by the State's chosen procedure; and (3) the countervailing governmental interest supporting use of the challenged procedure" (*Matter of Uniform Firefighters of Cohoes, Local 2562, IAFF, AFL-CIO v. City of Cohoes*, 94 N.Y.2d 686, 691-692, 709 N.Y.S.2d 481, 731 N.E.2d 137; *see Mathews v. Eldridge*, 424 U.S. 319, 334-335, 96 S.Ct. 893, 47 L.Ed.2d 18; *LaRossa, Axenfeld & Mitchell v. Abrams*, 62 N.Y.2d 583, 588, 479 N.Y.S.2d 181, 468 N.E.2d 19).

[3] Plaintiffs' private interests involved are substantial inasmuch as plaintiffs face the loss of St. Joseph's operating certificate. The interest of the State in the matter is also substantial, however, inasmuch as the State must attempt to contain rising Medicaid costs while still maintaining adequate health care facilities. "[D]ue process is a flexible constitutional concept calling for such procedural protections as a particular situation may demand" (*LaRossa, Axenfeld & Mitchell*, 62 N.Y.2d at 588, 479 N.Y.S.2d 181, 468 N.E.2d 19). Plaintiffs were aware of the task of the Commission and thus were aware that the closing of a CHS hospital was a possibility. Plaintiffs were given the opportunity to appear before the western RAC at a public hearing, and they in fact did so. Plaintiffs also were entitled to submit unlimited documents to the western RAC to assist the Commission in its task, and plaintiffs took advantage of that procedure by submitting various documents. Plaintiffs contend that the Commission should have informed them that St. Joseph was targeted for closure and then held an extensive hearing to discuss that prospect. That additional procedural safeguard would create an enormous fiscal and administrative burden. In the western region alone, the Commission recommended, inter alia, the closing of two hospitals, the downsizing of numerous other hospitals and nursing homes, and the joining under a single unified governance structure the facilities controlled by the Erie County Medical Center Corporation and Kaleida Health. We thus conclude that defendants met their burden on their cross motion with

respect to plaintiffs' right to procedural due process by establishing that the procedure set forth in the Legislation, i.e., conducting public hearings to elicit comments from all of the health care facilities and affording the health care facilities the opportunity to submit unlimited documents, was adequate and sufficient to protect that right.

*3 [4][5] We further conclude that defendants met their burden on their cross motion with respect to the contention of plaintiffs that they were denied their right to substantive due process. The denial of the right to substantive due process occurs only when "the governmental action was wholly without legal justification" (*Bower Assoc. v. Town of Pleasant Val.*, 2 N.Y.3d 617, 627, 781 N.Y.S.2d 240, 814 N.E.2d 410) and, importantly, " 'only the most egregious official conduct can be said to be arbitrary in the constitutional sense' " (*id.* at 628, 781 N.Y.S.2d 240, 814 N.E.2d 410, quoting *City of Cuyahoga Falls, Ohio v. Buckeye Community Hope Found.*, 538 U.S. 188, 198, 123 S.Ct. 1389, 155 L.Ed.2d 349). Plaintiffs acknowledge that the Commission's task in "right-sizing" health care was a legitimate government concern, but they contend that the Commission did not have a compelling interest to achieve that goal by closing health care facilities. The test, however, is not whether the State, through the Commission, had a compelling interest in closing health care facilities. Rather, the test is whether the Commission's action in recommending the closure of a health care facility was without legal justification, or "outrageously arbitrary" (*Natale v. Town of Ridgefield*, 170 F.3d 258, 263).

We conclude that plaintiffs were not deprived of their right to substantive due process because it cannot be said that the Commission's recommendation to close St. Joseph was without legal justification, nor was it "outrageously arbitrary" (*id.*). The Commission was charged with the task of "examining the supply of general hospital and nursing home facilities, and recommending changes that will result in a more coherent, streamlined health care system in the state of New York." To accomplish that task, the western RAC was charged with making "recommendations for reconfiguring its region's general hospital and nursing home bed supply to align bed supply with regional and

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

--- N.Y.S.2d ----
--- N.Y.S.2d ----, 2007 WL 2044870 (N.Y.A.D. 4 Dept.), 2007 N.Y. Slip Op. 06090
(Cite as: — N.Y.S.2d —)

local needs." The Legislation contemplated that some facilities should be closed and others resized, consolidated, converted, or restructured. Thus, the Commission's recommendation to close St. Joseph was in keeping with the purpose of the creation of the Commission.

V

[6] Plaintiffs next contend that the Legislation violates the Presentment Clause of the New York Constitution (N.Y. Const., art. IV, § 7) and the separation of powers doctrine based on the legislative veto provision of the Legislation. Pursuant to the Legislation, the Commissioner of Health is required to implement the recommendations of the Commission unless the Governor does not approve them or the Legislature enacts a concurrent resolution rejecting them, which is the equivalent of a legislative veto. Plaintiffs contend that the legislative veto provision runs afoul of the Presentment Clause because a resolution rejecting the recommendations would not be presented to the Governor. Plaintiffs further contend that the legislative veto violates the separation of powers doctrine because the Commission's recommendations were subject to the disapproval of the Legislature *after* prior approval by the Governor, which is "a total inversion of the legislative process."

*4 Plaintiffs contend that the entire Legislation is invalid based on the legislative veto. We conclude, however, that the legislative veto provision is severable from the Legislation. Thus, even if the legislative veto provision is unconstitutional, that provision does not invalidate the remainder of the Legislation.

The legislative veto provision may be severed from the Legislation unless, as plaintiffs contend, it is determined that the Legislature would not have enacted the Legislation without the legislative veto (see *Alaska Airlines v. Brock,* 480 U.S. 678, 685, 107 S.Ct. 1476, 94 L.Ed.2d 661; *CWM Chem. Servs., L.L.C. v. Roth,* 6 N.Y.3d 410, 423, 813 N.Y.S.2d 18, 846 N.E.2d 448). Here, plaintiffs contend that it is inconceivable that the Legislature intended to grant the Commission such powers if the recommendations of the Commission

were not subject to subsequent review by the Legislature. We cannot agree.

The Legislation contains a severability clause providing that, if any part of the act is adjudged to be invalid, "such judgment shall not affect, impair, or invalidate the remainder thereof...." The severability clause further states that "[i]t is hereby declared to be the intent of the legislature that this act would have been enacted even if such invalid provisions had not been included herein." The inclusion of a severability clause creates a presumption that the Legislature "did not intend the validity of the statute in question to depend on the validity of the constitutionally offensive provision" (*Alaska Airlines,* 480 U.S. at 686, 107 S.Ct. 1476). "[U]nless there is strong evidence" that the Legislature intended otherwise, the unconstitutional provision is severable (*id.*).

Here, the requisite "strong evidence" that the Legislature intended otherwise is plainly lacking. The Legislature enacted the Legislation with specific directives to the Commission and some control over the Commission through appointments. The Legislature set forth nine specific factors that the Commission was required to consider in making its recommendations. The Legislation is also specific with respect to the hearings that were required and the input the Commission was to receive from each RAC. Some members of the Commission and the RAC members were appointed by the temporary president of the senate and the speaker of the assembly. Because of the Legislature's specific directives and appointments to the Commission, we are compelled to reject plaintiffs' contention that it is inconceivable that the Legislature intended the Commission to make its recommendations without those recommendations being subject to subsequent review by the Legislature.

VI

[7][8] Plaintiffs further contend that the Commission's recommendations are invalid under the Free Exercise Clause of the New York Constitution (N.Y. Const., art. I, § 3). The Court of Appeals has held that "when the State imposes 'an incidental burden on the right to free

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

--- N.Y.S.2d ----                                                           Page 8
--- N.Y.S.2d ----, 2007 WL 2044870 (N.Y.A.D. 4 Dept.), 2007 N.Y. Slip Op. 06090
(Cite as: --- N.Y.S.2d ----)

exercise of religion' [a court] must consider the interest advanced by the legislation that imposes the burden, and that '[t]he respective interests must be balanced to determine whether the incidental burdening is justified' " (*Catholic Charities of Diocese of Albany v. Serio,* 7 N.Y.3d 510, 525, 825 N.Y.S.2d 653, 859 N.E.2d 459, *rearg. denied* 8 N.Y.3d 866, 831 N.Y.S.2d 767, 863 N.E.2d 1019). In determining whether legislation violates the Free Exercise Clause, "substantial deference is due the Legislature, and ... the party [challenging the legislation] bears the burden of showing that the challenged legislation, as applied to that party, is an unreasonable interference with religious freedom" (*id.*). Here, defendants met their burden on their cross motion and plaintiffs failed to raise an issue of fact whether the Legislation is an u nreasonable interference with religious freedom. The Legislation did not target Catholic hospitals for closing, and there is nothing in the Legislation itself that imposes any restrictions on religious freedom.

VII

*5 [9] Finally, plaintiffs contend that the Commission's recommendations violate the Contract Clause of the United States Constitution (U.S. Const., art. I, § 10, cl. [1] ). Plaintiffs contend that, because St. Joseph is required to close, there will be substantial impairment of CHS contracts with various vendors, suppliers, and employees.

[10] We conclude that the Legislation does not violate the Contract Clause. "[N]ot all impairments of contract are unconstitutional" (*Association of Surrogates & Supreme Ct. Reporters Within City of N.Y. v. State of New York,* 79 N.Y.2d 39, 46, 580 N.Y.S.2d 153, 588 N.E.2d 51). A court must first determine whether there was a substantial impairment of a contractual relationship (*see 19th St. Assoc. v. State of New York,* 79 N.Y.2d 434, 442, 583 N.Y.S.2d 811, 593 N.E.2d 265; *Association of Surrogates & Supreme Ct. Reporters Within City of N.Y.,* 79 N.Y.2d at 46, 580 N.Y.S.2d 153, 588 N.E.2d 51). If there was, then the impairment "must be examined in light of the nature and purpose of the State legislation, and will be upheld if it is reasonable and necessary to accomplish a

legitimate public purpose" (*Association of Surrogates & Supreme Ct. Reporters Within City of N.Y.,* 79 N.Y.2d at 46, 580 N.Y.S.2d 153, 588 N.E.2d 51; *see United States Trust Co. of N.Y. v. State of New Jersey,* 431 U.S. 1, 22, 97 S.Ct. 1505, 52 L.Ed.2d 92, *reh. denied* 431 U.S. 975, 97 S.Ct. 2942, 53 L.Ed.2d 1073; *Matter of Subway-Surface Supervisors Assn. v. New York City Tr. Auth.,* 44 N.Y.2d 101, 109, 404 N.Y.S.2d 323, 375 N.E.2d 384). "Courts generally defer to legislative judgment as to necessity and reasonableness" (*Association of Surrogates & Supreme Ct. Reporters Within City of N.Y.,* 79 N.Y.2d at 46, 580 N.Y.S.2d 153, 588 N.E.2d 51).

Here, the purpose of the Legislation was for the Commission to examine the current supply of hospital and nursing home facilities and to re configure the supply to align with the demand or need. The Legislature determined that minimizing excess capacity was necessary to promote stability and efficiency in the health care system. That is a legitimate public purpose, and the task of the Commission in recommending facilities to close, downsize, or consolidate was both necessary and reasonable to accomplish that purpose.

VIII

Accordingly, although the court properly declared that the Legislation is constitutional, we conclude that the order and judgment should be modified by vacating the provision dismissing those causes of action seeking a declaratory judgment.

It is hereby ORDERED that the order and judgment so appealed from be and the same hereby is modified on the law by vacating the provision dismissing those causes of action seeking a declaratory judgment and as modified the order and judgment is affirmed without costs.

SCUDDER, P.J., LUNN and PERADOTTO, JJ., concur with CENTRA, J. FAHEY, J., dissents and votes to reverse in accordance with the following Opinion:
I respectfully dissent because I cannot agree with the majority that the Enabling Legislation at issue, i.e., section 31 of part E of chapter 63 of the Laws of 2005

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

--- N.Y.S.2d ----
--- N.Y.S.2d ----, 2007 WL 2044870 (N.Y.A.D. 4 Dept.), 2007 N.Y. Slip Op. 06090
(Cite as: --- N.Y.S.2d ----)

(hereafter, Legislation) is constitutional. The manner in which the Legislation has been implemented and the procedural history of this case have been set out by the majority and I shall not repeat them here. I disagree with the majority on two grounds and thus conclude that the statute should be declared unconstitutional on those grounds. I agree with plaintiffs that defendant New York State Commission on Healthcare Facilities in the 21st Century (Commission) violated their right to procedural due process, and I further agree with plaintiffs that the Legislation violates the Presentment Clause of the New York Constitution and the separation of powers doctrine.

I

*6 The Legislation provides for six regional advisory committees (RACs) to hold public hearings and then to make recommendations to the Commission. The Commission would then determine which hospitals were to lose their Certificates of Operation (operating certificates). The Commission recommended changes with respect to the operation of 57 hospitals, approximately one quarter the state's total number of hospitals. It is uncontested that "[e]ach interested party, including plaintiff Catholic Health System, Inc. (CHS), was limited to a ten (10) minute address" at a public hearing conducted by the western RAC, and plaintiffs also submitted numerous documents to the RAC. The actual decision-making body, the Commission, did not hear testimony from any of the affected health care providers or conduct any public hearings. Thus, none of the parties potentially affected by the recommendations of the RACs was afforded an opportunity to make a presentation to the final decision-making body.

At stake is the continued operation of plaintiff St. Joseph Hospital of Cheektowaga (St. Joseph) that is in fact a solvent health care provider. For the first three quarters of 2006, St. Joseph operated at a surplus of approximately $2 million. It serves approximately 30,000 patients per year and employs 800 people.

Pursuant to the Legislation, plaintiffs were provided with the opportunity to express their opinions at a public hearing and through unlimited document

submissions to the western RAC, which then presented its recommendations to the Commission. Significantly, none of the hospitals in the region covered by the western RAC was told which were to be closed prior to the public hearing held by the western RAC. St. Joseph did not receive notice of its potential closing prior to the announcement of all hospital closings recommended by the Commission. Further, St. Joseph was given no opportunity to be heard by the Commission before it made its decision.

II

In determining whether there was a violation of the right to procedural due process under the United States Constitution, a court must make a two-part inquiry. First, the court must consider whether there is in fact a constitutionally protected property interest and, if so, the court must then determine whether constitutionally sufficient due process has been provided with respect to the protected property interest (see Logan v. Zimmerman Brush Co., 455 U.S. 422, 428, 102 S.Ct. 1148, 71 L.Ed.2d 265). "Many controversies have raged about the cryptic and abstract words of the Due Process Clause, but there can be no doubt that at a minimum they require that deprivation of life, liberty or property by adjudication be preceded by notice and opportunity for hearing appropriate to the nature of the case" (Mullane v. Central Hanover Bank & Trust Co., 339 U.S. 306, 313, 70 S.Ct. 652, 94 L.Ed. 865). The majority correctly states the minimum standard for ensuring procedural due process in New York, as set forth in Matter of Uniform Firefighters of Cohoes, Local 2562, IAFF, AFL-CIO v. City of Cohoes, 94 N.Y.2d 686, 691-692, 709 N.Y.S.2d 481, 731 N.E.2d 137.

*7 Neither the parties nor Supreme Court contested the fact that St. Joseph had a constitutionally protected property interest in its operating certificate. Likewise, the majority concludes that plaintiffs have a protected property interest in St. Joseph's operating certificate, but further concludes that the procedures provided by the Legislation are constitutionally sufficient under the United States Constitution and the New York Constitution.

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

--- N.Y.S.2d ----
--- N.Y.S.2d ----, 2007 WL 2044870 (N.Y.A.D. 4 Dept.), 2007 N.Y. Slip Op. 06090
(Cite as: --- N.Y.S.2d ----)

The majority's conclusion is that a government's interest in restructuring the health care system can override the minimal requirements of notice and a hearing. I do not agree that this additional safeguard would create an overwhelming burden for the government. The history of the procedure governing such closings supports this conclusion.

Prior to the enactment of the Legislation, section 2806(6)(a) of the Public Health Law set forth the procedure to be followed by respondent New York State Health Commissioner (Health Commissioner) in revoking a hospital's operating certificate. That section afforded the Health Commissioner the right to "revoke a hospital['s] operating certificate, after taking into consideration the total number of beds necessary to meet the public need ... and after finding that ... revoking the operating certificate of such facility would be within the public interest in order to conserve health resources by restricting the number of beds and/or the level of services to those which are actually needed." The remainder of section 2806(6) sets forth a detailed procedure to be followed by the Health Commissioner, including providing notice and a hearing, before revoking any operating certificate.

Thus, as noted, Public Health Law § 2806(2) provides a hospital with a statutory right to notice of a hearing before its operating certificate may be revoked. In providing the protections afforded by that statute, the Legislature wrote: "It is the intention of the legislature to provide a mechanism to protect the rights of patients to proper health care while taking due consideration of the due process and property rights of the operators of such facilities" (L. 1978, ch. 713, § 1). The Legislature itself clearly recognized that hospital operators have property rights in their operating certificates and that they are entitled to due process when those rights are threatened.

Of course, this is the case with all manner of licenses that are issued by the State of New York (see generally O'Brien v. O'Brien, 66 N.Y.2d 576, 583-584, 498 N.Y.S.2d 743, 489 N.E.2d 712 [medical license]; Matter of Moore v. Macduff, 309 N.Y. 35, 38-39, 127 N.E.2d 741 [driver's license]; Matter of Bender v. Board of Regents of Univ. of State of N.Y., 262 App.Div. 627, 631, 30 N.Y.S.2d 779 [dental license] ). Thus, the relevant case law and the Public Health Law clearly indicate that CHS has a significant property interest in St. Joseph's operating certificate.

The Legislation at issue herein, specifically sections 9 and 11, suspends the rights to notice and the hearing guaranteed by Public Health Law § 2806(2) for a temporary period of time. The suspension of those rights is to remain in effect until June 2008, at which time St. Joseph is to be closed. In essence, the Legislature is suspending a party's right to procedural due process in order to implement a policy decision on a one-time basis.

*8 Notice, to be meaningful, must be actual notice. To close a health care facility without at least allowing the facility to explore the basis for the government's decision is a violation of constitutionally protected due process rights. St. Joseph should have been given a pretermination notice and an opportunity for a hearing. That is not to say that the Commission is required to conduct adversarial proceedings. Rather, it must publicly state its recommendations and allow those affected to explore the basis for its decisions through a hearing process. I recognize that an additional round of hearings by the Commission thus would have been required but, given the serious nature of the Commission's decision, this is the minimum necessary to satisfy plaintiffs' constitutional procedural due process rights. I am compelled to conclude that the Legislation is unconstitutional inasmuch as the Legislature suspended the requirements for revocation of a hospital's operating certificate set forth in Public Health Law § 2806 without providing even minimal procedural due process protections.

III

Further, the implementation of the Commission's recommendations violates the Presentment Clause of the New York Constitution as well as the separation of powers doctrine. The Legislation requires the Health Commissioner to carry out the Commission's recommendations unless the Governor does not approve them, which did not occur here, or the Legislature

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

--- N.Y.S.2d ----
--- N.Y.S.2d ----, 2007 WL 2044870 (N.Y.A.D. 4 Dept.), 2007 N.Y. Slip Op. 06090
(Cite as: --- N.Y.S.2d ----)

adopts a "concurrent resolution" rejecting them. The Legislature's concurrent resolution is a veto of the Commission's recommendations and must be a veto of the entirety of the Commission's recommendations.

It is apparent that the Legislation inverts the usual procedure utilized for the passage of a bill. According to the usual procedure, a bill is presented to the Governor for his or her signature or veto after passage by the Senate and the Assembly. Should the Governor sign the bill, it becomes law; should the bill be vetoed, the veto may be overridden by a two-thirds vote of the Legislature. Here, the Legislation creates a process that allows the recommendations of the Commission to become law without ever being presented to the Governor after the action of the Legislature. Further, the Governor must transmit his or her message of approval of the Commission's recommendations *before* action by the Legislature instead of *after* action by the Legislature. The Legislation then allows for a veto of the Governor's proposal by a majority vote of the Legislature rather than by a two-thirds vote, and the Governor has no right to veto such legislative action. Stated differently, the Legislature has in effect assumed the veto powers of the Governor.

IV

Although, as I have concluded, section 9 of the Legislation violates both the Presentment Clause and the separation of powers doctrine, I further note that section 10 contains a severability clause providing that, "[i]f any clause, sentence, paragraph, subdivision, section or part of this act shall be adjudged by any court of competent jurisdiction to be invalid, such judgment shall not affect, impair, or invalidate the remainder thereof, but shall be confined in its operation to the clause, sentence, paragraph, subdivision, section or part thereof directly involved in the controversy in which such judgment shall have been rendered. It is hereby declared to be the intent of the legislature that this act would have been enacted even if such invalid provisions had not been included therein."

*9 A severability clause creates the presumption that the Legislature intended the act to be divisible (*see*

*Alaska Airlines v. Brock,* 480 U.S. 678, 686, 107 S.Ct. 1476, 94 L.Ed.2d 661; *National Adv. Co. v. Town of Niagara,* 942 F.2d 145, 148). New York courts, however, have declared an entire act unconstitutional even though it contained a severability clause (*see e.g. Matter of New York State Superfund Coalition v. New York State Dept. of Envtl. Conservation,* 75 N.Y.2d 88, 94, 550 N.Y.S.2d 879, 550 N.E.2d 155). In determining whether to give effect to the severability clause, courts must look to the intent of the Legislature in including the clause in the Act. This Court has before it the affidavit of the former Majority Leader of the New York State Assembly who oversaw the debate and voting on this issue. He stated therein that he believed that neither he nor his colleagues would have voted for this legislation had it not contained the veto provision. I can only conclude therefrom that the inclusion of the veto provision permeated all the decisions made by the Legislature in enacting the Legislation. Thus, the severability clause should not be given effect because the Legislature would not have enacted the Legislation without the veto (*see Alaska Airlines,* 480 U.S. at 685, 107 S.Ct. 1476; *CWM Chem. Servs., L.L.C. v. Roth,* 6 N.Y.3d 410, 423, 813 N.Y.S.2d 18, 846 N.E.2d 448).

In refusing to credit the affidavit of the former Majority Leader, the court relied on *Civil Serv. Empls. Assn. v. County of Oneida,* 78 A.D.2d 1004, 1005, 433 N.Y.S.2d 907, *lv. denied* 53 N.Y.2d 603, 439 N.Y.S.2d 1027, 421 N.E.2d 854, in which this Court wrote that "postenactment statements or testimony by an individual legislator, even a sponsor, [are] irrelevant and [were] properly excluded." In failing to rely on the affidavit of the former Majority Leader, the majority implicitly concludes that postenactment statements cannot be considered. Such a conclusion, however, ignores the fact that "[t]his postenactment rule does not apply ... when such testimony might be appropriate in extraordinary circumstances, such as when the constitutionality of a particular measure is challenged and the existence of a discriminatory purpose, or motivation, becomes relevant" (*id.,* citing *Village of Arlington Hgts. v. Metropolitan Hous. Dev. Corp.,* 429 U.S. 252, 97 S.Ct. 555, 50 L.Ed.2d 450). Although this case does not involve the existence of any discriminatory purpose, the circumstances are clearly "extraordinary" (*id.*). The magnitude of the deprivation

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

--- N.Y.S.2d ----
--- N.Y.S.2d ----, 2007 WL 2044870 (N.Y.A.D. 4 Dept.), 2007 N.Y. Slip Op. 06090
(Cite as: --- N.Y.S.2d ----)

Page 12

and the minimal nature of the protection offered by the Legislation to the property interest of St. Joseph demand that this Court apply the exception to the postenactment rule and consider the affidavit of the former Majority Leader.

Given that the veto provision is not severable from the remainder of the Legislation, I conclude that the entire Legislation is unconstitutional for the further reasons that it violates the Presentment Clause and the separation of powers doctrine. Further, even assuming, arguendo, that the legislative veto provision was severable, I conclude that the Legislation may nevertheless constitute an improper delegation of legislative authority to the Commission (*see generally Boreali v. Axelrod,* 71 N.Y.2d 1, 9-11, 523 N.Y.S.2d 464, 517 N.E.2d 1350; *Matter of Levine v. Whalen,* 39 N.Y.2d 510, 515-516, 384 N.Y.S.2d 721, 349 N.E.2d 820).

V

**\*10** The decision whether to close a hospital can never be easy, and the Legislature and the Governor were faced with difficult choices. The procedures for approval of the Commission's recommendations set forth in the Legislation do not, however, provide the minimal procedural due process rights to which plaintiffs are entitled, and the Legislation violates the Presentment Clause of the New York Constitution and the separation of powers doctrine. Accordingly, I would reverse the order and judgment, deny defendants' cross motion for summary judgment, reinstate the amended complaint, grant plaintiffs' motion for summary judgment in part, grant judgment in favor of plaintiffs declaring that the Legislation is unconstitutional and grant the injunctive relief sought.

N.Y.A.D. 4 Dept.,2007.
St. Joseph Hosp. of Cheektowaga v. Novello
--- N.Y.S.2d ----, 2007 WL 2044870 (N.Y.A.D. 4 Dept.), 2007 N.Y. Slip Op. 06090

END OF DOCUMENT

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

**GASIOR  REPLY AFFIDAVIT  - EXHIBIT B**

Westlaw.

Not Reported in F.Supp.2d

Page 1

Not Reported in F.Supp.2d, 2001 WL 664628 (S.D.N.Y.)
**(Cite as: Not Reported in F.Supp.2d)**

**H**
West 95 Housing Corp. v. New York City Dept. of
Housing Preservation and Development
S.D.N.Y.,2001.
Only the Westlaw citation is currently available.
United States District Court, S.D. New York.
WEST 95 HOUSING CORP.; West Side 95 Manor
Associates; and Mid State Management
Corporation, Plaintiffs,
v.
NEW YORK CITY DEPARTMENT OF
HOUSING PRESERVATION AND
DEVELOPMENT; New York City Housing
Development Corporation; the City of New York;
New York State Division of Housing and
Community Renewal; Joseph B. Lynch, as
Commissioner of the New York State Division of
Housing and Community Renewal; and the State of
New York, Defendants.
**No. 01 CIV 1345 SHS.**

June 12, 2001.

OPINION AND ORDER
STEIN, District J.
*1 West 95 Housing Corp., West Side 95 Manor
Associates, and Mid State Management Corp.
(collectively, "West 95"), owners of property
developed pursuant to Article II of New York's
Private Housing Financing Law-commonly known
as the Mitchell-Lama Law-brought this action
against city and state regulatory agencies alleging
various violations of their constitutional rights in
connection with their plan to withdraw their
property from the Mitchell-Lama program. West 95
moved for a preliminary injunction, and defendants
have cross-moved to dismiss the complaint pursuant
to Fed.R.Civ.P. 12(b)(6) for failure to state a claim
upon which relief can be granted.

At a hearing on March 7, 2001, the Court denied
West 95's motion for a preliminary injunction
without prejudice to its renewal at a later date. Now,

for the reasons set forth below, the Court grants in
part and denies in part defendants' motion to
dismiss the complaint.

I. BACKGROUND

A. The Mitchell-Lama Law

The Mitchell-Lama Law was originally enacted in
1955 for the purpose of encouraging and inducing
private real estate investors to build and operate low
and middle income housing in the state of New
York. *See* N.Y. Priv. Hous. Fin. Law § 11
(McKinney's 1987). Pursuant to the law, developers
are offered long-term government-funded mortgage
loans, real estate tax abatements, and other financial
incentives to purchase property in blighted areas
and build and maintain housing projects. In
exchange, the developers agree to abide by
regulations on profits, rent increases, the tenant
selection process, and their ability to transfer the
property for so long as the property continues to
receive the benefits of the Mitchell-Lama program.
*See generally id.* §§ 11-37. In particular,
corporations organized for the purpose of building
and managing Mitchell-Lama projects must include,
in their bylaws, a provision stating that "the
company has been organized to serve a public
purpose" and that all land acquired by the
corporation "shall be deemed to be acquired,
rehabilitated, or created for the proper effectuation
of the purposes of [the Mitchell-Lama Law]." *Id.* §
13(13).

In its original form, the Mitchell-Lama law
provided that the corporations organized to build
and manage Mitchell-Lama projects-i.e., limited
profit housing companies-were prohibited from
voluntarily dissolving and withdrawing the property
from the program for a period of thirty-five years.
*See id.* § 35(1). Moreover, even after the thirty-five
year waiting period, the prior consent of the New

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                                    Page 2

Not Reported in F.Supp.2d, 2001 WL 664628 (S.D.N.Y.)
**(Cite as: Not Reported in F.Supp.2d)**

York State Commissioner of Housing or other supervising agency was required before limited profit housing companies could dissolve. *See id.* By 1960, however, the law had been amended to permit limited profit housing companies to voluntarily withdraw from the Mitchell-Lama program twenty years from the project's "occupancy date" without first seeking the consent of regulatory officials. *See id.* § 35(2). According to Senator MacNeil Mitchell, one of the principal sponsors of the law, the amendment was motivated by a legislative finding that "the prohibition of voluntary dissolution for 35 years, and then only with the consent of the housing commissioner, was the primary disincentive to private sector development." Aff. of MacNeil Mitchell, *In re Application of Winthrop Gardens, Inc.,* No. 9381/87, N.Y. Sup.Ct. Albany Co., dated Feb. 22, 1988 (Compl.Ex. 2), at ¶ 9.

### B. The Rent Stabilization Laws

*\*2* New York's Rent Stabilization Law ("RSL"), N.Y.C. Admin. Code § 26-501 et seq. (McKinney's 1987), was enacted in 1969. Pursuant to that law, limits were placed on the percentage by which rents could be raised each time an apartment is vacated or a new lease is signed. By its terms, the law excepted buildings for which a certificate of occupancy is obtained after March 10, 1969, from its limits on rent increases. *See* N.Y.C. Admin. Code § 26-504(a)(1)(d). The Emergency Tenant Protection Act of 1974 ("ETPA"), N.Y. Unconsol. Law § 8621 et seq. (McKinney's 1987), however, amended the RSL and, among other things, extended application of the RSL to buildings constructed before January 1, 1974. *See* N.Y. Unconsol. Law § 8625(a)(5); N.Y.C. Admin. Code § 26-504(b); *Central Park Assocs. v. Haynes,* 171 Misc.2d 463, 465-66, 654 N.Y.S.2D 967, 968 (N.Y.Civ.Ct. Dec. 23, 1996).

Mitchell-Lama projects are exempted from the RSL and the ETPA. *See* N.Y. Unconsol. Law § 8625(a)(3); N.Y.C. Admin. Code § 26-504(a)(1)(a). When a project withdraws from the program, however, its exemption expires. Because those laws set the "initial legal regulated rent" as that rent charged pursuant to the last effective lease or rental

agreement, *see* N.Y. Unconsol. Law § 8 626(b)(2); N.Y.C. Admin. Code § 26-512(b)(3), their application to former Mitchell-Lama projects results in an "initial legal regulated rent" based on the below-market Mitchell-Lama rents.

### C. West Side Manor and the Dispute that Led to this Case

West 95 owns West Side Manor, a middle-income rental housing development located at 70 West 95th Street, New York, NY. Compl. ¶¶ 7-10. West Side Manor was constructed as a Mitchell-Lama project in 1969 and has been in the Mitchell-Lama program since that time. *Id.* ¶¶ 15, 40-45. The New York City Department of Buildings issued a certificate of occupancy for the building on August 7, 1969; accordingly, West 95's right to withdraw the project from Mitchell-Lama pursuant to section 35(2) of the Private Housing Finance Law vested twenty years later, i.e., in August 1989. *Id.* ¶ 46.

In the summer of 2000, a dispute arose between the New York City Department of Housing Preservation and Development ("HPD") and West 95 over vacancies at West Side Manor. According to HPD, West 95's failure to timely rent apartments upon vacancy to prospective tenants who had earlier been placed on waiting lists is violative of section 3-16 of the Mitchell-Lama rules. According to West 95, however, neither section 3-16 nor any other rule requires it to rent vacant apartments. Rather, says West 95, the rules merely dictate to whom it must rent if it does elect to fill a vacancy.

In September 2000, this dispute came to a head when HPD wrote to West 95 threatening to remove and replace the Board of Directors of West 95 Housing Corp. pursuant to section 3-13 of the Mitchell-Lama rules unless West 95 provided a schedule for renting vacant apartments by October 6, 2000. Compl. Ex. 12. Rather than provide that schedule, West 95 informed HPD on October 6, 2000, that it would "immediately proceed to exercise the statutory and contractual rights granted to privatize the project." *Id.* Ex. 7. West 95 claims that since giving that notice, it has complied or has prepared to comply with every regulatory

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                                Page 3

Not Reported in F.Supp.2d, 2001 WL 664628 (S.D.N.Y.)
**(Cite as: Not Reported in F.Supp.2d)**

requirement for dissolution. Compl. ¶¶ 62-68.

*3 According to West 95, HPD has taken a series of action designed to delay or thwart the withdrawal of West Side Manor from Mitchell-Lama. First, HPD has pressed its position with respect to vacancies at West Side Manor and has scheduled a hearing with the intent of replacing the Board of Directors. *See* Compl. Ex. 13. Second, HPD has taken the position that certain provisions of a Land Disposition Agreement dated October 5, 1966 ("LDA") and the Deed to the land upon which West Side Manor was built preclude dissolution until June 25, 2002. *See id.* ¶ 85; Ex. 15. According to the complaint, however, HPD has thus far refused to identify any provision in either the LDA or the Deed that restrict the right to dissolve, and the LDA explicitly states that "Nothing expressed in or to be implied from this agreement is intended or shall be construed to prevent, foreclose or prohibit the housing company .. . [from] voluntarily dissolving the housing company pursuant to ... [the Mitchell-Lama Law]." *Id.* ¶¶ 42, 86, Ex. 3 (LDA Article IV, § 408(B), at 7083). Third, HPD's Inspector General commenced an investigation into West 95's financial affairs, which investigation, says West 95, is "selectively directed" and "patently intended to chill West 95's privatization plans and implicitly threaten sanctions against West 95" for proceeding with privatization. *Id.* ¶¶ 87-90, Ex. 16.

In response, West 95 filed this action pursuant to 42 U.S.C. § 1983 against HPD, the New York City Housing Development Corporation, and the City of New York, alleging that their actions violated or threatened to violate its rights pursuant to the Contracts Clause in Article I, section 10 of the United States Constitution, the Takings Clause of the Fifth Amendment, and the Equal Protection and Due Process Clauses of the Fourteenth Amendment. West 95 also named the New York State Division of Housing and Community Renewal ("DHCR") and the State of New York as defendants, contending that the RSL, as modified by the ETPA, violates the Contracts Clause, the Takings Clause, and the Equal Protection Clause. West 95 subsequently amended its complaint to name Joseph B. Lynch as a defendant in his official capacity as Commissioner of DHCR.

West 95 sought a preliminary injunction prohibiting HPD from conducting the hearing scheduled for the purpose of removing the board and from otherwise removing the board of directors, and defendants cross-moved to dismiss the complaint pursuant to Fed R. Civ. P. 12(b)(1) on the grounds that West 95's claims are not ripe for review and that the state defendants are immune from suit pursuant to the Eleventh Amendment and pursuant to Fed.R.Civ.P. 12(b)(6) for failure to state a claim. The city defendants also requested that the Court abstain from exercising jurisdiction over this case. At a hearing on March 7, 2001, the Court denied West 95's motion for a preliminary injunction without prejudice to its renewal at a later date. This opinion resolves defendants' motions to dismiss.

## II. DISCUSSION

### A. Subject Matter Jurisdiction

*4 Because a motion to dismiss for lack of subject matter jurisdiction pursuant to Fed.R.Civ.P. 12(b)(1) concerns a court's "very power to hear the case," that issue should be decided first. *United States ex rel. Kreindler & Kreindler v. United Tech. Corp.,* 985 F.2d 1148, 1155-56 (2d Cir.1993); *Greenberg v. Trace Int'l Holdings, Inc.,* No. 99 Civ. 0306, 1999 WL 587935, at *1 n. 1 (S.D.N.Y. Aug. 4, 1999). In resolving such a motion, a court may consider evidence outside the pleadings. *See Marakova v. United States,* 201 F.3d 110, 113 (2d Cir.2000); *Kamen v. American Tel. & Tel. Co.,* 791 F.2d 1006, 1011 (2d Cir.1986). A plaintiff bears the burden of proving the existence of subject matter jurisdiction by a preponderance of the evidence. *Marakova,* 201 F.3d at 113. In this case, defendants contend principally that none of plaintiffs' claims are ripe for review.

Ripeness is a "constitutional prerequisite to exercise of jurisdiction by federal courts." *Marchi v. Board of Coop. Educ. Servs.,* 173 F.3d 469, 478 (2d Cir.1999) (quoting *Federal Election Comm'n v. Central Long Island Tax Reform Immediately Comm.,* 616 F.2d 45, 51 (2d Cir.1980)). "Where a party seeks to challenge a statute or policy prior to

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d

Not Reported in F.Supp.2d, 2001 WL 664628 (S.D.N.Y.)
**(Cite as: Not Reported in F.Supp.2d)**

its enforcement, the ripeness doctrine requires that the challenge grow out of a 'real, substantial controversy between parties' involving a 'dispute definite and concrete." ' *Id.* (quoting *Babbitt v. United Farm Workers Nat'l Union,* 442 U.S. 289, 298 (1979)). In other words, federal courts must avoid "entangling themselves in abstract disagreements." *Abbott Labs. v. Gardner,* 387 U.S. 136, 148-49 (1967), *overruled on other grounds, Califano v. Sanders,* 430 U.S. 99 (1977). In evaluating whether a claim is ripe, a court must consider: (1) the fitness of the issues for judicial review, and (2) the injury or hardship to the parties of withholding judicial consideration. *Nutritional Health Alliance v. Shalala,* 144 F.3d 220, 225 (2d Cir.1998); *see also Abbott Labs.,* 387 U.S. at 149. West 95's claims against the city defendants and the state defendants will be examined in turn.

### 1. *West 95's claims against the city defendants are ripe with the exception of its takings claim.*

As against the city defendants, West 95 claims that (1) HPD's alleged efforts to prevent West 95 from withdrawing from the Mitchell-Lama program constitutes an impermissible interference with West 95's vested contract rights, in violation of the Contracts Clause; (2) any requirement that West 95 rent apartments that it would prefer to keep vacant constitutes an physical taking of its property without compensation in violation of the Takings Clause; (3) HPD is selectively enforcing Mitchell-Lama regulations against West 95 for no legitimate governmental purpose, in violation of the Equal Protection Clause; and (4) HPD has predetermined the outcome of the hearing regarding vacancies, in violation of the Due Process Clause. The city defendants contend that none of these claims are ripe for review because, according to them, they arise out of actions West 95 predicts they will take, and not actions they have already taken. Specifically, the city defendants note that the board has not yet been removed, none of the vacant apartments have, as yet, been leased against the wishes of West 95, and HPD has not "formally" refused to issue of Letter of No Objection to West 95's withdrawal from Mitchell-Lama.

\*5 Ordinarily, a plaintiff need not "await the consummation of threatened injury to obtain preventative relief." *Valmonte v. Bane,* 18 F.3d 992, 999 (2d Cir.1994); *accord Lipsman ex rel. Lipsman v. New York City Bd. of Educ.,* No. 98 Civ.2008, 1999 WL 498230, at \*3 (S.D.N.Y. Jul. 14, 1999). Rather, a "claim is ripe if the perceived threat due to the putatively illegal conduct ... is sufficiently real and immediate to constitute an existing controversy." *Valmonte,* 18 F.3d at 999; *Lipsman,* 1999 WL 498230, at \*3. As further explained below, however, a takings claim, by its nature, has additional ripeness requirements. Accordingly, the ripeness of West 95's takings claim will be analyzed separately.

### a. *West 95's non-takings claims against the city defendants are ripe.*

The crux of West 95's non-takings claims is that HPD is unlawfully attempting to interfere with its right to privatize by (1) unlawfully withholding the Letter of No Objection; and (2) undertaking to remove the Board of Directors at a "hearing" whose outcome is predetermined in violation of its right to due process; and (3) selectively investigating West 95 in violation of its right to equal protection of the laws. In support of these claims, West 95 has produced letters from HPD which flatly state that " HPD has concluded that the Housing Company is in violation of the Mitchell-Lama Rules and that such violation justifies removal of the Housing Company's Board of Directors" and "HPD cannot issue the letter of no objection ... [because] the LDA and Deed prohibit such dissolution at this time." Compl. Exs. 13, 15. These letters demonstrate that the threat perceived by West 95 due to the allegedly illegal conduct is "sufficiently real and immediate to constitute an existing controversy."

The city defendants attempt to blunt the effect of these letters by contending that they do not constitute sufficiently "final" decisions of HPD because there are unspecified "administrative remedies" as well as state court procedures pursuant to Article 78 of New York's Civil Practice Law and Rules available to West 95. The city defendants have not, however, identified any administrative

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d, 2001 WL 664628 (S.D.N.Y.)
**(Cite as: Not Reported in F.Supp.2d)**

procedures available with respect to HPD's refusal to issue the Letter of No Objection, and there is no indication that the HPD official presiding over the hearing regarding the vacancies-an official who ultimately reports to HPD's commissioner-is empowered to reverse HPD's longstanding interpretation of the Mitchell-Lama Rules, rather than to merely resolve any factual disputes between the agency and West 95. Moreover, even if the positions taken by HPD were not final, West 95 has demonstrated, "by more than mere allegations," that resort to additional procedures before the agency would be futile. *See Honess 52 Corp. v. Town of Fishkill,* 1 F.Supp.2d 294, 301 (S.D.N.Y.1998). Thus, the possibility that West 95 might convince HPD to reverse its position through an administrative process does not render its non-takings claims unripe.

*6 The city defendants' reference to Article 78 is similarly unavailing. Pursuant to New York law, an Article 78 proceeding is not a continuation of an administrative review process, but rather is a new proceeding challenging a decision by an administrative body or officer. *See* N.Y. C.P.L.R. § 7804; *Meachem v. Wing,* 77 F.Supp.2d 431, 442 (S.D.N.Y.1999). Thus, whether a party pursues an Article 78 action is immaterial to the determination of whether an administrative action is sufficiently final so as to be ripe for review.

West 95's non-takings claims against the city defendants are ripe not only because they are fit for review, as discussed above, but also because withholding review would work a hardship against it. In particular, the city defendants' suggestion that the Court require West 95 to complete every single step in the dissolution process-presumably including paying off West Side Manor's subsidized mortgages-and await the pro forma issuance of a "formal" rejection of its request for a Letter of No Objection would place West 95 in the position of having given up the benefits of the Mitchell-Lama program while still being subject to all lawful Mitchell-Lama regulations. The doctrine of ripeness does not require that parties engage in self-destructive behavior in order to ripen their claims.

### b. *West 95's takings claims against the city defendants are not ripe.*

Because the Fifth Amendment prohibits only uncompensated takings, a takings claim is not ripe for federal court review "until the owner has unsuccessfully attempted to obtain just compensation through the procedures provided by the State." *Villager Pond, Inc. v. Town of Darien,* 56 F.3d 375, 379 (2d Cir.1995) (quoting *Williamson County Reg'l Planning Comm'n v. Hamilton Bank,* 473 U.S. 172, 195 (1985)). An attempt to obtain relief pursuant to a state compensation procedure must be attempted even if that procedure is "unsure and undeveloped," so long as there is a colorable basis in state law for the owner to seek compensation. *Southview Assocs. v. Bongartz,* 980 F.2d 84, 99-100 (2d Cir.1992); *see also Villager Pond,* 56 F.3d at 380.

New York law permits property owners to seek compensation for municipal takings in its courts. *See Goldfine v. Kelly,* 80 F.Supp.2d 153, 161 (S.D.N.Y.2000); *see also, e.g., Ward v. Bennett (In re Ward),* 214 A.D.2d 741, 743-44, 625 N.Y.S.2d 609, 612-13 (2d Dep't 1995). Accordingly, because West 95 has not attempted to obtain compensation in state court, its takings claim against the city defendants is not ripe for review here. *See Rivervale Realty Co. v. Town of Orangetown,* 816 F.Supp. 937, 943 (S.D.N.Y.1993).

### 2. *West 95's claims against the state defendants are ripe.*

As against the state defendants, West 95 claims that (1) the RSL impairs its right to voluntarily withdraw from Mitchell-Lama in violation of the Contracts Clause; (2) the RSL constitutes a regulatory taking of its property without compensation in violation of the Takings Clause; and (3) the RSL distinguishes between Mitchell-Lama projects built before 1974 and those built after 1974 without a rational basis in violation of the Equal Protection Clause. The state defendants contend that none of these claims are ripe for review because the RSL does not yet apply to West Side Manor and they have not yet determined whether they will enforce the RSL

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d, 2001 WL 664628 (S.D.N.Y.)
**(Cite as: Not Reported in F.Supp.2d)**

against West Side Manor when it withdraws from the Mitchell-Lama program.

*7 Although the state defendants' argument might have merit if West 95 was mounting an "as applied" challenge to the RSL, West 95 has chosen to mount a facial challenge. *See* Pl.'s Mem. at 10. Facial challenges to regulation "are generally ripe the moment the challenged regulation or ordinance is passed." *Suitum v. Tahoe Regional Planning Agency,* 520 U.S. 725, 736 n. 10 (1997); *see also Kittay v. Guiliani,* 112 F.Supp.2d 342, 350 (S.D.N.Y.2000). Accordingly, West 95's facial challenges to the RSL are ripe for review.

### 3. The State of New York and the Division of Housing and Community Renewal must be dismissed from this action pursuant to the Eleventh Amendment.

The state defendants contend that they are immune from suit in federal court pursuant to the Eleventh Amendment, even where, as here, the suit seeks only injunctive relief. *See Seminole Tribe v. Florida,* 517 U.S. 44, 54-55 (1996); *Pennhurst State Sch. & Hosp. v. Halderman,* 465 U.S. 89, 99-101 (1974). West 95 responds that its claims fall under the exception to Eleventh Amendment immunity first recognized in *Ex parte Young,* 209 U.S. 123 (1908). *See Pennhurst,* 465 U.S. at 104-05.

In general, the *Young* exception applies to "suits seeking declaratory and injunctive relief against state officers" whose ongoing action or threat of action would violate federal law. *Idaho v. Coeur d'Alene Tribe,* 521 U.S. 261, 267-77 (1997). The exception does not apply, however, to suits against states or state agencies. *See, e.g., Santiago v. New York State Dep't of Corr. Servs.,* 945 F.2d 25, 31 (2d Cir.1991). Accordingly, West 95's claims challenging the RSL must be dismissed as against the State of New York and Division of Housing and Community Renewal pursuant to the Eleventh Amendment. West 95 may proceed against Commissioner Lynch in his individual capacity pursuant to the *Young* exception.

### B. Failure to State a Claim

Having resolved defendants' challenges to the Court's subject matter jurisdiction, the Court now turns to their motions to dismiss the complaint pursuant to Fed.R.Civ.P. 12(b)(6) for failure to state a claim. In deciding these motions, the Court accepts, as it must, all of the well-pleaded facts as true and draws all reasonable inferences from those allegations in favor of the plaintiff. *See Scheuer v. Rhodes,* 416 U.S. 232, 236 (1974). A complaint will survive a motion to dismiss unless "it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief." *Conley v. Gibson,* 355 U.S. 41, 45-46 (1957). Each of West 95's claims will be examined in turn.

### 1. The Contracts Clause claims

Article I, Section 10, Cl. 1 of the U.S. Constitution provides that "[n]o State shall ... pass any ... Law impairing the Obligation of Contracts." By its terms, the clause "is aimed at the legislative power of the State, and not at ... the acts of administrative or executive boards or officers." *New Orleans Waterworks v. Louisiana Sugar Refining Co.,* 125 U.S. 18, 30 (1888). In other words, whether a statute violates the contracts clause "must be determined by examining the statute itself and asking whether it breached or substantially impaired a contract or whether it required state officials to do so." *Association of Surrogate's & Supreme Court Reporters v. New York,* No. 92 Civ. 4004, 1995 WL 555777, at *2 (S.D.N.Y. Sept. 19, 1995).

*8 To state a claim for violation of the Contracts Clause, a plaintiff must allege facts sufficient to demonstrate that a state law "operated as a substantial impairment of a contractual relationship. " *General Motors Corp. v. Romein,* 503 U.S. 181, 186 (1992) (quoting *Allied Structural Steel Co. v. Spannaus,* 438 U.S. 234, 244 (1978)). There are three components to this inquiry: (1) "whether there is a contractual relationship"; (2) "whether a change in law impairs that contractual relationship"; and (3) "whether the impairment is substantial." *Id.* Even if a state law constitutes a substantial impairment,

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d

Not Reported in F.Supp.2d, 2001 WL 664628 (S.D.N.Y.)
(Cite as: Not Reported in F.Supp.2d)

Page 7

however, it will survive a Contracts Clause challenge if it serves "a significant and legitimate public purpose" and "the adjustment of 'the rights and responsibilities of contracting parties [is based] upon reasonable conditions and [is] of a character appropriate to the public purpose justifying [the legislation's] adoption." *Energy Reserves Group, Inc. v. Kansas Power & Light Co.,* 459 U.S. 400, 411-12 (1983) (quoting *United States Trust Co. v. New Jersey,* 431 U.S. 1, 22 (1977)).

With respect to the city defendants, West 95 claims that HPD's efforts to delay or prevent West Side Manor's withdrawal from the Mitchell-Lama program impair its "contractual" rights to do so. The acts complained of, however-enforcement of broadly (and allegedly unlawfully) interpreted Mitchell-Lama regulations, refusal to issue a Letter of No Objection, commencement of an audit for the purpose of harassment-are executive "acts of administrative ... officers," and not acts of legislation. Accordingly, they cannot form the basis of a claim pursuant to the Contracts Clause. *See New Orleans Waterworks,* 125 U.S. at 30.

The gravamen of West 95's Contracts Clause claim against the state defendants, in contrast, is that the RSL-a legislative act-unconstitutionally impairs its contractual rights to withdraw from the Mitchell-Lama program. Assuming without deciding, however, that West 95 has pled facts sufficient to establish the existence of a contractual relationship and an impairment of that relationship, its Contracts Clause against the state defendants nevertheless fails because it has not established that any impairment is substantial.

When considering the severity of an impairment, the Court must consider "whether the industry the complaining party has entered has been regulated in the past." *Energy Reserves Group,* 459 U.S. at 411; *accord Kraebel v. New York City Dep't of Housing Preservation and Dev.,* 959 F.2d 395, 403 (2d Cir.1992). West 95's industry-rental of residential property in New York City-has been called "heavily regulated" by the United States Court of Appeals for the Second Circuit. *See Kraebel,* 959 F.2d at 404 . Thus, West 95 "cannot claim surprise that [its contractual] relationships ... are affected by

governmental action." *Id.*

Moreover, the RSL, as amended by the ETPA, contains provisions pursuant to which property owners may apply for an adjustment of the initial legal regulated rent where there are "unique or peculiar circumstances materially affecting the initial legal regulated rent [that have] resulted in a rent which is substantially different from the rents generally prevailing in the same area for substantially similar housing accommodations." N.Y.C. Admin. Code § 26-513. Because these provisions provide a mechanism by which property owners may seek adjustments of the regulated rent to reflect market conditions, the impairment "cannot be described as substantial or severe for purposes of the contract clause" even if resort to that mechanism imposes some burden and delay. *Cf. Kraebel,* 959 F.2d at 403.

*9 Even if the RSL were to substantially impair West 95's contractual expectations, it would nevertheless survive scrutiny pursuant to the Contracts Clause because it was enacted for a legitimate state purpose-"to prevent exactions of unjust, unreasonable and oppressive rents" during a housing "emergency," *see* N.Y.C. Admin. Code § 26-501-and the mechanism cited above that ensures that initial regulated rents reflect market conditions satisfies the requirement that any adjustment of the rights of property owners be based upon " reasonable conditions." *See Energy Reserves,* 459 U.S. at 411-12; *Kraebel,* 959 F.2d at 403. Accordingly, West 95's Contracts Clause claims are dismissed.

*2. The remaining Takings Clause claims*

The Takings Clause of the Fifth Amendment prohibits the taking of "private property ... for public use, without just compensation ." U.S. Const. amend. V. In general, to state a claim pursuant to 42 U.S.C. § 1983 for violation of the Takings Clause, a plaintiff must allege facts sufficient to establish: " (1) a property interest (2) that has been taken under color of state law (3) without just compensation." *Frooks v. Town of Cortlandt,* 997 F.Supp. 438, 452 (S.D.N.Y.1998). A claim that a statute works a

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d

Not Reported in F.Supp.2d, 2001 WL 664628 (S.D.N.Y.)
**(Cite as: Not Reported in F.Supp.2d)**

Page 8

taking on its face-such as West 95's takings claim against the state defendants-however, requires more: a plaintiff "must establish that *no set of circumstances* exists under which the [challenged a]ct would be valid." *Rent Stabilization Ass'n v. Dinkins,* 5 F.3d 591, 595 (2d Cir.1993) (quoting *General Elec. Co. v. New York State Dep't of Labor,* 936 F.2d 1448, 1456 (2d Cir.1991)) (emphasis and alteration in original). The fact that a statute might work an uncompensated taking under some conceivable set of circumstances is insufficient to render it unconstitutional on its face. *Id.* (quoting *United States v. Salerno,* 481 U.S. 739, 745 (1987)).

It is beyond peradventure that application of the RSL is constitutional in at least some circumstances. *See, e.g. Federal Home Loan Mortgage Corp. v. New York State Div. of Housing & Cmty. Renewal,* 83 F.3d 45, 47-48 (2d Cir.1996). Thus, West 95's facial challenge-in essence, a claim that the law is overbroad, *see Rent Stabilization Ass'n,* 5 F.3d at 595-must fail. *See id.*

### 3. *The Equal Protection Clause claims*

West 95 asserts two distinct types of equal protections claims: (1) a claim that the RSL violates the equal protection clause on its face by distinguishing between Mitchell-Lama units built before 1974 and those built after 1974 "without a rational basis"; and (2) a claim that the city defendants are selectively enforcing Mitchell-Lama regulations against it. Each will be examined in turn.

#### a. *The RSL does not violate the Equal Protection Clause on its face.*

Although West 95 characterizes the RSL as distinguishing between classes of Mitchell-Lama buildings, on its face it does no such thing. Rather, the statute distinguishes between all buildings built before 1974 and those built thereafter. *See* N.Y. Unconsol. Law § 8625(a)(5); N.Y.C. Admin. Code § 26-504(b). The former are subject to the law; the latter are not. N.Y. Unconsol. Law § 8625(a)(5); N.Y .C. Admin. Code § 26-504(b).

*10 Where, as here, a challenged statute implicates neither a fundamental right nor a suspect class, its treatment of different classes enjoys "a heavy presumption of constitutionality." *Kittay v. Giuliani,* 112 F.Supp.2d 342, 353 (S.D.N.Y.2000). Such a statute will survive an equal protection challenge so long as "the classification scheme embodied in the [statute] is rationally related to a legitimate state interest." *Pennell v. City of San Jose,* 485 U.S. 1, 14 (1988). Moreover, the Court need not-and should not-decide whether the legislature's decision was correct; "[r]ather, 'those challenging the legislative judgment must convince the court that the legislative facts on which the classification is apparently based could not reasonably be conceived to be true by the governmental decisionmaker." ' *Minnesota v. Clover Leaf Creamery Co.,* 449 U.S. 456, 464 (1981) (quoting *Vance v. Bradley,* 440 U.S. 93, 111 (1979)).

The RSL and EPTA were enacted to combat the ill effects of a perceived housing shortage-clearly a valid governmental concern. *See* N.Y. Unconsol. Law § 8622; N.Y.C. Admin. Code § 26-501. The legislature could reasonably have concluded that the statutes' exemption from regulation of buildings built or rehabilitated after January 1, 1974, furthers that purpose because the promise of freedom from regulation encourages construction of new housing stock. Accordingly, the RSL does not violate the equal protection clause on its face.

#### b. *West 95 has stated a claim for selective enforcement.*

In order to state a claim for selective enforcement, a plaintiff must plead facts sufficient to show: (1) that it was "selectively treated" compared with others similarly situated; and (2) that the selective treatment was carried out with malicious or bad faith intent to injure. *See LaTrieste Rest. & Cabaret v. Village of Port Chester,* 40 F.3d 587, 590 (2d Cir.1994). A plaintiff may satisfy the first prong by alleging that the government suddenly began enforcement against it after a lengthy period of non-enforcement. *See id.*

West 95 has alleged that HPD had knowledge of the

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d

Not Reported in F.Supp.2d, 2001 WL 664628 (S.D.N.Y.)
(Cite as: Not Reported in F.Supp.2d)

Page 9

vacant apartments at West Side Manor for some time, and took no action to compel West 95 to rent those units. Compl. ¶ 80. However, after West 95 sought to withdraw from the Mitchell-Lama program, HPD allegedly: (1) scheduled a hearing for the purpose of removing the Board of Directors; (2) launched an audit of West Side Manor's financial records; and (3) stated that it would refuse to provide a Letter of No Objection based on purported restrictions in the LDA and Deed without identifying those restrictions or addressing express language in the LDA preserving West 95's right to withdraw. West 95 has also alleged that by these actions, the city defendants are treating it differently than other Mitchell-Lama projects, and that these actions were taken with the bad faith intent to interfere with West 95's right to withdraw from the Mitchell-Lama program. These allegations are sufficient to state a claim for selective enforcement in violation of the Equal Protection clause.

### 4. The Due Process Clause claim

*11 The essence of West 95's procedural due process claim is that HPD has predetermined the result of the hearing scheduled for the purpose of removing the Board of Directors, thus depriving it of a meaningful opportunity to be heard. Thus, West 95 is claiming not that the statutory procedures for removal of Mitchell-Lama boards are constitutionally infirm in and of themselves, but instead that HPD is acting in a manner unauthorized by the relevant statutes, rendering their protection ineffective.

Where the random, unauthorized acts of government employees deprive an individual of property or liberty, "the Due Process Clause of the Fourteenth Amendment is not violated ..., so long as the State provides a meaningful postdeprivation remedy." *Hellenic Am. Neighborhood Action Comm. v. City of New York,* 101 F.3d 877, 880 (2d Cir.1996). With respect to the unauthorized acts of employees or agencies of the City of New York, the United States Court of Appeals for the Second Circuit has explicitly held that New York's Article 78 proceeding is "a perfectly adequate postdeprivation remedy" that suffices to satisfy the

Due Process Clause. *Id.* at 881. Accordingly, West 95's due process claim is dismissed.

### C. Abstention

The city defendants contend that the Court should abstain from exercising its jurisdiction in this case pursuant to the doctrines first set forth in *Younger v. Harris,* 401 U.S. 37 (1971), *Railroad Comm'n v. Pullman Co.,* 312 U.S. 496 (1941), and *Buford v.Sun Oil Co.,* 319 U.S. 315 (1943). As the city defendants concede, however, because the Court denied West 95's motion for a preliminary injunction prohibiting HPD from conducting the hearing regarding vacancies, and that hearing has now taken place, its application for *Younger* abstention is now moot.

The city defendants' applications for *Pullman* and *Buford* abstention were directed at West 95's constitutional challenges to the RSL. All of West 95's claims related to the RSL, however, are being dismissed. Accordingly, the city defendants' applications for *Pullman* and *Buford* abstention are also moot.

### III. CONCLUSION

For the reasons set forth above, the city defendants' motion to dismiss the complaint is denied with respect to West 95's equal protection claim, and is in all other respects granted, and the state defendants' motion to dismiss the complaint is granted.

SO ORDERED:

S.D.N.Y.,2001.
West 95 Housing Corp. v. New York City Dept. of Housing Preservation and Development
Not Reported in F.Supp.2d, 2001 WL 664628 (S.D.N.Y.)

END OF DOCUMENT

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Sir:

Please take notice that the within is a true copy of

duly filed and entered in the office of the Clerk of                         County, on
the                   day of                    , 20   .

Yours, etc.,

ANDREW M. CUOMO
Attorney General,

Attorney For

Office and Post Office Address
120 Broadway, New York, N.Y. 10271

To                                                    , Esq.

Attorney for

Sir:

Please take notice that the within

will be presented for settlement and signature herein
to the Hon.
one of the judges of the within named Court, at

In the Borough of
City of New York, on the                        day of
                              20    , at        M.
Dated, N.Y.,                                       , 20

Yours, etc.
ANDREW M. CUOMO
Attorney General,

Attorney For

Office and Post Office Address
120 Broadway, New York, N.Y. 10271

To                                                    , Esq.

Attorney for

---

07-CV-3432 (CLB)(KNF)

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

JOHN E. ANDRUS MEMORIAL, INC.
(d/b/a ANDRUS ON HUDSON),

                    Plaintiff,

    - against -

RICHARD F. DAINES, as Comm'r
of the N.Y.S. Dept. of Health,

                    Defendant.

REPLY AFFIDAVIT OF JOHN
GASIOR IN SUPPORT OF
DEFENDANT'S MOTION FOR
SUMMARY JUDGMENT

ANDREW M. CUOMO
Attorney General

Attorney for............ Defendant

Office and Post Office Address
120 Broadway, New York, N.Y. 10271
Tel.   (212) 416-8570
                    Personal service of a copy of

within.....................................................

is admitted this.............................day of

.........................................................20