# AFFIDAVIT OF DAVID R. SANDMAN Ph.D

# PART 1 OF 8

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
--------------------------------------------------------------------X

JOHN E. ANDRUS MEMORIAL, INC. (d/b/a ANDRUS   :
ON HUDSON),                                              :

                             Plaintiff,             :

                                                :      Index No.
                -against-                    07-3432

                                                :

RICHARD F. DAINES, as Commissioner of the New York
State Department of Health,                  :

                            Defendant.
--------------------------------------------------------------------X

**AFFIDAVIT IN SUPPORT OF DEFENDANT'S
MOTION FOR SUMMARY JUDGMENT**

STATE OF NEW YORK   }ss.:
COUNTY OF NEW YORK }

      **DAVID R. SANDMAN, Ph.D.**, being duly sworn, deposes and says:

      1.      I am Managing Director of Manatt Health Solutions. Prior to
that, I served as the Executive Director of the New York State Commission on
Health Care Facilities in the 21st Century ("Commission"), throughout its existence.
The Commission was created by Part K of Chapter 58 of the Laws of 2005, as
added by Section 31 of Part E of Chapter 63 of the Laws of 2005 (the "Enabling
Legislation"), a copy of which is annexed hereto as Exhibit A. I am familiar with the
facts set forth herein and I make this affidavit in support of defendant's motion for
summary judgment.

      2.      Plaintiff seeks declaratory and injunctive relief to permanently
enjoin the defendants from taking any action to enforce provisions of the Enabling
Legislation, asserting that its constitutional rights as guaranteed by the United
States and New York State constitutions are being violated. As will be discussed,
the process for carrying out the Commission's duties, as outlined by the Enabling

Legislation and implemented by the Commission, provided all interested parties a
full opportunity to present their views and relevant data to the Commission and/or to
its regional advisory committees ("RACs") for their consideration.  Such
consideration was undertaken in an unbiased manner, and all interested parties
were given an equal opportunity to present data and views.

## THE COMMISSION MANDATE

3.     Section 1 of the Enabling Legislation, entitled "Legislative

findings," provides that,

> The legislature hereby finds and declares that the health care system
> in the state must first and foremost provide quality care and be
> responsive to community health care needs.  To do so, the health
> care system must have the capacity to provide this quality care in
> multiple settings within regions throughout the state.  In order to
> achieve maximum return from valued resources that have been
> invested in the health care system, those resources must also be
> aligned so that excess capacity is minimized, thereby promoting
> stability and efficiency in the health care delivery system
> infrastructure.

> The legislature further finds that it is in the interest of the state to
> undertake at this time a rational, independent review of health care
> capacity and resources in the state to ensure that the regional and
> local supply of general hospital and nursing home facilities is best
> configured to appropriately respond to community needs for quality,
> affordable and accessible care, with meaningful efficiencies in delivery
> and financing that promote infrastructure stability.  In order to
> undertake such review rationally and equitably, the legislature
> determines that it is necessary to establish a commission separate
> and apart from existing bodies responsible for the establishment and
> continued oversight of general hospitals and nursing homes, which
> shall be charged with examining the supply of general hospital and
> nursing home facilities, and recommending changes that will result in
> a more coherent, streamlined health care system in the state of
> New York.

4.     These legislative findings recognize that the presence of

excess capacity threatens the stability and efficiency of the State's health care

system.   As noted in the Commission's final report, entitled "A Plan to Stabilize

and Strengthen New York's Health Care System ("Final Report")," a copy of which

- 2 -

is available on the Commission's website at

www.nyhealthcarecommission.org/final/commissionfinal report.pdf and is attached

hereto as Exhibit B, "[e]xcess capacity in our state's health care system locks us

into a vicious cycle," which includes quality of care being jeopardized, unnecessary

utilization of services, duplication of services fueling a medical arms race,

endangerment of the health care safety net, and increased health care costs.  Final

Report, pages 48-57.

     5.     The Enabling Legislation charged the Commission with

"examining the system of general hospitals and nursing homes in New York state

and recommending changes to that system in light of factors submitted pursuant to

section five of this act and additional factors established by the commission."

Enabling Legislation § 2.

     6.     Section 5 of the Enabling Legislation set forth factors to be

considered by the Commission on its deliberations, including:

     (i)     the need for capacity in the hospital and nursing home systems in each region of the state;

     (ii)     the capacity currently existing in such systems in each region of the state;

     (iii)     the economic impact of right sizing actions on the state, regional and local economies, including the capacity of the health care system to provide employment or training to health care workers affected by such actions;

     (iv)     the amount of capital debt being carried by general hospitals and nursing homes, and the nature of the bonding and credit enhancement, if any, supporting such debt, and the financial status of general hospitals and nursing homes, including revenues from medicare, medicaid, other government funds, and private third-party payors;

     (v)     the availability of alternative sources of funding with regard to the capital debt of affected facilities and a plan for paying or retiring any outstanding bonds in accordance with the contract with bondholders;

- 3 -

(vi)    the existence of other health care services in the affected region, including the availability of services for the uninsured and underinsured, and including services provided other than by general hospitals and nursing homes;

(vii)    the potential conversion of facilities or current facility capacity for uses other than as inpatient or residential health care facilities;

(viii)    the extent to which a facility serves the health care needs of the region, including serving medicaid recipients, the uninsured, and underserved communities; and

(ix)    the potential for improved quality of care and the redirection of resources from supporting excess capacity toward reinvestment into productive health care purposes, and the extent to which the actions recommended by the commission would result in greater stability and efficiency in the delivery of needed health care services for a community.

7.    Pursuant to the Enabling Legislation, the Commission consisted of 18 statewide members and up to 36 regional members appointed by the Governor and Legislature. Enabling Legislation § 2(b), (a).

8.    The Enabling Legislation also provided for regional input. For purposes of such input, the State was divided into six regions (Long Island, New York City, Hudson Valley, Northern, Central and Western). Enabling Legislation § 7(b). Plaintiff is located in the Hudson Valley Region. The Enabling Legislation required the appointment of regional members to the Commission, who were authorized to vote only on recommendations related solely to their respective regions. Enabling Legislation § 7(a). The Enabling Legislation also required the creation of one Regional Advisory Committee ("RAC") for each region, which was required to "develop recommendations for reconfiguring its region's general hospital and nursing home bed supply to align bed supply with regional and local needs." Enabling Legislation § 7(c), (d). The RACs were required to transmit their final reports to the Commission on November 15, 2006. A copy of the Hudson Valley

- 4 -

Regional Advisory Committee Report is available at
www.nyhealthcarecommission.org/docs/final/appendix2-hudsonvalley/rac.pdf. and
is annexed hereto as Exhibit C.

9.    The Commission itself was required to "develop
recommendations for reconfiguring the state's general hospital and nursing home
bed supply to align bed supply to regional needs," and specifically to "make
recommendations relating to facilities to be closed and facilities to be resized,
consolidated, converted or restructured" in each region of the State. Enabling
Legislation § 8. The Commission was to transmit this report to the Governor and
Legislature by December 1, 2006.

10.    Section 9 of the Enabling Legislation provides that the
Commissioner of Health "shall take all actions necessary to implement, in a
reasonable, cost efficient manner, the recommendations of the Commission,"
unless the Governor fails to transmit the Final Report, along with his approval, to
the Legislature on or before December 5, 2006, or a majority of the members of
each house of the Legislature vote to adopt a concurrent resolution rejecting the
Commission's recommendations in their entirety by December 31, 2006.

11.    The Commission transmitted the Final Report to the Governor
and Legislature on November 28, 2006, and Governor Pataki transmitted the Final
Report and his approval thereof to the Legislature on November 30, 2006. A copy
of the transmittal and approval is annexed hereto as Exhibit D. The legislature did
not pass a concurrent resolution rejecting the Commission's recommendations prior
to the end of 2006.

- 5 -

## **THE COMMISSION PROCESS**

12.    The Commission, which operated independently of any existing state agency, used an approach that was both quantitative and qualitative . The Commission's decision making process was informed and driven by review of objective data and quantitative analysis.  But, the Commission's recommendations also reflected significant public input, understanding of local market conditions, and professional judgment.

13.    The Commission and its staff performed detailed analysis of each hospital and nursing home throughout the State.  Central to the Commission's quantitative analysis was its "analytic framework" and, for hospitals, its "absorption and access analysis."

14.    The analytic framework applied the factors that the Commission was required to consider under the Enabling Legislation, and required the consideration of over 40 metrics for each hospital and nursing home, reflecting six criteria:  service to vulnerable populations, availability of services, quality of care, utilization, viability and economic impact.  This framework was a starting point for focused and continual deliberations and discussions, and did not constitute final determinations of which institutions to rightsize.  The analytic framework is discussed in the Final Report, at pages 68-70. Analytic framework data relevant to nursing homes are available at www.nyhealthcarecommission.org/docs/final/appendix5-nursinghomedata.pdf and is annexed hereto as Exhibit E.

15.    A presentation by Commission staff entitled "Identifying Opportunities to Shift Long Term Care Resources," which discusses the allocation of long term care resources, is annexed hereto as Exhibit G.

- 6 -

16.    The quantitative data utilized by the Commission were primarily derived from information reported by facilities themselves on the Institutional Cost Reports submitted to the Department of Health each year. See 10 NYCRR §§ 86-1.3, 400.18.

17.    The Commission's qualitative analysis was conducted in conjunction with the RACs. Both the Commission and the Hudson Valley RAC were required by the Enabling Legislation to conduct extensive outreach to stakeholders in the region including but not limited to community-based organizations, health care providers, labor unions, payers, businesses and consumers. Enabling Legislation §§ 7(a), 8(a). In particular, the Commission and the RACs were charged with conducting formal public hearings, and fostering discussions among stakeholders. Id.

18.    The Commission and RACs conducted nineteen public hearings statewide, including three in the Hudson Valley Region. Details concerning the time and location of these hearings are annexed hereto as Exhibit H. The agendas for the public hearings, are annexed hereto as Exhibit I. Plaintiff did not choose to participate in these public hearings.

19.    Reflecting its mandate to foster discussions among stakeholders, the Commission encouraged voluntary rightsizing efforts. Philosophically, the Commission believed that "bottom-up" solutions derived by health care providers can be superior to "top-down" imposed edicts. Practically, the Commission also believed that locally developed solutions with stakeholder participation are easier to implement. In particular, the Commission offered facilities a procedure that was designed to enable facilities to engage in voluntary rightsizing discussions under the supervision of the Commission and the Department of Health without incurring antitrust liability. The memorandum to

- 7 -

facilities announcing that procedure is available at
www.nyhealthcarecommission.org/docs/voluntary_rightsizing_procedure.pdf and is
annexed hereto as Exhibit J.

      20.    Early in the Commission process facilities of interest were
identified by Commission staff. Plaintiff was identified as a possible candidate for
right-sizing and /or conversion to an assisted living program due to its low
occupancy level, recent history of patient care deficits, low care needs of its
residents and its financial problems. Another consideration was its prior decision to
seek to become an alternative care provider as a continuing care retirement
community.

      21.    As noted in the Hudson Valley RAC report, the Hudson Valley
RAC, along with Commission staff, made a point of arranging to meet with
representatives of such facilities of interest to learn each facility's perspective on
the factors leading to their being identified as right-sizing candidates.

      22.    Members of the Hudson Valley RAC and Commission staff met
with Betsy Biddle, plaintiff's executive director, on or about June 19, 2006. At that
meeting topics included plaintiff's previous attempt to convert itself into a continuing
care retirement community, reducing its nursing home bed complement to 72; its
proposal to transfer 50 beds to Beth Abraham Hospital in resolution of outstanding
debts resulting from the proposed conversion and its general finances. A copy of
Ms. Biddle's letter to Dr. Robert Amler, the Hudson Valley RAC chairperson, dated
June 23, 2006, thanking him for the meeting, is annexed hereto as Exhibit K.
Attachments to the letter included plaintiff's 2005 financial statement and an
agreement between plaintiff and Beth Abraham Hospital to transfer authority to
operate the 50 nursing home beds.

- 8 -

23.    While plaintiff did not seek further opportunity to present its views, such opportunity was available to facilities that sought to do so.

24.    For example, the Commission recommended the closure of Community Hospital of Dobbs Ferry, which was also located in the Hudson Valley Region.

25.    Community Hospital at Dobbs Ferry submitted comments to the Commission and RACs including:

-    A letter from the President and CEO of St. John's Riverside Hospital, Jim Foy, to Dr. Robert Amler, the Hudson Valley RAC chairperson, dated April 18, 2006, which thanked Dr. Amler for the opportunity to meet with the Hudson Valley RAC on April 18, 2006, and sought to explain the importance of Community Hospital at Dobbs Ferry to the Riverside Health Care System, which includes St. John's Riverside Hospital.

-    Mr. Foy again wrote to Dr. Amler on May 11, 2006, providing information requested by Dr. Amler as a further follow up to an April 7, 2006 meeting. Mr. Foy detailed the relationship of the different entities comprising the Riverside Health Care System including St. John's Riverside Hospital, Yonkers General Hospital and Community Hospital at Dobbs Ferry. The letter included numerous attachments describing the System's organization and finances.

-    Representatives of Community Hospital at Dobbs Ferry, including its President and CEO, Ronald J. Corti, met with

- 9 -

Commission staff on October 6, 2006, to explain the services

that Mr. Corti believed were essential services provided by

Community Hospital to the surrounding communities.

### THE COMMISSION'S RECOMMENDATIONS

26.    The Commission made recommendations to rightsize and

reconfigure health care facilities in each region of the state.

27.    In regard to plaintiff, the Commission recommended that

plaintiff downsize all 247 nursing home beds and add 140 assisted living program

beds and possibly other non-institutional services. Final Report, page 122.

28.    The Commission further discussed its recommendations,

stating:

> Andrus-on-Hudson is a not-for-profit, 247-bed residential health care facility that provides baseline and sub-acute services in Westchester County. Its board of trustees tried for seven years to convert their campus into a continuing care retirement community (CCRC), with independent apartments and 48 SNF beds, but was denied building rights by the town of Hastings. They currently have 176 beds occupied (71% of its certified beds, or 89% of "available beds," pending a 50-bed sale to another provider). The facility had been operating at a significant loss until 2006, and receives financial support from the Andrus Family Foundation. The home owes the foundation $13 million, but that sum may not be exchanged. The facility claims that it is now operating in the black.
>
> Andrus-on-Hudson has one of the lowest case mix indexes in the State (0.91). Of their 176 residents, about half have low-acuity conditions. These residents could be better served in an ALP, if that were available. The physical plant is old and in need of capital improvements. The facility has private rooms and baths; and therefore, its conversion to an ALP facility would be economical. The facility has a history of a high number of deficiencies (26 in its 2005 survey), many of which are attributable to the building's deteriorating condition.
>
> . . .
>
> There are opportunities to shift resources from institutions to other settings in Westchester County. The State's bed need methodology shows an excess of 653 beds. There are over 1,000 PA and PBs in the existing beds, and county occupancy was only 88% in 2004.

- 10 -

> There are too many nursing home beds and not enough appropriate residents in Westchester nursing homes. At the same time, Westchester has an unmet need for approximately 1,100 non-institutional slots.
>
> The optimal direction would be to build new ALP homes on the Andrus campus. Should that not be feasible, the Commission recommends a floor-by-floor renovation of the existing building to create ALP apartments and common space out of the nursing floors.

### THE COMPLAINT

29.     Plaintiff contests the accuracy of various data relied upon by the Commission, but these objections are misplaced and/or inconsistent with the publicly available information.

30.     Plaintiff complains that the Hudson Valley RAC used older occupancy data and did not allow for the 50 beds it was proposing to transfer. However, the RAC merely served an advisory role to the Commission and the Commission noted the proposed 50 bed transfer and the 2004 occupancy level with and without the 50 beds at issue. Also the Commission looked to the most recent data available to it when reviewing different facilities. 2005 data was not reported to the Department of Health by facilities until mid-2006, too late for consideration by the Commission. 2006 financial data could not be available until 2007, so it could not be relied upon by the Commission. However, the Commission did note and consider plaintiff's 2005 financial statement and plaintiff's representation that its operations were not losing money in 2006.

31.     Even allowing for the proposed 50 bed transfer, plaintiff had among the lowest occupancy rates in Westchester County.

32.     There was no disputing the data considered by the Commission that from 2001-2003 plaintiff had among the highest rates in Westchester for admitting low care patients, with 21% of these admissions being considered Reduced Physical Functioning A or Reduced Physical Functioning B

- 11 -

patients, the two lowest care categories. See 10 NYCRR § 86-2.30 and Appendix 13-A; Elcor Health Services v. Novello, 100 NY2d 273 (2003).[1] In 2003 plaintiff had 45 residents classified on the lowest category, Reduced Physical Functioning A.

A listing of Reduced Physical Functioning A and Reduced Physical Function B resident counts for all facilities is annexed hereto as Exhibit L.

   33. Plaintiff's 2003 case mix of 0.91, was the lowest of all nursing homes in the Hudson Valley Region, with few having CMIs below 1.1. A list of 2003 CMIs for all Hudson Valley Region nursing homes is annexed hereto as Exhibit M. On information and belief plaintiff's CMI continues to be below 1.0.

   34. Given plaintiff's low patient CMI and its past desire to provide a wider range of care as a continuing care retirement community, plaintiff appeared a particularly well suited facility for conversion. The age of its physical plant, over sixty years old, also supported for rebuilding and/or conversion to a less intense use. Also, the Commission viewed use of the facility as a single structure assisted living facility as possibly more acceptable to the local community than the proposed continuing care retirement community, which included construction of over 200 new independent living units along with the continued operation of a nursing home.

---

[1] Nursing Home resident care needs are evaluated regularly through the Patient Review Instrument ("PRI"), which must be submitted by facilities quarterly. See 10 NYCRR § 86-2.11(b). The PRI calls for information regarding a resident's condition, including medical diagnosis and treatments, activities of daily living (ADL), behavior and specialized services required, such as physical and occupational therapies during the four weeks prior to completion of the PRI. Based upon the information included on the PRI, the resident can be assigned to the appropriate Resource Utilization Group ("RUG-II") category. Nursing homes are required to submit new PRIs for all residents in their case every six months, in accordance with a schedule determined by the Department. Twice a year, at the half way point between PRI submissions for all residents in the facility, each facility must submit PRIs for all new residents admitted since the previous assessment and report all resident discharges. See 10 NYCRR § 86-2.11(b). Each RUG-II category has a weight reflecting relative service utilization. The average of this weight for all residents at a nursing home is the facility's case mix index ("CMI").

35.    The Commission's finding that plaintiff had 26 deficiencies in 2005 is an accurate depiction of that survey. The statement of deficiencies resulting from a May 2005 survey of plaintiff's operation is annexed hereto as Exhibit N and shows 26 deficiencies in the care provided to residents. For some deficiencies there are repeated violations as the care to multiple residents failed to conform to minimum standards.

36.    Finally, it should be noted that when facilities did not respond to Commission inquiries and available data indicated the facility might warrant review, the Commission explicitly recommended such review by the Commissioner of Health and, if warranted, closure, downsizing or conversions. See Commission recommendations for Sky View Rehabilitation and Health Care Center (Final Report, page 126) and Split Rock Rehabilitation and Health Care Center (Final Report, page 176).

### IMPLEMENTATION

37.    Pursuant to the Enabling Legislation, the Commissioner of Health is mandated to "take all actions necessary to implement, in a reasonable, cost efficient manner, the recommendations of the Commission," Enabling Legislation § 9.

38.    Such implementation, as well as plaintiff's request to transfer 50 beds to another nursing home, is discussed in the affidavit of Neil Benjamin, the Director of the Department of Health's Division of Health Facility Planning.

- 13 -

WHEREFORE, it is respectfully submitted that the Defendants' motion for summary judgment should be granted and the petition/complaint dismissed.

DAVID R. SANDMAN, Ph.D.

Sworn to before me this

/D day of July, 2007

NOTARY PUBLIC

MARIANELLA SANTIAGO
Notary Public, State of New York
No. 01SA4991173
Qualified in Bronx County
Commission Expires January 27, 20/ᵒ

- 14 -

# SANDMAN EXHIBIT A

# Commission on Health Care Facilities in the 21st Century

## Enabling Legislation

Section 1. Legislative findings. The legislature hereby finds and declares that the health care system in the state must first and foremost provide quality care and be responsive to community health care needs. To do so, the health care system must have the capacity to provide this quality care in multiple settings within regions throughout the state. In order to achieve maximum return from valued resources that have been invested in the health care system, those resources must also be aligned so that excess capacity is minimized, thereby promoting stability and efficiency in the health care delivery system infrastructure.

The legislature further finds that it is in the interest of the state to undertake at this time a rational, independent review of health care capacity and resources in the state to ensure that the regional and local supply of general hospital and nursing home facilities is best configured to appropriately respond to community needs for quality, affordable and accessible care, with meaningful efficiencies in delivery and financing that promote infrastructure stability. In order to undertake such review rationally and equitably, the legislature determines that it is necessary to establish a commission separate and apart from existing bodies responsible for the establishment and continued oversight of general hospitals and nursing homes, which shall be charged with examining the supply of general hospital and nursing home facilities, and recommending changes that will result in a more coherent, streamlined health care system in the state of New York.

§ 2. Commission established. (a) There is hereby created in the executive department a commission to be known as the "Commission on Health Care Facilities in the Twenty-First Century," hereafter referred to as the "commission," which shall be charged with examining the system of general hospitals and nursing homes in New York state and recommending changes to that system in light of factors submitted pursuant to section five of this act and additional factors established by the commission.

(b) The commission shall consist of eighteen statewide members, and regional members appointed pursuant to section seven of this act. The eighteen statewide members shall be appointed as follows: (i) two members shall be appointed by the temporary president of the senate; (ii) two members shall be appointed by the speaker of the assembly; (iii) one member shall be appointed by the minority leader of the senate; (iii) one member shall be appointed by the minority leader of the assembly; and (V) twelve members shall be appointed by the Governor. The Governor shall designate the chair from among the statewide members of the commission.

(c) The members of the commission shall receive no compensation for their services as members, but shall be allowed their actual and necessary expenses incurred in the performance of their duties. Members of the commission shall be considered public officers for purposes of section 17 of the public officers law. Commission members shall be subject to the same conflict of interest provisions that apply to members of the state hospital review and planning council.

(d) The commission shall begin to act forty-five days after this act shall have become a law. A quorum shall consist of a majority of the members of the commission entitled to vote on the matter under consideration. Approval of any matter shall require the affirmative vote of a majority of the members voting thereon.

(e) The commission shall adopt by-laws for the management and regulation of its affairs. Only statewide members of the commission appointed pursuant to subdivision (b) of this section shall be entitled to vote on the adoption of such by-laws.

§ 3. Appointments to commission. The legislative leaders shall submit their appointments to the governor, and the governor shall make his or her appointments, no later than forty-five days after this act becomes a law. If any such appointment is not made by such date, the appointing officer may make the appointment after that date, but the vacant appointment shall not count for calculation of a quorum until it is filled. Vacancies in the commission shall be filled in the same manner as the member whose vacancy is being filled was appointed.

§ 4. Commission staff and agency liaison. (a) The commissioner of health shall designate such employees of the department of health as are reasonably necessary to provide support services to the commission. The commission, acting by the chair of the commission, may employ additional staff and consultants, who shall be paid from amounts available to the commission for that purpose.

(b) The commissioner of health shall appoint: (i) one or more representatives of the department to serve as liaison between the department and the commission; (ii) one or more representatives of the public health council to serve as liaison between that council and the commission; and (iii) one or more representatives of the state hospital review and planning council to serve as liaison between that council and the commission. The director of the dormitory authority of the state of New York shall appoint one or more representatives of the authority to serve as liaison between the authority and the commission. All state agencies, public authorities and public benefit corporations shall provide such assistance as may be reasonably requested by the chair of the commission.

§ 5. Factors and information for consideration. (a) Factors. The commissioner of health and the director of the dormitory authority of the state of New York shall submit to the commission, no later than ninety days after this act becomes a law, a list of factors to be considered in its deliberations, which shall include:

(i) the need for capacity in the hospital and nursing home systems in each region of the state;

(ii) the capacity currently existing in such systems in each region of the state;

(iii) the economic impact of right sizing actions on the state, regional and local economies, including the capacity of the health care system to provide employment or training to health care workers affected by such actions;

(iv) the amount of capital debt being carried by general hospitals and nursing homes, and the nature of the bonding and credit enhancement, if any, supporting such debt, and the financial status of general hospitals and nursing homes, including revenues from medicare, medicaid, other government funds, and private third-party payors;

(v) the availability of alternative sources of funding with regard to the capital debt of affected facilities and a plan for paying or retiring any outstanding bonds in accordance with the contract with bondholders;

(vi) the existence of other health care services in the affected region, including the availability of services for the uninsured and underinsured, and including services provided other than by general hospitals and nursing homes;

(vii) the potential conversion of facilities or current facility capacity for uses other than as inpatient or residential health care facilities;

2

(viii) the extent to which a facility serves the health care needs of the region, including serving medicaid recipients, the uninsured, and underserved communities; and

(ix) the potential for improved quality of care and the redirection of resources from supporting excess capacity toward reinvestment into productive health care purposes, and the extent to which the actions recommended by the commission would result in greater stability and efficiency in the delivery of needed health care services for a community.

The commissioner of health and the director of the dormitory authority of the state of New York may submit additional relevant factors to be considered in the deliberations of the commission. The commission may also adopt additional factors to be considered in its deliberations.

(b) The commissioner shall also submit to the commission such information as may be available from the department of health on general hospital and nursing home capacity and services, including, but not limited to, information from:

(i) operating certificate files;

(ii) institutional cost reports;

(iii) facility occupancy reports;

(iv) annual reports of the certificate of need program; and

(v) the statewide planning and research cooperative system.

Records submitted to the commission or any committee thereof shall not be subject to disclosure pursuant to article 6 of the public officers law, unless the record would be a public record before being submitted to the commission.

§ 6. Deliberations of commission. The deliberations, meetings and other proceedings of the commission and any committee thereof shall be governed by article 7 of the public officers law, provided that, notwithstanding section 105 of the public officers law, the commission and any committee thereof shall conduct business in executive session anytime it is addressing in detail the medical, financial, or credit history of a particular general hospital or nursing home. Any one or more members of a committee may participate in a meeting of such committee by means of a conference telephone, conference video or similar communications equipment allowing all persons participating in the meeting to hear each other at the same time. Participation by such means shall constitute presence in person at a meeting. At any meetings of the commission conducted by means of a conference telephone, conference video or similar communications equipment, other than executive sessions, the public shall be given an opportunity to listen. If a meeting other than an executive session is to be conducted by means of a conference telephone, conference video or similar communications equipment, the public notice for the meeting shall inform the public that such equipment will be used, and identify the means by which the public may listen to such meeting.

§ 7. Regional input. (a) There shall be six regional members of the commission for each region established pursuant to this section. For each region, two regional members shall be appointed by the governor, two regional members shall be appointed by the temporary president of the senate, and two regional members shall be appointed by the speaker of the assembly. Regional members shall be considered to be members of the commission for purposes of this act, provided that:

3

(i) Regional members shall vote and be counted for quorum purposes only when the commission is acting on recommendations relating solely to the regional members' respective region; and

(ii) Regional members shall not be considered to be members of the commission for purposes of participation in commission meetings, except where items relating specifically to that member's region are on the agenda of a commission meeting.

(b) For purposes of this act, there shall be six regions:

(i) Long Island, consisting of Nassau and Suffolk counties;

(ii) New York City;

(iii) Hudson Valley, consisting of Delaware, Dutchess, Orange, Putnam, Rockland, Sullivan, Ulster, Westchester counties;

(iv) Northern, consisting of Albany, Clinton, Columbia, Essex, Franklin, Fulton, Greene, Hamilton, Montgomery, Otsego, Rensselaer, Saratoga, Schenectady, Schoharie, Warren, Washington counties;

(v) Central, consisting of Broome, Cayuga, Chemung, Chenango, Cortland, Herkimer, Jefferson, Lewis, Livingston, Madison, Monroe, Oneida, Onondaga, Ontario, Oswego, Schuyler, Seneca, St. Lawrence, Steuben, Tioga, Tompkins, Wayne, Yates counties; and

(vi) Western, consisting of Allegany, Cattaraugus, Chautauqua, Erie, Genesee, Niagara, Orleans, Wyoming counties.

(c) The commission shall establish a regional advisory committee for each region. The maximum number of members of each regional advisory committee shall be determined by the commission. Members of each regional advisory committee shall be appointed in equal numbers by the governor, the temporary president of the senate and the speaker of the assembly. The appointing officers shall submit to the commission their appointments to the regional advisory committees no later than ninety days after this act shall have become a law. If any such appointment is not made by such date, the appointing officer may make the appointment after that date, but the vacant appointment shall not count for calculation of a quorum until it is filled. Vacancies in regional advisory committees shall be filled in the same manner as the member whose vacancy is being filled was appointed. The regional advisory committees shall begin to act ninety days after this act shall have become a law.

. (d) Each regional advisory committee shall develop recommendations for reconfiguring its region's general hospital and nursing home bed supply to align bed supply with regional and local needs. In carrying out its functions, a regional advisory committee shall foster discussions among, and conduct formal public hearings with requisite public notice to solicit input from, local stakeholder interests, including but not limited to community-based organizations, health care providers, labor unions, payers, businesses and consumers. In developing its recommendations, each regional advisory committee shall as far as practicable estimate the efficiencies that may be derived from such hospital and nursing home reconfiguration. On November 15, 2006, each regional advisory committee shall transmit to the commission a report containing its recommendations, which shall include specific recommendations for facilities to be closed and specific recommendations for facilities to be resized, consolidated, converted, or restructured. Such recommendations shall include: (i) recommended dates by which such actions should occur; (ii) necessary investments, if any, that should be made in each case to carry out the regional advisory committee's recommendations, including any necessary workforce, training, or other investments to ensure that remaining facilities are able to adequately provide services within the context of a restructured institutional provider health care system in such region; and (iii) the regional advisory

4

committee's justification for its recommendations, including the use of any factors developed pursuant to section five of this act.

(e) The failure of any regional advisory committee to perform the duties imposed by this section shall not affect the obligation of the commission to perform the duties imposed by section eight of this act.

§ 8. Commission recommendations. (a) The commission shall develop recommendations for reconfiguring the state's general hospital and nursing home bed supply to align bed supply to regional needs. Recommendations referencing closing, resizing, consolidation, conversion, or restructuring in a specific region shall not reference more than one region. In carrying out its functions, the commission shall collaborate with the regional advisory committees insofar as practicable to foster discussions among, and conduct formal public hearings with requisite public notice to solicit input from, statewide and regional stakeholder interests, including but not limited to community-based organizations, health care providers, labor unions, payers, businesses and consumers. The commission shall formally solicit recommendations from health care experts, county health departments, community-based organizations, state and regional health care industry associations, labor unions and other interested parties in each region of the state, and it shall take into account such recommendations and the recommendations of the regional advisory committees during its deliberations. In developing its recommendations, the commission shall as far as practicable estimate the efficiencies that may be derived from such hospital and nursing home reconfiguration, and shall consider the recommendations of the regional advisory committees.

(b) The commission shall make recommendations relating to facilities to be closed and facilities to be resized, consolidated, converted, or restructured, within each region. The regional commission members for a particular region shall vote as members of the commission only when the commission is acting on recommendations relating solely to that region.

(c) Such recommendations shall include: (i) recommended dates by which such actions should occur; (ii) necessary investments, if any, that should be made in each case to carry out the commission's recommendations, including any necessary workforce, training, or other investments to ensure that remaining facilities are able to adequately provide services within the context of a restructured institutional provider health care system; (iii) the commission's response to the recommendations of the regional advisory committees; and (iv) the commission's justification for its recommendations, including the use of the factors pursuant to section five of this act.

(d) In addition, the commission may include in its report: (i) recommendations on a streamlined regulatory processes to address the provision of needed community health services; (ii) recommendations for changes to the hospital and nursing home reimbursement systems to facilitate the transition to a restructured institutional provider system and to ensure that health care services other than those provided by general hospitals and nursing homes are adequately reimbursed, including recommendations to address the capital and operating costs of closing, resizing, consolidation, conversion or restructuring; and (iii) a summary of recommendations made to the commission by health care experts, community based organizations, county health departments, state and regional health care industry associations, labor unions, and others that were not included in the commission's recommendations.

(e) On or before December 1, 2006, the commission shall transmit to the governor and the legislature a report containing its recommendations, which shall include specific recommendations for facilities to be closed and specific recommendations for facilities to be resized, consolidated, converted, or restructured.

5

§ 9. Implementation of recommendations. (a) Notwithstanding any contrary provision of law, rule or regulation related to the establishment, construction, approval, suspension or revocation of the operating certificates, closure, resizing, consolidation, conversion or restructuring of the general hospitals or nursing homes identified in the commission's recommendations, including but not limited to sections 2801-A, 2802, 2805, 2806, and 2806-B of the public health law, the commissioner of health shall take all actions necessary to implement, in a reasonable, cost-efficient manner, the recommendations of the commission pursuant to subdivisions (b) and (c) of section eight of this act, including, but not limited to: (i) coordination with local government officials and health departments, management and labor representatives of affected facilities, and other parties as the commissioner deems appropriate; (ii) the rescission of operating certificates and establishment approvals issued to those facilities selected for closure by the commission; (iii) expediting consideration of such applications for consolidation, conversion or restructuring of existing health care providers as are submitted in accordance with the recommendations of the commission, provided, however, that the commissioner of health may administratively approve such applications when such approvals are, as determined by the commissioner of health, necessary to ensure continuity of essential health care services; and (iv) reflecting such recommendations in the administration of funds available pursuant to section 2818 of the public health law. Such facilities shall submit to the commissioner of health, at a time and in a form as determined by the commissioner of health, an acceptable plan of resizing, closure, conversion, consolidation or restructuring in accordance with applicable regulations. The commissioner of health shall take all steps necessary to protect patient safety and preserve patient medical records.

(b) The provisions of subdivision (a) of this section shall not apply: (i) unless the governor has transmitted the commission's report under section eight of this act with his or her written approval of the recommendations of the commission pursuant to subdivisions (b) and (c) of section eight of this act to the commissioner of health and transmitted a message to the legislature stating his or her approval of the report on or before December 5, 2006; and (ii) if a majority of the members of each house of the legislature vote to adopt a concurrent resolution rejecting the recommendations of the commission pursuant to subdivisions (b) and (c) of section eight of this act in their entirety by December 31, 2006, after receiving a message from the governor under this subdivision. In no event shall the commissioner of health begin to implement the recommendations of the commission pursuant to subdivisions (b) and (c) of section eight of this act prior to December 31, 2006. Provided, however, that nothing herein shall be construed as limiting the authority of the commissioner of health to enforce or implement any provision of the public health law relating to the establishment or licensure of hospitals, as defined by section 2801 of the public health law.

§ 10. Severability clause. If any clause, sentence, paragraph, subdivision, section or part of this act shall be adjudged by any court of competent jurisdiction to be invalid, such judgment shall not affect, impair, or invalidate the remainder thereof, but shall be confined in its operation to the clause, sentence, paragraph, subdivision, section or part thereof directly involved in the controversy in which such judgment shall have been rendered. It is hereby declared to be the intent of the legislature that this act would have been enacted even if such invalid provisions had not been included herein.

§ 11. This act shall take effect immediately, provided that sections two through eight of this act shall expire and be deemed repealed December 31, 2006, and sections nine and ten of this act shall expire and be deemed repealed June 30, 2008.

# SANDMAN EXHIBIT B

# A Plan to Stabilize and Strengthen New York's Health Care System



## FINAL REPORT
### *of the*
## COMMISSION ON HEALTH CARE FACILITIES IN THE 21ST CENTURY

December 2006

**Commission on Health Care Facilities
in the 21st Century**
90 Church Street • New York, New York 10007

www.nyhealthcarecommission.org

# COMMISSION ON HEALTH CARE FACILITIES IN THE 21st CENTURY

**Chair**

Stephen Berger

**Vice Chair**

Robert Hinckley

**Statewide Members**

Leo Brideau

Craig Duncan

Robert Gaffney

Rosa Gil, DSW

Howard Howlett, Jr.

Darlene Kerr

Ruben King-Shaw, Jr.

Mark Kissinger

Patrick Lee

Kristin Proud

Neil Roberts

Teresa Santiago

Buford Sears

Albert J. Simone, Ph.D.

Bishop Joseph Sullivan

Peter Velez

**Regional Members**

*Central Region:*
Stephen Albertalli
Susan Crossett
Jeffery Davis
Bonnie DeVinney
Patrick Mannion
Herbert Marshall

*Hudson Valley:*
Robert Doar
R. Abel Garraghan
William Mooney, Sr.
Arthur Weintraub
Lelia Wood-Smith

*Long Island:*
Patricia Acampora
Bert Brodsky
Richard Guardino, Jr.
Kim Kubasek
Donna M. O'Brien
John O'Connell

*New York City:*
Martin Begun
John F. Haggerty
Andrew Sichenze
Jerry Weber

*Northern:*
Peter Capobianco
Dorothy Harris
Arthur Spiegel

*Western:*
Paul Boylan
Carol Cassell
Judge Joseph Mattina
Heidi Nauleau
Sister Mary Ann Schimscheiner
Henry Sloma

**Commission Staff**

David Sandman, Ph.D.
Executive Director

Mark Ustin
Deputy Director and General Counsel

*Senior Policy Analysts:*
Vincent Fitts
Hilton Marcus
Barbara McRedmond
Janette A. Simms

*Special Assistants:*
Shirley Chen
Shavon Foskey

# TABLE OF CONTENTS

Prologue ........................................................................................................................... 1
Executive Summary ........................................................................................................ 4

I. Dynamism of New York's Health Care System ...................................................... 19
    Catching Up to Change ............................................................................................ 19
    Hospital and Nursing Home Closures ..................................................................... 20

II. Instability of the System ......................................................................................... 29
    Hospital System Fiscal Instability .......................................................................... 29
    Nursing Home System Fiscal Instability ................................................................ 35

III. Excess Capacity ..................................................................................................... 48
    New York State Has Too Many Hospital Beds ....................................................... 48
    Regions of New York State Have Too Many Nursing Home Beds ........................ 51
    New York State Has Too Few Home- and Community-Based Alternatives to Nursing Homes ........................................................................................................................... 54
    What's Wrong With Excess Capacity? .................................................................... 54
    Excess Capacity Jeopardizes Quality of Care ........................................................ 55
    Excess Capacity Promotes Unnecessary Utilization of Services ............................ 56
    Excess Capacity Duplicates Services and Hinders Collaboration .......................... 56
    Excess Capacity Threatens Safety Net Services ..................................................... 57
    Excess Capacity Increases Costs ............................................................................. 57

IV. Adapting to and Managing Change ....................................................................... 58
    Framework for Solutions – Producing Maximum Efficiencies .............................. 59
    Benefits of Closure and Consolidation ................................................................... 59
    Impact of Closures: What Does The Evidence Say? .............................................. 60

V. Commission Process and Methodology .................................................................. 64
    Commission Approach ............................................................................................. 65
    Commission Structure .............................................................................................. 65
    Regional Definitions and Representation ................................................................ 65
    Regional Advisory Committees ............................................................................... 67
    Local Input and Community Outreach ..................................................................... 67
    Analytic Framework ................................................................................................ 68
    Absorption and Access Analysis (AAA) ................................................................ 70
    Voluntary Rightsizing Efforts ................................................................................. 71

VI. Policy Recommendations ...................................................................................... 73
    A. Reimbursement and Medicaid ............................................................................ 73
    B. The Uninsured .................................................................................................... 75
    C. Developing Primary Care Infrastructure ............................................................ 77
    D. Developing Hybrid Delivery Models .................................................................. 79
    E. State University of New York (SUNY) Hospitals ............................................... 80

F. Healthcare Workforce Development ......................................................................... 81
G. Information Technology .......................................................................................... 82
H. County Nursing Homes............................................................................................ 83
I. Niche Providers ........................................................................................................ 84
J. Roadmap for the Future: Continuation of the Commission's Work ....................... 85

VII. Recommendations for Facility Rightsizing and Reconfiguration ......................... 86
Preface to Recommendations........................................................................................ 86

Central Region - Acute Care Recommendations ........................................................ 91
    Recommendation 1 - Crouse Hospital (Onondaga County) and University Hospital, SUNY
    Upstate Health Science Center (Onondaga County)....................................................... 91
    Recommendation 2 - Auburn Hospital (Cayuga County)...................................................... 94
    Recommendation 3 - St. Joseph's Hospital (Chemung County) and Arnot Ogden Medical
    Center (Chemung County)............................................................................................... 96
    Recommendation 4 - Albert Lindley Lee Hospital (Oswego County) .................................. 99

Central Region - Long Term Care Recommendations ........................................................ 101
    Recommendation 1 - Van Duyn Home and Hospital (Onondaga County) and Community
    General Hospital's Skilled Nursing Facility (Onondaga County)........................................ 101
    Recommendation 2 - Mercy of Northern New York (Jefferson County)............................ 103
    Recommendation 3 - Willow Point (Broome County) ....................................................... 105
    Recommendation 4 - Lakeside Nursing Home (Tompkins County) ................................... 106
    Recommendation 5 - United Helpers, Canton (St. Lawrence County).............................. 107

Hudson Valley Region Acute Care Recommendations ........................................................ 109
    Recommendations 1 - Kingston Hospital (Ulster County) and Benedictine Hospital (Ulster
    County) ........................................................................................................................... 109
    Recommendation 2 - Sound Shore Medical Center (Westchester County) and Mt. Vernon
    Hospital (Westchester County).......................................................................................... 111
    Recommendation 3 - Orange Regional Medical Center (Orange County)......................... 114
    Recommendation 4 - Community Hospital at Dobbs Ferry (Westchester County) ........... 115
    Recommendation 5 - Westchester Medical Center (Westchester County)......................... 118

Hudson Valley Region Long-Term Care Recommendations ................................................ 121
    Recommendation 1 - The Valley View Center for Nursing Care and Rehab (Orange) ..... 121
    Recommendation 2 - Andrus-on-Hudson (Westchester)..................................................... 122
    Recommendation 3 - Taylor Care Center (Westchester)..................................................... 124
    Recommendation 4 - Achieve Rehabilitation (Sullivan)..................................................... 125
    Recommendation 5 - Sky View Rehabilitation and Health Care Center (Westchester)..... 126

Long Island Region Acute Care Recommendations............................................................... 128
    Recommendation 1 - Eastern Long Island Hospital (Suffolk County), Southampton Hospital
    (Suffolk County), Peconic Medical Center (Formerly Central Suffolk) (Suffolk County),
    Brookhaven Memorial Medical Center (Suffolk County), and University Hospital at Stony
    Brook (Suffolk County)..................................................................................................... 128

Recommendation 2 - University Hospital at Stony Brook (Suffolk County)...................... 132
Recommendation 3 - St. Charles Hospital (Suffolk County) and J.T. Mather Memorial
Hospital (Suffolk County) ................................................................................................ 134
Recommendation 4 - Nassau University Medical Center (Nassau County)........................ 137
Recommendation 5 - Long Beach Medical Center (Nassau County)................................... 140

Long Island Region Long-Term Care Recommendations....................................................... 143
Recommendation 1 - A. Holly Patterson Extended Care Facility (Nassau County) .......... 143
Recommendation 2 - Cold Spring Hills Center for Nursing and Rehabilitation (Nassau
County) .............................................................................................................................. 145
Recommendation 3 - Brunswick Hospital Center, Inc. (Suffolk County)........................... 146

New York City Region Acute Care Recommendations ........................................................... 149
Recommendation 1 - New York Methodist Hospital (Kings County) and New York
Community Hospital of Brooklyn (Kings County) ............................................................ 149
Recommendation 2 - Victory Memorial Hospital (Kings County) ...................................... 151
Recommendation 3 - Peninsula Hospital Center (Queens County) and St. John's Episcopal
Hospital South Shore (Queens County)............................................................................. 153
Recommendation 4 - Queens Hospital Center (Queens County) ........................................ 156
Recommendation 5 - Parkway Hospital (Queens County).................................................. 157
Recommendation 6 - New York Westchester Square Medical Center (Bronx County) .... 159
Recommendation 7 - Cabrini Medical Center (New York County)..................................... 160
Recommendation 8 - Beth Israel Medical Center - Petrie Campus (New York County)... 164
Recommendation 9 - North General Hospital (New York County) ..................................... 164
Recommendation 10 - St. Vincent's Midtown Hospital (New York County) and St.
Vincent's Manhattan (New York County) ......................................................................... 167
Recommendation 11 - New York Downtown Hospital (New York County)....................... 170
Recommendation 12 - Manhattan Eye Ear and Throat Hospital (New York County)....... 174

New York City Long-Term Care Recommendations .............................................................. 176
Recommendation 1 - Split Rock Rehabilitation and Health Care Center (Bronx)............. 176

Northern Region Acute Care Recommendations..................................................................... 180
Recommendation 1 - Bellevue Woman's Hospital (Schenectady County)......................... 180
Recommendation 2 - St. Clare's Hospital (Schenectady County) and Ellis Hospital
(Schenectady County)....................................................................................................... 182

Northern Region Long-Term Care Recommendations............................................................ 186
Recommendation 1 - Ann Lee Infirmary and Albany County Home (Albany) ................. 186
Recommendation 2 - The Avenue and The Dutch Manor (Schenectady County) ............. 187
Recommendation 3 - Glendale Home (Schenectady County) ............................................ 189

Western Region Acute Care Recommendations...................................................................... 191
Recommendation 1 - Millard Fillmore Hospital – Gates Circle (Erie County)................. 191
Recommendation 2 - St. Joseph Hospital of Cheektowaga, New York (Erie County) ...... 193
Recommendation 3 - DeGraff Memorial Hospital (Niagara County) ................................ 194

Recommendation 4 - Sheehan Memorial Hospital (Erie County) ....................................... 195
Recommendation 5 - Erie County Medical Center/Erie County Medical Center Corporation
(Erie County) and Buffalo General Hospital/Kaleida Health (Erie County) ...................... 198
Recommendation 6 - Lockport Memorial Hospital (Niagara County) and Inter-Community
Memorial Hospital at Newfane (Niagara County) ................................................................ 203
Recommendation 7 - Bertrand Chaffee Hospital (Erie County), TLC Health Network - Lake
Shore Hospital (Chautauqua County), TLC Health Network - Tri-County Memorial
Hospital (Cattaraugus County), Brooks Memorial Hospital (Chautauqua County) and
Westfield Memorial Hospital (Chautauqua County) ........................................................... 205
Recommendation 8 - Mount St. Mary's Hospital and Health Center (Niagara County) and
Niagar Falls Memorial Medical Center (Niagara County) ................................................... 209

Western Region Long-Term Care Recommendations ............................................................ 212
Recommendation 1 - Mount View Health Facility (Niagara County)................................. 212
Recommendation 2 - Nazareth Nursing Home and Mercy Hospital Skilled Nursing Facility
(Erie County) ........................................................................................................................ 213
Recommendation 3 - Williamsville Suburban, LLC (Erie County) ................................... 216
Recommendation 4 - DeGraff Memorial Hospital Skilled Nursing Facility (Niagara County)
and Millard Fillmore Gates Circle Skilled Nursing Facility (Erie County)......................... 217

VIII. Financing........................................................................................................................... 219
Potential Benefits and Reinvestment Opportunities for Providers .......................................... 220
Potential Savings for Payors .................................................................................................. 221
Total Benefits and Savings: ................................................................................................... 225
Potential Costs: General Principles......................................................................................... 225
Potential Cost Categories: Closure, Construction & Affiliation.............................................. 226
Funding: Principles for Investment.......................................................................................... 230

## APPENDICES

Appendix 1 - Regional Advisory Committee Members
Appendix 2 - Regional Advisory Committee Reports
        Central
        Hudson Valley
        Long Island
        New York City
        Northern
        Western
Appendix 3 - Briefing on Acute Care Reimbursement
Appendix 4 - Briefing on Long-term Care Reimbursement
Appendix 5 - Data
        Analytic Maps
        Analytic Framework Data
        Absorption and Access Analysis

## LIST OF FIGURES

Figure 1: Hospital Operating Margins, New York State and United States, 1996-2004.............. 30
Figure 2: Hospital Operating Margins by Region, 2004....................................................... 31
Figure 3: Nursing Homes with Operating Losses, 1997-2004 ...................................................... 35
Figure 4. Distribution of Uninsured by Race/Ethnicity for New York State, Nonelderly, 2002-
2003.......................................................................................................................................... 37
Figure 5: Estimated Number of Assisted Living Facilities in the United States, 1995-2000....... 39
Figure 6: New York State and National Hospital Length of Stay, 1994-2004 ............................. 42
Figure 7: New York State Hospital Length of Stay by Region, 2004 .......................................... 43
Figure 8: New York State Nursing Homes Average Length of Stay, 1996-2003 ........................ 44
Figure 9: Percentage of Nursing Home Residents able to Independently Perform Activities of
Daily Living ............................................................................................................................... 45
Figure 10. Hospital Licensed and Available Bed Occupancy Rates, 1994 to 2004 ..................... 49
Figure 11. Hospital Licensed Bed Occupancy Rates by Region, 2004 ........................................ 50
Figure 12. Hospital Available Bed Occupancy Rates by Region, 2004 ........................................ 50
Figure 13. Nursing Home Licensed Bed Occupancy Rates, 1994 to 2004.................................... 51
Figure 14. Nursing Home Licensed Bed Occupancy Rates by Region, 2003 (Adjusted for partial
years)......................................................................................................................................... 52
Figure 15. New York State Counties with LTC Resource Shift Opportunities............................. 53
Figure 16. Commission Regions.................................................................................................... 66

## LIST OF TABLES

Table 1. New York State Hospital Closures since 1983 ............................................................... 21
Table 2. New York State Nursing Home Closures since 1983..................................................... 23
Table 3. Nursing Home Sponsorship............................................................................................ 28
Table 4. Statewide Ranking of Hospitals with Limited Access to Capital.................................... 33
Table 5. New York State Hospital Medians Compared to Rating Agency Medians..................... 34
Table 6. Uninsured in New York City and New York State, Nonelderly, 2002-2003 ................. 37
Table 7. Number of Medicaid Waiver Clients in Residential Settings......................................... 40
Table 8. Employment and Wages of Registered Nurses by State, May 2005 .............................. 46
Table 9. Nursing Home Staff Turnover, 2002 ............................................................................. 46
Table 10. Beds Per 1,000 Population – Selected States................................................................ 48
Table 11. Public Hearings by Region .......................................................................................... 68
Table 12. Commission Framework Criteria Metric....................................................................... 69

## PROLOGUE

The Commission on Health Care Facilities in the 21st Century was created to review and strengthen New York State's acute and long term care delivery systems. Systems, by definition, are comprised of multiple parts that form a unified whole. Such definition does not apply to New York's health care industry where we confront a fragmented patchwork of health care resources. Some areas of our state have excess health care resources while others have shortages. We have widespread and unnecessary duplication of services. We have too much institution-focused care and not enough home and community based options. We have too few primary care resources to keep people well and out of the hospital. We spend extravagantly on health care and yet still leave too many without adequate access to the health care they need. We have yet to come to grips with changes in medicine that render parts of a massive bricks-and-mortar infrastructure obsolete.

Our hospitals and nursing homes, as described in this report, are in dangerously unstable condition. Years of chronic losses and growing numbers of empty beds have led some hospitals to close their doors and others are on the brink of collapse. Even the relatively "successful" hospitals that manage to break-even or eke out a modestly positive margin do not have sufficient resources to reinvest and maintain the high-quality, modern health care that New Yorkers deserve. A growing percentage of nursing homes are losing money from operations. It is not in the best interests of patients to rely on health care providers in such financial straits, and closures due to market forces alone threaten ongoing access to quality care, especially for the State's most vulnerable residents.

Hovering over the instability of our hospital and nursing home providers is a growing problem of affordability. New York should be proud of having one of the largest and most generous Medicaid programs in the nation. It is a very costly program to maintain, however, and its costs are rising at an unsustainable rate. The total cost of the Medicaid program has nearly doubled over the last decade to approximately $45 billion per year. Medicaid is a crippling budget item for the state and many counties. Upstate counties, which lack broad tax bases but have growing Medicaid populations, are particularly struggling under these cost burdens. We must regain control over Medicaid costs and spend more wisely to maintain health care services without crowding out our ability to finance other important social needs.

1

In fulfilling its mandate, the Commission had to face difficult choices. Decisions to reconfigure or close health care institutions are never simple or without controversy. Even when a closure will have no adverse impact on health care delivery and makes enormous economic sense, history has shown that opposition may arise. Such feelings of institutional loyalty are understandable. There are many groups, organizations, and individuals with personal, and often financial, interests in local hospitals. The Commission carefully considered community issues in its deliberations. The Commission also recognizes that our current predicament is in part a result of past failures to make honest and hard choices. We will not get to a better place until we confront our problems head-on and take action that is in the best interests of the entire system and its patients. An orderly transition that respects the needs of health care workers and communities affected by the recommendations in this report is required.

The work of this Commission is a start, not an end, to the facility rightsizing process. Additional opportunities to remove excess capacity exist but cannot be realized absent changes in reimbursement, reductions in length-of-stay, broader availability of non-institutional services, and removal of other obstacles. The Commission made responsible choices given real-world constraints. More can and should be done if circumstances change.

The recommendations in this report are a step in what must be a broader process to reconfigure our health care system. It is beyond the practical scope of a single Commission to address or resolve all of the state's health care issues. Yet, we are impressed by the various important agendas that have been presented to the Commission and which must be addressed in future initiatives. Structured decisions about health care resource allocations must be continuous rather than a one-shot phenomenon. Issues of the uninsured, mental health, and primary care development should be at the forefront of an ongoing reform agenda.

It has been a privilege to examine New York State's health care system and develop immediate and long-term agendas for change. We are grateful to the members of the Commission and the regional advisory committees who volunteered their time and talents to this important work. The Commission's staff worked with great dedication and professionalism. The Department of Health, Dormitory Authority of the State of New York, Division of the Budget, and other agencies provided tremendous support. Our thanks go to the numerous members of the public, providers, and organizations that engaged in this process, provided vital information, and helped shape our thinking. By working together, we are confident that New York will seize the

2

opportunity to build a health care system that is stronger, better, fairer, more affordable and that meets the needs of communities.

Stephen Berger                                  David Sandman, Ph.D.

Chairman                                        Executive Director

## EXECUTIVE SUMMARY

### A System in Crisis

The Commission on Health Care Facilities is a nonpartisan panel established to review New York State's acute and long-term care systems. New York is home to some of the world's finest and most sophisticated hospitals. We have superb nursing homes that provide advanced and humane care to our sickest and most frail residents. We have a strong and growing foundation of non-institutional care providers. Our health care providers employ a skilled and dedicated workforce. The State has a historic commitment to ensuring access to care for its most vulnerable citizens and we expend vast sums of public resources on health care. Public and private initiatives are underway to further improve access, improve quality of care, and produce greater value for the dollars spent on health care services.

Despite these strengths, the Governor and Legislature recognized the need for improvements and thus established the Commission. The challenges facing our system developed over a long period and cannot be linked to a single time or policy. Similarly, these problems will not be solved overnight; solutions will require sustained efforts.

The Commission reaches a stark and basic conclusion: our state's health care system is broken and in need of fundamental repairs. Today, New York is struggling to maintain a 20th century institutional infrastructure in the face of mounting costs, excess capacity, and unmet needs for community-based alternatives. Weaknesses in our system are readily apparent:

- Turbulence afflicts our health care providers; facility closures and declarations of bankruptcy are too common. Since 1983, 70 hospitals and over 63 nursing homes have closed in New York State. Some of our oldest and proudest names in health care struggle under the unintended consequences of bankruptcy proceedings. Patient access to stable health care services is at risk.
- Our health care providers are in weak financial condition. For the past eight years, the state's hospitals as a group have lost money. A majority of the state's nursing homes, even some that are fully occupied, operate at a loss. Such losses cannot be sustained indefinitely.

4

- Negative or inadequate fiscal margins limit the ability of providers to reinvest in their systems, obtain the latest technologies, access capital, and upgrade their physical plants. Many of our hospitals and nursing homes are outdated and in need of capital improvements.

- Hospital average lengths of stay have decreased but remain unacceptably and unjustifiably long in many parts of the state.

- Too many New Yorkers – almost one in five nonelderly residents – continue to lack health insurance coverage and face barriers to care and worse health outcomes as a result.

- Virtually every region of the state has an unmet need for additional home and community-based services. As consumer preferences change and technology advances, this gap could widen.

- Primary care capacity is insufficient, so that some patients go without preventive and basic services. Inadequate primary care worsens health care status, allows chronic conditions to go unmanaged, and results in back-end care that is more costly and less beneficial than front-end services.

- Our Medicaid program, already the largest and most expensive in the nation, is growing at an unsustainable rate.

- Reimbursement mechanisms distort patterns of service delivery and induce facilities to pursue high margin services, sometimes at the expense of more essential community needs. The current rate paradigm is encouraging a medical arms race for duplicative provision of high-end services and discouraging the provision of preventive, primary, and other baseline services.

### Why We Must Act Now

From crisis arises opportunity. It is not too late to restructure New York's health care delivery system. The time to act, however, is now. Absent intervention, the Commission believes that the future of our state's health care system is bleak. Unless we act decisively, further facility closures and bankruptcies are almost certain to occur. Moreover, the facilities that close due to market forces alone may be the ones most critical to preserving access.

5

Without intervention, our providers will spiral further into debt and be forced to make difficult decisions to cut services and lay off workers. Without change, our providers will lack the financial stability needed to invest in new technologies and remain on the cutting edge of modern health care. Unless we shift course, health care expenditures will rise at unsustainable rates, further burden our taxpayers, and cripple our ability to devote resources to the full array of public needs including education, housing, and transportation.

Confronting and solving these problems will require difficult, perhaps unpopular, decisions and strong leadership from our elected officials and others. There is no other responsible choice. We cannot deny reality, bury our heads in the sand, or cling to established patterns. We must overcome our reliance on outdated institutions and strengthen those that remain. New Yorkers deserve and demand a 21st century health system that is more flexible, leaner, stronger and more affordable than the one we have today.

### Excess Capacity Weakens Our System

A fundamental driver of the crisis in our health care delivery system is excess capacity. New York State is over-bedded and many hospital beds lie empty on any given day. The statewide hospital occupancy rate has fallen from 82.8% of certified beds in 1983 to 65.3% in 2004, a decrease of 17.5%. On a staffed bed basis, approximately one quarter of hospital beds are currently unoccupied. Occupancy rates vary by region and are especially low in Western, Northern, and Central regions. Some individual hospitals are more than half empty. Certain pockets of the state have too many nursing home beds while others have too few. The statewide average nursing home occupancy rate has been in decline since 1994 despite a gradually aging population.

Declining occupancy rates are driven in part by shifts in the venues in which health care is provided. Health care services are migrating rapidly out of large institutional settings into ambulatory, home and community-based settings. Hospitals face increasing competition from niche providers such as ambulatory surgery centers, who often provide services that are well reimbursed and deprive hospitals of revenues that were historically used to cross-subsidize less profitable services. Similarly, long term care

6

is evolving towards shorter sub-acute stays in nursing homes, increased resident turnover in nursing homes, and the provision of long term care in non-institutional settings.

Excess capacity has negative consequences for our health care system:

- **Quality of Care is Jeopardized**: In health care, there is a direct positive relationship between volume and quality of care. The more cases or procedures performed, the better the outcome. Excess capacity disperses volume and expertise, potentially diminishing quality. It is a public health imperative to concentrate volumes at fewer institutions and create Centers of Excellence. Excess capacity also subsidizes inferior quality by blocking investments in equipment and staff.

- **Unnecessary Utilization Occurs**: Hospitalizations expand in relation to the number of available beds. Supply induces demand and unused capacity creates pressure to admit patients solely in order to generate revenue. Similarly, greater numbers of expensive tests and procedures are performed when resources like imaging machines, diagnostic labs and surgical suites are available and need to generate revenue. Areas with excess capacity repeatedly demonstrate higher rates of hospital admission and services that cannot be explained by differences in rates of illness or age.

- **Duplication Fuels a Medical Arms Race**: New York's hospitals compete for the most expensive and sophisticated technologies that produce higher financial margins. The result in unnecessary duplication of high-end services like magnetic resonance imaging and cardiac catheterization labs and too little integration of regional service delivery. Eliminating these redundancies will save money without compromising access to care.

- **The Safety Net is Endangered**: Low occupancy rates and associated financial pressures can lessen hospitals' commitment to provide care for vulnerable populations. As fiscal pressures increase, facilities may feel forced to close or shrink their less financially viable services in inner city neighborhoods or rural communities.

- **Costs Increase**: Excess capacity is expensive. Maintaining a "bricks and mortar" based system carries enormous costs. Even empty beds, wards, and buildings that

7

are unused and unstaffed have fixed costs that must be paid and which are spread over a diminishing number of patients. Additionally, dollars are diverted from other productive uses and reinvestment opportunities are thwarted.

## The Commission Process: Public and Local Participation

The Commission is a broad-based, nonpartisan panel established by Governor Pataki and the New York State Legislature to undertake a rational, independent review of health care capacity and resources. It was created to ensure that the regional and local supply of hospital and nursing home facilities is best configured to respond to community needs for high-quality, affordable and accessible care, with meaningful efficiencies in delivery and financing that promote infrastructure stability.

The Commission was specifically charged with rightsizing institutions. Rightsizing includes the possible consolidation, closure, conversion, and restructuring of institutions. Over the course of 18 months, the Commission evaluated each hospital and nursing home in the state to develop its final recommendations. The Commission's process balanced "science" and "art." Its deliberations were informed and driven by extensive review of objective data and quantitative analysis. However, its deliberations were more than a "numbers game" and its final recommendations are not solely the product of mathematical algorithms. Public input, understandings of local market conditions, professional judgment, and factual information were combined to form the basis of the Commission's work.

The Commission operated independently of any existing agency or entity. Given the size and diversity of New York State, the structure of the Commission had a strong focus on regional concerns and issues. The state was formally divided into six regions by its enabling statute. In addition to eighteen statewide voting members, the Commission had up to six regional members for each of the six regions. The regional members had voting authority on matters related solely to their region.

Furthermore, each of the six regions had Regional Advisory Committee (RAC) consisting of up to twelve members. The RACs provided essential community knowledge and insights into local conditions. They played vital information-gathering roles by fostering discussions with and among local stakeholders. Each of the RACs held

8

extensive meetings with hospital and nursing leaders and representatives from trade groups, organized labor, patient advocates, insurers, researchers, and public health officials. The final advisory reports of the RACs are included as appendices to this report.

The Commission and RACs held public hearings across the state to further solicit input from a wide array of interested parties including patients and consumers, providers, payors, labor, elected officials, and the business community. In total, nineteen hearings were held throughout the regions. The Commission heard from hundreds of witnesses and reviewed thousands of pages of testimony.

## Summary of Policy Recommendations

The Commission's direct mandate to rightsize and reconfigure facilities was a vast and necessary endeavor. Nevertheless, the work of the Commission is only one element in a comprehensive reform agenda. No single Commission can address or resolve all of the State's health care issues. The work of this Commission is one step in what must be an ongoing and wide-ranging process to modernize and reshape New York's health care system. The Commission makes the following recommendations to provide a blueprint for additional work necessary to more fully reconfigure our system:

- New York should undertake a comprehensive review of reimbursement policy and develop new payment systems that support a realignment of health services delivery.

- New York should strive for health coverage that is universal, continuous, affordable to individuals and families, and affordable and sustainable for society at large. New York should study coverage expansion efforts in other states and adopt additional strategies to sustain its recent progress in reducing the number of uninsured New Yorkers. While guarding against fraud, New York should lower administrative barriers to enrollment to help ensure that all uninsured but eligible persons are placed in the appropriate program and make it easier for eligible persons to retain coverage.

- New York should expand primary care capacity, including facilities, equipment, information technology and workforce.

9



- New York should develop and test "hybrid" delivery and financing models that are less than a hospital and more than a primary care center.
- New York should undertake a comprehensive analysis of the feasibility and advisability of privatizing the State University of New York (SUNY) teaching hospitals at Stony Brook, Syracuse, and Brooklyn.
- New York should cultivate its health care workforce by implementing strategies to address persistent shortages in a variety of occupations and to educate and retrain workers to prepare them for increasing uses of heath technologies in their jobs. Workers displaced by Commission recommendations should receive assistance in obtaining employment in other healthcare settings.
- New York should promote the increased use of health information technologies and ensure that these systems are able to communicate, using open architecture and embracing the principle of interoperability.
- New York should undertake a comprehensive review of the future role of county-owned and operated nursing homes. A clear policy should be developed to guide decision-making about county nursing homes and to protect indigent residents.
- New York should develop a mechanism whereby niche providers share in the burden of paying for public goods and charity care. New York should also consider the possible need for quality-of-care monitoring and reporting in non-regulated and private settings.
- New York should implement an ongoing process to sustain the efforts initiated by this Commission.

### Summary of Facility Recommendations

Per its statutory obligation, the Commission makes the following recommendations to rightsize and reconfigure health care facilities in each region of the state. The recommendations apply equitably across all regions. The acute care recommendations address 57 hospitals, or one-quarter of all hospitals in the state. The acute care recommendations include 48 reconfiguration, affiliation, and conversion

10

schemes, and 9 facility closures. Collectively, the recommendations will reduce inpatient capacity by approximately 4,200 beds, or 7 percent of the states' supply. The long-term recommendations for downsizing or closing nursing homes will make highly-targeted nursing bed reductions of approximately 3,000, or 2.6 percent of the state's supply. Twice as many nursing homes will be downsized as closed. In addition, the long-term care recommendations will create more than 1,000 new non-institutional slots.

**Central:**

- Crouse Hospital and SUNY Upstate Medical Center should be joined under a single unified governance structure under the control of an entity other than the State University of New York, and the joined facility should be licensed for approximately 500 to 600 beds.

- Auburn Hospital should downsize by approximately 100 beds and discontinue its obstetrical services.

- Arnot Ogden Hospital and St. Joseph's Hospital should participate in discussions supervised by the Commissioner of Health to explore the affiliation of such facilities.

- Albert Lindley Lee Hospital should close all of its 67 beds and convert to an outpatient/urgent care center with Article 28 diagnostic and treatment center licensure.

- Van Duyn Home and Hospital and Community General Hospital's skilled nursing facility should be joined under a single unified governance structure under the control of Community General Hospital and downsize their combined number of beds by approximately 75.

- Mercy of Northern New York should downsize 76 nursing home beds, add assisted living, adult care, and possibly other non-institutional services.

- Willow Point should downsize by between 83 and 103 nursing home beds, rebuild its facility in an appropriate configuration, and add adult day care.

- Lakeside Nursing Home should close and assisted living, adult day care, and possibly other non-institutional services should be added in Tompkins County by another sponsor.

11



- United Helpers, Canton should downsize by approximately 64 nursing home beds, rebuild its facility, and add assisted living and possibly other non-institutional services.

**Hudson Valley:**

- Kingston and Benedictine Hospitals should be joined under a single unified governance structure, contingent upon Kingston Hospital continuing to provide access to reproductive services in a location proximate to the hospital. The joined facility should be licensed for approximately 250 to 300 beds.
- Mt. Vernon Hospital should downsize approximately 32 medical/surgical beds, convert approximately 20 additional medical/surgical beds into a transitional care unit, convert approximately an additional 24 medical/surgical beds into mentally impaired chemical abusers unit.
- Sound Shore Medical Center should decertify approximately 9 pediatrics and 60 medical/surgical beds and convert additional medical/surgical and obstetrics beds into level III NICU beds and detoxification beds.
- Contingent upon financing, Orange Regional Medical Center should close its existing campuses and consolidate operations at a new, smaller replacement facility that is licensed for approximately 350 beds.
- Community Hospital at Dobbs Ferry should close in an orderly fashion.
- Westchester Medical Center should evaluate establishing the Children's Hospital as an independent entity and review its clinical service mix to identify opportunities for reconfiguration that is non-duplicative of services in community hospitals.
- Valley View Center for Nursing Care and Rehab should downsize by approximately 160 nursing home beds and add assisted living, adult day care and possibly other non-institutional services. The facility should also convert 50 nursing home beds to ventilator-dependent and behavioral step-down units.
- Andrus on Hudson should downsize all 247 nursing home beds and add assisted living and possibly other non-institutional services.
- Taylor Care Center should downsize by approximately 140 nursing home beds.

12

- Achieve Rehabilitation should downsize by approximately 40 nursing home beds.
- Sky View Rehabilitation and Health care Center should close, downsize, or convert pending a review by the Commissioner of Health

**Long Island:**

- Eastern Long Island Hospital, Southampton Hospital, Peconic Medical Center should be joined in a single unified governance structure. The new entity should develop an affiliation with University Hospital at Stony Brook. Brookhaven Hospital should continue joint planning with these hospitals and explore joining the new entity. All of these hospitals should implement the bed reconfiguration scheme described in the complete recommendation.
- University Hospital at Stony Brook should be given operational freedom to affiliate with other hospitals and create a regional health care delivery system.
- St. Charles Hospital should downsize 77 medical/surgical beds, convert the remaining 37 medical/surgical beds to psychiatric and alcohol detoxification beds, and discontinue its emergency department.
- J.T. Mather Memorial Hospital should convert all 37 of its psychiatric and alcohol detoxification beds to medical/surgical beds.
- Nassau University Medical Center should downsize by 101 beds and revise its bed configuration across service lines.
- Long Beach Medical Center should downsize by approximately 55 beds. Contingent on other developments, Long Beach should reconfigure as a smaller facility focused on emergency and ambulatory services.
- A. Holly Patterson should downsize by approximately 589 nursing home beds and transfer its subacute services to Nassau University Medical Center. A. Holly Patterson should also rebuild a smaller facility on its existing campus and add assisted living and possibly other non-institutional services.
- Cold Spring Hills Center for Nursing and Rehabilitation should downsize by approximately 90 nursing home beds an d add a ventilator unit, and evening adult program, and a hemo-dialysis center.

13

- Brunswick Hospital Skilled Nursing Facility should close and assisted living and possibly other non-institutional services should be added in Suffolk County by another sponsor.

**New York City:**

- New York Methodist Hospital and New York Community Hospital of Brooklyn should merge into a single entity with two campuses, downsize by an approximate total of 100 beds, and expand ambulatory services.
- Victory Memorial Hospital should close in an orderly fashion and the site should be converted to a diagnostic and treatment center and/or a facility offering a continuum of long term care services.
- Peninsula Hospital should downsize by approximately 99 beds and St. John's Episcopal Hospital should downsize by approximately 81 beds. Contingent upon financing, the two facilities should merge and rebuild a single facility with approximately 400 beds.
- Queens Hospital Center should add approximately 40 medical/surgical beds.
- Parkway Hospital should close in an orderly fashion,
- Westchester Square Medical Center should close in an orderly fashion.
- Cabrini Medical Center should close in an orderly fashion.
- Beth Israel Medical Center – Petrie Campus should convert approximately 80 detoxification beds to 80 psychiatric beds.
- North General Hospital should enter into a stronger corporate relationship with Mount Sinai Medical Center.
- St. Vincent's Midtown Hospital should close in an orderly fashion. The psychiatric beds and ambulatory services operated by St. Vincent's Midtown should be transferred and operated by St. Vincent's Manhattan or other sponsors.
- New York Downtown Hospital should decertify approximately 74 medical/surgical beds and 4 pediatric beds, discontinue inpatient pediatric services, and reorganize its outpatient clinics under new sponsorship.
- Manhattan Eye Ear and Throat Hospital should downsize all 150 beds.

14



- Split Rock Rehabilitation and Health Care Center should close, downsize or convert pending a review by the Commissioner of Health.

**Northern:**

- Bellevue Woman's Hospital should close in an orderly fashion and its maternity, neonatal, eating disorders, and mobile outpatient services should be added to another hospital in Schenectady County.

- St. Clare's Hospital and Ellis Hospital should be joined under a single unified governance structure and the resulting entity should be licensed for 300 to 400 beds.

- Ann Lee Infirmary and Albany County Home should merge, downsize by at least 345 nursing home beds, rebuild a unified facility, and simultaneously add or provide financial support for non-institutional services.

- The Avenue and Dutch manor should merge and downsize by approximately 200 nursing home beds in a rebuilt Avenue facility and should add assisted living, adult day care and possibly other non-institutional services.

- The Glendale Home should downsize by approximately 192 beds.

**Western:**

- Millard Fillmore Hospital – Gates Circle should close in an orderly fashion.

- St. Joseph Hospital should close in an orderly fashion.

- DeGraff Memorial Hospital should downsize all 70 medical/surgical beds. It should convert to a long term care facility encompassing its current 80 nursing home beds and the 75 nursing home beds currently at Millard Fillmore Hospital - Gates Circle.

- Sheehan Memorial Hospital should downsize 69 medical/surgical beds. The 22 inpatient detoxification beds currently at Erie County Medical Center should be added to Sheehan, and Sheehan should add ambulatory care services, methadone maintenance, and outpatient psychiatric services.

- The facilities controlled by Erie County Medical Center Corporation and Kaleida Health should be joined under a single unified governance structure under the

15



control of an entity other than Erie County Medical Center Corporation, Kaleida Health, or any public benefit corporation. The new entity should have a single unified board with powers sufficient to consolidate services into centers of excellence.

- Lockport Memorial Hospital and Inter-Community Memorial Hospital at Newfane should engage in a full asset merger and reconfiguration of services.

- Bertrand Chaffee Hospital should downsize by at least 25 beds, seek designation as a critical access hospital, and affiliate with TLC Tri-County and TLC Lake Shore.

- Brooks Memorial Hospital should seek designation as a sole community provider.

- TLC Tri-County should downsize 28 medical /surgical beds and convert the remaining 10 medical/surgical beds to detoxification beds.

- TLC Lake Shore should downsize all 42 medical/surgical beds and 40 nursing home beds and convert to an Article 28 diagnostic and treatment center. At its option, Lake Shore should continue to operate approximately 20 psychiatric beds or these beds should be added by another local sponsor.

- Westfield Memorial Hospital should downsize all 32 inpatient beds and convert to an Article 28 diagnostic and treatment center.

- Mount St. Mary's Hospital and Health Center or its sponsoring entity and Niagara Falls Memorial Medical center should participate in discussions supervised by the Commissioner of Health to explore the affiliation of such facilities.

- Mount View Health Facility should downsize all 172 nursing home beds, rebuild a new facility on its existing campus, add assisted living, adult day services and possibly other non-institutional services.

- Nazareth Nursing Home should downsize all 125 nursing home beds and convert the facility for use in the PACE program at the former Our Lady of Victory Hospital.

- Mercy Hospital Skilled Nursing facility should add 10 beds and transfer all of its beds to the former Our Lady of Victory Hospital

- St. Elizabeth's Home should covert its adult home beds to an assisted living program.

16

- Williamsville Suburban should close.

## Financing

The Commission's recommendations will benefit New Yorkers and the health care system. First, they will promote stability of health care providers thereby ensuring access to care and the provision of public goods. Second, they will reduce unnecessary public and private spending and produce overall cost savings for all payors. Third, they will produce numerous opportunities for reinvestment in the system thereby providing substantial financial benefits to providers and the patients served by them.

System restructuring also provides many savings for payors, both in terms of actual reductions in current expenditures and avoided future costs. Such opportunities for savings include reductions in inappropriate utilization, avoided capital investment and leveraged savings. The total estimated savings for payors is around $806 million annually or $8 billion over ten years. This includes an annual savings to Medicaid of around $249 million, or $2.5 billion over ten years, and an annual savings to Medicare of around $322 million, or $3.2 billion over ten years. The total estimated benefit to providers is around $721 million annually or $7.2 billion over ten years. Together, these calculations yield a total benefit to payors and providers of over $1.5 billion annually, or $15 billion over ten years.

The realization of these savings will also entail costs. Broad systemic changes must be supported with appropriate resources and investments are required to implement these recommendations. Potential costs are associated with closures, new construction, and affiliations. Not all of these costs will be borne by the State. It is estimated that implementation will entail a total cost of approximately $1.2 billion, including approximately $350 million in closure costs, $1.1 billion in construction costs, $11 million in affiliation planning costs, and $300 million in offsets from the sale of facility real property. Almost $606 million of these costs are attributable to two contingent projects that the Commissioner will not be required to implement absent available funding.

Vast and unprecedented sums are available to support the restructuring of New York's health care system and cover costs associated with implementing the

17

Commission's recommendations. The Health Care Efficiency and Affordability Law for New Yorkers (HEAL-NY) allocates $1 billion over four years for capital grant funds to finance physical reconfiguration, conversion, downsizing, or closure of hospitals and nursing homes. Additionally, the Federal-State Health Reform Partnership (F-SHRP) allocates an additional $1.5 billion for similar purposes.

Although HEAL-NY and F-SHRP and critical to financing the Commission's recommendations, they are not and should not be the only sources of funding. Indeed, public funds should be used in the most prudent possible manner. Insofar as facilities are capable of funding their own closure, conversion, affiliation, or rightsizing, they should be expected to do so. The Commission believes it to be appropriate that costs will be shared among all interested parties. Taxpayer dollars should be used judiciously and equitably.

## I. Dynamism of New York's Health Care System

Little remains static in New York's health care system. Regulatory changes, technological and clinical innovations, patient preferences, and varying business models contribute to this constant transformation. Rapid and broad scale change is inevitable; it requires adaptive strategies. Yet today, New York is struggling to maintain a 20th century institutional infrastructure in the face of mounting costs, excess capacity, and unmet need for community-based alternatives. To strengthen our system, New York must overcome its over-reliance on outdated institutions and improve the fiscal stability of its health care providers to guarantee the ongoing provision of important safety-net functions, public goods, and world-class quality of care.

### Catching Up to Change

The past decade was a period of especially dramatic change for NY's health care system and its financing mechanisms. Under the regime of New York's Prospective Hospital Reimbursement Methodology (NYPHRM), established in 1983, the New York State Department of Health set hospital reimbursement rates. Only health maintenance organizations and similar managed-care entities were allowed to negotiate fees with hospitals. Essentially, NYPHRM established cost-based inpatient rates for Medicaid and Blue Cross. Other private insurance companies were required to pay a fixed "mark-up" of 11% above the Blue Cross rate.[1]

The Health Care Reform Act of 1996 (HCRA) replaced NYPHRM. HCRA deregulated hospital rate negotiation so that insurers, employers, and other health care payers now directly negotiate rates with hospitals. The State continues to establish Medicaid fee-for-service reimbursement rates. The federal government sets Medicare rates.

Under NYPHRM, NY's hospitals generally experienced modest or break-even financial margins. The artificial margins created by NYPHRM were exposed by HCRA. Hospital industry leaders have argued that providers were disadvantaged in their ability to thrive in the newly competitive environment. According to the Greater New York Hospital Association (GNYHA),

---

[1] Raske, K.E. (2006, February 7). Testimony Of Kenneth E. Raske, President of Greater New York Hospital Association on the Executive Budget Proposal for 2006–07 Before the New York State Senate Finance And Assembly Ways and Means Committees. Retrieved July 21, 2006, from Greater New York Hospital Association Web site: http://www.gnyha.org/testimony/2006/pt20060207.pdf

19

"[a]fter deregulation in 1997, hospitals' precariously balanced financial well-being collapsed because health insurers were able to establish negotiated rates by using the old NYPHRM payments as the ceiling. That is, plans negotiated down from a State-set, cost-based rate rather than from market-set, charge-based payments, as had been the case in other states. In addition, the State was no longer able to rescue ailing hospitals through special rate appeals or revenue enhancements because it no longer controlled most of hospital revenue."[2]

Concomitant to the change in state regulation, the federal government reduced Medicare's hospital reimbursement rates in 1997. The Balanced Budget Act of 1997 (BBA) resulted in major revenue losses for New York hospitals. Due to New York City's heavy concentration of academic medical centers and its large medically indigent population, the BBA's sharp reductions in general medical education (GME) and disproportionate share hospital (DSH) payments resulted in an especially considerable drop of New York City hospitals' collective revenue.[3]

### Hospital and Nursing Home Closures

The turbulence associated with such changes is illustrated by widespread closures and bankruptcies of hospitals and nursing homes. Since 1983, 70 hospitals and over 63 nursing homes have closed in New York State, including 34 hospitals and 44 nursing homes since 1994. Additionally, numerous facilities have declared bankruptcy. Despite these closures, excess capacity remains and resistance to mergers and other consolidations persists. Understandably, facility boards, workers, and communities are committed to preserving institutions in which they have perceived investments.

---

[2] Ibid

[3] For a discussion of BBA's impact on NYC hospitals, see, e.g., Salit, S., Fass, S., & Nowak, M. (2002). Out of the frying pan: New York City hospitals in an age of deregulation. *Health Affairs. 21*, 127-139.

20