# AFFIDAVIT OF DAVID R. SANDMAN Ph.D

.

# PART 2 OF 8

## IV. Adapting to and Managing Change

New York's health care system has multiple strengths on which to build. The state has some of the finest hospitals in the world, nursing homes that provide superb and concerned care to our most frail and elderly residents, a strong foundation of non-institutional care providers, a committed health care workforce, and a vast commitment of public dollars to health care. From crisis arises opportunity; the dire condition of the State's health care system creates an opportunity to reshape the health care system of tomorrow.

It is not too late to reconfigure NY's health care delivery system. The time to act, however, is now. We can no longer deny reality or bury our heads in the sand. We cannot continue to bail out troubled and unneeded facilities simply because they exist or to satisfy powerful constituencies. We cannot rely solely on market-based incentives to eliminate excess capacity or promote public goods. We need a health care delivery system that is more flexible and provides better value than the one we have today. We need to look beyond the "bricks and mortar" of the hospital and nursing home and instead to the health care delivery system as a whole.

Absent intervention, the Commission believes that the future of our state's health care system is bleak. It is painfully obvious that health care providers cannot sustain chronic annual losses and continue to fulfill their missions; it is impossible to provide care for which we cannot pay. Closures and bankruptcies of health care institutions have become increasingly common. Given the financial predicament of New York's hospitals and nursing homes, more are almost certain to close. Moreover, without state involvement, those facilities that are forced to close based on market forces alone may be those facilities that are most valued by various communities throughout the State. We are left with a stark choice; we can fail to act thereby allowing the system to drift in an unplanned direction, costs to keep rising, and access to care to remain in doubt. Alternatively, we can direct system systemic change, ensuring that New Yorkers continue to receive high-quality, accessible health care. We choose the latter path.

Transformation of our health care system, above all else, must benefit patients and taxpayers. Stabilization and modernization of our system will also benefit New York State's economy and competitiveness. Health care is a major engine of the State's economy. Hospitals and health systems in the state generate approximately $91.5 billion each year for local and state

58

economies and support more than 644,900 jobs. These figures represent nearly ten percent of the gross state product and over 7 percent of all non-farm jobs.[66] To stabilize the employment marketplace, the State must work to stabilize the health care industry, including the restructuring and closing of hospitals.

## Framework for Solutions – Producing Maximum Efficiencies

The Commission is charged with "rightsizing" institutions to stabilize the State's health care system. Rightsizing includes the possible consolidation, closure, conversion, and restructuring of institutions, and reallocation of local and statewide resources.
The strategy adopted to remove excess capacity from the hospital and nursing home systems will dictate the opportunities and scale of benefits realized. Strategies such as outright closure of a facility, a merger of multiple facilities or an across the board reduction in beds all meet the goal of reducing overall capacity. However, the closure of hospitals and nursing homes generally presents the greatest opportunity for savings by concentrating the benefits of lowered capacity.

### Benefits of Closure and Consolidation

According to Manatt, Phelps, and Phillips, a leading health care law firm, "When a hospital is drowning in red ink with no hope of resurfacing, the logical step for trustees-consistent with their fiduciary obligation to preserve and protect the charitable asset under their control-is to close the hospital."[67] The closure of a facility has many advantages including the removal of fixed operating costs, forgone capital expenses, elimination of duplicative services within the market, increased efficiency at remaining institutions and opportunities for lease, sale or conversion of the facility's property. Operating costs such as utilities, cleaning, security and maintenance do not transfer to other facilities along with the patient base of a closed facility. Additional savings are realized by forgoing renovations on aged physical plants. Depending on the age of the physical plant, significant capital investments are required on an ongoing basis to keep a facility current with modern care and regulatory requirements. These capital expenditures include activities such as correcting fire safety deficiencies, improving air conditioning,

---

[66] Health Care Association of New York State. (2006, June). What's at stake: The impact of New York's hospitals on the economy and our communities.

[67] Schwartz, J.R. (2001, January). Closing...Closing...Closed. Retrieved September 25, 2006, from Manatt, Phelps, and Phillips Web site: http://www.manatt.com/newsevents.aspx?id=225&folder=24

converting from semi-private to private rooms, renovating outpatient spaces, and improving parking facilities and elevators. Furthermore, the benefits of these eliminated costs accrue indefinitely.

To a lesser extent, some of these benefits may also be realized in the case of facility consolidations or mergers. In these instances, operating costs may be reduced, duplicative services may be removed from the market, facilities may operate more efficiently and opportunities for conversion may arise. However, a successful merger presents different challenges than outright closure of a facility. Consolidation of administrative services is an early and obvious benefit of merger agreements, but greater efficiencies are realized by integrating and rationalizing clinical services and removing excess capacity from the combined entity. Integrating clinical services requires addressing complex compromises among medical staffs and employee unions. Medical staff may be resistant to integration and make efforts to protect their territory within the remaining institution. These and other challenges have plagued merger attempts throughout the country and led to unsuccessful attempts to rightsize capacity.[68] In New Jersey, a special commission formed to study its state's hospital system concluded that "Reducing staffed beds, consolidating clinical services, and eliminating duplicative administrative functions appear to be necessary but insufficient to accomplish system-wide savings that the anticipated reductions in utilization will require."[69]

## Impact of Closures: What Does The Evidence Say?

**Health Care Providers Emerge Stronger:** Peer-reviewed evidence from past hospital closures confirm that the closure of institutions may contribute to the vitality of remaining institutions. In urban markets, hospital closure may result in an "evolutionary increase" in efficiency among remaining institutions in the market. Evaluation research indicates that when an urban hospital closes, other hospitals within their markets experience increased inpatient and emergency room visits and became more efficient on a cost per adjusted admission basis. Frequently the hospital

---

[68] Meyer, J.A., Wicks, E.K., & Carlyn, M. (1998). A tale of two cities: Hospital mergers in St. Louis and Philadelphia not reducing excess capacity. Economic and Social Research Institute: Washington, DC.
[69] Advisory Commission on Hospitals (1999). Report of the Advisory Commission on Hospitals. Retrieved September 22, 2006, from New Jersey Department of Health and Senior Services Web site: http://www.state.nj.us/health/hcsa/acoh/trends.htm

that closed was the least efficient in the market prior to closure.[70] The remaining institutions become more efficient by absorbing the additional patient volume and filling previously established, but unused capacity.

**Access to Care and Health Status Are Preserved:** Peer-reviewed studies indicate that the repercussions of hospital closures on public health are nonexistent or minimal. There is little evidence of changes in access to care, health status, or mortality rates following hospital closures. For example, Buchmueller, Jacobson and Wold found that hospital closures have a modest effect on access to care in urban areas. Moreover, they found that "...hospital closures may shift care to doctor's offices, generally considered an appropriate and cost-effective source of regular care."[71] Additionally, studies of the impact of rural hospital closures in Saskatchewan, Canada found that despite fears to the contrary, residents in affected communities reported that hospital closures did not affect their own health.[72] A study by the Office of Inspector General of the U.S. Department of Health and Human Services (OIG) found that of the hospitals closed nationwide in 2000, 50 percent of rural facilities and 52 percent of urban facilities were within three miles of another inpatient facility. An additional 18 percent of closed rural facilities were between four and 10 miles of another hospital, as were an additional 38 percent of the urban facilities that closed. In most cases when a hospital closed, health care was still available nearby.[73]

Closures have far less impact than feared because facilities that close have been in trouble for extended periods of time. Almost always, they have experienced a cycle of declining patient census and revenues and gradually withered away until reaching the point of closure. In testimony before the New York City Council, GNYHA stated that "we note that most hospitals that close experience a significant drop in demand before they get to the point of closure. As indicated previously, troubled hospitals often curtail services in the interest of keeping the institution afloat. In addition, when possible, hospitals that are part of multi-hospital systems and

---

[70] Lindrooth R.C., LoSasso A., & Bazzoli G. (2003). The effect of hospital closure on markets. *Journal of Health Economics. 22 (5).* 691-712

[71] Buchmueller T.C., Jacobson M., & Wold C. (2003). How far to the hospital? The effect of hospital closures on access to care. *Journal of Health Economics. 25 (4).* 740-761.

[72] Liu L., Hader J., Broassart B., White R., & Lewis S. (2001). Impact of rural hospital closures in Saskatchewan, Canada. *Social Science & Medicine. 52 (12).* 1793-1804.

[73] U.S. Department of Health and Human Services, Office of the Inspector General. (2002). *Hospital Closure 2000* (OEI-04-02-00010). Available online: http://oig.hhs.gov/oei/reports/oei-04-02-00010.pdf

that are facing financial problems often transfer and consolidate services to other sites in order to enhance the efficiency of their operations. As word of a hospital's financial troubles are made public, many of the hospital's patients also begin to seek care elsewhere, and the medical staff begin to obtain privileges at other hospitals. Thus, by the time a hospital closes, its occupancy rate is typically already low, and many patients have already begun to seek care from other providers...In summary, the negative impact on access related to the closure of a hospital is typically a gradual process that tracks the pace of financial deterioration of the hospital rather than occurring suddenly as the institution physically closes its doors."[74]

• **Community Needs Are Met:** Another benefit of facility closure is the opportunity to convert the facility to alternative uses which better align resources with community needs. Closed facilities may be used for non-acute medical services or developed for residential or commercial purposes. Numerous examples exist of such successful conversions, including:

   o Morrisania Hospital, an 11-story Bronx hospital which closed, reopened under the auspices of the Women's Housing and Economic Development Corporation to provide apartments for low-income and formerly homeless families. In addition, the facility hosts a family health center and the Urban Horizons Center which offers an array of social services such as job training, a Head Start program, child care and counseling. The conversion was financed by a $23 million investment of state, federal and private funds.

   o St. Marys' Hospital, in Rochester, closed its inpatient services in 1999. The facility now operates as a comprehensive community health center and urgent care center.

   o Amsterdam Memorial Hospital, in 2002, closed its inpatient acute care beds. It retains an inpatient rehabilitation unit, and provides urgent care services and ambulatory surgery.

   o In 1997, Germantown Hospital in Philadelphia, PA joined the Albert Einstein Healthcare Network. The inpatient beds were transferred to the nearby Albert Einstein Medical Center and the Germantown facility was converted to Germantown Community Health Services. The facility includes a 170-bed nursing home, a 24

---

[74] Greater New York Hospital Association. (2005, June 15). Testimony of Greater New York Hospital Association before the New York City Council Committee on Health at a Hearing on Hospital Closures, delivered by Susan C. Waltman.

hour emergency department, outpatient diagnostic and treatment services and physician offices.[75]

On the long term care side, a combination of surplus nursing home beds together with a need for non-institutional services creates an opportunity to shift resources from nursing home facilities to alternatives. For example, New York State's own "Rightsizing Demonstration" permitted nursing home beds to be permanently de-certified and exchanged for other certified capacity, including adult day health care, long-term home health care, and Medicaid-supported Assisted Living Program (aka "ALP") beds. As many as 2,500 nursing home beds could be converted under this demonstration.

Other States have similar voluntary rightsizing initiatives that convert nursing home resources into non-institutional alternatives, including Wisconsin, Nebraska, Kentucky, Iowa, Washington, and Minnesota. Through Minnesota's initiative, nursing home beds declined by nearly 4,000 or 8% in two years, falling in line with declining nursing home utilization rates. At the same time, they expanded their Elderly Waiver and Alternative Care programs, so that Minnesota spends nearly equally between nursing facilities and home care, serving more individuals than previously, according to the Minnesota Dept of Human Services.

---

[75] Baittinger, E., & Zuckerman, A. (2005). Hospital closures: Moving from failure to revitalized community resources. *Strategies & Solutions, March 2005*. Retrieved September 27, 2006, from http://www.hss-inc.com/enewsletters/march2005.htm.

## V. Commission Process and Methodology

The Commission on Health Care Facilities in the 21st Century was a broad-based, non-partisan panel created by Governor Pataki and the New York State Legislature to undertake a rational, independent review of health care capacity and resources in New York State. It was created to ensure that the regional and local supply of hospital and nursing home facilities is best configured to appropriately respond to community needs for high-quality, affordable and accessible care, with meaningful efficiencies in delivery and financing that promote infrastructure stability.

The Commission was statutorily charged with evaluating all nursing homes and general acute care hospitals using factors listed below:

1.  The need for capacity in the hospital and nursing home systems in each region;
2.  The capacity currently existing in such systems in each region;
3.  The economic impact of right-sizing actions on the state, regional and local economies, including the capacity of the health care system to provide employment or training to health care workers affected by such actions;
4.  The amount of capital debt being carried by general hospitals and nursing homes, and the nature of the bonding and credit enhancement, if any, supporting such debt, and the financial status of general hospitals and nursing homes, including revenues from Medicare, Medicaid, other government funds, and private third-party payors;
5.  The availability of alternative sources of funding with regard to the capital debt of affected facilities and a plan for paying or retiring any outstanding bonds in accordance with the contract with bondholders;
6.  The existence of other health care services in the affected region, including the availability of services for the uninsured and underinsured, and including services provided other than by general hospitals and nursing homes;
7.  The potential conversion of facilities or current facility capacity for uses other than as inpatient or residential health care facilities;
8.  The extent to which a facility serves the health care needs of the region, including serving Medicaid recipients, the uninsured, and underserved communities; and
9.  The potential for improved quality of care and the redirection of resources from supporting excess capacity toward reinvestment into productive health care purposes, and the extent to which the actions recommended by the Commission would result in greater stability and efficiency in the delivery of needed health care services for a community.



**Commission Approach**

The Commission's task required an approach that balanced "science" and "art." Its deliberations were significantly informed and driven by extensive review of objective data and quantitative analysis. However, analysis of community needs and resources cannot be reduced to a mere "numbers game" and the Commission's recommendations are not solely the product of mathematical algorithms. Significant public input, understandings of local market conditions, professional judgment, and factual information were combined to form the basis of the Commission's deliberations.

**Commission Structure**

The Commission operated independently of any existing agency or entity. While the Commission relied on the data and expertise from various state agencies, including the Department of Health (DOH), the Dormitory Authority for the State of New York, and the Division of the Budget, the Commission was neither a part nor an initiative of these agencies. The Commission was staffed by seven full-time dedicated employees, including an executive director, a deputy director/lead counsel, policy analysts, and assistants. Its chairman was Stephen Berger. From July 2005 to December 2006, the Commission met 14 times.

The Commission had eighteen statewide members, 12 of whom were appointed by the Governor, 2 by the Assembly Speaker, 1 by the Assembly's Minority Leader, 2 by the President Pro Tem of the Senate, and 1 by the Senate's Minority Leader. Statewide members voted on every issue pertaining to the Commission, including its final recommendations.

**Regional Definitions and Representation**

Given the size and diversity of the State of New York, the structure of the Commission was designed to have a strong focus on regional concerns and issues. For the Commission's purposes, the State was divided into six regions:

- **Central:** Broome, Cayuga, Chemung, Chenango, Cortland, Herkimer, Jefferson, Lewis, Livingston, Madison, Monroe, Oneida, Onondaga, Ontario, Oswego, Schuyler, Seneca, St. Lawrence, Steuben, Tioga, Tompkins, Wayne, and Yates counties
- **Hudson Valley:** Delaware, Dutchess, Orange, Putnam, Rockland, Sullivan, Ulster, and Westchester counties

65

- **Long Island:** Nassau and Suffolk counties
- **New York City:** Bronx, Kings (Brooklyn), New York (Manhattan), Queens and Richmond (Staten Island) counties
- **Northern:** Albany, Clinton, Columbia, Essex, Franklin, Fulton, Greene, Hamilton, Montgomery, Otsego, Rensselaer, Saratoga, Schenectady, Schoharie, Warren, and Washington counties
- **Western:** Allegany, Cattaraugus, Chautauqua, Erie, Genesee, Niagara, Orleans, and Wyoming counties

**Figure 16. Commission Regions**



In addition to the eighteen statewide voting members, there were up to six regional members for each of the six regions listed above, appointed in equal part by the Governor, Senate, and Assembly. These regional members voted and were counted for quorum purposes only when the Commission acted on recommendations relating solely to the regional member's respective region.



**Regional Advisory Committees**

In addition to the Commission body, the legislation established regional advisory committees (RACs). Each of the six regions listed above had an associated RAC. Each RAC was established with twelve potential members, appointed in equal parts by the Governor, Senate, and Assembly.

The RACs played an important role in the Commission's process. They provided essential community knowledge and insights into local market conditions. They played vital information gathering roles by fostering discussions with and among local stakeholders. Each of the six RACs held extensive meetings with key stakeholders, including hospital CEOs, nursing home administrators, and representatives from trade groups, unions, patient advocates, insurers, and public health officials.

Each RAC was charged with developing non-binding recommendations "for reconfiguring its region's general hospital and nursing home bed supply to align bed supply with regional and local needs." In addition identifying specific facilities to be reconfigured or closed, the legislation required each RAC to address the following points in its submitted report:

| | |
|---|---|
| (i) | Recommended dates by which such actions should occur; |
| (ii) | Necessary investments, if any, that should be made in each case to carry out the regional advisory committee's recommendations, including any necessary workforce, training, or other investments to ensure that remaining facilities are able to adequately provide services within the context of a restructured institutional provider health care system in such region; and |
| (iii) | The regional advisory committee's justification for its recommendations, including its use of the factors. |

Following the qualitative data-gathering phase of the public hearings and private meetings, each RAC developed its set of initial, non-binding recommendations. To facilitate an active engagement by the RACs with the entire Commission, each RAC met with full Commission before officially transmitting their reports to the Commission on November 15, 2006. This ensured that the Commission would properly consider the local expertise of the RAC, and the interests and concerns of local and regional stakeholders.

**Local Input and Community Outreach**

The legislature charged the Commission and the RACs with holding formal public hearings with public notice to solicit local input from a wide array of interested parties including

67

patients and consumers, providers, payers, labor, elected officials, and the business community. In total, nineteen hearings were held throughout the regions. The Commission and RACs heard from hundreds of witnesses and reviewed thousands of pages of testimony submitted during the hearings. Additionally, numerous parties submitted written testimony to the RACs throughout the tenure of the Commission.

**Table 11. Public Hearings by Region**

| Region | Date | Location |
|---|---|---|
| Central | February 21, 2006 | Binghamton |
| | February 24, 2006 | Syracuse |
| | March 27, 2006 | Rochester |
| | April 4, 2006 | Watertown |
| Hudson Valley | February 15, 2006 | Valhalla |
| | February 22, 2006 | New Paltz |
| | March 1, 2006 | Middletown |
| Long Island | March 22, 2006 | Riverhead |
| | April 11, 2006 | Hempstead |
| New York City | February 17, 2006 | Staten Island |
| | February 24, 2006 | Brooklyn |
| | March 7, 2006 | Queens |
| | March 28, 2006 | Bronx |
| | March 30, 2006 | Manhattan |
| Northern | February 8, 2006 | Albany |
| | March 1, 2006 | Plattsburgh |
| Western | February 27, 2006 | Sanborn |
| | March 3, 2006 | Buffalo |
| | March 14, 2006 | Jamestown |

**Analytic Framework**

The Commission and staff performed detailed analysis of each hospital and nursing home throughout the State. In order to focus its efforts at rightsizing the health care delivery system, the Commission unanimously adopted an analytic framework to focus the Commission's hard-look analysis on several hospitals and nursing homes. This framework was a starting point for focused and continual deliberations and discussions, and was not final determinations of which institutions to rightsize.

Derived from the nine legislated factors listed above, the Commission and staff designed a rational, independent, and equitable approach that categorically differentiated each hospital and nursing home using six key criteria. Once established, these criteria served as a basis by which all institutions were evaluated:

1. Service to Vulnerable Populations
2. Availability of Services
3. Quality of Care
4. Utilization
5. Viability
6. Economic Impact

Within each criteria, the Commission examined numerous metrics, as shown below:

**Table 12. Commission Framework Criteria Metrics**

| Vulnerable Populations | Availability of Services | Quality of Care | Utilization | Viability | Economic Impact |
|---|---|---|---|---|---|
| · % Uninsured Discharges<br><br>· % Medicaid Discharges<br><br>· % Medicare Discharges<br><br>· ER payor mix<br><br>· % Medicaid Admissions (nursing homes)<br><br>· % High acuity<br><br>· DSH Hospital<br><br>· MUA<br><br>· % Non-white Discharges | · Provision of Comprehensive Services<br><br>· Provision of Essential Services/Sole Community Provider<br><br>· Distance/ Commute Time to Other Providers<br><br>· Rural Hospital Designation | · JCAHO accreditation<br><br>· Special Designations<br><br>· CMS Hospital Compare Data<br><br>· CMS Nursing Home Compare Data | · Inpatient Occupancy Rates<br><br>· Volume of Outpatient Visits<br><br>· Volume of ED Visits | · Profitability<br><br>· Days of Cash on Hand<br><br>· Capital Debt<br><br>· Bonding and Credit Enhancements<br><br>· Linkages and Affiliations | · FTEs/County Population<br><br>· Local Unemployment Rate |

Because regions provide the best set of comparisons and respect differences across the state, each institution's rating was assigned relative to institutions within the same region. Each institution received a rating of -1, 0, or +1 on each criterion, and each criterion carried equal weight. Therefore, each institution received a final rating of -6 to +6, and from this final score,

institutions were divided into three categories: high, medium, and low priority for rightsizing. Those institutions that were rated as high priority received a harder-look analysis than those with a low priority. However, these categories were not determinative. High priority institutions were not necessarily subject to Commission recommendations nor were low priority institutions necessarily immune.

This analytic framework had some distinct advantages. It sufficiently accounted for real world complexities, while remaining understandable, explainable, and actionable; and while it was evidence-based, data-driven, and objective, it allowed for professional and practical judgment that accounted for nuances and subtleties that an overly-rigid algorithm could not.

This analytic framework was the start of a multi-leveled analysis performed by the Commission and staff. To complement the framework, the Commission sought regional input by stakeholders, experts, and members of the community through multiple public hearings held throughout the State.

**Absorption and Access Analysis (AAA)**

The Commission developed a model for determining whether adequate alternative inpatient capacity exists within reasonable proximity to a hospital considered for closure. The model revealed whether inpatients at a particular hospital could be absorbed by neighboring hospitals and the travel time that would be required if patients were to disperse among those hospitals. The model drew on work by The Health Economics and Outcomes Research Institute (THEORI) at GNYHA. Neither THEORI nor GNYHA had any involvement or influence on the Commission's analysis or deliberations regarding any individual facilities.

The model simulated the closure of individual hospital campuses (focal hospitals) throughout New York State based on 2004 SPARCS and ICR data. In preparation, each patient in the SPARCS database was assigned to a cohort. A cohort was a group of patients residing in the same ZIP code and admitted to the hospital for the same condition or procedure. Elective admissions were grouped into 35 clinically meaningful service lines (such as cardiac surgery, neurology, orthopedics, and psychiatry), while emergency admissions were grouped together as if they were a distinct service line. To simulate a closure, the focal hospital's patients were randomly reassigned to other hospitals (coverage partners) based upon the real-world distribution of cases in the patient's cohort. (For example, if patients in a particular cohort were admitted to

70

hospitals other than the focal hospital in the proportion of 30% to Hospital A and 70% to Hospital B, then the focal hospital's patients were randomly reassigned to those hospitals in the same proportion.) The coverage partners were sorted based on their share of the focal hospital's reassigned patients, and *principal* coverage partners were identified, usually as the hospitals to which the first two-thirds of the focal hospital's patients were reassigned.

To determine whether the focal hospital's coverage partners had sufficient capacity to absorb its patients, each reassigned patient's inpatient days were added to the coverage partner's daily census on approximately the same dates and times that the patient was in the focal hospital. Then a revised average daily census and peak daily census were computed for the coverage partner. The peak daily census was defined as the thirty days of the year in which the daily census— measured at the peak hours of day—was highest. Finally, the revised average and peak daily census counts were compared with the coverage partner's available beds.

To determine whether it was feasible for the focal hospital's patients to travel to their reassigned hospitals, the weighted average driving time to the reassigned hospitals was computed for the focal hospital's patients. The weighting of the average driving times to each reassigned hospital was based on each coverage partner's share of the focal hospital's reassigned patients. The average driving times were computed from the centroid of each patient's Census tract to the reassigned hospital.

The model is fundamentally conservative and does not rely on assumptions that we might realistically make regarding an altered health care delivery landscape. For example, it assumes no reduction in average length of stay (ALOS) although even a very modest ALOS reduction can dramatically increase capacity. Furthermore, it assumes no reduction in overall service utilization although the reduction of excess capacity can be assumed to reduce inappropriate utilization of services.

**Voluntary Rightsizing Efforts**

The Commission promulgated policies to encourage and protect facilities that wished to engage in voluntary rightsizing efforts. Philosophically, the Commission believed that "bottom-up" solutions derived by health care providers can be superior to "top-down" imposed edicts. Practically, the Commission also believed that locally developed solutions with stakeholder buy-in are easier to implement.

71

Because talks between facilities were for the purpose of developing potential
Commission recommendations, the Commission was able to extend its umbrella of state action
immunity to shield such facilities from potential antitrust violations. The Commission's
procedures were developed collaboratively with the State Department of Health and the Office of
the State Attorney General. In addition, representatives of the Commission briefed the Federal
Department of Justice and the Federal Trade Commission on these procedures, neither of which
expressed objections. The formal procedures used to conduct such voluntary discussion between
providers were described and disseminated to all health facilities in the State.[76]

---

[76] Commission on Health Care Facilities in the 21st Century. (2006). *Voluntary Rightsizing Procedure*, 1-2.
    Available online: http://www.nyhealthcarecommission.org/docs/voluntary_rightsizing_procedure.pdf.

## VI. Policy Recommendations

The Commission's direct mandate and authority to rightsize and reconfigure the states' hospital and nursing home industries was a vast and complicated endeavor. Despite the breadth of its charge, the work of the Commission is only one element in a comprehensive reform agenda. In some respects, the Commission's recommendations for specific facilities address the "symptoms" of a sick system. It is equally or more critical to also address the "root causes" so that comprehensive rightsizing and reconfiguration can occur.

The Commission's enabling statute provides for recommendations related to a streamlined regulatory process, reimbursement, and other topics. As part of its deliberations, the Commission frequently considered the ways in which the structure and financing of the health care delivery system affect its mandate to create a system that better meets community needs. Thus, the Commission makes the following recommendations for areas needing broader policy reform. It is hoped that these recommendations will provide a blueprint for further work toward improving our health care system.

### A. Reimbursement and Medicaid

Financial incentives powerfully affect the supply, demand, and location of healthcare services. At times, they distort patterns of service delivery. Driven by the imperative of financial survival, providers may pursue high-margin services rather than services that best align with community needs. Fiscal pressures can also drive facilities to provide otherwise redundant or unneeded services solely to cross-subsidize other elements in their service mix that are crucial but unprofitable.

Direct state action to change the amount and distribution of funding for Medicaid and public goods would be an important step in reforming the reimbursement system in New York. Furthermore, Medicaid policy has the potential to influence the actions of private and federal payors. The Commission recommends that the State of New York undertake a comprehensive review of reimbursement policy and develop new payment systems that support a realignment of health services delivery. Such review should recognize these principles:

73

- The current growth rate of Medicaid expenditures is an unsustainable burden on taxpayers.
- Diversion of health care resources is unacceptable. Dollars that are freed up must be reinvested in the health care system.
- Reimbursement reform should strengthen the long-term viability of institutions that disproportionately serve vulnerable populations including the uninsured and low income patients.
- Reimbursement reform should encourage the provision of preventive, primary and other baseline services and discourage the medical arms race for duplicative provision of high-end services.
- The relationship between private payers and the financial viability of the health care delivery system needs to be carefully examined. Reducing unnecessary hospital capacity and maintaining critical health services are as important to the insurance sector as they are to the public sector. As such, it is reasonable to expect these companies to participate in initiatives to promote financial alignment between payers and providers, and to participate in reinvestment strategies by reimbursing adequately while maintaining adequate reserves to meet current and future health care needs.
- Future capital investments should reflect shifts in the venue of care from institutional to home and community based settings.

Within the specific arena of long term care, New York State should:

- Expand the availability of home and community-based alternatives to nursing home placement and educate physicians, paraprofessionals, and consumers about these alternatives.
- Implement recently enacted reforms to the current method of facility-based reimbursement.
- Explore alternate payment methods such as resident-based pricing and/or the expansion of managed care models on a demonstration basis.
- Implement its single point-of-entry system.

74

- Develop programs and reimbursement mechanisms for high-quality, cost- effective chronic care management.
- Address the disproportionate burden on particular institutions of uncompensated long term care patients.

Comprehensive discussions of issues and options in acute and long term care reimbursement reform can be found in the appendices to this report.

## B. The Uninsured

The uninsured remains one of the most serious and persistent health care problems both in the nation and New York. The United States is the only wealthy industrialized nation that does not provide universal health insurance coverage. Nearly one in five non-elderly individuals in the US and NY State lack health care coverage.

The uninsured face problems accessing needed health care services. Many either do not receive or postpone seeking care due to financial barriers. When they do receive care, it is often episodic and fragmented. Preventable or treatable chronic conditions develop into more complicated and expensive conditions to treat. Compared to insured patients, uninsured patients have less favorable health outcomes and higher rates of complications and deaths. The Institute of Medicine estimates that lack of health insurance causes roughly 18,000 unnecessary deaths every year.[77]

Uninsured Americans often present to hospital emergency rooms where their care can be uncoordinated and more expensive to deliver. In addition, health care providers bear a substantial burden in providing care for this to the uninsured and indigent. According to the Urban Institute, New York State's medical providers spent about $2.8 billion in 2005 on providing care for uninsured New Yorkers.[78] Hospitals provided $1.8 billion of that care, and physicians accounted for $412 million. The balance came from health centers, Veterans facilities, and the federal Indian Health Service.

---

[77] Institute of Medicine. (2002). *Care without coverage: Too little, too late* (LCCN 2002105905, 1-212). Washington, DC: National Academies Press.

[78] Bovbjerg, R.R., Dorn, S., Hadley, J., Holahan, J., & Miller, D.M. (2006). Caring for the Uninsured in New York. *Urban Institute*, Retrieved October 20, 2006, from http://www.urban.org/publications/311372.html.

A comprehensive solution to the uninsured will require federal efforts. However, New York State has made major strides in expanding access to health insurance for its residents. Between 2000 and 2004, the percentage of the uninsured in NYS declined while the percentage nationally has increased. Although the numbers of uninsured clearly remain unacceptably and chronically high, the trend in New York State is moving in the right direction.

The encouraging developments in NY are due in large part to expansion of our public coverage programs combined with relative stability in our base of employer-sponsored coverage. NY State has large and generous public insurance programs. New York Medicaid's program now covers more than 4.5 million NYS residents. Of those, roughly 2 million are children and another 2 million are adults. It also covers half a million elderly persons as well as 600,000 blind and disabled persons. New York's Medicaid program has one of the broadest coverage eligibilities in the nation and offers a very comprehensive benefit package. In addition, New York's Child Health Plus is one of the nation's oldest and largest state children's health insurance programs. It covers children up to age 19, at higher income eligibility levels than Medicaid, and has approximately 400,000 enrollees. One of the newer programs in the state is Family Health Plus, a public health insurance program for adults between the ages of 19 and 64 who do not have health insurance - either on their own or through their employers - but have income or resources too high to qualify for Medicaid. It is available to single adults, couples without children, and parents with limited incomes. Family Health Plus has more than half a million enrollees.

Healthy New York was established to make insurance more affordable and more accessible to workers in small businesses with 50 or fewer employees. It is also available to eligible working uninsured individuals including sole proprietors. The program, which now has more than 100,000 enrollees, creates standardized health insurance benefit packages that are offered by health maintenance organizations (HMOs) in New York State.

The Commission recommends that New York State reaffirm its historic commitment to health care for the poor and other vulnerable populations. Consistent with the Institute of Medicine's guiding principles,[79] New York State should ensure that health coverage is universal, continuous, affordable to individuals and families, and affordable and sustainable for society at large. While guarding against fraud, New York should lower administrative barriers to

---

[79] Institute of Medicine. (2004). *Insuring America's health: Principles and recommendations* (LCCN 2003114736, 1-224). Washington, DC: National Academies Press.

enrollment to help ensure that all uninsured but eligible persons are placed in the appropriate program and make it easier for eligible persons to retain coverage. New York should build upon its impressive network of public programs to weave them into a seamless system of coverage that is more coordinated and easier to navigate. Furthermore, New York should study coverage expansion efforts in other states and adopt additional strategies to sustain its recent progress in reducing the number of uninsured New Yorkers.

## C. Developing Primary Care Infrastructure

Primary care is an essential component of the health care delivery system. Patients and society as a whole derive substantial benefits when patients have regular and continuous access to care in the least intensive, least expensive venue appropriate to a patient's condition.

Effective reform and investment in primary care is essential to reversing long term trends affecting health care costs, access and quality, especially for underserved populations. Evidence shows that having a primary care physician promotes overall community health. In New York City, for example, minority populations without a primary care giver were 3.5 times more likely to be hypertensive,[80] and patients receiving blood pressure checks in the emergency department were eight times more likely to be non-compliant with their treatment.[81] Rural residents also face barriers to high quality primary and preventive care including longer distances to get to health care delivery sites, physician shortages, lack of transportation, and a scarcity of mental health professionals and programs.[82] Compared with their urban counterparts, residents of rural areas are more likely to report fair or poor health status, to have chronic conditions, and to die from heart disease. They have fewer visits to health care providers and are less likely to receive recommended preventive services. Rural minorities appear to be particularly disadvantaged.[83]

---

[80] Shea, S., Misra D., Ehrlich, M.H., Field, L., & Francis, C.K. (1992). Predisposing factors for severe, uncontrolled hypertension in an inner-city minority population. *New England Journal of Medicine. 327.* 776-781.

[81] Shea, S., Misra D., Ehrlich, M.H., Field, L., & Francis, C.K. (1992). Correlates of nonadherence to hypertension treatment in an inner-city minority population. *American Journal of Public Health. 82 (11).* 1607-1612.

[82] United States Department of Health & Human Services Agency for Health Care Policy and Research. (1996). *Improving Health for Rural Populations Research in Action Fact Sheet* (AHCPR Publication No. 96-P040). Rockville, MD: Agency for Health Care Policy and Research. Available online: http://www.ahrq.gov/research/rural.htm

[83] United States Department of Health & Human Services Agency for Healthcare Research and Quality. (2005). *Health care disparities in rural areas: Selected findings from the 2004 National Healthcare Disparities report* (AHRQ Publication No. 05-P022). Rockville, MD: Agency for Healthcare Research and Quality. Available online: http://www.ahrq.gov/research/ruraldisp/ruraldispar.pdf

77

Some patients, especially those in low income communities, face difficulties accessing primary care other than in a hospital setting. Private physician's offices may refuse or limit the care they provide to Medicaid patients. Further, there are not enough primary care providers in indigent neighborhoods. Of nine low-income minority communities in New York City, for example, only 28 primary care physicians had hospital privileges and were fully accessible to 1.7 million residents.[84] Government funded clinics may have unacceptably long waiting lists, or be inconveniently located.

Given the scarcity of private physicians for low income patients, hospitals often fill a crucial need by providing primary care outpatient services. However, hospitals are not optimally suited to provide primary care. Emergency departments, in particular, are not the best venue for patients to receive primary care. Because contact with patients is episodic and because different physicians may be seen each time, emergency departments lack the ability to provide long-term continuity and the integration of care across multiple disciplines. Care provided in emergency departments is also very expensive. In contrast to the fragmented emergency department model of primary care, high quality primary care can help people lead healthy lives, improve health outcomes, provide coordination of care across a continuum of services, prevent unnecessary hospitalizations, and reduce costs. [85]

The Commission recommends pursuit of a primary care reform agenda including the following elements:

- ensuring that all New York residents have a primary care "home"
- stemming the erosion of primary care capacity
- investing in primary care infrastructure, including investment in facilities, equipment and information technology
- ensuring adequate financial support to the primary health care safety net
- gaining participation by all payors to support such investments, and
- investing in the development of a primary care workforce.

---

[84] Brelloche, C., Carter, A.B. (1990). Building primary health care in NYC's low-income communities. *Community Service Society of New York* working paper. *iv.5.*

[85] Rosenbaum, S., Shin, P., Whittington R.P.T. (2006). Laying the foundation: Health system reform in New York State and the primary care imperative: Executive summary. Retrieved September 22, 2006, from the Community Health Care Association of New York State Web site:





## D. Developing Hybrid Delivery Models

During its analysis and deliberations, the Commission repeatedly identified communities whose needs could be well served with less than a "full service" hospital but which require more than an ambulatory care center. In these areas, there tends to be a single hospital with low utilization, weak finances, and inferior quality. While such institutions may appear to be candidates for closure, they cannot be closed unless an alternative set of services remains available to community residents. To close a hospital without preserving certain services would irresponsibly leave parts of the state bereft of needed health care access.

Most often, the services that required preservation include a combination of emergency or urgent care, ambulatory care, and to a lesser extent, ambulatory surgery, and imaging. However, today's reimbursement system makes this an unprofitable and unviable set of services. Hospitals are thus required to maintain unnecessary services for the sole purpose of cross-subsidizing the necessary but money-losing services. The lack of alternatives has led to a situation in which whole hospitals must be maintained in order to deliver the smaller subset of needed services that could be provided by more focused facilities. These hospitals face structural financial challenges, and in response, may pursue unnecessary capital investments in order to expand their revenue base.

At the moment, there is no financially viable model for this kind of hybrid institution, other than a Critical Access Hospital (CAH). CAHs receive higher Medicare reimbursement rates based on the costs of services rendered. The criteria for this federal designation are designed for rural settings and would not apply broadly enough to be useful in all instances

To better align community needs and resources, the Commission recommends that the State and industry collaborate to test and develop new "hybrid" delivery models. Such hybrids would maintain features of a traditional hospital determined to be necessary while eliminating redundant and unneeded features. Creative and financially viable alternatives, such as free standing emergency rooms or community health centers with urgicare capabilities, could advance the achievement of a rightsized and restructured health care delivery system. The benefits could include enhanced access to services, less duplication, and amelioration of the economic impact of full hospital closures.

79



### E. State University of New York (SUNY) Hospitals

The State University of New York operates teaching hospitals at its Health Science Centers in Brooklyn, Syracuse and Stony Brook. The SUNY hospitals are important resources and recipients of public funds and subsidies. Their academic mission to train physicians and their mission to serve patients regardless of ability to pay must be preserved. Similarly, the SUNY hospitals must be able to compete within the marketplace, operate cost effectively, and establish stronger relationships with community hospitals.

As state-controlled institutions, the SUNY teaching hospitals faced unique challenges adapting to new market conditions that arose in the 1990s. To address these constraints, New York State enacted "hospital flex legislation" in 1998 that granted the SUNY hospitals greater operational flexibility to participate in managed care networks and similar cooperative arrangements. This flexibility was not completely unfettered, however, and the SUNY hospitals continue to suffer competitive disadvantages. Additional legislation has since been proposed that would further expand operational flexibility, even going so far as to restructure the SUNY hospitals as private, not-for-profit corporations. Other states, including Massachusetts, Michigan, and Wisconsin, have take this approach and spun off their teaching hospitals to allow them to function more effectively in the market.

Supporters of privatizing the SUNY hospitals cite numerous advantages to spinning-off the hospitals from the State University system. They contend that doing so will enable the hospitals to work cooperatively with other health care providers to develop high-quality, cost-effective systems of care within their respective regions. Increased management autonomy will promote more effective long-term planning, expedite short-term decision-making and help ensure future competitiveness and financial stability. Non-public facilities will have more competitive salary and benefit obligations to employees. Privatization would also decrease or eliminate the need for ongoing State subsidies, which currently amount to over $147 million in annual operating costs and $350 million in capital costs. Proponents also point out that many leading academic medical centers operate their medical schools and principal teaching hospitals under separate ownership without deleterious effects on their research enterprise. Prominent examples include Harvard, Yale, Cornell, Columbia and Washington Universities, all of which

own no hospitals yet remain leaders in research funding according to the National Institutes of Health (NIH) rankings. [86]

There is also considerable opposition to potential privatization of the SUNY hospitals. Organized labor, especially the New York State Public Employees Federation (PEF) and New York State United Teachers (NYSUT), opposes privatization based on fears of lay-offs and benefit cuts. Opponents also argue that privatization would not improve efficiency or quality, would erode the educational mission, and potentially result in elimination of important but unprofitable services.

The Commission recommends that the Commissioner of Health, in consultation with other relevant parties, conduct a comprehensive analysis of the feasibility of privatizing the teaching hospitals at Stony Brook, Syracuse and Brooklyn. This analysis should consider the clinical and economic impact of potential changes on the hospitals, their communities, their medical school affiliations, their research capabilities, their employees, and taxpayers. Based on the results of this analysis, the Commissioner should develop a concrete timetable for action.

## F. Healthcare Workforce Development

Maintaining and developing the healthcare workforce should be a key public policy concern. The healthcare workforce is a large component of New York's economy, accounting for 1 in 9 jobs in the state. The success of the health care system across the entire continuum of care is dependent upon an adequate supply of qualified personnel at all levels. Shortages have led to recruitment and retention problems throughout the industry. Further, the ongoing implementation of health information technology has created gaps between the skill levels of the current healthcare workforce and the skills required to deliver care in a high-tech environment.

Over the past several years, approximately $1.3 billion has been invested in workforce recruitment, retraining and retention through five programs: the Health Care Worker Retraining Initiative, Community Health Care Conversion Demonstration Project, TANF Health Worker Retraining Initiative, Supplemental General Hospital, Recruitment and Retention Rate Adjustment Program, and the Nursing Home Quality Improvement Demonstration Program. Today, additional strategies should be implemented to:

---

[86] National Institues of Health, (2006). Award Trends Ranking Information. Retrieved October 20, 2006, from National Institutes of Health Offices of Extramural Research Web site: http://grants.nih.gov/grants/award/awardtr.htm

81

- redress persistent shortages in a variety of occupations including registered nurses, pharmacists, radiology technicians, home care attendants and other paraprofessionals, and to
- educate and retrain workers to prepare them for the increasing uses of advanced health technologies in their jobs
- facilitate the timely transfer of personnel displaced by Commission recommendations to other employment within the health care sector.

**G. Information Technology**

The need for improved use of information technology throughout the health care system has been well publicized in recent years. Effective use of IT in hospitals, nursing homes, ambulatory care centers and physician's offices can improve quality of care, reduce errors and control costs. Reconfiguration of the healthcare system places higher demands on information sharing as patients are moved into different settings based on their changing clinical needs. In addition, the ability of the State to monitor potential epidemics, bio-terrorism and general health trends can be significantly improved by the electronic availability of timely, standardized information. Similarly, those involved in regional health planning efforts across the state would benefit from access to electronic databases.

The effectiveness of information technology is constrained if health care providers cannot share information with each other, within the context of HIPAA and privacy concerns. As the HIT infrastructure is developed in NY, the state must ensure that systems are able to communicate, using open architecture and embracing the principle of interoperability. It is not in the public interest for individual health information to become a commodity or for information systems to become balkanized.

HIT systems are costly and require significant investment in hardware, software and training. Further, HIT is a high-risk endeavor. When implemented properly, it can yield incredible results. Failed implementation can be catastrophically expensive and time consuming.

Given these barriers, the healthcare industry lags behind other industries in its investment and use of IT. Industries such as financial services have invested 10% or more of their revenues in information systems, while the health care industry is estimated to have invested less than 4% of its revenues. Part of the reason may be that currently, providers bear almost all of the costs of

IT investment, while the financial benefits accrue to those who pay for care. Accelerating forward momentum towards universal adoption of IT may require shared investment strategies between government, providers, payers and purchasers. The availability of Heal NY Grants for IT investment is a promising opportunity to further advances in this area.

## H. County Nursing Homes

Approximately 10% of the nursing home beds in NYS are in county owned and operated facilities. These homes are departments of county government and are ultimately governed by elected representatives. Many of these 44 county-owned facilities lose money each year and pressure from taxpayers to hold the line on property taxes is stronger than ever. Further, the face of long term care is changing with the growth of home and community based services. This shift calls into question the appropriateness of the county homes' traditional institutional model. Increasingly, counties are asking whether they should remain in the nursing home business.

A report issued by the Center for Governmental Research, "What Should be Done With County Nursing Facilities in New York State?" outlines the challenges faced by county nursing homes and describes the range of options that counties have pursued or considered.[87] County homes differ from proprietary and voluntary homes in a number of ways. County homes have a mission to care for poor and indigent elderly county residents regardless of ability to pay. They have difficulty competing with the voluntary and proprietary sectors for high-intensity, better reimbursed patients. County homes receive certain revenue and incur unique expenses because of their status as government entities. While they benefit from intergovernmental transfers and county subsidies, they also carry a burden of cost allocations that may bear little relationship to actual expense, and their employees often receive more generous wages, salaries and benefits than their counterparts in private homes. While each home has an administrator, policy and management decisions rest with the county legislature or board of supervisors who are subject to numerous pressures.

According to the Center for Governmental Research, counties will have an increasingly difficult time operating their nursing homes as if they were just another department of county government. Among the options that counties have pursued or considered are the following:

---

[87] Center for Governmental Research, Inc. (1997). *What Should Be Done With County Nursing Facilities in New York State?* Rochester, NY: CGR, Inc. Executive summary available online: http://government.cce.cornell.edu/doc/reports/options/summary.asp

- Contract for management services to operate the county home
- Sell licensed beds
- Convert the home to a public benefit corporation
- Transfer the home to a not-for-profit corporation or sell to a proprietary corporation.

Given the complexity of this issue, New York State should undertake a comprehensive review of the future role of county-owned and operated nursing homes. These facilities are essential providers of care for residents who are otherwise difficult to serve. However, many of these homes are in severe financial distress, lack operational flexibility, are burdened with excessive labor costs and struggle to maintain quality of care. A clear policy should be developed to guide decision making about county nursing homes in a changing environment and to protect poor and indigent residents who may have difficulty receiving care in other settings.

## I. Niche Providers

A significant amount of health care services has migrated out of the hospital to other settings. Ambulatory, "niche" providers are unburdened by the large overhead costs borne by hospitals and so can be less costly for payors and users. Patients benefit from a wider choice of venues in which to receive care.

The movement of services out of large institutions is likely to continue. This would not be problematic except for the fact that hospitals treat a disproportionate share of complex and difficult high-risk cases, while other providers effectively "cherry pick," profiting more from specializing in lower-risk cases utilizing high value services. In today's health care environment, hospitals rely on high value services to subsidize less profitable services that are critical to the community. Examples of these less profitable "public goods" are emergency departments, trauma centers, burn care services, and non-income generating services like disaster preparedness. In addition, payer surcharges on high value services are used to fund other public good functions such as indigent care. As a result, the out-migration of high value services from hospitals to niche providers has the potential for weakening these public good funding sources. Alternate funding mechanisms for these essential services are needed and niche providers must share in the burden of paying for public goods and charity care. In addition, there may be a need to enhance quality-of-care monitoring and reporting in non-regulated and private settings.

## J. Roadmap for the Future: Continuation of the Commission's Work

The work of the Commission illustrates the many and diverse opportunities that exist to improve the delivery of health care services in New York State. The Commission's work should be considered a beginning, rather than an end, of a broader reform effort. We need to build on this effort to address an ongoing need for structured decision-making regarding health care resource allocations. The speed of change in health care, driven by changing technology, populations and finance, makes it essential that the work of reforming the system and the regulatory framework be continuous. New York State should implement an ongoing process to sustain the efforts initiated by this Commission.

## VII. Recommendations for Facility Rightsizing and Reconfiguration

### PREFACE TO RECOMMENDATIONS

The following provisions apply to all the recommendations in this section:

1.    Unless otherwise specified, the term "add" means that the Commissioner of Health shall approve one or more applications for approval to provide the enumerated service(s) and/or establish or construct the approximate number of enumerated beds or slots to be operated by or in affiliation with the enumerated facility(ies).

2.    "ADHCP" means an adult day health care program described in Part 425 of Title 10 of the New York Codes, Rules and Regulations.

3.    Unless otherwise specified, the term "affiliate" means that the Commissioner of Health shall approve an application providing for greater clinical or financial integration between the subject facilities, which may include the possible allocation of services between such facilities and/or the joining of such facilities under a single unified governance structure.  Where a subject facility fails to execute a binding agreement to effect such affiliation by the date specified in the recommendation, the Commissioner of Health may revoke or annul the operating certificate of that facility. Where no date is specified, such date shall be deemed to be December 31, 2007.

4.    "ALP" means an assisted living program described in section 461-l of the Social Services Law.

5.    Unless otherwise specified, "beds" means inpatient acute care beds.

6.    Unless otherwise specified, the term "close" means that the Commissioner of Health shall revoke the operating certificate of the subject facility as expeditiously as

86

necessary and possible to preserve quality of care, and that the subject facility shall be converted to another use and/or sold or otherwise transferred. Unless otherwise specified, any beds associated with such operating certificate shall cease to exist, and shall not be transferred to another facility or otherwise allocated.

7.    Unless otherwise specified, the term "convert", as applied to a facility, means that the Commissioner of Health shall revoke the operating certificate of the subject facility and approve an application for the establishment of the new facility identified in the recommendation. Unless otherwise specified, the term "convert", as applied to beds means that the Commissioner of Health shall approve an application to change the designation of the approximate number of enumerated beds on the operating certificate of the subject facility from their current designation to the designation specified in the recommendation.

8.    Unless otherwise specified, the term "discontinue" means that the Commissioner of Health shall limit and/or modify the operating certificate of the subject facility and/or take any other action necessary to eliminate that facility's authorization to provide the enumerated service(s), and shall eliminate any associated beds from the operating certificate of the subject facility. Such beds shall cease to exist, and shall not be transferred to another facility or otherwise allocated.

9.    Unless otherwise specified, the term "downsize" means that the Commissioner of Health shall eliminate the approximate number of enumerated beds from the operating certificate of the subject facility. Such beds shall cease to exist, and shall not be transferred to another facility or otherwise allocated.

10.    "DTC" means a diagnostic and treatment center described in Article 28 of the Public Health Law.

11.    Unless otherwise specified, the term "explore" shall mean that the Commissioner of Health shall supervise discussions including the subject facilities intended to evaluate

87

the enumerated goal(s), and, should the Commissioner determine such goal(s) to be consistent with the mandate and other recommendations of the Commission, implement such goals as described in this report.

12.  Unless otherwise specified, the term "facility" means a provider, building or campus.

13.  Unless otherwise specified, the term "joined under a single unified governance structure" means that the Commissioner of Health shall approve an application joining the subject facilities under a single unified governance structure that has full authority to engage in strategic planning, restructure clinical services, bed capacity, and facilities, and negotiate and contract on behalf of subject facilities, and the incentive to structure services to achieve maximum efficiency. The governing board of the new entity must have powers sufficient to compel actions by any of the individual institutions. Where a subject facility fails to execute a binding agreement to effect such joining by the date specified in the recommendation, the Commissioner of Health may revoke or annul the operating certificate of that facility. Where no date is specified, such date shall be deemed to be December 31, 2007.

14.  "LTHHCP" means a long term home health care program described in article 36 of the Public Health Law.

15.  "PACE" means a program of all-inclusive care for the elderly described in subdivision 11 of section 4403-f of the Public Health Law.

16.  Unless otherwise specified, the term "rebuild" means that the Commissioner of Health shall approve an application to construct a facility to replace the subject facility or facilities that is reasonably consistent with the terms of the recommendation, and that the subject facility shall be converted to another use and/or sold or otherwise transferred.

17. "RHCF" means a residential health care facility described in Article 28 of the Public Health Law.

18. "TCU" means a transitional care unit described in Article 28 of the Public Health Law.

19. Unless otherwise specified, the term "transfer" means that the Commissioner of Health shall approve an application to move the location of the enumerated beds that is reasonably consistent with the terms of the recommendation, but that such beds shall continue to be operated by the same subject facility.

20. Where a recommendation requires action on the part of a subject facility in order to be implemented, the Commissioner of Health shall have the authority to take any action necessary to compel such action by the subject facility, including but not limited to refusal to act on any application from the subject facility, refusal to provide any other consent requested by the subject facility, or the suspension, limitation or modification of that facility's operating certificate.

21. Where a recommendation or the results thereof may have an adverse effect on competition, the Commissioner of Health shall take any steps necessary to actively supervise the implementation of such recommendation and/or the results of such recommendation, to ensure that such implementation or results remain consistent with the clearly articulated policy of the State in regard to such implementation or results.

22. The Commissioner shall implement all recommendations pursuant to, and in a manner consistent with, (i) the police power of the State, (ii) the Commissioner's specific authority and duty to take cognizance of the interests of health and life of the people of the State, and of all matters pertaining thereto, and (iii) the Commissioner's duty to take all actions necessary to implement the recommendations in a reasonable, cost-efficient manner.

89

23.   Unless otherwise specified, the Commissioner of Health shall implement each
      recommendation as expeditiously as possible, but in no event later than June 30,
      2008.

# CENTRAL REGION

# ACUTE CARE RECOMMENDATIONS

## *Recommendation 1*

### Facility (ies)

Crouse Hospital (Onondaga County)
University Hospital, SUNY Upstate Health Science Center (Onondaga County)

### Recommended Action

It is recommended that Crouse Hospital and SUNY Upstate Medical Center be joined under a single unified governance structure under the control of an entity other than the State University of New York, and that the joined facility be licensed for approximately 500 to 600 inpatient beds. It is further recommended that the Commissioner refrain from either approving any applications that have been or will be filed by either facility or providing any other consent requested by either facility, prior to the execution by the facilities of a binding agreement to join under a single unified governance structure, except where such approval or consent is necessary to protect the life, health, safety and welfare of facility patients, residents or staff.

### Facility Description(s)

University Hospital is a 366-bed, tertiary referral center for the greater Syracuse region. It has the city's only level 1 trauma center, and provides more than 80 hospital-based clinics and numerous specialty centers, including the area's only pediatric emergency center and intensive care unit, burn center, regional oncology center, and renal and pancreatic transplant program.

91

University Hospital is the teaching hospital of Central New York's only academic medical center, the State University of New York (SUNY) Upstate Medical Center at Syracuse. It is part of the SUNY Upstate Medical University, which also houses the colleges of medicine, nursing, graduate studies, and health professions. The SUNY Upstate Medical University is Onondaga County's leading employer, with approximately 3,300 full time equivalent employees.

Crouse Hospital, a 576-bed facility, is the larger of the two institutions. It offers emergency, medical/surgical and intensive care, psychiatry, numerous outpatient services, and more than half of the area's obstetrical and neonatal care. The hospital is a major teaching site for SUNY medical students and residents. Crouse has approximately 1,800 full-time equivalent employees.

The campuses of Crouse Hospital and SUNY Upstate Medical University are adjacent, and at some locations they are physically interconnected.

### Assessment

University Hospital and Crouse have a combined total of 942 certified beds on two interconnected campuses, both of which require major modernization. Their combined average daily census was only 563 in 2004. Neither institution can be eliminated completely; portions of both are required to meet the community's health care needs and to sustain SUNY Upstate's medical education role.

| Summary Statistics 2004 | **SUNY** | **Crouse** |
|---|---|---|
| | | |
| Discharges | 16,770 | 21,603 |
| Inpatient % Medicaid/Uninsured | 24% | 26% |
| Uncompensated Care | $65 million | $23 million |
| ED Visits | 48,704 | 24,716 |
| Certified Beds | 366 | 576 |
| Staffed Beds | 366 | 463 |
| Average Daily Census | 294 | 269 |

Collectively, SUNY and Crouse have excess inpatient capacity. SUNY operated all of its 366 beds at an average occupancy rate of 80% from 2002 to 2004. Crouse had an average occupancy of certified beds of just 47% between 2002 and 2004. Crouse, however, reports operating only 463 of its 576 beds for a staffed occupancy rate of 60% in 2004. A combined organization of approximately 500-600 beds will be sized sufficiently to meet patient needs, the education requirements of SUNY, and maintain the competitive hospital market within the Syracuse area.

Excess capacity weakens the financial status of Crouse Hospital. Crouse filed for bankruptcy protection in 2001, with debts of $91 million. The hospital emerged from bankruptcy in 2003 by deferring payment of $62 million in principal for five years. Repayment of the $62 million begins in 2008.

Each hospital plans to undertake independently very costly and duplicative modernization projects. The two hospitals' plans cost approximately $190 million in total. University Hospital soon will construct a six-story addition to its east wing, which will house a children's hospital as well as expanded cardiovascular, neuroscience and oncology programs. The $99 million expansion project will increase the amount of space dedicated to pediatric medicine from 18,000 square feet to 87,000 square feet, and it is anticipated to open in the spring of 2009. Crouse Hospital also needs substantial capital investment in order to remain competitive. Many parts of Crouse are at least 30 years old. The hospital is in the early stages of an $88 million dollar capital campaign to upgrade its facilities.

The strategy of continuing to invest in these two separate yet adjacent entities with duplicative services can no longer be justified. An integrated organization will reduce the duplication of services across the two facilities (e.g., emergency departments, medical/surgical beds, operating rooms), consolidate the patient base for medical education, reduce administrative inefficiencies, and minimize capital investment. Medical education will be enhanced, and the combined entity should help the physician shortage across upstate New York.

93

## *Recommendation 2*

### Facility (ies)

Auburn Hospital (Cayuga County)

### Recommended Action

It is recommended that Auburn Hospital downsize by approximately 91 beds to approximately 100 certified beds. It is further recommended that Auburn Hospital discontinue its obstetrical services and that these services be provided by other area hospitals.

### Facility Description(s)

Auburn Memorial Hospital is a suburban community hospital in Cayuga County with 191 licensed beds. It offers emergency, medical/surgical and intensive care, psychiatry and obstetrics services. It has no outpatient services at the hospital site. It had approximately 6,508 discharges and 23,054 emergency visits in 2004. Approximately 40% of its admissions originated in the emergency department. The facility occupies a city block in a single building with wings dating from between 1920 and 1970. The hospital has an adjacent 80-bed nursing home, the Finger Lakes Center for Living, which is fully occupied. Its payor mix is comprised of 55% Medicare, 20% commercial insurance, and 16% Medicaid. The hospital had approximately 794 FTEs in 2003.

### Assessment

Auburn Hospital is underutilized. Only 40-45% of its certified beds have been occupied in recent years; in 2004, it had just 41% occupancy of its certified beds. One-hundred beds are currently staffed, and its average daily census is 68. The hospital suffered loss of key staff and significant revenues were lost when inpatient care transitioned to outpatient settings.

94

Auburn is struggling financially. The hospital had a near break-even operating margin prior to 2003. In 2004, Auburn reported a loss of $3.1 million. In 2005, their operating loss increased to $5 million. The projected operating loss for 2006 is between $2 and $3 million. Its debt is approximately $50 million, including $19.5 million secured by Cayuga County, $5 million financing for the nursing home, $3.9 million line of credit from First Niagara Bank, a pension plan under-funded by approximately $20 million, and a $260,000 mortgage for an urgent care center. Auburn has no DASNY debt.

Auburn is implementing a fiscal stabilization plan to ameliorate its financial difficulties. It has retained a consulting firm for turnaround assistance, and is aggressively cutting costs.

Auburn should alter its current service mix. It has only 15 obstetrics beds and, according to the provider, performs approximately 300 births per year. These services are readily available at other area hospitals. The Commission recommends the elimination of obstetrics at Auburn because these services contribute to Auburn's financial problems, and the elimination of obstetrics will not create community access problems. Additionally, Auburn has a small complement of 14 psychiatric beds, of which, according to the hospital, only half are filled. Given the full occupancy of psychiatric beds in neighboring Syracuse, it is worth exploring whether these services can be more effectively organized on a regional basis.

Despite its small size and low utilization, Auburn should not be closed. The hospital is located 23 miles from the nearest hospital, which is in Syracuse, and is bordered on the west by Seneca County, which does not have a single hospital. Closure of the hospital would result in an increase in estimated average travel time for patients from 9 to 52 minutes. Auburn Memorial Hospital is necessary to preserve access to care.

Optimally, Auburn could close part of its physical plant to reduce fixed costs and reflect its actual staffing level. However, its physical configuration in a single, low-lying building makes this difficult to do. Auburn can enhance its physical plant by establishing more single bedded rooms that would be more attractive to patients, thereby helping increase its overall patient volume.

95

## *Recommendation 3*

### Facility (ies)

St. Joseph's Hospital (Chemung County)
Arnot Ogden Medical Center (Chemung County)

### Recommended Action

It is recommended that Arnot Ogden Medical Center and St. Joseph's Hospital participate in discussions supervised by the Commissioner of Health to explore the affiliation of such facilities to end the medical arms race in Elmira that is expending scarce resources on duplicative services and progressively weakening both institutions. St. Joseph's pursuit of a relationship with the Guthrie Health System will not serve the best interests of the Elmira community. It is further recommended that the Commissioner refrain from either approving any applications that have been or will be filed by either facility or providing any other consent requested by either facility, prior to the conclusion of such discussions between Arnot Ogden Medical Center and St. Joseph's Hospital, as determined by the Commissioner of Health, except where such approval or consent is necessary to protect the life, health, safety and welfare of facility patients, residents or staff. If either Arnot Ogden Medical Center or St. Joseph's Hospital fail to participate in such discussions in good faith, as determined by the Commissioner of Health, it is recommended that the Commissioner of Health close that facility and expand the other to accommodate the patient volume of the closed facility.

### Facility Description(s)

Arnot Ogden Medical Center is a non-sectarian 216-bed, tertiary referral center in Elmira, which includes a heart institute, cancer center, diabetes center, health center for women, maternal and child health center, and an HIV primary care clinic. Arnot Ogden also provides level III neonatal care and level II trauma care. The next closest location for these services is approximately 70

96

miles away. The hospital has updated its facility, including an expanded emergency department that was completed in 2005. It has approximately 1,300 full-time equivalent employees.

St. Joseph's is a 224-bed Catholic acute care facility in Elmira that provides medical/surgical and physical medicine and rehabilitation services. The facility also provides inpatient and outpatient mental health, drug and alcohol services. The emergency department is approved to receive involuntary psychiatric admissions. St. Joseph's is an aging facility and requires investments in facility upgrades, including an upgraded emergency department. St. Joseph's has approximately 800 full-time equivalent employees.

Both hospitals are located in the city of Elmira, approximately two miles apart.

### Assessment

There is excess inpatient capacity in Elmira. The two hospitals each ran at an average daily census of approximately 137 patients in 2004. Respectively, they had occupancy rates of 63% at Arnot Ogden and 61% at St Joseph's based on certified beds in that year. St Joseph's operated 183 of their 224 certified beds, while Arnot Ogden operated all 216 of their certified beds. St. Joseph's occupancy based on available beds was 75% in 2004.

St. Joseph's is barely breaking even financially. From 2001 to 2003, St. Joseph's reported negative profit margins with an average loss of -2%. It has invested between $1.5 and $1.8 million annually on technology and facility upgrades. Profit margins at Arnot Ogden are somewhat stronger than at St. Joseph's, with an average loss of 0.5% for the period 2001 through 2003. Neither facility carries DASNY debt.

Competition for medical services has been particularly fierce between these two hospitals. Arnot Ogden has traditionally provided a full scope of cardiac services, including cardiac catheterizations. St. Joseph's submitted a certificate of need application for cardiac catheterization services, which was denied. Arnot Ogden also provides outpatient dialysis services, which is approximately 70% occupied. St. Joseph's submitted a certificate of need

97

application for similar dialysis services, which was approved. The local planning agency, the Finger Lakes Health Systems Agency, however, did not support the establishment of dialysis services at St. Joseph's.

Arnot Ogden and St. Joseph's attempted to merge approximately fifteen years ago. They resolved potential religious issues during the merger proceedings; however, the merger was ultimately unsuccessful due to their inability to resolve existing debt structure under a new entity.

St. Joseph's contacted Pennsylvania-based Guthrie Health three years ago about forming a partnership. Guthrie has secured a presence in New York's southern tier. Guthrie operates Corning Hospital, which is west of Elmira in Corning, New York, and a base of Guthrie Clinic physicians in practice sites throughout the Southern Tier. This outreach has impacted physician referral patterns in Elmira. Historically, physicians in the community have tried to maintain a balance between the two hospitals. Recently, Guthrie Clinic based physicians are admitting to St. Joseph's and referring specialty care to Robert Packer Hospital, a Guthrie-affiliated facility in Sayre, Pennsylvania that provides tertiary care. Admissions at Arnot Ogden have declined approximately 800 per year.

St. Joseph's announced in June 2006 its intention to form a collaborative partnership with Guthrie. Further collaboration between Guthrie and St. Joseph's will not fulfill the need for a single hospital in Elmira with common governance and management. The Commission believes that the Elmira community would be best served by an integrated provider with the capacity to rationalize services and ensure that health care needs are met within the community. Integration of Arnot Ogden and St. Joseph's would reduce the duplication of services across the two facilities (e.g., emergency departments, medical/surgical beds, operating rooms), reduce administrative inefficiencies, limit the medical arms race between the facilities, and ensure the continuation of health care availability in the area.

98

## *Recommendation 4*

**Facility (ies)**

Albert Lindley Lee Hospital (Oswego County)

**Recommended Action**

It is recommended that Albert Lindley Lee Hospital close all of its 67 beds. It is further recommended that the hospital convert to an outpatient/urgent care center with Article 28 diagnostic and treatment center licensure.

**Facility Description(s)**

Albert Lindley Lee Memorial Hospital is a 67-bed acute care facility in the town of Fulton in Oswego County. The hospital offers medical/surgical and emergency care. A.L. Lee has approximately 321 full-time equivalent employees. Despite its small size, the facility is underutilized; roughly half its beds were empty in 2003. Certified and staffed occupancy at A.L. Lee was 56% in 2004. The hospital's operating margin was -2% from 2000 through 2003. A.L. Lee has (non-DASNY) long-term debt of approximately $4 million. The recent renovation of its emergency room and outpatient facilities cost approximately $3.4 million. More substantial renovations are required in order for the facility to remain up-to-date and competitive.

**Assessment**

A.L. Lee Hospital is in close proximity, approximately twelve miles, to Oswego Hospital. Oswego is larger and more modern and sophisticated than A.L. Lee. Oswego has 132 certified beds and provides a broad array of services, including inpatient obstetrics and a more comprehensive outpatient program. Oswego Hospital recently completed $35 million worth of capital renovations, including a new ambulatory surgery entrance, operating rooms, intensive care unit, maternity department and other upgrades. Oswego is also in reasonably strong



financial shape; it posted a positive 4.3% margin in 2003. A.L. Lee Hospital and Oswego
Hospital had extensive merger talks, but these ended when A.L. Lee Hospital withdrew from the
discussions.

There is excess inpatient capacity in Oswego County and no demonstrated need for two hospitals
in the Oswego County area. The two hospitals had a combined total average daily census of 106
patients in 2004. The two hospitals have 199 certified beds, which, if were all located at one
facility would be 72% occupied. A single facility will operate more efficiently and will have a
larger patient volume which will allow it to offer more comprehensive services and improve
quality of care. Oswego Hospital is the more appropriate location for this combined facility
because it is larger and recently renovated, and because the population of Fulton, where A.L. Lee
is located, continues to shrink.

Other hospitals in A.L. Lee's service area also could accommodate the patients when A.L. Lee
closes. A.L. Lee's closure will not have a major impact on local physicians' ability to practice
medicine because many have privileges at both A.L. Lee and Oswego Hospital

A health care facility in Fulton must remain to meet the outpatient and urgent care needs of the
community. A.L. Lee provided approximately 47,000 outpatient visits in 2004. Patients using the
facility will continue to need access to community-based primary care. Oswego Hospital's
outpatient facility provided approximately 190,000 outpatient visits in 2004, and it is unclear if
the existing facilities could accommodate the additional volume from A.L. Lee.