UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

------------------------------------------------------------------- x

JOHN E. ANDRUS MEMORIAL, INC. (d/b/a ANDRUS ON HUDSON),

                                  Plaintiff,

-against-

RICHARD F. DAINES, as Commissioner of the New York State Department of Health,

                                  Defendant.

------------------------------------------------------------------- x

2007 Civ. 3432 (CLB)(MDF)


**PROPOSED FINDINGS OF FACT IN SUPPORT OF PLAINTIFF'S MOTION FOR A PRELIMINARY INJUNCTION**

        Plaintiff John E. Andrus, Inc. (d/b/a Andrus on Hudson), by its attorneys, Cadwalader, Wickersham & Taft LLP, respectfully submits that the following facts have been established on its motion for a preliminary injunction:

I.      **The Andrus**

1.      John E. Andrus Memorial, Inc., ("the Andrus") is a not-for-profit charitable organization that was established in 1953.  The Andrus is located in Hastings-on-Hudson, and has been licensed as a residential health care facility by the New York State Department of Health since 1969.  Currently, it is certified to provide care to up to 197 residents.

2.      The Andrus is a certified provider in the Federal Medicare program, providing subacute and skilled nursing and rehabilitative services to individuals aged 65 and over; and in the State Medicaid program, providing medical assistance, including long-term nursing home care, to indigent and medically needy individuals.

3.    Currently, the Andrus cares for 196 elderly residents, the majority of whom are either from the area immediately surrounding the Andrus, or have a responsible party within 5 miles of the facility.

4.    The average age of the Andrus' residents is 88, and currently there are 5 residents over 100 years of age.

5.    Approximately 75% of its long-term care residents financially qualify for Medicaid while 33% of the remaining residents, or 8% of its total population, are paid for by Medicare.

II.    **Creation Of The New York State Commission On Healthcare Facilities In The Twenty-First Century**

6.    In April, 2005, the New York State Legislature passed, and then-Governor George E. Pataki signed, legislation creating the New York State Commission on Healthcare Facilities in the 21st Century ("Commission"). See Part K of Chapter 58 of the Laws of 2003 as added by Section 31 of Part E of Chapter 63 of the Laws of 2005 (the "Enabling Legislation").

7.    The Enabling Legislation required the Commission to seek regional input. For purposes of such input, the State was divided into six regions (Long Island, New York City, Hudson Valley, Northern, Central and Western). The Andrus is located in the Hudson Valley Region.

8.    The Enabling Legislation required the appointment of regional members to the Commission, who were authorized to vote only on recommendations related to their respective regions. The Enabling Legislation at § 7(c), (d) also required the creation of

one Regional Advisory Committee ("RAC") for each region, which was required to "develop recommendations for reconfiguring its region's general hospital and nursing home bed supply to align bed supply with regional and local needs." The RACs were required by the Enabling Legislation to transmit their final reports to the Commission on November 15, 2006.

9.  Section 5 of the Enabling Legislation sets forth a list of factors that the RAC and Commission were required to consider when making recommendations or decisions affecting particular hospitals or nursing homes in the State. Among the factors to be considered by the Berger Commission and RAC were "the economic impact of right sizing actions on the state, regional and local economies, including the capacity of the health care system to provide employment or training to health care workers affected by such actions"; "the financial status of general hospitals and nursing homes..."; "the potential conversion of facilities or current facility capacity for uses other than as inpatient or residential health care facilities"; "the extent to which a facility serves the health care needs of the region, including serving Medicaid recipients, the uninsured, and underserved communities"; and "the potential for improved quality of care and . . . greater stability and efficiency in the delivery of needed health care services for a community".

10.  Section 8 of the Enabling Legislation required the Commission to "develop recommendations for reconfiguring the state's general hospital and nursing home bed supply to align bed supply to regional needs," and specifically to "make recommendations relating to facilities to be closed and facilities to be resized, consolidated, converted or restructured" in each region of the State. The Enabling

Legislation instructed the Commission to transmit its recommendations to the Governor and Legislature by December 1, 2006.

11.    Section 9 of the Enabling Legislation provides that the New York State Commissioner of Health must implement the Berger Commission recommendations, unless the Governor fails to transmit the final recommendations, along with his approval, to the Legislature on or before December 5, 2006, or a majority of the members of each house of the Legislature vote to adopt a concurrent resolution rejecting the Commission's recommendations in their entirety by December 31, 2006.  Section 9 further provides that the Health Commissioner "shall take all actions necessary to implement, in a reasonable, cost efficient manner, the recommendations of the Commission"... and "shall take all steps necessary to protect patient safety ...."

12.    The Commission transmitted its final recommendations, entitled A Plan to Stabilize and Strengthen New York's Health Care System ("Final Report")," to the Governor and Legislature on November 28, 2006.

13.    Governor Pataki transmitted the Final Report and his approval thereof to the Legislature on November 30, 2006.

14.    The New York State Legislature did not pass a concurrent resolution rejecting the Commission's recommendations prior to the end of 2006.

III.    **The Commission Process**

15.    The Commission developed an analytic framework that was supposed to apply the factors that the Commission was required to consider under the Enabling Legislation.

-4-

16.     This analytic framework was supposed to be applied to each facility in the State.

17.     The Enabling Legislation (§§ 7(a), 8(a)) required both the Commission and the Hudson Valley RAC to conduct extensive outreach to stakeholders in the region including but not limited to community-based organizations, health care providers, labor unions, payers, businesses and consumers.  In particular, the Commission and the RACs were charged with conducting formal public hearings, and fostering discussions among stakeholders.

18.     The Commission and RACs conducted nineteen public hearings statewide, including three in the Hudson Valley Region.  These Hudson Valley meetings were conducted prior to June 19, 2006.

19.     No notice was given to the Andrus in advance of any of the public hearings that the Andrus was being considered for closure, or the reasons that it was being considered for closure.

20.     The Andrus did not participate in any of the public hearings identified in the preceding paragraphs.

21.     At no other time in the RAC or Commission deliberations did either body notify the Andrus that it was being considered for closure or the reasons that it was being considered for closure.

22.     Members of the Hudson Valley RAC and Commission staff met with Betsy Biddle, Andrus' executive director, on or about June 19, 2006.  At that meeting was discussed the Andrus' previous attempt to operate a continuing care retirement community; its

subsequent successful efforts to increase its resident census; its transfer of 50 nursing home beds to Beth Abraham Hospital; and its improved finances.

23.   None of the staff of the RAC or the Commission participating in the meeting told the Andrus that it was being considered for closure.

24.   One participant at the meeting told Ms. Biddle that the meeting was an opportunity to tell the "good story" of the Andrus.

25.   Ms. Biddle informed the participants of the Andrus' unsuccessful proposal to develop a continuing care retirement community ("CCRC").  She also informed the participants that in July 2002, after learning of the decision by the Village of Hastings-on-Hudson authorities to deny the Andrus the development permit needed to proceed with a CCRC, the Andrus had agreed to transfer 50 beds to another not-for-profit nursing facility, Beth Abraham Health Services, and reduced its nursing home bed complement to 197 beds. She advised them that the Andrus also resumed admissions to the nursing homes and had increased occupancy from an average census of 72 residents in 2002 to a level of 176 residents by year end 2005, reflecting a 90% occupancy rate with its existing 197 bed complement.  She also noted that the census was currently 182 residents, and had even occasionally climbed above 190 residents in the early part of 2006.  Finally, she advised the participants that, with improved occupancy levels, the Andrus had achieved an operating surplus in 2005, and had continued operating in the black through 2006.

26.   At the request of the participants, after the meeting, Ms. Biddle provided to the RAC certified financial statements for 2005.  The financial statement shows a surplus of $509,179.

27.    This June 2006 meeting was the only substantive communication between the Commission or RAC members and representatives of the Andrus.

IV.    **The RAC Report and Commission's Recommendations**

28.    The Hudson Valley RAC report cited the Andrus' alleged "low occupancy and case mix index (in 2003, 39.2% and .90, respectively)" and resulting "obvious financial problems."

29.    The foregoing information cited in the RAC report is inaccurate in the following respects:

30.    First, the 2003 data cited by the Hudson Valley RAC were stale and unrepresentative of the Andrus.

31.    The Andrus averaged 97 occupied beds in 2003 due to the temporary suspension of admissions pending its CCRC proposal. By 2005, that figure rose to an average of 171 residents, reaching 176 residents by year end. The Andrus' occupancy continued to improve in 2006. On June 20, 2006, the day of the meeting between the RAC and representatives of the Andrus, the census stood at 183 residents.

32.    Second, the cited occupancy rate of 39%, even for 2003, is inaccurate and understates the Andrus' true occupancy levels.

33.    The Hudson Valley RAC presumed a bed capacity of 247 certified beds rather than the Andrus' true complement of 197 beds due to the Andrus' voluntary transfer of 50 beds. The foregoing presumption is incorrect.

34. The RAC was informed at the June 2006 meeting of a 2002 agreement to move 50 of its nursing home beds to another nursing home provider, and was provided with a copy of the transfer agreement immediately following the meeting.

35. In 2003, the Andrus' occupancy rate was 49% based on 197 certified beds. By 2005 and 2006, the Andrus achieved average occupancy rates of 87% and 90% respectively.

36. <u>Third</u>, the RAC's reference to the Andrus' "obvious financial problems" is mistaken.

37. By 2005, the Andrus was operating at a surplus; again in 2006, the Andrus continued to operate in the black. This information was also timely shared with the Hudson Valley RAC at the June 2006 meeting and confirmed by the Andrus' 2005 certified financial statements submitted to the RAC's Chair that same week.

38. The RAC report was not made public until the Berger Commission released its Final Report in November 2006. None of the information contained in the Report was shared with providers or the public until after all final recommendations had been made by the Berger Commission.

39. The Final Report recommended that the Andrus downsize all "247" nursing home beds and add 140 assisted living program beds and possibly other non-institutional services.

40. In the Final Report, the Berger Commission described the Andrus as a "247 bed" facility that "has been operating at a significant loss until 2006" and that it only now "claims" to be operating in the black. The foregoing description is inaccurate in the following respects:

41.   In July 2002, the Andrus had voluntarily "rightsized" to a 197 bed nursing facility, and has been successfully approaching 100% capacity.

42.   The Department of Health was aware of the Andrus' agreement to transfer 50 of its beds several years prior to the issuance of either the RAC report or the Final Report.

43.   The Department of Health decertified 50 of the Andrus' beds and reduced its certified beds to 197 effective as of July 1, 2006.  The effective date of the decertification of the 50 beds was at least four months prior to the issuance of either the RAC report or the Final Report.

44.   The Andrus' occupancy levels, maintained at 90% or better over the past several years, reflect the strong, continued demand for its nursing home services among Westchester's senior citizens.  For the past three months, the Andrus' occupancy has averaged 99%, and as of April 11, 2008 stands at 196—with only one vacancy.

45.   The Andrus was operating at a surplus, not a deficit, as early as 2005, as supported by the Andrus' financial statements for 2005, certified by the Andrus' independent auditors to be accurate.  The Andrus' 2005 certified financial statements reported a surplus (net of grant monies) of $509,179 on the Statement of Operations.

46.   The 2005 certified financial statements were furnished to the RAC in June 2006.  Neither the RAC report nor the Berger Commission Final Report even mentions the Andrus' 2005 financial statements.

47. The Final Report states that "[t]he facility has a history of a high number of deficiencies (26 in its 2005 survey), many of which are attributable to the building's deteriorating condition." The foregoing description of the Andrus' survey history is inaccurate:

48. In the Department of Health's 2005 resident survey, the Andrus was cited for only 8 survey deficiencies related to resident care, none of which involved harm to any patients, and 6 other deficiencies for building/environment, for a total of 14 deficiencies, not 26.

49. In the past 8 years, the Andrus has never been cited for as many as 26 deficiencies in any given survey.

V.   **Alleged "Low Acuity" Does Not Justify Andrus' Closure**

50. In the Final Report, the Berger Commission presumed that the "low" acuity of the Andrus' residents relative to other nursing homes meant that a majority of its residents "could be better served in an ALP". This presumption was erroneous for the following reasons:

51. The residential health care facility beds now in use at the Andrus cannot be converted to assisted living slots without profoundly disrupting the 24-hour nursing home care that many of its residents require.

52. The RAC and Berger Commission cited to the Andrus' Physical A and Physical B residents to support the assumption that the Andrus' residents could be safely cared for in an assisted living program.

53. The Andrus' Physical A and Physical B residents comprise a distinct minority of the Andrus' resident population, and close to half suffer from dementia or other mental

impairment. The remainder of the residents have greater care needs and would require continued nursing home care.

54.    The majority of the Andrus' current residents will continue to require skilled nursing care.

55.    Classification as "Physical A" or "Physical B" denotes nursing home eligibility.

56.    The Andrus' Physical A and Physical B residents have been determined to be so infirm and medically needy as to qualify for nursing home care under the Department of Health's own criteria.

57.    Most of the Andrus' residents are covered by the Medicaid program.

58.    It will cost the State three million dollars or more per year in additional funds to cover their nursing home care at other nursing facilities in Westchester County.

VI.    **Implementation of the Berger Commission's Closure Recommendation**

59.    On January 31, 2007, Department of Health (the "Department") sent a letter to the Andrus ("Implementation Outline") advising it of the Commission's recommendation and outlining the Department's plan for implementing the Commission's recommendation by June 30, 2008.

60.    The Department of Health has agreed that it will not attempt to enforce the part of the Commission's recommendation relating the Andrus' addition of 140 assisted living beds.

61.    Conversion to 140 assisted living beds and elimination of all nursing home beds is not a financially viable option.

62.    The Village of Hastings-on-Hudson will not likely approve any further development of the Andrus' campus.

VII.    **Impact of the Implementation of the Closure Recommendation on the Andrus and its Residents**

63.    The next step in implementing the Commission's recommendation would be the submission of a closure plan by the Andrus. Preparing such a plan would require the Andrus to notify hospitals and other health care providers referring patients for long term care, as well as prospective residents inquiring about admission to the Andrus, that it will no longer be able to accept admissions to the nursing home.

64.    Without a continued source of referrals, the Andrus' resident census will decrease, and operating deficits will result.

65.    If the Andrus were to close, the majority of its 196 current residents would have to be placed in another nursing facility for skilled nursing care.

66.    Transfer trauma is a phenomenon recognized in health care and geriatric medicine in which residents transferred from one health care facility to another suffer physical and/or mental distress leading up to, during, and immediately after the transfer. The risk of transfer trauma may be heightened by the degree of change experienced by the resident, the age and frailty of the residents, and the degree of the resident's cognitive impairment.

67.    The symptoms of transfer trauma may include stress, increased risk of falls, and increased mortality rates.

68.    The greater the distance that a nursing home resident will be forced to relocate, the greater the likelihood that the resident will experience transfer trauma.

69.    The Andrus' residents will experience transfer trauma if required to relocate to another nursing facility.

70.    Given the average age and frailty of the Andrus' residents, as well as the high levels of cognitive impairment among their residents, the residents are particularly susceptible to suffering transfer trauma.  This is further heightened by the strong ties many residents have to the local community, and their familiarity with the Andrus and its residents and staff that has developed over their time at the facility.

71.    The vast majority of the residents currently residing at the Andrus have strong ties to Hastings-on-Hudson or the immediate vicinity.  Of the 196 current residents, 108 residents came to the Andrus from a prior address within 5 miles of the facility.   An additional 42 residents have a responsible party or other family within a 5 mile radius of the facility.   Many of these residents have resided at the Andrus for several years and have bonded with the Andrus as their "home" while maintaining strong ties to the community-at-large.

72.    The Andrus also currently cares for 33 Sisters from two orders of nuns.  One group of 14 nuns is from an order with a community in Dobbs Ferry, and they are among the 150 residents with ties to the communities within 5 miles of the Andrus, as described above. An additional 19 nuns, from an order based in New Rochelle, Westchester County, are also currently residing at the Andrus.   Eleven of these nuns suffer from dementia. Because of exceptional design features offered at the Andrus, the nuns from each order

have been able to continue living and worshipping together in daily prayer at the Andrus. (The Andrus has an auditorium in the nursing facility that is utilized as a chapel.) If forced to relocate, the Sisters could not be transferred as a group and continue their worship practices at another nursing facility.

73.    Of the 196 current residents of the Andrus, 115 suffer from dementia or other cognitive impairments.

74.    Of the remaining 27 residents previously residing beyond 5 miles of the Andrus, 24 are either suffering from dementia or are significantly medically compromise with a higher case mix index than "Physical A" or "Physical B". On average, they have resided at the Andrus for the past 4 years; transferring them away from "home" also presents great risk due to their physical and cognitive impairments.

75.    Many of the current residents of the Andrus would have to be transferred to New York City. However, only 17 of the residents come from New York City. 13 of those residents have dementia, 10 have a responsible party within 5 miles of the Andrus, and 6 have a case mix index higher than Physical A or Physical B. Transferring them to facilities outside of Westchester County would be no less risky.

76.    Since the Commission's final report was issued in November 2006, at least 300 additional nursing home beds have been or will be removed from the supply of beds in Westchester County due to the voluntary closure of the Guild Home for the Aged Blind in Yonkers, New York, and the voluntary surrender of an additional 91 beds by the Taylor Care Center in Valhalla, New York.

77.    With the foregoing voluntary bed reductions, there will be a shortage of nursing home beds in Westchester County if the Andrus were forced to eliminate its 197 beds.

78.    Because of the foregoing reductions in beds, it will be even more difficult to place the residents of the Andrus in need of continued nursing home care at a facility within the vicinity of the Andrus.

Dated:    New York, New York
          April 11, 2008

                         Respectfully submitted,

                         CADWALADER, WICKERSHAM & TAFT LLP


                         By:  _____s/Peter G. Bergmann_____
                                   Peter G. Bergmann (PB-9691)

                         Attorneys for Plaintiff
                           John E. Andrus Memorial, Inc.
                           (d/b/a Andrus on Hudson)
                         One World Financial Center
                         New York, New York  10281
                         Telephone: (212) 504-6000