UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

-------------------------------------------------------------------- x

JOHN E. ANDRUS MEMORIAL, INC. (d/b/a ANDRUS
ON HUDSON),

                                  Plaintiff,

               -against-

RICHARD F. DAINES, as Commissioner of the New York
State Department of Health,

                              Defendant.

-------------------------------------------------------------------- x

2007 Civ. 3432 (CLB)(MDF)

**AFFIDAVIT OF BETSY
BIDDLE IN SUPPORT OF
PLAINTIFF'S MOTION
FOR A PRELIMINARY
INJUNCTION**

STATE OF NEW YORK      )
                          :  ss.:
COUNTY OF WESTCHESTER )

        BETSY BIDDLE, being duly sworn, deposes and says:

        1.     I am the Executive Director of plaintiff John E. Andrus Memorial, Inc., d/b/a Andrus on Hudson (the "Andrus"), and have served in that capacity since September 1999. The Andrus is a 197 bed not-for-profit nursing home built in 1953, and located in Hastings-on-Hudson in Westchester County. I am personally and fully familiar with the facts set forth below. I submit this affidavit in support of plaintiff's motion for preliminary injunctive relief enjoining the defendant from taking any action to close the plaintiff's nursing facility pursuant to a recommendation made by the New York State Commission on Health Care Facilities in the 21st Century ("the Berger Commission").

**A.    A Preliminary Injunction is Critical to the Health and Safety
of its Residents of the Andrus and to Preserve the Status Quo**

2.    Unless a preliminary injunction is issued, the Department of Health will force the Andrus to proceed with closure of its nursing facility and surrender its operating certificate by June 30, 2008.  This would be devastating for the Andrus as a charitable institution, which has been meeting the long term care needs of Westchester County senior citizens for more than five decades,  and is currently successfully operating at <u>99%</u> occupancy (196 of its 197 certified beds are occupied).  That level of occupancy is remarkable when one recognizes that for most Berger Commission facilities recommended for closure, the public disclosure of the closure recommendation became a self-fulfilling prophecy.  Another casualty of closure would be the loss of over 200 jobs at the nursing home.

3.    Most significantly, however, closure would be tragic for the Andrus' residents, as shuttering the Andrus' nursing home would necessitate the transfer of its 196 residents to other facilities far away from the Andrus and the support provided by family and caregivers.  Those transfers would pose a material risk of harm to these frail and elderly residents.  I know the Andrus' residents as well as anyone, and sincerely believe that, given their advanced age and frailties, many of our residents simply would not survive the trauma of being moved from the nursing facility that they consider their "home" to another nursing facility, with an entirely new set of caregivers and in an entirely new environment.  At the supplemental hearing, the Andrus will present the testimony of geriatric medical experts to speak about the grave risk of "transfer trauma".

4.    The "equities" tip decidedly in the Andrus' favor.  The State has maintained that the goal of the Berger Commission is to "right size" nursing homes and address the excess capacity of nursing home beds on a regional basis.  Closure of the Andrus would turn

that goal on its head, by forcing the closure of the one nursing facility that has filled virtually every one of its beds and has experienced an operating surplus for the past three (3) years (excluding the extraordinary legal fees incurred last year in this litigation), while delivering quality care to elderly residents equal or superior to that of any other facility in the Hudson Valley region. Moreover, recent events since the issuance of the Berger Commission's final report, underscore the irrationality of forcing the Andrus to close. Since November 2006, more than 300 nursing home beds have been or will be eliminated in Westchester County due to voluntary initiatives by various facilities. This situation presents the prospect that, with the closure of the Andrus, there will be too few nursing beds in Westchester County to meet the public need.

5.     What is more, the Andrus would likely prevail at trial on its claims that the State violated due process of law, along with other of the Andrus' constitutional rights, by adopting the seriously flawed Berger Commission recommendation to close the Andrus' nursing home without giving the Andrus notice and opportunity for a hearing. At no time during the Berger Commission's proceedings was the Andrus informed that closure was being considered or that the Berger Commission was relying on outmoded data and demonstrably mistaken information about the Andrus' occupancy, financial condition, and resident care. Having never received such notice, the Andrus was never made aware that it had to defend itself against a recommended closure and the grounds for such a recommendation, either at the Berger Commission's public hearings or in any other setting. That is, the Andrus was kept in the dark about the Berger Commission's plans and its reasons for closing the Andrus' nursing home.

6.     Thus, whatever "opportunity" there may have been to appear before the Berger Commission, the Andrus never had the chance to refute the numerous factual errors and assumptions that evidently formed the basis for the Commission's recommendation to shut down

the Andrus, and to present data directly to the Berger Commission showing the substantial number of its resident census, its financial stability, and the fine care being provided to its elderly residents.

7.      This lack of due process clearly harmed the Andrus:  there is a complete disconnect between, on the one hand, the troubled facility depicted in the Hudson Valley Regional Advisory Committee ("RAC") report, which was charged with assisting the Berger Commission in making recommendations specific to the Hudson Valley, and the Berger Commission report and, on the other hand, the true picture of the Andrus.  Copies of these reports are attached as Exhibits A and B respectively.  Without having afforded the Andrus notice and a meaningful opportunity to be heard, the Berger Commission, with only the flawed report of the Hudson Valley RAC, determined that the Andrus' nursing home should be forced to close, despite available evidence showing that the Andrus was – and to this day continues to be – a thriving, financially stable not-for-profit nursing facility addressing the care needs of 196 senior citizens.

8.      What is at stake, however, is more than the Andrus' property interest; it is the continued care and safety of those elderly residing there who call the Andrus their home.

**B.**    **The Andrus**

9.      The Andrus is a not-for-profit charitable organization established in 1953 by the family of John E. Andrus to provide a home for elderly individuals.  Located in Hastings-on-Hudson, the Andrus operates on the same 26-acre campus and in the same original structure as it did when it first opened its doors over 50 years ago.

10.     In 1969 and continuing for the next 39 years, the Andrus has been licensed as a "residential health care facility", or nursing home by the New York State Department of Health, and is currently certified to care for up to 197 residents.  The Andrus is a certified

provider in the Federal Medicare program, providing subacute and skilled nursing and rehabilitative services to individuals aged 65 and over; and in the State Medicaid program, providing medical assistance, including long-term nursing home care, to indigent and medically needy individuals.

11.     The Andrus currently cares for 196 elderly residents, the majority of whom are from Westchester County or elsewhere in the Hudson Valley region. More than three-fourths of our residents either come from Hastings-on-Hudson or another community within 5 miles of the Andrus or have a responsible party from that same area.

12.     The approximately 170 individuals receiving long-term nursing care at the Andrus have each resided there, on average, for roughly four years.

13.     The Andrus' residents are elderly:  their average age is 88 years.  The Andrus residents are also infirm:  only 31 of the Andrus' current residents can be characterized as "low acuity"[1] and not suffering from dementia.  Many of these residents require the 24-hour nursing supervision provided only in a nursing facility.  The remaining 84% of the Andrus' residents have substantial care needs that cannot be adequately met in any other level of care lower than a nursing home.

14.     Finally, the majority of the Andrus residents are both elderly and poor: roughly 75% of its long-term care residents financially qualify for Medicaid while 33% of the remaining residents, or 8% of its total population, are paid for by Medicare.

---

[1]   The New York State Department of Health has used the term "low acuity" synonymously with those nursing home residents categorized as "Reduced Physical Functioning A" or "Reduced Physical Functioning B" under the Department of Health's Resource Utilization Group ("RUG")-II reimbursement classification system.  See 10 N.Y.C.R.R. § 86-2.30 and Appendix 13-A.

C.    **A Preliminary Injunction Will Prevent Irreparable Harm
to the Andrus and its Residents**

1.    **Submission of a Closure Plan Would Jeopardize
Andrus' Continued Operation**

15.    By letter dated January 31, 2007, the Department of Health outlined a
series of steps to be taken by the Andrus in furtherance of the Berger Commission closure
recommendation, culminating in the Commissioner of Health's revocation of the Andrus'
nursing home Operating Certificate by June 30, 2008.  A copy of the January 31, 2007 letter is
annexed as Exhibit C.  Despite the Court's denial of defendant's motion for summary judgment,
the defendant has informed the Andrus that, absent a preliminary injunction, it intends to move
forward with implementing the Berger Commission's closure recommendation during the
pendency of this litigation.

16.    Absent a continuation of the stay, the next step that the Andrus would be
compelled to take is the preparation and submission of a closure plan to the Department of
Health.  See Exhibit C.  Preparing a closure plan would begin with the sorry task of notifying the
hospitals and physicians in the Andrus' surrounding communities, as well as any prospective
residents inquiring about admission, that it could no longer accept admissions to the nursing
home.  Referral sources and prospective residents would immediately look elsewhere, resulting
in a self-fulfilling prophecy of reduced admissions and lower occupancy, financial hardship, and
certain demise.  This would be particularly ironic—and tragic—considering that the Andrus is
the nursing home of choice for many of the elderly residents in Westchester County, operating at
virtually full capacity.

17.    Quite literally overnight, then, the Andrus would be transformed from a
thriving institution and community resource into a moribund facility and pariah in the health care
provider community.  Even if the facility were to remain technically in operation through trial,

admissions and occupancy would plummet once word of its closure plan was made public. Essentially, there would be no turning back once a closure plan is formulated and submitted. Thus, the very act of preparing and submitting a closure plan would irrevocably harm the Andrus' continued viability, making the final act of formally surrendering its operating certificate a *fait d'accompli*.

18.     Finally, in its complaint, the Andrus asks for only declaratory and injunctive relief against the State, not monetary damages. Even if the Andrus could somehow be adequately compensated for the harm it would suffer if the defendant moved forward with its closure recommendation -- leaving aside the harm to our residents -- I am advised by our attorneys that money damages from the State are unavailable to the Andrus in federal court under the Eleventh Amendment to the United States Constitution. Therefore, if a preliminary injunction is not granted, the Andrus will be unable to ever obtain any form of meaningful redress in federal court for the violation of its constitutional rights.

**2.     The Andrus' Residents Would Suffer Transfer Trauma**

19.     Should the Andrus be forced to proceed with closure, the vast majority of its 196 current residents would have to be placed in another nursing facility because they will continue to require care in a skilled nursing facility setting. Our residents will also be at serious risk of suffering psychologically and physically from being uprooted from their "home" and community and forced to live and receive nursing home care in an unfamiliar environment.

20.     "Transfer trauma" is a phenomenon that is well recognized in the health care community and geriatric medicine. Residents of a nursing home often suffer physical and/or mental distress leading up to, during, and immediately following transfer to another facility. According to the literature, among the factors that can increase the likelihood of transfer trauma are the age of nursing home residents, the level of their cognitive impairment, and the

degree of change experienced by the residents, including any changes in the quality of care provided as well as changes in the physical environment where the resident lives and receives care.

21.    The Andrus' medical experts will testify to the significant role dementia plays in aggravating the incidence and degree of transfer trauma that elderly nursing home residents experience.  In the Andrus' case, the impact of transfer trauma will likely be severe and broad in scope, as the Andrus' resident population is both aged, with an average of 88, and cognitively impaired, with 115 of them suffering from dementia.

22.    The medical literature also suggests that the greater the distance that a nursing home resident will be forced to relocate, the greater the likelihood that the resident will experience transfer trauma.  This factor, too, will also increase the magnitude of transfer trauma for residents of the Andrus.  The vast majority of the residents currently residing at the Andrus have strong ties to Hastings-on-Hudson or the immediate vicinity. Of the 196 current residents, 108 residents came to the Andrus from a prior address within 5 miles of the facility.   An additional 42 residents have a responsible party or other family within a 5 mile radius of the facility.  Many of these residents have resided at the Andrus for several years and have bonded with the Andrus as their "home" while maintaining strong ties to the community-at-large.

23.    The Andrus also currently cares for 33 Sisters from two religious orders of nuns.  One group of 14 nuns is from a community located in Dobbs Ferry, Westchester County, and they are among the 150 residents with ties to communities within 5 miles of the Andrus, as described above.   An additional 19 nuns, from a religious order based in New Rochelle, Westchester County, are also currently residing at the Andrus.  Eleven of these nuns suffer from dementia.  Because of the exceptional design features offered at the Andrus, the nuns from each order have been able to continue living and worshipping together in daily prayer at the Andrus.

The Andrus has an auditorium in the nursing facility that is utilized as a chapel.  If forced to relocate, it is highly unlikely that the Sisters could be transferred as a group and continue their worship practices together at another nursing facility.  I know of no other local nursing home that could accommodate our nuns as a group.

24.     Of the remaining 27 residents previously residing beyond 5 miles from the Andrus, 24 are either suffering from dementia or are significantly medically compromised with a higher case mix index than "Physical A" or "Physical B".  On average, they have resided at the Andrus for the past 4 years; transferring them away from "home" also presents great risk due to their physical and cognitive impairments.

25.     While most of our residents have close ties to Hastings-on-Hudson and the other surrounding communities, only a small fraction could actually be transferred to a nearby nursing facility, even assuming they could withstand the stress of such a move.  In a survey conducted by my staff last month, we could only identify 38 nursing home beds currently available within 5 miles of the Andrus.  Thus, the vast majority of our residents -- 158 frail, elderly individuals -- would have to be moved to facilities beyond 5 miles away to effect the Berger Commission's closure mandate.

26.     Many of our residents would have to be transferred to facilities in New York City.  However, only 17 of our current residents come from New York City.  Of these, 13 have dementia, 10 have a responsible party within 5 miles of the Andrus, and 6 have a case mix index higher than Physical A or Physical B.  Thus, transferring them to facilities outside of Westchester County would be no less risky given their current ties to the local community as well as their cognitive impairments and overall frailty.

27.     The current shortage of beds in the communities immediately surrounding the Andrus can be explained in part by the voluntary closure of the Guild Home for the Aged

Blind, located in Yonkers, New York.  This facility <u>voluntarily</u> relinquished all 219 of its certified beds -- a significant reduction in nursing home bed capacity in southern Westchester County that was not accounted for or known by the Berger Commission or Hudson Valley RAC when it recommended the elimination of the Andrus' beds.  One other nursing facility that was ordered to downsize from 321 to 181 beds -- Taylor Care Center – is voluntarily agreeing to a further reduction of another 91 nursing home beds.  Because of these voluntary reductions, there will be at least 113 fewer beds in Westchester County than the Berger Commission foresaw when it made its closure recommendation – without requiring closure of the Andrus' 197 beds.  Upon information and belief, the most recent Department of Health estimates for nursing home bed need in Westchester County indicate that, in light of these voluntary downsizings, there may actually be a deficit of over 100 beds in the County if the Andrus were forced to close, creating yet another health care planning crisis, the very opposite of the "over-bedding" issue the Berger Commission was supposed to address.

**D.     The Andrus' Constitutional Claims Have Great Merit**

        28.     In its complaint, the Andrus asserted five constitutional claims.  <u>First</u>, it alleged that its procedural due process rights were violated because the closure recommendation was made without first providing the Andrus with notice and opportunity to be heard.  <u>Second</u>, it maintains that in seeking to close the Andrus' nursing home and revoke its operating certificate, the defendant had violated its substantive due process rights.  <u>Third</u>, the Andrus alleges that the revocation of its operating certificate would constitute an unconstitutional "taking".  <u>Fourth</u>, it alleges that forcing the Andrus to close or convert to an assisted living facility without providing funding violates both substantive due process and the Takings Clause.  <u>Finally</u>, it alleges that implementation of the Berger Commission's recommendation would impermissibly interfere with its existing contractual relationships in violation of the Contracts Clause.  In its March 10,

2008 Memorandum and Order, this Court denied defendant's motion for summary judgment with respect to all of those claims.

29.    The Andrus submits that the following facts fully support its constitutional claims:

1.    **The June 2006 Meeting With the RAC**

30.    Regarding any "notice" given to the Andrus, the Andrus' only substantive communication with either the Hudson Valley RAC or the Berger Commission occurred at a single meeting held on June 20, 2006, at the Hudson Valley RAC's office on the campus of Westchester Medical College, in Valhalla, New York, which I attended.

31.    Attending the June 2006 meeting were members of the Hudson Valley RAC along with a Berger Commission staff member (Alison Silvers).  At none of the discussions before, during or after the meeting was there any mention or suggestion that the RAC or the Berger Commission had already identified the Andrus for right-sizing, or was requesting the meeting to discuss why it should be closed for any reason, such as alleged low occupancy level, recent history of patient care deficits, low care needs of its residents, and financial problems, cited later in their Reports.  If the closure of the Andrus' nursing home was on their agenda, the participants kept it completely hidden from me.

32.    To the contrary, I was told that the meeting was sought, in the words of one Commission representative, to hear the "good story" that the Andrus had to tell about its current situation and future plans.  With much pride, I obliged the RAC, and explained how the Andrus had turned around its operations following the rejection by the Village of its proposed CCRC.  I told the participants that while the Andrus' proposal to develop a continuing care retirement community ("CCRC") on the campus was being reviewed, we suspended admissions to the nursing home, causing revenue to fall, but that in late 2002 we resumed admissions and

over the past few years steadily restored our resident census. I also informed the participants that in July 2002, after learning of the decision by the Village of Hastings-on-Hudson authorities to deny the Andrus the development permit needed to proceed with a CCRC, the Andrus had agreed to transfer 50 beds to another not-for-profit nursing facility, Beth Abraham Health Services, and reduced its nursing home bed complement to 197 beds. I told them that the Andrus also resumed admissions to the nursing home and had increased occupancy from an average census of 72 residents in 2002 to a level of 176 residents by year end 2005, reflecting a 90% occupancy rate with our existing 197 bed complement. I also noted that our census was currently 182 residents, and had even occasionally climbed above 190 residents in the early part of 2006.

33.     Lastly, I advised the meeting participants that, with our improved occupancy levels, the Andrus had achieved an operating surplus in 2005, and had continued operating in the black through 2006.

34.     By the discussion at the meeting, I certainly had no reason to suspect that the RAC or Berger Commission would recommend that any adverse action would be taken against the Andrus.

35.     The participants at the June 2006 meeting from the RAC and Berger Commission welcomed my offer to provide copies of the Andrus' 2005 certified financial statements and the July 2002 agreement to transfer 50 nursing home beds to another facility. Later that week, on June 23, 2006, I sent the Andrus' 2005 certified financial statements and a copy of the transfer agreement to the RAC's Chair.

36.     With no notice of "closure" or any grounds for closure, the Andrus never had any meaningful opportunity to defend itself for the simple reason that it did not know it needed to defend itself. What is more, in the Andrus' circumstances, depriving the facility of

notice was the worst-possible scenario and especially injurious to the Andrus, precisely because the RAC and Berger Commission had apparently already effectively "pre-judged" the Andrus' nursing home for possible closure early on in the process.

37.    Following the June 2006 meeting, the Andrus never heard again from either the Hudson Valley RAC or the Berger Commission until November 28, 2006, the very day that the RAC and Berger Commission simultaneously made public their final reports.

**2.    The RAC Report's Faulty Findings**

38.    Many of the errors that resulted in the Berger Commission's recommendation to close the Andrus can be traced to the mistaken factual assumptions and flawed data relied on by the Hudson Valley RAC in its final report.

39.    The Hudson Valley RAC report cited the Andrus' alleged "low occupancy and case mix index (in 2003, 39.2% and .90, respectively)" and "obvious financial problems." Those statements reflect the Hudson Valley RAC's materially erroneous views about the Andrus' occupancy and financial status, in the following respects:

40.    First, the 2003 data cited by the Hudson Valley RAC was stale and unrepresentative of the Andrus.  The Andrus averaged 97 occupied beds in 2003 due to the temporary suspension of admissions pending the Village of Hastings-on-Hudson's review and approval of the CCRC proposal.  However, by 2005, that figure rose to an average of 171 residents, reaching 176 residents by year end.  Our occupancy continued to improve in 2006.  On June 20, 2006, the day of my meeting with the RAC, our census stood at 183 residents.  I shared all of this information with the RAC at our meeting.  Despite having timely received this information, the Hudson Valley RAC obviously ignored it and preferred to rely on the old data instead, evidently because it was more suited to support a closure objective.  Meanwhile, other Westchester nursing homes were not even supplying information.

41.     Second, the cited occupancy rate of 39%, even for 2003, is inaccurate and grossly understates the Andrus' true occupancy levels, because the Hudson Valley RAC mistakenly presumed a bed capacity of 247 certified beds rather than the Andrus' true complement of 197 beds due to the Andrus' voluntary agreement to transfer 50 beds to another nursing facility.  That error is inexcusable, as I informed the RAC at our June 2006 meeting of the 2002 agreement to move 50 of our beds, and I even provided them with a copy of the transfer agreement immediately following the meeting.  In 2003, the Andrus' occupancy rate was 49% based on 197 certified beds.  By 2005 and 2006, the Andrus achieved average occupancy rates of 87% and 90% respectively.

42.     Third, the RAC's reference to the Andrus' "obvious financial problems" is also mistaken and ignores the fact that by 2005, the Andrus was operating at a surplus.  Again in 2006, the Andrus continued to operate in the black.  This information was also timely shared with the Hudson Valley RAC at the June 2006 meeting and confirmed by the Andrus' 2005 certified financial statements submitted to the RAC's Chair that same week.  That data, too, was ignored.

**3.     No Notice of the RAC Report's Faulty Findings**

43.     The Hudson Valley RAC issued its report to the Berger Commission containing its "rightsizing" recommendations on November 15, 2006.  However, the RAC Report was not released to the public – nor made accessible to the Andrus – until the Berger Commission issued its Final Report on November 28, 2006.  Consequently, the Andrus was never given the opportunity to speak with or present testimony to the Berger Commission directly to refute the many flawed assumptions and factual inaccuracies in the Hudson Valley RAC Report.  Likewise, without affording the Andrus any notice of its contemplated actions or a meaningful opportunity to be heard, the Berger Commission issued its Final Report on

November 28, 2006, recommending that <u>all</u> of the Andrus' nursing home beds be eliminated and its operating certificate rescinded.

44.    The Berger Commission did hold public hearings, which had taken place in the early part of 2006 and were concluded by the time the RAC met with me in June 2006.

45.    The "generalized" notice supposedly provided by the passing of the Enabling Legislation is insufficient for a number of reasons:

46.    <u>First</u>, if it were true that the mere possibility that a hospital or nursing facility could be closed were enough to compel a facility to participate in the Berger Commission hearings, then virtually every facility in the State (over 1,000 of them) would have availed itself of the public hearing process.  Such an eventuality would have inundated the Commission and brought its work to a screeching halt.  Moreover, on information and belief, other facilities were clearly informed that they were slated for closure.

47.    With so much at stake for targeted facilities, any "burden" of notice and hearings would have been modest, but was clearly warranted to ensure (i) that the Berger Commission makes its recommendations on the basis of sound, reliable data that can be tested by the one party with the most to lose from the Commission's reliance on faulty information; and (ii) that the Commission does not act (as happened here) to revoke an operating certificate inconsistently with the facts or the governing statutory factors.  Indeed, in this case, it would have been no burden at all for the RAC or Berger Commission to have at least alerted the Andrus that it was a candidate for closure and identified the "factors" informing its thinking in this regard, by simply saying so at the June 2006 meeting.  It is the RAC and Berger Commission, and not the Andrus, that chose not to avail itself of that opportunity.

48.    <u>Second</u>, the mere possibility of closure does not inform any adversely affected facility of the particular grounds that the Berger Commission may have been relying on

as the basis for its recommended action.  Thus, a facility like the Andrus would have no way of knowing what documents or information it needed to present, if any, to address those grounds. Without knowing that basic information, any "opportunity" to be heard is hardly meaningful.

49.    Finally, the "generalized notice" to all facilities that they could be forced to close by the Berger Commission is also inadequate because the Berger Commission was not granted the power to select facilities for closure at whim, without regard to any particular facts or circumstances.  That is, an across-the-board elimination of hospital and nursing home beds in New York State was not the Berger Commission's sole statutory "mandate".  If it were so, then one might argue that any and all facilities in the State are "fair game" for closure and are "on notice" by virtue of the Berger Commission's very existence.  Instead, the Legislature directed the Berger Commission to consider a host of factors when making any "rightsizing" recommendations.

50.    As a general matter, unless a facility is notified in advance that the Berger Commission is considering closure based on one or more of the statutory factors, a facility would have no reason to suspect it was being targeted.  This is especially true in the Andrus' case, where it was successfully operating at near-capacity and with a surplus; was caring for a majority of Medicaid residents; was meeting the continued demand for its services in the community; and was not amenable to ready conversion to any alternative use – all factors that under the Enabling Legislation would weigh heavily against the Andrus' being targeted for closure.

### 4.    The Fundamental Flaws in the Berger Commission's Report

51.    Like the Hudson Valley RAC, the Berger Commission based its recommendations on several fundamentally flawed assumptions about the Andrus' financial circumstances and nursing home operations.  In so doing, the Berger Commission acted wholly inconsistent with the facts about the Andrus as well as the factors set out in the Enabling

Legislation that were to guide the Berger Commission before it recommended such drastic action as the revocation of a facility's operating certificate.

52.    In the Final Report, the Berger Commission described the Andrus as a "247 bed" facility that "has been operating at a significant loss until 2006" and that it only now "claims" to be operating in the black.  See Exhibit B, page 123.  In fact, the Andrus years earlier had voluntarily "rightsized" to a 197 bed nursing facility, and has been successfully approaching 100% capacity.  Equally significant, the Andrus' solid occupancy levels, around 90% or better, over the past several years reflect the strong, continued demand for its nursing home services among Westchester's senior citizens.  Our occupancy today stands at 196 with only one vacancy.  On information and belief, no other hospital or nursing home slated for closure by the Berger Commission has an occupancy anywhere close to ours

53.    Moreover, several years before the Berger Commission's report was released, the Department of Health knew about the 50 beds transferred to Beth Abraham.[2]

54.    Furthermore, contrary to the Berger Commission's suggestion, it is more than a "claim", but a fact, that the Andrus was operating at a surplus, not a deficit.  Indeed, the Andrus' independent auditors reviewed the Andrus' financial statements for 2005, certified them to be accurate, and reported a surplus (net of grant monies) of $509,179 on the Statement of Operations.  The 2005 certified financial statements were furnished to the RAC in June 2006, but neither the RAC nor the Berger Commission even mention them.    Instead, the Berger Commission dismissed what I told the RAC at our meeting as a mere "claim", and then only with respect to fiscal year 2006, not 2005.  In doing so, the Berger Commission contravened the

---

[2] The Department of Health formally decertified the 50 beds effective as of July 1, 2006, a date four months prior to the release of the report.

statutory mandate that it properly consider the "financial status of a facility" when deciding whether closure or other adverse action is warranted.

     **5.**      **Assisted Living Is Not A Viable Option**

     55.     The Berger Commission has offered the Andrus the "Hobson's choice" of either closing down its nursing home entirely, or converting to a lower level of care and adding 140 Assisted Living Program ("ALP") beds with <u>zero</u> nursing home beds. This latter option, however, is simply not viable.

     56.     Converting the Andrus to an assisted living facility, at best, would yield severe operating shortfalls. Here too, the Berger Commission failed to properly consider the "economic impact of right sizing", one of the other factors delineated in the Enabling Legislation.

     57.     Obviously, closing the nursing home would force the Andrus to lay off over 200 employees, and would sever our relations with physicians, food vendors and other suppliers, and the many other individuals and entities with whom the Andrus does business in order to maintain and operate its nursing home. This will no doubt have a negative impact on the local economy, a factor that the Berger Commission also should have considered pursuant to the Enabling Legislation.

     58.     In the Final Report, the Berger Commission asserts that the Andrus' conversion to an ALP would be "economical". Exhibit B, p. 123. In one scenario, the Berger Commission recommends that the Andrus complete a floor by floor renovation of its existing facility to convert it to an ALP. However, such a statement ignores the reality that any conversion of the Andrus' physical plant – designed and built a half century ago – into a residence that is both attractive to prospective assisted living residents and fully compliant with

ALP regulations, would be a very costly undertaking.  In this regard as well, the Berger Commission failed to properly consider the "economic impact" of the mandated conversion.

59.     As an alternative, the Berger Commission states that the Andrus could build additional ALP homes on its campus.  However, the Village of Hastings-on-Hudson previously refused the Andrus permission to develop its property when it rejected its plan to expand the campus to a CCRC.  Simply put, the 26 acres on which these ALP homes would be built are in all probability essentially untouchable.

      **6.**      **<u>"Low Acuity" Does Not Justify Closure</u>**

60.     In the Final Report, the Berger Commission presumed that the "low" acuity of the Andrus on Hudson's residents relative to other nursing homes meant that a majority of its residents "could be better served in an ALP".  Exhibit B, p. 123   Contrary to that conclusory assertion, the residential health care facility beds now in use at the Andrus cannot be converted to assisted living slots without profoundly disrupting the 24-hour nursing home care that many of our residents require.

61.     The RAC and Berger Commission cited to the Andrus' Physical A and Physical B residents to support the assumption that the Andrus' residents could be safely cared for in an assisted living program.  These residents comprise a distinct minority of the Andrus' resident population, and close to half of them suffer from dementia or other mental impairment. The vast majority of our residents clearly have greater care needs and would require continued nursing home care.  Thus, it makes no sense that a significant majority of the Andrus' residents would be forced to transfer to another nursing facility – a traumatic event for any chronically ill senior – based on the Berger Commission's belief that <u>some</u> of the Andrus' low-acuity residents could get by with only assisted living.

62. Furthermore, the Berger Commission itself assumed that only an estimated 19% of the Physical A and Physical B nursing home residents in the State could be cared for in an alternative level of care setting.  See Exhibit B.  The Andrus' Physical A and Physical B residents are no different; one-half of them suffer from the onset of dementia and need 24-hour nursing supervision.

63. The Berger Commission recommended closing the Andrus' nursing home and converting it to an ALP despite – or perhaps because of – the fact that none of the Commission's staff or members ever visited the Andrus' nursing home, much less performed any clinical assessment of the Andrus' residents and their actual care needs.  Indeed, if the Berger Commission's recommendations affecting the Andrus were implemented, most of the Andrus' residents -- largely frail elderly averaging 88 years old who consider the Andrus their home -- would have to be transferred to another skilled nursing facility and consequently endure the trauma associated with such a move.

64. Moreover, transferring most of the Andrus' residents to another nursing home will not only cause "transfer trauma" for these aged, frail residents, but will also actually cost the Medicaid program and the rest of the health care system more money – estimated conservatively at more than $3.8 million a year.[3]  That is because the Andrus happens to be one of the lowest-cost facilities in Westchester County – a fact apparently lost on the Berger Commission.  Such an outcome is plainly contrary to the aim of "rightsizing".

65. Furthermore, since most of the Andrus' residents are covered by the Medicaid program, it will end up costing the State three or more million dollars per year in

---

[3] This estimate is based on an analysis my staff and I performed of the 2006 Medicaid reimbursement rates of Westchester County nursing homes promulgated by the Department of Health, and a comparison of the Andrus' rates with the rates of nursing facilities within a five- mile radius of the Andrus.

additional funds to cover their nursing home care at nearby facilities in Westchester County.  In this regard, the Berger Commission similarly failed to take into consideration "the extent to which [the Andrus] serves the healthcare needs of the region, including serving Medicaid recipients", also a factor in the Enabling Legislation.

7.    **Overstatement of Survey Deficiencies**

66.    The Berger Commission made several other factual errors about the Andrus in its Final Report.  For instance, the Final Report states that "[t]he facility has a history of a high number of deficiencies (26 in its 2005 survey), many of which are attributable to the building's deteriorating condition."  Exhibit B, p. 123.

67.    With so many other errors in the Berger Commission's report, defendant has apparently sought to elevate the importance of the 2005 survey results over some of the other "factors" underlying the Commission's recommendation.  However, on this factor as well, the Berger Commission expressly relied on flatly inaccurate data and proceeded on the demonstrably mistaken assumption that the Andrus had a history of patient care deficits, which justified its closure.

68.    In the Department of Health's 2005 resident survey, the Andrus was cited for only 8 survey deficiencies related to resident care, none of which involved harm to any patients, and 6 other deficiencies for building/environment, for a total of 14 deficiencies, not 26.  Thus, the Berger Commission's misstatement nearly doubled the actual number of Andrus survey citations.  Nor were any of the cited deficiencies at Andrus at a high level of severity or scope as to constitute substandard quality of care under the survey regulations.

69.    In all of my eight years with the Andrus, the facility has never been cited with as many as 26 deficiencies on any annual resident survey.

## CONCLUSION

70.     In light of the current 99% occupancy level at the Andrus; the grave risk of transfer trauma to our aged and often cognitively impaired residents; and the shortage of available beds in the surrounding communities; issuing a preliminary injunction is absolutely essential to preventing irreparable harm both to the Andrus and to our residents.

71.     Further, our constitutional claims have a substantial likelihood of success on the merits.  The Berger Commission's mandate to close the Andrus' nursing home was made without first providing the Andrus with notice and an opportunity to be heard on the matter.  Further, it was premised on misinformation about the Andrus' operations and financial status, and makes no sense economically, financially, or clinically.  As its recommendations also defy the factors set forth in the Enabling Legislation, the mandate is wholly without legal justification.

WHEREFORE, for the foregoing reasons, I urge the Court to grant plaintiff's motion for a preliminary injunction, and to enjoin the defendant from taking any further steps to implement the Berger Commission's recommendations affecting the Andrus.

s/Betsy Biddle
Betsy Biddle

Sworn to before me this
10th day of April, 2008.

s/Notary Public
Notary Public