# A Plan to Stabilize and Strengthen New York's Health Care System



## Final Report
### *of the*
### Commission on Health Care Facilities in the 21st Century

December 2006

**Commission on Health Care Facilities in the 21st Century**
90 Church Street • New York, New York 10007

www.nyhealthcarecommission.org

**COMMISSION ON HEALTH CARE FACILITIES IN THE 21st CENTURY**

**Chair**

Stephen Berger

**Vice Chair**

Robert Hinckley

**Statewide Members**

Leo Brideau

Craig Duncan

Robert Gaffney

Rosa Gil, DSW

Howard Howlett, Jr.

Darlene Kerr

Ruben King-Shaw, Jr.

Mark Kissinger

Patrick Lee

Kristin Proud

Neil Roberts

Teresa Santiago

Buford Sears

Albert J. Simone, Ph.D.

Bishop Joseph Sullivan

Peter Velez

**Regional Members**

*Central Region:*

Stephen Albertalli

Susan Crossett

Jeffery Davis

Bonnie DeVinney

Patrick Mannion

Herbert Marshall

*Hudson Valley*:

Robert Doar

R. Abel Garraghan

William Mooney, Sr.

Arthur Weintraub

Lelia Wood-Smith

*Long Island:*

Patricia Acampora

Bert Brodsky

Richard Guardino, Jr.

Kim Kubasek

Donna M. O'Brien

John O'Connell

*New York City:*

Martin Begun

John F. Haggerty

Andrew Sichenze

Jerry Weber

*Northern:*

Peter Capobianco

Dorothy Harris

Arthur Spiegel

*Western:*

Paul Boylan

Carol Cassell

Judge Joseph Mattina

Heidi Nauleau

Sister Mary Ann Schimscheiner

Henry Sloma

**Commission Staff**

David Sandman, Ph.D.

Executive Director

Mark Ustin

Deputy Director and General Counsel

*Senior Policy Analysts:*

Vincent Fitts

Hilton Marcus

Barbara McRedmond

Janette A. Simms

*Special Assistants*:

Shirley Chen

Shavon Foskey

# TABLE OF CONTENTS

Prologue ........................................................................................................................... 1
Executive Summary ........................................................................................................ 4

I. Dynamism of New York's Health Care System ........................................................ 19
  Catching Up to Change ............................................................................................. 19
  Hospital and Nursing Home Closures ..................................................................... 20

II. Instability of the System ........................................................................................... 29
  Hospital System Fiscal Instability ........................................................................... 29
  Nursing Home System Fiscal Instability ................................................................. 35

III. Excess Capacity ....................................................................................................... 48
  New York State Has Too Many Hospital Beds ....................................................... 48
  Regions of New York State Have Too Many Nursing Home Beds ......................... 51
  New York State Has Too Few Home- and Community-Based Alternatives to Nursing Homes
  ..................................................................................................................................... 54
  What's Wrong With Excess Capacity? ..................................................................... 54
  Excess Capacity Jeopardizes Quality of Care ......................................................... 55
  Excess Capacity Promotes Unnecessary Utilization of Services ........................... 56
  Excess Capacity Duplicates Services and Hinders Collaboration ......................... 56
  Excess Capacity Threatens Safety Net Services ...................................................... 57
  Excess Capacity Increases Costs .............................................................................. 57

IV. Adapting to and Managing Change ........................................................................ 58
  Framework for Solutions – Producing Maximum Efficiencies ............................... 59
  Benefits of Closure and Consolidation ..................................................................... 59
  Impact of Closures: What Does The Evidence Say? ............................................... 60

V. Commission Process and Methodology .................................................................... 64
  Commission Approach ............................................................................................... 65
  Commission Structure ............................................................................................... 65
  Regional Definitions and Representation ................................................................. 65
  Regional Advisory Committees ................................................................................. 67
  Local Input and Community Outreach ...................................................................... 67
  Analytic Framework .................................................................................................. 68
  Absorption and Access Analysis (AAA) .................................................................. 70
  Voluntary Rightsizing Efforts ................................................................................... 71

VI. Policy Recommendations ........................................................................................ 73
  A. Reimbursement and Medicaid .............................................................................. 73
  B. The Uninsured ...................................................................................................... 75
  C. Developing Primary Care Infrastructure ............................................................. 77
  D. Developing Hybrid Delivery Models .................................................................... 79
  E. State University of New York (SUNY) Hospitals ................................................ 80

F. Healthcare Workforce Development ................................................................. 81
G. Information Technology ................................................................................... 82
H. County Nursing Homes ................................................................................... 83
I. Niche Providers ................................................................................................ 84
J. Roadmap for the Future: Continuation of the Commission's Work .................... 85

VII. Recommendations for Facility Rightsizing and Reconfiguration ........................ 86
Preface to Recommendations .................................................................................. 86

Central Region - Acute Care Recommendations ...................................................... 91
Recommendation 1 - Crouse Hospital (Onondaga County) and University Hospital, SUNY
Upstate Health Science Center (Onondaga County) ............................................. 91
Recommendation 2 - Auburn Hospital (Cayuga County) ...................................... 94
Recommendation 3 - St. Joseph's Hospital (Chemung County) and Arnot Ogden Medical
Center (Chemung County) .................................................................................. 96
Recommendation 4 - Albert Lindley Lee Hospital (Oswego County) .................... 99

Central Region - Long Term Care Recommendations ............................................. 101
Recommendation 1 - Van Duyn Home and Hospital (Onondaga County) and Community
General Hospital's Skilled Nursing Facility (Onondaga County) .......................... 101
Recommendation 2 - Mercy of Northern New York (Jefferson County) ............... 103
Recommendation 3 - Willow Point (Broome County) ......................................... 105
Recommendation 4 - Lakeside Nursing Home (Tompkins County) ..................... 106
Recommendation 5 - United Helpers, Canton (St. Lawrence County) ................ 107

Hudson Valley Region Acute Care Recommendations ............................................ 109
Recommendations 1 - Kingston Hospital (Ulster County) and Benedictine Hospital (Ulster
County) ............................................................................................................ 109
Recommendation 2 - Sound Shore Medical Center (Westchester County) and Mt. Vernon
Hospital (Westchester County) .......................................................................... 111
Recommendation 3 - Orange Regional Medical Center (Orange County) ........... 114
Recommendation 4 - Community Hospital at Dobbs Ferry (Westchester County) ........... 115
Recommendation 5 - Westchester Medical Center (Westchester County) .......... 118

Hudson Valley Region Long-Term Care Recommendations .................................... 121
Recommendation 1 - The Valley View Center for Nursing Care and Rehab (Orange) ..... 121
Recommendation 2 - Andrus-on-Hudson (Westchester) ..................................... 122
Recommendation 3 - Taylor Care Center (Westchester) .................................... 124
Recommendation 4 - Achieve Rehabilitation (Sullivan) ..................................... 125
Recommendation 5 - Sky View Rehabilitation and Health Care Center (Westchester) ..... 126

Long Island Region Acute Care Recommendations ................................................ 128
Recommendation 1 - Eastern Long Island Hospital (Suffolk County), Southampton Hospital
(Suffolk County), Peconic Medical Center (Formerly Central Suffolk) (Suffolk County),
Brookhaven Memorial Medical Center (Suffolk County), and University Hospital at Stony
Brook (Suffolk County) ...................................................................................... 128

Recommendation 2 - University Hospital at Stony Brook (Suffolk County) ..................... 132
Recommendation 3 - St. Charles Hospital (Suffolk County) and J.T. Mather Memorial
Hospital (Suffolk County) ................................................................................ 134
Recommendation 4 - Nassau University Medical Center (Nassau County) ...................... 137
Recommendation 5 - Long Beach Medical Center (Nassau County) ................................ 140

Long Island Region Long-Term Care Recommendations ....................................................... 143
Recommendation 1 - A. Holly Patterson Extended Care Facility (Nassau County) .......... 143
Recommendation 2 - Cold Spring Hills Center for Nursing and Rehabilitation (Nassau
County) ............................................................................................................. 145
Recommendation 3 - Brunswick Hospital Center, Inc. (Suffolk County) ......................... 146

New York City Region Acute Care Recommendations ......................................................... 149
Recommendation 1 - New York Methodist Hospital (Kings County) and New York
Community Hospital of Brooklyn (Kings County) .......................................... 149
Recommendation 2 - Victory Memorial Hospital (Kings County) ................................... 151
Recommendation 3 - Peninsula Hospital Center (Queens County) and St. John's Episcopal
Hospital South Shore (Queens County) .......................................................... 153
Recommendation 4 - Queens Hospital Center (Queens County) ..................................... 156
Recommendation 5 - Parkway Hospital (Queens County) ............................................... 157
Recommendation 6 - New York Westchester Square Medical Center (Bronx County) .... 159
Recommendation 7 - Cabrini Medical Center (New York County) .................................. 160
Recommendation 8 - Beth Israel Medical Center - Petrie Campus (New York County) ... 164
Recommendation 9 - North General Hospital (New York County) .................................. 164
Recommendation 10 - St. Vincent's Midtown Hospital (New York County) and St.
Vincent's Manhattan (New York County) ....................................................... 167
Recommendation 11 - New York Downtown Hospital (New York County) ..................... 170
Recommendation 12 - Manhattan Eye Ear and Throat Hospital (New York County) ....... 174

New York City Long-Term Care Recommendations ............................................................ 176
Recommendation 1 - Split Rock Rehabilitation and Health Care Center (Bronx) ............. 176

Northern Region Acute Care Recommendations ................................................................... 180
Recommendation 1 - Bellevue Woman's Hospital (Schenectady County) ....................... 180
Recommendation 2 - St. Clare's Hospital (Schenectady County) and Ellis Hospital
(Schenectady County) ...................................................................................... 182

Northern Region Long-Term Care Recommendations .......................................................... 186
Recommendation 1 - Ann Lee Infirmary and Albany County Home (Albany) ................. 186
Recommendation 2 - The Avenue and The Dutch Manor (Schenectady County) ............. 187
Recommendation 3 - Glendale Home (Schenectady County) .......................................... 189

Western Region Acute Care Recommendations .................................................................... 191
Recommendation 1 - Millard Fillmore Hospital – Gates Circle (Erie County) ................. 191
Recommendation 2 - St. Joseph Hospital of Cheektowaga, New York (Erie County) ...... 193
Recommendation 3 - DeGraff Memorial Hospital (Niagara County) ............................... 194

Recommendation 4 - Sheehan Memorial Hospital (Erie County) ...................................... 195
Recommendation 5 - Erie County Medical Center/Erie County Medical Center Corporation
(Erie County) and Buffalo General Hospital/Kaleida Health (Erie County) ...................... 198
Recommendation 6 - Lockport Memorial Hospital (Niagara County) and Inter-Community
Memorial Hospital at Newfane (Niagara County) ............................................................ 203
Recommendation 7 - Bertrand Chaffee Hospital (Erie County), TLC Health Network - Lake
Shore Hospital (Chautauqua County), TLC Health Network - Tri-County Memorial
Hospital (Cattaraugus County), Brooks Memorial Hospital (Chautauqua County) and
Westfield Memorial Hospital (Chautauqua County) .......................................................... 205
Recommendation 8 - Mount St. Mary's Hospital and Health Center (Niagara County) and
Niagar Falls Memorial Medical Center (Niagara County) ................................................. 209

Western Region Long-Term Care Recommendations ............................................................ 212
Recommendation 1 - Mount View Health Facility (Niagara County)................................ 212
Recommendation 2 - Nazareth Nursing Home and Mercy Hospital Skilled Nursing Facility
(Erie County) ................................................................................................................... 213
Recommendation 3 - Williamsville Suburban, LLC (Erie County) ................................... 216
Recommendation 4 - DeGraff Memorial Hospital Skilled Nursing Facility (Niagara County)
and Millard Fillmore Gates Circle Skilled Nursing Facility (Erie County)....................... 217

VIII. Financing.................................................................................................................. 219
Potential Benefits and Reinvestment Opportunities for Providers ......................................... 220
Potential Savings for Payors ............................................................................................... 221
Total Benefits and Savings: ................................................................................................ 225
Potential Costs:  General Principles.................................................................................... 225
Potential Cost Categories:  Closure, Construction & Affiliation........................................... 226
Funding: Principles for Investment...................................................................................... 230

### APPENDICES

Appendix 1 - Regional Advisory Committee Members
Appendix 2 - Regional Advisory Committee Reports
            Central
            Hudson Valley
            Long Island
            New York City
            Northern
            Western
Appendix 3 - Briefing on Acute Care Reimbursement
Appendix 4 - Briefing on Long-term Care Reimbursement
Appendix 5 - Data
            Analytic Maps
            Analytic Framework Data
            Absorption and Access Analysis

# LIST OF FIGURES

Figure 1: Hospital Operating Margins, New York State and United States, 1996-2004 .............. 30
Figure 2: Hospital Operating Margins by Region, 2004 ................................................. 31
Figure 3: Nursing Homes with Operating Losses, 1997-2004 .................................... 35
Figure 4. Distribution of Uninsured by Race/Ethnicity for New York State, Nonelderly, 2002-2003 ................................................................................................................. 37
Figure 5: Estimated Number of Assisted Living Facilities in the United States, 1995-2000 ....... 39
Figure 6: New York State and National Hospital Length of Stay, 1994-2004 ........................... 42
Figure 7: New York State Hospital Length of Stay by Region, 2004 ........................................ 43
Figure 8: New York State Nursing Homes Average Length of Stay, 1996-2003 ....................... 44
Figure 9: Percentage of Nursing Home Residents able to Independently Perform Activities of Daily Living ........................................................................................................... 45
Figure 10. Hospital Licensed and Available Bed Occupancy Rates, 1994 to 2004 .................... 49
Figure 11. Hospital Licensed Bed Occupancy Rates by Region, 2004 ...................................... 50
Figure 12. Hospital Available Bed Occupancy Rates by Region, 2004 ..................................... 50
Figure 13. Nursing Home Licensed Bed Occupancy Rates, 1994 to 2004 ................................. 51
Figure 14. Nursing Home Licensed Bed Occupancy Rates by Region, 2003 (Adjusted for partial years) ................................................................................................................... 52
Figure 15. New York State Counties with LTC Resource Shift Opportunities ........................... 53
Figure 16. Commission Regions ................................................................................. 66

# LIST OF TABLES

Table 1. New York State Hospital Closures since 1983 ................................................ 21
Table 2. New York State Nursing Home Closures since 1983 ....................................... 23
Table 3. Nursing Home Sponsorship ........................................................................ 28
Table 4. Statewide Ranking of Hospitals with Limited Access to Capital ..................................... 33
Table 5. New York State Hospital Medians Compared to Rating Agency Medians ................... 34
Table 6. Uninsured in New York City and New York State, Nonelderly, 2002-2003 ................ 37
Table 7. Number of Medicaid Waiver Clients in Residential Settings ....................................... 40
Table 8. Employment and Wages of Registered Nurses by State, May 2005 ............................ 46
Table 9. Nursing Home Staff Turnover, 2002 ............................................................ 46
Table 10. Beds Per 1,000 Population – Selected States ................................................ 48
Table 11. Public Hearings by Region ....................................................................... 68
Table 12. Commission Framework Criteria Metric ...................................................... 69

# PROLOGUE

The Commission on Health Care Facilities in the 21st Century was created to review and strengthen New York State's acute and long term care delivery systems. Systems, by definition, are comprised of multiple parts that form a unified whole. Such definition does not apply to New York's health care industry where we confront a fragmented patchwork of health care resources. Some areas of our state have excess health care resources while others have shortages. We have widespread and unnecessary duplication of services. We have too much institution-focused care and not enough home and community based options. We have too few primary care resources to keep people well and out of the hospital. We spend extravagantly on health care and yet still leave too many without adequate access to the health care they need. We have yet to come to grips with changes in medicine that render parts of a massive bricks-and-mortar infrastructure obsolete.

Our hospitals and nursing homes, as described in this report, are in dangerously unstable condition. Years of chronic losses and growing numbers of empty beds have led some hospitals to close their doors and others are on the brink of collapse. Even the relatively "successful" hospitals that manage to break-even or eke out a modestly positive margin do not have sufficient resources to reinvest and maintain the high-quality, modern health care that New Yorkers deserve. A growing percentage of nursing homes are losing money from operations. It is not in the best interests of patients to rely on health care providers in such financial straits, and closures due to market forces alone threaten ongoing access to quality care, especially for the State's most vulnerable residents.

Hovering over the instability of our hospital and nursing home providers is a growing problem of affordability. New York should be proud of having one of the largest and most generous Medicaid programs in the nation. It is a very costly program to maintain, however, and its costs are rising at an unsustainable rate. The total cost of the Medicaid program has nearly doubled over the last decade to approximately $45 billion per year. Medicaid is a crippling budget item for the state and many counties. Upstate counties, which lack broad tax bases but have growing Medicaid populations, are particularly struggling under these cost burdens. We must regain control over Medicaid costs and spend more wisely to maintain health care services without crowding out our ability to finance other important social needs.

In fulfilling its mandate, the Commission had to face difficult choices. Decisions to reconfigure or close health care institutions are never simple or without controversy. Even when a closure will have no adverse impact on health care delivery and makes enormous economic sense, history has shown that opposition may arise. Such feelings of institutional loyalty are understandable. There are many groups, organizations, and individuals with personal, and often financial, interests in local hospitals. The Commission carefully considered community issues in its deliberations. The Commission also recognizes that our current predicament is in part a result of past failures to make honest and hard choices. We will not get to a better place until we confront our problems head-on and take action that is in the best interests of the entire system and its patients. An orderly transition that respects the needs of health care workers and communities affected by the recommendations in this report is required.

The work of this Commission is a start, not an end, to the facility rightsizing process. Additional opportunities to remove excess capacity exist but cannot be realized absent changes in reimbursement, reductions in length-of-stay, broader availability of non-institutional services, and removal of other obstacles. The Commission made responsible choices given real-world constraints.  More can and should be done if circumstances change.

The recommendations in this report are a step in what must be a broader process to reconfigure our health care system. It is beyond the practical scope of a single Commission to address or resolve all of the state's health care issues. Yet, we are impressed by the various important agendas that have been presented to the Commission and which must be addressed in future initiatives. Structured decisions about health care resource allocations must be continuous rather than a one-shot phenomenon. Issues of the uninsured, mental health, and primary care development should be at the forefront of an ongoing reform agenda.

It has been a privilege to examine New York State's health care system and develop immediate and long-term agendas for change. We are grateful to the members of the Commission and the regional advisory committees who volunteered their time and talents to this important work. The Commission's staff worked with great dedication and professionalism. The Department of Health, Dormitory Authority of the State of New York, Division of the Budget, and other agencies provided tremendous support. Our thanks go to the numerous members of the public, providers, and organizations that engaged in this process, provided vital information, and helped shape our thinking. By working together, we are confident that New York will seize the

opportunity to build a health care system that is stronger, better, fairer, more affordable and that meets the needs of communities.

Stephen Berger                                 David Sandman, Ph.D.

Chairman                                       Executive Director

# EXECUTIVE SUMMARY

## A System in Crisis

The Commission on Health Care Facilities is a nonpartisan panel established to review New York State's acute and long-term care systems. New York is home to some of the world's finest and most sophisticated hospitals. We have superb nursing homes that provide advanced and humane care to our sickest and most frail residents.  We have a strong and growing foundation of non-institutional care providers. Our health care providers employ a skilled and dedicated workforce. The State has a historic commitment to ensuring access to care for its most vulnerable citizens and we expend vast sums of public resources on health care. Public and private initiatives are underway to further improve access, improve quality of care, and produce greater value for the dollars spent on health care services.

Despite these strengths, the Governor and Legislature recognized the need for improvements and thus established the Commission. The challenges facing our system developed over a long period and cannot be linked to a single time or policy. Similarly, these problems will not be solved overnight; solutions will require sustained efforts.

The Commission reaches a stark and basic conclusion: our state's health care system is broken and in need of fundamental repairs. Today, New York is struggling to maintain a 20th century institutional infrastructure in the face of mounting costs, excess capacity, and unmet needs for community-based alternatives. Weaknesses in our system are readily apparent:

- Turbulence afflicts our health care providers; facility closures and declarations of bankruptcy are too common. Since 1983, 70 hospitals and over 63 nursing homes have closed in New York State. Some of our oldest and proudest names in health care struggle under the unintended consequences of bankruptcy proceedings. Patient access to stable health care services is at risk.

- Our health care providers are in weak financial condition. For the past eight years, the state's hospitals as a group have lost money. A majority of the state's nursing homes, even some that are fully occupied, operate at a loss. Such losses cannot be sustained indefinitely.

- Negative or inadequate fiscal margins limit the ability of providers to reinvest in their systems, obtain the latest technologies, access capital, and upgrade their physical plants. Many of our hospitals and nursing homes are outdated and in need of capital improvements.

- Hospital average lengths of stay have decreased but remain unacceptably and unjustifiably long in many parts of the state.

- Too many New Yorkers – almost one in five nonelderly residents – continue to lack health insurance coverage and face barriers to care and worse health outcomes as a result.

- Virtually every region of the state has an unmet need for additional home and community-based services. As consumer preferences change and technology advances, this gap could widen.

- Primary care capacity is insufficient, so that some patients go without preventive and basic services. Inadequate primary care worsens health care status, allows chronic conditions to go unmanaged, and results in back-end care that is more costly and less beneficial than front-end services.

- Our Medicaid program, already the largest and most expensive in the nation, is growing at an unsustainable rate.

- Reimbursement mechanisms distort patterns of service delivery and induce facilities to pursue high margin services, sometimes at the expense of more essential community needs. The current rate paradigm is encouraging a medical arms race for duplicative provision of high-end services and discouraging the provision of preventive, primary, and other baseline services.

### Why We Must Act Now

From crisis arises opportunity. It is not too late to restructure New York's health care delivery system. The time to act, however, is now. Absent intervention, the Commission believes that the future of our state's health care system is bleak. Unless we act decisively, further facility closures and bankruptcies are almost certain to occur. Moreover, the facilities that close due to market forces alone may be the ones most critical to preserving access.

5

Without intervention, our providers will spiral further into debt and be forced to make difficult decisions to cut services and lay off workers. Without change, our providers will lack the financial stability needed to invest in new technologies and remain on the cutting edge of modern health care. Unless we shift course, health care expenditures will rise at unsustainable rates, further burden our taxpayers, and cripple our ability to devote resources to the full array of public needs including education, housing, and transportation.

Confronting and solving these problems will require difficult, perhaps unpopular, decisions and strong leadership from our elected officials and others. There is no other responsible choice. We cannot deny reality, bury our heads in the sand, or cling to established patterns. We must overcome our reliance on outdated institutions and strengthen those that remain. New Yorkers deserve and demand a 21st century health system that is more flexible, leaner, stronger and more affordable than the one we have today.

### Excess Capacity Weakens Our System

A fundamental driver of the crisis in our health care delivery system is excess capacity. New York State is over-bedded and many hospital beds lie empty on any given day. The statewide hospital occupancy rate has fallen from 82.8% of certified beds in 1983 to 65.3% in 2004, a decrease of 17.5%. On a staffed bed basis, approximately one quarter of hospital beds are currently unoccupied. Occupancy rates vary by region and are especially low in Western, Northern, and Central regions. Some individual hospitals are more than half empty. Certain pockets of the state have too many nursing home beds while others have too few.  The statewide average nursing home occupancy rate has been in decline since 1994 despite a gradually aging population.

Declining occupancy rates are driven in part by shifts in the venues in which health care is provided. Health care services are migrating rapidly out of large institutional settings into ambulatory, home and community-based settings. Hospitals face increasing competition from niche providers such as ambulatory surgery centers, who often provide services that are well reimbursed and deprive hospitals of revenues that were historically used to cross-subsidize less profitable services. Similarly, long term care

is evolving towards shorter sub-acute stays in nursing homes, increased resident turnover in nursing homes, and the provision of long term care in non-institutional settings.

Excess capacity has negative consequences for our health care system:

- **Quality of Care is Jeopardized**: In health care, there is a direct positive relationship between volume and quality of care. The more cases or procedures performed, the better the outcome. Excess capacity disperses volume and expertise, potentially diminishing quality. It is a public health imperative to concentrate volumes at fewer institutions and create Centers of Excellence. Excess capacity also subsidizes inferior quality by blocking investments in equipment and staff.

- **Unnecessary Utilization Occurs**: Hospitalizations expand in relation to the number of available beds. Supply induces demand and unused capacity creates pressure to admit patients solely in order to generate revenue. Similarly, greater numbers of expensive tests and procedures are performed when resources like imaging machines, diagnostic labs and surgical suites are available and need to generate revenue. Areas with excess capacity repeatedly demonstrate higher rates of hospital admission and services that cannot be explained by differences in rates of illness or age.

- **Duplication Fuels a Medical Arms Race**: New York's hospitals compete for the most expensive and sophisticated technologies that produce higher financial margins. The result in unnecessary duplication of high-end services like magnetic resonance imaging and cardiac catheterization labs and too little integration of regional service delivery. Eliminating these redundancies will save money without compromising access to care.

- **The Safety Net is Endangered**: Low occupancy rates and associated financial pressures can lessen hospitals' commitment to provide care for vulnerable populations. As fiscal pressures increase, facilities may feel forced to close or shrink their less financially viable services in inner city neighborhoods or rural communities.

- **Costs Increase**: Excess capacity is expensive. Maintaining a "bricks and mortar" based system carries enormous costs. Even empty beds, wards, and buildings that

are unused and unstaffed have fixed costs that must be paid and which are spread over a diminishing number of patients. Additionally, dollars are diverted from other productive uses and reinvestment opportunities are thwarted.

### The Commission Process: Public and Local Participation

The Commission is a broad-based, nonpartisan panel established by Governor Pataki and the New York State Legislature to undertake a rational, independent review of health care capacity and resources. It was created to ensure that the regional and local supply of hospital and nursing home facilities is best configured to respond to community needs for high-quality, affordable and accessible care, with meaningful efficiencies in delivery and financing that promote infrastructure stability.

The Commission was specifically charged with rightsizing institutions. Rightsizing includes the possible consolidation, closure, conversion, and restructuring of institutions. Over the course of 18 months, the Commission evaluated each hospital and nursing home in the state to develop its final recommendations. The Commission's process balanced "science" and "art." Its deliberations were informed and driven by extensive review of objective data and quantitative analysis. However, its deliberations were more than a "numbers game" and its final recommendations are not solely the product of mathematical algorithms. Public input, understandings of local market conditions, professional judgment, and factual information were combined to form the basis of the Commission's work.

The Commission operated independently of any existing agency or entity. Given the size and diversity of New York State, the structure of the Commission had a strong focus on regional concerns and issues. The state was formally divided into six regions by its enabling statute. In addition to eighteen statewide voting members, the Commission had up to six regional members for each of the six regions. The regional members had voting authority on matters related solely to their region.

Furthermore, each of the six regions had Regional Advisory Committee (RAC) consisting of up to twelve members. The RACs provided essential community knowledge and insights into local conditions. They played vital information-gathering roles by fostering discussions with and among local stakeholders. Each of the RACs held

extensive meetings with hospital and nursing leaders and representatives from trade groups, organized labor, patient advocates, insurers, researchers, and public health officials. The final advisory reports of the RACs are included as appendices to this report.

The Commission and RACs held public hearings across the state to further solicit input from a wide array of interested parties including patients and consumers, providers, payors, labor, elected officials, and the business community. In total, nineteen hearings were held throughout the regions. The Commission heard from hundreds of witnesses and reviewed thousands of pages of testimony.

### Summary of Policy Recommendations

The Commission's direct mandate to rightsize and reconfigure facilities was a vast and necessary endeavor. Nevertheless, the work of the Commission is only one element in a comprehensive reform agenda. No single Commission can address or resolve all of the State's health care issues. The work of this Commission is one step in what must be an ongoing and wide-ranging process to modernize and reshape New York's health care system. The Commission makes the following recommendations to provide a blueprint for additional work necessary to more fully reconfigure our system:

- New York should undertake a comprehensive review of reimbursement policy and develop new payment systems that support a realignment of health services delivery.
- New York should strive for health coverage that is universal, continuous, affordable to individuals and families, and affordable and sustainable for society at large. New York should study coverage expansion efforts in other states and adopt additional strategies to sustain its recent progress in reducing the number of uninsured New Yorkers. While guarding against fraud, New York should lower administrative barriers to enrollment to help ensure that all uninsured but eligible persons are placed in the appropriate program and make it easier for eligible persons to retain coverage.
- New York should expand primary care capacity, including facilities, equipment, information technology and workforce.

- New York should develop and test "hybrid" delivery and financing models that are less than a hospital and more than a primary care center.
- New York should undertake a comprehensive analysis of the feasibility and advisability of privatizing the State University of New York (SUNY) teaching hospitals at Stony Brook, Syracuse, and Brooklyn.
- New York should cultivate its health care workforce by implementing strategies to address persistent shortages in a variety of occupations and to educate and retrain workers to prepare them for increasing uses of heath technologies in their jobs. Workers displaced by Commission recommendations should receive assistance in obtaining employment in other healthcare settings.
- New York should promote the increased use of health information technologies and ensure that these systems are able to communicate, using open architecture and embracing the principle of interoperability.
- New York should undertake a comprehensive review of the future role of county-owned and operated nursing homes. A clear policy should be developed to guide decision-making about county nursing homes and to protect indigent residents.
- New York should develop a mechanism whereby niche providers share in the burden of paying for public goods and charity care. New York should also consider the possible need for quality-of-care monitoring and reporting in non-regulated and private settings.
- New York should implement an ongoing process to sustain the efforts initiated by this Commission.

### Summary of Facility Recommendations

Per its statutory obligation, the Commission makes the following recommendations to rightsize and reconfigure health care facilities in each region of the state. The recommendations apply equitably across all regions. The acute care recommendations address 57 hospitals, or one-quarter of all hospitals in the state. The acute care recommendations include 48 reconfiguration, affiliation, and conversion

10

schemes, and 9 facility closures. Collectively, the recommendations will reduce inpatient capacity by approximately 4,200 beds, or 7 percent of the states' supply. The long-term recommendations for downsizing or closing nursing homes will make highly-targeted nursing bed reductions of approximately 3,000, or 2.6 percent of the state's supply. Twice as many nursing homes will be downsized as closed. In addition, the long-term care recommendations will create more than 1,000 new non-institutional slots.

**Central:**

- Crouse Hospital and SUNY Upstate Medical Center should be joined under a single unified governance structure under the control of an entity other than the State University of New York, and the joined facility should be licensed for approximately 500 to 600 beds.

- Auburn Hospital should downsize by approximately 100 beds and discontinue its obstetrical services.

- Arnot Ogden Hospital and St. Joseph's Hospital should participate in discussions supervised by the Commissioner of Health to explore the affiliation of such facilities.

- Albert Lindley Lee Hospital should close all of its 67 beds and convert to an outpatient/urgent care center with Article 28 diagnostic and treatment center licensure.

- Van Duyn Home and Hospital and Community General Hospital's skilled nursing facility should be joined under a single unified governance structure under the control of Community General Hospital and downsize their combined number of beds by approximately 75.

- Mercy of Northern New York should downsize 76 nursing home beds, add assisted living, adult care, and possibly other non-institutional services.

- Willow Point should downsize by between 83 and 103 nursing home beds, rebuild its facility in an appropriate configuration, and add adult day care.

- Lakeside Nursing Home should close and assisted living, adult day care, and possibly other non-institutional services should be added in Tompkins County by another sponsor.

- United Helpers, Canton should downsize by approximately 64 nursing home beds, rebuild its facility, and add assisted living and possibly other non-institutional services.

**Hudson Valley:**

- Kingston and Benedictine Hospitals should be joined under a single unified governance structure, contingent upon Kingston Hospital continuing to provide access to reproductive services in a location proximate to the hospital. The joined facility should be licensed for approximately 250 to 300 beds.
- Mt. Vernon Hospital should downsize approximately 32 medical/surgical beds, convert approximately 20 additional medical/surgical beds into a transitional care unit, convert approximately an additional 24 medical/surgical beds into mentally impaired chemical abusers unit.
- Sound Shore Medical Center should decertify approximately 9 pediatrics and 60 medical/surgical beds and convert additional medical/surgical and obstetrics beds into level III NICU beds and detoxification beds.
- Contingent upon financing, Orange Regional Medical Center should close its existing campuses and consolidate operations at a new, smaller replacement facility that is licensed for approximately 350 beds.
- Community Hospital at Dobbs Ferry should close in an orderly fashion.
- Westchester Medical Center should evaluate establishing the Children's Hospital as an independent entity and review its clinical service mix to identify opportunities for reconfiguration that is non-duplicative of services in community hospitals.
- Valley View Center for Nursing Care and Rehab should downsize by approximately 160 nursing home beds and add assisted living, adult day care and possibly other non-institutional services. The facility should also convert 50 nursing home beds to ventilator-dependent and behavioral step-down units.
- Andrus on Hudson should downsize all 247 nursing home beds and add assisted living and possibly other non-institutional services.
- Taylor Care Center should downsize by approximately 140 nursing home beds.

- Achieve Rehabilitation should downsize by approximately 40 nursing home beds.
- Sky View Rehabilitation and Health care Center should close, downsize, or convert pending a review by the Commissioner of Health

**Long Island:**
- Eastern Long Island Hospital, Southampton Hospital, Peconic Medical Center should be joined in a single unified governance structure. The new entity should develop an affiliation with University Hospital at Stony Brook. Brookhaven Hospital should continue joint planning with these hospitals and explore joining the new entity. All of these hospitals should implement the bed reconfiguration scheme described in the complete recommendation.
- University Hospital at Stony Brook should be given operational freedom to affiliate with other hospitals and create a regional health care delivery system.
- St. Charles Hospital should downsize 77 medical/surgical beds, convert the remaining 37 medical/surgical beds to psychiatric and alcohol detoxification beds, and discontinue its emergency department.
- J.T. Mather Memorial Hospital should convert all 37 of its psychiatric and alcohol detoxification beds to medical/surgical beds.
- Nassau University Medical Center should downsize by 101 beds and revise its bed configuration across service lines.
- Long Beach Medical Center should downsize by approximately 55 beds. Contingent on other developments, Long Beach should reconfigure as a smaller facility focused on emergency and ambulatory services.
- A. Holly Patterson should downsize by approximately 589 nursing home beds and transfer its subacute services to Nassau University Medical Center. A. Holly Patterson should also rebuild a smaller facility on its existing campus and add assisted living and possibly other non-institutional services.
- Cold Spring Hills Center for Nursing and Rehabilitation should downsize by approximately 90 nursing home beds an d add a ventilator unit, and evening adult program, and a hemo-dialysis center.

- Brunswick Hospital Skilled Nursing Facility should close and assisted living and possibly other non-institutional services should be added in Suffolk County by another sponsor.

**New York City:**
- New York Methodist Hospital and New York Community Hospital of Brooklyn should merge into a single entity with two campuses, downsize by an approximate total of 100 beds, and expand ambulatory services.
- Victory Memorial Hospital should close in an orderly fashion and the site should be converted to a diagnostic and treatment center and/or a facility offering a continuum of long term care services.
- Peninsula Hospital should downsize by approximately 99 beds and St. John's Episcopal Hospital should downsize by approximately 81 beds. Contingent upon financing, the two facilities should merge and rebuild a single facility with approximately 400 beds.
- Queens Hospital Center should add approximately 40 medical/surgical beds.
- Parkway Hospital should close in an orderly fashion,
- Westchester Square Medical Center should close in an orderly fashion.
- Cabrini Medical Center should close in an orderly fashion.
- Beth Israel Medical Center – Petrie Campus should convert approximately 80 detoxification beds to 80 psychiatric beds.
- North General Hospital should enter into a stronger corporate relationship with Mount Sinai Medical Center.
- St. Vincent's Midtown Hospital should close in an orderly fashion. The psychiatric beds and ambulatory services operated by St. Vincent's Midtown should be transferred and operated by St. Vincent's Manhattan or other sponsors.
- New York Downtown Hospital should decertify approximately 74 medical/surgical beds and 4 pediatric beds, discontinue inpatient pediatric services, and reorganize its outpatient clinics under new sponsorship.
- Manhattan Eye Ear and Throat Hospital should downsize all 150 beds.

- Split Rock Rehabilitation and Health Care Center should close, downsize or convert pending a review by the Commissioner of Health.

**Northern:**
- Bellevue Woman's Hospital should close in an orderly fashion and its maternity, neonatal, eating disorders, and mobile outpatient services should be added to another hospital in Schenectady County.
- St. Clare's Hospital and Ellis Hospital should be joined under a single unified governance structure and the resulting entity should be licensed for 300 to 400 beds.
- Ann Lee Infirmary and Albany County Home should merge, downsize by at least 345 nursing home beds, rebuild a unified facility, and simultaneously add or provide financial support for non-institutional services.
- The Avenue and Dutch manor should merge and downsize by approximately 200 nursing home beds in a rebuilt Avenue facility and should add assisted living, adult day care and possibly other non-institutional services.
- The Glendale Home should downsize by approximately 192 beds.

**Western:**
- Millard Fillmore Hospital – Gates Circle should close in an orderly fashion.
- St. Joseph Hospital should close in an orderly fashion.
- DeGraff Memorial Hospital should downsize all 70 medical/surgical beds. It should convert to a long term care facility encompassing its current 80 nursing home beds and the 75 nursing home beds currently at Millard Fillmore Hospital - Gates Circle.
- Sheehan Memorial Hospital should downsize 69 medical/surgical beds. The 22 inpatient detoxification beds currently at Erie County Medical Center should be added to Sheehan, and Sheehan should add ambulatory care services, methadone maintenance, and outpatient psychiatric services.
- The facilities controlled by Erie County Medical Center Corporation and Kaleida Health should be joined under a single unified governance structure under the

control of an entity other than Erie County Medical Center Corporation, Kaleida Health, or any public benefit corporation. The new entity should have a single unified board with powers sufficient to consolidate services into centers of excellence.

- Lockport Memorial Hospital and Inter-Community Memorial Hospital at Newfane should engage in a full asset merger and reconfiguration of services.

- Bertrand Chaffee Hospital should downsize by at least 25 beds, seek designation as a critical access hospital, and affiliate with TLC Tri-County and TLC Lake Shore.

- Brooks Memorial Hospital should seek designation as a sole community provider.

- TLC Tri-County should downsize 28 medical /surgical beds and convert the remaining 10 medical/surgical beds to detoxification beds.

- TLC Lake Shore should downsize all 42 medical/surgical beds and 40 nursing home beds and convert to an Article 28 diagnostic and treatment center. At its option, Lake Shore should continue to operate approximately 20 psychiatric beds or these beds should be added by another local sponsor.

- Westfield Memorial Hospital should downsize all 32 inpatient beds and convert to an Article 28 diagnostic and treatment center.

- Mount St. Mary's Hospital and Health Center or its sponsoring entity and Niagara Falls Memorial Medical center should participate in discussions supervised by the Commissioner of Health to explore the affiliation of such facilities.

- Mount View Health Facility should downsize all 172 nursing home beds, rebuild a new facility on its existing campus, add assisted living, adult day services and possibly other non-institutional services.

- Nazareth Nursing Home should downsize all 125 nursing home beds and convert the facility for use in the PACE program at the former Our Lady of Victory Hospital.

- Mercy Hospital Skilled Nursing facility should add 10 beds and transfer all of its beds to the former Our Lady of Victory Hospital

- St. Elizabeth's Home should covert its adult home beds to an assisted living program.

16

- Williamsville Suburban should close.

**Financing**

The Commission's recommendations will benefit New Yorkers and the health care system. First, they will promote stability of health care providers thereby ensuring access to care and the provision of public goods. Second, they will reduce unnecessary public and private spending and produce overall cost savings for all payors. Third, they will produce numerous opportunities for reinvestment in the system thereby providing substantial financial benefits to providers and the patients served by them.

System restructuring also provides many savings for payors, both in terms of actual reductions in current expenditures and avoided future costs.  Such opportunities for savings include reductions in inappropriate utilization, avoided capital investment and leveraged savings. The total estimated savings for payors is around $806 million annually or $8 billion over ten years. This includes an annual savings to Medicaid of around $249 million, or $2.5 billion over ten years, and an annual savings to Medicare of around $322 million, or $3.2 billion over ten years. The total estimated benefit to providers is around $721 million annually or $7.2 billion over ten years. Together, these calculations yield a total benefit to payors and providers of over $1.5 billion annually, or $15 billion over ten years.

The realization of these savings will also entail costs. Broad systemic changes must be supported with appropriate resources and investments are required to implement these recommendations. Potential costs are associated with closures, new construction, and affiliations. Not all of these costs will be borne by the State. It is estimated that implementation will entail a total cost of approximately $1.2 billion, including approximately $350 million in closure costs, $1.1 billion in construction costs, $11 million in affiliation planning costs, and $300 million in offsets from the sale of facility real property.  Almost $606 million of these costs are attributable to two contingent projects that the Commissioner will not be required to implement absent available funding.

Vast and unprecedented sums are available to support the restructuring of New York's health care system and cover costs associated with implementing the

17

Commission's recommendations. The Health Care Efficiency and Affordability Law for New Yorkers  (HEAL-NY) allocates $1 billion over four years for capital grant funds to finance physical reconfiguration, conversion, downsizing, or closure of hospitals and nursing homes. Additionally, the Federal-State Health Reform Partnership (F-SHRP) allocates an additional $1.5 billion for similar purposes.

Although HEAL-NY and F-SHRP and critical to financing the Commission's recommendations, they are not and should not be the only sources of funding. Indeed, public funds should be used in the most prudent possible manner. Insofar as facilities are capable of funding their own closure, conversion, affiliation, or rightsizing, they should be expected to do so. The Commission believes it to be appropriate that costs will be shared among all interested parties. Taxpayer dollars should be used judiciously and equitably.

# I. Dynamism of New York's Health Care System

Little remains static in New York's health care system.  Regulatory changes, technological and clinical innovations, patient preferences, and varying business models contribute to this constant transformation.  Rapid and broad scale change is inevitable; it requires adaptive strategies. Yet today, New York is struggling to maintain a 20th century institutional infrastructure in the face of mounting costs, excess capacity, and unmet need for community-based alternatives. To strengthen our system, New York must overcome its over-reliance on outdated institutions and improve the fiscal stability of its health care providers to guarantee the ongoing provision of important safety-net functions, public goods, and world-class quality of care.

## Catching Up to Change

The past decade was a period of especially dramatic change for NY's health care system and its financing mechanisms. Under the regime of New York's Prospective Hospital Reimbursement Methodology (NYPHRM), established in 1983, the New York State Department of Health set hospital reimbursement rates.  Only health maintenance organizations and similar managed-care entities were allowed to negotiate fees with hospitals.  Essentially, NYPHRM established cost-based inpatient rates for Medicaid and Blue Cross. Other private insurance companies were required to pay a fixed "mark-up" of 11% above the Blue Cross rate.[1]

The Health Care Reform Act of 1996 (HCRA) replaced NYPHRM. HCRA deregulated hospital rate negotiation so that insurers, employers, and other health care payers now directly negotiate rates with hospitals.  The State continues to establish Medicaid fee-for-service reimbursement rates. The federal government sets Medicare rates.

Under NYPHRM, NY's hospitals generally experienced modest or break-even financial margins. The artificial margins created by NYPHRM were exposed by HCRA. Hospital industry leaders have argued that providers were disadvantaged in their ability to thrive in the newly competitive environment. According to the Greater New York Hospital Association (GNYHA),

---

[1] Raske, K.E. (2006, February 7). Testimony Of Kenneth E. Raske, President of Greater New York Hospital Association on the Executive Budget Proposal for 2006–07 Before the New York State Senate Finance And Assembly Ways and Means Committees. Retrieved July 21, 2006, from Greater New York Hospital Association Web site: http://www.gnyha.org/testimony/2006/pt20060207.pdf

"[a]fter deregulation in 1997, hospitals' precariously balanced financial well-being collapsed because health insurers were able to establish negotiated rates by using the old NYPHRM payments as the ceiling. That is, plans negotiated down from a State-set, cost-based rate rather than from market-set, charge-based payments, as had been the case in other states. In addition, the State was no longer able to rescue ailing hospitals through special rate appeals or revenue enhancements because it no longer controlled most of hospital revenue."[2]

Concomitant to the change in state regulation, the federal government reduced Medicare's hospital reimbursement rates in 1997. The Balanced Budget Act of 1997 (BBA) resulted in major revenue losses for New York hospitals. Due to New York City's heavy concentration of academic medical centers and its large medically indigent population, the BBA's sharp reductions in general medical education (GME) and disproportionate share hospital (DSH) payments resulted in an especially considerable drop of New York City hospitals' collective revenue.[3]

**Hospital and Nursing Home Closures**

The turbulence associated with such changes is illustrated by widespread closures and bankruptcies of hospitals and nursing homes. Since 1983, 70 hospitals and over 63 nursing homes have closed in New York State, including 34 hospitals and 44 nursing homes since 1994. Additionally, numerous facilities have declared bankruptcy. Despite these closures, excess capacity remains and resistance to mergers and other consolidations persists. Understandably, facility boards, workers, and communities are committed to preserving institutions in which they have perceived investments.

---

[2] Ibid
[3] For a discussion of BBA's impact on NYC hospitals, see, e.g., Salit, S., Fass, S., & Nowak, M. (2002). Out of the frying pan: New York City hospitals in an age of deregulation. *Health Affairs*. *21*, 127-139.

**Table 1. New York State Hospital Closures since 1983**

| Hospital Name | County | Year Closed |
|---|---|---|
| Brunswick Hospital Center* | Suffolk | 2005 |
| New York United Hospital | Westchester | 2005 |
| St. Vincent's Catholic Medical Center – St. Mary's | Kings | 2005 |
| The Hospital | Delaware | 2005 |
| St. Vincent's Catholic Medical Center – Bayley Seton | Richmond | 2005 |
| Our Lady of Mercy Medical Center – Florence D'Urso Pav | Bronx | 2004 |
| St. Vincent's Catholic Medical Center – St. Joseph's | Queens | 2004 |
| Beth Israel Medical Center – Singer Division | New York | 2004 |
| Staten Island University Hospital – Concord Div | Richmond | 2003 |
| Myers Community Hospital | Wayne | 2003 |
| Brooklyn Hospital Center – Caledonian Campus | Kings | 2003 |
| Interfaith Medical Center – Jewish Hospital of Brooklyn | Kings | 2003 |
| Mary McClellan Hospital | Washington | 2003 |
| Island Medical Center | Nassau | 2003 |
| St. Agnes Hospital | Westchester | 2003 |
| Amsterdam Memorial* | Montgomery | 2002 |
| Olean General Hospital* | Cattaraugus | 2001 |
| Genesee Hospital | Monroe | 2001 |
| Massapequa General Hospital | Nassau | 2000 |
| St. John's Episcopal Hospital, Community Div | Suffolk | 1999 |
| New York Flushing Hospital Medical Center – North Div | Queens | 1999 |
| St. Mary's Hospital | Monroe | 1999 |
| Lady of Victory – Lackawanna | Erie | 1999 |
| Union Hospital of the Bronx | Bronx | 1998 |
| Salamanca | Cattaraugus | 1998 |
| Columbus Community Healthcare | Erie | 1998 |
| Leonard Hospital | Rensselaer | 1997 |
| Samaritan Medical Center – Stone Street Div | Jefferson | 1997 |
| Mohawk Valley General | Herkimer | 1996 |
| Julia Butterfield Memorial | Putnam | 1996 |
| Wyckoff Heights Hospital – Jackson Heights Div | Queens | 1996 |
| Flushing Hospital – Little Neck Div | Queens | 1996 |
| Westchester Medical Center – Mental Retardation Institute | Westchester | 1995 |
| Medical Arts Center Hospital | New York | 1994 |

**Table 1 (continued). New York State Hospital Closures since 1983**

| Hospital Name | County | Year Closed |
|---|---|---|
| Mercy Hospital | Jefferson | 1993 |
| Greene Division – Columbia-Greene Medical Center | Greene | 1993 |
| St. Francis | Erie | 1992 |
| Waterloo Memorial – Taylor Brown | Seneca | 1991 |
| Adirondack Regional | Saratoga | 1991 |
| Salamanca | Cattaraugus | 1991 |
| Tioga General | Tioga | 1990 |
| Community | Delaware | 1989 |
| Holy Family Medical Center | Kings | 1989 |
| Arnold Gregory | Orleans | 1989 |
| Emma Laing Stevens | Washington | 1989 |
| Childrens | Oneida | 1988 |
| Jamestown General | Chautauqua | 1988 |
| Doctors Sunnyside | Orange | 1988 |
| Parsons | Queens | 1988 |
| Johnstown | Fulton | 1988 |
| Baptist Medical Center | Kings | 1987 |
| Long Island Jewish – Manhasset Division | Nassau | 1987 |
| Sheridan Park | Erie | 1987 |
| Deaconess Division – Buffalo General | Erie | 1987 |
| Seneca Falls | Seneca | 1986 |
| Flatbush General | Kings | 1986 |
| Lafayette General | Erie | 1986 |
| Bethesda | Steuben | 1986 |
| Cohoes Memorial | Albany | 1986 |
| Tuxedo Memorial | Orange | 1985 |
| Lydia E. Hall | Nassau | 1985 |
| Boulevard | Queens | 1985 |
| Prospect | Bronx | 1985 |
| Ideal-United Health Services | Broome | 1984 |
| Herkimer Memorial | Herkimer | 1984 |
| Terrace Heights | Queens | 1984 |
| Cumberland | Kings | 1983 |
| Jewish Memorial | New York | 1983 |
| Rose | Oneida | 1983 |

* Brunswick Hospital – closed all medical-surgical beds, but maintain rehabilitation services, Amsterdam Memorial – closed emergency department, ICU and ceased using medical-surgical beds in 2002, in 2005 received approval to reopen inpatient beds. The beds are used for sub-acute care in connection with their nursing home, Olean General – services consolidated at main Olean General site and still in operation.
Source: New York State Department of Health

**Table 2. New York State Nursing Home Closures since 1983**

| Nursing Home Name | County | Year Closed |
|---|---|---|
| Childs Nursing Home Company | Albany | 2006 |
| Cedar Hedge Nursing Home | Clinton | 2006 |
| Episcopal Residential Health Care Facility | Erie | 2006 |
| The Hospital Skilled Nursing Facility | Delaware | 2005 |
| Sunrest Health Facilities | Suffolk | 2005 |
| New York United Hospital Medical Center Skilled Nursing Pavilion | Westchester | 2005 |
| Hebrew Home For The Aged At Riverdale Baptist Div | Bronx | 2005 |
| Rehab Institute Of New York At Florence Nightingale Health Center | New York | 2005 |
| Menorah Home & Hospital For Aged And Infirm | Kings | 2005 |
| Kresge Residence | Erie | 2004 |
| Hutton Nursing Home | Ulster | 2004 |
| Manor Oak Skilled Nursing Facilities | Chautauqua | 2004 |
| St Lukes Manor Of Batavia | Genesee | 2004 |
| Manor Oak Skilled Nursing Facilities | Erie | 2004 |
| Loeb Center Montefiore Medical Center | Bronx | 2004 |
| Norloch Manor | Monroe | 2004 |
| Bethel Methodist Home | Westchester | 2003 |
| Wesley-On-East | Monroe | 2003 |
| Mary McClellan Skilled Nursing Facility | Washington | 2003 |
| Mt St Mary's Long Term Care Facility | Niagara | 2003 |
| Eden Park Health Care Center | Columbia | 2003 |
| Potsdam Nursing Home | St Lawrence | 2003 |
| St Mary's Manor | Niagara | 2003 |
| Manor Oak Skilled Nursing Facilities Inc | Wyoming | 2003 |
| The Gardens At Manhattan Health And Rehabilitation Center | Erie | 2003 |
| Eden Park Health Care Center | Albany | 2003 |
| St Clare Manor | Niagara | 2003 |
| Williamsville View Manor | Erie | 2003 |
| Lyden Care Center | Queens | 2002 |
| Genesee Hospital ECF | Monroe | 2002 |
| Our Lady of Victory/Head Trauma Unit | Erie | 2002 |
| Chandler Care Center | Westchester | 2002 |
| The Waters of Syracuse | Onondaga | 2002 |
| Beechwood Sanitarium | Monroe | 2000 |
| Dover Nursing Home | Kings | 2000 |
| Niagara Lutheran Delaware Home | Erie | 1999 |

**Table 2 (continued). New York State Nursing Home Closures since 1983**

| Nursing Home Name | County | Year Closed |
|---|---|---|
| Oswego Hospital ECF | Oswego | 1999 |
| Dutchess County HCF | Dutchess | 1999 |
| Leisure Arms | Rensselaer | 1997 |
| Eden Park Nursing | Rensselaer | 1997 |
| Broadacres | Oneida | 1996 |
| Madonna Residences, Inc | Kings | 1995 |
| Franklin Plaza Nursing Home | Nassau | 1994 |
| Catherine McAuley Manor | Erie | 1993 |
| Swiss Home Health Related Facility | Westchester | 1993 |
| St. Mary's Hospital Brain Injury Unit | Monroe | 1992 |
| Maryknoll Nursing Home | Westchester | 1991 |
| Gerrit Smith Memorial Infirmary | Madison | 1991 |
| Taylor-Brown Memorial Hospital Nursing Home | Seneca | 1990 |
| Good Samaritan Nursing Home | Albany | 1990 |
| Elcor's Marriott Manor Health Related Facility | Chemung | 1990 |
| Arnold Gregory Memorial Hospital Skilled Nursing Facility | Orleans | 1989 |
| Strong Memorial Hospital Skilled Nursing Facility | Monroe | 1988 |
| Chenango Bridge Nursing Home | Broome | 1988 |
| Placid Memorial Hospital | Essex | 1988 |
| Surfside Nursing Home | Queens | 1988 |
| City Hospital at Elmhurst Public Home | Queens | 1988 |
| St. George Nursing Home | Erie | 1988 |
| Margaret-Anthony Nursing Home | Chautauqua | 1988 |
| House of the Holy Comforter | Bronx | 1986 |
| Flower City Nursing Home | Monroe | 1985 |
| Jewish Home & Infirmary of Rochester | Monroe | 1985 |

Source: New York State Department of Health

Health care facilities close for a variety of reasons, and rarely close due to one isolated cause.  Common factors that lead to closures include:

- **Poor financial health**: First and foremost, facilities close due to lack of funds.   As the adage indicates, "no margin, no mission."  Not surprisingly, hospitals and nursing homes that close tend to have been in severe financial distress for an extended period of time before closing.

- **Aging physical plant**: Nationally, the average age of a hospital physical plant in 2004 was 9.8 years.[4]  In New York, the Dormitory Authority for the State of New York (DASNY) estimates that the average age of a New York hospital in 2004 was approximately 12.5 years.  Nationally, the biggest increases in capital expenditures have occurred in regular fixed equipment, meaning that hospitals have concentrated on repairs and renovations rather than design and construction of new facilities.[5]

- **Aging physical plant for nursing homes**:  According to officials at the Department of Health, the majority of nursing homes in New York State were built before 1960.  From the information available, the median year at which facilities began operating as nursing homes is 1971, but many facilities operate in buildings much older, built for purposes other than nursing homes and later converted.

- **Low occupancy rates:** An empty bed does not generate revenue. Even when a bed is unoccupied, there are significant fixed costs associated with maintaining that bed, including staffing and capital costs.  Unoccupied beds are significant money drains on hospitals and nursing homes.  Low occupancy rates can also indicate that facilities are unnecessary or undesirable; empty beds can reflect choices by patients and physician to seek and provide care elsewhere.

- **Poor community reputation:** All hospitals and nursing homes are community institutions, serving and served by people in the community.  Those facilities with reputations as providers of high-quality care and as "good citizens" attract the area's physicians and patients.  A good reputation therefore generally sustains a higher occupancy rate and a poor one helps sink an institution.

- **Weak management/leadership:** A critical factor to any successful hospital and nursing home is strong and efficient management and leadership.  Management is responsible for

---

[4] American Hospital Association, (2006). Chartbook: Trends Affecting Hospitals and Health Systems, April 2006. Retrieved July 24, 2006, from the American Hospital Association Web site: http://www.aha.org/aha/research-and-trends/health-and-hospital-trends/2006.html
[5] Runy, L. (2003).Penny wise? Financial pressures force a short-term mind-set in capital spending. *Health Facilities Management. 16(2)*, 20-21.

establishing and implementing a strategic plan that is in keeping with an organization's mission. Health care leaders should create a sense of organizational commitment, and provide a supportive work environment to help to prevent/protect against burnout, which will ultimately reduce employee turnover and save money.[6]

According to the Healthcare Financial Management Association, rating agencies such as Moody's and Standard and Poor's cite the following governance and management issues as critical to their rating decisions:

- o *Governance*: Is the board involved in a meaningful way in strategic decision-making for the hospital? Does the board have the necessary skills to make informed decisions? Do skills of board members complement those of the management team?

- o *Management*: Has management proven its ability to weather regulatory change and market threats? Do senior managers inform and educate their board? Do they have demonstrated relevant experience? Do they use effective methods to monitor and improve performance? Do they use systematic strategic and financial planning? Do they assess and serve community needs?[7]

- **Weak markets/access to capital**: Many facilities have deferred capital improvements and require significant upgrades to their physical plants. Yet, access to capital financing is weak for many New York State providers that struggle with high debt burdens and limited liquidity. Without adequate access to capital, hospitals and nursing homes cannot invest in the physical plant or equipment that will ensure high-quality health care.

- **Difficulty attracting and retaining staff:** Hospitals and nursing homes in New York State, as with the rest of the nation, are finding it increasingly difficult to attract and

---

[6] See: Organzo, A.J., et al, (2006). Are attributes or organizational performance in large health care organizations relevant in primary care practices? *Health Care Management Review. 31 (1)*, 2-10.
Castle, N.G. (2006). Organizational commitment and turnover of nursing home administrators. *Health Care Management Review. 31 (2)*, 156-165.

[7] HFMA, & Pricewaterhouse Coopers (2003). Financing the future report 1: How are hospitals financing the future? Access to capacity in health care today. Retrieved July 21, 2006, from Healthcare Financial Management Association Web site: http://www.hfma.org/NR/rdonlyres/2E95F3D0-B095-4F04-8AA1-AAE264109806/0/FNF1_No1.pdf

retain quality health care workers.  Experienced nurses are in especially short supply. In addition, the migration of young workers from upstate New York to New York City and other parts of the country has exacerbated the shortage of health care workers upstate.[8]

- **Competition from other providers**: Hospitals and nursing homes face increasing competition both within their industries and from alternative providers.
  - **Within the Industry:** Hospitals and nursing homes compete vigorously among themselves in multiple ways. First, hospitals must selectively contract with health plans to be placed on their preferred provider networks.  This may induce hospitals to offer significant price reductions to the plan to receive this network designation and/or to provide services attractive to health plans.[9]  Second, hospitals are engaged in a "medical arms race" for high-margin services where they make redundant investments in costly clinical technologies to provide services attractive to individual plan beneficiaries and physicians.[10] In the face of declining occupancy rates, nursing homes also compete vigorously with one another to fill beds.  Nursing homes are devoting increasing money and effort to marketing activities, targeting discharge planners with their information.
  - **Alternative sites of care:** Hospitals face increasing competition from other providers of care, such as ambulatory surgery centers, that have lower overhead costs than hospitals.  The services provided by these niche providers are often well-reimbursed and deprive hospitals of revenues that were historically used to cross subsidize less profitable services. Similarly, nursing homes face increasing competition as more long term services are provided in non-institutional settings. Patient preferences and technology advances are driving a shift to home and community-based settings. This is especially so for nursing homes which provide a great deal of custodial care and who thus compete for the same resident pool with home care agencies and assisted living residences.

---

[8] See: Roberts, S. Flight of young adults is causing alarm upstate. (2006, June 13). *New York Times*, p. A1. Available online: http://www.nytimes.com/2006/06/13/nyregion/13census.html

[9] Devers, K.J., Brewster, L.R., & Casalino, L.P. (2003). Changes in hospital competitive strategy: A new medical arms race?. *Health Services Research. 38 (1 Pt 2)*, 447-469.  Available online: http://www.pubmedcentral.gov/articlerender.fcgi?tool=pubmed&pubmedid=12650375

[10] Ibid

- **Size of nursing home**: Following national trends, those New York State nursing homes that have closed tend to be smaller institutions.  Nationwide, the proportion of homes with fewer than 100 beds declined from 65.7% of total facilities to just over 50%[11]  It is important to note that studies have shown that poor quality is less of a contributing factor to closure than size[12].

-  **"Cashing out"**: Unlike New York hospitals, a large proportion (48%) of New York nursing homes are proprietary (for-profit), so that the real estate on which a nursing home sits can be sold with few restrictions and the licensed beds are transferable to other nursing homes.  Establishing a new nursing home has become increasingly difficult; therefore, each licensed nursing home bed has a high market value. Consequently, some providers prefer to "cash out" rather than to continue operations, often by selling their real estate assets.

**Table 3. Nursing Home Sponsorship**

| Region | Ownership Class | | |
| --- | --- | --- | --- |
| | **Proprietary** | **Public** | **Voluntary** |
| **Central** | 36% | 8% | 56% |
| **Hudson Valley** | 46% | 10% | 45% |
| **Long Island** | 76% | 4% | 21% |
| **New York City** | 53% | 4% | 43% |
| **Northern** | 32% | 19% | 49% |
| **Western** | 45% | 12% | 43% |
| **Statewide** | 48% | 8% | 44% |

Source: New York State Department of Health

---

[11] Centers for Disease Control and Prevention, (1995, 1997, 1999). National Nursing Home Survey. Retrieved July 24, 2006, from National Center for Health Statistics Web site: http://www.cdc.gov/nchs/nnhs.htm#Public-Use%20Data%20Files

[12] Castle, N.G. (2005).Nursing home closures and quality of care. *Medical Care Research and Review. 62 (1)*, 111-132.  Available online: http://mcr.sagepub.com/cgi/reprint/62/1/111.pdf

## II. Instability of the System

The Commission finds New York States' health care providers to be in critically unstable condition. Providers cannot sustain chronic financial losses and continue to provide the world class health care and important public goods that New Yorkers expect and deserve. "[N]o ordinary enterprise can continue to operate indefinitely with losses.  Hospitals with losses for several years should either close, merge, or make changes to become more profitable."[13] As hospitals and nursing homes struggle to remain solvent, they face possible closure due to market forces alone. Because such market driven closures can occur irrespective of or even contrary to public policy goals, access to and quality of care are at risk. The most important institutions to preserve may also be the most fragile.

### Hospital System Fiscal Instability

The dire financial situation of New York's hospitals can be seen across all categories of hospitals, from rural to inner-city, from large academic medical centers to small critical access hospitals. According to the Healthcare Association of New York State (HANYS), hospitals in New York State have lost an aggregate $2.4 billion over the past eight years.[14]  In 2005 alone, the statewide operating margin[15], which is the traditional measure of hospitals' financial health, was -0.2% (-$95.4 million).[16] While some hospitals are on relatively solid financial ground, the majority are losing money, just breaking even, or operating with a 0-1% financial margin.[17] [18]

Margins in New York have never been generous.  Year after year, New York hospitals' operating margins fall far below national norms.  Before 1997, those margins were artificially

---

[13] Duffy, S.O., & Friedman, B. (1993). Hospitals with chronic financial losses: What came next?. *Health Affairs.* *12 (2)*, 151-163.  Available online: http://content.healthaffairs.org/cgi/reprint/12/2/151

[14] Healthcare Association of New York State. (2006, November 16). New York's hospitals lose money for the 8th straight year: Negative operating margin ranks New York 49th in the nation. Retrieved November 16, 2006, from Healthcare Association of New York State Web site: http://www.hanys.org/communications/pr/2006/upload/11_15_06_EightYearsFinancial.pdf

[15] Gain or loss from operating sources (operating income/total operating revenue).

[16] Healthcare Association of New York State. (2006, November 16). New York's hospitals lose money for the 8th straight year: Negative operating margin ranks New York 49th in the nation. Retrieved November 16, 2006, from Healthcare Association of New York State Web site: http://www.hanys.org/communications/pr/2006/upload/11_15_06_EightYearsFinancial.pdf

[17] Ibid

[18] The New York Health Plan Association (NYHPA) paints a different picture by using net income, finding that two-thirds in fact generated profits in 2004, and of the one-third of hospitals that had losses, 15 facilities comprised approximately 75% of total losses for New York State.  See: http://www.empirenewswire.com/release/downloads/nyshpa.pdf

maintained in the zero to 1% range, and after a nominal improvement in 1997, they declined precipitously.  In 2005, the national average operating margin for hospitals was 3.7%, four percentage points higher than New York State's.[19]  Comparing 1996-2003 operating margins in the 50 states and the District of Columbia, New York State has the dubious distinction of ranking among the very worst in terms of operating margins.[20]

**Figure 1: Hospital Operating Margins, New York State and United States, 1996-2004**



Source: Greater New York Health Association analysis of Medicare cost reports

Certain regions in the State fare worse than others.  Hospitals in the New York City region are the most financially vulnerable in the State.  A July 2003 United Hospital Fund

---

[19] Healthcare Association of New York State. (2006, November 16). New York's hospitals lose money for the 8th straight year: Negative operating margin ranks New York 49th in the nation. Retrieved November 16, 2006, from Healthcare Association of New York State Web site:
http://www.hanys.org/communications/pr/2006/upload/11_15_06_EightYearsFinancial.pdf

[20] Raske, K.E. (2006, February 7). Testimony Of Kenneth E. Raske, President of Greater New York Hospital Association on the Executive Budget Proposal for 2006–07 Before the New York State Senate Finance and Assembly Ways and Means Committees. Retrieved July 21, 2006, from Greater New York Hospital Association Web site: http://www.gnyha.org/testimony/2006/pt20060207.pdf

found that one-third of New York City hospitals' viability was "in doubt," and faced financial problems "severe enough to jeopardize their continuing viability." [21]

**Figure 2: Hospital Operating Margins by Region, 2004**



Source: HANYS 2004 Audited Financial Statements[22]

Weak operating margins are not the sole indicators of hospitals' annual financial stress. New York State hospitals are also the most heavily indebted in the nation. The equity financing ratio (the percent of assets financed through cash savings as opposed to debt) in New York is the worst of the 50 states and the District of Columbia.  While most hospitals in the nation finance capital investments by an approximately 50%-50% combination of savings and borrowings, New York State had an 18% equity financing contribution rate by 2003.[23]  In other

---

[21] Brooks, P. (2003, July). Losses continue at NYC hospitals; Viability of one-third in doubt. *Hospital Watch*, *14 (3)*, 1-6.  Available online: http://www.uhfnyc.org/usr_doc/hwv14n3.pdf

[22] Healthcare Association of New York State. (2005, November 16). Hospitals in New York lose money for seventh year in a row. Retrieved September 21, 2006, from Healthcare Association of New York State Web site: http://www.hanys.org/communications/pr/111505_pr.cfm

[23] Raske, K.E. (2006, February 7). Testimony Of Kenneth E. Raske, President of Greater New York Hospital Association on the Executive Budget Proposal for 2006–07 Before the New York State Senate Finance and Assembly Ways and Means Committees. Retrieved July 21, 2006, from Greater New York Hospital Association Web site: http://www.gnyha.org/testimony/2006/pt20060207.pdf

words, New York State relies more on debt to cover necessary expenses than does any other state's health care delivery system.  This heavy dependence on debt will further destabilize New York's health care delivery system, and may cripple the State's health care structure in the long term.

The fiscal problems of NY's hospitals are reflected in and exacerbated by their difficulties raising capital. US hospitals generally have a wide range of capital sources to tap, both external and internal.[24]  External sources of capital include proceeds generated from bond issuances, bank loans, sale of real estate, real estate investment trusts, public grants, and philanthropy.  Internal sources include operating and non-operating cash flow and divested assets.

The Healthcare Financial Management Association identified two types of hospitals to discern which hospitals have the best access to capital.  The first type, those with "broad access" to capital, has stellar financial profiles: high profitability, high liquidity, and limited debt burden.  Those with "limited access" to capital are neither profitable nor have adequate liquid assets, and are significantly burdened with debt.  According to this report, New York's access to capital is bleak.  Compared to the fifty states and DC, "New York ranks first in both proportion and number of hospitals designated as having limited access to capital."[25] The State's limited access to capital is also reflected in the bond ratings of the various New York hospitals.  Due to many factors, including average age of plant, days cash on hand, as well as operating margin and debt to capitalization ratios, the hospitals' bond ratings are dismal.  In its February 2006 report, the Moody's rating agency referred to New York State as "one of the most difficult, if not the most difficult, states to operate a hospital."[26]

---

[24] Healthcare Financial Management Association, & Pricewaterhouse Coopers.  (2003). Financing the future project reports I and II. Retrieved July 21, 2006, from Healthcare Financial Management Association Web site: http://www.hfma.org/library/accounting/capitalfinance/FinancingtheFuture.htm

[25] Ibid

[26] Moody's Investor's Service Global Credit Research. (2006). Not-for-profit hospitals: 2006 State of the States. Moody's Investor's Service 2006 Outlook.

**Table 4. Statewide Ranking of Hospitals with Limited Access to Capital**

| Rank | Wide | Constrained |
|------|------|-------------|
| 1 | Indiana | **New York** |
| 2 | Wisconsin | Hawaii |
| 3 | Nebraska | Washington, DC |
| 4 | New Hampshire | Pennsylvania |
| 5 | Vermont | West Virginia |
| 6 | Minnesota | New Jersey |
| 7 | Ohio | North Dakota |
| 8 | Virginia | Massachusetts |
| 9 | Arizona | California |
| 10 | Tennessee | Connecticut |

Source: Solucient[27]

The low credit rating of the hospitals has two primary effects.  First, the higher the debt service costs due to poor credit ratings, the less an institution can spend on other expenditures such as capital improvement, technology upgrades, and pension coverage.  Second, because the bond ratings are bleak, the vast majority of not-for-profit hospitals and nursing homes in the DASNY portfolio require some sort of credit enhancement.  Credit enhancement sources include letters of credit, bond insurance, local taxes, and the Federal Housing Administration's (FHA) section 242 Hospital Mortgage Insurance Program.[28]  Notably, in 2000, the FHA program insured over 70% of hospital credits issued through DASNY, and over 60% of FHA-insured debt nationwide is in New York State.[29]

---

[27] Healthcare Financial Management Association, & Pricewaterhouse Coopers.  (2003). Financing the future II Report 6: The outlook for capital access and spending. Retrieved July 21, 2006, from Healthcare Financial Management Association Web site: http://www.hfma.org/NR/rdonlyres/ED7D0E8B-E896-4B1C-8466-B33CA4B72095/0/FF2_No6_Outlook_w1.pdf

[28] See: United States Government Accountability Office. (2006). *Hospital mortgage insurance program: Program and risk management could be enhanced* (1-66), showing that the geographic concentration of FHA-insured hospitals located in New York "makes the [FHA] program vulnerable to state policies and regional economic conditions."  Availabe online: http://www.gao.gov/new.items/d06316.pdf

[29] Health Care Reform Working Group. (2004). *Health Care Reform Working Group – Final Report, November 17, 2004*, 1-32. Available online: http://www.health.state.ny.us/health_care/medicaid/related/health_care_reform/pdf/final_report.pdf

**Table 5. New York State Hospital Medians Compared to Rating Agency Medians**

| | Hospital Medians | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|
| | New York State, 2003* | S&P, All Health Care, 2004** | | | | Fitch Nonprofit Hospital and Health Care System, 2004*** | | | |
| Ratios | | AA+ to AA- | A+ to A- | BBB+ to BBB- | Spec | AA | A | BBB | Below BBB |
| Average Age of Plant | 12.5 | 8.9 | 9.1 | 9.8 | 12.6 | 9.4 | 9.9 | 9.3 | 13.1 |
| Days Operating Cash Available | 30.1 | 211 | 159 | 110 | 50 | 232.2 | 177.2 | 117.5 | 49.3 |
| Operating Margin | 0.0% | 3.1% | 3.5% | 1.2% | (1.3%) | 3.5% | 2.5% | 1.0% | (1.8%) |
| Debt to Capitalization | 50.9% | 32.8% | 37.3% | 44.3% | 65.3% | 34.8% | 39.0% | 47.3% | 75.1% |

Source: * DASNY, 2003 audited financial statements
    ** Standard and Poor's, "U.S. Not-For-Profit Health Care 2004 Median Ratios," June 10, 2004
    *** FitchRatings, Health Care Special Report, "2005 Median Ratios for Nonprofit Hospitals and Health Care Systems," August 9, 2005

To help ameliorate the hospitals' limited capital access, DASNY, the State agency that provides financing and construction services to not-for-profit healthcare facilities and the State's largest issuer of health-related debt, issued secured hospital revenue bonds. These bonds "were issued to allow financially distressed New York not-for-profit- hospitals access to the capital markets. The establishment of the Secured Hospital Program became necessary because the physical plants of certain hospitals were deteriorating, but such hospitals' financial conditions were too weak to enable them to borrow the monies necessary to modernize their facilities."[30] Authorization to issue bonds under this program, however, expired on March 1, 1998. Approximately $837 million is outstanding, spread over ten institutions. Currently, DASNY offers multiple programs to provide financing for capital construction and rehabilitation projects for non-profit health care facilities in New York State which are secured by various credit structures.

---

[30] Dormitory Authority State of New York. Financial services: Health care. Retrieved July 24, 2006, from Dormitory Authority State of New York Web site: http://dasny.org/finance/finserv/index.php#anchor820988

**Nursing Home System Fiscal Instability**

New York State's nursing homes are in a similarly precarious situation. In 1997, less than a quarter of the State's nursing homes were operating in the red. The majority - at least 55% - now operate at a loss.

**Figure 3: Nursing Homes with Operating Losses, 1997-2003**



Source:   Residential Health Care Facility-4 (RHCF-4) Cost Reports, 1997-2003

The financial strain on NY nursing homes may be increasing. According to a survey conducted by the Joint Association Task Force on Nursing Home Reimbursement, New York's median nursing home margin fell from +0.6% in 2001 to -0.1% in 2002, and again to -0.6% in 2003. Rural nursing homes are in much worse financial health, with median margins declining from -5.2% to -7.4% in the same time period.[31]  As a result of these poor margins, nursing

---

[31] Joint Association Task Force on Nursing Home Reimbursement.  (2006).  *Joint Association Task Force on Nursing Home Reimbursement: A briefing for member facilities.*  6-7.
The Task Force was comprised of the New York Association of Homes and Services for the Aging, the Healthcare Association of New York State, and the New York State Health Facilities Association.

homes financial position is also deteriorating: the median number of days cash-on-hand in 2003 was only 21.[32]

**Pressures on the System**

Numerous pressures on the system contribute to the weak bottom lines of NY's health care providers. Moody's Investor Services attributes the bleak financial condition of New York hospitals to:  the state's "challenging" demographics, including a high Medicaid-dependent and large immigrant population; payer concentration (tightening of the insurance market); a high degree of competition between providers; high cost of operation; merger difficulties; large number of high-cost academic medical centers; and the legacy of a highly regulated system.[33] Additional major factors include:

o **Uninsured residents.** The problem of the uninsured and underinsured is one of the most vexing problems facing health care delivery in both New York State and the United States as a whole.  Over 45 million Americans below 65 years-old, 18% of the non-elderly US population, lacked health care coverage in 2004.[34]  An estimated 17% of New York State residents under age 65, almost 3 million New Yorkers, are uninsured.[35]  A large portion of the State's uninsured population lives in New York City; 25% of City residents are uninsured, whereas 13% of State residents living outside of the City are uninsured.[36]  Most of the uninsured in New York are low-income, working adults. Members of racial/ethnic minorities are disproportionately uninsured.

---

[32] Department of Health. (2003). *Residential Health Care Facility Cost Reports (RHCF-4).*

[33] Moody's Investor's Service Global Credit Research. (2006). Not-for-profit hospitals: 2006 State of the States. Moody's Investor's Service 2006 Outlook.

[34] Kaiser Commission on Medicaid and the Uninsured, (2006, January). The uninsured: a primer - Key facts about Americans without health insurance. Retrieved July 24, 2006, from Kaiser Family Foundation Web site http://kff.org/uninsured/upload/7451.pdf

[35] Kaiser Family Foundation, New York: Health insurance coverage of nonelderly 0-64, states (2003-2004), U.S. (2004). Retrieved July 24, 2006, from statehealthfacts.org Web site: http://www.statehealthfacts.org/cgi-bin/healthfacts.cgi?action=profile&area=New+York&category=Health+Coverage+%26+Uninsured&sub category=Health+Insurance+Status&topic=Nonelderly+%280%2d64%29

[36] Holahan, D., Ely, A., Haslanger, K., Birnbaum, M., & Hubert, E. (2004). Health insurance coverage in New York, 2002.  Retrieved July 24, 2006 from United Health Fund Web site: http://www.uhfnyc.org/usr_doc/chartbook2004.pdf

**Table 6. Uninsured in New York City and New York State, Nonelderly, 2002-2003**

| | Uninsured Nonelderly (Children and Adults under age 65) | |
|---|---|---|
| | New York City | New York State |
| At or below 200% of the Federal Poverty Level | 65% | 62% |
| Workers and their dependents | 75% | 78% |
| Adults ages 18-64 | 83% | 83% |

Source:   March 2003 and March 2004 Current Population Survey, Annual Social and Economic Supplement

**Figure 4. Distribution of Uninsured by Race/Ethnicity for New York State, Nonelderly, 2002-2003**



Source:   March 2003 and March 2004 Current Population Survey, Annual Social and Economic Supplement

Lack of health coverage is a serious burden for the uninsured themselves and for the institutions that care for them.  Those without health coverage are less likely to seek and receive preventive care, more likely to be hospitalized for avoidable health problems, and more likely to be diagnosed in the later (and more expensive) stages of disease.[37]  Even in New York

---

[37] Kaiser Commission on Medicaid and the Uninsured, (2006, January). The uninsured: a primer - Key facts about Americans without health insurance. Retrieved July 24, 2006, from Kaiser Family Foundation Web site http://kff.org/uninsured/upload/7451.pdf

City with its vast public hospital system, uninsured residents face larger obstacles to care than those with insurance.[38]

NY's hospitals provide substantial amounts of uncompensated care to the uninsured and also receive some support for their care of the uninsured. New York is one of a few states that has a public funding pool to reimburse hospitals for free care they provide as well as for bad debt from patient care.[39] In FY 2005-06, New York State provided $847 million per year in HCRA funding to subsidize care for the uninsured; $765 million from the general hospital indigent care pool, and $82 million from the high need indigent care pool. Pool funds are distributed through a complex formula based in part on the level of unreimbursed care each hospital provides in comparison to other hospitals and the proportion of unreimbursed care to each hospital's total costs.[40] The distribution formula relies on 1996 cost data and has not been updated.. The pool does not completely compensate hospitals for the cost of providing care to uninsured New Yorkers. According to GNYHA, HCRA covers a statewide average of 50% of the cost of providing care to the uninsured, ranging from 20% to 80% coverage for particular hospitals.[41] In addition to HCRA, hospitals rely on other public monies to support their margins.

o **Outmigration of services.** The delivery of many acute care services has shifted from an inpatient to an outpatient setting. This shift has been driven by changing reimbursement incentives, clinical technology and pharmaceutical innovation, and consumer preferences. Cardiac catheterization, colonoscopy, and cancer treatment (radiation therapy and chemotherapy) services are now largely provided on an ambulatory basis.

This shift in care has precipitated the growth in ambulatory surgery centers (ASCs), outpatient cancer centers, and outpatient diagnostic centers. These centers increase competition in health care, and may improve quality by specialization of services.[42] However, many outpatient centers practice "cream skimming," choosing to provide the most profitable

---

[38] Louis Harris and Associates, Inc. (1998, February). 1997 survey of health care in New York City. Retrieved July 24, 2006, from The Commonwealth Fund Web site: http://www.cmwf.org/surveys/surveys_show.htm?doc_id=228066

[39] More information is available online: http://www.health.state.ny.us/nysdoh/hcra/hcrahome.htm

[40] Greater New York Hospital Association. Questions and answers on the New York health care reform act. Retrieved July 24, 2006, from the Greater New York Hospital Association Web site: http://www.gnyha.org/pubinfo/HCRA_QA.pdf

[41] Greater New York Hospital Association. Questions and answers on the New York health care reform act. Retrieved July 24, 2006, from the Greater New York Hospital Association Web site: http://www.gnyha.org/pubinfo/HCRA_QA.pdf

[42] Shactman, D. (2005). Specialty hospitals, ambulatory surgery centers, and general hospitals: Charting a wise public policy course. *Health Affairs. 24 (3)*, 868-873. Available online: http://content.healthaffairs.org/cgi/content/full/24/3/868?

medical services without bearing the burden of providing other less attractively reimbursed ones. They also do not bear the full overhead costs incurred by institutions in which the services were previously provided. Because these centers capture some of the lucrative services from hospitals by selecting certain profitable diagnostic related groups (DRGs), general hospitals may lose those profitable patients to the centers and will continue to disrupt the general hospitals' cross-subsidization of unprofitable services that only Article 28 hospitals are required to provide.  Second, the outpatient centers may avoid patients who are uninsured or underinsured, leaving the burden of uncompensated care solely on general hospitals.[43]  Finally, the shift of the locus of care could further reduce New York hospitals' low occupancy rates and exacerbate the problem of excess capacity.[44]

**Figure 5: Estimated Number of Assisted Living Facilities in the United States, 1995-2000**



Source:   National Center for Assisted Living

---

[43] See, e.g., Guterman, S. (2006). Specialty hospitals: A problem or a symptom? *Health Affairs. 25 (1)*, 95-105. Available online: http://content.healthaffairs.org/cgi/content/full/25/1/95
[44] Shactman, D. (2005). Specialty hospitals, ambulatory surgery centers, and general hospitals: Charting a wise public policy course. *Health Affairs. 24 (3)*, 868-873.  Available online: http://content.healthaffairs.org/cgi/content/full/24/3/868?

Within the long term care sector, nursing facilities in New York State are also facing some competition from home and community-based providers. The growth of attractive, supportive housing alternatives for seniors with the means to afford them helped drive these changes in nursing home occupancy rates and patient populations. These newer alternatives include a variety of residential senior housing and assisted living arrangements. In 2002, it was estimated that assisted living facilities in the United States housed 910,000 people.[45]

Assisted living has grown rapidly as a supportive housing arrangement. However, because costs are high and public reimbursement scarce, older persons with modest means have had limited access to this option. This may be changing. While efforts are in their nascent stages, the AARP reports that there have been successful experiments in extending assisted living services to low income, frail elderly residents of subsidized housing.[46] Many states have advanced the growth of residential care through assisted living by providing for such facility care in their Medicaid Waiver programs. As a result, some states have seen an increase in ALP residents and a concomitant decrease in nursing home clients.

**Table 7. Number of Medicaid Waiver Clients in Residential Settings**

| State | Year | | |
|-------|------|------|------|
| | 2000 | 2002 | 2004 |
| **Arizona** | 1,240 | 2,300 | 3,067 |
| **Colorado** | 2,654 | 3,773 | 3,804 |
| **Florida** | 1,458 | 2,681 | 4,167 |
| **Georgia** | 2,262 | 2,759 | 2,851 |
| **Minnesota** | 397 | 2,895 | 4,144 |
| **New Jersey** | 699 | 1,500 | 2,195 |
| **Oregon** | 2,573 | 3,600 | 3,731 |
| **Washington** | 2,919 | 3,762 | 7,404 |

Source:   AARP, Wilden, R. & Redfoot, D.L., "In Brief: Adding Assisted Living Services to Subsidized Housing: Serving Frail Older Persons With Low Incomes," Research Report of the AARP Public Policy Institute, January 2002.

---

[45] Mollica, R. (2002). State assisted living policy: 2002. Retrieved July 24, 2006, from National Academy for State Health Policy Web site: http://www.nashp.org/_docdisp_page.cfm?LID=24F0A0A1-2066-4E84-B113F4B919FC006C

[46] Wilden, R., & Redfoot, D.L. (2002, January). Adding assisted living services to subsidized housing: Serving frail older persons with low incomes. Retrieved July 24, 2006, from AARP Web site: http://assets.aarp.org/rgcenter/il/2002_01_living.pdf

In addition to assisted living, growth has also occurred in home and community-based alternatives to institutional care. There are now more than 3,500 adult day centers operating in the US providing care for 150,000 seniors each day.[47]

The Program of All-Inclusive Care for the Elderly (PACE) model successfully shifts the focus of long-term care to non-institutional settings.  PACE combines Medicare and Medicaid payments into one capitated payment (set fee per patient) to long-term care providers, who carefully plan and manage service delivery to keep nursing-home-eligible seniors out of hospitals and nursing homes.  Program evaluations have shown a decrease in hospital and nursing home utilization among PACE participants, which is more powerful due to the fact that all participants have chronic conditions and disabilities.  PACE expansion in New York has been slow, but there are some successful growing programs and the legislature recently approved the addition of four more "pre-PACE-like" (Medicaid capitation only) programs.

o **Declining Hospital Average Length of Stay (ALOS).** Declines in ALOS exacerbate problems associated with excess inpatient capacity. While still higher than the national average, New York State's inpatient hospital ALOS has fallen considerably.  The ALOS for New York State in 2004 was 6.1 days, down from 8.4 days in 1994. Prior to 1994, ALOS was consistently in the range of 8.5 to 9.3 days).[48]  The national average LOS for hospital inpatient stays was 4.8 days in 2003, down from 5.7 days in 1994.[49]  The recent drop in LOS is primarily attributable to clinical and pharmaceutical innovations and an increase in ambulatory or same-day surgery. Treatment advances, including new drug therapies and less invasive surgical techniques, have made possible fewer and shorter hospital stays, as have cost-management controls and alternative forms of health care organization and payment.[50]

Though lower than in the past, the high ALOS in NY hospitals is not justified by patient severity and should be further reduced. A shorter length of stay can often benefit

---

[47] (2006, July 14). Aging services in America: The facts. Retrieved July 24, 2006, from American Association of Homes and Services for the Aging Web site: http://www.aahsa.org/aging_services/default.asp

[48] Department of Health. (2004). *Statewide Planning and Research Cooperative System*, 243. Available online: http://www.nyhealthcarecommission.org/docs/sparcs_complete_november2005.pdf.  Earlier information is available in the Statewide Planning and Research Cooperative System Annual Reports.

[49] Kozak, L.J., Owings, M.F., & Hall, M.J. (2004). National hospital discharge survey: 2001 annual summary with detailed diagnosis and procedure data. *Vital Health Statistics. 13 (156)*.  Available online: http://www.cdc.gov/nchs/data/series/sr_13/sr13_156.pdf

[50] (2002, October 10). Length of hospital stays continues to decline. Retrieved July 24, 2006, from HealthLink: Medical College of Wisconsin Web site: http://healthlink.mcw.edu/article/1013703780.html

patients, allowing them to return to their daily lives soon after hospitalization. Patients can be exposed to infections often present in hospitals and to the possibility of medical errors. The benefits of getting people up and moving around are best realized by moving them to residential environments such as their homes or nursing homes.[51] If ALOS were reduced to more appropriate levels, the excess capacity in New York State would be substantially greater than it is today.

In addition, shorter ALOS can have significant cost benefits for hospitals. Most payers have abandoned per diem payment structures to correct the perverse incentive to extend a hospital's ALOS as long as possible. The shift to a prospective payment system (PPS) means that hospitals receive a fixed payment per admission and a longer length of stay does not generate extra revenue. Instead, the costs associated with a longer LOS increase costs and cut into a hospital's margins.

**Figure 6: New York State and National Hospital Length of Stay, 1994-2004**



Source: National Hospital Discharge Survey: National Center for Health Statistics and Statewide Planning and Research Cooperative System (SPARCS) data

---

[51] Excellus Blue Cross/Blue Shield. (2002). Average length of stay in upstate New York hospitals: Opportunities for savings. *Excellus Health Policy Reports*. *4*, 1-16. Available online: https://www.excellusbcbs.com/download/files/excellus_health_policy_report_4.pdf

**Figure 7: New York State Hospital Length of Stay by Region, 2004**



Source: 2004 Statewide Planning and Research Cooperative System (SPARCS) data

As with hospitals, ALOS in New York's nursing homes has declined dramatically over the last decade. Much of the decrease is attributable to changes in the service mix of nursing homes; many facilities have reduced their focus on traditional long-term services to expand their post-acute short-term rehabilitation services, which generally have a length-of-stay of less than 30 days. Between the growing short-stay services and the changing admission patterns for longer stay residents, the average length of stay in New York's nursing homes has been cut in half in just under seven years. The statewide average was 217 days in 2003, down from 463 days in 1996.

This increased churning of nursing home residents has had an impact on facility operations and finances. Facilities must provide increased nursing ratios, increased housekeeping services, increased documentation and supervision, and specialized clinical and therapeutic services. While Medicare pays additionally for each resident requiring more nursing and therapy, Medicaid reimbursement had been capped according to the facility's 1983 cost structure and other ceilings. Therefore, while the industry's costs have risen dramatically,

it is not clear that revenues have kept pace. Recent legislation to update the nursing home base year may address this imbalance.

**Figure 8: New York State Nursing Homes Average Length of Stay, 1996-2003**



Source: Residential Health Care Facility-4 (RHCF-4) Cost Reports, 1996-2003

o    **Drop in Severity of Illness (Hospitals).** Contrary to the national trend, the severity of illness of New York City residents who require hospitalization as measured by the case mix index (CMI) has declined sharply in a majority of City hospitals.[52]   Due largely to fortunate developments related to major epidemics (e.g., AIDS, substance abuse, tuberculosis), high-acuity admissions have fallen. This drop in CMI directly affects the financial viability of the State's and City's hospital system.   "Under DRG payment systems, the CMI determines how much inpatient revenue a hospital will receive. In theory, since DRG payments are based on costs, the CMI should not affect hospital profitability.  However, in practice, the CMI is often related to profits."[53]

---

[52] United Hospital Fund, (2005).Drop in severity of illness further strains hospital finances. *Hospital Watch*. *16 (1)*, 1-6. Available online: http://www.uhfnyc.org/usr_doc/hw16_1.pdf

[53] United Hospital Fund, (2005).Drop in severity of illness further strains hospital finances. *Hospital Watch*. *16 (1)*, 1-6. Available online: http://www.uhfnyc.org/usr_doc/hw16_1.pdf

o        **Increase in Severity of Illness and Disability (Nursing Homes):**  While the hospitals may be experiencing severity declines, nursing homes are dealing with more needy patients and residents—getting them "sicker and quicker."  Nationwide, nursing home residents are older and more frail, and this is certainly true in New York as well.

**Figure 9: Percentage of Nursing Home Residents able to Independently Perform Activities of Daily Living**



Source: National Nursing Home Survey

o        **Workforce Issues.** New York is more expensive than most states to employ workers, including nurses and other health care workers.  According to the Bureau of Labor Statistics, New York ranks sixth among all the States in salaries for registered nurses.[54] Retention of experienced health care personnel, especially nurses, is also a challenge. A 2004 GNYHA study found an 8.5% turnover rate for registered nurses at GNYHA-member hospitals. More than one- third of the hospitals reported turnover rates of 10% or higher.[55] To address these

---

[54] Bureau of Labor Statistics, (2005). Occupational employment and wages, May 2005: Registered Nurses. Retrieved July 24, 2006, from U.S. Department of Labor Web site: http://www.bls.gov/oes/current/oes291111.htm

[55] Greater New York Hospital Association, (2004, April 23). New York-area hospitals continue to face shortage of nurses. Retrieved July 24, 2006, from Greater New York Hospital Association Web site: http://www.gnyha.org/press/2004/pr20040423.html

issues, more than $1.3 billion has been invested in workforce recruitment, retraining, and retention though various programs.

**Table 8. Employment and Wages of Registered Nurses by State, May 2005**

| State | Estimated Total Employment | Mean Wage | |
|---|---|---|---|
| | | Hourly | Annual |
| California | 226,350 | $33.86 | $70,430 |
| Maryland | 49,010 | $32.37 | $67,330 |
| Massachusetts | 76,870 | $31.85 | $66,250 |
| Hawaii | 9,240 | $31.49 | $65,490 |
| New Jersey | 80,940 | $30.32 | $63,070 |
| New York | 164,370 | $30.29 | $63,010 |

Source: Bureau of Labor Statistics, May 2005 Occupation and Wage Estimates

For nursing homes, turnover for registered nurses, licensed practical nurses, and certified nursing aides categories is significant. While better than the national average, turnover rates for these categories are between 40 and 50%. These translate to vacancy rates of 16-17% for RNs and LPNs.

**Table 9. Nursing Home Staff Turnover, 2002**

| Licensure | New York State | National |
|---|---|---|
| C.N.A | 41.7% | 71.1% |
| L.P.N | 33.3% | 48.9% |
| Staff R.N | 44.4% | 48.9% |

Source: American Health Care, 2002 Survey of Nursing Staff Vacancy & Turnover Rates in Nursing Homes

Often, these vacancies are "filled" with overtime and agency staffing, both of which contribute to a facility's instability. Over-time and agency payments are a significant financial burden for many nursing homes, whose Medicaid rates do not recognize these increase costs. Moreover, both overtime use and agency staff use are correlated with lower quality measures, so that a facility's reputation—and often its occupancy—are hurt by staff turnover and vacancies.

o    **Shifting Demographics and Consumer Preferences.** Changes in demographics have a significant impact on the demand for hospital and nursing home beds.[56]  Trends in total population suggest that statewide need for inpatient capacity will remain flat for the foreseeable future, with some differences at the regional level. Aging of the population will occur slowly, affecting demand only gradually. Growth in the 75+ cohort, which generates the largest demand for nursing home care, will be relatively flat over the next 20 years. The average baby boomer will be 55 in 2010, so the full impact of this generation will not be felt until the 2020s, when the baby boom generation first reaches their mid-70s. Older people today are healthier than older people of decades ago. People live longer, retire later, have fewer disabilities, have less functional loss, and report themselves to be in better health. The National Academy of Sciences reports a statistically significant 3.6% decline in chronic disability prevalence rates in the elderly United States population, from 24.9% in 1982, to 21.3% in 1994.   These trends, together with continuing advances in medical care may have contributed to the nursing home utilization decline for the 65+ population between 1998 and 2003.

Beyond demographics, consumer attitudes towards and preferences for health care services are changing. Patients are now more engaged in medical decision-making, participate as active partners in their care, value living independently, and shun institutional care arrangements. Technology advances increasingly allow patients to realize their preferences. The impact of these shifting preferences is likely to be felt most strongly in the long term care continuum of services. While the bulk of today's frail elderly, who were shaped by the Depression and WWII, are fairly trusting and accepting of institutions, the generations behind them—including the "silent generation" and the "baby boomers" show strong preferences for non-institutional alternatives.

---

[56] Commission on Health Care Facilities in the 21st Century. (2006). *Planning for the future: Capacity needs in a changing health care system*, 1-41. New York: Commission on Health Care Facilities in the 21st Century.

### III. Excess Capacity

Excess capacity in our state's health care system locks us into a vicious cycle. The costs associated with maintaining unneeded beds and institutions are steep. Perpetuating inefficiencies at weak, unneeded facilities drives the costs of health care ever higher. As a result, access to care is diminished, quality of care suffers, safety net functions are threatened, and modern health care becomes increasingly unaffordable for individuals, businesses, and government.

**New York State Has Too Many Hospital Beds**

A fundamental driver of the crisis in New York's health care delivery system is excess capacity. Simply stated, New York State is over-bedded and many beds lie empty. There are approximately 3.3 hospital beds per 1,000 New Yorkers, compared to the national figure of 2.8 beds per 1,000 people.[57] Were ALOS in NY hospitals closer to national norms, the excess capacity in the state would be substantially greater. Even a statewide reduction in ALOS to the levels in the Central and Northern regions of the state would result in significantly more excess capacity.

**Table 10. Beds Per 1,000 Population – Selected States**

| Rank | State | Beds/1,000 Population (2004) | Rank | State | Beds/1,000 Population (2004) |
|---|---|---|---|---|---|
| 1 | District of Columbia | 6.2 | 11 | Iowa | 3.7 |
| 2 | South Dakota | 6.0 | 11 | Kentucky | 3.7 |
| 3 | North Dakota | 5.6 | 13 | Arkansas | 3.5 |
| 4 | Montana | 4.7 | 13 | Tennessee | 3.5 |
| 5 | Mississippi | 4.5 | 15 | Alabama | 3.4 |
| 6 | Nebraska | 4.2 | 16 | Missouri | 3.3 |
| 7 | West Virginia | 4.1 | **16** | **New York** | **3.3** |
| 8 | Wyoming | 4.0 | 18 | Minnesota | 3.2 |
| 9 | Kansas | 3.8 | 18 | Pennsylvania | 3.2 |
| 9 | Louisiana | 3.8 | 20 | Oklahoma | 3.1 |

Source: Kaiser Family Foundation

---

[57] Kaiser Family Foundation, New York: Beds per 1,000 Population, 1999-2004. Retrieved August 21, 2006, from statehealthfacts.org Web site: http://www.statehealthfacts.org/cgi-bin/healthfacts.cgi?action=profile&area=New+York&category=Providers+%26+Service+Use&subcategory=Hospital+Trends&topic=Beds%2c+1999%2d2004

Excess capacity is both a cause and an effect of low and steadily declining hospital occupancy rates. The statewide hospital occupancy rate has fallen from 82.8% in 1983 to 65.3% in 2004, a decrease of 17.5%, including a decline from 73.4% of certified beds in 1994, a decrease of 8.1%. On a given day, as many as one-third or more of the state's hospital beds lie empty. This is far lower than what historically has been considered an ideal rate of 85%, which ensures efficient operations and allows some surge capacity for periods when the daily patient census increases. On a staffed bed basis, approximately 77% of beds statewide are occupied.[58]

While statewide occupancy rates are low, there is some variation of occupancy both between and within regions. The average occupancy rate for many individual hospitals show them to be more than half empty, and some regions of the State, including the Western and Central regions, have especially low occupancy rates based on both certified and staffed bed count.

**Figure 10. Hospital Licensed and Available Bed Occupancy Rates, 1994 to 2004**



Source: 2004 Statewide Planning and Research Cooperative System (SPARCS) data

.

---

[58] New York State Department of Health. (2004). *Institutional Cost Reports,* 1-52. Available online:
     http://www.nyhealthcarecommission.org/docs/2004_icr_commission_data.pdf

**Figure 11. Hospital Licensed Bed Occupancy Rates by Region, 2004**



**Figure 12. Hospital Available Bed Occupancy Rates by Region, 2004**



**Regions of New York State Have Too Many Nursing Home Beds**

Nursing home occupancy in New York State has been steadily declining, from 97% in 1997 to 93% in 2004. There are various definitions of the ideal nursing home occupancy rate. A 97% occupancy rate historically has been the goal for nursing homes in terms of viability and efficiency. The New York State Department of Health also uses 97% as a measure of whether new beds can be made available in region. From a financial perspective, maintaining at least a 95% occupancy rate is crucially important to nursing homes because that is the rate required to qualify for "bed-hold payments," which allows the State to compensate nursing homes in order for the nursing home to reserve an empty bed while waiting for its resident to return from a hospitalization.

**Figure 13. Nursing Home Licensed Bed Occupancy Rates, 1994 to 2004**



**Figure 14. Nursing Home Licensed Bed Occupancy Rates by Region, 2003 (Adjusted for partial years)**



Although occupancy rates have been declining, New York's nursing homes have increased the numbers of people they serve. Shorter-term stays for sub-acute care have become so prevalent that the number of total nursing home admissions has more than doubled since 1997. The rapid growth of sub-acute services, together with rapid resident turnover rates (less than 30 days length-of-stay), reduces the occupancy of an efficient provider. The State's nursing home average length of stay decreased from approximately one year in 1997 to 217 days in 2003. Patient turnover leads to vacant beds due to admission/discharge timing issues, the need to match roommate gender and other factors.

According to the 2007 New York State residential health care facility bed need methodology, the State has roughly the right number of beds. In the aggregate, the supply is roughly equivalent to need, with about 2,000 beds still needed statewide. However, this analysis is based on current utilization patterns. Many trends could only further strengthen the need to shift future resources. For example, progress in medical treatment and technology has enabled many older New Yorkers to live longer in less restricted settings. Though the population is

gradually aging, the shift to home and community-based care could keep pace with this trend, particularly as baby boomers turn away from institutional care settings.

The bed need methodology also reveals that nursing home beds are unevenly distributed across the state. The methodology indicates that the Bronx, New York (Manhattan), Westchester, Schenectady, St. Lawrence, Oneida, Monroe, Chatauqua, and Albany counties have too many beds. Notably, the bed need methodology does not tell the whole picture; even in counties with a calculated deficit of beds, the county occupancy remains quite low, indicating over-bedding. These counties include Cayuga, Jefferson, Westchester, Putnam, and Columbia.

The Commission also considered the relative availability of non-institutional long-term care alternatives, such as adult day health care, long-term home care, and supportive housing, in determining whether there was excess capacity in the nursing home sector. If a county has a high occupancy but few home- and community-based options, it is likely that the nursing home beds are utilized by individuals who may otherwise be cared for in an alternate setting, if it existed. After examining the State's bed need methodology and figures, county nursing home occupancy, and availability of non-institutional care alternatives, several counties emerge as high-priorities for resource shifts:

**Figure 15. New York State Counties with LTC Resource Shift Opportunities**



**New York State Has Too Few Home- and Community-Based Alternatives to Nursing Homes**

Regardless of nursing home bed availability, the state has an insufficient supply of non-institutional alternatives. Many additional "slots" of adult day health care, long-term home health care, and supportive housing are needed.  In the majority of counties, the existing supply of such alternative services meets less than half of the total calculated need. As a result, some residents who do not require institutional care are institutionalized because there are no available alternatives for them. The shortage of non-institutional slots is more severe in upstate and rural areas of the state.

A combination of surplus nursing home beds together with a need for non-institutional services creates an opportunity to shift resources from facilities to alternatives.  For example, New York State's own rightsizing demonstration permitted nursing home beds to be permanently de-certified and exchanged for other certified capacity, including adult day health care, long-term home health care, and Medicaid-supported Assisted Living Program (ALP) beds.  As many as 2,500 nursing home beds were eligible for conversion under this demonstration.

Shifting resources to non-institutional care requires certain factors to be in place. Limiting factors may be insufficient supplies of affordable and accessible senior housing, and limited workforce availability such as qualified home care attendants.  Thus, it is consistent that many States with rightsizing initiatives have focused on creating more assisted living, supportive housing, and other congregate care options that can be more staff-efficient.  Additionally, investment and support of technology and informal caregivers can make shifting resources out of nursing homes more viable.

**What's Wrong With Excess Capacity?**

A surplus of beds threatens quality of care, promotes inefficiencies, increases costs, threatens the provision of public goods, and contributes to the fragile finances of health care providers.  In many other industries, the cost of excess capacity is borne by the institution or corporation itself.  In health care delivery, however, a large portion of excess capacity falls on the tax-paying public, due to the presence of Medicare, Medicaid, and other public health

payors.[59] The heavy public cost of unneeded beds has prompted state and federal lawmakers to concentrate on elimination of excess capacity. For example, former Congressional Representative Pete Stark, stated "Low occupancy is a symptom of the indulgent spending spree the Country's hospitals have been on," and Gail Wilensky, former Administrator of the Health Care Financing Administration (now Centers for Medicare and Medicaid Services) suggested that four out of every ten empty staffed hospital beds should be reduced.[60] "[P]ressure to fill empty beds puts hospitals at a disadvantage in negotiating rates with payers and the widespread availability of beds means that physicians have few incentives to shorten the length of stay of their patients. Most importantly, the oversupply means that the industry is not generating enough revenue to adequately cover its fixed costs."[61]

**Excess Capacity Jeopardizes Quality of Care**

In health care, there is a direct positive relationship between volume and outcomes. The more cases or procedures performed by a hospital or physician, the better the quality of care. A review of 135 studies found that 71% of studies of hospital volume and 69% of studies of physician volume reported statistically significant associations between higher volume and better outcomes.[62] It is a public health imperative to concentrate higher volumes at fewer institutions to improve patient care. For this reason, New York and many other states establish minimum volume thresholds below which hospitals may not perform certain advanced procedures. Excess capacity in the hospital system disperses volume and expertise while potentially diminishing quality care.

Excess capacity also subsidizes inferior care by blocking necessary investments. Facilities have less chance of attracting the best doctors, buying and maintaining the latest equipment, and maintaining adequate nurse staffing when they must devote inordinate resources to preserving old, underused physical plants. With fewer resources to spend on equipment, salaries, and new technologies, the quality of care suffers.

---

[59] Gaynor, M., & Anderson, G.F. (1995). Uncertain demand, the structure of hospital costs, and cost of empty hospital beds. *Journal of Health Economics. 14 (3)*, 292.

[60] Ibid, p. 293.

[61] Advisory Commission on Hospitals (1999). Report of the Advisory Commission on Hospitals. Retrieved September 22, 2006, from New Jersey Department of Health and Senior Services Web site: http://www.state.nj.us/health/hcsa/acoh/trends.htm

[62] Halm, E.A., Lee, C., & Chassin, M.R. (2002). Is volume related to outcome in health care? A systemic review and methodologic critique of the literature. *Annals of Internal Medicine. 137*, 511-520.

**Excess Capacity Promotes Unnecessary Utilization of Services**

It is well documented that hospitalizations expand in relation to number of beds available. Capacity generates utilization so that a bed built is a bed filled, a phenomenon often called Roemer's law. Similarly, greater numbers of expensive tests and procedures are performed when resources like imaging machines, diagnostic labs, and surgical suites are available and need to be paid for. Areas with excess capacity repeatedly demonstrate higher rates of hospital admission, greater numbers of patient days, and surgeries; differences that cannot be explained by differences in rates of illness or age according to the Dartmouth Atlas of Health Care.[63] "In situations where there is excess capacity, the body of evidence suggests that physicians tend to utilize more [medically unnecessary] procedures...Studies have found similar relationships in physician supply-to-utilization patterns (such as between supplies of cardiologists and invasive heart procedures) and high-tech equipment-to-utilization patterns. It appears that much of the unwanted variation in hospitalization rates, use of procedures, and intensity of care is directly attributable to the differences across geographic areas in physicians, technology and beds per capita."[64]

Similar patterns occur among nursing homes that are struggling to fill excess beds and qualify for bed-hold payments. To maintain occupancy levels, nursing homes may admit less-intensive residents who do not require such round the clock skilled care. But doing so can not only negatively impact the facility's Medicaid rate by lowering its case mix index; it can also institutionalize individuals that could have their needs met in a less-restrictive alternative.

**Excess Capacity Duplicates Services and Hinders Collaboration**

When capacity exceeds community need, health care providers must compete vigorously to maintain a viable market share. For instance, prior to the reduction of services at St. Mary's Hospital in 1999 and the closure of the Genesee Hospital in 2001, Rochester area hospitals were operating at less than 70% occupancy, and perceived the need to engage in competitive but non-productive activities such as advertising. Hospitals felt compelled to purchase physician

---

[63] Center for the Evaluative Clinical Sciences. (2005). Supply-Sensitive Care. Retrieved September 22, 2006, from Dartmouth Atlas Project Brief Web site: http://www.dartmouthatlas.org/topics/supply_sensitive.pdf

[64] Finger Lakes Health Systems Agency. (2005). *Capacity Matters*. 1-16. Rochester: Finger Lakes Health Systems Agency.

practices, a financially draining strategy, in an effort to lock in or capture market share. Instead of joint services, hospitals instead concluded they must have enough capacity to satisfy their individual sought-after market share. For instance, hoping to gain market share, in the last half of the 1990s each hospital system in Monroe County developed new obstetric units for more births than they historically experienced; the result was an excess of obstetric capacity which lasted until the closure of the Genesee Hospital.[65]

Today, New York's providers continue to compete with another in a "medical arms race." To attract both physicians and patients, they feel compelled to seek the most sophisticated technologies and specialties that generate higher reimbursement rates and financial margins. The result is unnecessary duplication of services, especially of costly high-end services like magnetic resonance imaging, cardiac catheterization, and transplant centers, and too little integration of regional service delivery. Elimination of systemic redundancies could save money without compromising access to care.

**Excess Capacity Threatens Safety Net Services**

Low occupancy rates and the associated financial pressures on hospitals can lessen hospitals' commitments to provide care for vulnerable populations. Hospitals in financial trouble may be forced to retrench, resulting in potential loss of access to care. As fiscal pressures increase, facilities may be inclined to close or shrink their less financially viable services in inner city neighborhoods or in rural communities.

**Excess Capacity Increases Costs**

Excess capacity is expensive to maintain. Despite the dramatic shift to outpatient care, the costs of maintaining a "bricks and mortar" based health system hang like an albatross around the neck of New York's providers and taxpayers. Even beds, wards, or buildings that are unused and unstaffed represent fixed costs that must still be paid and thus spread over a dwindling number of patients and other over all other services at that particular facility. Additionally, dollars spent in retiring capital debt of a given facility are not available for other productive uses. Finally, dollars spent on duplicative service capacity caused by excess capacity cannot be then captured and reinvested to fill community needs.

---

[65] Ibid

## IV. Adapting to and Managing Change

New York's health care system has multiple strengths on which to build. The state has some of the finest hospitals in the world, nursing homes that provide superb and concerned care to our most frail and elderly residents, a strong foundation of non-institutional care providers, a committed health care workforce, and a vast commitment of public dollars to health care. From crisis arises opportunity; the dire condition of the State's health care system creates an opportunity to reshape the health care system of tomorrow.

It is not too late to reconfigure NY's health care delivery system. The time to act, however, is now. We can no longer deny reality or bury our heads in the sand. We cannot continue to bail out troubled and unneeded facilities simply because they exist or to satisfy powerful constituencies. We cannot rely solely on market-based incentives to eliminate excess capacity or promote public goods. We need a health care delivery system that is more flexible and provides better value than the one we have today. We need to look beyond the "bricks and mortar" of the hospital and nursing home and instead to the health care delivery system as a whole.

Absent intervention, the Commission believes that the future of our state's health care system is bleak. It is painfully obvious that health care providers cannot sustain chronic annual losses and continue to fulfill their missions; it is impossible to provide care for which we cannot pay. Closures and bankruptcies of health care institutions have become increasingly common. Given the financial predicament of New York's hospitals and nursing homes, more are almost certain to close.  Moreover, without state involvement, those facilities that are forced to close based on market forces alone may be those facilities that are most valued by various communities throughout the State.  We are left with a stark choice; we can fail to act thereby allowing the system to drift in an unplanned direction, costs to keep rising, and access to care to remain in doubt. Alternatively, we can direct system systemic change, ensuring that New Yorkers continue to receive high-quality, accessible health care. We choose the latter path.

Transformation of our health care system, above all else, must benefit patients and taxpayers. Stabilization and modernization of our system will also benefit New York State's economy and competitiveness. Health care is a major engine of the State's economy. Hospitals and health systems in the state generate approximately $91.5 billion each year for local and state

economies and support more than 644,900 jobs. These figures represent nearly ten percent of the gross state product and over 7 percent of all non-farm jobs.[66] To stabilize the employment marketplace, the State must work to stabilize the health care industry, including the restructuring and closing of hospitals.

**Framework for Solutions – Producing Maximum Efficiencies**

The Commission is charged with "rightsizing" institutions to stabilize the State's health care system.  Rightsizing includes the possible consolidation, closure, conversion, and restructuring of institutions, and reallocation of local and statewide resources. The strategy adopted to remove excess capacity from the hospital and nursing home systems will dictate the opportunities and scale of benefits realized. Strategies such as outright closure of a facility, a merger of multiple facilities or an across the board reduction in beds all meet the goal of reducing overall capacity. However, the closure of hospitals and nursing homes generally presents the greatest opportunity for savings by concentrating the benefits of lowered capacity.

**Benefits of Closure and Consolidation**

According to Manatt, Phelps, and Phillips, a leading health care law firm, "When a hospital is drowning in red ink with no hope of resurfacing, the logical step for trustees- consistent with their fiduciary obligation to preserve and protect the charitable asset under their control-is to close the hospital."[67] The closure of a facility has many advantages including the removal of fixed operating costs, forgone capital expenses, elimination of duplicative services within the market, increased efficiency at remaining institutions and opportunities for lease, sale or conversion of the facility's property. Operating costs such as utilities, cleaning, security and maintenance do not transfer to other facilities along with the patient base of a closed facility. Additional savings are realized by forgoing renovations on aged physical plants. Depending on the age of the physical plant, significant capital investments are required on an ongoing basis to keep a facility current with modern care and regulatory requirements. These capital expenditures include activities such as correcting fire safety deficiencies, improving air conditioning,

---

[66] Health Care Association of New York State. (2006, June). What's at stake: The impact of New York's hospitals on the economy and our communities.
[67] Schwartz, J.R. (2001, January). Closing...Closing...Closed. Retrieved September 25, 2006, from Manatt, Phelps, and Phillips Web site: http://www.manatt.com/newsevents.aspx?id=225&folder=24

converting from semi-private to private rooms, renovating outpatient spaces, and improving parking facilities and elevators. Furthermore, the benefits of these eliminated costs accrue indefinitely.

To a lesser extent, some of these benefits may also be realized in the case of facility consolidations or mergers. In these instances, operating costs may be reduced, duplicative services may be removed from the market, facilities may operate more efficiently and opportunities for conversion may arise. However, a successful merger presents different challenges than outright closure of a facility. Consolidation of administrative services is an early and obvious benefit of merger agreements, but greater efficiencies are realized by integrating and rationalizing clinical services and removing excess capacity from the combined entity. Integrating clinical services requires addressing complex compromises among medical staffs and employee unions. Medical staff may be resistant to integration and make efforts to protect their territory within the remaining institution. These and other challenges have plagued merger attempts throughout the country and led to unsuccessful attempts to rightsize capacity.[68] In New Jersey, a special commission formed to study its state's hospital system concluded that "Reducing staffed beds, consolidating clinical services, and eliminating duplicative administrative functions appear to be necessary but insufficient to accomplish system-wide savings that the anticipated reductions in utilization will require."[69]

**Impact of Closures: What Does The Evidence Say?**

**Health Care Providers Emerge Stronger:** Peer-reviewed evidence from past hospital closures confirm that the closure of institutions may contribute to the vitality of remaining institutions. In urban markets, hospital closure may result in an "evolutionary increase" in efficiency among remaining institutions in the market. Evaluation research indicates that when an urban hospital closes, other hospitals within their markets experience increased inpatient and emergency room visits and became more efficient on a cost per adjusted admission basis. Frequently the hospital

---

[68] Meyer, J.A., Wicks, E.K., & Carlyn, M. (1998). A tale of two cities: Hospital mergers in St. Louis and Philadelphia not reducing excess capacity. Economic and Social Research Institute: Washington, DC.

[69] Advisory Commission on Hospitals (1999). Report of the Advisory Commission on Hospitals. Retrieved September 22, 2006, from New Jersey Department of Health and Senior Services Web site: http://www.state.nj.us/health/hcsa/acoh/trends.htm

that closed was the least efficient in the market prior to closure.[70] The remaining institutions become more efficient by absorbing the additional patient volume and filling previously established, but unused capacity.

**Access to Care and Health Status Are Preserved:** Peer-reviewed studies indicate that the repercussions of hospital closures on public health are nonexistent or minimal. There is little evidence of changes in access to care, health status, or mortality rates following hospital closures. For example, Buchmueller, Jacobson and Wold found that hospital closures have a modest effect on access to care in urban areas. Moreover, they found that "…hospital closures may shift care to doctor's offices, generally considered an appropriate and cost-effective source of regular care."[71]  Additionally, studies of the impact of rural hospital closures in Saskatchewan, Canada found that despite fears to the contrary, residents in affected communities reported that hospital closures did not affect their own health.[72] A study by the Office of Inspector General of the U.S. Department of Health and Human Services (OIG) found that of the hospitals closed nationwide in 2000, 50 percent of rural facilities and 52 percent of urban facilities were within three miles of another inpatient facility. An additional 18 percent of closed rural facilities were between four and 10 miles of another hospital, as were an additional 38 percent of the urban facilities that closed. In most cases when a hospital closed, health care was still available nearby.[73]

Closures have far less impact than feared because facilities that close have been in trouble for extended periods of time. Almost always, they have experienced a cycle of declining patient census and revenues and gradually withered away until reaching the point of closure. In testimony before the New York City Council, GNYHA stated that "we note that most hospitals that close experience a significant drop in demand underline before they get to the point of closure. As indicated previously, troubled hospitals often curtail services in the interest of keeping the institution afloat. In addition, when possible, hospitals that are part of multi-hospital systems and

---

[70] Lindrooth R.C., LoSasso A., & Bazzoli G. (2003). The effect of hospital closure on markets. *Journal of Health Economics. 22 (5).* 691-712

[71] Buchmueller T.C., Jacobson M., & Wold C. (2003). How far to the hospital? The effect of hospital closures on access to care. *Journal of Health Economics. 25 (4).* 740-761.

[72] Liu L., Hader J., Broassart B., White R., & Lewis S. (2001). Impact of rural hospital closures in Saskatchewan, Canada. *Social Science & Medicine. 52 (12).* 1793-1804.

[73] U.S. Department of Health and Human Services, Office of the Inspector General. (2002). *Hospital Closure 2000* (OEI-04-02-00010).  Available online: http://oig.hhs.gov/oei/reports/oei-04-02-00010.pdf

that are facing financial problems often transfer and consolidate services to other sites in order to enhance the efficiency of their operations. As word of a hospital's financial troubles are made public, many of the hospital's patients also begin to seek care elsewhere, and the medical staff begin to obtain privileges at other hospitals. Thus, by the time a hospital closes, its occupancy rate is typically already low, and many patients have already begun to seek care from other providers…In summary, the negative impact on access related to the closure of a hospital is typically a gradual process that tracks the pace of financial deterioration of the hospital rather than occurring suddenly as the institution physically closes its doors."[74]

- **Community Needs Are Met:** Another benefit of facility closure is the opportunity to convert the facility to alternative uses which better align resources with community needs. Closed facilities may be used for non-acute medical services or developed for residential or commercial purposes. Numerous examples exist of such successful conversions, including:

  o Morrisania Hospital, an 11-story Bronx hospital which closed, reopened under the auspices of the Women's Housing and Economic Development Corporation to provide apartments for low-income and formerly homeless families. In addition, the facility hosts a family health center and the Urban Horizons Center which offers an array of social services such as job training, a Head Start program, child care and counseling. The conversion was financed by a $23 million investment of state, federal and private funds.

  o St. Marys' Hospital, in Rochester, closed its inpatient services in 1999. The facility now operates as a comprehensive community health center and urgent care center.

  o Amsterdam Memorial Hospital, in 2002, closed its inpatient acute care beds. It retains an inpatient rehabilitation unit, and provides urgent care services and ambulatory surgery.

  o In 1997, Germantown Hospital in Philadelphia, PA joined the Albert Einstein Healthcare Network. The inpatient beds were transferred to the nearby Albert Einstein Medical Center and the Germantown facility was converted to Germantown Community Health Services. The facility includes a 170-bed nursing home, a 24

---

[74] Greater New York Hospital Association. (2005, June 15). Testimony of Greater New York Hospital Association before the New York City Council Committee on Health at a Hearing on Hospital Closures, delivered by Susan C. Waltman.

hour emergency department, outpatient diagnostic and treatment services and physician offices.[75]

On the long term care side, a combination of surplus nursing home beds together with a need for non-institutional services creates an opportunity to shift resources from nursing home facilities to alternatives. For example, New York State's own "Rightsizing Demonstration" permitted nursing home beds to be permanently de-certified and exchanged for other certified capacity, including adult day health care, long-term home health care, and Medicaid-supported Assisted Living Program (aka "ALP") beds. As many as 2,500 nursing home beds could be converted under this demonstration.

Other States have similar voluntary rightsizing initiatives that convert nursing home resources into non-institutional alternatives, including Wisconsin, Nebraska, Kentucky, Iowa, Washington, and Minnesota. Through Minnesota's initiative, nursing home beds declined by nearly 4,000 or 8% in two years, falling in line with declining nursing home utilization rates. At the same time, they expanded their Elderly Waiver and Alternative Care programs, so that Minnesota spends nearly equally between nursing facilities and home care, serving more individuals than previously, according to the Minnesota Dept of Human Services.

---

[75] Baittinger, E., & Zuckerman, A. (2005). Hospital closures: Moving from failure to revitalized community resources. *Strategies & Solutions*, *March 2005*. Retrieved September 27, 2006, from http://www.hss-inc.com/enewsletters/march2005.htm.

## V. Commission Process and Methodology

The Commission on Health Care Facilities in the 21st Century was a broad-based, non-partisan panel created by Governor Pataki and the New York State Legislature to undertake a rational, independent review of health care capacity and resources in New York State. It was created to ensure that the regional and local supply of hospital and nursing home facilities is best configured to appropriately respond to community needs for high-quality, affordable and accessible care, with meaningful efficiencies in delivery and financing that promote infrastructure stability.

The Commission was statutorily charged with evaluating all nursing homes and general acute care hospitals using factors listed below:

1. The need for capacity in the hospital and nursing home systems in each region;
2. The capacity currently existing in such systems in each region;
3. The economic impact of right-sizing actions on the state, regional and local economies, including the capacity of the health care system to provide employment or training to health care workers affected by such actions;
4. The amount of capital debt being carried by general hospitals and nursing homes, and the nature of the bonding and credit enhancement, if any, supporting such debt, and the financial status of general hospitals and nursing homes, including revenues from Medicare, Medicaid, other government funds, and private third-party payors;
5. The availability of alternative sources of funding with regard to the capital debt of affected facilities and a plan for paying or retiring any outstanding bonds in accordance with the contract with bondholders;
6. The existence of other health care services in the affected region, including the availability of services for the uninsured and underinsured, and including services provided other than by general hospitals and nursing homes;
7. The potential conversion of facilities or current facility capacity for uses other than as inpatient or residential health care facilities;
8. The extent to which a facility serves the health care needs of the region, including serving Medicaid recipients, the uninsured, and underserved communities; and
9. The potential for improved quality of care and the redirection of resources from supporting excess capacity toward reinvestment into productive health care purposes, and the extent to which the actions recommended by the Commission would result in greater stability and efficiency in the delivery of needed health care services for a community.

**Commission Approach**

The Commission's task required an approach that balanced "science" and "art." Its deliberations were significantly informed and driven by extensive review of objective data and quantitative analysis. However, analysis of community needs and resources cannot be reduced to a mere "numbers game" and the Commission's recommendations are not solely the product of mathematical algorithms. Significant public input, understandings of local market conditions, professional judgment, and factual information were combined to form the basis of the Commission's deliberations.

**Commission Structure**

The Commission operated independently of any existing agency or entity. While the Commission relied on the data and expertise from various state agencies, including the Department of Health (DOH), the Dormitory Authority for the State of New York, and the Division of the Budget, the Commission was neither a part nor an initiative of these agencies. The Commission was staffed by seven full-time dedicated employees, including an executive director, a deputy director/lead counsel, policy analysts, and assistants. Its chairman was Stephen Berger. From July 2005 to December 2006, the Commission met 14 times.

The Commission had eighteen statewide members, 12 of whom were appointed by the Governor, 2 by the Assembly Speaker, 1 by the Assembly's Minority Leader, 2 by the President Pro Tem of the Senate, and 1 by the Senate's Minority Leader. Statewide members voted on every issue pertaining to the Commission, including its final recommendations.

**Regional Definitions and Representation**

Given the size and diversity of the State of New York, the structure of the Commission was designed to have a strong focus on regional concerns and issues. For the Commission's purposes, the State was divided into six regions:

- **Central:** Broome, Cayuga, Chemung, Chenango, Cortland, Herkimer, Jefferson, Lewis, Livingston, Madison, Monroe, Oneida, Onondaga, Ontario, Oswego, Schuyler, Seneca, St. Lawrence, Steuben, Tioga, Tompkins, Wayne, and Yates counties

- **Hudson Valley:** Delaware, Dutchess, Orange, Putnam, Rockland, Sullivan, Ulster, and Westchester counties

- **Long Island:** Nassau and Suffolk counties
- **New York City:** Bronx, Kings (Brooklyn), New York (Manhattan), Queens and Richmond (Staten Island) counties
- **Northern:** Albany, Clinton, Columbia, Essex, Franklin, Fulton, Greene, Hamilton, Montgomery, Otsego, Rensselaer, Saratoga, Schenectady, Schoharie, Warren, and Washington counties
- **Western:** Allegany, Cattaraugus, Chautauqua, Erie, Genesee, Niagara, Orleans, and Wyoming counties

**Figure 16. Commission Regions**



In addition to the eighteen statewide voting members, there were up to six regional members for each of the six regions listed above, appointed in equal part by the Governor, Senate, and Assembly. These regional members voted and were counted for quorum purposes only when the Commission acted on recommendations relating solely to the regional member's respective region.

**Regional Advisory Committees**

In addition to the Commission body, the legislation established regional advisory committees (RACs). Each of the six regions listed above had an associated RAC. Each RAC was established with twelve potential members, appointed in equal parts by the Governor, Senate, and Assembly.

The RACs played an important role in the Commission's process. They provided essential community knowledge and insights into local market conditions. They played vital information gathering roles by fostering discussions with and among local stakeholders. Each of the six RACs held extensive meetings with key stakeholders, including hospital CEOs, nursing home administrators, and representatives from trade groups, unions, patient advocates, insurers, and public health officials.

Each RAC was charged with developing non-binding recommendations "for reconfiguring its region's general hospital and nursing home bed supply to align bed supply with regional and local needs." In addition identifying specific facilities to be reconfigured or closed, the legislation required each RAC to address the following points in its submitted report:

| | |
|---|---|
| (i) | Recommended dates by which such actions should occur; |
| (ii) | Necessary investments, if any, that should be made in each case to carry out the regional advisory committee's recommendations, including any necessary workforce, training, or other investments to ensure that remaining facilities are able to adequately provide services within the context of a restructured institutional provider health care system in such region; and |
| (iii) | The regional advisory committee's justification for its recommendations, including its use of the factors. |

Following the qualitative data-gathering phase of the public hearings and private meetings, each RAC developed its set of initial, non-binding recommendations. To facilitate an active engagement by the RACs with the entire Commission, each RAC met with full Commission before officially transmitting their reports to the Commission on November 15, 2006. This ensured that the Commission would properly consider the local expertise of the RAC, and the interests and concerns of local and regional stakeholders.

**Local Input and Community Outreach**

The legislature charged the Commission and the RACs with holding formal public hearings with public notice to solicit local input from a wide array of interested parties including

patients and consumers, providers, payers, labor, elected officials, and the business community. In total, nineteen hearings were held throughout the regions. The Commission and RACs heard from hundreds of witnesses and reviewed thousands of pages of testimony submitted during the hearings. Additionally, numerous parties submitted written testimony to the RACs throughout the tenure of the Commission.

**Table 11. Public Hearings by Region**

| Region | Date | Location |
|---|---|---|
| **Central** | February 21, 2006 | Binghamton |
| | February 24, 2006 | Syracuse |
| | March 27, 2006 | Rochester |
| | April 4, 2006 | Watertown |
| **Hudson Valley** | February 15, 2006 | Valhalla |
| | February 22, 2006 | New Paltz |
| | March 1, 2006 | Middletown |
| **Long Island** | March 22, 2006 | Riverhead |
| | April 11, 2006 | Hempstead |
| **New York City** | February 17, 2006 | Staten Island |
| | February 24, 2006 | Brooklyn |
| | March 7, 2006 | Queens |
| | March 28, 2006 | Bronx |
| | March 30, 2006 | Manhattan |
| **Northern** | February 8, 2006 | Albany |
| | March 1, 2006 | Plattsburgh |
| **Western** | February 27, 2006 | Sanborn |
| | March 3, 2006 | Buffalo |
| | March 14, 2006 | Jamestown |

**Analytic Framework**

The Commission and staff performed detailed analysis of each hospital and nursing home throughout the State.  In order to focus its efforts at rightsizing the health care delivery system, the Commission unanimously adopted an analytic framework to focus the Commission's hard-look analysis on several hospitals and nursing homes.  This framework was a starting point for focused and continual deliberations and discussions, and was not final determinations of which institutions to rightsize.

Derived from the nine legislated factors listed above, the Commission and staff designed a rational, independent, and equitable approach that categorically differentiated each hospital and nursing home using six key criteria.  Once established, these criteria served as a basis by which all institutions were evaluated:

| |
|---|
| 1.  Service to Vulnerable Populations |
| 2.  Availability of Services |
| 3.  Quality of Care |
| 4.  Utilization |
| 5.  Viability |
| 6.  Economic Impact |

Within each criteria, the Commission examined numerous metrics, as shown below:

**Table 12. Commission Framework Criteria Metrics**

| Vulnerable Populations | Availability of Services | Quality of Care | Utilization | Viability | Economic Impact |
|---|---|---|---|---|---|
| • **% Uninsured Discharges**<br><br>• **% Medicaid Discharges**<br><br>• **% Medicare Discharges**<br><br>• **ER payor mix**<br><br>• **% Medicaid Admissions (nursing homes)**<br><br>• **% High acuity**<br><br>• **DSH Hospital**<br><br>• **MUA**<br><br>• **% Non-white Discharges** | • **Provision of Comprehensive Services**<br><br>• **Provision of Essential Services/Sole Community Provider**<br><br>• **Distance/ Commute Time to Other Providers**<br><br>• **Rural Hospital Designation** | • **JCAHO accreditation**<br><br>• **Special Designations**<br><br>• **CMS Hospital Compare Data**<br><br>• **CMS Nursing Home Compare Data** | • **Inpatient Occupancy Rates**<br><br>• **Volume of Outpatient Visits**<br><br>• **Volume of ED Visits** | • **Profitability**<br><br>• **Days of Cash on Hand**<br><br>• **Capital Debt**<br><br>• **Bonding and Credit Enhancements**<br><br>• **Linkages and Affiliations** | • **FTEs/County Population**<br><br>• **Local Unemployment Rate** |

Because regions provide the best set of comparisons and respect differences across the state, each institution's rating was assigned relative to institutions within the same region.  Each institution received a rating of -1, 0, or +1 on each criterion, and each criterion carried equal weight.  Therefore, each institution received a final rating of -6 to +6, and from this final score,

institutions were divided into three categories: high, medium, and low priority for rightsizing. Those institutions that were rated as high priority received a harder-look analysis than those with a low priority. However, these categories were not determinative. High priority institutions were not necessarily subject to Commission recommendations nor were low priority institutions necessarily immune.

This analytic framework had some distinct advantages. It sufficiently accounted for real world complexities, while remaining understandable, explainable, and actionable; and while it was evidence-based, data-driven, and objective, it allowed for professional and practical judgment that accounted for nuances and subtleties that an overly-rigid algorithm could not.

This analytic framework was the start of a multi-leveled analysis performed by the Commission and staff. To complement the framework, the Commission sought regional input by stakeholders, experts, and members of the community through multiple public hearings held throughout the State.

**Absorption and Access Analysis (AAA)**

The Commission developed a model for determining whether adequate alternative inpatient capacity exists within reasonable proximity to a hospital considered for closure. The model revealed whether inpatients at a particular hospital could be absorbed by neighboring hospitals and the travel time that would be required if patients were to disperse among those hospitals. The model drew on work by The Health Economics and Outcomes Research Institute (THEORI) at GNYHA. Neither THEORI nor GNYHA had any involvement or influence on the Commission's analysis or deliberations regarding any individual facilities.

The model simulated the closure of individual hospital campuses (focal hospitals) throughout New York State based on 2004 SPARCS and ICR data. In preparation, each patient in the SPARCS database was assigned to a cohort. A cohort was a group of patients residing in the same ZIP code and admitted to the hospital for the same condition or procedure. Elective admissions were grouped into 35 clinically meaningful service lines (such as cardiac surgery, neurology, orthopedics, and psychiatry), while emergency admissions were grouped together as if they were a distinct service line. To simulate a closure, the focal hospital's patients were randomly reassigned to other hospitals (coverage partners) based upon the real-world distribution of cases in the patient's cohort. (For example, if patients in a particular cohort were admitted to

hospitals other than the focal hospital in the proportion of 30% to Hospital A and 70% to Hospital B, then the focal hospital's patients were randomly reassigned to those hospitals in the same proportion.) The coverage partners were sorted based on their share of the focal hospital's reassigned patients, and *principal* coverage partners were identified, usually as the hospitals to which the first two-thirds of the focal hospital's patients were reassigned.

To determine whether the focal hospital's coverage partners had sufficient capacity to absorb its patients, each reassigned patient's inpatient days were added to the coverage partner's daily census on approximately the same dates and times that the patient was in the focal hospital. Then a revised average daily census and peak daily census were computed for the coverage partner. The peak daily census was defined as the thirty days of the year in which the daily census— measured at the peak hours of day—was highest. Finally, the revised average and peak daily census counts were compared with the coverage partner's available beds.

To determine whether it was feasible for the focal hospital's patients to travel to their reassigned hospitals, the weighted average driving time to the reassigned hospitals was computed for the focal hospital's patients. The weighting of the average driving times to each reassigned hospital was based on each coverage partner's share of the focal hospital's reassigned patients. The average driving times were computed from the centroid of each patient's Census tract to the reassigned hospital.

The model is fundamentally conservative and does not rely on assumptions that we might realistically make regarding an altered health care delivery landscape. For example, it assumes no reduction in average length of stay (ALOS) although even a very modest ALOS reduction can dramatically increase capacity. Furthermore, it assumes no reduction in overall service utilization although the reduction of excess capacity can be assumed to reduce inappropriate utilization of services.

**Voluntary Rightsizing Efforts**

The Commission promulgated policies to encourage and protect facilities that wished to engage in voluntary rightsizing efforts. Philosophically, the Commission believed that "bottom-up" solutions derived by health care providers can be superior to "top-down" imposed edicts. Practically, the Commission also believed that locally developed solutions with stakeholder buy-in are easier to implement.

71

Because talks between facilities were for the purpose of developing potential Commission recommendations, the Commission was able to extend its umbrella of state action immunity to shield such facilities from potential antitrust violations. The Commission's procedures were developed collaboratively with the State Department of Health and the Office of the State Attorney General. In addition, representatives of the Commission briefed the Federal Department of Justice and the Federal Trade Commission on these procedures, neither of which expressed objections. The formal procedures used to conduct such voluntary discussion between providers were described and disseminated to all health facilities in the State.[76]

---

[76] Commission on Health Care Facilities in the 21st Century.  (2006). *Voluntary Rightsizing Procedure*, 1-2.
    Available online: http://www.nyhealthcarecommission.org/docs/voluntary_rightsizing_procedure.pdf.

## VI. Policy Recommendations

The Commission's direct mandate and authority to rightsize and reconfigure the states' hospital and nursing home industries was a vast and complicated endeavor. Despite the breadth of its charge, the work of the Commission is only one element in a comprehensive reform agenda. In some respects, the Commission's recommendations for specific facilities address the "symptoms" of a sick system. It is equally or more critical to also address the "root causes" so that comprehensive rightsizing and reconfiguration can occur.

The Commission's enabling statute provides for recommendations related to a streamlined regulatory process, reimbursement, and other topics. As part of its deliberations, the Commission frequently considered the ways in which the structure and financing of the health care delivery system affect its mandate to create a system that better meets community needs. Thus, the Commission makes the following recommendations for areas needing broader policy reform. It is hoped that these recommendations will provide a blueprint for further work toward improving our health care system.

### A. Reimbursement and Medicaid

Financial incentives powerfully affect the supply, demand, and location of healthcare services. At times, they distort patterns of service delivery. Driven by the imperative of financial survival, providers may pursue high-margin services rather than services that best align with community needs. Fiscal pressures can also drive facilities to provide otherwise redundant or unneeded services solely to cross-subsidize other elements in their service mix that are crucial but unprofitable.

Direct state action to change the amount and distribution of funding for Medicaid and public goods would be an important step in reforming the reimbursement system in New York. Furthermore, Medicaid policy has the potential to influence the actions of private and federal payors. The Commission recommends that the State of New York undertake a comprehensive review of reimbursement policy and develop new payment systems that support a realignment of health services delivery. Such review should recognize these principles:

- The current growth rate of Medicaid expenditures is an unsustainable burden on taxpayers.
- Diversion of health care resources is unacceptable. Dollars that are freed up must be reinvested in the health care system.
- Reimbursement reform should strengthen the long-term viability of institutions that disproportionately serve vulnerable populations including the uninsured and low income patients.
- Reimbursement reform should encourage the provision of preventive, primary and other baseline services and discourage the medical arms race for duplicative provision of high-end services.
- The relationship between private payers and the financial viability of the health care delivery system needs to be carefully examined. Reducing unnecessary hospital capacity and maintaining critical health services are as important to the insurance sector as they are to the public sector. As such, it is reasonable to expect these companies to participate in initiatives to promote financial alignment between payers and providers, and to participate in reinvestment strategies by reimbursing adequately while maintaining adequate reserves to meet current and future health care needs.
- Future capital investments should reflect shifts in the venue of care from institutional to home and community based settings.

Within the specific arena of long term care, New York State should:

- Expand the availability of home and community-based alternatives to nursing home placement and educate physicians, paraprofessionals, and consumers about these alternatives.
- Implement recently enacted reforms to the current method of facility-based reimbursement.
- Explore alternate payment methods such as resident-based pricing and/or the expansion of managed care models on a demonstration basis.
- Implement its single point-of-entry system.

- Develop programs and reimbursement mechanisms for high-quality, cost- effective chronic care management.
- Address the disproportionate burden on particular institutions of uncompensated long term care patients.

Comprehensive discussions of issues and options in acute and long term care reimbursement reform can be found in the appendices to this report.

### B. The Uninsured

The uninsured remains one of the most serious and persistent health care problems both in the nation and New York. The United States is the only wealthy industrialized nation that does not provide universal health insurance coverage. Nearly one in five non-elderly individuals in the US and NY State lack health care coverage.

The uninsured face problems accessing needed health care services. Many either do not receive or postpone seeking care due to financial barriers. When they do receive care, it is often episodic and fragmented. Preventable or treatable chronic conditions develop into more complicated and expensive conditions to treat. Compared to insured patients, uninsured patients have less favorable health outcomes and higher rates of complications and deaths. The Institute of Medicine estimates that lack of health insurance causes roughly 18,000 unnecessary deaths every year.[77]

Uninsured Americans often present to hospital emergency rooms where their care can be uncoordinated and more expensive to deliver. In addition, health care providers bear a substantial burden in providing care for this to the uninsured and indigent. According to the Urban Institute, New York State's medical providers spent about $2.8 billion in 2005 on providing care for uninsured New Yorkers.[78] Hospitals provided $1.8 billion of that care, and physicians accounted for $412 million. The balance came from health centers, Veterans facilities, and the federal Indian Health Service.

---

[77] Institute of Medicine. (2002). *Care without coverage: Too little, too late* (LCCN 2002105905, 1-212). Washington, DC: National Academies Press.
[78] Bovbjerg, R.R., Dorn, S., Hadley, J., Holahan, J., & Miller, D.M. (2006). Caring for the Uninsured in New York. *Urban Institute*, Retrieved October 20, 2006, from http://www.urban.org/publications/311372.html.

A comprehensive solution to the uninsured will require federal efforts. However, New York State has made major strides in expanding access to health insurance for its residents. Between 2000 and 2004, the percentage of the uninsured in NYS declined while the percentage nationally has increased. Although the numbers of uninsured clearly remain unacceptably and chronically high, the trend in New York State is moving in the right direction.

The encouraging developments in NY are due in large part to expansion of our public coverage programs combined with relative stability in our base of employer-sponsored coverage. NY State has large and generous public insurance programs. New York Medicaid's program now covers more than 4.5 million NYS residents. Of those, roughly 2 million are children and another 2 million are adults. It also covers half a million elderly persons as well as 600,000 blind and disabled persons. New York's Medicaid program has one of the broadest coverage eligibilities in the nation and offers a very comprehensive benefit package. In addition, New York's Child Health Plus is one of the nation's oldest and largest state children's health insurance programs. It covers children up to age 19, at higher income eligibility levels than Medicaid, and has approximately 400,000 enrollees. One of the newer programs in the state is Family Health Plus, a public health insurance program for adults between the ages of 19 and 64 who do not have health insurance - either on their own or through their employers - but have income or resources too high to qualify for Medicaid. It is available to single adults, couples without children, and parents with limited incomes. Family Health Plus has more than half a million enrollees.

Healthy New York was established to make insurance more affordable and more accessible to workers in small businesses with 50 or fewer employees. It is also available to eligible working uninsured individuals including sole proprietors. The program, which now has more than 100,000 enrollees, creates standardized health insurance benefit packages that are offered by health maintenance organizations (HMOs) in New York State.

The Commission recommends that New York State reaffirm its historic commitment to health care for the poor and other vulnerable populations. Consistent with the Institute of Medicine's guiding principles,[79] New York State should ensure that health coverage is universal, continuous, affordable to individuals and families, and affordable and sustainable for society at large. While guarding against fraud, New York should lower administrative barriers to

---

[79] Institute of Medicine. (2004). *Insuring America's health: Principles and recommendations* (LCCN 2003114736, 1-224). Washington, DC: National Academies Press.

enrollment to help ensure that all uninsured but eligible persons are placed in the appropriate program and make it easier for eligible persons to retain coverage. New York should build upon its impressive network of public programs to weave them into a seamless system of coverage that is more coordinated and easier to navigate.  Furthermore, New York should study coverage expansion efforts in other states and adopt additional strategies to sustain its recent progress in reducing the number of uninsured New Yorkers.

### C. Developing Primary Care Infrastructure

Primary care is an essential component of the health care delivery system. Patients and society as a whole derive substantial benefits when patients have regular and continuous access to care in the least intensive, least expensive venue appropriate to a patient's condition.

Effective reform and investment in primary care is essential to reversing long term trends affecting health care costs, access and quality, especially for underserved populations. Evidence shows that having a primary care physician promotes overall community health. In New York City, for example, minority populations without a primary care giver were 3.5 times more likely to be hypertensive,[80] and patients receiving blood pressure checks in the emergency department were eight times more likely to be non-compliant with their treatment.[81] Rural residents also face barriers to high quality primary and preventive care including longer distances to get to health care delivery sites, physician shortages, lack of transportation, and a scarcity of mental health professionals and programs.[82] Compared with their urban counterparts, residents of rural areas are more likely to report fair or poor health status, to have chronic conditions, and to die from heart disease. They have fewer visits to health care providers and are less likely to receive recommended preventive services. Rural minorities appear to be particularly disadvantaged.[83]

---

[80] Shea, S., Misra D., Ehrlich, M.H., Field, L., & Francis, C.K. (1992). Predisposing factors for severe, uncontrolled hypertension in an inner-city minority population. *New England Journal of Medicine. 327.* 776-781.

[81] Shea, S., Misra D., Ehrlich, M.H., Field, L., & Francis, C.K. (1992). Correlates of nonadherence to hypertension treatment in an inner-city minority population. *American Journal of Public Health. 82 (11).* 1607-1612.

[82] United States Department of Health & Human Services Agency for Health Care Policy and Research. (1996). *Improving Health for Rural Populations Research in Action Fact Sheet* (AHCPR Publication No. 96-P040). Rockville, MD: Agency for Health Care Policy and Research. Available online: http://www.ahrq.gov/research/rural.htm

[83] United States Department of Health & Human Services Agency for Healthcare Research and Quality. (2005). *Health care disparities in rural areas: Selected findings from the 2004 National Healthcare Disparities report* (AHRQ Publication No. 05-P022). Rockville, MD: Agency for Healthcare Research and Quality. Available online: http://www.ahrq.gov/research/ruraldisp/ruraldispar.pdf

Some patients, especially those in low income communities, face difficulties accessing primary care other than in a hospital setting. Private physician's offices may refuse or limit the care they provide to Medicaid patients. Further, there are not enough primary care providers in indigent neighborhoods. Of nine low-income minority communities in New York City, for example, only 28 primary care physicians had hospital privileges and were fully accessible to 1.7 million residents.[84]  Government funded clinics may have unacceptably long waiting lists, or be inconveniently located.

Given the scarcity of private physicians for low income patients, hospitals often fill a crucial need by providing primary care outpatient services. However, hospitals are not optimally suited to provide primary care. Emergency departments, in particular, are not the best venue for patients to receive primary care. Because contact with patients is episodic and because different physicians may be seen each time, emergency departments lack the ability to provide long-term continuity and the integration of care across multiple disciplines. Care provided in emergency departments is also very expensive. In contrast to the fragmented emergency department model of primary care, high quality primary care can help people lead healthy lives, improve health outcomes, provide coordination of care across a continuum of services, prevent unnecessary hospitalizations, and reduce costs. [85]

The Commission recommends pursuit of a primary care reform agenda including the following elements:

- ensuring that all New York residents have a primary care "home"
- stemming the erosion of primary care capacity
- investing in primary care infrastructure, including investment in facilities, equipment and information technology
- ensuring adequate financial support to the primary health care safety net
- gaining participation by all payors to support such investments, and
- investing in the development of a primary care workforce.

---

[84] Brelloche, C., Carter, A.B. (1990). Building primary health care in NYC's low-income communities. *Community Service Society of New York* working paper. *iv:5.*

[85] Rosenbaum, S., Shin, P., Whittington R.P.T. (2006). Laying the foundation: Health system reform in New York State and the primary care imperative: Executive summary. Retrieved September 22, 2006, from the Community Health Care Association of New York State Web site:

**D. Developing Hybrid Delivery Models**

During its analysis and deliberations, the Commission repeatedly identified communities whose needs could be well served with less than a "full service" hospital but which require more than an ambulatory care center. In these areas, there tends to be a single hospital with low utilization, weak finances, and inferior quality. While such institutions may appear to be candidates for closure, they cannot be closed unless an alternative set of services remains available to community residents. To close a hospital without preserving certain services would irresponsibly leave parts of the state bereft of needed health care access.

Most often, the services that required preservation include a combination of emergency or urgent care, ambulatory care, and to a lesser extent, ambulatory surgery, and imaging. However, today's reimbursement system makes this an unprofitable and unviable set of services. Hospitals are thus required to maintain unnecessary services for the sole purpose of cross-subsidizing the necessary but money-losing services. The lack of alternatives has led to a situation in which whole hospitals must be maintained in order to deliver the smaller subset of needed services that could be provided by more focused facilities. These hospitals face structural financial challenges, and in response, may pursue unnecessary capital investments in order to expand their revenue base.

At the moment, there is no financially viable model for this kind of hybrid institution, other than a Critical Access Hospital (CAH). CAHs receive higher Medicare reimbursement rates based on the costs of services rendered. The criteria for this federal designation are designed for rural settings and would not apply broadly enough to be useful in all instances

To better align community needs and resources, the Commission recommends that the State and industry collaborate to test and develop new "hybrid" delivery models. Such hybrids would maintain features of a traditional hospital determined to be necessary while eliminating redundant and unneeded features. Creative and financially viable alternatives, such as free standing emergency rooms or community health centers with urgicare capabilities, could advance the achievement of a rightsized and restructured health care delivery system. The benefits could include enhanced access to services, less duplication, and amelioration of the economic impact of full hospital closures.

## E. State University of New York (SUNY) Hospitals

The State University of New York operates teaching hospitals at its Health Science Centers in Brooklyn, Syracuse and Stony Brook. The SUNY hospitals are important resources and recipients of public funds and subsidies. Their academic mission to train physicians and their mission to serve patients regardless of ability to pay must be preserved. Similarly, the SUNY hospitals must be able to compete within the marketplace, operate cost effectively, and establish stronger relationships with community hospitals.

As state-controlled institutions, the SUNY teaching hospitals faced unique challenges adapting to new market conditions that arose in the 1990s. To address these constraints, New York State enacted "hospital flex legislation" in 1998 that granted the SUNY hospitals greater operational flexibility to participate in managed care networks and similar cooperative arrangements. This flexibility was not completely unfettered, however, and the SUNY hospitals continue to suffer competitive disadvantages. Additional legislation has since been proposed that would further expand operational flexibility, even going so far as to restructure the SUNY hospitals as private, not-for-profit corporations. Other states, including Massachusetts, Michigan, and Wisconsin, have take this approach and spun off their teaching hospitals to allow them to function more effectively in the market.

Supporters of privatizing the SUNY hospitals cite numerous advantages to spinning-off the hospitals from the State University system. They contend that doing so will enable the hospitals to work cooperatively with other health care providers to develop high-quality, cost-effective systems of care within their respective regions. Increased management autonomy will promote more effective long-term planning, expedite short-term decision-making and help ensure future competitiveness and financial stability. Non-public facilities will have more competitive salary and benefit obligations to employees. Privatization would also decrease or eliminate the need for ongoing State subsidies, which currently amount to over $147 million in annual operating costs and $350 million in capital costs. Proponents also point out that many leading academic medical centers operate their medical schools and principal teaching hospitals under separate ownership without deleterious effects on their research enterprise. Prominent examples include Harvard, Yale, Cornell, Columbia and Washington Universities, all of which

own no hospitals yet remain leaders in research funding according to the National Institutes of Health (NIH) rankings. [86]

There is also considerable opposition to potential privatization of the SUNY hospitals. Organized labor, especially the New York State Public Employees Federation (PEF) and New York State United Teachers (NYSUT), opposes privatization based on fears of lay-offs and benefit cuts. Opponents also argue that privatization would not improve efficiency or quality, would erode the educational mission, and potentially result in elimination of important but unprofitable services.

The Commission recommends that the Commissioner of Health, in consultation with other relevant parties, conduct a comprehensive analysis of the feasibility of privatizing the teaching hospitals at Stony Brook, Syracuse and Brooklyn. This analysis should consider the clinical and economic impact of potential changes on the hospitals, their communities, their medical school affiliations, their research capabilities, their employees, and taxpayers. Based on the results of this analysis, the Commissioner should develop a concrete timetable for action.

### F. Healthcare Workforce Development

Maintaining and developing the healthcare workforce should be a key public policy concern. The healthcare workforce is a large component of New York's economy, accounting for 1 in 9 jobs in the state. The success of the health care system across the entire continuum of care is dependent upon an adequate supply of qualified personnel at all levels. Shortages have led to recruitment and retention problems throughout the industry. Further, the ongoing implementation of health information technology has created gaps between the skill levels of the current healthcare workforce and the skills required to deliver care in a high-tech environment.

Over the past several years, approximately $1.3 billion has been invested in workforce recruitment, retraining and retention through five programs: the Health Care Worker Retraining Initiative, Community Health Care Conversion Demonstration Project, TANF Health Worker Retraining Initiative, Supplemental General Hospital, Recruitment and Retention Rate Adjustment Program, and the Nursing Home Quality Improvement Demonstration Program. Today, additional strategies should be implemented to:

---

[86] National Institues of Health, (2006). Award Trends Ranking Information. Retrieved October 20, 2006, from National Institutes of Health Offices of Extramural Research Web site: http://grants.nih.gov/grants/award/awardtr.htm

- redress persistent shortages in a variety of occupations including registered nurses, pharmacists, radiology technicians, home care attendants and other paraprofessionals, and to

- educate and retrain workers to prepare them for the increasing uses of advanced health technologies in their jobs

- facilitate the timely transfer of personnel displaced by Commission recommendations to other employment within the health care sector.

## G. Information Technology

The need for improved use of information technology throughout the health care system has been well publicized in recent years. Effective use of IT in hospitals, nursing homes, ambulatory care centers and physician's offices can improve quality of care, reduce errors and control costs. Reconfiguration of the healthcare system places higher demands on information sharing as patients are moved into different settings based on their changing clinical needs. In addition, the ability of the State to monitor potential epidemics, bio-terrorism and general health trends can be significantly improved by the electronic availability of timely, standardized information. Similarly, those involved in regional health planning efforts across the state would benefit from access to electronic databases.

The effectiveness of information technology is constrained if health care providers cannot share information with each other, within the context of HIPAA and privacy concerns. As the HIT infrastructure is developed in NY, the state must ensure that systems are able to communicate, using open architecture and embracing the principle of interoperability. It is not in the public interest for individual health information to become a commodity or for information systems to become balkanized.

HIT systems are costly and require significant investment in hardware, software and training. Further, HIT is a high-risk endeavor. When implemented properly, it can yield incredible results. Failed implementation can be catastrophically expensive and time consuming.

Given these barriers, the healthcare industry lags behind other industries in its investment and use of IT. Industries such as financial services have invested 10% or more of their revenues in information systems, while the health care industry is estimated to have invested less than 4% of its revenues. Part of the reason may be that currently, providers bear almost all of the costs of

IT investment, while the financial benefits accrue to those who pay for care. Accelerating forward momentum towards universal adoption of IT may require shared investment strategies between government, providers, payers and purchasers. The availability of Heal NY Grants for IT investment is a promising opportunity to further advances in this area.

## H. County Nursing Homes

Approximately 10% of the nursing home beds in NYS are in county owned and operated facilities. These homes are departments of county government and are ultimately governed by elected representatives. Many of these 44 county-owned facilities lose money each year and pressure from taxpayers to hold the line on property taxes is stronger than ever. Further, the face of long term care is changing with the growth of home and community based services. This shift calls into question the appropriateness of the county homes' traditional institutional model. Increasingly, counties are asking whether they should remain in the nursing home business.

A report issued by the Center for Governmental Research, "What Should be Done With County Nursing Facilities in New York State?" outlines the challenges faced by county nursing homes and describes the range of options that counties have pursued or considered.[87] County homes differ from proprietary and voluntary homes in a number of ways. County homes have a mission to care for poor and indigent elderly county residents regardless of ability to pay. They have difficulty competing with the voluntary and proprietary sectors for high-intensity, better reimbursed patients. County homes receive certain revenue and incur unique expenses because of their status as government entities. While they benefit from intergovernmental transfers and county subsidies, they also carry a burden of cost allocations that may bear little relationship to actual expense, and their employees often receive more generous wages, salaries and benefits than their counterparts in private homes. While each home has an administrator, policy and management decisions rest with the county legislature or board of supervisors who are subject to numerous pressures.

According to the Center for Governmental Research, counties will have an increasingly difficult time operating their nursing homes as if they were just another department of county government. Among the options that counties have pursued or considered are the following:

---

[87] Center for Governmental Research, Inc. (1997). *What Should Be Done With County Nursing Facilities in New York State?* Rochester, NY: CGR, Inc. Executive summary available online: http://government.cce.cornell.edu/doc/reports/options/summary.asp

- Contract for management services to operate the county home
- Sell licensed beds
- Convert the home to a public benefit corporation
- Transfer the home to a not-for-profit corporation or sell to a proprietary corporation.

Given the complexity of this issue, New York State should undertake a comprehensive review of the future role of county-owned and operated nursing homes. These facilities are essential providers of care for residents who are otherwise difficult to serve. However, many of these homes are in severe financial distress, lack operational flexibility, are burdened with excessive labor costs and struggle to maintain quality of care. A clear policy should be developed to guide decision making about county nursing homes in a changing environment and to protect poor and indigent residents who may have difficulty receiving care in other settings.

## I. Niche Providers

A significant amount of health care services has migrated out of the hospital to other settings. Ambulatory, "niche" providers are unburdened by the large overhead costs borne by hospitals and so can be less costly for payors and users. Patients benefit from a wider choice of venues in which to receive care.

The movement of services out of large institutions is likely to continue. This would not be problematic except for the fact that hospitals treat a disproportionate share of complex and difficult high-risk cases, while other providers effectively "cherry pick," profiting more from specializing in lower-risk cases utilizing high value services.  In today's health care environment, hospitals rely on high value services to subsidize less profitable services that are critical to the community. Examples of these less profitable "public goods" are emergency departments, trauma centers, burn care services, and non-income generating services like disaster preparedness. In addition, payer surcharges on high value services are used to fund other public good functions such as indigent care. As a result, the out-migration of high value services from hospitals to niche providers has the potential for weakening these public good funding sources. Alternate funding mechanisms for these essential services are needed and niche providers must share in the burden of paying for public goods and charity care. In addition, there may be a need to enhance quality-of-care monitoring and reporting in non-regulated and private settings.

**J. Roadmap for the Future: Continuation of the Commission's Work**

  The work of the Commission illustrates the many and diverse opportunities that exist to improve the delivery of health care services in New York State. The Commission's work should be considered a beginning, rather than an end, of a broader reform effort. We need to build on this effort to address an ongoing need for structured decision-making regarding health care resource allocations. The speed of change in health care, driven by changing technology, populations and finance, makes it essential that the work of reforming the system and the regulatory framework be continuous. New York State should implement an ongoing process to sustain the efforts initiated by this Commission.

## VII. Recommendations for Facility Rightsizing and Reconfiguration

## PREFACE TO RECOMMENDATIONS

The following provisions apply to all the recommendations in this section:

1. Unless otherwise specified, the term "add" means that the Commissioner of Health shall approve one or more applications for approval to provide the enumerated service(s) and/or establish or construct the approximate number of enumerated beds or slots to be operated by or in affiliation with the enumerated facility(ies).

2. "ADHCP" means an adult day health care program described in Part 425 of Title 10 of the New York Codes, Rules and Regulations.

3. Unless otherwise specified, the term "affiliate" means that the Commissioner of Health shall approve an application providing for greater clinical or financial integration between the subject facilities, which may include the possible allocation of services between such facilities and/or the joining of such facilities under a single unified governance structure. Where a subject facility fails to execute a binding agreement to effect such affiliation by the date specified in the recommendation, the Commissioner of Health may revoke or annul the operating certificate of that facility. Where no date is specified, such date shall be deemed to be December 31, 2007.

4. "ALP" means an assisted living program described in section 461-l of the Social Services Law.

5. Unless otherwise specified, "beds" means inpatient acute care beds.

6. Unless otherwise specified, the term "close" means that the Commissioner of Health shall revoke the operating certificate of the subject facility as expeditiously as

86

necessary and possible to preserve quality of care, and that the subject facility shall be converted to another use and/or sold or otherwise transferred. Unless otherwise specified, any beds associated with such operating certificate shall cease to exist, and shall not be transferred to another facility or otherwise allocated.

7.    Unless otherwise specified, the term "convert", as applied to a facility, means that the Commissioner of Health shall revoke the operating certificate of the subject facility and approve an application for the establishment of the new facility identified in the recommendation. Unless otherwise specified, the term "convert", as applied to beds means that the Commissioner of Health shall approve an application to change the designation of the approximate number of enumerated beds on the operating certificate of the subject facility from their current designation to the designation specified in the recommendation.

8.    Unless otherwise specified, the term "discontinue" means that the Commissioner of Health shall limit and/or modify the operating certificate of the subject facility and/or take any other action necessary  to eliminate that facility's authorization to provide the enumerated service(s), and shall eliminate any associated beds from the operating certificate of the subject facility. Such beds shall cease to exist, and shall not be transferred to another facility or otherwise allocated.

9.    Unless otherwise specified, the term "downsize" means that the Commissioner of Health shall eliminate the approximate number of enumerated beds from the operating certificate of the subject facility. Such beds shall cease to exist, and shall not be transferred to another facility or otherwise allocated.

10.    "DTC" means a diagnostic and treatment center described in Article 28 of the Public Health Law.

11.    Unless otherwise specified, the term "explore" shall mean that the Commissioner of Health shall supervise discussions including the subject facilities intended to evaluate

the enumerated goal(s), and, should the Commissioner determine such goal(s) to be consistent with the mandate and other recommendations of the Commission, implement such goals as described in this report.

12.    Unless otherwise specified, the term "facility" means a provider, building or campus.

13.    Unless otherwise specified, the term "joined under a single unified governance structure" means that the Commissioner of Health shall approve an application joining the subject facilities under a single unified governance structure that has full authority to engage in strategic planning, restructure clinical services, bed capacity, and facilities, and negotiate and contract on behalf of subject facilities, and the incentive to structure services to achieve maximum efficiency.  The governing board of the new entity must have powers sufficient to compel actions by any of the individual institutions. Where a subject facility fails to execute a binding agreement to effect such joining by the date specified in the recommendation, the Commissioner of Health may revoke or annul the operating certificate of that facility.  Where no date is specified, such date shall be deemed to be December 31, 2007.

14.    "LTHHCP" means a long term home health care program described in article 36 of the Public Health Law.

15.    "PACE" means a program of all-inclusive care for the elderly described in subdivision 11 of section 4403-f of the Public Health Law.

16.    Unless otherwise specified, the term "rebuild" means that the Commissioner of Health shall approve an application to construct a facility to replace the subject facility or facilities that is reasonably consistent with the terms of the recommendation, and that the subject facility shall be converted to another use and/or sold or otherwise transferred.

17.    "RHCF" means a residential health care facility described in Article 28 of the Public Health Law.

18.    "TCU" means a transitional care unit described in Article 28 of the Public Health Law.

19.    Unless otherwise specified, the term "transfer" means that the Commissioner of Health shall approve an application to move the location of the enumerated beds that is reasonably consistent with the terms of the recommendation, but that such beds shall continue to be operated by the same subject facility.

20.    Where a recommendation requires action on the part of a subject facility in order to be implemented, the Commissioner of Health shall have the authority to take any action necessary to compel such action by the subject facility, including but not limited to refusal to act on any application from the subject facility, refusal to provide any other consent requested by the subject facility, or the suspension, limitation or modification of that facility's operating certificate.

21.    Where a recommendation or the results thereof may have an adverse effect on competition, the Commissioner of Health shall take any steps necessary to actively supervise the implementation of such recommendation and/or the results of such recommendation, to ensure that such implementation or results remain consistent with the clearly articulated policy of the State in regard to such implementation or results.

22.    The Commissioner shall implement all recommendations pursuant to, and in a manner consistent with, (i) the police power of the State, (ii) the Commissioner's specific authority and duty to take cognizance of the interests of health and life of the people of the State, and of all matters pertaining thereto, and (iii) the Commissioner's duty to take all actions necessary to implement the recommendations in a reasonable, cost-efficient manner.

23.    Unless otherwise specified, the Commissioner of Health shall implement each recommendation as expeditiously as possible, but in no event later than June 30, 2008.

# CENTRAL REGION

# ACUTE CARE RECOMMENDATIONS

## *Recommendation 1*

### Facility (ies)

Crouse Hospital (Onondaga County)

University Hospital, SUNY Upstate Health Science Center (Onondaga County)

### Recommended Action

It is recommended that Crouse Hospital and SUNY Upstate Medical Center be joined under a single unified governance structure under the control of an entity other than the State University of New York, and that the joined facility be licensed for approximately 500 to 600 inpatient beds.  It is further recommended that the Commissioner refrain from either approving any applications that have been or will be filed by either facility or providing any other consent requested by either facility, prior to the execution by the facilities of a binding agreement to join under a single unified governance structure, except where such approval or consent is necessary to protect the life, health, safety and welfare of facility patients, residents or staff.

### Facility Description(s)

University Hospital is a 366-bed, tertiary referral center for the greater Syracuse region. It has the city's only level 1 trauma center, and provides more than 80 hospital-based clinics and numerous specialty centers, including the area's only pediatric emergency center and intensive care unit, burn center, regional oncology center, and renal and pancreatic transplant program.

University Hospital is the teaching hospital of Central New York's only academic medical center, the State University of New York (SUNY) Upstate Medical Center at Syracuse. It is part of the SUNY Upstate Medical University, which also houses the colleges of medicine, nursing, graduate studies, and health professions. The SUNY Upstate Medical University is Onondaga County's leading employer, with approximately 3,300 full time equivalent employees.

Crouse Hospital, a 576-bed facility, is the larger of the two institutions. It offers emergency, medical/surgical and intensive care, psychiatry, numerous outpatient services, and more than half of the area's obstetrical and neonatal care. The hospital is a major teaching site for SUNY medical students and residents. Crouse has approximately 1,800 full-time equivalent employees.

The campuses of Crouse Hospital and SUNY Upstate Medical University are adjacent, and at some locations they are physically interconnected.

## Assessment

University Hospital and Crouse have a combined total of 942 certified beds on two interconnected campuses, both of which require major modernization.  Their combined average daily census was only 563 in 2004. Neither institution can be eliminated completely; portions of both are required to meet the community's health care needs and to sustain SUNY Upstate's medical education role.

| Summary Statistics 2004 | **SUNY** | **Crouse** |
|---|---|---|
|  |  |  |
| Discharges | 16,770 | 21,603 |
| Inpatient  % Medicaid/Uninsured | 24% | 26% |
| Uncompensated Care | $65 million | $23 million |
| ED Visits | 48,704 | 24,716 |
| Certified Beds | 366 | 576 |
| Staffed Beds | 366 | 463 |
| Average Daily Census | 294 | 269 |

Collectively, SUNY and Crouse have excess inpatient capacity. SUNY operated all of its 366 beds at an average occupancy rate of 80% from 2002 to 2004. Crouse had an average occupancy of certified beds of just 47% between 2002 and 2004. Crouse, however, reports operating only 463 of its 576 beds for a staffed occupancy rate of 60% in 2004. A combined organization of approximately 500-600 beds will be sized sufficiently to meet patient needs, the education requirements of SUNY, and maintain the competitive hospital market within the Syracuse area.

Excess capacity weakens the financial status of Crouse Hospital. Crouse filed for bankruptcy protection in 2001, with debts of $91 million. The hospital emerged from bankruptcy in 2003 by deferring payment of $62 million in principal for five years. Repayment of the $62 million begins in 2008.

Each hospital plans to undertake independently very costly and duplicative modernization projects. The two hospitals' plans cost approximately $190 million in total. University Hospital soon will construct a six-story addition to its east wing, which will house a children's hospital as well as expanded cardiovascular, neuroscience and oncology programs. The $99 million expansion project will increase the amount of space dedicated to pediatric medicine from 18,000 square feet to 87,000 square feet, and it is anticipated to open in the spring of 2009.  Crouse Hospital also needs substantial capital investment in order to remain competitive. Many parts of Crouse are at least 30 years old. The hospital is in the early stages of an $88 million dollar capital campaign to upgrade its facilities.

The strategy of continuing to invest in these two separate yet adjacent entities with duplicative services can no longer be justified. An integrated organization will reduce the duplication of services across the two facilities (e.g., emergency departments, medical/surgical beds, operating rooms), consolidate the patient base for medical education, reduce administrative inefficiencies, and minimize capital investment. Medical education will be enhanced, and the combined entity should help the physician shortage across upstate New York.

## *Recommendation 2*

### Facility (ies)

Auburn Hospital (Cayuga County)

### Recommended Action

It is recommended that Auburn Hospital downsize by approximately 91 beds to approximately 100 certified beds. It is further recommended that Auburn Hospital discontinue its obstetrical services and that these services be provided by other area hospitals.

### Facility Description(s)

Auburn Memorial Hospital is a suburban community hospital in Cayuga County with 191 licensed beds. It offers emergency, medical/surgical and intensive care, psychiatry and obstetrics services. It has no outpatient services at the hospital site. It had approximately 6,508 discharges and 23,054 emergency visits in 2004. Approximately 40% of its admissions originated in the emergency department. The facility occupies a city block in a single building with wings dating from between 1920 and 1970. The hospital has an adjacent 80-bed nursing home, the Finger Lakes Center for Living, which is fully occupied. Its payor mix is comprised of 55% Medicare, 20% commercial insurance, and 16% Medicaid. The hospital had approximately 794 FTEs in 2003.

### Assessment

Auburn Hospital is underutilized. Only 40-45% of its certified beds have been occupied in recent years; in 2004, it had just 41% occupancy of its certified beds. One-hundred beds are currently staffed, and its average daily census is 68. The hospital suffered loss of key staff and significant revenues were lost when inpatient care transitioned to outpatient settings.

Auburn is struggling financially. The hospital had a near break-even operating margin prior to 2003.  In 2004, Auburn reported a loss of $3.1 million. In 2005, their operating loss increased to $5 million. The projected operating loss for 2006 is between $2 and $3 million. Its debt is approximately $50 million, including $19.5 million secured by Cayuga County, $5 million financing for the nursing home, $3.9 million line of credit from First Niagara Bank, a pension plan under-funded by approximately $20 million, and a $260,000 mortgage for an urgent care center. Auburn has no DASNY debt.

Auburn is implementing a fiscal stabilization plan to ameliorate its financial difficulties. It has retained a consulting firm for turnaround assistance, and is aggressively cutting costs.

Auburn should alter its current service mix. It has only 15 obstetrics beds and, according to the provider, performs approximately 300 births per year. These services are readily available at other area hospitals. The Commission recommends the elimination of obstetrics at Auburn because these services contribute to Auburn's financial problems, and the elimination of obstetrics will not create community access problems. Additionally, Auburn has a small complement of 14 psychiatric beds, of which, according to the hospital, only half are filled. Given the full occupancy of psychiatric beds in neighboring Syracuse, it is worth exploring whether these services can be more effectively organized on a regional basis.

Despite its small size and low utilization, Auburn should not be closed. The hospital is located 23 miles from the nearest hospital, which is in Syracuse, and is bordered on the west by Seneca County, which does not have a single hospital. Closure of the hospital would result in an increase in estimated average travel time for patients from 9 to 52 minutes. Auburn Memorial Hospital is necessary to preserve access to care.

Optimally, Auburn could close part of its physical plant to reduce fixed costs and reflect its actual staffing level. However, its physical configuration in a single, low-lying building makes this difficult to do. Auburn can enhance its physical plant by establishing more single bedded rooms that would be more attractive to patients, thereby helping increase its overall patient volume.

95

## *Recommendation 3*

### Facility (ies)

St. Joseph's Hospital (Chemung County)

Arnot Ogden Medical Center (Chemung County)

### Recommended Action

It is recommended that Arnot Ogden Medical Center and St. Joseph's Hospital participate in discussions supervised by the Commissioner of Health to explore the affiliation of such facilities to end the medical arms race in Elmira that is expending scarce resources on duplicative services and progressively weakening both institutions. St. Joseph's pursuit of a relationship with the Guthrie Health System will not serve the best interests of the Elmira community.  It is further recommended that the Commissioner refrain from either approving any applications that have been or will be filed by either facility or providing any other consent requested by either facility, prior to the conclusion of such discussions between Arnot Ogden Medical Center and St. Joseph's Hospital, as determined by the Commissioner of Health, except where such approval or consent is necessary to protect the life, health, safety and welfare of facility patients, residents or staff.  If either Arnot Ogden Medical Center or St. Joseph's Hospital fail to participate in such discussions in good faith, as determined by the Commissioner of Health, it is recommended that the Commissioner of Health close that facility and expand the other to accommodate the patient volume of the closed facility.

### Facility Description(s)

Arnot Ogden Medical Center is a non-sectarian 216-bed, tertiary referral center in Elmira, which includes a heart institute, cancer center, diabetes center, health center for women, maternal and child health center, and an HIV primary care clinic. Arnot Ogden also provides level III neonatal care and level II trauma care. The next closest location for these services is approximately 70

96

miles away. The hospital has updated its facility, including an expanded emergency department that was completed in 2005. It has approximately 1,300 full-time equivalent employees.

St. Joseph's is a 224-bed Catholic acute care facility in Elmira that provides medical/surgical and physical medicine and rehabilitation services. The facility also provides inpatient and outpatient mental health, drug and alcohol services. The emergency department is approved to receive involuntary psychiatric admissions. St. Joseph's is an aging facility and requires investments in facility upgrades, including an upgraded emergency department. St. Joseph's has approximately 800 full-time equivalent employees.

Both hospitals are located in the city of Elmira, approximately two miles apart.

**Assessment**

There is excess inpatient capacity in Elmira. The two hospitals each ran at an average daily census of approximately 137 patients in 2004. Respectively, they had occupancy rates of 63% at Arnot Ogden and 61% at St Joseph's based on certified beds in that year. St Joseph's operated 183 of their 224 certified beds, while Arnot Ogden operated all 216 of their certified beds. St. Joseph's occupancy based on available beds was 75% in 2004.

St. Joseph's is barely breaking even financially. From 2001 to 2003, St. Joseph's reported negative profit margins with an average loss of -2%. It has invested between $1.5 and $1.8 million annually on technology and facility upgrades. Profit margins at Arnot Ogden are somewhat stronger than at St. Joseph's, with an average loss of 0.5% for the period 2001 through 2003. Neither facility carries DASNY debt.

Competition for medical services has been particularly fierce between these two hospitals. Arnot Ogden has traditionally provided a full scope of cardiac services, including cardiac catheterizations. St. Joseph's submitted a certificate of need application for cardiac catheterization services, which was denied. Arnot Ogden also provides outpatient dialysis services, which is approximately 70% occupied. St. Joseph's submitted a certificate of need

application for similar dialysis services, which was approved. The local planning agency, the
Finger Lakes Health Systems Agency, however, did not support the establishment of dialysis
services at St. Joseph's.

Arnot Ogden and St. Joseph's attempted to merge approximately fifteen years ago. They
resolved potential religious issues during the merger proceedings; however, the merger was
ultimately unsuccessful due to their inability to resolve existing debt structure under a new
entity.

St. Joseph's contacted Pennsylvania-based Guthrie Health three years ago about forming a
partnership. Guthrie has secured a presence in New York's southern tier. Guthrie operates
Corning Hospital, which is west of Elmira in Corning, New York, and a base of Guthrie Clinic
physicians in practice sites throughout the Southern Tier. This outreach has impacted physician
referral patterns in Elmira. Historically, physicians in the community have tried to maintain a
balance between the two hospitals. Recently, Guthrie Clinic based physicians are admitting to St.
Joseph's and referring specialty care to Robert Packer Hospital, a Guthrie-affiliated facility in
Sayre, Pennsylvania that provides tertiary care. Admissions at Arnot Ogden have declined
approximately 800 per year.

St. Joseph's announced in June 2006 its intention to form a collaborative partnership with
Guthrie. Further collaboration between Guthrie and St. Joseph's will not fulfill the need for a
single hospital in Elmira with common governance and management. The Commission believes
that the Elmira community would be best served by an integrated provider with the capacity to
rationalize services and ensure that health care needs are met within the community. Integration
of Arnot Ogden and St. Joseph's would reduce the duplication of services across the two
facilities (e.g., emergency departments, medical/surgical beds, operating rooms), reduce
administrative inefficiencies, limit the medical arms race between the facilities, and ensure the
continuation of health care availability in the area.

## *Recommendation 4*

### Facility (ies)

Albert Lindley Lee Hospital (Oswego County)

### Recommended Action

It is recommended that Albert Lindley Lee Hospital close all of its 67 beds. It is further recommended that the hospital convert to an outpatient/urgent care center with Article 28 diagnostic and treatment center licensure.

### Facility Description(s)

Albert Lindley Lee Memorial Hospital is a 67-bed acute care facility in the town of Fulton in Oswego County. The hospital offers medical/surgical and emergency care. A.L. Lee has approximately 321 full-time equivalent employees. Despite its small size, the facility is underutilized; roughly half its beds were empty in 2003. Certified and staffed occupancy at A.L. Lee was 56% in 2004. The hospital's operating margin was -2% from 2000 through 2003. A.L. Lee has (non-DASNY) long-term debt of approximately $4 million.  The recent renovation of its emergency room and outpatient facilities cost approximately $3.4 million. More substantial renovations are required in order for the facility to remain up-to-date and competitive.

### Assessment

A.L. Lee Hospital is in close proximity, approximately twelve miles, to Oswego Hospital. Oswego is larger and more modern and sophisticated than A.L. Lee. Oswego has 132 certified beds and provides a broad array of services, including inpatient obstetrics and a more comprehensive outpatient program. Oswego Hospital recently completed $35 million worth of capital renovations, including a new ambulatory surgery entrance, operating rooms, intensive care unit, maternity department and other upgrades. Oswego is also in reasonably strong

financial shape; it posted a positive 4.3% margin in 2003. A.L. Lee Hospital and Oswego Hospital had extensive merger talks, but these ended when A.L. Lee Hospital withdrew from the discussions.

There is excess inpatient capacity in Oswego County and no demonstrated need for two hospitals in the Oswego County area. The two hospitals had a combined total average daily census of 106 patients in 2004.  The two hospitals have 199 certified beds, which, if were all located at one facility would be 72% occupied. A single facility will operate more efficiently and will have a larger patient volume which will allow it to offer more comprehensive services and improve quality of care. Oswego Hospital is the more appropriate location for this combined facility because it is larger and recently renovated, and because the population of Fulton, where A.L. Lee is located, continues to shrink.

Other hospitals in A.L. Lee's service area also could accommodate the patients when A.L. Lee closes. A.L. Lee's closure will not have a major impact on local physicians' ability to practice medicine because many have privileges at both A.L. Lee and Oswego Hospital

A health care facility in Fulton must remain to meet the outpatient and urgent care needs of the community. A.L. Lee provided approximately 47,000 outpatient visits in 2004. Patients using the facility will continue to need access to community-based primary care. Oswego Hospital's outpatient facility provided approximately 190,000 outpatient visits in 2004, and it is unclear if the existing facilities could accommodate the additional volume from A.L. Lee.

# CENTRAL REGION

# LONG-TERM CARE RECOMMENDATIONS

## *Recommendation 1*

### Facility (ies)

Van Duyn Home and Hospital (Onondaga County)

Community General Hospital's Skilled Nursing Facility (Onondaga County)

### Recommended Action

It is recommended that Van Duyn Home and Hospital and Community General Hospital's Skilled Nursing Facility be joined under a single unified governance structure under the control of Community General Hospital, and downsize their combined number of RHCF beds by approximately 75.

### Facility Description(s)

Van Duyn is a 526-bed residential health care facility located in Syracuse, owned and operated by Onondaga County. Van Duyn provides baseline services[*] and shorter-term care. It serves a key role in moving patients out of the hospital, including potential residents who are unlikely to be admitted to private facilities due to their Medicaid-pending status, which puts months of payment at risk for a provider.

---

[*] Baseline services are designated by operating certificate. A facility that provides baseline services offers all services required by federal and state regulations: nursing and medical care, which includes podiatry and opthamology, physical and occupational therapy, social services, recreational activities, dietician services, nutritional support, and personal care.

While Van Duyn has fairly high occupancy rate, ranging from 95% to 97% over the 2002 to 2004 period, the facility operates at a considerable operating loss. The projected deficit for Van Duyn in 2006-07 is $8 million, which is a significant burden on Onondaga tax-payers.

Van Duyn has a very low case mix index (1.02 in 2003, compared to an adjusted statewide average of 1.19), and 22% of its residents in 2001-2003 were designated as "PA" or "PB," which are the two lowest need levels by the resource utilization group (RUG) score. PA and PB residents have the greatest potential for placement in alternative community settings. Van Duyn may be filling some its beds with individuals who may be better-served in less-restrictive settings.

Van Duyn is on the same campus as Community General Hospital (CGH), which, in addition to providing acute care services, also houses a 50-bed skilled nursing facility (SNF). The Community General SNF also has a fairly high occupancy rate, which ranged from 94% to 96% over the 2002 to 2004 period. CGH receives a hospital-based SNF Medicaid rate. The CGH SNF's case mix index in 2003 was 1.02, which is relatively low, and between 2001 and 2003, 19% of its residents fell in the PA/PB category. At the same time, CGH needs space for its acute care plans, including private rooms.

## Assessment

Both Van Duyn and the CGH SNF face constraints due to their physical plants. Van Duyn's building includes a long, double-loaded corridor, which impairs the staff's line-of-sight, and restricts social interactions and on-floor therapeutic activities. Some existing nursing home beds are unnecessary given Onondaga's Program of All Inclusive Care for the Elderly (PACE) and the growth of home- and community-based services in the county that could delay or avoid nursing home placement.

An integrated organization will reduce the duplication of services across the two facilities, reduce operating costs at Van Duyn, enable Van Duyn to receive a hospital-based reimbursement rate, and create an integrated continuum of care on the campus. Under Community General's

control, Van Duyn must continue its role as a leading provider of care serving hard-to-place populations including those patients with Medicaid-pending status. The reconfiguration and change of ownership is being developed with a consultant, and will require capital support.


## *Recommendation 2*

### Facility (ies)

Mercy of Northern New York (Jefferson County)

### Recommended Action

It is recommended that Mercy of Northern New York downsize by 76 RHCF beds to 224 RHCF beds.  It is further recommended that the facility add a 60-bed ALP, a 16-slot ADHCP and possibly other non-institutional services in the vacated Madonna building.

### Facility Description(s)

Mercy of Northern New York (MNNY) is a voluntary, 300-bed residential health care facility in Jefferson County.  The facility provides baseline services and a broader spectrum of services, including certified home care, renal dialysis, and ambulatory physical and behavioral health services.  The facility emerged from bankruptcy in January 2006, and is developing plans to put itself on solid financial footing.  MNNY suffers from relatively low occupancy, which ranged from 92% to 94% over 2002 to 2004, and a 90% Medicaid payor mix, which has reduced bed-hold revenue by several hundred thousand dollars each year.

MNNY has a low case mix index (1.09), and approximately 25% of its residents in 2001-03 were low-acuity.  MNNY has questionable quality of care.  It has been at the top of the *Consumer Reports* nursing home watch list for the past four years.  The combination of low occupancy and

low revenue resulted in the facility providing nursing hours per resident per day significantly that was below statewide average, which in turn could hurt its quality of care and reputation.

**Assessment**

Jefferson County presents a compelling opportunity to shift long-term care resources from institutional to alternative settings.  There is a small surplus of nursing home beds according to the need methodology. The county had an occupancy rate of less than 89% in 2004, and has a shortage of non-institutional alternatives.  Jefferson has only 20 slots of non-institutional services per 1,000 seniors, which is significantly below the statewide average of 33 slots per 1,000 seniors.  In particular, Jefferson County has no Medicaid assisted living program (ALP) beds, which may explain why so many low-acuity residents are in nursing homes.

MNNY has a viable plan for converting its Madonna Home into an ALP.  It would house 15 units per floor, designed as a Green House model.  This model includes the construction of homes for 6 to 10 elders who require skilled nursing care, and is designed to create a warm, welcoming community. By reducing its bed complement by 76 beds, MNNY should vacate one existing building on its campus, which should be renovated to house an ALP and adult day health care program (ADHCP) for approximately $1 million, for which the provider will arrange financing.  MNNY already warehouses its empty beds for this purpose, and the process to vacate should take fewer than six months.

This recommendation will require the establishment of an adult home for the purposes of creating an ALP.  We recommend that the Department expedite this unless quality and competence standards are not met.

*Recommendation 3*

**Facility (ies)**

Willow Point (Broome County)

**Recommended Action**

It is recommended that Willow Point downsize by between 83 and 103 RHCF beds to approximately 280 to 300 RHCF beds, rebuild its facility in a configuration that reflects today's therapeutic milieu, and add a 30-slot ADHCP.

**Facility Description(s)**

Willow Point is a 383-bed residential health care facility owned and operated by Broome County. It provides baseline services. While the facility enjoyed fairly high occupancy (96-98% in the 2002 to 2004 period), it is plagued by several problems. First, Willow Point is financially unstable and is a financial burden on the county. In 2000-02, it lost over $6.4 million. Second, the facility has quality problems. It had 12 survey deficiencies, which is significantly above the regional average of 5, and a few immediate jeopardy citations of life-threatening situations. Some of Willow Point's Medicare quality indicators fall well below statewide averages, including the percentage of residents in pain and who lose continence. The size and age of the Willow Point facility is inappropriate for skilled nursing care. Its long, double-loaded corridors inhibit interactions and do not provide today's therapeutic milieu.

**Assessment**

There is opportunity for resource shifts in Broome County. While the bed need methodology shows few surplus beds, the 2004 occupancy across the county was only 92.8%. In addition, the county still needs over 650 slots for non-institutional services, especially for adult day health care, for which only 20 slots exists for the entire county.

Because of the age, size, and physical layout of the facility, the Commission recommends that the facility be replaced with a modern, high-quality facility that houses multiple levels of care. The new facility should accommodate an ADHCP on the first floor, perhaps with additional space to expand if future needs warrant.  The new facility should be opened for residents in approximately two-and-a-half to three years.

## Recommendation 4

### Facility (ies)

 Lakeside Nursing Home (Tompkins County)

### Recommended Action

It is recommended that Lakeside Nursing Home close, and that an 80-bed ALP, a 25-slot ADHCP and possibly other non-institutional services be added somewhere in Tompkins County by another sponsor, pending completion of an RFP process.

### Facility Description(s)

Lakeside Nursing Home is a 260-bed propriety residential health care facility in Tompkins county. It provides baseline services.  Lakeside does not offer a broad spectrum of services, and does not provide post-acute care or specialty services. Its case mix index was 1.05 in 2003.

Due to severe quality issues several years ago, the Department of Health arranged a receivership of Lakeside Nursing Home by Peregrine Health Management Company in 2000. Quality of care has improved under Peregrine's receivership, although the facility has appeared on the *Consumer Reports* watchlist for the past four years.

The facility operates under Chapter 11 bankruptcy protection, and maintains sizable debts, including to the State. It has had a large operating loss for a number of years. In 2004, the facility ran at less than 85% occupancy, and which has reached as low as 65%.

## Assessment

Tompkins County has a documented excess supply of nursing home beds according to the bed need methodology. The county's nursing facilities as a whole operate at only 92.7% occupancy. Tompkins County has 28 non-institutional slots per 1,000 seniors compared to a statewide average of 33 slots per 1,000 seniors, and has no ALP beds or ADHCP slots within its borders.

Due to severe quality concerns and financial distress, Lakeside Nursing Home should close. In its place, the Department of Health should seek development via an request for proposal process of an 80-bed ALP and 20-30-slot ADHCP. Upon selection of a developer and operator, Lakeside should proceed to close.

## *Recommendation 5*

## Facility (ies)

United Helpers, Canton (St. Lawrence County)

## Recommended Action

It is recommended that United Helpers, Canton downsize by approximately 64 RHCF beds to approximately 96 RHCF beds, rebuild its facility, and add a 48-bed ALP and possibly other non-institutional services.

**Facility Description(s)**

United Helpers Canton (UHC) is a 160-bed not-for-profit residential health care facility in St. Lawrence County.  UHC has a sub-acute care program and provides outpatient physical therapy. United Helpers is part of a broader system that provides a full continuum of services, including independent living and adult home programs, and other skilled nursing facilities.  UHC had a relatively high occupancy of 95% in 2004; however, nearly 30% of those beds in 2001-03 were occupied by low-acuity residents, some of whom could likely be served by an ALP if that were available.

**Assessment**

St. Lawrence County is over-bedded. The bed need methodology indicates a surplus of 158 nursing home beds.  It has a dearth of non-institutional alternatives, including no ALP beds or ADHCP slots.

UHC proposed downsizing by 16 beds in its plans for a replacement facility, and to build state-of-the-art "pods" of 12 and neighborhoods of 48.  The Commission recommends that UHC further downsize its RHCF beds and convert them to lower levels of care, for which is a significant unmet need in that community.

UHC should submit a certificate of need (CON) application for a replacement facility.  UHC is working with a number of local organizations as it plans its replacement facility in Canton.  This may include co-locating an on-site child day care center and hospice residence. The Commission recommends that this CON include a 48-bed ALP. No quality and competence issues are anticipated as the United Helpers system already owns and operates adult homes in New York.

# HUDSON VALLEY REGION

# ACUTE CARE RECOMENDATIONS

## *Recommendation 1*

### Facility (ies)

Kingston Hospital (Ulster County)

Benedictine Hospital (Ulster County)

### Recommended Action

It is recommended that Kingston and Benedictine Hospitals be joined under a single unified governance structure, provided that Kingston Hospital continues to provide access to the reproductive services currently offered at such hospital at a location proximate to Kingston Hospital. It is recommended that the joined facility be licensed for approximately 250 to 300 inpatient beds.  It is further recommended that the Commissioner refrain from either approving any applications that have been or will be filed by either facility or providing any other consent requested by either facility, prior to the execution by the facilities of a binding agreement to join under a single unified governance structure, except where such approval or consent is necessary to protect the life, health, safety and welfare of facility patients, residents or staff.  If Kingston and Benedictine Hospitals fail to execute such an agreement by December 31, 2007, it is recommended that the Commissioner of Health close one of the facilities and expand the other to accommodate the patient volume of the closed facility.

## Facility Description(s)

Kingston Hospital and Benedictine Hospital are located in Kingston within blocks of one another. Benedictine, a community hospital sponsored by the Benedictine Sisters, is the larger facility of the two, and has 222 licensed beds. Kingston, a secular community hospital, has 145 licensed beds. Both hospitals provide medical/surgical, emergency, and obstetrics care, and run level I perinatal centers.  The two hospitals had a similar number of inpatient discharges and emergency visits, but Kingston had significantly more outpatient visits than Benedictine. Kingston is affiliated with Margaretville Hospital, a federally-designated critical access hospital in Delaware County. Each of the hospitals has approximately 750 full-time equivalent employees.

## Assessment

There are too many hospital beds in Kingston. Neither hospital is fully occupied; however, neither hospital can readily absorb all of the other hospital's patients. Sixty-nine percent of Benedictine's 176 available beds were occupied in 2004.  Kingston operated all of its 145 certified beds, and had a 73.7% occupancy rate in 2004.

There is unnecessary and wasteful duplication of services in Kingston and in Ulster County. Both Kingston and Benedictine hospitals are designated stroke centers and level I perinatal centers. Both facilities operate emergency departments and provide medical/surgical and maternity care. Although Kingston Hospital has only 9 licensed maternity beds, they had 491 obstetrics discharges; Benedictine Hospital has 16 maternity beds, which is almost twice the number as Kingston, but performed only 376 births. Neither maternity program is financially viable at this low volume, and neither can afford to offer access to the specialized services and amenities that a larger combined program might afford.

Both institutions are financially precarious. In 2003, Kingston Hospital had a -10.4% operating margin; Benedictine's operating margin was -2.1%. Each of the hospitals has (non DASNY) long-term debt of approximately $25 million.

110

The institutions have drafted an unsigned memorandum of agreement to establish a parent corporation with broad powers over the two hospitals. The new corporation will become the sole corporate member of both hospitals, which will continue as separate and distinct corporations. Kingston Hospital will retain its identity as a non-sectarian institution, and Benedictine will continue to function as a Catholic hospital sponsored by the Benedictine Sisters, conforming to the Ethical and Religious Directives for Catholic Health Care Services. The proposed structure will allow for continued access to a full range of reproductive health services in Kingston.

Reconfiguration will improve the financial standing of both facilities, reduce duplication of services, allow for efficient future investments, and improve the organization's ability to meet the community's health care needs. This arrangement also offers a new model for merging sectarian and non-sectarian intuitions, which potentially could be replicated in other areas of the State.

## *Recommendation 2*

### **Facility (ies)**

Sound Shore Medical Center (Westchester County)

Mt. Vernon Hospital (Westchester County)

### **Recommended Action**

It is recommended that Mt. Vernon Hospital downsize approximately 32 medical/surgical beds, and convert approximately 20 additional medical/surgical beds into a 20 bed transitional care unit. It is further recommended that Mt. Vernon Hospital convert approximately 24 additional medical/surgical beds into a 24 bed mentally impaired chemical abusers (MICA) unit, provided that the Commissioner of Mental Health and the Commissioner of Alcoholism and Substance Abuse Services approve such conversions. It is recommended that Sound Shore Medical Center