decertify approximately 9 pediatrics and 60 medical/surgical beds, and convert additional medical/surgical and obstetrics beds into 5 additional Level III NICU beds and 5 detoxification beds.

## Facility Description(s)

Sound Shore Medical Center and Mt. Vernon Hospital are separately licensed facilities within the Sound Shore Health Care System, which also includes a 150-bed nursing home, school of nursing, adult day health program, and a Medicaid managed care organization. Both are teaching hospitals affiliated with the New York Medical College.

Sound Shore has 321 certified beds, of which 240 were staffed in 2004. It is an area trauma center, designated stroke center, comprehensive community cancer center and level III neonatal intensive care unit. Sound Shore has approximately 1,200 full-time equivalent employees.

Mt. Vernon Hospital has 228 certified beds, of which 164 were staffed in 2004. It offers medical/surgical services, and specializes in behavioral health services, including one of two psychiatric units in Westchester county approved to receive involuntary admissions of patients who may be an immediate danger to themselves or others. Approximately 47% of Mt. Vernon's patients come from medically underserved communities. Thirty-three percent of its inpatients were Medicaid-covered or uninsured, and 73% of emergency department visits were Medicaid-covered or uninsured in 2004. A large share of Mt. Vernon's approximately 600 employees reside in the local community, which has a substantial minority population.

## Assessment

Sound Shore and Mt. Vernon entered into an affiliation agreement in 1996. Both hospitals share a common parent corporation with authority for strategic planning and system direction. Working through integrated leadership, the system succeeded in a financial turnaround of Mt. Vernon Hospital. According to Mt. Vernon, its operating margin in 2005 was $1.2 million. By affiliating, each hospital saves capital through economies of scale, service reconfiguration and

programmatic changes such as the consolidation of previously duplicative obstetrics departments at the Sound Shore campus and psychiatry departments at the Mt. Vernon campus.

The Sound Shore Health System should further rightsize and reconfigure its services by implementing the following changes:

- Mt. Vernon Hospital should decertify 32 medical/surgical beds, and convert another 44 medical/surgical beds to a 20-bed transitional care unit (a New York State pilot program) and a 24-bed mentally impaired chemical abusers (MICA) unit. Mt. Vernon's total bed complement will be reduced by 32 beds.

- Sound Shore Medical Center should decertify 9 pediatric and 60 medical/surgical beds, and convert additional medical/surgical and obstetrics beds to 5 additional level III neonatal intensive care unit beds and 5 detoxification service beds. Sound Shore's total bed complement will be reduced by 71 beds.

This restructuring plan eliminates excess capacity by converting beds for underused services to those for needed services, and consolidating service lines and reducing duplication between the hospitals. This restructuring plan will strengthen Mt. Vernon Hospital, which provides essential, accessible care to the residents of the medically underserved City of Mt. Vernon, and the hospital will continue to offer services designed to meet the particular needs of the local community, including emergency, medical/surgical, AIDS, psychiatry, transitional, behavioral and detoxification care.

*Recommendation 3*

**Facility (ies)**

Orange Regional Medical Center (Orange County)

**Recommended Action**

Contingent upon financing, it is recommended that Orange Regional Medical Center close its existing campuses and consolidate its operations at a new, smaller replacement facility that is downsized by approximately 100 beds to approximately 350 beds.

**Facility Description(s)**

Orange Regional Medical Center (ORMC) was formed in September 2002 by merging the Arden Hill Hospital in Goshen with the Horton Medical Center in Middletown. ORMC's two campuses are eight miles apart. The Arden Hill Hospital has174 licensed beds, and the Horton Medical Center has 276 licensed beds. ORMC provides inpatient medical/surgical, behavioral health and physical rehabilitation services, and outpatient services at 15 locations. Together with Bon Secours Hospital and St. Anthony Community Hospital, ORMC serves the western half of Orange County, and has a 38% market share of County discharges. The St. Luke's/Cornwall system largely serves the eastern half of the County and has a 25% market share of County discharges. Twenty-seven percent of discharges of county residents occur in other counties.

ORMC employs approximately 2,500 people, and is the largest non-governmental employer in Orange County.  According to ORMC, its operating profit was $4 million in 2005, and it carries $54 million in outstanding debt. ORMC has clinical affiliations with NY-Presbyterian Hospital, Westchester Medical Center, and the New York University Hospital for Joint Diseases.

**Assessment**

ORMC's facilities upgraded its technologies, recruited additional physicians, and strengthened its financial position following the merger and system restructuring. Its services include diagnostic imaging, behavioral health, oncology, physical rehabilitation, and diagnostic cardiac catheterization.

ORMC should further rationalize its provision of care to meet the growing health care needs of its community, which is among the fastest growing counties in New York. The two existing hospitals are old and out-dated and cannot accommodate modern technology. Neither hospital has sufficient capacity to absorb the other. If the campuses were consolidated, ORMC would achieve economies of scale in its staffing, supplies, plant operations and equipment.

ORMC acquired a 61-acre site to construct a smaller facility than the two hospitals with approximately 350 licensed beds. The site is located between the existing campuses and at the intersection of major roads. The cost to construct and establish this new facility is approximately $250 million.  In addition, the system requires approximately $54 million to retire its outstanding debt. Despite its positive margin, ORMC's creditworthiness relative to other hospitals nationally is low, and it has limited access to capital in the private markets.

## *Recommendation 4*

**Facility (ies)**

Community Hospital at Dobbs Ferry (Westchester County)

**Recommended Action**

It is recommended that Community Hospital at Dobbs Ferry close in an orderly fashion.

**Facility Description(s)**

Community Hospital at Dobbs Ferry (CHDF) is a small general hospital. It has 50 certified beds, 30 of which are operational. It had an average daily census of only 20 inpatients in 2004. CHDF provides only basic medical/surgical services; it does not provide obstetric, pediatric or psychiatric care. It specializes in short-stay surgery, of which it performs approximately 3,000 procedures per year. The hospital's emergency room provided nearly 9,000 visits in 2004. CHDF is located in an affluent suburb, and the majority of the town's residents have commercial insurance or Medicare. The community supports the hospital with fundraising efforts, most recently to support the renovation of its emergency room. The hospital has approximately 150 full-time equivalent employees.

The hospital had many years of operating losses and defaulted on federal loans twice.   Riverside Health Care System (Riverside) acquired CHDF at auction for $4.6 million. Riverside operates two acute-care campuses in Yonkers, St. John's Riverside Hospital and the Park Care Pavilion. CHDF operates under a management contract with St. John's Riverside, which also serves as its passive parent.

**Assessment**

Community Hospital at Dobbs Ferry performs poorly on the Commission's criteria. It has extremely low utilization, provides no specialized services, provides very little care to vulnerable populations, and makes only a small economic contribution to the region's economy. CHDF had approximately 1,696 discharges in 2004. In 2004, only 5% of its inpatients had Medicaid coverage or were uninsured, and 6% of its patients came from medically underserved areas. It has 50 certified beds and an average daily census of approximately 20 patients.

Community Hospital at Dobbs Ferry is a prime example of excess capacity, which the Commission was charged to eliminate.  Excess capacity jeopardizes quality of care by dispersing patients over too many institutions, induces unnecessary and costly utilization of services, and causes needless and duplicative capital investment.

Analysis performed by the Commission indicates that patients who currently use CHDF readily could be absorbed within reasonable travel times by neighboring institutions, including St. John's Riverside, Westchester Medical Center, White Plains Hospital and Phelps Memorial Hospital, all of which provide more comprehensive ranges of services. Those urgent/emergent patients using CHDF's emergency department could similarly be absorbed by neighboring hospitals within acceptable travel time limits.

CHDF is only 3 miles north of the St. John's Riverside Andrus site in Yonkers. It has been asserted that surgeons using CHDF do not practice at St. John's Riverside, and would not transfer their business there because of physician and patient preference to avoid Yonkers. The Commission does not find this a convincing argument for maintaining the Dobbs Ferry site. A hospital should not remain open in order to serve the convenience of a small number of physicians.

While CHDF lost money for fifteen straight years, Riverside's CEO reported that revenue generated by CHDF resulted in approximately $700,000 profit to the Riverside system in 2005, and that CHDF absorbed approximately $2 million per year in system overhead expenses. It is uncertain whether CHDF will continue to generate profit for Riverside, especially given its prior chronic losses. The Riverside system is sustainable without the financial contributions of Dobbs Ferry. Furthermore, environmental changes will make positive contributions to Riverside's bottom line. NY State is in the process of approving a certificate of need application for a cardiac catheterization lab that Riverside estimates will ultimately generate approximately $2.5 million in total annual revenues. Reimbursement changes by Medicare will also positively affect Riverside's financial condition.

While the Commission is concerned with the financial viability of the Riverside system, it is not persuaded that an unnecessary hospital should remain open simply to subsidize other hospitals. The argument that we should sustain a hospital that scores so poorly under the Commission's analytic framework in order to shore up another hospital is not supportable within the

Commission's charge, which specifically targets opportunities to rightsize the health care delivery system in order to best meet community health care needs.

## Recommendation 5

### Facility (ies)

Westchester Medical Center (Westchester County)

### Recommended Action

It is recommended that Westchester Medical Center evaluate the clinical and financial viability of reestablishing the Fareri Children's Hospital as an independent entity and determine the impact of such change on access to and quality of care in the Hudson Valley region as well as the impact on both the Medical Center and the Children's Hospital. It is further recommended that Westchester Medical Center conduct a strategic planning process to evaluate its clinical service mix and identify opportunities for reconfiguration that is non-duplicative of services in community hospitals.

### Facility Description(s)

Westchester Medical Center (WMC) is an academic medical center affiliated with the New York Medical College in Valhalla. It is the Hudson Valley region's specialty referral center for all tertiary and quaternary levels of care, including organ transplantation. It has the region's only level 1 trauma center, the region's only burn center, the Fareri Children's Hospital, and the state-funded regional resource center for training and preparedness against terrorist attacks and natural disasters.

WMC provided approximately 23,809 discharges, 25,868 emergency visits and 145,290 outpatient visits in 2004. Thirty-one percent of its inpatients and 39% of its emergency

department admissions were Medicaid-covered or uninsured in 2004. WMC reported that 90% of its 635 certified and available beds are occupied. WMC's children's hospital has 120 beds and is fully occupied. WMC has approximately 4,000 full-time equivalent employees across all of its facilities.

WMC is operated by the Westchester County Health Care Corporation, (WCHCC) a public benefit corporation established by New York State in 1997 to assume the function of Westchester County's Department of Hospitals. WCHCC financed itself by issuing serial bonds backed by Westchester County. According to a transition agreement with WCHCC, the County has guaranteed debt to finance WCHCC's working capital so long as WCHCC meets certain performance measures. If WCHCC does not meet these performance measures, the County can compel WCHCC to hire consultants to evaluate and possibly restructure its fiscal affairs, and must offer its recommendations to the County government.

## Assessment

The vision of WMC is to serve as a non-duplicative, tertiary referral center for all counties in the Hudson Valley. Although community hospitals have increased their provision of tertiary services, this goal has been largely realized. Today, WMC has among the highest case mix indexes in New York State, which reflects the acuity level of its patients.

WMC has had significant operating and financial problems following its conversion to a public benefit corporation. WMC's operating deficits from 2001 to 2004 total $207 million. These losses triggered an audit by the State government, management changes, hiring of a consultant, and implementation of a financial recovery plan. The current executive management team has competently reduced costs and improved the facility's financial viability. It is renegotiating its contracts with commercial payers to increase payments to the facility. WMC projects a $22 million surplus in 2006, made possible in part due to a county subsidy of approximately $55 million. In addition, WMC recently received the State's commitment to increase its Medicaid payments by $75 million over three years. Independent agencies have raised their ratings of WMC's debt.

WMC's recent fiscal stabilization enables the facility to make clinical and structural changes that could further strengthen the institution. It is especially critical to evaluate the optimal relationship between WMC and the Children's Hospital. Currently, the facilities are fully integrated financially, operationally, and managerially. Of $270 million in total outstanding bonds at WMC, approximately two-thirds - $140 million - is attributable to the Children's Hospital. It has been estimated that the annual operating loss of Children's Hospital is approximately $20 million, or roughly one-third of the total annual operating loss at WMC in 2005. WMC must undertake a comprehensive evaluation of the feasibility of establishing Children's Hospital as an independent facility. Furthermore, WMC must proceed with a strategic planning process to assess their clinical portfolio and their position in the market.

# HUDSON VALLEY REGION

# LONG-TERM CARE RECOMMENDATIONS

## *Recommendation 1*

### Facility (ies)

The Valley View Center for Nursing Care and Rehab (Orange)

### Recommended Action

It is recommended that Valley View Center for Nursing Care and Rehab downsize by approximately 160 RHCF beds to approximately 360 RHCF beds and add an 80-bed ALP, a 30-slot ADHCP and possibly other non-institutional services in the vacated building.  In the remaining buildings, it is recommended that the facility convert 50 RHCF beds to a 20-bed ventilator-dependent unit and a 30-bed behavioral step-down unit.

### Facility Description(s)

The Valley View is a 520-bed residential health care facility, owned and operated by Orange County.  The facility provides baseline services, locked dementia care, an expanding and successful short-term rehabilitation program, and an 8-bed AIDS care center that has been entirely unoccupied since 2003.  It coordinates closely with the county's long-term home health care program.

With a new administrator in place, Valley View has over 95% occupancy of its staffed beds, and it has a high case mix index (1.16).  It had 17 deficiencies compared to a regional average of 5, but no immediate jeopardies.  Valley View's faces significant financial problems. It has lost over

121

$1 million per year in operations, and had a loss of $2.6 million in 2002. The facility's labor contract requires greater than 50% benefits and includes staff maintenance restrictions.

Valley View operates two buildings, including the Perry building that houses 160 beds with shared bathrooms.  Valley View has eliminated beds from the Perry building and intends to close it as soon as feasible.

**Assessment**

Orange County's population has grown significantly. While the county has a documented bed need of 388 additional nursing home beds, the existing providers are only 92% occupied. Moreover, the county has large unmet need for non-institutional services, particularly ALP beds and ADHCP slots.  With more non-institutional options available in the county, the long-term care system will be better balanced for the future population growth.

The Perry building should be closed and converted to accommodate an ALP and ADHCP.

## *Recommendation 2*

**Facility (ies)**

Andrus-on-Hudson (Westchester)

**Recommended Action**

It is recommended that Andrus-on-Hudson downsize all 247 RHCF beds and add 140 ALP beds and possibly other non-institutional services.

## Facility Description(s)

Andrus-on-Hudson is a not-for-profit, 247-bed residential health care facility that provides baseline and sub-acute services in Westchester County. Its board of trustees tried for seven years to convert their campus into a continuing care retirement community (CCRC), with independent apartments and 48 SNF beds, but was denied building rights by the town of Hastings. They currently have 176 beds occupied (71% of its certified beds, or 89% of "available beds," pending a 50-bed sale to another provider). The facility had been operating at a significant loss until 2006, and receives financial support from the Andrus Family Foundation. The home owes the foundation $13 million, but that sum may not be exchanged. The facility claims that it is now operating in the black.

Andrus-on-Hudson has one of the lowest case mix indexes in the State (0.91). Of their 176 residents, about half have low-acuity conditions. These residents could be better served in an ALP, if that were available. The physical plant is old and in need of capital improvements. The facility has private rooms and baths; and therefore, its conversion to an ALP facility would be economical. The facility has a history of a high number of deficiencies (26 in its 2005 survey), many of which are attributable to the building's deteriorating condition.

## Assessment

There are opportunities to shift resources from institutions to other settings in Westchester County. The State's bed need methodology shows an excess of 653 beds. There are over 1,000 PAs and PBs in the existing beds, and county occupancy was only 88% in 2004. There are too many nursing home beds and not enough appropriate residents in Westchester nursing homes. At the same time, Westchester has an unmet need for approximately 1,100 non-institutional slots.

The optimal direction would be to build new ALP homes on the Andrus campus. Should that not be feasible, the Commission recommends a floor-by-floor renovation of the existing building to create ALP apartments and common space out of the nursing floors.

123

## *Recommendation 3*

### Facility (ies)

Taylor Care Center (Westchester)

### Recommended Action

It is recommended that Taylor Care Center downsize by approximately 140 RHCF beds to approximately 181 RHCF beds.

### Facility Description(s)

Taylor Care Center (TCC) is operated by the Westchester Public Health Corporation, which also operates the Westchester Medical Center.  TCC is a 321-bed residential health care facility which provides baseline services, and has a 27-bed ventilator-dependent care unit.  TCC offers distinctive sub-acute care for individuals with complex medical needs.  The facility fills 42 beds with these complex sub-acute residents, referred by Westchester Medical Center, St. John's Hospital, White Plains Hospital, Montefiore Hospital, and Columbia-Presbyterian Hospital. TCC is licensed for an additional 252 beds, but staffs only 156. Its occupancy rate based on certified beds is only 79%, assuming all 156 staffed are occupied.

TCC has a high case mix index (1.25), and provides solid quality of care. TCC houses 10 uncompensated residents.  Very few nursing homes, even county-financed nursing homes, have more than 1 or 2 residents on charity care.  Due to its high-intensity care and several uncompensated cases, TCC operates at a significant loss of $6 million per year, which is down from as much as $13 million in previous years.

**Assessment**

Both the bed need methodology results and the 88% county-wide occupancy provide evidence that Westchester County is over-bedded. TCC in particular competes with some high-quality nursing homes who are finding it difficult to keep their beds filled. Downsizing TCC will strengthen a number of other facilities in the county.

## *Recommendation 4*

**Facility (ies)**

Achieve Rehabilitation (Sullivan)

**Recommended Action**

It is recommended that Achieve Rehabilitation downsize by approximately 40 RHCF beds to approximately 100 RHCF beds.

**Facility Description(s)**

Achieve Rehabilitation is a 140-bed residential health care facility in Sullivan County, providing baseline services. Challenges at the facility include:

- Low occupancy. Only 89% of its beds were occupied in 2004, which, according to its administrator, has not increased since then.
- Quality of care. Achieve had 16 survey deficiencies, including two level 3, actual-harm deficiencies. The regional average for total deficiencies is 4. In addition, Achieve has a much higher rate of substantiated complaints than the statewide average.
- Low acuity. Over one-quarter of Achieve's residents have low-acuity conditions. Some of these residents could be served in a less-restrictive setting.

**Assessment**

A downsized facility could devote additional resources to solve or mitigate its substantial quality of care problems.  Closure of Achieve is impractical because there would be an insufficient number of nursing home beds in Sullivan County should Achieve close. There are only four nursing homes in Sullivan County, and there is a documented deficit of 137 beds in the county according to the state need methodology.  The other three nursing homes in the county have very high occupancy rates.

## *Recommendation 5*

**Facility (ies)**

Sky View Rehabilitation and Health Care Center (Westchester)

**Recommended Action**

It is recommended that Sky View Rehabilitation and Health Care Center close, downsize or convert, contingent on the determination of the Commissioner of Health, after a comprehensive review of the facility in light of the Commission's analytic framework, that such closure, downsizing or conversion would be consistent with the mandate and other recommendations of the Commission.

**Facility Description(s)**

Skyview Rehabilitation and Health Care Center is a 192-bed proprietary residential health care facility that provides baseline services in Westchester County.  It had an occupancy rate of 93% in 2004.  Skyview faces quality and viability issues.

**<u>Assessment</u>**

This facility was identified as a facility of interest based on the Commission's criteria.  The Regional Advisory Committee and Commission repeatedly contacted the administrator of this facility, but have received no response to date. Given the facility's location in the well-served northwest of Westchester, closure, downsizing or conversion may be warranted. The Commissioner's review should be completed by June 30, 2007, and any closure, downsizing or conversion should be completed by June 30, 2008.

# LONG ISLAND REGION

# ACUTE CARE RECOMMENDATIONS

## *Recommendation 1*

### Facility (ies)

Eastern Long Island Hospital (Suffolk County)

Southampton Hospital (Suffolk County)

Peconic Medical Center (Formerly Central Suffolk) (Suffolk County)

Brookhaven Memorial Medical Center (Suffolk County)

University Hospital at Stony Brook (Suffolk County)

### Recommended Action

It is recommended that Eastern Long Island Hospital, Peconic Medical Center, and Southampton Hospital be joined in a single unified governance structure with full authority to develop a strategic plan which restructures the hospitals to ensure access to services, rationalize bed capacity, minimize duplication of services, create management efficiencies and develop an integrated health care delivery system for the North and South Forks, Riverhead and the communities immediately to the west. It is further recommended that the Commissioner refrain from either approving any applications that have been or will be filed by any of the facilities or providing any other consent requested by any of the facilities, prior to the execution by the facilities of a binding agreement to join under a single unified governance structure, except where such approval or consent is necessary to protect the life, health, safety and welfare of facility patients, residents or staff.

128

It is recommended that these hospitals develop an affiliation with University Hospital at Stony Brook in order to gain access to tertiary care services and the other benefits inherent in relationship with an academic medical center.

It is recommended that Brookhaven Memorial Hospital continue joint planning with the three East End hospitals, and explore becoming part of the new entity.

It is further recommended that the hospitals implement the following bed and service reconfigurations:

Southampton Hospital, currently certified for 168 beds, should downsize its certified bed capacity to 125, to be comprised of 103 medical/surgical, 3 pediatric, and 19 obstetrics, for a reduction of 37 medical surgical and 6 pediatric beds.

Brookhaven Memorial Hospital, currently certified for 321 beds, should increase its certified bed capacity to 326, to be comprised of 262 medical/surgical, 14 obstetrics, 10 pediatric, and 40 psychiatry, for a reduction of 10 obstetrics and 5 pediatric beds, and an addition of 20 psychiatry beds.

Eastern Long Island Hospital, currently certified for 80 beds, should expand its certified bed capacity to 85, to be comprised of 37 medical surgical, 5 alcohol detox, 23 psychiatry, and 20 alcohol rehabilitation, for an addition of 5 psychiatry beds.

Peconic Bay Medical Center, currently certified for 154 beds, should downsize its certified bed capacity to 140 beds, comprised of 114 medical/surgical, 8 obstetrics, and 18 physical medicine rehabilitation beds, for a reduction of 32 medical surgical beds, and a transfer of 18 certified physical medicine rehabilitation beds from University Hospital at Stony Brook.

University Hospital should downsize 18 certified, but not available physical medicine rehabilitation beds. These 18 beds should be added to Peconic Bay Medical Center.

**Facility Description(s)**

The "East End" hospitals, Eastern Long Island, Peconic, and Southampton hospitals, historically have served the easternmost part of Long Island, including the south and north forks, Riverhead, and communities immediately to their west. Brookhaven Memorial is close to the East End hospitals, located on the south shore of Suffolk County. Recent changes in the area's demographics, including a 7% growth in population in the four hospitals' joint service area, has prompted a four-way joint planning effort to meet the needs of their shared community.

| (2004 data) | Eastern Long Island Hospital | Peconic Hospital | Southampton Hospital | Brookhaven Hospital |
|---|---|---|---|---|
| Certified Beds | 80 | 154 | 168 | 321 |
| Staffed Beds | 80 | 154 | 120 | 251 |
| ADC | 62 | 74 | 69 | 231 |
| Discharges | 3,084 | 6,079 | 6,844 | 14,254 |
| ED Visits | 7,980 | 23,809 | 24,886 | 58,832 |
| Operating Margin (2003) | -1.6% | -0.3%% | -3.4% | 0.4% |
| % Medicaid/Uninsured | 24% | 17% | 15% | 20% |
| FTE | 267 | 621 | 639 | 1,452 |

Eastern Long Island, Peconic and Brookhaven hospitals are clinically affiliated with SUNY Stony Brook. Southampton Hospital is developing a similar affiliation. Each of the hospitals has an active, supportive relationship with Suffolk County's network of health centers that serve as the outpatient healthcare safety net in Suffolk.

All four hospitals provide medical/surgical and emergency services. Peconic, Brookhaven and Southampton hospitals provide obstetric and pediatric services. Eastern Long Island Hospital has expertise in psychiatry and substance abuse services. Brookhaven Memorial, the largest of the four institutions, has an approved certificate of need to build a diagnostic cardiac catheterization lab.

## Assessment

Because of the topography of the East End, the distribution of population, and distance and drive times between the hospitals, particularly in summer, access to emergency and acute inpatient care must be maintained at all three locations. None of the East End hospitals is a viable candidate for closure.

The size of the East End's population, however, makes it impracticable to maintain three small, independent community hospitals, all of which aspire to provide a comprehensive range of health services. Competition for patient volume in this sparsely populated area further will clinically and financially weaken two and possibly all three hospitals. It is imperative to rationalize and consolidate service delivery to improve the hospitals' quality of care and fiscal standing.

The three East End hospitals, together with Brookhaven Memorial Hospital, have developed a proposal to reconfigure services and joint governance. Given this proposed cooperative venture, the hospitals have withdrawn certificate of need applications for competitive services. The detailed plan includes: the growth of centers of excellence in obstetrics, primarily at Southampton and Brookhaven hospitals, with a smaller program at Peconic hospital, an expanded behavioral health program at Eastern Long Island and Brookhaven hospitals that will serve all four hospitals, additional physical medicine rehabilitation services at Peconic Bay to serve all four hospitals, overall reductions in medical/surgical and pediatric bed capacity at all four hospitals.  Additionally, the hospitals recognize the need for expanded outpatient services.

Three of the hospitals developed a collaborative relationship, the Peconic Health System (PHS), in 1997, but they dissolved this relationship in 2006. PHS disbanded because there was a lack of capital for investment, and the hospitals ultimately disapproved of its governance structure. The lack of capital restrained the system from making required investments to rationalize services and from realizing economies of scale. In addition, the PHS board of directors required supermajority ratification process for many proposals, and had insufficient delegatory powers from the individual hospital boards that had remained in place. This structure made it difficult for

meaningful change to occur; therefore, the interests of the individual hospitals were favored over the collective interests of all the East End hospitals.

The current four-member planning group has hired a consultant to propose the most effective governance structure for the new entity. The Commission believes that this new governance structure should include representation not only of the founding members, but also of other community members who did not serve as a trustee of any of the hospitals and who share a broad definition of the communities to be served.

University Hospital at Stony Brook and these community hospitals have conducted discussions to form a larger health network. The community hospitals would gain Stony Brook's assistance as an academic, tertiary partner, thereby improving the provision of care to Suffolk residents. These discussions should continue. Patients must have access to tertiary services that cannot be efficiently provided at a community hospital. University Hospital, as the regional academic health center, should assume this role.

## *Recommendation 2*

### **Facility (ies)**

University Hospital at Stony Brook (Suffolk County)

### **Recommended Action**

It is recommended that University Hospital at Stony Brook be given the operational and governance freedom to enter into meaningful partnerships with other hospitals so as to create a health care delivery system that will better serve the needs of the region.

## Facility Description(s)

University Hospital at Stony Brook is Suffolk County's only academic medical center and its only tertiary care provider. At 504 certified beds, it has the county's only open heart surgery program, comprehensive cancer center, comprehensive epilepsy center, and level III neonatal intensive care unit. The hospital has a level I trauma center. It had approximately 29,954 discharges, 64,727 ED visits and 269,815 outpatient visits in 2004. Medicaid-covered and uninsured patients represented 22% of its discharges and 32% of its emergency department admissions.  University Hospital at Stony Brook had approximately 4,055 full-time equivalent employees in 2003.

## Assessment

University Hospital at Stony Brook is an important regional provider of tertiary health services, and a health care delivery leader in Long Island. It has not sufficiently strengthened its relationships with surrounding community hospitals. As a publicly financed academic medical center, University Hospital must enter into health system partnerships with other hospitals to strengthen its regional role. Compared with University Hospital, the two other SUNY hospitals in Syracuse and Brooklyn have relatively stronger ties to their neighboring community hospitals.

The Commission recognizes the overarching importance of the provision of medical education at the University. University Hospital should continue align itself with SUNY, but also have the operational and governance independence to enter into meaningful partnerships with other hospitals so as to create a health care delivery system that will better serve the needs of the region. The intellectual and financial assets of University Hospital, which include the expertise of its staff, the depth of its clinical programs, and the hundreds of millions of dollars already invested in equipment and facilities, must be leveraged for a greater good. The failure to expand University Hospital's regional role would result in a lost opportunity to better serve the residents of Long Island and strengthen the community hospitals upon which it is dependent for referrals. In addition, a failure to create a stronger relationship may encourage community hospitals to pursue the development of alternatives with other health systems, which may diminish

University Hospital's regional influence and increase the likelihood of the need to subsidize the hospital, which is a burden that will ultimately fall on all New York State taxpayers.

## *Recommendation 3*

### Facility (ies)

St. Charles Hospital (Suffolk County)

J.T. Mather Memorial Hospital (Suffolk County)

### Recommended Action

It is recommended that St. Charles Hospital downsize 77 medical/surgical beds, convert the remaining 37 medical/surgical beds to psychiatric and alcohol detoxification beds, provided that the Commissioner of Mental Health and the Commissioner of Alcoholism and Substance Abuse Services approve such conversions, and discontinue its emergency department. It is further recommended that J.T. Mather Memorial Hospital convert all 37 of its psychiatric and alcohol detoxification beds to medical/surgical beds, provided that the Commissioner of Mental Health and the Commissioner of Alcoholism and Substance Abuse Services approve such conversions. It is further recommended that the Commissioner refrain from either approving any applications that have been or will be filed by either facility or providing any other consent requested by either facility, prior to the implementation of the foregoing service reconfiguration, except where such approval or consent is necessary to protect the life, health, safety and welfare of facility patients, residents or staff.

### Facility Descriptions

These two hospitals are located less than a mile apart on adjacent parcels of property in the town of Port Jefferson. Their location in Suffolk County is not easily accessible, as Port Jefferson is a

distance north from the Long Island Expressway, which is the major thoroughfare in Nassau and Suffolk Counties.

J. T. Mather is a free-standing community hospital with 248 certified beds. St. Charles is a member of the Catholic Health Services of Long Island with 289 certified beds.

St. Charles' services include physical medicine and rehabilitation, obstetrics, alcohol rehabilitation, orthopedics, general medical/surgical services and pediatric beds, several outpatient rehabilitation centers and an emergency department. J.T. Mather focuses on acute medical/surgical care and also maintains 37 beds for psychiatry and alcohol detoxification.  In addition to general medical/surgical beds, both hospitals operate emergency departments. The Mather emergency room volume is approximately twice that of St. Charles. Perhaps reflecting their differences in clinical configuration, Mather's uncompensated care cost was $21,216,477 versus St. Charles' uncompensated care of $1,789,004.

Mather Hospital generated a modest surplus from operations for the past several years, but is now reporting operating losses and declining utilization. St. Charles has fiscally stabilized, reduced expenses, and has operated at essentially break even for one year, following several years of significant operating losses. Information supplied by St. Charles showed bottom line losses as follows: $25 million in 2000, $24.5 million in 2001, $12.6 million in 2002, $8 million in 2003, $8.9 million in 2004, and $614,000 in 2005. St. Charles has debt service costs on $72 million, of which $69.1 is DASNY debt. Mather has debt service costs on $32.2 million, $28.3 million of which is DASNY debt.

Both hospitals have suffered volume losses from program investments made by SUNY University Hospital at Stony Brook and from shifts in physician participation in insurance plans. In this area, discharge volumes are decreasing at Mather, St. Charles and St. Catherine of Siena while Stony Brook is experiencing an increase in discharges.

Mather and St. Charles share a common medical staff. Each of the hospitals employs approximately 1,300 full-time equivalents.

## Assessment

In the past, these hospitals voluntarily created an alliance to distribute services so that both could survive and focus on niche roles to better serve their communities. The goal of the Mather - St. Charles Health Alliance was to avoid the competitive duplication of costly services and technologies and permit more resources to be invested in clinical program development. It was also structured to accommodate the Ethical and Religious Directives for Catholic Healthcare Organizations. Mather focused on acute medical/surgical services and St. Charles pursued a specialty rehabilitation hospital strategy in addition to operating orthopedic and obstetrical services. Duplication however remains for medical/surgical and emergency services and other services, such as behavioral health, are split between the facilities.

In recent years, reimbursement reductions and the movement of care from inpatient to ambulatory and niche providers have created an imbalance in the Alliance which makes it difficult to maintain and build on the relationship. There is pressure on both hospitals to continually invest in facilities and technology to remain competitive. Recently, for example, both hospitals launched competitive bariatric surgery programs. Competition for medical/surgical services, including orthopedics and neurosurgery, is ongoing.

The debt of St. Charles Hospital is part of the obligated group for the Catholic Health Services of Long Island (CHS).  The CEO of CHS has proposed a new strategy for St. Charles focusing on the niche services of acute rehabilitation, obstetrics, alcohol rehabilitation, hospice, and other specialty programs.  Accordingly, CHS recently moved substance abuse beds from Mercy to St. Charles. It was reported by CHS leadership that there are financial issues facing several of the other CHS hospitals so it is preferable to continue to operate St. Charles as a niche provider rather than to cease operations.

The Commission believes that the goals of the previously constituted Alliance between the two hospitals as it was envisioned approximately 10 years ago represents the most feasible approach to meeting the health care needs of the community. Market changes, competition for

medical/surgical services and the influence of Stony Brook have created challenges to meeting these goals. Although only one full service hospital is theoretically required to meet community needs, both Mather and St. Charles have been the beneficiaries of substantial capital investment. The proposed action will create one such full service hospital operated between two campuses and two sponsors.

The duplication of medical/surgical services in Port Jefferson must be eliminated to end the medical arms race for those services, avoid expending scarce resources, and prevent the progressive weakening of both St. Charles and Mather. With this realignment of beds and services, both hospitals will continue to serve the market without duplication and can develop and provide complementary, non-duplicative clinical programs into the future. In particular, St. Charles should pursue development of its plans for niche services for rehabilitation, obstetrics, psychiatry, alcohol rehabilitation, palliative care and hospice and can pursue its desire to utilize remaining excess facilities for other than Article 28 services. J.T. Mather should enhance its position as the main acute care hospital with the emergency department and free up its behavioral health and alcohol detoxification beds to accommodate the medical/surgical needs of the local community.

## *Recommendation 4*

### **Facility (ies)**

Nassau University Medical Center (Nassau County)

### **Recommended Action**

It is recommended that Nassau University Medical Center downsize its certified capacity of 631 to 530 certified beds, to be comprised of 173 medical/surgical, 26 pediatric, 30 obstetrics, 25 physical medicine rehabilitation, 120 psychiatry, 13 child psychiatry, 20 alcohol detoxification,

137

30 substance abuse rehabilitation, 10 burn care, 33 intensive care, 6 pediatric intensive care, 28 NICU, and 16 prison health beds. This represents a downsizing of 133 medical/surgical, 20 pediatric, 6 obstetrics, 5 physical medicine/rehabilitation, and 10 NICU beds, together with an addition of 30 psychiatry, 13 child psychiatry, and 30 substance abuse rehabilitation beds, provided that the Commissioner of Mental Health and the Commissioner of Alcoholism and Substance Abuse Services approve such additions.

## Facility Description(s)

Nassau University Medical Center, a 631-bed community teaching hospital, is part of the Nassau Health Care Corporation (NHCC), which also includes the A. Holly Patterson Extended Care Facility (AHP), an 889-bed skilled nursing facility, and six Article 28 diagnostic and treatment centers that are located in communities with high health care needs.

NUMC is the principal safety net hospital for low income and uninsured residents of Nassau County. Located in East Meadow in central Nassau County, the Medical Center had approximately 22,728 discharges 75,022 emergency department visits, and 196,398 outpatient visits in 2004. Medicaid-covered and uninsured patients represent 51% of discharges and 57% of emergency department admissions. The Medical Center had approximately 3,019 full-time equivalent employees in 2003.

NHCC receives a substantial subsidy from Nassau County to compensate it for the major role it plays in providing acute care access to many Nassau County communities with documented health disparities and large proportions of low income or underinsured residents. NHCC was created to assist Nassau County in addressing a budget shortfall by purchasing the assets from the County and transferring those assets to a newly formed public benefit corporation. NHCC financed the purchase with additional debt that was guaranteed by Nassau County. The establishment of a public benefit corporation was also intended to provide increased flexibility to operate the constituent facilities free of government-owned restrictions.

## Assessment

NUMC has faced great challenges and obstacles before and since it achieved financial stability in 1999, when its ownership was transferred from the county to NHCC. Unstable leadership and shifting strategies have punctuated its precarious operating history. NUMC operates in the same competitive marketplace as do other Long Island hospitals, but it is burdened by operational constraints due to the county's prior ownership. The increased debt load, which is secured by Nassau County funds, coupled with a disproportionately heavy Medicaid payor mix, has intensified government oversight and involvement. Accordingly, the Nassau County government retained consultants to help stabilize NHCC's finances, and has recently appointed new management and governance of NHCC.

The continued existence of NUMC as an acute care hospital is critical to the residents of Nassau County; it is the county's main safety net provider. Poverty in NUMC's primary service area is almost double the rate in the county overall. Compared to other Long Island hospitals, NUMC's patients are disproportionately racial minorities and are foreign-born, non-English speaking residents. According to NUMC, it had over 50% of all Medicaid inpatient discharges from Nassau County hospitals. While other providers in Nassau County play an important role in providing access to Medicaid, uninsured and underserved populations, many of these hospitals operate their staffed beds at relatively high occupancy rates and have long wait periods in their emergency departments for inpatient beds. If NUMC were to close, neighboring hospitals could not absorb NUMC's 75,000 emergency visits and approximately 21,000 inpatient admissions.

The leadership of NHCC understands that it must redefine its mission and develop appropriate strategies given its and its competitors' fiscal and operating situations. NHCC developed a plan that redefines its mission and strengthens its core clinical services. In July 2006, NHCC negotiated a $40 million bail-out plan with the State, including an agreement to rescind most of the subsidy cuts originally proposed, to increase reimbursement for its nursing home, and to provide additional state aid for treating uninsured patients. In exchange, NHCC recommitted itself to its mission to serve the surrounding communities of East Meadow, Westbury,

Hempstead, Freeport, Roosevelt and Uniondale, most of which have large minority and uninsured populations.

NUMC must focus on being a high-quality community teaching hospital providing for the health care needs of the communities that are dependent on it for primary, emergent and acute care. It should continue to provide certain tertiary services: trauma, burn, and neonatal care. It should not invest in tertiary services that require significant investment to develop. It should continue to develop collaborations with alternate facilities that offer those tertiary services NUMC does not provide.

NUMC has three vacant floors of raw space that could be used for program expansion or consolidation. NUMC should modify its existing space to its most efficient use before any new construction. This is particularly important with respect to the rebuilding of  A. Holly Patterson Nursing Home.


### *Recommendation 5*

#### Facility (ies)

Long Beach Medical Center (Nassau County)

#### Recommended Action

It is recommended that Long Beach Medical Center downsize its bed capacity to approximately 145 beds. Contingent upon New York State's development of new reimbursement options and alternative institutional models, Long Beach should reconfigure as a smaller facility focused on emergency and ambulatory care services with a more limited number of inpatient beds and linkages to a more comprehensive partner.

**Facility Description(s)**

Long Beach Medical Center (LBMC) consists of a 203-bed community hospital and a 200-bed sub-acute and skilled nursing facility. LBMC is located in the city of Long Beach on a south shore barrier island accessible to the mainland by three drawbridges located at the east, west and middle of Long Beach Island. LBMC is located adjacent to the central drawbridge that connects to Nassau County. The closest hospital to Long Beach is South Nassau Communities Hospital which is located 5 miles to the north over the adjacent drawbridge. Seven miles to the west is St. John's Episcopal Hospital and nine miles to the west is Peninsula Hospital. While these distances do not appear to be a barrier to alternate access, all three drawbridges are frequently up during summer, snarling traffic and blocking emergency access.

LBMC had 5,621 discharges, 14,743 emergency department visits, and had an average daily census of 117 patients in 2004. The hospital reported 76% occupancy of its available beds for 2005. LBMC's inpatient payor mix includes a high percentage of Medicare (59%), and Medicaid and Uninsured (28%) patients. LBMC had approximately 970 full-time equivalent employees in 2003. The hospital has $28 million in long-term debt, approximately $22 million with DASNY.

LBMC had break-even operational margins between 2001 and 2004. Its revenue has recently, and most likely temporarily, lost approximately 12% of its revenue due to requirements imposed by the New York State Office of Alcoholism and Substance Abuse Services (OASAS) that LBMC cease treating inpatient substance abuse patients until OASAS licenses LBMC to resume. LBMC has submitted required certificate of need applications to provide inpatient substance abuse services.

**Assessment**

There are approximately 40,000 residents in Long Beach and its adjacent island communities. There is a relatively large concentration of nursing homes, adult homes and assisted living facilities in Long Beach, and 16% of the population is over 65 years old. Because of the concentration of healthcare and housing facilities for the elderly, summer-time surges in

population, recreational and boating facilities, geographic isolation, and dependence on drawbridges to access the mainland, LBMC, despite its size and unstable financial situation, must remain open so that the community has appropriate access to emergency services and acute care. Eighty-eight percent of LBMC inpatients who are Long Beach residents were admitted under an emergent classification, and 68% of Long Beach residents who were admitted to other hospitals also were categorized as emergent.

While the Long Beach community seeks emergency and acute care at LBMC, Long Beach residents travel off the island for elective treatment. There were approximately 6,000 discharges in New York State of Long Beach residents, and of these, approximately 3,000 were discharged from LBMC.  The remaining 50% sought care at mainland hospitals, including South Nassau Communities Hospital, St. Francis Hospital, North Shore University Hospital and Mercy Medical Center for acute inpatient, surgical and maternity care that LBMC does not provide.

LBMC cannot compete in the medical arms race. LBMC would benefit from reconfiguration and support from or integration with a strong partner or health system. The hospital has attempted to join a larger system; however, the hospital's largely medical, low-acuity case mix and its financial situation make it an unattractive acquisition target or potential partner.

The City of Long Beach needs a health care facility, and changes in the reimbursement system and an affiliation with a strong partner would improve LBMC's financial standing. LBMC will likely benefit from the proposed changes in Medicare's reimbursement, but will not solve the hospital's structural financial problems. Should there be changes in reimbursement, LBMC should be reconfigured as a new type of provider, with relatively few beds, and with a focus on emergency and ambulatory care, with a limited number of clinical services, with adequate capacity to stabilize and transfer patients with more complicated cases. Pending such changes, LBMC should eliminate its excess capacity by decertifying and downsizing to 145 certified beds, a level that accommodates its average daily census at reasonable occupancy, and permits the hospital to add adequate beds to accommodate periods of peak census in the summer.

# LONG ISLAND REGION

# LONG-TERM CARE RECOMMENDATIONS

## *Recommendation 1*

### Facility (ies)

 A. Holly Patterson Extended Care Facility (Nassau County)

### Recommended Action

It is recommended that A. Holly Patterson Extended Care Facility (AHP) downsize by approximately 589 RHCF beds to approximately 300 RHCF beds, and transfer its sub-acute services to the empty floors of the Nassau University Medical Center (NUMC), provided that such sub-acute services continue to be operated by AHP.  It is further recommended that AHP rebuild a smaller facility on its existing campus, and add a 150-bed ALP and possibly other non-institutional services.

### Facility Description(s)

A. Holly Patterson Extended Care Facility (AHP) is an 889-bed residential health care facility owned and operated by the Nassau County Health Care Corporation, a public benefit corporation. It provides baseline services, and operates an 80-bed subacute service, a 20-bed AIDS unit, and provides ventilator care.

AHP's occupancy rate of 60% is one of the lowest occupancy levels in the State. In 2002, it filled 84% of its beds. Approximately 23% of its beds are filled with low-acuity residents, some of whom can be served in a less-intensive setting if such services were available. Quality of care

143

is of concern at AHP. The number of deficiencies cited by State surveyors ranged from 5 to 16 over the last three years, whereas the regional median is 3. Some of AHP's quality indicators are far below the regional average, including percent of residents losing bowel and bladder control, residents experiencing pain, and short-stay residents obtaining pressure sores.

## Assessment

Nassau County has excess nursing home capacity. Despite a paper need for more than 1,200 nursing home beds, the county operates at a meager 90% occupancy rate. Even when AHP eliminated its unused beds, the remaining providers ran at about a 6% vacancy rate in 2004. Such excess capacity hurts the providers financially. Providers lose bed-hold payments, are forced to accept lower-acuity individuals than they might otherwise, thereby reducing total Medicaid revenue through a lower CMI, and must spend valuable funds on marketing efforts to capture the available admissions.

AHP should transfer its sub-acute residents to the Nassau University Medical Center (NUMC) campus. The NUMC building has 3 empty floors that could be remodeled to satisfy nursing home regulations to accommodate AHP's sub-acute services. The Commission does not recommend moving the remaining long-term AHP program off the current campus because the development of an ALP and perhaps independent-living on the campus with the SNF has tremendous value.

The Commission recommends that the State immediately decertify 309 of AHP's licensed beds. None of these beds is currently not in use. Nassau County Health Care Corporation should concomitantly contract for the development of a 150-bed Medicaid ALP on the campus, to be completed within 24 months. Upon completion of the ALP construction, the State should decertify 120 further beds over the first 12-month period, and the remaining 160 when the ALP is operational.

## *Recommendation 2*

**Facility (ies)**

Cold Spring Hills Center for Nursing and Rehabilitation (Nassau County)

**Recommended Action**

It is recommended that Cold Spring Hills Center for Nursing and Rehabilitation downsize by approximately 90 RHCF beds (one building) to approximately 582 RHCF beds, and add a 24-bed Ventilator unit, an evening ADHCP, and a 12-station hemo-dialysis center on the existing campus.

**Facility Description(s)**

Cold Spring Hills (CSH) is a 672-bed proprietary residential health care facility housed in several buildings.  It houses a sub-acute program, a 50-slot gerontological-psychiatric adult day program, and a long-term home health care program.  It has a high case mix index of 1.18.  The facility was placed in receivership in 1996, and purchased in October 2004.  Since the purchase, there have been quality and occupancy improvements at CSH. According to the provider, it ran at 94.5% occupancy in 2005.

CSH has been cited for between 6 and 12 deficiencies over the last three years, while the regional median is 3. It was cited with a level 3 deficiency in its last survey, falling in the bottom quintile for the region.  Community reputation has been described as poor. The facility's recent affiliation with the North Shore-Long Island Jewish Health System, however, may strengthen both quality of care and community reputation.

**Assessment**

Nassau County has excess nursing home beds.  2004 county occupancy was 90%, and nearly 900 PA/PB level residents occupy SNF beds in the county.  Nursing homes in the county informed the Commission that it is difficult to keep beds filled, particularly with the recent new facilities established in the area.  In addition, CSH borders Suffolk County, which has a stronger occupancy level (96%), but also a small number of calculated excess beds (48).  A downsizing at CSH could strengthen providers in both counties.

CSH is among the largest nursing homes in the State. The recommendation to downsize will maintain CSH in its current reimbursement peer group and will ease surplus capacity in the region.  An entire building should be closed to maximize efficiencies and gains from downsizing. CSH, with its clinical affiliation with North Shore-LIJ, should be bolstered in its ability to serve a post-acute role.

The Commission recommends approving its application for 24 ventilator beds and for the creation of an on-site, 12-station hemodialysis center.  The Commission further recommends that CSH's application for a 50-slot shift of evening adult day care be approved to provide additional non-institutional resources for the community,

*Recommendation 3*

**Facility (ies)**

Brunswick Hospital Center, Inc. (Suffolk County)

**Recommended Action**

It is recommended that Brunswick Hospital Center, Inc. downsize all 94 RHCF beds and close as an Article 28 long term care facility. It is further recommended that a 50-bed ALP and possibly

other non-institutional services be added somewhere in Suffolk County by another sponsor, pending completion of an RFP process.

**Facility Description(s)**

Brunswick Hospital Center, Inc. is a proprietary health care corporation that operates a 64-bed physical medicine and rehabilitation facility (the "Brunswick Physical Medicine and Rehabilitation Hospital", also recommended for closure), a 94-bed nursing home (the "Brunswick Nursing Home"), and a 124-bed psychiatric facility licensed under Article 31 of the Mental Hygiene Law (the "Brunswick Hall Center for Behavioral Health & Wellness"). These facilities share a campus in Amityville, which neighbors Broadlawn Manor, a 320-bed residential health care facility.

Previously, Brunswick Hospital Center, Inc. also operated an emergency room and medical/surgical unit licensed for an additional 192 medical/surgical beds, but those beds were decertified and those units discontinued pursuant to a petition for reorganization under Chapter 11 of the United States Bankruptcy Code filed in October 2005. That case is pending.

The Brunswick Nursing Home had been in receivership from 2001-05. The facility saw admissions decline in this period. It currently runs at 95% occupancy, and makes a profit. Even though Brunswick's emergency room and medical/surgical unit ceased operations, Brunswick Nursing Home maintains its hospital-based Medicaid rate.

This nursing home has raised some quality concerns. It was cited for 15 deficiencies in its most recent survey, compared to a regional median of 3. It has poor performance measures on pressure sores, weight gain, and continence. Some of its survey deficiencies are due to its physical plant, which is housed in two cottages dating from 1938 and the early 1950s. The operator plans to move the nursing home operation into the general hospital building. While this would provide in-wall gases for ventilator-dependent residents, the hospital building is 120 years old, and would not provide state-of-the-art long-term care.

**<u>Assessment</u>**

New facilities in Suffolk County have increased the supply of nursing home beds and competition for appropriate residents. With nearly 1,000 low-acuity residents in Suffolk nursing homes, non-institutional alternatives must be established.

Brunswick Nursing Home does not appear to have a strong referral base from local hospitals. Good Samaritan and North Shore hospitals refer their patients to this nursing home and to their own affiliated facilities. Notably, Good Samaritan may work more closely to refer to Catholic Health System facilities and North Shore recently entered into an affiliation with CSH.

The creation of the ALP for Suffolk County should proceed through an RFP process.

# NEW YORK CITY REGION

# ACUTE CARE RECOMMENDATIONS

## *Recommendation 1*

### Facility (ies)

New York Methodist Hospital (Kings County)

New York Community Hospital of Brooklyn (Kings County)

### Recommended Action

It is recommended that New York Methodist Hospital and New York Community Hospital of Brooklyn merge into a single entity with two separate campuses. It is further recommended that Methodist downsize by 60 to 510 beds, and that NY Community Hospital downsize by 40 beds to 90 beds and add ambulatory services.

### Facility Description(s)

New York Methodist Hospital is a community teaching hospital in Park Slope, Brooklyn. It has 570 certified beds, all of which are in service. The hospital had approximately 32,179 discharges in 2004. In 2004, over 66,000 patients were treated in the emergency department, which is a designated stroke center. Its special services include interventional and surgical cardiology, a modern birthing center, and inpatient and outpatient rehabilitation. It draws patients from throughout the borough, and provides an extensive array of ambulatory services and sites including family health centers in Downtown Brooklyn, Canarsie, and Red Hook

Approximately 32% of its discharged patients in 2004 were either covered by Medicaid or were uninsured.  The hospital has been financially stable for the past 15 years.  It is affiliated with the Weill Cornell College of Cornell University and is a member of the NY-Presbyterian Healthcare System. New York Methodist employed approximately 2,738 full-time equivalents (FTEs) in 2003.

New York Community Hospital of Brooklyn is located in Midwood, Brooklyn, and has 134 certified beds, all of which are in service. The hospital provides only acute medical and surgical services, with approximately 6,327 discharges in 2004. The emergency department had approximately 15,783 visits in 2004, and is a designated stroke center. The hospital does not have outpatient clinics. It draws patients primarily from southern Brooklyn, including from Sheepshead Bay and Coney Island.

NY Community has been financially stable for the past 10 years. It is affiliated with the Weill Cornell College of Cornell University and is a member of the NY-Presbyterian Healthcare System. NY Community employed approximately 476 FTEs in 2003.

## Assessment

The Commission supports a full asset merger of NY Methodist and NY Community Hospital into a single institution with one operating certificate and governing board. The integration will allow each of the two sites to reduce the number of beds. NY Community will eliminate 40 beds, and NY Methodist will eliminate 60. This reduction would take place over a three-year period, and enable the institutions to achieve economies of scale and reduce operating costs.

The population of southern Brooklyn is growing, and there is a deficit of outpatient services in the area, particularly for maternal and child health. NY Community Hospital does not have the space to provide ambulatory services, and its neighboring hospital, Beth Israel Kings Highway Division, also lacks outpatient services. The only hospital that provides ambulatory care in southern Brooklyn is Coney Island Hospital.  The proposed merger will allow NY Community Hospital to reconfigure empty space from the bed reduction to create an ambulatory care center.

*Recommendation 2*

**Facility (ies)**

Victory Memorial Hospital (Kings County)

**Recommended Action**

It is recommended that Victory Memorial Hospital close in an orderly fashion. Following this planned closure, it is further recommended that the site be converted under new sponsorship to a diagnostic and treatment center and/or as a facility offering a continuum of long term care services that would be compatible with the remaining Victory Nursing Home.

**Facility Description(s)**

Victory Memorial Hospital is a 243-bed hospital in the southwest section of Brooklyn. It provides adult medical/surgical and obstetrics services. All of its certified beds are staffed. The hospital's 2004 certified bed occupancy rate was 62%, and the hospital had 23,808 emergency visits. Medicaid-covered and uninsured patients represented 34% of total inpatients in 2004. The hospital carries approximately $32 million in long term debt, approximately $26.9 million of which is DASNY debt, secured by the Federal Housing Administration's Hospital Mortgage Insurance Program. The hospital employed approximately 1,025 FTEs in 2003. The hospital has an adjacent, hospital-affiliated nursing home with 150 beds.

**Assessment**

Victory Memorial declared chapter 11 bankruptcy in November 2006 following years of severe financial trouble. Victory continues to default on its obligations and has difficulty making payroll. The hospital is attempting to raise capital through a short-term loan, and sale of its property and its long-term home health care ("Lombardi") program. These short-term cash infusions, however, will not adequately ameliorate the facility's financial problems.

In 2005, in an effort to stabilize the institution, the Department of Health and Maimonides Medical Center structured a plan to stave off Victory's bankruptcy. As part of this bail-out plan, Victory received a $2 million grant from the Department of Health, a $1 million grant from the NYS Senate Speaker's fund, and a $5 million loan from Maimonides Medical Center, which included a five-year partnership between the two medical centers as a condition of the loan.

Despite these efforts, Victory has entered chapter 11 bankruptcy proceedings. Its reported medical/surgical volume has steadily and sharply declined. Patients and physicians have defected to neighboring hospitals, primarily to Lutheran Medical Center. Cash flow is a major problem.

As part of its partnership agreement, Maimonides hired a consultant to develop a restructuring plan for Victory. The consultant found that even a smaller hospital would continue to lose money, even with unlikely increases of discharges. Maimonides then proposed evaluating whether Victory could be converted to either a diagnostic and treatment center (D&TC), providing needed primary care and outpatient obstetrics and mental health services to the community, or to a site for a continuum of long-term care services.

Victory can close as an inpatient facility without disruption to access to or availability of care. Were Victory to close, it initially appeared that approximately 25-35 patients may be difficult to accommodate at Victory's coverage partners, which include Maimonides, Lutheran, NY Methodist and Coney Island hospitals. A number of factors, however, mitigate this concern:

- Victory's 2004 average daily census was inflated by long lengths of stay relative to the borough average. If patients were treated instead at Victory's coverage partners, which have more appropriate lengths of stay, then many more patients could be covered by the remaining hospitals.
- Volume at Victory has declined further since 2004. Its average daily census has dropped to approximately 130. Surrounding institutions can definitely absorb Victory's current inpatient volume should Victory close.

- Physician referral patterns have already changed. Doctors have begun redirecting patients to other area hospitals.

Notably, the two recent Brooklyn hospital closures, St. Mary's and Brooklyn Hospital's Caledonian campus, were in the northern part of the borough. The primary service areas of those hospitals do not overlap with that of Victory.

The community does need access to comprehensive ambulatory care services. In 2004, Victory Memorial had approximately 85,000 outpatient visits. The community's access to outpatient care should be preserved when Victory closes. When Victory Memorial closes, efforts should also be made to ensure Victory Nursing Home's continuing survival.

The Commission recommends the immediate decertification of all inpatient beds at Victory. The entrance of the institution into bankruptcy proceedings is likely to place the interests of a creditors' committee in opposition to those of community health.


### *Recommendation 3*

**Facility (ies)**

Peninsula Hospital Center (Queens County)
St. John's Episcopal Hospital South Shore (Queens County)

**Recommended Action**

It is recommended that Peninsula Hospital Center downsize by approximately 99 beds to approximately 173 beds and that St. John's Episcopal Hospital downsize by approximately 81 beds to approximately 251 beds. Contingent upon financing, it is recommended that Peninsula Hospital Center and St. John's Episcopal Hospital merge and rebuild a single facility with

approximately 400 inpatient beds, and provide comprehensive emergency, inpatient, psychiatric and ambulatory services.

## Facility Description(s)

Peninsula Hospital Center is a community teaching hospital located near the east end of the Rockaway Peninsula in Queens. The hospital is certified for 272 beds, of which 173 are available. In 2004, the hospital had approximately 5,707 discharges, 26,430 emergency department visits, and 33,929 visits at its primary care family health center. Medicaid-covered and uninsured patients represented 24% of discharges and 68% of emergency department visits. It offers medical/surgical, pediatric, and traumatic brain injury services. Peninsula has stroke center designation for southeast Queens, and is the acute care hospital affiliate of the Addabbo Family Health Center, one of two federally qualified health centers in Queens. Peninsula has improved the efficiency of it operations and reduced its length of stay. The hospital operates at a near break-even margin, and has little long-term debt (approximately $3 million). Peninsula employed approximately 1,066 people in 2003, most of whom are local residents. Peninsula also runs an adjacent 200 bed hospital-based skilled nursing facility with a short-term rehabilitation unit, respiratory therapy, Alzheimer's disease and high-acuity services.

St. John's Episcopal Hospital is located at the far eastern end of the Rockaway Peninsula. It is certified for 332 beds, of which 251 are available. Its inpatient services include medical/surgical, maternity, psychiatry and detoxification services, and the hospital offers provides psychiatric outpatient services, a continuing day treatment program, home-based crisis intervention program, and outpatient services in adult homes. It is designated to receive emergency involuntary psychiatric admissions. In 2004, the hospital had approximately 10,708 discharges and 27,898 emergency department visits. Fifty-one percent of its inpatients and 48% of its emergency department visits were either Medicaid-covered or uninsured. The hospital showed an operating margin of 4% in 2004, and has long-term (DASNY) debt of approximately $14 million. Like Peninsula, it is a major employer for the Rockaway community. St. John's Episcopal Hospital is part of Episcopal Health Services Inc., which also owns and operates two Rockaway-area nursing homes and the St. John's Medical Services PC.

## Assessment

The optimal solution to meet the health care needs of the Rockaways is the establishment and construction of one new hospital with an appropriate configuration of needed services and number of beds in a convenient location for the bulk of the population. Neither of the two hospitals runs at full capacity, yet neither can fully absorb the other's patient load. The mix of services between the two hospitals is relatively complementary, but they have unnecessary overlaps in medical/surgical capacity. Their medical staffs overlap. Both facilities are old and in need of extensive capital renovation. Neither has an adequate physical plant in the optimal location to serve the needs of this growing community. In an effort to avoid assuming more debt than it can comfortably carry, Peninsula Hospital has made steady but relatively small investments in its physical plant. St. John's has renovated part of its outmoded facility but more needs to be done.

This optimal health care delivery solution has major barriers to implementation, including considerable capital needs to cover construction costs, estimated at $1 million/bed in the New York City region, and an apparent unwillingness by either of the providers to merge or consolidate.

This recommendation is shaped by the particularities of the Far Rockaways area, including:

- The Rockaways are located on an isolated barrier peninsula accessible by two bridges to Brooklyn and Queens, and by one road into Nassau County.
- 40% of the residents are African-American, compared to 25% in NYC as a whole.
- The NYC Department of Health and Mental Hygiene identified the Rockaways as an area with income and health disparities.
- It is difficult to attract and retain physicians to practice in the community.
- The middle-class population of the peninsula is growing, and there is an influx of younger families with children. Approximately 15-20,000 new residents are expected to

move into housing currently under construction. There is a migration of Orthodox and Russian Jewish and Hispanic immigrants from Central America into the community.

▪ The Peninsula is oversaturated with nursing home and adult home beds, which account for nearly 60% of the combined nursing and adult homes in Queens. There are 17 nursing homes and 12 adult homes on the Rockaway peninsula.

### *Recommendation 4*

#### Facility (ies)

Queens Hospital Center (Queens County)

#### Recommended Action

It is recommended that Queens Hospital Center add approximately 40 medical/surgical beds.

#### Facility Description(s)

Queens Hospital Center, a member of the NYC Health and Hospitals Corporation, is a 243-bed community hospital serving primarily the neighborhoods of Jamaica and southwest Queens. The hospital provides medical/surgical, maternity, and behavioral health services. It was recently renovated and downsized from 408 beds. Queens Hospital Center is an important safety-net provider to low-income communities with compromised access to health care services. Medicaid and uninsured patients represent 79% of inpatients and emergency department admissions. While Queens Hospital Center has 5% of the total certified beds in the borough, it has 19% of the alcohol detoxification beds, 26% of the drug detoxification beds, and 9% of the psychiatric beds. Queens Hospital Center employed approximately 1,911 FTEs in 2003. The hospital's strategic priorities include the development of a comprehensive cancer center, and the completion of a new ambulatory care pavilion.

**Assessment**

Queens Hospital Center developed its plans for the recently completed modernization prior to the St. Joseph's Hospital closure in 2004. Consequently, Queens Hospital Center's downsized bed capacity does not meet the needs of its community. On days of peak census, the hospital exceeds its certified capacity despite a relatively low 4.2 day length of stay. Its ED and inpatient units are overcrowded. An ambulatory pavilion construction project is underway, which could be modified to include a 40-bed inpatient expansion.

## *Recommendation 5*

**Facility (ies)**

Parkway Hospital (Queens County)

**Recommended Action**

It is recommended that Parkway Hospital close in an orderly fashion.

**Facility Description(s)**

Parkway is a 251-bed proprietary, for-profit community hospital located in Forest Hills, Queens. It operates 140 beds, and provides only adult medical/surgical care. It does not offer maternity, psychiatric, or pediatrics services. In 2004, it had approximately 9,365 discharges and 13,973 emergency department visits. Most of its patients have private coverage or Medicare.  In 2004, the hospital's occupancy based on available beds was 66%, and it had an average daily census of 146. According to the hospital's administration, average daily census in 2006 further declined to 130. Its operating margin is approximately -5%.

It is one of only two for-profit hospitals in New York State. Parkway is the primary hospital for several physician group practices, many of which are owned by the hospital operators. These practices are located throughout Queens and Brooklyn. According to the hospital, in the first quarter of 2006, Parkway employed 570 full-time equivalent employees, down from 696 in the fourth quarter of 2004.

Parkway Hospital filed for Chapter 11 bankruptcy protection in June 2005. While the hospital hoped that it would emerge from bankruptcy in the third quarter of 2006, its losses for the first quarter of this year totaled $4.7 million, which was $2.5 million more than the hospital budgeted. Bankrupt Parkway Hospital lost $810,542 in June 2006 alone, and patient revenue in June 2006 was $5.5 million, which was under expected budget by $825,000 due to of lower revenue from Medicaid and Medicare.  In 2004, the hospital had approximately $13 million in (non-DASNY) long-term debt. If the hospital emerges from bankruptcy, it must file a certificate of need application with DOH for change of ownership.

**<u>Assessment</u>**

Using the Commission's framework criteria, Parkway Hospital is the only hospital in New York State to receive below-average scores on all six of the criteria: service to vulnerable populations, quality of care, utilization, viability, availability of services, and economic impact. The NYC RAC agreed that "using the need criteria …and particularly considering this hospital's past problems with financial and administrative mismanagement, and more importantly, quality of care, Parkway is a prime candidate for closure."

Parkway's low occupancy rate and poor finances indicate that it is unneeded and cannot stand as a viable, stand-alone entity, surrounded by larger, more comprehensive facilities.  Analysis using 2004 data, which is more favorable to Parkway than current data, to measure Parkway's capacity to close suggests that it might be difficult to accommodate all of Parkway's patients at other area hospitals. This concern, however, is mitigated by various factors.  Parkway's extended lengths of stay inflated its 2004 average daily census. Reductions in lengths of stay would substantially reduce the number of occupied beds and patient days so that patients would be accommodated at

the hospital's coverage partners. Furthermore, Parkway's inpatient average daily census has declined since 2004, indicating that patients already have chosen to seek care in alternative facilities.

## Recommendation 6

### Facility

New York Westchester Square Medical Center (Bronx County)

### Recommended Action

It is recommended that New York Westchester Square Medical Center close in an orderly fashion.

### Facility Description(s)

Westchester Square Medical Center (WSMC) is located in the eastern Bronx. It is certified for 205 beds, of which 163 are staffed. The hospital provides only adult medical/surgical care and no specialty services. WSMC is a certified stroke center.  The hospital claims it had 7,852 discharges and emergency room volume of 23,000 in 2005. WSMC operates at a near-breakeven operating margin. It is a sponsored member of the NY Presbyterian Health System (NYPHS). It employed approximately 575 FTEs in 2003.

### Assessment

Westchester Square represents excess capacity in the system. It functions largely as a feeder to tertiary hospitals in NYPHS. An analysis measuring its capacity to close confirms that WSMC's patients could be absorbed by surrounding hospitals, including St. Barnabas Hospital, which

NYPHS also sponsors. Its principal neighboring coverage partners include Montefiore/Weiler Campus, Jacobi , Montefiore/Moses Campus, Our Lady of Mercy, and St. Barnabas hospitals.

Using the Commission's framework criteria, WSMC scored low on service to vulnerable populations, utilization, viability, and availability of services. Relative to regional institutions, its payor mix includes few Medicaid-covered and uninsured patients even though the hospital's service area in the south and northeast Bronx encompasses some federally designated medically underserved areas (MUAs). Twelve percent of the hospital's inpatients in 2004 were Medicaid-covered or uninsured. Moreover, it is underutilized and provides no specialty care. Its certified bed occupancy rate in 2004 was only 51%. WSMC provides only general medical/surgical services; it provides no maternity, psychiatric, or substance abuse care.

## *Recommendation 7*

### Facility (ies)

Cabrini Medical Center (New York County)

### Recommended Action

It is recommended that Cabrini Medical Center close in an orderly fashion.

### Facility Description(s)

Cabrini Medical Center (Cabrini) is an acute care hospital in Manhattan's Gramercy Park neighborhood. Cabrini's campus occupies an entire city block in downtown Manhattan, and contains five buildings. Two buildings are used for clinical care, and the remaining buildings are used primarily for hospital administration.  It has a total of 474 licensed beds, of which, according to the hospital, 338 are in service.  Approximately 25% of its certified and 73% of its available beds were occupied, and its medical/surgical volume has been in steady decline.

160

Cabrini offers inpatient medical/surgical, psychiatric, and rehabilitation services, and is a State-designated AIDS center. Its emergency department and outpatient clinics are well utilized. Cabrini had approximately 9,800 total discharges, 18,674 ED visits and 55,052 outpatient visits in 2004. It has a clinical affiliation with Mt. Sinai Hospital. The hospital employed approximately 1,357 FTEs in 2003.

The facility has been in financial difficulty for years, and missed payroll twice. While its recent financial condition has somewhat improved, it continues to struggle with fiscal problems. These improvements are largely attributable to efficiency gains, including a reduction in what had been a 14-day average length of stay. The 2004 operating margin was approximately -4%. The hospital reported that its losses in 2005 totaled approximately $10 million. It has incurred approximately $36 million debt to service, and $44 million in unserviced debt to its sponsor, the Sisters of Cabrini. The hospital has no DASNY-insured debt, and it recently retired its debt to the NYS Housing Finance Authority with a private refinancing.

**<u>Assessment</u>**

Cabrini Medical Center should close. According to the Commission's framework criteria, Cabrini scored poorly on utilization, quality of care, viability, and availability of services. Its score for the service to vulnerable populations criterion was average for the region.

In public presentations, Cabrini leadership acknowledged the strong arguments that support its closure:

- "We are located in 'Bed Pan Alley' with one of the largest concentrations of medical/surgical acute care hospitals in the country.
- The need for inpatient hospitalizations continues to shrink.
- We recognize Manhattan will unlikely ever again need the same number of medical/surgical beds. There is excess capacity and the continued arms race to fill beds among the existing competitors is not healthy.
- Like our neighbors, our financial picture has been troubled for over five years.

161

- ▪ We do not provide tertiary and quaternary services provided by our neighboring institutions.
- ▪ We sit on a very valuable piece of real estate that could easily be sold off for more condominiums.
- ▪ There is a growing consensus in many public arenas that the smaller institutions should either close or restructure.
- ▪ Virtually all providers are struggling and the responsible thing to do is to shrink or restructure over-capacity before we see even bigger and more catastrophic collapses and resulting declines in quality of care."

The Commission's capacity to close analysis confirms that Cabrini's patients readily could be absorbed by its coverage partners, including Beth Israel Petrie Division, Bellevue, NYU Tisch, and Mount Sinai hospitals. The NYC RAC concluded "There is no continuing need for an inpatient medical/surgical capacity at this facility. While the administration and the board have been very aggressive in attempting to preserve Cabrini as a hospital, and have been creative in developing different configurations including reducing medical/ surgical beds, it appears to us that the surrounding hospitals can easily absorb inpatient admissions from this market area."

Cabrini's leadership impressed the Commission with its realistic self-assessment, candor, and their creative efforts to reconfigure the institution. The Commission is not persuaded, however, of the need to maintain Cabrini either in its current form or in the new form proposed by Cabrini leadership. Provisions must be made, however, to ensure continued access to certain services, especially psychiatry, outpatient, and emergency services. These services provided at Cabrini can and must be transferred to surrounding institutions without creating access problems for the community:

- **Psychiatry** – Neighboring Beth Israel Medical Center is prepared to assume all of Cabrini's psychiatric beds, pending the State's certificate of need approvals for such a transfer. Cabrini has 78 licensed inpatient psychiatric beds, including 28 recently approved geropsychiatric beds.  Beth Israel has a comprehensive psychiatric program, including inpatient, outpatient, and community-based care. Under the proposed plan,

Beth Israel would convert the majority of its current inpatient detoxification beds to psychiatry, and transition approximately 75% of the inpatient detoxification program to outpatient clinics. This transition is consistent with trends in substance abuse care and with state policy objectives. Beth Israel's detoxification beds are located in a separate pavilion, together with the hospital's existing inpatient psych services.

The Commission also consulted with the leadership of NYU Medical Center. NYU-Tisch Hospital currently operates 22 inpatient psychiatric beds, and Bellevue Hospital operates 339 psychiatric beds at full capacity. NYU has space and resource constraints, but expressed a willingness to evaluate the expansion of inpatient psychiatric care should it be necessary in order to accommodate patients displaced by a Cabrini closure.

- **Outpatient services** – Beth Israel Medical Center's 300,000-square-foot Phillips Ambulatory Care Center is located within an easy walk to Cabrini, at the major public transportation hub of Union Square. Beth Israel easily can absorb an additional 50,000 outpatient visits at this site. In addition, NYU Medical Center plans to expand its primary care and general medical/surgical capacities at its nearby Hospital for Joint Diseases.

- **Emergency services** – Analysis evaluating Cabrini's capacity to close demonstrated that Cabrini's urgent/emergent patients can be absorbed at neighboring Bellevue, NYU Tisch, Beth Israel Petrie, and St. Vincent's Manhattan hospitals, all within appropriate travel times. In addition, the nearby NYU Tisch Hospital filed a CON application to double its emergency department's size and bed count.

Cabrini has relatively little debt for an institution of its size, and no DASNY debt. According to Cabrini, the real property on which the hospital sits is estimated to be worth approximately $130 million, which easily will cover the hospital's debts and leave funds to support the overall health care mission of the sponsor.

## *Recommendation 8*

### Facilty (ies)

Beth Israel Medical Center - Petrie Campus (New York County)

### Recommended Action

It is recommended that Beth Israel–Petrie Campus convert approximately 80 detoxification beds to approximately 80 psychiatric beds, provided that the Commissioner of Mental Health and the Commissioner of Alcoholism and Substance Abuse Services approve such changes.

### Assessment

This action will preserve community access to psychiatric beds currently located at Cabrini Medical Center.

## *Recommendation 9*

### Facility (ies)

North General Hospital (New York County)

### Recommended Action

It is recommended that North General Hospital enter into a passive parent corporate relationship with Mount Sinai Medical Center.

## Facility Description(s)

North General Hospital (NGH) is a community hospital in central Harlem in upper Manhattan. It has 200 certified beds, 152 of which were available in 2004.  Sixty-four percent of its certified beds were occupied in 2004. In 2004, the facility had approximately 8,132 discharges and 31,709 emergency department visits. NGH provides inpatient medical surgical, psychiatry and alcohol detoxification services. In 2004, approximately 67% of its discharges were medical/surgical patients, 21% were substance abuse patients and 12% were psychiatry patients.

NGH is a safety net provider.  Medicaid-covered and uninsured patients represented approximately 65% of inpatient cases, and 72% of inpatients live in federally-designated medically underserved areas (MUAs). About 60% of its patients are African-American, and about 40% are Hispanic. NGH's relatively high case mix index reflects the poor health status of its surrounding community.  NGH employed approximately 921 FTEs in 2003.

Following years of clinical affiliations with a variety of partners, NGH entered into an affiliation in 2004 with The Mount Sinai Hospital. The affiliation includes collaborative clinical programs in anesthesiology, cardiology, dentistry, emergency medicine, gynecology, urology, ophthalmology, radiology, general surgery and vascular surgery.

## Assessment

According to the Commission's analytic framework, NGH scored low on quality, viability, availability of services and quality of care. It scored high on service to vulnerable populations. While NGH serves medically underserved communities in Harlem, it is neither the only nor the largest provider of care to these communities. A capacity to close analysis demonstrated that NGH's patients could be served by surrounding hospitals, including Mount Sinai, Metropolitan, Harlem, St. Luke's Roosevelt - St. Luke's Division, NY Presbyterian - Columbia University, and Lenox Hill hospitals. NGH may see increasing competitive pressures when Harlem Hospital completes its renovation and modernization.

NGH suffers from a heavy debt load. Established in 1979, NGH was the last hospital built immediately prior to seriously disadvantageous changes in Medicare's capital reimbursement methodology. As a result, it was overbuilt, and the revenue cannot cover its tremendous debt load. In 2004, the hospital had a long-term debt load of approximately $155 million, $141 million with DASNY. Its debt is secured through a state service contract, so that the State is obligated to pay its debt should the hospital default on payments. Over the years, the hospital has consistently received loans and grants from the State in order to ensure its continued existence.

NGH's new leadership has made significant improvements. While it suffered from annual operating losses between 1996 and 2004, it enjoyed a positive margin in 2005, its first in ten years, and it is projecting a surplus for 2006. NGH claims that the improvements are not a result of one-shot transactions, but rather a result of their comprehensive turn-around plan and clinical affiliation with Mount Sinai. NGH claims that inpatient discharges increased by 30% between 2003 and 2005, emergency department visits increased by 15%, and that concomitantly, average length of stay dropped by 7%.

NGH's relationship with Mount Sinai has benefited NGH by allowing NGH to expand its clinical programs and attract new clinical leaders, including nine new chairs and chiefs and a new chief nursing officer. In 2004, NGH and Mount Sinai received approval to convert existing outpatient departments to diagnostic and treatment centers, which generated additional incremental revenue to support their ambulatory operations. Finally, NGH and Mount Sinai received joint approval for a jointly sponsored diagnostic catheterization laboratory at NGH.

NGH and Mount Sinai together have developed a plan for NGH to form a passive parent relationship with Mount Sinai. The two hospitals would continue to share administrative and information technology services, which will improve North General's bottom line. The two hospitals also proposed to reconfigure their clinical services; potentially relocating Mount Sinai's psychiatric to NGH. Finally, they launched a joint community-outreach and education venture to improve the health status of Harlem residents. Under the proposed passive parent relationship, tertiary referrals would presumably flow from NGH to Mount Sinai. This affiliation would

allow NGH to receive better creditor rates for loans, more competitive prices for goods and services, and improve NGH's leverage in rate negotiations with insurance companies.

The Commission supports NGH's restructuring plan. The recent turnaround spearheaded by NGH's CEO and board is impressive, particularly given its decades of struggle and a heavy debt burden. The proposed relationship with Mount Sinai provides the best possible avenue for the hospital to achieve stability and to advance its mission in Harlem.

## *Recommendation 10*

### Facility (ies)

St. Vincent's Midtown Hospital (New York County)
St. Vincent's Manhattan (New York County)

### Recommended Action

It is recommended that St. Vincent's Midtown Hospital close in an orderly fashion. It is further recommended that approximately 12 psychiatric beds currently operated by St. Vincent's Midtown Hospital be added by St. Vincent Catholic Medical Center system (SVCMC) and operated by St. Vincent's Manhattan, provided that the Commissioner of Mental Health approves such additions.  Should St. Vincent's Manhattan deem that to be impracticable, it is recommended that such 12 psychiatric beds instead be added elsewhere in New York County by another sponsor, provided that the Commissioner of Mental Health approves such additions. It is further recommended that ambulatory care services currently provided by St. Vincent's Midtown Hospital be maintained or developed in this neighborhood by SVCMC or another sponsor.

## Facility Description(s)

St. Vincent's Midtown Hospital is a non-merged affiliate of the St. Vincent Catholic Medical Center; therefore, it is not subject to SVCMC's current bankruptcy proceedings. Located on the west side of midtown Manhattan, the hospital has 250 licensed beds, of which 149 are available. Its occupancy rate based on certified beds is 34%. The hospital's services include adult medical/ surgical care, a small 12 bed psychiatry unit, and an inpatient detoxification program. According to information supplied by the hospital, it had just over 7,100 discharges and approximately 28,000 emergency department visits in 2005. The hospital employed approximately 670 FTEs in 2003.

## Assessment

St. Vincent's Midtown Hospital should close. It is poorly utilized, and area residents are unlikely to receive care at St. Vincent's Midtown, preferring to receive care at its neighboring institutions. The hospital has less than a 10% share of its own primary service area.  According to the hospital, more than 50% of patients served by St. Vincent's emergency department are not Manhattan residents, further evidence of low community dependence.

A quantitative capacity to close analysis showed that the average daily inpatient census of 85 patients could readily be absorbed by the hospital's coverage partners, including the two divisions of St. Luke's Roosevelt, Beth Israel Petrie Division, Mount Sinai, Bellevue, St. Vincent Manhattan, NY Presbyterian/Columbia, and Lenox Hill hospitals.

Patients seen in the St. Vincent's Midtown emergency department could also be absorbed elsewhere within reasonable travel times. According to the hospital, only about 10% of the 28,000 patients that arrive at the St. Vincent's Midtown emergency department are admitted to Midtown. Another 800 are transported downtown to St. Vincent's Manhattan on 12th Street. Furthermore, a major emergency department expansion project at the St. Luke's Roosevelt - Roosevelt Division, which is within ten blocks of St. Vincent's Midtown, will easily accommodate potential patients displaced from a St. Vincent's Midtown closure. The Roosevelt

emergency department is expanding from16, 500 to 27,000 square feet, from 27 to 51 treatment stations, and from a capacity of 54,000 to an estimated capacity of 100,000 visits. The renovation has the potential to include an urgent-care facility to treat the bulk of patients who do not require admission. This expansion will be able to absorb the St. Vincent's Midtown emergency department volume.  Finally, St. Vincent's Midtown's physical plant is inefficient and is spread across two sides of a street.

St. Vincent Midtown had approximately 53,000 outpatient visits in 2004, excluding visits to its methadone programs. The Commission carefully evaluated whether alternate outpatient facilities could absorb St. Vincent's Midtown outpatient visits. St. Vincent Midtown and a federally qualified health center (FQHC) are currently negotiating for the FQHC to assume management of St. Vincent's ambulatory care operations. Furthermore, an additional FQHC is within blocks of the hospital and it too can absorb a significant portion of this volume.

The hospital lost $1 million in 2005 and has very little cash on hand. While St. Vincent's Midtown nears a breakeven operating margin, the SVCMC leadership reported that the service mix currently provided at the site cannot sustain the hospital's viability and solvency. The medical/surgical inpatients generally are low-acuity, and the majority of its detoxification patients could and should be treated in an outpatient setting.

The hospital has approximately $49.8 million in long-term debt, approximately $41 million of which it owes to DASNY. Midtown Manhattan real estate values remain high, particularly in the up-and-coming Clinton neighborhood where the hospital is located, and a sale of the building would cover a complete repayment of its debt. According to system leadership, sale of the St. Vincent Midtown campus would generate approximately $90 million.

SVCMC presented an alternate plan for the Midtown campus. SVCMC proposed to further integrate Midtown with the downtown campus, which itself requires major physical and programmatic reconfiguration, including complete overhaul of its hospital once they emerge from bankruptcy. SVCMC proposes to reconfigure services between its two Manhattan campuses, and to reconstruct the Midtown campus to accommodate fewer inpatient beds, an

ambulatory surgery facility focused on orthopedics, and an emergency department with an expanded urgent care facility. They proposed to reduce medical/surgical capacity from 137 to 56 beds, to transfer 33 psychiatric beds from the St. Vincent's Manhattan (downtown) site to the Midtown site, and to transfer a 20-bed acute rehabilitation unit from the downtown site to the Midtown site to support Midtown's proposed orthopedic program. They would discontinue detoxification services.

Rather than endorse SVCMC's restructuring plan, the Commission recommends that St. Vincent Midtown close. The midtown Manhattan community does not need a 56-bed medical/surgical facility. The surrounding community is not dependent on the hospital. Several comprehensive facilities that serve the same patients can readily absorb Midtown's inpatient and emergency department volume, and are within blocks of the current location.  Additionally, the transfer of psychiatric beds to St. Vincent's Manhattan or another area sponsor will preserve community access to psychiatric beds. There is little demand within Manhattan for another orthopedic specialty hospital, which would have to compete with Hospital for Joint Diseases, the Hospital for Special Surgery, and the comprehensive Orthopedics programs at other academic medical centers. Finally, sponsors have been identified to ensure continuation of outpatient services.

The State should not sustain an unneeded hospital campus in order to shore up another hospital in a system. Sustaining an unneeded hospital is not supportable within the Commission's charge, which specifically targets opportunities to right-size the delivery system in order to best meet community need.

## *Recommendation 11*

### **Facility (ies)**

New York Downtown Hospital (New York County)

## Recommended Action

It is recommended that New York Downtown Hospital decertify approximately 70 medical surgical and 4 pediatric beds, reducing its licensed capacity from 254 to 180. It is further recommended that New York Downtown Hospital discontinue its inpatient pediatric services and that these services be added to other facilities. It is further recommended that New York Downtown Hospital reorganize its outpatient clinics under new sponsorship.

## Facility Description(s)

New York Downtown Hospital, located in the heart of the financial district, is the only community hospital in lower Manhattan. The hospital has 254 certified beds, of which approximately 150 are in service. In 2004, it had a 34% occupancy rate of its certified beds, and 80% of its staffed beds. In 2004, there were approximately 11,306 discharges, 30,409 emergency department visits. According to NY Downtown leadership, the hospital had approximately 100,000 outpatient visits in 2005. The hospital's inpatient services include adult and pediatric medical/surgical care and obstetrics.  More than 40% of inpatient discharges are obstetrics cases. The hospital employed approximately 1,091 FTEs in 2003.

Approximately half the hospital's admissions originate as emergency department visits. As the closest hospital to Manhattan's growing Chinatown, NY Downtown has a 48% market share of this community and approximately 49% of its patients are Asian. Vulnerable populations constitute a substantial portion of the hospital's patients. Forty-seven percent of inpatients are Medicaid-covered or uninsured, and 56% of patients come from medically underserved areas. Patient volume is likely to increase, as the commercial and residential population of this area is growing and multiple construction programs are underway and planned.

## Assessment

NY Downtown Hospital's situation is complex and presents many financial and health delivery challenges. The hospital has a history of operating losses, although the magnitude of these has

been steadily declining since 2003. In 2003, it lost approximately $18 million, in 2004, $15 million, and in 2005, $13 million. NY Downtown projects an operating loss of $9.7 million in 2006 and $7.4 million in 2007. The progressive decline in operating losses has been attributed to management's expense reduction initiatives and the renegotiation of managed care contracts. In 2004, the hospital had long-term debt of approximately $74.6 million, approximately $51 million of which was with DASNY.

Two events severely impacted the hospital's financial standing.  First, as the closest hospital to the World Trade Center site, NY Downtown was heavily impacted by September 11th due to the inaccessibility of the hospital due to the area's security measures. Its admissions did not begin to rebound until 2003.  Second, in 2004, NYU Medical Center severed its sponsorship arrangement with NY Downtown, and once again, NY Downtown's volume of business declined. Today, NY Downtown is affiliated with the New York Presbyterian Health Care system. The volume of admissions is approaching that of 2000, prior to the two events described above.

NY Downtown has a newly renovated $25 million emergency facility designed to serve the urgent and emergency needs of the growing Downtown community. The emergency department is 28,000 square feet, and includes state-of-the-art individual asthma treatment stations, a chest pain emergency unit, a women's health suite, an expanded PromptCare service to expedite care for non-acute patients, and the largest decontamination facility in the City.

The hospital recently sold an adjacent parking lot for $75 million in cash to commercial developers. The hospital used approximately $55 million of this to pay vendors, invest in a major new IT system, settle claims with NYU arising from the dissolution of the previous sponsorship arrangement, and provide additional cash collateral to DASNY; approximately $20 million has not yet been spent.

Nearly 50% of NY Downtown's patients were Medicaid-covered or uninsured in 2004. The majority of the hospital's inpatients are maternity and medical cases, which are neither highly reimbursed nor particularly profitable, and its high-volume emergency department and clinics serve a large uninsured population. Analysis measuring the impact of NY Downtown's closure

demonstrated that its patients could be absorbed by its coverage partners, including Beth Israel's Petrie Division, Bellevue, NYU Tisch, St. Vincent's Manhattan, Maimonides Medical Center, Lutheran Medical Center and NY-Presbyterian Weill Cornell Division hospitals. Notably, while NY Downtown has developed a strong relationship with the Asian community, St. Vincent's Manhattan and Beth Israel, both of which are located in downtown Manhattan, have also successfully reached out to the Asian population.

Quality of care at NY Downtown is improving. In 2004, it was named as one of 100 most improved hospitals by Solucient, and, in 2006, it won first prize in New York State's patient safety award program. The Leapfrog Group has recognized the hospital for its computerized drug prescribing systems.  The medical staff has been strengthened with the recruitment of new physician leadership: a chief medical officer, chiefs of anesthesiology, obstetrics and gynecology, and surgery, and a director of geriatrics.

The Commission carefully reviewed NY Downtown's strategic plan, developed in cooperation with New York Presbyterian Health Care System (NYPHCS), of which NY Downtown is an affiliate. The plan includes achievable initiatives that have the potential to bring the hospital to a break-even position in 2008, including elimination of inpatient pediatrics and consolidation of this service with NYPHCS, and restructure and divestiture of its three outpatient clinics, and without an addition of unneeded tertiary services.

The proposed amalgamation of NY Downtown's pediatric care with that of NYPHCS will improve both NY Downtown's bottom line and its quality of pediatric care.  Second, the proposed financial restructure of the hospital's three outpatient clinics will save NY Downtown approximately $2 million a year. The hospital has approached various community clinics, including the Chinatown Health Clinic, and is exploring several options to restructure its outpatient financing while maintaining access to services. NY Downtown also plans to collaboratively develop with NYPHCS an occupational health and preventive services program in a yet-to-be constructed 25,000 square-foot space adjacent to the hospital.

The Commission rejected the possible closure of NY Downtown Hospital. While lower Manhattan may not require a full-service acute care hospital, the community served by NY Downtown does need access to emergency and ambulatory services. NY Downtown fulfills these needs. The services at NY Downtown, the level of investment in its new emergency department, its dedication to the medically underserved populations of Chinatown and lower Manhattan, the strength of the hospital's strategic recovery plan, and its substantial debt argue for the maintenance of this facility. Financing its closure and the necessary reestablishment of many of its services does not make economic sense.

NY Downtown's challenging financial situation exemplifies the need for systemic reimbursement reform. The conversion of NY Downtown to an emergent/urgent care center with a strong ambulatory care presence might best align community resources and needs. Given the current reimbursement methodology, however, such a conversion would leave the hospital's finances dangerously vulnerable. In order to provide emergency and ambulatory care, a hospital must cross-subsidize these services with acute and/or tertiary services for which there is less demonstrable need. Absent changes in reimbursement, it is not feasible to convert NY Downtown to a more appropriately configured and financially viable facility.

## *Recommendation 12*

**Facility (ies)**

Manhattan Eye Ear and Throat Hospital (New York County)

**Recommended Action**

It is recommended that Manhattan Eye Ear and Throat Hospital downsize all 150 beds.

174

## Facility Description(s)

Manhattan Eye Ear and Throat Hospital (MEETH) provides treatment for diseases of the eye, ear and throat, and also offers plastic and reconstructive surgery. It is one of two such specialty hospitals in New York City. The hospital is licensed for 150 beds, of which 30 are in service. According to the provider, the average daily census is 3 inpatients with a 10% occupancy rate based on available beds. The hospital's primary service is ambulatory surgery, and it performs approximately 50 outpatient surgeries per day.  MEETH provides outpatient clinics in ophthalmology, otolaryngology and plastic surgery.  Eighty-five percent of these outpatient visits are for elective plastic surgery.  The hospital has lost money annually since 1998, and projects a $7.7 million operating loss in 2006.  MEETH employed approximately 241 FTEs in 2003.

## Assessment

MEETH's former board of directors sought to close the hospital in 1999. The MEETH medical staff opposed the closure, and the Office of the New York Attorney General required MEETH to find a new sponsor for the institution. In 2000, Lenox Hill Hospital became MEETH's sponsor, holding typical reserved powers, but each institution has retained separate licensure. Lenox Hill has invested approximately $40 million in MEETH.

Lenox Hill seeks to conclude a full asset merger with MEETH and reconfigure MEETH. Prior to implementing this change, the Office of the New York Attorney General required Lenox Hill to issue a request for proposals from all possibly interested institutions to sponsor or take over MEETH.  While many health systems expressed initial interest, no proposals besides that from Lenox Hill were ultimately submitted. Lenox Hill's plan for MEETH includes the preservation of its outpatient services, the closure of all of its inpatient beds, the sale of part of MEETH's real estate holdings, and the possible lease of space to Calvary Hospital to establish end-of-life cancer services in Manhattan. The Commission supports this direction.

# NEW YORK CITY REGION

# LONG-TERM CARE RECOMMENDATIONS

## *Recommendation 1*

### Facility (ies)

Split Rock Rehabilitation and Health Care Center (Bronx)

### Recommended Action

It is recommended that Split Rock Rehabilitation and Health Care Center close, downsize or convert, contingent on the determination of the Commissioner of Health, after a comprehensive review of the facility in light of the Commission's analytic framework, that such closure, downsizing or conversion would be consistent with the mandate and other recommendations of the Commission.

### Facility Description(s)

Split Rock Rehabilitation and Health Care Center is a 240-bed proprietary residential health care facility that provides baseline services, and has ventilator-dependent beds and an adult day health care program. It had an occupancy rate of less than 93% in 2004. In addition, there have been quality concerns at the facility.

## Assessment

This facility was identified as a facility of interest based on the Commission's criteria. The Commission repeatedly contacted the administrator of this facility, but has received no response to date. Closure, downsizing or conversion may be warranted. The Commissioner's review should be completed by June 30, 2007, and any closure, downsizing or conversion should be completed by June 30, 2008.

## NYC Regional Assessment

After careful review, the Commission concludes that the NYC region does not have a significant excess of nursing home beds. In addition, the prime opportunities for right-sizing in NYC are being completed on a voluntary basis through the State's rightsizing demonstration program.

When evaluating the long-term care delivery situation in New York City, the following facts were considered:

- While the NYC region has roughly one third (38%) of all nursing home beds in the State, it also has around half of the State's population.
- Looking at beds per seniors 1,000 seniors, NYC has 48 beds/1000 while NYS as a whole has 52 beds/1000.
- Four out of five counties (boroughs) that comprise the NYC region, except the Bronx, have bed deficits based on the State's bed need methodology.
- Richmond County (Staten Island) has a calculated need for 295 additional beds and its existing beds are over 96% occupied. Additionally, Staten Island is among the fastest growing counties in the State, with a projected population increase of 42% over the next 30 years.
- Queens County has a calculated need for over 1,700 beds. Queen County is also projected to grow rapidly, by over 30% in the next 30 years. Within Queens, there may be some

excess beds concentrated in the Far Rockaways section. The Commission assessed selected facilities in the Rockaways that are implementing needed turn-around plans.

- New York County (Manhattan) has a documented need for 733 additional beds and an occupancy rate of over 97%. Manhattan nursing homes do have a relatively high proportion of low acuity residents but the cost of real estate in Manhattan generally makes the creation of ALPs unaffordable.

- Kings County (Brooklyn) has a documented need for 938 additional beds. Two Brooklyn facilities are under investigation by the State Attorney General and their future is uncertain; their closure could further exacerbate the shortage.

- On paper, Bronx County has a documented excess of over 2,000 beds and provides over 86 beds per 1,000 seniors. However, Bronx beds are 97% occupied, which is one of the highest average occupancy rates in the entire State. There were no Bronx-based facilities that performed especially poorly across the Commission's review criteria.

Furthermore, activities within the NYC market independent of the Commission are rightsizing the region's nursing home bed supply. Specifically:

- Florence Nightingale Health Center in Manhattan recently closed in 2005. Its closure removed 561 beds from the region's supply.

- Menorah Home and Hospital for the Aged and Infirm (Bushwick) in Brooklyn recently closed in 2005. Its closure removed 206 beds from the region's supply.

- A nursing home in Brooklyn is planning to close within months. Its closure will remove 45 beds from the region's supply.

- In Round 1 of the State's Nursing Home Rightsizing Demonstration, NYC-based facilities decertified 571 beds, or 80% of the total beds decertified statewide.

  o Terence Cardinal Cooke Health Center in Manhattan decertified 156 beds

  o Beth Abraham Health Services in the Bronx decertified 72 beds

  o Cobble Hill Health Center in Brooklyn decertified 156 beds

  o Menorah  Nursing Home in Brooklyn decertified 21 beds

  o Metropolitan Jewish Geriatric in Brooklyn decertified 156 beds

  o Rutland Nursing Home in Brooklyn decertified 10 beds

178

- Nursing homes in the NYC region have applied in Round 2 of the State's Nursing Home Rightsizing Demonstration. If approved, these applications would decertify additional beds from the region's supply and create additional LTHHCP and ALP slots.

# NORTHERN REGION

# ACUTE CARE RECOMMENDATIONS

## *Recommendation 1*

### Facility (ies)

Bellevue Woman's Hospital (Schenectady County)

### Recommended Action

It is recommended that Bellevue Woman's Hospital close in an orderly fashion. It is further recommended that Bellevue Woman's Hospital's maternity, neonatal, eating disorders, and mobile outpatient education and screening services be added to another hospital in Schenectady County.

### Facility Description(s)

Bellevue Woman's Hospital is one of two remaining not-for-profit women's specialty hospitals in the nation, and the only one in the State. It has 55 certified beds, 40 of which were staffed in 2004.  Its average daily census was 22 patients in 2004. Its chief service line is low-risk obstetrics. It had approximately 2,200 deliveries in 2004. It also had approximately 2,000 ambulatory surgeries in 2004, and houses breast and pelvic care health centers. Bellevue has partnered with a local mental health provider and the local medical college to train specialists in eating disorder treatment. It does not offer high-risk maternity care, medical surgical care, or emergency services. Eighteen percent of Bellevue's patients in 2004 were Medicaid-covered.

**Assessment**

The hospital's financial situation is dire and its future viability is in serious jeopardy. It has a substantial debt load and its business model is dependent on the provision of poorly-reimbursed obstetrical services. As of 2004, the hospital's (non-DASNY) long- term debt was approximately $15.5 million. Bellevue has tried to address its financial problems by diversifying the hospital's service base and securing philanthropic support. These measures, however, have proven to be insufficient.  Financial statements for 2004 and 2005 indicate a negative net worth, significant debt, and losses from operations.  The hospital's net deficits at the end of 2004 and 2005 were respectively $1.192 million and $1.320 million, and its total deficit as of the end of 2005 was $17.690 million.  Additionally, Bellevue is unaffiliated with any other hospitals or systems that could provide substantial financial or management assistance to improve the current financial situation.

A capacity to close analysis confirms that Bellevue's patients readily could be absorbed by its coverage partners, including St. Clare's, St. Peter's Albany and Albany Medical Center hospitals. Provided that its distinctive level II neonatal intensive care and an eating disorder program services are transferred to one of the other area hospitals, Bellevue's closure will not affect availability of care. Furthermore, most complicated obstetric and neonatal cases are already diverted to the larger area hospitals, so closing Bellevue will not affect provision of these more high-tech services.

Consolidation of services offered by Bellevue with another area hospital will have quality of care and financial benefits. Consolidating all of Schenectady institutions' deliveries (approximately 3,000 annual births in 2004) into a single area hospital would allow investment in a more comprehensive neonatal intensive care unit than is currently offered by Bellevue. Its closure will also improve the viability of the remaining hospitals in Schenectady by allowing them to capture Bellevue's patient base, a high percentage of which is privately insured.

Bellevue employed approximately 275 FTEs in 2003, which was less than 0.5% of the workforce in Schenectady County. If Bellevue closes, its employees will be easily employed by other

institutions because the elimination of services at Bellevue will be accompanied by a transfer of its services elsewhere in the area.

## *Recommendation 2*

### Facility (ies)

St. Clare's Hospital (Schenectady County)
Ellis Hospital (Schenectady County)

### Recommended Action

It is recommended that St. Clare's Hospital and Ellis Hospital be joined under a single unified governance structure with full authority to restructure the hospitals, rationalize bed and clinical capacity, minimize duplication of services and capital investment, and develop an integrated health care delivery system. It is further recommended that the resulting entity downsize from 568 beds to between 300 and 400 beds, representing a downsizing of between 168 and 268 beds. It is further recommended that the Commissioner refrain from either approving any applications that have been or will be filed by either facility or providing any other consent requested by either facility, prior to the execution by the facilities of a binding agreement to join under a single unified governance structure, except where such approval or consent is necessary to protect the life, health, safety and welfare of facility patients, residents or staff. If St. Clare's and Ellis Hospitals fail to execute such an agreement by December 31, 2007, it is recommended that the Commissioner of Health close one of the facilities and expand the other to accommodate the patient volume of the closed facility.

### Facility Description(s)

Ellis Hospital is a community hospital in Schenectady, located in close proximity to St. Clare's Hospital. Ellis Hospital has 368 certified beds, of which 272 were staffed in 2004. Its average

daily census was approximately 256. Seventy-one percent of its available beds were occupied in 2004. It provides medical/surgical, emergency, inpatient psychiatric, and outpatient services. Its services include a stroke program, cardiac catheterization, angioplasty, and cardiac surgery. It eliminated its obstetrical services in 2000. Ellis has approximately 33,000 emergency room and 34,000 outpatient visits in 2004. Eight percent of its patients were either covered by Medicaid or uninsured in 2004, and its uncompensated care cost is estimated to have cost the hospital $3.4 million in 2004. Ellis employed approximately 1,550 FTEs in 2003, which was just over 2% of the workforce in Schenectady County. There are 82 skilled nursing facility (SNF) beds located within the hospital plant.

After several years of negative balances, Ellis's financial situation improved, and it now enjoys a positive operating margin. In 2004, Ellis spun off a primary care clinic and re-established it as a federally qualified health center (FQHC) to take advantage of FQHC's higher reimbursement rates. Ellis also reduced the number of its full-time equivalent employees. Ellis carried a substantial debt load of approximately $37.9 million in 2004, $33.2 million of which is with DASNY.

St. Clare's Hospital is a Catholic community hospital with 200 certified beds, of which, according to the hospital, 118 are staffed. Its average daily census was 84 in 2004. It offers medical/surgical, emergency, and obstetric services, as well as a 6-bed geriatric unit and an outpatient sleep disorders unit. St. Clare's has approximately 38,000 emergency department and 51,000 outpatient visits per year. St. Clare's Hospital employed approximately 921 FTEs in 2003, which was just over 1% of the workforce in Schenectady County.

St. Clare's is the main safety net provider in Schenectady. Twenty percent of its inpatients are either covered by Medicaid or uninsured. St. Clare's uncompensated care cost in 2004 is estimated to have cost the hospital $7.6 million.

The service and payor mix at St. Clare's has placed the hospital in financial jeopardy. St. Clare's operating margin in 2004 was -5%. In 2004, it carried only $4.5 million of (non-DASNY) debt; however, its pension plan is underfunded by $27 million. The hospital has little cash. It has

183

limited ability to make the kinds of future investments that are required for it to remain competitive and efficient.

## **Assessment**

Both Ellis and St. Clare's are underutilized. With adequate preservation of the core services provided by St. Clare's to underserved populations, a consolidation of the two hospitals will reduce costly duplication of services and create efficiencies. These savings could be re-invested in other needed services such as primary and preventive care. The efficiencies to be derived by consolidating the expertise of St. Clare's in the delivery of high-volume, low-reimbursement services with Ellis' expertise in the delivery of more specialized, high-reimbursement services will allow greater cross-subsidization, thereby ensuring the ongoing stability of essential services.

The care provided by both Ellis and St. Clare's hospitals is generally adequate. Ellis's stroke and heart attack care is excellent. The consolidation of Ellis and St. Clare's likely will improve the quality of heart attack and heart failure care at both facilities.  Similarly, a stronger relationship between the geriatric acute care unit at St. Clare's and Ellis' residential health care facility will improve the area's quality of elder care.

Absent a consolidation of Ellis and St. Clare's, competition between the two major hospitals in Schenectady will continue to erode and destabilize both hospitals. Both hospitals will face mounting financial difficulties, which will likely culminate in the bankruptcy and/or closure of one or the other. A failure to unite the hospitals will necessitate further, otherwise unnecessary infusions of capital, most likely from the State, as private lenders are unlikely to be willing to invest in such an unstable market.

There should be only one hospital or health system providing inpatient care in Schenectady county. The consolidation of Ellis and St. Clare's will improve the viability of both hospitals, support improvements in quality of care, minimize the need for State subsidy, eliminate the duplication of services between those entities and allow services to be rationalized between the

two campuses.  This consolidation will reduce costs by eliminating the excess capacity at both campuses, and propel the reuse and conversion of the facilities and capital resources to more appropriate uses.

# NORTHERN REGION

# LONG-TERM CARE RECOMMENDATIONS

## *Recommendation 1*

### Facility (ies)

Ann Lee Infirmary and Albany County Home (Albany)

### Recommended Action

It is recommended that Ann Lee Infirmary and Albany County Home merge, downsize by at least 345 RHCF beds, rebuild a unified facility, and simultaneously add or contractually provide financial support for non-institutional services.

### Facility Description(s)

Both Ann Lee and Albany County Home are residential health care facilities owned and operated by Albany county. Ann Lee has 175 certified beds, and Albany County Home has 420 certified beds. Both facilities have low occupancy. According to the County, Albany County Home currently occupies only 60% of its beds in 2003, and Ann Lee occupies 91% of its beds. The homes have been operating with substantial financial losses for several years. The County reports having provided more than $5 million in 2005 to subsidize these facilities.

The facilities raise quality of care concerns. According to recent State surveys, Albany County Home had 14 deficiencies and 1 citation for actual harm, and Ann Lee had 5 deficiencies with 1 citation for actual harm. Ann Lee's case mix index from 2003 (0.87) was the lowest in the State.

186

This low CMI has a tremendous impact on the facility's revenue. If Ann Lee merges with Albany County Home, Ann Lee's CMI and revenues will increase.

**Assessment**

The County of Albany has a low nursing home occupancy rate (93% in 2004). In addition, nursing homes in the county of Albany lose residents to those facilities in Saratoga County.

Merging Ann Lee and Albany County Home will ameliorate problems associated with the low occupancy of the two facilities. Both facilities are old and out-of-date, and are unsuitable for modern skilled nursing care. Amalgamating the two homes will enable the newly constructed facility to use capital funds more resourcefully. A new facility with a regionally appropriate bed count will improve quality of care and the financial standing of both the newly merged facility and the County, which will no longer have to subsidize two inefficient facilities.

## *Recommendation 2*

**Facility (ies)**

The Avenue and The Dutch Manor (Schenectady County)

**Recommended Action**

It is recommended that The Avenue and The Dutch Manor merge and downsize both facilities by approximately 48 RHCF beds to approximately 200 RHCF beds in a rebuilt Avenue facility. It is further recommended that the merged entity add a 50-bed ALP, a 25-slot ADHCP and possibly other non-institutional services in a renovated Dutch Manor facility.

## Facility Description(s)

The Avenue and The Dutch Manor are owned and operated by an eight-facility proprietary group. The group runs five facilities in the Northern region.  The Avenue is a 224-bed residential health care facility and the Dutch Manor is an 86-bed facility.  Both provide baseline services and sub-acute care.

These facilities are located a short distance from each other. Both have weak occupancy. In 2003, the Avenue occupied approximately 48% of its beds, and the Dutch Manor occupied approximately 78% of its beds.

The Avenue has suffered from significant operating losses for the last several years.  Approximately 20% of its residents were low-acuity in 2003.  Its quality has varied over the years.  In its latest survey, the Department of Health cited three deficiencies, including one for actual harm.  It is housed in a building from the 1950s, and past scandals have hurt its reputation.

The Dutch Manor, on the other hand, attracts a good private pay market and is profitable.  It is housed, however, in an old building that is less than optimal for current skilled nursing care.

## Assessment

As with most areas of New York State, Schenectady has enough nursing home beds but insufficient non-institutional alternatives.  The Commission calculates that approximately 32 current Schenectady nursing home residents can be cared for in an ALP.  Availability of ALP beds will reduce current and future need for skilled nursing beds.

The owner of The Avenue and Dutch Manor nursing homes stated that the homes will submit a certificate of need application to the State for a single replacement facility of both facilities, with an amalgamated downsizing by 68 beds.  In addition, the Dutch Manor would need to be renovated to be suitable for an ALP.

## *Recommendation 3*

### Facility (ies)

Glendale Home (Schenectady County)

### Recommended Action

It is recommended that the Glendale Home downsize by approximately 192 RHCF beds to approximately 168 RHCF beds to be operated in the newest building.

### Facility Description(s)

Glendale Home is a residential health care facility owned and operated by Schenectady County. It provides baseline services and some short-term care. The home decertified 168 beds in 2002 resulting in a certified capacity of 360 beds, staffing only 305. Approximately 87% of its certified beds were occupied in 2003.

Glendale Home faces many challenges. Its occupancy is low, which is driven by competition in its geographic area. The facility operates at a substantial operating loss, which the County is required to subsidize. The subsidy in 2005 was $6.4 million, which accounted for 22% of the home's operating budget. The facility had a high case mix index in 2003 (1.10), and correspondingly relatively few of its residents are low-acuity. The home, however, has had quality issues, including 10 deficiencies and two immediate jeopardies in its last survey.

The facility now operates beds in two of its three buildings, one with 137 beds and built in 1934, and one with 168 beds, built in 1979. The remaining building, built in 1960, has no beds, and is instead used for administrative and support services. Much of this building stands vacant.

**<u>Assessment</u>**

The Glendale Home is having difficulty filling its beds with appropriate residents given its large size.  Furthermore, a large number of Schenectady residents seek long-term care in neighboring Saratoga County, which has just received approval for two new facilities. Potential Glendale Home residents also seek care in Albany and Rensselaer counties.

This plan to downsize Glendale Home will use the resources available on its existing campus, which will minimize the dislocation of current residents and mitigate any potentially negative impact on long-term care services in Schenectady County.

# WESTERN REGION

# ACUTE CARE RECOMMENDATIONS

## *Recommendation 1*

### Facility (ies)

Millard Fillmore Hospital – Gates Circle (Erie County)

### Recommended Action

It is recommended that Millard Fillmore Hospital – Gates Circle close in an orderly fashion. It is further recommended that Millard Fillmore Hospital – Gates Circle's 75 RHCF beds be preserved and transferred to DeGraff Memorial Hospital.

### Facility Description(s)

Millard Fillmore Hospital - Gates Circle is a 189-bed, acute care hospital, and is a member of the Kaleida Health Care System. It provides emergency, medical/surgical and outpatient care. Gates Circle has specialized programs in neurology and stroke care, and is a designated stroke center in the Western Region. Gates Circle had approximately 7,800 discharges and 18,000 emergency department visits in 2004. Medicaid-covered and uninsured patients represented 10% of total discharges. Approximately 26% of inpatients live in medically underserved areas. Gates Circle also houses 75 skilled nursing facility beds, which offers subacute short-term rehabilitation care.

**<u>Assessment</u>**

Erie County, in which Millard Fillmore Hospital – Gates Circle is located, has substantial excess inpatient capacity. The greater Buffalo metropolitan area and Erie County's population continues to shrink.  Erie County's population is projected to further decline by 15% between 2000 and 2030. Erie County's inpatient capacity, however, has not correspondingly dropped. As a result, there are numerous underutilized facilities in the Buffalo area. To preserve competitive market balance, it is essential that both of the region's two major hospital systems – Kaleida Health and Catholic Health System – participate in downsizing their facility infrastructure.

Within the Kaleida System, Millard Fillmore Hospital – Gates Circle has been identified as the optimal candidate for closure. Among the Kaleida System hospitals, the Gates Circle campus is outdated and in need of extensive capital upgrades. It is underutilized, and had an occupancy rate of 59% of certified beds in 2004. Analysis measuring Gates Circle's capacity to close indicated that all of its patients could be readily absorbed by its coverage partners, which include Buffalo General (also a Kaleida member), Erie County Medical Center, Sisters of Charity Buffalo, and Kenmore Mercy hospitals.

The hospital's long term debt is part of Kaleida Health 's $191 million indebtedness, including $155 million that is DASNY and HUD insured. Following consecutive losses in its first five years as a system, Kaleida Health had a positive and growing bottom line for the past three years. In 2005, Kaleida Health posted a $26 million profit on $935 million in revenues. Of those amounts, Millard Fillmore-Gates Circle contributed a $14 million surplus on revenues of $170 million. The remaining $12 million surplus was spread across the systems' other four hospitals and its nursing facilities.

## *Recommendation 2*

### Facility (ies)

St. Joseph Hospital of Cheektowaga, New York (Erie County)

### Recommended Action

It is recommended that St. Joseph Hospital of Cheektowaga close in an orderly fashion.

### Facility Description

St. Joseph Hospital of Cheektowaga, New York is a 208-bed acute care hospital, and a member of the Catholic Health System – Buffalo Hospital System. It provides emergency, medical/surgical, and outpatient care. The hospital had approximately 5,842 discharges and 22,477 emergency department visits in 2004. Medicaid-covered and uninsured cases represented just 5% of discharges, and 4% of patients came from medically underserved areas in 2004. St. Joseph's had a 3.4% operating margin in 2003. The hospital has $3.3 million of (non-DASNY) long-term debt. St. Joseph employed approximately 555 full time equivalent employees in 2003.

### Assessment

As noted above, Erie County is substantially over-bedded and presents major opportunities for each of the major systems to downsize and reconfigure acute care services. Within the Catholic Health System, the underutilized St. Joseph Hospital has been identified as the optimal candidate for closure. St Joseph Hospital and Sisters of Charity Hospital, another member of the Catholic Health System, are less than 6 miles apart. Both of these hospitals have occupancy rates of less than 50% based on licensed beds. St. Joseph filled approximately 44% of its licensed beds and 58% of its available beds in 2004. Analysis performed by the Commission indicates that St. Joseph's patients could readily be absorbed by the hospital's coverage partners, which include Mercy Hospital and Sisters of Charity Hospital, which are both members of the Catholic Health

193

System, and by Millard Fillmore Suburban Hospital, Buffalo General Hospital, and the Erie County Medical Center. St. Joseph does not provide unique services and is not a major provider of care to vulnerable populations.

The Catholic Health System has developed creative and productive alternate uses for decommissioned hospitals and there may be potential to redevelop the St. Joseph site. Catholic Health System, for example, has worked with the New York State Department of Health to develop its Mercy Ambulatory Care Center (MACC) program in Orchard Park. The MACC has an emergency room and two inpatient beds for patients who require up to 36-hour length of stay. The campus also includes physician offices, a laboratory, x-ray machines, a pharmacy, and a diagnostic testing facility.  Not all providers on the campus are part of the CHS; in fact, many are simply tenants in the facility's "medical mall."

## *Recommendation 3*

### **Facility (ies)**

DeGraff Memorial Hospital (Niagara County)

### **Recommended Action**

It is recommended DeGraff Memorial Hospital downsize all 70 medical/surgical beds and cease operation as an acute care hospital.  It is further recommended that DeGraff Memorial Hospital convert completely to a Residential Health Care Facility encompassing its existing 80 RHCF beds and the 75 RHCF beds to be transferred from Millard Fillmore Hospital- Gates Circle.

### **Facility Description(s)**

DeGraff Memorial is a 70-bed acute care hospital, and a member of the Kaleida Health Care System. It provides emergency and medical/surgical care. It also houses an 80-bed skilled

nursing facility unit. DeGraff provided nearly 3,000 discharges and approximately 7,500 emergency department visits in 2004. 7% of its inpatients were Medicaid-covered or uninsured in 2004, and 2% of patients came from medically underserved areas.

**Assessment**

Using the Commission's framework criteria, DeGraff Memorial performed poorly on quality, viability, and availability of services. Analysis performed by the Commission indicated that its average daily census of 46 acute patients could be readily absorbed by the hospital's coverage partners, which include Kenmore Mercy, Millard Fillmore Suburban, Buffalo General, Saint Mary's, Erie County Medical Center, Sisters of Charity, Millard Fillmore and Women and Children's hospitals. The hospital's long term debt is reported with that of the Kaleida system.

There is an excess of medical/surgical beds in the Western region, and patients' access to care will not be compromised if DeGraff closes. Given the ready access to more comprehensive services at neighboring hospitals, there is no need for the medical/surgical component of DeGraff. However, as described in the long term care report, DeGraff operates a well-utilized skilled nursing facility that should be maintained. The occupancy of its SNF is 97%. DeGraff's physical plant is in good condition. The conversion of DeGraff to a long-term care facility will mitigate the effects of its closure as an acute care facility, and will enable the provision of needed long-term care services in the Buffalo metropolitan area.

## *Recommendation 4*

**Facility (ies)**

Sheehan Memorial Hospital (Erie County)

## Recommended Action

It is recommended that Sheehan Memorial Hospital be maintained as an Article 28 provider. It is further recommended that 69 medical/surgical beds at Sheehan Memorial hospital be downsized. It is further recommended that 22 inpatient detoxification beds currently at Erie County Medical Center be transferred to Sheehan Memorial Hospital, provided that the Commissioner of Alcoholism and Substance Abuse Services approves such transfers. It is further recommended that Sheehan Memorial Hospital enhance its community based ambulatory care services, be licensed to provide methadone maintenance, and be licensed as an Article 31 provider of outpatient psychiatric services, provided that the Commissioner of Alcoholism and Substance Abuse Services and Commissioner of Mental Health approve such actions.

## Facility Description(s)

Sheehan Memorial Hospital is a safety net provider, and is located in a poor, underserved community in downtown Buffalo. Although it is licensed for 109 total beds, 69 medical/surgical beds were taken out of service in 2003. It currently operates 30 substance abuse rehabilitation beds and 10 medically managed detoxification beds. As part of its restructuring plan, Sheehan also closed its emergency room.

Sheehan operates at 90% occupancy of its staffed beds. It offers adult and pediatric primary care, diagnostic services, radiology, and has specialty clinics in gynecology, cardiology, orthopedics, pulmonary care, urology, general surgery, and podiatry. Sheehan had approximately 1,100 discharges in 2004. Its current ambulatory care volume is approximately 11,500 visits. With approximately 240 full-time equivalent employees, Sheehan is an important employer in its community and its large campus serves as a neighborhood anchor.

Sheehan is successfully executing a turnaround plan. Sheehan first entered chapter 11 bankruptcy protection in 2002. Following continuing financial and leadership problems, Sheehan reconstituted the Board under new leadership, and again sought chapter 11 bankruptcy protection in 2004**.** Sheehan has since engaged a new chief executive officer, entered into collaborative

relationships with Grace Manor Nursing Home and Kaleida Health, and cut costs by half. After suffering from yearly deficits, Sheehan posted a nearly $4 million surplus in 2005. Sheehan expects to emerge from bankruptcy in 2006 with a remaining $4 million debt service. It has virtually no pension obligations.

Built in 1976, Sheehan is among the newer hospitals in Erie County. The physical plant is in relatively good condition. One of its five floors that had housed medical/surgical beds is currently vacant.

## Assessment

Sheehan has voluntarily downsized and reconfigured its services to align with the greatest needs of its community: substance abuse treatment and outpatient services. The closure of its emergency room and medical/surgical beds reduced duplicative services that are now provided by more comprehensive nearby facilities. The refocused Sheehan fills a critical need. In Erie County, Sheehan provides 38% of drug detoxification and rehabilitation services and 44% of hospital inpatient substance abuse services. Residents of Sheehan's service area are 2.3 times more likely to be admitted to substance abuse treatment programs than the County's residents as a whole.

It is feasible to close Sheehan. Sheehan has low utilization and is financially vulnerable. Its inpatients could be absorbed by its principal coverage partner, Erie County Medical Center. Sheehan is small and is not formally linked to a larger partner or system.

However, there are compelling reasons why Sheehan should remain open and be strengthened. Sheehan offers accessible, culturally competent primary and specialty care to a poor, underserved community whose members have higher rates of morbidity than Erie County residents as a whole. Seventy-nine percent of Sheehan's patients are minorities. One third of Sheehan's service area residents live in poverty, compared to 12% for Erie County as a whole. Forty percent of Sheehan's patients do not use a car as their primary means of transportation; many walk to Sheehan for care. Sixty-eight percent of Sheehan's detoxification/rehabilitation

197

patients have at least one physical co-morbidity, including cardiovascular disease, asthma, diabetes, hypertension, cancer or HIV.

Of the two inpatient substance abuse providers in Erie County, Sheehan and Erie County Medical Center(ECMC), only Sheehan is operating at capacity. At ECMC, substance abuse services are a minor component of the hospital's overall mission. The transfer of Erie County Medical Center's 22 detoxification beds to Sheehan would give patients the benefit of a comprehensive, focused, high quality program in a facility where substance abuse treatment is the major service line.

Sheehan is a vital provider of services to a community with severe health care needs. Following years of mismanagement, the current board and executive leadership is capable and committed. With a consolidation of substance abuse services and expansion of outpatient care, Sheehan provides access to health care for disadvantaged patients and is a public health asset worth preserving.

## *Recommendation 5*

### Facility (ies)

Erie County Medical Center/Erie County Medical Center Corporation (Erie County)
Buffalo General Hospital/Kaleida Health (Erie County)

### Recommended Action

It is recommended that the facilities controlled by the Erie County Medical Center Corporation and Kaleida Health be joined under a single unified governance structure under the control of an entity other than Erie County Medical Center Corporation, Kaleida Health, or any other public benefit corporation. It is further recommended that this entity consist of a reconstituted single

board including representation of Kaleida Health, the Erie County Medical Center Corporation, the University at Buffalo School of Medicine and Biomedical Sciences, and community leaders. If the Commissioner of Health determines that the single board proposed by the member entities does not meet these requirements, it is further recommended that the Commissioner of Health alter the composition of the board to satisfy these requirements. It is further recommended that this entity have unified management with powers sufficient to compel the service mix provided at any of the individual institutions under its control.  It is further recommended that the joined entity utilize existing infrastructure to the extent possible to consolidate all necessary services into clinical centers of excellence, including tertiary, quaternary, psychiatric, and long term care services. It is further recommended that the joined entity develop new infrastructure in which to locate comprehensive heart and vascular services.  It is further recommended that the Commissioner of Health:

(i)     Refrain from either approving any applications that have been or will be filed by either entity or providing any other consent requested by either facility, prior to the execution by the facilities of a binding agreement to join under a single unified governance structure pursuant to the terms of this recommendation, except where such approval or consent is necessary to protect the life, health, safety and welfare of facility patients, residents or staff;

(ii)    If Kaleida Health and Erie County Medical Center Corporation fail to execute such an agreement by December 31, 2007, close either Buffalo General Hospital or Erie County Medical Center and expand the other to accommodate the patient volume of the closed facility; and

(iii)   Present to the State Legislature any necessary draft legislation in a time and manner sufficient to implement this recommendation by June 30, 2008.

**Facility Description(s)**

Erie County Medical Center (ECMC) is a 550-bed hospital sponsored by a public benefit corporation established in 2004. The hospital is situated on 67-acre, largely undeveloped campus. ECMC provides comprehensive acute care services, including level I trauma, burn care, kidney transplant, psychiatry, physical medicine/rehabilitation, and detoxification services.

ECMC has one of the highest case mix indexes of all New York State hospitals. According to ECMC leadership, ECMC had approximately 12,000 discharges and 48,000 emergency department visits in 2005. Its numerous outpatient clinics had approximately 243,185 visits in 2004. ECMC serves a large number of indigent patients; approximately 25% of its inpatients were Medicaid-covered or uninsured in 2004, and 25% of its patients live in medically underserved areas. ECMC reports that approximately 70% of its 505 available beds are occupied. ECMC's main campus has 125 skilled nursing facility beds. In addition, ECMC operates the Erie County Home, a 586-bed skilled nursing facility.  Virtually all of the nursing home beds operated by ECMC are occupied. ECMC has $106 million in long-term debt, most of which is secured by the County. ECMC has approximately 2,787 full-time-equivalent employees.

Recently resolved litigation required that the County subsidize ECMC through 2008. The amount of this subsidy decreases each year: $28 million in 2004, $19 million in 2005, $20 million in 2006, $14 million in 2007. After 2008, the County will provide ECMC with $8 million annually as debt service coverage. ECMC finished in the black including the subsidy in 2005. It is projecting a surplus in 2006 of approximately $16 million.

Buffalo General Hospital (BGH) is a 501-bed member of the Kaleida Health Care System. BGH is located on the Buffalo Niagara Medical Campus, a densely developed site that also houses the Roswell Park Cancer Institute and other research institutions. BGH is the focal point for Kaleida's development of high-tech, tertiary care services. It provides comprehensive medical/surgical, psychiatry and physical medicine/rehabilitation services. It had approximately 17,000 discharges and 38,000 emergency department visits in 2004. Nineteen percent of BGH's inpatients were Medicaid-covered or uninsured in 2003, 23% of its patients live in medically underserved areas. The hospital reports an occupancy rate of 67% of its 501 available beds. BGH's long-term debt is reported together with other components of the Kaleida System. BGH has approximately 2,300 full-time-equivalent employees. Since its founding seven years ago, the Kaleida system has voluntarily decertified 638 beds and eliminated more than 1 million square feet of space.

**Assessment**

This recommendation is partly shaped by the particularities of Erie County and the Buffalo metropolitan area, including:

- The county is over-bedded, with more inpatient capacity than is required to meet the health care needs of its shrinking population.
- There is duplication of costly tertiary and quaternary services. Redundancy of these services reduces quality of care due to insufficient patient volume.
- Access to critical services, including psychiatry, trauma and burn care, must be maintained.
- There must be sufficient graduate medical education capacity to strengthen the academic mission of the University at Buffalo School of Medicine and ensure an adequate future supply of physicians.
- Erie County and the City of Buffalo both face serious economic challenges. Economic control boards oversee their finances.

A comprehensive plan to reconfigure service delivery in Buffalo must address ECMC. ECMC is burdened with substantial legacy costs from its establishment as a public benefit corporation (PBC) and from high fringe benefit costs embedded within its labor contract with a public employees union. When the Erie County Medical Center Corporation was launched in January 2004, it took over a large healthcare network that serves as the primary safety net provider to residents of Erie County.

The public benefit corporation was established with the assumption that it would provide area residents with quality health care, while reducing the fiscal burden on County taxpayers which in the six years ending in 2003, totaled $119 million in subsidies.  Unfortunately, the public benefit corporation model did not resolve the financial crisis for the County. The Office of the Comptroller of NYS criticized the way in which ECMC was created, finding that Erie County had followed the same unsuccessful model used by Nassau and Westchester Counties, i.e., taking a public hospital that was losing significant amounts of money and encumbering it with

significant new debt, and setting it up as an independent agency with no specific new revenue or operational initiatives that would help it achieve self-sufficiency.

Erie County Medical Center and Buffalo General Hospital are both vital components of the local health care delivery system. Analysis of patient discharge data reveals that ECMC and BGH are each other's principal coverage partners. Each of these large facilities provides basic and high-tech services. They are both major teaching facilities for the State University of New York at Buffalo.

As competing institutions, the resources of ECMC and BGH are not leveraged in the most effective manner to benefit the community, contain costs, and drive improvements in quality of care. After considering numerous scenarios for the reorganization of services at ECMC and BGH, the Commission finds that combining ECMC and Kaleida into a new, not-for-profit entity with one board and chief executive is the optimal approach for the people of Erie County. A single entity will be able to reduce duplication of services, enhance quality of care, maintain the provision of public goods, reduce costs, preserve employment, and support an academic mission. While imperfect, the Commission further finds that this approach entails fewer risks, is less disruptive, and can be achieved at lower cost than other proposals that were considered.

ECMC and Kaleida themselves attempted to forge a combined entity on a voluntary basis. This effort broke down due to labor issues involving public and non-public employees and difficulties involved in working within a public benefit corporation structure. However, such a combined entity offers numerous advantages. It makes effective use of scarce resources because it does not demolish and rebuild infrastructure that already exists. The plan protects public goods currently provided by the facilities. The plan also maintains critically needed residency training slots that could otherwise be at risk. The facilities will be retained, maintaining a range of services for the community and preserving jobs. The public benefit corporation, however, would be dissolved, freeing the resulting new entity to compete in the market without the overhead imposed by its debt and excess labor costs.

There are complex challenges involved in dissolving a public benefit corporation and resolving the legacy issues at ECMC. Implementation of this recommendation may require statutory change by the legislature. Any substantive plan for reconfiguring service delivery in Erie County, however, must grapple with ECMC and confront the governance and labor challenges posed by the facility. Failure to do so is an unacceptable lost opportunity.

## *Recommendation 6*

### Facility (ies)

Lockport Memorial Hospital (Niagara County)
Inter-Community Memorial Hospital at Newfane (Niagara County)

### Recommended Action

It is recommended that Lockport Memorial Hospital and Inter-Community Memorial Hospital at Newfane engage in a full asset merger and reconfiguration of services.

### Facility Description(s)

Lockport Memorial Hospital has 134 licensed beds,and a 2004 average daily census of 71 patients. It provides medical/surgical, pediatric, obstetric, drug and alcohol rehabilitation, and outpatient services. It had approximately 4,691 discharges and 14,935 ED visits in 2004. Approximately 11% of inpatients were Medicaid-covered or uninsured in 2004. Its 2004 operating margin was -1%, and the hospital has reported a positive operating margin for 2005. Lockport has $12 million in long-term debt, $8.8 million of which is secured by DASNY and the federal Department of Housing and Urban Development.

Inter-Community Memorial at Newfane has 71 licensed beds, of which it staffs 51. Average daily census in 2004 was 32 patients. It provides medical/surgical, obstetric, pediatric, and

outpatient care. It had approximately 2,565 discharges and 7,837 emergency department visits in 2004. 14% of inpatients were Medicaid-covered or uninsured in 2004. Inter-Community's operating margin since 1994 has been positive. Inter-Community's 2004 operating margin was 1%. Inter-Community has approximately $5.3 million in (non-DASNY) long-term debt.

## Assessment

Lockport Memorial and Inter-Community Memorial hospitals entered into an affiliation in 2000. Inter-Community helped stabilize Lockport's finances, and has since granted Lockport approximately $2 million in assistance. The two hospitals are controlled by a unregulated, passive parent, the Eastern Niagara Health System. They share a single executive staff and have consolidated certain operations, such as one clinical laboratory. There is some overlap between their medical staffs. Collectively they report achieving $1.8 million per year in savings through by having consolidated their operations.

The hospitals are approximately 10 miles apart, and share a similar patient base. Each hospital is the other's primary coverage partner. Despite their close proximity, neither facility should close. Eastern Niagara County is rural and lacks public transportation. Travel to both facilities is difficult, due partly to each hospital's dependence on a volunteer emergency medical system. In addition, the two hospital structure helps attracts physicians to serve a community in which parts are designated as medically undeserved.

## *Recommendation 7*

### Facility (ies)

Bertrand Chaffee Hospital (Erie County)

TLC Health Network – Lake Shore Hospital (Chautauqua County)

TLC Health Network – Tri-County Memorial Hospital (Cattaraugus County)

Brooks Memorial Hospital (Chautaqua County)

Westfield Memorial Hospital (Chautauqua County)

### Recommended Action

It is recommended that Bertrand Chaffee Hospital downsize by at least 25 inpatient beds to less than 25 beds and seek designation as a Critical Access Hospital or sole community provider, and that Brooks Memorial Hospital seek designation as a sole community provider, and that:

(i) Bertrand Chaffee Hospital affiliate with TLC Tri-County and TLC Lake Shore;

(ii) TLC Tri-County downsize 28 medical/surgical beds, convert the remaining 10 medical/surgical beds to 10 detoxification beds provided that the Commissioner of Alcoholism and Substance Abuse Services approves such additions, and continue to provide chemical dependency, emergency and outpatient primary care services;

(iii) TLC Lake Shore downsize all 42 medical/surgical beds and 40 RHCF beds and convert its acute care services to an outpatient/urgent care center with Article 28 diagnostic and treatment center licensure;

(iv) TLC Lake Shore, at its option, either continue to provide mental health services or downsize all 20 psychiatric beds provided that approximately 20 psychiatric beds be added somewhere in southern Erie, northern Chautauqua or northern Cattaraugus Counties by another sponsor, pending completion of an RFP process and provided that the Commissioner of Mental Health approves such additions; and

(iv) Westfield Memorial Hospital downsize all 32 inpatient beds and convert to an outpatient/urgent care center with Article 28 diagnostic and treatment center licensure.

**Facility Descriptions**

Bertrand Chaffee, TLC Tri-County and TLC Lake Shore are three rural hospitals that form a cluster in the Southeast corner of the Commission's Western region.  The TLC Network includes Lake Shore Health Care Center and Tri-County Memorial Hospital.  Bertrand Chaffee is located to the east of these facilities, all of which are linked by Route 39.  The baseline data on the acute care services offered by these three facilities is as follows:

| 2004 Data | Bertrand Chaffee | Tri-County | Lake Shore |
|---|---|---|---|
| Certified beds | 49 | 62 | 62 |
| Available beds | 32 | 116 | |
| Average daily census | 16 | 24 | 33 |
| Discharges | 1,385 | 3,236 | |
| % Medicaid-covered/uninsured | 7% | 11% | |
| Emergency department visits | 9,308 | 17,680 | |
| Operating margin (2003) | -4.8 | -8.9 | |
| Long-term debt | N/A | $11.9M (non-DASNY) | |
| Full-time equivalents (2003) | 287 | 599 | |

Bertrand Chaffee has 49 certified beds, including a 45-bed medical/surgical unit and a 4-bed intensive care unit.  Bertrand Chaffee also operates 80 residential health care facility beds.

TLC Health Network – Tri-County Memorial Hospital has 62 certified beds, including a 38-bed medical unit and a 24-bed chemical dependency (alcohol rehabilitation) unit.  Tri-County, located in Gowanda, also operates 3 primary care clinics and 2 dental clinics.

TLC Health Network – Lake Shore Hospital has 62 certified beds, including a 39-bed medical/surgical unit, a 3-bed intensive care unit, and a 20-bed mental health unit. Lake Shore

also operates 160 residential health care facility beds and a 267-slot long term home health care program.

Brooks Memorial Hospital, located in downtown Dunkirk, has 99 licensed beds, and offers medical/surgical and maternity care. Brooks had approximately 3,386 discharges, 14,201 emergency department visits and 78,755 outpatient visits in 2004. Twelve percent of its discharges were of Medicaid-covered and uninsured patients in 2004. The hospital reported that 40% of its certified beds were occupied in 2004, and had a -1.9% operating margin in 2003. Brooks holds $3.3 million of (non-DASNY) long-term debt.

Westfield Memorial Hospital is a 32-bed hospital on the western border of Chautauqua County. It is a member of the St. Vincent Health System in Erie, Pennsylvania.  It offers medical/surgical and obstetric inpatient care and outpatient care.  Westfield had approximately 1,032 discharges and 6,455 emergency department visits in 2004. Eleven percent of its discharges in 2004 were Medicaid-covered or uninsured. Approximately 23% of its certified beds were occupied in 2004, and its 2003 operating margin was -0.5%. Its average daily census was 7 patients in 2004. Westfield holds $4 million of (non-DASNY) long-term debt.

## Assessment

The geographic proximity of these small rural hospitals, coupled with their current clinical specializations, provide a unique opportunity to concentrate medical/surgical, psychiatric and chemical dependency services and to achieve substantial efficiencies. The affiliation of Bertrand Chaffee and TLC Network would include financial and management consolidation and implementation of a single information technology system. At this time, a committee with representation from each board and management as well as physicians, has been established to evaluate the affiliation.

Bertrand Chaffee has had significant financial difficulties and recently appealed to its community for financial support in order to remain open.  The facility provides care to residents of Southern Erie County as well as Northeastern Cattaraugus County. The next closest acute care facility is

TLC Tri-County Memorial Hospital, which is approximately 18 miles away. This plan strengthens Bertrand Chaffee by providing the opportunity to become a sole community provider or Critical Access Hospital, thereby increasing reimbursement to the facility. Since the facility has an average daily census of 16, decreasing the number of licensed beds to 25 will not affect the ability of the hospital to provide necessary care to the community.

TLC Tri-County's 62 licensed beds includes 24 alcohol rehabilitation beds and 38 medical/surgical beds. The elimination of Tri-County's medical/surgical beds is essential to allow Bertrand Chaffee to qualify for such increased reimbursement.  Moreover, such downsizing will allow Tri-County to expand its current specialization in the area of chemical dependency.  Presently, the average daily census of Tri-County's 24 alcohol rehabilitation beds is 22, whereas its medical/surgical beds have an average daily census of only 3.  The proposed redistribution of beds allows needed services to continue and expand to be provided in the community.  The proposal also recognizes the need for the availability of emergency/urgent care for this rural community.

Lake Shore is located only 17 miles north of Brooks using the New York State Thruway.  They share medical staff, and there are frequent referrals between the two.  Similarly, Westfield Memorial is located approximately 23 miles south of Brooks via the Thruway.  Brooks has had numerous updates over time, including a modernization within the past 4 years. Given Brooks' size and occupancy, it could easily absorb both Westfield's average daily census of 7 patients and Lake Shore's average daily medical/surgical census of 21 patients.

The decertification of both Lake Shore's and Westfield's inpatient beds will improve Brooks' occupancy and margin, resulting in more funds for reinvestment and better access to capital markets.  Moreover, it will also allow Brooks to apply for sole community provider status, further improving the hospital's bottom line.  This can be accomplished without limiting access to vital services in a rural setting. Both Lake Shore and Westfield should continue to provide urgent and ambulatory care. Given the size and mix of both Lake Shore and Westfield, it is appropriate that they become primarily emergent/urgent and ambulatory care campus. A complete closure of these facilities is not in the best interest of these rural communities.

*Recommendation 8*

**Facility (ies)**

Mount St. Mary's Hospital and Health Center (Niagara County)

Niagara Falls Memorial Medical Center (Niagara County)

**Recommended Action**

It is recommended that Mount St. Mary's Hospital and Health Center or its sponsoring entity and Niagara Falls Memorial Medical Center participate in discussions supervised by the Commissioner of Health to explore the creation of a single unified governance structure to end the medical arms race in Niagara County that is expending scarce resources on duplicative services.  It is further recommended that the Commissioner refrain from either approving any applications that have been or will be filed by either facility or providing any other consent requested by either facility prior to the conclusion of such discussions, as determined by the Commissioner of Health, except where such approval or consent is necessary to protect the life, health, safety and welfare of facility patients, residents or staff.  If either Mount St. Mary's Hospital and Health Center or its sponsoring entity or Niagara Falls Memorial Medical Center fail to participate in such discussions in good faith, as determined by the Commissioner of Health, it is recommended that the Commissioner of Health close that facility and expand the other to accommodate the patient volume of the closed facility.

**Facility Description(s)**

Mount St. Mary's Hospital and Health Center (MSM) is a 175-bed acute care facility, which became a member of the Ascension Health System in 1997. It provides medical/surgical, alcohol rehabilitation and maternity care, and has a level I perinatal care designation.  In 2004, MSM's occupancy rate was 60.2% based on 175 certified beds and 67.8% based on its 155 available beds. Its average daily census was 105 patients in 2004. MSM's emergency department visits

209

decreased from 21,121 in 2003 to 20,342 in 2004. The hospital has approximately 722 full–time equivalent employees. Additionally, Our Lady of Peace Nursing Care Residence (OLP) is a separately incorporated affiliate of MSM that operates a 250-bed nursing home on MSM's campus.

Niagara Falls Memorial Medical Center (NFMMC) is a 183- bed acute care facility, which provides medical/surgical care and pediatric and psychiatric services. It too has a level I perinatal care designation. NFMMC's 2004 occupancy rate was 67.5%.  NFMMC's 66 licensed psychiatric beds had an average daily census of 54 patients in 2004.  NFMMC has had a steady increase in emergency department visits. In 2003, it had 24,296 emergency department visits, and in 2004, it had 24,673 visits. It has approximately 834 full-time equivalent employees.

MSM and NHMMC are located six miles apart.

**Assessment**

Duplication of services fuels the medical arms race and wastes limited resources. Maternity care is an obvious example of the duplication of services taking place in this area. MSM has ten licensed maternity beds with an average daily census of four, while NFMMC has sixteen licensed maternity beds also with an average daily census of four.

Approximately 9 years ago, MSM and NFMMC formed Health System of Niagara with the intention of combining the two hospitals. That effort met with resistance and the plan ultimately broke down. Today, the hospitals are fierce competitors.

According to MSM, Ascension Health provided NFMCC with approximately $23.5 million to go forward with the talks. After the deal fell apart, Ascension forgave all but $5.0 million of the debt. MSM believes that this situation put NFMMC in a better financial position, which continues today. While MSM had an operating margin of 2.2% in 2002, it decreased to -1.1% in 2003. Conversely, NFMMC had an operating margin of
-6.3% in 2002 which improved to a positive 0.4% by 2003.

The Niagara County community would be best served by an integrated provider with the capacity to rationalize services and ensure that health care needs are met within the community. The issues of religious identity and the amount of debt for each institution are formidable obstacles to overcome. Nonetheless, there is an opportunity to create a direction for the future organization of health services in Niagara County. Regional planning efforts would reduce duplication of services across the two facilities (e.g., emergency departments, medical/surgical beds, maternity, operating rooms), reduce administrative inefficiencies, limit the medical arms race between the facilities and ensure the future of health care availability in the area.

# WESTERN REGION

# LONG-TERM CARE RECOMMENDATIONS

## *Recommendation 1*

### Facility (ies)

Mount View Health Facility (Niagara County)

### Recommended Action

It is recommended that Mount View Health Facility downsize all 172 RHCF beds, rebuild a new facility on its existing campus, and add a 100-bed ALP, a 50-slot ADHCP and possibly other non-institutional services.

### Facility Description(s)

Mount View is a 172-bed residential health care facility, owned and operated by Niagara County. In addition to baseline services, Mount View operates a 25-slot adult day health care program.

The facility faces many problems, and has recently entered into a contract of sale with Senior Associates of Batavia.  According to the County executive, the contract includes a clause that the sale becomes null and void if the Commission makes any recommendation that specifically affects this facility.

Challenges facing Mount View include:
- a very low occupancy  (it has occupied less than 80% of its beds since 2004, and is currently runs at approximately 75% its capacity);

- a very outdated building, which was originally built as a school in the early twentieth century;
- a relatively low case mix (1.07), with 15% of its staffed beds occupied by low-acuity individuals; and,
- an uncertain financial viability. The facility loses approximately $2.5 million annually, and requires subsidization from Niagara County, which the taxpayers cannot afford.

According to the Niagara County manager and the facility's administrator, employee benefits comprise 52% of wages, which is unusually high.

**Assessment**

While the county legislature approved the facility's sale, this area of Niagara county requires the expansion of less-restrictive settings. It has less need for 24-hour skilled nursing care. The Mount View facility is located on an attractive campus, which could be redeveloped to house continuum-of-care services, including adult day care and an ALP. Approximately 125 individuals reside at Mount View, some of whom should be transferred to an ALP when it is established and built.


## *Recommendation 2*

**Facility (ies)**

Nazareth Nursing Home and Mercy Hospital Skilled Nursing Facility (Erie County)

**Recommended Action**

It is recommended that:

(i)  Nazareth Nursing Home downsize all 125 RHCF beds and the facility be converted for use as part of a PACE program to be added at the former Our Lady of Victory Hospital;

(ii) 10 RHCF beds be added to the 74 RHCF beds currently at Mercy Hospital Skilled Nursing Facility, and all 84 RHCF beds be transferred from Mercy Hospital Skilled Nursing Facility to the former Our Lady of Victory Hospital; and

(iii) 80 adult home beds at St. Elizabeth's Home of Lancaster in Erie County be converted to an 80-bed ALP.

**Facility Description(s)**

Nazareth Nursing Home, Mercy Hospital Skilled Nursing Facility, St. Elizabeth's Home of Lancaster and the Our Lady of Victory Hospital campus are members of the Catholic Health System of Western New York (CHS).

Nazareth Nursing Home is a freestanding, 125-bed not-for-profit residential health care facility that provides baseline services. Nazareth provides acceptable, quality care; the 2005 survey cited five deficiencies, which is the statewide average. It suffers with financial difficulties. According to the operators, the facility has losses of approximately $1 million annually, and occupancy declined from 96.7% in 2003 to 95.2% in 2004. Its case mix index was 1.09 in 2003.

Mercy Hospital Skilled Nursing Facility is a 74-bed hospital-based residential health care facility that provides baseline services. It has a reputation for providing quality care, is financially stable, and benefits from an extremely high occupancy, which was over 99% in 2003 and 2004.

St. Elizabeth's Home is a 117-bed adult home in extreme financial difficulty. Its operating cost per resident is approximately $60 per day, which is high and is about twice as much as the Supplementary Security Income (SSI) payments available for each resident.

Our Lady of Victory Hospital (OLV) was an acute care hospital prior to closing in 1999. The Catholic Health System (CHS) is converting the former OLV campus to facility that resembles a continuing care retirement community (CCRC), with a full continuum of long-term care services. These services will be provided in a five-building complex that will include a centrally-located Main Street-styled area, with a convenient medical office, retail stores and a park-like green

space. CHS is near completion of the initial phase of the project, which involves the development of 74 low-to-moderate-income senior housing units. CHS has also been authorized to work with the Department of Health to develop a Program of All-inclusive Care for the Elderly (PACE), which is pending.  Finally, CHS has filed a pending certificate of need application to move its RHCF beds from Mercy Hospital to the OLV campus.

## Assessment

As a whole, Erie County's long-term care delivery system must be restructured.  While the average county occupancy in 2004 was strong (95%), there is a documented surplus of beds using the state's need methodology.  Taking into account the number of low-acuity individuals in the beds, the county has nearly 200 excess beds.  Approximately half of its non-institutional need, however, is unmet, and supportive housing for frail and disabled seniors is in short supply. CHS's plans to reconfigure its long-term care services are supported by the Commission.

This plan will stabilize or reconfigure CHS's facilities.  First, the plan will help stabilize Nazareth Nursing Home. Although it changed ownership in 2000 when it was acquired by CHS, a timely certificate of need was not filed, so the facility was unable to take advantage of increased revenue due to its potential rebasing.  According to CHS, this has resulted in a steady and crippling financial decline. CHS has stated that it will close Nazareth Nursing Home regardless of potential Commission recommendations.  Nazareth's existing residents need to be transitioned before the nursing home closes.

Similarly, CHS has indicated that, absent some extraordinary changes, it will close St. Elizabeth's Home.  CHS's overall plan must ensure that adequate community resources are available to address the dislocation that would result from such closures.

CHS plans on establishing a new ALP at St. Elizabeth's.  Second, CHS also plans to transfer RHCF beds from the Mercy Hospital skilled nursing facility to a more home-like setting.  This will benefit Erie County's acute and long-term care.  Space will be made available for additional acute care services at the Mercy Hospital.  According to CHS, the additional RHCF beds will

allow for a more efficient staffing and care model at 21 beds per unit.  Finally, the conversion of OLV to a PACE will establish needed non-institutional services and provide the necessary bridge between the senior housing and RHCF components.

### *Recommendation 3*

#### Facility (ies)

Williamsville Suburban, LLC (Erie County)

#### Recommended Action

It is recommended that Williamsville Suburban downsize all 220 RHCF beds.

#### Facility Description(s)

Williamsville Suburban is a proprietary 220-bed residential health care facility located in a suburb of Buffalo. It provides baseline services and outpatient physical and occupational therapy. It is part of the Legacy Group, which operates three facilities in Erie County. Williamsville Suburban is the largest facility in the group.

The Legacy Group has not submitted cost reports since 2002 and is in chapter 11 bankruptcy protection. Certified financial and occupancy data for the previous 4 years are unavailable.

For several years, the facility has had quality and survey problems.  It has had an extremely high number of deficiencies when compared to the other facilities within the Western region and the entire state. The April 2006 survey recorded 22 deficiencies.  The 2005 survey resulted in 26 deficiencies; its 2004 survey resulted in 31 deficiencies, including 2 immediate jeopardies. The statewide average is five deficiencies. Moreover, the facility complaint substantiation rate for 2001-2003 was 38.1%; the statewide average was 5.9%.

Their case-mix index was 1.13 in 2003, and they run a 40-bed sub-acute unit, which is self-reported to be approximately 60-75% full.  It provides no other specialized care and no non-SNF services.

According to Williamsville Suburban's recent administrator, the facility improved under his leadership and turned a profit in 2005.  This has not been verified; their report was unaudited. This administrator claimed that the most recent occupancy rate is 93%, and that they had approximately 38 low-acuity patients.

**Assessment**

Erie County's long-term care delivery system must be restructured. While the county's overall occupancy in 2004 was strong (95%), the State's bed need methodology indicates that there is a surplus of beds. After taking into account the number of low-acuity individuals in the beds, the county seems to have over 200 excess beds. Approximately half of its non-institutional need is unmet, and supportive housing for frail and disabled seniors continues to be an issue.

There is strong competition for nursing home residents in the Williamsville area. There are seven nursing homes in Williamsville, and as the population in Erie County declines, excess capacity in its long-term care delivery system will likely grow.  The existing residents should be transitioned before Williamsville Suburban closes.

## *Recommendation 4*

**Facility (ies)**

DeGraff Memorial Hospital Skilled Nursing Facility (Niagara County)

Millard Fillmore Gates Circle Skilled Nursing Facility (Erie County)

**Recommended Action**

It is recommended that Millard Fillmore Gates Circle downsize all 75 RHCF beds, and upon the closure of the acute care beds at DeGraff Memorial Hospital (see Western Region Acute Care Recommendation), that those 75 RHCF beds be added to DeGraff contingent upon the suitable conversion of DeGraff.

**Facility Description(s)**

DeGraff Memorial Hospital and Millard Fillmore Gates Circle Hospital are both recommended for closure (see acute care recommendations). Both these facilities house skilled nursing facility (SNF) units (80-beds and 75-beds, respectively), which provide baseline services and sub-acute care. DeGraff's SNF has a very high occupancy (97%) and occupancy at Gates Circle is relatively high, but has fallen in the last few years (from 98% in 2002 to 93% in 2005). Both have survey deficiencies slightly above the regional average of 5 (7 and 6 respectively) and no immediate jeopardy citations. Their financial performance is reported with their respective hospital's financial information.

**Assessment**

This recommendation would: 1) maintain an appropriate numbers of SNF beds in Erie and Niagara counties, 2) maintain the better skilled nursing service provider in Erie and Niagara counties, and 3) mitigate the impact of hospital closure by converting the DeGraff building to meet long-term care needs. DeGraff is located in a growing area. A SNF in that community would have value. It also would enable the preservation of other health care and health-related services in that community that could be co-located with the nursing home.

## VIII. Financing

The Commission's recommendations will provide significant benefits to New Yorkers and various components of the health care system. First, the Commission's recommendations will promote stability of health care providers thereby assuring access to care, supporting the provision of public goods, enabling technology and capital reinvestments, and improving quality of care. Second, the Commission's recommendations will reduce unnecessary public and private health care spending and produce overall cost savings for all payors. Third, the Commission's recommendations will produce numerous opportunities for reinvestment in the system thereby providing substantial financial benefits to health care providers and the patients served by them.

Systemic changes require resources. Investments are necessary to implement the Commission's recommendations. Short term costs must be incurred to produce benefits in the immediate and long terms.

This section estimates the potential savings and costs that can be reasonably associated with the Commission's recommendations. These estimates are based on the experience of similar facility reconfigurations in the past and draw on the combined experience of the State Department of Health, the Dormitory Authority of the State of New York, and the State Division of the Budget. While the estimates are based on some substantial assumptions and carry a "band of error," they represent measurable phenomena and provide reasonable indicators of the order of magnitude of achievable efficiencies and necessary investments. These estimates also provide a useful tool for estimating an appropriate level of State investment in specific recommendations.

Caveats apply to these projections. Estimates of savings and costs are difficult to make absent the sort of detailed knowledge of facility operations possessed only by a facility operator. The Commission had substantial interaction with the operators of the facilities which are the subject of the Commission recommendations and obtained important proprietary information about those facilities. In no case, though, could an operator share all the necessary information with the Commission in light of the competitive interests of those facilities. Some important information may even be beyond the reach of facility operators. For instance, absent some compelling need, it would be unusual for an operator to have a current appraisal of its real property. Furthermore, actual savings and costs will be partially dependent on the decisions made by facility operators during the implementation process. Much of the implementation of

219

the recommendations will be influenced by the rapidity with which the market responds to such recommendations, the timing of available financing, and other external events impacting the need for facility capacity.

**Potential Benefits and Reinvestment Opportunities for Providers**

Significant benefits from system restructuring, including closure, downsizing, conversion or affiliation, accrue to health care providers thereby improving stability of the delivery system. Some of these cannot be quantified financially; they include the advantages of shared medical and administrative expertise, quality of care improvements attributable to consolidated volume, and improved access to credit markets.  Other benefits can be quantified, including:

- **Transferred Volume:**  When a facility closes, its patients will seek and receive services elsewhere. Patient volume will be transferred from closed facilities to other facilities. Such volume increases drive efficiencies, both in terms of finances and quality of care. Higher occupancy rates lead to better margins, and in turn, better access to capital and more funds for reinvestment.

- **Improved Access to State Funding:**  Facility closures have direct positive implications on the reimbursement of indigent care, graduate medical education and workforce recruitment & retention. Insofar as closed facilities will no longer draw from the applicable HCRA pools, their allocations will be redistributed to the remaining pool participants.

- **Elimination of Duplicative Costs:**  When facilities affiliate under a single unified governance structure, the resulting entity can achieve major efficiencies by eliminating or reducing unnecessary costs. For example, combined institutions can shed duplicative administrative staff and duplicative support services like laboratories, laundries, and food service operations, and can combine costly information technology systems.  Some of these savings also benefit payors, to the extent that such savings are reflected in reimbursement rates.

**Potential Savings for Payors**

System restructuring also provides many savings for payors, both in terms of actual reductions in current expenditures and avoided future costs. Such opportunities for savings include:

- **Reductions in Inappropriate Utilization:** Hospitalizations and the use of expensive procedures increase in relation to the capacity that exists. This is most often regarded as a function of Roemer's Law; namely, the principle enunciated by health care economist Milton Roemer that supply induces demand where reimbursement is guaranteed by a third party. More colloquially, "a bed built is a bed filled".

  Reductions in excess capacity can eliminate inappropriate or unneeded utilization of services, reduce the costs associated with such utilization, and improve care by limiting unneeded and risky procedures. Previous hospital closures have established that some volume from a closed facility will not transfer to remaining facilities. This phenomenon is particularly likely in the highly competitive economic environment faced by hospitals in New York State, and the actual experience of recent closures suggests that its impact is significant. Similarly, the reduction of excess beds in a facility removes the incentive to fill those beds, resulting in greater efficiency and a reduction in inappropriate care.

  While this analysis clearly applies in the case of hospital closures and downsizings, it is less likely that nursing home residents will forego care upon closure of their nursing home. However, not every nursing home resident requires skilled nursing services. In fact, several of the Commission's recommendations are premised on the recognition that many nursing home residents would be more appropriately served in less intensive settings. It is for that reason that the Commission has recommended the conversion of some nursing home beds to less intensive assisted living, adult day health care, or long term home health care slots. These conversions will generate direct payer savings.

- **Avoided Capital Investment:** Physical plants, especially if underutilized, are expensive to maintain. Even empty buildings, wards, and beds carry fixed costs that must be paid. Furthermore, many of NY's health care facilities are old and in need of extensive renovation and capital upgrades. Depending on the age of a physical plant, capital investments are needed to keep current with modern therapeutic and regulatory requirements. The closure or downsizing of a facility generates substantial savings by avoiding capital expenses such as fire code compliance upgrades, improving heating and air conditioning, conversions to single rooms, modernizing elevators and other spaces, and expanding parking. These foregone capital expenses, which would otherwise be reflected in reimbursement rates, are substantial.

- **Leveraged Savings:** Additional savings can be achieved by the targeted reinvestment of the foregoing savings into further savings-generating activities. Similarly, funds currently used by the State to address potential emergency closures can be redirected toward initiatives designed to promote further system efficiencies.

**Estimating Benefits and Savings: Transferred Volume and Reduction in Inappropriate Utilization**

To ascertain the potential benefits to payers from avoided hospital volume and to providers from transferred hospital volume, the Commission first determined the dollar value of that volume by multiplying the 2004 discharges of each facility recommended for closure by that facility's average Medicaid rate per discharge. This yields a reasonable proxy for the value of the transferred and avoided volume, with three caveats. First, some of that volume was covered by payors other than Medicaid. However, the rates paid by private payers are proprietary and cannot be discerned. Second, some of that volume is uncompensated. However, the impact of that volume will be ameliorated by the fact that the receiving facilities' respective share of the indigent care pool will be increased by the closures. Third, the rates paid for transferred volume will change depending on the average rates of the receiving facilities, some of which are lower and some of which are higher than the closed facility. Recognizing these limitations, the Medicaid rate proxy is an appropriate method for estimating the dollar value of avoided and transferred volume.

To determine the proportions of volume that are likely to be avoided and transferred, The Commission reviewed the impact of several recent hospital closures on patient volume and used that data to generate an appropriate "avoidance factor."  That factor was then applied to the dollar value of the discharges from the facilities recommended for closure.  In the case of facilities recommended for downsizing, a percentage of that factor representing the percentage of beds being downsized was applied.

A similar process was applied in regard to nursing homes.  First, the average regional rate per day for each nursing home recommended for downsizing was used to determine an average annual rate per resident. This figure was further adjusted based on each facility's actual occupancy to yield a dollar value for the volume of patients served by the downsized beds.  The downsizings attributable to conversions were then segregated from the "pure" downsizings.  The dollar value of those "pure" downsizings represents the provider benefit accruing from them, insofar as that volume is likely to transfer elsewhere.  The annual dollar value of the downsizings attributable to conversions was then reduced by the annual cost of the lower acuity slots that will result from such conversions, yielding a figure representing the payer benefit accruing from such conversions.

Similar caveats apply to the nursing home estimates.  While it could also be argued that the new low-acuity slots will be filled by individuals not currently receiving any formal long term care services, the result could be in a net increase in annual costs.  Such an argument is without merit. Since no lower-intensity service is added without eliminating an equal or greater number of nursing home beds, it is appropriate to assume a net cost savings.

**Estimating Benefits: Improved Access to State Funding**

To estimate potential benefits to providers, the dollar value representing the likely volume transfer was supplemented by a figure representing the indigent care, graduate medical education and workforce recruitment and retention pool distributions which would otherwise be made to facilities recommended for closure.  Under the current iteration of HCRA, such funds will automatically be redistributed to remaining facilities.

**Estimating Benefits and Savings: Elimination of Duplicative Costs**

To estimate the potential savings attributable to the elimination of duplicative costs at affiliating facilities, each facility's annual expenditure on administrative and general labor costs was obtained from that facility's 2004 cost report.   Where facilities have been recommended for affiliation, their expenditures were averaged, and the excess was identified as a potential benefit. The percentage of such costs attributable to patients covered by Medicaid managed care was then identified as a potential benefit to the Medicaid system since those savings will likely be reflected in facility rates, and the remainder identified as a potential benefit to the providers themselves.

**Estimating Benefits and Savings: Avoided Capital Investment**

To estimate the potential savings attributable to avoided capital investment, first Commission staff identified pending Certificate of Need (CON) projects attributable to such facilities that would be unnecessary or inappropriate in light of Commission recommendations. Then, Commission staff calculated the extent to which the cost of such projects (including both principal and interest costs) would be reflected in those facilities' annual Medicaid rates.  The resulting figure represents the capital costs of pending projects that would be avoided by Commission recommendations.

However, the list of pending CON applications is not an exhaustive representation of the capital investments in the hospital and nursing home system that will be necessary in the years to come.  In order to accurately reflect such investments on the hospital side, the Commission used each hospital's average age of plant to identify the potential cost of upgrading that hospital to the statewide average age of plant, eliminating any duplication where a hospital already had an application for such upgrade pending  Then, Commission staff calculated the extent to which the cost of such projects (including both principal and interest costs) would be reflected in those facilities' annual Medicaid rates.

The analysis on the nursing home side necessarily differed, since the amount of each project to be reflected in the State Medicaid rate is capped by law.  Therefore, the Commission estimated the cost of each such project and the amount of the applicable cap before calculating the extent to which the cost of such projects (including both principal and interest costs) would be reflected in those facilities' annual Medicaid rates.

**Estimating Benefits: Leveraged Savings**

To estimate the potential Medicaid savings attributable to the reinvestment of other calculated savings, Commission staff first identified the ratio of the cost of the Commission's recommendations to the potential Medicaid savings to be otherwise derived from the recommendations. Staff then applied that ratio to those savings themselves in order to identify the further savings to be derived from those reinvested funds.

In order to estimate additional savings that can be derived from funds currently used by the State to address emergency closures, staff identified the average amount of funds loaned each year from the Health Care Restructuring Pool for such purposes. That amount was reduced by the proportion of excess beds being removed from the system by the Commission recommendations, in order to identify a useful proxy for the amount of emergency fundings likely to be necessary after implementation of the recommendations. The difference represents Restructuring Pool funds likely to be available to generate additional costs savings. Those savings were then calculated by applying the same ratio applied to other Commission savings.

**Total Benefits and Savings:**

The total estimated savings for payors is around $806 million annually or $8 billion over ten years. This includes an annual savings to Medicaid of around $249 million, or $2.5 billion over ten years, and an annual savings to Medicare of around $322 million, or $3.2 billion over ten years. The total estimated benefit to providers is around $721 million annually or $7.2 billion over ten years. Together, these calculations yield a total benefit to payors and providers of over $1.5 billion annually, or $15 billion over ten years.

**Potential Costs:  General Principles**

Implementation of the Commission's recommendations will require capital investments in some instances. Some of the recommendations are essentially cost-free. For example, recommendations in which the Commission has recommended further study and/or discussion carry no measurable cost. Similarly, recommendations that require only the decertification of a number of beds generally have negligible direct costs. Other long-term recommendations are contingent on various factors; unless those factors are fulfilled, no immediate costs will be

incurred. It is also imperative to note that just because a recommendation carries costs, that fact alone does not require that those costs be covered with public funds. In fact, the opposite is true. Insofar as facilities are capable of funding their own closure, conversion, affiliation, or rightsizing, they must do so. Taxpayer funds should be used prudently.

The realization of some Commission recommendations will entail costs, some of which are substantial and which should be estimated. Just like the savings estimates, the potential costs are difficult to ascertain with precision and are necessarily based on some broad assumptions. As with the savings estimates however, they represent measurable phenomena and provide reasonable indicators of the order of magnitude of necessary investments.

**Potential Cost Categories: Closure, Construction & Affiliation**

The likely costs of implementing the Commission's recommendation fall into three general categories:

**Closure costs:** These costs associated with closure include the outstanding debt of the facility to be closed, including outstanding capital debt as well as vendor debt, pension costs and any other third party liabilities. Insofar as this cost category includes debt of the Dormitory Authority and/or the Federal Housing Authority, it is particularly important to be cognizant of those debts and ensure their repayment so as not to jeopardize the industry's access to future capital investment. Similarly, insofar as a facility's debt represents a potential obligation of the State (as is the case with facilities participating in the Secured Hospital Program), that fact needs to be carefully considered and the necessary investments made to ensure that the net costs to the State do not outweigh the concomitant benefits. There are also direct costs attendant to the closure process itself, including costs of severance and retraining for employees, maintenance and security for the physical plant, and medical record transfer/storage. Finally, there are also legal and consulting costs associated with the planning and implementation of the closure process. While it is particularly difficult to estimate these latter costs since so much is dependent on variables outside the control of the Commission (e.g., whether or not a facility declares bankruptcy, thereby multiplying its legal costs considerably), some attempt to estimate these costs is warranted.

226

**Construction costs:**  Such costs encompass not only new construction such as when the Commission recommends that a facility be rebuilt, but also the costs of renovating existing infrastructure such as in the case of bed or building conversions.  The Department of Health has extensive experience estimating such costs in the context of the certificate of need (CON) process and is able to do so taking into account not only the difference between new construction and renovations, but also cost variations across regions.

**Affiliation costs:** This analysis does account for the costs of affiliation planning. Affiliation costs are difficult to project because of wide variation in the circumstances under which the affiliations will occur. In the case of simple affiliations (e.g., affiliation under a passive parent or the further affiliation of facilities already enjoying a close relationship), the costs are likely to be minimal. In more complex cases (e.g., full asset merger or the affiliation of religious and secular facilities), the costs could be considerable.  In some cases, such affiliation will also require substantial capital investment and other significant implementation costs. However, the impracticality of defining those capital costs in each instance precludes any useful estimate of those capital costs and they have been excluded for the purposes of this analysis. This exclusion is justified; the efficiencies resulting from affiliation clearly benefit the affiliating entities and it is appropriate to expect the costs of such affiliation to be borne by those entities. In particular cases, however, it may be appropriate for public funding to be directed toward such costs.

**Estimating Costs of Closures and Restructuring**

Facility cost reports provide a solid basis from which to begin quantifying the likely costs of closures and conversions and each facility's ability to contribute to those costs.  These cost reports, and the balance sheets on which they are based, capture many costs inherent in facility closure, including capital debt, vendor debt, and pension costs, as well as the assets available to cover those costs.  Since, in a closure scenario, all of a facility's assets can conceivably be used to offset closure costs, it is appropriate to begin the analysis of such costs by identifying a facility's net assets. When those assets are negative, that reflects what it likely to be a net cost of closure.  Where those assets are positive, that reflects an available cost offset. In theory, a facility's net assets incorporate both restricted and unrestricted assets.  Restricted assets (e.g.,

charitable donations for some restricted purpose) may be available to offset closure costs but also may not. In practice, however, there are few variations between the unrestricted and total net assets of the facilities recommended for closure. Consequently, each facility's total net assets were used as a starting point for estimating closure costs.

As with the savings estimates, caveats apply to these cost estimates. The Commission did not always have access to specific information held by facilities. For example, without knowing the details of specific facilities' loan obligations, the Commission had to assume the presence of full closure costs even when the Commission has recommended a facility's conversion or rebuilding. In these cases, it is possible that a facility will be able to convert or rebuild without triggering the sort of liabilities associated with closure (e.g., without violating a bond covenant or other contractual obligation). In such cases, we have erred on the conservative side and assumed that these costs will occur although they may not.

Real property value is an important piece of a facility's assets. Therefore, where available, the fair market value of facility real property has been included as a cost offset. These estimates are a useful mechanism for identifying those closure recommendations that can be substantially or completely subsidized by the sale of facility real estate. Some cautions are appropriate. First, a facility's balance sheet includes an amount representing real property value but only that property's net book value (generally, the purchase price less accumulated depreciation). In many cases, especially downstate, that value bears little relationship to the property's fair market value. Thus, the values used as offsets were obtained from the facilities themselves. In some, but not all cases, the providers' estimates were based on independent appraisals. Second, it was not possible in all cases to obtain the fair market value of facility real property. In such cases, the potential value of the facility's real property was not included as a potential cost offset. Third, where real property fair market value was included, it was impossible to extract the portion of that value that was already included on that facility's balance sheet. Thus, a portion of that facility's real property value may have been double-counted.

The closure process itself can entail costs. The Commission examined past hospital closures to identify some average transaction costs, as a means of predicting the likely cost of future closures. The analysis of previous closures generated an average per bed, per month cost. The same analysis identified an average length of time within which closures have been completed. The result was a cost per bed figure, easily adaptable to specific hospital closure

recommendations. That number, with some modifications, also provided the basis for an analogous assessment of likely nursing home closure transaction costs. The first modification involves average length of closure; nursing homes typically close much more quickly than hospitals. Similarly, the per bed cost of closure is generally much smaller, owing at least in part to the smaller staffing ratios in nursing homes.

Both hospital and nursing home closures will entail legal and consulting costs. These costs are extremely variable, depending in large part on decisions made by providers and regulators during the closure process. One of the biggest decisions to be made by facilities recommended for closure is whether or not to declare bankruptcy; a declaration that can be extremely costly unto itself. For purposes of the Commission's cost analysis, staff assumed that every facility recommended for closure would declare bankruptcy. In practice, this will not necessarily be true. With this assumption in mind, prior closure experiences were reviewed to generate an average per month legal and consulting cost.

The costs of new construction were relatively easier to determine. These estimates were based on actual experience with new construction and renovations in connection with the certificate of need process. These estimates take into account regional price differences, which can be considerable. The cost estimates do encompass everything directly related to construction, but do not include land or financing costs, or the costs of demolition, where applicable. They also assume the renovation of existing facilities where possible but specific factors may impact an existing structure's appropriateness for conversion. Also, in instances where the new construction is not tied to bed number (e.g., where the new construction is a diagnostic and treatment center), the analysis estimated the necessary bed count and/or square footage and the cost was determined based on that estimate.

The foregoing calculations yield a total cost of approximately $1.2 billion, including approximately $350 million in closure costs, $1.1 billion in construction costs, $11 million in affiliation planning costs, and $300 million in offsets from the sale of facility real property. Not all of these costs will be borne by the State; almost $606 million of that is attributable to two contingent projects that the Commissioner will not be required to implement absent available funding.

**Funding: Principles for Investment**

Vast and unprecedented sums are available to support the restructuring of NY State's health care system and cover the costs of implementing the Commission's recommendations. The Health Care Efficiency and Affordability Law for New Yorkers (HEAL-NY) allocates $1 billion over four years.  HEAL-NY will improve the stability, quality, and efficiency of the health care delivery system by providing capital grant funds to cover expenses associated with physical reconfiguration, conversion, downsizing, or closure of hospitals and nursing homes. Furthermore, the Federal-State Health Reform Partnership (F-SHRP) allocates an additional $1.5 billion for similar purposes. F-SHRP is a five year demonstration that will promote efficient operation of the State's health care system, consolidate and rightsize the delivery system, shift emphasis in long term care from institutional-based to community-based settings, expand the adoption of advanced health information technology, and improve ambulatory and primary care provision.

Although HEAL and F-SHRP are critical to financing the commission's recommendations, they are not and should not be the only sources of funding. Indeed, public funds should be used in the most prudent possible manner. Taxpayer dollars must be used judiciously. Insofar as facilities are capable of funding their own closure, conversion, affiliation, or rightsizing, they should be expected to do so. Additional sources of financing include traditional third-party financing mechanisms, debt restructuring, the HCRA restructuring pool, and others. The Commission believes it to be appropriate that costs will be shared among all the interested parties and that the State need only contribute a portion of those costs. That portion may be determined by the State in light of the following guidance for future funding decisions. By category, the Commission suggests that the following principles should govern State investment in the Commission recommendations:

**Closure Costs:**

1.  Facilities should be expected to self-fund insofar as possible, including through the sale of assets.

2.  State funds should be made available only in the absence of other possible funding.

3.  If state funds are to be used, this cost category should be given priority for funding under the Federal-State Health Reform Partnership (F-SHRP), since this cost category is most likely to

result in measurable state and federal savings, and the availability of F-SHRP funds is tied to such measures.

4.  If State funds are to be used, priority should be given, first, to those facilities that participate in the Secured Hospital Program, then to other DASNY clients, then to those non-DASNY clients that are not part of an obligated group.

## Construction Costs:

1.  Facilities should be expected to self-fund insofar as possible, including via private third-party financing.

2.  State funds should be made available only in the absence of other possible funding.

3.  If state funds are to be used, this cost category should be given priority for funding under the Healthcare Efficiency and Affordability Law (HEAL), since this cost category is more clearly eligible for such funding than the other cost categories.

4.  If State funds are to be used, priority should be given to those facilities that are not part of an obligated group.

## Affiliation Costs:

1.  Facilities should be expected to self-fund insofar as possible, except in regard to affiliation planning costs.

2.  State funds should be made available only in the absence of other possible funding, except in regard to affiliation planning costs.

3.  If state funds are to be used, priority should be given to recommendations for full asset merger or affiliation under an active parent, as opposed to affiliation under a passive parent or some lesser affiliation.