797andrc

```
 1   UNITED STATES DISTRICT COURT
     SOUTHERN DISTRICT OF NEW YORK
 2   ------------------------------------x
 3   JOHN E. ANDRUS MEMORIAL, INC.,
     doing business as Andrus on Hudson,
 4
                    Plaintiff,
 5
            v.                          07 Civ. 3432(CLB)
 6
 7   RICHARD F. DAINES, as Commissioner of
     the New York State Department of Health,
 8
                    Defendant.
 9   ------------------------------------x
10                                      United States Courthouse
                                        White Plains, N.Y.
11                                      September 7, 2007
                                        10:00 a.m.
12
13
14   Before:
15              THE HONORABLE CHARLES L. BRIEANT,
16                                      District Judge
17
18                      APPEARANCES
19
     CADWALADER, WICKERSHAM & TAFT, LLP
20        Attorneys for Plaintiff
     BRIAN THOMAS McGOVERN
21   PETER G. BERGMANN
22
23   ANDREW M. CUOMO
          Attorney General for the State of New York
24   JOHN PETER GASIOR
          Assistant Attorney General
25
```

CHRISTINA M. ARENDS-DIECK, RPR, RMR, CRR
(914) 390-4103

1           THE DEPUTY CLERK: Andrus against Daines.

2           THE COURT: Who wishes to be heard in support of the

3    motion?

4           MR. GASIOR: Your Honor, if I might be heard, John

5    Gasior for the defendant.

6           THE COURT: Yes.

7           MR. GASIOR: Good morning, your Honor.

8           As I mentioned, my name is John Gasior, an Assistant

9    Attorney General with the New York Attorney General's Office

10   here today representing the defendant, Richard F. Daines,

11   Commissioner for the New York State Department of Health.

12          I'm appearing today in support of the defendant's

13   motion for summary judgment. Essentially, the motion is

14   seeking to dismiss the complaint which has been brought by the

15   plaintiff, Andrus, the operator of a nursing home here in

16   Westchester County.

17          As I think the Court is aware, the Commission for

18   Healthcare Facilities in the 21st Century, which was created by

19   the New York State Legislature, has recommended that a number

20   of facilities, hospitals and nursing homes be closed throughout

21   the state, and Andrus is one of those. Andrus' challenges are

22   based on constitutional principles which we believe do not have

23   merit.

24          The enabling legislation which is at issue in this

25   litigation was perhaps one of the most far-sweeping in New

1    York's history. The prime directive -- and I think this has to
2    be stressed throughout this litigation -- to the Commission
3    which was created by the enabling legislation was to maximize
4    healthcare resources by aloting those resources -- and this is
5    important -- so that excess capacity would be minimized. Again
6    and again, the enabling legislation's mandate is to reduce
7    excess capacity.
8         THE COURT: I don't think they question that. Do
9    they? I think the only issue that I can see here is one of
10   administrative due process. I don't know that your adversaries
11   question that they can dispose of excess capacity.
12        MR. GASIOR: And in fact, your Honor, I believe they
13   do admit, I think it was on page 25 of their memorandum of law,
14   that the streamlining process was -- that they did not question
15   the streamlining process; that that was a necessary component.
16        But if we're going to consider, then, whether there
17   was substantive due process, the focus of the Court has to be
18   not on whether they got some facts wrong, but on whether the
19   determination to close Andrus, or, rather, to convert Andrus
20   into --
21        THE COURT: As I understand it, they can't convert it,
22   because nobody will stand up to the Village. Is that right?
23   The Village wouldn't give them a permit to convert it.
24        MR. GASIOR: In the past, they attempted to turn the
25   facility -- or Andrus did seek to convert the facility part

1  into a continuing-care residential community. I think I've got
2  that right. A CCRC. That was some years ago. And part of the
3  reason for that, as I understand it, is that Andrus wanted to
4  build additional facilities, something along the lines of 200,
5  perhaps, I think it was, if I read the record correctly, 200
6  additional facilities.
7      In its recommendation, the Berger Commission -- I
8  referred to the Commission on the 21st Century, which is the
9  Berger Commission, as I think both parties do. That was the
10 name of the chairman of the Commission. So the Berger
11 Commission specifically, in its recommendations, I think on
12 about page 123 of the final report, stated that it was their
13 recommendation that, in addition to all of the nursing home
14 beds that were currently in operation at Andrus, that those be
15 downsized completely; that the facility be converted into an
16 assisted living facility. It could do that.
17     The Commission had two options for that. They could
18 either build additional facilities and recognize that that
19 might be a problem. They also recommended the option that the
20 current facility be converted, floor by floor, into assisted
21 living residences. Part of the reason that the Commission
22 found that that was an option that Andrus should explore is
23 because of its particular facility. Apparently, there are
24 bathrooms on each of the floors and that the configuration of
25 the facility, as opposed to other facilities within the region,

1  could be converted to that use.

2  I would like to emphasize that it's not just Andrus
3  that the Commission had focused on when it was making its
4  recommendations. Again and again, when Andrus opposes the
5  decision that was made and the way that it was done, it focuses
6  only on itself.

7  THE COURT: That's all it can litigate. It has no
8  standing to litigate Cheektowaga with you.

9  MR. GASIOR: But it is challenging the decision, a
10 decision made under the police power, as authorized by the
11 Legislature, to make regional-wide decisions. And so it's not
12 just a horse race to determine which facility has the most
13 funding, which one has the better facility, which one has the
14 lower case index among its residents. The Commission was
15 required to look on a regional basis. And nowhere in Andrus'
16 papers does it address that particular concern, which is a
17 driving concern, which is to eliminate excess capacity within
18 the region.

19 There is something in the order of 636 excess capacity
20 nursing home beds in Westchester County. If I could stress
21 anything, that is one of the things both that the enabling
22 legislation focused on in the Berger Commission's report; the
23 excess capacity was strangling healthcare facilities.

24 THE COURT: Well, now, long before the Berger
25 Commission, the Commissioner of Health had the right, under the

1  statute, to deal with this problem. Isn't that so?
2          MR. GASIOR: Article 28 does permit the Commissioner
3  of the Department of Health to revoke a license if it finds
4  there is overcapacity.
5          THE COURT: And that has its own provisions for an
6  opportunity to be heard and for notice.
7          MR. GASIOR: Separate and apart from those that were
8  provided by the enabling legislation.
9          THE COURT: And maybe the enabling legislation is a
10 little bit cockeyed. That's what the dissenting opinion in
11 Cheektowaga seems to suggest.
12         MR. GASIOR: That's a dissenting opinion, your Honor.
13         THE COURT: I know that, but it's going to the Court
14 of Appeals, isn't it?
15         MR. GASIOR: It is, your Honor. And it should reach
16 there fairly soon, I would think.
17         THE COURT: I would think so. And that leads me to
18 another issue. Maybe I ought to wait until I hear the other
19 side, also, but why isn't this a Burford abstention case?
20         MR. GASIOR: I hadn't quite thought about addressing
21 that, your Honor, but I think that there are --
22         THE COURT: You have other cases besides Cheektowaga.
23 You have Judge Bellantoni.
24         MR. GASIOR: There are cases, I think, that -- I can't
25 think of the hospital now.

1    THE COURT: Dobbs Ferry Hospital. Right down the road
2  from this place.
3    MR. GASIOR: Absolutely, your Honor. But I would say
4  that I would assert that the Fourth Department's determination
5  in the St. Joseph Cheektowaga case was the appropriate one.
6    THE COURT: That's the role of an advocate, isn't it?
7    MR. GASIOR: It certainly is, your Honor.
8    THE COURT: I don't know that it was.
9    Could I hear your adversary. And if you want to
10 respond further, you can.
11   MR. GASIOR: Absolutely.
12   THE COURT: I'm puzzled that the Legislature would
13 have two separate ways of dealing with this when you have a
14 tried and true statute which nobody questions the validity of
15 and this one, which, at least on papers submitted, there's some
16 question.
17   MR. GASIOR: Well, your Honor, if I could, part of the
18 reason why it was necessary to create a new commission is
19 because there is a lot of institutional and political
20 reluctance to close a facility.
21   THE COURT: No. Really?
22   MR. GASIOR: Believe it or not, your Honor.
23   THE COURT: I don't.
24   And then the other thing is that the Court in these
25 other cases has been considering issues wholly apart from

1  Fourteenth Amendment due process issues.
2       MR. GASIOR: Other issues have certainly been raised,
3  your Honor.
4       THE COURT: Issues about whether you can do this kind
5  of a thing in the Legislature with a -- what is it, a
6  two-house --
7       MR. GASIOR: Well, that's one of the issues, but I
8  will note one of the other issues, which was just decided
9  yesterday in the Court of Appeals, it's the first of the Berger
10 Commission cases, and I think there are a dozen now.
11      THE COURT: Could we have the citation?
12      MR. GASIOR: I have the case, and it's tucked in my
13 bag. And I even brought a copy of it for you.
14      THE COURT: Why don't you go to the bag.
15      Have you got a copy for opposing counsel?
16      MR. GASIOR: Yes, I do.
17      It's not really a decision, your Honor, but you'll see
18 that the issue that was raised in this case, it was -- McKinney
19 was the name of the case. The issue in particular that was
20 raised there, McKinney v. Commissioner of the State Department
21 of Health, was whether there had been an improper delegation of
22 legislative authority to the Berger Commission. And that case
23 worked its way up from Supreme Bronx through the First
24 Department, both of which found that it did not. And that is
25 the first of the cases to reach the New York Court of Appeals.

1  And the Court of Appeals summarily, in what looks like a
2  one-sentence decision, said, "Appeal dismissed without costs
3  sua sponte upon the ground that no substantial constitutional
4  question is directly involved." So that's the first.
5        THE COURT: That's the First Department case.
6        MR. GASIOR: Yes, your Honor. Came out of the First
7  Department.
8        THE COURT: Yes. I didn't realize that had been
9  decided.
10       MR. GASIOR: It was just yesterday, your Honor.
11       THE COURT: Why don't I let you reserve some time and
12 maybe hear the proponent here in the case.
13       MR. GASIOR: Thank you, your Honor.
14       MR. McGOVERN: Thank you, your Honor.
15       My name is Brian McGovern.
16       THE COURT: Yes. Why don't you take the lectern,
17 Mr. McGovern.
18       MR. McGOVERN: Thank you, your Honor.
19       If I may just follow up on a couple of your comments
20 during my adversary's presentation.
21       You are correct that there is a statutory procedure,
22 under Public Health Law Article 28, for a hearing, notice and
23 hearing, in the event that the Department of Health determines
24 to take the extraordinary measure of closing a nursing home.
25       THE COURT: For reasons of no public convenience and

```
1    necessity served.
2         MR. McGOVERN:  As well as for cause.
3         THE COURT:  Well, forget the cause, because we all
4    know about those cases.
5         MR. McGOVERN:  Sure.
6         THE COURT:  And that's the only issue with your
7    client, that they think you have excess capacity.
8         MR. McGOVERN:  Your Honor, that is one of the -- we do
9    not dispute, as you're correct, that one of the purposes of the
10   enabling legislation is --
11        THE COURT:  To duplicate a power that the Commissioner
12   already had.
13        MR. McGOVERN:  Yes.  The Commissioner already had that
14   authority under the Public Health Law.  But the Legislature
15   empowered the Berger Commission to review hospitals and nursing
16   homes across the state to determine these right-size issues.
17        THE COURT:  And to close.
18        MR. McGOVERN:  You're correct, your Honor.
19        However, what counsel omitted is that, while the
20   Berger Commission did have the authority to make those
21   decisions, it did not have the -- it was required to consider,
22   on a facility-specific basis, statutory factors to determine
23   whether closure of that particular facility was appropriate.
24   Among other things, the Berger Commission was required to
25   consider the financial status of the nursing home.  It was to
```

1  consider the occupancy level of the nursing home.

2       The point about excess capacity is more than ironic in
3  this case. Andrus had near-full capacity in 2005, 2006. And
4  through this day, it is operating at 90 percent capacity.

5       THE COURT: This used to be a retirement home?

6       MR. McGOVERN: Your Honor, this facility has operated
7  as a nursing home.

8       THE COURT: Nursing home or retirement home?

9       MR. McGOVERN: As a nursing home pursuant to an
10 operating certificate issued in 1969.

11      THE COURT: And when was it founded?

12      MR. McGOVERN: It was founded in 1953 as a home for
13 elderly residents. And in 1969, the Department of Health
14 established a regulatory procedure for the licensure of
15 residential healthcare facilities commonly known as nursing
16 homes.

17      THE COURT: So is there a nursing home within the
18 retirement home, or was everybody thereafter a patient of the
19 nursing home?

20      MR. McGOVERN: Every one of those residents was a
21 patient of the nursing home. Every one of the residents today
22 at the Andrus is a resident of that nursing home. Every one of
23 those residents has been determined to be medically qualified
24 for nursing home care. That means that a determination has
25 been made that they require 24-hour nursing supervision.

1                And so they are meeting a need of the residents in
2       their facility and in the greater Westchester community. This
3       is a facility that is near full capacity. In contrast, if
4       you -- in the Berger Commission report, at page 35, the Berger
5       Commission noted that, statewide, 55 percent of nursing homes
6       are operating at a loss.
7                THE COURT: You see, the difficulty I see with that
8       argument is this. If the procedure is adequate -- it may not
9       be adequate -- if the due process is adequate, they have the
10      right to be wrong. That doesn't rise to a constitutional level
11      to come in and say, well, they gave proper notice, they had an
12      adequate hearing, the client had an opportunity to be heard and
13      present evidence and so forth, and they had due deliberation.
14      Once that's done, there's no more constitutional issue here, it
15      seems to me.
16               MR. McGOVERN: Your Honor, if that process --
17               THE COURT: You have to go to an Article 78 when you
18      get beyond that. If this were due process, you don't belong
19      here.
20               MR. McGOVERN: Well, your Honor, we have two due
21      process claims in this matter, one procedural due process where
22      the Andrus was given no notice that it was even being
23      considered for closure and had no opportunity --
24               THE COURT: They can cure that tomorrow, can't they?
25      All they have to do is give you notice and a hearing.

1   MR. McGOVERN: Well, if they provided us with notice
2   and hearing today, they would have to revoke their mandate that
3   now is in place --
4   THE COURT: Sure.
5   MR. McGOVERN: -- to close the nursing home.
6   THE COURT: Sure.
7   MR. McGOVERN: And, your Honor, it's hard to really
8   treat our two due process claims as separate and apart. They
9   are really one in the same.
10  THE COURT: What's the other one?
11  MR. McGOVERN: The other is a substantive due process
12  claim, your Honor.
13  THE COURT: I don't know that that has much meaning,
14  because this is a business in which the State has a very
15  powerful interest in which, for years, the New York statute has
16  recognized the State has an interest in controlling excess
17  capacity, and they could probably close the best possible, most
18  well-financed home in the state if the bureaucrats decide to do
19  that.
20      I think this case presents a problem which hasn't been
21  addressed. And I think it's a Burford problem. They have not
22  actually closed you or forced you to put these patients out on
23  the street. Isn't that right?
24  MR. McGOVERN: No, your Honor. With all due respect,
25  pursuant to the Berger Commission recommendation, which now has

1    the force and effect of law, the Andrus is going to have to
2    close down its nursing home and surrender its operating
3    certificate to the State.
4           THE COURT: I'm going to take a brief recess and ask
5    counsel to confer, and I'll talk with you after the recess.
6           My suggestion would be this. The State has a primary
7    interest in the validity, or non, of this alternative
8    legislative scheme. And I'm not going to characterize it. The
9    Court of Appeals of New York, in which everybody should have a
10   lot of confidence, is about to hear the Cheektowaga case. If
11   this Court were to try the issues, before the Court could reach
12   the constitutional issues, the Court would have to consider all
13   of the state law issues, unless the New York Court of Appeals
14   had ruled upon them, and I don't know why anyone, including the
15   Attorney General of New York, would want this Court messing
16   around in this thing while it's being fought out in the Novello
17   case and these other cases that are going to go up, including
18   Judge Bellantoni. And so my suggestion would be that you agree
19   with each other and the Court to maintain the status quo. You
20   can intervene, if you like, in the Cheektowaga case or appear
21   as an amicus curiae if you like. The Court will stay all
22   discovery in this case. And after St. Joseph comes down, if
23   there's anything left to rule on, I will.
24           I don't think there's a substantive due process claim
25   that's worth much thought. That's not a ruling. I think there

1   is a procedural due process claim here which sounds like you
2   have a probability of success, reasonable probability of
3   success, on the merits. But I think that they can cure it so
4   easily because they can either have the Health Commissioner
5   proceed against Andrus under the statute or they can go back
6   and do it right. And my guess is, if they go back and do it
7   right, they're going to be equally resolved. And if the due
8   process is given, I don't consider that there's a
9   constitutional issue if the result is wrong or arbitrary and
10  capricious. I think you have to go to the State for an Article
11  78 on that. That's just a tentative view. That's not a
12  finding.
13          I don't think it's in anyone's interest to proceed any
14  further with this case until St. Joseph is resolved.
15          MR. McGOVERN: If I may, your Honor, just to follow
16  up.
17          THE COURT: And, frankly, I would be willing to impose
18  that on you, after hearing everybody, but I think you would be
19  better off if you do it by agreement.
20          MR. McGOVERN: Your Honor, if I may. The St. Joseph's
21  case, as you point out, does raise state law issues as well.
22          THE COURT: Sure.
23          MR. McGOVERN: Our case is based solely on federal
24  constitutional claims. So we have no analog to any of the
25  state law claims that are being --

1      THE COURT: They are claiming the same things, aren't
2  they?
3      MR. McGOVERN: There is some overlap, certainly, in
4  the constitutional claims.
5      Your Honor, with all due respect, we present a case
6  far more compelling than St. Joseph's Hospital.
7      THE COURT: You do, but it's an awfully simple case,
8  because, if you win it, they're going to go back to the drawing
9  board and do it to you right.
10     MR. McGOVERN: Well, your Honor, I --
11     THE COURT: You have to be practical in this thing.
12 And I don't see why you want to be in unnecessary litigation.
13 And I can't understand why the Attorney General of New York
14 wants to be in the Second Circuit, which is where he's going if
15 we go that route. And after he finishes, let's assume the
16 Court agrees with you, which is a strong assumption to make.
17 Let's assume that the Circuit affirms. They go right back to
18 the drawing board. They do it right, which they could have
19 done in the beginning, or they have the Health Commissioner act
20 under the statute, which he can do.
21     MR. McGOVERN: Well, I do acknowledge that if there
22 were notice and hearing, that, if they do it the right way now,
23 with the history that we've already gone through, I really
24 raise a question of whether that could be a fair proceeding or
25 whether that's going to be a preordained result to ratify

1   retroactively what they had done improperly in the first place.
2          THE COURT: The priests of the temple may never
3   question its holy mysteries.
4          May I suggest to you that you go talk with each other.
5   The clerk will escort you to our conference room, which is
6   around the corner. And as soon as I get caught up on my
7   calendar, I'll come and speak with you.
8          MR. McGOVERN: Thank you, your Honor.
9          MR. GASIOR: Thank you, your Honor.
10         (Recess)
11         (Second call)
12         THE DEPUTY CLERK: Andrus v. Daines resumed.
13         THE COURT: The Court has given careful consideration
14  to the issues raised this morning in connection with the
15  hearing and has also spoken informally with counsel for both
16  sides of this litigation.
17         The Court concludes as a matter of discretion that at
18  least some of the issues, and perhaps all of them, is highly
19  likely to be resolved or made more clear by the New York Court
20  of Appeals when it decides the case of St. Joseph's Hospital of
21  Cheektowaga, which I have been referring to as Cheektowaga.
22  That was case against Novello, which was decided by the
23  Appellate Division with a dissenting opinion in the Fourth
24  Department on July 18th of this year. That appeal has been
25  taken and will be reached fairly soon.

1           The Court also notes that there are other state court
2  cases pending, including the Community Hospital in Dobbs Ferry
3  against Novello, decided by Justice Bellantoni of the
4  Westchester County Supreme Court on July 10th, 2007.  And we
5  discussed earlier on the record the McKinney case, which the
6  First Department of the Supreme Court decided on June 19th,
7  2007 and as to which the Court has been informed that the New
8  York Court of Appeals declined leave to appeal.
9           The Court concludes that this is a proper case for
10 Burford abstention.  It's quite clear that the State has a very
11 profound interest in the operation of the healthcare facilities
12 within its borders and that the issue of excessive beds is a
13 proper matter of state concern which is sufficient to justify a
14 Burford abstention.
15          The Court does understand that there is a
16 constitutional issue, perhaps two issues, raised in this
17 litigation as to which the Court has an unflagging duty to
18 accept jurisdiction and decide.  However, as I said earlier,
19 the Court would have to reach the state law issues first, and I
20 believe all of them at least will be resolved in connection
21 with the Cheektowaga litigation by the New York Court of
22 Appeals.
23          Accordingly, the Court orders that all proceedings in
24 this matter are hereby stayed, including pretrial discovery,
25 and the operating certificate of the plaintiff shall remain in

797andrc

1  full force and effect until further order of this Court.  And
2  the plaintiff is not required to commence the preparation of
3  its closing plan pursuant to the order of the Berger Commission
4  until a further order of this Court.  And the Burford
5  abstention will extend to a period of ten business days
6  following the date on which the Court of Appeals decision is
7  rendered in the Cheektowaga matter.
8       Counsel for both sides are invited immediately upon
9  learning of that decision to call it to the attention of this
10 Court.  And the Court will set a date within the ten-day period
11 or as soon thereafter as the business of the Court permits, at
12 which time the order being entered today will be considered at
13 an end and the remaining merits of the case, if there are any,
14 will be resolved by the Court or a decision entered with
15 respect to the matter.  The motion will remain in abeyance,
16 also, until that time.
17      By the way, the plaintiff is free, if so advised, to
18 enter into the Cheektowaga cace either as an intervenor or as
19 an amicus curiae if you want to do that.  You're certainly not
20 required to do it.
21      The foregoing is the disposition made today of the
22 matters being heard.  If there's anything unclear or
23 inconsistent with this Court's prior informal discussions with
24 counsel, that's certainly unintentional on my part, and if you
25 will call it to my attention, I'll modify the order

1  accordingly.
2      And I will begin with you, Mr. Gasior.
3      MR. GASIOR:  Thank you, your Honor.  I believe that's
4  what we discussed.
5      THE COURT:  Thank you, sir.
6      MR. McGOVERN:  We are accepting of your Honor's order.
7      THE COURT:  All right.  It's so ordered on the
8  transcript.
9      I don't think there's any necessity to issue a formal
10 order or serve it on the Commissioner of Health or anything
11 like that.  Is there, sir?  We don't have to do that.
12     MR. GASIOR:  No, your Honor.  We can take the
13 transcript, I think.  That will be sufficient for our client.
14     THE COURT:  All right.
15     I thank you all for your attendance and your efforts
16 in connection with the matter.  Please let us know as soon as
17 they decide.
18     MR. GASIOR:  Yes, your Honor.
19     THE COURT:  Please have a pleasant weekend.
20     MR. McGOVERN:  Thank you, your Honor.
21     THE COURT:  The Court will be in recess.
22
23                              - - - -
24
25

CHRISTINA M. ARENDS-DIECK, RPR, RMR, CRR
(914) 390-4103