UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

------------------------------------------------------------------ x
                                        :

JOHN E. ANDRUS MEMORIAL, INC. (d/b/a ANDRUS   :
ON HUDSON),

                                  :

                       Plaintiff,     :

                                  :     2007 Civ. 3432 (CLB)(MDF)

           -against-                   :

                                  :

RICHARD F. DAINES, as Commissioner of the New York   :     **NOTICE OF MOTION**
State Department of Health,

                                  :

                   Defendant.     :

                                  :

                                  :
------------------------------------------------------------------ x

C O U N S E L :

        PLEASE TAKE NOTICE that, upon the annexed Affidavit of Betsy Biddle,

sworn to on April 10, 2008, together with the exhibits annexed thereto, and upon the

accompanying Memorandum of Law dated April 11, 2008, and upon all prior papers filed and

proceedings had herein, plaintiff John E. Andrus Memorial, Inc. will make a motion before this

Court, at the United States Courthouse, 300 Quarropas Street, White Plains, New York, on April

25, 2008 for an order pursuant to Federal Rule of Civil Procedure 65 to prevent the defendant

from taking any further steps to implement the recommendation made by the Commission on

Health Care Facilities in the 21st Century to close the Andrus' nursing facility, or otherwise seek

the surrender of the Andrus' operating certificate pending the final determination of this action,

and granting such other and further relief as the Court may deem just and proper.

Dated:   New York, New York
         April 11, 2008

                                    CADWALADER, WICKERSHAM & TAFT LLP

                                    By: _____
                                              Peter G. Bergmann

                                    Attorneys for Plaintiff John E. Andrus
                                     Memorial, Inc.
                                    One World Financial Center
                                    New York, New York  10281
                                    Telephone:  (212) 504-6000


TO:    John P. Gasior, Esq.
       Assistant Attorney General
       Office of the Attorney General of the State of New York
       Attorneys for Defendant
       120 Broadway – 24th Floor
       New York, New York  10271

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

———————————————————————— x

JOHN E. ANDRUS MEMORIAL, INC. (d/b/a ANDRUS
ON HUDSON),

                                Plaintiff,

                -against-

RICHARD F. DAINES, as Commissioner of the New York
State Department of Health,

                            Defendant.

———————————————————————— x

2007 Civ. 3432 (CLB)(MDF)

**AFFIDAVIT OF BETSY BIDDLE IN SUPPORT OF PLAINTIFF'S MOTION FOR A PRELIMINARY INJUNCTION**

STATE OF NEW YORK     )
                      :  ss.:
COUNTY OF WESTCHESTER )

        BETSY BIDDLE, being duly sworn, deposes and says:

        1.     I am the Executive Director of plaintiff John E. Andrus Memorial, Inc., d/b/a Andrus on Hudson (the "Andrus"), and have served in that capacity since September 1999. The Andrus is a 197 bed not-for-profit nursing home built in 1953, and located in Hastings-on-Hudson in Westchester County. I am personally and fully familiar with the facts set forth below. I submit this affidavit in support of plaintiff's motion for preliminary injunctive relief enjoining the defendant from taking any action to close the plaintiff's nursing facility pursuant to a recommendation made by the New York State Commission on Health Care Facilities in the 21st Century ("the Berger Commission").

**A.    A Preliminary Injunction is Critical to the Health and Safety
of its Residents of the Andrus and to Preserve the Status Quo**

2.    Unless a preliminary injunction is issued, the Department of Health will force the Andrus to proceed with closure of its nursing facility and surrender its operating certificate by June 30, 2008. This would be devastating for the Andrus as a charitable institution, which has been meeting the long term care needs of Westchester County senior citizens for more than five decades, and is currently successfully operating at 99% occupancy (196 of its 197 certified beds are occupied). That level of occupancy is remarkable when one recognizes that for most Berger Commission facilities recommended for closure, the public disclosure of the closure recommendation became a self-fulfilling prophecy. Another casualty of closure would be the loss of over 200 jobs at the nursing home.

3.    Most significantly, however, closure would be tragic for the Andrus' residents, as shuttering the Andrus' nursing home would necessitate the transfer of its 196 residents to other facilities far away from the Andrus and the support provided by family and caregivers. Those transfers would pose a material risk of harm to these frail and elderly residents. I know the Andrus' residents as well as anyone, and sincerely believe that, given their advanced age and frailties, many of our residents simply would not survive the trauma of being moved from the nursing facility that they consider their "home" to another nursing facility, with an entirely new set of caregivers and in an entirely new environment. At the supplemental hearing, the Andrus will present the testimony of geriatric medical experts to speak about the grave risk of "transfer trauma".

4.    The "equities" tip decidedly in the Andrus' favor. The State has maintained that the goal of the Berger Commission is to "right size" nursing homes and address the excess capacity of nursing home beds on a regional basis. Closure of the Andrus would turn

that goal on its head, by forcing the closure of the one nursing facility that has filled virtually every one of its beds and has experienced an operating surplus for the past three (3) years (excluding the extraordinary legal fees incurred last year in this litigation), while delivering quality care to elderly residents equal or superior to that of any other facility in the Hudson Valley region. Moreover, recent events since the issuance of the Berger Commission's final report, underscore the irrationality of forcing the Andrus to close. Since November 2006, more than 300 nursing home beds have been or will be eliminated in Westchester County due to voluntary initiatives by various facilities. This situation presents the prospect that, with the closure of the Andrus, there will be too few nursing beds in Westchester County to meet the public need.

5.    What is more, the Andrus would likely prevail at trial on its claims that the State violated due process of law, along with other of the Andrus' constitutional rights, by adopting the seriously flawed Berger Commission recommendation to close the Andrus' nursing home without giving the Andrus notice and opportunity for a hearing. At no time during the Berger Commission's proceedings was the Andrus informed that closure was being considered or that the Berger Commission was relying on outmoded data and demonstrably mistaken information about the Andrus' occupancy, financial condition, and resident care. Having never received such notice, the Andrus was never made aware that it had to defend itself against a recommended closure and the grounds for such a recommendation, either at the Berger Commission's public hearings or in any other setting. That is, the Andrus was kept in the dark about the Berger Commission's plans and its reasons for closing the Andrus' nursing home.

6.    Thus, whatever "opportunity" there may have been to appear before the Berger Commission, the Andrus never had the chance to refute the numerous factual errors and assumptions that evidently formed the basis for the Commission's recommendation to shut down

the Andrus, and to present data directly to the Berger Commission showing the substantial number of its resident census, its financial stability, and the fine care being provided to its elderly residents.

7.    This lack of due process clearly harmed the Andrus: there is a complete disconnect between, on the one hand, the troubled facility depicted in the Hudson Valley Regional Advisory Committee ("RAC") report, which was charged with assisting the Berger Commission in making recommendations specific to the Hudson Valley, and the Berger Commission report and, on the other hand, the true picture of the Andrus. Copies of these reports are attached as Exhibits A and B respectively. Without having afforded the Andrus notice and a meaningful opportunity to be heard, the Berger Commission, with only the flawed report of the Hudson Valley RAC, determined that the Andrus' nursing home should be forced to close, despite available evidence showing that the Andrus was – and to this day continues to be – a thriving, financially stable not-for-profit nursing facility addressing the care needs of 196 senior citizens.

8.    What is at stake, however, is more than the Andrus' property interest; it is the continued care and safety of those elderly residing there who call the Andrus their home.

**B.    The Andrus**

9.    The Andrus is a not-for-profit charitable organization established in 1953 by the family of John E. Andrus to provide a home for elderly individuals. Located in Hastings-on-Hudson, the Andrus operates on the same 26-acre campus and in the same original structure as it did when it first opened its doors over 50 years ago.

10.    In 1969 and continuing for the next 39 years, the Andrus has been licensed as a "residential health care facility", or nursing home by the New York State Department of Health, and is currently certified to care for up to 197 residents. The Andrus is a certified

4

provider in the Federal Medicare program, providing subacute and skilled nursing and rehabilitative services to individuals aged 65 and over; and in the State Medicaid program, providing medical assistance, including long-term nursing home care, to indigent and medically needy individuals.

11.    The Andrus currently cares for 196 elderly residents, the majority of whom are from Westchester County or elsewhere in the Hudson Valley region. More than three-fourths of our residents either come from Hastings-on-Hudson or another community within 5 miles of the Andrus or have a responsible party from that same area.

12.    The approximately 170 individuals receiving long-term nursing care at the Andrus have each resided there, on average, for roughly four years.

13.    The Andrus' residents are elderly:  their average age is 88 years.  The Andrus residents are also infirm:  only 31 of the Andrus' current residents can be characterized as "low acuity"[1] and not suffering from dementia.  Many of these residents require the 24-hour nursing supervision provided only in a nursing facility.  The remaining 84% of the Andrus' residents have substantial care needs that cannot be adequately met in any other level of care lower than a nursing home.

14.    Finally, the majority of the Andrus residents are both elderly and poor: roughly 75% of its long-term care residents financially qualify for Medicaid while 33% of the remaining residents, or 8% of its total population, are paid for by Medicare.

---

[1]    The New York State Department of Health has used the term "low acuity" synonymously with those nursing home residents categorized as "Reduced Physical Functioning A" or "Reduced Physical Functioning B" under the Department of Health's Resource Utilization Group ("RUG")-II reimbursement classification system. See 10 N.Y.C.R.R. § 86-2.30 and Appendix 13-A.

**C.**   **A Preliminary Injunction Will Prevent Irreparable Harm**
         **to the Andrus and its Residents**

   **1.**   **Submission of a Closure Plan Would Jeopardize**
            **Andrus' Continued Operation**

   15.   By letter dated January 31, 2007, the Department of Health outlined a series of steps to be taken by the Andrus in furtherance of the Berger Commission closure recommendation, culminating in the Commissioner of Health's revocation of the Andrus' nursing home Operating Certificate by June 30, 2008. A copy of the January 31, 2007 letter is annexed as Exhibit C. Despite the Court's denial of defendant's motion for summary judgment, the defendant has informed the Andrus that, absent a preliminary injunction, it intends to move forward with implementing the Berger Commission's closure recommendation during the pendency of this litigation.

   16.   Absent a continuation of the stay, the next step that the Andrus would be compelled to take is the preparation and submission of a closure plan to the Department of Health. See Exhibit C. Preparing a closure plan would begin with the sorry task of notifying the hospitals and physicians in the Andrus' surrounding communities, as well as any prospective residents inquiring about admission, that it could no longer accept admissions to the nursing home. Referral sources and prospective residents would immediately look elsewhere, resulting in a self-fulfilling prophecy of reduced admissions and lower occupancy, financial hardship, and certain demise. This would be particularly ironic—and tragic—considering that the Andrus is the nursing home of choice for many of the elderly residents in Westchester County, operating at virtually full capacity.

   17.   Quite literally overnight, then, the Andrus would be transformed from a thriving institution and community resource into a moribund facility and pariah in the health care provider community. Even if the facility were to remain technically in operation through trial,

admissions and occupancy would plummet once word of its closure plan was made public. Essentially, there would be no turning back once a closure plan is formulated and submitted. Thus, the very act of preparing and submitting a closure plan would irrevocably harm the Andrus' continued viability, making the final act of formally surrendering its operating certificate a *fait d'accompli*.

18.    Finally, in its complaint, the Andrus asks for only declaratory and injunctive relief against the State, not monetary damages. Even if the Andrus could somehow be adequately compensated for the harm it would suffer if the defendant moved forward with its closure recommendation -- leaving aside the harm to our residents -- I am advised by our attorneys that money damages from the State are unavailable to the Andrus in federal court under the Eleventh Amendment to the United States Constitution.    Therefore, if a preliminary injunction is not granted, the Andrus will be unable to ever obtain any form of meaningful redress in federal court for the violation of its constitutional rights.

**2.    The Andrus' Residents Would Suffer Transfer Trauma**

19.    Should the Andrus be forced to proceed with closure, the vast majority of its 196 current residents would have to be placed in another nursing facility because they will continue to require care in a skilled nursing facility setting. Our residents will also be at serious risk of suffering psychologically and physically from being uprooted from their "home" and community and forced to live and receive nursing home care in an unfamiliar environment.

20.    "Transfer trauma" is a phenomenon that is well recognized in the health care community and geriatric medicine. Residents of a nursing home often suffer physical and/or mental distress leading up to, during, and immediately following transfer to another facility. According to the literature, among the factors that can increase the likelihood of transfer trauma are the age of nursing home residents, the level of their cognitive impairment, and the

7

degree of change experienced by the residents, including any changes in the quality of care provided as well as changes in the physical environment where the resident lives and receives care.

21.    The Andrus' medical experts will testify to the significant role dementia plays in aggravating the incidence and degree of transfer trauma that elderly nursing home residents experience. In the Andrus' case, the impact of transfer trauma will likely be severe and broad in scope, as the Andrus' resident population is both aged, with an average of 88, and cognitively impaired, with 115 of them suffering from dementia.

22.    The medical literature also suggests that the greater the distance that a nursing home resident will be forced to relocate, the greater the likelihood that the resident will experience transfer trauma. This factor, too, will also increase the magnitude of transfer trauma for residents of the Andrus. The vast majority of the residents currently residing at the Andrus have strong ties to Hastings-on-Hudson or the immediate vicinity. Of the 196 current residents, 108 residents came to the Andrus from a prior address within 5 miles of the facility. An additional 42 residents have a responsible party or other family within a 5 mile radius of the facility. Many of these residents have resided at the Andrus for several years and have bonded with the Andrus as their "home" while maintaining strong ties to the community-at-large.

23.    The Andrus also currently cares for 33 Sisters from two religious orders of nuns. One group of 14 nuns is from a community located in Dobbs Ferry, Westchester County, and they are among the 150 residents with ties to communities within 5 miles of the Andrus, as described above. An additional 19 nuns, from a religious order based in New Rochelle, Westchester County, are also currently residing at the Andrus. Eleven of these nuns suffer from dementia. Because of the exceptional design features offered at the Andrus, the nuns from each order have been able to continue living and worshipping together in daily prayer at the Andrus.

8

The Andrus has an auditorium in the nursing facility that is utilized as a chapel. If forced to relocate, it is highly unlikely that the Sisters could be transferred as a group and continue their worship practices together at another nursing facility. I know of no other local nursing home that could accommodate our nuns as a group.

24.     Of the remaining 27 residents previously residing beyond 5 miles from the Andrus, 24 are either suffering from dementia or are significantly medically compromised with a higher case mix index than "Physical A" or "Physical B". On average, they have resided at the Andrus for the past 4 years; transferring them away from "home" also presents great risk due to their physical and cognitive impairments.

25.     While most of our residents have close ties to Hastings-on-Hudson and the other surrounding communities, only a small fraction could actually be transferred to a nearby nursing facility, even assuming they could withstand the stress of such a move. In a survey conducted by my staff last month, we could only identify 38 nursing home beds currently available within 5 miles of the Andrus. Thus, the vast majority of our residents -- 158 frail, elderly individuals -- would have to be moved to facilities beyond 5 miles away to effect the Berger Commission's closure mandate.

26.     Many of our residents would have to be transferred to facilities in New York City. However, only 17 of our current residents come from New York City. Of these, 13 have dementia, 10 have a responsible party within 5 miles of the Andrus, and 6 have a case mix index higher than Physical A or Physical B. Thus, transferring them to facilities outside of Westchester County would be no less risky given their current ties to the local community as well as their cognitive impairments and overall frailty.

27.     The current shortage of beds in the communities immediately surrounding the Andrus can be explained in part by the voluntary closure of the Guild Home for the Aged

9

Blind, located in Yonkers, New York. This facility voluntarily relinquished all 219 of its certified beds -- a significant reduction in nursing home bed capacity in southern Westchester County that was not accounted for or known by the Berger Commission or Hudson Valley RAC when it recommended the elimination of the Andrus' beds. One other nursing facility that was ordered to downsize from 321 to 181 beds -- Taylor Care Center – is voluntarily agreeing to a further reduction of another 91 nursing home beds. Because of these voluntary reductions, there will be at least 113 fewer beds in Westchester County than the Berger Commission foresaw when it made its closure recommendation – without requiring closure of the Andrus' 197 beds. Upon information and belief, the most recent Department of Health estimates for nursing home bed need in Westchester County indicate that, in light of these voluntary downsizings, there may actually be a deficit of over 100 beds in the County if the Andrus were forced to close, creating yet another health care planning crisis, the very opposite of the "over-bedding" issue the Berger Commission was supposed to address.

**D.    The Andrus' Constitutional Claims Have Great Merit**

28.    In its complaint, the Andrus asserted five constitutional claims. First, it alleged that its procedural due process rights were violated because the closure recommendation was made without first providing the Andrus with notice and opportunity to be heard. Second, it maintains that in seeking to close the Andrus' nursing home and revoke its operating certificate, the defendant had violated its substantive due process rights. Third, the Andrus alleges that the revocation of its operating certificate would constitute an unconstitutional "taking". Fourth, it alleges that forcing the Andrus to close or convert to an assisted living facility without providing funding violates both substantive due process and the Takings Clause. Finally, it alleges that implementation of the Berger Commission's recommendation would impermissibly interfere with its existing contractual relationships in violation of the Contracts Clause. In its March 10,

10

2008 Memorandum and Order, this Court denied defendant's motion for summary judgment with respect to all of those claims.

29.    The Andrus submits that the following facts fully support its constitutional claims:

## 1.    The June 2006 Meeting With the RAC

30.    Regarding any "notice" given to the Andrus, the Andrus' only substantive communication with either the Hudson Valley RAC or the Berger Commission occurred at a single meeting held on June 20, 2006, at the Hudson Valley RAC's office on the campus of Westchester Medical College, in Valhalla, New York, which I attended.

31.    Attending the June 2006 meeting were members of the Hudson Valley RAC along with a Berger Commission staff member (Alison Silvers). At none of the discussions before, during or after the meeting was there any mention or suggestion that the RAC or the Berger Commission had already identified the Andrus for right-sizing, or was requesting the meeting to discuss why it should be closed for any reason, such as alleged low occupancy level, recent history of patient care deficits, low care needs of its residents, and financial problems, cited later in their Reports. If the closure of the Andrus' nursing home was on their agenda, the participants kept it completely hidden from me.

32.    To the contrary, I was told that the meeting was sought, in the words of one Commission representative, to hear the "good story" that the Andrus had to tell about its current situation and future plans. With much pride, I obliged the RAC, and explained how the Andrus had turned around its operations following the rejection by the Village of its proposed CCRC. I told the participants that while the Andrus' proposal to develop a continuing care retirement community ("CCRC") on the campus was being reviewed, we suspended admissions to the nursing home, causing revenue to fall, but that in late 2002 we resumed admissions and

over the past few years steadily restored our resident census. I also informed the participants that in July 2002, after learning of the decision by the Village of Hastings-on-Hudson authorities to deny the Andrus the development permit needed to proceed with a CCRC, the Andrus had agreed to transfer 50 beds to another not-for-profit nursing facility, Beth Abraham Health Services, and reduced its nursing home bed complement to 197 beds. I told them that the Andrus also resumed admissions to the nursing home and had increased occupancy from an average census of 72 residents in 2002 to a level of 176 residents by year end 2005, reflecting a 90% occupancy rate with our existing 197 bed complement. I also noted that our census was currently 182 residents, and had even occasionally climbed above 190 residents in the early part of 2006.

33.     Lastly, I advised the meeting participants that, with our improved occupancy levels, the Andrus had achieved an operating surplus in 2005, and had continued operating in the black through 2006.

34.     By the discussion at the meeting, I certainly had no reason to suspect that the RAC or Berger Commission would recommend that any adverse action would be taken against the Andrus.

35.     The participants at the June 2006 meeting from the RAC and Berger Commission welcomed my offer to provide copies of the Andrus' 2005 certified financial statements and the July 2002 agreement to transfer 50 nursing home beds to another facility. Later that week, on June 23, 2006, I sent the Andrus' 2005 certified financial statements and a copy of the transfer agreement to the RAC's Chair.

36.     With no notice of "closure" or any grounds for closure, the Andrus never had any meaningful opportunity to defend itself for the simple reason that it did not know it needed to defend itself. What is more, in the Andrus' circumstances, depriving the facility of

notice was the worst-possible scenario and especially injurious to the Andrus, precisely because the RAC and Berger Commission had apparently already effectively "pre-judged" the Andrus' nursing home for possible closure early on in the process.

37.    Following the June 2006 meeting, the Andrus never heard again from either the Hudson Valley RAC or the Berger Commission until November 28, 2006, the very day that the RAC and Berger Commission simultaneously made public their final reports.

## 2.    **The RAC Report's Faulty Findings**

38.    Many of the errors that resulted in the Berger Commission's recommendation to close the Andrus can be traced to the mistaken factual assumptions and flawed data relied on by the Hudson Valley RAC in its final report.

39.    The Hudson Valley RAC report cited the Andrus' alleged "low occupancy and case mix index (in 2003, 39.2% and .90, respectively)" and "obvious financial problems." Those statements reflect the Hudson Valley RAC's materially erroneous views about the Andrus' occupancy and financial status, in the following respects:

40.    First, the 2003 data cited by the Hudson Valley RAC was stale and unrepresentative of the Andrus. The Andrus averaged 97 occupied beds in 2003 due to the temporary suspension of admissions pending the Village of Hastings-on-Hudson's review and approval of the CCRC proposal. However, by 2005, that figure rose to an average of 171 residents, reaching 176 residents by year end. Our occupancy continued to improve in 2006. On June 20, 2006, the day of my meeting with the RAC, our census stood at 183 residents. I shared all of this information with the RAC at our meeting. Despite having timely received this information, the Hudson Valley RAC obviously ignored it and preferred to rely on the old data instead, evidently because it was more suited to support a closure objective. Meanwhile, other Westchester nursing homes were not even supplying information.

13

41.    Second, the cited occupancy rate of 39%, even for 2003, is inaccurate and grossly understates the Andrus' true occupancy levels, because the Hudson Valley RAC mistakenly presumed a bed capacity of 247 certified beds rather than the Andrus' true complement of 197 beds due to the Andrus' voluntary agreement to transfer 50 beds to another nursing facility.  That error is inexcusable, as I informed the RAC at our June 2006 meeting of the 2002 agreement to move 50 of our beds, and I even provided them with a copy of the transfer agreement immediately following the meeting.  In 2003, the Andrus' occupancy rate was 49% based on 197 certified beds.  By 2005 and 2006, the Andrus achieved average occupancy rates of 87% and 90% respectively.

42.    Third, the RAC's reference to the Andrus' "obvious financial problems" is also mistaken and ignores the fact that by 2005, the Andrus was operating at a surplus.  Again in 2006, the Andrus continued to operate in the black.  This information was also timely shared with the Hudson Valley RAC at the June 2006 meeting and confirmed by the Andrus' 2005 certified financial statements submitted to the RAC's Chair that same week.  That data, too, was ignored.

### 3.    No Notice of the RAC Report's Faulty Findings

43.    The Hudson Valley RAC issued its report to the Berger Commission containing its "rightsizing" recommendations on November 15, 2006.  However, the RAC Report was not released to the public – nor made accessible to the Andrus – until the Berger Commission issued its Final Report on November 28, 2006.  Consequently, the Andrus was never given the opportunity to speak with or present testimony to the Berger Commission directly to refute the many flawed assumptions and factual inaccuracies in the Hudson Valley RAC Report.  Likewise, without affording the Andrus any notice of its contemplated actions or a meaningful opportunity to be heard, the Berger Commission issued its Final Report on

November 28, 2006, recommending that <u>all</u> of the Andrus' nursing home beds be eliminated and its operating certificate rescinded.

44.     The Berger Commission did hold public hearings, which had taken place in the early part of 2006 and were concluded by the time the RAC met with me in June 2006.

45.     The "generalized" notice supposedly provided by the passing of the Enabling Legislation is insufficient for a number of reasons:

46.     <u>First</u>, if it were true that the mere possibility that a hospital or nursing facility could be closed were enough to compel a facility to participate in the Berger Commission hearings, then virtually every facility in the State (over 1,000 of them) would have availed itself of the public hearing process. Such an eventuality would have inundated the Commission and brought its work to a screeching halt. Moreover, on information and belief, other facilities were clearly informed that they were slated for closure.

47.     With so much at stake for targeted facilities, any "burden" of notice and hearings would have been modest, but was clearly warranted to ensure (i) that the Berger Commission makes its recommendations on the basis of sound, reliable data that can be tested by the one party with the most to lose from the Commission's reliance on faulty information; and (ii) that the Commission does not act (as happened here) to revoke an operating certificate inconsistently with the facts or the governing statutory factors. Indeed, in this case, it would have been no burden at all for the RAC or Berger Commission to have at least alerted the Andrus that it was a candidate for closure and identified the "factors" informing its thinking in this regard, by simply saying so at the June 2006 meeting. It is the RAC and Berger Commission, and not the Andrus, that chose not to avail itself of that opportunity.

48.     <u>Second</u>, the mere possibility of closure does not inform any adversely affected facility of the particular grounds that the Berger Commission may have been relying on

as the basis for its recommended action.  Thus, a facility like the Andrus would have no way of knowing what documents or information it needed to present, if any, to address those grounds. Without knowing that basic information, any "opportunity" to be heard is hardly meaningful.

49.    Finally, the "generalized notice" to all facilities that they could be forced to close by the Berger Commission is also inadequate because the Berger Commission was not granted the power to select facilities for closure at whim, without regard to any particular facts or circumstances.  That is, an across-the-board elimination of hospital and nursing home beds in New York State was not the Berger Commission's sole statutory "mandate".  If it were so, then one might argue that any and all facilities in the State are "fair game" for closure and are "on notice" by virtue of the Berger Commission's very existence.  Instead, the Legislature directed the Berger Commission to consider a host of factors when making any "rightsizing" recommendations.

50.    As a general matter, unless a facility is notified in advance that the Berger Commission is considering closure based on one or more of the statutory factors, a facility would have no reason to suspect it was being targeted.  This is especially true in the Andrus' case, where it was successfully operating at near-capacity and with a surplus; was caring for a majority of Medicaid residents; was meeting the continued demand for its services in the community; and was not amenable to ready conversion to any alternative use – all factors that under the Enabling Legislation would weigh heavily against the Andrus' being targeted for closure.

### 4.    The Fundamental Flaws in the Berger Commission's Report

51.    Like the Hudson Valley RAC, the Berger Commission based its recommendations on several fundamentally flawed assumptions about the Andrus' financial circumstances and nursing home operations.  In so doing, the Berger Commission acted wholly inconsistent with the facts about the Andrus as well as the factors set out in the Enabling

Legislation that were to guide the Berger Commission before it recommended such drastic action as the revocation of a facility's operating certificate.

52.    In the Final Report, the Berger Commission described the Andrus as a "247 bed" facility that "has been operating at a significant loss until 2006" and that it only now "claims" to be operating in the black.  See Exhibit B, page 123.  In fact, the Andrus years earlier had voluntarily "rightsized" to a 197 bed nursing facility, and has been successfully approaching 100% capacity.  Equally significant, the Andrus' solid occupancy levels, around 90% or better, over the past several years reflect the strong, continued demand for its nursing home services among Westchester's senior citizens.  Our occupancy today stands at 196 with only one vacancy. On information and belief, no other hospital or nursing home slated for closure by the Berger Commission has an occupancy anywhere close to ours

53.    Moreover, several years before the Berger Commission's report was released, the Department of Health knew about the 50 beds transferred to Beth Abraham.[2]

54.    Furthermore, contrary to the Berger Commission's suggestion, it is more than a "claim", but a fact, that the Andrus was operating at a surplus, not a deficit.  Indeed, the Andrus' independent auditors reviewed the Andrus' financial statements for 2005, certified them to be accurate, and reported a surplus (net of grant monies) of $509,179 on the Statement of Operations.  The 2005 certified financial statements were furnished to the RAC in June 2006, but neither the RAC nor the Berger Commission even mention them.   Instead, the Berger Commission dismissed what I told the RAC at our meeting as a mere "claim", and then only with respect to fiscal year 2006, not 2005.  In doing so, the Berger Commission contravened the

_____

[2] The Department of Health formally decertified the 50 beds effective as of July 1, 2006, a date four months prior to the release of the report.

statutory mandate that it properly consider the "financial status of a facility" when deciding whether closure or other adverse action is warranted.

### 5.    Assisted Living Is Not A Viable Option

55.    The Berger Commission has offered the Andrus the "Hobson's choice" of either closing down its nursing home entirely, or converting to a lower level of care and adding 140 Assisted Living Program ("ALP") beds with <u>zero</u> nursing home beds.  This latter option, however, is simply not viable.

56.    Converting the Andrus to an assisted living facility, at best, would yield severe operating shortfalls.  Here too, the Berger Commission failed to properly consider the "economic impact of right sizing", one of the other factors delineated in the Enabling Legislation.

57.    Obviously, closing the nursing home would force the Andrus to lay off over 200 employees, and would sever our relations with physicians, food vendors and other suppliers, and the many other individuals and entities with whom the Andrus does business in order to maintain and operate its nursing home.  This will no doubt have a negative impact on the local economy, a factor that the Berger Commission also should have considered pursuant to the Enabling Legislation.

58.    In the Final Report, the Berger Commission asserts that the Andrus' conversion to an ALP would be "economical".  Exhibit B, p. 123.  In one scenario, the Berger Commission recommends that the Andrus complete a floor by floor renovation of its existing facility to convert it to an ALP.  However, such a statement ignores the reality that any conversion of the Andrus' physical plant – designed and built a half century ago – into a residence that is both attractive to prospective assisted living residents and fully compliant with

ALP regulations, would be a very costly undertaking. In this regard as well, the Berger Commission failed to properly consider the "economic impact" of the mandated conversion.

59. As an alternative, the Berger Commission states that the Andrus could build additional ALP homes on its campus. However, the Village of Hastings-on-Hudson previously refused the Andrus permission to develop its property when it rejected its plan to expand the campus to a CCRC. Simply put, the 26 acres on which these ALP homes would be built are in all probability essentially untouchable.

### 6. "Low Acuity" Does Not Justify Closure

60. In the Final Report, the Berger Commission presumed that the "low" acuity of the Andrus on Hudson's residents relative to other nursing homes meant that a majority of its residents "could be better served in an ALP". Exhibit B, p. 123  Contrary to that conclusory assertion, the residential health care facility beds now in use at the Andrus cannot be converted to assisted living slots without profoundly disrupting the 24-hour nursing home care that many of our residents require.

61. The RAC and Berger Commission cited to the Andrus' Physical A and Physical B residents to support the assumption that the Andrus' residents could be safely cared for in an assisted living program. These residents comprise a distinct minority of the Andrus' resident population, and close to half of them suffer from dementia or other mental impairment. The vast majority of our residents clearly have greater care needs and would require continued nursing home care. Thus, it makes no sense that a significant majority of the Andrus' residents would be forced to transfer to another nursing facility – a traumatic event for any chronically ill senior – based on the Berger Commission's belief that some of the Andrus' low-acuity residents could get by with only assisted living.

62.     Furthermore, the Berger Commission itself assumed that only an estimated 19% of the Physical A and Physical B nursing home residents in the State could be cared for in an alternative level of care setting. See Exhibit B. The Andrus' Physical A and Physical B residents are no different; one-half of them suffer from the onset of dementia and need 24-hour nursing supervision.

63.     The Berger Commission recommended closing the Andrus' nursing home and converting it to an ALP despite – or perhaps because of – the fact that none of the Commission's staff or members ever visited the Andrus' nursing home, much less performed any clinical assessment of the Andrus' residents and their actual care needs. Indeed, if the Berger Commission's recommendations affecting the Andrus were implemented, most of the Andrus' residents -- largely frail elderly averaging 88 years old who consider the Andrus their home -- would have to be transferred to another skilled nursing facility and consequently endure the trauma associated with such a move.

64.     Moreover, transferring most of the Andrus' residents to another nursing home will not only cause "transfer trauma" for these aged, frail residents, but will also actually cost the Medicaid program and the rest of the health care system more money – estimated conservatively at more than $3.8 million a year.[3] That is because the Andrus happens to be one of the lowest-cost facilities in Westchester County – a fact apparently lost on the Berger Commission. Such an outcome is plainly contrary to the aim of "rightsizing".

65.     Furthermore, since most of the Andrus' residents are covered by the Medicaid program, it will end up costing the State three or more million dollars per year in

---

[3] This estimate is based on an analysis my staff and I performed of the 2006 Medicaid reimbursement rates of Westchester County nursing homes promulgated by the Department of Health, and a comparison of the Andrus' rates with the rates of nursing facilities within a five- mile radius of the Andrus.

additional funds to cover their nursing home care at nearby facilities in Westchester County. In this regard, the Berger Commission similarly failed to take into consideration "the extent to which [the Andrus] serves the healthcare needs of the region, including serving Medicaid recipients", also a factor in the Enabling Legislation.

7.    **Overstatement of Survey Deficiencies**

66.    The Berger Commission made several other factual errors about the Andrus in its Final Report. For instance, the Final Report states that "[t]he facility has a history of a high number of deficiencies (26 in its 2005 survey), many of which are attributable to the building's deteriorating condition." Exhibit B, p. 123.

67.    With so many other errors in the Berger Commission's report, defendant has apparently sought to elevate the importance of the 2005 survey results over some of the other "factors" underlying the Commission's recommendation. However, on this factor as well, the Berger Commission expressly relied on flatly inaccurate data and proceeded on the demonstrably mistaken assumption that the Andrus had a history of patient care deficits, which justified its closure.

68.    In the Department of Health's 2005 resident survey, the Andrus was cited for only 8 survey deficiencies related to resident care, none of which involved harm to any patients, and 6 other deficiencies for building/environment, for a total of 14 deficiencies, not 26. Thus, the Berger Commission's misstatement nearly doubled the actual number of Andrus survey citations. Nor were any of the cited deficiencies at Andrus at a high level of severity or scope as to constitute substandard quality of care under the survey regulations.

69.    In all of my eight years with the Andrus, the facility has never been cited with as many as 26 deficiencies on any annual resident survey.

## CONCLUSION

70.    In light of the current 99% occupancy level at the Andrus; the grave risk of transfer trauma to our aged and often cognitively impaired residents; and the shortage of available beds in the surrounding communities; issuing a preliminary injunction is absolutely essential to preventing irreparable harm both to the Andrus and to our residents.

71.    Further, our constitutional claims have a substantial likelihood of success on the merits. The Berger Commission's mandate to close the Andrus' nursing home was made without first providing the Andrus with notice and an opportunity to be heard on the matter. Further, it was premised on misinformation about the Andrus' operations and financial status, and makes no sense economically, financially, or clinically. As its recommendations also defy the factors set forth in the Enabling Legislation, the mandate is wholly without legal justification.

WHEREFORE, for the foregoing reasons, I urge the Court to grant plaintiff's motion for a preliminary injunction, and to enjoin the defendant from taking any further steps to implement the Berger Commission's recommendations affecting the Andrus.

_____
Betsy Biddle

Sworn to before me this
10th day of April, 2008.

_____
Notary Public

DIANE M MELLACI
Notary Public - State of New York
NO. 01ME6176322
Qualified in Westchester County
My Commission Expires 10/29/11

Exhibit A

# Hudson Valley Regional Advisory Committee

# Final Report Submitted to the Commission on Health Care Facilities in the Twenty-First Century

## November 15, 2006

Dr. Robert Amler, Chair ◻ Charles Bell ◻ William Florence ◻
David H. Freed* ◻ Peter Hamilton* ◻ Kenneth Herman ◻
Dr. Linda Landesman ◻ Michael Pascale ◻ Dr. Barry Perlman

*New members as of June 2, 2006, did not attend any meetings

# TABLE OF CONTENTS

INTRODUCTION                                                    1

PART 1:  FACILITY REVIEW & ANALYSIS                            3

   ACUTE CARE FACILITIES                                   3

   LONG TERM CARE FACILITIES                              10

PART 2:  COMMITTEE COMMENTARY AND POLICY
      RECOMMENDATIONS                                    13

   ACUTE CARE                                             13

   LONG TERM CARE                                         16

# INTRODUCTION

## CHARGE AND PURPOSE

This report is respectfully submitted to the New York State Commission on Health Care Facilities in the Twenty-First Century by the Hudson Valley Regional Advisory Committee. In the authorizing legislation, Regional Advisory Committees were commissioned to ensure that the knowledge and expertise of local stakeholders were well integrated into the Commission's recommendation process. Regional Advisory Committees members were asked, in particular, to contribute their knowledge of local circumstances, history, and understanding of potential solutions. The Regional Advisory Committees were charged with adding value to the Commission's deliberations by developing qualitative insights and local understandings that can ultimately be merged with the largely quantitative analyses being conducted by Commission staff.

The Hudson Valley Regional Advisory Committee (the Committee) held 16 meetings, from December 2005 through June 2006, including 3 formal public hearings in Middletown, New Paltz, and Valhalla. These hearings included participation by 34 health care providers, health care associations, community-based organizations, payers, and consumers. The Committee members discussed fundamental issues, specifically quality of care, access barriers, reimbursement policies, and market strategies affecting the provision of acute- and long-term health care in the Hudson Valley region as well as the State of New York. The Committee has included some discussion of these elements in this report, recognizing that their resolution lies well outside the formal charge and available resources of the Committee.

## REGIONAL BACKGROUND

The Hudson Valley region, as defined by the Commission, is composed of eight counties north and northwest of New York City: Delaware, Dutchess, Orange, Putnam, Rockland, Sullivan, Ulster, and Westchester, the most populous by far. The region encompasses a diverse array of communities and lifestyle settings ranging from inner-city urban, with significant urban health problems, suburban and exurban communities, to rural agricultural. In addition, access to care is compromised in the large forested mountainous areas that include America's northernmost section of Appalachia, with limited transportation, limited access to medical specialties, and five federally designated Critical Access Hospitals (CAHs).

Population growth in this region is forecasted to continue to grow at approximately 5% per year. The elderly population (persons 75 years and older) is forecasted to grow from 5% of the region's population in 2000 to 8% in 2030. Above-average growth will continue in Orange, Putnam, Sullivan, and Ulster. Modest declines in population are forecasted in Delaware, Rockland, and Westchester.

1

The population of the Hudson Valley region is diverse in race, color, ethnicity, primary language, etc. The region has a rich history and highly developed network of social services, mental health services, advocacy for children and elderly, disability services, and vocational rehabilitation. The region is also home to a vibrant and healthy private sector that includes biotechnology and pharmaceutical companies, and innovative healthcare and service providers. In 2004, average wages in the region were approximately $44,300. In 2000 an estimated 11.4% of the population in the Hudson Valley, was uninsured. There are 22 designated Medically Underserved Areas or Populations in this region.

The current geographic distribution of healthcare facilities, both acute- and long-term care, is an unplanned and somewhat arbitrary result of history and community development. Planning is required to right-size this allocation. A strategic and evidence-based network of integrated healthcare service – from ambulatory to long-term care settings – is needed to manage and care for patients as they move through the various levels of care. This model would ideally encompass health promotion and preventive care for all residents, enhanced occupational safety and health, improved access to acute- and long-term care and rehabilitative services, and embedded quality-assurance elements.

# PART 1
# FACILITY REVIEW AND ANALYSIS

## THE REVIEW PROCESS

In order to fully review each of the facilities the Committee took the following steps:

- Gathered and reviewed individual facility data provided by the Commission, provider associations, providers of acute and long-term care
- Reviewed data from additional sources including the Centers for Medicare and Medicaid Services (CMS) Hospital Compare; Joint Commission on Accreditation of Healthcare Organizations survey results; and Department of Health Surveys
- Reviewed provider presentations at Committee meetings
- Reviewed testimony provided at three public hearings
- Held individual meetings with providers from facilities of interest, provider representatives who wanted to discuss their facilities in more detail than their public testimony allowed, interested community members, and experts in the field. In addition, representatives from Northern Metropolitan Hospital Association (NorMet), Hospital Association of New York State (HANYS), New York State Health Facilities Association (NYSHFA), New York State Association of Homes and Services for the Aging (NYSAHSA), and Home Care Association of New York State (HCANYS) made presentations to the Committee. Facility market penetration and geographic location were also analyzed
- Reviewed and analyzed audited financial statements of acute-care facilities of interest.

All facility data were compared with the Commission's criteria. Based on its review and analysis the Committee makes the following observations and nonbinding recommendations in accordance with its formal charge:

## *ACUTE CARE FACILITIES*

In reviewing the northern tier consisting of six counties, Delaware, Dutchess, Orange, Putnam, Sullivan, and Ulster, it is evident that the hospitals are fairly well distributed geographically up to an hour's drive from each other, with few exceptions Five of the hospitals are designated Critical Access Hospitals (CAH). One each in Sullivan, and Ulster, and three in Delaware County. In the southern tier consisting of Rockland and Westchester counties, Westchester clearly has a denser concentration of hospitals, thereby reflecting the greater population density. These facilities are located close to each other and actively compete for patients in each other's markets. The Committee examined each facility with respect to the Commission's six criteria, in particular occupancy rates and market share, because of the smaller distances and shorter travel times compared to the northern parts of the region.

In the last few years, five hospitals in the Hudson Valley region have closed voluntarily, principally on the basis of market forces. Many other facilities have downsized, right-sized, or realigned their services to adjust to new economic, technological, and professional realities.

3

Other health care systems have taken steps to consolidate, merge, or coordinate specialties to improve efficiencies and reduce costs. The reductions in bed capacity to date, as well as the reductions proposed by the Committee, are summarized in the following chart:

| Name of Acute Care Facility | Decrease in certified beds | Closure/Decertification | Actual/ Proposed |
|---|---|---|---|
| Julia Butterfield Memorial | (36) | Closed | Actual |
| *Delaware Valley Hospital | (17) | Decertified | Actual |
| *Margaretville Memorial Hospital | (7) | Decertified | Actual |
| *O'Connor Hospital | (13) | Decertified | Actual |
| *Catskill Regional Medical Center – G Hermann Site | (15) | Decertified | Actual |
| *Ellenville Regional Hospital | (26) | Decertified | Actual |
| St. Agnes Hospital | (106) | Closed | Actual |
| New York United Hospital | (224) | Closed | Actual |
| St. Francis Beacon Division | (100) | Closed | Actual |
| The Hospital | (45) | Closed | Actual |
| Mount Vernon Hospital | (32) | Decertify | Proposed |
| Sound Shore Medical Center | (71) | Decertify | Proposed |
| Orange Regional Medical Center | (100) | Decertify | Proposed |
| Total Regional Reduction | (792) | | |

* Now designated CAH

## FACILITIES OF INTEREST

*The Kingston Hospital and Benedictine Hospital* have initiated discussions with the help of a facilitator regarding sharing services under the protective antitrust umbrella of the Commission. As of the date of this report, the two hospitals plan to execute a Memorandum of Agreement. The Memorandum of Agreement is currently under review by the Archdiocese of New York and the sponsors of Benedictine Hospital.

The two hospitals have submitted a request to the New York State Department of Health for a short-term loan from HEAL-NY to cover some initial transaction costs. The hospitals have also submitted materials to the Public Advocacy Group in the Attorney General's Office, and anticipate meeting with the staff of the Attorney General's office during the summer of 2006. The hospitals expect to have a binding alignment agreement by September 1, 2006 and submit a Certificate of Need (CON) application by October 1, 2006. The Committee agrees this is the right direction to take.

**Recommendation:**
The Committee recommends that the Commission encourage the process and continue its umbrella of protection. However, if it appears that these two facilities are not going to take definitive action, the Commission should undertake a careful evaluation to consider closure or conversion of one of the inpatient facilities, and reconfigure ambulatory services and outpatient diagnostic services. The Committee has additional comments, contained later in this report, concerning antitrust protection afforded by the Commission.

_Saint Francis Hospital and Vassar Brothers Medical Center_ both located in Poughkeepsie, offer similar services to similar populations. The two hospitals serve their populations in various ways. For example, St. Francis Hospital is the only Level II Trauma Center between Albany Medical Center and Westchester Medical Center. It has the only secure inpatient psych services as well as outpatient services. In addition it runs a full-day preschool program. Recently, the Hospital Foundation raised over $3,000,000 for improvements to the facility.

Several years ago, the two hospitals entered into a shared-service agreement that included information technology which resulted in cost savings for both institutions. This arrangement, which was widely believed to be beneficial to both hospitals and the community, ended when the State Attorney General brought an antitrust action. The financial effects of this action were catastrophic for St. Francis Hospital and for Vassar Brothers Medical Center. Since then, however, both hospitals have become profitable. St. Francis Hospital recently completed a public sale of municipal bonds through Merrill Lynch, an innovative financing approach, and as a result has a very strong balance sheet. Vassar Brothers has joined the Health Quest System and continues to meet the needs of its community and is financially strong. Both hospitals are now financially sound and have not needed government intervention to bail them out.

Although the vulnerable populations in the city of Poughkeepsie might benefit from some coalescence of services, the two hospitals currently operate under an antitrust settlement agreement with New York State, in which they are contractually prohibited from discussing any type of merger or shared services arrangements. As a result, the two hospitals are legally precluded from considering any consolidation of services The Committee finds this unfortunate because the City of Poughkeepsie has limited financial resources to serve its vulnerable population, and therefore would benefit from the efficiencies that might be realized through right-sizing.

**Recommendation:**
The Committee recommends that the Commission discuss with the State Attorney General the nullification of the settlement agreement that prohibits shared services discussions.

_Sound Shore Health System_ includes the Mount Vernon Hospital and Sound Shore Medical Center of Westchester. The system is proceeding with right-sizing moves under a single management structure that is consistent with the Commission's charge. The Sound Shore Health System has received approval for 20 Transitional Care Unit (TCU) beds and has submitted a Certificate of Need (CON) request for 24 Mentally Impaired Chemical Abusers (MICA) beds. They are matching the services they provide at each facility with their respective communities' needs. In addition, services not provided elsewhere in the area are being added or expanded. For example, they consolidated the Obstetrics and Gynecology services at Sound Shore Medical Center of Westchester, and provide psychiatric and HIV services at The Mount Vernon Hospital.

The Committee finds compelling reasons, based on the Commission's criteria, to support the current management team and their right-sizing plans. About 47% of Mount Vernon patients come from medically underserved communities. The hospital employs about 633 FTEs, with the

5

majority coming from the immediate community. The Committee has reviewed the hospitals' audited financial statements and other data.

**Recommendation:**
The Committee agrees with the plan submitted by the Sound Shore management and recommends the decertification and conversion of the following beds in the Sound Shore Health System:

| Mount Vernon Hospital | Current Certified Beds | Decertified | Converted | Proposed Beds |
|---|---|---|---|---|
| Type of Bed: | | | | |
| Mentally Impaired Chemical Abusers | 0 | | 24 | 24 |
| Transitional Care Unit | 0 | | 20 | 20 |
| ICU | 12 | (2) | | 10 |
| Medical/Surgical | 184 | (30) | (44) | 110 |
| Other Units | 32 | | | 32 |
| Total Bed Complement | 228 | (32) | 0 | 196 |

| Sound Shore Medical Center of Westchester | Current Certified Beds | Decertified | Converted | Proposed Beds |
|---|---|---|---|---|
| Type of Bed: | | | | |
| Pediatric | 14 | (9) | | 5 |
| Obstetrics | 24 | | (1) | 23 |
| Neonatal (level III) | 10 | | 5 | 15 |
| Detox | 10 | | 5 | 15 |
| Medical/Surgical | 251 | (60) | (11) | 180 |
| ICU | 12 | | | 12 |
| Total Bed Complement | 321 | (69) | (2) | 250 |

*Westchester Medical Center (WMC)* is the region's specialty referral center for tertiary and quaternary levels of care. It also hosts the region's only Level 1 Trauma Center, the region's only Burn Center, and the state-funded Regional Resource Center for training and preparedness against terrorist attacks, natural disasters, and other types of disasters. Because of the poor financial performance of this institution and significant management problems, an outside management group was contracted in 2004 to turn the institution around and restore its financial health. The Committee recognizes that the Hudson Valley region depends on this facility because of its designation and the services it provides. Therefore it met with the interim CEO, an employee of the outside "turnaround" management group, to review his leadership team's strategy and plans.

After a full and complete description of WMC's restoration plans, the Committee found strong reason to initially support the management team's strategy and the CEO's ability as an administrator to implement those plans. Additionally, the Committee reviewed and analyzed WMC's audited financial statements and related financial documents. It is evident that the management team has taken several key steps to improve the financial viability of the institution. These include implementing a time and attendance system to better manage and control payroll

costs, and a new billing and collections system, which has significantly reduced the size and age of the accounts receivable. In addition to the operational improvements, many clinical initiatives have been implemented to improve the quality and safety of patient care. The Committee further noted that since the meeting with the CEO, several of WMC's important objectives have been reached or nearly reached.

**Recommendation:**
It appears that Westchester Medical Center is taking valid steps toward recovery. The Committee recommends continued monitoring of the facility and a re-examination of its financial and managerial health in 2007.

*The Community Hospital at Dobbs Ferry (CHDF)* has low occupancy and poor market share. It scores the lowest of all hospitals in our region, based on the Commission's six criteria, and thus there is a strong case for closure. In its own cluster of zip codes, it draws only 7% market share, and 45% within its immediate zip code of 10522.

After further analysis, the Committee learned that the hospital was recently bought at auction by Riverside Health Care System (Riverside), which operates its neighboring acute-care hospitals to the South in Yonkers: St. John's Riverside Hospital and the Park Care Pavilion, formerly Yonkers General Hospital. Riverside now operates CHDF as a profitable facility for ambulatory care and inpatient medical-surgical services. Also, the Dobbs Ferry community raised $11 million to renovate the emergency department. This facility is profitable and has earned tangible financial support from its community. According to Riverside's CEO, CHDF generates approximately $750,000 annual profit to the system, and absorbs approximately $2 million per year in system overhead expenses.

Some Committee members have questioned what would be the benefit of closing CHDF? There are no efficiencies to be gained, and possibly profit to be lost. Only about 8% of their patients are Medicaid patients. It does not cause any real burden to the taxpayers. But if the hospital closes, there could be an additional burden to the taxpayers because the hospital's contribution to supporting Riverside's operations in Yonkers would be lost. Riverside's CEO asserts that his main facility would capture very few of the CHDF patients. He also reports that the loss of revenue would threaten financial stability at St. John's Riverside Hospital and Park Care Pavilion; it would particularly damage their ability to provide indigent care and needed community-based services to the people of the southwest area of Yonkers. Riverside has demonstrated its institutional commitment with many programs that focus public outreach efforts most intensively on those Yonkers neighborhoods with the greatest need. In addition, in reviewing its financial reports the Committee found that the management is effectively addressing billing and system problems to improve the quality of care and the efficiency of the institutions.

The Committee members requested an expert financial review by the New York State Department of Health of St. John's Riverside Hospital and CHDF's financials to verify the facts and examine in greater detail the financial and social consequences of closing the CHDF. The Committee urges the Commission to carefully examine the results of this expert review when it

is completed. A key question is whether there is truly no or minimal costs to New York taxpayers if CHDF stays open in its current mode. Additional questions are, if CHDF is closed, should St. John's Riverside Hospital be considered for HEAL-NY support to offset its losses and pay off debt, and conversely, if CHDF remains open, should Riverside decertify 50-60 beds in the Riverside System.

**Recommendation:**
The Committee finds that, viewed independently, CHDF is a candidate for closure. The potential value of the Dobbs Ferry property is a considerable factor in this evaluation. However the Committee recommends that the Commission not take this action without careful evaluation of the impact this may have on the financial stability of the Riverside Health Care System. If, in fact, Riverside receives a positive impact from CHDF, and there is limited if any savings to the state from closure, this creative approach should not be thwarted. If, after review, the Commission decides in favor of closure, consideration should be given to allocating HEAL-NY funds, allocated to debt repayment; to repay the $8 million debt CHDF has with Riverside in the event that it is not otherwise provided in the accounting processes.

In summary, three alternatives are being submitted for continued review and decision making by the Commission:
1. Close CHDF
2. Close inpatient beds and fully convert CHDF to an ambulatory facility which includes ambulatory surgery
3. Maintain CHDF in its current form and if utilization of inpatient facility drops, revisit option 1 and 2.

The Committee recommends that after the expert financial analysis has been completed and the key questions identified have been sufficiently addressed, the Commission should make its decision before the final report is published. The alternative chosen should not only provide financial stability to the Riverside System, but also provide the needed services to the vulnerable community in Yonkers.

OTHER RIGHT-SIZING OPPORTUNITIES IN YONKERS—The Committee finds that additional opportunities may exist to further optimize healthcare services in Yonkers to better serve the indigent community in the south side of the city as well as the northern community. The Committee recommends that the Commission encourage additional discussions on this point. It is suggested that such discussions include Riverside Health Care System and St. Joseph's Medical Center, as well as community health centers, private practitioners, especially large group practices, and other medically related provider groups, other interested community-based organizations and businesses. The goal of this effort would be an integrated system of medical care in Yonkers. It is suggested that the Yonkers based hospitals take the lead in this effort by availing themselves of the protective antitrust umbrella afforded by the Commission to initiate the suggested discussions.

## OTHER PROVIDERS WHO PRESENTED AT COMMITTEE MEETINGS

*Delaware Valley Hospital, Margaretville Memorial Hospital, and O'Connor Hospital* have worked together to voluntarily right-size, reorganize their services, including converting all of the hospitals to designated Critical Access Hospitals. In addition, they developed plans for the types of ambulatory services needed by the communities they serve. The Committee supports their efforts to date and recommends that consideration be given to allocation of HEAL-NY dollars in 2006 and 2007 to improve the ambulatory care services provided by all three facilities.

*Orange Regional Medical Center* has been formed as a single hospital from a full-asset merger of two hospitals in the Middletown area. Horton Medical Center and Arden Hill Hospital combined in 2000. The CEO of Orange Regional Medical Center presented to the Committee a proposal to close the two aging plants and replace them with a totally new facility on new acreage at the intersection of Interstate 84 and US Route 17. The proposed medical center will have approximately 100 fewer acute care beds than their current capacity, in favor of more ambulatory service capabilities. The new plans include further consolidation of services and significant improvement of systems. The management team anticipates submitting a Certificate of Need in August. The Committee had a positive response to these consolidation plans. However in the absence of a Certificate of Need filing at the time of this report, the Committee makes no recommendation about this hospital.

*St. Luke's-Cornwall Hospital* was formed in 2002 when St. Luke's Hospital Newburgh and Cornwall Hospital merged and restructured as a single medical center with two campuses (Newburgh and Cornwall). This merger was driven by the market and economic forces at the time and is a good example of community right-sizing. New programs continue to be developed, services have been consolidated and operational improvements are being made.

## OTHER HOSPITAL SYSTEMS IN THE HUDSON VALLEY REGION

*Bon Secours* includes Bon Secours Community Hospital, Good Samaritan Hospital and St. Anthony Community Hospital. Additionally Bon Secours Charity Health System provides the services of a Certified Home Health Agency, two long-term care facilities, an assisted living and adult home facility, and several other off-site medical programs.

*Pinnacle Healthcare, Inc.* members are: Hudson Valley Hospital Center, Sound Shore Medical Center of Westchester, St. John's Riverside Hospital - Andrus Pavilion & Park Care Pavilion, Taylor Care Center, The Mount Vernon Hospital, and Westchester Medical Center.

*Health Quest* operates Northern Dutchess Hospital Center, Vassar Brothers Medical Center, and Putnam Hospital.

The Committee recommends that these systems be examined as potential models of right-sizing and reviewed for further change opportunities within their individual structures.

## LONG-TERM CARE FACILITIES

Based on the criteria developed by the New York State Department of Health, and data provided by Commission staff, the Committee identified seven nursing home facilities for further analysis. Administrators of these facilities were invited to discuss their facilities and the available financial, utilization, and quality data. The Committee also noted important changing trends in the provision of long-term care. An important factor that affects decision-making in this region is that as the population in the Hudson Valley continues to increase; the percent of elderly (those over 65 years) is forecasted to increase as well. In addition, significant changes in consumer attitudes and preferences are requiring a more community-/home-based approach to care for this growing segment of the population.

## FACILITIES OF INTEREST

*Achieve Rehabilitation and Nursing*—This facility was selected because of low occupancy (93.1% in 2003), case mix concerns and a history of survey and complaint issues. After a conference call with the new administrator at Achieve Rehabilitation and Nursing, the Committee was not confident of the direction in which the facility is moving. The administrator did not adequately answer questions regarding the financial viability of the facility and the quality of care being provided. At the time of the conference call, a DOH survey had just been completed; the results are not yet available.

**Recommendation:**
Based on the survey results, and given the absence of up-to-date financial data, the Committee recommends that the Commission consider conversion of the facility to much needed Assisted Living Program (ALP) beds in Sullivan County.

*Andrus-on-Hudson*—When reviewing the Commission criteria, Andrus-on-Hudson was highlighted because of low occupancy and case mix (in 2003, 39.2% and .90 respectively). Because of these factors, there are obvious financial problems. After speaking with the Administrator, the Committee is less concerned about the financial stability (since there is a large foundation underwriting their capital expenditures) than about the low acuity of their patients.

**Recommendation:**
The Committee recommends that this facility be considered for conversion to ALP beds.

*Bethel Nursing and Rehab*—Based on the 2003 data initially reviewed by the Committee, both facilities of Bethel Nursing and Rehab were considered as facilities of interest because of their low occupancy (87.5% and 85.7%), quality of care and financial problems. The Committee met with the new Administrator of the facilities. The Committee supports the progress made to date. In addition to improving occupancy, the administration has made significant improvements in patient safety and service quality. Other priorities that the management team discussed are the need to improve staff retention and service delivery.

**Recommendation:**
The Committee recommends continued monitoring of progress by evaluating 2005 and 2006 data when available from the New York State Department of Health Survey, and ICRs, before considering decertification or conversion of beds.

*Sky View Rehabilitation and Health Care Center* --was identified as a facility of interest based on the Commission's criteria. The Committee repeatedly tried to contact the administrator of this facility, left messages and sent a certified letter from David Sandman indicating the Committee's interest. To date they have not contacted the Committee.

**Recommendation:**
In the absence of updated information, the Committee recommends that the facility be considered for closure or conversion.

*Taylor Care Center*—is operated by Westchester Medical Center. The Center operates in an aging plant in need of upgrades. In 2003, Taylor Care's occupancy was 79%. The Committee notes that the case mix is different from a typical nursing home because it provides more post-acute care than sub-acute care. The management team concurs that they need to decertify and convert beds at this facility. 100 beds have been mothballed to date.

**Recommendation:**
The Committee recommends decertifying the 100 mothballed beds and converting some beds to ALP beds. The management team has hired a consultant to study the market and make program/rightsizing recommendations. The report is not yet available. It will be submitted to the Commission hopefully within the next few weeks. After the Commission reviews the consultant's report, additional changes should be considered.

*The Valley View Center for Nursing and Rehabilitation*— This facility is owned and operated by Orange County. The facility was identified because of occupancy, financial and quality of care problems. After speaking with the administrator, it is evident that significant steps have been taken to right-size as the facility decertifies and converts beds. The Committee noted that the administration is taking needed steps to reduce costs and improve revenue by expanding services. For example, they are negotiating a separate contract with their county employees that should significantly reduce indirect labor costs. Also, they are negotiating with Meals-on-Wheels to move their headquarters and food service to Valley View's campus. Additionally,

they have been speaking with Orange County officials about centralizing services for the aging on their campus such as the Office of the Aging. The County has already agreed to move Adult Protective Services to this campus.

**Recommendation:**
The Committee supports the management team's plan to decertify 160 beds and convert the space to much needed ALP beds in Orange County.

*Victory Lake Nursing Center* -- was identified as a facility of interest based on the Commission's criteria. The Committee repeatedly tried to contact the administrator of this facility, left messages and sent a certified letter from David Sandman indicating the Committee's interest. To date they have not contacted the Committee.

**Recommendation:**
In the absence of updated information, the Committee recommends that the facility be considered for closure or conversion.

# PART 2
# COMMITTEE COMMENTARY
# AND POLICY RECOMMENDATIONS

Based on its review and analysis the Committee presents the following commentary and policy recommendations in accordance with its formal charge:

## *ACUTE CARE*

### ANTITRUST CONCERNS
*Comments on this topic will be forwarded in the following weeks.*

### CERTIFIED BEDS AND SURGE CAPACITY

The Committee finds that in addition to the day-to-day capacity analysis, discussion is also warranted in the realm of surge capacity. New York State has invested heavily (and justifiably) in statewide monitoring and response systems to ensure adequate access to healthcare facilities during a terrorist attack, natural disaster, and other calamities. Because of this investment, it is critical to look at the total number of acute care beds, the location of functional beds, and beds that can be used for surge capacity. It is therefore recommended that the Commission review each facility in the region and request that all unstaffed beds be decertified so that the true size of the working system can be known. Once the system size is established, beds can be added to individual facilities for surge capacity and these beds would need to be maintained in operating condition (furnished, equipment operational and clean) but not staffed. Consideration should be given to these facilities in the form of a small sum or rate to cover the cost of maintaining this classification of beds.

### COMPETITIVE ENVIRONMENT

New York State hospitals are facing well-documented economic pressures. Five significant concerns that affect the Hudson Valley Region are:

- The loss of patient revenue as a result of the migration of patients to hospitals in Connecticut and New Jersey. Those hospitals receive reimbursement rates 18 to 25 percent higher than New York State hospitals. They are stronger financially and therefore have the means to make themselves attractive to New York residents who have full benefit insurance. Nor Met estimates that some out-of-state hospitals just over the border see one-third or more of their patients from New York State. New York State's Medicaid money leaving the state to Greenwich Hospital alone is $1.3 million per year. New Jersey hospitals near the border treat some 10,000 patients per year from New York. The Committee finds that this is a real loss for New York and its taxpayers; they are left paying for a greater proportion of low-pay and no-pay, and also risk losing some of the

13

best nurses, physicians, and other providers – those with the greatest professional mobility – to higher paying and more rewarding work opportunities.

- Critical expenses have increased beyond normal inflation and faster than revenue growth. Reimbursement rates need to be commensurate with the costs. The current reimbursement system does not adequately compensate for outpatient care. The Medicaid rate should be brought in line with current costs and improved to provide primary care and preventive care.

- Private enterprise providers are not subject to the same Certificate of Need (CON) regulations to which hospitals must adhere; therefore an uneven playing field is created. This results in the movement of insured patients from hospital-based services to centers established by independent physician groups and private corporations.

- Insurance companies and other healthcare payers have no responsibility to participate in the development and maintenance of the healthcare providers and systems from which they derive their profits. The Westchester County Association's (WCA) Taskforce on Health Care recommends mandatory reinvestment in community health care by the businesses in Westchester. They further propose other cost-cutting measures that would streamline access to and payment/reimbursement for healthcare services. Their approach would bring new money into the system without increased burden on the state/ tax payer.

- Infusion of capital for facilities' improvement and Information Systems (IS) is required. Sources might include: Insurance investing, Health Care Efficiency and Affordability Law (HEAL-NY), Federal State Health Reform Partnership (F-SHRP), other state and federal sources, and easing of private bond markets. Insurance providers need to invest a percentage of their profits into the hospitals with whom they contract.

The Committee strongly suggests that the Commission pursues the needed reimbursement and CON changes necessary to allow NYS hospitals to compete on a "level playing field", and support the development and implementation of legislation that would mandate the WCA proposal. In addition, some form of regional health system planning to provide stronger mechanisms for data collection, monitoring, oversight and coordination at the regional level needs to be considered. The health systems planning process should be open to participation and input by a full range of stakeholders, including providers, payers, workers and consumers.

## NEW YORK STATE LICENSED MENTAL HEALTH SYSTEM (Article 31)

It is important to keep in mind that the Article 28 system provides 35% of the in and out patient services provided for by Article 31. The Committee has not made any recommendations which would adversely affect this system in the Hudson Valley Region. However, we suggest that this issue be carefully reviewed as changes in Article 28 facilities are made, to avoid inadvertently having an adverse affect on the Article 31 services.

## SAFETY NET HOSPITALS

The Committee is not recommending closure of any "safety net" hospitals. While it is beyond the Committee's charge to recommend changes in reimbursement methodologies, it is suggesting that the Commission carefully examine the approach to reimbursement for these vulnerable hospitals in order to ensure that there is no further degradation of the system of "safety-net" hospitals which is essential for care of the indigent in underserved areas. It is the view of the Committee that a number of such critical hospitals may not survive without recognition of and appropriate response to their situation.

## *LONG-TERM CARE*

## COMMUNITY-BASED LONG-TERM CARE OPTIONS

As part of its review of long-term care, the Committee met with providers of community-based services. This was extremely beneficial as the Committee addressed the increasing need for services and the public's preference for care in less restrictive and non-institutional settings. The Committee reviewed the New York State Department of Health's analysis of unmet non-institutional community-based service needs.

The data for the Hudson Valley region have been summarized as follows:

| County | DOH Unmet Needs | Approved ADHC Slots | Approved LTHHCP Slots | Approved ACF Beds | Approved ALP Beds |
|---|---|---|---|---|---|
| Delaware | 306 | 0 | 50 | 65 | 0 |
| Dutchess | 584 | 72 | 325 | 421 | 115 |
| Orange | 942 | 84 | 453 | 439 | 55 |
| Putnam | 605 | 27 | 75 | 0 | 0 |
| Rockland | 543 | 127 | 295 | 1,130 | 146 |
| Sullivan | 247 | 64 | 100 | 181 | 0 |
| Ulster | (85) | 15 | 204 | 145 | 102 |
| Westchester | 1,107 | 473 | 2,233 | 1,574 | 40 |
| **Total HV** | 4,249 | 862 | 3,735 | 3,955 | 458 |

Based on the Committee's review of all the available data, it is evident that there is a consumer preference and need for additional community-based services, especially congregate care. More affordable senior housing and assisted living program (ALP) beds are one option. Based on the Committee's meetings with providers and public hearing testimony, the Committee recommends expansion of the Assisted Living Program and Enhanced Assisted Living Residences (EALR), particularly in the rural communities. These programs are designed for persons who are eligible to receive care in a nursing home, but who are medically stable and can therefore be served in less intensive and expensive settings. For those facilities under consideration for downsizing or closure, the Committee recommends that the excess bed capacity be converted to ALP beds or EALRs.

Adult Day Health Care Programs are another alternative for congregate care in less intensive settings. As these programs are expanded within the region, the Committee recommends consideration of a model of care that includes transportation. This will improve the access and delivery of services to a population that might otherwise be isolated from health care and activity. The Long-Term Home Health Care Programs (Lombardi Programs) offer another alternative for community-based health care. Advances in technology, especially telemedicine

16

and telemonitoring, have enhanced the ability of long-term home healthcare providers to serve more patients in rural settings. The Committee supports these advances and recommends that these programs be allocated HEAL-NY and F-SHARP dollars to improve the access and care to elderly, disabled and chronically-ill patients in the community.

## CONCERNS ABOUT LONG-TERM CARE FOR PERSONS WITH SERIOUS AND PERSISTENT MENTAL ILLNESS (SPMI)

The Committee is aware that many PA/PB (low acuity) patients in long-term care facilities that would be potentially eligible for transfer to alternative settings, in addition to medical and activities of daily living support requirements may have SPMI. This group might do well in alternative settings such as ALPs or other congregate residential settings. However, it is critical that mental health professionals be included in the transition and care planning for the SPMI population, to ensure the protection and adequacy of services available to this vulnerable population.

## POLICY SOLUTIONS

Changes in state policy must develop solutions in order to reduce the institutional and financial barriers to community-based care for elderly, disabled and chronically-ill consumers. These barriers include: the lack of affordable, accessible housing, which often makes nursing home care the only option for those losing their housing; the limited number of service providers willing to offer community-based care because of low reimbursement rates; the lack of resources committed to high-quality discharge planning; and the lack of community-based practitioners with offices that are fully accessible to those with mobility impairments and those who are deaf and hearing-impaired.

Based on the Committee's review of the long-term care market, it is clear that a carefully coordinated approach to care delivery is essential. The establishment of the Long-Term Care Restructuring Advisory Council and development of local Point of Entry programs are first steps. The services provided should include an integrated approach to long-term care and development of a continuum of care options for the elderly, disabled and chronically-ill populations. The system should include a wide spectrum of community-based services as well as education and training for family care-givers. As recommendations to reduce nursing home bed capacity are implemented, it is important that options are available to the lower acuity patients now residing in nursing homes. Continuum of care planning and service integration must include community options such as ALPs, Adult Day Center programs and low-cost senior housing for the elderly, disabled and chronically-ill populations.

Exhibit B

# A Plan to Stabilize and Strengthen New York's Health Care System



### FINAL REPORT
### *of the*
### COMMISSION ON HEALTH CARE FACILITIES IN THE 21ST CENTURY

December 2006

**Commission on Health Care Facilities
in the 21st Century**
90 Church Street • New York, New York 10007

www.nyhealthcarecommission.org

## COMMISSION ON HEALTH CARE FACILITIES IN THE 21st CENTURY

**Chair**

Stephen Berger

**Vice Chair**

Robert Hinckley

**Statewide Members**

Leo Brideau

Craig Duncan

Robert Gaffney

Rosa Gil, DSW

Howard Howlett, Jr.

Darlene Kerr

Ruben King-Shaw, Jr.

Mark Kissinger

Patrick Lee

Kristin Proud

Neil Roberts

Teresa Santiago

Buford Sears

Albert J. Simone, Ph.D.

Bishop Joseph Sullivan

Peter Velez

**Regional Members**

*Central Region:*
Stephen Albertalli
Susan Crossett
Jeffery Davis
Bonnie DeVinney
Patrick Mannion
Herbert Marshall

*Hudson Valley:*
Robert Doar
R. Abel Garraghan
William Mooney, Sr.
Arthur Weintraub
Lelia Wood-Smith

*Long Island:*
Patricia Acampora
Bert Brodsky
Richard Guardino, Jr.
Kim Kubasek
Donna M. O'Brien
John O'Connell

*New York City:*
Martin Begun
John F. Haggerty
Andrew Sichenze
Jerry Weber

*Northern:*
Peter Capobianco
Dorothy Harris
Arthur Spiegel

*Western:*
Paul Boylan
Carol Cassell
Judge Joseph Mattina
Heidi Nauleau
Sister Mary Ann Schimscheiner
Henry Sloma

**Commission Staff**

David Sandman, Ph.D.
Executive Director

Mark Ustin
Deputy Director and General Counsel

*Senior Policy Analysts:*
Vincent Fitts
Hilton Marcus
Barbara McRedmond
Janette A. Simms

*Special Assistants:*
Shirley Chen
Shavon Foskey

# TABLE OF CONTENTS

Prologue ........................................................................................................................... 1
Executive Summary .......................................................................................................... 4

I. Dynamism of New York's Health Care System............................................................ 19
    Catching Up to Change............................................................................................... 19
    Hospital and Nursing Home Closures........................................................................ 20

II. Instability of the System.............................................................................................. 29
    Hospital System Fiscal Instability ............................................................................. 29
    Nursing Home System Fiscal Instability ................................................................... 35

III. Excess Capacity ......................................................................................................... 48
    New York State Has Too Many Hospital Beds .......................................................... 48
    Regions of New York State Have Too Many Nursing Home Beds ............................ 51
    New York State Has Too Few Home- and Community-Based Alternatives to Nursing Homes
    ...................................................................................................................................... 54
    What's Wrong With Excess Capacity?....................................................................... 54
    Excess Capacity Jeopardizes Quality of Care............................................................ 55
    Excess Capacity Promotes Unnecessary Utilization of Services................................ 56
    Excess Capacity Duplicates Services and Hinders Collaboration ............................. 56
    Excess Capacity Threatens Safety Net Services......................................................... 57
    Excess Capacity Increases Costs ............................................................................... 57

IV. Adapting to and Managing Change ............................................................................ 58
    Framework for Solutions – Producing Maximum Efficiencies .................................. 59
    Benefits of Closure and Consolidation ...................................................................... 59
    Impact of Closures: What Does The Evidence Say? .................................................. 60

V. Commission Process and Methodology ....................................................................... 64
    Commission Approach................................................................................................ 65
    Commission Structure................................................................................................ 65
    Regional Definitions and Representation ................................................................... 65
    Regional Advisory Committees.................................................................................. 67
    Local Input and Community Outreach ....................................................................... 67
    Analytic Framework .................................................................................................. 68
    Absorption and Access Analysis (AAA) .................................................................. 70
    Voluntary Rightsizing Efforts.................................................................................... 71

VI. Policy Recommendations .......................................................................................... 73
    A. Reimbursement and Medicaid .............................................................................. 73
    B. The Uninsured....................................................................................................... 75
    C. Developing Primary Care Infrastructure ............................................................... 77
    D. Developing Hybrid Delivery Models..................................................................... 79
    E. State University of New York (SUNY) Hospitals ................................................. 80

F. Healthcare Workforce Development ................................................................... 81
G. Information Technology .................................................................................... 82
H. County Nursing Homes .................................................................................... 83
I. Niche Providers ................................................................................................. 84
J. Roadmap for the Future: Continuation of the Commission's Work .................. 85

VII. Recommendations for Facility Rightsizing and Reconfiguration ......................... 86
Preface to Recommendations ................................................................................ 86

Central Region - Acute Care Recommendations ...................................................... 91
Recommendation 1 - Crouse Hospital (Onondaga County) and University Hospital, SUNY
Upstate Health Science Center (Onondaga County) ............................................ 91
Recommendation 2 - Auburn Hospital (Cayuga County) ..................................... 94
Recommendation 3 - St. Joseph's Hospital (Chemung County) and Arnot Ogden Medical
Center (Chemung County) ................................................................................... 96
Recommendation 4 - Albert Lindley Lee Hospital (Oswego County) ................... 99

Central Region - Long Term Care Recommendations ............................................ 101
Recommendation 1 - Van Duyn Home and Hospital (Onondaga County) and Community
General Hospital's Skilled Nursing Facility (Onondaga County) ......................... 101
Recommendation 2 - Mercy of Northern New York (Jefferson County) ............. 103
Recommendation 3 - Willow Point (Broome County) ......................................... 105
Recommendation 4 - Lakeside Nursing Home (Tompkins County) ..................... 106
Recommendation 5 - United Helpers, Canton (St. Lawrence County) ................. 107

Hudson Valley Region Acute Care Recommendations .......................................... 109
Recommendations 1 - Kingston Hospital (Ulster County) and Benedictine Hospital (Ulster
County) ............................................................................................................. 109
Recommendation 2 - Sound Shore Medical Center (Westchester County) and Mt. Vernon
Hospital (Westchester County) .......................................................................... 111
Recommendation 3 - Orange Regional Medical Center (Orange County) ........... 114
Recommendation 4 - Community Hospital at Dobbs Ferry (Westchester County) ........... 115
Recommendation 5 - Westchester Medical Center (Westchester County) ........... 118

Hudson Valley Region Long-Term Care Recommendations .................................. 121
Recommendation 1 - The Valley View Center for Nursing Care and Rehab (Orange) ..... 121
Recommendation 2 - Andrus-on-Hudson (Westchester) ..................................... 122
Recommendation 3 - Taylor Care Center (Westchester) ..................................... 124
Recommendation 4 - Achieve Rehabilitation (Sullivan) ..................................... 125
Recommendation 5 - Sky View Rehabilitation and Health Care Center (Westchester) ..... 126

Long Island Region Acute Care Recommendations ............................................... 128
Recommendation 1 - Eastern Long Island Hospital (Suffolk County), Southampton Hospital
(Suffolk County), Peconic Medical Center (Formerly Central Suffolk) (Suffolk County),
Brookhaven Memorial Medical Center (Suffolk County), and University Hospital at Stony
Brook (Suffolk County) ...................................................................................... 128

Recommendation 2 - University Hospital at Stony Brook (Suffolk County)...................... 132
Recommendation 3 - St. Charles Hospital (Suffolk County) and J.T. Mather Memorial
Hospital (Suffolk County) .................................................................................................. 134
Recommendation 4 - Nassau University Medical Center (Nassau County)....................... 137
Recommendation 5 - Long Beach Medical Center (Nassau County)................................. 140

Long Island Region Long-Term Care Recommendations...................................................... 143
Recommendation 1 - A. Holly Patterson Extended Care Facility (Nassau County) .......... 143
Recommendation 2 - Cold Spring Hills Center for Nursing and Rehabilitation (Nassau
County)................................................................................................................................. 145
Recommendation 3 - Brunswick Hospital Center, Inc. (Suffolk County).......................... 146

New York City Region Acute Care Recommendations ......................................................... 149
Recommendation 1 - New York Methodist Hospital (Kings County) and New York
Community Hospital of Brooklyn (Kings County) .............................................................. 149
Recommendation 2 - Victory Memorial Hospital (Kings County) ..................................... 151
Recommendation 3 - Peninsula Hospital Center (Queens County) and St. John's Episcopal
Hospital South Shore (Queens County)............................................................................... 153
Recommendation 4 - Queens Hospital Center (Queens County) ....................................... 156
Recommendation 5 - Parkway Hospital (Queens County)................................................. 157
Recommendation 6 - New York Westchester Square Medical Center (Bronx County) .... 159
Recommendation 7 - Cabrini Medical Center (New York County)................................... 160
Recommendation 8 - Beth Israel Medical Center - Petrie Campus (New York County)... 164
Recommendation 9 - North General Hospital (New York County) .................................... 164
Recommendation 10 - St. Vincent's Midtown Hospital (New York County) and St.
Vincent's Manhattan (New York County) ........................................................................... 167
Recommendation 11 - New York Downtown Hospital (New York County)...................... 170
Recommendation 12 - Manhattan Eye Ear and Throat Hospital (New York County)....... 174

New York City Long-Term Care Recommendations ............................................................. 176
Recommendation 1 - Split Rock Rehabilitation and Health Care Center (Bronx)............. 176

Northern Region Acute Care Recommendations................................................................... 180
Recommendation 1 - Bellevue Woman's Hospital (Schenectady County)........................ 180
Recommendation 2 - St. Clare's Hospital (Schenectady County) and Ellis Hospital
(Schenectady County)......................................................................................................... 182

Northern Region Long-Term Care Recommendations.......................................................... 186
Recommendation 1 - Ann Lee Infirmary and Albany County Home (Albany) ................. 186
Recommendation 2 - The Avenue and The Dutch Manor (Schenectady County) ............. 187
Recommendation 3 - Glendale Home (Schenectady County) ............................................ 189

Western Region Acute Care Recommendations.................................................................... 191
Recommendation 1 - Millard Fillmore Hospital – Gates Circle (Erie County)................. 191
Recommendation 2 - St. Joseph Hospital of Cheektowaga, New York (Erie County) ...... 193
Recommendation 3 - DeGraff Memorial Hospital (Niagara County) ................................ 194

Recommendation 4 - Sheehan Memorial Hospital (Erie County) ...................................... 195
Recommendation 5 - Erie County Medical Center/Erie County Medical Center Corporation
(Erie County) and Buffalo General Hospital/Kaleida Health (Erie County) ...................... 198
Recommendation 6 - Lockport Memorial Hospital (Niagara County) and Inter-Community
Memorial Hospital at Newfane (Niagara County) ............................................................. 203
Recommendation 7 - Bertrand Chaffee Hospital (Erie County), TLC Health Network - Lake
Shore Hospital (Chautauqua County), TLC Health Network - Tri-County Memorial
Hospital (Cattaraugus County), Brooks Memorial Hospital (Chautauqua County) and
Westfield Memorial Hospital (Chautauqua County) .......................................................... 205
Recommendation 8 - Mount St. Mary's Hospital and Health Center (Niagara County) and
Niagar Falls Memorial Medical Center (Niagara County) ................................................. 209

Western Region Long-Term Care Recommendations .......................................................... 212
Recommendation 1 - Mount View Health Facility (Niagara County)................................. 212
Recommendation 2 - Nazareth Nursing Home and Mercy Hospital Skilled Nursing Facility
(Erie County) .................................................................................................................... 213
Recommendation 3 - Williamsville Suburban, LLC (Erie County) ................................... 216
Recommendation 4 - DeGraff Memorial Hospital Skilled Nursing Facility (Niagara County)
and Millard Fillmore Gates Circle Skilled Nursing Facility (Erie County)........................ 217

VIII. Financing.................................................................................................................... 219
Potential Benefits and Reinvestment Opportunities for Providers ......................................... 220
Potential Savings for Payors ............................................................................................. 221
Total Benefits and Savings: .............................................................................................. 225
Potential Costs:  General Principles................................................................................... 225
Potential Cost Categories:  Closure, Construction & Affiliation.......................................... 226
Funding: Principles for Investment.................................................................................... 230

## APPENDICES

Appendix 1 - Regional Advisory Committee Members
Appendix 2 - Regional Advisory Committee Reports
        Central
        Hudson Valley
        Long Island
        New York City
        Northern
        Western
Appendix 3 - Briefing on Acute Care Reimbursement
Appendix 4 - Briefing on Long-term Care Reimbursement
Appendix 5 - Data
        Analytic Maps
        Analytic Framework Data
        Absorption and Access Analysis

## LIST OF FIGURES

Figure 1: Hospital Operating Margins, New York State and United States, 1996-2004 ............. 30
Figure 2: Hospital Operating Margins by Region, 2004 ............................................................ 31
Figure 3: Nursing Homes with Operating Losses, 1997-2004 .................................................... 35
Figure 4. Distribution of Uninsured by Race/Ethnicity for New York State, Nonelderly, 2002-2003 ............................................................................................................................................ 37
Figure 5: Estimated Number of Assisted Living Facilities in the United States, 1995-2000 ....... 39
Figure 6: New York State and National Hospital Length of Stay, 1994-2004 ............................ 42
Figure 7: New York State Hospital Length of Stay by Region, 2004 ......................................... 43
Figure 8: New York State Nursing Homes Average Length of Stay, 1996-2003 ....................... 44
Figure 9: Percentage of Nursing Home Residents able to Independently Perform Activities of Daily Living .............................................................................................................................. 45
Figure 10. Hospital Licensed and Available Bed Occupancy Rates, 1994 to 2004 .................... 49
Figure 11. Hospital Licensed Bed Occupancy Rates by Region, 2004 ....................................... 50
Figure 12. Hospital Available Bed Occupancy Rates by Region, 2004 ....................................... 50
Figure 13. Nursing Home Licensed Bed Occupancy Rates, 1994 to 2004 ................................. 51
Figure 14. Nursing Home Licensed Bed Occupancy Rates by Region, 2003 (Adjusted for partial years) ........................................................................................................................................ 52
Figure 15. New York State Counties with LTC Resource Shift Opportunities ........................... 53
Figure 16. Commission Regions ................................................................................................. 66

## LIST OF TABLES

Table 1. New York State Hospital Closures since 1983 .............................................................. 21
Table 2. New York State Nursing Home Closures since 1983 .................................................... 23
Table 3. Nursing Home Sponsorship ......................................................................................... 28
Table 4. Statewide Ranking of Hospitals with Limited Access to Capital .................................. 33
Table 5. New York State Hospital Medians Compared to Rating Agency Medians ..................... 34
Table 6. Uninsured in New York City and New York State, Nonelderly, 2002-2003 ................. 37
Table 7. Number of Medicaid Waiver Clients in Residential Settings ......................................... 40
Table 8. Employment and Wages of Registered Nurses by State, May 2005 .............................. 46
Table 9. Nursing Home Staff Turnover, 2002 ........................................................................... 46
Table 10. Beds Per 1,000 Population – Selected States .............................................................. 48
Table 11. Public Hearings by Region ......................................................................................... 68
Table 12. Commission Framework Criteria Metric ..................................................................... 69