# PROLOGUE

The Commission on Health Care Facilities in the 21st Century was created to review and strengthen New York State's acute and long term care delivery systems. Systems, by definition, are comprised of multiple parts that form a unified whole. Such definition does not apply to New York's health care industry where we confront a fragmented patchwork of health care resources. Some areas of our state have excess health care resources while others have shortages. We have widespread and unnecessary duplication of services. We have too much institution-focused care and not enough home and community based options. We have too few primary care resources to keep people well and out of the hospital. We spend extravagantly on health care and yet still leave too many without adequate access to the health care they need. We have yet to come to grips with changes in medicine that render parts of a massive bricks-and-mortar infrastructure obsolete.

Our hospitals and nursing homes, as described in this report, are in dangerously unstable condition. Years of chronic losses and growing numbers of empty beds have led some hospitals to close their doors and others are on the brink of collapse. Even the relatively "successful" hospitals that manage to break-even or eke out a modestly positive margin do not have sufficient resources to reinvest and maintain the high-quality, modern health care that New Yorkers deserve. A growing percentage of nursing homes are losing money from operations. It is not in the best interests of patients to rely on health care providers in such financial straits, and closures due to market forces alone threaten ongoing access to quality care, especially for the State's most vulnerable residents.

Hovering over the instability of our hospital and nursing home providers is a growing problem of affordability. New York should be proud of having one of the largest and most generous Medicaid programs in the nation. It is a very costly program to maintain, however, and its costs are rising at an unsustainable rate. The total cost of the Medicaid program has nearly doubled over the last decade to approximately $45 billion per year. Medicaid is a crippling budget item for the state and many counties. Upstate counties, which lack broad tax bases but have growing Medicaid populations, are particularly struggling under these cost burdens. We must regain control over Medicaid costs and spend more wisely to maintain health care services without crowding out our ability to finance other important social needs.

1

In fulfilling its mandate, the Commission had to face difficult choices. Decisions to reconfigure or close health care institutions are never simple or without controversy. Even when a closure will have no adverse impact on health care delivery and makes enormous economic sense, history has shown that opposition may arise. Such feelings of institutional loyalty are understandable. There are many groups, organizations, and individuals with personal, and often financial, interests in local hospitals. The Commission carefully considered community issues in its deliberations. The Commission also recognizes that our current predicament is in part a result of past failures to make honest and hard choices. We will not get to a better place until we confront our problems head-on and take action that is in the best interests of the entire system and its patients. An orderly transition that respects the needs of health care workers and communities affected by the recommendations in this report is required.

The work of this Commission is a start, not an end, to the facility rightsizing process. Additional opportunities to remove excess capacity exist but cannot be realized absent changes in reimbursement, reductions in length-of-stay, broader availability of non-institutional services, and removal of other obstacles. The Commission made responsible choices given real-world constraints.  More can and should be done if circumstances change.

The recommendations in this report are a step in what must be a broader process to reconfigure our health care system. It is beyond the practical scope of a single Commission to address or resolve all of the state's health care issues. Yet, we are impressed by the various important agendas that have been presented to the Commission and which must be addressed in future initiatives. Structured decisions about health care resource allocations must be continuous rather than a one-shot phenomenon. Issues of the uninsured, mental health, and primary care development should be at the forefront of an ongoing reform agenda.

It has been a privilege to examine New York State's health care system and develop immediate and long-term agendas for change. We are grateful to the members of the Commission and the regional advisory committees who volunteered their time and talents to this important work. The Commission's staff worked with great dedication and professionalism. The Department of Health, Dormitory Authority of the State of New York, Division of the Budget, and other agencies provided tremendous support. Our thanks go to the numerous members of the public, providers, and organizations that engaged in this process, provided vital information, and helped shape our thinking. By working together, we are confident that New York will seize the

opportunity to build a health care system that is stronger, better, fairer, more affordable and that meets the needs of communities.

Stephen Berger                                    David Sandman, Ph.D.

Chairman                                          Executive Director

## EXECUTIVE SUMMARY

### A System in Crisis

The Commission on Health Care Facilities is a nonpartisan panel established to review New York State's acute and long-term care systems. New York is home to some of the world's finest and most sophisticated hospitals. We have superb nursing homes that provide advanced and humane care to our sickest and most frail residents. We have a strong and growing foundation of non-institutional care providers. Our health care providers employ a skilled and dedicated workforce. The State has a historic commitment to ensuring access to care for its most vulnerable citizens and we expend vast sums of public resources on health care. Public and private initiatives are underway to further improve access, improve quality of care, and produce greater value for the dollars spent on health care services.

Despite these strengths, the Governor and Legislature recognized the need for improvements and thus established the Commission. The challenges facing our system developed over a long period and cannot be linked to a single time or policy. Similarly, these problems will not be solved overnight; solutions will require sustained efforts.

The Commission reaches a stark and basic conclusion: our state's health care system is broken and in need of fundamental repairs. Today, New York is struggling to maintain a 20th century institutional infrastructure in the face of mounting costs, excess capacity, and unmet needs for community-based alternatives. Weaknesses in our system are readily apparent:

- Turbulence afflicts our health care providers; facility closures and declarations of bankruptcy are too common. Since 1983, 70 hospitals and over 63 nursing homes have closed in New York State. Some of our oldest and proudest names in health care struggle under the unintended consequences of bankruptcy proceedings. Patient access to stable health care services is at risk.
- Our health care providers are in weak financial condition. For the past eight years, the state's hospitals as a group have lost money. A majority of the state's nursing homes, even some that are fully occupied, operate at a loss. Such losses cannot be sustained indefinitely.

4

- Negative or inadequate fiscal margins limit the ability of providers to reinvest in their systems, obtain the latest technologies, access capital, and upgrade their physical plants. Many of our hospitals and nursing homes are outdated and in need of capital improvements.

- Hospital average lengths of stay have decreased but remain unacceptably and unjustifiably long in many parts of the state.

- Too many New Yorkers – almost one in five nonelderly residents – continue to lack health insurance coverage and face barriers to care and worse health outcomes as a result.

- Virtually every region of the state has an unmet need for additional home and community-based services. As consumer preferences change and technology advances, this gap could widen.

- Primary care capacity is insufficient, so that some patients go without preventive and basic services. Inadequate primary care worsens health care status, allows chronic conditions to go unmanaged, and results in back-end care that is more costly and less beneficial than front-end services.

- Our Medicaid program, already the largest and most expensive in the nation, is growing at an unsustainable rate.

- Reimbursement mechanisms distort patterns of service delivery and induce facilities to pursue high margin services, sometimes at the expense of more essential community needs. The current rate paradigm is encouraging a medical arms race for duplicative provision of high-end services and discouraging the provision of preventive, primary, and other baseline services.

### Why We Must Act Now

From crisis arises opportunity. It is not too late to restructure New York's health care delivery system. The time to act, however, is now. Absent intervention, the Commission believes that the future of our state's health care system is bleak. Unless we act decisively, further facility closures and bankruptcies are almost certain to occur. Moreover, the facilities that close due to market forces alone may be the ones most critical to preserving access.

5

Without intervention, our providers will spiral further into debt and be forced to make difficult decisions to cut services and lay off workers. Without change, our providers will lack the financial stability needed to invest in new technologies and remain on the cutting edge of modern health care. Unless we shift course, health care expenditures will rise at unsustainable rates, further burden our taxpayers, and cripple our ability to devote resources to the full array of public needs including education, housing, and transportation.

Confronting and solving these problems will require difficult, perhaps unpopular, decisions and strong leadership from our elected officials and others. There is no other responsible choice. We cannot deny reality, bury our heads in the sand, or cling to established patterns. We must overcome our reliance on outdated institutions and strengthen those that remain. New Yorkers deserve and demand a 21st century health system that is more flexible, leaner, stronger and more affordable than the one we have today.

### Excess Capacity Weakens Our System

A fundamental driver of the crisis in our health care delivery system is excess capacity. New York State is over-bedded and many hospital beds lie empty on any given day. The statewide hospital occupancy rate has fallen from 82.8% of certified beds in 1983 to 65.3% in 2004, a decrease of 17.5%. On a staffed bed basis, approximately one quarter of hospital beds are currently unoccupied. Occupancy rates vary by region and are especially low in Western, Northern, and Central regions. Some individual hospitals are more than half empty. Certain pockets of the state have too many nursing home beds while others have too few. The statewide average nursing home occupancy rate has been in decline since 1994 despite a gradually aging population.

Declining occupancy rates are driven in part by shifts in the venues in which health care is provided. Health care services are migrating rapidly out of large institutional settings into ambulatory, home and community-based settings. Hospitals face increasing competition from niche providers such as ambulatory surgery centers, who often provide services that are well reimbursed and deprive hospitals of revenues that were historically used to cross-subsidize less profitable services. Similarly, long term care

6

is evolving towards shorter sub-acute stays in nursing homes, increased resident turnover in nursing homes, and the provision of long term care in non-institutional settings.

Excess capacity has negative consequences for our health care system:

- **Quality of Care is Jeopardized**: In health care, there is a direct positive relationship between volume and quality of care. The more cases or procedures performed, the better the outcome. Excess capacity disperses volume and expertise, potentially diminishing quality. It is a public health imperative to concentrate volumes at fewer institutions and create Centers of Excellence. Excess capacity also subsidizes inferior quality by blocking investments in equipment and staff.

- **Unnecessary Utilization Occurs**: Hospitalizations expand in relation to the number of available beds. Supply induces demand and unused capacity creates pressure to admit patients solely in order to generate revenue. Similarly, greater numbers of expensive tests and procedures are performed when resources like imaging machines, diagnostic labs and surgical suites are available and need to generate revenue. Areas with excess capacity repeatedly demonstrate higher rates of hospital admission and services that cannot be explained by differences in rates of illness or age.

- **Duplication Fuels a Medical Arms Race**: New York's hospitals compete for the most expensive and sophisticated technologies that produce higher financial margins. The result in unnecessary duplication of high-end services like magnetic resonance imaging and cardiac catheterization labs and too little integration of regional service delivery. Eliminating these redundancies will save money without compromising access to care.

- **The Safety Net is Endangered**: Low occupancy rates and associated financial pressures can lessen hospitals' commitment to provide care for vulnerable populations. As fiscal pressures increase, facilities may feel forced to close or shrink their less financially viable services in inner city neighborhoods or rural communities.

- **Costs Increase**: Excess capacity is expensive. Maintaining a "bricks and mortar" based system carries enormous costs. Even empty beds, wards, and buildings that

are unused and unstaffed have fixed costs that must be paid and which are spread over a diminishing number of patients. Additionally, dollars are diverted from other productive uses and reinvestment opportunities are thwarted.

### The Commission Process: Public and Local Participation

The Commission is a broad-based, nonpartisan panel established by Governor Pataki and the New York State Legislature to undertake a rational, independent review of health care capacity and resources. It was created to ensure that the regional and local supply of hospital and nursing home facilities is best configured to respond to community needs for high-quality, affordable and accessible care, with meaningful efficiencies in delivery and financing that promote infrastructure stability.

The Commission was specifically charged with rightsizing institutions. Rightsizing includes the possible consolidation, closure, conversion, and restructuring of institutions. Over the course of 18 months, the Commission evaluated each hospital and nursing home in the state to develop its final recommendations. The Commission's process balanced "science" and "art." Its deliberations were informed and driven by extensive review of objective data and quantitative analysis. However, its deliberations were more than a "numbers game" and its final recommendations are not solely the product of mathematical algorithms. Public input, understandings of local market conditions, professional judgment, and factual information were combined to form the basis of the Commission's work.

The Commission operated independently of any existing agency or entity. Given the size and diversity of New York State, the structure of the Commission had a strong focus on regional concerns and issues. The state was formally divided into six regions by its enabling statute. In addition to eighteen statewide voting members, the Commission had up to six regional members for each of the six regions. The regional members had voting authority on matters related solely to their region.

Furthermore, each of the six regions had Regional Advisory Committee (RAC) consisting of up to twelve members. The RACs provided essential community knowledge and insights into local conditions. They played vital information-gathering roles by fostering discussions with and among local stakeholders. Each of the RACs held

8

extensive meetings with hospital and nursing leaders and representatives from trade groups, organized labor, patient advocates, insurers, researchers, and public health officials. The final advisory reports of the RACs are included as appendices to this report.

The Commission and RACs held public hearings across the state to further solicit input from a wide array of interested parties including patients and consumers, providers, payors, labor, elected officials, and the business community. In total, nineteen hearings were held throughout the regions. The Commission heard from hundreds of witnesses and reviewed thousands of pages of testimony.

### Summary of Policy Recommendations

The Commission's direct mandate to rightsize and reconfigure facilities was a vast and necessary endeavor. Nevertheless, the work of the Commission is only one element in a comprehensive reform agenda. No single Commission can address or resolve all of the State's health care issues. The work of this Commission is one step in what must be an ongoing and wide-ranging process to modernize and reshape New York's health care system. The Commission makes the following recommendations to provide a blueprint for additional work necessary to more fully reconfigure our system:

- New York should undertake a comprehensive review of reimbursement policy and develop new payment systems that support a realignment of health services delivery.

- New York should strive for health coverage that is universal, continuous, affordable to individuals and families, and affordable and sustainable for society at large. New York should study coverage expansion efforts in other states and adopt additional strategies to sustain its recent progress in reducing the number of uninsured New Yorkers. While guarding against fraud, New York should lower administrative barriers to enrollment to help ensure that all uninsured but eligible persons are placed in the appropriate program and make it easier for eligible persons to retain coverage.

- New York should expand primary care capacity, including facilities, equipment, information technology and workforce.

- New York should develop and test "hybrid" delivery and financing models that are less than a hospital and more than a primary care center.
- New York should undertake a comprehensive analysis of the feasibility and advisability of privatizing the State University of New York (SUNY) teaching hospitals at Stony Brook, Syracuse, and Brooklyn.
- New York should cultivate its health care workforce by implementing strategies to address persistent shortages in a variety of occupations and to educate and retrain workers to prepare them for increasing uses of heath technologies in their jobs. Workers displaced by Commission recommendations should receive assistance in obtaining employment in other healthcare settings.
- New York should promote the increased use of health information technologies and ensure that these systems are able to communicate, using open architecture and embracing the principle of interoperability.
- New York should undertake a comprehensive review of the future role of county-owned and operated nursing homes. A clear policy should be developed to guide decision-making about county nursing homes and to protect indigent residents.
- New York should develop a mechanism whereby niche providers share in the burden of paying for public goods and charity care. New York should also consider the possible need for quality-of-care monitoring and reporting in non-regulated and private settings.
- New York should implement an ongoing process to sustain the efforts initiated by this Commission.

### Summary of Facility Recommendations

Per its statutory obligation, the Commission makes the following recommendations to rightsize and reconfigure health care facilities in each region of the state. The recommendations apply equitably across all regions. The acute care recommendations address 57 hospitals, or one-quarter of all hospitals in the state. The acute care recommendations include 48 reconfiguration, affiliation, and conversion

schemes, and 9 facility closures. Collectively, the recommendations will reduce inpatient capacity by approximately 4,200 beds, or 7 percent of the states' supply. The long-term recommendations for downsizing or closing nursing homes will make highly-targeted nursing bed reductions of approximately 3,000, or 2.6 percent of the state's supply. Twice as many nursing homes will be downsized as closed. In addition, the long-term care recommendations will create more than 1,000 new non-institutional slots.

**Central:**

- Crouse Hospital and SUNY Upstate Medical Center should be joined under a single unified governance structure under the control of an entity other than the State University of New York, and the joined facility should be licensed for approximately 500 to 600 beds.
- Auburn Hospital should downsize by approximately 100 beds and discontinue its obstetrical services.
- Arnot Ogden Hospital and St. Joseph's Hospital should participate in discussions supervised by the Commissioner of Health to explore the affiliation of such facilities.
- Albert Lindley Lee Hospital should close all of its 67 beds and convert to an outpatient/urgent care center with Article 28 diagnostic and treatment center licensure.
- Van Duyn Home and Hospital and Community General Hospital's skilled nursing facility should be joined under a single unified governance structure under the control of Community General Hospital and downsize their combined number of beds by approximately 75.
- Mercy of Northern New York should downsize 76 nursing home beds, add assisted living, adult care, and possibly other non-institutional services.
- Willow Point should downsize by between 83 and 103 nursing home beds, rebuild its facility in an appropriate configuration, and add adult day care.
- Lakeside Nursing Home should close and assisted living, adult day care, and possibly other non-institutional services should be added in Tompkins County by another sponsor.

- United Helpers, Canton should downsize by approximately 64 nursing home beds, rebuild its facility, and add assisted living and possibly other non-institutional services.

**Hudson Valley:**
- Kingston and Benedictine Hospitals should be joined under a single unified governance structure, contingent upon Kingston Hospital continuing to provide access to reproductive services in a location proximate to the hospital. The joined facility should be licensed for approximately 250 to 300 beds.
- Mt. Vernon Hospital should downsize approximately 32 medical/surgical beds, convert approximately 20 additional medical/surgical beds into a transitional care unit, convert approximately an additional 24 medical/surgical beds into mentally impaired chemical abusers unit.
- Sound Shore Medical Center should decertify approximately 9 pediatrics and 60 medical/surgical beds and convert additional medical/surgical and obstetrics beds into level III NICU beds and detoxification beds.
- Contingent upon financing, Orange Regional Medical Center should close its existing campuses and consolidate operations at a new, smaller replacement facility that is licensed for approximately 350 beds.
- Community Hospital at Dobbs Ferry should close in an orderly fashion.
- Westchester Medical Center should evaluate establishing the Children's Hospital as an independent entity and review its clinical service mix to identify opportunities for reconfiguration that is non-duplicative of services in community hospitals.
- Valley View Center for Nursing Care and Rehab should downsize by approximately 160 nursing home beds and add assisted living, adult day care and possibly other non-institutional services. The facility should also convert 50 nursing home beds to ventilator-dependent and behavioral step-down units.
- Andrus on Hudson should downsize all 247 nursing home beds and add assisted living and possibly other non-institutional services.
- Taylor Care Center should downsize by approximately 140 nursing home beds.

- Achieve Rehabilitation should downsize by approximately 40 nursing home beds.
- Sky View Rehabilitation and Health care Center should close, downsize, or convert pending a review by the Commissioner of Health

**Long Island:**

- Eastern Long Island Hospital, Southampton Hospital, Peconic Medical Center should be joined in a single unified governance structure. The new entity should develop an affiliation with University Hospital at Stony Brook. Brookhaven Hospital should continue joint planning with these hospitals and explore joining the new entity. All of these hospitals should implement the bed reconfiguration scheme described in the complete recommendation.
- University Hospital at Stony Brook should be given operational freedom to affiliate with other hospitals and create a regional health care delivery system.
- St. Charles Hospital should downsize 77 medical/surgical beds, convert the remaining 37 medical/surgical beds to psychiatric and alcohol detoxification beds, and discontinue its emergency department.
- J.T. Mather Memorial Hospital should convert all 37 of its psychiatric and alcohol detoxification beds to medical/surgical beds.
- Nassau University Medical Center should downsize by 101 beds and revise its bed configuration across service lines.
- Long Beach Medical Center should downsize by approximately 55 beds. Contingent on other developments, Long Beach should reconfigure as a smaller facility focused on emergency and ambulatory services.
- A. Holly Patterson should downsize by approximately 589 nursing home beds and transfer its subacute services to Nassau University Medical Center. A. Holly Patterson should also rebuild a smaller facility on its existing campus and add assisted living and possibly other non-institutional services.
- Cold Spring Hills Center for Nursing and Rehabilitation should downsize by approximately 90 nursing home beds an d add a ventilator unit, and evening adult program, and a hemo-dialysis center.

- Brunswick Hospital Skilled Nursing Facility should close and assisted living and possibly other non-institutional services should be added in Suffolk County by another sponsor.

**New York City:**

- New York Methodist Hospital and New York Community Hospital of Brooklyn should merge into a single entity with two campuses, downsize by an approximate total of 100 beds, and expand ambulatory services.
- Victory Memorial Hospital should close in an orderly fashion and the site should be converted to a diagnostic and treatment center and/or a facility offering a continuum of long term care services.
- Peninsula Hospital should downsize by approximately 99 beds and St. John's Episcopal Hospital should downsize by approximately 81 beds. Contingent upon financing, the two facilities should merge and rebuild a single facility with approximately 400 beds.
- Queens Hospital Center should add approximately 40 medical/surgical beds.
- Parkway Hospital should close in an orderly fashion,
- Westchester Square Medical Center should close in an orderly fashion.
- Cabrini Medical Center should close in an orderly fashion.
- Beth Israel Medical Center – Petrie Campus should convert approximately 80 detoxification beds to 80 psychiatric beds.
- North General Hospital should enter into a stronger corporate relationship with Mount Sinai Medical Center.
- St. Vincent's Midtown Hospital should close in an orderly fashion. The psychiatric beds and ambulatory services operated by St. Vincent's Midtown should be transferred and operated by St. Vincent's Manhattan or other sponsors.
- New York Downtown Hospital should decertify approximately 74 medical/surgical beds and 4 pediatric beds, discontinue inpatient pediatric services, and reorganize its outpatient clinics under new sponsorship.
- Manhattan Eye Ear and Throat Hospital should downsize all 150 beds.

- Split Rock Rehabilitation and Health Care Center should close, downsize or convert pending a review by the Commissioner of Health.

**Northern:**
- Bellevue Woman's Hospital should close in an orderly fashion and its maternity, neonatal, eating disorders, and mobile outpatient services should be added to another hospital in Schenectady County.
- St. Clare's Hospital and Ellis Hospital should be joined under a single unified governance structure and the resulting entity should be licensed for 300 to 400 beds.
- Ann Lee Infirmary and Albany County Home should merge, downsize by at least 345 nursing home beds, rebuild a unified facility, and simultaneously add or provide financial support for non-institutional services.
- The Avenue and Dutch manor should merge and downsize by approximately 200 nursing home beds in a rebuilt Avenue facility and should add assisted living, adult day care and possibly other non-institutional services.
- The Glendale Home should downsize by approximately 192 beds.

**Western:**
- Millard Fillmore Hospital – Gates Circle should close in an orderly fashion.
- St. Joseph Hospital should close in an orderly fashion.
- DeGraff Memorial Hospital should downsize all 70 medical/surgical beds. It should convert to a long term care facility encompassing its current 80 nursing home beds and the 75 nursing home beds currently at Millard Fillmore Hospital - Gates Circle.
- Sheehan Memorial Hospital should downsize 69 medical/surgical beds. The 22 inpatient detoxification beds currently at Erie County Medical Center should be added to Sheehan, and Sheehan should add ambulatory care services, methadone maintenance, and outpatient psychiatric services.
- The facilities controlled by Erie County Medical Center Corporation and Kaleida Health should be joined under a single unified governance structure under the

control of an entity other than Erie County Medical Center Corporation, Kaleida Health, or any public benefit corporation. The new entity should have a single unified board with powers sufficient to consolidate services into centers of excellence.

- Lockport Memorial Hospital and Inter-Community Memorial Hospital at Newfane should engage in a full asset merger and reconfiguration of services.

- Bertrand Chaffee Hospital should downsize by at least 25 beds, seek designation as a critical access hospital, and affiliate with TLC Tri-County and TLC Lake Shore.

- Brooks Memorial Hospital should seek designation as a sole community provider.

- TLC Tri-County should downsize 28 medical /surgical beds and convert the remaining 10 medical/surgical beds to detoxification beds.

- TLC Lake Shore should downsize all 42 medical/surgical beds and 40 nursing home beds and convert to an Article 28 diagnostic and treatment center. At its option, Lake Shore should continue to operate approximately 20 psychiatric beds or these beds should be added by another local sponsor.

- Westfield Memorial Hospital should downsize all 32 inpatient beds and convert to an Article 28 diagnostic and treatment center.

- Mount St. Mary's Hospital and Health Center or its sponsoring entity and Niagara Falls Memorial Medical center should participate in discussions supervised by the Commissioner of Health to explore the affiliation of such facilities.

- Mount View Health Facility should downsize all 172 nursing home beds, rebuild a new facility on its existing campus, add assisted living, adult day services and possibly other non-institutional services.

- Nazareth Nursing Home should downsize all 125 nursing home beds and convert the facility for use in the PACE program at the former Our Lady of Victory Hospital.

- Mercy Hospital Skilled Nursing facility should add 10 beds and transfer all of its beds to the former Our Lady of Victory Hospital

- St. Elizabeth's Home should covert its adult home beds to an assisted living program.

- Williamsville Suburban should close.

### Financing

The Commission's recommendations will benefit New Yorkers and the health care system. First, they will promote stability of health care providers thereby ensuring access to care and the provision of public goods. Second, they will reduce unnecessary public and private spending and produce overall cost savings for all payors. Third, they will produce numerous opportunities for reinvestment in the system thereby providing substantial financial benefits to providers and the patients served by them.

System restructuring also provides many savings for payors, both in terms of actual reductions in current expenditures and avoided future costs. Such opportunities for savings include reductions in inappropriate utilization, avoided capital investment and leveraged savings. The total estimated savings for payors is around $806 million annually or $8 billion over ten years. This includes an annual savings to Medicaid of around $249 million, or $2.5 billion over ten years, and an annual savings to Medicare of around $322 million, or $3.2 billion over ten years. The total estimated benefit to providers is around $721 million annually or $7.2 billion over ten years. Together, these calculations yield a total benefit to payors and providers of over $1.5 billion annually, or $15 billion over ten years.

The realization of these savings will also entail costs. Broad systemic changes must be supported with appropriate resources and investments are required to implement these recommendations. Potential costs are associated with closures, new construction, and affiliations. Not all of these costs will be borne by the State. It is estimated that implementation will entail a total cost of approximately $1.2 billion, including approximately $350 million in closure costs, $1.1 billion in construction costs, $11 million in affiliation planning costs, and $300 million in offsets from the sale of facility real property. Almost $606 million of these costs are attributable to two contingent projects that the Commissioner will not be required to implement absent available funding.

Vast and unprecedented sums are available to support the restructuring of New York's health care system and cover costs associated with implementing the

Commission's recommendations. The Health Care Efficiency and Affordability Law for New Yorkers (HEAL-NY) allocates $1 billion over four years for capital grant funds to finance physical reconfiguration, conversion, downsizing, or closure of hospitals and nursing homes. Additionally, the Federal-State Health Reform Partnership (F-SHRP) allocates an additional $1.5 billion for similar purposes.

Although HEAL-NY and F-SHRP and critical to financing the Commission's recommendations, they are not and should not be the only sources of funding. Indeed, public funds should be used in the most prudent possible manner. Insofar as facilities are capable of funding their own closure, conversion, affiliation, or rightsizing, they should be expected to do so. The Commission believes it to be appropriate that costs will be shared among all interested parties. Taxpayer dollars should be used judiciously and equitably.

## I. Dynamism of New York's Health Care System

Little remains static in New York's health care system. Regulatory changes, technological and clinical innovations, patient preferences, and varying business models contribute to this constant transformation. Rapid and broad scale change is inevitable; it requires adaptive strategies. Yet today, New York is struggling to maintain a 20th century institutional infrastructure in the face of mounting costs, excess capacity, and unmet need for community-based alternatives. To strengthen our system, New York must overcome its over-reliance on outdated institutions and improve the fiscal stability of its health care providers to guarantee the ongoing provision of important safety-net functions, public goods, and world-class quality of care.

### Catching Up to Change

The past decade was a period of especially dramatic change for NY's health care system and its financing mechanisms. Under the regime of New York's Prospective Hospital Reimbursement Methodology (NYPHRM), established in 1983, the New York State Department of Health set hospital reimbursement rates. Only health maintenance organizations and similar managed-care entities were allowed to negotiate fees with hospitals. Essentially, NYPHRM established cost-based inpatient rates for Medicaid and Blue Cross. Other private insurance companies were required to pay a fixed "mark-up" of 11% above the Blue Cross rate.[1]

The Health Care Reform Act of 1996 (HCRA) replaced NYPHRM. HCRA deregulated hospital rate negotiation so that insurers, employers, and other health care payers now directly negotiate rates with hospitals. The State continues to establish Medicaid fee-for-service reimbursement rates. The federal government sets Medicare rates.

Under NYPHRM, NY's hospitals generally experienced modest or break-even financial margins. The artificial margins created by NYPHRM were exposed by HCRA. Hospital industry leaders have argued that providers were disadvantaged in their ability to thrive in the newly competitive environment. According to the Greater New York Hospital Association (GNYHA),

---

[1] Raske, K.E. (2006, February 7). Testimony Of Kenneth E. Raske, President of Greater New York Hospital Association on the Executive Budget Proposal for 2006–07 Before the New York State Senate Finance And Assembly Ways and Means Committees. Retrieved July 21, 2006, from Greater New York Hospital Association Web site: http://www.gnyha.org/testimony/2006/pt20060207.pdf

"[a]fter deregulation in 1997, hospitals' precariously balanced financial well-being collapsed because health insurers were able to establish negotiated rates by using the old NYPHRM payments as the ceiling. That is, plans negotiated down from a State-set, cost-based rate rather than from market-set, charge-based payments, as had been the case in other states. In addition, the State was no longer able to rescue ailing hospitals through special rate appeals or revenue enhancements because it no longer controlled most of hospital revenue."[2]

Concomitant to the change in state regulation, the federal government reduced Medicare's hospital reimbursement rates in 1997. The Balanced Budget Act of 1997 (BBA) resulted in major revenue losses for New York hospitals. Due to New York City's heavy concentration of academic medical centers and its large medically indigent population, the BBA's sharp reductions in general medical education (GME) and disproportionate share hospital (DSH) payments resulted in an especially considerable drop of New York City hospitals' collective revenue.[3]

**Hospital and Nursing Home Closures**

The turbulence associated with such changes is illustrated by widespread closures and bankruptcies of hospitals and nursing homes. Since 1983, 70 hospitals and over 63 nursing homes have closed in New York State, including 34 hospitals and 44 nursing homes since 1994. Additionally, numerous facilities have declared bankruptcy. Despite these closures, excess capacity remains and resistance to mergers and other consolidations persists. Understandably, facility boards, workers, and communities are committed to preserving institutions in which they have perceived investments.

---

[2] Ibid

[3] For a discussion of BBA's impact on NYC hospitals, see, e.g., Salit, S., Fass, S., & Nowak, M. (2002). Out of the frying pan: New York City hospitals in an age of deregulation. *Health Affairs. 21*, 127-139.

**Table 1. New York State Hospital Closures since 1983**

| Hospital Name | County | Year Closed |
|---|---|---|
| Brunswick Hospital Center* | Suffolk | 2005 |
| New York United Hospital | Westchester | 2005 |
| St. Vincent's Catholic Medical Center – St. Mary's | Kings | 2005 |
| The Hospital | Delaware | 2005 |
| St. Vincent's Catholic Medical Center  – Bayley Seton | Richmond | 2005 |
| Our Lady of Mercy Medical Center – Florence D'Urso Pav | Bronx | 2004 |
| St. Vincent's Catholic Medical Center – St. Joseph's | Queens | 2004 |
| Beth Israel Medical Center – Singer Division | New York | 2004 |
| Staten Island University Hospital – Concord Div | Richmond | 2003 |
| Myers Community Hospital | Wayne | 2003 |
| Brooklyn Hospital Center – Caledonian Campus | Kings | 2003 |
| Interfaith Medical Center – Jewish Hospital of Brooklyn | Kings | 2003 |
| Mary McClellan Hospital | Washington | 2003 |
| Island Medical Center | Nassau | 2003 |
| St. Agnes Hospital | Westchester | 2003 |
| Amsterdam Memorial* | Montgomery | 2002 |
| Olean General Hospital* | Cattaraugus | 2001 |
| Genesee Hospital | Monroe | 2001 |
| Massapequa General Hospital | Nassau | 2000 |
| St. John's Episcopal Hospital, Community Div | Suffolk | 1999 |
| New York Flushing Hospital Medical Center – North Div | Queens | 1999 |
| St. Mary's Hospital | Monroe | 1999 |
| Lady of Victory – Lackawanna | Erie | 1999 |
| Union Hospital of the Bronx | Bronx | 1998 |
| Salamanca | Cattaraugus | 1998 |
| Columbus Community Healthcare | Erie | 1998 |
| Leonard Hospital | Rensselaer | 1997 |
| Samaritan Medical Center – Stone Street Div | Jefferson | 1997 |
| Mohawk Valley General | Herkimer | 1996 |
| Julia Butterfield Memorial | Putnam | 1996 |
| Wyckoff Heights Hospital – Jackson Heights Div | Queens | 1996 |
| Flushing Hospital – Little Neck Div | Queens | 1996 |
| Westchester Medical Center – Mental Retardation Institute | Westchester | 1995 |
| Medical Arts Center Hospital | New York | 1994 |

**Table 1 (continued). New York State Hospital Closures since 1983**

| Hospital Name | County | Year Closed |
|---|---|---|
| Mercy Hospital | Jefferson | 1993 |
| Greene Division – Columbia-Greene Medical Center | Greene | 1993 |
| St. Francis | Erie | 1992 |
| Waterloo Memorial – Taylor Brown | Seneca | 1991 |
| Adirondack Regional | Saratoga | 1991 |
| Salamanca | Cattaraugus | 1991 |
| Tioga General | Tioga | 1990 |
| Community | Delaware | 1989 |
| Holy Family Medical Center | Kings | 1989 |
| Arnold Gregory | Orleans | 1989 |
| Emma Laing Stevens | Washington | 1989 |
| Childrens | Oneida | 1988 |
| Jamestown General | Chautauqua | 1988 |
| Doctors Sunnyside | Orange | 1988 |
| Parsons | Queens | 1988 |
| Johnstown | Fulton | 1988 |
| Baptist Medical Center | Kings | 1987 |
| Long Island Jewish – Manhasset Division | Nassau | 1987 |
| Sheridan Park | Erie | 1987 |
| Deaconess Division – Buffalo General | Erie | 1987 |
| Seneca Falls | Seneca | 1986 |
| Flatbush General | Kings | 1986 |
| Lafayette General | Erie | 1986 |
| Bethesda | Steuben | 1986 |
| Cohoes Memorial | Albany | 1986 |
| Tuxedo Memorial | Orange | 1985 |
| Lydia E. Hall | Nassau | 1985 |
| Boulevard | Queens | 1985 |
| Prospect | Bronx | 1985 |
| Ideal-United Health Services | Broome | 1984 |
| Herkimer Memorial | Herkimer | 1984 |
| Terrace Heights | Queens | 1984 |
| Cumberland | Kings | 1983 |
| Jewish Memorial | New York | 1983 |
| Rose | Oneida | 1983 |

* Brunswick Hospital – closed all medical-surgical beds, but maintain rehabilitation services, Amsterdam Memorial – closed emergency department, ICU and ceased using medical-surgical beds in 2002, in 2005 received approval to reopen inpatient beds. The beds are used for sub-acute care in connection with their nursing home, Olean General – services consolidated at main Olean General site and still in operation.
Source: New York State Department of Health

**Table 2. New York State Nursing Home Closures since 1983**

| Nursing Home Name | County | Year Closed |
|---|---|---|
| Childs Nursing Home Company | Albany | 2006 |
| Cedar Hedge Nursing Home | Clinton | 2006 |
| Episcopal Residential Health Care Facility | Erie | 2006 |
| The Hospital Skilled Nursing Facility | Delaware | 2005 |
| Sunrest Health Facilities | Suffolk | 2005 |
| New York United Hospital Medical Center Skilled Nursing Pavilion | Westchester | 2005 |
| Hebrew Home For The Aged At Riverdale Baptist Div | Bronx | 2005 |
| Rehab Institute Of New York At Florence Nightingale Health Center | New York | 2005 |
| Menorah Home & Hospital For Aged And Infirm | Kings | 2005 |
| Kresge Residence | Erie | 2004 |
| Hutton Nursing Home | Ulster | 2004 |
| Manor Oak Skilled Nursing Facilities | Chautauqua | 2004 |
| St Lukes Manor Of Batavia | Genesee | 2004 |
| Manor Oak Skilled Nursing Facilities | Erie | 2004 |
| Loeb Center Montefiore Medical Center | Bronx | 2004 |
| Norloch Manor | Monroe | 2004 |
| Bethel Methodist Home | Westchester | 2003 |
| Wesley-On-East | Monroe | 2003 |
| Mary McClellan Skilled Nursing Facility | Washington | 2003 |
| Mt St Mary's Long Term Care Facility | Niagara | 2003 |
| Eden Park Health Care Center | Columbia | 2003 |
| Potsdam Nursing Home | St Lawrence | 2003 |
| St Mary's Manor | Niagara | 2003 |
| Manor Oak Skilled Nursing Facilities Inc | Wyoming | 2003 |
| The Gardens At Manhattan Health And Rehabilitation Center | Erie | 2003 |
| Eden Park Health Care Center | Albany | 2003 |
| St Clare Manor | Niagara | 2003 |
| Williamsville View Manor | Erie | 2003 |
| Lyden Care Center | Queens | 2002 |
| Genesee Hospital ECF | Monroe | 2002 |
| Our Lady of Victory/Head Trauma Unit | Erie | 2002 |
| Chandler Care Center | Westchester | 2002 |
| The Waters of Syracuse | Onondaga | 2002 |
| Beechwood Sanitarium | Monroe | 2000 |
| Dover Nursing Home | Kings | 2000 |
| Niagara Lutheran Delaware Home | Erie | 1999 |

**Table 2 (continued). New York State Nursing Home Closures since 1983**

| Nursing Home Name | County | Year Closed |
|---|---|---|
| Oswego Hospital ECF | Oswego | 1999 |
| Dutchess County HCF | Dutchess | 1999 |
| Leisure Arms | Rensselaer | 1997 |
| Eden Park Nursing | Rensselaer | 1997 |
| Broadacres | Oneida | 1996 |
| Madonna Residences, Inc | Kings | 1995 |
| Franklin Plaza Nursing Home | Nassau | 1994 |
| Catherine McAuley Manor | Erie | 1993 |
| Swiss Home Health Related Facility | Westchester | 1993 |
| St. Mary's Hospital Brain Injury Unit | Monroe | 1992 |
| Maryknoll Nursing Home | Westchester | 1991 |
| Gerrit Smith Memorial Infirmary | Madison | 1991 |
| Taylor-Brown Memorial Hospital Nursing Home | Seneca | 1990 |
| Good Samaritan Nursing Home | Albany | 1990 |
| Elcor's Marriott Manor Health Related Facility | Chemung | 1990 |
| Arnold Gregory Memorial Hospital Skilled Nursing Facility | Orleans | 1989 |
| Strong Memorial Hospital Skilled Nursing Facility | Monroe | 1988 |
| Chenango Bridge Nursing Home | Broome | 1988 |
| Placid Memorial Hospital | Essex | 1988 |
| Surfside Nursing Home | Queens | 1988 |
| City Hospital at Elmhurst Public Home | Queens | 1988 |
| St. George Nursing Home | Erie | 1988 |
| Margaret-Anthony Nursing Home | Chautauqua | 1988 |
| House of the Holy Comforter | Bronx | 1986 |
| Flower City Nursing Home | Monroe | 1985 |
| Jewish Home & Infirmary of Rochester | Monroe | 1985 |

Source: New York State Department of Health

Health care facilities close for a variety of reasons, and rarely close due to one isolated cause. Common factors that lead to closures include:

- **Poor financial health**: First and foremost, facilities close due to lack of funds. As the adage indicates, "no margin, no mission." Not surprisingly, hospitals and nursing homes that close tend to have been in severe financial distress for an extended period of time before closing.

- **Aging physical plant**: Nationally, the average age of a hospital physical plant in 2004 was 9.8 years.[4] In New York, the Dormitory Authority for the State of New York (DASNY) estimates that the average age of a New York hospital in 2004 was approximately 12.5 years. Nationally, the biggest increases in capital expenditures have occurred in regular fixed equipment, meaning that hospitals have concentrated on repairs and renovations rather than design and construction of new facilities.[5]

- **Aging physical plant for nursing homes**: According to officials at the Department of Health, the majority of nursing homes in New York State were built before 1960. From the information available, the median year at which facilities began operating as nursing homes is 1971, but many facilities operate in buildings much older, built for purposes other than nursing homes and later converted.

- **Low occupancy rates:** An empty bed does not generate revenue. Even when a bed is unoccupied, there are significant fixed costs associated with maintaining that bed, including staffing and capital costs. Unoccupied beds are significant money drains on hospitals and nursing homes. Low occupancy rates can also indicate that facilities are unnecessary or undesirable; empty beds can reflect choices by patients and physician to seek and provide care elsewhere.

- **Poor community reputation:** All hospitals and nursing homes are community institutions, serving and served by people in the community. Those facilities with reputations as providers of high-quality care and as "good citizens" attract the area's physicians and patients. A good reputation therefore generally sustains a higher occupancy rate and a poor one helps sink an institution.

- **Weak management/leadership:** A critical factor to any successful hospital and nursing home is strong and efficient management and leadership. Management is responsible for

---

[4] American Hospital Association, (2006). Chartbook: Trends Affecting Hospitals and Health Systems, April 2006. Retrieved July 24, 2006, from the American Hospital Association Web site:
http://www.aha.org/aha/research-and-trends/health-and-hospital-trends/2006.html
[5] Runy, L. (2003).Penny wise? Financial pressures force a short-term mind-set in capital spending. *Health Facilities Management. 16(2)*, 20-21.

establishing and implementing a strategic plan that is in keeping with an organization's mission. Health care leaders should create a sense of organizational commitment, and provide a supportive work environment to help to prevent/protect against burnout, which will ultimately reduce employee turnover and save money.[6]

According to the Healthcare Financial Management Association, rating agencies such as Moody's and Standard and Poor's cite the following governance and management issues as critical to their rating decisions:

- o *Governance*: Is the board involved in a meaningful way in strategic decision-making for the hospital? Does the board have the necessary skills to make informed decisions? Do skills of board members complement those of the management team?

- o *Management*: Has management proven its ability to weather regulatory change and market threats? Do senior managers inform and educate their board? Do they have demonstrated relevant experience? Do they use effective methods to monitor and improve performance? Do they use systematic strategic and financial planning? Do they assess and serve community needs?[7]

- **Weak markets/access to capital**: Many facilities have deferred capital improvements and require significant upgrades to their physical plants. Yet, access to capital financing is weak for many New York State providers that struggle with high debt burdens and limited liquidity. Without adequate access to capital, hospitals and nursing homes cannot invest in the physical plant or equipment that will ensure high-quality health care.

- **Difficulty attracting and retaining staff**: Hospitals and nursing homes in New York State, as with the rest of the nation, are finding it increasingly difficult to attract and

---

[6] See: Organzo, A.J., et al, (2006). Are attributes or organizational performance in large health care organizations relevant in primary care practices? *Health Care Management Review. 31 (1)*, 2-10.
  Castle, N.G. (2006). Organizational commitment and turnover of nursing home administrators. *Health Care Management Review. 31 (2)*, 156-165.

[7] HFMA, & Pricewaterhouse Coopers (2003). Financing the future report 1: How are hospitals financing the future? Access to capacity in health care today. Retrieved July 21, 2006, from Healthcare Financial Management Association Web site: http://www.hfma.org/NR/rdonlyres/2E95F3D0-B095-4F04-8AA1-AAE264109806/0/FNF1_No1.pdf

retain quality health care workers. Experienced nurses are in especially short supply. In addition, the migration of young workers from upstate New York to New York City and other parts of the country has exacerbated the shortage of health care workers upstate.[8]

- **Competition from other providers**: Hospitals and nursing homes face increasing competition both within their industries and from alternative providers.
  - **Within the Industry:** Hospitals and nursing homes compete vigorously among themselves in multiple ways. First, hospitals must selectively contract with health plans to be placed on their preferred provider networks. This may induce hospitals to offer significant price reductions to the plan to receive this network designation and/or to provide services attractive to health plans.[9] Second, hospitals are engaged in a "medical arms race" for high-margin services where they make redundant investments in costly clinical technologies to provide services attractive to individual plan beneficiaries and physicians.[10] In the face of declining occupancy rates, nursing homes also compete vigorously with one another to fill beds. Nursing homes are devoting increasing money and effort to marketing activities, targeting discharge planners with their information.
  - **Alternative sites of care:** Hospitals face increasing competition from other providers of care, such as ambulatory surgery centers, that have lower overhead costs than hospitals. The services provided by these niche providers are often well-reimbursed and deprive hospitals of revenues that were historically used to cross subsidize less profitable services. Similarly, nursing homes face increasing competition as more long term services are provided in non-institutional settings. Patient preferences and technology advances are driving a shift to home and community-based settings. This is especially so for nursing homes which provide a great deal of custodial care and who thus compete for the same resident pool with home care agencies and assisted living residences.

---

[8] See: Roberts, S. Flight of young adults is causing alarm upstate. (2006, June 13). *New York Times*, p. A1. Available online: http://www.nytimes.com/2006/06/13/nyregion/13census.html

[9] Devers, K.J., Brewster, L.R., & Casalino, L.P. (2003). Changes in hospital competitive strategy: A new medical arms race?. *Health Services Research. 38 (1 Pt 2)*, 447-469. Available online: http://www.pubmedcentral.gov/articlerender.fcgi?tool=pubmed&pubmedid=12650375

[10] Ibid

- **Size of nursing home**: Following national trends, those New York State nursing homes that have closed tend to be smaller institutions. Nationwide, the proportion of homes with fewer than 100 beds declined from 65.7% of total facilities to just over 50%[11] It is important to note that studies have shown that poor quality is less of a contributing factor to closure than size[12].

- **"Cashing out"**: Unlike New York hospitals, a large proportion (48%) of New York nursing homes are proprietary (for-profit), so that the real estate on which a nursing home sits can be sold with few restrictions and the licensed beds are transferable to other nursing homes. Establishing a new nursing home has become increasingly difficult; therefore, each licensed nursing home bed has a high market value. Consequently, some providers prefer to "cash out" rather than to continue operations, often by selling their real estate assets.

**Table 3. Nursing Home Sponsorship**

| Region | Ownership Class | | |
|---|---|---|---|
| | Proprietary | Public | Voluntary |
| Central | 36% | 8% | 56% |
| Hudson Valley | 46% | 10% | 45% |
| Long Island | 76% | 4% | 21% |
| New York City | 53% | 4% | 43% |
| Northern | 32% | 19% | 49% |
| Western | 45% | 12% | 43% |
| Statewide | 48% | 8% | 44% |

Source: New York State Department of Health

---

[11] Centers for Disease Control and Prevention, (1995, 1997, 1999). National Nursing Home Survey. Retrieved July 24, 2006, from National Center for Health Statistics Web site: http://www.cdc.gov/nchs/nnhs.htm#Public-Use%20Data%20Files

[12] Castle, N.G. (2005).Nursing home closures and quality of care. *Medical Care Research and Review. 62 (1)*, 111-132. Available online: http://mcr.sagepub.com/cgi/reprint/62/1/111.pdf

## II. Instability of the System

The Commission finds New York States' health care providers to be in critically unstable condition. Providers cannot sustain chronic financial losses and continue to provide the world class health care and important public goods that New Yorkers expect and deserve. "[N]o ordinary enterprise can continue to operate indefinitely with losses.  Hospitals with losses for several years should either close, merge, or make changes to become more profitable."[13] As hospitals and nursing homes struggle to remain solvent, they face possible closure due to market forces alone. Because such market driven closures can occur irrespective of or even contrary to public policy goals, access to and quality of care are at risk. The most important institutions to preserve may also be the most fragile.

**Hospital System Fiscal Instability**

The dire financial situation of New York's hospitals can be seen across all categories of hospitals, from rural to inner-city, from large academic medical centers to small critical access hospitals. According to the Healthcare Association of New York State (HANYS), hospitals in New York State have lost an aggregate $2.4 billion over the past eight years.[14]  In 2005 alone, the statewide operating margin[15], which is the traditional measure of hospitals' financial health, was -0.2% (-$95.4 million).[16] While some hospitals are on relatively solid financial ground, the majority are losing money, just breaking even, or operating with a 0-1% financial margin.[17] [18]

Margins in New York have never been generous.  Year after year, New York hospitals' operating margins fall far below national norms.  Before 1997, those margins were artificially

---

[13] Duffy, S.O., & Friedman, B. (1993). Hospitals with chronic financial losses: What came next?. *Health Affairs*. *12 (2)*, 151-163.  Available online: http://content.healthaffairs.org/cgi/reprint/12/2/151

[14] Healthcare Association of New York State. (2006, November 16). New York's hospitals lose money for the 8th straight year: Negative operating margin ranks New York 49th in the nation. Retrieved November 16, 2006, from Healthcare Association of New York State Web site:
http://www.hanys.org/communications/pr/2006/upload/11_15_06_EightYearsFinancial.pdf

[15] Gain or loss from operating sources (operating income/total operating revenue).

[16] Healthcare Association of New York State. (2006, November 16). New York's hospitals lose money for the 8th straight year: Negative operating margin ranks New York 49th in the nation. Retrieved November 16, 2006, from Healthcare Association of New York State Web site:
http://www.hanys.org/communications/pr/2006/upload/11_15_06_EightYearsFinancial.pdf

[17] Ibid

[18] The New York Health Plan Association (NYHPA) paints a different picture by using net income, finding that two-thirds in fact generated profits in 2004, and of the one-third of hospitals that had losses, 15 facilities comprised approximately 75% of total losses for New York State. See:
http://www.empirenewswire.com/release/downloads/nyshpa.pdf

maintained in the zero to 1% range, and after a nominal improvement in 1997, they declined precipitously. In 2005, the national average operating margin for hospitals was 3.7%, four percentage points higher than New York State's.[19] Comparing 1996-2003 operating margins in the 50 states and the District of Columbia, New York State has the dubious distinction of ranking among the very worst in terms of operating margins.[20]

**Figure 1: Hospital Operating Margins, New York State and United States, 1996-2004**



Source: Greater New York Health Association analysis of Medicare cost reports

Certain regions in the State fare worse than others. Hospitals in the New York City region are the most financially vulnerable in the State. A July 2003 United Hospital Fund

[19] Healthcare Association of New York State. (2006, November 16). New York's hospitals lose money for the 8th straight year: Negative operating margin ranks New York 49th in the nation. Retrieved November 16, 2006, from Healthcare Association of New York State Web site: http://www.hanys.org/communications/pr/2006/upload/11_15_06_EightYearsFinancial.pdf

[20] Raske, K.E. (2006, February 7). Testimony Of Kenneth E. Raske, President of Greater New York Hospital Association on the Executive Budget Proposal for 2006–07 Before the New York State Senate Finance and Assembly Ways and Means Committees. Retrieved July 21, 2006, from Greater New York Hospital Association Web site: http://www.gnyha.org/testimony/2006/pt20060207.pdf

found that one-third of New York City hospitals' viability was "in doubt," and faced financial problems "severe enough to jeopardize their continuing viability."[21]

**Figure 2: Hospital Operating Margins by Region, 2004**



Source: HANYS 2004 Audited Financial Statements[22]

Weak operating margins are not the sole indicators of hospitals' annual financial stress. New York State hospitals are also the most heavily indebted in the nation. The equity financing ratio (the percent of assets financed through cash savings as opposed to debt) in New York is the worst of the 50 states and the District of Columbia. While most hospitals in the nation finance capital investments by an approximately 50%-50% combination of savings and borrowings, New York State had an 18% equity financing contribution rate by 2003.[23] In other

---

[21] Brooks, P. (2003, July). Losses continue at NYC hospitals; Viability of one-third in doubt. *Hospital Watch, 14 (3)*, 1-6. Available online: http://www.uhfnyc.org/usr_doc/hwv14n3.pdf

[22] Healthcare Association of New York State. (2005, November 16). Hospitals in New York lose money for seventh year in a row. Retrieved September 21, 2006, from Healthcare Association of New York State Web site: http://www.hanys.org/communications/pr/111505_pr.cfm

[23] Raske, K.E. (2006, February 7). Testimony Of Kenneth E. Raske, President of Greater New York Hospital Association on the Executive Budget Proposal for 2006–07 Before the New York State Senate Finance and Assembly Ways and Means Committees. Retrieved July 21, 2006, from Greater New York Hospital Association Web site: http://www.gnyha.org/testimony/2006/pt20060207.pdf

words, New York State relies more on debt to cover necessary expenses than does any other state's health care delivery system. This heavy dependence on debt will further destabilize New York's health care delivery system, and may cripple the State's health care structure in the long term.

The fiscal problems of NY's hospitals are reflected in and exacerbated by their difficulties raising capital. US hospitals generally have a wide range of capital sources to tap, both external and internal.[24] External sources of capital include proceeds generated from bond issuances, bank loans, sale of real estate, real estate investment trusts, public grants, and philanthropy. Internal sources include operating and non-operating cash flow and divested assets.

The Healthcare Financial Management Association identified two types of hospitals to discern which hospitals have the best access to capital. The first type, those with "broad access" to capital, has stellar financial profiles: high profitability, high liquidity, and limited debt burden. Those with "limited access" to capital are neither profitable nor have adequate liquid assets, and are significantly burdened with debt. According to this report, New York's access to capital is bleak. Compared to the fifty states and DC, "New York ranks first in both proportion and number of hospitals designated as having limited access to capital."[25] The State's limited access to capital is also reflected in the bond ratings of the various New York hospitals. Due to many factors, including average age of plant, days cash on hand, as well as operating margin and debt to capitalization ratios, the hospitals' bond ratings are dismal. In its February 2006 report, the Moody's rating agency referred to New York State as "one of the most difficult, if not the most difficult, states to operate a hospital."[26]

---

[24] Healthcare Financial Management Association, & Pricewaterhouse Coopers. (2003). Financing the future project reports I and II. Retrieved July 21, 2006, from Healthcare Financial Management Association Web site: http://www.hfma.org/library/accounting/capitalfinance/FinancingtheFuture.htm
[25] Ibid
[26] Moody's Investor's Service Global Credit Research. (2006). Not-for-profit hospitals: 2006 State of the States. Moody's Investor's Service 2006 Outlook.

**Table 4. Statewide Ranking of Hospitals with Limited Access to Capital**

| Rank | Wide | Constrained |
|------|------|-------------|
| 1 | Indiana | **New York** |
| 2 | Wisconsin | Hawaii |
| 3 | Nebraska | Washington, DC |
| 4 | New Hampshire | Pennsylvania |
| 5 | Vermont | West Virginia |
| 6 | Minnesota | New Jersey |
| 7 | Ohio | North Dakota |
| 8 | Virginia | Massachusetts |
| 9 | Arizona | California |
| 10 | Tennessee | Connecticut |

Source: Solucient[27]

The low credit rating of the hospitals has two primary effects. First, the higher the debt service costs due to poor credit ratings, the less an institution can spend on other expenditures such as capital improvement, technology upgrades, and pension coverage. Second, because the bond ratings are bleak, the vast majority of not-for-profit hospitals and nursing homes in the DASNY portfolio require some sort of credit enhancement. Credit enhancement sources include letters of credit, bond insurance, local taxes, and the Federal Housing Administration's (FHA) section 242 Hospital Mortgage Insurance Program.[28] Notably, in 2000, the FHA program insured over 70% of hospital credits issued through DASNY, and over 60% of FHA-insured debt nationwide is in New York State.[29]

---

[27] Healthcare Financial Management Association, & Pricewaterhouse Coopers. (2003). Financing the future II Report 6: The outlook for capital access and spending. Retrieved July 21, 2006, from Healthcare Financial Management Association Web site: http://www.hfma.org/NR/rdonlyres/ED7D0E8B-E896-4B1C-8466-B33CA4B72095/0/FF2_No6_Outlook_w1.pdf

[28] See: United States Government Accountability Office. (2006). *Hospital mortgage insurance program: Program and risk management could be enhanced* (1-66), showing that the geographic concentration of FHA-insured hospitals located in New York "makes the [FHA] program vulnerable to state policies and regional economic conditions." Availabe online: http://www.gao.gov/new.items/d06316.pdf

[29] Health Care Reform Working Group. (2004). *Health Care Reform Working Group – Final Report, November 17, 2004*, 1-32. Available online: http://www.health.state.ny.us/health_care/medicaid/related/health_care_reform/pdf/final_report.pdf

**Table 5. New York State Hospital Medians Compared to Rating Agency Medians**

| Ratios | Hospital Medians | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|
| | New York State, 2003* | S&P, All Health Care, 2004** | | | | Fitch Nonprofit Hospital and Health Care System, 2004*** | | | |
| | | AA+ to AA- | A+ to A- | BBB+ to BBB- | Spec | AA | A | BBB | Below BBB |
| Average Age of Plant | 12.5 | 8.9 | 9.1 | 9.8 | 12.6 | 9.4 | 9.9 | 9.3 | 13.1 |
| Days Operating Cash Available | 30.1 | 211 | 159 | 110 | 50 | 232.2 | 177.2 | 117.5 | 49.3 |
| Operating Margin | 0.0% | 3.1% | 3.5% | 1.2% | (1.3%) | 3.5% | 2.5% | 1.0% | (1.8%) |
| Debt to Capitalization | 50.9% | 32.8% | 37.3% | 44.3% | 65.3% | 34.8% | 39.0% | 47.3% | 75.1% |

Source: * DASNY, 2003 audited financial statements
　　　 ** Standard and Poor's, "U.S. Not-For-Profit Health Care 2004 Median Ratios," June 10, 2004
　　 *** FitchRatings, Health Care Special Report, "2005 Median Ratios for Nonprofit Hospitals and Health Care Systems," August 9, 2005

To help ameliorate the hospitals' limited capital access, DASNY, the State agency that provides financing and construction services to not-for-profit healthcare facilities and the State's largest issuer of health-related debt, issued secured hospital revenue bonds. These bonds "were issued to allow financially distressed New York not-for-profit- hospitals access to the capital markets. The establishment of the Secured Hospital Program became necessary because the physical plants of certain hospitals were deteriorating, but such hospitals' financial conditions were too weak to enable them to borrow the monies necessary to modernize their facilities."[30] Authorization to issue bonds under this program, however, expired on March 1, 1998. Approximately $837 million is outstanding, spread over ten institutions. Currently, DASNY offers multiple programs to provide financing for capital construction and rehabilitation projects for non-profit health care facilities in New York State which are secured by various credit structures.

---

[30] Dormitory Authority State of New York. Financial services: Health care. Retrieved July 24, 2006, from Dormitory Authority State of New York Web site: http://dasny.org/finance/finserv/index.php#anchor820988

**Nursing Home System Fiscal Instability**

New York State's nursing homes are in a similarly precarious situation.  In 1997, less than a quarter of the State's nursing homes were operating in the red. The majority - at least 55% - now operate at a loss.

**Figure 3: Nursing Homes with Operating Losses, 1997-2003**



Source:   Residential Health Care Facility-4 (RHCF-4) Cost Reports, 1997-2003

The financial strain on NY nursing homes may be increasing.  According to a survey conducted by the Joint Association Task Force on Nursing Home Reimbursement, New York's median nursing home margin fell from +0.6% in 2001 to -0.1% in 2002, and again to -0.6% in 2003.  Rural nursing homes are in much worse financial health, with median margins declining from -5.2% to -7.4% in the same time period.[31]  As a result of these poor margins, nursing

---

[31] Joint Association Task Force on Nursing Home Reimbursement.  (2006).  *Joint Association Task Force on Nursing Home Reimbursement: A briefing for member facilities.*  6-7.
The Task Force was comprised of the New York Association of Homes and Services for the Aging, the Healthcare Association of New York State, and the New York State Health Facilities Association.

homes financial position is also deteriorating: the median number of days cash-on-hand in 2003 was only 21.[32]

**Pressures on the System**

Numerous pressures on the system contribute to the weak bottom lines of NY's health care providers. Moody's Investor Services attributes the bleak financial condition of New York hospitals to: the state's "challenging" demographics, including a high Medicaid-dependent and large immigrant population; payer concentration (tightening of the insurance market); a high degree of competition between providers; high cost of operation; merger difficulties; large number of high-cost academic medical centers; and the legacy of a highly regulated system.[33] Additional major factors include:

o **Uninsured residents.** The problem of the uninsured and underinsured is one of the most vexing problems facing health care delivery in both New York State and the United States as a whole. Over 45 million Americans below 65 years-old, 18% of the non-elderly US population, lacked health care coverage in 2004.[34] An estimated 17% of New York State residents under age 65, almost 3 million New Yorkers, are uninsured.[35] A large portion of the State's uninsured population lives in New York City; 25% of City residents are uninsured, whereas 13% of State residents living outside of the City are uninsured.[36] Most of the uninsured in New York are low-income, working adults. Members of racial/ethnic minorities are disproportionately uninsured.

---

[32] Department of Health. (2003). *Residential Health Care Facility Cost Reports (RHCF-4)*.

[33] Moody's Investor's Service Global Credit Research. (2006). Not-for-profit hospitals: 2006 State of the States. Moody's Investor's Service 2006 Outlook.

[34] Kaiser Commission on Medicaid and the Uninsured, (2006, January). The uninsured: a primer - Key facts about Americans without health insurance. Retrieved July 24, 2006, from Kaiser Family Foundation Web site http://kff.org/uninsured/upload/7451.pdf

[35] Kaiser Family Foundation, New York: Health insurance coverage of nonelderly 0-64, states (2003-2004), U.S. (2004). Retrieved July 24, 2006, from statehealthfacts.org Web site: http://www.statehealthfacts.org/cgi-bin/healthfacts.cgi?action=profile&area=New+York&category=Health+Coverage+%26+Uninsured&sub category=Health+Insurance+Status&topic=Nonelderly+%280%2d64%29

[36] Holahan, D., Ely, A., Haslanger, K., Birnbaum, M., & Hubert, E. (2004). Health insurance coverage in New York, 2002. Retrieved July 24, 2006 from United Health Fund Web site: http://www.uhfnyc.org/usr_doc/chartbook2004.pdf

**Table 6. Uninsured in New York City and New York State, Nonelderly, 2002-2003**

|  | Uninsured Nonelderly (Children and Adults under age 65) | |
|---|---|---|
|  | New York City | New York State |
| At or below 200% of the Federal Poverty Level | 65% | 62% |
| Workers and their dependents | 75% | 78% |
| Adults ages 18-64 | 83% | 83% |

Source: March 2003 and March 2004 Current Population Survey, Annual Social and Economic Supplement

**Figure 4. Distribution of Uninsured by Race/Ethnicity for New York State, Nonelderly, 2002-2003**



Source: March 2003 and March 2004 Current Population Survey, Annual Social and Economic Supplement

Lack of health coverage is a serious burden for the uninsured themselves and for the institutions that care for them. Those without health coverage are less likely to seek and receive preventive care, more likely to be hospitalized for avoidable health problems, and more likely to be diagnosed in the later (and more expensive) stages of disease.[37] Even in New York

---

[37] Kaiser Commission on Medicaid and the Uninsured, (2006, January). The uninsured: a primer - Key facts about Americans without health insurance. Retrieved July 24, 2006, from Kaiser Family Foundation Web site http://kff.org/uninsured/upload/7451.pdf

City with its vast public hospital system, uninsured residents face larger obstacles to care than those with insurance.[38]

NY's hospitals provide substantial amounts of uncompensated care to the uninsured and also receive some support for their care of the uninsured. New York is one of a few states that has a public funding pool to reimburse hospitals for free care they provide as well as for bad debt from patient care.[39] In FY 2005-06, New York State provided $847 million per year in HCRA funding to subsidize care for the uninsured; $765 million from the general hospital indigent care pool, and $82 million from the high need indigent care pool. Pool funds are distributed through a complex formula based in part on the level of unreimbursed care each hospital provides in comparison to other hospitals and the proportion of unreimbursed care to each hospital's total costs.[40] The distribution formula relies on 1996 cost data and has not been updated.. The pool does not completely compensate hospitals for the cost of providing care to uninsured New Yorkers. According to GNYHA, HCRA covers a statewide average of 50% of the cost of providing care to the uninsured, ranging from 20% to 80% coverage for particular hospitals.[41] In addition to HCRA, hospitals rely on other public monies to support their margins.

o     **Outmigration of services.** The delivery of many acute care services has shifted from an inpatient to an outpatient setting. This shift has been driven by changing reimbursement incentives, clinical technology and pharmaceutical innovation, and consumer preferences. Cardiac catheterization, colonoscopy, and cancer treatment (radiation therapy and chemotherapy) services are now largely provided on an ambulatory basis.

This shift in care has precipitated the growth in ambulatory surgery centers (ASCs), outpatient cancer centers, and outpatient diagnostic centers. These centers increase competition in health care, and may improve quality by specialization of services.[42] However, many outpatient centers practice "cream skimming," choosing to provide the most profitable

---

[38] Louis Harris and Associates, Inc. (1998, February). 1997 survey of health care in New York City. Retrieved July 24, 2006, from The Commonwealth Fund Web site:
http://www.cmwf.org/surveys/surveys_show.htm?doc_id=228066
[39] More information is available online: http://www.health.state.ny.us/nysdoh/hcra/hcrahome.htm
[40] Greater New York Hospital Association. Questions and answers on the New York health care reform act. Retrieved July 24, 2006, from the Greater New York Hospital Association Web site:
http://www.gnyha.org/pubinfo/HCRA_QA.pdf
[41] Greater New York Hospital Association. Questions and answers on the New York health care reform act. Retrieved July 24, 2006, from the Greater New York Hospital Association Web site:
http://www.gnyha.org/pubinfo/HCRA_QA.pdf
[42] Shactman, D. (2005). Specialty hospitals, ambulatory surgery centers, and general hospitals: Charting a wise public policy course. *Health Affairs. 24 (3)*, 868-873. Available online:
http://content.healthaffairs.org/cgi/content/full/24/3/868?

medical services without bearing the burden of providing other less attractively reimbursed ones. They also do not bear the full overhead costs incurred by institutions in which the services were previously provided. Because these centers capture some of the lucrative services from hospitals by selecting certain profitable diagnostic related groups (DRGs), general hospitals may lose those profitable patients to the centers and will continue to disrupt the general hospitals' cross-subsidization of unprofitable services that only Article 28 hospitals are required to provide. Second, the outpatient centers may avoid patients who are uninsured or underinsured, leaving the burden of uncompensated care solely on general hospitals.[43] Finally, the shift of the locus of care could further reduce New York hospitals' low occupancy rates and exacerbate the problem of excess capacity.[44]

**Figure 5: Estimated Number of Assisted Living Facilities in the United States, 1995-2000**



Source:  National Center for Assisted Living

---

[43] See, e.g., Guterman, S. (2006). Specialty hospitals: A problem or a symptom? *Health Affairs. 25 (1)*, 95-105. Available online: http://content.healthaffairs.org/cgi/content/full/25/1/95
[44] Shactman, D. (2005). Specialty hospitals, ambulatory surgery centers, and general hospitals: Charting a wise public policy course. *Health Affairs. 24 (3)*, 868-873.  Available online: http://content.healthaffairs.org/cgi/content/full/24/3/868?

Within the long term care sector, nursing facilities in New York State are also facing some competition from home and community-based providers. The growth of attractive, supportive housing alternatives for seniors with the means to afford them helped drive these changes in nursing home occupancy rates and patient populations. These newer alternatives include a variety of residential senior housing and assisted living arrangements. In 2002, it was estimated that assisted living facilities in the United States housed 910,000 people.[45]

Assisted living has grown rapidly as a supportive housing arrangement. However, because costs are high and public reimbursement scarce, older persons with modest means have had limited access to this option. This may be changing. While efforts are in their nascent stages, the AARP reports that there have been successful experiments in extending assisted living services to low income, frail elderly residents of subsidized housing.[46] Many states have advanced the growth of residential care through assisted living by providing for such facility care in their Medicaid Waiver programs. As a result, some states have seen an increase in ALP residents and a concomitant decrease in nursing home clients.

**Table 7. Number of Medicaid Waiver Clients in Residential Settings**

| State | Year | | |
|-------|------|------|------|
|       | 2000 | 2002 | 2004 |
| Arizona | 1,240 | 2,300 | 3,067 |
| Colorado | 2,654 | 3,773 | 3,804 |
| Florida | 1,458 | 2,681 | 4,167 |
| Georgia | 2,262 | 2,759 | 2,851 |
| Minnesota | 397 | 2,895 | 4,144 |
| New Jersey | 699 | 1,500 | 2,195 |
| Oregon | 2,573 | 3,600 | 3,731 |
| Washington | 2,919 | 3,762 | 7,404 |

Source: AARP, Wilden, R. & Redfoot, D.L., "In Brief: Adding Assisted Living Services to Subsidized Housing: Serving Frail Older Persons With Low Incomes," Research Report of the AARP Public Policy Institute, January 2002.

---

[45] Mollica, R. (2002). State assisted living policy: 2002. Retrieved July 24, 2006, from National Academy for State Health Policy Web site: http://www.nashp.org/_docdisp_page.cfm?LID=24F0A0A1-2066-4E84-B113F4B919FC006C

[46] Wilden, R., & Redfoot, D.L. (2002, January). Adding assisted living services to subsidized housing: Serving frail older persons with low incomes. Retrieved July 24, 2006, from AARP Web site: http://assets.aarp.org/rgcenter/il/2002_01_living.pdf

In addition to assisted living, growth has also occurred in home and community-based alternatives to institutional care. There are now more than 3,500 adult day centers operating in the US providing care for 150,000 seniors each day.[47]

The Program of All-Inclusive Care for the Elderly (PACE) model successfully shifts the focus of long-term care to non-institutional settings. PACE combines Medicare and Medicaid payments into one capitated payment (set fee per patient) to long-term care providers, who carefully plan and manage service delivery to keep nursing-home-eligible seniors out of hospitals and nursing homes. Program evaluations have shown a decrease in hospital and nursing home utilization among PACE participants, which is more powerful due to the fact that all participants have chronic conditions and disabilities. PACE expansion in New York has been slow, but there are some successful growing programs and the legislature recently approved the addition of four more "pre-PACE-like" (Medicaid capitation only) programs.

o    **Declining Hospital Average Length of Stay (ALOS).** Declines in ALOS exacerbate problems associated with excess inpatient capacity. While still higher than the national average, New York State's inpatient hospital ALOS has fallen considerably. The ALOS for New York State in 2004 was 6.1 days, down from 8.4 days in 1994. Prior to 1994, ALOS was consistently in the range of 8.5 to 9.3 days).[48] The national average LOS for hospital inpatient stays was 4.8 days in 2003, down from 5.7 days in 1994.[49] The recent drop in LOS is primarily attributable to clinical and pharmaceutical innovations and an increase in ambulatory or same-day surgery. Treatment advances, including new drug therapies and less invasive surgical techniques, have made possible fewer and shorter hospital stays, as have cost-management controls and alternative forms of health care organization and payment.[50]

Though lower than in the past, the high ALOS in NY hospitals is not justified by patient severity and should be further reduced. A shorter length of stay can often benefit

---

[47] (2006, July 14). Aging services in America: The facts. Retrieved July 24, 2006, from American Association of Homes and Services for the Aging Web site: http://www.aahsa.org./aging_services/default.asp

[48] Department of Health. (2004). *Statewide Planning and Research Cooperative System,* 243. Available online: http://www.nyhealthcarecommission.org/docs/sparcs_complete_november2005.pdf. Earlier information is available in the Statewide Planning and Research Cooperative System Annual Reports.

[49] Kozak, L.J., Owings, M.F., & Hall, M.J. (2004). National hospital discharge survey: 2001 annual summary with detailed diagnosis and procedure data. *Vital Health Statistics. 13 (156).* Available online: http://www.cdc.gov/nchs/data/series/sr_13/sr13_156.pdf

[50] (2002, October 10). Length of hospital stays continues to decline. Retrieved July 24, 2006, from HealthLink: Medical College of Wisconsin Web site: http://healthlink.mcw.edu/article/1013703780.html

patients, allowing them to return to their daily lives soon after hospitalization. Patients can be exposed to infections often present in hospitals and to the possibility of medical errors. The benefits of getting people up and moving around are best realized by moving them to residential environments such as their homes or nursing homes.[51] If ALOS were reduced to more appropriate levels, the excess capacity in New York State would be substantially greater than it is today.

In addition, shorter ALOS can have significant cost benefits for hospitals. Most payers have abandoned per diem payment structures to correct the perverse incentive to extend a hospital's ALOS as long as possible. The shift to a prospective payment system (PPS) means that hospitals receive a fixed payment per admission and a longer length of stay does not generate extra revenue. Instead, the costs associated with a longer LOS increase costs and cut into a hospital's margins.

**Figure 6: New York State and National Hospital Length of Stay, 1994-2004**



Source: National Hospital Discharge Survey: National Center for Health Statistics and Statewide Planning and Research Cooperative System (SPARCS) data

---

[51] Excellus Blue Cross/Blue Shield. (2002). Average length of stay in upstate New York hospitals: Opportunities for savings. *Excellus Health Policy Reports. 4*, 1-16. Available online: https://www.excellusbcbs.com/download/files/excellus_health_policy_report_4.pdf

**Figure 7: New York State Hospital Length of Stay by Region, 2004**



Source: 2004 Statewide Planning and Research Cooperative System (SPARCS) data

As with hospitals, ALOS in New York's nursing homes has declined dramatically over the last decade. Much of the decrease is attributable to changes in the service mix of nursing homes; many facilities have reduced their focus on traditional long-term services to expand their post-acute short-term rehabilitation services, which generally have a length-of-stay of less than 30 days. Between the growing short-stay services and the changing admission patterns for longer stay residents, the average length of stay in New York's nursing homes has been cut in half in just under seven years. The statewide average was 217 days in 2003, down from 463 days in 1996.

This increased churning of nursing home residents has had an impact on facility operations and finances. Facilities must provide increased nursing ratios, increased housekeeping services, increased documentation and supervision, and specialized clinical and therapeutic services. While Medicare pays additionally for each resident requiring more nursing and therapy, Medicaid reimbursement had been capped according to the facility's 1983 cost structure and other ceilings. Therefore, while the industry's costs have risen dramatically,

it is not clear that revenues have kept pace. Recent legislation to update the nursing home base year may address this imbalance.

**Figure 8: New York State Nursing Homes Average Length of Stay, 1996-2003**



Source: Residential Health Care Facility-4 (RHCF-4) Cost Reports, 1996-2003

o    **Drop in Severity of Illness (Hospitals).** Contrary to the national trend, the severity of illness of New York City residents who require hospitalization as measured by the case mix index (CMI) has declined sharply in a majority of City hospitals.[52] Due largely to fortunate developments related to major epidemics (e.g., AIDS, substance abuse, tuberculosis), high-acuity admissions have fallen. This drop in CMI directly affects the financial viability of the State's and City's hospital system. "Under DRG payment systems, the CMI determines how much inpatient revenue a hospital will receive. In theory, since DRG payments are based on costs, the CMI should not affect hospital profitability. However, in practice, the CMI is often related to profits."[53]

---

[52] United Hospital Fund, (2005).Drop in severity of illness further strains hospital finances. *Hospital Watch. 16 (1),* 1-6. Available online: http://www.uhfnyc.org/usr_doc/hw16_1.pdf

[53] United Hospital Fund, (2005).Drop in severity of illness further strains hospital finances. *Hospital Watch. 16 (1),* 1-6. Available online: http://www.uhfnyc.org/usr_doc/hw16_1.pdf

o    **Increase in Severity of Illness and Disability (Nursing Homes):**  While the hospitals may be experiencing severity declines, nursing homes are dealing with more needy patients and residents—getting them "sicker and quicker."  Nationwide, nursing home residents are older and more frail, and this is certainly true in New York as well.

**Figure 9: Percentage of Nursing Home Residents able to Independently Perform Activities of Daily Living**



Source: National Nursing Home Survey

o    **Workforce Issues.** New York is more expensive than most states to employ workers, including nurses and other health care workers.  According to the Bureau of Labor Statistics, New York ranks sixth among all the States in salaries for registered nurses.[54] Retention of experienced health care personnel, especially nurses, is also a challenge. A 2004 GNYHA study found an 8.5% turnover rate for registered nurses at GNYHA-member hospitals. More than one- third of the hospitals reported turnover rates of 10% or higher.[55] To address these

---

[54] Bureau of Labor Statistics, (2005). Occupational employment and wages, May 2005: Registered Nurses. Retrieved July 24, 2006, from U.S. Department of Labor Web site: http://www.bls.gov/oes/current/oes291111.htm
[55] Greater New York Hospital Association, (2004, April 23). New York-area hospitals continue to face shortage of nurses. Retrieved July 24, 2006, from Greater New York Hospital Association Web site: http://www.gnyha.org/press/2004/pr20040423.html

issues, more than $1.3 billion has been invested in workforce recruitment, retraining, and retention though various programs.

**Table 8. Employment and Wages of Registered Nurses by State, May 2005**

| State | Estimated Total Employment | Mean Wage | |
|-------|----------------------------|-----------|---|
| | | Hourly | Annual |
| California | 226,350 | $33.86 | $70,430 |
| Maryland | 49,010 | $32.37 | $67,330 |
| Massachusetts | 76,870 | $31.85 | $66,250 |
| Hawaii | 9,240 | $31.49 | $65,490 |
| New Jersey | 80,940 | $30.32 | $63,070 |
| New York | 164,370 | $30.29 | $63,010 |

Source: Bureau of Labor Statistics, May 2005 Occupation and Wage Estimates

For nursing homes, turnover for registered nurses, licensed practical nurses, and certified nursing aides categories is significant. While better than the national average, turnover rates for these categories are between 40 and 50%. These translate to vacancy rates of 16-17% for RNs and LPNs.

**Table 9. Nursing Home Staff Turnover, 2002**

| Licensure | New York State | National |
|-----------|----------------|----------|
| C.N.A | 41.7% | 71.1% |
| L.P.N | 33.3% | 48.9% |
| Staff R.N | 44.4% | 48.9% |

Source: American Health Care, 2002 Survey of Nursing Staff Vacancy & Turnover Rates in Nursing Homes

Often, these vacancies are "filled" with overtime and agency staffing, both of which contribute to a facility's instability. Over-time and agency payments are a significant financial burden for many nursing homes, whose Medicaid rates do not recognize these increase costs. Moreover, both overtime use and agency staff use are correlated with lower quality measures, so that a facility's reputation—and often its occupancy—are hurt by staff turnover and vacancies.

o   **Shifting Demographics and Consumer Preferences.** Changes in demographics have a significant impact on the demand for hospital and nursing home beds.[56] Trends in total population suggest that statewide need for inpatient capacity will remain flat for the foreseeable future, with some differences at the regional level. Aging of the population will occur slowly, affecting demand only gradually. Growth in the 75+ cohort, which generates the largest demand for nursing home care, will be relatively flat over the next 20 years. The average baby boomer will be 55 in 2010, so the full impact of this generation will not be felt until the 2020s, when the baby boom generation first reaches their mid-70s. Older people today are healthier than older people of decades ago. People live longer, retire later, have fewer disabilities, have less functional loss, and report themselves to be in better health. The National Academy of Sciences reports a statistically significant 3.6% decline in chronic disability prevalence rates in the elderly United States population, from 24.9% in 1982, to 21.3% in 1994. These trends, together with continuing advances in medical care may have contributed to the nursing home utilization decline for the 65+ population between 1998 and 2003.

Beyond demographics, consumer attitudes towards and preferences for health care services are changing. Patients are now more engaged in medical decision-making, participate as active partners in their care, value living independently, and shun institutional care arrangements. Technology advances increasingly allow patients to realize their preferences. The impact of these shifting preferences is likely to be felt most strongly in the long term care continuum of services. While the bulk of today's frail elderly, who were shaped by the Depression and WWII, are fairly trusting and accepting of institutions, the generations behind them—including the "silent generation" and the "baby boomers" show strong preferences for non-institutional alternatives.

---

[56] Commission on Health Care Facilities in the 21st Century. (2006). *Planning for the future: Capacity needs in a changing health care system*, 1-41. New York: Commission on Health Care Facilities in the 21st Century.

## III. Excess Capacity

Excess capacity in our state's health care system locks us into a vicious cycle. The costs associated with maintaining unneeded beds and institutions are steep. Perpetuating inefficiencies at weak, unneeded facilities drives the costs of health care ever higher. As a result, access to care is diminished, quality of care suffers, safety net functions are threatened, and modern health care becomes increasingly unaffordable for individuals, businesses, and government.

### New York State Has Too Many Hospital Beds

A fundamental driver of the crisis in New York's health care delivery system is excess capacity. Simply stated, New York State is over-bedded and many beds lie empty. There are approximately 3.3 hospital beds per 1,000 New Yorkers, compared to the national figure of 2.8 beds per 1,000 people.[57] Were ALOS in NY hospitals closer to national norms, the excess capacity in the state would be substantially greater. Even a statewide reduction in ALOS to the levels in the Central and Northern regions of the state would result in significantly more excess capacity.

**Table 10. Beds Per 1,000 Population – Selected States**

| Rank | State | Beds/1,000 Population (2004) | Rank | State | Beds/1,000 Population (2004) |
|------|-------|------|------|-------|------|
| 1 | District of Columbia | 6.2 | 11 | Iowa | 3.7 |
| 2 | South Dakota | 6.0 | 11 | Kentucky | 3.7 |
| 3 | North Dakota | 5.6 | 13 | Arkansas | 3.5 |
| 4 | Montana | 4.7 | 13 | Tennessee | 3.5 |
| 5 | Mississippi | 4.5 | 15 | Alabama | 3.4 |
| 6 | Nebraska | 4.2 | 16 | Missouri | 3.3 |
| 7 | West Virginia | 4.1 | 16 | **New York** | **3.3** |
| 8 | Wyoming | 4.0 | 18 | Minnesota | 3.2 |
| 9 | Kansas | 3.8 | 18 | Pennsylvania | 3.2 |
| 9 | Louisiana | 3.8 | 20 | Oklahoma | 3.1 |

Source: Kaiser Family Foundation

---

[57] Kaiser Family Foundation, New York: Beds 1,000 Population, 1999-2004. Retrieved August 21, 2006, from statehealthfacts.org Web site: http://www.statehealthfacts.org/cgi-bin/healthfacts.cgi?action=profile&area=New+York&category=Providers+%26+Service+Use&subcategory=Hospital+Trends&topic=Beds%2c+1999%2d2004

Excess capacity is both a cause and an effect of low and steadily declining hospital occupancy rates. The statewide hospital occupancy rate has fallen from 82.8% in 1983 to 65.3% in 2004, a decrease of 17.5%, including a decline from 73.4% of certified beds in 1994, a decrease of 8.1%. On a given day, as many as one-third or more of the state's hospital beds lie empty. This is far lower than what historically has been considered an ideal rate of 85%, which ensures efficient operations and allows some surge capacity for periods when the daily patient census increases. On a staffed bed basis, approximately 77% of beds statewide are occupied.[58]

While statewide occupancy rates are low, there is some variation of occupancy both between and within regions. The average occupancy rate for many individual hospitals show them to be more than half empty, and some regions of the State, including the Western and Central regions, have especially low occupancy rates based on both certified and staffed bed count.

**Figure 10. Hospital Licensed and Available Bed Occupancy Rates, 1994 to 2004**



Source: 2004 Statewide Planning and Research Cooperative System (SPARCS) data

---

[58] New York State Department of Health. (2004). *Institutional Cost Reports,* 1-52. Available online: http://www.nyhealthcarecommission.org/docs/2004_icr_commission_data.pdf

**Figure 11. Hospital Licensed Bed Occupancy Rates by Region, 2004**



**Figure 12. Hospital Available Bed Occupancy Rates by Region, 2004**

