Assessment

This recommendation is partly shaped by the particularities of Erie County and the Buffalo metropolitan area, including:

- The county is over-bedded, with more inpatient capacity than is required to meet the health care needs of its shrinking population.
- There is duplication of costly tertiary and quaternary services. Redundancy of these services reduces quality of care due to insufficient patient volume.
- Access to critical services, including psychiatry, trauma and burn care, must be maintained.
- There must be sufficient graduate medical education capacity to strengthen the academic mission of the University at Buffalo School of Medicine and ensure an adequate future supply of physicians.
- Erie County and the City of Buffalo both face serious economic challenges. Economic control boards oversee their finances.

A comprehensive plan to reconfigure service delivery in Buffalo must address ECMC. ECMC is burdened with substantial legacy costs from its establishment as a public benefit corporation (PBC) and from high fringe benefit costs embedded within its labor contract with a public employees union. When the Erie County Medical Center Corporation was launched in January 2004, it took over a large healthcare network that serves as the primary safety net provider to residents of Erie County.

The public benefit corporation was established with the assumption that it would provide area residents with quality health care, while reducing the fiscal burden on County taxpayers which in the six years ending in 2003, totaled $119 million in subsidies. Unfortunately, the public benefit corporation model did not resolve the financial crisis for the County. The Office of the Comptroller of NYS criticized the way in which ECMC was created, finding that Erie County had followed the same unsuccessful model used by Nassau and Westchester Counties, i.e., taking a public hospital that was losing significant amounts of money and encumbering it with

significant new debt, and setting it up as an independent agency with no specific new revenue or operational initiatives that would help it achieve self-sufficiency.

Erie County Medical Center and Buffalo General Hospital are both vital components of the local health care delivery system. Analysis of patient discharge data reveals that ECMC and BGH are each other's principal coverage partners. Each of these large facilities provides basic and high-tech services. They are both major teaching facilities for the State University of New York at Buffalo.

As competing institutions, the resources of ECMC and BGH are not leveraged in the most effective manner to benefit the community, contain costs, and drive improvements in quality of care. After considering numerous scenarios for the reorganization of services at ECMC and BGH, the Commission finds that combining ECMC and Kaleida into a new, not-for-profit entity with one board and chief executive is the optimal approach for the people of Erie County. A single entity will be able to reduce duplication of services, enhance quality of care, maintain the provision of public goods, reduce costs, preserve employment, and support an academic mission. While imperfect, the Commission further finds that this approach entails fewer risks, is less disruptive, and can be achieved at lower cost than other proposals that were considered.

ECMC and Kaleida themselves attempted to forge a combined entity on a voluntary basis. This effort broke down due to labor issues involving public and non-public employees and difficulties involved in working within a public benefit corporation structure. However, such a combined entity offers numerous advantages. It makes effective use of scarce resources because it does not demolish and rebuild infrastructure that already exists. The plan protects public goods currently provided by the facilities. The plan also maintains critically needed residency training slots that could otherwise be at risk. The facilities will be retained, maintaining a range of services for the community and preserving jobs. The public benefit corporation, however, would be dissolved, freeing the resulting new entity to compete in the market without the overhead imposed by its debt and excess labor costs.

There are complex challenges involved in dissolving a public benefit corporation and resolving the legacy issues at ECMC. Implementation of this recommendation may require statutory change by the legislature. Any substantive plan for reconfiguring service delivery in Erie County, however, must grapple with ECMC and confront the governance and labor challenges posed by the facility. Failure to do so is an unacceptable lost opportunity.

## Recommendation 6

### Facility (ies)

Lockport Memorial Hospital (Niagara County)

Inter-Community Memorial Hospital at Newfane (Niagara County)

### Recommended Action

It is recommended that Lockport Memorial Hospital and Inter-Community Memorial Hospital at Newfane engage in a full asset merger and reconfiguration of services.

### Facility Description(s)

Lockport Memorial Hospital has 134 licensed beds, and a 2004 average daily census of 71 patients. It provides medical/surgical, pediatric, obstetric, drug and alcohol rehabilitation, and outpatient services. It had approximately 4,691 discharges and 14,935 ED visits in 2004. Approximately 11% of inpatients were Medicaid-covered or uninsured in 2004. Its 2004 operating margin was -1%, and the hospital has reported a positive operating margin for 2005. Lockport has $12 million in long-term debt, $8.8 million of which is secured by DASNY and the federal Department of Housing and Urban Development.

Inter-Community Memorial at Newfane has 71 licensed beds, of which it staffs 51. Average daily census in 2004 was 32 patients. It provides medical/surgical, obstetric, pediatric, and

outpatient care. It had approximately 2,565 discharges and 7,837 emergency department visits in 2004. 14% of inpatients were Medicaid-covered or uninsured in 2004. Inter-Community's operating margin since 1994 has been positive. Inter-Community's 2004 operating margin was 1%. Inter-Community has approximately $5.3 million in (non-DASNY) long-term debt.

## Assessment

Lockport Memorial and Inter-Community Memorial hospitals entered into an affiliation in 2000. Inter-Community helped stabilize Lockport's finances, and has since granted Lockport approximately $2 million in assistance. The two hospitals are controlled by a unregulated, passive parent, the Eastern Niagara Health System. They share a single executive staff and have consolidated certain operations, such as one clinical laboratory. There is some overlap between their medical staffs. Collectively they report achieving $1.8 million per year in savings through by having consolidated their operations.

The hospitals are approximately 10 miles apart, and share a similar patient base. Each hospital is the other's primary coverage partner. Despite their close proximity, neither facility should close. Eastern Niagara County is rural and lacks public transportation. Travel to both facilities is difficult, due partly to each hospital's dependence on a volunteer emergency medical system. In addition, the two hospital structure helps attracts physicians to serve a community in which parts are designated as medically undeserved.

*Recommendation 7*

<u>Facility (ies)</u>

Bertrand Chaffee Hospital (Erie County)

TLC Health Network – Lake Shore Hospital (Chautauqua County)

TLC Health Network – Tri-County Memorial Hospital (Cattaraugus County)

Brooks Memorial Hospital (Chautaqua County)

Westfield Memorial Hospital (Chautauqua County)

<u>Recommended Action</u>

It is recommended that Bertrand Chaffee Hospital downsize by at least 25 inpatient beds to less than 25 beds and seek designation as a Critical Access Hospital or sole community provider, and that Brooks Memorial Hospital seek designation as a sole community provider, and that:

(i) Bertrand Chaffee Hospital affiliate with TLC Tri-County and TLC Lake Shore;

(ii) TLC Tri-County downsize 28 medical/surgical beds, convert the remaining 10 medical/surgical beds to 10 detoxification beds provided that the Commissioner of Alcoholism and Substance Abuse Services approves such additions, and continue to provide chemical dependency, emergency and outpatient primary care services;

(iii) TLC Lake Shore downsize all 42 medical/surgical beds and 40 RHCF beds and convert its acute care services to an outpatient/urgent care center with Article 28 diagnostic and treatment center licensure;

(iv) TLC Lake Shore, at its option, either continue to provide mental health services or downsize all 20 psychiatric beds provided that approximately 20 psychiatric beds be added somewhere in southern Erie, northern Chautauqua or northern Cattaraugus Counties by another sponsor, pending completion of an RFP process and provided that the Commissioner of Mental Health approves such additions; and

(iv) Westfield Memorial Hospital downsize all 32 inpatient beds and convert to an outpatient/urgent care center with Article 28 diagnostic and treatment center licensure.

205

**Facility Descriptions**

Bertrand Chaffee, TLC Tri-County and TLC Lake Shore are three rural hospitals that form a cluster in the Southeast corner of the Commission's Western region. The TLC Network includes Lake Shore Health Care Center and Tri-County Memorial Hospital. Bertrand Chaffee is located to the east of these facilities, all of which are linked by Route 39. The baseline data on the acute care services offered by these three facilities is as follows:

| 2004 Data | Bertrand Chaffee | Tri-County | Lake Shore |
|---|---|---|---|
| Certified beds | 49 | 62 | 62 |
| Available beds | 32 | 116 | |
| Average daily census | 16 | 24 | 33 |
| Discharges | 1,385 | 3,236 | |
| % Medicaid-covered/uninsured | 7% | 11% | |
| Emergency department visits | 9,308 | 17,680 | |
| Operating margin (2003) | -4.8 | -8.9 | |
| Long-term debt | N/A | $11.9M (non-DASNY) | |
| Full-time equivalents (2003) | 287 | 599 | |

Bertrand Chaffee has 49 certified beds, including a 45-bed medical/surgical unit and a 4-bed intensive care unit. Bertrand Chaffee also operates 80 residential health care facility beds.

TLC Health Network – Tri-County Memorial Hospital has 62 certified beds, including a 38-bed medical unit and a 24-bed chemical dependency (alcohol rehabilitation) unit. Tri-County, located in Gowanda, also operates 3 primary care clinics and 2 dental clinics.

TLC Health Network – Lake Shore Hospital has 62 certified beds, including a 39-bed medical/surgical unit, a 3-bed intensive care unit, and a 20-bed mental health unit. Lake Shore

also operates 160 residential health care facility beds and a 267-slot long term home health care program.

Brooks Memorial Hospital, located in downtown Dunkirk, has 99 licensed beds, and offers medical/surgical and maternity care. Brooks had approximately 3,386 discharges, 14,201 emergency department visits and 78,755 outpatient visits in 2004. Twelve percent of its discharges were of Medicaid-covered and uninsured patients in 2004. The hospital reported that 40% of its certified beds were occupied in 2004, and had a -1.9% operating margin in 2003. Brooks holds $3.3 million of (non-DASNY) long-term debt.

Westfield Memorial Hospital is a 32-bed hospital on the western border of Chautauqua County. It is a member of the St. Vincent Health System in Erie, Pennsylvania.  It offers medical/surgical and obstetric inpatient care and outpatient care.  Westfield had approximately 1,032 discharges and 6,455 emergency department visits in 2004. Eleven percent of its discharges in 2004 were Medicaid-covered or uninsured. Approximately 23% of its certified beds were occupied in 2004, and its 2003 operating margin was -0.5%. Its average daily census was 7 patients in 2004. Westfield holds $4 million of (non-DASNY) long-term debt.

## Assessment

The geographic proximity of these small rural hospitals, coupled with their current clinical specializations, provide a unique opportunity to concentrate medical/surgical, psychiatric and chemical dependency services and to achieve substantial efficiencies. The affiliation of Bertrand Chaffee and TLC Network would include financial and management consolidation and implementation of a single information technology system. At this time, a committee with representation from each board and management as well as physicians, has been established to evaluate the affiliation.

Bertrand Chaffee has had significant financial difficulties and recently appealed to its community for financial support in order to remain open.  The facility provides care to residents of Southern Erie County as well as Northeastern Cattaraugus County. The next closest acute care facility is

TLC Tri-County Memorial Hospital, which is approximately 18 miles away. This plan strengthens Bertrand Chaffee by providing the opportunity to become a sole community provider or Critical Access Hospital, thereby increasing reimbursement to the facility. Since the facility has an average daily census of 16, decreasing the number of licensed beds to 25 will not affect the ability of the hospital to provide necessary care to the community.

TLC Tri-County's 62 licensed beds includes 24 alcohol rehabilitation beds and 38 medical/surgical beds. The elimination of Tri-County's medical/surgical beds is essential to allow Bertrand Chaffee to qualify for such increased reimbursement. Moreover, such downsizing will allow Tri-County to expand its current specialization in the area of chemical dependency. Presently, the average daily census of Tri-County's 24 alcohol rehabilitation beds is 22, whereas its medical/surgical beds have an average daily census of only 3. The proposed redistribution of beds allows needed services to continue and expand to be provided in the community. The proposal also recognizes the need for the availability of emergency/urgent care for this rural community.

Lake Shore is located only 17 miles north of Brooks using the New York State Thruway. They share medical staff, and there are frequent referrals between the two. Similarly, Westfield Memorial is located approximately 23 miles south of Brooks via the Thruway. Brooks has had numerous updates over time, including a modernization within the past 4 years. Given Brooks' size and occupancy, it could easily absorb both Westfield's average daily census of 7 patients and Lake Shore's average daily medical/surgical census of 21 patients.

The decertification of both Lake Shore's and Westfield's inpatient beds will improve Brooks' occupancy and margin, resulting in more funds for reinvestment and better access to capital markets. Moreover, it will also allow Brooks to apply for sole community provider status, further improving the hospital's bottom line. This can be accomplished without limiting access to vital services in a rural setting. Both Lake Shore and Westfield should continue to provide urgent and ambulatory care. Given the size and mix of both Lake Shore and Westfield, it is appropriate that they become primarily emergent/urgent and ambulatory care campus. A complete closure of these facilities is not in the best interest of these rural communities.

208

*Recommendation 8*

<u>**Facility (ies)**</u>

Mount St. Mary's Hospital and Health Center (Niagara County)
Niagara Falls Memorial Medical Center (Niagara County)

<u>**Recommended Action**</u>

It is recommended that Mount St. Mary's Hospital and Health Center or its sponsoring entity and
Niagara Falls Memorial Medical Center participate in discussions supervised by the
Commissioner of Health to explore the creation of a single unified governance structure to end
the medical arms race in Niagara County that is expending scarce resources on duplicative
services. It is further recommended that the Commissioner refrain from either approving any
applications that have been or will be filed by either facility or providing any other consent
requested by either facility prior to the conclusion of such discussions, as determined by the
Commissioner of Health, except where such approval or consent is necessary to protect the life,
health, safety and welfare of facility patients, residents or staff. If either Mount St. Mary's
Hospital and Health Center or its sponsoring entity or Niagara Falls Memorial Medical Center
fail to participate in such discussions in good faith, as determined by the Commissioner of
Health, it is recommended that the Commissioner of Health close that facility and expand the
other to accommodate the patient volume of the closed facility.

<u>**Facility Description(s)**</u>

Mount St. Mary's Hospital and Health Center (MSM) is a 175-bed acute care facility, which
became a member of the Ascension Health System in 1997. It provides medical/surgical, alcohol
rehabilitation and maternity care, and has a level I perinatal care designation. In 2004, MSM's
occupancy rate was 60.2% based on 175 certified beds and 67.8% based on its 155 available
beds. Its average daily census was 105 patients in 2004. MSM's emergency department visits

decreased from 21,121 in 2003 to 20,342 in 2004. The hospital has approximately 722 full–time equivalent employees. Additionally, Our Lady of Peace Nursing Care Residence (OLP) is a separately incorporated affiliate of MSM that operates a 250-bed nursing home on MSM's campus.

Niagara Falls Memorial Medical Center (NFMMC) is a 183- bed acute care facility, which provides medical/surgical care and pediatric and psychiatric services. It too has a level I perinatal care designation. NFMMC's 2004 occupancy rate was 67.5%. NFMMC's 66 licensed psychiatric beds had an average daily census of 54 patients in 2004. NFMMC has had a steady increase in emergency department visits. In 2003, it had 24,296 emergency department visits, and in 2004, it had 24,673 visits. It has approximately 834 full-time equivalent employees.

MSM and NHMMC are located six miles apart.

Assessment

Duplication of services fuels the medical arms race and wastes limited resources. Maternity care is an obvious example of the duplication of services taking place in this area. MSM has ten licensed maternity beds with an average daily census of four, while NFMMC has sixteen licensed maternity beds also with an average daily census of four.

Approximately 9 years ago, MSM and NFMMC formed Health System of Niagara with the intention of combining the two hospitals. That effort met with resistance and the plan ultimately broke down. Today, the hospitals are fierce competitors.

According to MSM, Ascension Health provided NFMCC with approximately $23.5 million to go forward with the talks. After the deal fell apart, Ascension forgave all but $5.0 million of the debt. MSM believes that this situation put NFMMC in a better financial position, which continues today. While MSM had an operating margin of 2.2% in 2002, it decreased to -1.1% in 2003. Conversely, NFMMC had an operating margin of -6.3% in 2002 which improved to a positive 0.4% by 2003.

The Niagara County community would be best served by an integrated provider with the capacity to rationalize services and ensure that health care needs are met within the community. The issues of religious identity and the amount of debt for each institution are formidable obstacles to overcome. Nonetheless, there is an opportunity to create a direction for the future organization of health services in Niagara County. Regional planning efforts would reduce duplication of services across the two facilities (e.g., emergency departments, medical/surgical beds, maternity, operating rooms), reduce administrative inefficiencies, limit the medical arms race between the facilities and ensure the future of health care availability in the area.

# WESTERN REGION

# LONG-TERM CARE RECOMMENDATIONS

### *Recommendation 1*

#### Facility (ies)

Mount View Health Facility (Niagara County)

#### Recommended Action

It is recommended that Mount View Health Facility downsize all 172 RHCF beds, rebuild a new facility on its existing campus, and add a 100-bed ALP, a 50-slot ADHCP and possibly other non-institutional services.

#### Facility Description(s)

Mount View is a 172-bed residential health care facility, owned and operated by Niagara County. In addition to baseline services, Mount View operates a 25-slot adult day health care program.

The facility faces many problems, and has recently entered into a contract of sale with Senior Associates of Batavia. According to the County executive, the contract includes a clause that the sale becomes null and void if the Commission makes any recommendation that specifically affects this facility.

Challenges facing Mount View include:
- a very low occupancy (it has occupied less than 80% of its beds since 2004, and is currently runs at approximately 75% its capacity);

212

- a very outdated building, which was originally built as a school in the early twentieth century;

- a relatively low case mix (1.07), with 15% of its staffed beds occupied by low-acuity individuals; and,

- an uncertain financial viability. The facility loses approximately $2.5 million annually, and requires subsidization from Niagara County, which the taxpayers cannot afford.

According to the Niagara County manager and the facility's administrator, employee benefits comprise 52% of wages, which is unusually high.

## Assessment

While the county legislature approved the facility's sale, this area of Niagara county requires the expansion of less-restrictive settings. It has less need for 24-hour skilled nursing care. The Mount View facility is located on an attractive campus, which could be redeveloped to house continuum-of-care services, including adult day care and an ALP. Approximately 125 individuals reside at Mount View, some of whom should be transferred to an ALP when it is established and built.

## *Recommendation 2*

## Facility (ies)

Nazareth Nursing Home and Mercy Hospital Skilled Nursing Facility (Erie County)

## Recommended Action

It is recommended that:

(i) Nazareth Nursing Home downsize all 125 RHCF beds and the facility be converted for use as part of a PACE program to be added at the former Our Lady of Victory Hospital;

213

(ii) 10 RHCF beds be added to the 74 RHCF beds currently at Mercy Hospital Skilled Nursing Facility, and all 84 RHCF beds be transferred from Mercy Hospital Skilled Nursing Facility to the former Our Lady of Victory Hospital; and

(iii) 80 adult home beds at St. Elizabeth's Home of Lancaster in Erie County be converted to an 80-bed ALP.

## Facility Description(s)

Nazareth Nursing Home, Mercy Hospital Skilled Nursing Facility, St. Elizabeth's Home of Lancaster and the Our Lady of Victory Hospital campus are members of the Catholic Health System of Western New York (CHS).

Nazareth Nursing Home is a freestanding, 125-bed not-for-profit residential health care facility that provides baseline services. Nazareth provides acceptable, quality care; the 2005 survey cited five deficiencies, which is the statewide average. It suffers with financial difficulties. According to the operators, the facility has losses of approximately $1 million annually, and occupancy declined from 96.7% in 2003 to 95.2% in 2004. Its case mix index was 1.09 in 2003.

Mercy Hospital Skilled Nursing Facility is a 74-bed hospital-based residential health care facility that provides baseline services. It has a reputation for providing quality care, is financially stable, and benefits from an extremely high occupancy, which was over 99% in 2003 and 2004.

St. Elizabeth's Home is a 117-bed adult home in extreme financial difficulty. Its operating cost per resident is approximately $60 per day, which is high and is about twice as much as the Supplementary Security Income (SSI) payments available for each resident.

Our Lady of Victory Hospital (OLV) was an acute care hospital prior to closing in 1999. The Catholic Health System (CHS) is converting the former OLV campus to facility that resembles a continuing care retirement community (CCRC), with a full continuum of long-term care services. These services will be provided in a five-building complex that will include a centrally-located Main Street-styled area, with a convenient medical office, retail stores and a park-like green

space. CHS is near completion of the initial phase of the project, which involves the development of 74 low-to-moderate-income senior housing units. CHS has also been authorized to work with the Department of Health to develop a Program of All-inclusive Care for the Elderly (PACE), which is pending. Finally, CHS has filed a pending certificate of need application to move its RHCF beds from Mercy Hospital to the OLV campus.

## Assessment

As a whole, Erie County's long-term care delivery system must be restructured. While the average county occupancy in 2004 was strong (95%), there is a documented surplus of beds using the state's need methodology. Taking into account the number of low-acuity individuals in the beds, the county has nearly 200 excess beds. Approximately half of its non-institutional need, however, is unmet, and supportive housing for frail and disabled seniors is in short supply. CHS's plans to reconfigure its long-term care services are supported by the Commission.

This plan will stabilize or reconfigure CHS's facilities. First, the plan will help stabilize Nazareth Nursing Home. Although it changed ownership in 2000 when it was acquired by CHS, a timely certificate of need was not filed, so the facility was unable to take advantage of increased revenue due to its potential rebasing. According to CHS, this has resulted in a steady and crippling financial decline. CHS has stated that it will close Nazareth Nursing Home regardless of potential Commission recommendations. Nazareth's existing residents need to be transitioned before the nursing home closes.

Similarly, CHS has indicated that, absent some extraordinary changes, it will close St. Elizabeth's Home. CHS's overall plan must ensure that adequate community resources are available to address the dislocation that would result from such closures.

CHS plans on establishing a new ALP at St. Elizabeth's. Second, CHS also plans to transfer RHCF beds from the Mercy Hospital skilled nursing facility to a more home-like setting. This will benefit Erie County's acute and long-term care. Space will be made available for additional acute care services at the Mercy Hospital. According to CHS, the additional RHCF beds will

allow for a more efficient staffing and care model at 21 beds per unit. Finally, the conversion of OLV to a PACE will establish needed non-institutional services and provide the necessary bridge between the senior housing and RHCF components.

## *Recommendation 3*

### Facility (ies)

Williamsville Suburban, LLC (Erie County)

### Recommended Action

It is recommended that Williamsville Suburban downsize all 220 RHCF beds.

### Facility Description(s)

Williamsville Suburban is a proprietary 220-bed residential health care facility located in a suburb of Buffalo. It provides baseline services and outpatient physical and occupational therapy. It is part of the Legacy Group, which operates three facilities in Erie County. Williamsville Suburban is the largest facility in the group.

The Legacy Group has not submitted cost reports since 2002 and is in chapter 11 bankruptcy protection. Certified financial and occupancy data for the previous 4 years are unavailable.

For several years, the facility has had quality and survey problems. It has had an extremely high number of deficiencies when compared to the other facilities within the Western region and the entire state. The April 2006 survey recorded 22 deficiencies. The 2005 survey resulted in 26 deficiencies; its 2004 survey resulted in 31 deficiencies, including 2 immediate jeopardies. The statewide average is five deficiencies. Moreover, the facility complaint substantiation rate for 2001-2003 was 38.1%; the statewide average was 5.9%.

216

Their case-mix index was 1.13 in 2003, and they run a 40-bed sub-acute unit, which is self-reported to be approximately 60-75% full. It provides no other specialized care and no non-SNF services.

According to Williamsville Suburban's recent administrator, the facility improved under his leadership and turned a profit in 2005. This has not been verified; their report was unaudited. This administrator claimed that the most recent occupancy rate is 93%, and that they had approximately 38 low-acuity patients.

## Assessment

Erie County's long-term care delivery system must be restructured. While the county's overall occupancy in 2004 was strong (95%), the State's bed need methodology indicates that there is a surplus of beds. After taking into account the number of low-acuity individuals in the beds, the county seems to have over 200 excess beds. Approximately half of its non-institutional need is unmet, and supportive housing for frail and disabled seniors continues to be an issue.

There is strong competition for nursing home residents in the Williamsville area. There are seven nursing homes in Williamsville, and as the population in Erie County declines, excess capacity in its long-term care delivery system will likely grow. The existing residents should be transitioned before Williamsville Suburban closes.

## *Recommendation 4*

## Facility (ies)

DeGraff Memorial Hospital Skilled Nursing Facility (Niagara County)
Millard Fillmore Gates Circle Skilled Nursing Facility (Erie County)

**Recommended Action**

It is recommended that Millard Fillmore Gates Circle downsize all 75 RHCF beds, and upon the closure of the acute care beds at DeGraff Memorial Hospital (see Western Region Acute Care Recommendation), that those 75 RHCF beds be added to DeGraff contingent upon the suitable conversion of DeGraff.

**Facility Description(s)**

DeGraff Memorial Hospital and Millard Fillmore Gates Circle Hospital are both recommended for closure (see acute care recommendations). Both these facilities house skilled nursing facility (SNF) units (80-beds and 75-beds, respectively), which provide baseline services and sub-acute care. DeGraff's SNF has a very high occupancy (97%) and occupancy at Gates Circle is relatively high, but has fallen in the last few years (from 98% in 2002 to 93% in 2005). Both have survey deficiencies slightly above the regional average of 5 (7 and 6 respectively) and no immediate jeopardy citations. Their financial performance is reported with their respective hospital's financial information.

**Assessment**

This recommendation would: 1) maintain an appropriate numbers of SNF beds in Erie and Niagara counties, 2) maintain the better skilled nursing service provider in Erie and Niagara counties, and 3) mitigate the impact of hospital closure by converting the DeGraff building to meet long-term care needs. DeGraff is located in a growing area. A SNF in that community would have value. It also would enable the preservation of other health care and health-related services in that community that could be co-located with the nursing home.

## VIII. Financing

The Commission's recommendations will provide significant benefits to New Yorkers and various components of the health care system. First, the Commission's recommendations will promote stability of health care providers thereby assuring access to care, supporting the provision of public goods, enabling technology and capital reinvestments, and improving quality of care. Second, the Commission's recommendations will reduce unnecessary public and private health care spending and produce overall cost savings for all payors. Third, the Commission's recommendations will produce numerous opportunities for reinvestment in the system thereby providing substantial financial benefits to health care providers and the patients served by them.

Systemic changes require resources. Investments are necessary to implement the Commission's recommendations. Short term costs must be incurred to produce benefits in the immediate and long terms.

This section estimates the potential savings and costs that can be reasonably associated with the Commission's recommendations. These estimates are based on the experience of similar facility reconfigurations in the past and draw on the combined experience of the State Department of Health, the Dormitory Authority of the State of New York, and the State Division of the Budget. While the estimates are based on some substantial assumptions and carry a "band of error," they represent measurable phenomena and provide reasonable indicators of the order of magnitude of achievable efficiencies and necessary investments. These estimates also provide a useful tool for estimating an appropriate level of State investment in specific recommendations.

Caveats apply to these projections. Estimates of savings and costs are difficult to make absent the sort of detailed knowledge of facility operations possessed only by a facility operator. The Commission had substantial interaction with the operators of the facilities which are the subject of the Commission recommendations and obtained important proprietary information about those facilities. In no case, though, could an operator share all the necessary information with the Commission in light of the competitive interests of those facilities. Some important information may even be beyond the reach of facility operators. For instance, absent some compelling need, it would be unusual for an operator to have a current appraisal of its real property. Furthermore, actual savings and costs will be partially dependent on the decisions made by facility operators during the implementation process. Much of the implementation of

219

the recommendations will be influenced by the rapidity with which the market responds to such recommendations, the timing of available financing, and other external events impacting the need for facility capacity.

**Potential Benefits and Reinvestment Opportunities for Providers**

Significant benefits from system restructuring, including closure, downsizing, conversion or affiliation, accrue to health care providers thereby improving stability of the delivery system. Some of these cannot be quantified financially; they include the advantages of shared medical and administrative expertise, quality of care improvements attributable to consolidated volume, and improved access to credit markets. Other benefits can be quantified, including:

- **Transferred Volume:** When a facility closes, its patients will seek and receive services elsewhere. Patient volume will be transferred from closed facilities to other facilities. Such volume increases drive efficiencies, both in terms of finances and quality of care. Higher occupancy rates lead to better margins, and in turn, better access to capital and more funds for reinvestment.

- **Improved Access to State Funding:** Facility closures have direct positive implications on the reimbursement of indigent care, graduate medical education and workforce recruitment & retention. Insofar as closed facilities will no longer draw from the applicable HCRA pools, their allocations will be redistributed to the remaining pool participants.

- **Elimination of Duplicative Costs:** When facilities affiliate under a single unified governance structure, the resulting entity can achieve major efficiencies by eliminating or reducing unnecessary costs. For example, combined institutions can shed duplicative administrative staff and duplicative support services like laboratories, laundries, and food service operations, and can combine costly information technology systems. Some of these savings also benefit payors, to the extent that such savings are reflected in reimbursement rates.

**Potential Savings for Payors**

System restructuring also provides many savings for payors, both in terms of actual reductions in current expenditures and avoided future costs. Such opportunities for savings include:

- **Reductions in Inappropriate Utilization:** Hospitalizations and the use of expensive procedures increase in relation to the capacity that exists. This is most often regarded as a function of Roemer's Law; namely, the principle enunciated by health care economist Milton Roemer that supply induces demand where reimbursement is guaranteed by a third party. More colloquially, "a bed built is a bed filled".

Reductions in excess capacity can eliminate inappropriate or unneeded utilization of services, reduce the costs associated with such utilization, and improve care by limiting unneeded and risky procedures. Previous hospital closures have established that some volume from a closed facility will not transfer to remaining facilities. This phenomenon is particularly likely in the highly competitive economic environment faced by hospitals in New York State, and the actual experience of recent closures suggests that its impact is significant. Similarly, the reduction of excess beds in a facility removes the incentive to fill those beds, resulting in greater efficiency and a reduction in inappropriate care.

While this analysis clearly applies in the case of hospital closures and downsizings, it is less likely that nursing home residents will forego care upon closure of their nursing home. However, not every nursing home resident requires skilled nursing services. In fact, several of the Commission's recommendations are premised on the recognition that many nursing home residents would be more appropriately served in less intensive settings. It is for that reason that the Commission has recommended the conversion of some nursing home beds to less intensive assisted living, adult day health care, or long term home health care slots. These conversions will generate direct payer savings.

221

- **Avoided Capital Investment:** Physical plants, especially if underutilized, are expensive to maintain. Even empty buildings, wards, and beds carry fixed costs that must be paid. Furthermore, many of NY's health care facilities are old and in need of extensive renovation and capital upgrades. Depending on the age of a physical plant, capital investments are needed to keep current with modern therapeutic and regulatory requirements. The closure or downsizing of a facility generates substantial savings by avoiding capital expenses such as fire code compliance upgrades, improving heating and air conditioning, conversions to single rooms, modernizing elevators and other spaces, and expanding parking. These foregone capital expenses, which would otherwise be reflected in reimbursement rates, are substantial.

- **Leveraged Savings:** Additional savings can be achieved by the targeted reinvestment of the foregoing savings into further savings-generating activities. Similarly, funds currently used by the State to address potential emergency closures can be redirected toward initiatives designed to promote further system efficiencies.

**Estimating Benefits and Savings: Transferred Volume and Reduction in Inappropriate Utilization**

To ascertain the potential benefits to payers from avoided hospital volume and to providers from transferred hospital volume, the Commission first determined the dollar value of that volume by multiplying the 2004 discharges of each facility recommended for closure by that facility's average Medicaid rate per discharge. This yields a reasonable proxy for the value of the transferred and avoided volume, with three caveats. First, some of that volume was covered by payors other than Medicaid. However, the rates paid by private payers are proprietary and cannot be discerned. Second, some of that volume is uncompensated. However, the impact of that volume will be ameliorated by the fact that the receiving facilities' respective share of the indigent care pool will be increased by the closures. Third, the rates paid for transferred volume will change depending on the average rates of the receiving facilities, some of which are lower and some of which are higher than the closed facility. Recognizing these limitations, the Medicaid rate proxy is an appropriate method for estimating the dollar value of avoided and transferred volume.

To determine the proportions of volume that are likely to be avoided and transferred, The Commission reviewed the impact of several recent hospital closures on patient volume and used that data to generate an appropriate "avoidance factor." That factor was then applied to the dollar value of the discharges from the facilities recommended for closure. In the case of facilities recommended for downsizing, a percentage of that factor representing the percentage of beds being downsized was applied.

A similar process was applied in regard to nursing homes. First, the average regional rate per day for each nursing home recommended for downsizing was used to determine an average annual rate per resident. This figure was further adjusted based on each facility's actual occupancy to yield a dollar value for the volume of patients served by the downsized beds. The downsizings attributable to conversions were then segregated from the "pure" downsizings. The dollar value of those "pure" downsizings represents the provider benefit accruing from them, insofar as that volume is likely to transfer elsewhere. The annual dollar value of the downsizings attributable to conversions was then reduced by the annual cost of the lower acuity slots that will result from such conversions, yielding a figure representing the payer benefit accruing from such conversions.

Similar caveats apply to the nursing home estimates. While it could also be argued that the new low-acuity slots will be filled by individuals not currently receiving any formal long term care services, the result could be in a net increase in annual costs. Such an argument is without merit. Since no lower-intensity service is added without eliminating an equal or greater number of nursing home beds, it is appropriate to assume a net cost savings.

**Estimating Benefits: Improved Access to State Funding**

To estimate potential benefits to providers, the dollar value representing the likely volume transfer was supplemented by a figure representing the indigent care, graduate medical education and workforce recruitment and retention pool distributions which would otherwise be made to facilities recommended for closure. Under the current iteration of HCRA, such funds will automatically be redistributed to remaining facilities.

**Estimating Benefits and Savings: Elimination of Duplicative Costs**

To estimate the potential savings attributable to the elimination of duplicative costs at affiliating facilities, each facility's annual expenditure on administrative and general labor costs was obtained from that facility's 2004 cost report.   Where facilities have been recommended for affiliation, their expenditures were averaged, and the excess was identified as a potential benefit. The percentage of such costs attributable to patients covered by Medicaid managed care was then identified as a potential benefit to the Medicaid system since those savings will likely be reflected in facility rates, and the remainder identified as a potential benefit to the providers themselves.

**Estimating Benefits and Savings: Avoided Capital Investment**

To estimate the potential savings attributable to avoided capital investment, first Commission staff identified pending Certificate of Need (CON) projects attributable to such facilities that would be unnecessary or inappropriate in light of Commission recommendations. Then, Commission staff calculated the extent to which the cost of such projects (including both principal and interest costs) would be reflected in those facilities' annual Medicaid rates.  The resulting figure represents the capital costs of pending projects that would be avoided by Commission recommendations.

However, the list of pending CON applications is not an exhaustive representation of the capital investments in the hospital and nursing home system that will be necessary in the years to come.  In order to accurately reflect such investments on the hospital side, the Commission used each hospital's average age of plant to identify the potential cost of upgrading that hospital to the statewide average age of plant, eliminating any duplication where a hospital already had an application for such upgrade pending  Then, Commission staff calculated the extent to which the cost of such projects (including both principal and interest costs) would be reflected in those facilities' annual Medicaid rates.

The analysis on the nursing home side necessarily differed, since the amount of each project to be reflected in the State Medicaid rate is capped by law.  Therefore, the Commission estimated the cost of each such project and the amount of the applicable cap before calculating the extent to which the cost of such projects (including both principal and interest costs) would be reflected in those facilities' annual Medicaid rates.

**Estimating Benefits: Leveraged Savings**

To estimate the potential Medicaid savings attributable to the reinvestment of other calculated savings, Commission staff first identified the ratio of the cost of the Commission's recommendations to the potential Medicaid savings to be otherwise derived from the recommendations. Staff then applied that ratio to those savings themselves in order to identify the further savings to be derived from those reinvested funds.

In order to estimate additional savings that can be derived from funds currently used by the State to address emergency closures, staff identified the average amount of funds loaned each year from the Health Care Restructuring Pool for such purposes. That amount was reduced by the proportion of excess beds being removed from the system by the Commission recommendations, in order to identify a useful proxy for the amount of emergency fundings likely to be necessary after implementation of the recommendations. The difference represents Restructuring Pool funds likely to be available to generate additional costs savings. Those savings were then calculated by applying the same ratio applied to other Commission savings.

**Total Benefits and Savings:**

The total estimated savings for payors is around $806 million annually or $8 billion over ten years. This includes an annual savings to Medicaid of around $249 million, or $2.5 billion over ten years, and an annual savings to Medicare of around $322 million, or $3.2 billion over ten years. The total estimated benefit to providers is around $721 million annually or $7.2 billion over ten years. Together, these calculations yield a total benefit to payors and providers of over $1.5 billion annually, or $15 billion over ten years.

**Potential Costs:  General Principles**

Implementation of the Commission's recommendations will require capital investments in some instances. Some of the recommendations are essentially cost-free. For example, recommendations in which the Commission has recommended further study and/or discussion carry no measurable cost. Similarly, recommendations that require only the decertification of a number of beds generally have negligible direct costs. Other long-term recommendations are contingent on various factors; unless those factors are fulfilled, no immediate costs will be

incurred. It is also imperative to note that just because a recommendation carries costs, that fact alone does not require that those costs be covered with public funds. In fact, the opposite is true. Insofar as facilities are capable of funding their own closure, conversion, affiliation, or rightsizing, they must do so. Taxpayer funds should be used prudently.

The realization of some Commission recommendations will entail costs, some of which are substantial and which should be estimated. Just like the savings estimates, the potential costs are difficult to ascertain with precision and are necessarily based on some broad assumptions. As with the savings estimates however, they represent measurable phenomena and provide reasonable indicators of the order of magnitude of necessary investments.

**Potential Cost Categories:  Closure, Construction & Affiliation**

The likely costs of implementing the Commission's recommendation fall into three general categories:

**Closure costs:** These costs associated with closure include the outstanding debt of the facility to be closed, including outstanding capital debt as well as vendor debt, pension costs and any other third party liabilities. Insofar as this cost category includes debt of the Dormitory Authority and/or the Federal Housing Authority, it is particularly important to be cognizant of those debts and ensure their repayment so as not to jeopardize the industry's access to future capital investment.  Similarly, insofar as a facility's debt represents a potential obligation of the State (as is the case with facilities participating in the Secured Hospital Program), that fact needs to be carefully considered and the necessary investments made to ensure that the net costs to the State do not outweigh the concomitant benefits. There are also direct costs attendant to the closure process itself, including costs of severance and retraining for employees, maintenance and security for the physical plant, and medical record transfer/storage.  Finally, there are also legal and consulting costs associated with the planning and implementation of the closure process.  While it is particularly difficult to estimate these latter costs since so much is dependent on variables outside the control of the Commission (e.g., whether or not a facility declares bankruptcy, thereby multiplying its legal costs considerably), some attempt to estimate these costs is warranted.

**Construction costs:** Such costs encompass not only new construction such as when the Commission recommends that a facility be rebuilt, but also the costs of renovating existing infrastructure such as in the case of bed or building conversions. The Department of Health has extensive experience estimating such costs in the context of the certificate of need (CON) process and is able to do so taking into account not only the difference between new construction and renovations, but also cost variations across regions.

**Affiliation costs:** This analysis does account for the costs of affiliation planning. Affiliation costs are difficult to project because of wide variation in the circumstances under which the affiliations will occur. In the case of simple affiliations (e.g., affiliation under a passive parent or the further affiliation of facilities already enjoying a close relationship), the costs are likely to be minimal. In more complex cases (e.g., full asset merger or the affiliation of religious and secular facilities), the costs could be considerable. In some cases, such affiliation will also require substantial capital investment and other significant implementation costs. However, the impracticality of defining those capital costs in each instance precludes any useful estimate of those capital costs and they have been excluded for the purposes of this analysis. This exclusion is justified; the efficiencies resulting from affiliation clearly benefit the affiliating entities and it is appropriate to expect the costs of such affiliation to be borne by those entities. In particular cases, however, it may be appropriate for public funding to be directed toward such costs.

## Estimating Costs of Closures and Restructuring

Facility cost reports provide a solid basis from which to begin quantifying the likely costs of closures and conversions and each facility's ability to contribute to those costs. These cost reports, and the balance sheets on which they are based, capture many costs inherent in facility closure, including capital debt, vendor debt, and pension costs, as well as the assets available to cover those costs. Since, in a closure scenario, all of a facility's assets can conceivably be used to offset closure costs, it is appropriate to begin the analysis of such costs by identifying a facility's net assets. When those assets are negative, that reflects what it likely to be a net cost of closure. Where those assets are positive, that reflects an available cost offset. In theory, a facility's net assets incorporate both restricted and unrestricted assets. Restricted assets (e.g.,

227

charitable donations for some restricted purpose) may be available to offset closure costs but also may not. In practice, however, there are few variations between the unrestricted and total net assets of the facilities recommended for closure. Consequently, each facility's total net assets were used as a starting point for estimating closure costs.

As with the savings estimates, caveats apply to these cost estimates. The Commission did not always have access to specific information held by facilities. For example, without knowing the details of specific facilities' loan obligations, the Commission had to assume the presence of full closure costs even when the Commission has recommended a facility's conversion or rebuilding. In these cases, it is possible that a facility will be able to convert or rebuild without triggering the sort of liabilities associated with closure (e.g., without violating a bond covenant or other contractual obligation). In such cases, we have erred on the conservative side and assumed that these costs will occur although they may not.

Real property value is an important piece of a facility's assets. Therefore, where available, the fair market value of facility real property has been included as a cost offset. These estimates are a useful mechanism for identifying those closure recommendations that can be substantially or completely subsidized by the sale of facility real estate. Some cautions are appropriate. First, a facility's balance sheet includes an amount representing real property value but only that property's net book value (generally, the purchase price less accumulated depreciation). In many cases, especially downstate, that value bears little relationship to the property's fair market value. Thus, the values used as offsets were obtained from the facilities themselves. In some, but not all cases, the providers' estimates were based on independent appraisals. Second, it was not possible in all cases to obtain the fair market value of facility real property. In such cases, the potential value of the facility's real property was not included as a potential cost offset. Third, where real property fair market value was included, it was impossible to extract the portion of that value that was already included on that facility's balance sheet. Thus, a portion of that facility's real property value may have been double-counted.

The closure process itself can entail costs. The Commission examined past hospital closures to identify some average transaction costs, as a means of predicting the likely cost of future closures. The analysis of previous closures generated an average per bed, per month cost. The same analysis identified an average length of time within which closures have been completed. The result was a cost per bed figure, easily adaptable to specific hospital closure

recommendations. That number, with some modifications, also provided the basis for an analogous assessment of likely nursing home closure transaction costs. The first modification involves average length of closure; nursing homes typically close much more quickly than hospitals. Similarly, the per bed cost of closure is generally much smaller, owing at least in part to the smaller staffing ratios in nursing homes.

Both hospital and nursing home closures will entail legal and consulting costs. These costs are extremely variable, depending in large part on decisions made by providers and regulators during the closure process. One of the biggest decisions to be made by facilities recommended for closure is whether or not to declare bankruptcy; a declaration that can be extremely costly unto itself. For purposes of the Commission's cost analysis, staff assumed that every facility recommended for closure would declare bankruptcy. In practice, this will not necessarily be true. With this assumption in mind, prior closure experiences were reviewed to generate an average per month legal and consulting cost.

The costs of new construction were relatively easier to determine. These estimates were based on actual experience with new construction and renovations in connection with the certificate of need process. These estimates take into account regional price differences, which can be considerable. The cost estimates do encompass everything directly related to construction, but do not include land or financing costs, or the costs of demolition, where applicable. They also assume the renovation of existing facilities where possible but specific factors may impact an existing structure's appropriateness for conversion. Also, in instances where the new construction is not tied to bed number (e.g., where the new construction is a diagnostic and treatment center), the analysis estimated the necessary bed count and/or square footage and the cost was determined based on that estimate.

The foregoing calculations yield a total cost of approximately $1.2 billion, including approximately $350 million in closure costs, $1.1 billion in construction costs, $11 million in affiliation planning costs, and $300 million in offsets from the sale of facility real property. Not all of these costs will be borne by the State; almost $606 million of that is attributable to two contingent projects that the Commissioner will not be required to implement absent available funding.

**Funding: Principles for Investment**

Vast and unprecedented sums are available to support the restructuring of NY State's health care system and cover the costs of implementing the Commission's recommendations. The Health Care Efficiency and Affordability Law for New Yorkers (HEAL-NY) allocates $1 billion over four years. HEAL-NY will improve the stability, quality, and efficiency of the health care delivery system by providing capital grant funds to cover expenses associated with physical reconfiguration, conversion, downsizing, or closure of hospitals and nursing homes. Furthermore, the Federal-State Health Reform Partnership (F-SHRP) allocates an additional $1.5 billion for similar purposes. F-SHRP is a five year demonstration that will promote efficient operation of the State's health care system, consolidate and rightsize the delivery system, shift emphasis in long term care from institutional-based to community-based settings, expand the adoption of advanced health information technology, and improve ambulatory and primary care provision.

Although HEAL and F-SHRP are critical to financing the commission's recommendations, they are not and should not be the only sources of funding. Indeed, public funds should be used in the most prudent possible manner. Taxpayer dollars must be used judiciously. Insofar as facilities are capable of funding their own closure, conversion, affiliation, or rightsizing, they should be expected to do so. Additional sources of financing include traditional third-party financing mechanisms, debt restructuring, the HCRA restructuring pool, and others. The Commission believes it to be appropriate that costs will be shared among all the interested parties and that the State need only contribute a portion of those costs. That portion may be determined by the State in light of the following guidance for future funding decisions. By category, the Commission suggests that the following principles should govern State investment in the Commission recommendations:

**Closure Costs:**

1. Facilities should be expected to self-fund insofar as possible, including through the sale of assets.

2. State funds should be made available only in the absence of other possible funding.

3. If state funds are to be used, this cost category should be given priority for funding under the Federal-State Health Reform Partnership (F-SHRP), since this cost category is most likely to

result in measurable state and federal savings, and the availability of F-SHRP funds is tied to such measures.

4. If State funds are to be used, priority should be given, first, to those facilities that participate in the Secured Hospital Program, then to other DASNY clients, then to those non-DASNY clients that are not part of an obligated group.

**Construction Costs:**

1. Facilities should be expected to self-fund insofar as possible, including via private third-party financing.

2. State funds should be made available only in the absence of other possible funding.

3. If state funds are to be used, this cost category should be given priority for funding under the Healthcare Efficiency and Affordability Law (HEAL), since this cost category is more clearly eligible for such funding than the other cost categories.

4. If State funds are to be used, priority should be given to those facilities that are not part of an obligated group.

**Affiliation Costs:**

1. Facilities should be expected to self-fund insofar as possible, except in regard to affiliation planning costs.

2. State funds should be made available only in the absence of other possible funding, except in regard to affiliation planning costs.

3. If state funds are to be used, priority should be given to recommendations for full asset merger or affiliation under an active parent, as opposed to affiliation under a passive parent or some lesser affiliation.

231

Exhibit C



# STATE OF NEW YORK
# DEPARTMENT OF HEALTH

Corning Tower   The Governor Nelson A. Rockefeller Empire State Plaza   Albany, New York 12237

January 31, 2007

Ms. Betsy Biddle
Andrus on Hudson Nursing Home
185 Old Broadway
Hastings-on-Hudson, New York 10706

Re:     Commission on Health Care Facilities in the 21st
        Century

Dear Ms. Biddle:

In accordance with Section 31 of Part E of Chapter 63 of the Laws of 2005, the Commission on Health Care Facilities in the 21st Century ("the Commission") has been authorized to develop specific recommendations to rightsize and reconfigure health care facilities in New York. Your facility is the subject of at least one of the recommendations contained in the Commission's December 2006 final report, *A Plan to Stabilize and Strengthen New York's Health Care System*, which became law on January 1, 2007 in accordance with Section 9 of Commission statute. All recommendations must be implemented by the Commissioner of Health no later than June 30, 2008.

The purpose of this letter is to advise you of the Department's expectations, as outlined on the enclosure, regarding the steps and deliverables necessary to implement the Commission's recommendations within the required timeframe. This implementation outline will be further defined to develop a process that assures appropriate compliance throughout the timeline.

Acknowledging the unique circumstances created by this process, the Department is committed to carrying out its implementation mandate within the parameters of the Report and enabling statute. Appropriate Central and Regional Office Department staff will be closely involved in the implementation process, and will welcome an ongoing discussion with affected providers as we move toward an orderly implementation of the Commission's recommendations.

Please contact Mr. Neil Benjamin, Assistant Director, Division of Health Facility Planning at (518) 402-0967 should you wish to schedule a meeting to discuss the implementation of this recommendation. In the meantime, your attention to the enclosure is respectfully requested.

Sincerely,

David Wollner
Director
Office of Health Systems Management

Enclosure
cc:     Regional Office Director

New York State Department of Health Implementation of Recommendation by the Commission on Health Care Facilities in the 21st Century

Facility Name:        **Andrus on Hudson Nursing Home**

Commission Region:        Hudson Valley
                          Long Term Care # 2

Commission Recommendation:

It is recommended that Andrus-on-Hudson downsize all 247 RHCF beds and add 140 ALP beds and possibly other non-institutional services.

*Note: Integral to an understanding of the above recommendation and terms used therein are the definitions contained in preface material of the Commission's final report. The final report is available on the Commission's website at www.nyhealthcarecommission.org and the Preface is located on page 86-90. You are urged to become familiar with these terms.*

Affected Facilities:        **Andrus on Hudson Nursing Home**

Outline of Implementation:

- Meet with DOH, to discuss NH closure and plans for ALP, no later than 6/30/07.

- Submit closure plan for NH no later than 9/30/07.

- Commissioner to approve NH closure plan no later than 12/31/07.

- Submit application for 140 bed ALP no later than 12/31/07.

- Commissioner approves ALP application no later than 6/30/08.

- Revocation of NH operating certificate by Commissioner no later than 6/30/08.

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

JOHN E. ANDRUS MEMORIAL, INC., (d/b/a
ANDRUS ON HUDSON),

                                                    *Plaintiff,*

                        - against -

RICHARD F. DAINES, as Commissioner of the
New York State Department of Health,

                                                    *Defendant.*

Index No. 2007 Civ. 3432 (CLB)(MDF)

NOTICE OF MOTION AND AFFIDAVIT
IN SUPPORT OF PLAINTIFF'S MOTION
FOR A PRELIMINARY INJUNCTION

CADWALADER, WICKERSHAM & TAFT LLP

One World Financial Center
New York, NY  10281

(212) 504-6000

Attorneys for Plaintiff