UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---

JOHN E. ANDRUS MEMORIAL, INC. (d/b/a ANDRUS ON HUDSON),

                        Plaintiff,

            -against-

RICHARD F. DAINES, as Commissioner of the New York State Department of Health,

                        Defendant.

07-CV-3432 (CLB)(MDF)

---

# MEMORANDUM OF LAW IN SUPPORT OF PLAINTIFF'S MOTION FOR A PRELIMINARY INJUNCTION

 

CADWALADER, WICKERSHAM & TAFT LLP
One World Financial Center
New York, New York 10281
Telephone: (212) 504-6000

Attorneys for Plaintiff

TABLE OF CONTENTS

PAGE

TABLE OF AUTHORITIES ................................................................................................. ii

PRELIMINARY STATEMENT .............................................................................................1

POINT I    THE ANDRUS IS ENTITLED TO A PRELIMINARY INJUNCTION ................3

    A.    The Andrus Will Suffer Irreparable Harm if the Defendant is not Enjoined ..................................................................................................3

        1.    The Andrus is Entitled to a Presumption of Irreparable Harm ..............................................................................................3

        2.    The Andrus Will Suffer Irreparable Harm to its Relationships with Providers, Vendors, and the Community ..........5

        3.    Impact on Current Andrus Residents .............................................6

    B.    The Andrus Has Demonstrated a Likelihood of Success on the Merits ..................................................................................................7

        1.    The Andrus is Likely to Succeed on its Procedural Due Process Claims ................................................8

            a.    The Andrus Has a Protected Property Interest in Its Operating Certificate ............................................................8

            b.    The Andrus Was Not Provided with Notice of Contemplated Closure .......................................................8

            c.    The Andrus Was Not Given a Meaningful Opportunity to be Heard ............................................................................9

        2.    The Andrus is Likely to Succeed on its Substantive Due Process Claims ...................................................10

        3.    The Andrus is Likely to Succeed on its Takings Claims ...............12

        4.    The Andrus is Likely to Succeed on its Contracts Clause Claims ..............................................................................13

    C.    The Public Interest is Best Served by Granting the Andrus Preliminary Injunctive Relief ..................................................................14

CONCLUSION .....................................................................................................................16

## TABLE OF AUTHORITIES

PAGE(S)

CASES:

Allied Structural Steel Co. v. Spannaus,
  438 U.S. 234 (1978)..........................................................................................13

Board of Regents v. Roth,
  480 U.S. 564 (1972)..........................................................................................11

Buffalo Teachers Fed'n v. Tobe,
  464 F.3d 362 (2d Cir. 2006), cert. denied, 127 S. Ct. 2133 (2007)..................13

Carey v. Klutznick,
  637 F.2d 834 (2d Cir. 1980)..............................................................................14

Cleveland Bd. of Educ. v. Loudermill,
  470 U.S. 532 (1985), cert. denied, 484 U.S. 946 (1988)...............................8, 11

County of Sacramento v. Lewis,
  523 U.S. 833 (1998)..........................................................................................10

Edelman v. Jordan,
  415 U.S. 651 (1974)............................................................................................4

Great Northern Life Ins. Co. v. Read,
  322 U.S. 47 (1944)..............................................................................................4

Huntleigh USA Corp. v. United States,
  6 Fed. Cl. 440 (2005) .......................................................................................12

Jolly v. Coughlin,
  76 F.3d 468 (2d Cir. 1996)..................................................................................3

Kennecott Copper Corp. v. State Tax Comm'n,
  327 U.S. 573 (1946)............................................................................................4

Libbie Rehab. Ctr., Inc. v. Shalala,
  26 F. Supp. 2d 128 (D.C. Cir. 1998)...................................................................6

Lucas v. South Carolina Coastal Council,
  505 U.S. 1003 (1992)........................................................................................12

Mathews v. Eldridge,
  424 U.S. 319 (1976)............................................................................................9

PAGE(S)

Memphis Light, Gas, & Water Div. v. Craft,
    436 U.S. 1 (1978)..................................................................................................8

Mullane v. Central Hanover Bank & Trust Co.,
    339 U.S. 306 (1950)..............................................................................................9

Plaza Health Labs., Inc. v. Perales,
    878 F.2d 577 (2d Cir. 1989)...............................................................................3, 7

St. Bartholomew's Church v. City of New York,
    728 F. Supp. 958 (S.D.N.Y. 1989), aff'd, 914 F.2d 348 (2d Cir. 1990), cert. denied,
    127 S. Ct. 2133 (2007).........................................................................................12

St. Joseph Hosp. of Cheektowaga v. Novello,
    43 A.D.3d 139, 840 N.Y.S.2d 263 (N.Y. App. Div. 4th Dep't 2007) ...................8

Standard & Poor's Corp. v. Commodity Exch., Inc.,
    683 F.2d 704 (2d Cir. 1982)................................................................................14

Tom Doherty Assocs. v. Saban Entm't, Inc.,
    60 F.3d 27 (2d Cir. 1997).................................................................................3-4, 7

U.S. v. State of N.Y.,
    708 F.2d 92 (2d Cir. 1983)....................................................................................4

Waldman Publishing Corp. v. Landoll, Inc.,
    43 F.3d 775 (2d Cir. 1994)....................................................................................3

Wantanabe Realty Corp. v. City of New York,
    315 F. Supp. 2d 375 (S.D.N.Y. 2003).................................................................10

STATUTES & OTHER AUTHORITIES:

Enabling Legislation, Part K of Chapter 58 of the Laws of 2003, as added by Section 31
    of Part E of Chapter 63 of the Laws of 2005 § 5 ..............................................9, 11

Tracy Greene, Relocation Stress Syndrome in Older Adults, 5 Soc. Work Today 38
    (2005) ....................................................................................................................6

## **PRELIMINARY STATEMENT**

Plaintiff John E. Andrus Memorial, Inc. d/b/a Andrus on Hudson ("the Andrus") submits this memorandum of law in support of its motion for a preliminary injunction to prevent the defendant from taking any further steps to implement the recommendation made by the Commission on Health Care Facilities for the 21st Century ("Berger Commission" or "Commission") to close the Andrus' nursing facility or rescind the Andrus' operating certificate pending the final resolution of this litigation. The relevant facts are set forth in the affidavit of Betsy Biddle, sworn to on April 10, 2008.

All of the elements to granting a preliminary injunction to the Andrus can be readily established. Regarding "irreparable harm", unless preliminary injunctive relief is granted, the Department of Health will force the facility to begin closing its operations and ultimately surrender its operating certificate. Doing so would result in the shutdown of the facility, totally and irrevocably. Once the process of closure has begun, the facility could not revive operations after the fact, rendering hollow any proof at trial that the Commission's recommendation to close the Andrus violated its due process rights.

Even if the Department of Health (the "Department") does not move forward to the point of requiring the Andrus to surrender its operating certificate before trial, having to take the next step in the process – the submission of a closure plan – would lead to that eventuality, as the Andrus would have to notify referring providers, vendors, and prospective residents of its impending closure. Engaging in such a process would seal the facility's fate, and there would be no turning back once it begins to terminate relationships with other providers and vendors and informs the community that it will not longer be a resource for long term care in the area.

More tragically, the Andrus' frail, elderly residents will very likely suffer harm if the Andrus is forced down the path of closure due to the absence of a stay. These residents, most of whom suffer from both cognitive and physical impairments, will be uprooted from their "home" and community where they have resided and received care for several years. With the limited supply of available nursing home beds in the vicinity of the Andrus, residents would be forced to relocate a considerable distance to a new facility, in a completely new setting and with entirely new caregivers and companions. This will undoubtedly add to the stress associated with being displaced, and put these residents at a heightened risk for "transfer trauma".

The Andrus can also establish a strong likelihood of success on its constitutional claims. The Berger Commission's recommendation to close the Andrus' nursing facility was based on outmoded and faulty data about the facility, and was arrived at in clear violation of its due process rights. <u>First</u>, the Andrus was never provided with notice that its facility was being targeted for closure: in the lone meeting between the Commission's regional subcommittee, the Hudson Valley Regional Advisory Committee ("RAC"), and representatives of the Andrus, this possibility was never even mentioned. <u>Second</u>, the Andrus was never provided with a meaningful opportunity to be heard to address and refute the many flawed factual assumptions made in arriving at a closure recommendation. The one meeting held with RAC members and the "public hearings" plainly do not suffice, as the Andrus was never informed that it was being targeted for closure, nor why.

<u>Finally</u>, the error-laden recommendations issued by the Hudson Valley RAC and Berger Commission make clear that the Andrus did not have a meaningful opportunity to be heard. The recommendations are premised on numerous mistaken assumptions about the Andrus' operations and its financial condition -- these errors would not likely have made their

way into the report if the Commission had provided the Andrus with notice and a meaningful opportunity to be heard.

## POINT I

## THE ANDRUS IS ENTITLED TO A PRELIMINARY INJUNCTION

Generally, a party is entitled to preliminary injunctive relief where a showing is made that the party will be irreparably harmed if the relief is not granted, and "either (1) 'a likelihood of success on the merits' or (2) 'sufficiently serious questions going to the merits to make them a fair ground for litigation and a balance of hardships tipping decidedly' in the movant's favor." Jolly v. Coughlin, 76 F.3d 468, 473 (2d Cir. 1996) (citing Waldman Publishing Corp. v. Landoll, Inc., 43 F.3d 775, 779-80 (2d Cir. 1994)). When the injunction is sought against a government actor to enjoin a proposed action ostensibly taken in the public interest pursuant to a statutory scheme, the party seeking an injunction must demonstrate (1) irreparable harm and (2) a likelihood of success on the merits. Plaza Health Labs., Inc. v. Perales, 878 F.2d 577, 580 (2d Cir. 1989).

The Andrus can demonstrate that, unless the Department is enjoined from implementing the Berger Commission's recommendation, both the Andrus and its 196 frail residents will be irreparably harmed, and that it has a substantial likelihood of success on the merits of its constitutional claims. As such, preliminary injunctive relief should be granted.

 A. **The Andrus Will Suffer Irreparable Harm if the Defendant is not Enjoined**

  1. **The Andrus is Entitled to a Presumption of Irreparable Harm**

"Irreparable harm" is harm that is actual and imminent, for which a party cannot be adequately compensated monetarily. Tom Doherty Assocs. v. Saban Entm't, Inc., 60 F.3d 27,

37 (2d Cir. 1997). The Second Circuit has noted in the past that forcing the closure of a business constitutes irreparable harm where the damage resulting from loss of the right to continue a business includes a loss of good will and cannot be measured solely in monetary terms. Id.

When considering whether a party has shown irreparable harm, a federal court may consider only those remedies available to that party in federal court. U.S. v. State of N.Y., 708 F.2d 92, 93 (2d Cir. 1983). Where, as here, any recovery for monetary damages would be barred in federal court by the Eleventh Amendment, irreparable harm may be presumed. Id. The fact that money damages is available to the party in another venue has no bearing on determining whether irreparable injury will result in the absence of a preliminary injunction issued by the Federal Court. Id. (finding irreparable harm even though the plaintiff could have sought compensation for its damages in the New York State Court of Claims).

The Eleventh Amendment bars the award of money damages to the Andrus against the defendant, a state official, in Federal Court. See Edelman v. Jordan, 415 U.S. 651, 663 (1974) (citing Great Northern Life Ins. Co. v. Read, 322 U.S. 47 (1944); Kennecott Copper Corp. v. State Tax Comm'n, 327 U.S. 573 (1946)). Thus, the only relief available to the Andrus is injunctive, and accordingly irreparable harm may be presumed.

Furthermore, as discussed below, if the defendant is not enjoined at this stage of the litigation and proceeds with a closure plan, any future relief that may be granted by the Court after a final determination on the merits may be moot or meaningless.

### 2. The Andrus Will Suffer Irreparable Harm to its Relationships with Providers, Vendors, and the Community

If the Court does not preserve the status quo and preliminarily enjoin the defendant from carrying out the Berger Commission's recommendation, the Andrus will be required to submit a closure plan to the Department of Health. Biddle Aff. at ¶ 16. The submission of a closure plan will cause injury to the Andrus and its "good will", which cannot be remedied by monetary damages even if such relief were available in this Court. Such a plan will require the Andrus to inform other providers and prospective residents that it will no longer be able to accept referrals or admit new residents. Id. Once made aware of a closure plan, providers and potential residents will turn to other nursing facilities instead. As a consequence, the Andrus will be faced with a falling resident census and mounting financial losses. Id. at ¶ 17.

Even assuming that the Andrus is not actually forced to surrender its operating certificate before trial, it cannot simply flip the switch back on after it has embarked on a closure plan. Even if the Andrus ultimately prevails on the merits, it would likely be unable to ever re-establish itself and reclaim its reputation in the community as a reliable provider of long term care services to the elderly -- a reputation burnished over decades to generations of Westchester's seniors.

Of course, if the defendant does fully implement the Berger Commission's recommendation and force the Andrus to turn in its operating certificate, the irreparable nature of the harm would be that much more certain and pronounced. That harm cannot be quantified and the Andrus could not be compensated for it with money damages.

### 3. **Impact on Current Andrus Residents**

Apart from the noncompensable damages suffered by the Andrus should the closure recommendation proceed, its current residents will also suffer irreparable harm. Once closure proceeds, residents will have to be transferred to other nursing facilities and, in the process, will experience "transfer trauma".

Courts have considered the impact of transfer trauma, which includes negative physical and psychological effects on a patient when forced to transfer involuntarily. See Libbie Rehab. Ctr., Inc. v. Shalala, 26 F. Supp. 2d 128, 132 (D.C. Cir. 1998) (weighing the potential harm to patients who would be transferred if plaintiff nursing home was improperly terminated from the Medicare and Medicaid programs). Based on the affidavits submitted, the court in Libbie recognized that the patients were likely to suffer physical and mental harm if forced to relocate. Id. Similarly, studies have demonstrated that factors such as age, frailty, and cognitive impairment will all influence the severity of transfer trauma experienced by the residents. See, e.g., Tracy Greene, Relocation Stress Syndrome in Older Adults, 5 Soc. Work Today 38 (2005).

Given the particular vulnerabilities of the Andrus' current residents, the stress from dislocation suffered by these residents is likely to be that much greater. The residents at the Andrus average 88 years of age, and long term residents have resided at the facility, on average, four years. Biddle Aff. at ¶¶ 12-13. 115 of the 196 residents suffer from dementia, a condition that exacerbates the trauma associated with moving elderly from one nursing facility to another. Id. at ¶ 21.

Additionally, the Andrus cares for two groups of nuns who currently live and worship together at the Andrus. Id. at ¶ 23. Given the limited supply of beds among nursing

homes near the Andrus, no one facility could accept these nuns as a group. Id. If forced to relocate to other facilities and separate from one another, they will lose that strong spiritual bond and sense of community experienced at the Andrus, which would likely increase the severity of transfer trauma they will experience.

Viewed as a whole, the population of the Andrus is particularly susceptible to transfer trauma, and would likely be irreparably harmed if forced to relocate.

B.     **The Andrus Has Demonstrated a Likelihood of Success on the Merits**

A party is entitled to preliminary injunctive relief where, in addition to demonstrating irreparable harm, it has demonstrated a likelihood of success on the merits. Plaza Health Labs., 878 F.2d at 580-81.

A showing of a "substantial" likelihood of success is required only when seeking a mandatory injunction, or when the *effect* of the preliminary relief cannot be undone once it has been complied with. Tom Doherty Assocs., 60 F.3d at 35. Neither situation is present here, as the Andrus is not seeking to force the defendant to take any action, but is simply asking the Court to maintain the status quo. Moreover, the effect of the order -- preliminarily enjoining closure -- can be undone at a later point, notwithstanding the June 30, 2008 Berger Commission implementation deadline.[1]

---

[1] In the absence of any continued authority to implement the Berger Commission's recommendation, the State could seek closure of a hospital or nursing home now, or any time after June 30, 2008, if it were to determine, following notice and hearing consistent with due process, that closure was appropriate under the existing statutory framework of the Public Health Law. That is, the Department of Health would not be forever precluded from closing the Andrus' nursing home, or any other facility in the State, even if the statutory authority to act under the auspices of the Berger Commission were to expire.

-7-

In any event, a preliminary injunction is proper even under a higher standard, as the Andrus has a <u>substantial</u> likelihood of success on the merits.

1. **The Andrus is Likely to Succeed on its Procedural Due Process Claims**

   a. **The Andrus Has a Protected Property Interest in Its Operating Certificate**

It is generally recognized, and the defendant has not seriously disputed, that a health care facility has a protected property interest in its operating certificate. See, e.g., St. Joseph Hosp. of Cheektowaga v. Novello, 43 A.D.3d 139, 143-44, 840 N.Y.S.2d 263, 267 (N.Y. App. Div. 4th Dep't 2007) (property interest in operating certificate is "substantial").

   b. **The Andrus Was Not Provided with Notice of Contemplated Closure**

Once it is established that a protected property right exists, the minimum due process required by law is notice and an opportunity to be heard. Cleveland Bd. of Educ. v. Loudermill, 470 U.S. 532, 542 (1985), cert. denied, 484 U.S. 946 (1988). Notice is inadequate where it does not provide the party affected with an opportunity to marshal evidence and prepare a defense to the proposed action. See Memphis Light, Gas, & Water Div. v. Craft, 436 U.S. 1, 11-12 (1978). At oral argument on defendant's summary judgment motion, the Court observed that the Andrus had a "probability of success on the merits" of its procedural due process claim. Transcript of Oral Argument, John E. Andrus Memorial, Inc. v. Daines, 07 Civ. 3432, 15 (S.D.N.Y. Sept. 7, 2007) ("Tr.").

The Andrus was never given any notice that its nursing facility was being targeted for closure until after the final reports were issued. The Andrus was invited to a meeting with members of the Hudson Valley RAC, but was told that the purpose of this meeting was to tell the "good story" about the Andrus, including its turn-around after its plan to develop a Continuing

Care Retirement Community on the campus. Biddle Aff. at ¶ 32. At no point during the meeting was the Andrus informed that the RAC was considering the Andrus a candidate for closure. Biddle Aff. at ¶ 31, 34. The RAC obviously also never disclosed to the Andrus any of the reasons it was targeting the Andrus for closure. Without such notice, it was impossible for the Andrus to know what evidence to marshal and what defenses to offer. As such, any "notice" provided by the Berger Commission or the RAC was clearly inadequate.[2]

### c. The Andrus Was Not Given a Meaningful Opportunity to Be Heard

The fundamental requirement of due process is a meaningful opportunity to be heard. Mathews v. Eldridge, 424 U.S. 319, 333 (1976). An opportunity to be heard cannot be meaningful if it is not preceded by sufficient notice. Mullane v. Central Hanover Bank & Trust Co., 339 U.S. 306, 314 (1950).

The first and only notice the Andrus received that it had been slated for closure was the release of the RAC and Berger Commission Reports in November 2006. Biddle Aff. at ¶ 43. At no time before then was the Andrus informed that it was being targeted, or why it was being targeted. Id. at ¶ 5. As such, the public meetings that were held and the one meeting with the Andrus that took place in June 2006 do not satisfy the constitutional standard of a meaningful opportunity to be heard. After that June meeting, the Andrus was never again provided an

---

[2] It has been suggested in the defendant's summary judgment papers that the mere act of passing the Enabling Legislation put all health care facilities in New York State on notice of a potential closure recommendation. This argument cannot salvage the defective notice, however. The legislation did not grant the Commission unfettered authority to close facilities. Rather, the Commission was constrained to consider a set of prescribed factors that was to inform its decision-making. See Part K of Chapter 58 of the Laws of 2003 as added by Section 31 of Part E of Chapter 63 of the Laws of 2005 § 5 (the "Enabling Legislation"). Thus, facilities should have been informed of the specific factors being considered, as they applied to their individual circumstances, in order to mount an effective defense to a closure recommendation, and for the notice to pass constitutional muster.

opportunity to meet with Berger Commission or RAC officials, nor otherwise notified that closure was contemplated or why.

The lack of notice and an opportunity to be heard to the Andrus undoubtedly resulted in the numerous factual errors contained in the RAC and Commission reports. For instance, the Berger Commission Report contends that the Andrus "had been operating at a significant loss until 2006" and that the facility "claimed" to be operating in the black at the time the report was issued. Biddle Aff., Ex. A, at 123. However, the Andrus made more than a mere "claim" to the RAC that it was operating at a surplus. The Andrus provided the RAC with certified financial statements for 2005 showing an operating surplus of greater than $500,000. Biddle Aff. at ¶ 54. Further, the Commission claimed that the Andrus had been cited with 26 survey deficiencies in 2005. Biddle Aff., Ex. A, at 123. The correct number of deficiencies for 2005 was only 14. Biddle Aff. at ¶ 68.

### 2. The Andrus is Likely to Succeed on its Substantive Due Process Claims

The Andrus has also demonstrated a substantial likelihood of success on the merits on its substantive due process claim. Substantive due process bars the government from taking any action against an individual that is wholly without legal justification. County of Sacramento v. Lewis, 523 U.S. 833, 846 (1998). A government decision made in reliance on faulty or unreliable information can constitute a violation of substantive due process. Wantanabe Realty Corp. v. City of New York, 315 F. Supp. 2d 375, 393-94 (S.D.N.Y. 2003).

The Andrus can demonstrate that the actions of the Berger Commission and Hudson Valley RAC were wholly without legal justification. Though given authority to realign health care resources in New York State, the Commission was constrained by the Enabling

Legislation to consider certain factors – as they applied specifically to each affected facility – when making a recommendation to close any one facility.[3] Indeed, no state governmental body has, or has ever had, unfettered authority to rescind the operating certificate of a health care facility licensed under Article 28 of New York's Public Health Law.

Among the factors to be considered by the Berger Commission and RAC were the financial status of the facility, the feasibility of converting the use of existing facilities, the extent to which an existing facility meets the health care needs of the community, including Medicaid recipients, the economic impact of right-sizing actions, and the stability and efficiency achieved in the provision of health care in a given community. Enabling Legislation, § 5.

The Berger Commission report makes clear that those statutorily prescribed factors were not considered and applied when reaching the recommendation to close the Andrus' nursing home. Rather, that decision was based on several erroneous assumptions; among others, that the Andrus was still operating at low occupancy and in the red. In so doing, the RAC and Commission ignored data offered by the Andrus establishing that its occupancy levels had vastly improved after it resumed admissions to the nursing home and that it was operating in the black for the past two years. Biddle Aff. at ¶¶ 40-43.

Moreover, the Report recommended that the Andrus decertify all its nursing home beds and convert to assisted living. Biddle Aff. Ex. A, at 123. Such a conversion, however, is simply not feasible given, among other things, the Andrus' existing physical plant and the permits required to make such a conversion. Biddle Aff. at ¶¶ 58-59. The Berger Commission

---

[3] A protected property interest such as the Andrus' right to retain its operating certificate is created by state law. Cleveland Bd. of Educ., 470 U.S. at 538 (citing Board of Regents v. Roth, 480 U.S. 564, 577 (1972)).

also proceeded on the demonstrably inaccurate assumption that the Andrus was not providing quality care, relying on a gross overstatement of patient-survey deficiencies. Had the RAC or the Berger Commission ever raised these matters with the Andrus during its deliberations, the Andrus could have corrected this misinformation in advance of the Final Report.

Furthermore, relocating the Andrus' residents would not increase efficiency in the delivery of health care – it would actually cost the State close to an additional $4 million a year to care for the Andrus' Medicaid residents at other facilities. Biddle Aff. at ¶¶ 64-65.

These multiple and material errors demonstrate that the Commission did not follow the factors prescribed by the Enabling Legislation, and instead proceeded on invalid or incomplete data when recommending closure of the Andrus. Such action was violative of the Andrus' substantive due process rights.

### 3. The Andrus is Likely to Succeed on its Takings Claims

It is well-established that a government may not take any action that deprives a landowner of economically beneficial uses of the property without compensating that landowner. Lucas v. South Carolina Coastal Council, 505 U.S. 1003, 1017-18 (1992). Though not every action falls into this category, a "taking" exists where the action divests a property owner of all legitimate uses of the property. See Huntleigh USA Corp. v. United States, 6 Fed. Cl. 440, 445-47 (2005). Where a charitable organization is denied continued use of property in furtherance of its charitable mission, this also constitutes a taking. St. Bartholomew's Church v. City of New York, 728 F. Supp. 958, 966 (S.D.N.Y. 1989), aff'd, 914 F.2d 348 (2d Cir. 1990), cert. denied, 127 S. Ct. 2133 (2007).

As the Andrus has made clear, the existing physical plant is not suited to sustaining an assisted living facility alone financially. Biddle Aff. at ¶ 56. By forcing the Andrus to surrender its operating certificate and cease operation as a nursing home, the defendant would leave the Andrus without economically viable uses of its land and property and likewise without the means to fulfill its charitable mission -- providing a home to the elderly.

### 4. The Andrus is Likely to Succeed on its Contracts Clause Claims

Though the government may at times interfere with private contracts in the exercise of its police power, this right to interfere must be balanced with the rights of the individual affected. Allied Structural Steel Co. v. Spannaus, 438 U.S. 234, 243 (1978). Whether such interference is unconstitutional involves a three part inquiry: 1) are the impaired contractual rights substantial? 2) does the law or regulation serve a legitimate state purpose? and 3) if the purpose is legitimate, are the means of accomplishing the purpose reasonable and necessary? Buffalo Teachers Fed'n v. Tobe, 464 F.3d 362, 367-68 (2d Cir. 2006), cert. denied, 127 S. Ct. 2133 (2007).

The contractual rights that will be impaired if the Andrus is forced to close are clearly substantial, as the closure would interfere with every contract entered into by the Andrus. While the State's purpose in passing the Enabling Legislation may well have been legitimate, that does not justify the specific action taken against the Andrus. Indeed, as discussed above, the Commission's recommendation to close the Andrus' nursing home – made in disregard of the factors mandated in the Enabling Legislation – lacked any legitimacy and was otherwise unreasonable and unnecessary, particularly in light of the apparent deficit of nursing home beds in Westchester County that would result if the Andrus is forced to close. Biddle Aff. at ¶ 27.

### C. The Public Interest is Best Served by Granting the Andrus Preliminary Injunctive Relief

In addition to irreparable harm and likelihood of success, courts may, and often do, consider the public interest in granting or denying preliminary relief. Standard & Poor's Corp. v. Commodity Exch., Inc., 683 F.2d 704, 711 (2d Cir. 1982). The public interest is not solely represented by the views of a public agency, and may actually be best served by enjoining the actions of a government entity. See Carey v. Klutznick, 637 F.2d 834, 839 (2d Cir. 1980) (affirming the grant of a preliminary injunction against the United States Census Bureau, in part because the injunction was in the best interests of the public). Here, it is clear that the interests of the public are best served by granting the Andrus' request for preliminary injunctive relief.

As discussed above, the injury suffered by the Andrus as an institution if preliminary relief is denied will be severe and the Andrus will be left without a remedy. However, the harm visited upon the residents of the Andrus – aged, frail, and cognitively impaired – will be even more grave. Transferring these residents to other nursing facilities would very likely cause transfer trauma. See supra Part I.A.3. What is more, most of the residents come from, or have a responsible party or family, within 5 miles of the Andrus. Biddle Aff. at ¶ 22. Forcing these residents to relocate to facilities far from the Andrus will remove them from their home and the community they have known for many years, and will weaken or sever ties with relatives and loved ones, adding to the hardship of transfer.

To be sure, the State has an interest in streamlining the provision of health care and rightsizing excess capacity. Those interests, however, are not at all compromised by granting the relief requested by the Andrus. As discussed above, the Andrus is actually more efficient than nearby residential health care facilities. Biddle Aff. at ¶¶ 64-65.

As to excess capacity, the defendant asserted that there were 636 extra nursing home beds in Westchester County as of September 2007. Tr. at 5. However, this figure does not reflect the current situation in Westchester County: due to recent or planned voluntary closures of other facilities in the area, some 300 or more nursing home beds have been or will be eliminated from the County's supply. Biddle Aff. at ¶ 27. Clearly, the Berger Commission did not account for the removal of 300 or so beds a year later when it recommended that the Andrus' "247" beds be taken out of the supply. Though the State does have a legitimate interest in reducing excess capacity, it has an equal if not stronger interest in ensuring that sufficient capacity remains in Westchester County to meet the future long term care needs of the elderly.

Given the foregoing, the balance of equities is overwhelmingly in favor of granting the Andrus the relief requested.

## CONCLUSION

For the foregoing reasons, plaintiff's motion for preliminary injunctive relief preventing defendant from implementing the Berger Commission's recommendation to close the plaintiff's nursing facility should be granted.

Dated:   New York, New York
         April 11, 2008

                                             CADWALADER, WICKERSHAM & TAFT LLP

                                             By: /s/ Peter G. Bergmann
                                                 Peter G. Bergmann (PB-9691)

                                             Attorneys for Plaintiff
                                                John E. Andrus Memorial, Inc.
                                                (d/b/a Andrus on Hudson)
                                             One World Financial Center
                                             New York, New York 10281
                                             Telephone: (212) 504-6000

Of Counsel:
   Brian T. McGovern
   Ariel V. Gordon