UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
---------------------------------------------------------------x
JOHN E. ANDRUS MEMORIAL, INC. (d/b/a     :
ANDRUS ON HUDSON),                        :
                                          :        07-CV-3432 (CLB) (KNF)
                              Plaintiff,  :
            -against-                     :
                                          :
                                          :
RICHARD F. DAINES, as Commissioner of the :
New York State Department of Health,      :
                                          :
                           Defendant.     :
---------------------------------------------------------------x


## DEFENDANT'S MEMORANDUM OF LAW IN OPPOSITION TO PLAINTIFF'S MOTION FOR A PRELIMINARY INJUNCTION

**ANDREW M. CUOMO**
Attorney General of the State of New York
Attorney for Defendant
Office of the Attorney General
120 Broadway 24th floor
New York, New York 10271
212-416-8570

Of Counsel
John P. Gasior
Assistant Attorney General
Sasha Samberg-Champion
Assistant Solicitor General

## TABLE OF CONTENTS

PRELIMINARY STATEMENT . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

STATEMENT OF RELEVANT FACTS . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

ARGUMENT . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11

POINT I - ANDRUS CANNOT DEMONSTRATE A LIKELIHOOD OF SUCCESS
            ON THE MERITS SUFFICIENT TO JUSTIFY A PRELIMINARY
            INJUNCTION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11

    A. Andrus Cannot Substantiate A Due Process Cause of Action . . . . . . . . . . . . . . . . . 12

        1. Because Plaintiff's Operating Certificate is Subject to Revocation
           for Lack of Public Need, Any Arguable "Property Interest" It Has Is
           Limited. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13

        2. Andrus Received All The Procedural Due Process To Which It Was
           Constitutionally Entitled . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15

            a. Andrus received adequate notice, and was actually aware,
               that its operating license was subject to revocation. . . . . . . . . . . . . . . . . . . 15

            b. Andrus had a meaningful opportunity to be heard. . . . . . . . . . . . . . . . . . . . . 19

        3. Andrus Received Substantive Due Process Because The Procedures
           Employed By The Commission Were Neither Arbitrary Nor Outrageous . . . . . 24

    B. Andrus Cannot Substantiate A "Taking" Cause of Action . . . . . . . . . . . . . . . . . . . 25

    C. Andrus' Contracts Clause Claim Must Fail . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 28

POINT II - ANY PRELIMINARY INJUNCTION GRANTED SHOULD BE NO
             BROADER THAN NECESSARY TO PRESERVE THE STATUS
             QUO . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 31

CONCLUSION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 34

# TABLE OF AUTHORITIES

**Cases**

Acton v. United States, 401 F.2d 896 (9th Cir. 1968) .................................. 26

American Pelagic Fishing Co., Inc. v. U.S., 379 F.3d 1363 (Fed. Cir. 2004) ............... 26

Asbestec Const. Serv. Inc. v. U.S. E.P.A., 849 F.2d 765 (2nd Cir. 1988) .................. 26

Atkins v. Parker, 472 U.S. 115 (1985) ......................................... 14, 16

Board of Regents v. Roth, 408 U.S. 564 (1972) ..................................... 13

Bower Assocs. v. Town of Pleasant Valley, 2 N.Y.3d 617 (2004) ....................... 24

Buffalo Teachers Fed'n v. Tobe, 464 F.3d 362 (2d Cir. 2006), cert.
    denied 127 S. Ct. 2133 (2007) ............................................. 28-30

Burns Harbor Fish Co. v. Ralston, 800 F. Supp. 722 (S.D. Ind. 1992) ................... 26

Cleveland Bd. of Educ. v. Loudermill, 470 U.S. 532 (1985) ........................... 14

College Sav. Bank v. Florida Prepaid Postsecondary Educ. Expense Bd.,
    527 U.S. 666 (1999) ...................................................... 26

County Line Joint Venture v. Grand Prairie, 839 F.2d 1142 (5th Cir. 1988) ............... 14

County of Sacramento v. Lewis, 523 U.S. 833 (1998) ............................... 24

Dusenberry v. United States, 534 U.S. 161 (2002) ............................... 15, 18

Exxon Corporation v. Eagerton, 462 U.S. 176 (1983) ............................... 28

Gattis v. Gravett, 806 F.2d 778 (8th Cir. 1986) .................................... 14

Hanson Trust PLC v. ML SCM Acquisition, Inc., 781 F.2d 264 (2d Cir.1986) ............. 11

Hunter v. SEC, 879 F. Supp. 494 (E.D. Pa. 1995) .................................. 26

Jolly v. Coughlin, 76 F.3d 468 (2d Cir. 1996) ..................................... 12

JSG Trading Corp. v. Tray-Wrap, Inc., 917 F.2d 75 (2d Cir. 1990) ..................... 11

Kirk v. Maumee Valley Electric Co., 279 U.S. 797 (1929) ............................ 14

Lewis v. Hynes, 82 Misc.2d 256 (N.Y. Sup. Ct. Queens Cty. 1975),
     aff'd 51 A.D. 2d 550 (2d Dep't Jan. 19, 1976) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13

Loretto v. Teleprompter Manhattan CATV Corp., 458 U.S. 419 (1982) . . . . . . . . . . . . . . . . . 27

Lowrance v. Achtyl, 20 F.3d 529 (2d Cir. 1994) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 24

Lucas v. South Carolina Coastal Council, 505 U.S. 1003 (1992) . . . . . . . . . . . . . . . . . . . . . . . . 27

Mathews v. Eldridge, 424 U.S. 319 (1976) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12, 15, 20

Medical Soc. of the State of New York v. Cuomo, 976 F.2d 812 (2nd Cir. 1992) . . . . . . . . . . . 24

Medtronic, Inc. v. Lohr, 518 U.S. 470 (1996) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 24

Mitchell v. W.T. Grant Co., 416 U.S. 600 (1974) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12, 15

Moore v. Consol. Edison Co. of N.Y., Inc., 409 F.3d 506 (2d Cir.2005) . . . . . . . . . . . . . . . . . 11

Morrissey v. Brewer, 408 U.S. 471 (1972) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15, 20

Mullane v. Central Hanover, 339 U.S. 306 (1950) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15

Nassau Boulevard Shell Serv. Station v. Shell Oil Co., 869 F.2d 23 (2d Cir.1989) . . . . . . . 32, 33

Niagara Recycling, Inc., v. Town of Niagara, 83 A.D.2d 316 (4th Dept. 1981) . . . . . . . . . . . . . 24

Penn Cent. Transp. v. City of New York, 438 U.S. 104 (1978) . . . . . . . . . . . . . . . . . . . . . . . . . . 27

Plaza Health Labs., Inc. v. Perales, 878 F.2d 577 (2d Cir. 1989) . . . . . . . . . . . . . . . . . . 13, 14, 17

RR Village Association, Inc. v. Denver Sewer Corp., 826 F.2d 1197 (2nd Cir. 1987) . . . . . . . . . 20

Sal Tinnerello & Sons, Inc. v. Town of Stonington, 141 F.3d 46 (2d Cir. 1998) . . . . . . . . . 29, 30

San Remo Hotel, L.P. v. City & County of San Francisco, 545 U.S. 323 (2005) . . . . . . . . . . . . 28

Sanitation & Recycling Ind., Inc. v. City of New York, 928 F. Supp. 407
     (S.D.N.Y. 1996), aff'd, 107 F.3d 985 (2nd Cir. 1997) . . . . . . . . . . . . . . . . . . . . . . . . . . . 26, 29

Sanitation and Recycling Indus., Inc. v. City of New York, 107 F.3d 985
     (2d Cir. 1997) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 29, 30

St. Joseph Hospital of Cheektowaga v. Novello, 15 Misc.3d 333 (N.Y. Sup. Ct.

Erie Cty. 2007); aff'd as modified 840 N.Y.S.2d 263 (4th Dep't 2007) . . . . . . . . . 18, 25, 30

St. Joseph Hospital of Cheektowaga v. Novello, 43 A.D.3d 138 (4th Dep't 2007) . . . . . . . . . 24

Town of Orangetown v. Magee, 88 N.Y.2d 41 (1996) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 24

Tremper v. Ulster County Dept. of Probation, 160 F. Supp.2d 352 (N.D.N.Y. 2001) . . . . . . . . 12

Union Cosmetic Castle, Inc. v. Amorepacific Cosmetics USA, Inc., 454 F. Supp.2d 62
    (E.D.N.Y. 2006) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 33

United States v. Pewee Coal Co., 341 U.S. 114 (1951) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 26

Uzzillia v. Commissioner of Health, 47 A.D.2d 492 (2d Dep't 1975) . . . . . . . . . . . . . . . . . . . . 13

Weigner v. New York, 852 F.2d 646 (2d Cir. 1988) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18

Defendant, Richard F. Daines ("Defendant"), as Commissioner of the New York State Department of Health ("DOH"), by his attorney, Andrew M. Cuomo, Attorney General of the State of New York, respectfully submits this memorandum of law, along with the affidavits of Neil Benjamin ("Benjamin Aff."), Allison Silvers, M.D. ("Silvers Aff.") and John Gasior ("Gasior Aff."), in opposition to plaintiff's motion for a preliminary injunction ("Plaintiff's Motion"). The affidavit of David R. Sandman, PhD ("Sandman Aff."), previously submitted in support of defendants July 13, 2007 motion for summary judgment, is incorporated herein by reference in opposition to plaintiff's motion for a preliminary injunction.

## PRELIMINARY STATEMENT

In November 2006, the New York State Commission on Healthcare Facilities in the 21st-First Century ("Berger Commission") released its report, A Plan To Stabilize and Strengthen New York's Health Care System ("Commission Report"), which included the recommendation that the nursing home operated by plaintiff be restructured so as to provide assisted living care rather than nursing home care. On June 30, 2008, DOH's authority to implement the Berger Commission's recommendations will expire.[1] With that date looming, and fifteen months after the conduct that Andrus complains about, Andrus now has made its very first motion in this case, seeking a "preliminary" injunction that effectively would grant Andrus all the relief it seeks without a full adjudication on the merits. Specifically, plaintiff asks this court not simply to enjoin DOH from closing Andrus or modifying its operating certificate, but to enjoin DOH from

---

[1] Section eleven of the Enabling Legislation (annexed as Exhibit A to the Benjamin Aff.) which created the Berger Commission states that "sections nine and ten of this act shall expire and be deemed repealed June 30, 2008." Section nine of the Enabling Legislation, titled "Implementation of recommendations," provides DOH with the authority to implement the Commission Report's recommendation that Andrus eliminate all 247 residential health care beds that it was certified to operate and replace them with 140 assisted living program beds. See Sandman Aff. Exh. B at 123.

taking <u>any</u> further steps to implement the recommendations made by the Berger Commission,
including those steps that are necessary to preserve DOH's authority to act after June 30, 2008.
Thus, plaintiff seeks not to preserve the status quo pending trial, but to resolve this case in its
favor.

Plaintiff is not entitled to any preliminary injunction because there is no likelihood that
plaintiff will succeed on the merits of any of its claims. Plaintiff's due process claims amount to
no more than an assertion that the agency "got it wrong", a contention that should be raised in a
state-court administrative challenge and that is insufficient to state a constitutional claim.
Plaintiff does not assert that it was unaware of the Commission's inquiry or that it was unable to
submit to the Commission all relevant information; to the contrary, it concedes that it submitted
all the information it would have wanted the Commission to see, and did so after extensive
discussion with the Commission. Whatever this Court may think about the Commission's
conclusions — and defendants submit that those conclusions are reasonable and would be upheld
if they were actually challenged in a proper state-court action — these concessions by plaintiff
defeat its constitutional due process challenge, which must be based on the input to the
Commission, not the Commission's output. Plaintiff's takings and Contract Clause claims are
equally baseless.[2]

And even if plaintiff were entitled to some injunctive relief, it would not be entitled to the
over-broad injunction it seeks, which effectively would decide this case in plaintiff's favor rather

---

[2] Much of the legal reasoning contained herein is similar to that contained in the defendant's
previous motion for summary judgment. The Court's March 10, 2008 Memorandum and Order
denying defendant's motion for summary judgment did not reject any of those arguments, but simply
stated that there were genuine issues of material fact.

2

than preserving the status quo.  Defendant concedes, for purposes of the present motion only, that

Andrus would suffer irreparable harm should its operating certificate be terminated and should it

be forced to close its doors.[3]  However, Andrus has made no showing that it will suffer any

irreparable harm if the DOH takes preliminary steps to ensure that it retains authority to act and

that Andrus's closure, should it come to pass, will be orderly and well regulated.  To the

contrary, permitting DOH to take such preliminary steps is in the public interest, and so any

injunction issued should be narrowly tailored as set forth below.

## STATEMENT OF RELEVANT FACTS

In April of 2005, the New York State Legislature passed, and then Governor Pataki

signed, legislation creating the so-called Berger Commission, so named after the commission's

chairman, Stephen Berger.  The legislation came into being as Part K of Chapter 58 of the Laws

of 2003 as added by Section 31 of Part E of Chapter 63 of the Laws of 2005.  That statute will be

referred to herein as the "Enabling Legislation".  Benjamin Aff. Exh. A.

The Legislature's findings and purposes are summarized in Section 1 of Enabling

Legislation.  Among other things, the Legislature found that, in too many sectors of the State's

health care system, supply was ahead of demand.  It determined that health care resources must

"be aligned so that excess capacity is minimized, thereby promoting stability and efficiency in

the health care delivery system infrastructure. . . . that it is in the interest of the state to undertake

---

[3] Most of the alleged "harm" outlined in the affidavit of Betsy Biddle In Support Of Plaintiff's Motion For A Preliminary Injunction ("Biddle Aff.") flow from the proposed revocation of Andrus' operating license on June 30, 2008.  The alleged loss of jobs (Biddle Aff. ¶ 2), transfer of residents with attendant "transfer trauma" (Biddle Aff. ¶¶3, 19-27), severance of relationships with physicians, food vendors, suppliers and those with whom Andrus otherwise does business (Biddle Aff. ¶ 57), along with alleged negative community impact (id.), all would not occur "but for" the revocation of Andrus' operating license.

at this time a rational, independent review of health care capacity and resources in the state."

Toward this end the Legislature created the Commission:

> In order to undertake such review rationally and equitably, the legislature determines that it is necessary to establish a commission separate and apart from existing bodies responsible for the establishment and continued oversight of general hospitals and nursing homes, which shall be charged with examining the supply of general hospital and nursing home facilities, and recommending changes that will result in a more coherent, streamlined health care system in the state of New York.

Enabling Legislation, §1. The Commission was charged with ". . . examining the system of general hospitals and nursing homes in New York state and recommending changes to that system in light of factors submitted pursuant to section five of this act and additional factors established by the commission."[4]  Id. §2(a).

The Commission consisted of 18 statewide members and additional regional members from each of six regions, including the Hudson Valley Region, which is where the Andrus facility is located.[5]  Id., §7.  Each of the six regions had a regional advisory committee ("RAC") charged with "develop[ing] recommendations for reconfiguring its region's general hospital and

---

[4] A number of actions have been brought throughout the State challenging various aspects of the Enabling Legislation and its implementation. In McKinney v. Commissioner of New York State Dept. of Health, 41 A.D.3d 252 (1st Dep't 2007) appeal denied, 9 N.Y.3d 891 (2007), the Appellate Division, First Department, rejected the argument that the Enabling Legislation unconstitutionally delegated the Legislature's lawmaking power to the executive branch and affirmed dismissal of that action. The Appellate Division stated that, "[h]aving made the basic policy choice that some hospitals and nursing homes needed to be closed and others needed to be resized, consolidated, converted, or restructured, the legislation permissibly authorized the Commission 'to fill in details and interstices and to make subsidiary policy choices consistent with the enabling legislation'" Id. at 253.

[5] The Hudson Valley Region consists of Delaware, Dutchess, Orange, Putnam, Rockland, Sullivan, Ulster and Westchester counties. Sandman Aff. Exh. B at 65.

nursing home bed supply to align bed supply with regional and local needs." Id., §7(d); see also §7(d) (functions of RACs). After the submission of a RACs' recommendations (if any), the Commission was required to develop recommendations for reconfiguring the state's general hospital and nursing home bed supply to align bed supply to regional needs, id., §8(a), and "make recommendations relating to facilities to be closed and facilities to be resized, consolidated, converted, or restructured, within each region." Id., §8(b).

The Commission was required to work quickly. It was given a limited existence; the Commission, and its authority, were designated to expire on December 31, 2006. Id. §11.[6] The Enabling Legislation required the Commission, by December 1, 2006, to supply the Governor and the Legislature with recommendations which would include, inter alia, "specific recommendations for facilities to be closed and specific recommendations for facilities to be resized, consolidated, converted, or restructured." Id., §8(e). If the Governor approved the report/recommendations and if the Legislature did not vote to reject the recommendations on or by December 31, 2006, the recommendations would acquire the force of law. Id., §9(b).

Nineteen hearings were held throughout the State. Sandman Aff. ¶ 18. Three hearings were held in the Hudson Valley region. Sandman Aff. Exh. B at 68. Details concerning the time and location of these hearings, and the agendas for the public hearings, are annexed to the Sandman Aff. as Exhibits H and I respectively. The Commission and the RACs heard from

---

[6] Section 11 of the Enabling Legislation provides that sections 2-8, in which the Commission was created and defined, would "expire and be deemed repealed December 31, 2006." Section 9, under which DOH is directed to implement the Commission's recommendations, will "expire and be deemed repealed" on June 8, 2008.

hundreds of witnesses and reviewed thousands of pages of testimony submitted during hearings. Sandman Aff. Exh. B at 68.

Of particular relevance here, on or about June 19, 2006, members of the Hudson Valley RAC and Commission staff met with Betsy Biddle, plaintiff's executive director.  Sandman Aff. ¶ 22.  At that meeting, topics included a previous attempt by Andrus to convert itself into a continuing care retirement community, reducing its nursing home bed complement to 72, Andrus' proposal to transfer 50 beds to Beth Abraham Hospital, its resolution of outstanding debts resulting from the proposed conversion and its general finances.  Id.  A copy of Ms. Biddle's letter to Dr. Robert Amler, the Hudson Valley RAC chairperson, dated June 23, 2006, is annexed to the Sandman Aff. as Exhibit K.

In support of Plaintiff's Motion, Ms. Biddle asserts that the only "substantive communication" regarding the possible closure of Andrus occurred at a June 20, 2006 meeting with the Hudson Valley RAC.  Biddle Aff. ¶ 30.  Specifically, Ms. Biddle asserts that,

> At none of the discussions before, during or after the meeting was there any mention or suggestion that the RAC or the Berger Commission had already identified the Andrus for right-sizing, or was requesting the meeting to discuss why it should be closed for any reason . . . . If the closure of the Andrus' nursing home was on their agenda, the participants kept it completely hidden from me.

Biddle Aff. ¶ 31.

Notably, Ms. Biddle does not claim that she actually was unaware that the purpose for her meeting with the Hudson Valley RAC was to take a hard look at Andrus's continued viability, nor would such a claim be credible in view of the widespread publicity regarding the Commission's operations.  Her claim is only the unremarkable one that the RAC and

6

Commission members did not specifically inform her that closing Andrus was "on their agenda"
or otherwise had "already" been decided at the time of their meeting — as they could not have
informed her, since no such decision to close Andrus had yet been made. Thus, her account is
fully consistent with that of Allison Silvers, a staff member of the Berger Commission who
attended the June 20, 2006 meeting. Ms. Silvers recalls that, at the meeting, Ms. Biddle
presented the Hudson Valley RAC with updated financial and occupancy information, her
perspective on the plaintiff's prior attempt to become a continuing care retirement community
and her general views on why plaintiff is a valuable facility which should be allowed to continue
to operate unchanged. Silvers Aff. ¶ 4. And, while Ms. Silvers does not recall if Ms. Biddle
was explicitly told that plaintiff was a "facility of interest," she asserts that,

> there can be no doubt that [Ms. Biddle] knew that the meeting was
> part of the process created by the legislature to "rightsize" the health
> care system, which would necessarily include the involuntarily
> closure and reconfiguration of health care facilities, and that she was
> providing information which would be considered by the RAC and
> Commission as part of that process.

Silver Aff. ¶ 5.

On November 28, 2006 the Commission sent the Commission Report to the Governor
and the State Legislature. Sandman Aff. ¶ 11. Its recommendations directly affected 57
hospitals around the state, with 48 hospitals to be reconfigured or converted, and nine hospitals
to be closed altogether. Sandman Aff. Exh. B at 10-11; see also 91-218 (describing specific
recommendations). The Commission Report also recommended that approximately 25 nursing
facilities should be downsized, closed or otherwise reconfigured.[7] Id. at 11.

---

[7] The Commission estimated that the long-term recommendations for downsizing or closing
(continued...)

Among those 25 nursing facilities was Andrus-on-Hudson. The Commission Report recommended that Andrus eliminate all 247 residential health care ("RHC") beds that it was certified to operate and replace them with 140 assisted living program ("ALP") beds. Sandman Aff. Exh. B at 123. It noted that Westchester County as a whole had too many RHC beds and not enough ALP beds. Id. Andrus was an excellent candidate for a conversion to address this problem. First, it had one of the lowest "case mix indexes in the State," reflecting the relative good health of its patients.[8] Of Andrus' 176 residents, about half had low-acuity conditions and "could be better served in an ALP, if that were available." Id. Second, its physical plant was "old and in need of capital improvements" anyway. Third, its facility "has private rooms and baths," making conversion to an ALP "economical." Id.

On November 30, 2006, then Governor Pataki transmitted his approval to the Legislature. Sandman Aff. ¶ 11. The Legislature, in turn, did not vote to reject the recommendations. Id. Thus, as of January 1, 2007, the Commission Report gained the force of law and the Commission ceased to exist. The Commissioner of Health of the State of New York, currently defendant Richard F. Daines, became obliged under Enabling Legislation § 9(a) to "take all actions necessary to implement, in a reasonable, cost-efficient manner, the recommendations of the

---

[7] (...continued)
nursing homes would make highly-targeted nursing bed reductions of approximately 3,000, or 2.6 percent of the state's supply. Sandman Aff. Exh. B at 11. Twice as many nursing homes were to be downsized as closed. Id. The Commission estimated that implementing its recommendations for all facilities would result in savings of about $1.5 billion per year at a cost of approximately $1.2 billion. Id. 225-229.

[8] The Case Mix Index ("CMI") for nursing homes is defined at 10 N.Y.C.R.R. § 86-2.10(a)(5). How nursing home CMIs are developed is discussed in Sandman Aff. footnote 1.

commission." DOH must implement the Commission's recommendations by June 30, 2008. Sandman Aff. Exh. B at 90.

On January 31, 2007, DOH sent a letter to Andrus, advising plaintiff of the Commission's recommendations and requesting that plaintiff contact DOH to arrange a meeting, if such a meeting was desired. Benjamin Aff. ¶ 4, Exh. B. The letter included an implementation outline which, consistent with the Commission Report (see Sandman Aff. Exh. B at 90), provides that "the Commissioner shall implement each recommendation as expeditiously as possible, but in no event later than June 30, 2008." Accordingly, Andrus has known clearly, for well over a year, that closure on June 30, 2008 was a looming reality.

On April 30, 2007, Andrus filed the complaint in this case. And for a year, Andrus took no other action[9]. By contrast, the defendant, seeking to resolve this case, filed a motion for summary judgment on July 18, 2007. Gasior Aff. ¶ 4. That motion, after being stayed by this Court to await the resolution of certain state-court proceedings involving St. Joseph Hospital of Cheektowaga, was denied on March 10, 2008. A copy of the Court's Memorandum and Order is attached to the Gasior Affidavit as Exhibit A.

Immediately following that determination, defendant's counsel wrote the Court on March 13, 2008, and stated that,

> [I]t is defendant's understanding that, while the Court denied defendant's motion for summary judgment, there presently is no Court order preventing the New York State Department of Health ("DOH") from implementing the Berger Commission's

---

[9]    Before defendants even answered the complaint, plaintiff did serve defendant on May 30, 2007 with a First Request For Production Of Documents And Interrogatories. Gasior Aff. ¶ 3. Defendant produced documents responsive to those discovery demands on June 19th and 29th, 2007 and served written responses on July 2, 2008. Id.

> recommendation to close Andrus. Significantly, plaintiff has never moved for an order enjoining implementation of the Berger Commission's recommendations. It is important for DOH to move quickly on the Berger Commission's recommendations because section nine of the Enabling Legislation at issue in this litigation -- Implementation of Recommendations -- "shall expire and be deemed repealed June 30, 2008."
>
> Accordingly, absent an order specifically enjoining defendant from implementing the Berger Commission's recommendations regarding Andrus, DOH immediately will initiate procedures to revoke Andrus' operating license, and take such other measures as are necessary to fulfill the Berger Commission's recommendations.

Gasior Aff. Exh. B. In response to that letter, the Court scheduled a conference for March 28, 2008. Gasior Aff. ¶ 5. Defendant's concern regarding the June 30, 2008 deadline to implement the Berger Commission's recommendations was raised at the conference, as well as the issue of a preliminary injunction to enjoin Andrus' closure. Gasior Aff. Exh. C at 4:3-8, 5:9-20.

Following that conference, on April 15, 2008 -- nearly a full year after filing its complaint -- Andrus finally sought a preliminary injunction. Gasior Aff. ¶ 7. Shortly thereafter, the defendant again informed Andrus that it intended to take certain action prior to June 30, 2008 to preserve the status quo, i.e., defendant's ability to implement the Commission's recommendations should it prevail in this action. Gasior Aff. ¶ 7, Exh. F. Specifically, defendant told Andrus that it intended to issue Andrus a modified operating certificate that would terminate on June 30, 2008, the last day of DOH's authority to implement the recommendations. The substance of these discussions between the parties were later described for the Court in a series of written communications. See Gasior Aff. Exhs. D, E, F and G. Defendant informed the Court and Andrus that issuance of the proposed modified operating certificate action would have "no consequence whatsoever to Andrus' day-to-day operation prior to June 30, 2008," and that no one other than the parties even needed to know that such a certificate had been issued.

10

Gasior Aff. Exh. F.  Moreover, that letter informed the Court and Andrus that, should the Court issue a preliminary injunction, DOH would further amend the operating certificate to provide for its continued validity for the duration of this litigation, including appeals.  <u>Id.</u>  The bottom line, DOH made clear, was that its action would "have no effect on the status quo in this litigation," but instead would preserve the status quo.  <u>Id.</u>

On April 23, 2008, Andrus obtained a temporary restraining order barring DOH from taking any further action to implement the Commission's recommendations.  Gasior Aff. Exh. H. In support of this order, plaintiff's counsel relied primarily on his own letter of April 22, 2008 (Gasior Aff. Exh. G), which averred that DOH misunderstood the import of its own action, and that, in fact, issuance of the revised operating certificate would have "calamitous effects on the Andrus' continued viability."  Gasior Aff. Exh. G at 2 .  He also accused DOH of engaging in "brinkmanship."  <u>Id.</u>

## ARGUMENT

### POINT I
### ANDRUS CANNOT DEMONSTRATE A LIKELIHOOD OF SUCCESS ON THE MERITS SUFFICIENT TO JUSTIFY A PRELIMINARY INJUNCTION

A preliminary injunction is considered an "extraordinary" remedy that should not be granted as a routine matter. <u>See</u> <u>JSG Trading Corp. v. Tray-Wrap, Inc.</u>, 917 F.2d 75, 80 (2d Cir. 1990). It is "one of the most drastic tools in the arsenal of judicial remedies". <u>Hanson Trust PLC v. ML SCM Acquisition, Inc.</u>, 781 F.2d 264, 273 (2d Cir.1986); <u>Moore v. Consol. Edison Co. of N.Y., Inc.</u>, 409 F.3d 506, 510 (2d Cir.2005) (preliminary injunction is an "extraordinary and drastic remedy, one that should not be granted unless the movant, by a clear showing, carries the burden of persuasion."). Where a moving party seeks to enjoin government action taken in the

11

public interest pursuant to a statutory or regulatory scheme, the moving party is required to demonstrate irreparable harm and a "likelihood of success on the merits." Jolly v. Coughlin, 76 F.3d 468, 473 (2d Cir. 1996). Morever, because the preliminary injunction sought here by plaintiff would grant substantially all of the relief sought in the complaint, Andrus must establish a "substantial likelihood of success on the merits" in order to obtain the injunction. Tremper v. Ulster County Dept. of Probation, 160 F. Supp.2d 352, 356 (N.D.N.Y. 2001). In its decision on such a motion, the court must set forth the findings and conclusions that support granting or denying the preliminary injunction. See Fed. R. Civ. P. Rule 52(a)(2); Fengler v. Numismatic Americana, Inc., 832 F.2d 745 (2d Cir. 1987) (vacating preliminary injunction that did not include adequate findings of fact); Fabrication Enters. v. Hygenic Corp., 64 F.3d 53, 61-62 (2d Cir. 1995) (district court's lack of findings of fact or conclusions of law in denying the motion for preliminary injunction alone requires remand because it leaves appellate court unable to review the decision).

As will be discussed below, there is no likelihood that Andrus will be successful on the merits of its substantive claims. Accordingly, it is not be entitled to a preliminary injunction.

### A.    Andrus Cannot Substantiate A Due Process Cause of Action.

Even if Andrus had a property interest in its operating certificate -- the scope of which would be limited -- the procedures afforded under the Enabling Legislation provided all the process due. The basic requirements of due process are notice and an opportunity to be heard. Mitchell v. W.T. Grant Co., 416 U.S. 600, 634 (1974). Plaintiff had both. Application of the three-factor test articulated in Mathews v. Eldridge, 424 U.S. 319, 335 (1976), makes clear that plaintiff cannot make out a procedural due process violation.

1.    **Because Plaintiff's Operating Certificate is Subject to Revocation for Lack of Public Need, Any Arguable "Property Interest" It Has Is Limited.**

Any due process analysis must begin with an examination of the supposed property interest at issue. Here, any such property interest plaintiff may have in its operating certificate is at best qualified and extremely limited, given the power the State always has retained to revoke that operating certificate for lack of public need. "Property interests, or course, are created and their dimensions defined by existing rules or understandings that stem from an independent source such as state law." Board of Regents v. Roth, 408 U.S. 564, 577 (1972). In determining what, if any, property interest a litigant has, a court must "focus initially on the relevant statute, regulation, or contract establishing eligibility for the government benefit at issue." Plaza Health Labs., Inc. v. Perales, 878 F.2d 577, 581 (2d Cir. 1989). Thus, a statute conferring a benefit also defines its nature and scope. Roth, 408 U.S. at 578.

Long before the Enabling Legislation was enacted, New York law put all hospitals on notice that their continued operation, far from being an entitlement, would be conditioned on an ongoing public need for their beds and services. Specifically, N.Y. Public Health Law § 2806(6)(a) has long required the State to revoke a facility's operating certificate upon a determination by the Commissioner of Health that the facility's closure would serve the public interest by realigning the community's bed supply to actual public need.[10] The Enabling Legislation simply created a process by which this long-existing qualification could be more

---

[10] New York Public Health Law § 2801 includes "nursing home" within the definition of "Hospital." See Uzzillia v. Commissioner of Health, 47 A.D.2d 492, 496 n3 (2d Dep't 1975) (article 28 'hospital' includes 'nursing home'). As a "hospital" it is subject to the regulatory provisions of Article 28 of the Public Health Law. Lewis v. Hynes, 82 Misc.2d 256, 260 (N.Y. Sup. Ct. Queens Cty. 1975), aff'd 51 A.D. 2d 550 (2d Dep't Jan. 19, 1976).

13

effectively implemented by evaluating public need on a regional, as opposed to an individualized

or even localized basis. See Enabling Legislation, §§ 7(d), 8(a). Plaintiff cannot complain that

this pre-existing qualification took on greater practical force subsequent to the Enabling

Legislation's passage. Whatever protected interest plaintiff may have had was in a substantive

right, not in a particular procedure. See Cleveland Bd. of Educ. v. Loudermill, 470 U.S. 532, 541

(1985). Moreover, to the extent that the Enabling Legislation altered the character of plaintiff's

"entitlement," the Legislature may permissibly take such action without the need for heightened

procedural protections, as a "legislative determination provides all the process that is due."

Atkins v. Parker, 472 U.S. 115, 130 (1985) (footnote omitted);[11] see also County Line Joint

Venture v. Grand Prairie, 839 F.2d 1142, 1144 (5th Cir. 1988); Gattis v. Gravett, 806 F.2d 778,

781 (8th Cir. 1986) (though legislative alteration of previously conferred property interest may be

a deprivation, legislative process itself provides citizens with all process due).

Thus, facilities such as Andrus have no more than a conditional right to operate and they

must cease operating if the State determines that there is no longer a public need for their facility.

See Kirk v. Maumee Valley Electric Co., 279 U.S. 797, 802 (1929) (State's exercise of reserved

powers does not violate due process). The discretion retained by the State to revoke an operating

license "suggests that the recipients of such benefits have no entitlement to them" as would

trigger constitutional due process protections. Plaza Health Labs., 878 F.2d at 581. And, as

---

[11] In Atkins, plaintiffs were recipients of food stamps who challenged the notice given to
them following a change in federal law which reduced their benefits. The Court observed,
"[b]ecause the substantive reduction in the level of petitioners' benefits was the direct consequence
of the statutory amendment, they have no basis for challenging the procedure that caused them to
receive a different, less valuable property interest after the amendment became effective." Atkins,
472 U.S. at 130.

demonstrated below, the process afforded plaintiff was more than sufficient to protect whatever limited, conditional constitutional interest it may have had.

### 2. Andrus Received All The Procedural Due Process To Which It Was Constitutionally Entitled.

Andrus, and every Article 28 facility in New York, received all the notice and opportunity to be heard which could reasonably be provided and which the Constitution requires. The essence of procedural due process is notice and an opportunity to be heard. See, e.g. Mitchell v. W. T. Grant Co., 416 U.S. at 634. When due process is required, the process to be provided is itself a flexible concept. Mathews v. Eldridge, 424 U.S. 319, 335 (1976); Morrissey v. Brewer, 408 U.S. 471, 481 (1972). Under the circumstances presented, there can be no genuine issue of material fact that Andrus received both notice and a meaningful opportunity to be heard.

### a. Andrus received adequate notice, and was actually aware, that its operating license was subject to revocation.

Andrus received more than adequate notice that the Commission was considering revoking its operating license. Moreover, as Andrus concedes, it was actually aware at all relevant times that the Commission was engaged in such consideration, and was actually aware of its ability to discuss the matter with the Commission and the RAC, submit documentation, and otherwise influence the process. No more is required as a matter of constitutional due process. See Dusenberry v. United States, 534 U.S. 161, 170 (2002) (Due Process Clause's notice requirement is "only that the Government's effort be 'reasonably calculated' to apprise a party of the pendency of the action"); Mullane v. Central Hanover, 339 U.S. 306, 315 (1950) ("The criterion [for notice] is not the possibility of conceivable injury but the just and reasonable character of the requirements, having reference to the subject with which the statute deals.")

(internal quote omitted). Andrus' complaint — that is should have received some sort of super-notice, informing it not simply of the pendency of the process, but of the likelihood of a certain outcome — has no basis in due process jurisprudence, which is why precisely the same complaint already has been rejected by the New York courts.

There can be no serious question that Andrus knew of the Commission's deliberations and the possible consequences for it, i.e., that it received all of the notice required by constitutional due process. First of all, the Enabling Legislation is a public law. From the plain language of the statute it has always been clear that every hospital and nursing home in the State was being reviewed with an eye toward closure or restructuring. See Enabling Legislation § 2(a) (providing that the Commission "shall be charged with examining the system of general hospitals and nursing homes in New York state and recommending changes to that system"); id. § 8(b) (providing that the "commission shall make recommendations relating to facilities to be closed and facilities to be resized, consolidated, converted, or restructured, within each region."). Where a governmental entity is required to make decisions which will affect many individuals or entities, individualized notice is not required. See, e.g. Atkins, 472 U.S. at 129-31.

In any event, the record makes clear that Andrus was actually on clear notice that it was a candidate for Commission action. The Hudson Valley RAC early on identified Andrus as a "facility of interest" because of, inter alia, its "low occupancy level, recent history of patient care deficits, low care for the needs of its residents and financial problems." Sandman Aff. ¶ 20. Accordingly, members of the RAC, as well as Commission staff, met with Andrus' executive director on or about June 19, 2006. Id. ¶ 22. At that meeting, among the topics discussed were Andrus' previous attempt to convert itself into a continuing care retirement community; the

16

possibility of reducing its nursing home bed complement to 72; its proposal to transfer 50 beds to

Beth Abraham Hospital to resolve outstanding debts resulting from the proposed conversion; and

its general finances. Id.

Furthermore, as noted above, Allison Silvers, a staff member of the Berger Commission

who attended the June 20, 2006 meeting, recalls that Ms. Biddle presented the Hudson Valley

RAC with updated financial and occupancy information, her perspective on the plaintiff's prior

attempt to become a continuing care retirement community and her general views on why

plaintiff is a valuable facility which should be allowed to continue to operate unchanged. Silvers

Aff. ¶ 4. And while Ms. Silvers does not recall if Ms. Biddle was explicitly told that plaintiff

was a "facility of interest," she asserts that,

> there can be no doubt that [Ms. Biddle] knew that the meeting was
> part of the process created by the legislature to "rightsize" the health
> care system, which would necessarily include the involuntarily
> closure and reconfiguration of health care facilities, and that she was
> providing information which would be considered by the RAC and
> Commission as part of that process.

Silver Aff. ¶ 5. There can be no question that Andrus was put on notice of the seriousness of its

situation.

Tellingly, Andrus does not even allege, let alone establish with evidence, that it was not

aware of the Commission's proceeding or the possible consequences. See Plaza Health Labs.,

878 F.2d at 582 (finding no notice problem where plaintiff "does not claim to have been

unaware" of what was at issue and where "it would require little thought" for the plaintiff to have

deduced it). Rather, Andrus merely complains that "at no point during any of its

communications with the Hudson Valley RAC was the Andrus informed that it was being

targeted or considered for closure, nor told why it was being so targeted or considered."

17

Complaint ¶ 43 (emphasis added). It further complains that the Commission issued its final report "without affording the Andrus any notice <u>of its contemplated actions</u>." <u>Id.</u> ¶ 52 (emphasis added). Similarly, in support of plaintiff's motion for a preliminary injunction, Betsy Biddle carefully makes statements to the effect that Andrus was not told that the commission was <u>going</u> to close Andrus. Ms. Biddle states that "At none of the discussions before, during or after the [June 2006] meeting was there any mention or suggestion that the RAC or the Berger Commission <u>had already identified Andrus</u> for right-sizing . . . ." Biddle Aff. ¶ 11 (emphasis added). Again, she states that Andrus did not know it "needed to defend itself" because <u>it had</u> <u>"no notice of 'closure'</u> or any grounds for closure . . . ." Biddle Aff. ¶ 36 (emphasis added).

The super-notice that Andrus contends was not provided has never been required by constitutional due process. As a state court aptly put it, in disposing of a similar challenge to the Enabling Legislation:

> There is no question that the plaintiffs received notice of the deliberations of the [Berger] Commission and an opportunity to submit written material. <u>Every hospital was on notice that the Commission might recommend its closing or consolidation</u>. It is unreasonable to expect that as the Commission deliberated and certain hospitals became more likely to be affected that some sort of super notice would be required. The notice received by plaintiffs was sufficient.

<u>St. Joseph Hospital of Cheektowaga v. Novello</u>, 15 Misc.3d 333, 343-44 (N.Y. Sup. Ct. Erie Cty. 2007); <u>aff'd as modified</u> 840 N.Y.S.2d 263 (4th Dep't 2007) ("<u>St. Joseph I</u>") (emphasis added). The State's actions were reasonably calculated to put Andrus on notice of the pendency of the Commission's proceedings, and indeed Andrus was actually on notice of them. "Due process requires no more." <u>Dusenberry</u>, 534 U.S. at 173; <u>see</u> <u>Weigner v. New York</u>, 852 F.2d 646, 652 (2d Cir. 1988) (city fulfilled its notice obligation by informing interested parties of foreclosure

18

proceeding and available remedies; "it was not required to send additional notices as each step in the foreclosure proceeding was completed or when each of the available remedies was about to lapse").[12]

Finally, Ms. Biddle asserts that she was not told that the closure of facilities, like Andrus, was "on the agenda" of the Hudson Valley RAC and the Berger Commission.  Biddle Aff. ¶ 31. Once again, she does not claim actually to have been unaware that Andrus's closure was being considered, and such a claim would not be credible, considering that closure of facilities was the primary purpose for which the Commission and the RACs had been formed under the Enabling Legislation.  The Enabling Legislation did not create the Berger Commission for the mere purpose of collecting "good stories."  Biddle Aff. ¶ 32.  A far more serious purpose should have been evident to even a casual observer, much more so to one with a vested interest like Andrus.

### b.     Andrus had a meaningful opportunity to be heard.

Equally unavailable is Andrus' claim that it had no "meaningful opportunity to be heard," Complaint, ¶ 75; Biddle Aff. ¶¶ 36, 43.  Andrus, like all other facilities in the State, had frequent opportunities to influence the Commission process, including with respect to the very errors it now claims the Commission made.  Indeed, Andrus admits that it provided the Commission with all the information necessary to evaluate whether Andrus should remain open.  Accordingly, its

---

[12]  Indeed, if Andrus' theory of proper notice had been applied, it likely would have led to undesirable results.  Had the Commission notified some facilities that they were being considered for closing before deliberations were complete, Andrus would, with some justification, argue that the Commission had engaged in some measure of pre-judgment.  The most reasonable and fair means of notice under the circumstances was to let all facilities know from the outset that they could be selected for closing or other restructuring.

complaint does not sound in constitutional due process at all, but rather is a garden-variety claim of administrative error in disguise.

"[D]ue process is flexible and calls for such procedural protections as the particular situation demands." Morrissey v. Brewer, 408 U.S. 471, 481 (1972).  It does not necessarily require a trial-type hearing, RR Village Association, Inc. v. Denver Sewer Corp., 826 F.2d 1197 (2nd Cir. 1987), but rather requires only "some form of hearing" before an individual is finally deprived of a property interest. Matthews v. Eldridge, 424 U.S. at 333 (1976).  "The fundamental requirement of due process is the opportunity to be heard 'at a meaningful time and in a meaningful manner.'" Id. at 333.  In determining whether the process provided was sufficient, courts weigh: (1) "the private interest that will be affected by the official action"; (2) "the risk of an erroneous deprivation of such interest through the procedures used, and the probable value, if any, of additional or substitute procedural safeguards"; and (3) "the Government's interest, including the function involved and the fiscal and administrative burdens that the additional or substitute procedural requirement would entail." Id. at 335.

Here, Andrus was informed of objective data upon which the Commission would rely in rendering its determinations with respect to each hospital and nursing home (see Enabling Legislation § 5), and was provided an opportunity to submit corrected and/or updated information.  The Commission and the RACs conducted nineteen public hearings statewide, including three in the Hudson Valley.  Sandman Aff. ¶ 18.  Andrus was invited to participate in public hearings, though it did not do so.  Id.  It also was offered the opportunity to engage in voluntary rightsizing discussions under the supervision of the Commission and the Department of Health without incurring antitrust liability.  Id. ¶ 19.

20

Andrus' own complaint and the affidavit of Betsy Biddle further undermine its claim that it had no meaningful opportunity to be heard. It acknowledges, first, that its executive director met with the RAC and Commission staff. Complaint ¶ 43; Biddle Aff. ¶¶ 30-37. Andrus also acknowledges that the RAC requested information from it, (complaint ¶ 42; Biddle Aff. ¶ 34), and that it submitted considerable information to the RAC and to the Commission,(complaint ¶¶ 4, 43, 48, 50; Biddle Aff. ¶ 35). Andrus' real complaint is not that it had no opportunity to make the Commission aware of its views, but rather that the Commission, having been apprised of these views, disagreed with them. See, e.g., Complaint ¶ 46 ("The Andrus' Executive Director informed the Hudson Valley RAC that the Andrus was financially stable and provided supporting data. Nevertheless, without a proper factual basis, the Hudson Valley RAC appears to have reached the very opposite conclusion."). What is more, Andrus improperly seeks to have this Court determine whether the Berger Commission "got it right."

A comparison with the process afforded other facilities at similar risk, moreover, suggests that any deficiencies in the information available to the Commission were caused by Andrus' own lack of diligence in presenting its case. See Sandman Aff. ¶ 25 (describing efforts of another affected hospital). For example, unlike other facilities, Andrus did not participate in public hearings. Sandman Aff. ¶ 18. A constant refrain in Andrus' complaint is that the Commission and its staff failed to visit its facility or speak with its staff and residents. See Complaint ¶¶ 5, 6, 44, 58. But it would have been unreasonable for the Commission, unprompted, to conduct such extensive visits at each facility in the state, or even each facility ultimately targeted for closure or restructuring. There is no evidence that, if Andrus believed such visits would have been invaluable, it could not have arranged them. Fundamentally,

21

Andrus' suggestion is that the burden was on the Commission, not itself, to make its case for remaining open. It has not established that the Commission's procedures failed to provide it with the <u>opportunity</u> to be heard, which is all that due process requires; at most, it has established that it failed to fully take advantage of the opportunities provided.

In any event, the Commission did receive and work from accurate data. See Sandman Aff. ¶¶ 29-36. Andrus does not substantiate its misleading claim that the Commission based its recommendation on "several fundamentally flawed assumptions about the Andrus' current financial status and nursing home operations."[13] Complaint ¶ 53. For example, contrary to Andrus' claim that the Commission mistakenly called it a 247-bed facility, id. ¶ 54, the Commission specifically noted that Andrus was in the process of selling 50 beds, and calculated Andrus' occupancy rate based on both 197 and 247 available beds. See Sandman Aff. Exh. B at 123. Similarly, after stating that the facility "had been operating at a significant loss until 2006," a fact that Andrus does not dispute, the Commission specifically noted Andrus' claim that "it is now operating in the black." Id. Andrus' complaint that the Commission characterized this as a "claim" rather than a "fact," Complaint ¶ 55, is a quibble about wording rather than substance, as the Commission did not challenge the claim.

---

[13] Andrus' claims regarding inaccuracies in the Hudson Valley RAC's report, see Complaint ¶¶ 41-51, would be irrelevant even if true, so long as those inaccuracies did not make their way into the Commission Report, the only state action at issue. But in any case, the Hudson Valley RAC's report reveals that, far from ignoring Andrus' contentions that its financial situation was improving and its facially low occupancy rate was somewhat misleading, the RAC accepted these premises as true. See Hudson Valley RAC Report at 10 ("After speaking with the Administrator, the Committee is less concerned about the financial stability . . . than about the low acuity of their patients."). Andrus does not claim that the RAC was mistaken about the low acuity of its patients, the major factor driving the RAC's recommendation.

The Commission's statement that "about half" of Andrus' residents had low-acuity conditions and could be better served in an ALP, Sandman Aff. Exh. B at 123, is fully consistent with Andrus' statement that "many" of its residents require 24-hour nursing home care, Complaint ¶ 57, and would have to be transferred to another facility for such care, id. ¶ 58. Far from ignoring Andrus' previous failure to win local approval to convert its campus into a continuing care retirement community, see id. ¶ 62, the Commission specifically acknowledged this. See Sandman Aff. Exh. B at 123. As the Commission's executive director states, the Commission believed its recommended conversion of Andrus to "a single structure assisted living facility" would be "possibly more acceptable to the local community than the proposed continuing care retirement community, which included construction of over 200 new independent living units along with the continued operation of a nursing home." Sandman Aff. ¶ 34. Finally, Andrus cannot substantiate its claim that the Commission wrongly believed that Andrus had been cited for 26 deficiencies in 2005, Complaint ¶ 66. See Sandman Aff. ¶ 35 (explaining that Commission was correct).

Given that Andrus has not shown that the Commission made any of the errors it attributes to the Commission, it cannot demonstrate that any of the additional procedural steps it claims the Commission should have taken would have meaningfully reduced the risk of erroneous deprivation. It certainly has not shown that any such reduction could outweigh the monumental increase in administrative burden that it argues the Commission should have shouldered by conducting site visits with staff and patient interviews at each potentially affected facility. As the New York State Appellate Division recognized in rejecting a similar claim that a hospital was entitled to an individualized evidentiary hearing, employing the Article 28 procedures for each

23

facility targeted for closure or major restructuring would have created "an enormous fiscal and administrative burden." St. Joseph Hospital of Cheektowaga v. Novello, 43 A.D.3d 138, 144 (4th Dep't 2007) ("St. Joseph"). Andrus' claim of a procedural due process violation should be dismissed.

> **3. Andrus Received Substantive Due Process Because The Procedures Employed By The Commission Were Neither Arbitrary Nor Outrageous.**

To make out a claim for a violation of substantive due process, plaintiffs must show (1) the existence of a constitutional right, and (2) state action interfering with that right which is constitutionally "arbitrary." Lowrance v. Achtyl, 20 F.3d 529, 537 (2d Cir. 1994). Andrus has failed to meet this exacting standard. An "arbitrary action" in this context means much more than just an "incorrect or ill-advised" action. It must be "conscience-shocking," see, e.g. Lowrance at 537; see also County of Sacramento v. Lewis, 523 U.S. 833 (1998). "[S]ubstantive due process standards are violated only by conduct that is so outrageously arbitrary as to constitute a gross abuse of governmental authority." Bower Assocs. v. Town of Pleasant Valley, 2 N.Y.3d 617, 628-29 (2004) quoting Natale v. Town of Ridgefield, 170 F. 3d 258, 263 (2d Cir. 1999). The plaintiff must show that the governmental action was wholly without legal justification. Id. at 627; see also Town of Orangetown v. Magee, 88 N.Y.2d 41, 42 (1996); Niagara Recycling, Inc., v. Town of Niagara, 83 A.D.2d 316, 327 (4th Dept. 1981).

As a matter of law, the joint and several actions of the Defendant and the Commission which have set Andrus on the course to closure cannot be regarded as arbitrary or outrageous. Their actions fall squarely within the State's police power. See, e.g., Medtronic, Inc. v. Lohr, 518 U.S. 470, 475 (1996); Medical Soc. of the State of New York v. Cuomo, 976 F.2d 812, 816

24

(2nd Cir. 1992) ("The regulation of public health and cost of medical care are virtual paradigms of matters traditionally within police powers of the state."). Andrus does not, and could not, claim that the State acted in bad faith or for any impermissible purpose. See St. Joseph I, 15 Misc.3d at 342 (finding that "the actions of the State in enacting the Enabling Act were in furtherance of its police power by evaluating the State's health care system and by aligning health care resources in a stable and efficient manner," and so did not violate substantive due process).

Thus, Andrus' substantive due process claim, like its procedural due process claim, is based on no more than an assertion that the Commission got it wrong. Such a claim may be grounds for a state-court Article 78 action, but it does not state a substantive due process violation. Moreover, even if this Court were to evaluate Andrus' claims under Article 78 standards (which it should not, since such a claim is improper in federal court), the Commission did not act arbitrarily, as it had data available upon which it could rationally determine that Andrus Hospital should be slated for closure. Accordingly, Andrus' substantive due process claim has no likelihood of success.

**B.     Andrus Cannot Substantiate A "Taking" Cause of Action.**

In its third and fourth claims for relief, Andrus asserts that implementation of the Commission's recommendations affecting Andrus constitutes two distinct Takings Clause violations, one stemming from the "taking" of Andrus' operating certificate, Complaint ¶¶ 80-82, and the other stemming from the alleged loss of assets caused by and costs incurred as a result of carrying out the Commission's recommendations, id. ¶¶ 83-85. Andrus does not argue that the State should pay compensation; it argues only that Defendant should be enjoined from fulfilling

25

the mandate which will eventually bring about Andrus' closure. Id. at 82. Neither theory presents an actual Takings Clause violation.

With respect to Andrus' operating certificate, as discussed above, no nursing home or hospital in New York State has a legitimate expectation that it will hold its operating certificate in perpetuity. An Article 28 operating certificate, like other licenses created by the government, can be cancelled by the government and is not transferable; such a license may be categorically exempt from a takings claim. See, e.g. American Pelagic Fishing Co., Inc. v. U.S., 379 F.3d 1363, 1373 (Fed. Cir. 2004); Acton v. United States, 401 F.2d 896, 899 (9th Cir. 1968); Burns Harbor Fish Co. v. Ralston, 800 F. Supp. 722, 726-29 (S.D. Ind. 1992) (collecting cases). Moreover, while the assets of a business are "property," and any State taking of those assets may be a "deprivation," it is well established that "the activity of doing business or of making a profit is not property at all." College Sav. Bank v. Florida Prepaid Postsecondary Educ. Expense Bd., 527 U.S. 666, 667 (1999). The Second Circuit has recognized that the loss of a future business opportunity is not a protectable property interest. See Asbestec Const. Serv. Inc. v. U.S. E.P.A., 849 F.2d 765, 769-70 (2nd Cir. 1988); see also Sanitation & Recycling Ind., Inc. v. City of New York, 928 F. Supp. 407, 420-21 (S.D.N.Y. 1996), aff'd, 107 F:3d 985 (2nd Cir. 1997) ("right" to continue business on same terms as in the past is not a protectable property right); see also Hunter v. SEC, 879 F. Supp. 494, 497 (E.D. Pa. 1995) (examining lost potential business opportunities).

With respect to its second takings claim, Andrus has not made clear in what respect it believes it suffered a taking of its other assets. The most obvious categorical "taking" is a direct government seizure or physical invasion of private property. See, e.g., United States v. Pewee

Coal Co., 341 U.S. 114 (1951). No such situation is presented in this action. Nor does Andrus

allege that the government requires it to suffer a permanent physical invasion of property, see,

e.g. Loretto v. Teleprompter Manhattan CATV Corp., 458 U.S. 419 (1982) (state law required

landlords to permit cable companies to install cable facilities in apartment buildings). Nor,

finally, has Andrus been deprived of "all economically beneficial use" of its property. See Lucas

v. South Carolina Coastal Council, 505 U.S. 1003, 1019 (1992) (emphasis in original). Andrus

may convert its nursing home into other uses, such as the Commission's recommendation to add

assisted living and possibly other non-institutional services. Andrus occupies 26 acres of real

estate in Westchester County, Complaint ¶ 62, property which can readily be put to economically

robust uses. Compare Lucas, 505 U.S. at 1020 (taking found where trial court determined that

parcel of land had "been rendered valueless" by government action).

Indeed, Andrus has made no showing that the economic value of its property has been

reduced in any way, let alone to the unusual degree required to make out a constitutional claim.

See Penn Cent. Transp. v. City of New York, 438 U.S. 104, 124 (1978) ("[G]overnment may

execute laws and programs that adversely affect recognized economic values."). All that has

happened here is that the State, which previously saw fit to grant Andrus a license to operate a

certain type of facility on its premises, has withdrawn that permission. It has not restricted

Andrus' use of its property in any way beyond the general rule, not challenged here, that only

those who are granted operating certificates may operate health care facilities. As such, there is

no genuine "takings" claim before the Court.

Finally, to the extent that Andrus complains of the costs potentially associated with

carrying out the Commission's recommendations, see Complaint ¶ 84, its recourse right now is a

27

suit in the New York Court of Claims for compensation, not a Takings Clause claim before this

Court for injunctive relief. Not until the State actually fails to provide adequate compensation

for a supposed taking is a takings claim ripe. See San Remo Hotel, L.P. v. City & County of San

Francisco, 545 U.S. 323, 327 (2005). Moreover, the State has provided an administrative process

by which millions of dollars are currently available to assist facilities in carrying out the

Commission's recommendations. Benjamin Aff. ¶ 25. Because Andrus has not attempted to

secure compensation either administratively or in the Court of Claims, this Court should not

entertain its takings claim at all. The claim certainly has no likelihood of success.

**C.    Andrus' Contracts Clause Claim Must Fail**.

Andrus' fifth claim for relief contends that Andrus has an enforceable interest in

maintaining contractual relationships with physicians, staff and vendors, which depend upon

Andrus' retention of its operating certificate. See Complaint, ¶¶ 86-89. This claim can be

quickly disposed of, as Andrus fails to plead, let alone establish, a Contracts Clause violation.

The protections of the Contract Clause do "not trump the police power of a state to

protect the general welfare of its citizens, a power which is 'paramount to any rights under

contracts between individuals.'" Buffalo Teachers Fed'n v. Tobe, 464 F.3d 362, 367 (2d Cir.

2006), cert. denied 127 S. Ct. 2133 (2007) ("Buffalo Teachers"), quoting Allied Structural Steel

Co. v. Spannaus, 438 U.S. 234, 241 (1978). The Supreme Court "has long recognized that a

statute does not violate the Contract Clause simply because it has the effect of restricting, or even

barring altogether, the performance of duties created by contracts entered into prior to its

enactment. . . . The Contract Clause does not deprive the States of their 'broad power to adopt

general regulatory measures without being concerned that private contracts will be impaired, or

even destroyed, as a result.' " Exxon Corporation v. Eagerton, 462 U.S. 176, 190 (1983)

(citations omitted). Thus, a simple allegation that a state law impairs an obligation under a

contract, which is all that Andrus alleges, see Complaint ¶ 87, does "not necessarily give rise to a

viable Contracts Clause claim." Buffalo Teachers, 464 F.3d at 368. This cause of action can

thus be dismissed for failure to plead essential elements.

In any event, Andrus cannot come close to making out a Contracts Clause claim. It

cannot even clear the threshold inquiry of establishing that the contractual impairment is

"substantial" in relation to "the reasonable expectations" of those forming the contract. Buffalo

Teachers, 464 F.3d at 368. "If the plaintiff could anticipate, expect, or foresee the governmental

action at the time of contract execution, the plaintiff will ordinarily not be able to prevail." Sal

Tinnerello & Sons, Inc. v. Town of Stonington, 141 F.3d 46, 53 (2d Cir. 1998). Any claim that a

governmental entity's action was unforeseeable is "less potent" where that entity reserved the

right to take the action before the contract was formed. Id. Moreover, even when the

governmental entity had not previously taken the specific action in question, "[w]here an industry

is heavily regulated, regulation of contracts may be foreseeable." Sanitation and Recycling

Indus., Inc. v. City of New York, 107 F.3d 985, 993 (2d Cir. 1997); see id. at 994 ("[A]lthough

the City has never before regulated the duration of carters' contracts, carters have been for

decades subject to the City's regulations and may be held to have anticipated regulation of this

sort."); Sanitation and Recycling Indus., Inc. v. City of New York, 928 F. Supp. 407, 414

(S.D.N.Y. 1996)(Pollack, J.), aff'd by Sanitation Recycling Indus., Inc. v. City of New York, 107

F.3d 985, 993 (2d Cir. 1997) ("level of scrutiny" given a law "varies inversely with the degree of

prior regulation in a particular industry"). Here, not only is the health care industry heavily

29

regulated in general, but the Department of Health always reserved the specific right to revoke or

modify Andrus' operating license, either for cause or for lack of public need, even before the

Enabling Legislation. See St. Joseph, 15 Misc. 3d at 347 ("[T]he Enabling Act creates no greater

impingement on contract rights than Public Health Law § 2806(6) does."). After the passage of

the Enabling Legislation, of course, it was even more foreseeable that Andrus could be required

to close or restructure.

And even if Andrus could demonstrate substantial impairment of its reasonable

expectations, such impairment is permissible so long as it was a "reasonable and necessary"

means of serving "a legitimate public purpose such as remedying a general social or economic

problem." Buffalo Teachers, 464 F.3d at 368. There can be no question that the Enabling

Legislation served a "legitimate public purpose," as its purpose was neither "a benefit to special

interests," Sanitation & Recycling Indus., 107 F.3d at 993, nor "the financial benefit of the

sovereign," Buffalo Teachers, 464 F.3d at 368. Rather, it was intended to address the financial

and operational crisis in the healthcare industry and reduce overall expenditures by both private

companies and the State by cutting excess capacity. See id. at 368-69 ("[C]ourts have often held

that the legislative interest in addressing a fiscal emergency is a legitimate public interest."); Sal

Tinnerello & Sons, 141 F.3d at 54 ("[T]he economic interest of the state alone may be sufficient

to provide the necessary public purpose under the Contract Clause.").

Finally, because the State itself is not a party to the contracts at issue, this Court should

"defer to a legislature's determination as to whether a particular law was reasonable and

necessary." Buffalo Teachers at 369; see Sal Tinnerello & Sons, 141 F.3d at 54-55 (court should

not substitute its judgment for the Legislature's, but reviews legislative choice only for

rationality).  In any event, because the end of reducing excess capacity could not be accomplished without affecting contract rights, St. Joseph Hosp., 15 Misc. 3d at 347, Andrus cannot claim that the state action was unreasonable or unnecessary.  For all these reasons, Andrus' Contracts Clause claim must fail.

**POINT II**
**ANY PRELIMINARY INJUNCTION GRANTED SHOULD BE NO
BROADER THAN NECESSARY TO PRESERVE THE STATUS QUO**

Even if this Court were somehow to find a likelihood of success for any of Andrus' claims, it should limit any injunction granted to that necessary to preserve the status quo, i.e., to prevent Andrus from actually closing.  The overbroad injunction Andrus seeks would preclude DOH from taking the actions necessary to preserve its authority to implement the Commission's recommendations, even should it prevail in this action.  Thus, far from preserving the status quo, the injunction sought by Andrus would decide this case in its favor.

To preserve the status quo, DOH asks that it retain the continued authority to, inter alia: (1) require Andrus to prepare a closure plan; and (2) issue Andrus an amended operating certificate that terminates on June 30, 2008, with the assurance that an extension of the termination date will be issued if this case is not resolved by then.  As explained in the Benjamin Affidavit at ¶¶ 16-23 -- which is not contradicted by any party with actual knowledge[14] -- permitting DOH to take these actions will not result in irreparable harm.  As noted in the Benjamin Affidavit, the very purpose of a closure plan, which Andrus seeks to avoid, is to

---

[14]  Ms. Biddle is simply mistaken in her assertion that any of these actions must even be disclosed to Andrus' suppliers and patients.

31

eliminate or minimize the disruption caused by closure, should that closure eventually come to pass. Benjamin Aff. ¶¶ 15, 18-23.

Not only does Andrus have no evidence that such a carefully tailored injunction would expose it to any irreparable harm, but any doubts on the matter should be resolved against Andrus, given its failure to move in a timely manner for a preliminary injunction. Andrus has known since at least January 31, 2007 that DOH had until June 30, 2008 to implement the Commission's recommendations. Plaintiff's own complaint, filed in April 2007, explicitly referenced the June 30, 2008 date for revocation of Andrus' operating license and acknowledged that loss of the license would "terminate its very existence as a nursing home . . . ." Complaint ¶ 10. The stakes for Andrus, as highlighted by DOH's January 31, 2007 letter, could not have been clearer.

Andrus, however, only recently moved for a preliminary injunction to halt the June 30 revocation of the operating certificate, now a mere two months away.[15] Such delay in seeking what is intended to be preliminary, emergency relief is highly prejudicial to the defendant. Accordingly, where a plaintiff has engaged in such gamesmanship, courts sometimes preclude, as a matter of law, the finding that a plaintiff will suffer irreparable harm if the provisional remedy is not granted. In <u>Nassau Boulevard Shell Serv. Station v. Shell Oil Co.</u>, 869 F.2d 23 (2d Cir.1989) (per curiam), the Second Circuit granted an emergency motion for a preliminary

---

[15] Plaintiff may argue that it fortuitously obtained the *equivalent* of a preliminary injunction when, at the Court's urging (with no motion by the plaintiff pending), defendant consented to a "stay" of proceedings pending resolution of Defendant's motion for summary judgment. A voluntary "stay", however, does not amount to a preliminary injunction -- for example, it is not appealable.

injunction enjoining the defendant franchisor from terminating the plaintiff's franchise during the

pendency of the litigation, but warned that:

> In the future, however, franchisees seeking preliminary relief in
> disputes with their franchisors should move for such relief within a
> reasonable time after notice of termination of their franchise
> agreements. . . . If they do not do so, they should be prepared to
> suffer the loss of their business while they litigate the merits."

Id. at 24.   Similarly, Union Cosmetic Castle, Inc. v. Amorepacific Cosmetics USA, Inc., 454 F.

Supp.2d 62 (E.D.N.Y. 2006), is instructive here -- substituting "operating certificate" for "supply

of goods" in the court's following statement that,

> the principle behind the Second Circuit's admonitions in Nassau
> Boulevard Shell Serv. Station - that a plaintiff given notice of a
> defendant's intention to terminate the supply of goods that constitute
> the plaintiff's livelihood should not be permitted to wait until its own
> financial ruin is imminent before seeking an expedited provisional
> remedy - applies with equal force to the instant proceeding. As the
> Second Circuit noted, "[t]his is a delaying tactic that is inequitable to
> the franchisor and to the courts as well." Id. at 24.

Id. at 68-69.

Here, plaintiff has waited a full year to seek "preliminary" relief — or, for that matter,

any relief at all. Now it seeks an order that would change the status quo by preventing the State

from ever implementing the Commission's recommendation[16], and to obtain that order so late in

the day as to preclude a merits based decision or appellate review of the injunction. Such

gamesmanship should not be rewarded with the over-broad injunction that plaintiff seeks.

Rather, under these circumstances, the Court should resolve against the dilatory plaintiff any

doubts about the scope of the "preliminary" injunction needed to avoid irreparable harm.

---

[16] The Commission's recommendations were based on an evaluation of the Hudson Valley
region. Accordingly, the Court's determination will have repercussions beyond Andrus itself.

Accordingly, if the Court grants plaintiff a preliminary injunction, it should be narrowly tailored to provide that Andrus will be allowed to continue operating as a nursing home, pending resolution of its claims in this action on the merits, and DOH will otherwise be permitted to take the actions necessary to preserve its ability to effectuate the Berger Commission's recommendations, including requiring that Andrus prepare a closure plan in the eventuality that Andrus is finally closed.

## CONCLUSION

Defendant respectfully submits that plaintiff's Motion for Preliminary Injunction should be denied in full. If any injunction is to issue, such an injunction should bar DOH only from actually revoking Andrus' operating license or otherwise forcing it to close its doors as a nursing home pending resolution of this case on the merits.

Dated: New York, New York
      May 1, 2008

                    ANDREW M. CUOMO
                    Attorney General of the
                      State of New York
                    Attorney for Defendant

                    By:_____
                      John P. Gasior
                      Assistant Attorney General
                      120 Broadway, 24th Floor
                      New York, New York 10271
                      212-416-8570

TO:    Peter G. Bergmann, Esq.
       Brian McGovern, Esq.
       Cadwalader, Wickersham & Taft LLP
       One World Financial Center
       New York, New York 10281
       Telephone: 212-504-6000