UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
--------------------------------------------------------------------------------X

JOHN E. ANDRUS MEMORIAL, INC. (d/b/a ANDRUS    :
ON HUDSON),
                                                :
                                   Plaintiff,
                                                :

               - against -                      :    07-CV-3432

RICHARD F. DAINES, as Commissioner of the New York    :
State Department of Health,
                                                :

                                   Defendant.   :

--------------------------------------------------------------------------------X

## AFFIDAVIT IN OPPOSITION TO PLAINTIFF'S
## MOTION FOR A PRELIMINARY INJUNCTION

STATE OF NEW YORK   )ss.:
COUNTY OF ALBANY    )

       **NEIL BENJAMIN**, being duly sworn, deposes and says:

       1.     I am Director of the Division of Health Facility Planning in the
Office of Health Systems Management, New York State Department of Health
("Department" or "DOH"). I am familiar with the facts set forth herein.

       2.     I make this affidavit in opposition to plaintiff's motion for a
preliminary injunction enjoining the Department from "taking any further steps to
implement the Berger Commission's recommendation affecting plaintiff."

       3.     Plaintiff's proposed injunction is overbroad as it will provide the
entire relief plaintiff seeks in this matter as the Department's special powers under
the Berger Commission's enabling legislation expires on June 30, 2008. If any
injunction is to be issued, it should be a narrower injunction which would allow the
Department to take necessary steps to implement the Berger Commission's
recommendation, but which would enjoin the Department from requiring the actual

closure, reduction in size or conversion of plaintiff's facility. Such an injunction would protect plaintiff from any actual closure, but would allow the Department to take necessary actions prior to the expiration of the enabling legislation on June 30, 2008.

4. The New York State Commission on Health Care Facilities in the 21[1] Century ("Commission")[1] was created by Part K of Chapter 58 of the Laws of 2005, as added by Section 31 of Part E of Chapter 63 of the Laws of 2005 (the "Enabling Legislation"), a copy of which is annexed hereto as Exhibit A.

5. The Commission recommended that plaintiff "downsize," i.e., close, all 247 nursing home beds and add 140 assisted living program beds and possibly other non-institutional services.

6. Section 9 of the Enabling Legislation provides that the Commissioner of Health "shall take all actions necessary to implement, in a reasonable, cost efficient manner, the recommendations of the Commission," and provides that the Commissioner of Health shall take all steps necessary to protect patient safety.

7. Section 9 also provided the Commissioner of Health with special powers related to implementation of the Commission's recommendation:

> (a) Notwithstanding any contrary provision of law, rule or regulation related to the establishment, construction, approval, suspension or revocation of the operating certificate, closure, resizing, consolidation, conversion or restructuring of the general hospitals or nursing homes identified in the commission's recommendations, including but not limited to sections 2801-A, 2802, 2805, 2806, and 2806-B of the public health law, the commissioner of health shall take all actions necessary to implement, in a reasonable, cost-efficient manner, the recommendations of the commission....

___
[1] The Commission is often referred to as the Berger Commission.

8.      On January 31, 2007, the Department sent a letter to plaintiff
advising plaintiff of the Commission's recommendation and requesting that plaintiff
contact the Department to arrange a meeting if such a meeting was desired.  A
copy of this letter is annexed hereto as Exhibit B.

9.      The letter, in acknowledging "the unique circumstances created
by the process," assured facilities that

> the Department is committed to carrying out its implementation
> mandate within the parameters of the Report and enabling
> statute.  Appropriate Central and Regional Office Department
> staff will be closely involved in the implementation process, and
> will welcome an ongoing discussion with affected providers as
> we move toward an orderly implementation of the
> Commission's recommendations.

10.     The letter also set out an implementation outline as follows:

*       Meet with DOH, to discuss nursing home closure and
        plans for assisted living programs, no later than June 30,
        2007.

*       Submit closure plan for nursing home no later than
        September 30, 2007.

*       Commissioner to approve nursing home closure plan no
        later than December 31, 2007.

*       Submit application for 140 bed assisted living program
        no later than December 31, 2007.

*       Commissioner approves assisted living program
        application no later than June 30, 2008.

*       Revocation of nursing home operating certificate by
        Commissioner no later than June 30, 2008.

- 3 -

11.    The Department has previously acknowledged that if plaintiff were to downsize all of its nursing home beds and close its facility, the Department would not seek to compel plaintiff to convert the facility to an assisted living program. See my Affidavit in Support of Defendant's Motion for Summary Judgment, at paragraph 8.

12.    The Department has met repeatedly with plaintiff, as it has with representatives of other facilities which are the subject of Commission recommendations. During the course of these discussions regarding implementation of the Commission's recommendations, facilities have often proposed alternative means of meeting the Commission's recommendations, either asserting that reconfiguration could be achieved in a more efficient manner if the recommendation was modified or asserting that implementation of the Commission's recommendation would endanger patient safety. When warranted, the Department has agreed to modify the actions to be taken by facilities after finding that such modifications were necessary to protect patient health and safety or that the means of implementing the Commission's recommendation could be achieved in a most cost effective manner.

13.    Plaintiff has asserted in these implementation meetings that its closure would endanger its residents because sufficient nursing home beds are not available in nearby communities and that its residents would suffer transfer trauma if they were moved.

14.    Plaintiff has also proposed an alternative structure that would allow it to operate 120 nursing home beds, 140 assisted living beds, and provide other non-institutional long term care services. Such proposal was made in plaintiff's application for funds to assist in implementing the Commission's

- 4 -

recommendations. A copy of the cover letter to plaintiff's proposal, dated July 13, 2007, is annexed hereto as Exhibit C.

15.     To date, plaintiff has not demonstrated to the Department that implementation of the Commission's recommendation would endanger plaintiff's residents, as there appears to be sufficient beds available in Westchester County to absorb the residents that truly need nursing home care. Also, the requirement that a closure be well planned is partly intended to minimize the impact on residents. Certainly the legislature in enacting this process was aware that nursing home residents might need to be relocated. However, the Department is still reviewing plaintiff's assertion that patient health and safety require that plaintiff be allowed to continue to operate as a nursing home.

## THE PROPOSED INJUNCTION

16.     Plaintiff seeks to enjoin any steps to implement the Commission's recommendation. Assuming such injunction continued in effect until after June 30, 2008, the Department's powers under Section 9(a) of the enabling legislation will expire and plaintiff will have avoided having to act under the review process enacted by the legislature.

17.     However, such a broad injunction is not necessary to protect plaintiff. Rather, any injunction which may be issued should be limited to enjoining the Department from requiring the actual closure, reduction in size or conversion of plaintiff pending resolution of this litigation. Such an injunction would assure plaintiff is allowed to continue to operate in its current form and size pending resolution of its challenge to the Commission's recommendation.

- 5 -

18.    A narrower injunction would allow steps to be taken including having plaintiff prepare a closure plan, if closure is deemed necessary, and to allow the Department to modify plaintiff's operating certificate while the Department has the power to do so under the enabling legislation. Such operating certificate would then periodically be extended by the Department to allow plaintiff's continued operation in conformance with the injunction.

19.    Plaintiff may complain that having a time limited operating certificate will make it difficult to attract residents or staff. Such an argument is inconsistent with plaintiff's assertions that it has been a thriving facility during the period since the Commission's closure recommendation was issued in November 2006. Plaintiff's own assertions of success while subject to the closure recommendation are inconsistent with its argument that the threat of closure would harm its operations.

20.    Plaintiff's operation also is not endangered by preparation of a closure plan. Such a plan addresses the process of closure, most importantly, how the facility will go about advising residents and their families of the impending closure and relocating residents. A well thought out closure plan can greatly reduce the stress that residents or their families may suffer as the result of closure.

21.    Nothing would require the closure plan, at this time, to be provided to residents. That would only become necessary at the time the facility is actually closing. Similarly, preparation of a closure plan does not mean plaintiff would be expected to notify physicians, vendors or the community that it was closing or that new admissions would be prohibited. Ms. Biddle's assertion to this effect in paragraphs 16 and 17 of her Affidavit in Support of this motion are false and confuse preparation of a closure plan with implementation of a closure plan.

- 6 -

22.    Preparation of a closure plan is not an indication that a facility will close, only that closure is a sufficient possibility so that it is prudent to have a plan prepared in advance. The Department frequently requests facilities to submit closure plans when there is concern that a facility may need to close, whatever the reason.

23.    While the Department opposes the issuance of any injunction, if an injunction is issued, it should only provide that the Department may not implement the Berger Commission's recommendation regarding plaintiff by requiring plaintiff to close, reduce its current licensure for 197 beds or convert its operation to provide assisted living or other non-institutional services until a decision by this court finally deciding plaintiff's action challenging implementation of the Berger Commission's recommendation.  An injunction should further provide that nothing in the injunction precludes the Department from taking any preliminary steps short of requiring the actual closure, reduction in size or closure as mandated by the Berger Commission, nor should the Department be precluded from implementing the Berger Commission recommendations subsequent to June 30, 2008, in the event this action is decided in favor of Department.

## F-SHRP

24.    Further, an injunction barring the Department from taking necessary implementation steps prior to June 30, 2008, would jeopardize $1.5 billion in federal funds that have been made available to the State.

25.    The Federal-State Health Reform Partnership ("F-SHRP"), a Federal-State Health Reform Partnership Medicaid Section 1115 Demonstration is the result of a September 29, 2006 agreement between the Department and the U.S. Centers for Medicaid and Medicaid Services.  A copy of the agreement is annexed hereto as Exhibit D.

- 7 -

26.    The goals of this partnership including promoting the efficient operation of the State's health care system; consolidating and right-sizing New York's health care system by reducing excess capacity in the acute care systems; shifting emphasis in long-term care from institutional-based to community-based settings.

27.    Under F-SHRP, the federal government will invest up to $1.5 billion ($300 million per year) in agreed upon reform initiatives including initiatives to right size and restructure the acute and long-term care delivery system.

28.    The federal investment in these reforms is conditioned upon the following:

- The F-SHRP waiver must generate federal saving sufficient to offset the federal investment.

- The State must meet a series of established performance milestones set forth in the waiver terms and conditions including a final implementation report regarding the Berger Commission recommendations by July 15, 2008.

29.    Failure to take implementation steps prior to June 30, 2008, even due to a preliminary injunction, may be viewed by the federal government as a violation of the F-SHRP agreement.

**WHEREFORE**, it is requested that the motion be denied.

**NEIL BENJAMIN**

Sworn to before me this

$\dot{2}3$ day of April, 2008

**NOTARY PUBLIC**

HAROLD J. ROSENTHAL
NOTARY PUBLIC, State of New York
No. 4609489
Qualified in Albany County
Commission Expires March 30, 20___

- 8 -

# Benjamin Affidavit Exhibit A

# Commission on Health Care Facilities in the 21" Century

### Enabling Legislation

Section 1. Legislative findings. The legislature hereby finds and declares that the health care system in the state must first and foremost provide quality care and be responsive to community health care needs. To do so, the health care system must have the capacity to provide this quality care in multiple settings within regions throughout the state. In order to achieve maximum return from valued resources that have been invested in the health care system, those resources must also be aligned so that excess capacity is minimized, thereby promoting stability and efficiency in the health care delivery system infrastructure.

The legislature further finds that it is in the interest of the state to undertake at this time a rational, independent review of health care capacity and resources in the state to ensure that the regional and local supply of general hospital and nursing home facilities is best configured to appropriately respond to community needs for quality, affordable and accessible care, with meaningful efficiencies in delivery and financing that promote infrastructure stability. In order to undertake such review rationally and equitably, the legislature determines that it is necessary to establish a commission separate and apart from existing bodies responsible for the establishment and continued oversight of general hospitals and nursing homes, which shall be charged with examining the supply of general hospital and nursing home facilities, and recommending changes that will result in a more coherent, streamlined health care system in the state of New York.

§ 2. Commission established. (a) There is hereby created in the executive department a commission to be known as the "Commission on Health Care Facilities in the Twenty-First Century," hereafter referred to as the "commission," which shall be charged with examining the system of general hospitals and nursing homes in New York state and recommending changes to that system in light of factors submitted pursuant to section five of this act and additional factors established by the commission.

(b) The commission shall consist of eighteen statewide members, and regional members appointed pursuant to section seven of this act. The eighteen statewide members shall be appointed as follows: (i) two members shall be appointed by the temporary president of the senate; (ii) two members shall be appointed by the speaker of the assembly; (iii) one member shall be appointed by the minority leader of the senate; (iii) one member shall be appointed by the minority leader of the assembly; and (V) twelve members shall be appointed by the Governor. The Governor shall designate the chair from among the statewide members of the commission.

(c) The members of the commission shall receive no compensation for their services as members, but shall be allowed their actual and necessary expenses incurred in the performance of their duties. Members of the commission shall be considered public officers for purposes of section 17 of the public officers law. Commission members shall be subject to the same conflict of interest provisions that apply to members of the state hospital review and planning council.

(d) The commission shall begin to act forty-five days after this act shall have become a law. A quorum shall consist of a majority of the members of the commission entitled to vote on the matter under consideration. Approval of any matter shall require the affirmative vote of a majority of the members voting thereon.

A

(e) The commission shall adopt by-laws for the management and regulation of its affairs. Only statewide members of the commission appointed pursuant to subdivision (b) of this section shall be entitled to vote on the adoption of such by-laws.

§ 3. Appointments to commission. The legislative leaders shall submit their appointments to the governor, and the governor shall make his or her appointments, no later than forty-five days after this act becomes a law. If any such appointment is not made by such date, the appointing officer may make the appointment after that date, but the vacant appointment shall not count for calculation of a quorum until it is filled. Vacancies in the commission shall be filled in the same manner as the member whose vacancy is being filled was appointed.

§ 4. Commission staff and agency liaison. (a) The commissioner of health shall designate such employees of the department of health as are reasonably necessary to provide support services to the commission. The commission, acting by the chair of the commission, may employ additional staff and consultants, who shall be paid from amounts available to the commission for that purpose.

(b) The commissioner of health shall appoint: (i) one or more representatives of the department to serve as liaison between the department and the commission; (ii) one or more representatives of the public health council to serve as liaison between that council and the commission; and (iii) one or more representatives of the state hospital review and planning council to serve as liaison between that council and the commission. The director of the dormitory authority of the state of New York shall appoint one or more representatives of the authority to serve as liaison between the authority and the commission. All state agencies, public authorities and public benefit corporations shall provide such assistance as may be reasonably requested by the chair of the commission.

§ 5. Factors and information for consideration. (a) Factors. The commissioner of health and the director of the dormitory authority of the state of New York shall submit to the commission, no later than ninety days after this act becomes a law, a list of factors to be considered in its deliberations, which shall include:

(i) the need for capacity in the hospital and nursing home systems in each region of the state;

(ii) the capacity currently existing in such systems in each region of the state;

(iii) the economic impact of right sizing actions on the state, regional and local economies, including the capacity of the health care system to provide employment or training to health care workers affected by such actions;

(iv) the amount of capital debt being carried by general hospitals and nursing homes, and the nature of the bonding and credit enhancement, if any, supporting such debt, and the financial status of general hospitals and nursing homes, including revenues from medicare, medicaid, other government funds, and private third-party payors;

(v) the availability of alternative sources of funding with regard to the capital debt of affected facilities and a plan for paying or retiring any outstanding bonds in accordance with the contract with bondholders;

(vi) the existence of other health care services in the affected region, including the availability of services for the uninsured and underinsured, and including services provided other than by general hospitals and nursing homes;

(vii) the potential conversion of facilities or current facility capacity for uses other than as inpatient or residential health care facilities;

2

(viii) the extent to which a facility serves the health care needs of the region, including serving medicaid recipients, the uninsured, and underserved communities; and

(ix) the potential for improved quality of care and the redirection of resources from supporting excess capacity toward reinvestment into productive health care purposes, and the extent to which the actions recommended by the commission would result in greater stability and efficiency in the delivery of needed health care services for a community.

The commissioner of health and the director of the dormitory authority of the state of New York may submit additional relevant factors to be considered in the deliberations of the commission. The commission may also adopt additional factors to be considered in its deliberations.

(b) The commissioner shall also submit to the commission such information as may be available from the department of health on general hospital and nursing home capacity and services, including, but not limited to, information from:

(i) operating certificate files;

(ii) institutional cost reports;

(iii) facility occupancy reports;

(iv) annual reports of the certificate of need program; and

(v) the statewide planning and research cooperative system.

Records submitted to the commission or any committee thereof shall not be subject to disclosure pursuant to article 6 of the public officers law, unless the record would be a public record before being submitted to the commission.

§ 6. Deliberations of commission. The deliberations, meetings and other proceedings of the commission and any committee thereof shall be governed by article 7 of the public officers law, provided that, notwithstanding section 105 of the public officers law, the commission and any committee thereof shall conduct business in executive session anytime it is addressing in detail the medical, financial, or credit history of a particular general hospital or nursing home. Any one or more members of a committee may participate in a meeting of such committee by means of a conference telephone, conference video or similar communications equipment allowing all persons participating in the meeting to hear each other at the same time. Participation by such means shall constitute presence in person at a meeting. At any meetings of the commission conducted by means of a conference telephone, conference video or similar communications equipment, other than executive sessions, the public shall be given an opportunity to listen. If a meeting other than an executive session is to be conducted by means of a conference telephone, conference video or similar communications equipment, the public notice for the meeting shall inform the public that such equipment will be used, and identify the means by which the public may listen to such meeting.

§ 7. Regional input. (a) There shall be six regional members of the commission for each region established pursuant to this section. For each region, two regional members shall be appointed by the governor, two regional members shall be appointed by the temporary president of the senate, and two regional members shall be appointed by the speaker of the assembly. Regional members shall be considered to be members of the commission for purposes of this act, provided that:

(i) Regional members shall vote and be counted for quorum purposes only when the commission is acting on recommendations relating solely to the regional members' respective region; and

(ii) Regional members shall not be considered to be members of the commission for purposes of participation in commission meetings, except where items relating specifically to that member's region arc on the agenda of a commission meeting.

(b) For purposes of this act, there shall be six regions:

(i) Long Island, consisting of Nassau and Suffolk counties;

(ii) New York City;

(iii) Hudson Valley, consisting of Delaware. Dutchess. Orange, Putnam, Rockland, Sullivan, Ulster, Westchester counties;

(iv) Northern, consisting of Albany. Clinton. Columbia. Essex, Franklin, Fulton, Greene, Hamilton, Montgomery, Otsego. Rensselaer, Saratoga, Schenectady, Schoharie, Warren, Washington counties:

(v) Central, consisting of Broome, Cayuga, Chemung. Chenango, Cortland, Herkimer, Jefferson, Lewis. Livingston, Madison. Monroe. Oneida. Onondaga, Ontario, Oswego, Schuyler, Seneca. St. Lawrence, Steuben. Tioga, Tompkins, Wayne, Yates counties; and

(vi) Western, consisting of Allegany, Cattaraugus. Chautauqua. Erie, Genesee, Niagara, Orleans, Wyoming counties.

(c) The commission shall establish a regional advisory committee for each region. The maximum number of members of each regional advisory committee shall be determined by the commission. Members of each regional advisory committee shall be appointed in equal numbers by the governor, the temporary president of the senate and the speaker of the assembly. The appointing officers shall submit to the commission their appointments to the regional advisory committees no later than ninety days after this act shall have become a law. If any such appointment is not made by such date, the appointing officer may make the appointment after that date, but the vacant appointment shall not count for calculation of a quorum until it is filled. Vacancies in regional advisory committees shall be filled in the same manner as the member whose vacancy is being filled was appointed. The regional advisory committees shall begin to act ninety days after this act shall have become a law.

(d) Each regional advisory committee shall develop recommendations for reconfiguring its region's general hospital and nursing home bed supply to align bed supply with regional and local needs. In carrying out its functions, a regional advisory committee shall foster discussions among, and conduct formal public hearings with requisite public notice to solicit input from, local stakeholder interests, including but not limited to community-based organizations, health care providers, labor unions, payers, businesses and consumers. In developing its recommendations, each regional advisory committee shall as far as practicable estimate the efficiencies that may be derived from such hospital and nursing home reconfiguration. On November 15, 2006, each regional advisory committee shall transmit to the commission a report containing its recommendations, which shall include specific recommendations for facilities to be closed and specific recommendations for facilities to be resized. consolidated. converted, or restructured. Such recommendations shall include: (i) recommended dates by which such actions should occur; (ii) necessary investments, if any. that should be made in each case to carry out the regional advisory committee's recommendations, including any necessary workforce, training, or other investments to ensure that remaining facilities are able to adequately provide services within the context of a restructured institutional provider health care system in such region: and (iii) the regional advisory

4

committee's justification for its recommendations, including the use of any factors developed pursuant to section five of this act.

(e) The failure of any regional advisory committee to perform the duties imposed by this section shall not affect the obligation of the commission to perform the duties imposed by section eight of this act.

§ 8. Commission recommendations. (a) The commission shall develop recommendations for reconfiguring the state's general hospital and nursing home bed supply to align bed supply to regional needs. Recommendations referencing closing, resizing, consolidation, conversion, or restructuring in a specific region shall not reference more than one region. In carrying out its functions, the commission shall collaborate with the regional advisory committees insofar as practicable to foster discussions among, and conduct formal public hearings with requisite public notice to solicit input from, statewide and regional stakeholder interests, including but not limited to community-based organizations, health care providers, labor unions, payers, businesses and consumers. The commission shall formally solicit recommendations from health care experts, county health departments, community-based organizations, state and regional health care industry associations, labor unions and other interested parties in each region of the state, and it shall take into account such recommendations and the recommendations of the regional advisory committees during its deliberations. In developing its recommendations, the commission shall as far as practicable estimate the efficiencies that may be derived from such hospital and nursing home reconfiguration, and shall consider the recommendations of the regional advisory committees.

(b) The commission shall make recommendations relating to facilities to be closed and facilities to be resized, consolidated, converted, or restructured, within each region. The regional commission members for a particular region shall vote as members of the commission only when the commission is acting on recommendations relating solely to that region.

(c) Such recommendations shall include: (i) recommended dates by which such actions should occur; (ii) necessary investments, if any, that should be made in each case to carry out the commission's recommendations, including any necessary workforce, training, or other investments to ensure that remaining facilities are able to adequately provide services within the context of a restructured institutional provider health care system; (iii) the commission's response to the recommendations of the regional advisory committees; and (iv) the commission's justification for its recommendations, including the use of the factors pursuant to section five of this act.

(d) In addition, the commission may include in its report: (i) recommendations on a streamlined regulatory processes to address the provision of needed community health services; (ii) recommendations for changes to the hospital and nursing home reimbursement systems to facilitate the transition to a restructured institutional provider system and to ensure that health care services other than those provided by general hospitals and nursing homes are adequately reimbursed, including recommendations to address the capital and operating costs of closing, resizing, consolidation, conversion or restructuring; and (iii) a summary of recommendations made to the commission by health care experts, community based organizations, county health departments, state and regional health care industry associations, labor unions, and others that were not included in the commission's recommendations.

(e) On or before December 1, 2006, the commission shall transmit to the governor and the legislature a report containing its recommendations, which shall include specific recommendations for facilities to be closed and specific recommendations for facilities to be resized, consolidated, converted, or restructured.

§ 9. Implementation of recommendations. (a) Notwithstanding any contrary provision of law, rule or regulation related to the establishment, construction, approval, suspension or revocation of the operating certificates, closure, resizing, consolidation, conversion or restructuring of the general hospitals or nursing homes identified in the commission's recommendations, including but not limited to sections 2801-A, 2802, 2805, 2806, and 2806-B of the public health law, the commissioner of health shall take all actions necessary to implement, in a reasonable, cost-efficient manner, the recommendations of the commission pursuant to subdivisions (b) and (c) of section eight of this act, including, but not limited to: (i) coordination with local government officials and health departments, management and labor representatives of affected facilities, and other parties as the commissioner deems appropriate; (ii) the rescission of operating certificates and establishment approvals issued to those facilities selected for closure by the commission; (iii) expediting consideration of such applications for consolidation, conversion or restructuring of existing health care providers as are submitted in accordance with the recommendations of the commission, provided, however, that the commissioner of health may administratively approve such applications when such approvals are, as determined by the commissioner of health, necessary to ensure continuity of essential health care services; and (iv) reflecting such recommendations in the administration of funds available pursuant to section 2818 of the public health law. Such facilities shall submit to the commissioner of health, at a time and in a form as determined by the commissioner of health, an acceptable plan of resizing, closure, conversion, consolidation or restructuring in accordance with applicable regulations. The commissioner of health shall take all steps necessary to protect patient safety and preserve patient medical records.

(b) The provisions of subdivision (a) of this section shall not apply: (i) unless the governor has transmitted the commission's report under section eight of this act with his or her written approval of the recommendations of the commission pursuant to subdivisions (b) and (c) of section eight of this act to the commissioner of health and transmitted a message to the legislature stating his or her approval of the report on or before December 5, 2006; and (ii) if a majority of the members of each house of the legislature vote to adopt a concurrent resolution rejecting the recommendations of the commission pursuant to subdivisions (b) and (c) of section eight of this act in their entirety by December 31, 2006, after receiving a message from the governor under this subdivision. In no event shall the commissioner of health begin to implement the recommendations of the commission pursuant to subdivisions (b) and (c) of section eight of this act prior to December 31, 2006. Provided, however, that nothing herein shall be construed as limiting the authority of the commissioner of health to enforce or implement any provision of the public health law relating to the establishment or licensure of hospitals, as defined by section 2801 of the public health law.

§ 10. Severability clause. If any clause, sentence, paragraph, subdivision, section or part of this act shall be adjudged by any court of competent jurisdiction to be invalid, such judgment shall not affect, impair, or invalidate the remainder thereof, but shall be confined in its operation to the clause, sentence, paragraph, subdivision, section or part thereof directly involved in the controversy in which such judgment shall have been rendered. It is hereby declared to be the intent of the legislature that this act would have been enacted even if such invalid provisions had not been included herein.

§ 11. This act shall take effect immediately. provided that sections two through eight of this act shall expire and be deemed repealed December 31, 2006, and sections nine and ten of this act shall expire and be deemed repealed June 30, 2008.

# Benjamin Affidavit Exhibit B



# STATE OF NEW YORK
# DEPARTMENT OF HEALTH

Corning Tower    The Governor Nelson A. Rockefeller Empire State Plaza    Albany, New York 12237

January 31, 2007

Ms. Betsy Biddle
Andrus on Hudson Nursing Home
185 Old Broadway
Hastings-on-Hudson, New York 10706

Re:    Commission on Health Care Facilities in the 21st
Century

Dear Ms. Biddle:

In accordance with Section 31 of Part E of Chapter 63 of the Laws of 2005, the Commission on Health Care Facilities in the 21st Century ("the Commission") has been authorized to develop specific recommendations to rightsize and reconfigure health care facilities in New York. Your facility is the subject of at least one of the recommendations contained in the Commission's December 2006 final report, *A Plan to Stabilize and Strengthen New York's Health Care System*, which became law on January 1, 2007 in accordance with Section 9 of Commission statute. All recommendations must be implemented by the Commissioner of Health no later than June 30, 2008.

The purpose of this letter is to advise you of the Department's expectations, as outlined on the enclosure, regarding the steps and deliverables necessary to implement the Commission's recommendations within the required timeframe. This implementation outline will be further defined to develop a process that assures appropriate compliance throughout the timeline.

Acknowledging the unique circumstances created by this process, the Department is committed to carrying out its implementation mandate within the parameters of the Report and enabling statute. Appropriate Central and Regional Office Department staff will be closely involved in the implementation process, and will welcome an ongoing discussion with affected providers as we move toward an orderly implementation of the Commission's recommendations.

Please contact Mr. Neil Benjamin, Assistant Director, Division of Health Facility Planning at (518) 402-0967 should you wish to schedule a meeting to discuss the implementation of this recommendation. In the meantime, your attention to the enclosure is respectfully requested.

Sincerely,

David Wollner
Director
Office of Health Systems Management

Enclosure
cc:    Regional Office Director

13

New York State Department of Health Implementation of Recommendation by the Commission on Health Care Facilities in the 21ˢᵗ Century

Facility Name:          **Andrus on Hudson Nursing Home**

Commission Region:          Hudson Valley
                            Long Term Care # 2

Commission Recommendation:

It is recommended that Andrus-on-Hudson downsize all 247 RHCF beds and add 140 ALP beds and possibly other non-institutional services.

*Note: Integral to an understanding of the above recommendation and terms used therein are the definitions contained in preface material of the Commission's final report. The final report is available on the Commission's website at www.nyhealthcarecommission.org and the Preface is located on page 86-90. You are urged to become familiar with these terms.*

Affected Facilities:          **Andrus on Hudson Nursing Home**

Outline of Implementation:

- Meet with DOH, to discuss NH closure and plans for ALP, no later than 6/30/07.

- Submit closure plan for NH no later than 9/30/07.

- Commissioner to approve NH closure plan no later than 12/31/07.

- Submit application for 140 bed ALP no later than 12/31/07.


- Commissioner approves ALP application no later than 6/30/08.

- Revocation of NH operating certificate by Commissioner no later than 6/30/08.

# Benjamin Affidavit Exhibit C



Andrus on Hudson
185 Old Broadway
Hastings-on-Hudson, NY 10706
(914) 478-3700


July 13, 2007

Mr. Robert G. Schmidt
Director, HEAL Implementation Team
New York State Department of Health
Division of Health Facility Planning
433 River Street, 6th Floor
Troy, NY 12180

RE:    Applications for HEAL/F-SHRP funding

Dear Mr. Schmidt:

As you may know, Andrus on Hudson has been affected by the
recommendations of the Commission on Health Care Facilities in the 21st
Century, which mandate removal of skilled nursing facility beds from
Andrus on Hudson's operating certificate and possible conversion to up
to 140 Assisted Living Program slots.. As detailed in our Application for
Financial Assistance for a "Combined Model" (the "Combined Model
Application") (enclosed), the Andrus on Hudson believes that the
recommendations, properly implemented, create an opportunity for the
organization to develop up to 140 ALP beds, assisted living, and
community-based programs, while maintaining a smaller complement of
SNF beds. To that end, Andrus on Hudson requests HEAL/F-SHRP
funding (Phase 4) to assist with implementation of the Commission's
recommendations in the manner set forth in the Combined Model
Application.

We are hopeful that the Department of Health will agree with us that the
Combined Model represents the most prudent approach for
implementing the Commission's recommendations, and will confirm its
acceptance of this model. Indeed, after considerable analysis of the
feasibility of different care models, Andrus on Hudson is essentially faced
with only two stark options— the Combined Model, which is the only
model that allows us enough income to remain operational; or (should

the Department reject that option) the "Closure Model", that is, closure of
our facility. Because both options present formidable financial costs to
Andrus on Hudson, we are requesting financial assistance under Phase 4
to implement whichever of these models we are forced to implement. See
also enclosed, Application for Financial Assistance for a Closure Model
(the "Closure Model Application").

Enclosed then are two separate applications for HEAL/F-SHRP funding
of two scenarios:

APPLICATION #1: COMBINED MODEL
          We prefer funding for this model.
          • 2 complete originals/ signed
          • 4 complete copies
          • 6 CDs loaded with complete
            applications/ support information

APPLICATION #2: CLOSURE MODEL[1]
          • 2 complete originals/ signed
          • 4 complete copies
          • 6 CDs loaded with complete
            applications/ support information

These applications are submitted in order to comply with the July 16th
deadline for funding requests and are not intended to infer acceptance of
the Commission's recommendations, especially since there is a court
proceeding pending to challenge these recommendations. Of course, any
Phase 4 funds made available to Andrus on Hudson will be used to
implement the Commission's recommendations under either the
Combined model (if accepted) or the Closure Model. If you have any
questions, please feel free to call me at (914) 478-3700 ext. 606.

Sincerely,

Betsy Biddle
Executive Director

_____

[1] This model is submitted under protest and with full reservation of our right to
challenge and to seek to enjoin implementation of the Commission's recommendations
to, among other things, eliminate all of the SNF beds of Andrus on Hudson and revoke
its nursing home operating certificate.

# Benjamin Affidavit Exhibit D

10/08/2008 14:18 FAX  518 473 2802      NYS DOH LEGAL AFFAIRS                        @002/004

# Federal-State Health Reform Partnership (F-SHRP)

On September 29, 2006, the Centers for Medicare and Medicaid Services (CMS) approved New York State's request to join in a partnership to reform and restructure the State's healthcare delivery system. To accomplish the reform and restructuring, CMS has approved a new five-year 1115 demonstration entitled Federal-State Health Reform Partnership (F-SHRP). The waiver is effective October 1, 2006.

## F-SHRP Goals and Objectives

The goals of this reform partnership are to promote the efficient operation of the State's health care system; consolidate and right-size New York's health care system by reducing excess capacity in the acute care system; shift emphasis in long-term care from institutional-based to community-based settings; expand the adoption of advanced health information technology and improve ambulatory and primary care provision.

Under F-SHRP, the federal government will invest up to $1.5 billion ($300 million per year) in agreed upon reform initiatives. The primary focus of these initiatives will be to right size and restructure the acute and long-term care delivery systems, expand the use of e-prescribing, foster the implementation of electronic medical records and regional health information organizations and expand ambulatory and primary care services.

The federal investment in these reforms is conditioned upon the following:

- The F-SHRP waiver must generate federal savings sufficient to offset the federal investment
- The State must meet a series of established performance milestones set forth in the waiver terms and conditions

## Savings

The reform initiatives to right-size and restructure the State's health care delivery system and to expand use of health information technology are expected to generate significant savings to both the State and federal government. However, these reforms will be implemented over a number of years and although some of the savings are expected to accrue in the next 5 years, much of the savings will be long term. In order to generate sufficient federal Medicaid savings to offset it's investment, CMS has agreed to count savings in two areas – savings generated due to decreased hospital utilization resulting from eliminating excess acute care capacity and savings generated through Medicaid managed care expansions. The managed care expansions include the current implementation of mandatory SSI enrollment and expansion of mandatory Medicaid enrollment in additional counties. Counting these managed care savings for F-SHRP required moving these populations from the existing 1115 Partnership Plan to the new F-SHRP waiver.

The state is required to generate $3 billion in gross Medicaid savings ($1.5 billion federal) over the 5-year waiver. Should the State not achieve these savings by the end of the waiver, it will be required to refund to the federal government the difference between the federal investment in the F-SHRP reforms and the federal savings generated.

**Performance Milestones**

The State is also required to meet a number of significant performance milestones. These milestones are as follows:

1. **Fraud and Abuse Recoveries.** By the end of the demonstration, the State will be responsible for increasing its Medicaid fraud and abuse recoveries to at least 1.5 percent of its total Medicaid expenditures for FFY 2005. The first year of the demonstration requires development of an audit plan to increase recoveries. Specific dollar recovery targets have been established for years 2 through 5 starting with $215 million in annual recoveries for year 2 and increasing to $644 million in recoveries for year 5. Failure to meet these targets will result in a penalty to be paid to the federal government equal to the difference between the actual and target recoveries. However, the penalty cannot exceed on an annual basis the FFP claimed for F-SHRP programs and the penalty is also limited to $500 million over the five-year waiver term.

2. **Preferred Drug List.** The State must implement a PDL for Medicaid. This PDL must be continued over the life of the demonstration.

3. **Baseline Data and Reporting.** The State must report to CMS by November 30, 2006 baseline data including hospital and nursing home discharge and debt data and managed care expenditure data.

4. **Employer Sponsored Insurance.** By January 1, 2008, the State must implement a program to increase the number of currently uninsured but employed New York residents with private insurance coverage. By January 1, 2009, the State must document some increase in the rates of private insurance for such individuals.

5. **Programmatic Changes.** By October 31, 2006, the State must have implemented the Medicaid cost containment initiatives enacted in New York's 2005/2006 State Budget relevant to demonstration programs including changes in FHP, increased Medicaid pharmacy copayments, a one year Managed care premium freeze and cap on administrative costs, expansion of managed long term care and pay for performance demonstrations. By February 1, 2007, the State must implement at least one new Medicaid cost efficiency initiative.

6. **Improvement in ADA Compliance.** By March 31, 2007, the State must submit a report outlining the State's plan for updating its on-site reviews of ADA compliance.

7. **Single Point-of-Entry.** By April 1, 2008, the State must have implemented a program to create a single-point-of-entry for Medicaid recipients needing long-term care in at least one region of the State.

8. **Commission on Health Care Facilities in the 21st Century (Commission).** By January 31, 2007, The State must submit a report indicating that there are no State statutory impediments to implementation of the Commission's recommendations, steps taken to implement the recommendations and a timeline for implementation. By July 15, 2008, a final report on implementation of the Commission's recommendations is required.

With the exception of the targets for audit recoveries, failure to meet any milestone results in termination of the demonstration.

### Funding

The mechanics of the how federal funds will flow to the State are as follows. Under the waiver, the State will be entitled to federal matching (FFP) for approved designated State health programs (DSHP). Approved programs include certain HCRA programs as well as health care programs administered by other State agencies such as the offices of Mental Health, Mental Retardation and Developmental Disabilities, Aging, Alcohol and Substance Abuse Services and Children and Family Services. These programs are not Medicaid programs and normally do not qualify for federal matching. The State will be eligible for 50% federal matching on State expenditures for these programs up to $300 million per year. This means the State must incur annual expenditures of $600 million to be entitled to the full $300 million in federal funds. After incurring the DSHP expenditures, the State may draw down the federal matching funds only as it is ready to expend State funds on the actual reform initiatives. For example, as the State expends money on HEAL-NY grants it can simultaneously draw down the equivalent amount of federal funds and use those funds on any of the reform initiatives. Federal funding is limited to $300 million annually and must be used for reform expenditures incurred in that year. The federal funds cannot be rolled over into subsequent years. However, the State has two years after each demonstration year to claim federal funds and pay for investment expenditures incurred during the demonstration year.

### Evaluation

F-SHRP is a five-year demonstration that will end on September 30, 2011. Over the five-year term, the State will be required to report quarterly and annually to CMS on progress of the waiver. Reporting will include a number of quantifiable metrics to assist CMS in evaluating the effectiveness of the State's reforms including grant activity, data on hospital and nursing home utilization and debt, progress on implementation of Commission recommendations and managed care enrollment information. In addition to reporting, a formal evaluation of the demonstration is required with a report due to CMS when the demonstration expires.

CENTERS FOR MEDICARE & MEDICAID SERVICES
SPECIAL TERMS AND CONDITIONS

NUMBER:      11-W-00234/2

TITLE:       Federal-State Health Reform Partnership Medicaid Section 1115
             Demonstration

AWARDEE:     New York Department of Health

## I.    PREFACE

The following are the Special Terms and Conditions (STCs) for New York's Federal-State
Health Reform Partnership section 1115(a) Medicaid Demonstration (hereinafter
"Demonstration"). The parties to this agreement are the New York Department of Health (State)
and the Centers for Medicare & Medicaid Services (CMS). The STCs set forth in detail the
nature, character, and extent of Federal involvement in the Demonstration and the State's
obligations to CMS during the life of the Demonstration. The STCs are effective October 1, 2006
unless otherwise specified. This Demonstration is approved through September 30, 2011.

The STCs have been arranged into the following subject areas: Program Description and
Objectives; General Program Requirements; Eligibility, Benefits, and Enrollment; Delivery
Systems; Federal-State Health Reform Partnership Activities; General Reporting Requirements;
General Financial Requirements; Monitoring Budget Neutrality; Medicaid Program Savings
Measures; Evaluation of the Demonstration; and Schedule of State Deliverables for the
Demonstration.

Additionally, one attachment has been included to provide supplementary information and
guidance for STC 42.

## II.    PROGRAM DESCRIPTION AND OBJECTIVES

The aging of New York's population, the continued shift in care from institutional to outpatient
settings and the quality and efficiency advantages that are available through health information
technology present the State with significant reform opportunities. The State has asked the
Federal government to partner with it to implement reform initiatives that will improve quality of
care and result in long-term savings for both the State and Federal government. The reform
initiatives that the State will pursue under this Demonstration include:

1.   Rightsizing Acute Care Infrastructure. New York's acute care infrastructure is
     outdated and oversized, while the facilities are highly leveraged with debt. The
     inexorable migration of health care services to the outpatient setting has added to the
     significant excess capacity that exists in the State, estimated at over 19,000 beds. As a

result, State law was enacted establishing the Commission on Health Care Facilities in the 21st Century (Commission) which is charged with recommending reconfiguration measures, including downsizing, restructuring and/or facility closures. Such measures will reduce future Medicaid inpatient hospital costs.

2. **Reforming Long Term Care.** The growth of non-institutional alternatives for long-term care services such as assisted living, advances in medical technology, overall improvement in the health of potential consumers and caregivers, and increasing preference for less restrictive alternatives is generating less demand for nursing facility services. New York will pursue the rightsizing of its long-term care system; implementation of a locally based but statewide point of entry (POE) system to help ensure appropriate services are rendered to recipients; a home modification program to enable recipients to stay at home; and a telehome care program to help individuals stay healthy and at home.

3. **Improvement in Primary/Ambulatory Care.** As increased emphasis is placed on services rendered in outpatient settings, capacity and quality become of primary importance. Under this Demonstration, New York will address the shortage of primary care services; implement programs to better manage individuals with chronic conditions, and collect quality of care data on outpatient services.

CMS will monitor these activities to ensure that the Demonstration delivers on the promise of increased efficiency and savings that it has been given.

## III.    GENERAL PROGRAM REQUIREMENTS

1. **Compliance with Federal Non-Discrimination Statutes.** The State agrees that it shall comply with all applicable Federal statutes relating to non-discrimination. These include, but are not limited to, the Americans with Disabilities Act of 1990, Title VI of the Civil Rights Act of 1964, section 504 of the Rehabilitation Act of 1973, and the Age Discrimination Act of 1975.

2. **Compliance with Medicaid Law, Regulation, and Policy.** All requirements of the Medicaid program expressed in law, regulation, and policy statement, not expressly waived or identified as not applicable in the award letter of which these STCs are part, shall apply to the Demonstration.

3. **Changes in Medicaid Law, Regulation, and Policy.** The State must, within the timeframes specified in the applicable law, regulation, or policy directive, come into compliance with any changes in Federal law, regulation, or policy that occur after the approval date of this Demonstration, unless the provision being changed is explicitly waived under the STCs herein governing the Demonstration. This requirement shall also apply to all applicable regulation and policy issued by CMS with respect to the Deficit Reduction Act of 2005, signed into law on February 8, 2006, including but not limited to the documentation of citizenship requirements contained in section 1903(x) of the Social

Security Act (the Act).

4. **Impact on Demonstration of Changes in Federal Law.** To the extent that a change in Federal law requires either a reduction or an increase in Federal financial participation (FFP) in expenditures under such the Demonstration, the State will adopt, subject to CMS approval, a modified budget neutrality agreement for the Demonstration as necessary to comply with such change. The modified budget neutrality agreement would be effective upon the implementation of the change. If mandated changes in the Federal law require State legislation, the changes must take effect on the day such State legislation becomes effective, or on the last day such legislation was required to be in effect under the law.

5. **State Plan Amendments.** The State shall not be required to submit title XIX State plan amendments for changes to any populations covered solely through the Demonstration. If a population covered through the State plan is affected by a change to the Demonstration, a conforming amendment to the State plan may be required except as otherwise noted in these STCs.

6. **Changes Subject to the Amendment Process.** Changes related to the health care reforms undertaken by this Demonstration, designated state health programs, eligibility, enrollment, benefits, enrollee rights, delivery systems, evaluation design, sources of non-Federal share of funding, budget neutrality, and other comparable program elements must be submitted to CMS as amendments to the Demonstration. The State must not implement changes to these elements without prior approval by CMS. Amendments to the Demonstration are not retroactive and FFP will not be available for changes to the Demonstration that have not been approved through the amendment process set forth in paragraph 7 below.

7. **Amendment Process:** Requests to amend the Demonstration must be submitted to CMS for approval no later than 120 days prior to the date of implementation of the change and may not be implemented until approved. Amendment requests must be reviewed by the Federal Review Team and must include, but are not limited to, the following:

   a) An explanation of the public process used by the State to reach a decision regarding the requested amendment;

   b) A data analysis which identifies the specific "with waiver" impact of the proposed amendment on the current budget neutrality expenditure cap. Such analysis shall include current "with waiver" and "without waiver" status on both a summary and detailed level through the current extension approval period using the most recent actual expenditures, as well as summary and detailed projections of the change in the "with waiver" expenditure total as result of the proposed amendment which isolates (by Eligibility Group) the impact of the amendment;

   c) A detailed description of the amendment, including impact on beneficiaries, with sufficient supporting documentation; and

d) If applicable, a description of how the evaluation design shall be modified to incorporate the amendment provisions.

8. **Continuation of the Demonstration.** This Demonstration will expire on September 30, 2011 and may not be extended. The State will comply with the Demonstration phase-out requirements and the transfer of populations as outlined in paragraph 9 below.

9. **Demonstration Phase-Out.** The State may suspend or terminate this Demonstration in whole or in part at any time prior to the date of expiration. The State must promptly notify CMS in writing of the reason(s) for the suspension or termination, together with the effective date. In the event the State elects to phase out the Demonstration, the State must submit a phase-out plan to CMS at least 6 months prior to initiating phase-out activities. Nothing herein shall be construed as preventing the State from submitting a phase-out plan with an implementation deadline shorter than 6 months when such action is necessitated by emergent circumstances. The phase-out plan is subject to CMS approval. If the project is terminated or any relevant waivers suspended by the State, FFP shall be limited to normal closeout costs associated with terminating the Demonstration including services and administrative costs of disenrolling participants.

If the State wants to continue limiting freedom of choice of providers for the Demonstration populations specified in Section VI, paragraph 45, the authority to do so must be transferred by amendment to the Partnership Plan demonstration project (11-W-00114/2) if that demonstration is still in operation. Otherwise, the State must request new authority to limit freedom of choice of providers for these populations.

10. **CMS Right to Terminate or Suspend.** CMS may suspend or terminate the Demonstration in whole or in part at any time before the date of expiration, whenever it determines, following a hearing that the State has materially failed to comply with the terms of the project. CMS shall promptly notify the State in writing of the determination and the reasons for the suspension or termination, together with the effective date.

11. **Finding of Non-Compliance.** The State does not relinquish its rights to challenge CMS' finding that the State materially failed to comply.

12. **Withdrawal of Waiver Authority.** CMS reserves the right to withdraw waivers or expenditure authorities at any time it determines that continuing the waivers or expenditure authorities would no longer be in the public interest or promote the objectives of title XIX. If a waiver or expenditure authority is withdrawn, FFP is limited to normal closeout costs associated with terminating the Demonstration, including services and administrative costs of disenrolling participants.

13. **Adequacy of Infrastructure.** The State will ensure the availability of adequate resources for implementation and monitoring of the Demonstration, including education, outreach, and enrollment; maintaining eligibility systems; implementation of milestones; and reporting on financial and other Demonstration components.

14. **Quality Review of Eligibility.** The State will continue to submit by December 31st of each year an alternate plan for Medicaid Eligibility Quality Control (MEQC) as permitted by Federal regulations at 42 CFR 431.812(c).

15. **Public Notice and Consultation with Interested Parties.** The State must comply with the State Notice Procedures set forth in 59 FR 49249 (September 27, 1994) when any program changes to the Demonstration, including but not limited to those referenced in paragraph 6 are proposed by the State.

16. **Compliance with Managed Care Regulations.** The State must comply with the managed care regulations at 42 CFR 438 et. seq., except as expressly waived or referenced in the expenditure authorities incorporated into the STCs. Capitation rates must be developed and certified as actuarially sound in accordance with 42 CFR 438.6.

17. **Federal Funds Participation.** No Federal matching funds for expenditures for this Demonstration will be provided until the effective date identified in the Demonstration approval letter. No FFP is available for this Demonstration for Medicare Part D drugs.

## IV.    ELIGIBILITY, BENEFITS, AND ENROLLMENT

The mandatory managed care program operated by New York provides Medicaid State Plan benefits through comprehensive managed care organizations to those recipients eligible under the State plan as noted below.

18. **Eligibility.**

The eligibility categories described below are subject to all applicable Medicaid laws and regulations, except as expressly waived through the waiver authorities for this Demonstration.

| State Plan Mandatory and Optional Groups | FPL Level and/or other qualifying criteria |
|---|---|
| Children under age 1 | Up to 200 % FPL |
| Children 1 through 5 | Up to 133% FPL |
| Children 6 through 18 | Up to 100% FPL |
| Children 19-20 | Monthly income standard (determined annually) |
| Adult (21-64) AFDC-related family members | Monthly income standard (determined annually) |

Under the Partnership Plan Demonstration (11-W-00114/2), the recipients in the categories above who live in New York City and 23 other counties are mandated into managed care enrollment. Under this Demonstration, recipients in these categories who live in the following counties will now be mandated into managed care enrollment:

| | | | | |
|---|---|---|---|---|
| Allegany | Cortland | Dutchess | Fulton | Montgomery |
| Putnam | Orange | Otsego | Schenectady | Seneca |
| Sullivan | Ulster | Washington | Yates | |



| State Plan Mandatory and Optional Groups | FPL Level and/or other qualifying criteria |
|---|---|
| Adults and children (0-64) receiving Supplemental Security Income (SSI) payments or otherwise disabled | Monthly income standard (determined annually) |
| Adults (65+) | Monthly income standard (determined annually) |

Under the Partnership Plan Demonstration (11-W-00114/2), the recipients in the categories above are not mandated into managed care enrollment. Under this Demonstration, all recipients in these categories who live in New York City and the counties that participate in the Partnership Plan will now be mandated into managed care enrollment.

19. **Eligibility Exclusions.** Notwithstanding the eligibility criteria in paragraph 18, the following persons are excluded from the Medicaid mandatory managed care program.

| |
|---|
| Individuals who become eligible for Medicaid only after spending down a portion of their income |
| Residents of state psychiatric facilities or residents of state certified or voluntary treatment facilities for children and youth |
| Patients in residential health care facilities (RHCF) at time of enrollment and residents in a RHCF who are classified as permanent |
| Participants in capitated long term care demonstration projects |
| Medicaid-eligible infants living with incarcerated mothers |
| Infants weighing less than 1200 grams at birth and other infants less than 6 months who meet the criteria for SSI-related categories |
| Individuals with access to comprehensive private health insurance if cost effective |
| Foster care children in the placement of a voluntary agency |
| Foster care children in direct care [at the option of the local Department of Social Services (LDSS)] |
| Certified blind or disabled children living or expected to live separate and apart from their parents for 30 days or more |
| Individuals expected to be Medicaid eligible for less than six months (except for pregnant women) |
| Individuals receiving long-term care services through long-term home health care programs, or child care facilities (except ICF services for the developmentally disabled) |
| Individuals eligible for Medicaid benefits only with respect to tuberculosis-related services |
| Individuals placed in Office of Mental Health (OMH)-licensed family care homes |
| Individuals enrolled in the restricted recipient program |
| Individuals with a "county of fiscal responsibility" code 99 in MMIS |
| Individuals receiving hospice services (at time of enrollment) |
| Youth in the care and custody of the commissioner of the Office of Family & Children Services |
| Individuals with a "county of fiscal responsibility" code of 97 (OMH in MMIS) |
| Individuals with a "county of fiscal responsibility" code of 98 (until program features are approved by the state and operational at the local district level to permit these individuals to voluntarily enroll in Medicaid managed care) |
| Individuals under sixty-five years of age (screened and require treatment) in the Centers for Disease Control and Prevention breast and/or cervical cancer early detection program and need treatment for |



| breast or cervical cancer. and are not otherwise covered under creditable health coverage. |
| Individuals who are eligible for Medicaid buy-in for the working disabled and must pay a premium |

20. **Eligibility Exemptions.** Notwithstanding the eligibility criteria in paragraph 18, the following persons may not be required but may voluntarily enroll in the Medicaid managed care program.

| Individuals who are HIV+ |
| Individuals with severe and persistent mental illness and children with serious emotional disturbances except those individuals whose behavioral health benefits are provided through the Medicaid fee-for-service program. |
| Individuals eligible for both Medicare/Medicaid (dual-eligibles) * |
| Individuals for whom a managed care provider is not geographically accessible |
| Individuals with chronic medical conditions who have been under active treatment for at least six months with a sub-specialist who is not a network provider for any Medicaid MCO in the service area or whose request has been approved by the New York State Department of Health Medical Director because of unusually severe chronic care needs |
| Individuals with end stage renal disease (ESRD) |
| Residents of intermediate care facilities for the mentally retarded (ICF/MR) |
| Individuals with characteristics and needs similar to those residing in an ICF/MR |
| Individuals already scheduled for a major surgical procedure (within 30 days of scheduled enrollment) with a provider who is not a participant in the network of any Medicaid MCO in the service area |
| Individuals with a developmental or physical disability receiving services through a Medicaid home and community based services (HCBS) waiver |
| Individuals with a developmental or physical disability whose needs are similar to participants receiving services through a Medicaid (HCBS) waiver |
| Participants in the Medicaid model waiver (care-at-home) programs |
| Individuals whose needs are similar to participants receiving services through the Medicaid model waiver (care-at-home) programs |
| Residents of alcohol/substance abuse long term residential treatment programs |
| Homeless individuals in the shelter system (at the option of the LDSS). Note: in New York City, all homeless individuals are exempt. |
| Native Americans |
| Individuals who cannot be served by a managed care provider due to a language barrier |
| Individuals temporarily residing out of district |
| Individuals with a "county of fiscal responsibility code of 98" (OMRDD in MMIS) in counties where program features are approved by the State and operational at the local district level to permit these individuals to voluntarily enroll. |
| Individuals who are eligible for the Medicaid buy-in for the working disabled and are not required to pay a premium |

* These persons may only join a qualified Medicaid Advantage Plan

21. **Mandatory Managed Care Program Benefits.** Benefits provided through this



Demonstration for the Medicaid managed care program are as follows:

| |
|---|
| Inpatient and outpatient hospital services |
| Clinic services including Rural Health Clinic and Federally Qualified Health Center services |
| Laboratory and X-ray services |
| Home health services |
| Early Periodic Screening, Diagnosis, and Treatment services (for individuals under age 21 only) |
| Family planning services and supplies |
| Physicians services including nurse practitioners and nurse midwife services |
| Dental services |
| Physical and occupational therapy |
| Speech, hearing and language therapy |
| Prescription drugs, over-the-counter drugs and medical supplies |
| Durable medical equipment including prosthetic and orthotic devices, hearing aids and prescription shoes |
| Vision care services including eyeglasses |
| Intermediate Care Facilities for the Mentally Retarded (ICF/MR) |
| Nursing facility services |
| Personal care services |
| Case management services |
| Hospice care services |
| TB-related services |
| Inpatient and outpatient behavioral health services (mental health and chemical dependence services) |
| Emergency medical services including emergency transportation |
| Adult day care |
| Personal Emergency Response Services (PERS) |
| Renal dialysis |
| Home and Community Based Services waivers (HCBS) |
| Care at Home Program (OMRDD) |
| Non-emergency transportation |
| Experimental or investigational treatment (covered on a case by case basis) |

22. **Facilitated Enrollment.** MCO, health care provider and community-based organization facilitated enrollers will engage in those activities described in 42 CFR 435.904(d)(2), as permitted by 42 CFR 435.904(e)(3)(ii), within the following parameters:

   a) Facilitated enrollers will provide program information to applicants and interested individuals as described in 42 CFR 435.905 (a).

   b) Facilitated enrollers must afford any interested individual the opportunity to apply for Medicaid without delay as required by 42 CFR 435.906.

c) If an interested individual applies for Medicaid by completing the information required under 42 CFR 435.907(a) and (b) and 42 CFR 435.910(a) and signing a Medicaid application, that application must be transmitted to the local department of social services (LDSS) for determination of eligibility.

d) The protocols for facilitated enrollment practices between the LDSS and the facilitated enrollers must:
    i.    Ensure that choice counseling activities are closely monitored to minimize adverse risk selection; and
    ii.   Specify that determinations of Medicaid eligibility are made solely by the LDSS.

e) The State must submit all protocols and training materials for any counties beginning to use facilitated enrollment processes to CMS for review and approval at least thirty days prior to starting facilitated enrollment.

## V.    DELIVERY SYSTEMS

23. **Contracts.** Procurement and the subsequent final contracts developed to implement selective contracting by the State with any provider group shall be subject to CMS approval prior to implementation. Existing contracts with Federally Qualified Health Centers (FQHC) shall continue in force.

Payments under contracts with public agencies, that are not competitively bid in a process involving multiple bidders, shall not exceed the documented costs incurred in furnishing covered services to eligible individuals (or a reasonable estimate with an adjustment factor no greater than the annual change in the consumer price index).

24. **Institutions for Mental Diseases (IMDs).** Services to enrollees of the State's mandatory managed care program who are patients in IMDs will be covered only to the extent permitted under Section VIII, paragraph 51.

25. **Health Services to Native American Populations.** The plan for patient management and coordination of services for Medicaid-eligible Native Americans developed for the Partnership Plan in consultation with the Indian tribes and/or representatives from the Indian health programs located in participating counties shall apply to recipients in this Demonstration.

## VI.    FEDERAL-STATE HEALTH REFORM PARTNERSHIP (F-SHRP) ACTIVITIES

### Funding
26. **State Obligation.** The State must invest $3.0 billion over the five-year demonstration period for health care reform initiatives in order to receive $1.5 billion in FFP.

a) These initiatives will include programs that will promote the efficient operation of the State's health care system; consolidate and right-size New York's health care system by reducing excess capacity in the acute care system; shift emphasis in long-term care from institutional-based to community-based settings; expand the use of e-prescribing, electronic medical records and regional health information organizations; and improve ambulatory and primary care provision.

b) These reform initiatives may include but are not limited to:

    i. Reform activities set forth in (a) above and consistent with the goals of Health Care Efficiency and Affordability Law for New Yorkers (HEAL NY)

    ii. State Department of Health programs–
       1. Diagnostic and Treatment Centers for Indigent Care

    iii. State Office on Aging programs – Expanded In-Home Services to the Elderly

    iv. Office of Mental Health programs –
       1. Community Support Services and Residential Services Program
       2. New York University Child Studies Center

    v. Office of Alcoholism and Substance Abuse Services – Prevention and Treatment Program

c) Additional State-only health care reform investments or changes in the listed uses will be considered an amendment to the Demonstration and processed in accordance with Section III, paragraph 7.

27. **Federal Financial Participation for Designated State Health Programs (DSHP).**

a) **Five-year Demonstration Period.** Federal Financial Participation (FFP) will be available beginning October 1, 2006. for State expenditures on the DSHP described in paragraph 28 incurred by the State during the period October 1, 2006 and ending September 30, 2011 subject to the limitations outlined below.

    i. FFP Cap. FFP for DSHP is limited to the lesser of $1.5 billion or half the amount of monies the State expends over the demonstration period on the health care reform activities described in paragraph 26.

    ii. Milestones. FFP will only be available if the milestones outlined in paragraphs 31 through 37 are completed in accordance with the due dates set forth for each milestone.

    iii. Demonstrated Savings. The State must achieve an amount of total

Medicaid program savings by the end of the Demonstration period as
calculated under the provisions of Section X.

    iv. <u>Reconciliation and Recoupment.</u> If the Federal share of these savings are
not at least equal to the amount determined under subparagraph (i) the
State must return to CMS the amount of Federal funds that exceed
Medicaid program savings achieved.

        1. As part of the annual report required under Section IV, paragraph
43, the State will report both DSHP claims and expenditures for
health care reforms.

        2. The reported claims and expenditures will be reconciled at the end
of the Demonstration with the State's MBES submissions.

        3. Any repayment required under this subparagraph will be
accomplished by the State making an adjustment for its excessive
claim for FFP on the CMS-64 by entering an amount in line 10(b)
of the Summary sheet equal to the amount by which FFP exceeds
Medicaid program savings.

b) **Annual Demonstration Year.** The following limitations apply to Federal funding of
DSHP in each Demonstration year:

    i. <u>FFP Cap.</u> FFP for DSHP is limited to the lesser of $300 million or half
of the State's expenditures on the health care reform activities specified
in paragraph 26. Any remaining FFP authority, if any, between the $300
million limit and the State's expenditures on health care reform, may not
roll over into subsequent demonstration years.

    ii. <u>Milestones.</u> FFP will only be available if the milestones outlined in
paragraphs 31 through 37 are completed in accordance with the due dates
set forth for each milestone.

    iii. <u>Timing.</u> The State may not draw Federal funds for the programs
described in paragraph 28 until such time as the State makes
expenditures for the health care reform initiatives described in paragraph
26.

    iv. <u>Reconciliation and Recoupment.</u>

        1. As part of the quarterly report required under Section IV,
paragraph 42, the State will report both DSHP claims and
expenditures for health care reforms.

        2. The reported claims and expenditures will be reconciled quarterly
with the State's MBES submission.

        3. Any amount of FFP provided in excess of the calculation in
subparagraph 2 (iii) will be reduced from future grant awards. To
accomplish this, the State must make an adjustment for it excessive
claim for FFP on the CMS-64 by entering an amount in line 10(b)
of the Summary sheet equal to the excessive claims.

c) **FFP Expiration.** The State agrees that the authority for Federal funding of DSHP expires on September 30, 2011; will not be available for any expenditure incurred after September 30, 2011; and may not be extended.

28. **Designated State Health Programs.** Subject to the conditions outlined in paragraphs 27 and 30 (f), FFP may be claimed for expenditures made for the following designated State health programs beginning October 1, 2006 through September 30, 2011:

    a) Health Care Reform Act programs –
        i. Healthy New York
        ii. AIDS Drug Assistance
        iii. Tobacco Use Prevention and Control
        iv. Health Workforce Retraining
        v. Recruitment and Retention of Health Care Workers
        vi. Telemedicine Demonstration
        vii. Pay for Performance Initiatives

    b) State Office on Aging programs –
        i. Community Services for the Elderly
        ii. Expanded In-Home Services to the Elderly

    c) Office of Mental Health – Community Support Services and Residential Services Program

    d) Office of Mental Retardation/Developmental Disabilities – Residential and Community Support Services

    e) Office of Alcoholism and Substance Abuse Services – Prevention and Treatment Program

    f) Office of Children and Family Services - Committees on Special Education direct care programs

    g) State Department of Health – Early Intervention Program Services

29. **Designated State Health Programs Claiming Process**

    a) Documentation of each designated state health program's expenditures must be clearly outlined in the State's supporting work papers and be made available to CMS.

    b) Federal funds must be claimed within two years after the calendar quarter in which the State disburses expenditures for the designated state health programs in paragraph 28. Claims may not be submitted for State expenditures disbursed after September 30, 2011. The State may draw Federal funds only as the State makes disbursements for the health care reform initiatives identified in paragraph 26.

c) Sources of non-Federal funding must be compliant with section 1903(w) of the Act and applicable regulations. To the extent that Federal funds from any Federal programs are received for the designated state health programs listed in paragraph 28, they shall not be used as a source of non-Federal share.

d) The administrative costs associated with programs in paragraph 28 and any others subsequently added by amendment to the Demonstration shall not be included in any way as Demonstration and/or other Medicaid expenditures.

e) Any changes to the designated state health programs listed in paragraph 28 shall be considered an amendment to the Demonstration and processed in accordance with Section III, paragraph 7.

**Milestones**

The State will be required to complete various activities by the prescribed dates below in order to continue the Demonstration. If the State fails to meet any milestone, with the exception of paragraph 30, it must begin Demonstration close-out procedures in accordance with Section III, paragraph 9. These milestones include State-level Medicaid reforms, reporting requirements related to F-SHRP, and compliance with Administration policy.

30. **Fraud and Abuse Recoveries.** Medicaid expenditure data for FFY 2005 shows that the State recovers less than one percent of its total Medicaid expenditures. By the end of this Demonstration, the State will be responsible for increasing its Medicaid fraud and abuse recoveries to at least 1.5 percent of its total Medicaid expenditures for FFY 2005 ($42.9 billion). This will be monitored using State-reported fraud and abuse recoveries on the CMS-64, line 9c for each Federal fiscal year.

a) By October 31, 2006, the State must develop and submit to CMS its plan for achieving this milestone by the end of the demonstration period, including details of Office of Medicaid Inspector General (OMIG) staffing and new budget proposals to further enhance OMIG resources.

b) By September 30, 2008, (for the period 10/1/07 through 9/30/08), the State must demonstrate that its annual level of fraud and abuse recoveries is equal to .5% of total computable Medicaid expenditures ($215 million).

c) By September 30, 2009, (for the period 10/1/08 through 9/30/09), the State must demonstrate that its annual level of fraud and abuse recoveries is equal to .75 percent of total computable Medicaid expenditures ($322 million).

d) By September 30, 2010, (for the period 10/1/09 through 9/30/10), the State must demonstrate that its annual level of fraud and abuse recoveries is equal to 1 percent of total computable Medicaid expenditures ($429 million).

e) By September 30, 2011, (for the period 10/1/10 through 9/30/11), the State must demonstrate that its annual level of fraud and abuse recoveries is equal to 1.5 percent of total computable Medicaid expenditures ($644 million).

f) Achievement of the above targets will be assessed within 90 days after the end of each Demonstration year. If the State does not meet the targets in any of the Demonstration years, the State will be required to pay the Federal government the lesser of:

        i. the dollar difference between actual and target recoveries (as specified above); or

        ii. total claimed FFP for designated state health programs in that Demonstration year, not to exceed $500 million over the five-year Demonstration period.

The Federal government will recoup the penalty calculated in items (i) and (ii) above. To accomplish this, the State must make an adjustment for its claims for FFP on the CMS-64 by entering an amount in line 10(b) of the Summary sheet equal to the amount of the penalty divided by the federal matching rate. This will ensure that the State's claim of FFP is reduced by the total computable amount calculated in items (i) and (ii) above.

31. **Preferred Drug List.** States currently have flexibility to control rising drug costs by implementing a preferred drug list (PDL). By February 1, 2007, the State must implement a PDL for Medicaid mandatory, optional and expansion populations, with the exception of enrollees in Family Health Plus. This PDL must remain in effect for the duration of this Demonstration period. If the State ends its PDL prior to the end of the demonstration, the Federal government will immediately cease providing FFP for designated State health programs.

32. **Baseline Data and Reporting.** After collaboration between the State and Federal governments to define the base year, the State must report to CMS by November 30, 2006 baseline data including, but not limited to:

a) Hospitals: total hospital discharges; Medicaid discharges, total hospital expenditures; and total hospital debt.

b) Nursing homes: total nursing facility days; Medicaid days, total nursing facility expenditures; and total nursing facility debt.

c) Managed care: total fee-for-service and managed care expenditures and enrollment for TANF and SSI enrollees, including the aged.

Once the baseline data is established, quarterly and annual reporting on these data elements is required under Section VII, paragraphs 42 and 43.

33. **Employer Sponsored Insurance.** States may design programs to incorporate private insurance options for beneficiaries. Under this milestone, the State will be required to increase health insurance coverage by coordinating currently available Medicaid funding with private insurance options.

    a) By January 1, 2008, the State must implement, subject to CMS approval, a program to increase the number of currently uninsured but employed New York residents with private insurance coverage. This private insurance coverage program should include members of New York's current waiver program, Family Health Plus.

    b) By January 1, 2009, the State must document increased rates of private insurance for individuals referenced above.

34. **Programmatic Changes.**

    a) By October 31, 2006, the State must implement the following Medicaid cost containment initiatives enacted in New York's 2005/2006 State Budget relevant to Demonstration programs. If the State ends its cost containment initiatives prior to the end of the demonstration, the Federal government will cease providing FFP for designated State health programs.

        1. Restructure the benefit package and cost sharing requirements for the Family Health Plus program (authorized under the Partnership Plan Demonstration 11-W-00114/2)
        2. Increase Medicaid co-payments for drugs from $.50 to $1 for generic drugs and from $2 to $3 for brand-name drugs;
        3. Implement managed care premium cost containment including a one year premium freeze and cap on administrative costs;
        4. Implement mandatory managed care enrollment for SSI recipients;
        5. Expand the managed long term care program; and
        6. Begin implementation of a collaborative multiple payer Pay for Performance demonstration.

    b) By February 1, 2007, the State must submit evidence that the State has implemented at least one new Medicaid cost efficiency initiative. These may include, but are not limited to State plan flexibility options offered by the Deficit Reduction Act of 2006. If the initiative requires legislative approval in order for the State to implement, legislative approval must be granted no later than July 1, 2007, and implementation must begin no later than January 1, 2008. After implementation, if the State ends its cost efficiency initiative prior to the end of the demonstration, the Federal government will cease providing FFP for designated state health programs.

    No initiative implemented as a result of other milestones or savings measures may be used to comply with this requirement.

35. **Improvement in ADA Compliance.** By March 31, 2007, the State must submit a report

outlining the State's plan for updating its on-site reviews of ADA compliance, including sampling methodology and timeframes. The report shall include an evaluation of possible incentives for MCOs to improve accessibility at beneficiary point-of-service.

36. **Single Point-of-Entry.** By April 1, 2008, the State must have implemented, subject to CMS approval, a program to create a single-point-of-entry for Medicaid recipients needing long-term care in at least one region of the State.

37. **Report on Progress of the Commission.** The State must submit two reports on the work of the Commission:

    a) By January 31, 2007, a report which shall include: certification from the State that there are no State statutory impediments to implementation of the Commission's recommendations on reconfiguring the State's general hospital and nursing home bed capacity; steps taken to implement those recommendations on or after January 1, 2007; and a timeline for implementation of those recommendations.

    b) By July 15, 2008, a report on the final recommendations of the Commission. This report shall provide a certification that each of the Commission's recommendations has been acted upon, as well as the strategy and timeline for full implementation. Any recommendations that have been completely implemented by this date should be so noted. The report shall also address how the implementation of the Commission's recommendations will impact the provision of primary/ambulatory care services in affected communities.

## VII. GENERAL REPORTING REQUIREMENTS

38. **General Financial Requirements.** The State must comply with all general financial requirements set forth in section VIII.

39. **Compliance with Managed Care Reporting Requirements.** The State must comply with all managed care reporting regulations at 42 CFR 438 et. seq. except as expressly waived or referenced in the expenditure authorities incorporated into these STCs.

40. **Reporting Requirements Related to Budget Neutrality.** The State must comply with all reporting requirements for monitoring budget neutrality set forth in section IX and the Medicaid Program Savings set forth in section X.

41. **Monthly Calls.** Monthly discussions between CMS and the State regarding this demonstration shall be conducted as part of the monthly calls held for the Partnership Plan Demonstration (11-W-00114/2). During these calls, the progress of the health care reforms authorized by this Demonstration shall be discussed, as well as any pertinent State legislative developments, and any Demonstration amendments the State is considering submitting. CMS shall update the State on any amendments or concept papers under review, as well as Federal policies and issues that may affect any aspect of

the Demonstration. The State and CMS shall jointly develop the agenda for the calls.

42. **Quarterly Reports:** The State must submit progress reports in accordance with the guidelines in Attachment A no later than 60 days following the end of each quarter.

43. **Annual Report.** The State must submit a draft annual report documenting accomplishments, project status, health reform initiatives, quantitative and case study findings, interim evaluation findings, utilization data, and policy and administrative difficulties in the operation of the Demonstration. Additionally, the annual report should include updated workbooks for both the reform metrics and budget neutrality monitoring. The State must submit the draft annual report no later than January 1 after the close of each Demonstration year. Within 30 days of receipt of comments from CMS, a final annual report must be submitted.

## VIII.     GENERAL FINANCIAL REQUIREMENTS

44. **Quarterly Reports.** The State must provide quarterly expenditure reports using Form CMS-64 to separately report total expenditures for services provided under the Medicaid program, including those provided through the Demonstration under section 1115 authority. This project is approved for expenditures applicable to services rendered during the Demonstration period. CMS shall provide FFP for allowable Demonstration expenditures only as long as they do not exceed the pre-defined limits on the costs incurred as specified in section IX.

45. **Reporting Expenditures Under the Demonstration:** The following describes the reporting of expenditures under the Demonstration:

a) In order to track expenditures under this Demonstration, the State must report Demonstration expenditures through the Medicaid and State Children's Health Insurance Program Budget and Expenditure System (MBES/CBES), following routine CMS-64 reporting instructions outlined in Section 2500 of the State Medicaid Manual. All Demonstration expenditures must be reported each quarter on separate Forms CMS-64.9 Waiver and/or 64.9P Waiver, identified by the Demonstration project number assigned by CMS (including the project number extension, which indicates the DY in which services were rendered or for which capitation payments were made).

b) For monitoring purposes, quarterly cost settlements and pharmaceutical rebates relevant to the Demonstration will be allocated (using an approved methodology) to the Demonstration populations specified in subparagraph (i) and offset against current quarter waiver expenditures. Demonstration expenditures net of these cost settlement offsets will be reported on Form CMS 64.9 Waiver. Amounts offset will be identifiable in the State's supporting work papers and made available to CMS.

c) For each Demonstration year, seven (7) separate waiver Forms CMS-64.9 Waiver

and/or 64.9P Waiver must be completed, using the waiver name noted below, to report expenditures for the following Demonstration populations, as well as for the designated State health programs.

    i.   **Demonstration Population 1:**   TANF Child under 1 through 20 required to enroll in managed care in Allegany, Cortland, Dutchess, Fulton, Montgomery, Putnam, Orange, Otsego, Schenectady, Seneca, Sullivan, Ulster, Washington and Yates counties [TANF Child New MC].

    ii.   **Demonstration Population 2:**   TANF Adults aged 21-64 required to enroll in managed care in Allegany, Cortland, Dutchess, Fulton, Montgomery, Putnam, Orange, Otsego, Schenectady, Seneca, Sullivan, Ulster, Washington, and Yates counties [TANF Adult New MC].

    iii.   **Demonstration Population 3:**   Disabled Adults and Children 0-64 voluntarily enrolled in managed care in those counties participating in the Partnership Plan as of October 1, 2006 [SSI 0-64 Current MC].

    iv.   **Demonstration Population 4:**   Disabled Adults and Children 0-64 required to enroll in managed care in those counties participating in the Partnership Plan as of October 1, 2006 [SSI 0-64 New MC].

    v.   **Demonstration Population 5:**   Aged or Disabled Elderly voluntarily enrolled in managed care in those counties participating in the Partnership Plan as of October 1, 2006 [SSI 65+ Current MC].

    vi.   **Demonstration Population 6:**   Aged or Disabled Elderly required to enroll in managed care in those counties participating in the Partnership Plan as of October 1, 2006 [SSI 65+ New MC].

    vii.   **Demonstration Expenditures:**   Designated State Health Programs [DSHP]

46. **Expenditures Subject to the Budget Neutrality Cap.** For purposes of this section, the term "expenditures subject to the budget neutrality cap" must include all Medicaid expenditures on behalf of individuals who are enrolled in this Demonstration and for designated State health program expenditures as described in paragraph 45 (e) (i-vii). All expenditures that are subject to the budget neutrality cap are considered Demonstration expenditures and must be reported on Forms CMS-64.9 Waiver and /or 64.9P Waiver.

All expenditures for managed care enrollment for Demonstration Populations 1 and 2 residing in the counties other than those specified in Section IV, paragraph 18 who are required to enroll in managed care ("current" mandatory managed care enrollment) will be reported under the Partnership Plan Demonstration (11-W-00114/2). These expenditures may not be reported under this Demonstration.

47. **Administrative Costs.** Administrative costs will not be included in the budget neutrality

limit, but the State must separately track and report additional administrative costs that are directly attributable to the Demonstration, subject to the restriction in Section VI, paragraph 29 (d). All administrative costs must be identified on the Forms CMS-64.10 Waiver and/or 64.10P Waiver.

48. **Claiming Period.** All claims for expenditures subject to the budget neutrality cap (including any cost settlements) must be made within 2 years after the calendar quarter in which the State made the expenditures. All claims for services during the Demonstration period (including any cost settlements) must be made within 2 years after the conclusion or termination of the Demonstration. During the latter 2-year period, the State must continue to identify separately net expenditures related to dates of service during the operation of the Demonstration on the CMS-64 waiver forms in order to properly account for these expenditures in determining budget neutrality.

49. **Reporting Member Months.** The following describes the reporting of member months for Demonstration populations:

   a) For the purpose of calculating the budget neutrality expenditure cap and for other purposes, the State must provide to CMS, as part of the quarterly report required under paragraph 42, the actual number of eligible member months for the Demonstration Populations defined in paragraph 45 (e) (i-vi). The State must submit a statement accompanying the quarterly report which certifies the accuracy of this information.

   The actual number of member months for current mandatory managed care enrollment for Demonstration Populations 1 and 2 as defined in paragraph 46 will not be used for the purpose of calculating the budget neutrality expenditure agreement for this Demonstration. They will be used for the budget neutrality expenditure agreement for the Partnership Plan Demonstration (11-W-00114/2).

   To permit full recognition of "in-process" eligibility, reported counts of member months may be subject to revisions after the end of each quarter. Member month counts may be revised retrospectively for up to two years as needed.

   b) The term "eligible member months" refers to the number of months in which persons are eligible to receive services. For example, a person who is eligible for 3 months contributes 3 eligible member months to the total. Two individuals who are eligible for 2 months each contribute 2 eligible member months to the total, for a total of 4 eligible member months.

   c) For the purposes of this Demonstration, the term "Demonstration eligibles" excludes unqualified aliens and refers only to the Demonstration Populations described in paragraph 45 (e) (i-vi).

50. **Standard Medicaid Funding Process.** The standard Medicaid funding process must be used during the Demonstration. The State must estimate matchable Demonstration

expenditures (total computable and Federal share) subject to the budget neutrality
expenditure cap and separately report these expenditures by quarter for each Federal
fiscal year on the Form CMS-37 for both the Medical Assistance Payments (MAP) and
State and Local Administration Costs (ADM). CMS shall make Federal funds available
based upon the State's estimate, as approved by CMS. Within 30 days after the end of
each quarter, the State must submit the Form CMS-64 quarterly Medicaid expenditure
report, showing Medicaid expenditures made in the quarter just ended. CMS shall
reconcile expenditures reported on the Form CMS-64 with Federal funding previously
made available to the State, and include the reconciling adjustment in the finalization of
the grant award to the State.

51. **Extent of Federal Financial Participation for the Demonstration.** Subject to CMS
approval of the source(s) of the non-Federal share of funding, CMS shall provide FFP at
the applicable Federal matching rates for the Demonstration as a whole as outlined
below, subject to the limits described in section IX:

   a) Administrative costs, including those associated with the administration of the
   Demonstration, subject to the restriction in Section VI, paragraph 29 (d);

   b) Net expenditures and prior period adjustments of the Medicaid program that are paid
   in accordance with the approved Medicaid State plan.

   c) FFP will be phased down for expenditures for services to a Partnership Plan enrollee
   age 21 through 64 residing in an Institution for Mental Disease for the first 30 days of
   an inpatient episode, subject to an aggregate annual limit of 60 days. The FFP match
   rate will be phased down as follows:

| Demonstration Year | Demonstration Period | Allowable Portion of Expenditures |
|---|---|---|
| 1 | October 1, 2006 – September 30, 2007 | 100% |
| 2 | October 1, 2007 – September 30, 2008 | 50% |
| 3 | October 1, 2008 – September 30, 2009 | 0% |

For Demonstration years 4 and 5, no FFP will be available for these services.

52. **Medicare Part D Drugs.** No FFP is available for this Demonstration for Medicare Part
D drugs.

53. **Sources of Non-Federal Share.** The State certifies that the non-Federal share of funds
for the Demonstration are State/local monies. The State further certifies that such funds
shall not be used to match for any other Federal grant or contract, except as permitted by
law. All sources of non-Federal funding must be compliant with section 1903(w) of the
Act and applicable regulations. In addition, all sources of the non-Federal share of
funding are subject to CMS approval.

   a) CMS shall review the sources of the non-Federal share of funding for the
   Demonstration at any time. The State agrees that all funding sources deemed

Demonstration Approval Period: October 1, 2006 through September 30, 2011                Page 20

unacceptable by CMS shall be addressed within the time frames set by CMS.

b) Any amendments that impact the financial status of the program shall require the State to provide information to CMS regarding all sources of the non-Federal share of funding.

54. **State Certification of Funding Conditions.** The State must certify that the following conditions for non-Federal share of Demonstration expenditures are met:

a) Units of government, including governmentally operated health care providers, may certify that State or local tax dollars have been expended as the non-Federal share of funds under the Demonstration.

b) To the extent the State utilizes certified public expenditures (CPEs) as the funding mechanism for title XIX (or under section 1115 authority) payments, CMS must approve a cost reimbursement methodology. This methodology must include a detailed explanation of the process by which the State would identify those costs eligible under title XIX (or under section 1115 authority) for purposes of certifying public expenditures.

c) To the extent the State utilizes CPEs as the funding mechanism to claim Federal match for payments under the demonstration, governmental entities to which general revenue funds are appropriated must certify to the State the amount of such tax revenue (State or local) used to satisfy demonstration expenditures. The entities that incurred the cost must also provide cost documentation to support the State's claim for Federal match.

d) The State may use intergovernmental transfers to the extent that such funds are derived from State or local tax revenues and are transferred by units of government within the State. Any transfers from governmentally operated health care providers must be made in an amount not to exceed the non-Federal share of title XIX payments. Under all circumstances, health care providers must retain 100 percent of the claimed expenditure. Moreover, no pre-arranged agreements (contractual or otherwise) exist between health care providers and State and/or local government to return and/or redirect any portion of the Medicaid payments. This confirmation of Medicaid payment retention is made with the understanding that payments that are the normal operating expenses of conducting business, such as payments related to taxes, (including health care provider-related taxes), fees, business relationships with governments that are unrelated to Medicaid and in which there is no connection to Medicaid payments, are not considered returning and/or redirecting a Medicaid payment.

55. **Monitoring the Demonstration.** The State will provide CMS with information to effectively monitor the Demonstration, upon request, in a reasonable time frame.

## IX.    MONITORING BUDGET NEUTRALITY

56. **Limit on Title XIX Funding.** The State shall be subject to a limit on the amount of
Federal title XIX funding that the State may receive on selected Medicaid expenditures
during the period of approval of the Demonstration. The limit is determined by using a
per capita cost method, and budget neutrality expenditure caps are set on a yearly basis
with a cumulative budget neutrality expenditure limit for the length of the entire
Demonstration. The data supplied by the State to CMS to set the annual limits is subject
to review and audit, and if found to be inaccurate, will result in a modified budget
neutrality expenditure limit.

57. **Risk.** The State shall be at risk for the per capita cost (as determined by the method
described below) for Demonstration eligibles under this budget neutrality agreement, but
not for the number of Demonstration eligibles in each of the groups. By providing FFP
for all Demonstration eligibles, The State shall not be at risk for changing economic
conditions that impact enrollment levels. However, by placing The State at risk for the
per capita costs for Demonstration eligibles under this agreement, CMS assures that
Federal Demonstration expenditures do not exceed the level of expenditures that would
have occurred had there been no Demonstration.

58. **Demonstration Populations Used to Calculate the Budget Neutrality Cap.** The
following Demonstration populations are used to calculate the budget neutrality cap and
are incorporated into the following eligibility groups (EGs):

a) **Eligibility Group 1:**   TANF Child under 1 through 20 required to enroll in
managed care in Allegany, Cortland, Dutchess, Fulton,
Montgomery, Putnam, Orange, Otsego, Schenectady,
Seneca, Sullivan, Ulster, Washington and Yates counties
(Demonstration Population 1)

b) **Eligibility Group 2:**   TANF Adults aged 21-64 required to enroll in managed
care in Allegany, Cortland, Dutchess, Fulton, Montgomery,
Putnam, Orange, Otsego, Schenectady, Seneca, Sullivan,
Ulster, Washington, and Yates counties (Demonstration
Population 2)

c) **Eligibility Group 3:**   Disabled Adults and Children 0-64 voluntarily enrolled in
managed care in those counties participating in the
Partnership Plan as of October 1, 2006 (Demonstration
Population 3)

d) **Eligibility Group 4:**   Disabled Adults and Children 0-64 required to enroll in
managed care in those counties participating in the
Partnership Plan as of October 1, 2006 (Demonstration
Population 4)

e) **Eligibility Group 5:**   Aged or Disabled Elderly 65+ voluntarily enrolled in managed care in those counties participating in the Partnership Plan as of October 1, 2006 (Demonstration Population 5)

f) **Eligibility Group 6:**   Aged or Disabled Elderly 65+ required to enroll in managed care in those counties participating in the Partnership Plan as of October 1, 2006 (Demonstration Population 6)

59. **Budget Neutrality Expenditure Cap:** The following describes the method for calculating the budget neutrality expenditure cap for the Demonstration:

a) For each year of the budget neutrality agreement an annual budget neutrality expenditure cap is calculated for each EG described in paragraph 58 as follows:

   i.   An annual EG estimate must be calculated as a product of the number of eligible member months reported by the State under paragraph 49 for each EG, times the appropriate estimated per member per month (PM/PM) costs from the table in subparagraph (ii) below.

   ii.  The PM/PM costs for the calculation of the annual budget neutrality expenditure cap for the eligibility groups subject to the budget neutrality agreement under this Demonstration are specified below.

| Eligibility Group | Trend Rate | DY 1 (10/1/06 – 9/30/07) | DY 2 (10/1/07 – 9/30/08) | DY 3 (10/1/08 – 9/30/09) | DY 4 (10/1/09 - 9/30/10) | DY 5 (10/1/10 - 9/30/11) |
|---|---|---|---|---|---|---|
| TANF Children under age 1 through 20 | 6.7% | $482.15 | $514.58 | $549.19 | $586.13 | $625.56 |
| TANF Adults 21-64 | 6.6% | $661.56 | $705.21 | $751.73 | $801.33 | $854.19 |
| Disabled Adults and Children 0 – 64 voluntarily enrolled in managed care | 6.12% | $1,746 | $1,852 | $1,966 | $2,086 | $2,214 |
| Disabled Adults and Children 0 – 64 required to enroll in managed care | 6.12% | $1,746 | $1,852 | $1,966 | $2,086 | $2,214 |
| Aged or Disabled Elderly 65+ voluntarily enrolled in managed care | 5.38% | $1,126 | $1,186 | $1,250 | $1,318 | $1,389 |
| Aged or Disabled Elderly 65+ required to enroll in managed care | 5.38% | $1,126 | $1,186 | $1,250 | $1,318 | $1,389 |

   iii. The annual budget neutrality expenditure cap for the Demonstration as a whole is the sum of the projected annual expenditure caps for each EG calculated in subparagraph (i) above.

b) The overall budget neutrality expenditure cap for the 5-year demonstration period is the sum of the annual budget neutrality expenditure caps calculated in subparagraph (a) (iii) above for each of the 5 years. The Federal share of the overall budget

Demonstration Approval Period: October 1, 2006 through September 30, 2011                              Page 23

neutrality expenditure cap represents the maximum amount of FFP that the State may receive for expenditures on behalf of Demonstration populations and expenditures described in paragraph 45 (e) during the Demonstration period.

60. **Enforcement of Budget Neutrality.** CMS shall enforce budget neutrality over the life of the Demonstration rather than on an annual basis. However, if the State exceeds the calculated cumulative budget neutrality expenditure cap by the percentage identified below for any of the Demonstration years, the State must submit a corrective action plan to CMS for approval.

| Demonstration Year | Cumulative Expenditure Cap Definition | Percentage |
|---|---|---|
| Year 1 | Budget neutrality expenditure cap plus | 1 percent |
| Years 1 and 2 | Combined budget neutrality expenditure caps plus | 0.5 percent |
| Years 1 through 3 | Combined budget neutrality expenditure caps plus | 0.4 percent |
| Years 1 through 4 | Combined budget neutrality expenditure caps plus | 0.3 percent |
| Years 1 through 5 | Combined budget neutrality expenditure caps plus | 0 percent |

61. **Exceeding Budget Neutrality.** If, at the end of this Demonstration period the overall budget neutrality expenditure cap has been exceeded, the excess Federal funds must be returned to CMS. If the Demonstration is terminated prior to the end of the budget neutrality agreement, an evaluation of this provision shall be based on the time elapsed through the termination date.

## X.    MEDICAID PROGRAM SAVINGS MEASURES

62. **Cumulative Savings Cap.** The State is required to save $3 billion total computable over the five-year demonstration period through specified health care reform initiatives in Section VI, paragraph 27. The $3 billion cumulative savings cap is considered a sub cap of the budget neutrality expenditure cap calculated in Section IX.

63. **Demonstration Populations Used to Calculate the Estimated Savings.** The following Demonstration populations are used to calculate the estimated savings and are incorporated into the following EGs:

   a) **Eligibility Group 1:**    TANF Child under 1 through 20 required to enroll in managed care in Allegany, Cortland, Dutchess, Fulton, Montgomery, Putnam, Orange, Otsego, Schenectady, Seneca, Sullivan, Ulster, Washington and Yates counties (Demonstration Population 1)

   b) **Eligibility Group 2:**    TANF Adults aged 21-64 required to enroll in managed care in Allegany, Cortland, Dutchess, Fulton, Montgomery, Putnam, Orange, Otsego, Schenectady, Seneca, Sullivan, Ulster, Washington, and Yates counties (Demonstration Population 2)



   c) **Eligibility Group 4:**   Disabled Adults and Children 0-64 required to enroll in managed care in those counties participating in the Partnership Plan as of October 1, 2006 (Demonstration Population 4)

   d) **Eligibility Group 6:**   Aged or Disabled Elderly 65+ required to enroll in managed care in those counties participating in the Partnership Plan as of October 1, 2006 (Demonstration Population 6)

64. **Estimated Medicaid Program Savings As a Subset of the Budget Neutrality Expenditure Cap:** The following describes the method for calculating the estimated Medicaid Program savings cap for the Demonstration:

   a) For each year of the budget neutrality agreement an annual Medicaid program savings is calculated for each EG described in paragraph 63 as follows:

      i. An annual EG estimate must be calculated as a product of the number of eligible member months reported by the State under paragraph 49 for each EG times the appropriate estimated per member per month (PM/PM) costs from the table in paragraph 59 (a)(ii).

      ii. The annual Medicaid savings cap for the Demonstration as a whole is the sum of the projected annual expenditure caps for each EG calculated in subparagraph (i) above minus the actual expenditures for the EGs in paragraph 63 reported on Forms CMS-64.9 Waiver and/or 64.9P Waiver.

   b) For each year under the Demonstration the amount of savings attributable to hospital rightsizing will be calculated using the following method from the data provided in the annual report required by Section VII, paragraph 43:

      i. (Base Year Medicaid discharges/enrollee – Demonstration Year Medicaid discharges/enrollee) * (Average DY Medicaid costs per discharge) * (Total DY Medicaid enrollees)

   c) The overall Medicaid savings cap for the 5-year demonstration period is the sum of the annual Medicaid savings calculated in subparagraph (a) (ii) plus the amount calculated in subparagraph (b) for each of the 5 years. The Federal share of the overall Medicaid savings limit represents the maximum amount of FFP that the State may receive.

## XI.   EVALUATION OF THE DEMONSTRATION

65. **Evaluation Design.** The State must submit to CMS for approval a draft evaluation design no later than January 1, 2007. At a minimum, the draft design must include a

discussion of the goals, objectives, and evaluation questions specific to the purposes of and expenditures made by the State for its health care reform activities. The draft design must discuss the outcome measures that will be used in evaluating the impact of these activities on the efficient operation of the State's health care system during the period of the Demonstration. The outcome measures below represent agreed-upon metrics under which the State and CMS can measure the shared financial benefit of the health care reforms and must be included in the evaluation design:

- Nursing home admissions - "Value of Averted Medicaid Nursing Home Admissions": For each fiscal year under the demonstration, the number of the reduction in the number of Demonstration Year (DY) Medicaid bed-days below Base Year (BY) level * average cost per bed-day * DY Medicaid enrollees.

- Reduction in Medicaid debt payment for hospitals - "Value of Avoided Inpatient Debt Payments": For each fiscal year under the demonstration, the reduction in the total inpatient debt per discharge from Base Year (BY) level * Medicaid discharges.

- Reduction in Medicaid debt payment for nursing homes - "Value of Avoided Nursing Home Debt Payments": For each fiscal year under the demonstration, the reduction in the total nursing facility debt per day from Base Year (BY) level * Medicaid days.

66. **Final Evaluation Plan and Implementation.** CMS shall provide comments on the draft design within 60 days of receipt, and the State must submit a final plan for the evaluation of the Demonstration described in paragraph 65, within 60 days of receipt of CMS comments. The State must implement the evaluation designs and report its progress on each in the quarterly reports. The State must submit to CMS a draft evaluation report 120 days prior to the expiration of the Demonstration. CMS shall provide comments within 60 days of receipt of the report. The State must submit the final report prior to the expiration date of the Demonstration.

67. **Cooperation with CMS Evaluators.** Should CMS conduct an independent evaluation of any component of the Demonstration, the State will cooperate fully with CMS or the independent evaluator selected by CMS. The State will submit the required data to the contractor or CMS.

## XI.     SCHEDULE OF STATE DELIVERABLES FOR THE DEMONSTRATION

| Date - Specific | Deliverable | STC Reference |
|---|---|---|
| 10/31/2006 | Submit Plan for Fraud and Abuse Recoveries | Section VI, paragraph 30 |
| 10/31/2006 | Implement Medicaid Cost Containment Initiatives | Section VI, paragraph 34 |
| 11/30/2006 | Submit Baseline Data on Health Reform Initiatives | Section VI, paragraph 32 |
| 1/1/2007 | Submit Evaluation Design | Section XI, paragraph 65 |

| Date - Specific | Deliverable | STC Reference |
|---|---|---|
| 1/31/2007 | Submit Initial Report on Progress of Commission | Section VI, paragraph 37 |
| 2/1/2007 | Implement Preferred Drug List | Section VI, paragraph 31 |
| 2/1/2007 | Implement New Medicaid Reform Initiative | Section VI, paragraph 34 |
| 3/31/2007 | Submit Report on MCO ADA Compliance Activities | Section VI, paragraph 35 |
| 1/1/2008 | Implement Employee Sponsored Insurance Program | Section VI, paragraph 33 |
| 4/1/2008 | Implement Single Point-of-Entry Program | Section VI, paragraph 36 |
| 7/15/2008 | Submit Report on Implementation of Commission's Recommendations | Section VI, paragraph 37 |
| 1/1/2009 | Demonstrate Fraud and Abuse Recoveries of $215 million | Section VI, paragraph 30 |
| 1/1/2009 | Document Increased Rates of Private Insurance | Section VI, paragraph 33 |
| 1/1/2009 | Demonstrate Fraud and Abuse Recoveries of $322 million | Section VI, paragraph 30 |
| 1/1/2011 | Demonstrate Fraud and Abuse Recoveries of $429 million | Section VI, paragraph 30 |
| 5/31/2011 | Submit Draft Evaluation Report | Section XI, paragraph 66 |
| 1/1/2012 | Demonstrate Fraud and Abuse Recoveries of $644 million | Section VI, paragraph 30 |
| 9/30/2011 | Submit Final Evaluation Report | Section XI, paragraph 66 |

| | Deliverable | STC Reference |
|---|---|---|
| Annual | By January 1st - Draft Report | Section VII, paragraph 43 |
| | By December 31st – MEQC Program Report | Section III, paragraph 14 |
| Quarterly | | |
| | Quarterly Operational Reports | Section VII, paragraph 42 |
| | CMS-64 Reports | Section IX, paragraph 45 |
| | Eligible Member Months | Section IX, paragraph 49 |

## ATTACHMENT A

### Quarterly Report Guidelines

Under Section VII, paragraph 42 of these STCs, the State is required to submit quarterly progress reports to CMS. The purpose of the quarterly report is to inform CMS of significant demonstration activity from the time of approval through completion of the demonstration. The reports are due to CMS 60 days after the end of each quarter.

The following report guidelines are intended as a framework and can be modified when agreed upon by CMS and the State. A complete quarterly progress report must include an updated budget neutrality monitoring workbook. as well as an updated reform metric workbook. An electronic copy of the report narrative. as well as both Microsoft Excel workbooks is provided.

### NARRATIVE REPORT FORMAT:

      **Title Line One** – Federal-State Health Reform Partnership

      **Title Line Two** - Section 1115 Quarterly Report

      **Demonstration/Quarter Reporting Period:**
            Example:
            Demonstration Year:  1 (10/1/06 - 9/30/07)
            Federal Fiscal Quarter: 4/2007 (7/07 - 9/07)

**Introduction:** Information describing the goal of the demonstration, what it does, and key dates of approval /operation. (This should be the same for each report.)

**Enrollment Information** :  Complete the following table that outlines all enrollment activity under the demonstration. The State should indicate "N/A" where appropriate. If there was no activity under a particular enrollment category. the State should indicate that by "0".

Note: Enrollment counts should be person counts for the current quarter only. not participant months.

| Population Groups | Current Enrollees | # Voluntary Disenrollments | # Involuntary Disenrollments |
|---|---|---|---|
| **Population 1 – TANF Child under 1 through 20 ("new" MC enrollment)** | | | |
| **Population 2 – TANF Child under 1 through 20 ("new" MC enrollment)** | | | |
| **Population 3 –  Disabled Adults and Children 0-64 ("old" voluntary MC enrollment)** | | | |
| **Population 4 –  Disabled Adults and Children 0-64 ("new" MC enrollment)** | | | |
| **Population 5 –  Aged or Disabled Elderly ("old" voluntary MC enrollment)** | | | |
| **Population 6 –  Aged or Disabled Elderly ("new" MC enrollment)** | | | |

## ATTACHMENT A

### Quarterly Report Guidelines

**Voluntary Disenrollments:**
Cumulative Number of Voluntary Disenrollments in Current Demonstration Year:
Reasons:

**Involuntary Disenrollments:**
Cumulative Number of Involuntary Disenrollments in Current Demonstration Year:
Reasons:

**Progress of Expansion of Mandatory Managed Care:** Summarize progress towards meeting projected enrollment targets

**Documentation of Successful Achievement of Milestones (if any during the quarter):**
Identify all activities relating to implementation of milestones required under the Demonstration, including but not limited to:
- The activities of the Commission and progress in implementing its recommendations;
- An explanation of grants, contracts or other financial arrangements entered into for purposes of implementing the health system reform efforts of this Demonstration; and
- Any other information pertinent to the health system reform efforts of this Demonstration.

**Consumer Issues:** A summary of the types of complaints or problems consumers identified about the program in the current quarter. Include any trends discovered, the resolution of complaints, and any actions taken or to be taken to prevent other occurrences. Also discuss feedback, issues or concerns received from the MCARP, advocates and county officials.

**Financial/Budget Neutrality Developments/Issues:**

Provide information on:
- Health reform expenditures – when and what
- Designated State health programs – amount of FFP claimed for the quarter
- Savings estimates
- Reform metrics

Submit both a completed reform metric workbook and an updated budget neutrality monitoring workbook

**Demonstration Evaluation:**

Summarize progress on evaluation design, plan and final report.

**Enclosures/Attachments:**

Identify by title any attachments along with a brief description of what information the document contains.

## ATTACHMENT A

### Quarterly Report Guidelines

**State Contact(s):**

Identify individuals by name, title, phone, fax, and address that CMS may contact should any questions arise.

**Date Submitted to CMS:**