042308TT1.txt

1

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
----------------------------------x
JOHN E. ANDRUS MEMORIAL, INC.,

                Plaintiff,

       v.                07 CV. 3432 (CLB)

RICHARD F. DAINES, as Commissioner
of the New York State Department
of Health,

              Defendant.
----------------------------------x
              U.S. Courthouse
              White Plains, N.Y.
              April 23, 2008
              9:30 a.m.

Before:      HON. CHARLES L. BRIEANT,
              United States District Judge

APPEARANCES

CADWALADER WICKERSHAM & TAFT, LLP
BY:  BRIAN T. MCGOVERN, Esq.
One World Financial Center
New York, N.Y.  10281
Attorney for Plaintiff

STATE OF NEW YORK
OFFICE OF THE ATTORNEY GENERAL
Litigation Bureau
120 Broadway
New York, N.Y.  10271-0332
BY:  JOHN P. GASIOR, Esq.
Assistant Attorney General

Sue Ghorayeb, R.P.R., C.S.R.
Official Court Reporter

 

                                                2

1           (Telephone conference)

2           MR. MCGOVERN:  Good morning.

042308TT1.txt

3      MR. BERGMANN:  Good morning.

4      THE COURT:  Good morning.

5      MS. BIDDLE:  Good morning.

6      THE COURT:  We have Mr. Gasior on the phone.

7      THE CLERK:  We do, Judge.  Mr. Gasior.

8      THE COURT:  Good morning.

9      THE CLERK:  Mr. Gasior, can you hear me?

10      MR. GASIOR:  Hello.

11      THE COURT:  Yes.  Can you hear us all right?

12      THE CLERK:  Yes.  Yes, we can hear you.

13      THE COURT:  If you can't hear at any time, please

14 speak up.  Good morning, everybody.

15      MR. BERGMANN:  Good morning, Judge.

16      MR. McGOVERN:  Good morning, Judge.

17      MR. GASIOR:  Good morning.

18      THE COURT:  Who wishes to start?

19      MR. McGOVERN:  Your Honor, it's Brian McGovern, on

20 behalf of Andrus on Hudson, applying for a Temporary

21 Restraining Order.

22      The -- as Your Honor is aware, we have previously

23 filed a motion for a preliminary -- we have filed a motion

24 for preliminary injunction --

25      THE COURT:  Yes.

Sue Ghorayeb,  Official Court Reporter

□                                                              3


1      MR. McGOVERN:  -- one week ago and with a return

2 date of this coming Friday.

3      We filed that motion following our last court

4 conference with Your Honor, on a two-week turnaround, with

5 the understanding that the preliminary injunction motion

Page 2

042308TT1.txt
6   would be briefed and the Court would hold any necessary
7   evidentiary hearing to make a ruling on our preliminary
8   injunction motion at the earliest practicable time.

9       Mr. Gasior contacted me requesting an adjournment
10  on account of his need to assist his parents with a move to a
11  healthcare facility, and of course we have no objection to
12  granting his --

13      THE COURT:  I'm sorry.  He had contacted you for
14  adjournment to do what?

15      MR. McGOVERN:  He requested an adjournment of the
16  return date on the preliminary injunction motion for
17  originally one week, so that he could travel to Florida to
18  assist his parents --

19      THE COURT:  Yes.

20      MR. McGOVERN:  -- with a move to a nursing
21  facility.  And, of course, we are very sympathetic to that
22  and have no objection to adjourning the return date of that
23  motion.  However, all we requested from Mr. Gasior is that,
24  within that one week period, that the status quo in effect
25  continue, at least until we are before Your Honor on our

                Sue Ghorayeb,  Official Court Reporter

▫                                                                 4


1   motion, and that, that was how the Court understood the
2   parties were to proceed.

3       When we last appeared before you, on March 28th,
4   you expressed the view that your intent was to keep the
5   status quo in place until you had a chance to make the
6   appropriate findings of fact and rule on the preliminary
7   injunction motion, and we moved fast on that motion, Your
8   Honor.

                        Page 3

042308TT1.txt
9       THE COURT:   And send you all to the Court of

10  Appeals.

11          MR. MCGOVERN:   If, if that be the case, if that's

12  where --

13          THE COURT:   Well --

14          MR. MCGOVERN:   -- the course of the litigation

15  takes us, that, that may be the case, Your Honor.

16          But, in any event, Mr. Gasior requested the one

17  week adjournment.   We had no objection to the adjournment.

18          THE COURT:   Mr. Gasior has seen these papers?

19          MR. MCGOVERN:   He should have them by now.   I have

20  arranged to fax them and hand-deliver them to his office.

21          Mr. Gasior and I spoke this morning, at 8:30 in the

22  morning.   I advised him of this application.   And the issue

23  is -- concerns what Mr. Gasior has advised is his client's

24  intention, while this motion is pending, to issue an amended

25  operating certificate, which would cut off the operating

                Sue Ghorayeb,   Official Court Reporter
                                                                    5
0

1  certificate of the Andrus as of June 30, 2008.

2          It currently operates under an operating

3  certificate without any limitation on its term, and the

4  defendant has determined that it will amend that operating

5  certificate --

6          THE COURT:   Yes.

7          MR. MCGOVERN:   -- during the pendency of this

8  motion, to establish a June 30 cutoff for the operation of

9  the Andrus.

10          We submit, Your Honor, that -- and we requested

11  that the defendant refrain from, from issuing that amended

                                Page 4

042308TT1.txt

12    operating certificate until we get a chance to appear on the

13    motion, if -- on the return date of the motion. His client

14    refused to refrain to do that until March -- May 2, and in

15    light of that position, we are here to seek a Temporary

16    Restraining Order from the issuance of that amended operating

17    certificate.

18          The June 30 date is precisely the date that the

19    Berger Commission directed the State to terminate the

20    operating certificate of the Andrus. We are in court now to

21    challenge that very action as unconstitutional, and issuing

22    an amended certificate with that date would, would subvert

23    clearly the preliminary injunctive relief we are seeking, as

24    well as the ultimate relief in the case.

25          If the -- if the Andrus has to amend its operating

                    Sue Ghorayeb,  Official Court Reporter

0                                                              6


1    certificate, it has to tell the world, including prospective

2    residents and any referring providers, that its life can no

3    longer extend -- "we can no longer assure your residence in

4    this facility beyond June 30," or whatever date the State may

5    determine to further extend that date.

6          So, the, the amendment of the operating certificate

7    is an immediate and irreparable threat to the continued

8    viability of the Andrus. In addition, the Andrus can't sit

9    back and say, "well, we have an operating certificate as of

10   June 30." And while the State may not attempt to enforce

11   that operating -- amended operating certificate, assuming

12   Your Honor granted the preliminary injunction, the Andrus is

13   duty bound to effect any -- take any steps necessary in light

14   of that amendment of the operating certificate; that may also

                              Page 5

042308TT1.txt

15    involve arranging for the transfer of residents.

16          But at the very least, they have to disclose to

17    residents and prospective residents that their operating

18    certificate is, is no longer unlimited and is -- now has a

19    shortened life of June 30, and that will have a devastating

20    effect on its operations while this lawsuit is pending.  And

21    for those reasons, Your Honor, we would oppose.

22          I want to also point out, Your Honor, on the wall

23    of the Andrus is posted its operating certificate, which by

24    regulation it's required to publish in the facility, so that,

25    so that anyone who walks in the facility can know that this

                    Sue Ghorayeb,   Official Court Reporter

                                                                7


1    is a, this is a licensed facility, and it would have to

2    reflect that its, that its, that its operating certificate is

3    limited to June 30.

4          THE COURT:  All right.  I think the Court will have

5    to give you an evidentiary hearing on this issue, and I think

6    the Court will have to take whatever necessary steps to

7    maintain the status quo and to keep the lease alive while the

8    evidentiary hearing is conducted, and make findings of fact

9    and conclusions of law and send you to the Circuit.

10          I think also, as I thought the first time I saw the

11    case, this is really a New York State issue.  This is an

12    issue with respect to which, as far as I'm concerned, all the

13    branches of the State government ought to be primarily

14    concerned.

15          There may be some constitutional issues here, but

16    the issues that are primary in the case are how this care is

17    to be given, how it's to be financed, how it's to be

                                Page 6

042308TT1.txt
18   conducted.  And I really thought this was an abstention case

19   at the very beginning.  I thought that this famous case in

20   Cheektowaga -- is that where it is -- would have gone

21   somewhere and given us some learning on the subject through

22   the State Court.  I gather it hasn't.

23            MR. McGOVERN:  We have no --

24            THE COURT:  Can I have an impression from you and

25   from Mr. Gasior when you would be ready for the evidentiary

                Sue Ghorayeb,  Official Court Reporter

☐                                                          8


1   hearing?

2            I don't want to have a great big long-winded trial.

3   I want to get a very simple record, get the testimony, get

4   the exhibits, make the findings and conclusions, and send you

5   onward to a higher level of jurisprudence.  Have you talked

6   with each other over that?

7            MR. McGOVERN:  Well, we have discussed dates, our

8   available dates for depositions, which were also to be

9   scheduled.  And so I have provided Mr. Gasior with several

10  available dates that we do have and Mr. Gasior has not

11  indicated his availability on these dates.

12            MR. GASIOR:  Your Honor, this is John Gasior.  If I

13  might speak specifically to that issue.

14            We, Mr. McGovern and I, have spoken about what the

15  scope of any evidentiary hearing on the motion for a

16  preliminary injunction should be.  And I have informed Mr.

17  McGovern that the State Department of Health is prepared to

18  concede for purposes of the preliminary injunction that if

19  Andrus's doors are closed pursuant to the loss of its

20  certificate, that we will concede that that is irreparable

                            Page 7

042308TT1.txt
21    harm.  And we think that that would necessarily limit the
22    amount of depositions or an evidentiary hearing that's
23    required on the issue of irreparable harm.  Then the Court
24    could move strictly to the issue of whether Andrus is likely
25    to prevail on the merits of its case.

                    Sue Ghorayeb,  Official Court Reporter

□                                                                9


1              I think that that could significantly expedite the
2     hearing on the preliminary injunction and save the parties a
3     lot of time and trouble, when the State is prepared to
4     concede that if their doors are closed because the license is
5     pulled, that that is irreparable harm.

6              Which is not to say that the issuance of the
7     amended certificate would necessarily take place on June
8     30th.  As a matter of fact, the State is prepared for the
9     eventuality that the Court will issue a preliminary
10    injunction and the State will then reissue another
11    certificate extending the time, that the certificate would
12    remain in effect for however long this litigation lasts and a
13    determination could be made on the merits.

14             THE COURT:  I think that's a very fair thing to do.
15             MR. GASIOR:  Well -- and I would also mention, Your
16    Honor, that with respect to the scenario that Mr. McGovern
17    just described, about vendors and residents being surprised
18    or shocked by this amended certificate being issued, the --
19    it was public knowledge as far back as November of 2006 that
20    the Andrus, that the Andrus had been targeted for closure by
21    the Berger Commission recommendations, and but for this
22    litigation, Andrus would be closing on June 30th.  That date
23    has been a known quantity since November of 2006.

                              Page 8

042308TT1.txt
24          THE COURT:  Well, if you are bound to do that, and
25     the only reason you can't or don't do it is if the Court

                    Sue Ghorayeb,  Official Court Reporter
☐                                                              10


 1     issued an order, then I don't see any problem.  Because at
 2     the end of the day, a higher court is either going to say,
 3     "yes, it's a valid order and you got to adhere to it," or
 4     they're going to find a constitutional violation.
 5              That's what the claim here is, due process, right?
 6              MR. McGOVERN:  That's correct, Your Honor.
 7              THE COURT:  And they are going to tell you, "you
 8     can't do it," and you will have to go back to the legislature
 9     and try again.
10              MR. GASIOR:  Absolutely, Your Honor.  We recognize
11     that there is a chance of losing on the merits of the case.
12              We also -- the State also completely understands
13     that the Court may issue a preliminary injunction, and if
14     that happens, the Department of Health would be obligated to
15     issue a certificate that Andrus could show to residents, that
16     it could show to the Center for Medicare and Medicaid
17     Services, so that it could get paid --
18              THE COURT:  Yes.
19              MR. GASIOR:  -- under Medicaid or Medicare.  It
20     would have whatever it needed to continue to operate pending
21     resolution of this case.
22              And that -- certainly, the motion for preliminary
23     injunction would be decided before June 30th, and whatever
24     certificate amending the amended certificate needed to be
25     issued could be issued.  And that's why the Department of

                    Sue Ghorayeb,  Official Court Reporter
                                Page 9

042308TT1.txt                                    11

1   Health feels that merely sending out this amended certificate
2   does not disturb the status quo.

3            The Department is prepared to --

4            THE COURT:  Well, once you have indicated an
5   irrefutable intention to do it and this Court enjoins it,
6   then you got a lawsuit.  So, I don't see that there is any
7   real need to issue it until you have your evidentiary
8   hearing.

9            MR. GASIOR:  Well, the need for issuing it, Your
10  Honor, is --

11           THE COURT:  You would do it but for the
12  intervention of the Court, and the Court will sign an order
13  indicating that it's intervening.

14           MR. GASIOR:  And the reason that the Department is
15  concerned that it needs to be issued before June 30th is
16  because the enabling legislation states that its authority,
17  the Department of Health's authority, terminates on June
18  30th.  So if it has issued the --

19           THE COURT:  Well, if you would have issued it but
20  for the Court's order, I think that's all you need, if
21  anything, at some point.

22           MR. GASIOR:  If we are enjoined, Your Honor,
23  whether by a TRO here today or by a preliminary injunction,
24  then of course we will not issue that, that letter.

25           THE COURT:  But you have indicated an intention to

             Sue Ghorayeb,  Official Court Reporter
                                                 12

1   do so, and so you have a controversy.
                    Page 10

042308TT1.txt

2          And, you know, the worst thing in the world in
3    litigation is a rush job.  The worst thing in the world is a
4    court acting to make findings of fact and conclusions of law
5    under a deadline, and sometimes we can't avoid it, but we
6    want to make it as easy as possible.  So we do the best
7    scholarly, fair, objective job that we can, and then you are
8    in the hands of the distinguished Circuit.

9          You have no State Court litigation testing this at
10   the moment, do you?

11          MR. GASIOR:  Testing -- I'm sorry, Your Honor.

12          THE COURT:  Do you have presently pending in the
13   New York State court system anything that's presently testing
14   this issue of this committee, the Berger Commission?

15          MR. GASIOR:  There are other lawsuits pending, Your
16   Honor.  I think that most of them are in the process of
17   settling.  As a matter of fact, I think that -- well, last
18   week, there was the Parkway Hospital litigation in the
19   Southern District Bankruptcy Court.

20          The Bankruptcy Court issues were dismissed on a
21   motion to dismiss, and the Court said that if the debtor
22   wanted to pursue its State law claims, it needed to do so in
23   another forum.  And I think --

24          THE COURT:  What's the name of that case?

25          MR. GASIOR:  Parkway Hospital.

              Sue Ghorayeb,  Official Court Reporter
D                                                        13


1          THE COURT:  Parkway.

2          MR. GASIOR:  It's Judge Abrams' --

3          THE COURT:  Yes, yes.

4          MR. GASIOR:  -- case, and that order I believe was
                              Page 11

042308TT1.txt

5    entered last week dismissing the bankruptcy claims.

6         THE COURT:  That they should go sue in the State

7    Court.

8         MR. GASIOR:  And all of the remaining issues,

9    constitutional issue and State law issues, there was State

10   administrative proceedings claims, those State law issues she

11   said she was not going to decide and left it up to the

12   plaintiff to decide what they were going to do.  But she made

13   it clear that she didn't see any bankruptcy jurisdiction to

14   hear the State law claims.

15         I can try to get a copy of that order for you, but

16   I don't have it in my hands right now.

17         THE COURT:  Yes.

18         MR. McGOVERN:  Your Honor, if I may --

19         THE COURT:  Yes, certainly.

20         MR. McGOVERN:  -- comment a little bit on that.

21         Unlike the Parkway case, we have no State law

22   claims in this action.  Our claims are based on, on purely

23   federal constitutional claims of due process, and due process

24   takings and contract clause provisions under the U.S.

25   Constitution.  So the ruling in Parkway, that Parkway should

              Sue Ghorayeb,  Official Court Reporter

☐                                                    14

1    litigate its State law claims in State Court, doesn't give

2    much direction I believe.

3         The one case where we were waiting for the Court of

4    Appeals to weigh in was the Cheektowaga case --

5         THE COURT:  Yes.

6         MR. McGOVERN:  -- to which Your Honor referred, and

7    the Attorney General successfully argued to the Court of

                              Page 12

042308TT1.txt

8    Appeals that they should not hear the case.

9         The Attorney General's Office successfully argued

10   that, that the Court of Appeals should not hear that case,

11   and we are left only there with an Appellate Division case.

12        THE COURT:  And what was the reasoning that they

13   should not hear that case?

14        MR. McGOVERN:  Well, in the first instance, they

15   ruled that -- they dismissed the case as of right, on the

16   ground that it did not raise a substantial constitutional

17   question, and the State Attorney General argued precisely

18   that position.  And then when Cheektowaga moved for leave to

19   appeal, which they had the right to do --

20        THE COURT:  Yes.

21        MR. McGOVERN:  -- the Attorney General there

22   opposed again, arguing that the decision on -- by the Court

23   of Appeals on this issue would, would not have any statewide

24   importance, because there is only a handful of facilities out

25   there still litigating, so it really won't matter much how

                    Sue Ghorayeb,  Official Court Reporter
0                                                              15


1    the Court of Appeals rules on that issue.

2         Meanwhile, we had voluntarily, on consent, stayed

3    our case precisely to see how the Court of Appeals may rule

4    on questions concerning the Berger Commission, which included

5    by the way both State law claims and constitutional claims in

6    that case.

7         THE COURT:  And I gather it's their position or the

8    Berger Commission's position that the legislature through the

9    Commission can determine what eleemosynary services will be

10   rendered by whom and when and where; that there is no
                              Page 13

042308TT1.txt

11    constitutionally-protected due process right to have a

12    facility like this.

13        MR. McGOVERN:  Well, what the enabling legislation

14    provided, Your Honor, was that, that -- in making any of its

15    recommendations for right-sizing hospitals and nursing homes

16    throughout the State, the Commission was required to consider

17    several factors specific to each facility, to determine

18    whether -- which -- and those factors were to determine which

19    facilities were to be closed or right-sized.

20        In the case of the -- and one of those factors is

21    the financial condition of the facility.  And the finding

22    made with the -- the assumption made by the Berger Commission

23    was that this facility was operating at a deficit, completely

24    contrary to the actual operations of the Andrus.  And --

25        MR. GASIOR:  Your Honor.

        Sue Ghorayeb,  Official Court Reporter

□                                                        16


1        MR. McGOVERN:  So, if I just may add one point

2    that, that Mr. Bergmann has pointed out; that the enabling

3    legislation did not preclude or deny the provider's right to

4    pursue a constitutional due process claim if, if the Berger

5    Commission failed to either follow the factors or otherwise

6    deprive the nursing home of its due -- recognized property

7    interest in its operating certificate.  And there is no

8    question here that the operating certificate under which the

9    Andrus operates constitutes a property that's protected by

10    due process rights.

11        MR. GASIOR:  Your Honor, this is John Gasior.

12        THE COURT:  Yes.

13        MR. GASIOR:  If I can just comment on the impact of
                        Page 14

042308TT1.txt

14    the St. Joseph Cheektowaga hospital determination by the
15    Court of Appeals.  That was a merits-based determination.
16    The Court of Appeals found that there were no substantial
17    constitutional issues, the very kinds of issues that Mr.
18    McGovern is arguing here on behalf of Andrus.

19         Regardless of what the Attorney General argued to
20    the court, the court, in the first instance, found there was
21    no substantial issue and no substantial constitutional issue.
22    And then when St. Joseph appealed the second time -- I forget
23    whether it was as of right or for permission, I get those two
24    confused.  But the second time -- correct me if I'm wrong,
25    Mr. McGovern -- the Court of Appeals then imposed costs on

                    Sue Ghorayeb,  Official Court Reporter
0                                                          17


1    St. Joseph for bringing that second, that second appeal --
2    request for a second appeal, which I think substantially
3    shows that the Court of Appeals thought that they had
4    disposed of the issue effectively the first time by saying
5    there was no substantial constitutional issue involved there.
6         THE COURT:  So, is it fair to say that, from your
7    point of view, if a person has a facility especially
8    developed for purposes of rendering nursing services of a
9    charitable nature, and they have a certificate to operate it
10    and they have operated it for a reasonable number of years,
11    that they have no vested right in continuing to do so because
12    the State doesn't want them to?
13         MR. GASIOR:  The State always has the option to
14    review that certificate and if it feels that it's not
15    necessary, or somehow or other at odds with the public
16    interest, to withhold that certificate, and that was a
                              Page 15

042308TT1.txt

17    procedure that was merely extended --

18            THE COURT:   Without, without compensation?

19            MR. GASIOR:   That's correct, Your Honor.

20            MR. MCGOVERN:   Well, if I may, Your Honor, I do

21    wish to respond and correct Mr. Gasior on a couple of points.

22            Firstly, the -- neither of those rulings by the

23    Court of Appeals reached the merits of the Appellate Division

24    Fourth Department decision on whether the State had violated

25    the due process rights of St. Joseph's Hospital at

              Sue Ghorayeb,   Official Court Reporter

0                                                              18

1    Cheektowaga.   Neither of those rulings is a merits

2    determination.

3            Moreover, Your Honor, the -- it's well-settled that

4    if, if a -- if the Court, if the Court of Appeals determines

5    that the appeal is not correct as of right, the party does

6    have the option of moving for leave to appeal.  And when that

7    motion for leave to appeal is denied, it's, it's, it's not

8    uncommon for the court to impose costs --

9            MR. BERGMANN:   Which is $200.

10            MR. MCGOVERN:   -- in the amount of $200.

11            THE COURT:   Well --

12            MR. MCGOVERN:   It's the rule rather than the

13    exception that when a motion for leave is filed and denied,

14    the movant has to pay costs, not because they shouldn't have

15    moved, but because the practice in the Court of Appeals is to

16    impose it.

17            THE COURT:   Well, this Court will have to assume

18    the Court of Appeals of New York knew what it was doing and

19    acted intentionally in the matter and is a final source of

                              Page 16

042308TT1.txt

20  non-constitutional law for the State of New York.  It's an

21  Erie issue, Erie Railroad.  Yes, sir.

22          MR. BERGMANN:  Your Honor, Peter Bergmann.  I just

23  wanted to say one thing, which was that the Berger Commission

24  legislation was modeled on the federal base closing

25  legislation that took place a couple of years earlier.  The

            Sue Ghorayeb,  Official Court Reporter

☐                                                          19

1   key difference though, which somehow has gotten lost in

2   translation, is the fact that the bases that were going to be

3   closed were all owned by the federal government.

4           Here, as Your Honor just mentioned --

5           THE COURT:  Yes.

6           MR. BERGMANN:  -- the nursing homes and hospitals

7   are not owned by the government but rather by, by private or

8   eleemosynary interests, and, you know, and that intellectual

9   issue never got addressed anywhere.

10          THE COURT:  Well, then, the next question that that

11  poses is:  If you have an eleemosynary facility and you want

12  to use it to benefit the persons for whom the corporation was

13  formed a hundred years ago or whenever they did it, you have

14  no right to do it against the wishes of the State.  That's

15  what we are hearing.

16          MR. BERGMANN:  Well --

17          THE COURT:  That the State can tell you, "you have

18  no constitutional right to continue to operate Andrus."

19          MR. BERGMANN:  I don't think --

20          THE COURT:  "Certificate or not, you have no -- you

21  will still turn it into a warehouse."

22          MR. BERGMANN:  And I would say to Your Honor that
                            Page 17

042308TT1.txt

23    the State, even under the enabling legislation, had

24    guidelines and a structure that they had to follow.

25            They couldn't arbitrarily decide to close any

            Sue Ghorayeb,  Official Court Reporter

☐                                                                  20

1    facility.  They had --

2            THE COURT:  But that's what the Fourth Department

3    adjudicated.

4            MR. BERGMANN:  No, even with the Fourth Department

5    adjudication.

6            MR. MCGOVERN:  If I may speak on that issue.

7            THE COURT:  Yes.

8            MR. MCGOVERN:  Even the Fourth Department majority

9    decision recognized that a not-for-profit healthcare provider

10   does have a protected property interest in its operating

11   certificate.  So even the majority opinion --

12           THE COURT:  Under New York law.

13           MR. MCGOVERN:  Under, under New York and federal

14   constitutional law, because there were both federal and State

15   law issues litigated.

16           THE COURT:  Maybe you will give us a copy of those

17   cases at some point.

18           MR. MCGOVERN:  Yes.

19           MR. GASIOR:  Those cases were provided.

20           THE COURT:  That comes to me as somewhat of a

21   surprise.  I think maybe in this area, which has an economic

22   aspect to it, the State might be able to say, "we are not

23   going to allow certain types of healthcare facilities

24   eleemosynary."

25           MR. GASIOR:  Well, Your Honor, I think that what
                                Page 18

042308TT1.txt

Sue Ghorayeb,  Official Court Reporter

1   Mr. McGovern left unsaid, though, when he said that the

2   Fourth Department found that the hospital had a protected

3   property interest is that the Fourth Department then went on

4   and found there was no constitutional violations at all.

5           MR. McGOVERN:  Well, as Your Honor pointed out back

6   in September of '07, the dissent did find a violation of

7   procedural due process.

8           THE COURT:  Well, it's a lawsuit, isn't it?

9           And we have to deal with it professionally, and

10  that means that we have to rule and roll.  We have to make a

11  record and we have to send you on to wiser minds, and we have

12  to do it promptly.  We do not want to forfeit any right the

13  State has.  On the other hand, we don't want the State doing

14  a lot of paper shuffling that may cause trouble down the road

15  if, if you were right.

16          MR. McGOVERN:  I mean the trouble down the road,

17  Your Honor, is not -- could, could occur immediately and

18  irreparably if this amended operating certificate is issued.

19          It's not the easy solution that Mr. Gasior is

20  outlining here.

21          THE COURT:  Well, it's fairly clear to me that they

22  will do it unless enjoined.

23          MR. McGOVERN:  I would agree.

24          THE COURT:  Once you get to that point, your case

25  is not moot, you've got a lawsuit, and you can get it

Sue Ghorayeb,  Official Court Reporter

042308TT1.txt

1    adjudicated at some point along the road on the merits. And
2    it's not necessary for him to actually issue the certificate
3    in order to litigate.

4          MR. McGOVERN:  Correct, Your Honor.  And we are
5    only asking them to refrain, on this application, refrain
6    from issuing that amended operating certificate while Your
7    Honor makes findings.

8          THE COURT:  Well, can I get a date agreed to for a
9    hearing?

10         MR. GASIOR:  Well, a hearing on frankly which
11   motion, the application for a TRO or the preliminary
12   injunction?

13         THE COURT:  Well, the Court was figuring to try the
14   merits under Rule 65(a).

15         The Court was figuring to have a very brief
16   discovery, preferably none, but if you have to have it, you
17   can.  Get your documents together, come in and try it.

18         MR. McGOVERN:  Well, Your Honor, as I said, we have
19   offered a number of dates to Mr. Gasior to schedule the
20   depositions prior to any hearing or trial in the case.  We
21   have not heard back from him.

22         MR. GASIOR:  I just got those in the last few days.
23   I haven't had time to circulate it properly to the client.

24         THE COURT:  If permitted, you will prove the
25   following facts.  Maybe he will stipulate to these facts.  He

              Sue Ghorayeb,  Official Court Reporter

1    has indicated a willingness to stipulate irreparable damage,
2    can't ask for much more than that.

042308TT1.txt

 3          MR. GASIOR:  That's absolutely true, Your Honor.  I
 4   think that would negate the necessity for a lot of discovery
 5   and depositions and all sorts of submissions of affidavits,
 6   which the plaintiff seems to want to do.

 7          There is no need to get into an issue of how many
 8   people have dementia within Andrus, how many people live
 9   within 5 miles of Andrus, whether there would be an impact.

10          THE COURT:  I am not sure that's true.  I can't, I
11   can't commit to that at this point.

12          MR. GASIOR:  But if we are prepared to concede that
13   if the doors are closed because their license has terminated
14   or will terminate, that that's irreparable harm, doesn't
15   that -- I think that --

16          THE COURT:  Yes.  But you see nobody, nobody has
17   brought me to the constitutional violation.  Nobody has said
18   to me, "well, Judge, it's really arbitrary and capricious.
19   They are doing it to us and they didn't do it to somebody
20   down in Parkway, who is bankrupt, and they are going to do
21   this and that, and it's arbitrary and capricious."  I don't
22   know.

23          MR. MCGOVERN:  Your Honor, just on that question,
24   and we do have and have established that the recommendations
25   to close the Andrus is wholly without justification given

              Sue Ghorayeb,  Official Court Reporter
 ⌷                                                          24


 1   their optimal occupancy and quality of care.  All of the
 2   assumptions made --

 3          THE COURT:  Yes, but that's in your eyes, and
 4   that's not necessarily a decision entrusted to the federal
 5   courts.  Okay.

                        Page 21

042308TT1.txt

6       MR. McGOVERN:  But it is, Your Honor, with due

7  respect, when what's at stake is an operating certificate

8  where, where the settled law, both from the state courts and

9  the federal courts, is that a healthcare provider with a duly

10  issued license or operating certificate has a protected

11  property interest in that and it cannot be taken away on

12  arbitrary grounds, and we have shown based on the multiple

13  factual errors that the Berger Commission did just that.

14       And, of course, besides the flaws in the findings,

15  they provided no notice or hearing before they went ahead and

16  made these -- this recommendation, and that is --

17       THE COURT:  But it's not an adjudicating body, is

18  it?  It's just a political body from the legislature.  It's

19  not a court.

20       MR. McGOVERN:  Well, but -- it's not a court, Your

21  Honor.  That's correct.  But the, but the -- as I mentioned

22  earlier, the enabling legislation did require them to

23  consider several factors --

24       MR. GASIOR:  Judge --

25       MR. McGOVERN:  -- specific, specific to each

            Sue Ghorayeb,  Official Court Reporter
D                                                      25


1  facility --

2       THE COURT:  Is it --

3       MR. McGOVERN:  -- and they ignored it.

4       THE COURT:  Is it fair to say that nobody else can

5  get these certificates today?

6       If somebody wanted to open Andrus today, they

7  couldn't do it.

8       MR. McGOVERN:  They could not do it without

042308TT1.txt
9   getting -- without going through the public health counsel,
10  establishing a public need --
11          THE COURT:  Yes.
12          MR. McGOVERN:  -- and meeting all of the other
13  criteria for the issuance of an operating certificate.
14          But once that -- once a provider receives an
15  operating certificate, that becomes a protected property
16  interest, and that's the settled law in the federal courts
17  and in the state courts.  There is no serious question on
18  that issue, Your Honor.
19          MR. GASIOR:  But, again, going back to St. Joseph
20  at Cheektowaga, despite the fact that that may be considered
21  a property interest, it did not stop the Fourth Department
22  from saying that due process has not been violated by the
23  procedures used by the Berger Commission.
24          THE COURT:  Depending on the evidence.  Depending
25  on the evidence.

            Sue Ghorayeb,  Official Court Reporter
☐                                                           26


1           MR. GASIOR:  But that's a merit-based
2   determination, Your Honor.
3           I think if we are focussing on the preliminary
4   injunction today, it's still incumbent upon Andrus to show
5   that irreparable harm and a likelihood of success on the
6   merits.
7           THE COURT:  When public interest is involved there
8   is irreparable harm, and we are not going to waste your time.
9   That's the main thing to understand here.  We are not going
10  to waste your time.  We are going to get a record.  We are
11  going to get findings of fact and conclusions of law.  We are
                        Page 23

042308TT1.txt
12    going to bless you and send you on your way.  That's what I
13    want to do.

14             I want to get dates by which you can live with, so
15    we don't have letters wanting adjournments, and I want to fit
16    you in on my other cases, which I hate to say, I have a few.
17    That's what I really want to do.

18             MR. McGOVERN:  So -- and, Your Honor, we want to
19    make sure that you do have the appropriate record and can
20    make the appropriate findings on all of the elements to a
21    preliminary injunction, including irreparable harm.

22             THE COURT:  Yes.

23             MR. McGOVERN:  So, it's not, it's no -- again, it's
24    not the easy solution of simply saying "we are not going to
25    contest irreparable harm."  Because when -- as Your Honor

                    Sue Ghorayeb,  Official Court Reporter
□                                                                      27


1    pointed out, there is a pretty good chance that the Second
2    Circuit may be reviewing whatever findings and rulings you
3    make, and that, that standard will be whether you exercised
4    appropriate discretion in granting that preliminary
5    injunction.

6             THE COURT:  Yes.

7             MR. McGOVERN:  And we need to have those facts
8    establishing the irreparable harm in the record --

9             THE COURT:  Well --

10            MR. McGOVERN:  -- not withstanding a stipulation.

11            THE COURT:  Well, you can give me an offer of

12    proof.  You don't have to agree about the useless testimony.

13            MR. BERGMANN:  But it's in the proposed findings

14    that we have submitted to Your Honor already.

                              Page 24

042308TT1.txt
15          THE COURT:  Well, all right.

16          MR. BERGMANN:  And, Your Honor, we have only -- we

17   have asked for three depositions, and we gave them 15

18   potential dates for those depositions in the month of May,

19   starting next Monday, which is April 28th.  So we have -- you

20   know, we have done everything Your Honor has asked.

21          THE COURT:  Well, you know, if you can't work out a

22   schedule that suits everybody, I will just call it in for

23   trial, and you can bring your witnesses and have the

24   depositions right then and there.

25          That's what I would like to do.  I would like to

                    Sue Ghorayeb,  Official Court Reporter
☐                                                         28


1    agree on dates here.  So, is there going to be a necessity

2    for a bond on this injunction?

3          MR. McGOVERN:  Your Honor, we would request a

4    waiver of any bond on the application.  I think the issue of

5    cost or damages relates solely to the Andrus.

6          THE COURT:  I'm sorry.

7          MR. McGOVERN:  We would request a waiver of any

8    security posting.

9          THE COURT:  Well, you better really address

10   yourself to the Attorney General, because the Attorney

11   General has an interest in making sure that there is not a

12   lot of injunctions floating around that aren't bonded.

13          MR. McGOVERN:  John, I'm assuming you are not

14   requiring the posting of a security or bond on this?

15          MR. GASIOR:  As I sit here now, I don't think so.

16   But, Brian, that's something I am going to have to ask my

17   Bureau Chief.

                            Page 25

042308TT1.txt
18        THE COURT:  Well, why don't you anticipate the

19   Bureau Chief, because if it makes it embarrassing or

20   difficult for you, I will just order a reasonable bond and

21   move on.

22        MR. GASIOR:  Your Honor --

23        THE COURT:  I would like to resolve this issue now,

24   while I have you on the phone.

25        I would like to get scheduling in place while I

          Sue Ghorayeb,  Official Court Reporter
□                                                          29


1   have you on the phone.

2        MR. GASIOR:  Your Honor, I am going to go on a limb

3   and say that the Attorney General's Office will not require a

4   bond.

5        THE COURT:  I can't hear you, sir.

6        MR. GASIOR:  I am going to go out on a limb, Your

7   Honor, as a mere Assistant Attorney General, and say that the

8   Attorney General's Office will not require a bond.

9        THE COURT:  Thank you, sir.

10        MR. McGOVERN:  I think that's a secure limb.

11        THE COURT:  Well, I have never seen these bonds

12   collected.  I understand they used to be.

13        Can we have a date for the return date or a date

14   for a hearing, or what do you want to do?

15        MR. McGOVERN:  Well --

16        MR. GASIOR:  Well --

17        THE COURT:  The Court is prepared to issue this

18   Order to Show Cause and fill in a date.

19        MR. GASIOR:  If the Court issues the order -- the

20   TRO on the Order to Show Cause --

Page 26

042308TT1.txt
21        THE COURT:  Right.

22        MR. GASIOR:  -- I would request that -- we have

23   discussed this with Mr. McGovern -- that the return date be

24   set for May 7th, and the State's papers be served on April --

25   on May 1st.


          Sue Ghorayeb,  Official Court Reporter

0                                                         30



1         THE COURT:  How are we set for May 7th?

2         The Court is consulting the deputy clerk.

3         THE CLERK:  It's listed already at 9:30.

4         THE COURT:  Okay.  May 7th at 9:30.

5         MR. GASIOR:  Yes, Your Honor.

6         MR. McGOVERN:  So, Your Honor, if I could just

7    understand what the scope --

8         THE COURT:  I'm sorry.

9         MR. McGOVERN:  I want to understand that the scope

10   of the return date on the -- of May 7th, would that also be

11   to set down hearing dates?

12        THE COURT:  I thought that that would be the first

13   hearing in the case; that you would go in and start

14   presenting whatever you have to present in documents and

15   evidence.  Now, if that's not feasible, you will tell me.

16        MR. BERGMANN:  Well, we would like to have these

17   three depositions and we --

18        THE COURT:  Can they have the three depositions

19   before then?

20        MR. GASIOR:  Your Honor, I just received those

21   requests -- those dates, I think it was earlier this week or

22   late last week.  I don't have it right in front of me, but I

23   have sent that up to Albany.

                         Page 27

042308TT1.txt
24          But what the Court needs to understand and what

25  plaintiff needs to understand is that at least two of those

                Sue Ghorayeb,  Official Court Reporter
                                                            31

1   people, Mr. Sandman and I believe -- I can't think of her

2   name now; they are not State employees.

3           The State and DRH can't compel these people to show

4   up.  They were citizens who engaged in the Berger Commission

5   process and we -- the State does not control them.  We can't

6   make them show up.  It's conceivable that if they said they

7   didn't want to show up, that the plaintiff would have to

8   subpoena them.  I wish we could control them, but we don't.

9           THE COURT:  Well, of course, the Court can subpoena

10  them.

11          MR. GASIOR:  Absolutely, Your Honor.

12          THE COURT:  I hate to tell you this, because I know

13  you are an experienced practitioner, but the Court can also

14  draw an adverse inference.

15          So, if I have to subpoena somebody to go testify in

16  Albany, we can.  Their deposition can be taken in the

17  Northern District.

18          MR. GASIOR:  Let me make sure, Your Honor, that,

19  and I assure you that we would -- the State would like to

20  have these people show up.  But, again, because they are not,

21  they are not parties, they are not State employees, they are

22  private citizens, we can't control them.

23          THE COURT:  Were they decisionmakers?

24          MR. McGOVERN:  Two of the three are actually State

25  employees.  One of them is no longer, to my knowledge,

                Sue Ghorayeb,  Official Court Reporter
                                Page 28

042308TT1.txt

1    employed by the State.  So, two of the three are.

2              MR. BERGMANN:  But the one that he is referring to

3    was the Executive Director of the Berger Commission, and he

4    is, he is actually running a state-sponsored foundation right

5    now in Albany.  And --

6              THE COURT:  Well, may I suggest this.  Maybe you

7    can get an agreement as to one or two of these people as to

8    what they will testify to, for purposes of this case only.

9              If you can't do that, the Court will direct that

10   they testify in Albany.  And the -- you may have to move to

11   enforce that in the Northern District.  The Northern District

12   is used to telling the State what to do.

13             MR. BERGMANN:  As Your Honor may recall, I clerked

14   there --

15             THE COURT:  I had forgotten.  For which Judge?

16             MR. BERGMANN:  -- for Judge Foley.

17             THE COURT:  Foley, yes.  When were you clerking?

18             MR. BERGMANN:  1973 to 1974.

19             THE COURT:  I used to sit there then.

20             MR. BERGMANN:  I have worked for you there.

21             THE COURT:  I don't remember you, but I know that I

22   sat in Utica and I had a whole courtroom full of Indians one

23   day.  It's a nice courthouse up there in Utica.

24             MR. BERGMANN:  Yes.

25             THE COURT:  Well, have we gotten any closer to

              Sue Ghorayeb,  Official Court Reporter

1    getting a date?

042308TT1.txt

2              MR. McGOVERN:  As I said --

3              THE COURT:  You have to go up there and get your

4    subpoena out --

5              MR. McGOVERN:  Right.

6              THE COURT:  -- in the Northern District --

7              MR. BERGMANN:  We will do that.

8              THE COURT:  -- for these people, if you care about

9    them.  If they are going to testify to the same effect, why

10   don't you just take the most convincing one and have a

11   stipulation with your adversary about the other two.

12             MR. BERGMANN:  They are different, Your Honor.

13             THE COURT:  They are different?

14             MR. BERGMANN:  Yes.  One of, one of the individuals

15   sat on the Berger Commission, and the other individual was an

16   employee at all times at the Department of Health and was the

17   liaison with the Berger Commission.  And the third one, as we

18   indicated, was the Executive Director of the Berger

19   Commission.  So it's not -- we're -- we pared it down.

20             THE COURT:  Yes.

21             MR. BERGMANN:  And we are happy to do what we need

22   to do, but we obviously were trying to do this in a cordial

23   way with the Attorney General.

24             THE COURT:  All right.  What do you want to do?

25             What date do you want to start your trial?

              Sue Ghorayeb,  Official Court Reporter
П                                                          34


1              MR. McGOVERN:  Well, Your Honor, just because I

2    know that Mr. Gasior has to travel --

3              THE COURT:  Yes.

4              MR. McGOVERN:  -- to attend to his parents, I don't
                              Page 30

042308TT1.txt

 5  know how feasible it is.

 6        We have dates pending.  We are waiting to hear from
 7  Mr. Gasior.  And they were sent on Monday, so I am not
 8  faulting him for not getting back.

 9        THE COURT:  These are the dates for the
10  depositions?

11        MR. McGOVERN:  These are the dates for the
12  depositions, but they are also dates -- there was 15 dates,
13  so we can use the other -- the subsequent dates for hearings,
14  at the Court's convenience, of course.

15        So, I'm not sure by May 7th we can -- we will have
16  the opportunity to have scheduled those depositions, given
17  Mr. Gasior's limited availability --

18        THE COURT:  Mr. Gasior.

19        MR. McGOVERN:  -- for doing the hearing.

20        THE COURT:  What date do you want to come in?

21        MR. GASIOR:  Your Honor, I understand what the
22  plaintiffs are saying, that they would like to take
23  depositions.  And let me suggest that if the Court were to
24  issue a TRO, let's say for 10 days or 14 days, whatever, that
25  we would work expeditiously with them to get the depositions

              Sue Ghorayeb,  Official Court Reporter

 1  they need.  And that if we couldn't do it at the end of that
 2  time, we could consent to extend the TRO in order to allow
 3  them to get these three depositions.  And as soon as those
 4  were concluded, then we can go ahead and have the hearing
 5  that the Court is talking about.

 6        All right.  So, I don't know that I want to commit
 7  to a particular date for the hearing when -- if the Court

042308TT1.txt

8    issues a TRO, we will work expeditiously to get them the

9    three depositions that they would want, and at the conclusion

10   of the last -- the third, we would then immediately approach

11   the Court about a date for the hearing.

12            THE COURT:  That seems reasonable.  But I can't

13   issue an Order to Show Cause without a return date, so I have

14   to fill in a date.  But that sounds reasonable.

15            MR. GASIOR:  Could the Court -- I'm sorry.

16            THE COURT:  I say that sounds reasonable.  Fill in

17   the date.

18            MR. GASIOR:  I mean the Court could set it ten days

19   out, I suppose, or whatever date that would be on that week.

20            The Court could extend it, if necessary.  I think

21   the Court has the authority to extend it past ten days, if

22   required.

23            MR. McGOVERN:  So if -- if I, if I may suggest, for

24   purposes of the return date, if we could keep May 7th as the

25   return date.

            Sue Ghorayeb,  Official Court Reporter

□                                                              36


1            THE COURT:  I'm sorry.

2            MR. McGOVERN:  We could keep May 7th as the return

3    date, agree on a briefing schedule, agree on that briefing

4    schedule.  And then Mr. Gasior and I will report to the Court

5    on -- on or before the seventh, when we believe that we could

6    schedule our first hearing date and given the scheduling of

7    the three depositions that we have requested.

8            THE COURT:  Do you want to do that, Mr. Gasior?

9            MR. GASIOR:  Well, that sounds fine, Your Honor.

10           MR. McGOVERN:  And we would further agree, as I
                            Page 32

042308TT1.txt

11    understand from Mr. Gasior, to an extension of the TRO until

12    we can work out the appropriate dates for the hearing.

13             MR. GASIOR:  My main concern, Your Honor, is that

14    the TRO be issued, because that would be a clear indication

15    that my client is precluded from proceeding with issuing the

16    amended certificate, and that way there will be no question

17    later on that it was not able to proceed with meeting the

18    Berger Commission's mandate by June 30th.

19             THE COURT:  They did all they could.  They did all

20    they could.

21             Did I understand a moment or two ago in the

22    conversation that there is some other vendors similarly

23    situated as to which some settlement has been reached?

24             What kind of a settlement can you do with an

25    operating certificate?


              Sue Ghorayeb,  Official Court Reporter

◻                                                          37



1              MR. GASIOR:  I don't know.

2              THE COURT:  What did they do?

3              MR. GASIOR:  I don't know if it's a settlement.

4    Maybe it's a settlement of litigation, Your Honor.

5              For example, Dobbs Ferry Hospital, there were I

6    think -- what's the word -- arrangements made with other

7    hospitals.  And the certificate, the certificate was to be

8    revoked, but because there was pending litigation, it's my

9    understanding, and I don't have personal knowledge of that,

10   that there are some settlements to account for what's taking

11   place, for example, at Dobbs Ferry Hospital.

12             THE COURT:  Well, can that be made available to, at

13   least, to the plaintiff in this case and maybe even to the

                        Page 33

042308TT1.txt

14   Court.  You know, he who fights and runs away, lives to fight
15   another day.  And I'm sitting here listening to this and I'm
16   sort of wondering frankly what harm does it do, you know.
17          The idea of the Commission is probably a
18   theoretically good one.  Maybe there are too many facilities,
19   maybe they are wasteful.  There are a lot of people in these
20   homes and it's hard to find a good place to go.
21          And I have turned 85 years old.  This is a serious
22   thing to me.  I'm not laughing at the problem.
23          MR. BERGMANN:  And, Your Honor, there is a health
24   and safety exception to the Berger Commission
25   recommendations, and there have been in fact findings for

                    Sue Ghorayeb,  Official Court Reporter
                                                                    38

1    various facilities of a health and safety exception, which
2    have allowed other facilities to stay open beyond June 30th.
3          THE COURT:  But not forever.
4          MR. BERGMANN:  Well, no.  For, for at least an
5    additional five years, and then they will reconsider again.
6          And, Your Honor, we have had plenty of meetings up
7    in Albany to talk settlement.  I don't want to obviously
8    reveal what we have offered.  But we have had, in my count,
9    at least, five meetings up in Albany to try and settle this.
10          THE COURT:  Is this entity a free-standing entity,
11   or is this a part of the entire so-called SURDNA or the
12   umbrella philanthropy that the millionaire straphanger had?
13          MR. BERGMANN:  It's a free-standing entity, Your
14   Honor.
15          THE COURT:  Yes.
16          MR. BERGMANN:  And SURDNA is a separate foundation.
                                Page 34

042308TT1.txt

17          THE COURT:  Yes.  Well, it's always good to see
18   what you can do.
19          MR. BERGMANN:  But you know that Andrus and SURDNA
20   are just a reversal of the letters.
21          THE COURT:  Yes, and I guess there is legends
22   surrounding it.  How long have you been with the foundation?
23          MS. BIDDLE:  Nine years.
24          THE COURT: Yes.  Well, all right.  I think I ought
25   to fill it in and send you on your way.  Is there anything we

          Sue Ghorayeb,  Official Court Reporter
                                                    39


1    haven't covered, which we should have?
2           MR. GASIOR:  Could I just perhaps -- since I'm not
3    there --
4           THE COURT:  Yes.
5           MR. GASIOR:  What exactly, Your Honor, is going to
6    happen now, Your Honor?
7           THE COURT:  Well, my understanding of what's going
8    to happen is, the Court is going to sign this order.
9           The Court is going to strike out the bond, but not
10   make you in a formal position of waiving it.  And they are
11   going to take their three depositions somehow, if they can,
12   and then come in on a return day and try the case.  That's
13   what I'm seeing.
14          MR. BERGMANN:  Right.
15          MR. McGOVERN:  I think that's correct.
16          MR. GASIOR:  And -- okay, Your Honor.
17          And, Brian, the May 1st date was good with you on
18   our papers?
19          MR. McGOVERN:  Yes.
                         Page 35

042308TT1.txt

20          MR. GASIOR:  I don't know if he is going to put

21     that in the order.

22          THE COURT:  I will put it in the order, if there is

23     no problem.

24          MR. McGOVERN:  That's fine, Judge.

25          THE COURT:  You want me to write it in?

            Sue Ghorayeb,  Official Court Reporter
                                                        40

1           MR. GASIOR:  That's fine, Your Honor.

2           MR. McGOVERN:  It was May 1st.  That's their

3      opposition date to be served.

4           THE COURT:  It's May 1st at 9:30 a.m..

5           THE CLERK:  He is filing the papers on the 1st.

6      They are coming in on the seventh.

7           THE COURT:  Oh, the seventh.

8           MR. McGOVERN:  Yes.

9           THE COURT:  Okay.

10          MR. BERGMANN:  And there is a provision in the

11     order, Your Honor, for their papers.

12          THE COURT:  I'm sorry.

13          MR. BERGMANN:  There is a provision in the order

14     for when their papers are due.

15          THE COURT:  All right.

16          MR. GASIOR:  That's May 1st, right?

17          MR. BERGMANN:  Right.

18          MR. McGOVERN:  Right.

19          THE COURT:  Is that okay?

20          MR. GASIOR:  Yes, Your Honor.

21          THE COURT:  Personal service has to be made at 120

22     Broadway, right?

042308TT1.txt

23              MR. McGOVERN:  Yes.

24              THE COURT:  When are you going to serve it?

25              MR. McGOVERN:  I will serve them today.


                Sue Ghorayeb,  Official Court Reporter                    41

 0


 1              THE COURT:  4:45?

 2              MR. McGOVERN:  Can you make it 5:00, just -- 5:00

 3  o'clock.

 4              THE COURT:  All right.

 5              MR. McGOVERN:  Yeah.  I wouldn't want that 15

 6  minutes to invalidate this.

 7              THE COURT:  And you are going to serve opposing

 8  papers when?

 9              MR. GASIOR:  May 1st is what they said.

10              MR. McGOVERN:  That I will ask for at 4:45.

11              No.  5:00 o'clock is fine too.

12              THE COURT:  The Court is issuing the order at 10:30

13  a.m., "See transcript."

14              The Court makes all of the findings of fact and

15  conclusions of law to support the order, which are set forth

16  in the proposed order itself.

17              Thank you all for your participation.  Is there

18  anything else we can cover while we are here?

19              If you want to conform this copy, you are free to

20  do so.

21              MR. McGOVERN:  Thank you, Your Honor.

22              THE COURT:  That's the Court's official copy.

23              Are you in Florida today, sir?

24              Where are you, Mr. Gasior?

25              MR. GASIOR:  I am leaving Friday morning.
                              Page 37

042308TT1.txt

Sue Ghorayeb, Official Court Reporter

42

1           They are moving on -- we are moving them on Monday.
2           THE COURT:  Well, it's a tough thing to have to do.
3           MR. GASIOR:  They are 93 and 91.
4           THE COURT:  That's marvelous.
5           Was your father a lawyer?
6           MR. GASIOR:  No.  Actually, he worked for Pratt &
7   Whitney.  He worked on the shuttle engines.
8           THE COURT:  Oh, yes.
9           MR. GASIOR:  The space shuttle development for
10  them.
11          THE COURT:  Space shuttle, yes.
12          MR. GASIOR:  He was also in World War II.  He flew
13  a B-25 in China.
14          THE COURT:  Oh, Do Little.
15          MR. GASIOR:  It was one of the Do Little.  He was
16  not a raider, but he did fly, you know, a B-25 in the
17  Burma-China campaign.
18          THE COURT:  And there was Stillwell from Yonkers.
19          MR. GASIOR:  Was he from Yonkers?
20          THE COURT:  Stillwell, yes.  Stillwell's brother
21  had a big estate on North Broadway.
22          My wife is from Yonkers.
23          MR. GASIOR:  Oh.
24          THE COURT:  And Stillwell went to China, Burma and
25  all of those places.

Sue Ghorayeb, Official Court Reporter

43

042308TT1.txt

1          MR. GASIOR:  Sure.  My father knew several people

2     from the Flying Tigers.

3          THE COURT:  Yes.

4          MR. GASIOR:  Well, thank you, Your Honor.

5          THE COURT:  A part of my job.  Nobody is supposed

6     to thank me.  But I know that for a department to get it done

7     and move on, it's very important for you, and I think that's

8     true for the plaintiff too.

9          Get your record and you go on to the Court of

10    Appeals.

11         MR. GASIOR:  Yes, Your Honor.

12         THE COURT:  There was a very famous time one time

13    where we had Judge Solomon, who was a New Yorker, went out to

14    Washington State.  And he was visiting New York and some big

15    issue arose, some tremendous issue, and it was claimed that

16    different judges were disqualified, so Solomon took care of

17    it.

18         This guy wanted to stop the world and he wanted an

19    Order to Show Cause to stop the world.  So, Solomon says,

20    "well," he says, "you want to get to the Court of Appeals,

21    I'm here to help you get there.  Petition is dismissed."

22         We got the newspaper article.  They called him the

23    fastest gallon in the West, but you can't always do that.

24         Well, thank you very much for participating by

25    telephone.  I don't ordinarily do that, but I thought I ought

              Sue Ghorayeb,  Official Court Reporter
    □                                                         44


1     to under these circumstances.

2          MR. GASIOR:  I appreciate it, Your Honor.

                        Page 39

042308TT1.txt

3      MR. McGOVERN:  Thank you, Your Honor.

4      THE COURT:  Thank you all for your effort.

5      MR. McGOVERN:  Thank you, Your Honor.

6      MR. BERGMANN:  Thank you, Your Honor.

7      THE COURT:  Thank you.

8      (Case adjourned)

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

　　　　　Sue Ghorayeb,  Official Court Reporter

0