062408WT.txt

15

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-----------------------------------x
JOHN E. ANDRUS MEMORIAL, INC.,

                Plaintiff,

      v.                 07 CV. 3432 (CLB)

RICHARD F. DAINES, as Commissioner
of the New York State Department
of Health,

                Defendant.
-----------------------------------x
               U.S. Courthouse
               White Plains, N.Y.
               June 24, 2008
               3:00 p.m.

Before:      HON. MARK D. FOX,
            United States Magistrate Judge

APPEARANCES

CADWALADER WICKERSHAM & TAFT, LLP
BY:  BRIAN T. MCGOVERN, Esq.
One World Financial Center
New York, N.Y.  10281
Attorney for Plaintiff

STATE OF NEW YORK
OFFICE OF THE ATTORNEY GENERAL
Litigation Bureau
120 Broadway
New York, N.Y.  10271-0332
BY:  JOHN P. GASIOR, Esq.
Assistant Attorney General

Sue Ghorayeb, R.P.R., C.S.R.
Official Court Reporter

 

16

1        THE CLERK:  In the matter of Andrus versus New York

2  State Health Department.  The Honorable Mark D. Fox

062408WT.txt
3   presiding.

4           THE COURT:   Note your appearances for the record,
5   please.

6           MR. McGOVERN:   Brian McGovern and Peter Bergmann,
7   attorneys for John E. Andrus Memorial, Inc., plaintiffs in
8   the action.

9           THE COURT:   Okay.

10          MR. GASIOR:   John Gasior from the New York Attorney
11  General's Office here on behalf of the defendant Daines.

12          THE COURT:   Okay.   The issue before us today
13  concerns the status of a Temporary Restraining Order.

14          As I understand the letter briefs, which were faxed
15  with permission today, it is the defendant's position that
16  Judge Brieant's Temporary Restraining Order issued on April
17  23rd, which specifies that everything is stayed pending the
18  final determination of the matter, and further orders that
19  the defendant and its agents are enjoined from, among other
20  things, issuing an amended operating certificate to Andrus
21  and otherwise seeking to revoke or modify the Andrus
22  operating certificate.

23          It is the defendants' position that that is expired
24  because ten days have passed, and because, according to the
25  defendants, Judge Brieant did not make a finding of good

            Sue Ghorayeb,   Official Court Reporter
□                                                       17


1   cause for the continuance.   Is that basically your position?
2           MR. GASIOR:   Yes, Your Honor.
3           THE COURT:   All right.   And it is the plaintiff's
4   position, if I understand it correctly, that, first of all,
5   Judge Brieant did make sufficient findings.   Although, he may

                        Page 2

062408WT.txt
6    not have used the words "good cause," he made findings which
7    will be sufficient to establish good cause.

8              And in any event, separate and aside from the
9    findings in the order that Judge Brieant issued that good
10   cause exists for the issuance of a TRO, as we speak, I would
11   advise counsel that I was in consultation this morning with
12   Chief Judge Wood on a number of occasions.  We are of the
13   view that Judge Brieant is unavailable, and the reports and
14   the recommendations which I will be issuing in this matter
15   will be reviewed by Judge Stein, who is sitting in Part I.
16   Judge Stein is aware of it.  I have spoken to him as well.

17             You can also be aware that I will be issuing a
18   report and recommendation today, either today or tomorrow
19   morning, on the issue of a Temporary Restraining Order.
20   Instead of the usual ten days to file objections, you will
21   have I think two business days to file objections to those,
22   because of the shortness of time.

23             So, let me hear from the defendant, first, since
24   this is your application.

25             MR. GASIOR:   Thank you, Your Honor.   John Gasior

                    Sue Ghorayeb,  Official Court Reporter
□                                                             18


1    for the defendants.

2              Your Honor, it is by no means clear, I think as the
3    Court has noted, at least, it is not clear to the defendants
4    that the actions taken by Judge Brieant in reaction to
5    plaintiff's -- I believe it was June 2nd letter or May 2nd
6    letter, actually serve to meet the requirements of Rule 65.
7              Because of the impending June 30th deadline by
8    which the enabling legislation in issue in this litigation

                              Page 3

062408WT.txt
 9   causes the authority of the Department of Health to expire,
10   the cost of an error in this case of DOH failing to act and
11   to lose all authority is particularly of concern to the
12   defendant.  So, although it may be inferred or possibly
13   inferred from the record or from the parties' understanding,
14   or Judge Brieant's understanding that it was extended, it is
15   imperative for the Department of Health to get a clear
16   reading from the Court as to the status of the Temporary
17   Restraining Order.
18          THE COURT:  But what I am wondering about,
19   candidly, Mr. Gasior, is that this was issued on April 23rd.
20   Today is June 24th.
21          MR. GASIOR:  Actually --
22          THE COURT:  If you were concerned about all this,
23   it strikes me it's kind of odd that you didn't do anything
24   about it, in terms of either seeking reconsideration from
25   Judge Brieant or filing any kind of appeal for two months.

                Sue Ghorayeb,  Official Court Reporter
□                                                              19


 1   Do you want to address that?
 2          MR. GASIOR:  Yes, Your Honor.  It was our
 3   understanding -- we thought that a close reading of the order
 4   by the Judge would say that the Temporary Restraining Order
 5   was going to expire at the initial hearing, which I think was
 6   scheduled for May 7th.  But, then, because of the
 7   understanding of the parties that some discovery would take
 8   place, it was our understanding in a liberal sense that the
 9   TRO would extend until the hearing which is supposed to take
10   place tomorrow.  Anticipating --
11          THE COURT:  Which will take place tomorrow.

                            Page 4

062408WT.txt

12          MR. GASIOR:  Yes, Your Honor.  And it was our
13     intent that when we were in front of Judge Brieant, at that
14     point in time, to seek the clarification that we are seeking
15     now.  The reason that we raised the issue with the Court at
16     the conference on Monday was for the same reason that we
17     would have raised it with Judge Brieant.
18          We wanted a clear understanding that before the
19     close of June 30th, that we were -- that DOH was explicitly
20     under a direction not to take any further action, and so
21     that's why we raised it at that point in time.  We would have
22     done it with Judge Brieant.  He certainly had a history and
23     knowledge of the events that had led up to that point in
24     time, and we could have addressed our concerns in enough time
25     before the June 30th deadline to have had the issue raised by

                Sue Ghorayeb,  Official Court Reporter
0                                                            20


1     the Judge that had been hearing the matter.
2          So, we felt confident that we will be able to raise
3     it at that time and have the issue resolved, just as we are
4     resolving it now.
5          So -- and our proposal would have been then, as it
6     is now, that the Department be enabled -- permitted by the
7     Court to issue an amended certificate by June 30th.  And
8     after further consultation with the Department of Health
9     after our last meeting, it was felt that we could include in
10    that certificate that would have a deadline of six months or
11    perhaps a longer time if the Court felt that that was
12    appropriate, and that that would serve, number 1, to preserve
13    the Department's authority under the legislation.
14          Section 11 of the enabling legislation says that

Page 5

062408WT.txt
15   Section 9, which provides DOH with the authority to
16   implement, expires and will be deemed repealed. This is a
17   novel situation for the Department and it's certainly a novel
18   situation for this office. And, so, in an abundance of
19   caution, we were going to raise the issue with Judge Brieant,
20   but we have raised it now with this Court.
21         We feel that that will -- that, that disposition of
22   permitting the Department to issue an amended certificate
23   with a future expiration date serves to preserve the
24   Department's authority, but it also meets the concerns of the
25   plaintiff in this case. Number 1, it will allow there to be

                    Sue Ghorayeb,  Official Court Reporter
D                                                              21


1    a functioning, fully operative certificate, that if the
2    Center for Medicaid and Medicare Services has any questions,
3    they can look to an effective certificate. Certainly, the
4    Department of Health would be able to continue to operate
5    with a fully operational certificate. And --
6          THE COURT: Is your client prepared, is your client
7    prepared to agree and consent to the concept that issuance of
8    such a stay will preclude or prevent the operation of all the
9    notice requirements and all of the regulations, including the
10   posting of the certificate of operation, the temporary
11   certificate of operation, and notice to all vendors and
12   notice to all patients?
13         MR. GASIOR: Your Honor, we would contest that
14   really a lot of that is really unnecessary.
15         THE COURT: I am not asking you whether in your
16   view it's necessary or not. My question is: Whether it is
17   necessary or not, is it your understanding and is your client

                              Page 6

062408WT.txt
18  prepared to agree that all of that would be stayed?

19          MR. GASIOR:  Yes, Your Honor.

20          THE COURT:  Okay.  Anything else?

21          MR. GASIOR:  We feel that that outcome allows

22  the -- meets all of the concerns then that the plaintiff has;

23  certainly those --

24          THE COURT:  Can you stay CMS?  Can you bind CMS?

25          MR. GASIOR:  Certainly, this Court can.  I think --

            Sue Ghorayeb,  Official Court Reporter
□                                                              22


1           THE COURT:  I am not asking you if the Court can.

2   I am asking can your Department.

3           MR. GASIOR:  I don't think the Department can bind

4   CMS, Your Honor.

5           THE COURT:  I didn't think so either.  Okay.

6   Anything?  Go ahead, please.  I didn't mean to interrupt.

7           MR. GASIOR:  Only that we feel that this

8   disposition, by allowing an amended certificate with a

9   certain cutoff date, six months, a year, meets not only the

10  needs of the regulators but it also -- it really is I believe

11  somewhat disingenuous for the plaintiff to try and shield

12  their, their residents and families from the fact that we

13  have a serious litigation pending.

14          They have been facing the prospect of closure since

15  November 2006, Your Honor, and there is the possibility that

16  they will lose this litigation, and it doesn't serve their

17  clients, their residents well for them to try and shield them

18  from the real possibility that this will take place.  It is a

19  possibility, Your Honor.

20          And we believe that the disposition of allowing an

                           Page 7

062408WT.txt
21    amended certificate with a one year expiration date or a six

22    months expiration date allows them to continue to operate.

23    And certainly if they are compelled to notify their clients

24    that there has been an amended certificate, they can point to

25    the fact that it's one year out and that litigation is

                    Sue Ghorayeb,   Official Court Reporter
□                                                                    23


1    continuing, and certainly, it won't have a different effect

2    than the fact that for over a year and a half now they have

3    been operating under the threat of closure, and yet they

4    maintain that they are a thriving organization, so.

5              THE COURT:   What I'm a little confused about is,

6    what benefit does your client get from the issuance of

7    another temporary certificate that gives an end date a year

8    from now versus the situation now where the temporary

9    certificate has no end date?

10             MR. GASIOR:   Because this new certificate will have

11   been issued as part of the Berger Commission process.   They

12   will have undertaken to have terminated the certificate as

13   issued to Andrus, and so it will have taken a definite step.

14   It will be a bright line in the sand, Your Honor.

15             Under Section 9, one of the steps that the

16   Commissioner was compelled to do was to undertake that

17   process.   And we, at least, in the terms of this litigation,

18   we feel that issuance of that certificate with a termination

19   date has established definitively that process has started to

20   move forward and that --

21             THE COURT:   What's the difference between issuing a

22   temporary certificate with a termination date a year from now

23   versus issuing a temporary certificate that has no

                              Page 8

062408WT.txt
24  termination date specified, but which simply states that if
25  the litigation is successful, if the litigation or if the

                Sue Ghorayeb,  Official Court Reporter
□                                                                    24


1   litigation brought by the Department of Health -- if the
2   Department of Health prevails in this litigation, they can
3   terminate 60 days after the Court issues the final order?
4           MR. GASIOR:  Honestly, Your Honor, I don't know how
5   that is then going to be -- what kind of effect that's going
6   to have for the Feds, the federal government, for CMS.  They
7   may look at that and go like, "well, this is some sort of
8   conditional operating license," whereas, if it has a definite
9   date.
10          It's not unlike what I have been told by the
11  Department of Health, that years ago all certificates had a
12  termination date and then had to be renewed on some sort of
13  annual or bi-annual basis, I am not sure exactly what, but
14  there is a precedent for this, that at one time certificates
15  could have end dates.
16          But by having an end date, it shows that it's an
17  unconditional certificate to operate.  There is no questions
18  asked, and then we don't have to enter into a lot of riders
19  or additions to the --
20          THE COURT:  I have been trying to find some middle
21  ground here.  It appears the Department doesn't see one.
22          Okay.  Anything else you want to tell me on this?
23          MR. GASIOR:  No, Your Honor.
24          THE COURT:  Okay.  Thank you, Mr. Gasior.
25          MR. GASIOR:  Thank you, Your Honor.

                Sue Ghorayeb,  Official Court Reporter
                            Page 9

062408WT.txt
☐                                                                    25


1              THE COURT:  Mr. Bergmann.

2              MR. McGOVERN:  Yes, Your Honor.

3              THE COURT:  Mr. McGovern, excuse me.

4              MR. McGOVERN:  That's quite all right.  It's Brian

5    McGovern.

6              THE COURT:  Right.

7              MR. McGOVERN:  And I just find it ironic that Mr.

8    Gasior would, would take the position that we are somehow --

9    we shouldn't be shielding our residents from the pendency of

10   this litigation, and in the same breath he is telling the

11   Court, "they don't have to tell their residents that their

12   amended -- that their certificate has been amended with a

13   termination date of June 30, 2008."  The regulations require

14   the Andrus to take that action.

15             This -- Your Honor, Mr. Gasior said that he had

16   hoped to argue this before Judge Brieant once we got before

17   Judge Brieant for the preliminary injunction hearing that was

18   adjourned on consent of all parties to argue this issue.

19             Well, in fact, we argued that very same issue.  The

20   exact arguments advanced here were argued before Judge

21   Brieant on April 23rd.

22             THE COURT:  Okay.  Now, you have told me in your

23   papers that you believed that the findings that Judge Brieant

24   made on the record on the issuance of the Temporary

25   Restraining Order are sufficient to establish good cause.


             Sue Ghorayeb,  Official Court Reporter
☐                                                                    26


1              MR. McGOVERN:  Yes, Your Honor.
                            Page 10

062408WT.txt

2           THE COURT:  Okay.  Why don't you put on the

3   record -- you have the transcripts with you?

4           I would like you to place on the record exactly

5   what those findings consist of, because I don't have those

6   transcripts.

7           MR. McGOVERN:  Well, I can provide the Court with a

8   copy of the transcripts.

9           THE COURT:  We don't have time for that.  So you

10  put on the record the portions that you think establish good

11  cause, so we can make a determination on it.

12          MR. McGOVERN:  Well, firstly, we did make the same

13  arguments that counsel has made here, concerning in this

14  instance the June 30 deadline for the State taking action.

15  That same point was advanced to Judge Brieant, and we argued

16  then, as we have argued now, that issuing an amended

17  operating certificate would cause irreparable harm to the

18  Andrus operations.

19          THE COURT:  Okay.

20          MR. McGOVERN:  So those arguments were all before

21  Judge Brieant.

22          THE COURT:  What I want to hear is the good cause

23  argument, for the good cause findings, the basis for them.

24          You need a couple of minutes.  Why don't I give you

25  a couple of minutes to pull those out.  We will take a brief

                Sue Ghorayeb,  Official Court Reporter

1   second call.

2           (Recess)

3           THE COURT:  Okay.  Back on the record.

4           Go ahead, please, Mr. McGovern.
                            Page 11

062408WT.txt

5        MR. McGOVERN:  Yes, Your Honor.  As I mentioned, we
6   have set forth our arguments before Judge Brieant, and
7   following my argument on specifically the issue of the
8   amended operating certificate, the Judge -- the Court stated
9   on Page 7 of the transcript, Line 4:
10       "The Court:  All right.  I think the Court will
11   have to give you an evidentiary hearing on this issue, and I
12   think the Court will have to take whatever necessary steps to
13   maintain the status quo and to keep the" -- it says "lease,"
14   it's a typo, it's -- "license alive while the evidentiary
15   hearing is conducted, and make findings of fact and
16   conclusions of law and send you to the Circuit."
17       Further, it goes on to say that, that in -- the
18   Court goes on to later say, on Page 9 of the transcript, at
19   Line 3:  "I think that that could significantly expedite the
20   hearing on the preliminary injunction and save the parties a
21   lot of time and trouble, when the State is prepared to
22   concede that if their doors are closed because the license is
23   pulled, that that is irreparable harm."
24        Going on now to Page 10 of the transcript and Line
25   22, Mr. Gasior states:  "And that -- certainly, the motion

             Sue Ghorayeb,   Official Court Reporter
                                                        28

1   for preliminary injunction would be decided before June 30th,
2   and whatever certificate amending -- the amended certificate
3   needed to be issued could be issued.  And that's why the
4   Department of Health feels that merely sending out this
5   amended certificate does not disturb the status quo."
6        "The Court:  Well, once you have indicated an
7   irrefutable intention to do it and this Court enjoins it,
                        Page 12

062408WT.txt

8   then you got a lawsuit. So, I don't see that there is any

9   real need to issue it until you have your evidentiary

10  hearing."

11          The Court continues later on that same page:

12          "The Court: You would do it but for the

13  intervention of the Court, and the Court will sign an order

14  indicating that it's intervening."

15          The Court continues later on the same page:

16          "The Court: Well, if you would have issued it but

17  for the Court's order, I think that's all you need, if

18  anything, at some point." That's Mr. -- that's the court

19  responding again to Mr. Gasior.

20          I'm speaking to the court at the time: "I mean the

21  trouble down the road, Your Honor, is that could, could occur

22  immediately and irrefutably if this amended operating

23  certificate is issued. It's not the easy solution that Mr.

24  Gasior is outlining here." (Pg. 21 sic)

25          "The Court: Well, it's fairly clear to me that

            Sue Ghorayeb,  Official Court Reporter
0                                                              29


1   they will do it unless enjoined."

2          And I stated, "I would agree."

3          I think those are the primary points where the

4   Judge, in response to the very same issue that's being raised

5   on this application, the Court determined that it needed --

6   the word was need -- to issue a temporary injunction until a

7   hearing is held and he can make findings of fact and

8   conclusions of law.

9          THE COURT: Okay. Go ahead.

10         MR. McGOVERN:  Okay. And just, and just on the
                            Page 13

062408WT.txt

11  whole issue of the timing as well, we were talking about

12  dates, "The Court:  That seems reasonable, but I can't" --

13           THE COURT:  What page are you reading from?

14           MR. McGOVERN:  I'm sorry.  Excuse me.  That's page

15  35.

16           THE COURT:  Okay.

17           MR. McGOVERN:  Line 12 of the transcript.

18           THE COURT:  Okay.

19           MR. McGOVERN:  "The Court:  That seems reasonable.

20  But I can't issue an Order to Show Cause without a return

21  date, so I have to fill in a date.  But that sounds

22  reasonable."  Discussing working out scheduling the

23  depositions and then having the actual hearing.  (Pg. 35)

24           THE COURT:  So, you are saying there was basically

25  agreement that good cause existed to put it over beyond the

                 Sue Ghorayeb,  Official Court Reporter
□                                                        30


1  ten days.

2           MR. McGOVERN:  It's un -- it's unambiguous in my

3  view, Your Honor, from the plain terms of this transcript.

4           "Mr. Gasior:  Could the Court -- I'm sorry."

5           "The Court:  I say that sounds reasonable.  Fill in

6  the date.

7           "I mean" -- "Mr. Gasior:  I mean the Court could

8  set it ten days out, I suppose, or whatever date that would

9  be on that week.  The Court could extend it, if necessary.  I

10 think the Court has the authority to extend it past ten days,

11 if required."

12          And we went on to discuss that May 7th may not be a

13 realistic date, and, indeed, it was not even close to being a
                             Page 14

062408WT.txt

14   realistic date.  We had proposed dates for depositions two

15   days earlier, prior to the hearing, that went from early

16   April through late May, and the defendant didn't offer the

17   first deposition until June 3rd.

18          There was no way that we would be in front of Judge

19   Brieant.  We couldn't be in front of Judge Brieant because we

20   didn't get depositions that were agreed upon until June, and

21   here we are two months later faced with the same arguments,

22   the same threats to -- the same threats of, of pulling the

23   operating certificate and amending it.

24          These -- you couldn't, you couldn't imagine how,

25   how parallel the arguments being made now track the arguments

              Sue Ghorayeb,  Official Court Reporter

□                                                          31


1   being made in front of Judge Brieant.  And if this is really

2   what it boils down to, Your Honor, is reargument of that same

3   motion, and as Your Honor knows under local Rule 6.3, if

4   you -- a party seeking reargument of a motion shall do so

5   within ten days, not 61 days.

6          THE COURT:  Anything further on this issue, Mr.

7   McGovern?

8          MR. McGOVERN:  Lastly, if I may just add one other

9   portion from the transcript at Page 41, Line 12.

10         "The Court:  The Court is issuing the order at

11   10:30 a.m., "See transcript."

12         "The Court makes all of the findings of fact and

13   conclusions of law to support the order, which are set forth

14   in the proposed order itself.

15         "Thank you all for your participation.  Is there

16   anything else we can cover while we are here?"
                      Page 15

062408WT.txt

17          THE COURT:  Mr. McGovern, what page was that?
18          MR. McGOVERN:  That was Page 41, Lines 12 through
19   18.
20          MR. GASIOR:  What's the date of that transcript?
21          MR. McGOVERN:  The date of the transcript is
22   April 23, 2008.
23          MR. GASIOR:  Thank you.
24          THE COURT:  Okay.  Thank you.  Mr. McGovern,
25   anything further?

                Sue Ghorayeb,  Official Court Reporter
□                                                              32


1          MR. McGOVERN:  One other further comment, Your
2    Honor.  In the letter that Mr. Gasior submitted, he makes the
3    point that if there's any harm done, we always have a remedy
4    at law in money damages.  That is absolutely not the --
5    that's not the law in, in this -- in the federal courts.
6          Under the Eleventh Amendment of the United States
7    Constitution, the Federal Court cannot award money damages
8    against the State.  Our only remedy is declaratory and
9    injunctive relief, and if we do not obtain that relief, we
10   have no remedy before this Court and it's irreparable.
11          Thank you, Your Honor.
12          THE COURT:  Okay.  Thank you.
13          (Recess)
14          THE COURT:  Okay.  This is a continuation of the
15   oral argument.  Mr. Gasior, please.
16          MR. GASIOR:  Your Honor, I would just like to note
17   that I believe that Mr. McGovern has helped to make my point
18   I think the fact that he had to read from Page 7, 9, 10, 31
19   and 41, statements from the record to try and show that there
                                Page 16

062408WT.txt
20    was a clear and unambiguous, a good cause showing on the
21    record pursuant to Rule 65, does not make me comfortable and
22    certainly does not make my client comfortable that the
23    Department has been unambiguously enjoined from issuing a
24    certificate, from carrying out what they believe to be
25    necessary to effectuate the Berger Commission's

                    Sue Ghorayeb,   Official Court Reporter
 ᴅ                                                                33


 1    recommendations, and to preserve their authority after the
 2    June 30th deadline to do that.
 3              All that we are asking for and all that we were
 4    going to seek to do with Judge Brieant on the day of the
 5    hearing was to have a clear declared statement from him that
 6    in fact we were enjoined, unambiguously, one way or the
 7    other, and that's all that we are seeking now.
 8              I'm sorry to have to trouble the Court with this,
 9    but my client feels that the stakes are simply too high, and
10    that once we get a definitive answer on this in a short and
11    concise single place, there won't be any second guessing on
12    behalf of either the District Court or the Second Circuit.
13    But the Department does feel that it is necessary for them to
14    continue to have, have had and exercise the authority under
15    the enabling statutes to issue the amended certificate with
16    what we feel are protections that will allow the Andrus to
17    continue pending the results of this litigation.
18              THE COURT:  All right, Mr. Gasior.  Thank you.
19              I have to tell you that looking at the order that
20    Judge Brieant signed contemporaneously with it, or
21    immediately after the proceedings that were recited for the
22    record, he states on Page 2 of the order that he signed at
                              Page 17

062408WT.txt

23    10:30 a.m., on April 23rd, "Ordered that pending the hearing

24    and determination of plaintiff's application for preliminary

25    injunctive relief, defendant and its agents be and hereby are

                    Sue Ghorayeb,   Official Court Reporter

☐                                                              34


1    enjoined from, A, taking any further steps to implement the

2    recommendation made by the Commission on healthcare

3    facilities in the 21st Century to close John E. Andrus

4    Memorial, Inc.'s nursing facility; B, issuing an amended

5    operating certificate to the Andrus, and, C, otherwise

6    seeking to revoke or modify the Andrus operating

7    certificate."

8              Now, I don't know what you could possibly want that

9    would be, that would be any more clear in terms of what the

10   effect of the order was than that, particularly taken with

11   the statements on the record where counsel agreeing on behalf

12   of their clients to go ahead with discovery and extend any

13   term of this order accordingly; which, clearly, to my mind is

14   an indication of an agreement that reasonable cause exists

15   for the extension beyond the statutory ten days.

16             But I understand your argument and I will -- again,

17   I will take a look at the transcript and I will read it as

18   far as that's concerned.

19             Now, separate and apart from the effect of the

20   order that Judge Brieant issued on April 23rd, I would like

21   to hear something from counsel concerning the issue of -- and

22   you've already talked about hardship.  I would like to hear

23   about the issue of reasonable likelihood of success on the

24   merits.  So, let me first ask Mr. McGovern to tell me what

25   his position is in that regard, and then I will hear from

                                Page 18

062408WT.txt

Sue Ghorayeb,  Official Court Reporter

☐                                                                          35

1   Mr. Gasior.

2            MR. MCGOVERN:  Thank you, Your Honor.  If I just
3   may add that, we believe that to the extent Mr. Gasior
4   believes that a clarification was necessary for Judge --

5            THE COURT:  Mr. McGovern, I have already decided on
6   that issue.  Okay.  I am going to issue my report and
7   recommendation sometime tomorrow to Judge Stein.  Let's get
8   to the second issue.

9            MR. MCGOVERN:  With regard to the likelihood of
10  success on the merits, Your Honor, we believe that our two
11  principal claims for relief, procedural due process and
12  substantive due process, in particular, we have a substantial
13  likelihood of success on the merits.

14            There is no question that the Andrus was never
15  offered a hearing, nor was it ever provided notice of the
16  grounds that were being considered for closing the facility.

17            Specifically, in an affidavit from the defendants,
18  the Andrus was identified, according to defendants, early on
19  in the process, for several reasons; financial problems,
20  quality of care problems, survey problems, occupancy
21  problems.  The problem is no one ever notified the Andrus
22  that it was being considered for closure or why it was being
23  considered for closure.  In fact, it had one meeting with the
24  Berger Commission's Regional Advisory Committee, one meeting,
25  and at that meeting --

Sue Ghorayeb,  Official Court Reporter

☐                                                                          36

Page 19

062408WT.txt

1           THE COURT:  That was in 2006.

2           MR. McGOVERN:  In 2006.  And at the meeting -- and

3  Miss Biddle was invited to appear before the RAC to tell its

4  good story.

5           THE COURT:  RAC being the Regional Assessment

6  Committee or --

7           MR. McGOVERN:  Advisory Committee.

8           THE COURT:  Advisory Committee.

9           MR. McGOVERN:  Yes.  To tell its good story,

10 because it had positive things to say and tell the RAC, and

11 it did so.  And, in fact, it discussed how the Andrus

12 occupancy had achieved 90 percent and plus in 2006; how, in

13 2005, the Andrus had an operating surplus of over a half a

14 million, and continued to operate at a surplus through all of

15 2006.

16          The issue of the quality of its care never came up

17 in the meeting.  But according to the, to the final report of

18 the Commission, the Andrus was -- supposedly had 26 survey

19 deficiencies, which was cited as the basis for the quality of

20 care issues.  In fact, that survey was almost one half the

21 number of survey deficiencies, 14, and only eight of them

22 involved resident care.  None of them involved actual harm to

23 any residents.

24          THE COURT:  Have any of those been corrected?

25          MR. McGOVERN:  They were corrected immediately.

           Sue Ghorayeb,  Official Court Reporter

□                                                          37

1           THE COURT:  Okay.

2           MR. McGOVERN:  Immediately.  And, in fact, Your

062408WT.txt
3   Honor, its most recent survey is even an improvement on that
4   2000 -- May 2005 survey that was misquoted in the final
5   report.

6          The final report goes on to say that the Andrus had
7   significant operating losses until 2006 and only claims to
8   have operated in the black in 2006.

9          Well, the Andrus, at the request of the RAC,
10   submitted its financial statements for 2005 following that
11   meeting, which showed a profit, operating surplus, net of
12   grants, of over a half a million.

13              THE COURT:  Net of grants?

14              MR. McGOVERN:  Net of any grants.

15              THE COURT:  All right.

16              MR. McGOVERN:  Of over a half a million dollars.

17          And as I pointed out, the Andrus -- in the final
18   report, the Andrus is cited as a facility with 247 beds.  It
19   had voluntarily discontinued use of 50 of those beds in 2002.
20   And if you look at the occupancy based on a facility that's
21   operating with a 197-bed capacity, it was 90 percent or
22   better from 2005 onward, and to this day is operating at
23   95 percent or better.

24              THE COURT:  Did the Health Department have to
25   approve the relinquishment of those 50 beds or were they on

                 Sue Ghorayeb,  Official Court Reporter
☐                                                                   38


1   notice about it?

2              MR. McGOVERN:  They were, they were, they were on
3   notice of that contemporaneous with the transfer, but they
4   ultimately finally decertified the beds effective July 1,
5   2006, five months before the final report was issued.

                              Page 21

062408WT.txt
6        So there's no dispute that those 50 beds, whether
7    you -- whether they are decertified in 2002 or 2006, by the
8    time that final report was issued, those 50 beds were no
9    longer part of the Andrus complement.

10        So, this is a facility -- mind you, Your Honor, the
11   Berger Commission was intent on right-sizing based on
12   evaluation of facility-specific factors, and one of those
13   factors was obviously the occupancy and financial status of
14   those facilities.  And they actually selected a facility that
15   happens to be outperforming virtually every nursing facility
16   in Westchester County on those two important factors.  You
17   cannot find a more disparate finding against the facts.

18        And the due, the due process clause has both a
19   procedural and substantive, but, Your Honor, really if -- if
20   the Andrus had an opportunity to be heard and an opportunity
21   to correct the misinformation, we wouldn't be here having to
22   be fighting its closure.  But, unfortunately, that was not
23   provided to the Andrus.  And we believe that those are the
24   principal bases for establishing substantial likelihood of
25   success.

                    Sue Ghorayeb,   Official Court Reporter

1        There are other facts, mistaken facts reported in
2    the final report, but those are the principal facts that are
3    directly contrary to the information that the Andrus provided
4    to the RAC, and contrary to the factors that were supposed to
5    govern the RAC's determination.  This is --

6        THE COURT:  Okay.  Thank you.

7        Mr. Gasior.

8        MR. GASIOR:  Well, Your Honor, the first thing I

062408WT.txt
 9  would point out is that in a substantive due process
10  calculation or analysis, it's not enough for the Court to
11  find that the Commission got it wrong.

12          THE COURT:  Oh, no question.  The question for a
13  due process violation is whether there was notice and an
14  opportunity to be heard.

15          MR. GASIOR:  I'm talking about substantive due
16  process, though, Your Honor.

17          THE COURT:  Okay.

18          MR. GASIOR:  And in terms of substantive due
19  process, the decision has to be shocking to the conscience.
20  I don't think that there is any way that you can say that
21  what the Commission did and its analysis was shocking to the
22  conscience.

23          THE COURT:  Well, let me ask you something.  Is it
24  your position then that if what plaintiff's counsel just
25  recited to me about those factual deficiencies in the

                Sue Ghorayeb,  Official Court Reporter
□                                                              40


 1  findings, or what he says about the findings is correct, that
 2  the Commission was wrong on all of those factors, you don't
 3  find that shocking?

 4          MR. GASIOR:  No, Your Honor, because I don't think
 5  that the Commission got the factors wrong.

 6          THE COURT:  That's a different issue.  That's a
 7  different issue.  You may be right, and if you are right,
 8  then you will prevail at the trial of this matter.

 9          MR. GASIOR:  No, Your Honor.  And I would disagree
10  also that even if they got some of those facts wrong, it's
11  not shocking.

                            Page 23

062408WT.txt
12          THE COURT:  How about if they got all of them
13   wrong?  That's what he is alleging.
14          MR. GASIOR:  That still I don't think would rise to
15   the level of abuse of discretion, Your Honor.
16          THE COURT:  Yes.
17          MR. GASIOR:  But I don't -- I am not in any way,
18   nor is the Department of Health, the defendant in this case
19   prepared to concede that they got it wrong.
20          As Mr. McGovern mentioned, with respect to their
21   financial ability, the court -- the report said that they
22   claimed to have had -- been showing to have been operating in
23   the black, so it's not that they didn't know that
24   information.  They had it.
25          Also, in terms of the 50-bed complement, whether it

               Sue Ghorayeb,  Official Court Reporter
□                                                          41


1    was there, whether they should count 197 beds or 247 beds, I
2    think it must be, the report contains a reference to both of
3    those.  And at the deposition of the Executive Director of
4    the Commission, he also explained in terms of the violations
5    that had been found at the Andrus that it was really a
6    question of how you counted them; that if you count them one
7    way, it looks like a lower number of deficiencies.  If you
8    count them another, it looks like there is a higher number of
9    deficiencies.  But what's key is how the Berger Commission
10   counted them and was it counting them the same for all of
11   those facilities.  I think that's the important point, Your
12   Honor.
13          THE COURT:  Those are the things that are going to
14   have to be explored in the testimony, there is no question

                          Page 24

062408WT.txt
15  about that.

16            What about the procedural due process aspect?

17            MR. GASIOR:  Your Honor, the complaint on Andrus's

18  part is that they didn't have notice of the outcome of the

19  process, not that the process was undertaken itself.  The key

20  is, was there notice and an opportunity to be heard.

21            And I would direct the Court's attention to the

22  court in St. Joseph's Hospital of Cheektowaga, where the

23  court made the finding "every hospital was on notice that the

24  Commission might recommend its closing or consolidation.

25  It's unreasonable to expect that as the Commission

            Sue Ghorayeb,  Official Court Reporter

☐                                                              42


1   deliberated and certain hospitals became more likely to be

2   affected that some sort of super notice will be required."

3            They met with the RAC, Your Honor.  They were able

4   to provide them with information, as much as they wanted.

5            THE COURT:  In 2006 you are talking about?

6            MR. GASIOR:  Yes, Your Honor.

7            THE COURT:  Okay.

8            MR. GASIOR:  Before any determination was made.

9            And Dr. Sandman has testified at his deposition

10  also that he received dozens of calls from facilities begging

11  him to let them come and speak with him, and to provide him

12  with information.

13            I think that the Fourth Department -- actually, I

14  guess it was the Supreme Court's finding in the St. Joseph

15  case, which was affirmed by the Fourth Department, that every

16  facility knew what was happening and was aware that the

17  Commission had been formed not just to receive the good news

                              Page 25

062408WT.txt
18  or the good things that facilities were doing, they had a
19  serious purpose in mind.

20          And if you look at all of the press reports that
21  were released at that time, all of the facilities knew that
22  closure of the facility was a distinct possibility, and that
23  if they wanted to avoid that possibility or at least to
24  minimize it, that they needed to get involved in the public
25  hearings that were being held, and there are three of them in

                Sue Ghorayeb,  Official Court Reporter
☐                                                              43


1   the Hudson Valley region.
2           THE COURT:  But how was that communicated to
3   Andrus?
4           That's something you are going to have to address
5   in your proof tomorrow.
6           MR. GASIOR:  I believe that those notices were sent
7   to every facility in the State, Your Honor.
8           THE COURT:  You'll have, you'll have to prove that.
9           Okay.  Anything else on this issue?
10          MR. GASIOR:  No, that's all I have, Your Honor.
11          THE COURT:  Okay.  Thank you very much.
12          Anything further?
13          MR. McGOVERN:  Yes.  If I may briefly, Your Honor.
14          Mr. Gasior says that the Berger Commission
15  acknowledged that they were -- that they claimed to be
16  operating on surplus; that only concerned 2006.
17          What they did find, what they did find directly
18  contrary to the financial statements was that they were
19  operating at a significant loss through 2005, the last, the
20  last completed year, and that's an important year and they

                            Page 26

062408WT.txt
21   got that completely wrong, Your Honor.

22         And there's -- there is one way to count the
23   deficiencies and we will have a witness who will address the
24   issue of the number of deficiencies. And -- but there is no,
25   no question. We will, we will offer to establish that

               Sue Ghorayeb,  Official Court Reporter

☐                                                              44


1    they've got the count wrong by almost 100 percent.

2                THE COURT:  Okay.

3                MR. MCGOVERN:  One other point on the St. Joseph of
4    Cheektowaga, on the generalized notice, there -- the
5    dissenting opinion, which never got to be heard in the New
6    York State Court of Appeals, found that the facilities are
7    entitled to specific notice about the grounds that are being
8    considered for their closure.  Your Honor, there is a
9    distinction.

10         If, if the legislature had decreed that the Berger
11   Commission should reduce bed capacity at every facility by 20
12   percent, and you provided that notice, there wouldn't be a
13   procedural due process issue here.  But the legislature told
14   the Berger Commission that you have to look facility by
15   facility at a myriad of factors before you decide to
16   right-size or close a facility.  And as a matter of due
17   process, before that determination is made, the Andrus was
18   entitled to at least know what those, what those factors that
19   were being relied upon, what was the information, and an
20   opportunity to correct any errors.

21         After all, that's what, that's what procedural due
22   process is about, reducing the risk of the deprivation of a
23   property interest erroneously.  And without that notice and

                              Page 27

062408WT.txt
24    hearing, that we have in this case a myriad of errors that

25    has resulted in an unfortunate recommendation to close the

            Sue Ghorayeb,  Official Court Reporter
☐                                                            45


1    Andrus.

2              THE COURT:  Okay.  Thank you very much, gentlemen.

3              MR. McGOVERN:  Thank you, Your Honor.

4              THE COURT:  I will be issuing a report and

5    recommendation before the close of business tomorrow.

6              Your objections, you will have two days to make

7    objections.  They should be addressed to Judge Stein, who

8    will be sitting in Part I.

9              While that's going on, I guess we are going to go

10   ahead with the hearing tomorrow on the issue of the

11   preliminary injunction.  So, we will start that testimony at

12   10:00 o'clock.  Thank you very much.

13             MR. McGOVERN:  Thank you, Your Honor.

14             MR. GASIOR:  Thank you, Your Honor.

15             (Case adjourned)

16

17

18

19

20

21

22

23

24

25

            Sue Ghorayeb,  Official Court Reporter
                        Page 28

062408WT.txt