UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

-------------------------------------------------------------x
JOHN E. ANDRUS MEMORIAL, INC. (d/b/a    :    Filed Electronically
ANDRUS ON HUDSON),                       :
                                         :    07-CV-3432 (CLB) (MDF)
                            Plaintiff,   :
        -against-                        :
                                         :
                                         :
RICHARD F. DAINES, as Commissioner of the :
New York State Department of Health,     :
                                         :
                            Defendant.   :
-------------------------------------------------------------x

## DEFENDANT'S POST-HEARING
## MEMORANDUM OF LAW IN OPPOSITION TO
## PLAINTIFF'S MOTION FOR A PRELIMINARY INJUNCTION

ANDREW M. CUOMO
Attorney General of the
 State of New York
Attorney for Defendants
120 Broadway - 24th Floor
New York, New York 10271

John Gasior
Barbara Hathaway
Assistant Attorneys General
Of Counsel
212-416-8570

## TABLE OF CONTENTS

PRELIMINARY STATEMENT .................................................... 1

STATEMENT OF FACTS ...................................................... 1

    Testimony by Dr. David Sandman ............................................... 1

    Testimony by Betsy Biddle ................................................... 4

    Testimony by Mark Kissinger ................................................. 7

    Testimony by Neil Benjamin .................................................. 8

    Testimony by Sharon Carlo ................................................... 9

    Testimony by Dr. Jeffrey Nichols ............................................. 10

ARGUMENT ............................................................... 13

    A. Plaintiff Has Failed To Show It Will Suffer Irreparable Injury .................... 13

    B. There Is No Likelihood Plaintiff Will Succeed On The Merits .................... 17

CONCLUSION .............................................................. 20

# TABLE OF AUTHORITIES

**Cases**

Atkins v. Parker, 472 U.S. 115 (1985) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19

Bell & Howell: Mamiya Co. v. Masel Supply Co., 719 F.2d 42 (2d Cir. 1983) . . . . . . . . . . . . . 13

Bower Assocs. v. Town of Pleasant Valley, 2 N.Y.3d 617 (2004) . . . . . . . . . . . . . . . . . . . . . . . 17

Cathedral Rock of North College Hill, Inc. v. Shalala, 223 F.3d 354 (6th Cir. 2000) . . . . . . . . 16

County of Sacramento v. Lewis, 523 U.S. 833 (1998) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17

Freilich v. Upper Chesapeake Health, Inc., 313 F.3d 205 (4th Cir. 2002) . . . . . . . . . . . . . . . . . 15

Jolly v. Coughlin, 76 F.3d 468 (2d Cir. 1996) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

Lowrance v. Achtyl, 20 F.3d 529 (2d Cir. 1994) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17

Lujan v. Defenders of Wildlife, 504 U.S. 555 (1992) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15

Mullane v. Central Hanover, 339 U.S. 306 (1950) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19

Niagara Recycling, Inc., v. Town of Niagara, 83 A.D.2d 316 (4th Dept. 1981) . . . . . . . . . . . . . 17

O'Bannon v. town Court Nursing Center, 447 U.S. 773 (1980) . . . . . . . . . . . . . . . . . . . . . . . 16, 17

Powers v. Ohio, 499 U.S. 400 (1991) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15

Singleton v. Wulff, 428 U.S. 106 (1976) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15

St. Joseph Hospital of Cheektowaga v. Novello, 15 Misc.3d 333
(N.Y. Sup. Ct. Erie Cty. 2007); aff'd as modified 840 N.Y.S.2d 263 (4th Dep't 2007) . . . . . . . 19

Sweeney v. Bane, 996 F.2d 1384 (2d Cir. 1993) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13

Town of Orangetown v. Magee, 88 N.Y.2d 41 (1996) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17

Warth v. Seldin, 422 U.S. 490 (1975) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15

## PRELIMINARY STATEMENT

Defendant submits this Post-Hearing Memorandum of Law in Opposition to Plaintiff's Motion for a Preliminary Injunction.[1] In order to obtain a preliminary injunction, plaintiff is required to demonstrate irreparable harm and a "likelihood of success on the merits." Jolly v. Coughlin, 76 F.3d 468, 473 (2d Cir. 1996). The evidence adduced at the hearing on plaintiff's motion fails to support plaintiff's motion on either issue.

## STATEMENT OF FACTS

The following facts were admitted into evidence at the June 25th and 26th hearing.

**Dr. David Sandman**, the former Executive Director of the Commission on Healthcare Facilities in the 21st-First Century ("Commission"), testified for defendant. Dr. Sandman was responsible for providing general oversight of the Commission's process and serving as a public spokesperson for the Commission. Tr. 286. The Commission's mandate was to make facility-specific recommendations in the form of "right-sizing," which could include closure. Tr. 287. He explained that the issue of "overcapacity" of hospitals and nursing homes has been an issue in New York for a very long time and, prior to the Commission's formation, the healthcare delivery system had been adrift. Tr. 288. Creation of the Commission was received by those in the healthcare industry -- providers, organized labor, provider associations -- with a great sense of excitement. Tr. 289. Nothing like the Commission had ever been created in New York State -- it was an unprecedented, very high-profile event, and virtually everybody in the healthcare industry, and perhaps beyond, was aware of its existence. Tr. 290-92. There were hundreds of articles written about the Commission and Commission meetings were public events attended by

---

[1] Defendant hereby incorporates by reference his prior-submitted Memorandum of Law, dated May 1, 2008, and the supporting affidavits in opposition to plaintiff's motion.

hundreds of observers. Tr. 292. Within the healthcare industry, the Commission and its mandate were extremely widely known. Tr. 292.

The Commission engaged in "outreach" to healthcare facilities in multiple ways, and there was ample opportunity for everyone to be heard by the Commission. Tr. 293. Beyond the 19 public hearings held across the state -- 3 in the Hudson Valley Region -- the Commission maintained an open-door policy. Tr. 293. Providers had constant access to the Commission and many took advantage of the opportunity to send the Commission boxes of materials. Tr. 293. Providers often requested multiple meetings with Commissioners, Regional Advisory Committees (RACs) or Commission staff. Tr. 293. Some providers hired lobbyists or law firms, while some worked through their trade associations, to represent them in Commission matters. Tr. 293. It was the practice and procedure of the RAC to send notices of public hearings to each facility within the Hudson Valley Region, to elected officials, county executives and trade associations, with a request to disseminate the notices to their members. Tr. 294-97. All of the Commission-related hearings were widely publicized, with notices provided, in advance, to facilities by mail, through the Department of Health ("DOH") website and possibly by posting in the State Register. Tr. 295, 301. The notices themselves (Exhibits F and G) specifically stated the purpose of the Commission, including its mandate to "ensure that the regional and local supply of hospital and nursing home facilities is best configured to appropriately respond to community needs . . .," and that the RAC was charged with developing recommendations "for reconfiguring its region's hospital and nursing home bed supply to align bed supply with regional and local needs."

Anyone who appeared at a RAC hearing could testify (Tr. 302) and the speakers

2

oftentimes included CEO's or other senior-level representatives, individual providers,

representatives of trade associations, organized labor and consumer advocacy groups. Tr. 304.

Speakers at the hearings frequently were permitted to speak beyond a ten-minute limit if they

wanted to (Tr. 321-22) and could provide written summaries, of any length, of their comments.

Tr. 319. Dr. Sandman was approached by some of those who attended the public hearings, who

"came to make the case for their particular facility, as to why it ought to be preserved and

essentially left alone by the Commission." Tr. 305. Other than the public hearings, Dr. Sandman

was contacted by healthcare facility directors or administrators "on a constant basis," either

directly or through representatives, lawyers, elected officials, letter-writing campaigns and

petitions, including requests for more formal meetings. Tr. 305-06. Facilities either requested to

send Dr. Sandman documentation about their facilities or simply did so. Tr. 306.

One concern expressed by some groups was that the Commission not issue "a premature

public list of facilities that may be the subject of a Commission recommendation", the concern

being that doing so would create "a self-perpetuating cycle of irreparable harm." Tr. 307. These

concerns were no longer valid once the Commission's November 2006 Report was issued.

Dr. Sandman testified that it "absolutely" was generally understood by the persons who

contacted him that the Commission had the mandate to recommend the closure of healthcare

facilities. Tr. 309. No one who contacted Dr. Sandman ever expressed the conclusion (or

assumption) that their facility was not subject to review by the Commission. Tr. 309. When

Sandman contacted a facility, he informed them that the Commission was interested in learning

more about their facility to inform the Commission's deliberations. Tr. 315. Every licensed

facility within the purview of the Commission was considered for right sizing, using the same

3

metrics. Tr. 320.

Regarding the counting of deficiencies at facilities, Dr. Sandman testified that
Commission staff looked at survey inspection reports on the DOH website and counted the
number of human figures representing the scope of residents affected to determine the number of
deficiencies. Tr. 310. Commission staff used the same methodology for computing deficiencies
for all of the facilities it considered. Tr. 310. Exhibit H, a printout from the DOH website,
shows how the Commission concluded that Andrus had 26 deficiencies. Tr. 311. The
"Residents Affected" column in Exhibit H has a total of 26 (Tr. 313) for 2005, which is the
number of deficiencies listed in the Commission's Report for Andrus (Exhibit A at 123).

**Betsy Biddle**, the Executive Director of Andrus nursing home, testified for plaintiff. Ms
Biddle has 33-years experience working in nursing homes (9 with Andrus), including nursing
home management (Tr. 226, 232) and during that time she was familiar with the statutes
governing healthcare facilities in New York. Lauren Reinertsen was Andrus' licensed Nursing
Home Administrator and she was responsible for keeping Ms. Biddle current on regulatory
compliance at Andrus. Tr. 233-34. Ms. Reinertsen would always tell Ms. Biddle when she
received notice from any regulatory agency that might impact the operation of Andrus. Tr. 281.
Two organizations, the New York State Home and Hospital Service (NYAHSA) and the Greater
New York Hospital Association (GNYHA) provide Andrus with information "about things that
are going on in the Legislature; things that are going on in terms of regulations." Tr. 234-35.
Ms. Biddle acknowledged that she probably received information from NYAHSA and GNYHA
when the Enabling Legislation created the Commission. Tr. 235. Ms. Biddle and Lauren
Reinertsen both were aware that the Enabling Legislation had passed the Legislature. Tr. 244.

4

It was Ms. Biddle's understanding, at the time that the Commission was formed, that the
Commission was going to look at excess nursing home beds. Tr. 237. While Ms. Biddle
testified that she "didn't pay attention" to the Enabling Legislation until after the Commission
Report was released in November 2006 (Tr. 240, 242), she also testified that she "was really
paying attention to what was happening with the Berger when they asked me to come and speak"
(Tr. 244), which was in June 2006. Tr. 201; Exhibit 5.

Ms. Biddle testified that, when she became aware of the Enabling Legislation, nothing led
her to believe that Andrus might be one of the facilities that the Commission would be looking at
to close. Tr. 248. At the time the Enabling Legislation was enacted in April 2005, Ms. Biddle
would go to attorneys at Cadwalader Wickersham & Taft if she had a question with respect to
New York State regulatory or statutory matters concerning Andrus' operations, but she did not
seek Cadwalader's advice about how the Enabling Legislation might affect Andrus. Tr. 250-51.

When Ms. Biddle was contacted in May 2006 by Mark Ustin, a representative of the
Commission, and asked to attend a meeting (Tr. 201), she understood that the RAC was looking
at all nursing homes in the region and that the RAC was part of the Commission process. Tr.
255. She also understood, when she met with the RAC, that they were going to report to the
Commission and that the Commission had the power to recommend the closure of nursing
homes. Tr. 264-65. Nonetheless, Ms. Biddle claimed she had no idea that any of the actions by
either the RAC or the Commission applied to Andrus because she believed that none of the
factors being considered applied to Andrus. Tr. 260-61. While Ms. Biddle testified that no one
from the RAC, the Commission or DOH ever gave her any indication that Andrus was one of the
facilities that they were "considering closing" (Tr. 261), she also testified that no one ever told

5

her that Andrus was exempt from consideration by the Commission (Tr. 266), and no one at the
meeting with the RAC told her that Andrus was not under consideration by the RAC or the
Commission. Tr. 267.

Ms. Biddle testified that, at the meeting with the RAC, she "went through the whole
history of Andrus, the CCRC [Continuing Care Retirement Community], and then the -- what we
had done with Beth Abram, and about our 50 beds, and that we had filled to 90 percent, and that
we were financially viable . . . ." Tr. 203. Regarding Andrus' finances, Ms. Biddle testified that
in May of 2006 she told Mr. Ustin from the Commission that Andrus "had been financially
viable for the first time in our lives last year . . . ." Tr. 201. In fact, while Andrus had a $500,000
operating surplus in 2005, that surplus had dropped 60% in 2006 to $200,000. Tr. 200-01. Ms.
Biddle understood that the RAC had "'welcomed my offer to provide copies of the Andrus 2005
certified financial statements,' and other documents" in order to verify what she had been telling
them. Tr. 265. Ms. Biddle knew the RAC was conducting hearings, she knew they wanted
information about nursing homes, that she was invited to a meeting with the RAC to tell Andrus'
story and she was asked for documentation, which she provided. Tr. 266. Ms. Biddle testified
that, even if Andrus was a "target", it does not mean that Andrus was going to be closed. Tr.
275.

When the Commission's November 2006 Report was issued, recommending Andrus'
closure, Ms. Biddle informed Andrus' residents of that fact. Tr. 278. She had a large meeting
with residents and staff where she told them about the recommendations in the Report and that
Andrus was going to fight on two fronts, legally as well as talking with DOH. Tr. 278. Since
then, she has kept the residents and staff apprised, on a monthly basis, of developments in this

6

litigation. Tr. 278. She also informed families of Andrus' residents and Andrus' vendors that there is a "stay" in effect and that if anything changed she would let them know. Tr. 279. Despite these communications by Ms. Biddle, she asserts in her affidavit in support of a preliminary injunction that Andrus, "to this day," continues to be a thriving, financially stable facility. Biddle Aff. ¶ 7. Nonetheless, Ms. Biddle testified that issuance of an amended operating certificate by DOH would now create a problem with occupancy and distress residents and staff (Tr. 230).

**Mark Kissinger**, DOH Deputy Commissioner for the Office of Long Term Care, testified for defendant. Mr. Kissinger testified concerning the DOH requirements nursing homes must follow when closing, and DOH's oversight of such closures. Nursing homes must submit a closure plan and receive DOH's written approval before implementing the plan. Tr. 154. DOH's highest priority in overseeing the implementation of closure plans is the health and safety of the residents during the transition. Tr. 156. Closure plans must include information concerning the process to identify appropriate placements for the residents, including "insuring that the wishes of current patients/residents/families are respected when placement decisions are made, and insuring that concerns such as geographic location, public transportation, type of facility/ provider, medical care, etc. are addressed . . . ." Exhibit C, p. 4, ¶ 11. A closure plan must also insure that medical records are transferred in a secure manner, and include a plan for follow-up after residents are relocated. Id. ¶¶ 12, 16. DOH regional staff are involved in overseeing that closure plans are properly implemented and the process goes smoothly. Tr. 157. Among other things, DOH staff monitor whether adequate staff is maintained at the facility to provide care to the residents during the transition period. Tr. 159. Mr. Kissinger testified that he is aware of

7

nursing home closures that have been accomplished in an orderly fashion. Tr. 159. He also testified that "if you work with the facility and the clinicians, both in the Department and the facilities, as well as the families, you can minimize that, the risk" of transferring residents. Tr. 162.

**Neil Benjamin**, DOH's Director of the Division of Health Facility Planning, testified on behalf of the defendant. Mr. Benjamin served as the DOH liaison to the Commission, pursuant to section 4 of the Enabling Legislation. Tr. 174. As liaison, he had regular meetings with the Commission staff. At the request of Commission staff, Mr. Benjamin collected a broad range of the most currently available data on every health care facility in the State. This data included information on the facilities' Medicaid reimbursement rates, their long-term debt, and information known as case-mix data concerning the medical needs and diagnoses of the residents. Tr. 175 - 76.

From 2002 through 2007, Mr. Benjamin was involved in negotiating on behalf of DOH the transfer of 50 beds from Andrus to Beth Abraham Health Services. Tr. 176. This transfer came about as a result of the inability of Andrus to obtain local zoning approval for a continuing care retirement center on its property, which was to have been a joint venture with Beth Abraham. When the deal fell through, Andrus was under financial obligation to Beth Abraham, which it sought to fulfill by transferring 50 beds to Beth Abraham. Mr. Benjamin informed the Commission staff that Andrus had contracted to sell the beds. Tr. 186. The beds remained on Andrus' license until January 24, 2007, when they were decertified retroactive to July 1, 2006. Tr. 176 - 78, 187; Ex. D. That the beds were not decertified earlier resulted in Beth Abraham's not having to undergo a public need test as part of its Certificate of Need application to take on

8

the 50 beds. Tr. 178.

**Sharon Carlo**, RN, a consultant and former DOH employee and nursing home administrator, testified (over defendant's objection) as an expert witness for plaintiff. Ms. Carlo described the method by which nursing homes are inspected by DOH and how statements of deficiencies are written. She explained that every nursing home regulatory requirement is assigned a "tag" number, and a home is cited for a violation of that tag when it fails to comply with that standard, irrespective of how many times it did so or how many residents were affected. In addition to the tag, deficiencies are categorized by their scope and severity - i.e., how many residents are affected by the deficiency and how severe the deficiency is. The deficiency is then assigned a letter value to signify its scope and severity. Tr. 118-27, Ex. 2. Ms. Carlo opined that the bare number of "tags" is not the most reliable and valid measure of quality of care in a nursing home. Rather, "the most reliable identifier of the quality of care is the types of deficiencies that have been cited and the scope and severity of those deficiencies. ... it is never the number, the total number, of deficiencies." Tr. 129. Accordingly, it is important to look at the scope and severity of a facility's deficiencies. Tr. 142-43. She testified that according to her method of calculating, there were 14 deficiencies on plaintiff's 2005 statement of deficiencies, and not 26, as indicated in the Commission Report. Tr. 130 - 31.

Although Ms. Carlo testified that, in her experience as a DOH employee, deficiencies were calculated by counting the number of tags, irrespective of the scope and severity, Tr. 132, she acknowledged that she was not a member of the Commission or a staff person to the Commission. She did not work on Commission-related issues at DOH, and had no knowledge of how the Commission analyzed statement of deficiencies or counted the number of deficiencies.

9

Tr. 142. Ms. Carlo further testified that a nursing home is required to post its operating certificate and to inform residents of any change to the operating certificate. Tr. 135 - 36. She opined that learning that an operating certificate was limited or eliminated would be distressing to residents, and that an operating certificate with a termination date of June 30, 2008, would have an impact on physician referrals to the facility. Tr. 138. Ms. Carlo is not an attorney, and could not opine on the impact of a court order on these requirements. Tr. 146.

**Dr. Jeffrey Nichols** testified (over defendant's objection) as an expert witness for plaintiff on the issue of the "transfer trauma" that could be experienced by the residents of Andrus if they were required to move to a different facility. Dr. Nichols defined transfer trauma as "the cognitive and functional decline that dementia – primarily dementia patients, although some cognitively intact patients, have when they've moved from one environmental structure to a different one." Tr. 61-62 (emphasis added). Although generally 75% of nursing home residents have dementia, Tr. 61, at Andrus only 40% of the residents had been identified as having significant cognitive impairment (which includes more than dementia). Tr. 77.

Dr. Nichols' testimony was based on his understanding of nursing home residents in general, and not on Andrus residents specifically. He reviewed the most recent progress notes and psychiatric consultations for approximately 40 Andrus residents, all of whom were selected by Andrus. All of these residents were among the 40% of Andrus residents who have cognitive impairments. Tr. 74, 87. Dr. Nichols did not know how many of the residents for whom he reviewed records were low acuity patients, referred to as Physical A or Physical B. Tr. 88.[2] Dr.

---

[2] Physical A and Physical B residents require the least amount of care and are the most independent. Tr. 80.

10

Nichols visited the facility, but he did not conduct a clinical assessment of a single Andrus resident. Tr. 76, 88. Nor did he speak with any family members of Andrus residents. Tr. 88. Accordingly, Dr. Nichols was unable to testify concerning the risk of transfer trauma to any particular Andrus resident. Tr. 91.

Dr. Nichols testified generally that transfers can cause stress on nursing home residents with dementia due to, among other things, a change in their physical environment and disruption of relationships with family members and the staff who care for them on a daily basis, creating psychological and physical risks. Tr. 70. The stress of a transfer on residents with dementia could cause a decline in function. According to Dr. Nichols, the medical literature shows that there is a one-to-three percent increase in mortality in the first three months after transfer. Tr. 68. He further said that while all nursing home residents have high risks of falling, there is anecdotal evidence that this risk is increased by transfer. Tr. 69.

Dr. Nichols further testified that it was difficult to say with certainty that any particular adverse event, such as a fall, was caused by a transfer. Tr. 73-74. As he explained, "clearly, this is a group of people who are old and ill. So when bad things happen, they're never entirely unexpected. Life expectancy overall for residents in nursing homes is only about two and a half to three years. And clearly, when you have a progressive, degenerative, neurologic disease, the fact that you get worse is not necessarily completely unexpected. So really, what you're talking about is excess morbidity and mortality beyond what's to be expected from their illness." Tr. 74. Therefore, one can never say with certainty that any particular event, such as a fall, is related to the transfer or that it would not have happened absent the transfer. Tr. 95.

In addition to residents with dementia, Dr. Nichols testified that "there would appear to

11

be" risks associated with transferring residents with other forms of cognitive impairment. Tr. 70. He acknowledged that residents who are less cognitively impaired would have less difficulty learning to get around in a new physical environment. Tr. 88. Residents with a higher level of cognitive ability would "not necessarily [be] more stressed by [a change] because if you're more cognitively intact, you might be able to understand what's happening to you better." Tr. 89. Dr. Nichols also testified that low acuity residents "may be" at risk of transfer trauma and that they "could" experience the same loss and are "not necessarily" at less risk due to transfer than other residents. Tr. 80 - 81. Dr. Nichols added that some low acuity residents could live in an assisted living setting, but he could give no opinion on how many. Tr. 81-82.

Finally, Dr. Nichols acknowledged that nursing homes close and residents transfer from one facility to another for a variety of reasons, and some residents make a successful transition. Tr. 90. He himself had taken steps to minimize any adverse effects of transfer on his own patients by, for example, making sure that complete information is sent to the new facility and by reassuring the resident. Tr. 93. Dr. Nichols did not know the family members of Andrus residents or where they lived, and admitted that it was possible for family members to stay in touch after a resident transferred. Tr. 91. Indeed, it is possible that some of Andrus' residents would be closer to family after a transfer. Tr. 92. On the other hand, residents can be subject to some of the same stressors even if they remain in the same facility; for example, if a staff member who has cared for them leaves the employ of the facility. Tr. 91.

In the final analysis, Dr. Nichols admitted that the only way to completely eliminate the risk of transfer trauma is never to transfer any nursing home residents. Tr. 95.

12

## ARGUMENT

### A.    Plaintiff Has Failed To Show It Will Suffer Irreparable Injury

Plaintiff utterly failed to show that any irreparable harm would result from defendant's issuance of an amended operating certificate[3] or from requiring plaintiff to prepare a closure plan. Plaintiff's claims of injury to its business are speculative and refuted by the evidence, and its claims of harm to the residents are similarly speculative, and should not be considered on this motion because plaintiff lacks standing to raise them.[4]

It is axiomatic that a movant for a preliminary injunction must establish that it would suffer irreparable harm absent an injunction. Irreparable harm is "the single most important prerequisite for the issuance of a preliminary injunction." Bell & Howell: Mamiya Co. V. Masel Supply Co., 719 F.2d 42, 45 (2d Cir. 1983), quoted in Rodriguez v. DeBuono, 175 F.3d 227, 234 (2d Cir. 1998). Plaintiff must show an injury that is "neither remote nor speculative, but actual and imminent and that cannot be remedied by an award of monetary damages." Shapiro v. Cadman Towers, Inc., 51 F.3d 328, 332 (2d Cir. 1995), quoted in Rodriquez, 175 F.3d at 234. See also Sweeney v. Bane, 996 F.2d 1384, 1387 (2d Cir. 1993).

---

[3] On June 30, 2008, Judge Sidney H. Stein adopted this Court's Report and Recommendation, which extended Judge Brieant's April 23, 2008 Temporary Restraining Order, effectively barring DOH from issuing Andrus an amended operating certificate on or before June 30, 2008. The legal effect of that TRO on DOH's authority to issue Andrus an amended certificate is not now before the Court.

[4] For purposes of this motion only, defendant does not contest that forcing Andrus to close would constitute irreparable injury. However, the issuance of an amended operating certificate and requiring plaintiff to prepare a closure plan, while all further implementation of the Commission's recommendations are stayed, would not irreparably injure plaintiff. Defendant's Memorandum of Law in Opposition to Plaintiff's Motion for a Preliminary Injunction, dated May 1, 2008, at 3, 31.

13

Here, plaintiff contends that the mere issuance of an amended operating certificate would ruin its business because residents would leave the facility, physicians would stop referring residents to the facility, and vendors would cease doing business with Andrus. This claim is completely speculative and belied by the evidence at the hearing. Ms. Biddle testified that she has informed the residents, families and physicians of the Commission's November 2006 recommendation, which was enacted into law, that Andrus close or convert to an ALP. She has further regularly advised them of the status of this litigation, and that a stay is in effect. Despite widespread knowledge that a State law has been passed requiring DOH to implement the Commission's recommendations, according to Ms. Biddle, Andrus is thriving - with increased occupancy and improved financial status. There is no reason to believe that simply knowing that an amended operating certificate has been issued would alter this situation. The Andrus could simply inform the residents and others that further implementation has been stayed pending the outcome of this case, as it has in the past. Especially if the certificate had an end date of December 31, 2008, or even June 30, 2009, which defendant would not oppose, it is utterly speculative to assume that Andrus would suffer anything near the extent of harm to its business that would constitute irreparable injury. The testimony that residents would be distressed if the operating certificate had a termination date of June 30, 2008 (Tr. 137-38), is not only irrelevant, because it does not address the impact on residents of a certificate with a date farther in the future, it also is speculative. Plaintiff presented no evidence that residents would actually leave or that the other parade of horribles it hypothesized would actually come to pass.

Plaintiff's claim that the residents will suffer transfer trauma similarly does not support a finding of irreparable injury. First, it is irrelevant if all that occurs is the issuance of an amended

14

operating certificate, which will not cause any resident to be transferred until some future date. Second, Andrus lacks standing to raise this claim on behalf of its residents. It is well established that in order to meet the constitutional requirements of standing, a party must have suffered an injury in fact that is fairly traceable to the defendant's actions, and which is likely to be redressed by a favorable decision. Lujan v. Defenders of Wildlife, 504 U.S. 555, 560-61 (1992). Moreover, as a prudential matter, a party generally may not assert the rights or interests of third parties. Warth v. Seldin, 422 U.S. 490, 499 (1975). Third party standing is allowed only where 1) the litigant has suffered an injury in fact, 2) the litigant has a close relationship to the third party, and 3) there is some hindrance to the third party's ability to protect his or her own interests. See generally Powers v. Ohio, 499 U.S. 400, 411 (1991); Singleton v. Wulff, 428 U.S. 106, 114-16 (1976).

Here, this test is not satisfied. Even assuming Andrus has suffered an injury in fact, it is not in the kind of close relation to its residents making it as effective or nearly as effective a proponent as the residents themselves. The Andrus' interest is clearly in remaining open. The residents, as consumers of health care, have an interest in the efficiency and economy of the overall health care system that the Commission was created to achieve. In any event, there is no impediment to the residents asserting their own rights, as nursing home residents have done in many other cases. See Freilich v. Upper Chesapeake Health, Inc., 313 F.3d 205, 215 (4th Cir. 2002).

Moreover, the claim of transfer trauma, even if considered, is far too speculative in this case and, in any event, is not a proper basis on which to enjoin implementation of the Commission's recommendations. Plaintiff's expert on transfer trauma, Dr. Nichols,

15

acknowledged that he could not opine on the risk to any particular Andrus resident, as he had not assessed any individual residents. Indeed, he acknowledged that any particular adverse event could never be definitively attributed to a transfer. This alone renders his testimony far too speculative and insufficient to support a preliminary injunction. Furthermore, there is no dispute that Andrus has a low acuity resident population, and that only 40% of its residents have been identified as having cognitive impairments, contrasted to the average of 75% of nursing home residents with dementia. It is also clear from Dr. Nichols' testimony that it is dementia patients who are primarily at risk of transfer trauma - Dr. Nichols' testimony concerning residents who are not so impaired was equivocal and based on "anecdotal" evidence. Thus, plaintiff utterly failed to show that any Andrus resident is in imminent danger of a non-speculative injury.

Finally, the risk of transfer trauma, which hypothetically is always a possibility, but which can be minimized with proper planning and implementation, is not the kind of injury which should be considered in a challenge to the closure of a nursing home. In O'Bannon v. Town Court Nursing Center, 447 U.S. 773, 784 (1980), the Court held that nursing home patients were not entitled to a hearing prior to the termination of the home's Medicare and Medicaid provider status. The Court specifically rejected the risk of transfer trauma as a source of any such right, despite assuming for purposes of the decision "that there is a risk that some residents may encounter severe emotional and physical hardship as a result of a transfer." Id. at 784 n. 16. Similarly, in Cathedral Rock of North College Hill, Inc. v. Shalala, 223 F.3d 354, 364 (6th Cir. 2000), the Court rejected a nursing home's challenge to the termination of its participation in Medicare. Relying on O'Bannon, the court rejected the nursing home's claim that it should not have to exhaust its administrative remedies because doing so would result in the discharge and

16

transfer of residents who were on Medicaid. The court found that "[b]ecause the ... patients do not have standing to challenge the Secretary's determination, [the home] cannot rely solely on the irreparable harm to its patients in this analysis." 223 F.3d at 364. Accordingly, the hypothetical risk of transfer trauma is insufficient as a matter of law to support either a claim on the merits or irreparable injury.

## B. There Is No Likelihood Plaintiff Will Succeed On The Merits

Regarding likelihood of success on the merits, plaintiff's evidence was targeted only at due process claims. Plaintiff did little, if anything, to support its contracts and takings claims. Regarding substantive due process, plaintiff's evidence can only be characterized as "the Commission got it wrong." Such evidence cannot support a substantive due process claim. Andrus failed to demonstrate that the Commission's actions were constitutionally "arbitrary." Lowrance v. Achtyl, 20 F.3d 529, 537 (2d Cir. 1994). An "arbitrary action" in this context means much more than just an "incorrect or ill-advised" action. It must be "conscience-shocking," see, e.g. Lowrance at 537; see also County of Sacramento v. Lewis, 523 U.S. 833 (1998). "[S]ubstantive due process standards are violated only by conduct that is so outrageously arbitrary as to constitute a gross abuse of governmental authority." Bower Assocs. v. Town of Pleasant Valley, 2 N.Y.3d 617, 628-29 (2004) quoting Natale v. Town of Ridgefield, 170 F. 3d 258, 263 (2d Cir. 1999). Plaintiff must show that the governmental action was wholly without legal justification. Id. at 627; see also Town of Orangetown v. Magee, 88 N.Y.2d 41, 42 (1996); Niagara Recycling, Inc., v. Town of Niagara, 83 A.D.2d 316, 327 (4th Dept. 1981).

The Commission's Report, however, is not infected with "conscience-shocking" errors. Rather than errors, the Report reflects an awareness of all the facts that plaintiff now claims it got

17

wrong. First, Andrus argues that the Report got the number of beds wrong, but the Report states that Andrus is a 247-bed facility, which was true, because at the time the 50 Beth Abram beds were on plaintiff's operating certificate. Nonetheless, the Report also acknowledges the 50-bed sale to another provider, and calculates the occupancy rate both ways. That the Report does not provide the level of detail about the bed sale that Andrus provides in this litigation does not detract from the fact that the Commission's calculation of occupied beds, at 89%, accurately states Andrus' own position regarding occupancy. Second, Andrus argues the significance of the Report's statement that Andrus operated at a loss until 2006, when it allegedly showed a profit in 2005. This one year disparity is insignificant when compared to Ms. Biddle's testimony that Andrus became "financially viable for the first time" in 2005 (Tr. 201) and the Report's acknowledgment that Andrus claimed to be in the black. The Court also should note that Andrus' profits dropped 60% in 2006. Tr. 200-01. Third, Andrus makes much of the Report's listing of 26 deficiencies, alleging there only were 14. But Dr. Sandman demonstrated that DOH records <u>do</u> show 26 deficiencies, when the number of human figures signifying the scope of the deficiencies are counted. Exhibit H. This is a rational way of counting deficiencies, which takes scope and severity into account. The same method used to calculate Andrus' deficiencies was used for all other facilities, meaning that Andrus' received equal treatment with respect to this metric. Fourth, there is no dispute that Andrus has a relatively low acuity resident population, some of whom are appropriate candidates for assisted living. Fifth, Andrus does not dispute that the facility has private rooms and baths. In sum, the "errors" posited by Andrus are largely absent and inconsequential. They certainly are not "conscience shocking". Instead of constitutionally arbitrary action, the Commission Report is aimed at furthering efficiency and

18

economy in the health care system - an important public purpose encompassed within the State's police power.

Nor has Andrus substantiated that it did not receive procedural due process, which at its essence, requires notice and an opportunity to be heard. Mitchell v. W. T. Grant Co., 416 U.S. 416 U.S. 600, 634 (1974). While Ms. Biddle testified at length that the RAC and Commission did not keep Andrus posted on the progress of their fact finding and deliberations, the due process notice requirement is "only that the Government's effort be 'reasonably calculated' to apprise a party of the pendency of the action", a fact of which Ms. Biddle was fully aware. Dusenberry v. United States, 534 U.S. 161, 170 (2002). She knew that the Commission had been formed, that the Commission was looking at excess nursing home beds, that the RAC with whom she met was part of the Commission process and that the RAC could recommend closure of nursing homes. No one ever told Ms. Biddle that Andrus was exempt from consideration by the Commission and no one at her meeting with the RAC told her that Andrus was not under consideration by the RAC or the Commission. In fact, Ms. Biddle testified that she "was really paying attention to what was happening with the Berger when they asked me to come and speak." Tr. 244. Ms. Biddle was fully apprised of the pendency of the Commission's actions. Due process notice did not require the Commission to inform Andrus of the "possibility" conceivable injury. Mullane v. Central Hanover, 339 U.S. 306, 315 (1950). In this instance, although the legislative process provided all necessary process, Andrus had far greater notice and thus all the process that was due. See Atkins v. Parker, 472 U.S. 115, 130 (1985).

Hearing testimony by Dr. David Sandman, the Commission's Executive Director, served to corroborate the court's finding in St. Joseph Hospital of Cheektowaga v. Novello, 15 Misc.3d

19

333, 343-44 (N.Y. Sup. Ct. Erie Cty. 2007); aff'd as modified 840 N.Y.S.2d 263 (4th Dep't

2007), that "every hospital was on notice that the Commission might recommend its closing or

consolidation." Health care facilities in New York were well aware that they were subject to the

Commission's review and that that review could result in a closure recommendation.

Procedural due process required no more.

**CONCLUSION**

Defendant respectfully submits that plaintiff's Motion for Preliminary Injunction should

be denied in full.

Dated: New York, New York
      July 3, 2008

                     ANDREW M. CUOMO
                     Attorney General of the
                      State of New York
                     Attorney for Defendant

                 By: _____
                    John P. Gasior
                     Barbara Hathaway
                     Assistant Attorneys General
                     120 Broadway, 24th Floor
                     New York, New York 10271
                     212-416-8570

TO:    Peter G. Bergmann, Esq.
        Brian McGovern, Esq.
        Cadwalader, Wickersham & Taft LLP
        One World Financial Center
        New York, New York 10281
        Telephone: 212-504-6000

20
