UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

-----------------------------------------------------------------------X
                        :

JOHN E. ANDRUS MEMORIAL, INC.       :       Index No. 2007 Civ. 3432
(d/b/a ANDRUS ON HUDSON),         :       (CLB) (MDF)
                        :

                   Plaintiff,    :
          -against-             :
                        :

RICHARD F. DAINES, as Commissioner of the  :
New York State Department of Health,     :
                        :

                 Defendant.   :
                        :

-----------------------------------------------------------------------X

## POST-HEARING MEMORANDUM OF LAW IN SUPPORT
## OF PLAINTIFF'S MOTION FOR A PRELIMINARY INJUNCTION

CADWALADER, WICKERSHAM & TAFT LLP
One World Financial Center
New York, New York  10281
Telephone: (212) 504-6000

Attorneys for Plaintiff

**TABLE OF CONTENTS**

**PAGE**

TABLE OF AUTHORITIES ......................................................................... ii

PRELIMINARY STATEMENT ...................................................................... 1

BACKGROUND ....................................................................................... 4

    The Andrus and its Residents ............................................................... 4

    The Aborted CCR Project and Suspension of Nursing Home Admissions ..................... 5

    The Resumption of Nursing Home Admissions and the Andrus' Improved
    Occupancy and Finances ..................................................................... 5

POINT I      THE ANDRUS IS ENTITLED TO A PRELIMINARY INJUNCTION ............. 6

POINT II    THE ANDRUS WILL SUFFER IRREPARABLE HARM IF THE
               DEFENDANT IS NOT ENJOINED ................................................ 7

POINT III   THE ANDRUS HAS DEMONSTRATED A LIKELIHOOD OF
               SUCCESS ON THE MERITS ...................................................... 10

          A.    The Andrus Is Likely To Succeed On Its Procedural Due Process
               Claims ................................................................ 10

               The Law ................................................................ 10

               The Hearing Evidence ..................................................... 11

          B.    The Andrus Is Likely To Succeed On Its Substantive Due Process
               Claims ................................................................ 14

CONCLUSION ....................................................................................... 20

# TABLE OF AUTHORITIES

**PAGE(S)**

**CASES:**

Carey v. Klutznick,
637 F.2d 834 (2d Cir. 1980) ........................................................................ 20

Cleveland Bd. of Educ. v. Loudermill,
470 U.S. 532 (1985), cert. denied, 484 U.S. 946 (1988) .......................... 10

County of Sacramento v. Lewis,
523 U.S. 833 (1998) ..................................................................................... 14

Jolly v. Coughlin,
76 F.3d 468 (2d Cir. 1996) ............................................................................. 6

Libbie Rehab. Ctr., Inc. v. Shalala,
26 F. Supp. 2d 128 (D.C. Cir. 1998) ............................................................ 8

Lowrance v. Achtyl,
20 F.3d 529 (2d Cir. 1994) ..................................................................... 14-15

Mathews v. Eldridge,
424 U.S. 319 (1976) ..................................................................................... 11

Memphis Light, Gas, & Water Div. v. Craft,
436 U.S. 1 (1978) ......................................................................................... 10

Mullane v. Central Hanover Bank & Trust Co.,
339 U.S. 306 (1950) ..................................................................................... 11

Plaza Health Labs., Inc. v. Perales,
878 F.2d 577 (2d Cir. 1989) .................................................................... 6, 10

Schwartzberg v. Califano,
453 F.Supp. 1042, 1047 (S.D.N.Y. 1978) .................................................... 8

Standard & Poor's Corp. v. Commodity Exch., Inc.,
683 F.2d 704 (2d Cir. 1982) ........................................................................ 20

Tom Doherty Assocs. v. Saban Entm't, Inc.,
60 F.3d 27 (2d Cir. 1997) ............................................................................... 7

Waldman Publ'g Corp. v. Landoll, Inc.,
43 F.3d 775 (2d Cir. 1994) ............................................................................. 6

**PAGE(S)**

Wantanabe Realty Corp. v. City of New York,
    315 F. Supp. 2d 375 (S.D.N.Y. 2003) .................................................................................. 14

**STATUTES & OTHER AUTHORITIES:**

10 N.Y.C.R.R.
    § 401.3(h) ................................................................................................................................. 2
    § 415.3(h) ................................................................................................................................. 8

Enabling Legislation, Part K of Chapter 58 of the Laws of 2003, as added by Section 31
    of Part E of Chapter 63 of the Laws of 2005 §§ 9, 11 ........................................................... 2

## PRELIMINARY STATEMENT

Plaintiff John E. Andrus Memorial, Inc. d/b/a Andrus on Hudson ("the Andrus") submits this post-hearing memorandum in support of its motion for a preliminary injunction to prevent the defendant from taking any further steps to implement the recommendation made by the Commission on Health Care Facilities for the 21st Century (the "Berger Commission" or "Commission") to close the Andrus' nursing facility or to rescind or modify the Andrus' operating certificate pending the final resolution of this litigation. For the Court's convenience, we have submitted with this memorandum a copy of the Proposed Findings of Fact previously submitted in support of the Andrus' motion, which have been annotated with references to the hearing record evidence.

The issues that this Court identified for hearing on the Andrus' preliminary injunction application were succinctly described in the Report and Recommendation of Magistrate Judge Fox dated June 25, 2008 (the "June 25, 2008 R&R"). Defendant objected to the June 25, 2008 R&R with respect only to irreparable harm. By order dated June 30, 2008, District Judge Stein adopted the June 25, 2008 R&R in full. Accordingly, the matters which the Andrus was required to prove at the hearing in order to establish procedural and substantive due process violations are set forth in the June 25, 2008 R&R and are law of the case. The Andrus has established all the elements necessary to support the granting of a preliminary injunction.

Defendant has conceded that the "Andrus would suffer irreparable harm should its operating certificate be terminated and should it be forced to close its doors." Def's Memorandum of Law in Opposition to Plaintiff's Motion for a Preliminary Injunction, p. 3. This limited concession, however, does not justify narrowing the scope of preliminary injunctive relief to the actual closure of the Andrus. The defendant has sought to be allowed to issue an

amended operating certificate, with a termination date some time in the future.  Significantly, the claimed urgency for issuing an amended operating certificate by June 30, 2008 – the expiration date of defendant's statutory authority to implement the Berger Commission's recommendations[1] -- has now passed, and there is no longer any justification that defendant can invoke for allowing the Department of Health to issue an amended operating certificate, or take any other steps toward closure of the Andrus.

Moreover, as shown at the trial, the Andrus would suffer irreparable harm if the Department of Health were permitted to take such action.  The Andrus, currently operating pursuant to an operating certificate with an indefinite term, would be obligated to immediately inform its residents, their next of kin, and their physicians -- as well as the health care community -- of the fact that the facility had been issued an amended operating certificate, to its immediate and irrevocable detriment.  10 N.Y.C.R.R. § 401.3(h).  Learning that the Andrus was issued an operating certificate with a date certain for termination would be extremely traumatic to Andrus residents, who view the facility as their home and have chosen to spend their remaining years at the facility.  Residents would be confronted with the real possibility of a forced transfer to another facility in the future.

What is more, this news would have a deleterious effect on the Andrus' occupancy, at a nursing facility that depends primarily on word of mouth from existing residents and family for future referrals and admissions.  The fall in resident census would in turn

---

[1]     Section 9 of the Enabling Legislation authorizes the defendant Commissioner of Health to implement the Berger Commission's recommendations.  See Part K of Chapter 58 of the Laws of 2003, as added by Section 31 of Part E of Chapter 63 of the Laws of 2005 ("Enabling Legislation"), § 9.  However, Section 11 of the Enabling Legislation contains a sunset clause, providing that "sections nine and ten [relating to severability] of this act shall expire and be deemed repealed June 30, 2008."  Id., § 11.  The Andrus reserves all rights to argue that the defendant lacks any continuing authority to implement the Berger Commission recommendation to close the Andrus.

adversely impact its revenues and financial viability.  Such a downward spiral would ultimately result in the Andrus' collapse and closure -- precisely what the Andrus is seeking to prevent in this lawsuit.  As Dr. Nichols' testimony has established, if the Andrus' frail, elderly residents are forced to relocate due to the Andrus' closure, these residents will likely experience "transfer trauma" from the stress and strain associated with being displaced.

The Andrus has also established a substantial likelihood of success on its procedural and substantive due process claims.  The Berger Commission's recommendation to close the Andrus' nursing facility was based on demonstrably inaccurate and faulty data about the facility, and was arrived at in clear violation of its due process rights.  First, the Andrus was never provided with notice that its facility was being targeted for closure or why it was identified as a candidate for closure.  This is so despite the fact that those "facilities of interest" that the Executive Director of the Berger Commission had contacted (which did not include the Andrus) were told directly that they were being considered for rightsizing.  However, at no time before or during the one meeting between the Commission's regional body, the Hudson Valley Regional Advisory Committee ("RAC"), and a representative of the Andrus, was this possibility ever mentioned.  To the contrary, the Andrus was asked to meet with the RAC to "tell your good story" about its improved occupancy and financial condition, conveying the very opposite message to the Andrus, that it had no cause for concern about its fate before the Berger Commission.

Second, the Andrus was never afforded a meaningful opportunity to address and refute the many flawed factual assumptions about the Andrus that the Berger Commission had made in arriving at a closure recommendation.  The one meeting held with RAC members and the "public hearings" plainly do not suffice, as the Andrus was never informed that it was being targeted for closure.  Nor was the Andrus ever told of the reasons that the RAC or Berger

Commission had identified it internally as a "facility of interest", leaving them without any ability, or any perceived need, to correct the many inaccuracies about its operations that made their way into the Final Report.

Finally, the error-laden Final Report of the Berger Commission itself makes clear that the Andrus did not have a meaningful opportunity to be heard. The recommendations are premised on numerous mistaken assumptions about the Andrus' occupancy, its financial condition, the quality of the care of its residents, its physical plant, and the suitability of its residents for placement in an alternative care setting. These errors could have been avoided and would not have yielded the flawed closure recommendation in the Final Report had the Commission provided the Andrus with notice and a meaningful opportunity to be heard. Further, these errors also demonstrate that the pretext for the Commission's recommendation to close the Andrus was so fundamentally flawed and patently arbitrary as to truly "shock the conscience" and violate the substantive due process rights of the Andrus.

## **BACKGROUND**

The Andrus and its Residents

Established in 1953, the Andrus is a not-for-profit nursing home located in Hastings-on-Hudson, New York. Transcript of Preliminary Injunction Hearing in Andrus v. Daines, 07-CV-3432 (June 25-26, 2008) ("Hr'g Tr.") at 191:1-3 (Biddle). The Andrus has operated a residential health care facility or licensed nursing home since 1969, Hr'g Tr. (Biddle) 191:8-10, and is certified to care for up to 197 residents, Hr'g Tr. (Biddle) 191:25-192:1. The Andrus' operating certificate is of indefinite term. Hr'g Tr. (Biddle) 191:11-13.

Currently, the Andrus is caring for over 190 residents. Hr'g Tr. (Biddle) 191:22-24. The average age of the Andrus residents is between 88 and 89 years, and their average

4

length of stay is four years.  Hr'g Tr. (Biddle) 192:16-21.  Some residents have lived at the Andrus for almost twenty years.  Hr'g Tr. (Biddle) 192:16-18.

Of its current 191 residents, the majority are frail and elderly, Hr'g Tr. (Nichols) 78:9-13, with approximately 40% having been identified as suffering from dementia or other cognitive impairments.  Hr'g Tr. (Nichols) 77:9-14.  Additional residents may also experience mild or moderate dementia but have not been identified as such.  Hr'g Tr. (Nichols) 77:9-78:5.

The Aborted CCRC Project and Suspension of Nursing Home Admissions

In 1996, the Andrus began to explore a joint venture with Beth Abraham Health Services to develop a Continuing Care Retirement Community ("CCRC") on its campus.  Hr'g Tr. 193:11-14, 194:4-7.  A CCRC is a community that provides a continuum of care, including independent living, assisted living, and skilled nursing care, on one campus.  Hr'g Tr. (Biddle) 193:2-9.  While starting to develop this CCRC, the Andrus suspended admissions to its nursing home, as it had received Department of Health approval to reduce the total number of nursing home beds at its facility.  Hr'g Tr. (Biddle) 195:18-20, 194:17-23.  During the suspension of admissions, the Andrus was forced to turn away prospective residents interested in long term care at the Andrus.  Hr'g Tr. (Biddle) 196:18-24.

Both the New York State Departments of Health and Insurance approved the Andrus' CCRC project in or around 2000.  Hr'g Tr. (Biddle) 194:12-16.  However, in 2001, the Village of Hastings-on-Hudson denied the zoning necessary to allow the project to go forward. Hr'g Tr. (Biddle) 195:21-22.

The Resumption of Nursing Home Admissions and the Andrus' Improved Occupancy and Finances

Thereafter, after refurbishing the residential units, the Andrus began admitting new residents to its nursing facility.  Hr'g Tr. (Biddle) 196:1-10.  Also, in July 2002, the Andrus

agreed to transfer 50 of its residential health care facility beds to Beth Abraham as part of dissolving their joint venture.  Hr'g Tr. (Biddle) 196:25-197:11.  See Plaintiff's Ex. 4.  Pursuant to this agreement, the Andrus relinquished any right to use those 50 beds.  Hr'g Tr. (Biddle) 197:8-11.  The Department of Health was aware of the transfer as early as 2003, and informed the Berger Commission of the transfer of the 50 beds in 2006.  Hr'g Tr. (Benjamin) 176:4-13.

Prior to 2005, the Andrus, like the majority of nursing homes in New York State, operated at a deficit, Hr'g Tr. (Biddle) 201:12-20.  See Def.'s Ex. A at p. 35 (hereinafter "Report").  With the resumption of admissions, the Andrus was able to quickly improve both its occupancy and financial condition.  Hr'g Tr. (Biddle) 197:14-198:10, 198:21-199:1.  By 2005, the Andrus had achieved a net operating surplus of over $509,000.  Pl.'s Ex. 6.  The Andrus' occupancy continued to improve and its financial performance remained strong in 2006.  Hr'g Tr. (Biddle) 197:25-198:3, 200:19-23.

## POINT I

## THE ANDRUS IS ENTITLED TO A PRELIMINARY INJUNCTION

Generally, a party is entitled to preliminary injunctive relief where a showing is made that the party will be irreparably harmed if the relief is not granted, and "either (1) 'a likelihood of success on the merits' or (2) 'sufficiently serious questions going to the merits to make them a fair ground for litigation and a balance of hardships tipping decidedly' in the movant's favor."  Jolly v. Coughlin, 76 F.3d 468, 473 (2d Cir. 1996) (citing Waldman Publishing Corp. v. Landoll, Inc., 43 F.3d 775, 779-80 (2d Cir. 1994)).  When the injunction is sought against a government actor to enjoin a proposed action ostensibly taken in the public interest pursuant to a statutory scheme, the party seeking an injunction must demonstrate (1) irreparable harm and (2) a likelihood of success on the merits.  Plaza Health Labs., Inc. v. Perales, 878 F.2d 577, 580 (2d Cir. 1989).

The Andrus has demonstrated that both the Andrus and its over 190 frail residents will be irreparably harmed unless the defendant is enjoined from taking any steps to implement the Berger Commission recommendation, and that it has a substantial likelihood of success on the merits of its due process claims.  As such, preliminary injunctive relief should be granted.

## POINT II

### THE ANDRUS WILL SUFFER IRREPARABLE
### HARM IF THE DEFENDANT IS NOT ENJOINED

"Irreparable harm" is harm that is actual and imminent, for which a party cannot be adequately compensated monetarily.  Tom Doherty Assocs. v. Saban Entm't, Inc., 60 F.3d 27, 37 (2d Cir. 1997).  See also authorities in Pl's Memo. of Law in Support dated April 11, 2008.  Regarding "irreparable harm" to the Andrus, the Court in the June 25, 2008 R&R observed the following:

> There will be irreparable harm to the Andrus if it is issued a new operating certificate with an expiration date of June 30, 2008 or any other date, because the Andrus is required under Department of Health regulations to notify "each patient or resident, his next of kin, his sponsor and his physician . . . immediately upon receipt of notification by the Department revoking, suspending, limiting, annulling or refusing to issue the operating certificate."  N.Y. Comp. Codes R. & Regs. tit. 10, § 401.3(h). The Andrus is also required to post the operating certificate "conspicuously."  N.Y. Comp. Codes R. & Regs. tit. 10, § 401.2(c). The Federal Centers for Medicare and Medicaid Services may sanction the Andrus for failure to operate in compliance with all applicable State regulations.  42 C.F.R. 483.75(b).  The Andrus's compliance with these regulations, upon receipt of an amended operating certificate with an expiration date, would cause immediate, likely irreparable adverse impact, on the Andrus's viability.

The evidentiary hearing fully corroborates the Court's conclusions in the June 25, 2008 R&R.  As a preliminary matter, operating certificates are required to be posted conspicuously by nursing homes.  Hr'g Tr. (Carlo) 135:4-14.  Thus, the Andrus would be

7

required to post an amended operating certificate at its nursing home, which would inform anyone entering the building that their continued operation was limited.  More importantly, residents, family members, and physicians would have to be informed of any change in a facility's operating certificate as soon as such a change is made.  Hr'g Tr. (Carlo) 135:15-136:10.  Even if these requirements were not enforced by the Department, they could still be enforced by the Federal Centers for Medicare and Medicaid Services.  Hr'g Tr. (Carlo) 136:15-20.

Operating under an operating certificate with a specific expiration date would likely impact adversely future referrals to the Andrus as family members and physicians would not want to place a resident in a facility from which he or she would have to be uprooted shortly thereafter.  Hr'g Tr. (Carlo) 138:13-22.  Ms. Biddle has testified that she would tell residents, families, staff, physicians, vendors and the hospitals of any amendment to the Andrus' operating certificate not only because she is obligated to under the New York State regulations, but also because of her ethical obligation to the facility's residents.  Hr'g Tr. (Biddle) 228:17-229:24, see also  Hr'g Tr. (Carlo) 147:13-20.

In addition to the distress of being told that the Andrus would be closing, the residents would be at risk when they were actually transferred away from the facility.  "Transfer trauma" is the cognitive and functional decline experienced, primarily in dementia patients, following a transfer from one care setting to another.  Hr'g Tr. (Nichols) 61:23-62:2.[2]  This decline is often due to a variation in established routines and familiar  surroundings and

---

[2] The Andrus as well as its residents has the requisite standing to raise the issue of "transfer trauma".  See, e.g., Libbie Rehabilitation Center, Inc. v. Shalala, 26 F.Supp. 2d 128, 132 (D.D.C. 1998) (granting nursing home preliminary injunction against termination from Medicare and Medicaid programs on showing of "irreparable harm", based on evidence of "transfer trauma" to its residents); Schwartzberg v. Califano, 453 F.Supp. 1042, 1047 (S.D.N.Y. 1978) (considering nursing home's claim of transfer trauma to its residents if terminated from Medicare and Medicaid programs).  Indeed, the Department of Health's own regulations impose upon a nursing home the responsibility for ensuring the safe discharge of residents being transferred out of the facility.  See 10 N.Y.C.R.R. § 415.3(h).

caregivers. Hr'g Tr. (Nichols) 65:20-66:15. Frail residents are also at risk when transferred between facilities. Hr'g Tr. (Nichols) 67:23-68:7. The risks associated with transfer trauma are increased mortality rates, Hr'g Tr. (Nichols) 68:9-15, increased falls, Hr'g Tr. (Nichols) 69:11-15, and stress and agitation, Hr'g Tr. (Nichols) 69:21-70:13. There is no effective means to eliminate the risk of transfer trauma. Hr'g Tr. (Nichols) 95:18-21.

The Berger Commission did not consider resident-specific clinical data to determine the cognitive condition of the Andrus' residents, and in particular whether they suffered from dementia. Nor did the Berger Commission attempt to quantify the impact of transfer trauma on these residents. Sandman Depo. 141:19-142:5, 270:25-271:4.

As for the defendant, no Department study of transfer trauma has ever been conducted. Hr'g Tr. (Kissinger) 161:19-24. One of the Department officials charged with implementation of nursing home closure recommendations acknowledged that he was unfamiliar with the data and with any studies supporting the Andrus' claim that its residents would suffer transfer trauma if forced to relocate to another facility. Hr'g Tr. (Kissinger) 165:1-23. Nor did the Berger Commission ever study the risk of transfer posed to the residents of the Andrus specifically. Hr'g Tr. (Kissinger) 163:5-13.

Though the residents at the Andrus, particularly those with dementia, are well integrated and functional in their current nursing home environment, Hr'g Tr. (Nichols) 75:14-21, some of these residents would suffer harm if transferred to another facility, Hr'g Tr. (Nichols) 78:14-21. Dr. Jeffrey Nichols, a geriatrician and expert on dementia and transfer trauma among nursing home residents, testified that this trauma would be particularly pronounced among the frail dementia residents at the Andrus. Hr'g Tr. (Nichols) 95:18-21. Dr. Nichols also testified that transferred residents often feel a sense of loss when they are

transferred away from a familiar care setting and familiar caregivers.  Hr'g Tr. (Nichols) 65:20-66:15.

Viewed as a whole, the population of the Andrus is particularly susceptible to transfer trauma, and would likely be irreparably harmed if forced to relocate or even forced to contemplate relocation.

**POINT III**

**THE ANDRUS HAS DEMONSTRATED A
LIKELIHOOD OF SUCCESS ON THE MERITS**

A party is entitled to preliminary injunctive relief where, in addition to demonstrating irreparable harm, it has demonstrated a likelihood of success on the merits.  Plaza Health Labs., 878 F.2d at 580-81.

**A.    The Andrus is Likely to Succeed on its Procedural Due Process Claims**

The Law.   Once it is established that a protected property right exists[3], the minimum due process required by law is notice and an opportunity to be heard.  Cleveland Bd. of Educ. v. Loudermill, 470 U.S. 532, 542 (1985), cert. denied, 484 U.S. 946 (1988).  Notice is inadequate where it does not provide the party affected with an opportunity to marshal evidence and prepare a defense to the proposed action.  See Memphis Light, Gas, & Water Div. v. Craft, 436 U.S. 1, 11-12 (1978).   At oral argument on defendant's summary judgment motion, the Court observed that the Andrus had a "probability of success on the merits" of its procedural due process claim.  Transcript of Oral Argument, John E. Andrus Memorial, Inc. v. Daines, 07 Civ. 3432, 15 (S.D.N.Y. Sept. 7, 2007) ("Sept. 7, 2007 Tr.").

---

[3]    The existence of a property right was addressed in the Plaintiff's Memorandum of Law in Support of its Motion for a Preliminary Injunction, and defendant has provided no factual or legal basis to support a contrary contention that the Andrus has no property right in its operating certificate.

The other core requirement of due process is a meaningful opportunity to be heard.  Mathews v. Eldridge, 424 U.S. 319, 333 (1976).  The very purpose for providing notice and hearing under process is to avoid any erroneous deprivation of a property interest.  Id.  An opportunity to be heard cannot be meaningful if it is not preceded by sufficient notice.  Mullane v. Central Hanover Bank & Trust Co., 339 U.S. 306, 314 (1950).

In the June 25, 2008 R&R, the Court framed the issue for hearing with respect to the Andrus' procedural due process claim, as follows:

> In support of its procedural due process claim, Plaintiff argues that it was never notified that it was being targeted for closure, until the Regional Advisory Committee and Berger Commission reports, which recommended the Andrus's closure or conversion to assisted living, were released.  Only one meeting took place between the Andrus and the Hudson Valley Regional Advisory Committee and the Andrus was told that the purpose of the meeting was to tell the "good story" about the Andrus.  If this is true, it seems that the Andrus was not provided with notice and an opportunity to be heard, as required to satisfy procedural due process, see Cleveland Bd. of Educ. v Loudermill, 470 U.S. 532, 542 (1985).

The Hearing Evidence.    The evidence adduced at the hearing establishes conclusively that the foregoing meeting was indeed all the "notice" that the Andrus received, and that the Andrus was never given notice that its nursing facility was being targeted for closure, nor the reasons for being targeted, until after the Berger Commission's Final Report was issued, in violation of procedural due process.  Likewise, having never been given adequate notice, the Andrus was never afforded a meaningful opportunity to be heard and to correct the many inaccuracies in the Berger Commission's Final Report (detailed in the next Point).

In May 2006, Ms. Biddle was contacted by Mark Ustin from the Berger Commission. Hr'g Tr. (Biddle) 201:2-11.[4]  Mr. Ustin asked Ms. Biddle how the Andrus was doing. In response, Ms. Biddle explained that, after resuming admissions to the Andrus' nursing home following the rejection of the CCRC plan, the Andrus had gone from 72 residents to over 160 residents, and that the facility was financially strong. Hr'g Tr. (Biddle) 201:12-20. Mr. Ustin then asked her to meet with the Regional Advisory Committee ("RAC") to tell her "good story". Hr'g Tr. (Biddle) 201:12-22. Although Ms. Biddle consulted with an attorney after the call from Mr. Ustin, Ms. Biddle thereafter met with the RAC by herself, without an attorney. Hr'g Tr. (Biddle) 280:3-14.

Ms. Biddle's meeting with the RAC took place in June 2006. Hr'g Tr. (Biddle) 202:1-33. At no time prior to or during this meeting did anyone from the RAC or Berger Commission tell Ms. Biddle that the Andrus was a "facility of interest" to the Commission. Hr'g Tr. (Biddle) 202:7-203:10. Ms. Biddle discussed with the RAC the Andrus' improved occupancy, the transfer of 50 of its nursing home beds to Beth Abraham, and its positive financial performance. Hr'g Tr. (Biddle) 203:2-10. After the meeting, she sent the RAC's Chair, Dr. Robert Amler, a copy of the Andrus' 2005 audited financial statements and its 50-bed transfer agreement with Beth Abraham. Hr'g Tr. (Biddle) 203:14-24, Pl.'s Ex. 5. The Andrus' 2005 financial statements confirmed the information Ms. Biddle shared with the RAC at the June 2006 meeting, and reflected an operating surplus of over $500,000 for 2005. See Pl.'s Exs. 5, 6

---

[4] At some point after enactment of the Enabling Legislation, the Executive Director of the Andrus, Betsy Biddle, became aware of the legislation. Hr'g Tr. (Biddle) 248:15-17. However, the mere passage of the Enabling Legislation did not notify Ms. Biddle that her facility would be considered for closure, particularly given that the nursing facility had rebuilt its occupancy and was financially viable.[4] Hr'g Tr. (Biddle) 248:18-249:5. In any event, the argument that the "generalized notice" to every facility in New York State, by virtue of the enactment of the Enabling Legislation, was sufficient as a matter of constitutional law was advanced on defendant's motion for summary judgment, and was rejected by Judge Brieant.

at Note 10.[5]  At that meeting, Ms. Biddle also provided updated financial and census showing

that the facility had an occupancy of 183 residents and had continued operating at a surplus in

2006.  Hr'g Tr. (Biddle) 209:2-15.[6]

Following her meeting with the RAC, and having shared the Andrus'

"good story", Ms. Biddle had no reason to believe that the RAC or the Berger Commission

would consider the Andrus as a candidate for closure, for any reason.

Ms. Biddle did not receive any requests for additional information.  Hr'g Tr.

(Biddle) 208:13-15. The Andrus did not otherwise hear from the RAC or Berger Commission

again, until the Final Report was published on November 28, 2006.  Hr'g Tr. (Biddle) 209:24-

210:6.

Defendant has also pointed to the three public hearings held by the Hudson Valley

RAC in February and March of 2006.  All three hearings took place well before the RAC

contacted Ms. Biddle to meet with her.  See Def.'s Exs. F and G.  Regardless of when the public

---

[5]    At his deposition, Mr. Benjamin questioned the accuracy of the financial statements sent to Dr. Amler because the copy was unsigned, and stated that he would have contacted the facility and asked it to resubmit.  (Benjamin Depo. 147:2-17).  There is no question that the financial statements contained in Plaintiff's Exhibit 5 (the unsigned copy) and Exhibit 6 (the signed copy) are otherwise identical, and that the copy sent to Dr. Amler was accurate.  Nor was the Andrus ever told that the financial statements submitted in 2006 were deficient in any way.

[6]    At the evidentiary hearing, the defendant did not present testimony from any witness with personal knowledge of this meeting.  See Hr'g (Sandman) Tr. 314:18-24.  The defendant did submit an opposition affidavit on the motion from former Berger Commission staff member, Allison Silvers.  Ms. Silvers was present at the meeting, but defendant did not call her to testify at the hearing.  In any event, Ms. Silvers' affidavit does not contradict Ms. Biddle's testimony in any material respect.  Ms. Silvers acknowledges that the Andrus presented updated financial and occupancy information to the RAC – information that regrettably was ignored in the RAC's report.  See Biddle Aff. Ex. A.  Affidavit of Allison Silvers in Opposition to Plaintiff's Motion for a Preliminary Injunction ("Silvers Aff.") at ¶ 4.  Ms. Silvers also did not contest Ms. Biddle's account of the meeting detailed in Ms. Biddle's moving affidavit.  See Biddle Aff. at ¶¶31-33.  Nor does Ms. Silvers recall ever telling Ms. Biddle that the Andrus was a "facility of interest."  Silvers Aff. at ¶ 5.  Instead, Ms. Silvers repeats the argument made in defendant's previously denied motion for summary judgment that simply knowing that the Berger Commission was given the authority to "right size" the heath care system was sufficient notice to the Andrus and all other facilities that they might be considered for closure.  Silvers Aff. at ¶ 5.

hearings were scheduled, they were hardly a meaningful opportunity to be heard where the Andrus never received notice as to whether, why, and what information it would need, in order to appear and marshal a defense to a contemplated closure recommendation.

The lack of notice and an opportunity to be heard to the Andrus undoubtedly resulted in the numerous factual errors contained both in the RAC and Berger Commission Reports. That so many errors were made is the unfortunate by-product of a constitutionally flawed process, and vividly illustrates how the lack of procedural due process afforded to the Andrus can, and unless enjoined by the Court, will deprive the Andrus of its protected property interest in its nursing home operating certificate.

**B.    The Andrus is Likely to Succeed on its Substantive Due Process Claims**

The Andrus has also demonstrated a substantial likelihood of success on the merits on its substantive due process claim. Substantive due process bars the government from taking any action against an individual that is wholly without legal justification. County of Sacramento v. Lewis, 523 U.S. 833, 846 (1998). A government decision made in reliance on faulty or unreliable information can constitute a violation of a party's substantive due process rights. Wantanabe Realty Corp. v. City of New York, 315 F. Supp. 2d 375, 393-94 (S.D.N.Y. 2003). Where a government's action is found to be "conscience-shocking", the conduct may contravene substantive due process. Lowrance v. Achtyl, 20 F.3d 529, 537 (2d Cir. 1994).

In the June 25, 2008 R&R, the Court summarized the Andrus' substantive due process claim, as follows:

> In support of its substantive due process claims, Plaintiff argues that the factual information relied upon by the Berger Commission in reaching its determination to close the Andrus was overwhelmingly faulty. The enabling legislation which created the Berger Commission provided that, in deciding whether to close a particular facility, the Commission was to focus on criteria including the extent to which an existing facility meets the health

14

> care needs of the community, the stability and efficiency achieved in the provision of health care, the economic impact of any actions recommended by the Commission, and the feasibility of converting the use of existing facilities. The Andrus argues that the Berger Commission erroneously assumed the Andrus was operating at low occupancy and at a deficit, by considering the Andrus to be a 247-bed facility even though it had become a 197-bed facility in 2002 and by failing to consider its 2005 financial statements, which reported a surplus of over half a million dollars. The Andrus argues that the Commission erroneously reported that the Andrus had been cited by inspectors for 26 deficiencies in 2005, when the 2005 deficiency report actually listed only 14 deficiencies. If the information upon which the Berger Commission relied was wrong and without basis, it seems that the Commission's findings and recommendation to close the Andrus based on these findings would be outrageously arbitrary and conscience-shocking, in violation of substantive due process, see Lowrance v. Achtyl, 20 F.3d 529, 537 (2d Cir. 1994).

Through the evidence presented at the hearing, the Andrus has demonstrated that the Berger Commission's recommendation to close the Andrus was wholly arbitrary and without any legal justification.

Notably, the Berger Commission staff acknowledged that the Berger Commission was supposed to apply the factors delineated in the Enabling Legislation before deciding to right size or close any one facility. Sandman Depo. 99:9-15; Enabling Legislation § 5. The factors included the financial viability of the facility, service to vulnerable populations, availability of services, quality of care, utilization, and economic impact. Sandman Depo. 273:5-13. The Commission staff also acknowledged that it was important to consider the most up-to-date occupancy and financial data available. Sandman Depo. at 182:13-23. The Berger Commission utterly failed to do so in Andrus' case.

*Misstatement of the Andrus' Occupancy.* In 2006, prior to the Final Report, the Department of Health had informed Berger Commission staff that 50 of the Andrus' original complement of 247 nursing home beds had been transferred to Beth Abraham pursuant to

agreement, with the Department of Health's approval, and that those beds were no longer in use by the Andrus. Hr'g Tr. (Benjamin) 188:7-11. Yet, the Report mistakenly described the Andrus as a "247 bed" facility and erroneously referred to the sale of those beds, completed in 2002, as still "pending", Report at p. 123. The Department liaison to the Commission (Mr. Benjamin) considered it important that the Commission be made aware of this agreement and the status of the 50 beds because occupancy was one of the statutory factors. Benjamin Depo. 43:13-21.

*Misstatement of the Andrus' Financial Status.* The Final Report states that the Andrus "had been operating at a significant loss until 2006." Report at p. 122. (Emphasis added). However, the Andrus submitted certified financial statements that demonstrated that the facility had been operating at a surplus for 2005. Hr'g Tr. (Biddle) 211:25-212:5.

The Report also states that the Andrus "claim[ed]" to be operating at a surplus at the time it was issued. Report at 123. However, Ms. Biddle informed the RAC, in June 2006, not only of the Andrus' positive financial performance in 2005, but also of its continued operating surplus in 2006. Hr'g Tr. (Biddle) 209:2-12.

*Misstatement of the Quality of Care at the Andrus.* Concerning the quality of care provided to Andrus residents, the Final Report states that the Andrus was cited for 26 deficiencies in its May 2005 survey. Report at 123. In fact, the May 2005 Statement of Deficiencies reflects only 14 deficiencies. Pl.'s Ex. 1. Further, only 8 of these deficiencies ("F-tags") concerned resident care, while the remaining six concerned environmental deficiencies ("K-tags"). Hr'g Tr. (Carlo) 130:4-8. Such a count is arrived at by adding the "F-tag" deficiencies and the "K-tag" deficiencies cited in the "ID Prefix Tag" column on the May 2005 Statement of Deficiencies issued to the Andrus. Pl.'s Ex. 1; Hr'g Tr. (Carlo) 130:4-8. This tabulation is consistent with the methodology utilized by the Department of Health in counting deficiencies. Hr'g Tr. (Carlo) 132:15-18.

In the nine years during which Ms. Biddle has been the Executive Director, the facility has never been cited for as many as 26 deficiencies.  Hr'g Tr. (Biddle) 215:18-22.

Moreover, the May 2005 Statement of Deficiencies does not indicate that the Andrus was experiencing quality of care problems, according to former senior Department of Health nursing home surveillance official, Sharon Carlo.  Hr'g Tr. (Carlo) 133:19-134:3.  Ms. Carlo's opinion was based on the facts that: [1] there was no harm level deficiency cited; [2] there was no substandard quality of care found on the survey; and [3] there were not findings of immediate jeopardy.  Hr'g Tr. (Carlo) 133:19-134:3.

The only witness presented by the defendant on this issue has no familiarity with the survey process and did not testify that he had ever even reviewed the Andrus' May 2005 Survey of Deficiencies; only summary information provided on the Department's website.  See Hr'g Tr.(Sandman) 312:2-24.  On cross-examination, Mr. Sandman admitted that the number of deficiencies was actually 14, not 26.  Hr'g Tr. (Sandman) 313:16-25.[7]  In any event, the number of deficiencies alone is not the most reliable indicator of quality in terms of nursing home care. Hr'g Tr. (Carlo) 129:2-7.  Rather, the type of deficiencies, as well as their scope and severity, is a superior measure of the quality of care provided.  Hr'g Tr. (Carlo) 8-14.

*Misstatement of Care Needs of Andrus Residents.*  Nursing home residents classified under New York State's RUG-II case mix index ("CMI") system as "Physical A"

---

[7]     Mr. Sandman tried to justify the Berger Commission's erroneous count of the Andrus' deficiencies by explaining that the Commission had counted the "human figures" on a summary of a facility's Statement of Deficiencies appearing on a page from the Department of Health's website.  Hr'g Tr. (Sandman) 312:15-18, 313:3-8.  However, the "human figures" are merely a symbol denoting the scope of a deficiency and do not correlate to any actual number of deficiencies or residents harmed.  Def.'s Ex. H. Further, using this metric is clearly irrational: A facility with a widespread problem that caused no actual harm to patients and did not risk causing actual harm to patients would be considered to have "three deficiencies" under this method whereas a facility with a pattern of causing actual harm to residents would only have "two deficiencies".

("PA") and "Physical B" ("PB") are considered low acuity residents. 10 N.Y.C.R.R. § 86-2.30 and Appendix 13-A. Approximately 60 of the Andrus' residents, or 31%, are PA and PB residents. Pl.'s Ex. 7.

The Berger Commission assumed, without any clinical basis, that 19% of PA and PB residents in nursing homes statewide could be cared for in less restrictive settings, Report at 123. In the Final Report, the Berger Commission also erroneously assumed that the Andrus' PA and PB residents, constituting "about half" of its resident population, could all be cared for in a less restrictive setting. Report at 123. As the Andrus has shown, there is absolutely no support for either assumption. Moreover, no representative of the RAC or Berger Commission ever visited the Andrus, or requested or reviewed any clinical information about Andrus' residents beyond their case mix index. Hr'g Tr. (Biddle) 202:4-6, Sandman Depo. at 141:19-142:5

In contrast, the Andrus' medical expert, Dr. Nichols, testified (without rebuttal) that, while each determination should be made on a case-by-case basis, the "vast majority of [PA and PB residents] are not appropriate for assisted living." Hr'g Tr. (Nichols) 81:22-25. Dr. Nichols explained that dementia residents in nursing homes could not function well in assisted living generally, and that other cognitive impairments can make it difficult for otherwise physically healthy residents to function in the less structured setting of assisted living. Hr'g Tr. (Nichols) 82:1-14.

*Misstatement of Economically Viable Alternative Use.* The Final Report also mistakenly assumed that conversion of the Andrus' plant to an assisted living program would be economical. Report at p. 123. However, because of the size of the facility and the difference in revenues between skilled nursing and assisted living, it is not simply financially viable to convert the Andrus to assisted living. Hr'g Tr. (Biddle) 214:19-24.

18

The Andrus was not the only facility about which errors were made in the Report. Benjamin Depo. 14:15-18, 16:10-23. Defendant's witnesses testified that errors in the Report should be considered when determining whether or not to modify a recommendation. See Benjamin Depo. 118:13-119:4, Kissinger Depo. 36:20-37:4.

In addition to modifications based on factual errors, a number of other modifications were made for resident health and safety. See Kissinger Depo. 20:3-15, 34:13-35:23, 39:14-40:15, 83:15-84:21. There were also two nursing facilities that did not cooperate at all with the Berger Commission. Sandman Depo. 239:8-20. The Commission referred those facilities to the Department, to consider whether to close, downsize or convert, utilizing the Commission's framework. See Report at 126, 176. However, after reviewing more updated 2006 and 2007 occupancy and financial data, the Commissioner of Health determined not to close either one of these facilities. See Plaintiff's Ex. 9. Had the Berger Commission properly considered the Andrus' updated data, it should have similarly recommended no action against the Andrus.

Furthermore, what the defendant has never contested is the fact that relocating the Andrus' residents would not increase efficiency in the delivery of health care – a statutory factor in the Enabling Legislation. It would actually cost the State close to an additional $4 million a year to care for the Andrus' Medicaid residents at other facilities. Affidavit of Betsy Biddle in Support of Plaintiff's Motion for a Preliminary Injunction ("Biddle Aff.") at ¶¶ 64-65. That is because the Andrus is one of the lowest-cost nursing homes in the region. Biddle Aff. ¶ 64.

The Report included faulty or erroneous information about virtually every single one of the statutory factors that were to be considered by the Berger Commission before taking the drastic decision to revoke the Andrus' operating certificate. The myriad of errors -- involving facts and assumptions that were the putative basis for its closure recommendations --

indeed rises to the level of "conscience-shocking", and establishes that the recommendation was reached in violation of the Andrus' substantive due process rights.

### CONCLUSION

In addition to irreparable harm and likelihood of success, courts may, and often do, consider the public interest in granting or denying preliminary relief.  Standard & Poor's Corp. v. Commodity Exch., Inc., 683 F.2d 704, 711 (2d Cir. 1982).  The public interest is not solely represented by the views of a public agency, and may actually be best served by enjoining the actions of a government entity.  See Carey v. Klutznick, 637 F.2d 834, 839 (2d Cir. 1980) (affirming the grant of a preliminary injunction against the United States Census Bureau, in part because the injunction was in the best interests of the public).  Here, for the reasons set forth above, it is clear that the interests of the public are best served by granting the Andrus' request for preliminary injunctive relief.

For the foregoing reasons, plaintiff's motion for preliminary injunctive relief preventing defendant from implementing the Berger Commission's recommendation to close the plaintiff's nursing facility should be granted.

Dated:    New York, New York
          July 3, 2008

CADWALADER, WICKERSHAM & TAFT LLP

By:  _____s/Brian T. McGovern_____
          Brian T. McGovern (BM-5453)

Attorneys for Plaintiff
  John E. Andrus Memorial, Inc.
   (d/b/a Andrus on Hudson)
One World Financial Center
New York, New York  10281
Telephone: (212) 504-6000