# ORIGINAL

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-------------------------------------------------------x

JOHN E. ANDRUS MEMORIAL, INC.
(d/b/a ANDRUS ON HUDSON),

                 Plaintiff,

      - against -

RICHARD F. DAINES, as Commissioner of
the New York State Department of Health,

                 Defendant.
-------------------------------------------------------x



## REPORT & RECOMMENDATION

07 Civ. 3432 (KMK) (MDF)

TO: THE HONORABLE KENNETH M. KARAS, U.S.D.J.

Before your Honor is a motion for preliminary injunction filed on April 15, 2008 by

Plaintiff John E. Andrus Memorial, Inc. ("the Andrus"), a nursing home in Hastings-on-Hudson,

New York doing business as Andrus-on-Hudson. (Doc. 25.) Plaintiff commenced this action in

April 2007 seeking declaratory and injunctive relief from the attempt of Defendant Richard F.

Daines, Commissioner of the New York State Department of Health, to require the Andrus to

either cease operating as a nursing home or to operate as an assisted living facility. Defendant

seeks to do so pursuant to a recommendation, which has since acquired the force of law, by the

New York State Commission on Healthcare Facilities in the 21st Century, often referred to as the

"Berger Commission" after its chairman, Stephen Berger.

Plaintiff's motion for a preliminary injunction seeks "to prevent the defendant from

taking any further steps to implement the recommendation made by the [Berger Commission] to

close the Andrus' nursing facility, or otherwise seek the surrender of the Andrus' operating

certificate pending the final determination of this action." (Notice of Motion, Apr. 15, 2008.)

USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #:

Defendant filed its Memorandum of Law in Opposition to Plaintiff's Motion for a Preliminary

Injunction on May 1, 2008. A evidentiary hearing was held before this Court on June 25 and 26,

2008, during which this Court heard testimony from six witnesses: (1) Dr. Jeffrey Nichols, a

geriatrician and Plaintiff's medical expert on dementia and transfer trauma among nursing home

residents; (2) Sharon Carlo, a consultant to nursing homes in New York State and former New

York State Department of Health employee and nursing home administrator; (3) Mark Kissinger,

a member of the Berger Commission; (4) Neil Benjamin, New York State Department of Health

Director of the Division of Health Facility Planning; (5) Betsy Biddle, Executive Director of the

Andrus; and (6) David Sandman, the Executive Director of the Berger Commission. At the

hearing, portions of the depositions of Mr. Kissinger, Mr. Benjamin, and Mr. Sandman were

admitted into evidence pursuant to Rule 32 of the Federal Rules of Civil Procedure. (Hr'g Tr.

282:4-20, June 25-26, 2008.) Defendant submitted additional portions of these depositions to the

Court on June 30, 2008. Both Plaintiff and Defendant filed post-hearing briefs on July 3, 2008.

## I. BACKGROUND

### A. FINDINGS OF FACT

In April 2005, the New York State legislature created the Berger Commission by enacting

Section 31 of Part E of Chapter 63 of the Laws of 2005 (the "Enabling Legislation"). The

purpose of the Commission was to conduct "a rational, independent review of health care

capacity and resources in the state to ensure that the regional and local supply of general hospital

and nursing home facilities is best configured to appropriately respond to community needs."

Enabling Legislation § 1.

The Commission itself consisted of eighteen statewide members and six regional

members from each of six regions in New York State. Enabling Legislation § 7(a). The Enabling Legislation established a regional advisory committee ("RAC") for each of the six regions to "develop recommendations for reconfiguring its region's general hospital and nursing home bed supply to align bed supply with regional and local needs." Enabling Legislation § 7(d). By November 15, 2006, the RACs reported to the Berger Commission their specific recommendations for facilities to be closed, resized, consolidated, converted or restructured, the dates by which such actions should occur, any investments necessary to implement their recommendations, and their justifications for their recommendations. *See* Enabling Legislation § 7(d). The Commission made a final report to the Governor and Legislature by December 1, 2006 and, since the Governor approved the recommendations and the legislature did not reject the recommendations by December 31, 2006, the recommendations acquired the force of law. *See* Enabling Legislation § 9(b).

In reaching its final recommendations, the Commission was to consider the following factors:

> (i) the need for capacity in the hospital and nursing systems in each region of the state;
> (ii) the capacity currently existing in such systems in each region of the state;
> (iii) the economic impact of right sizing actions on the state, regional and local economies, including the capacity of the health care system to provide employment or training to health care workers affected by such actions;
> (iv) the amount of capital debt being carried by general hospitals and nursing homes, and the nature of the bonding and credit enhancement, if any, supporting such debt, and the financial status of general hospitals and nursing homes, including revenues from medicare, medicaid, other government funds, and private third-party payors;
> (v) the availability of alternative sources of funding with regard to the capital debt of affected facilities and a plan for paying or retiring any outstanding bonds in accordance with the contract with bondholders;
> (vi) the existence of other health care services in the affected region, including the

availability of services for the uninsured and underinsured, and including services provided other than by general hospitals and nursing homes;

(vii) the potential conversation of facilities or current facility capacity for uses other than as inpatient or residential health care facilities;

(viii) the extent to which a facility serves the health care needs of the region, including serving medicaid recipients, the uninsured, and underserved communities; and

(ix) the potential for improved quality of care and the redirection of resources from supporting excess capacity toward reinvestment into productive health care purposes, and the extent to which the actions recommended by the commission would result in greater stability and efficiency in the delivery of needed health care services for a community.

Enabling Legislation § 5(a). The Commission received additional information from the Department of Health, such as institutional cost reports and facility occupancy reports. *See* Enabling Legislation § 5(b).

The Andrus is located in the Hudson Valley Region. *See* Enabling Legislation § 7(b)(iii). It opened in 1953 and has remained continuously in operation since then. (Tr. 191:1-5.) The Andrus was issued its operating certificate in 1969 and currently has in effect an operating certificate with no expiration date. (Tr. 191:6-13.) The operating certificate is posted on the first floor of the Andrus, near the lobby, on an informational board which includes survey results and other information of interest about the facility. (Tr. 191:14-21.)

Betsy Biddle, the Executive Director of the Andrus, testified that, as of as of June 25, 2008, the Andrus had 191 out of its 197 licensed beds filled. (Tr. 191:22-192:1.) Approximately 19 to 22 of these residents were there for short-term rehabilitation, with plans to return home. (Tr. 192:4-8.) The remaining residents were frail, elderly people, with an average age of 89, who were in long-term care with an average length of stay of four years. (Tr. 192:4-18.)

Around 1996, the Andrus began "a predevelopment process" to convert its facility from a

4

nursing home into a continuing care retirement community. (Tr. 194:4-11.) A continuing care retirement community is a community which services nursing, assisted living, and independent living residents. (Tr. 193:2-5.) The community would have been operated as a joint venture between the Andrus and Beth Abraham Health Services. (Tr. 193:11-14.) Ms. Biddle testified that by around 2000 they had secured approval for the conversion from the Department of Insurance and the Department of Health, "[b]ut at the eleventh hour, after three years working with the village, they did not accept [the proposed] zoning, [and] would not give [the Andrus] the zoning amendment." (Tr. 193:18-24, 194:12-16.) The zoning board denied their application in November 2001 by a vote of 4-0. (Tr. 195:21-25.) Neil Benjamin, a Department of Health employee who testified for the Defendant, agreed in his testimony that "despite their best efforts, the Andrus . . . was unable to obtain zoning approval for the [continuing care retirement community]." (Tr. 176:14-24.) The project therefore had to be abandoned. (Tr. 193:24-25.)

At the time it sought approval to convert to a continuing care retirement community, the Andrus was certified to operate 247 nursing home beds. (Tr. 195:7-10.) The proposed continuing care retirement community would have had 72 nursing home beds and 201 beds total. (Tr. 194:17-195:6.) While the Andrus sought approval for its plans, it temporarily suspended admissions in anticipation of having to reduce the number of nursing home patients at its facility. (Tr. 195:13-17.) During this time, the Andrus received many inquiries about admissions for nursing home residents and had to turn away "a couple [of potential residents] every week." (Tr. 196:18-24.) By the time admissions were resumed in 2002, the resident census had decreased to the low 70s. (Tr. 197:17-19.) After admissions were resumed, the census increased significantly throughout 2005 and 2006 to an average of 184 in 2006. (Tr. 197:20-198:9.) With the

5

resumption of admissions, the Andrus's financial status improved as well from the decline in revenue during the suspension of admissions. (Tr. 198:18-25.) By 2005, the Andrus had a positive balance sheet, and it continued operating at a surplus in 2006. (Tr. 198:21-24, 200:19-21.) At the end of 2005, the Andrus had an operating surplus of over $500,000; at the end of 2006, the Andrus had an operating surplus of over $200,000. (Tr. 200:22-201:1.)

After the Andrus abandoned its plans to convert to a continuing care retirement community, the Andrus contracted to sell 50 licensed beds to Beth Abraham Health Services. (Tr. 176:24-177:7.) The sales agreement between the Andrus and Beth Abraham was dated July 3, 2002. (Tr. 180:20-22.) By July 2006, there existed a "conceptual agreement on the Department's part [with the Andrus] to approve the transfer of those 50 beds from Andrus to Beth Abraham," although the Department of Health did not notify the Andrus of the official decertification, which was retroactive to July 1, 2006, until a letter dated January 24, 2007. (Tr. 179:7-12, 188:19-189:12.) Mr. Benjamin testified that this was because "the Department agreed [to] allow those beds to remain on the license of the Andrus" to "eliminate the need for the buyer to undergo a public need test as part of its Certificate of Need application." (Tr. 177:24-178:24.) Ms. Biddle's understanding was that the beds were not to be used in the interim before the 50 beds were officially decertified from the Andrus's operating certificate, "because they would belong to Beth Abraham." (Tr. 197:8-13.)

Mr. Benjamin was the Department of Health liaison to the Berger Commission beginning around November 2005. (Tr. 181:22-24.) At least by July 2006, which was months earlier than the Hudson Valley RAC and Berger Commission recommendations, Mr. Benjamin was aware of the sale agreement "whereby the Andrus agreed to basically set those beds aside as if they

6

weren't there. . . . [and] agreed not to occupy those beds . . . ." (Tr. 182:17-25; Benjamin Dep. 43:2-12.) In fact, Mr. Benjamin had been "extensively involved in discussions between the Department [of Health] and the Andrus" regarding the sale. (Tr. 176:10-11.) He testified that he made the Berger Commission staff aware of the agreement prior to the issuance of the final report from the Berger Commission, although he did not tell the Berger Commission directly. (Tr. 186:2-19.) Mr. Benjamin felt "it was important that [the Berger Commission staff] knew of the ongoing discussions the Department was having with representatives of the Andrus within which [he] was made aware of the existence of that agreement regarding the fifty beds." (Benjamin Dep. 43:13-21.)

In May 2006, Ms. Biddle received a phone call from the Deputy Director and General Counsel of the Berger Commission, Mark Ustin. (Tr. 201:2-11, 255:6-8; Sandman Dep. 85:8-10.) During their telephone conversation, he asked Ms. Biddle "how the Andrus was doing, and [she] told him that [the Andrus] had gone from 72 to . . . 160 something people, and that [the Andrus] had been financially viable for the first time . . . last year and [the Andrus was] continuing to have good results this year." (Tr. 201:12-20.) Mr. Ustin then asked Ms. Biddle "to come to the RAC, and tell [her] good story." (Tr. 201:21-22, 203:11-13.) Mr. Ustin told Ms. Biddle that she had "such a good story to tell about [the Andrus's] occupancy and about [its] financial situation, that [she] should come and tell the RAC about what's going on." (Tr. 249:17-24.) Ms. Biddle consulted with the Andrus's counsel, the law firm of Cadwalader, Wickersham & Taft, prior to meeting with the RAC, but counsel did not accompany her to the meeting. (Tr. 267:13-15, 280:9-14.)

Ms. Biddle met with the Hudson Valley RAC in mid-June 2006 at the Westchester

Medical College in Valhalla, New York. (Tr. 202:1-6.) At the meeting, Ms. Biddle "went through the whole history of Andrus, the [continuing care retirement community], . . . what [the Andrus] had done with Beth Abraham, . . . [the sale of] 50 beds, . . . that [the Andrus] had filled to 90 percent, and that [it was] were financially viable." (Tr. 203:2-6.) She told the RAC that the Andrus was financially viable at that point midway through 2006, with a surplus around $100,000, and had been in 2005 as well. (Tr. 209:2-12.) She also told the RAC that the census at that time was 183, which was an improvement over the year-end census for 2005. (Tr. 209:13-18.) During the meeting, Ms. Biddle offered to send the RAC the Andrus's audited financial statements, which the RAC said it wanted, and the RAC requested a copy of the sales agreement from the 50-bed sale to Beth Abraham. (Tr. 203:16-24.) Ms. Biddle believed that the purpose of sending these documents was to give the RAC "proof [that] what [she] was saying was true." (Tr. 265:18-25.) Ms. Biddle mailed the financial statements and the sales agreement to Dr. Amber, who chaired the RAC meeting, on June 23, 2006. (Tr. 203:23-205:2.) The financial statements reflected that the Andrus's operating surplus in 2005 was over $500,000. (Tr. 207:21-208:2.)

Ms. Biddle never heard from Dr. Amler, any other representative of the RAC, or the Berger Commission in response to her letter. (Tr. 13-19.) The next communication she received from the RAC, the Berger Commission, or any of their staff concerning the Andrus was the Berger Commission report, which was released on November 28, 2006. (Tr. 209:24-210:6.) She was never aware of public hearings in the Hudson Valley Region that took place in February and March 2006 (Tr. 256:19-23, 299:23-300:21), even though Mr. Sandman testified that a notice of the public hearings was sent to each facility in the Hudson Valley Region (Tr. 294:22-25).

Ms. Biddle testified that she "was totally blindsided" when she learned that the Berger Commission had recommended the decertification of all nursing home beds at the Andrus, because "[she] thought [she] was doing a great job and really was happy to tell them [that]." (Tr. 203:7-10.) She never had any idea that the Andrus was being considered as a candidate for closure. (Tr. 209:19-23.) Nothing she heard, read, or was told led her to believe that the Andrus might be one of the facilities that the Berger Commission would recommend to close. (Tr. 248:18-23.) Around 2005, Ms. Biddle was aware of the Berger Commission's creation by the Enabling Legislation, but she "frankly, . . . wasn't paying attention to what was going on with the Berger, because [she] felt that [she] was doing a good job, [the Andrus was] financially viable, [it was] increasing [its] census, and that [it was] a good part of the healthcare system and [it was] giving good care." (Tr. 240:12-19, 241:24-242:9, 244:7-11.) She understood that the RAC was "looking at all facilities, both nursing homes and hospitals, in the region" as part of the Berger Commission process. (Tr. 255:10-21.) However, no one, before or after that meeting, ever told Ms. Biddle that the Andrus had been identified specifically as a "facility of interest" for potential closing. (Tr. 202:7-23.) Defendant presented no evidence to rebut Ms. Biddle's testimony that she was asked by Mark Ustin, Deputy Director and General Counsel of the Berger Commission, only to tell the Andrus's "good story" to the RAC and was never told that the Andrus was being considered by the RAC or Berger Commission for closing, and her testimony was credible.

The Berger Commission Report, which Mr. Sandman testified was "the record of the Commission's perspective on each facility" (Sandman Dep. 152:11-13), contained numerous inaccuracies about the Andrus. The Report stated that the Andrus "had been operating at a significant loss until 2006" (Biddle Aff., Ex. B, at 123, April 10, 2008), even though Ms. Biddle

had told the RAC at their June 2006 meeting and sent the RAC financial statements indicating that the Andrus had ended 2005 with an operating surplus of over $500,000, and was operating at a surplus at the time of the June 2006 meeting. (Tr. 211: 19-5.)

The Report stated that "[t]he facility has a history of a high number of deficiencies (26 in its 2005 survey)." (Biddle Aff., Ex. B, at 123.) Ms. Biddle testified, and Defendant's witness Mr. Sandman agreed, that the Andrus was cited for only 14 deficiencies in 2005, not 26 as the Berger Commission reported. (Tr. 214:4-8, 313:20-25.) Of the Andrus's 14 deficiencies in 2005, "eight related to residents and six related to environmental issues." (Tr. 129:17-20, 130:25-131:2.) The deficiencies were characterized by ratings of scope and severity, which revealed that none of the Andrus's deficiencies involved any harm to residents. (Tr. 118:22-119:18, 133:2-3, 215:13-14.) In Ms. Biddle's nine years at the Andrus, the Andrus had never been cited for 26 deficiencies in any survey cycle. (Tr. 18-22.) Ms. Sharon Carlo, a consultant to nursing homes in New York State and former Department of Health Employee and nursing home administrator, noted that the only place in the deficiency report she could "find a 26 at all [was] a sample size," "which would have been the number of folks who would have been looked at for a particular [deficiency]." (Tr. 131:10-14.) Ms. Carlo opined that the Andrus's 2005 deficiency report did not represent a facility that was experiencing quality of care problems. (Tr. 133:19-23.)

The Report stated that the Andrus was a "247-bed residential healthcare facility" with occupancy at "71% of its certified beds, or 89% of 'available beds,' pending a 50-bed sale to another provider." (Biddle Aff., Ex. B, at 123.) This was misleading because, as Mr. Benjamin testified, the beds remained on the Andrus's license to eliminate the requirement that Beth Abraham undergo a public need test. (Tr. 177:24-278:24.) Ms. Biddle testified that the beds

were not to be used by the Andrus in the interim. (Tr. 197:8-13.) Mr. Benjamin agreed that the agreement was one "whereby the Andrus agreed to basically set those beds aside as if they weren't there. They agreed not to occupy those beds . . . ." (Benjamin Dep. 43:2-12.) Ms. Biddle had discussed with the RAC at their June 2006 meeting the Andrus's 2002 agreement to sell 50 beds to Beth Abraham and Mr. Benjamin, a liaison to the Berger Commission, had made Berger Commission staff aware of the agreement prior to the issuance of the final report. (Tr. 181:22-24, 186:2-19.)

The Report stated, "Of [the Andrus's] 176 residents, about half have low-acuity conditions. These residents could be better served in an [assisted living program], if that were available." (Biddle Aff., Ex. B, at 123.) Ms. Biddle testified that this statement was inaccurate because "a lot of [the low-acuity patients at the Andrus] have dementia, and they . . . cannot necessarily be served better in an Assisted Living Program because part of what [the Andrus is] able to do for these patients with dementia is give them a routine that has guidance." (Tr. 212:6-21.) Ms. Biddle felt that these patients, "who consider [the Andrus] their home and have gotten routinized to the routine, as well as to the caregivers, would really suffer if they went to an Assisted Living Program." (Tr. 212:21-25.) No one from the Berger Commission or the RAC ever came to visit the Andrus, and no one ever requested any information from the Andrus concerning the patients' mental or medical conditions. (Tr. 213:1-6; Sandman Dep. 223:23-224:5, 229:23-230:6.)

The Report described the Andrus's "physical plant [as] old and in need of capital improvements." (Biddle Aff., Ex. B, at 123.) Ms. Biddle testified, however, that the building was constructed in 1952 of cement and steel, and was in good condition at the time of her June

2006 meeting with the RAC. (Tr. 213:22-214:2, 214:7-9.) In fact, the Department of Health had granted the Andrus "a limited review for $5 million to [update the] boilers, [the] electrical system and [the] plumbing." (Tr. 214:3-6.)

The Report stated that the Andrus "has private rooms and baths; and therefore, its conversion to an [Assisted Living Program] facility would be economical." (Biddle Aff., Ex. B, at 123.) Ms. Biddle testified that this was inaccurate because "the revenues that . . . derive from an Assisted Living Program versus a Skilled Nursing Program, . . . given the size of [the Andrus's] building," would not be economically viable. (Tr. 214:10-24.)

After the Berger Commission issued its final report and the Andrus discovered that the Commission had recommended decertification of all its nursing home beds, the Andrus immediately asked for a meeting with the Department of Health. (Tr. 216:10-23.) The Andrus met with the Department of Health in December 2006 and told the Department about "all of the mistakes that [it] felt were in the report." (Tr. 216:20-23, 217:3-7.) The Department recommended that the Andrus "wait a while," as "there [would] be further information coming out." (Tr. 216:21-25.) In January 2007, the Department sent a letter outlining the Berger Commissions's recommendations and how the Department planned to implement them. (Tr. 216:2-9.) The Andrus thereafter requested another meeting with the Department of Health, which took place in February 2007. (Tr. 216:24-217:2.) At that meeting the Department requested certain information from the Andrus, which it provided, and "then [the Andrus] never heard from them again." (Tr. 217:8-11.)

The Andrus also pursued a health and safety exception to the Berger Commission's recommendations. As Mr. Kissinger testified, "the statute that set up the Berger Commission . . .

12

allows the Department [of Health] to make certain modifications or exceptions to the letter of the recommendation[s]." (Tr. 164:6-9.) In fact, the Department of Health has made exceptions or modifications to the Commission's recommendations for some facilities. (Tr. 166:11-16.) The Andrus provided the Department of Health with information supporting the issuance of a health and safety exception to the Andrus. (Tr. 217:12-19, 218:4-13.) This included a letter, sent in February 2008, explaining the risk of transfer trauma to the residents of the Andrus, and a spreadsheet, sent in April 2008, of information about every resident in the Andrus, such as residents' ages, length of time at the Andrus, and residence before moving to the Andrus, and whether their families were nearby and whether they had dementia. (Tr. 219:13-220:18.) No one from the Department of Health followed up on any of the information the Andrus provided. (Tr. 217:16-19.)

In total, the Andrus had five meetings with Department of Health officials concerning the Berger Commission recommendations, and provided the Department with all of the information and documents it requested. (Tr. 217:25-218:7.) Mr. Kissinger testified that, as of June 25, 2008, the Department was still considering whether to grant a health and safety exception to the Andrus despite that the deadline to implement the Berger Commission's recommendations was June 30, 2008. (Tr. 164:15-25.)

In April 2008, Defendant sought to issue an amended operating certificate with an expiration date of June 30, 2008, or another date. (Tr. 228:13-16, 271:12-18; Def.'s Post-Hearing Br. 14.) The Andrus currently operates under a certificate with no expiration date. (Tr. 191:11-13.) In New York State, nursing home operating certificates are generally issued for an indefinite term. (Tr. 134:19-24.) Ms. Biddle and Ms. Carlo both testified that if an amended

13

operating certificate were issued, the Andrus would have to post the amended certificate at the Andrus and notify residents, family members, staff, doctors, hospitals, and vendors of the change. (Tr. 134:25-136:10, 139:13-17, 228:17-229:4.) Aside from the regulations, Ms. Biddle felt that the patients had a right to know that "their home has an end point to it, because the operating certificate is going to end." (Tr. 229:6-12.)

Ms. Biddle believed an amended operating certificate would "absolutely" have an impact on the Andrus's occupancy. (Tr. 229:25-230:3.) She testified that an amendment to the operating certificate would likely affect hospital referrals to the Andrus because "family members would not choose to put their parent or loved one [at the Andrus] for a short period of time and then have to move them again." (Tr. 229:13-24.) She believed that an amended operating certificate would cause "the community [to] lose confidence in [the Andrus's] ability to stay open, because the amended operating certificate would say that there [was] an end date, and therefore [the Andrus] would have a problem with [its] occupancy." (Tr. 230:4-8.) In addition, the residents and staff would be very distressed if an amended operating certificate were issued, because "this has been a place where people have worked for many years, and residents have lived for many years." (Tr. 230:9-17.) Ms. Carlo too stated that, in her opinion, issuing an amended operating certificate with a termination date of June 30, 2008, "certainly could impact on a nursing facility related to referral sources, physicians who would send their patients to that nursing facility. The possibility of uprooting folks more than once is really not something that anyone would be interested in doing, not a physician, not a family member, not anybody." (Tr. 138:13-22.)

Dr. Jeffrey Nichols, Plaintiff's medical expert, testified about dementia and patients' risk

14

of transfer trauma. Dementia is "a chronic loss of cognitive or thinking ability in at least two different spheres, one of which [is] loss of memory." (Tr. 59:6-9.) " Transfer trauma "is the cognitive and functional decline that . . . primarily dementia patients, although some cognitively intact patients, have when they're moved from one environmental structure to a different one." (Tr. 61:22-62:2.) The trauma includes behavioral disturbances, weight loss, and increased risk of falls and injury. (Tr. 63:10-11, 68:16-21.) In addition, Dr. Nichols, although noting that the literature on mortality and transfer trauma was "not terrific," stated that "there are both anecdotal and some research studies that would support at least one to three percent increase in mortality rate within the first one to three months after transfer." (Tr. 68:9-15.) In his professional opinion, there is increased morbidity and mortality among residents of nursing homes transferred from one care setting to another. (Tr. 74:11-19.)

Dr. Nichols estimated that 40 percent of the Andrus's residents had been identified as having dementia or cognitive impairments, although there are dementia residents in nursing homes that are not identified because "many mild to moderate stage dementia patients remain oriented and able to make a significant number of decisions for themselves." (Tr. 77:9-78:5.) These patients are also at risk during transfer from one care center to another. (Tr. 78:6-8.) At the Andrus, where "perhaps, 70 percent of the residents . . . are cognitively impaired, we would be talking perhaps of one to two additional deaths." (Tr. 100:2-10.)

Dr. Nichols estimated that "all the Andrus residents are frail." (Tr. 78:12-13.) The term "frail" lacks a strict definition but, refers generally to "patients who are thin, whose cognition is marginal, whose gait is slow or unsteady, [and] balance poor[,] . . . [who] frequently have decreased vision and hearing, [and] a variety of different combinations of medical problems."

15

(Tr. 67:11-22.) Frail elderly patients are at risk when transferred to from one care setting to another, because "they have very significantly impaired reserves. So anything that puts stress on those reserves . . . carries some risk . . . ." (Tr. 68:1-7.) Overall, Dr. Nichols estimated that "70 to 80 percent of the [long-term] residents of the Andrus . . . would be at risk" of transfer trauma. (Tr. 78:14-79:8.)

Even the best planning and arrangements cannot eliminate all the risks of transfer trauma. (Tr. 69:7-10.) Dr. Nichols participated in a study of transfer trauma funded by the New York State Department of Health which concluded that "the functional losses and cognitive losses that people sustain, the behavioral disturbances and so on, were not preventable by current techniques." (Tr. 62:17-63:2.) Dr. Nichols did acknowledge that, "clearly, this is a group of people who are old and ill. So when bad things happen, they're never entirely unexpected." (Tr. 74:1-2.) He admitted that it was impossible to say with certainty that any particular fall would be related to a transfer; he was "looking at statistical increases for populations, not what's going to happen to one particular individual." (Tr. 95:10-17.)

Mark Kissinger testified that the Department of Health's "whole intent with the closure plan and the closure plan guidelines is to make sure that . . . every resident is protected in that process." (Tr. 156:10-12.) The process includes notification and family meetings with the residents and their representatives. (Tr. 157:1-4.) He testified that the focus and "highest priority of the Department is to protect the health and safety of the residents through the transition period." (Tr. 158:20-22.) However, Mr. Kissinger never provided any details about how the Department of Health would minimize the potential trauma to the Andrus's residents of being told that their residence was being closed and they would have to move to a new home. He

16

testified that Berger Commission staff members did not generally make individual determinations of the risk posed in transferring residents from any particular facility to another. (Tr. 163: 5-13.)

Dr. Nichols also testified about the patients and facilities at the Andrus. He reviewed approximately 40 patient records and he toured the Andrus, although he did not perform physical or psychological evaluations of individual residents. (Tr. 74:20-75:11, 90:21-91:2.) Dr. Nichols testified that the Andrus's patients appeared to be "pretty well integrated into their communities without sustaining a lot of damage from being within the institution." (Tr. 74:20-75:21, 76:1-2.) He noted that "one of the things that's extraordinary about Andrus [was] how quiet it is. . . . [I]t's just a remarkably peaceful environment, which is quite supportive for dementia patients," because "one of the things that's frequently associated with behavioral disturbance for dementia residents is its ambient noise and difficulty understanding lots of different stimuli that are going on at the same time." (Tr. 1-13.) He believed the Andrus's "extremely large physical plant with private rooms, and quite large private rooms by industry standards," contributed to the peaceful environment. (Tr. 76:10-18.) Dr. Nichols also testified that he observed "good interactions between staff and the residents" of the Andrus, and that "the facility [was] successful in using behavioral and environmental techniques for management of behaviors, as opposed to attempting to sedate patients. (Tr. 76:19-21.)

The Andrus also contains "a number of units that are specifically designed for [housing] religious [sisters]." (Tr. 76:22-24.) There are sisters from at least two religious orders at the Andrus. (Tr. 96:24-25.) These sisters had "known each other for extended periods of time" and were able to continue living together at the Andrus. (Tr. 76:22-77:3, 92:21-25.) Dr. Nichols

17

explained that "[i]n each case, they have a cluster of adjacent rooms with an associated chapel or reflection room for the sisters, as well as . . . private rooms, which many of the sisters have been used to for their entire lives. So it kind of . . . recreates the convent experience for them in the nursing home setting." (Tr. 97:1-6.) In Dr. Nichol's opinion, that environment was "not something that could be recreated" were the sisters to be "transferred independently individually to different facilities." (Tr. 93:1-3.) He did not believe that any comparable nursing home arrangement was available. (Tr. 93:6-10.)

### B. PROCEDURAL HISTORY

Plaintiff commenced this action in April 2007. On July 13, 2007, Defendant moved for summary judgment on the grounds that there were no genuine issues of material fact and Plaintiff's constitutional challenges could not be supported. After oral arguments, Judge Charles L. Brieant, to whom this action was previously assigned, stayed the action and implementation of the Berger Commission's recommendations pending the outcome of a case involving similar issues, but different parties, in New York State court, *St. Joseph Hospital of Cheektowaga v. Novello*. On November 27, 2007, the New York State Court of Appeals dismissed the appeal in *St. Joseph Hospital of Cheektowaga* as of right, 9 N.Y.3d 988 (2007), and on February 12, 2008, the Court of Appeals denied a motion for leave to appeal, 10 N.Y.3d 702 (2008).

Judge Brieant denied Defendant's motion for summary judgment on March 10, 1008, on the grounds that issues of material fact remained. Since Judge Brieant's Memorandum and Order did not explicitly continue a stay of the implementation of the Berger Commission's recommendations, Plaintiff moved for a preliminary injunction on April 15, 2008. Before the motion was fully briefed, Plaintiff heard from Defendant that it sought to issue an amended

operating certificate to the Andrus with an expiration date of June 30, 2008. Plaintiff then

brought an order to show cause with a temporary restraining order. Judge Brieant issued the

temporary restraining order on April 23, 2008 and set a hearing date for the motion for

preliminary injunction, later postponed by agreement of both parties to June 25, 2008.

Before the preliminary injunction hearing, Defendant argued before this Court that the

temporary restraining order had expired. This Court issued a Report and Recommendation on

June 25, 2008, which recommended that the temporary restraining order had not expired, but,

even if it had, that it be extended until such time as a United States District Judge ruled on

Plaintiff's motion for preliminary injunction. On June 30, 2008, Judge Sidney H. Stein, sitting

for Part I, adopted this Court's June 25, 2008 Report and Recommendation and ruled that the

temporary restraining order issued by Judge Brieant on April 23, 2008, was extended until such

time as a United States District Judge rules on the forthcoming Report and Recommendation

from this Court on Plaintiff's motion for preliminary injunction.

## II. DISCUSSION

### A. STANDARD FOR ISSUANCE OF A PRELIMINARY INJUNCTION

The party seeking a preliminary injunction "must establish that it will suffer irreparable

harm in the absence of an injunction and demonstrate either (1) 'a likelihood of success on the

merits' or (2) 'sufficiently serious questions going to the merits to make them a fair ground for

litigation and a balance of the hardships tipping decidedly' in the movant's favor." *Jolly v.*

*Coughlin*, 76 F.3d 468, 473 (2d Cir. 1996) (quoting *Waldman Publishing Corp. v. Landoll, Inc.*,

43 F.3d 775, 779-80 (2d Cir.1994)).

### B. IRREPARABLE HARM

To establish irreparable harm, Plaintiff must prove that, without a preliminary injunction preventing Defendant from taking actions to further implement the Berger Commission's recommendations, it will suffer an injury "neither remote nor speculative, but actual and imminent and that cannot be remedied by an award of monetary damages." *Shapiro v. Cadman Towers, Inc.*, 51 F.3d 328, 332 (2d Cir. 1995) (quotation omitted).

If the Department of Health were to issue a new operating certificate to the Andrus which had an expiration date, any expiration date, the Andrus would be obligated under state and federal regulations to post the new operating certificate conspicuously in its facility and to notify its residents, residents' families, and physicians of the change. (Tr. 134:25-136:10, 139:13-17.) New York State regulations require nursing homes such as the Andrus to notify "each patient or resident, his next of kin, his sponsor and his physician . . . immediately upon receipt of notification by the Department revoking, suspending, limiting, annulling or refusing to issue the operating certificate." N.Y. Comp. Codes R. & Regs. tit. 10, § 401.3(h). The Andrus is also required to post the operating certificate "conspicuously." N.Y. Comp. Codes R. & Regs. tit. 10, § 401.2(c). The Federal Centers for Medicare and Medicaid Services may sanction the Andrus for failure to operate in compliance with all applicable State regulations. 42 C.F.R. § 483.75(b).

Ms. Biddle testified that she would also feel ethically obligated to let these parties and the Andrus's vendors know of any amendment to the Andrus's operating certificate. (Tr. 229:6-12.) Although Ms. Biddle testified that she informed the residents, families and physicians of the Berger Commission's recommendations, and she has kept them appraised of the status of its fight against closure through this litigation and its discussions with the Department of Health, at no time has Ms. Biddle had to inform them that the Andrus's operating certificate had a definite

expiration date, as Defendant now seeks to impose. As a matter of common sense, and as Ms. Carlo and Ms. Biddle testified, family members and physicians would be reluctant to place new residents in a facility whose operating certificate was to expire, because of the disruption and potential trauma of having to move and acclimate residents to yet another new environment. (Tr. 137:16-138:22, 229:13-230:17.)

Furthermore, if the Department of Health issued an operating certificate to the Andrus and it expired, the Andrus's residents would be at risk of transfer trauma, including behavioral disturbances, weight loss, increased risk of falls and injury, and possibly increased mortality rates. (Tr. 61:22-62:2, 63:10-11, 68:9-21.) As Dr. Nichols testified, even the best planning and arrangements could not eliminate these risks. (Tr. 69:7-10.)

As the Andrus points out in its post-hearing brief, nursing homes have standing to raise the issue of transfer trauma as irreparable harm in the face of potential closure. *See Libbie Rehabilitation Center, Inc. v. Shahala*, 26 F. Supp. 2d 128, 132 (D.D.C. 1998) ("Should the Government untimely and inappropriately terminate Libbie from the Medicare and Medicaid programs, the likelihood of irreparable injury in dislocating the residents of Libbie is clear and strongly influences this Court's conclusion that the preliminary injunction should issue."). Defendant attempts to argue that the Andrus has no standing to raise the issue of transfer trauma after *O'Bannon v. Town Court Nursing Center*, 447 U.S. 773 (1980). (Def.'s Post-Hearing Br. 16 (arguing that "[t]he Court specifically rejected the risk of transfer trauma as a source of any such right [to a hearing prior to the termination of the home's Medicare and Medicaid provider status], despite assuming for purposes of the decision that there is a risk that some residents may encounter severe emotional and physical hardship as a result of a transfer" (quotation omitted)).)

21

In *O'Bannon*, patients in a nursing home argued that they had "a constitutional right to a hearing before a state or federal agency . . . revoke[d] the home's authority to provide them with nursing care at government expense." *Id.* at 775. The patients argued that one source of such a right was that "a transfer may have such severe physical or emotional side effects that it is tantamount to a deprivation of life or liberty, which must be preceded by a due process hearing." *Id.* at 784. The Court held that the patients, even assuming they would suffer transfer trauma if forced to relocate, did not have a right to a hearing before their nursing home's Medicare status was revoked. *Id.* at 789-90. Here, the Andrus is not claiming that transfer trauma to its patients entitles it to a hearing before its operating certificate is amended, but rather arguing that transfer trauma to its patients is one reason that it will suffer irreparable harm if the Department of Health moves forward with its closure plans by issuing an operating certificate with a specific expiration date. Nursing homes such as the Andrus are in the business of ensuring the health and safety of their residents and, as such, it is appropriate to consider the effects an expiring operating certificate will have on the Andrus's residents.

I therefore conclude, and respectfully recommend that your Honor conclude, that the harm the Andrus would suffer if it notified its constituents of an expiring operating certificate and the transfer trauma its residents would suffer if forced to relocate after the operating certificate expired constitutes harm that is neither remote nor speculative, but actual and imminent, or irreparable harm.

## B. LIKELIHOOD OF SUCCESS

### i. PROCEDURAL DUE PROCESS CLAIM

To satisfy procedural due process, "a deprivation of . . . property [must] 'be preceded by

22

notice and opportunity for hearing appropriate to the nature of the case.'" *Cleveland Bd. of Educ.*

*v. Loudermill*, 470 U.S. 532, 542 (1985) (quoting *Mullane v. Central Hanover Bank & Trust Co.*,

339 U.S. 306, 313 (1950)). Notice must be "reasonably calculated, under all the circumstances,

to apprise interested parties of the pendency of the action and afford them an opportunity to

present their objections." *Mullane*, 339 U.S. at 314.

Here, the facts adduced at the hearing indicate that the Andrus was not given notice that

their facility was targeted for closure. Ms. Biddle, the Andrus's executive director, never had any

idea that the RAC or the Berger Commission was considering closing the Andrus. (Tr. 209:19-

23, 248:18-23.) The Director of the Berger Commission, Mr. Sandman, testified that facilities

generally learned that they were facilities of interest "through a phone call to the CEO" from the

chairman of a RAC, Mr. Sandman himself, or the Berger Commission staff at his direction.

(Sandman Dep. 170:21-171:7.) Although Mark Ustin, the Deputy Director and General Counsel

of the Berger Commission, telephoned the Andrus to ask it to meet with the RAC, he told the

Andrus that the purpose of the meeting was to tell its "good story" (Tr. 201:21-22.), not to defend

against possible closure. Ms. Biddle consulted with counsel before the meeting with the RAC,

then attended the meeting without counsel (Tr. 280:9-14), further supporting the Andrus's

contention that it was never notified of any need to defend against possible closure. (Tr. 249:17-

24.) Finally, due process considerations include "the risk of an erroneous deprivation . . .

through the procedures used." *Mathews v. Eldridge*, 424 U.S. 319, 335 (1976). It is apparent

here that the procedures used by the Berger Commission carried a high risk of erroneous

deprivation, as the Berger Commission's recommendation to close the Andrus or to convert it to

an assisted living facility was based on numerous inaccuracies about, for example, the Andrus's

record of deficiencies, financial situation, occupancy, and physical condition. (Tr. 211-215.)

Based on these facts, I conclude, and respectfully recommend that your Honor conclude, that the Andrus has a substantial likelihood of success on the merits of its procedural due process claim.

## ii. SUBSTANTIVE DUE PROCESS CLAIM

"Substantive due process protects individuals against government action that is arbitrary, conscience-shocking, or oppressive in a constitutional sense . . . ." *Lowrance v. Achtyl*, 20 F.3d 529, 537 (2d Cir. 1994) (citations omitted). The errors upon which the Berger Commission based its recommendations were conscience-shocking because they involved the very factors that the Enabling Legislation explicitly mandated that the Berger Commission consider. The Berger Commission was to consider, among other factors, the financial status of the nursing homes, the feasibility of conversion of the facilities to other uses, and facility occupancy. *See* Enabling Legislation § 5. The Andrus presented credible testimony that the Berger Commission Report contained inaccuracies related to the Andrus's operating surplus in 2005 and 2006, its history of deficiencies, the number of beds available for use, the condition of its physical facility, and the feasibility of converting it to an assisted living facility. (Tr. 181, 186, 211-15.) None of this information was contradicted or rebutted by Defendant at the hearing held on June 25 and 26, 2008 before this Court. As a result, I conclude, and respectfully recommend that your Honor conclude, that the recommendation of the Berger Commission to close the Andrus's nursing home facilities, based upon a number of erroneous facts about the facility, is arbitrary and shocks the conscience, and therefore establishes that the Andrus has a substantial likelihood of success on the merits of its substantive due process claim.

### III. CONCLUSION

In sum, I conclude, and respectfully recommend to your Honor, that the Andrus's motion

for a preliminary injunction prohibiting Defendant from taking any further steps to implement the

Berger Commission's recommendation to close the Andrus's nursing home facility or otherwise

seek the surrender of the Andrus' operating certificate pending the final determination of this

action should be granted because the Andrus has established both irreparable harm and a

likelihood of success on the merits.

### IV. NOTICE

Pursuant to 28 U.S.C. § 636(b)(1), as amended, and Rule 72(b), Fed. R. Civ. P., the

parties shall have ten (10) days, plus an additional three (3) days, pursuant to Rule 6(d), Fed. R.

Civ. P., or a total of thirteen (13) working days, (*see* Rule 6(a), Fed. R. Civ. P.), from the date

hereof, to file written objections to this Report and Recommendation. Such objections, if any,

shall be filed with the Clerk of the Court, with extra copies delivered to the chambers of the

Honorable Kenneth M. Karas, at the United States Courthouse, 300 Quarropas Street, White

Plains, New York 10601 and to the chambers of the undersigned at this Courthouse, 300

Quarropas Street, White Plains, New York 10601.

Failure to file timely objections to the Report and Recommendation will preclude later

appellate review of any order to judgment that will be entered by Judge Karas. *See Thomas v.*

*Arn*, 474 U.S. 140, 142 (1985); *Frank v. Johnson*, 968 F.2d 298 (2d Cir.), *cert. denied*, 113 S. Ct.

825 (1992); *Small v. Secretary of H.H.S.*, 892 F.2d 15, 16 (2d Cir. 1989) (*per curiam*); *Wesolek*

*v. Canadair, Ltd.*, 838 F.2d 55, 58 (2d Cir. 1988). Requests for extension of time to file

objections must be made to Judge Karas and should *not* be made to the undersigned.

Dated: July 17, 2008
     White Plains, New York

Respectfully submitted,

_____

Mark D. Fox
United States Magistrate Judge

Copies of the foregoing have been sent to the following:

Honorable Kenneth M. Karas, U.S.D.J.

Brian T. McGovern, Esq.
Cadwalader, Wickersham & Taft LLP
One World Financial Center
New York, NY 10281

John P. Gasior, Esq.
Assistant Attorney General of the State of New York
120 Broadway
New York, NY 10271-0332