UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---------------------------------------------------------------x

JOHN E. ANDRUS MEMORIAL, INC. (d/b/a ANDRUS ON HUDSON),

Plaintiff,

-against-

RICHARD F. DAINES, as Commissioner of the New York State Department of Health,

Defendant.

---------------------------------------------------------------x

Filed Electronically

07-CV-3432 (KMK) (MDF)

**DEFENDANT'S OBJECTIONS
TO REPORT AND RECOMMENDATION ON
PLAINTIFF'S MOTION FOR A PRELIMINARY INJUNCTION**

ANDREW M. CUOMO
Attorney General of the
State of New York
Attorney for Defendant
120 Broadway - 24th Floor
New York, New York 10271
Tel. No. 212-416-8570

John P. Gasior
Barbara K. Hathaway
Assistant Attorneys General
Of Counsel

# TABLE OF CONTENTS

Page

TABLE OF AUTHORITIES . . . . . iii

PRELIMINARY STATEMENT . . . . . 1

STATEMENT OF FACTS . . . . . 2

The Berger Commission Is Established To Review and Reconfigure New York's Health Care System . . . . . 2

The Berger Commission Recommends Closure or Conversion of Andrus . . . . . 4

Procedural History Of This Action . . . . . 5

The Preliminary Injunction Hearing . . . . . 5

Dr. David Sandman . . . . . 5
Betsy Biddle . . . . . 7
Mark Kissinger . . . . . 9
Neil Benjamin . . . . . 10
Sharon Carlo . . . . . 10
Dr. Jeffrey Nichols . . . . . 11

Report and Recommendation . . . . . 14

ARGUMENT PLAINTIFF'S MOTION FOR A PRELIMINARY INJUNCTION SHOULD BE DENIED . . . . . 15

Standard of Review . . . . . 15

A. Andrus Has No Likelihood of Success On Its Procedural Due Process Claim . . . . . 16

1. The Magistrate Judge Erred In Concluding that Andrus was entitled to individualized notice that its operating license was subject to revocation . . . . . 16

2. Andrus Received All The Procedural Due Process To Which It Was Constitutionally Entitled . . . . . 18

a. The Magistrate Judge Erred In Finding that Andrus did not have a meaningful opportunity to be heard . . . . . . . . . . . . . . . . . 18

b. The Magistrate Judge Erred In Finding that the Report contained errors, or that such errors constituted a due process violation . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20

B. The Magistrate Judge Erred In Concluding That Andrus Has A Likelihood of Success On Its Substantive Due Process Claim, Because The Commission's Actions Were Neither Arbitrary Nor Outrageous . . . . . . . . . . . . . . . . . . . . . . . 21

C. Plaintiff Has Failed To Show It Will Suffer Irreparable Injury . . . . . . . . . . . . . . 23

CONCLUSION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 24

# TABLE OF AUTHORITIES

**Cases** **Page**

Atkins v. Parker,
472 U.S. 115 (1985) ........ 17

Bower Assocs. v. Town of Pleasant Valley,
2 N.Y.3d 617 (2004) ........ 22

County of Sacramento v. Lewis,
523 U.S. 833 (1998) ........ 22

Jolly v. Coughlin,
76 F.3d 468 (2d Cir. 1996) ........ 16

Lowrance v. Achtyl,
20 F.3d 529 (2d Cir. 1994) ........ 21

Medical Soc. of the State of New York v. Cuomo,
976 F.2d 812 (2nd Cir. 1992) ........ 22

Medtronic, Inc. v. Lohr,
518 U.S. 470 (1996) ........ 22

Natale v. Town of Ridgefield,
170 F.3d 258 (2d Cir. 1999) ........ 22

RxUSA Wholesale Inc. v. Dep't of Health and Human Servs.,
467 F. Supp. 2d 285 (E.D.N.Y. 2006) ........ 15

St. Joseph Hospital of Cheektowaga v. Novello,
15 Misc.3d 333 (N.Y. Sup. Ct. Erie Cty. 2007); aff'd as modified,
43 A.D.3d 139, 840 N.Y.S.2d 263 (4th Dep't), appeal dismissed,
9 N.Y.3d 988 (2007), appeal denied, 10 N.Y.3d 702 (2008) ........ 18, 21, 22

Town of Orangetown v. Magee,
88 N.Y.2d 41 (1996) ........ 22

**Federal Statutes**

28 U.S.C. § 636 (b)(1) ........ 15

**State Statutes**

N.Y. Public Health Law § 2806(6)(a) ........ 16

**State Rules and Regulations**

10 N.Y.C.R.R. § 86-2.10(a)(5) ........ 4

**PRELIMINARY STATEMENT**

In this action, plaintiff John E. Andrus Memorial, Inc. (the "Andrus"), a nursing home, challenges the recommendation of the statutorily - created Berger Commission that it close its nursing home beds or convert to an assisted living program. Defendant submits these objections to the Report & Recommendation of U.S. Magistrate Judge Mark D. Fox, dated July 17, 2008, which recommended granting plaintiff's motion for a preliminary injunction prohibiting defendant Commissioner of Health from taking any further steps to implement the Berger Commission's recommendation to close the Andrus' nursing home facility or otherwise seek the surrender of the Andrus' operating certificate pending the final determination of this action.[1]

The Report & Recommendation should be rejected and the motion denied in its entirety because, even accepting all the facts as presented by plaintiff and as found by the Magistrate Judge, plaintiff fails to show a likelihood of success on the merits. Plaintiff's claim that it was entitled to individualized notice that its facility could be the subject of a Berger Commission recommendation is simply wrong – like every hospital and nursing home in New York State, it was subject to legislation mandating that the Berger Commission review the State's health care resources and make recommendations regarding the reconfiguration of the health care system. Similarly, even assuming there were errors in the Berger Commission's report, the proof falls far short of establishing a substantive or procedural due process violation. Moreover, the evidence shows that plaintiff had an opportunity to meet with the Berger Commission's representatives and, at that meeting, presented information on every relevant issue, and that there are no material errors in the Report. Plaintiff's disagreement with the Report simply does not establish a

---

[1] Defendant hereby incorporates by reference his prior-submitted Memorandum of Law, dated May 1, 2008, and the supporting affidavits in opposition to plaintiff's motion for a preliminary injunction, and his Post-Hearing Memorandum of Law, dated July 3, 2008.

likelihood of success on a procedural or substantive due process claim.

## STATEMENT OF FACTS

**The Berger Commission Is Established To Review and Reconfigure New York's Health Care System**

In April of 2005, the New York State Legislature passed, and then-Governor Pataki signed, legislation creating the New York State Commission on Health Care Facilities in the 21st Century, known as the Berger Commission ("Berger Commission" or "Commission"). In creating the Commission, the Legislature found that, in too many sectors of the State's health care system, supply was ahead of demand. It determined that health care resources must "be aligned so that excess capacity is minimized, thereby promoting stability and efficiency in the health care delivery system. . . ." Toward this end the Legislature charged the Berger Commission "with examining the supply of general hospital and nursing home facilities, and recommending changes that will result in a more coherent, streamlined health care system in the state of New York." Enabling Legislation, §1, introduced as defendant's Exh. E at the hearing. The Berger Commission was further charged with ". . . examining the system of general hospitals and nursing homes in New York state and recommending changes to that system in light of factors submitted pursuant to section five of this act and additional factors established by the commission." Id. §2(a).

The Berger Commission consisted of 18 statewide members and additional regional members from each of six regions, including the Hudson Valley Region, where the Andrus facility is located. Id., §7. Each of the six regions had a regional advisory committee ("RAC") charged with "develop[ing] recommendations for reconfiguring its region's general hospital and nursing home bed supply to align bed supply with regional and local needs." Id., §7(d). After

the submission of a RACs' recommendations (if any), the Commission was required to develop recommendations for reconfiguring the state's general hospital and nursing home bed supply to align bed supply to regional needs, id., §8(a), and "make recommendations relating to facilities to be closed and facilities to be resized, consolidated, converted, or restructured, within each region." Id., §8(b).

Nineteen hearings were held throughout the State, including three hearings in the Hudson Valley region. The Commission and the RACs heard from hundreds of witnesses and reviewed thousands of pages of testimony submitted during hearings. Sandman Aff. ¶ 18 & Exh. B at 68.

Of particular relevance here, on or about June 19, 2006, members of the Hudson Valley RAC and Commission staff met with Betsy Biddle, plaintiff's executive director. Sandman Aff. ¶ 22. At that meeting, topics included a previous attempt by Andrus to convert itself into a continuing care retirement community, reducing its nursing home bed complement to 72, Andrus' proposal to transfer 50 beds to Beth Abraham Hospital, its resolution of outstanding debts resulting from the proposed conversion and its general finances and resident census. Id. See also Tr. 203.

On November 28, 2006 the Commission sent its final Report to the Governor and the State Legislature. Sandman Aff. ¶ 11. Its recommendations directly affected 57 hospitals around the state, with 48 hospitals to be reconfigured or converted, and nine hospitals to be closed altogether. Sandman Aff. Exh. B at 10-11; see also 91-218 (describing specific recommendations). The Commission Report also recommended that approximately 25 nursing facilities should be downsized, closed or otherwise reconfigured. Id. at 11.

On November 30, 2006, then-Governor Pataki transmitted his approval to the Legislature.

Sandman Aff. ¶ 11. The Legislature, in turn, did not vote to reject the recommendations. Id. Thus, as of January 1, 2007, the Commission Report gained the force of law and the Commission ceased to exist.

**The Berger Commission Recommends Closure or Conversion of Andrus**

The Berger Commission Report recommended that Andrus eliminate all 247 residential health care ("RHC") beds that it was certified to operate and replace them with 140 assisted living program ("ALP") beds. Sandman Aff. Exh. B at 123. It noted that Westchester County as a whole had too many RHC beds and not enough ALP beds. Id. Andrus was an excellent candidate for a conversion to address this problem. First, it had one of the lowest "case mix indexes in the State," reflecting the relative good health of its patients.[2] Of Andrus' 176 residents, about half had low-acuity conditions and "could be better served in an ALP, if that were available." Id. Second, its physical plant was "old and in need of capital improvements." Third, its facility "has private rooms and baths," making conversion to an ALP "economical." Id. Recognizing that a sale of 50 beds had been pending, the Report calculated plaintiff's occupancy rate in 2 ways, with and without those beds. The Report also noted that the Andrus had been operating at a significant loss until 2006, but now had a surplus. Id.

On January 31, 2007, DOH sent a letter to Andrus, advising plaintiff of the Commission's recommendations and requesting that plaintiff contact DOH to arrange a meeting, if such a meeting was desired. Benjamin Aff. ¶ 4, Exh. B. The letter included an implementation outline which, consistent with the Commission Report (see Sandman Aff. Exh. B at 90), provides that

---

[2] The Case Mix Index ("CMI") for nursing homes is defined at 10 N.Y.C.R.R. § 86-2.10(a)(5). How nursing home CMIs are developed is discussed in Sandman Aff. footnote 1.

"the Commissioner shall implement each recommendation as expeditiously as possible, but in no event later than June 30, 2008." Accordingly, Andrus has known clearly, for over a year and one-half, that it was subject to closure.

**Procedural History Of This Action**

On April 30, 2007, Andrus filed the complaint in this case. And, for a year, Andrus took no other action. By contrast, the defendant, seeking to resolve this case, filed a motion for summary judgment on July 18, 2007. Gasior Aff. ¶ 4. That motion, after being stayed by Judge Brieant to await the resolution of certain state-court proceedings involving St. Joseph Hospital of Cheektowaga, was denied on March 10, 2008.

On April 15, 2008 -- nearly a full year after filing its complaint -- Andrus finally sought a preliminary injunction. Gasior Aff. ¶ 7. On April 23, 2008, Judge Brieant issued a temporary restraining order barring DOH from taking any further action to implement the Commission's recommendations. Gasior Aff. Exh. H. The court scheduled a hearing for 10 days later, leaving ample time to hear and determine the motion before June 30, 2008, when the statute creating the Berger Commission expired and was deemed repealed. Exh. E, § 11. That hearing was subsequently adjourned, and was held on June 25 and 26, 2008, before Magistrate Judge Fox.

**The Preliminary Injunction Hearing**

The following facts were admitted into evidence at the June 25th and 26th hearing.

**Dr. David Sandman**, the former Executive Director of the Berger Commission, testified that nothing like the Commission had ever been created in New York State -- it was an unprecedented, very high-profile event, and virtually everybody in the health care industry, and perhaps beyond, was aware of its existence. Tr. 290-92. There were hundreds of articles written

about the Commission and Commission meetings were public events attended by hundreds of observers. Tr. 292. Within the healthcare industry, the Commission and its mandate were extremely widely known. Tr. 292.

The Commission engaged in "outreach" to health care facilities in multiple ways. Tr. 293. Beyond the 19 public hearings held across the state -- 3 in the Hudson Valley Region -- the Commission maintained an open-door policy. Tr. 293. Providers had constant access to the Commission and many took advantage of the opportunity to meet with RAC or Commission staff and to send the Commission boxes of materials. Tr. 293. See also Tr. 305-06. It was the practice and procedure of the RAC to send notices of public hearings to each facility within the Hudson Valley Region, to elected officials, county executives and trade associations, with a request to disseminate the notices to their members. Tr. 294-97. All of the Commission-related hearings were widely publicized, with notices provided, in advance, to facilities by mail, through the Department of Health ("DOH") website and possibly by posting in the State Register. Tr. 295, 301.

Anyone who appeared at a RAC hearing could testify (Tr. 302) and the speakers oftentimes included CEO's or other senior-level representatives, individual providers, representatives of trade associations, organized labor and consumer advocacy groups. Tr. 304.

In considering deficiencies at facilities, Dr. Sandman testified that Commission staff examined inspection data on the DOH website and counted the number of human figure graphics, which represented the scope of residents affected by each deficiency, to determine the number of deficiencies, instead of simply counting the "tags" or number of standards violated. Tr. 310. Commission staff used the same methodology for computing deficiencies for all of the facilities

it considered. Tr. 310. Defendant's Exhibit H, a printout from the DOH website, shows how the Commission concluded that Andrus had 26 deficiencies in 2005. Tr. 311. The "Residents Affected" column in Exhibit H has a total of 26 (Tr. 313) for 2005, which is the number of deficiencies listed in the Commission's Report for Andrus (Exhibit A at 123).

**Betsy Biddle**, the Executive Director of Andrus nursing home, testified for plaintiff. Ms Biddle has 33-years experience working in nursing homes (9 with Andrus), including nursing home management (Tr. 226, 232). She testified that two organizations, the New York State Home and Hospital Service (NYAHSA) and the Greater New York Hospital Association (GNYHA) provide Andrus with information "about things that are going on in the Legislature; things that are going on in terms of regulations." Tr. 234-35. Ms. Biddle acknowledged that she probably received information from NYAHSA and GNYHA when the Enabling Legislation created the Commission. Tr. 235.

Ms. Biddle understood, at the time that the Commission was formed, that the Commission was charged with looking at excess nursing home beds throughout the State. Tr. 237. While Ms. Biddle testified that she "didn't pay attention" to the Enabling Legislation until after the Commission Report was released in November 2006 (Tr. 240, 242), she also testified that she "was really paying attention to what was happening with the Berger when they asked me to come and speak" (Tr. 244), which was in June 2006. Tr. 201; Exhibit 5.

When Ms. Biddle was contacted in May 2006 by Mark Ustin, a representative of the Commission, and asked to attend a meeting (Tr. 201), she understood that the RAC was looking at all nursing homes in the region and that the RAC was part of the Commission process. Tr. 255 (emphasis added). She also understood, when she met with the RAC, that they were going to

report to the Commission and that the Commission had the power to recommend the closure of nursing homes. Tr. 264-65. Nonetheless, Ms. Biddle claimed she had no idea that any of the actions by either the RAC or the Commission applied to Andrus because she believed that none of the factors being considered applied to Andrus. Tr. 260-61. While Ms. Biddle testified that no one from the RAC, the Commission or DOH ever gave her any indication that Andrus was one of the facilities that they were "considering closing" (Tr. 261), she also acknowledged that no one ever told her that Andrus was exempt from consideration by the Commission (Tr. 266), and no one at the meeting told her that Andrus was not under consideration. Tr. 267.

Ms. Biddle testified that, at the meeting with the RAC, she "went through the whole history of Andrus, the CCRC [Continuing Care Retirement Community], and then the -- what we had done with Beth Abram, and about our 50 beds, and that we had filled to 90 percent, and that we were financially viable . . . ." Tr. 203. Regarding Andrus' finances, Ms. Biddle testified that in May of 2006 she told Mr. Ustin from the Commission that Andrus "had been financially viable for the first time in our lives last year . . . ." Tr. 201. In fact, while Andrus had a $500,000 operating surplus in 2005, that surplus had dropped 60% in 2006 to $200,000. Tr. 200-01. Ms. Biddle understood that the RAC had "'welcomed my offer to provide copies of the Andrus 2005 certified financial statements,' and other documents" in order to verify what she had been telling them. Tr. 265. Ms. Biddle knew the RAC was conducting hearings, she knew they wanted information about nursing homes, that she was invited to a meeting with the RAC to tell Andrus' story and she was asked for documentation, which she provided. Tr. 266.

When the Commission's November 2006 Report was issued, recommending Andrus' closure, Ms. Biddle informed Andrus' residents of that fact. Tr. 278. Since then, she has kept

the residents and staff apprised, on a monthly basis, of developments in this litigation. Tr. 278. She also informed families of Andrus' residents and Andrus' vendors that there is a "stay" in effect and that if anything changed she would let them know. Tr. 279. Despite these communications by Ms. Biddle, she asserts in her affidavit in support of a preliminary injunction that Andrus, "to this day," continues to be a thriving, financially stable facility. Biddle Aff. ¶ 7.

**Mark Kissinger**, DOH Deputy Commissioner for the Office of Long Term Care, testified for defendant concerning the DOH requirements nursing homes must follow when closing, and DOH's oversight of such closures. Nursing homes must submit a closure plan and receive DOH's written approval before implementing the plan. Tr. 154. DOH's highest priority in overseeing the implementation of closure plans is the health and safety of the residents during the transition. Tr. 156. Closure plans must include information concerning the process to identify appropriate placements for the residents, including "insuring that the wishes of current patients/residents/families are respected when placement decisions are made, and insuring that concerns such as geographic location, public transportation, type of facility/ provider, medical care, etc. are addressed . . . ." Exhibit C, p. 4, ¶ 11. A closure plan must also insure that medical records are transferred in a secure manner, and include a plan for follow-up after residents are relocated. Id. ¶¶ 12, 16. DOH regional staff are involved in overseeing that closure plans are properly implemented and the process goes smoothly. Tr. 157. Among other things, DOH staff monitor whether adequate staff is maintained at the facility to provide care to the residents during the transition period. Tr. 159. Mr. Kissinger testified that he is aware of nursing home closures that have been accomplished in an orderly fashion. Tr. 159. He also testified that "if you work with the facility and the clinicians, both in the Department and the facilities, as well as the

families, you can minimize that, the risk" of transferring residents. Tr. 162.

**Neil Benjamin**, DOH's Director of the Division of Health Facility Planning, testified on behalf of the defendant. Mr. Benjamin served as the DOH liaison to the Commission, pursuant to section 4 of the Enabling Legislation. Tr. 174. As liaison, he had regular meetings with the Commission staff. At the request of Commission staff, Mr. Benjamin collected a broad range of the most currently available data on every health care facility in the State. This data included information on the facilities' Medicaid reimbursement rates, their long-term debt, and information known as case-mix data concerning the medical needs and diagnoses of the residents. Tr. 175 - 76.

From 2002 through 2007, Mr. Benjamin was involved in negotiating on behalf of DOH the transfer of 50 beds from Andrus to Beth Abraham Health Services. Tr. 176. This transfer came about as a result of the inability of Andrus to obtain local zoning approval for a continuing care retirement center on its property, which was to have been a joint venture with Beth Abraham. When the deal fell through, Andrus was under financial obligation to Beth Abraham, which it sought to fulfill by transferring 50 beds to Beth Abraham. Mr. Benjamin informed the Commission staff that Andrus had contracted to sell the beds. Tr. 186. However, the beds remained on Andrus' license until January 24, 2007, when they were decertified retroactive to July 1, 2006. Tr. 176 - 78, 187; Ex. D.

**Sharon Carlo**, RN, a consultant and former DOH employee and nursing home administrator, testified (over defendant's objection) as an expert witness for plaintiff. Ms. Carlo described the method by which nursing homes are inspected by DOH and how statements of deficiencies are written. She explained that every nursing home regulatory requirement is

assigned a "tag" number, and a home is cited for a violation of that tag when it fails to comply with that standard, irrespective of how many times it did so or how many residents were affected. In addition to the tag, deficiencies are categorized by their scope and severity - i.e., how many residents are affected by the deficiency and how severe the deficiency is. The deficiency is then assigned a letter value to signify its scope and severity. Tr. 118-27, Ex. 2. Ms. Carlo opined that the bare number of "tags" is not the most reliable and valid measure of quality of care in a nursing home. Rather, "the most reliable identifier of the quality of care is the types of deficiencies that have been cited and the scope and severity of those deficiencies. ... it is never the number, the total number, of deficiencies." Tr. 129. Accordingly, it is important to look at the scope and severity of a facility's deficiencies. Tr. 142-43. She testified that according to her method of calculating, there were 14 deficiencies on plaintiff's 2005 statement of deficiencies, and not 26, as indicated in the Commission Report. Tr. 130 - 31.

Although Ms. Carlo testified that, in her experience as a DOH employee, deficiencies were calculated by counting the number of tags, irrespective of the scope and severity, Tr. 132, she acknowledged that she was not a member of the Commission or a staff person to the Commission. She did not work on Commission-related issues at DOH, and had no knowledge of how the Commission analyzed statement of deficiencies or counted the number of deficiencies. Tr. 142.

**Dr. Jeffrey Nichols** testified (over defendant's objection) as an expert witness for plaintiff on the issue of the "transfer trauma" that could be experienced by the residents of Andrus if they were required to move to a different facility. Dr. Nichols defined transfer trauma as "the cognitive and functional decline that dementia – primarily dementia patients, although

some cognitively intact patients, have when they've moved from one environmental structure to a different one." Tr. 61-62 (emphasis added). Although generally 75% of nursing home residents have dementia, Tr. 61, at Andrus only 40% of the residents had been identified as having significant cognitive impairment (which includes more than dementia). Tr. 77.

Dr. Nichols' testimony was based on his understanding of nursing home residents in general, and not on Andrus residents specifically. He reviewed the most recent progress notes and psychiatric consultations for approximately 40 Andrus residents, all of whom were selected by Andrus. All of these residents were among the 40% of Andrus residents who have cognitive impairments. Tr. 74, 87. Dr. Nichols did not know how many of the residents for whom he reviewed records were low acuity patients, referred to as Physical A or Physical B. Tr. 88.[3] Dr. Nichols visited the facility, but he did not conduct a clinical assessment of a single Andrus resident. Tr. 76, 88. Nor did he speak with any family members of Andrus residents. Tr. 88. Accordingly, Dr. Nichols was unable to testify concerning the risk of transfer trauma to any particular Andrus resident. Tr. 91.

Dr. Nichols further testified that it was difficult to say with certainty that any particular adverse event, such as a fall, was caused by a transfer. Tr. 73-74, 95. As he explained, "clearly, this is a group of people who are old and ill. So when bad things happen, they're never entirely unexpected. Life expectancy overall for residents in nursing homes is only about two and a half to three years. And clearly, when you have a progressive, degenerative, neurologic disease, the fact that you get worse is not necessarily completely unexpected. So really, what you're talking

---

[3] Physical A and Physical B residents require the least amount of care and are the most independent. Tr. 80.

about is excess morbidity and mortality beyond what's to be expected from their illness." Tr. 74.

In addition to residents with dementia, Dr. Nichols testified that "there would appear to be" risks associated with transferring residents with other, less severe forms of cognitive impairment. Tr. 70. He acknowledged that residents who are less cognitively impaired would have less difficulty learning to get around in a new physical environment. Tr. 88. Residents with a higher level of cognitive ability would "not necessarily [be] more stressed by [a change] because if you're more cognitively intact, you might be able to understand what's happening to you better." Tr. 89. Dr. Nichols added that some low acuity residents could live in an assisted living setting, but he could give no opinion on how many. Tr. 81-82.

Finally, Dr. Nichols acknowledged that nursing homes close and residents transfer from one facility to another for a variety of reasons, and some residents make a successful transition. Tr. 90. He himself had taken steps to minimize any adverse effects of transfer on his own patients by, for example, making sure that complete information is sent to the new facility and by reassuring the resident. Tr. 93. Dr. Nichols did not know the family members of Andrus residents or where they lived, and admitted that it was possible for family members to stay in touch after a resident transferred. Tr. 91. Indeed, it is possible that some of Andrus' residents would be closer to family after a transfer. Tr. 92. On the other hand, residents can be subject to some of the same stressors even if they remain in the same facility; for example, if a staff member who has cared for them leaves the employ of the facility. Tr. 91.

In the final analysis, Dr. Nichols admitted that the only way to completely eliminate the risk of transfer trauma is never to transfer any nursing home residents. Tr. 95.

**Report and Recommendation**

In a Report and Recommendation dated July 17, 2008, U.S. Magistrate Judge Mark D. Fox found that Andrus had established both irreparable harm and a likelihood of success on the merits, and recommended that this Court grant plaintiff's motion for a preliminary injunction.

The Magistrate Judge found that while the Andrus was seeking approval to convert to a continuing care retirement community, its census had decreased to the low 70s, although it was certified to operate 247 beds. Its census increased to an average of 184 in 2005 and 2006. R&R at 5. Its financial status then improved, resulting in a surplus in 2005 and 2006. Id. at 6.

The Magistrate Judge further found that the Andrus's Executive Director, Ms. Biddle, was invited to meet with the RAC. At that meeting, she "went through the whole history of Andrus," including its attempted conversion, and its recently improved occupancy rate and financial status. Id. at 8.

Although Magistrate Judge Fox found that Ms. Biddle "understood that the RAC was 'looking at all facilities, both nursing homes and hospitals, in the region," he accepted her contention that she was "totally blindsided" and "never had any idea that the Andrus was being considered as a candidate for closure." Id. at 9.

Magistrate Judge Fox further found that the Berger Commission's Report contained numerous factual errors, including that Andrus first ran a surplus in 2006 (instead of 2005), the number of deficiencies it had in its 2005 inspection reports, its resident census, and that its low acuity patients could be better served in an ALP. Id. at 9-12. Magistrate Judge Fox found that Mr. Sandman agreed that Andrus had 14 deficiencies in 2005 instead of the 26 in the Report, although Mr. Sandman's unrebutted testimony, supported by Exhibit H from the DOH website,

shows that the Berger Commission counted deficiencies differently than the way Ms. Carlo explained, and that under the Commission's method there were 26 deficiencies.

The Magistrate Judge found that plaintiff had shown irreparable injury on the ground that the issuance of an amended operating certificate would negatively impact referrals to the Andrus, and that its residents could experience transfer trauma. Id. at 20-22. He further concluded that plaintiff had established a likelihood of success on the merits with respect to the procedural due process claim because the Andrus was not given individual notice that its facility was 'targeted for closure' and the errors in the Report showed that the procedures carried a high risk of erroneous deprivation. Id. at 23. Finally, the Magistrate Judge found a likelihood of success on the merits of the substantive due process claim based on the alleged errors. The Magistrate Judge incorrectly found that "None of this information was contradicted or rebutted by Defendant." Id. at 24.

## ARGUMENT

### PLAINTIFF'S MOTION FOR A PRELIMINARY INJUNCTION SHOULD BE DENIED

**Standard of Review**

In reviewing the report and recommendation of a magistrate judge, the district court must conduct a de novo review of those portions of the report to which a party has objected. See generally RxUSA Wholesale Inc. v. Dep't of Health and Human Servs., 467 F. Supp. 2d 285, 287 (E.D.N.Y. 2006); 28 U.S.C. § 636 (b)(1)(c). Upon such review, the Court may "accept, reject, or modify, in whole or in part, the findings or recommendations" of the magistrate judge.

In this case, defendant objects on the ground that the Magistrate Judge used the wrong standard of law with respect to plaintiff's procedural and substantive due process claims, made

erroneous findings of fact, and reached erroneous conclusions of law in many respects. Specifically, the Magistrate Judge incorrectly assumed that plaintiff was entitled to prior notice that it was a "target" for closure (even before the Commission's review was completed), incorrectly found that the Commission's conduct was arbitrary and shocks the conscience, erroneously found that plaintiff had shown it would be irreparably injured merely by the issuance of an amended operating certificate, incorrectly found that errors in the Report show a due process violation, and incorrectly stated that defendant did not introduce any evidence to counter the alleged errors in the Report.

Here, plaintiff utterly failed to meet its burden of demonstrating irreparable harm and a "likelihood of success on the merits." Jolly v. Coughlin, 76 F.3d 468, 473 (2d Cir. 1996). The preliminary injunction sought here by plaintiff, a full year after commencing this action, should be denied.

**A. Andrus Has No Likelihood of Success On Its Procedural Due Process Claim**

Even if Andrus had a property interest in its operating certificate -- the scope of which would be limited by DOH's authority to decertify it based on public need, N.Y. Public Health Law § 2806(6)(a) -- the procedures afforded under the Enabling Legislation provided all the process due. First, the Magistrate Judge erroneously concluded that plaintiff was entitled to individualized notice that it could be closed. Second, in any event, Andrus received all the notice and opportunity to be heard due under the circumstances.

**1. The Magistrate Judge Erred In Concluding that Andrus was entitled to individualized notice that its operating license was subject to revocation.**

Under these circumstances, where new legislation mandated a comprehensive review of

all New York hospitals and nursing homes, Andrus was not entitled to individualized notice that the Commission could recommend that it be closed – all facilities were on notice of this by operation of law. Andrus concedes that it was aware at all relevant times that the Commission was engaged in a review of all health care facilities, and of its ability to discuss the matter with the Commission and the RAC, submit documentation, and otherwise influence the process. No more is required as a matter of constitutional due process under these circumstances. Andrus' complaint — that it should have received some sort of super-notice, informing it not simply of the pendency of the process, but of the likelihood of a certain outcome — has no basis in due process jurisprudence, which is why precisely the same complaint already has been rejected by the New York courts.

There can be no serious question that Andrus knew of the Commission's deliberations and the possible consequences for it. First of all, the Enabling Legislation is a public law. From the plain language of the statute it has always been clear that every hospital and nursing home in the State was being reviewed with an eye toward closure or restructuring. See Enabling Legislation §§ 2(a), 8(b). Ms. Biddle admitted she knew as much. Tr. 255. Where a governmental entity is required to make decisions which will affect many individuals or entities, individualized notice is simply not required. See, e.g. Atkins v. Parker, 472 U.S. 115, 129-31 (1985).

The super-notice that Andrus contends was not provided has never been required by constitutional due process, and Ms. Biddle's subjective belief that the outcome of the Commission's review would be favorable to Andrus does not alter this. As a state court aptly put it, in disposing of a similar challenge to the Enabling Legislation:

> There is no question that the plaintiffs received notice of the deliberations of the [Berger] Commission and an opportunity to submit written material. Every hospital was on notice that the Commission might recommend its closing or consolidation. It is unreasonable to expect that as the Commission deliberated and certain hospitals became more likely to be affected that some sort of super notice would be required. The notice received by plaintiffs was sufficient.

St. Joseph Hospital of Cheektowaga v. Novello, 15 Misc.3d 333, 343-44 (N.Y. Sup. Ct. Erie Cty. 2007); aff'd as modified, 43 A.D.3d 139, 840 N.Y.S.2d 263 (4th Dep't), appeal dismissed, 9 N.Y.3d 988 (2007), appeal denied, 10 N.Y.3d 702 (2008) (emphasis added).

Indeed, if Andrus' theory of proper notice had been applied, it likely would have led to undesirable results. Had the Commission notified some facilities that they were being considered for closing before deliberations were complete, Andrus could argue that the Commission had engaged in some measure of pre-judgment. The most reasonable and fair means of notice under the circumstances was to let all facilities know from the outset that they could be selected for closing or other restructuring.

Thus, the Magistrate Judge incorrectly held that plaintiff did not receive appropriate notice and an opportunity to be heard simply because it was not individually informed that it was a "target" for closure. Accordingly, even if all of plaintiff's facts are accepted, it has no likelihood of success as a matter of law.

**2. Andrus Received All The Procedural Due Process To Which It Was Constitutionally Entitled.**

**a. The Magistrate Judge Erred In Finding that Andrus did not have a meaningful opportunity to be heard.**

In any event, the evidence amply demonstrates that Andrus had a meaningful opportunity to be heard, and plaintiff's claim to the contrary is unsupported by the evidence. Andrus, like all

other facilities in the State, had frequent opportunities to influence the Commission process. Indeed, Andrus admits that it provided the Commission with all the information necessary to evaluate whether Andrus should remain open. Accordingly, its complaint does not sound in constitutional due process at all, but rather is a garden-variety claim of administrative error in disguise.

Here, Andrus was aware of the kind of objective data upon which the Commission would rely in rendering its determinations with respect to each hospital and nursing home (see Enabling Legislation § 5), and was provided an opportunity to submit corrected and/or updated information. The Commission and the RACs conducted nineteen public hearings statewide, including three in the Hudson Valley. Sandman Aff. ¶ 18. Andrus could have participated in public hearings, though it did not do so. Id. It also was offered the opportunity to engage in voluntary rightsizing discussions under the supervision of the Commission and the Department of Health without incurring antitrust liability. Id. ¶ 19.

Andrus' own complaint and the affidavit and testimony of Betsy Biddle further undermine its claim that it had no meaningful opportunity to be heard. It acknowledges, first, that its executive director met with the RAC and Commission staff. Complaint ¶ 43; Biddle Aff. ¶¶ 30-37. Andrus also acknowledges that the RAC requested information from it (complaint ¶ 42; Biddle Aff. ¶ 34) , and that it submitted considerable information to the RAC and to the Commission,(complaint ¶¶ 4, 43, 48, 50; Biddle Aff. ¶ 35). Ms. Biddle testified that she described Andrus' "whole history" to the RAC. Tr. 200-03. Andrus' real complaint is not that it had no opportunity to make the Commission aware of its views, but rather that the Commission, having been apprised of these views, disagreed with them. In the end, Andrus is simply, and

improperly, seeking to have this Court determine whether the Berger Commission "got it right."

**b. The Magistrate Judge Erred In Finding that the Report contained errors, or that such errors constituted a due process violation.**

In any event, the Commission did receive and work from accurate data. See Sandman Aff. ¶¶ 29-36. The Magistrate Judge's findings that there were material errors in the Report, and that defendant did not counter plaintiff's claims of error, are simply wrong. There is no dispute that Andrus had been operating at a deficit for years, and only recently showed a surplus. Whether that was in 2005 or 2006 is not material. There is also no dispute that Andrus had a relatively healthy, "low acuity" resident population, some of whom could be served in an ALP. Nor is there any dispute that the Andrus has relatively large, private rooms – which the Commission found would make conversion to an ALP easier. The Magistrate Judge was also incorrect that Mr. Sandman "agreed" that the number of deficiencies was wrong. R&R p.10. On the contrary – he testified that the number 26 was accurate according to how the Commission counted deficiencies, which was a rational way of reflecting the scope of the deficiencies and not merely the number of standards violated. Furthermore, contrary to Andrus' claim that the Commission mistakenly called it a 247-bed facility, id. ¶ 54, the Commission specifically noted that Andrus was in the process of selling 50 beds, and calculated Andrus' occupancy rate based on both 197 and 247 available beds. See Sandman Aff. Exh. B at 123. There is no dispute that at the time the Report was issued, those 50 beds were legally on Andrus's operating certificate, and plaintiff's private agreement not to fill them does not alter this fact. The Commission was therefore aware of the material facts and of the context. Andrus simply disagrees with its decision. Moreover, these alleged "errors" involve non-dispositive and non-exclusive factors, no

one of which determined the outcome; the overarching basis for the recommendation was the Commission's examination of the health care needs of the region and, if reconfiguration was found to be necessary, which facility or facilities were most well-suited to close or reconfigure, while maintaining needed health care resources.

Given that Andrus has not shown that the Commission made any of the errors it attributes to the Commission, it similarly fails to show that any of the additional procedural steps it claims the Commission should have taken would have meaningfully reduced the risk of erroneous deprivation. It certainly has not shown that any such reduction could outweigh the monumental increase in administrative burden that it argues the Commission should have shouldered by conducting site visits with staff and patient interviews at each potentially affected facility. As the New York State Appellate Division recognized in rejecting a similar claim that a hospital was entitled to an individualized evidentiary hearing, employing the Article 28 procedures for each facility targeted for closure or major restructuring would have created "an enormous fiscal and administrative burden." St. Joseph Hospital of Cheektowaga v. Novello, 43 A.D.3d 138, 144 (4th Dep't 2007).

**B. The Magistrate Judge Erred In Concluding That Andrus Has A Likelihood of Success On Its Substantive Due Process Claim, Because The Commission's Actions Were Neither Arbitrary Nor Outrageous.**

To make out a claim for a violation of substantive due process, plaintiffs must show (1) the existence of a constitutional right, and (2) state action interfering with that right which is constitutionally "arbitrary." Lowrance v. Achtyl, 20 F.3d 529, 537 (2d Cir. 1994). Andrus has failed to meet this exacting standard. An "arbitrary action" in this context means much more than just an "incorrect or ill-advised" action. It must be "conscience-shocking," see, e.g.

Lowrance at 537; see also County of Sacramento v. Lewis, 523 U.S. 833 (1998). "[S]ubstantive due process standards are violated only by conduct that is so outrageously arbitrary as to constitute a gross abuse of governmental authority." Bower Assocs. v. Town of Pleasant Valley, 2 N.Y.3d 617, 628-29 (2004) quoting Natale v. Town of Ridgefield, 170 F. 3d 258, 263 (2d Cir. 1999). The plaintiff must show that the governmental action was wholly without legal justification. Id. at 627; see also Town of Orangetown v. Magee, 88 N.Y.2d 41, 42 (1996).

As a matter of law, the joint and several actions of the defendant and the Commission cannot be regarded as arbitrary or outrageous. Their actions fall squarely within the State's police power. See, e.g., Medtronic, Inc. v. Lohr, 518 U.S. 470, 475 (1996); Medical Soc. of the State of New York v. Cuomo, 976 F.2d 812, 816 (2nd Cir. 1992) ("The regulation of public health and cost of medical care are virtual paradigms of matters traditionally within police powers of the state."). Andrus does not, and could not, claim that the State acted in bad faith or for any impermissible purpose. See St. Joseph, 15 Misc.3d at 342 (finding that "the actions of the State in enacting the Enabling Act were in furtherance of its police power by evaluating the State's health care system and by aligning health care resources in a stable and efficient manner," and so did not violate substantive due process).

Thus, Andrus' substantive due process claim, like its procedural due process claim, is based on no more than an assertion that the Commission got it wrong. Such a claim may be grounds for a state-court Article 78 action, but it does not establish a substantive due process violation. Moreover, as discussed, the alleged "errors" in the report were not in fact errors, or were so minimal as to not effect the outcome (such as Andrus first having a surplus in 2006 instead of 2005). These alleged errors do not come close to meeting the high standard required

for a substantive due process claim. Thus, the Magistrate Judge erred in concluding that Andrus' substantive due process claim has a likelihood of success.

**C. Plaintiff Has Failed To Show It Will Suffer Irreparable Injury**

Plaintiff also failed to show that irreparable harm would result from defendant's issuance of an amended operating certificate[4] or from requiring plaintiff to prepare a closure plan. Plaintiff's claims of injury to its business are speculative and refuted by the evidence, and its claims of harm to the residents are similarly speculative, and should not be considered on this motion because plaintiff lacks standing to raise them.[5] See Defendant's Post-Hearing Memorandum of Law at 23-27. Plaintiff showed no more than that the issuance of an amended certificate would result in some diminution of revenue from loss of some residents – nothing approaching the catastrophic effect on its business required for irreparable injury. If Andrus informed its residents that it was continuing to press the litigation and that further implementation was stayed, there is no reason to conclude that the residents would react any differently to an amended certificate than they did to the original Berger Commission recommendation that the Andrus close.

With respect to transfer trauma, not only does Andrus lack standing to raise this issue, the

---

[4] On June 30, 2008, Judge Sidney H. Stein adopted Magistrate Judge Fox's Report and Recommendation, which extended Judge Brieant's April 23, 2008 Temporary Restraining Order, effectively barring DOH from issuing Andrus an amended operating certificate on or before June 30, 2008. The legal effect of that TRO on DOH's authority to issue Andrus an amended certificate is not now before the Court.

[5] For purposes of this motion only, defendant does not contest that forcing Andrus to close would constitute irreparable injury. However, the issuance of an amended operating certificate and requiring plaintiff to prepare a closure plan, if all further implementation of the Commission's recommendations are stayed, would not irreparably injure plaintiff. Defendant's Memorandum of Law in Opposition to Plaintiff's Motion for a Preliminary Injunction, dated May 1, 2008, at 3, 31.

evidence is completely speculative. Dr. Nichols did not evaluate any individual Andrus residents. There is no dispute that proper handling of transfer can minimize the adverse effects, and that some residents make a successful transition.

## CONCLUSION

Defendant respectfully submits that the July 17, 2008, Report and Recommendation should be rejected and plaintiff's Motion for Preliminary Injunction should be denied in full.

Dated: New York, New York
July 29, 2008

Respectfully submitted,

ANDREW M. CUOMO
Attorney General of the
State of New York
Attorney for Defendant

By: ______________________
John P. Gasior

______________________
Barbara K. Hathaway
Assistant Attorneys General
120 Broadway, 24th Floor
New York, New York 10271
212-416-8570

TO: Peter G. Bergmann, Esq.
Brian McGovern, Esq.
Cadwalader, Wickersham & Taft LLP
One World Financial Center
New York, New York 10281
Telephone: 212-504-6000

