UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

-----------------------------------------------------------------------X
:
JOHN E. ANDRUS MEMORIAL, INC.              :          2007 Civ. 3432
(d/b/a ANDRUS ON HUDSON),                  :          (KMK) (MDF)
:
                              Plaintiff,   :
            -against-                      :
:
RICHARD F. DAINES, as Commissioner of the  :
New York State Department of Health,       :
:
                              Defendant.   :
:
-----------------------------------------------------------------------X

**RESPONSE TO DEFENDANT'S OBJECTIONS
TO REPORT AND RECOMMENDATION ON
PLAINTIFF'S MOTION FOR A PRELIMINARY INJUNCTION**

CADWALADER, WICKERSHAM & TAFT LLP
One World Financial Center
New York, New York  10281
Telephone: (212) 504-6000

Attorneys for Plaintiff

# TABLE OF CONTENTS

**PAGE**

TABLE OF AUTHORITIES ......................................................................................... ii

PRELIMINARY STATEMENT ...................................................................................... 1

REPLY TO DEFENDANT'S STATEMENT OF FACTS ........................................... 2

    Establishment of the Berger Commission ......................................... 3

    Procedural History ................................................................................ 3

    The Preliminary Injunction Hearing .................................................. 6

    The Commission Process ...................................................................... 9

    Regulatory Framework ........................................................................ 10

REPLY TO DEFENDANT'S ARGUMENTS ............................................................ 10

    I.      Inadequacy of Generalized Notice ......................................... 11

    II.    Materiality of Errors ............................................................ 17

    III.   Showing of Irreparable Harm .............................................. 20

CONCLUSION ............................................................................................................ 23

# TABLE OF AUTHORITIES

PAGE(S)

## CASES:

Atkins v. Parker,
    472 U.S. 115 (1985).................................................................................. 13-14

Brody v. Village of Port Chester,
    434 F.3d 121 (2d Cir. 2005)............................................................................. 13

Board of Regents v. Roth,
    408 U.S. 564 (1972)......................................................................................... 14

Catanzano by Catanzano v. Wing,
    103 F.3d 223 (2d Cir. 1996)............................................................................ 12

Cleveland Bd. of Educ. v. Loudermill,
    470 U.S. 532 (1985), cert. denied, 488 U.S. 946 (1988) ..................................... 14

Frank v. Johnson,
    968 F.2d 298 (2d Cir.), cert. denied, 113 S.Ct. 825 (1992) ................................. 11

Mullane v. Central Hanover Bank & Trust Co.,
    339 U.S. 306 (1950)......................................................................................... 13

Reddington v. Staten Island Univ. Hosp.,
    511 F.3d 126 (2d Cir. 2007)............................................................................ 14

Ortiz v. Eichler,
    794 F.2d 889 (3d Cir. 1995)............................................................................ 14

St. Joseph Hosp. of Cheektowaga v. Novello,
    43 A.D.3d 139 (4th Dep't 2007), lv. to appeal denied, 10 N.Y.3d 702 (2008) ................. 4, 14

United States v. State of N.Y.,
    708 F.2d 92 (2d Cir. 1983).............................................................................. 20

Wantanabe Realty Corp. v. City of New York,
    315 F. Supp. 2d 375 (S.D.N.Y. 2003) .............................................................. 18

## STATUTES & OTHER AUTHORITIES:

Enabling Legislation, Part K of Chapter 58 of the Laws of 2003, as added by Section 31
of Part E of Chapter 63 of the Laws of 2005:
    § 5 ................................................................................................................. 3
    § § 9, 11........................................................................................................ 21

## PRELIMINARY STATEMENT

Plaintiff John E. Andrus Memorial, Inc. d/b/a Andrus on Hudson ("the Andrus"), a not-for-profit nursing home in Hastings-on-Hudson, New York, submits this response to Defendant's Objections to Report and Recommendation on Plaintiff's Motion for a Preliminary Injunction ("Objections"), and in further support of its motion for a preliminary injunction to prevent the defendant from taking any further steps to implement the recommendation made by the Commission on Health Care Facilities for the 21st Century (the "Berger Commission" or "Commission") to close the Andrus' nursing facility, or to rescind or modify the Andrus' operating certificate, pending the final resolution of this litigation.[1]  The Andrus submits that the defendant's Objections lack merit and do not warrant any modification of the Report and Recommendation issued by Magistrate Judge Mark D. Fox on July 17, 2008 (the "Report and Recommendation").

For the reasons discussed below, the Report and Recommendation should be adopted in full and the Andrus' motion for preliminary injunction granted in its entirety.  The Report and Recommendation reflects an exhaustive review and distillation of the evidence adduced at the hearing held before Magistrate Judge Fox on June 25 and 26, 2008, and the factual findings and legal conclusions therein are fully supported by detailed citations.  The record evidence demonstrates that the Andrus will be irreparably harmed should the defendant be allowed to "amend" its operating certificate, with a date certain for closure, or to otherwise implement the Berger Commission's recommendation to close the Andrus' nursing facility, and that the Andrus will very likely prevail on its procedural and substantive due process claims.

---

[1] The Andrus incorporates the points and authorities in its Memorandum in Support of Plaintiff's Motion for a Preliminary Injunction dated April 11, 2008 and Post-Hearing Memorandum of Law in Support of Plaintiff's Motion for a Preliminary Injunction dated July 3, 2008, as well as the affidavits and documentary evidence submitted in support of this motion.

This is not only the opinion of Magistrate Judge Fox but also reflects the views of Judge Brieant and Judge Stein, both of whom looked at this issue on plaintiff's application for a temporary restraining order. See Order to Show Cause for Injunctive Relief with Temporary Restraining Order dated April 23, 2008; Order dated June 30, 2008. Indeed, Judge Stein's order follows and affirms a prior Report and Recommendation of Magistrate Judge Fox dated June 25, 2008.

The testimony presented at the hearing substantiates Magistrate Judge Fox's finding that the Andrus had no notice that it was being considered as a "facility of interest" for possible closure by the Berger Commission, nor why it was being considered for closure under the statutorily mandated factors that the Berger Commission was supposed to apply to facilities. Moreover, the hearing evidence overwhelmingly establishes that the Berger Commission – having never afforded the Andrus the opportunity to point out the multiple errors made by Berger Commission staff and the Regional Advisory Committee ("RAC") about the Andrus – arrived at its flawed closure recommendation based on outmoded data and flatly inaccurate information about the Andrus' financial condition and operations.

Furthermore, there was ample testimony presented at the hearing about the immediate and irreparable harm that would result if the defendant were not enjoined from implementing the Commission's closure mandate – a result that was largely conceded by defendant. See Defendant's Post-Hearing Memorandum of Law in Opposition to Plaintiff's Motion for a Preliminary Injunction dated July 3, 2008 at 13, n.4.

## REPLY TO DEFENDANT'S STATEMENT OF FACTS

The relevant facts, fully supported by record citations, are set forth in the Report and Recommendation and will not be repeated here. For his part, in his Objections, defendant relies on selective snippets and largely ignores the relevant portions of the hearing transcript cited extensively in the Report and Recommendation. The Objections otherwise lack support in

the record or are flatly refuted by the hearing evidence.  The Andrus will highlight below some of the salient facts that the defendant omitted from the "Statement of Facts" section of his Objections.

## Establishment of the Berger Commission

The Enabling Legislation that established the Berger Commission did not confer unfettered discretion on the Berger Commission to close any or all hospitals and nursing homes. Rather, the statute prescribed several factors that the Berger Commission was required to consider before making any "right-sizing" or closure recommendation against any one particular facility, including: the financial status of the facility; the feasibility of converting the use of existing facilities; the extent to which an existing facility meets the health care needs of the community, including Medicaid recipients; the economic impact of right-sizing actions; and the stability and efficiency achieved in the provision of health care in a given community.  Enabling Legislation, Part K of Chapter 58 of the Laws of 2003, as added by Section 31 of Part E of Chapter 63 of the Laws of 2005, § 5.  As Magistrate Judge Fox correctly found, the Berger Commission made numerous erroneous assumptions about the Andrus and its operations that contravened the foregoing factors. Report and Recommendation, 9-10.

## Procedural History

Largely by omission, in the "Procedural History" contained in the Objections, defendant misleadingly suggests that the Andrus was somehow dilatory in moving for preliminary injunctive relief.  The actual proceedings to date reveal, to the contrary, that the Andrus was vigilant and promptly sought and obtained a stay of enforcement of the Berger Commission's closure recommendation.  On the other hand, it was defendant that delayed discovery and a hearing on the Andrus' preliminary injunction motion.

The Andrus commenced this action on April 30, 2007. Thirty days later, on May 30, 2007, just before defendant answered the complaint, the Andrus served its initial request for documents as well as interrogatories. After responding to the Andrus' initial discovery requests, defendant filed a motion for summary judgment seeking dismissal of the action in its entirety in July 2007.

After the motion was fully briefed, oral argument was held before Judge Brieant on September 7, 2007. At the conclusion of oral argument, and with the consent of both parties, the Court stayed implementation of the Berger Commission closure recommendation, along with all proceedings in this action, including further discovery, pending a ruling from the New York State Court of Appeals, on the merits, of an appeal from the majority opinion issued by the Appellate Division, Fourth Department, in a case entitled St. Joseph Hospital of Cheektowaga v. Novello, 43 A.D.3d 139 (4th Dep't 2007) (involving a different challenge to the Enabling Legislation and Berger Commission recommendations). Once the Court of Appeals in St. Joseph Hospital rendered its decision, the parties were to report to Judge Brieant and arrange for a Court conference to discuss the disposition of defendant's summary judgment motion and further proceedings in the action.

Shortly after the Court of Appeals dismissed the appeal as of right, without reaching the merits, in December 2007, the defendant consented to a continuation of the stay pending a motion then being made for leave to appeal in the St. Joseph Hospital case. Thus, the parties consented to a stay, first in September 2007 and again in December 2007, precisely to avoid the Andrus' having to file a motion for injunctive relief and the parties' having to brief another motion while defendant's summary judgment motion was sub judice.

After being apprised that the Court of Appeals had denied leave to appeal in St. Joseph Hospital in February 2008, this Court (Judge Brieant) issued its Memorandum and Order

dated March 10, 2008, denying defendant's motion for summary judgment on all claims for relief, concluding that "there are genuine issues of material fact as to whether the Enabling Legislation and the Berger Commission's procedures and recommendations satisfy the requirements of the Due Process, Takings, and Contracts Clauses of the United States Constitution."  Memorandum and Order, 7.  Thereafter, at a conference with the Court on March 28, 2008, the defendant asserted that the stay in place for the past seven months was no longer in effect, and that he would not consent to a further stay.

With the knowledge of the Court, the Andrus then promptly filed its motion for a preliminary injunction on April 11, 2008 with a return date of April 25, 2008.  However, after learning that the defendant would not agree to maintain the status quo pending resolution of the preliminary injunction motion, the Andrus on April 23, 2008 immediately sought and obtained a temporary restraining order ("TRO") from Judge Brieant against defendant's threatened action to issue an "amended" operating certificate to the Andrus.

At the April 23, 2008 hearing on the Andrus' TRO application, the Court set a return date of May 7, 2008 on the preliminary injunction motion.  However, both the parties and the Court understood that the initial return date would have to be adjourned and that the hearing on the preliminary injunction motion would not take place until the Andrus had the opportunity to conduct limited discovery – depositions of three former or current State officials involved with the Berger Commission or implementation of its recommendations.  Two days before the Court hearing, on April 21, 2008, the Andrus had offered 15 dates, from late April through the end of May 2008, for conducting the three depositions and holding the evidentiary hearing.  However, the earliest date that the defendant offered any of the three deponents for examination was June 3, 2008.  The last of the three depositions was taken on June 13, 2008.  Consequently, the evidentiary hearing was not scheduled until June 25, 2008.

Despite the fact that the TRO was in place since April 23, 2008, it was not until June 23, 2008 – two days before the hearing on the Andrus' preliminary injunction motion – that the defendant challenged the continued validity of the TRO, issued precisely two months earlier. Report and Recommendation dated June 25, 2008 ("First Report & Recommendation"), 4.  In his earlier Report and Recommendation, Magistrate Fox concluded that the TRO remained in effect, and that "cause" existed for extending the TRO.  First Report and Recommendation, 4-5.  By Order dated June 30, 2008, Judge Stein adopted that Report and Recommendation without any modification.

**The Preliminary Injunction Hearing**

The Andrus refers the Court to the Report and Recommendation for a complete discussion of the relevant facts established at the preliminary injunction hearing.  We point out below certain facts omitted from the Objections that also support the recommended grant of preliminary injunctive relief.

*The Andrus and its Residents.*  The Andrus is a not-for-profit home for the aged, established in 1953, and has operated as a residential health care facility, or licensed nursing home, since 1969.  Transcript of Preliminary Injunction Hearing in Andrus v. Daines, 07-CV-3432 (June 25-26, 2008) ("Hr'g Tr.") at 191:8-10 (Biddle).  The Andrus is certified to care for up to 197 residents, Hr'g Tr. (Biddle) 191:25-192:1, and its operating certificate is of indefinite term.  Hr'g Tr. (Biddle) 191:11-13.

Currently, the Andrus is caring for over 190 residents.  Hr'g Tr. (Biddle) 191:22-24.  The average age of the Andrus residents is between 88 and 89 years, and their average length of stay is four years.  Hr'g Tr. (Biddle) 192:16-21.  Some residents have lived at the Andrus for almost twenty years.  Hr'g Tr. (Biddle) 192:16-18.

The only hearing witness competent to testify about the clinical condition of the Andrus' residents was Dr. Jeffrey Nichols.  <u>See</u> Hr'g Tr. (Nichols) 74:20-77:8.  Dr. Nichols is a geriatrician with decades of experience caring for the elderly and studying dementia among nursing home residents and the phenomenon known as "transfer trauma".  Hr'g Tr. (Nichols) 53:21-25, 61:19-63-6.  Dr. Nichols also reviewed clinical data about the Andrus' residents in forming his expert opinions.  Hr'g Tr. (Nichols) 74:20-75:4.  In contrast, Mark Kissinger, a Department of Health official who testified for the defendant, admitted that he had no clinical background and that, to his knowledge, neither Berger Commission staff nor Department of Health staff reviewed clinical records of Andrus residents.  Hr'g Tr. (Kissinger) 159:15-160:7.

Of its current 191 residents, the majority are frail and elderly, Hr'g Tr. (Nichols) 78:9-13, with approximately 40% having been identified as suffering from dementia or other cognitive impairments.  Hr'g Tr. (Nichols) 77:9-14.  However, additional residents likely have mild or moderate dementia but have not been identified as such, because of the way dementia is diagnosed.  Hr'g Tr. (Nichols) 77:9-78:5.  As many as 80% of the Andrus' residents may be cognitively impaired.  Hr'g Tr. (Nichols) 78:22-79:8.

Contrary to the presumption made in the Berger Commission's Final Report, most Andrus residents, being frail and nursing-home eligible, are not appropriate for placement in an Assisted Living Program.  Hr'g Tr. (Nichols) 81:18-82:14.  These residents are also particularly susceptible to suffer transfer trauma.  Hr'g Tr. (Nichols) 78:14-21.  Dr. Nichols testified that in a population such as the Andrus, as many as 70% of the residents are at risk of suffering transfer trauma.  Hr'g Tr. (Nichols) 100-210.  Dr. Nichols testified to anecdotal evidence of resident deaths following transfer from nursing home closures in which he participated.  Hr'g Tr. (Nichols) 73:15-22.

*The Resumption of Nursing Home Admissions and the Andrus' Improved Occupancy and Finances.*  With the Department of Health's knowledge, beginning in 1998, the Andrus suspended admissions to its nursing home pending governmental review and approval of its proposal to develop a Continuing Care Retirement Community on its campus, to be jointly operated with Beth Abraham Health Services.  Hr'g Tr. (Biddle) 194:1-195:17.  All New York State regulatory bodies, including the Department of Health, approved the Andrus' CCRC project; however, in 2001, the Village of Hastings-on-Hudson denied the requisite zoning permits to develop the CCRC.  Hr'g Tr. (Biddle) 195:21-22.

Having been unable to develop a Continuing Care Retirement Community, the Andrus in 2002 refurbished the residential units in its facility and began admitting new residents to its nursing home.  Hr'g Tr. (Biddle) 196:1-10.  Also, in July 2002, the Andrus agreed to transfer 50 of its residential health care facility bed complement to Beth Abraham Health Services as part of dissolving their joint venture, reducing its bed count from 247 to 197.  Hr'g Tr. (Biddle) 196:25-197:11.  See Hr'g Ex. 4.  Pursuant to the transfer agreement, the Andrus relinquished any right to use those 50 beds.  Hr'g Tr. (Biddle) 197:8-11; Hr'g Ex. 4.  The Department of Health was aware of the transfer as early as 2003, and informed the Berger Commission of the transfer of the 50 beds, including the fact that the Department had determined to approve decertification of those beds, in mid-2006, four to five months before the Commission issued its Final Report.  Hr'g Tr. (Benjamin) 176:4-13.

As expected, during the suspension of nursing home admissions while development of the CCRC  project was ongoing, the Andrus had a reduction in its resident census and experienced a loss of revenue.  However, after the CCRC project ended, starting in 2002, the Andrus resumed admissions and steadily increased its occupancy and improved its financial condition.  The Andrus achieved a net operating surplus of over $509,000 in 2005.

Hr'g Ex. 6.  The Andrus' census continued to improve and its financial performance remained strong in 2006.  Hr'g Tr. (Biddle) 197:25-198:3, 200:19-23.

**The Commission Process**

By May 2006, the Andrus' census had improved to 184 residents, and it continued to operate at a surplus.  Hr'g Tr. (Biddle) 197:20-198:9, 200:22-201:1.  That same month, for the first time, the Executive Director of the Andrus, Betsy Biddle, was contacted by the Berger Commission.  Hr'g Tr. (Biddle) 201:2-11.  Unbeknownst to Ms. Biddle, the Berger Commission's staff had identified the Andrus as a "facility of interest" for possible closure; the staff member who telephoned Ms. Biddle, Mark Ustin, did not disclose that information to Ms. Biddle nor why the Andrus had been targeted for closure.  In contrast, at his deposition, the Executive Director of the Berger Commission, David Sandman, testified that when he contacted "facilities of interest", he told them that they were candidates for right-sizing. Sandman Dep. at 247:7-14, designated and submitted as part of the Hearing Record.  After Ms. Biddle told Mr. Ustin about the Andrus' occupancy and financial condition, Mr. Ustin invited Ms. Biddle to meet with the members of the Berger Commission staff and the Regional Advisory Committee ("RAC") to tell her "good story".  Hr'g Tr. (Biddle) 201:12-22, 203:11-13.  As further adduced at the preliminary injunction hearing, other facilities contacted by Berger Commission staff were informed that they were being considered as a candidate for closure or other right-sizing action. Hr'g Tr. (Sandman) 315:16-317:25.

Ms. Biddle then met with the RAC in June 2006.  Hr'g Tr. (Biddle) 201:1-6.  At that meeting, Ms. Biddle once again told the Andrus' "good story", including its strong occupancy and positive financial status in 2005 and continuing in 2006.  Hr'g Tr. (Biddle) 203:2-6.  In a follow-up letter, Ms. Biddle provided the RAC with a copy of the Andrus' 2005 financial

statements along with a copy of the 50-bed transfer agreement to provide the RAC with corroboration about what she had told them at the meeting.  Hr'g Tr. (Biddle) 203:23-205:2.

The Andrus did not hear again from either the RAC or the Berger Commission until the Berger Commission issued its Final Report in November 2006.  Hr'g Tr. (Biddle) 209:24-210:06.

**Regulatory Framework**

Under New York State regulations governing the operation of a nursing home, facilities are required to post their operating certificates conspicuously on the premises.  Hr'g Tr. (Carlo) 135:4-14.  Thus, the Andrus would be required to post any "amended" operating certificate, which would tell anyone entering the building that its continued operation was limited.  Further, and more importantly, these regulations require notification of residents, family members, and physicians of any change in a facility's operating certificate as soon as such a change is made.  Hr'g Tr. (Carlo) 135:15-136:10. These regulations are also enforced by the federal government's regulatory agency, the Centers for Medicare and Medicaid Services.  Hr'g Tr. (Carlo) 136:15-20.  Ms. Carlo further noted that telling residents of an amendment to a facility's operating certificate would be "incredibly, incredibly distressing", Hr'g Tr. (Carlo) 137:16-138:5, and that no family member or physician would be interested in placing a resident in a facility where it would be possible the resident would have to be uprooted and transferred into a new facility.  Hr'g Tr. (Carlo) 138:13-22.

**REPLY TO DEFENDANT'S ARGUMENTS**

In the Report and Recommendation, Magistrate Fox correctly applied the governing law in concluding that the Andrus was entitled to preliminary injunctive relief. Indeed, the legal principles and standards governing the evidentiary hearing, and ultimately the

disposition of the Andrus' preliminary injunction motion, were succinctly framed in Magistrate Judge Fox's prior Report and Recommendation dated June 25, 2008.   First Report and Recommendation, 5-6.  Since the defendant did <u>not</u> object to that aspect of the First Report and Recommendation, defendant is barred from now contesting those legal principles and standards. <u>Frank</u> v. <u>Johnson</u>, 968 F.2d 298 (2d Cir.), <u>cert. denied</u>, 113 S. Ct. 825 (1992).  Moreover, Judge Stein affirmed the First Report and Recommendation action, and this is now law of the case. Nevertheless, in the Objections, defendant, besides contesting Magistrate Fox's factual findings, has disputed in part the law applied by Magistrate Judge Fox in the instant Report and Recommendation.

   In addition to relying on the waiver resulting from failing to raise these issues before, the fact that this is now law of the case, and the well-supported discussion in the Report and Recommendation, we note below a number of erroneous legal arguments being advanced in the Objections.

## I.  <u>Inadequacy of Generalized Notice</u>

   The defendant repeats the argument that, regardless of the actual notice given to the Andrus, the generalized notice of the Berger Commission's existence provided to the Andrus and every other hospital and nursing home in New York State by the mere passage of the Enabling Legislation, is constitutionally sufficient as a matter of law, and that the Andrus was not entitled to any particularized notice that it had been targeted for closure or of the reasons it was being considered for closure.   Objections, 16-17.  This identical argument was also presented on the defendant's motion for summary judgment to Judge Brieant, and was effectively rejected by the Court when it denied the motion.  <u>See</u> Memorandum and Order, March 10, 2008.  Under the doctrine of law of the case, defendant should be precluded from re-litigating this point a second time.

The law of the case doctrine discourages reconsideration of issues that have been already decided either directly or by necessary implication.  See Catanzano by Catanzano v. Wing, 103 F.3d 223, 230-31 (2d Cir. 1996).  Under this doctrine, an issue previously decided in an action may only be revisited when there has been an intervening change in controlling law, when there is new evidence, or when necessary to correct a clear error of law or to prevent manifest injustice.  Id. at 321, fn.5.  None of these circumstances are present here.

Rather, the defendant has relied on the same cases and the same flawed reasoning that he cited in support of his summary judgment motion.  He cannot point to any "new evidence" presented at the preliminary injunction hearing to justify reconsideration of that argument.  Indeed, the enactment of the Enabling Legislation was never disputed on the prior summary judgment motion, nor disputed on this motion.  If defendant's legal position were sustained by Judge Brieant, the Court could have granted summary judgment in part on the procedural due process claim because, on the defendant's generalized notice theory, there were no issues of fact in dispute.  The Court nevertheless denied summary judgment on that claim, finding material issues of fact and, therefore necessarily, rejecting the purely legal contention that the generalized notice sufficed.  Nor can defendant demonstrate that there has been a change in controlling law or clear error of law, or that abiding by Judge Brieant's decision would result in any manifest injustice.

In the First Report and Recommendation dated June 25, 2008, Magistrate Judge Fox found that if the Andrus could provide evidence to support its contentions that it was told that the purpose of the only meeting between the Andrus and any representative of the Berger Commission was to tell its "good story" and that it received no other notice that it was being targeted for closure, it would be able to demonstrate that it had not been provided with notice and opportunity for a hearing as required by procedural due process.  First Report and

Recommendation, 6. The defendant failed to object to this point and the First Report and Recommendation was adopted in full by Judge Stein. As such, this has become law of the case and the defendant should be precluded from objecting to these legal conclusions.

Even if this argument had not been raised and rejected previously, it must still fail, as it is contrary to the established law regarding notice under due process. For any opportunity to be heard to be truly meaningful, an individual or entity must be given notice that it is being subjected to adverse action and will need to defend itself in a hearing or otherwise. Absent such notice, the opportunity for a hearing has "little reality or worth". Mullane v. Central Hanover Bank & Trust Co., 339 U.S. 306, 314 (1950). See Brody v. Village of Port Chester, 434 F.3d 121, 129 (2d Cir. 2005) (finding that property owner not properly notified of the available condemnation appeals process). The Andrus was never notified that it was being considered as a candidate for closure, let alone of the purported grounds, at any time prior to receiving the Berger Commission's Final Report. Hr'g Tr. (Biddle) 202:7-23. As Magistrate Judge Fox observed, the defendant presented no evidence to contradict this testimony, or specifically the testimony that the Andrus was advised that the purpose of the one meeting held with Berger Commission representatives was to tell the facility's "good story". Report and Recommendation, 9. Moreover, other facilities were specifically informed by the Berger Commission's Executive Director that they were candidates for "rightsizing". Sandman Dep. at 247:7-14, designated and submitted as part of the Hearing Record.

On the other hand, there is no support for the notion that the mere enactment of the Enabling Legislation, endowing the Berger Commission with the power to "right size" nursing homes and hospitals, was sufficient notice to any and all potentially adversely affected facilities to satisfy due process. As its primary authority, defendant cites to Atkins v. Parker, 472

U.S. 115 (1985), a case that is clearly inapposite.[2]  There, Congress enacted an across-the-board 2% reduction in a household's earned income that may be deducted when computing eligibility for food stamps.  In upholding the sufficiency of a "generalized" notice, the Supreme Court reasoned that this reduction in benefits "does not concern the procedural fairness of individual eligibility determinations.  Rather, it involves a legislatively mandated substantive change in the scope of the entire program."  Id. at 129.

By contrast, here, the Berger Commission was not directed to make, and did not make uniform, across-the-board reductions in bed capacity that have affected all hospitals and nursing homes across the State in the same manner.  Were that the case, then arguably the enactment of such a legislative mandate would have been enough notice to all uniformly affected facilities.

Instead, the Enabling Legislation called for case-by-case, facility-specific determinations, utilizing data gathered from a number of sources and applying a host of factors for evaluating facilities on an individualized, not generalized, basis.[3]  See, e.g., Ortiz v. Eichler, 794 F.2d 889, 894 (3d Cir. 1995) (distinguishing Atkins and holding that mere generalized notice inadequate where "the agency action challenged . . . concerns denying or terminating benefits on an individual, case-by-case basis").  Under the Berger Commission legislative framework, it is critical to due process that any facility facing possible closure – and the consequent deprivation

---

[2]    Defendant also cites to St. Joseph Hospital of Cheektowaga v. Novello, 43 A.D.3d 139, 148 (4th Dep't 2007) in support of this generalized notice theory.  However, the St. Joseph Hospital case also includes a vigorous dissent, and was never decided by the Court of Appeals.  See lv. to appeal denied, 10 N.Y.3d 702 (2008).  Further, the Fourth Department's majority decision in that case is not binding on this Court and would not be binding even as to matters of State law.  See Reddington v. Staten Island Univ. Hosp., 511 F.3d 126, 133 (2d Cir. 2007).

[3]    A protected property interest such as the Andrus' right to retain its operating certificate is created and defined by state law.  Cleveland Bd. of Educ. v. Loudermill, 470 U.S. 532, 538 (1985), cert. denied, 488 U.S. 946 (1988) (citing Board of Regents v. Roth, 408 U.S. 564, 577 (1972)).

of a property interest in its operating certificate – be given specific notice of the particular grounds that are the basis for the contemplated closure, and an opportunity to show that the grounds are mistaken or inconsistent with the legislatively mandated factors. This is the very opposite of the situation in <u>Atkins</u>, where there was no beneficiary-specific evaluation of eligibility, and generalized notice was found to be sufficient.

Further, there is no merit to defendant's disingenuous argument that giving notice to the Andrus that it was being considered for closure would have meant that the facility had been "pre-judged" for closure and that it would suffer potentially "undesirable results". Objections, 18. At the outset, the Andrus is not suggesting that it, or any other targeted facility, should have been notified publicly that it was being considered for closure. In fact, according to Mr. Sandman's testimony, all of the facilities contacted by him were told that they were "facilities of interest", a fact that was communicated privately to the facilities and not published for the world to know. Hr'g Tr. (Sandman) 316:11-317:14. No contention has been made, let alone proof offered at hearing, that those facilities suffered any ill effects. Thus, it was entirely possible to give the Andrus notice and opportunity to be heard before the Berger Commission made its final determination without any untoward results. Indeed, defendant concedes that the Andrus was identified "early on" in the Commission's process, and the Berger Commission did not arrive at its final recommendations until November 2006. Affidavit of David Sandman in Support of Defendant's Motion for Summary Judgment dated July 10, 2007, ¶ 20.

At the very least, any imagined collateral consequence to giving the Andrus advance notice, however dubious, can be no worse than the result yielded by the approach that the Berger Commission did take – the Andrus was "pre-judged" to be a "facility of interest" anyway, yet was never informed of that fact or of the underlying reasons, nor provided an

opportunity to present information to rebut or correct the many erroneous assumptions about the Andrus made by the Berger Commission in reaching its closure recommendation.

Finally, defendant asserts that individualized notice and hearing to those facilities identified for possible closure was not required because of the burden it would have placed on the State. However, that modest burden must be weighed against the drastic consequences of any potential errors if such procedures are not in place. Mathews v. Eldridge, 424 U.S. 319, 335 (1976). With a health care facility having to surrender its operating certificate, shutter its operations, and cease caring for its infirm residents and transferring them elsewhere based on a closure recommendation, the stakes could not be higher. Thus, when weighed against the impact of a closure recommendation – the loss of a substantial property interest – coupled with the risk of an erroneous deprivation resulting from an ill-considered recommendation to close based on erroneous information – as occurred in this case – the burden would be minimal indeed to notify those facilities of the contemplated closure and of the reasons, and to give them a meaningful opportunity to correct any mistaken assumptions about its operations, before the Berger Commission took such drastic action.

Defendant nevertheless argues that the "Andrus, like all other facilities in the State, had frequent opportunities to influence the Commission process, including with respect to the very errors it now claims the Commission made." Objections, 18-19. This assertion is made even though it is a record fact that the Andrus was never notified of the erroneous information given to or developed by the Berger Commission. Defendant then faults the Andrus for not having participated in the Berger Commission's public hearings nor for asking the Commission to visit the Andrus or evaluate its residents. This "blame the victim" defense is unavailing. To reiterate, the Andrus was never notified that closure was being contemplated, let alone the purported grounds for closure, at any time prior to receiving the Berger Commission's Final Report.

-16-

Likewise, at the June 2006 meeting, the RAC did not let the Andrus know of the contemplated closure of its nursing home and the grounds.  But even if for argument's sake that meeting were somehow sufficient notice -- and as Magistrate Fox found based on the uncontroverted hearing testimony, it clearly was not -- it did not give the Andrus a chance to address the Berger Commission at the public hearings.  That is because all of the Berger Commission hearings had taken place in the early part of 2006 and were concluded by the time the RAC met with the Andrus in June 2006.  Needless to say, to be meaningful, the notice must precede the opportunity to be heard, and not vice versa.

## II.    <u>Materiality of Errors</u>

In his objections, defendant asserts that any mistakes made in the Final Report are not material, and thus do not support the Andrus' due process claims.  This contention is without basis.  Contrary to defendant's assertion, the Andrus at the hearing demonstrated that the Final Report is replete with multiple, and material, errors regarding the Andrus – with respect to the very factors it was statutorily mandated to consider.

As Magistrate Fox correctly concluded, the errors demonstrated by the Andrus relate precisely to the factors the Berger Commission was required by statute to consider, namely the financial condition of the facility, the suitability to conversion to other uses, and the extent to which the facility serves the health care needs of the region.  In concluding that the Andrus was likely to prevail on its substantive due process claim, Magistrate Judge Fox found that "[t]he errors upon which the Berger Commission based its recommendations were conscience-shocking because they involved the very factors that the Enabling Legislation explicitly mandated the Berger Commission had considered."  The Report and Recommendation continued:

> The Berger Commission was to consider, among other factors, the financial status of the nursing homes, the feasibility of conversion of the facilities to other uses, and facility occupancy.

> *See* Enabling Legislation § 5. The Andrus presented credible testimony that the Berger Commission Report contained inaccuracies related to the Andrus' operating surplus in 2005 and 2006, its history of deficiencies, the number of beds available for use, the condition of its physical facility, and the feasibility of converting it to an assisted living facility. (Tr. 181, 186, 211-15.) None of this information was contradicted or rebutted by Defendant at the hearing held on June 25 and 26, 2008 before this Court.

Report and Recommendation, 24.

Indeed, defendant's own witness admitted that these mistaken facts formed the basis of the Commission's recommendation to close the Andrus' nursing home. See Deposition of David Sandman, 152:6-13, designated and submitted as part of the Hearing Record. If defendant's argument were accepted, it would mean that the Berger Commission would be free to make closure recommendations, which would have the force of law, without regard to the facts or the statutorily mandated factors, and also be immunized from any material mistakes. Such a flawed view, where a facility could be deprived of its property interest in its operating certificate without any factual or legal justification, does not comport with the settled law of substantive due process. Wantanabe Realty Corp. v. City of New York, 315 F. Supp. 2d 375, 393-4 (S.D.N.Y. 2003) (denying motion to dismiss substantive due process claim that municipality's demolition of plaintiff's roller coaster lacked justification, where, in deciding to order the demolition, municipal official admittedly relied on the factual determination of an engineer known to be unqualified to evaluate it for structural integrity).

In this regard, we note that in the Berger Commission Final Report, the Andrus was allegedly cited for 26 survey deficiencies by the Department of Health in 2005. The defendant's own witness, the Berger Commission's Executive Director, admitted that the number of 2005 survey deficiencies was 14, not 26. Hr'g Tr. (Sandman) 313:20-25. The count of 14 survey deficiencies represents the actual number of deficiencies cited in the Statement of

Deficiencies, the same method that the Department of Health utilizes to count deficiencies. Hr'g Tr. (Carlo) 132:15-18. Sharon Carlo, an expert in nursing home regulation and administration and a former Department of Health official, testified that the number of deficiencies alone is not the best indicator of the quality of care provided by a facility, as both <u>severity</u> and <u>scope</u> of any deficiencies must be considered. Hr'g Tr. (Carlo) 129:8-14. The scope of a deficiency can range from isolated to widespread, Hr'g Tr. (Carlo) 124:15-21, and the severity ranges from no harm to immediate jeopardy. Hr'g Tr. (Carlo) 124:24-125-5.

As Ms. Carlo testified, a more comprehensive picture of the quality of care at a facility can be provided by considering both the severity and scope of deficiencies, rather than their raw number. However, the methodology being defended by the defendant does not actually measure or in any way reliably correlate with quality of care. That approach involves counting "human figure graphics" from a summary provided to the public by the Department of Health on its webpage. Objections, 6. These figures represent only one of two "matrix" for determining the level of survey deficiencies – the scope of the deficiency. Thus, using defendant's "human figure graphics" as a proxy for quality of care, a facility which causes actual harm to a small number of residents would rank higher in quality care than a facility which did not harm any residents, but had a widespread problem regarding, for example, the physical plant or other environmental issues. This is patently irrational, and further supports the Magistrate's finding that the Andrus has demonstrated a likelihood of success on its substantive due process claim based on this error along with the many other errors documented in the hearing record.

As Magistrate Fox found, the other errors contained in the Final Report were multiple and material, and are a matter of record evidence. Report and Recommendation, 24. Further, he noted that these errors "involved the very factors that the Enabling Legislation explicitly mandated that the Berger Commission consider." Report and Recommendation, 24.

The Magistrate Judge also noted that the defendant had not contradicted any of this evidence regarding these inaccuracies.  Report and Recommendation, 24.  Not surprisingly, the defendant has not cited to anything in the record to support the fiction that the Final Report was error-free or that the errors were somehow not material.

## III.    Showing of Irreparable Harm

Defendant contends – without a single citation to the record or to the law  – that the Andrus has not demonstrated that it will suffer irreparable harm if an amended operating certificate were issued.  In contrast, both the Andrus' post-hearing submission and Magistrate Fox's Report and Recommendation cite to the ample evidence in the hearing record that the harm to the Andrus would extend beyond a mere "diminution of revenue" from the loss of "some" residents if the Andrus were forced to operate under an operating certificate with a date certain for closure.   The hearing evidence shows that the Andrus would indeed suffer a catastrophic and potentially irreversible loss of residents, revenues, and future referrals, to say nothing of the psychological toll on its residents from such grim news.  Hr'g Tr. (Carlo) 137:16- 138:22; (Biddle) 229:13-230:17.  Moreover, due to the inability of a plaintiff to obtain monetary damages from the State under the Eleventh Amendment, irreparable harm may be presumed. United States v. State of N.Y., 708 F.2d 92, 93 (2d Cir. 1983).  See Memorandum of Law in Support of Plaintiff's Motion for a Preliminary Injunction at 3-7.  It should also be noted that in the defendant's post-hearing submission, defendant conceded that the Andrus would suffer irreparable harm if forced to close.  See Defendant's Post-Hearing Memorandum of Law in Opposition to Plaintiff's Motion for a Preliminary Injunction dated July 3, 2008 at 13, n.4.

Further, defendant points to the testimony of Mark Kissinger as if it somehow demonstrates that the residents of the Andrus will not suffer any harm in the event the facility is closed.  Objections, 8.  However, Mr. Kissinger admitted that neither he, nor to his knowledge,

anyone else at the Department of Health, had evaluated the impact of transfer trauma on residents required to relocate from one care-setting to another under even Department-approved transfer and closure plans.  Hr'g Tr. (Kissinger) 161:19-24.  By contrast, as noted earlier, Dr. Nichols' testimony about the real risk of transfer trauma posed to the Andrus' residents was not credibly refuted.

On the other hand, defendant can no longer advance the sole countervailing consideration, asserted repeatedly prior to June 30, 2008, for allowing the Department of Health to "amend" the Andrus' operating certificate:    the June 30, 2008 statutory deadline for implementing the Berger Commission's recommendations.[4]

Beginning in March 2008, and continuing through June 2008, defendant invoked the June 30, 2008 implementation deadline as the primary ground for opposing full injunctive relief to the Andrus pending trial.[5]  Now that June 30, 2008 has come and gone, defendant has retreated from its prior representation that the Department of Health would or may lack the authority to implement the Berger Commission's recommendations unless defendant is allowed to amend the Andrus' operating certificate on or before June 30, 2008.  Instead, the defendant

---

[4]    Section Nine of the Enabling Legislation authorizes the defendant Commissioner of Health to implement the Berger Commission's recommendations.  See Part K of Chapter 58 of the Laws of 2003, as added by Section 31 of Part E of Chapter 63 of the Laws of 2005 ("Enabling Legislation"), § 9.  However, Section Eleven of the Enabling Legislation contains a sunset clause, providing that "sections nine and ten [relating to severability] of this act shall expire and be deemed repealed June 30, 2008."  Id., § 11.

[5]    See Letter from John Gasior, Assistant Attorney General, to Hon. Charles Brieant, United States District Court Judge (Mar. 13, 2008); Tr. 4:3-8, 5:3-8 (Mar. 28, 2008); Letter from John Gasior, Assistant Attorney General, to Hon. Charles Brieant, United States District Court Judge (Apr. 22, 2008); Benjamin Aff. in Opp'n to Pl.'s Mot. for a Prelim. Inj. (May 1, 2008) ¶ 3, 16; Gasior Aff. in Opp'n to Pl.'s Mot. for a Prelim. Inj. (May 1, 2008) ¶ 6-7; Def.'s Mem. of Law in Opp'n to Pl.'s Mot. for a Prelim. Inj. 6, 10, 32 (May 1, 2008); Letter from John Gasior, Assistant Attorney General, to Mark Fox, Magistrate Judge (June 22, 2008); Tr. 13:5-15 (June 23, 2008); Tr. 18:7-9, 33:1-2 (June 24, 2008); Letter from John Gasior, Assistant Attorney General, to Mark Fox, Magistrate Judge (June 24, 2008); Memo. in Supp. of Def.'s Objections to Report & Recommendation (June 27, 2008), pp. 1, 7; Tr. 7:23-25; 8:1-3; 8:15-18; 10:10-19; 14:7-14 (June 27, 2008).

has claimed, in a footnote, that the Department of Health's continued authority – an issue that defendant placed squarely before the Court in opposing the Andrus' preliminary injunction motion and a TRO – is "not now before the Court." Objections, 23 n. 4.

Thus, when it has served defendant's interests tactically, the June 30, 2008 implementation deadline has been cited as the principal rationale to deny preliminary injunctive relief to the Andrus. Having been unsuccessful in modifying the temporary restraining order prior to June 30, 2008, we are now told that this issue is not relevant to this motion after all, and the Court should still limit the scope of injunctive relief granted to the Andrus. The fact remains that the statute explicitly provides that the authority to implement the Berger Commission recommendations expires and is repealed on June 30, 2008, and that date has now come and gone. The Andrus reserves its right to make a further application if necessary regarding the defendant's continued authority to implement the Berger Commission closure recommendation.

## CONCLUSION

For the foregoing reasons, as well as the reasons set forth in the Andrus' post-hearing memorandum and its papers in support of its motion for preliminary injunctive relief, Magistrate Judge Fox's Report and Recommendation should be adopted in full and the Andrus' motion, granted in all respects, and the defendant should be enjoined from taking any steps to implement the Berger Commission's recommendation to close the Andrus nursing facility, including the issuance of an amended operating certificate, pending a final determination of this action.

Dated:    New York, New York
          August 12, 2008


                              CADWALADER, WICKERSHAM & TAFT LLP



                              By: _____/s/Brian T. McGovern_____
                                        Brian T. McGovern (BM-5453)

                              Attorneys for Plaintiff
                                John E. Andrus Memorial, Inc.
                                (d/b/a Andrus on Hudson)
                              One World Financial Center
                              New York, New York  10281
                              Telephone: (212) 504-6000


Of Counsel:
  Peter G. Bergmann
  Ariel V. Gordon