UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
----------------------------------------------------------------------x
JOHN E. ANDRUS MEMORIAL, INC.
(d/b/a ANDRUS ON HUDSON),

                                         Plaintiff,

                - against -

RICHARD F. DAINES, as Commissioner of
the New York State Department of Health,

                                      Defendant.
----------------------------------------------------------------------x

07-CV-3432 (CS)

**ORDER ADOPTING IN PART
AND MODIFYING REPORT
AND RECOMMENDATION**

Appearances:

Peter G. Bergmann, Esq.
Brian T. McGovern, Esq.
Ariel V. Gordon, Esq.
Cadwalader, Wickersham & Taft LLP
New York, NY
*Counsel for Plaintiff*

John P. Gasior, Esq.
Barbara K. Hathaway, Esq.
Office of the Attorney General, New York State
New York, NY
*Counsel for Defendant*

Seibel, J.

      Before the Court are the Objections of Defendant Richard F. Daines, Commissioner of

the New York State Department of Health ("DOH"), to a Report and Recommendation of the

Honorable Mark D. Fox, United States Magistrate Judge, issued on July 17, 2008 (the "R&R").

(Doc. 51.)  Judge Fox recommended that the Motion for Preliminary Injunction (Doc. 25) filed

by Plaintiff John E. Andrus Memorial, Inc., a nursing home in the Village of Hastings-on-

Hudson, New York, doing business as Andrus-on-Hudson (the "Andrus"), be granted, thereby

prohibiting Defendant from implementing the recommendation of the New York State
Commission on Healthcare Facilities in the 21st Century (the "Commission"), which would
require the Andrus to cease operating as a nursing home or to operate as an assisted living
facility.

A preliminary injunction hearing was held before Judge Fox on June 25 and 26, 2008.
He heard testimony from six witnesses: (1) Dr. Jeffrey Nichols, a geriatrician and Plaintiff's
medical expert on dementia and transfer trauma among nursing home residents; (2) Sharon
Carlo, a consultant to nursing homes in New York State and former DOH employee and nursing
home administrator; (3) Mark Kissinger, a member of the Commission; (4) Neil Benjamin, New
York State DOH Director of the Division of Health Facility Planning; (5) Betsy Biddle,
Executive Director of the Andrus; and (6) David Sandman, the Executive Director of the
Commission.  At the hearing, portions of the depositions of Mr. Kissinger, Mr. Benjamin and
Mr. Sandman were admitted into evidence pursuant to Rule 32 of the Federal Rules of Civil
Procedure.  (Hr'g Tr. 282:4-20, June 25-26, 2008.)  Defendants submitted additional portions of
these depositions to the Court on June 30, 2008.  Judge Fox issued the R&R on July 17, 2008,
recommending that Plaintiff's Motion for a Preliminary Injunction be granted.  Defendant filed
timely Objections to the R&R on July 29, 2008 ("Def's Objs.") (Doc. 54), and Plaintiff filed a
Response to Defendant's Objections on August 12, 2008 ("Pl.'s Resp.") (Doc. 56).

After carefully reviewing Defendant's Objections, the Response thereto, the affidavits
submitted by the parties, the transcripts of the preliminary injunction hearing, the deposition
excerpts, and the memoranda of law filed by the parties both before and after the preliminary

injunction hearing,[1] the Court adopts the R&R to the extent that is consistent with this Order and grants Plaintiff's Motion for a Preliminary Injunction.  Familiarity with the procedural history and facts as set forth in detail in the R&R is presumed.  To the extent that Defendant objects to Judge Fox's findings of fact and conclusions of law stated therein, this Opinion sets forth the Court's independent findings of fact and conclusions of law in accordance with Rule 52(a) of the Federal Rules of Civil Procedure.

## I.      BACKGROUND

In April 2005, the New York State Legislature passed, and then-Governor George E. Pataki signed, legislation creating the Commission.  *See* Part K of Chapter 58 of the Laws of 2003, as added by Section 31 of Part E of Chapter 63 of the Laws of 2005, 2005 N.Y. Sess. Laws Ch.63, § 31 (McKinney) (the "Enabling Legislation").[2]  The Commission was created for the purpose of conducting:

> [A] rational, independent review of health care capacity and resources in the state to ensure that the regional and local supply of general hospital and nursing home facilities is best configured to appropriately respond to community needs for quality, affordable and accessible care, with meaningful efficiencies in delivery and financing that promote infrastructure stability.

---

[1] In addition to Defendant's Objections and Plaintiff's Response, the Court has also given due consideration to Plaintiff's Memorandum of Law in Support of Plaintiff's Motion for Preliminary Injunction, filed on April 15, 2008 ("Pl.'s Mem.") (Doc. 26); Defendant's Memorandum of Law in Opposition to Plaintiff's Motion for a Preliminary Injunction, filed on May 1, 2008 ("Def.'s Opp'n") (Doc. 36); Plaintiff's Post-Hearing Memorandum of Law in Support of Plaintiff's Motion for Preliminary Injunction, filed on July 3, 2008 ("Pl.'s PH Mem.") (Doc. 49); and Defendant's Post-Hearing Memorandum of Law in Opposition to Plaintiff's Motion for a Preliminary Injunction, filed on July 3, 2008 ("Def's PH Mem.") (Doc. 48).

[2] The Enabling Legislation is also available at the Commission's website, http://www.nyhealthcarecommission.org/governing_law.htm (last visited Feb. 27, 2009).

Enabling Legislation § 1.  The Commission itself consisted of eighteen statewide members and regional members from six regions in New York State, *id*. § 7(a), one of which was the Hudson Valley region in which the Andrus is located, *id*. § (7)(b)(iii).

The Enabling Legislation required the Commission to "develop recommendations for reconfiguring the state's general hospital and nursing home bed supply to align bed supply to regional needs," and specifically to "make recommendations relating to facilities to be closed and facilities to be resized, consolidated, converted or restructured" and to transmit such recommendations to the Governor and Legislature by December 1, 2006.  *Id*. § 8(a)-(b), (e).  In making these recommendations, the Commission was required to consider a detailed set of factors, *id*. § (5)(a), and to analyze these factors in light of information provided to the Commission by the DOH, *id*. § 5(b).  In order to further the Commission's information-gathering capabilities and access to regional input, the Enabling Legislation also established regional advisory committees ("RACs") for each of the six regions.  *Id*. § (7)(c).  The RACs were charged with the task of "develop[ing] recommendations for reconfiguring its region's general hospital and nursing home bed supply to align bed supply with regional and local needs."  *Id*. § (7)(d).  In carrying out this task, the Enabling Legislation provided that the RACs "shall foster discussions among, and conduct formal public hearings with requisite public notice to solicit input from, local stakeholder interests, including but not limited to community-based organizations, health care providers, labor unions, payers, businesses and consumers."  *Id.*  The Commission was directed to "collaborate with the [RACs] insofar as practicable to foster discussions among, and conduct formal public hearings with requisite public notice to solicit input from, statewide and

regional stakeholder interests, including but not limited to community-based organizations, health care providers, labor unions, payers, businesses and consumers." *Id.* § 8(a).

The Commission and RACs conducted nineteen public hearings statewide, including three in the Hudson Valley Region on February 15, 2006, February 22, 2006, and March 1, 2006, respectively (the "Public Hearings"). (Hr'g Tr. 293:1-294:17.) Prior to each of these public hearings, the Hudson Valley RAC circulated a document entitled "Opportunity to Comment - Notice of Public Hearings" to various interested stakeholders, including healthcare facilities within the Hudson Valley Region (the "Public Notices"). (Hr'g Tr. 294:7-296:14; Def.'s Exs. F, G.) The Public Notices provided general information regarding the Commission's purpose and structure and invited oral testimony regarding (1) "[t]he misalignment between the supply of services and the needs of the community"; (2) "[s]pecific local changes regarding regional nursing home and hospital bed supply in order to better align the supply of services with local needs"; (3) "[n]eccessary investments to carry out such alignments"; and (4) "[t]imeline in which the aforementioned steps should be taken." (Def.'s Exs. F, G.) The Public Notices provided a list of speakers who had registered in advance, but they did not identify the specific subject matter of the speakers' testimony or whether any particular facilities would be discussed. (Hr'g Tr. 302:3-9.) As was the general practice across all regions (Hr'g Tr. 319:1-5), the Hudson Valley RAC explicitly provided in the Public Notices that only one representative per organization would be permitted to testify for a maximum of ten minutes at the Public Hearings. (Def.'s Exs. F, G.)

Betsy Biddle, the Executive Director of the Andrus, did not recall ever receiving the Public Notices (Hr'g Tr. 256:11-258:22), and no specific notice was given to the Andrus in

advance of the Public Hearings that the Andrus would be discussed or that the Andrus was being considered for closure.  (*Id*. 201:2-8, 209:19-210:6.)  Such notice may not have been possible because neither the Hudson Valley RAC nor the Commission was necessarily aware, at the time of the Public Hearings, of which facilities were preliminarily targeted for closure.  (Hr'g Tr. 303:18-304:1.)  The Andrus did not participate in any of the Public Hearings.  (Sandman Aff. ¶ 18.)

Ms. Biddle had her first interaction with the Commission in May 2006, when she received a phone call from Mark Ustin, the Deputy Director and General Counsel of the Commission.  (Hr'g Tr. 201:2-11, 255:6-8; Sandman Dep. 85:8.)  During their telephone conversation, Mr. Ustin asked Ms. Biddle "about how Andrus was doing," and Ms. Biddle informed him that the resident census at the Andrus "had gone from 72 to . . . 160 something people" and that the facility "had been financially viable for the first time [in 2005] and [was] continuing to have good results [in 2006]."  (Hr'g Tr. 201:12-20.)  Mr. Ustin then asked Ms. Biddle "to come to the [Hudson Valley] RAC . . . and tell [her] good story."  (*Id*. 201:21-22, 203:11-13.)  Mr. Ustin told Ms. Biddle that she had "such a good story to tell about [the Andrus's] occupancy and about [its] financial situation, that [she] should come and tell the [Hudson Valley] RAC about what's going on."  (*Id*. 249:17-24.)

Members of the Hudson Valley RAC and Commission staff met with Ms. Biddle on June 19, 2006.  (*Id*. 202:1-3.)  None of the staff of the Hudson Valley RAC or the Commission participating in the meeting told the Andrus that it was being considered for closure.  (*Id*. 202:24-203:10.)  Instead, Ms. Biddle and the members of the Hudson Valley RAC discussed the "whole history" of the Andrus, including (1) a failed joint venture with Beth Abraham Health

Services ("Beth Abraham") -- dashed at the "eleventh hour" by the Village of Hastings-on-Hudson's denial of zoning rights in November 2001 -- which, with the construction of additional facilities on Andrus's campus, would have converted the 247 nursing home beds the Andrus was then certified to operate into a continuing care retirement community with 72 nursing home beds and 201 beds total (*Id.* 193:13-195:10, 203:2-6); (2) the Andrus's positive resident census and financial trends since resuming admissions that were temporarily suspended in 2002 in anticipation of the Beth Abraham joint venture (*Id.* 180:20-22, 203:2-6; Biddle Aff. ¶ 32-33.); and (3) the Andrus's sale of 50 licensed beds to Beth Abraham by a sales agreement dated July 3, 2002 (the "Beth Abraham Sales Agreement") (Pl.'s Ex. 4) (Hr'g Tr. 180:20-22, 203:2-6; Biddle Aff. ¶ 32-33).

At the request of the Hudson Valley RAC and Commission staff attending the June 2006 meeting, Ms. Biddle sent the Meeting Chairperson, Robert W. Amler, M.D, a letter dated June 23, 2006  (Pl.'s Ex. 5), enclosing the Beth Abraham Sales Agreement and the Andrus's certified financial statements for 2005 (Pl's Ex. 6).  (Hr'g Tr. 203:16-24.)  Ms. Biddle believed that the Hudson Valley RAC asked for these materials in order to "verify" her "good story."  (*Id.* 265:13-266:22.)  This June 2006 meeting and the follow-up information sent by Ms. Biddle were the only substantive communications between the Commission or Hudson Valley RAC and representatives of the Andrus.  (*Id.* 209:24-210:6.)

On November 15, 2006, the Hudson Valley RAC issued its Final Report to the Commission (the "RAC Report") (Biddle Aff. Ex. A.), which contained specific recommendations for facilities to be closed, resized, consolidated, converted or restructured; the dates by which such actions should occur; information regarding investments necessary to

implement its recommendations; and justifications for the recommendations.  In listing the steps taken in the review process prior to issuing the RAC Report, the Hudson Valley RAC noted that it "[h]eld individual meetings with providers from facilities of interest" and "provider representatives who wanted to discuss their facilities in more detail than their public testimony allowed."  (RAC Report 3.)  The RAC Report identified the Andrus as a facility of interest and recommended that the "facility be considered for conversion to ALP beds."[3]  (RAC Report 10.) The Hudson Valley RAC based this recommendation on the Andrus's purported "low occupancy and case mix index (in 2003, 39.2% and .90, respectively)" and resulting "obvious financial problems."  (RAC Report 10.)  Referencing the June 2006 meeting with Ms. Biddle, the RAC Report noted that "the [Hudson Valley RAC] is less concerned about financial stability (since there is a large foundation underwriting [the Andrus's] capital expenditures) than about the low acuity of [the Andrus's] patients."  (RAC Report 10.)  The RAC Report was provided only to the Commission and was not public or otherwise available to the Andrus.  (Biddle Aff.  ¶ 43.)

On November 28, 2006, the Commission transmitted its final recommendations, entitled *A Plan to Stabilize and Strengthen New York's Health Care System* (the "Final Report") to the Governor and Legislature.  (Def.'s Ex. A.)[4]  In the Final Report, the Commission recommended that the Andrus downsize all "247 residential health care facility beds" that it was certified to

---

[3]  "ALP" means "Assisted Living Program."  According to the DOH's website, ALP "serves persons who are medically eligible for nursing home placement . . . in a less medically intensive, lower cost setting."  *See* http://www.health.state.ny.us/health_care/medicaid/program/longterm/alps.htm (last visited Feb. 27, 2009.)

[4]  The Final Report is also available at the Commission's website, http://www.nyhealthcarecommission.org/final_report.htm (last visited Feb. 24, 2009).

operate and replace them with 140 assisted living program beds.  (Final Report 122.)  The

Commission based its decision on the following findings: (1) that 176 of the 247 beds at the

Andrus were occupied, amounting to "71% of its certified beds, or 89% of 'available beds,'

pending a 50-bed sale to another provider"; (2) that although the Andrus "claims that it is now

operating in the black" it "had been operating at a significant loss until 2006"; (3) that the

Andrus "has one of the lowest case mix indexes in the State (0.91)" and that "about half have

low-acuity conditions," which "could be better served in an [assisted living program], if that

were available"; (4) that "the physical plant is old and in need of capital improvements"; (5) that

the conversion of the Andrus to an [assisted living program] facility "would be economical"; and

(6) that the Andrus "has a history of a high number of deficiencies (26 in its 2005 survey), many

of which are attributable to the building's deteriorating condition."  (*Id*. 123.)  Given these

findings, the Commission concluded that the closure of the Andrus presented "opportunities to

shift resources from institutions to other settings in Westchester County" where there are both

"too many nursing home beds" and "an unmet need for approximately 1,100 non-institutional

slots."  (*Id*.)  The Governor transmitted the Final Report and his approval thereof to the

Legislature on November 30, 2006, and the New York State Legislature did not pass a

concurrent resolution rejecting the Commission's recommendations prior to the end of 2006,

thereby giving the recommendations the force of law as of January 1, 2007.  Enabling

Legislation § 9(b).

       Perceiving the facility description in the Final Report to be inaccurate, representatives of

the Andrus met with the DOH in December 2006, and expressed their distress with the

Commission's final recommendation.  (Hr'g Tr. 216:20-23, 217:3-7.)  The DOH instructed that

the Andrus "wait a while," as "there [would] be further information coming out." (*Id*. 216:21-25.)  But on January 31, 2007, the DOH sent a letter to the Andrus including an implementation outline for the Commission's closure recommendation.  (*Id*. 216:2-9; Benjamin Aff. ¶ 4, Exh. B.) The Andrus requested another meeting with the DOH, which took place in February 2007.  (*Id*. 217:1-2.)  At that meeting, the DOH requested certain information from the Andrus, presumably to assess the validity of the Andrus's claims that the Final Report contained certain material errors.  (*Id*. 217:8-11.)  Accordingly, the Andrus engaged in "fact-finding" and eventually provided the DOH with additional information, including a letter dated February 28, 2008 (Pl.'s Ex. 8), explaining the risk of "transfer trauma" to the residents of the Andrus, and an email sent on April 8, 2008 (Pl.'s Ex. 7), attaching a spreadsheet containing the following information about every resident in the Andrus: (1) age; (2) length of time at the Andrus; (3) residence before moving to the Andrus; (4) proximity of family members to the facility; and (5) and whether the resident had been diagnosed as suffering from dementia.  (Hr'g Tr. 219:13-220:18.)  In total, the Andrus had five meetings with DOH officials concerning the Final Report and provided the DOH with all of the information and documents it requested.  (*Id*. 217:25-218:7.)

The DOH never followed up with the Andrus about any of the information it provided following the release of the Final Report.  (*Id*. 217:16-19.)  In April 2008, the DOH sought permission to issue the Andrus -- which currently operates under the authority of an open-ended operating certificate (*id*. 191:8-21.) -- an amended operating certificate with a fixed expiration date.  (*Id*. 228:13-16, 271:12-20; Def.'s PH Mem. 14.)

The instant lawsuit was filed on April 30, 2007, and Defendant moved for Summary Judgment on July 18, 2007 (Doc. 12).  Defendant's Summary Judgment Motion was held in

abeyance by the late United Stated District Judge Charles L. Brieant (to whom this action was previously assigned)[5] pending a decision by the New York Court of Appeals in a similar case, captioned *St. Joseph Hospital of Cheektowaga v. Novello,* No. 1247 SSD 60.  On November 27, 2007, the New York Court of Appeals dismissed the appeal as of right in *St. Joseph Hospital of Cheektowaga* "sua sponte, upon the ground that no substantial constitutional question is directly involved," 9 N.Y.3d 988 (2007), and on February 12, 2008, the Court of Appeals denied a motion for leave to appeal, 10 N.Y.3d 702 (2008).  Judge Brieant denied Defendant's Motion for Summary Judgment on March 10, 2008.  *John E. Andrus Mem'l, Inc. v. Daines*, No. 07-CV-3432, 2008 U.S. Dist. LEXIS 18189, at *10 (S.D.N.Y. Mar. 10, 2008).  Following the DOH's expression of its intention to go forward with the issuance of an amended operating certificate, Plaintiff sought a preliminary injunction preventing any steps to effectuate the closure of the Andrus.

## II.   DISCUSSION

### A.    STANDARD OF REVIEW

A district court reviewing a magistrate judge's report and recommendation "may accept, reject, or modify, in whole or in part, the findings or recommendations made by the magistrate judge." 28 U.S.C. § 636(b)(1)(C).  Where a party submits timely objections to a report and recommendation, as Defendant has here, the district court reviews the parts of the report and recommendation to which the party objected under a *de novo* standard of review.  *Id.*; Fed. R. Civ. P. 72(b)(3); *see id.* ("The district judge may accept, reject, or modify the recommended

_____

[5] Judge Brieant passed away in July 2008, and the case was reassigned to me on August 5, 2008.  (Doc. 55.)

-11-

disposition; receive further evidence; or return the matter to the magistrate judge with instructions.").

"[I]n providing for a '*de novo* determination' [in Section § 636(b)(1)] rather than *de novo* hearing, Congress intended to permit whatever reliance a district judge, in the exercise of sound judicial discretion, chose to place on a magistrate's proposed findings and recommendations." *United States v. Raddatz*, 447 U.S. 667, 676 (1980).  Accordingly, a district court's review of the record and the magistrate's recommendation on a motion for a preliminary injunction constitutes adequate *de novo* review under Section § 636(b)(1).  *Pan Am. World Airways, Inc. v. Int'l Bhd of Teamsters*, 894 F.2d 36, 40, n.3 (2d Cir. 1990) (citing *Raddatz*, 447 U.S. at 676); *see RxUSA Wholesale, Inc. v. Dep't of Health and Human Servs.*, 467 F. Supp. 2d 285, 287 (E.D.N.Y. 2006) ("Such *de novo* review does not entirely replace the Magistrate's efforts."); *M&G Elecs. Sales Corp. v. Sony Kabushiki Kaisha*, 250 F. Supp. 2d 91, 97-98 (E.D.N.Y. 2003) ("[A] court may in its sound discretion afford a degree of deference to the magistrate's report and recommendation." (citing *Raddatz*, 447 U.S. at 676)).  In light of these  principles, the Court makes a *de novo* determination with regard to the specific objections raised by Defendant.

## B.     PRELIMINARY INJUNCTION STANDARD

For this Court to issue a preliminary injunction against "government action taken in the public interest pursuant to a statutory or regulatory scheme," the Plaintiff must show "(i) irreparable harm absent the injunction and (ii) a likelihood of success on the merits." *Freedom Holdings, Inc. v. Spitzer*, 408 F.3d 112, 114 (2d Cir. 2005) (internal quotation marks omitted); *see Plaza Health Labs., Inc. v. Perales*, 878 F.2d 577, 580 (2d Cir. 1989) ("the district court should not apply the less rigorous fair-ground-for-litigation standard" in such circumstances).

C.       IRREPARABLE HARM

"Irreparable harm is the single most important prerequisite for the issuance of a preliminary injunction." *Rodriguez v. DeBuono*, 175 F.3d 227, 233-34 (2d Cir. 1999) (internal quotation marks omitted).  Accordingly, the Court must first determine whether Plaintiff has demonstrated that such injury is likely before addressing the other requirements for the issuance of an injunction. *Id*. at 234.  In the R&R, Judge Fox concluded that the Andrus established irreparable harm because (1) family members and physicians would be reluctant to place new residents in the Andrus after being informed, as required by relevant state and federal regulations, that the Andrus's operating certificate was to expire; and (2) the closure of the Andrus would place its residents at risk of transfer trauma, including behavioral disturbances, weight loss, increased risk of falls and injury, and possibly increased mortality rates.  (R&R 21.)

For the purposes of this motion only, Defendant concedes that forcing the Andrus to close would constitute irreparable injury.  (Defs. Obj. 23 n.5.)  Notwithstanding this concession, Defendant argues that the issuance of an amended operating certificate and requiring the Andrus to prepare a closure plan in anticipation of the expiration of its operating certificate would not irreparably injure Plaintiff if all further implementation of the Commission's recommendations were stayed.  (*Id*.)  Defendant claims that the diminution of revenue and potential loss of residents is insufficient to show irreparable harm because "there is no reason to conclude that the residents would react any differently to an amended certificate than they did to the original Berger Commission recommendation that the Andrus close." (*Id*. 23.)

"To establish irreparable harm, the movant must demonstrate 'an injury that is neither remote nor speculative, but actual and imminent' and that cannot be remedied by an award of

monetary damages." *Shapiro v. Cadman Towers, Inc.*, 51 F.3d 328, 332 (2d Cir. 1995) (quoting *Tucker Anthony Realty Corp. v. Schlesinger*, 888 F.2d 969, 975 (2d Cir. 1989)).  Irreparable harm exists "where a party is threatened with the loss of a business" or the loss of good will and customers, but not where the loss of goodwill was doubtful and lost profits could be compensated with money damages.  *Tom Doherty Assocs. Inc. v. Saban Entm't, Inc.*, 60 F.3d 27, 37-38 (2d Cir. 1995) (collecting cases).

Following these governing principles, Defendant's argument is contradicted by the record.  Nursing home operators are required to "post the operating certificate in a conspicuous place in its place of operation."  (Hr'g Tr. 135:5-14.)  The Andrus currently operates under the authority of an operating certificate issued in 1969 with no fixed termination date. (*Id*. 191:8-21.) It is posted on an "informational board" hanging near the entrance on the first floor of the facility, adjacent to the lobby.  (*Id*. 191:14-21.)  When an amended operating certificate is issued with a fixed termination date, the nursing home operator is required not only to post it conspicuously, but also to immediately notify all residents, their families and physicians of said termination date.  (*Id*. 135:20-136:14, 139:13-17, 228:17-229:4.)  Accordingly, it was reasonable to conclude, as Judge Fox did, and as Ms. Carlo and Ms. Biddle testified, that the issuance of an amended operating certificate with a fixed termination date would be "incredibly distressing" to the residents, and that family members and referring physicians would cease placing new residents in the Andrus once they became aware that a date certain for closure is now visible on the horizon.  (*Id*. 137:16-138:22, 229:13-230:17.)  Moreover, it would not be unreasonable to expect that current residents and their family members would begin seeking alternative placements upon notification that the preparations for closure were proceeding.  The distinction

-14-

Defendant seeks to draw between affirmatively requiring the Andrus to close, on the one hand, and issuing it an amended operating certificate and requiring it to prepare a closure plan, on the other, is not a meaningful one.  In both circumstances, it is reasonable to conclude that new admissions are likely to stop and that family members will seek to place existing residents at alternative facilities of their choosing, thereby dashing the goodwill the Andrus has established in its forty years of operation, placing the Andrus in financial peril that cannot be remedied by monetary damages,[6] and rendering any relief that may ultimately be granted by this Court meaningless.[7]

With respect to transfer trauma, Defendant argues that the Andrus "lacks standing" to raise the risk of danger to its residents imposed by transfer to a new facility and that the hearing evidence on that subject is "completely speculative" because Dr. Nichols did not evaluate individual Andrus residents.  (Defs. Obj. 23-24.)  With respect to the legal objection, the Court agrees with Judge Fox's conclusions that Defendant's standing argument, which relies on *O'Bannon v. Town Court Nursing Ctr.*, 447 U.S. 773 (1980), is misplaced, and that it is appropriate to consider transfer trauma as a source of irreparable harm in the context of a motion

---

[6]  Plaintiff is unable to collect a judgment for monetary damages in this action because Defendant is a state official entitled to sovereign immunity under the Eleventh Amendment.  *See Tenn. Student Assistance Corp. v. Hood*, 541 U.S. 440, 446 (2004).  Thus, in addition to the actual and imminent harms established by the record, irreparable harm may be presumed here because the only relief available to the Andrus is injunctive.  *See United States v. State of New York*, 708 F.2d 92, 93 (2d Cir. 1983).

[7]  For similar reasons, an amended operating certificate with an expiration date, and the implementation of a closure plan, are for more concrete steps toward closure on a date certain than was the Commission's initial recommendation, so residents, families, physicians and other referral sources are much more likely to react adversely to those actions than to the initial recommendation.

for a preliminary injunction to enjoin the closure of a nursing home.  In *O'Bannon*, the Supreme

Court held that residents of a nursing home did not have standing to challenge the government's

decertification of the facility at issue from the Medicare program without first granting the

residents a hearing.  *Id*. at 789-90.  Thus, while *O'Bannon* establishes that nursing home

residents do not have standing to assert a due process cause of action based on the risk of transfer

trauma caused by the federal or state government requiring a facility to close involuntarily; it

does not prevent a Court from considering transfer trauma in evaluating irreparable harm for the

purposes of determining whether to grant a nursing facility's motion for a preliminary injunction.

*See Mediplex, Inc. v. Shalala*, 39 F. Supp. 2d 88, 98-99 (D. Mass. 1999) (skilled nursing facility

may assert harm to residents as irreparable harm for purpose of preliminary injunction enjoining

federal government from terminating facility's status under Medicare and Medicaid programs

because facility had interest in protecting health of its residents); *Libbie Rehab. Ctr. v. Shalala,*

26 F. Supp. 2d 128, 132-33 (D.D.C. 1998) ("the likelihood of irreparable injury in dislocating

the residents of [the facility] is clear" and therefore it was "in the public interest that such an

injunction should issue"); *Int'l Long Term Care v. Shalala*, 947 F. Supp. 15, 20 (D.D.C. 1996)

(harm to nursing facility's residents relevant to irreparable harm determination); *see also*

*Schwartzberg v. Califano*, 453 F. Supp. 1042, 1047 (S.D.N.Y. 1978) (considering risk of transfer

trauma, but holding it was outweighed by danger to residents' health and safety imposed by

substandard care at facility).

　　　　With respect to the factual objection, the Court agrees with and defers to Judge Fox's

determination that the evidence establishes that the Andrus's residents would be irreparably

harmed if forced to relocate to a new facility.  Dr. Jeffrey Nichols, Plaintiff's medical expert,

testified that residents suffering from dementia are particularly susceptible to the phenomenon commonly known as "transfer trauma," which is cognitive and functional decline -- including behavioral disturbances, weight loss, an increased risk of falls and injury, and potentially increased morbidity and mortality -- when they are moved from one facility to another.  (Hr'g Tr. 63:10-11, 68:9-15, 74:11-19.)  After reviewing the then most-recent progress notes and psychiatric consultations on approximately forty residents and the Andrus's general facility statistics (*id*. 74:25-75:2), and touring the facility (*id*. 76:1-2), Dr. Nichols testified that it is his "professional belief" that seventy to eighty percent of the long-term care residents at the Andrus would suffer harm from the facility's closure and their subsequent transfer to a new facility (*id*. 78:19-79:8).

The argument that this evidence is "completely speculative" (Def.'s Objs. 24) is without merit, as the Court has no reason to doubt that Dr. Nichols, an expert in the field of geriatric medicine, fairly described the transfer trauma phenomenon, and the evidence establishes that the Andrus's population is particularly vulnerable as 115 of its 196 residents suffer from dementia. (Biddle Aff. ¶¶ 11, 21.)  Defendant has not refuted this vulnerability.  Moreover, although the Commission acknowledged receipt of information submitted by the Andrus regarding the risk of transfer trauma to its residents posed by the closure recommendation, it "did not look at . . . the particulars behind the letter" (*id*. 165:16-20), "never quantified transfer trauma in any way" in its review process  (Sandman Dep. 271:3-4), and did not conduct a review to determine whether residents at the Andrus suffering from dementia could be appropriately placed in an alternative facility (Kissinger Dep. 148:22-149:8).

On this record, the Court adopts Judge Fox's recommendation that the harm the Andrus would suffer if forced to notify its constituents of an expiring operating certificate, and the transfer trauma its residents would suffer if forced to relocate after the operating certificate expired, constitute harm that is neither remote nor speculative, but actual and imminent, and thus that Plaintiff has established irreparable harm.

### D.     LIKELIHOOD OF SUCCESS ON THE MERITS

Having determined that Plaintiff has established irreparable harm, the Court now turns to Plaintiff's likelihood of success on the merits of its procedural due process and substantive due process claims.  As a threshold matter, the Court must resolve the Parties' dispute over Plaintiff's burden.  Typically, in order to establish a likelihood of success on the merits, the movant must show that its chance of prevailing is greater than fifty percent.  *Abdul Wali v. Coughlin*, 754 F.2d 1015, 1025 (2d Cir. 1985). "[C]onsiderable room for doubt" may remain.  *Id*. A heightened "substantial likelihood of success" showing is required, however, where the preliminary injunction would grant substantially all of the relief sought in the complaint.  *Id*. at 1026; *Eng v. Smith*, 849 F.2d 80, 82 (2d Cir. 1988).  The heightened standard is justified only where "the effect of the order, once complied with, cannot be undone."  *Tom Doherty Assocs.*, 60 F.3d at 35.  Accordingly, the Court rejects Defendant's argument that the heightened standard should be applied here (Def's Opp'n 12), because the effect of a preliminary injunction enjoining closure or conversion to an assisted living facility can be undone at a later point.

### 1.     Procedural Due Process Claim

The Due Process Clause of the Fourteenth Amendment prohibits the States from depriving any person of property without "due process of law."  "From these cryptic and abstract

words" the Supreme Court has instructed that "individuals whose property interests are at stake are entitled to notice and an opportunity to be heard." *Dusenbery v. United States*, 534 U.S. 161, 167 (2002) (internal quotation marks and citations omitted).  Defendant does not dispute that the Andrus has a constitutionally protected property interest in its operating certificate.  *See St. Joseph Hosp. of Cheektowaga v. Novello*, 840 N.Y.S.2d 263, 267 (N.Y. App. Div. 2007) (hospital had protected property interest in its operating certificate).  Thus, the issue before the Court is whether the Andrus received adequate notice and an opportunity to be heard prior to the Commission's recommendation that the Andrus's operating certificate be revoked.

### a.      Notice and Opportunity to be Heard

In the R&R, Judge Fox concluded that the Andrus has a substantial likelihood of success on the merits of its procedural due process claim.  (R&R 24.)  Judge Fox based his recommendation on the conclusions that (1) the Andrus was not given notice that it was targeted for closure; and (2) the Andrus did not receive a meaningful opportunity to be heard in light of the procedures used by the Commission, as evidenced by the numerous inaccuracies in the Final Report regarding the Andrus's financial viability, occupancy, and record of deficiencies; the suitability of an assisted living program for the Andrus's low acuity residents; and the efficiency of converting the facility to an assisted living facility.  *Id.*

Defendant objects to the R&R on the grounds that the Andrus was not entitled to individualized notice that its operating license was subject to revocation under established principles of constitutional due process governing governmental actions affecting a large number of individuals or entities.  (Def.'s Objs. 16-18.)  As for the Andrus's opportunity to be heard, Defendant objects to the R&R on the grounds that (1) the Public Notices, the Public Hearings

and the June 2006 meeting between the Hudson Valley RAC and Ms. Biddle provided the

Andrus with all the process it was due given the administrative burden faced by the Commission;

and (2) Judge Fox's finding that the Final Report contained material errors and that Defendant

did not counter Plaintiff's claims of error "are simply wrong."  (*Id.* 20.)

Relying on *Atkins v. Parker*, 472 U.S. 115, 129-31 (1985), Defendant argues that due

process did not require the Commission to provide the Andrus with individualized notice that the

Commission was considering revoking its operating license because the Enabling Legislation

made clear that the Commission was reviewing "every hospital and nursing home in the State . . .

with an eye toward closing or restructuring." (Def.'s Objs. 17.)[8] Defendant fails to appreciate

that generalized notice by operation of law is only sufficient where the deprivation in question

"involves a legislatively mandated substantive change in the scope of the entire program."

*Atkins*, 472 U.S. at 129.  In *Atkins*, the Supreme Court held that generalized notice mailed to over

16,000 food-stamp recipients advising them of a change in federal law that might have resulted

in either a reduction or a termination of their food stamp benefits did not violate the recipients'

procedural due process rights.  *Id.* at 117.  The Supreme Court reasoned that the recipients were

not entitled to advance notice of the statute's "specific impact" on their entitlement to food

stamps because their benefits were reduced or terminated based on a "mass change" and did "not

---

[8]  Plaintiff argues that the law of the case doctrine precludes my consideration of
Defendant's argument that the Andrus was not entitled to any particularized notice that it had
been targeted for closure.  (Pl.'s Opp'n 11-13.)  In light of my substantive resolution of the issue,
I need not address this argument, except to note that the law of the case doctrine is discretionary
and "where the prior decision was made by a different judge, the principle 'generally does not
limit a court's discretion to reconsider the issue.'"  *Steinborn v. Daiwa Secs. Am.*, No.
92-CV-782, 1995 U.S. Dist. LEXIS 19165, at *2 n.1 (S.D.N.Y. Dec. 26, 1995) (quoting *Liona
Corp. v. PCH Assocs.*, 949 F.2d 585, 592 (2d Cir. 1991)).

concern the procedural fairness of individual eligibility determinations." *Id*. at 127-29.

Accordingly, courts interpreting *Atkins* have held that where the legislation at issue calls for

individualized determinations rather than an "across-the-board change," then "particularized

notice" is required. *Youakim v. McDonald*, 71 F.3d 1274, 1290-91 (7th Cir. 1995) (due process

required governmental agency to provide recipients of foster care benefits opportunity to

establish eligibility under new standards before benefits were eliminated); *accord Ortiz v.*

*Eichler*, 794 F.2d 889, 894 (3d Cir. 1986) (generalized notice inadequate where "[t]he agency

action challenged . . . concerns denying or terminating benefits on an individual, case-by-case

basis.")

   Here, the Enabling Legislation specifically directed the Commission to consider the

following set of factors in reaching its final recommendations:

> (i) the need for capacity in the hospital and nursing home systems in each region of the state;
>
> (ii) the capacity currently existing in such systems in each region of the state;
>
> (iii) the economic impact of right sizing actions on the state, regional and local economies, including the capacity of the health care system to provide employment or training to health care workers affected by such actions;
>
> (iv) the amount of capital debt being carried by general hospitals and nursing homes, and the nature of the bonding and credit enhancement, if any, supporting such debt, and the financial status of general hospitals and nursing homes, including revenues from Medicare, Medicaid, other government funds, and private third-party payors;
>
> (v) the availability of alternative sources of funding with regard to the capital debt of affected facilities and a plan for paying or retiring any outstanding bonds in accordance with the contract with bondholders;
>
> (vi) the existence of other health care services in the affected region, including the availability of services for the uninsured and underinsured, and including services provided other than by general hospitals and nursing homes;

(vii) the potential conversion of facilities or current facility capacity for uses other than as inpatient or residential health care facilities;

(viii) the extent to which a facility serves the health care needs of the region, including serving Medicaid recipients, the uninsured, and underserved communities; and

(ix) the potential for improved quality of care and the redirection of resources from supporting excess capacity toward reinvestment into productive health care purposes, and the extent to which the actions recommended by the commission would result in greater stability and efficiency in the delivery of needed health care services for a community.

Enabling Legislation § 5(a).  These factors clearly required the Commission to make individual, facility-specific determinations.  Indeed, Mr. Sandman, the Executive Director of the Berger Commission, testified that the Commission's "mandate was to make *facility-specific* recommendations for reform in the form of right-sizing."  (Hr'g Tr. 287:8-13 (emphasis added).)  Thus, *Atkins* is distinguishable because this is not a case involving across-the-board mass change, and thus the mere enactment of the Enabling Legislation is insufficient in itself to satisfy the notice requirements of procedural due process.[9]  Further, as discussed below, general notice of the existence of the statute would not provide information regarding the grounds for the Commission's contemplated action as to a particular facility.

Having established that notice by operation of law is inapplicable and that individualized notice was required, the Court must next determine whether the method of notice actually used by the Commission satisfied the "straightforward test of reasonableness under the circumstances." *Dusenbery*, 534 U.S. at 167.  "An elementary and fundamental requirement of

---

[9]  Although the Court's legal conclusions are reached independently, it should be noted that Defendant conceded at the preliminary injunction hearing that the attention the Commission received in the press was "[n]ot by itself" sufficient specific notice to the Andrus in order to satisfy the requirements of procedural due process.  (Hr'g Tr. 291:18-25.)

due process in any proceeding which is to be accorded finality is notice reasonably calculated, under all the circumstances, to apprise interested parties of the pendency of the action and afford them an opportunity to present their objections." *Mullane v. Cent. Hanover Bank*, 339 U.S. 306, 314 (1950).  This requirement imposes a good faith obligation on the government to employ means which amount to more than just a "gesture," but "such as one desirous of actually informing the absentee might reasonably adopt to accomplish it." *Id*. at 315; *accord Luessenhop v. Clinton County*, 466 F.3d 259, 269 (2d Cir. 2006) (discussing government's "obligation to make a good faith attempt to inform interested parties")

Under this standard, Judge Fox concluded that the Andrus was not given sufficient notice that it was a "facility of interest" being targeted for closure.  Defendant objects on the ground that there is no basis in due process jurisprudence for the Andrus's complaint that it "should have received some sort of super-notice, informing it not simply of the *pendency* of the process, but of the likelihood of a certain *outcome*."  (Def.'s Objs. 17 (emphasis in original).)  This objection is misplaced, as it has long been established that "[t]he opportunity to present reasons, either in person or in writing, why proposed action should not be taken is a fundamental due process requirement." *Cleveland Bd. of Educ. v. Loudermill*, 470 U.S. 532, 546 (1985).  Here, the Andrus was not informed of the Commission's proposed action until after the Final Report was issued, and therefore, did not have the opportunity to present its reasons why an amended operating certificate with a fixed expiration date should not be issued.  The means of notice Defendant points to as satisfying the Commission's due process obligations are flawed for the following reasons.

-23-

First, the Public Notices were insufficient because they merely informed various healthcare constituencies in the Hudson Valley Region that the Public Hearings would be conducted.  Assuming that the Public Notices were actually sent to Ms. Biddle or another Andrus representative,[10] the Public Notices were not reasonably calculated to afford Plaintiff an opportunity to present objections because they did not even inform Plaintiff that the Andrus would be discussed, let alone that it was being considered for closure and/or of the Hudson Valley RAC's or the Commission's reasons for recommending its closure.  The record casts serious doubt on whether it would even have been possible, had the Andrus attended the Public Hearings, for it to discuss such contemplated action at the Public Hearings, as Mr. Sandman testified that neither the Hudson Valley RAC nor the Commission was necessarily aware of the facilities that were preliminarily targeted for closure at the time of the Public Hearings.  (Hr'g Tr. 303:12-25.)  Moreover, the ten minutes allotted to each speaker at the public hearings would have been insufficient for a reasonable discussion of the issues specific to the Andrus.

Second, the June 2006 meeting was insufficient to effect notice because of the misleading nature of the invitation Ms. Biddle received.   Mark Ustin, the Deputy Director and General Counsel of the Commission, represented that the purpose of the meeting was for Ms. Biddle to "come . . . and tell [her] good story" about the Andrus's positive trends in occupancy and operating surplus.  (*Id*. 201:21-22, 203:11-13, 249:17-24.)  In the circumstances, it cannot be said that this invitation was reasonably calculated to inform Ms. Biddle that the Andrus was being considered for closure sufficient to provide her with an opportunity to present a defense at

---

[10]  This fact was not clearly established at the preliminary injunction hearing.  (*See* Hr'g Tr. 256:11-258:21.)

the meeting.  To the contrary, all indications were that the Andrus's representative was appearing before the Hudson Valley RAC because the Andrus was an example of a success story.[11]  Thus, while in ordinary circumstances an invitation to appear before a RAC could conceivably constitute sufficient notice of possible closure, in the unique circumstances present here, that invitation did not suffice.  Even at the meeting, Ms. Biddle was not told that the Andrus was a "facility of interest" (Silver Aff.  ¶ 5), and therefore it is unsurprising that she "didn't have any idea" that the Andrus was being considered for closure and left the meeting "really happy" with the impression that she was "doing a great job" (Hr'g Tr. 203:7-10).

Moreover, the record establishes that the Andrus was not provided with the means of notice the Commission typically employed once a facility was identified as a candidate for closure.  If the Commission identified a facility as a candidate for "right-sizing," it was designated a "facility of interest" and additional facility-specific information was requested from the DOH Liaison.  (Sandman Dep. 46:21-47:20, 48:22-49:3.)  In addition, Mr. Sandman, the Executive Director of the Commission, testified that the Commission "made a particular point" of contacting the facilities of interest themselves to gather information at this point.  (*Id.* 51:10-23.)  Mr. Sandman recalled that the Commission contacted representatives of several facilities and informed them by phone or by mail that they "were being considered for some kind of rightsizing" and therefore the Commission was "interested in learning more about their facility."  (*Id.* 246:11-247:14; Hr'g Tr. 315:6-317:25.)  This form of notice was generally accomplished by way of "phone call to the CEO" from the chairperson of a RAC, Mr. Sandman

---

[11]  Ms. Biddle's testimony regarding the telephone call with Mr. Ustin was uncontradicted and Judge Fox found it credible.  (R&R at 9.)

himself, or the Commission's staff at Mr. Sandman's direction.  (Sandman Dep. 170:21-171:7.)
Defendant has not submitted any evidence that the Andrus was provided with any such form of
notice.  The record is clear that its contact with the Andrus, in fact, sent precisely the opposite
message.  In light of the Commission's awareness of the need to provide individual notice to
facilities of interest, and its practice of doing so, its communications with the Andrus were a
breach of its good faith obligation to employ means reasonably calculated to apprise the Andrus
of the pendency of the closure recommendation and afford Plaintiff an opportunity to present its
objections.

Although the Court appreciates that "the Government's interest, and hence that of the
public, in conserving scarce fiscal and administrative resources is a factor that must be weighed"
and that "[a]t some point the benefit of an additional safeguard to the [entity] affected . . . may be
outweighed by the cost," *Mathews v. Eldridge*, 424 U.S. 319, 348 (1976),[12] the facts adduced at

---

[12]  *Mathews* set out a three-part test for determining what process is due in a given situation:

> [I]dentification of the specific dictates of due process generally requires consideration of three distinct factors: First, the private interest that will be affected by the official action; second, the risk of an erroneous deprivation of such interest through the procedures used, and the probable value, if any, of additional or substitute procedural safeguards; and finally, the Government's interest, including the function involved and the fiscal and administrative burdens that the additional or substitute requirement would entail.

*Mathews*, 424 U.S. at 334-35.  While the *Matthews* balancing test has been passed over by the Supreme Court in favor of *Mullane*'s reasonableness test for determining the adequacy of a method used to give notice, *see Dusenbery*, 534 U.S. at 167-68, the balancing test is still instructive in assessing the procedures the Commission utilized in arriving at the decision to recommend the Andrus's closure.  Here, all three factors militate in favor of the conclusion that the Commission's process with respect to the Andrus was inadequate.  First, the private interest in avoiding closure is obviously great.  Second, the risk of erroneous deprivation and the value of additional safeguards is great, as discussed in Part II.D.1.c.  Third, as discussed in the text, the burden on the government is neither great nor more than it was willing to shoulder voluntarily

the preliminary injunction hearing suggest that the administrative burden of providing the Andrus with a meaningful opportunity to present its objections to the Commission's closure recommendation prior to the issuance of the Final Report do not nearly approach this point.  In addition to the aforementioned testimony establishing that the Commission did in fact provide other facilities with notice sufficient to provide such an opportunity, Mr. Sandman testified that he was contacted "multiple times . . . every week" by representatives of various healthcare facilities requesting an opportunity for "a more formal meeting" before the issuance of the Final Report.  (Hr'g Tr. 305:12-20.)  Specifically, regarding the now defunct Cabrini Medical Center, Mr. Sandman recalled that the Commission "had maybe a half a dozen individual meetings at their request, to discuss their facility and potential for restructuring plans and what the Commission may or may not recommend about their facility."  (*Id*. 306: 9-15.)  In light of this evidence suggesting that the Commission was willing to entertain individualized meetings with the representatives of other facilities being targeted for closure, the Court cannot conclude that providing the Andrus with meaningful notice and an opportunity to present its objections would have placed an undue fiscal or administrative burden on the Commission.  This is not to suggest that an evidentiary hearing or site visits are required.  Rather, the Court holds no more than that on these facts--where the Andrus was not even given a "heads-up," but was in fact sent the opposite message--the notice and opportunity to be heard were insufficient, and that such a "heads-up" would not have unduly burdened the Commission.

The foregoing conclusions are not disturbed by the non-binding decisions in *St. Joseph Hosp. of Cheektowaga v. Novello*, 828 N.Y.S.2d 877 (N.Y. Sup. Ct. 2007) ("*St. Joseph Hospital*

---

prior to issuing its recommendations for other health care providers.

*I*"), *aff'd as modified*, 840 N.Y.S.2d 263 ("*St. Joseph Hospital II*"), on which Defendant relies heavily in opposing Plaintiff's procedural due process claim.  In *St. Joseph Hospital I*, the Supreme Court of New York, Erie County, granted the New York State Health Commissioner's motion for summary judgment on a challenge to the facial constitutionality of the Enabling Legislation asserted by a hospital that the Commission recommended for closure.  The court found that "[e]very hospital was on notice that the Commission might recommend its closing or consolidation" and, therefore, it was "unreasonable to expect that as the Commission deliberated and certain hospitals became more likely to be affected that some sort of super notice would be required."  828 N.Y.S.2d at 885.  In *St. Joseph Hospital II*, the Appellate Division affirmed the lower court's decision on the ground that "the procedure set forth in the [Enabling] Legislation, i.e., conducting public hearings to elicit comments from all of the health care facilities and affording the health care facilities the opportunity to submit unlimited documents, was adequate and sufficient" to protect the hospital's right to due process.  840 N.Y.S.2d at 267.  The Appellate Division reasoned that the hospital was afforded all the process it was due because it was "aware of the task of the Commission" and that closure "was a possibility"; it knew of the public hearings being conducted and had in fact appeared at a RAC meeting; and it submitted various documents to the RAC.  *Id.*

The Court is not persuaded by the *St. Joseph's Hospital* cases for two reasons.  First, unlike the *St. Joseph's Hospital* cases, the Court here reviews an "as-applied" challenge to the procedures employed by the Commission, rather than a "facial challenge" to the Enabling Legislation's constitutionality, which places a more onerous burden on the plaintiff.  "In mounting a facial challenge," the plaintiff "bears the heavy burden of demonstrating that, as

written, the [legislative act] could never be applied in a manner that would afford claimants constitutionally adequate notice." *N.Y. State NOW v. Pataki*, 261 F.3d 156, 171 (2d Cir. 2001) (internal quotation marks and citations omitted).  Here, Plaintiff argues that it was not given the specific notice that was provided to other candidates for "rightsizing," and in fact was affirmatively misled.  Accordingly, I review here the manner of notice the Commission provided to the Andrus, and do not endeavor to determine the constitutionality of the Enabling Legislation in any other circumstances, including where, in the course of "foster[ing] discussions . . . to solicit input from . . . health care providers," Enabling Legislation §§ 7(d), 8(a), such health care providers were actually informed by the Commission or the RACs that they were being targeted for rightsizing and given an opportunity to object to the reasoning for such proposed action.  *See DeMichele v. Greenburgh Cent. Sch. Dist. No. 7*, 167 F.3d 784, 789 (2d Cir. 1999) (declining to construe procedural due process claim as facial challenge where plaintiff failed to demonstrate that the Constitution would be offended in all circumstances).  Thus, this case is factually distinguishable from the *St. Joseph's Hospital* cases in that Ms. Biddle was misled into believing that she was appearing before the Hudson Valley RAC as an example of a success story, not because her facility was being considered for closure.

Second, the Court disagrees that "[e]very hospital was on notice that the Commission might recommend its closing or consolidation" and that therefore it was "unreasonable to expect that as the Commission deliberated and certain hospitals became more likely to be affected that some sort of super notice would be required." *St. Joseph Hospital I*, 828 N.Y.S.2d at 885.  As already discussed, the mere enactment of the Enabling Legislation was insufficient to satisfy the notice requirements of procedural due process because the Enabling Legislation required the

Commission to make individual, facility-specific determinations.  Consequently, the Commission was obligated to provide some manner of "notice reasonably calculated, under all the circumstances, to apprise interested parties of the pendency of the action and afford them an opportunity to present their objections."  *Mullane*, 339 U.S. at 314.  I cannot agree with characterization of such a long-established minimal requirement of procedural due process as "super notice."  Although the Due Process Clause does not require "heroic efforts" to "*provide* actual notice," the State must, at minimum, "*attempt to provide* actual notice."  *Dusenbery*, 534 U.S. at 170 (emphasis in original); *accord Jones v. Flowers*, 547 U.S. 220, 225 (2006) ("[W]hen mailed notice of a tax sale is returned unclaimed, the State must take additional reasonable steps to *attempt to provide* notice to the property owner before selling his property, if it is reasonable to do so." (emphasis added)) Indeed, the Commission in fact ordinarily undertook to provide such notice.  Thus, I agree with the dissenting opinion in *St. Joseph's Hospital II* that "[t]o close a health care facility without at least allowing the facility to explore the basis for the government's decision is a violation of constitutionally protected due process rights."  840 N.Y.S.2d at 273 (Fahey, J., dissenting).

b.      **Materiality of Errors**

Defendant contends that Judge Fox erred in concluding that the Final Report contained

numerous inaccuracies about the Andrus, thus evidencing that the procedures used by the

Commission were insufficiently reasonable to comport with due process.  *See Mathews*, 424 U.S.

at 335.  The Court will address Defendant's objections to these inaccuracies individually.

(1)     **Financial Viability**

The Final Report stated that the Andrus "had been operating at a significant loss until

2006."  (Final Report 123.)  Judge Fox found that this statement was erroneous because Ms.

Biddle had told the Hudson Valley RAC at the June 2006 meeting -- and sent it corroborating

financial statements thereafter -- that the Andrus had ended 2005 with an operating surplus of

over $500,000, and was operating at a surplus at the time of the June 2006 meeting.  (R&R 9-

10.)  Defendant contends that "[t]here is no dispute that [the] Andrus had been operating at a

deficit for years, and only recently showed a surplus."  (Def.'s Objs. 20.)  Defendant argues that

whether the Andrus emerged from its deficit in 2005 or 2006 "is not material."  (*Id.*)

Factually, there is no disputing that the Final Report was incorrect in this regard.  Note

10 of the financial statements clearly establishes that the Andrus had a surplus of $509,179 at the

end of 2005.[13]  (Hr'g Tr. 207:24-208:2.)  Further, Mr. Sandman himself acknowledged that, to

the extent that the Andrus "did not operate at a significant loss in 2005, the [Final Report] would

not be accurate." (Sandman Dep. 214:16-24.)  The Court rejects Defendant's premise that the

_____

[13]  This number is derived by subtracting the $1,146,501 the Andrus received from the
Financially Disadvantaged Grant from New York State -- which the Andrus used in its Medicaid
rate for fiscal years 2002 and 2003 -- from the $1,655,680 current year operating gain reported as
of December 31, 2005.

distinction between 2005 and 2006 was not material, as the current financial status of the facility was one of the factors the Commission was explicitly directed to review.  *See* Enabling Legislation § 5(a).  Moreover, the Final Report stated that the Andrus "claimed" to be "now operating in the black," as if Ms. Biddle's representation to that effect was conjured in 2006 just to avoid closure or there was some other reason to doubt it.  (Final Report 123.)  Finally, as Mr. Sandman testified, the Commission sought to base its recommendations on the most current, accurate information available, with an emphasis on trends rather than any particular snapshot of a given point in time.  (Sandman Dep. 183:12-23.)  Thus, presenting Andrus as having only recent, uncorroborated financial success, when in fact it had documented a sustained period of profitability, presented a materially skewed portrait of the trend at the facility.

### (2)     Occupancy

The Final Report stated that the Andrus was a "247-bed residential healthcare facility" with occupancy at "71% of its certified beds, or 89% of 'available beds,' pending a 50-bed sale to another provider."  (Final Report 123.)  Judge Fox found this statement to be misleading because the Commission staff was aware of the terms of the Beth Abraham Sales Agreement, whereby the DOH permitted the fifty beds to remain on the Andrus's license solely to eliminate the requirement that Beth Abraham undergo a public need test.  (R&R 10-11.)  Defendant argues that the Commission specifically noted that the Andrus was in the process of selling fifty beds and calculated the Andrus's occupancy rate based on both 197 and 247 beds, and therefore that the Commission was aware of the material facts.  (Def.'s Objs. 20.)

Neil Benjamin, the DOH Director of the Division of Health Facility Planning and designated DOH Liaison to the Commission (Hr'g Tr. 173:21-174:21), testified that, from the

period of 2003 through 2007, he was "extensively involved" in the discussions between the

DOH and the Andrus regarding the Andrus's failed joint venture with Beth Abraham and the

eventual sale of fifty beds pursuant to the Sales Agreement.  (*Id*. 176:10-13.)  Prior to the

issuance of the Final Report, Mr. Benjamin was aware that the Sales Agreement prohibited the

Andrus from utilizing fifty of the 247 beds on the Andrus operating certificate, and that those

fifty beds had not in fact been used by the Andrus since 2002.  (*Id*. 176:4-13, 180:20-182:15,

197:8-13.)  Indeed, there was a "conceptual agreement" on the DOH's part to approve the Sales

Agreement as early as July 2006.  (*Id*. 188:19-23.)  This testimony is corroborated by a January

24, 2007 letter (Def.'s Ex. D), in which the DOH formally approved the Andrus's request "for

permanent decertification of 50 [residential health care facility] beds, to a licensed capacity of

197 beds," retroactive to July 1, 2006, "the approximate date that the [DOH] advanced verbal

approval." (*Id*.; Hr'g Tr. 177:16-19.)

As both Ms. Biddle and Mr. Benjamin made the Commission staff aware of the terms of

the Sales Agreement prior to the issuance of the Final Report (Hr'g Tr. 186:2-19), and the DOH

letter explicitly acknowledged that the "[c]ontinued inclusion of these 50 beds on the Andrus

operating certificate, absent the ability to admit patients pursuant to the terms of the [Sales

Agreement], has created a financial hardship for the Andrus, particularly as it prepares to

implement the recommendations of the Commission" (Def.'s Ex.  D.), the Court agrees with

Judge Fox's conclusion that the Final Report's reliance on these artificially deflated occupancy

figures was misleading.  Moreover, as the 50 beds had been "off-line" since 2002, the Final

Report's description of the Andrus as a 247-bed facility (albeit one with a pending 50-bed sale)

suggests that the Commission misunderstood the historical capacity of the Andrus and perhaps of the local area.

### (3)     Record of Deficiencies

The Final Report stated that "[t]he facility has a high number of deficiencies (26 in its 2005 survey)."  (Final Report 123.)  Judge Fox found that this statement was inaccurate because Ms. Biddle testified, and Mr. Sandman agreed, that the Andrus was cited for only fourteen deficiencies in 2005, not twenty-six as the Commission reported.  (R&R 10.)  Defendant objects to Judge Fox's characterization of Mr. Sandman's testimony and argues that the number twenty-six was accurate according to the Commission's methodology, which purportedly involved "counting the number of human figures" appearing under the "Residents Affected" column for the Andrus's May 12, 2005 Certification Survey, as listed on a document entitled "Andrus on Hudson: Inspection Report, June 2008" (Def.'s Ex. H), which at one time was available on the DOH's public website.  (Hr'g Tr. 310:20-313:8; Def.'s Objs. 20.; Def.'s PH Mem. 18.) Defendant's objection is not supported by the record.

Sharon Carlo, a nursing home consultant and former DOH employee with experience managing DOH nursing home certification surveys (Hr'g Tr. 110:5-111:9), testified that the Statement of Deficiencies issued to the Andrus following the DOH survey completed May 12, 2005  (the "Statement of Deficiencies") (Pl.'s Ex. 1) contained fourteen survey deficiencies,

including eight "F tags"[14]  related to quality of care issues and six "K tags"[15]  related to

environmental issues (Hr'g Tr. 130:7-131:2).  Cross-referencing the "F tags" to the federally

mandated "Assessment of Factors Used to Determine the Seriousness of Deficiencies Matrix"

(the "Deficiencies Matrix") (Pl.'s Ex. 2), one was a "B" level deficiency, representing a pattern

of no actual harm with potential for minimal harm; six were "D" level deficiencies, representing

isolated instances of no actual harm with potential for more than minimal harm that is not

immediate jeopardy; and one was an "E" level deficiency, representing a pattern of no actual

harm with potential for more than minimal harm that is not immediate jeopardy (Hr'g Tr.

133:1-18).  When asked to determine how the Commission came up with the number twenty-six,

Ms. Carlo testified that it appeared to her that the Commission mistakenly relied on the sample

size specified in the Statement of Deficiencies -- twenty-six residents -- as a statement of the

cumulative number of deficiencies for which the Andrus was cited.  (*Id*. 131:5-14.)

Mr. Sandman answered "yes" in response to defense counsel's question as to whether

"the number of human figures under the Residents Affected column" adds up to twenty-six (*id*.

313:3-8), and also, when asked to count the number of deficiencies in the Statement of

Deficiencies, unequivocally answered that he counted "14 named deficiencies" (*id*. 313:24-25).

The Commission's methodology thus seems to have overstated the number of deficiencies, none

---

[14]  "F tag" is jargon for the combination of the prefix "F" and an identification number
listed in the "ID Prefix Tag" column of a Statement of Deficiencies to identify the related
regulatory standard as published in the *Federal Register*.

[15]  "K tag" is jargon for the combination of the prefix "K" and an identification number
listed in the "ID Prefix Tag" column of a Statement of Deficiencies to identify the related
National Fire Protection Agency Life Safety Code requirements as adopted by the State of New
York and published in the *Compilation of Codes, Rules and Regulations of the State of New
York*.

of which caused any actual harm to Andrus residents or even amounted to a "substandard quality of care" within the meaning of the Deficiencies Matrix. (Pl.'s Ex. 2; Hr'g Tr. 133:25-134:3.) While Defendant argues that it used that methodology across the board and thus that any overstatement affected all facilities equally (*see* Def.'s PH Mem. 18), this does not appear to be the case, given that the Commission's methodology takes greater account of the number of residents affected by a deficiency than it does of the seriousness of a deficiency. Thus, it could easily present a misleading picture of the extent or dangerousness of deficiencies at one facility relative to another.

### (4)    Suitability of Assisted Living Program for Low Acuity Residents

The Final Report stated that "[o]f [the Andrus's] 176 residents, about half have low-acuity conditions. These residents could be better served in an [assisted living program], if that were available." (Final Report 123.) Judge Fox found credible Ms. Biddle's testimony that this statement was inaccurate because "a lot of [the low-acuity patients at the Andrus] have dementia, and they . . . cannot necessarily be served better in an assisted living program because part of what [the Andrus] is able to do for these patients with dementia is give them a routine that has guidance." (R&R 11; Hr'g Tr. 212:6-21.) Defendant objects on the grounds that there is "no dispute that [the] Andrus had a relatively healthy, 'low acuity' resident population, some of whom could be served in an [assisted living program]." (Def.'s Objs. 20.)

While Defendant is correct that there is no dispute regarding the acuity statistics cited in the Final Report, the Court agrees with and defers to Judge Fox's determination that, based on the evidence presently before the Court, Plaintiff likely will be able to establish that the statement that roughly half of the Andrus's residents could be better served in an assisted living

program was inaccurate, especially given the fact that the Commission and the Hudson Valley

RAC had not obtained information from the Andrus concerning the residents' mental or medical

conditions.  (Hr'g Tr. 213:1-6; Sandman Dep. 223:23-224:5, 229:23-230:6.)

**(5)     Efficiency of Conversion to Assisted Living Facility**

The Final Report stated that the Andrus "has private rooms and baths; and therefore, its

conversion to an [assisted living program] facility would be economical."  (Final Report 123.)

Judge Fox found Ms. Biddle's testimony credible that this statement was inaccurate because "the

revenues that . . . derive from an Assisted Living Program versus a Skilled Nursing Program . . .

given the size of [the Andrus's] building," would not be economically viable.  (R&R 12; Hr'g

Tr. 214:10-24.)  Defendant objects on the grounds that there is no "dispute that the Andrus has

relatively large, private rooms – which the Commission found would make conversion to an

ALP easier."  (Def.'s Objs. 20.)  "Easier" and "economically viable" are not, however, the same

thing.  Even if the facility could be converted at reasonable cost, there would be no point in

doing so if the resulting facility would not generate sufficient revenue.  As defendant has not

submitted any evidence to counter Ms. Biddle's testimony, the Court defers to Judge Fox's

finding of fact that such conversion is not economically feasible.[16]

While it cannot be said on the current record whether or not these apparent inaccuracies

would have made a difference in the Commission's conclusions, they do suggest that the

---

[16]  There are material errors as to the Andrus's occupancy and financial status in the Hudson Valley RAC's report to the Commission.  I need not address those individually, as the Commission's Final Report presumably reflects its final thinking regarding the Andrus.  The inability of the Andrus to address these errors in the RAC report prior to the Commission's final action, however, contributed to a process with a high risk of erroneous deprivation.

procedures employed by the Commission in its consideration of the Andrus were not reasonable under the circumstances.

*       *       *

Due process "is not a technical conception with a fixed content unrelated to time, place and circumstances," but rather is "flexible and calls for such procedural protections as the particular situation demands." *Mathews*, 424 at 334.  While the judicial model of an evidentiary hearing is not required in all circumstances, it is "necessary . . . that the procedures be tailored, in light of the decision to be made, to the capacities and circumstances of those who are to be heard to insure that they are given a meaningful opportunity to present their case." *Id*. at 348-49 (internal quotation marks and citation omitted).  Given the Commission's failure to provide the Andrus with a meaningful opportunity to be heard and the numerous material inaccuracies contained in the Final Report, I conclude that the Commission's procedures were not reasonably tailored, in light of the circumstances, to satisfy the process the Andrus was due before having its right to exist as a nursing home revoked.  Accordingly, I adopt Judge Fox's recommendation that Plaintiff has established a likelihood of success on its procedural due process claim.  My holding is a narrow one, applicable solely to the peculiar factual circumstances at issue in this case.

2.       <u>**Substantive Due Process Claim**</u>

In the R&R, Judge Fox concluded that Plaintiff has a substantial likelihood of success on the merits of its substantive due process claim because the Commission's recommendation to close the Andrus was based on a number of erroneous facts about the facility and thus was arbitrary and shocked the conscience.  (R&R 24.)  Defendant objects on the grounds that, as a matter of law, the joint and several actions of the Defendant and the Commission cannot be

regarded as arbitrary or outrageous because their actions fall squarely within the State's police power to regulate public health and the cost of medical care.  (Def.'s Objs. 22.)

Separate from the right to fair process, the Due Process Clause "cover[s] a substantive sphere as well."  *County of Sacramento v. Lewis*, 523 U.S. 833, 840 (1998).  "Substantive due process protects individuals against government action that is arbitrary, conscience-shocking, or oppressive in a constitutional sense, but not against government action that is incorrect or ill-advised."  *Lowrance v. Achtyl*, 20 F.3d 529, 537 (2d Cir. 1994) (citations omitted).  "The shocks-the-conscience test is necessarily imprecise," but it is clear that liability "depends on the state of mind of the government actor and the context in which the action was taken."  *O'Connor v. Pierson*, 426 F.3d 187, 203 (2d Cir. 2005).  As the Supreme Court has explained, "the constitutional concept of conscience-shocking duplicates no traditional category of common-law fault, but rather points clearly away from liability, or clearly toward it, only at the ends of the tort law's spectrum of culpability."  *County of Sacramento*, 523 U.S. at 848.  Accordingly, "liability for negligently inflicted harm is categorically beneath the threshold of constitutional due process," while "conduct intended to injure in some way unjustifiable by any government interest is the sort of official action most likely to rise to the conscience-shocking level."  *Id*. at 849 (citing *Daniels v. Williams*, 474 U.S. 327, 331 (1986)).  Culpability somewhere in the middle is "a matter for closer calls . . . . demand[ing] an exact analysis of circumstances before any abuse of power is condemned as conscience-shocking."  *Id*. at 836, 849-50, 862 (substantive due process not violated when police officer caused death through "deliberate or reckless indifference" to life in high-speed automobile chase aimed at apprehending suspected offender, but "purpose to cause harm" unrelated to legitimate object of arrest would constitute arbitrary

conduct shocking the conscience); *accord O'Connor*, 426 F.3d at 203 (although Board of Education's demand that teacher release his medical records was arbitrary because Board was not competent to independently evaluate those records, deliberate indifference would not support liability where no "intent to injure or spite").

In light of these principles, the Court cannot conclude that the closure recommendation "shocked the conscience." Plaintiff has not submitted sufficient evidence at this point to establish the requisite culpability to state a substantive due process claim. Plaintiff's reliance on *Wantanabe Realty Corp. v. City of New York*, 315 F. Supp. 2d 375 (S.D.N.Y. 2003), for the principle that "a government decision made in reliance on faulty or unreliable information can constitute a violation of a party's substantive due process rights" (Pl.'s Opp'n 14; Pl.'s Resp. 18), is misplaced. In *Wantanabe*, the court denied the City of New York's motion for summary judgment on a roller coaster owner's claim that the City's tearing down of his roller coaster deprived him of substantive due process. Crucial to the Court's holding was the borough commissioner's testimony that he knew that no engineers qualified to determine the strength of the structure's steel had examined it prior to his ordering the demolition on the grounds that the steel was defective, and that questions of fact existed as to whether City Hall had communicated to the borough commissioner its desire that the roller coaster be inspected and torn down. *Id*. at 392-93. Reasoning that the culpability requirement would be satisfied by "intentional conduct that otherwise is sufficiently egregious . . . while merely negligent conduct would not," the court held that the borough commissioner's "apparent knowledge of the lack of justification for the demolition could provide the requisite level of culpability." *Id*. at 394.

Here, there is no evidence that the Commission knew or intended that the information it relied on in recommending the closure of the Andrus was incorrect.  While Plaintiff could argue that the Commission's failure to obtain sufficient accurate information about the Andrus and its patients establishes a degree of negligence on the part of the Commission approaching deliberate or reckless indifference, there is no suggestion in the record that the Commission intended to cause the Andrus harm or that its recommendation was motivated by illegitimate political concerns.  *Cf. Wantanabe*, 315 F. Supp. at 393 (denying summary judgment motion where questions of fact existed regarding undue influence of City Hall on demolition decision); *Town of Orangetown v. Magee*, 88 N.Y.2d 41, 53 (N.Y. 1996) (holding that revocation of property owner's building permit violated substantive due process where evidence supported trial court's conclusion that such official action was "motivated entirely by political concerns").  Moreover, it is beyond dispute that the Enabling Legislation contemplated that the Commission would recommend that certain facilities be closed (Enabling Legislation § 8), and that such "regulation of public health and cost of medical care are virtual paradigms of matters traditionally within police powers of the state."  *Med. Soc'y of N.Y. v. Cuomo*, 976 F.2d 812, 816 (2d Cir. 1992).  Thus, the Court concludes that Plaintiff has not established a likelihood of success on the merits of its substantive due process claim, and the R&R is hereby modified accordingly.

## III.   CONCLUSION

The State of New York created the Commission in order to stabilize and strengthen New York's health care system (Final Report 4), and it may well be that the Commission's recommendation that reconfiguring the Andrus from a nursing home to an assisted living facility is in the best interests of the system as a whole.  I have no view on that subject.  But I am

-41-

compelled to grant the Andrus's Motion for a Preliminary Injunction prohibiting Defendant from taking any further steps to implement the Commission's recommendation because doing so would cause irreparable harm and Plaintiff has a reasonable likelihood of success on its claim that the Commission's recommendation was issued without providing Plaintiff the process it was due.

Based on the foregoing, it is hereby **ORDERED** that the Report and Recommendation of Judge Fox (Doc. 51) is adopted to the extent that it is consistent with this Opinion and Plaintiff's Motion for a Preliminary Injunction (Doc. 25) is **GRANTED**. Defendant is prohibited from taking any further steps to implement the Commission's recommendation to close the Andrus or otherwise seek the amendment or surrender of the Andrus's operating certificate pending the final determination of this action.

The Clerk of Court is respectfully directed to terminate the pending motion (Doc. 25), and the parties are directed to appear for a case management conference on March 26, 2009 at 10:15 a.m.

**SO ORDERED**

Dated: March __3__, 2009
       White Plains, New York

_Cathy Seibel_
CATHY SEIBEL, U.S.D.J.

-42-